# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

KELVIN LEON JONES, et al.,

     *Plaintiffs,*

    v.

RON DESANTIS, in his official capacity as Governor of Florida, et al.,

     *Defendants.*

Consolidated Case No. 4:19-cv-300-RH-MJF

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Plaintiffs allege that conditioning the right to vote on payment of legal financial obligations ("LFOs") is unconstitutional because it requires payment of a tax to be eligible to vote; imposes an undue burden on the fundamental right to vote; conditions voting rights on the ability to pay and, thus, discriminates on the basis of wealth; retroactively strips returning citizens of their right to vote as punishment for a crime; constitutes an excessive fine; discriminates on the basis of race; and denies otherwise eligible voters the right to vote without due process of law by failing to provide reliable information on eligibility. As enacted, SB7066 prohibits otherwise eligible returning citizens from registering and voting if they have certain unpaid LFOs. Plaintiffs filed this action seeking relief from this Court, including an order

declaring the LFO requirements of SB7066 to be unconstitutional and enjoining Defendants from enforcing them. Defendants contend that Plaintiffs claims should be dismissed because (1) their injuries are not redressable; and (2) this Court should abstain and defer to the state courts. For the reasons outlined below, the Court should deny Defendants' motion.

## BACKGROUND

Before passage of Amendment 4, Florida had one of the harshest felony disenfranchisement regimes in the country—permanently disenfranchising over 1.6 million people. Last November, over 5 million Floridians voted in support of Amendment 4, which provides that "any disqualification from voting arising from a felony conviction shall terminate and voting rights shall be restored upon completion of all terms of sentence including parole or probation."[1] Fla. Const. art. VI, § 4(a). The Amendment provided that the only category of citizens whose voting rights would not be automatically restored are those convicted of murder or a felony sexual offense. *Id.* § 4(b). The text of the Amendment does not contain any mention of repayment of LFOs as a prerequisite to automatic rights restoration. *Id.* In the lead

---

[1]   Fla. Div. of Elections, Voting Restoration Amendment 14-01, https://dos.elections.myflorida.com/initiatives/initdetail.asp?account=64388 &seqnum=1 (last visited August 29, 2019).

up to the election, it was widely reported that Amendment 4 would restore voting rights to approximately 1.4 million Floridians with felony convictions in their past.[2]

Amendment 4 went into effect on January 8, 2019, and Defendants began implementing it by registering Plaintiffs, and other returning citizens who had completed incarceration and supervision but still had outstanding LFOs. The Florida Legislature enacted and Governor DeSantis signed SB7066 into law in response. In his signing statement, Governor DeSantis said he believed voters' adoption of Amendment 4 was "a mistake."[3] By its terms, SB7066 denies automatic restoration of voting rights for individuals with past felony convictions if they have certain outstanding LFOs. Pursuant to SB7066, hundreds of thousands of Floridians, including Plaintiffs and members of the Plaintiff class, will be denied the right to vote. *See* Smith Report ¶¶ 8, 61, Dkt. 98-3. The LFO requirements included in SB7066 negate voters' efforts to restrict permanent disenfranchisement to only those individuals convicted of the enumerated offenses by continuing to permanently disenfranchise people simply because they cannot pay outstanding LFOs.

---

[2] *See*, *e.g.*, Samantha J. Gross & Elizabeth Koh, *What is Amendment 4 on Florida ballot? It Affects Restoration of Felons' Voting Rights*, Miami Herald (Oct. 5, 2018) (https://www.miamiherald.com/news/politics-government/election%20/article219547680.html) (estimated 1.6 million).

[3] *See* Gov. Ron DeSantis, SB7066 Signing Statement (June 28, 2019), https://www.flgov.com/wp-content/uploads/2019/06/6.282.pdf.

Plaintiffs allege that by conditioning rights restoration on payment of fines and fees SB7066 violates their constitutional rights. Defendants argue that Plaintiffs' claims should be dismissed because this Court purportedly lacks the power to redress the constitutional violations alleged; and argue this Court should abstain from deciding their claims because there are unresolved questions of state law that "could" be dispositive. State Defs. Mot. to Dismiss at 13, Dkt. 97 (hereinafter "Mot."). Because this Court has the power to grant the full extent of relief sought by Plaintiffs, Plaintiffs' claims are redressable. And because the resolution of any state law questions raised by Defendants would not be dispositive as to the validity of the restoration scheme in SB7066 under the *federal* Constitution, there is no need for this Court to abstain from considering Plaintiffs' claims.

During the hearing of August 15, 2019, this Court asked the parties to brief the following question: If Amendment 4 is interpreted to include an implicit LFO requirement—and such a requirement is unconstitutional—would enjoining the LFO requirement affect the remainder of Amendment 4's automatic rights restoration scheme? Plaintiffs maintain that there is no textual or legal basis for interpreting Amendment 4 to require payment of LFOs as a condition precedent to automatic rights restoration. Moreover, even if this were a plausible interpretation of the text of Amendment 4, constitutional avoidance doctrine requires that it be construed in a manner that does not render the provision constitutionally infirm. But, if Florida

courts nonetheless read such an unconstitutional requirement into Amendment 4, this Court can enjoin enforcement of that particular requirement without disturbing the automatic restoration of voting rights that over 64 percent of Florida voters supported in November 2018.[4]

## I.    Defendants' Motion to Dismiss under Rule 12(b)(1).

### A.    *Redressability*

Defendants first argue that Plaintiffs lack standing. To establish standing, a plaintiff must show that she has suffered an injury in fact, traceable to the defendant, which is likely to be redressed by a favorable ruling. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Defendants do not dispute that Plaintiffs have suffered an injury in fact, traceable to their actions. They argue only that the constitutional injuries alleged by Plaintiffs are not redressable by this Court. Mot. at 8.

"[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982). Indeed, "[r]edressability is established . . . when a favorable decision would amount to a *significant increase* in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered." *Mulhall v.*

---

[4] It may be unnecessary for the Court to reach this question. For example, if the Court concludes that SB7066 is unconstitutional as applied to Floridians who lack the ability to pay off their LFOs, its remedy (*e.g.*, a declaration of inability to pay) would not facially invalidate SB7066 (or any provision of the Florida Constitution), but would rather order as applied relief for a set of particularly affected persons.

*UNITE HERE Local 355*, 618 F.3d 1279, 1290 (11th Cir. 2010) (emphasis added); *see also Utah v. Evans*, 536 U.S. 452, 464 (2002) (requiring only that victory for the plaintiffs result in a "change in legal status" giving rise to "a significant increase in the likelihood [of] relief."). Even where the ultimate resolution of a claim is "dependent on many factors outside the [defendant's] control," a claim is redressable so long as "an order against the named defendants would offer some relief." *Chiles v. United States*, 69 F.3d 1094, 1096 (11th Cir. 1995).

The power of federal courts to enjoin state officials from enforcing unconstitutional laws is well established. *See, e.g.*, *Ex parte Young*, 209 U.S. 123, 155-56 (1908). Plaintiffs have alleged that SB7066 requires returning citizens to pay off certain outstanding LFOs to be eligible to vote, and that such a requirement violates their constitutional rights. Should this Court find for Plaintiffs that the LFO requirement imposed by SB7066 is unconstitutional, it has the power and equitable authority to enjoin Defendants from enforcing the challenged provisions of SB7066. *Id*. Thus, Plaintiffs claims are redressable. *Larson*, 456 U.S. at 243 n.15.

This is so regardless of whether, as Defendants claim, the Florida Constitution "might" be interpreted at some later date to include some yet to be defined LFO requirement. Mot. at 9.[5] Plaintiffs are presently denied the right to vote on the basis

---

[5] Defendants' redressability and abstention arguments, by their own terms, do not address the procedural due process arguments that Plaintiffs have raised. Those arguments relate to SB7066's

of unpaid LFOs pursuant to SB7066. Defendants' theory for lack of redressability is premised on an unpresented hypothetical wherein this Court strikes down SB7066's LFO requirement as unconstitutional but the Secretary of State—who is tasked with enforcement of Amendment 4—nonetheless *chooses* to interpret Amendment 4 to require payment of LFOs and denies Plaintiffs the right to vote on that basis. Or, the question reaches Florida courts and—despite the canon of constitutional avoidance and this Court's ruling—they interpret Amendment 4 to incorporate an unconstitutional LFO requirement.[6] Moreover, in both hypotheticals, the interpretation of Amendment 4 would have to match SB7066 *exactly*, an unlikely proposition given SB7066's specificity and inclusion of civil liens, typically seen as falling outside the criminal justice system. Such hypotheticals do not disprove redressability in the here and now.

---

lack of internal clarity and the Secretary's failure to administer SB7066 in a manner that will not lead to the erroneous deprivation of the right to vote. A future adjudication as to the meaning of Amendment 4 could not affect those claims.

[6] Defendants assert that: "[e]ven if Plaintiffs succeed, the Florida Constitution would serve as a bar to felon re-enfranchisement until the Florida courts say that 'all terms of the sentence' *excludes* legal fines, fees, restitution, and other obligations." Mot. at 11. This gets the analysis backwards and denies the Secretary's agency to interpret and enforce Amendment 4 in the first instance. *See* Fla. Stat. § 15.13, 97.012. If this Court holds that SB7066's LFO requirement is unconstitutional, there is no reason why the Secretary should *assume* Amendment 4 includes this unconstitutional requirement absent a Florida court ruling to the contrary. This is particularly true where the Secretary *admits* that Amendment 4 is susceptible to an interpretation that does not include an LFO requirement, *see, e.g*, Mot. at 12-13 (noting that Amendment 4 is "susceptible" to more than one interpretation), and where the Secretary has previously *not* enforced any LFO requirement as part of Amendment 4 itself, insofar as she allowed Plaintiffs and others similarly situated to register to vote and vote. *See, e.g*, Gruver Compl. at ¶¶ 10-19; Raysor FAC at ¶ 41; McCoy Compl. at ¶¶ 16, 21.

Plaintiffs of course dispute that Article VI § 4(a) requires payment of LFOs, but whether it does or not has no effect on whether such a requirement is unconstitutional, or on whether the specific requirements imposed by SB7066 violate Plaintiffs' rights and can be enjoined. Plaintiffs' claims under SB7066 put both questions squarely before this Court. And a ruling on either question would not only give rise to immediate relief for Plaintiffs, it would also result in "a change in legal status" between the parties that causes "a significant increase in the likelihood" that Plaintiffs will be able to obtain relief from any other attempts by Defendants to deny Plaintiffs the right to vote on the basis of unpaid LFOs. *See Utah v. Evans*, 536 U.S. at 464. Simply put, if Defendants are unconstitutionally denying Plaintiffs' right to vote, this Court can order Defendants to stop doing so, whatever the source of that unconstitutional denial.

Defendants' reliance on *Florida Family Policy Council v. Freeman* ("*FFPC*"), 561 F.3d 1246 (2009), is misplaced. In *FFPC*, the plaintiff challenged a canon of ethics governing judicial recusals but failed to challenge a statute that entitles parties to an action to trigger recusal. *Id.* at 1256-57. The statute was enforceable only by the state courts, and only upon request of unknown future parties to state court actions. *Id.* at 1257. The Eleventh Circuit held that without addressing the statute, enjoining enforcement of ethics rules would not redress the injury; that a federal court had no power to enjoin state court proceedings; and that it was

8

impossible to identify and enjoin the future parties who might seek to invoke the statute. *Id.* In this case, by contrast, the Court would only need to enjoin the Defendants' enforcement of the law, which is plainly within the Court's jurisdiction under *Ex parte Young*.

B.    *Abstention*

"The law is crystal clear in the Eleventh Circuit. Federal courts do not abstain when voting rights are alleged to be violated." *League of Women Voters of Florida, Inc. v. Detzner*, 354 F. Supp. 3d 1280, 1283 (N.D. Fla. 2018). Even in non-voting rights cases, *Pullman* abstention must be "narrow and tightly circumscribed" and is "to be exercised only in *special* or '*exceptional*' circumstances." *Duke v. James*, 713 F.2d 1506, 1510 (11th Cir. 1983). But "voting rights cases are particularly inappropriate for abstention," *Siegel v. LePore*, 234 F.3d 1163, 1174 (11th Cir. 2000), because in voting rights cases plaintiffs allege "impairment of [their] fundamental civil rights," *Harman v. Forssenius*, 380 U.S. 528, 537 (1965). Abstention is even more inappropriate where the inevitable delay it will cause could preclude resolution of the case before the upcoming elections. *Detzner*, 354 F. Supp. 3d at 1284 (citing *Harman*, 380 U.S. at 537).

Indeed, time is of the essence. The 2020 elections are only a few months away, and there is no guarantee that state court proceedings will be completed in time to vindicate Plaintiffs' *federal* constitutional rights. Regardless of how the Florida

Supreme Court may interpret the state constitution, the same federal question would remain before this Court: whether the state may, consistent with various federal constitutional guarantees, deny the right to vote to returning citizens who cannot pay outstanding LFOs. Therefore, there is no basis for abstention.

Defendants argue that this Court should abstain from deciding whether SB7066 unconstitutionally denies Floridians their right to vote until the Florida Supreme Court can determine whether Amendment 4 itself requires the payment of LFOs as a condition on voting. Mot. at 11-16. But there is no basis for any LFO requirement in the text of Amendment 4 nor any indication that an LFO requirement was intended by the Florida voters who enacted the Amendment. Indeed, Florida officials, including Defendants, implemented Amendment 4 beginning on January 8, 2019 by allowing people to register to vote without requiring the payment of LFOs.[7] As such, Plaintiffs dispute that there is any "unsettled question of state law," *Siegel*, 234 F.3d at 1174, as to whether the Florida Constitution requires payment of LFOs, which would require this Court to "guess as to the definitive resolution" by Florida courts, *Louisiana Power & Light Co. v. City of Thibodaux*, 360 U.S. 25, 29 (1959).

---

[7] In contrast, Defendants have not yet implemented an LFO requirement, despite the fact that SB7066 went into effect on July 1, 2019, because they cannot reliably determine which voters have outstanding LFOs. Meanwhile, local elections have already been held in 2019 across numerous municipalities, allowing thousands of returning citizens to exercise their right to vote, including those with outstanding LFOs.

Even if Defendants' reading of Amendment 4 were plausible, it is not the sole, mandatory reading of the text of Amendment 4, and the constitutional avoidance canon requires that it be rejected. "[W]hen one interpretation of a law raises serious constitutional problems, courts will construe the law to avoid those problems so long as the reading is not plainly contrary to legislative intent." *Pine v. City of W. Palm Beach, Fla.*, 762 F.3d 1262, 1270 (11th Cir. 2014) ("Florida courts also apply the canon of constitutional avoidance when interpreting state and local laws.").[8]

Resolution of this issue, however, is neither "dispositive of the case" before this Court, nor would its resolution "materially alter the constitutional questions presented" by Plaintiffs' claims. *Siegel*, 234 F.3d at 1174. Regardless of whether the challenged provisions of SB7066 are mandated by Article VI, § 4 of the Florida Constitution, the question of whether they violate the U.S. constitution remains and must be answered by this Court.

Defendants suggest that if Article VI, § 4 requires payment of any LFOs as a condition of rights restoration, then Plaintiffs have no grounds for constitutional challenge, because "Section 2 of the Fourteenth Amendment 'affirmatively

---

[8] In this voting rights case, the fact that constitutional avoidance will likely play a crucial role in any Florida state court's interpretation of Amendment 4 counsels *for* a speedy adjudication of the federal questions raised in this case. This Court and any appeal to the Eleventh Circuit are the best venues to determine whether an LFO requirement for voting eligibility violates the U.S. Constitution and the answer to that question would be of assistance in applying constitutional avoidance to Amendment 4.

sanctions' disenfranchisement of felons and re-enfranchisement consistent with state law." Mot. at 15 (internal brackets omitted) (citing *Richardson v. Ramirez*, 418 U.S. 24, 54 (1974), and *Hand v. Scott*, 888 F.3d 1206, 1207 (11th Cir. 2018)). This contention is flat wrong.[9]

First, state laws governing disenfranchisement and re-enfranchisement—even if permissible as a general rule under *Richardson*—are not immune to constitutional scrutiny. *See Shepherd v. Trevino*, 575 F.2d 1110, 1114-15 (5th Cir. 1978) ("[S]elective disenfranchisement or reenfranchisement of convicted felons must pass the standard level of scrutiny applied to state laws allegedly violating the equal protection clause."); *see also*, *e.g.*, *Hunter v. Underwood*, 471 U.S. 222 (1985) (enjoining the application of the criminal disenfranchisement provision in the Alabama state constitution on equal protection grounds); *Hand*, 888 F.3d at 1209 (relying on *Hunter* and applying equal protection analysis to determine if Florida's pre-Amendment 4 clemency procedures violated the Equal Protection Clause); *Owen v. Barnes*, 711 F.2d 25, 27 (3rd Cir. 1983) (finding that it is "generally accepted" that a state may not disenfranchise or re-enfranchise individuals with felony convictions on a "wholly arbitrary basis."). Second, these lawsuits challenge

---

[9] In addition to being wrong, Defendants' overstated claims about *Richardson* conflict with their request for abstention. Defendants seem to suggest that *Richardson* is dispositive on the merits of Plaintiffs' claims, because in their view any felony disenfranchisement scheme is constitutional so long as it is consistent with state law. But rather than suggest the Court rely on *Richardson* and dispose of this case, they seek to delay ultimate resolution by asking this Court to abstain.

a discriminatory manner of *re*-enfranchisement, or re-disenfranchisement in the case of Plaintiffs, not the initial disenfranchisement possibly sanctioned by *Richardson. See generally*, 418 U.S. 24. A determination that Article IV, § 4 has an LFO requirement hidden within it therefore has no bearing on whether that requirement, as implemented by SB7066, is constitutional.

Furthermore, although Defendants acknowledge that the Florida courts may very well decline their invitation to read an LFO requirement into the state constitution, they provide no explanation for how such a decision would impact Plaintiffs' federal constitutional claims other than to suggest that "the alleged burdens on Plaintiffs' rights might well be resolved without addressing the federal constitutional issues," because "the state statute at issue would arguably run afoul of state law," rendering a decision as to "whether the statute complies with the U.S. Constitution . . . unnecessary." Mot. at 2, 14. This argument does not properly counsel for abstention, however, because Defendants' position depends upon a series of questionable "mights." The Florida Supreme Court *might* reject Defendants' interpretation. Defendants *might* then determine that SB7066 violates state law. And then what? Defendants *might* stop enforcing SB7066—but they have not said they would, only that in such a scenario SB7066 would "arguably" violate the state constitution. *See Wollschlaeger v. Gov. of Fla.*, 848 F.3d 1293, 1322 (11th Cir. 2017) (relying on *U.S. v. Stevens*, 559 U.S. 469, 480 (2010), for the proposition

that courts should not decline to enforce constitutional rights in reliance on the "benevolence" of enforcing officials).

Finally, the Florida Supreme Court may advise that Amendment 4 neither mandates nor prohibits an LFO requirement, but rather permits the legislature to define the phrase "all terms of sentence including parole and probation." Such a ruling would confirm Plaintiffs' position that the LFO requirement is a creature of statute challenged in this case and would not change the posture of this case.

In sum, Defendants' abstention argument relies upon a long series of "mights" that even if they come to pass would not change the constitutional questions presented in this case. Abstention would take considerable time and threaten to unlawfully disenfranchise Plaintiffs in the upcoming presidential primary election. As it stands, *this Court* faces a tight schedule for adjudicating this case. Abstention is inappropriate in this case, for the same reason that it is "particularly inappropriate" in voting cases. *See Siegel*, 234 F.3d at 1174. Constitutional "deprivations may not be justified by some remote administrative benefit to the State." *Harman*, 380 U.S. at 542.

Plaintiffs' injuries are redressable by this Court and abstention is not appropriate. The Court should deny Defendants' motion to dismiss.

14

## II.    Severability

Last November, over five million Floridians voted to end Florida's system of permanent disenfranchisement for the majority of Floridians with prior felony convictions by providing for automatic restoration of rights to all returning citizens except those convicted of murder or felony sexual offenses.

Amendment 4 added a clause to subsection (a) and a new subsection (b) to Article VI § 4, such that the text now reads:

> (a)    No person convicted of a felony, or adjudicated in this or any other state to be mentally incompetent, shall be qualified to vote or hold office until restoration of civil rights or removal of disability. <u>Except as provided in subsection (b) of this section, any disqualification from voting arising from a felony conviction shall terminate and voting rights shall be restored upon completion of all terms of sentence, including parole or probation.</u>
>
> <u>(b)    No person convicted of murder or a felony sexual offense shall be qualified to vote until restoration of civil rights.</u>
>
> (b̶ <u>c</u>)    No person may appear on the ballot for re-election to any of the following offices . . . if by the end of the current term of office, the person will have served (or, but for resignation, would have served) in that office for eight consecutive years.[10]

Defendants argue that the phrase "all terms of sentence" in the text of Amendment 4 includes an unstated requirement that returning citizens pay certain LFOs associated with their conviction before their rights are automatically restored, and thus the Florida Legislature enacted SB7066 to "implement" that requirement.

---

[10] Constitutional Amendment Petition Form, Fla Dept. of State, https://dos.elections.myflorida.com/initiatives/fulltext/pdf/64388-1.pdf (last visited Aug. 29, 2019).

Setting aside the parties' dispute as to what conditions trigger automatic rights restoration, it is *most* evident from the text that the primary purpose of Amendment 4 was to end Florida's system of *permanent* disenfranchisement for all Floridians with prior felony convictions, instead permanently disenfranchising *only* persons convicted of murder or felony sexual offenses absent clemency.

The Court has asked the parties to address how an unconstitutional LFO requirement, if read into Article VI § 4, would impact the remainder of that provision.[11] In other words, can automatic rights restoration continue to be enforced in the absence of an LFO requirement? The answer is yes. A supposed LFO "requirement" can easily be severed from the remainder of Art. VI § 4 because it does not even appear in the text of the provision—it is merely one potential, and Plaintiffs would argue unsupportable, interpretation of the text.

Moreover, even if the Court were to find otherwise, the result would not be to return to the pre-Amendment 4 scheme. The clearest intent of voters was to limit permanent disenfranchisement to only those convicted of murder or felony sexual offenses. That is accomplished by a separate, self-executing, and standalone provision in § 4(b). Thus, if the unconstitutional and unwritten LFO "requirement" advocated by Defendants is read as mandated by and not severable from the amended

---

[11] For the reasons stated above, the Court may deny Defendants' motion to dismiss without reaching this question.

text of § 4(a), then this Court must invalidate *all* of § 4(a) as it relates to felony

disenfranchisement and leave in place only that provision in § 4(b) that gives effect

to the voters' intent to restrict permanent disenfranchisement to persons convicted

of the enumerated crimes.

A.   *Legal Standards*

Severability is "a judicially created doctrine which recognizes a court's

obligation to uphold the constitutionality of legislative enactments where it is

possible to remove the unconstitutional portions." *Fla. Dep't of State v. Mangat*, 43

So. 3d 642, 649 (Fla. 2010). "[T]he purpose underlying severability [is] to preserve

the constitutionality of enactments where it is possible to do so." *Ray v. Mortham*,

742 So. 2d 1276, 1281 (Fla. 1999).

Under Florida law, even absent a severability clause, unconstitutional

provisions will be severed if the following factors are met:

> (1) they can be separated from the remaining valid provisions[;] (2) the
> legislative purpose expressed in the valid provisions can be
> accomplished independently of those which are void[;] (3) the good and
> the bad features are not so inseparable in substance that it can be said
> that the Legislature would have passed the one without the other[;] and
> (4) an act complete in itself remains after the invalid provisions are
> stricken.

*Wollschlaeger*, 848 F.3d at 1317-18 (quoting *State v. Catalano*, 104 So. 3d 1069,

1080 (Fla. 2012)). Although courts should consider all the elements, "the key

determination is whether the overall legislative intent is still accomplished without the invalid provisions." *Catalano*, 104 So. 3d at 1080-81.

The same standard governs construction of citizen-enacted constitutional amendments. *Ray,* 742 So. 2d at 1281. "[T]he initiative power of . . . citizens to amend the Constitution must be respected as an important aspect of the democratic process." *Id.*; *see Brown v. Browning*, 668 F.3d 1271, 1279 (11th Cir. 2012) (quoting *State v. Div. of Bond Fin. of Dep't of Gen. Servs.*, 278 So.2d 614, 617 (Fla.1973)). ("Florida's citizen initiative is every bit a part of the state's lawmaking function . . . [a]nd . . . '[a]n amendment to the Constitution, duly adopted, is [an] expression of the will and intent of the law-making power.'"); *see also Arizona State Legislature v. Arizona Independent Redistricting Commission*, 135 S. Ct. 2652, 2674 (2015) (recognizing modern initiative process as a form of legislative power).

As such, just as courts have "an affirmative duty to preserve the validity of legislative enactments when it is at all possible to do so," *Wollschlaeger*, 848 F.3d at 1318 (quoting *Coral Springs St. Sys., Inc. v. City of Sunrise*, 371 F.3d 1320, 1347-48 (11th Cir. 2004)), they have the same duty with regard to citizen enactments. *See also id.* (quoting *Frazier ex rel. Frazier v. Winn*, 535 F.3d 1279, 1283 (11th Cir. 2008)) (holding that the Court should invalidate no more of a challenged provision than it must). Thus, "[j]ust as we view the severability of laws with deference to the legislative prerogative to enact the law, we conclude that we must afford no less

deference to constitutional amendments initiated by our citizens and uphold the amendment if, after striking the invalid provisions, the purpose of the amendment can still be accomplished." *Ray*, 742 So. 2d at 1281.

    B.    *The purported LFO requirement can be severed from the rest of Article VI, § 4(a).*

    There is no mention of payment of LFOs in the text of Article VI, § 4 of the Florida Constitution. Thus, to the extent an LFO requirement exists, it is extratextual. Nonetheless, Defendants argue that a future state court opinion might hold that "all terms of sentence including probation and parole" encompasses payment of all LFOs, including those converted to civil liens.[12] At issue, therefore, is whether, if requiring completion of LFOs violates the constitutional rights of Plaintiffs and the Plaintiff class, that single nontextual "term" could then be severed to preserve the constitutionality of Article VI, § 4. It can.

    The "key determination" is whether Floridians' overall purpose in amending Article VI § 4—ending permanent disenfranchisement for returning citizens with non-exempt convictions and establishing automatic rights restoration—will be

---

[12] Tellingly, legislators sponsoring SB 7066 conceded that alternative, less restrictive draft legislation that restored rights once LFOs were converted to civil liens and that did not require payment of court costs, would have effectuated the purpose of Amendment 4. May 2 Senate Hearing at 6:35:50-6:38:38, https://www.flsenate.gov/media/VideoPlayer?EventID=2443575804_2019051020&Redirect=true (colloquy between Senators Jason Pizzo and Jeff Brandes).

furthered even absent an LFO requirement read into the text. *See Catalano*, 104 So. 3d at 1080-81; *see also Wollschlaeger*, 848 F.3d at 1318. It will.

In *Wollschlaeger*, the Eleventh Circuit upheld a lower court's finding that restrictions on medical providers' ability to ask patients about firearm ownership violated the providers' First Amendment rights. *Id.* at 1307. Applying Florida law, the circuit court held that the provisions were severable because the remaining provisions establishing the right of patients to decline to answer questions about firearm ownership in a medical setting, and protecting patients from discrimination on the basis of firearm ownership, continued to further the legislature's overall purpose—"protecting the rights of firearm owners in the area of health care." *Id.* at 1318. So too here will the purpose of ending permanent disenfranchisement for Floridians with non-exempt convictions continue to be furthered by provisions granting automatic restoration of rights upon completion of all terms of sentence, including supervision.

Furthermore, in *Ray*, the court determined that certain provisions of what is now Article VI § 4(c), which establishes term limits for candidates, violated the federal Constitution insofar as it applied to candidates for federal office, and thus provisions were unenforceable as applied to such candidates. 742 So. 2d at 1280. There, the overall purpose of the underlying amendment "was the limitation of terms for elected officials, be they state legislators, federal legislators, or cabinet officials."

*Id.* at 1282. The Court found that simply because the limitation of terms could not be enforced as to federal legislators, that did "not mean that the overriding purpose of the amendment cannot be accomplished as to the remaining offices." *Id.* So too here, in that even *if* some part of voters' purpose was to limit automatic rights restoration to those who had completed payment of LFOs in addition to their term of incarceration, probation, and parole, severing that unconstitutional requirement does not defeat the overall purpose of extending automatic rights restoration to individuals who have completed the terms of their sentence. And, such a requirement would constitute only "a small part of the whole" purpose of Article VI § 4, which acts overall to end permanent disenfranchisement for the majority of Floridians with past felony convictions and instead provide for automatic restoration of rights. *See Coral Springs*, 371 F.3d at 1348 (applying Florida law to determine that cutting out exclusions for certain types of signs did not defeat the purpose of creating a "comprehensive and coherent system of sign regulation").

Defendants make much of a colloquy during an argument before the Florida Supreme Court about Amendment 4's compliance with the single-subject rule where certain justices questioned whether LFOs were included in the phrase "completion of all terms of sentence." *See* Mot. at 3-4. But this discussion is irrelevant to the determination of whether such a requirement is central to the restoration scheme or can be severed. *See Ray*, So. 2d at 1282-83. Indeed, to the extent the Florida Supreme

Court determined that "all terms of sentence including probation and parole" encompassed LFOs in deciding whether the Amendment could be placed on the ballot (it did not), it does not mean that such a requirement is "so mutually dependent" on the other provisions "that the *overall* purpose of the amendment cannot be accomplished absent the invalid provisions." *Id*. at 1282.

Severing an unconstitutional LFO requirement—absent from the text—would not defeat the purpose of Article VI § 4 as amended. Section 4 furthers voters' overall objective of ending permanent disenfranchisement for returning citizens with a felony conviction other than an exempt offense and providing for automatic restoration of rights without an LFO requirement. And it would continue to require returning citizens to complete their term of incarceration, including any term of supervision, even after severing any unconstitutional LFO requirement. Thus, the second, and key factor weighs in favor of severability.

The fourth factor also weighs in favor of severability because the requirement in Article VI § 4 that returning citizens complete their terms of incarceration and supervision constitutes a complete act on its own, absent any requirement that returning citizens pay their LFOs. Indeed, Defendants accepted that Article VI § 4 could stand as a complete act absent an LFO requirement, because they acknowledge that the Florida Supreme Court could determine that "the Constitution's text does *not* include legal fines, fees, restitution, and other obligations. . . ." *See* Mot. at 2;

*see also id.* at 9 (stating that the constitution "might" serve as a bar to re-enfranchisement for individuals with outstanding LFOs and thus also conceding that it "might" not); *id.* at 11 (allowing for possibility that Florida courts could find "that 'all terms of sentence' *excludes*" LFOs); *id.* at 12 (noting that Article VI § 4 is "susceptible" to more than one interpretation); *id.* at 13 (noting that "there is no definition of 'all terms of sentence' in the state constitutional text"); *id.* at 14 (acknowledging that the text of the Constitution may exclude LFOs). In other words, Defendants have tacitly conceded that if Article VI, § 4 does in fact contain a silent LFO requirement, it can be severed from the rest of the provision's text, and § 4 can continue to be implemented without requiring payment of LFOs. Thus, the fourth prong of the inquiry weighs in favor of severability.[13]

The remaining two factors are also met. First, any requirement that returning citizens pay outstanding LFOs can be separated from the remaining valid provisions in Article VI § 4. *See Wollschlaeger*, 848 F.3d at 1317-18 (laying out the first factor). For one, an LFO requirement would apply to a distinct universe of people than the requirement that individuals complete any term of incarceration or supervision. *See, e.g.*, *id.* at 1318 (finding challenged provisions severable where the remaining provisions "regulate a different group of persons" than the provisions "found

---

[13] Defendants' statements in this regard are also noteworthy in light of the constitutional avoidance doctrine, which requires courts to adopt a plausible, or even merely fair, interpretation of a law that avoids potential constitutional infirmity.

constitutionally wanting"). The LFO requirement applies only to those returning citizens that have completed incarceration and supervision and still have outstanding LFOs. For returning citizens who do not have outstanding LFOs, Article VI § 4 operates entirely unchanged whether there is an LFO requirement or not.[14] Similarly, Article VI § 4 operates entirely the same for individuals incarcerated or on supervision for a felony conviction because those individuals continue to be barred from re-enfranchisement regardless of any LFO requirement. And, for those individuals who have completed all terms of incarceration or supervision, an LFO requirement, if it existed, would act entirely on its own to bar them from re-enfranchisement.[15] Thus, an LFO requirement would clearly operate independently from the remaining valid provisions in Article VI § 4.

Furthermore, although an LFO requirement would serve to delay or foreclose rights restoration for individuals with outstanding LFOs, neither its presence nor absence would otherwise affect the mechanics of automatic restoration, which is mandated by Article VI § 4 as amended. Nor would it "render[] the enactment

---

[14] While the legal implications of Article VI § 4 of would remain unchanged for these individuals, Plaintiffs have alleged in their complaints substantial evidence that the LFO requirement enacted under SB7066 is likely to continue to disenfranchise a substantial portion of these individuals because they will be unable to determine as a factual matter whether they have paid off their disqualifying LFOS. *See, e.g.,* Gruver Compl. ¶¶ 76-78; 136-143.

[15] Indeed, the requirements of incarceration and supervision are so clearly separable from outstanding LFOs that (1) persons on parole and probation have severely curtailed rights and remain under state supervision, while those who have completed supervision but have outstanding LFOs do not; and (2) state courts may convert outstanding LFOs to civil judgments subject to the oversight of civil courts when supervision is complete.

nonsensical or otherwise chang[e] its essential meaning beyond what is necessary to cure the constitutional defect." *Schmitt v. State*, 590 So. 2d 404, 415 (Fla. 1991). Therefore, the first factor favors severability.

Finally, the third factor also supports severability, because an LFO requirement is not "so inseparable in substance" from incarceration and supervision such "that it can be said that [Florida voters] would have passed the one without the other." *See Ray*, 742 So. 2d at 1281. Ending permanent disenfranchisement for the majority of returning citizens and re-enfranchising over a million Floridians is a sufficiently "compelling purpose" that the Court may infer that Florida voters would have approved restoration even absent an LFO requirement. *Schmitt*, 590 So. 2d at 415 (finding the intent of the legislature in eradicating child exploitation was sufficiently compelling to infer that it "would have approved the remainder of the statute without the illegal portion had it appreciated the deficiencies of the latter," and therefore the court would do "a grave disservice" in striking down the entire statute rather than severing the unconstitutional portion).

Severability is not precluded simply because it is "impossible to be *certain* that the voters would have adopted the amendment had it not contained [the challenged] provisions." *Ray*, 742 So. 2d at 1283 (finding that proponents of severability need not "prove that the voters would have adopted the amendment had it not contained [the challenged] provisions" (internal quotations omitted)). Rather,

there must be more than mere "doubt [as to] whether the amendment would have passed without the [challenged] provisions." *Id.* at 1281. Here, given the lack of textual support for any LFO provision, the suggestion that voters would not have enacted Amendment 4 absent a requirement that returning citizens pay off their LFOs is no more than "conjecture and speculation," which are insufficient to preclude severability. *Id.* at 1283. This is true even where there is evidence that the backers of an initiative (as distinguished from the voters who enacted it) supported the unconstitutional provision in question. *Id.* (finding the federal term limits severable from the other term limits despite "several media reports suggesting that the backers of the amendment often focused on the excesses of career federal legislators").

Because it is reasonable to infer that voters would have enacted the text of Amendment 4 absent an LFO requirement, which unlike the probation and parole provisions was not found anywhere in the text of the Amendment, the third factor counsels for severability.

Because all of the factors governing severability under Florida law are met, an unconstitutional LFO requirement may be severed from Article VI § 4.

C.      *If the purported LFO requirement cannot be severed from Art VI § 4(a), then Art VI § 4(a) must be struck in its entirety, as it relates to felony disenfranchisement.*

Severing only the second provision of subsection (a) and returning to a system of permanent disenfranchisement for all citizens convicted of felonies would clearly contravene the purpose of Article VI § 4 as amended. If the Court finds that an implicit LFO requirement cannot otherwise be severed from the provision that returning citizens must complete "all terms of sentence including probation and parole" to be eligible for rights restoration, it cannot simply declare that provision void and end its analysis there. Instead, it must proceed to analyze whether the provision amending Article VI § 4 to provide for automatic rights restoration for returning citizens with non-exempt offenses upon completion of all terms of sentence can be severed from the remaining valid provisions in Article VI § 4. *See Coral Springs*, 371 F.3d at 1347 ("Whether a statute is severable is determined by its relation to the overall legislative intent of the statute of which it is part, and whether the statute, less the invalid provisions, can still accomplish this intent."); *see also Schmitt*, 590 So. 2d at 414 ("[T]he question is whether the taint of an illegal provision has infected the entire enactment, requiring the whole unit to fail.").

There are three provisions at issue.[16] Article VI § 4(a) contains two relevant provisions—first the provision that no person convicted of a felony shall be qualified to vote until their rights are restored; and second the provision, added by Amendment 4, that—except for the carve-out in subsection (b)—disqualification terminates for persons convicted of a felony upon completion of all terms of sentence. Fla. Const. Art VI, § 4(a). The third provision at issue is subsection (b), which provides that persons convicted of murder and felony sexual offenses are not qualified to vote unless their rights are restored through the clemency process. *Id.* at § 4(b). If the second provision in subsection (a) is void because it is found to have an unconstitutional LFO requirement that cannot be severed, then the Court must determine whether that provision can be severed from the remaining valid provisions in the first part of subsection (a) and in subsection (b).

In evaluating severability, "[t]he 'key determination is whether the overall legislative intent is still accomplished without the invalid provisions.'" *Wollschlaeger*, 848 F.3d at 1318 (quoting *Catalano*, 104 So. 3d at 1080-81). Here, this determination is dispositive. Severing the second provision of subsection (a) and leaving the first provision in place would entirely defeat the purpose of the voters in

---

[16] The constitutionality of subsection (a) disenfranchising persons adjudicated mentally incompetent is not at issue in this litigation. Plaintiffs do believe there is any serious question as to whether provisions related to disqualifying persons on the basis of a felony conviction can be severed from those related to persons adjudicated mentally incompetent, and thus do not address the issue here.

amending Article VI § 4. The amended provisions speak for themselves. Where before there was permanent disenfranchisement for all persons convicted of a felony absent clemency, now only two categories of felony convictions are permanently disenfranchising. Where before there was no provision for automatic rights restoration, now the vast majority of returning citizens qualify for automatic restoration upon completion of sentence. Severing only the second provision of subsection (a) and returning to a system of permanent disenfranchisement for all citizens convicted of felonies would clearly contravene the purpose of Article VI § 4 as amended. As such the second provision of subsection (a) is not severable from the first provision, and if the former is determined to be unconstitutional, both must be struck down, leaving only disenfranchisement for murder and felony sex offenses.

The other factors also weigh against severability of the automatic rights restoration provision from the remainder of Article VI § 4(a). Both provisions of subsection (a) regulate the same group of people, subject to the carve out in subsection (b) for persons convicted of murder or felony sexual offense. *Cf. Wollschlaeger*, 848 F.3d at 1318 (finding provisions separable under the first factor where they regulate different groups of people). Nor can either provision operate independently of each other and still further the purpose of ending permanent disenfranchisement and establishing automatic restoration. And, severing the second provision of subsection (a) but preserving the first would undermine the logic and

structure of the Article as a whole, by rendering subsection (b) superfluous.[17] Thus, the two provisions cannot be separated and the first factor counsels against severability.

Furthermore, it is "wholly implausible," *Coral Springs*, 371 F.3d at 1318, that Florida voters would prefer retaining the precise system of permanent disenfranchisement they overwhelmingly voted to end, over limiting permanent disenfranchisement to the two categories of crime they expressly carved out from automatic rights restoration. In amending Article VI § 4 as they did, voters made clear that the only persons subject to permanent disqualification should be those convicted of murder of felony sexual offense. Here it is not simply "conjecture and speculation" that voters wanted to end permanent disenfranchisement for all citizens except those convicted of murder and felony sexual offenses, it is precisely what they did. *See Ray*, 742 So. 2d at 1283. It cannot be said that voters would have chosen to enact Article VI as amended without the second provision in subsection (a)

---

[17] The first provision of subsection (a) establishes that all persons are disqualified from voting when they are convicted of a felony unless their rights are restored; the second provision establishes a process for automatic termination of disqualification and restoration of rights for persons other than those identified in subsection (b); and subsection (b) establishes that persons convicted of murder and felony sexual offense do not qualify for automatic restoration, and are disqualified from voting unless their rights are restored. *See* Fla. Const. art. VI § 4. If the second provision in subsection (a) is severed, then the remaining provisions related to felonies are that (1) persons are disqualified from voting when they are convicted of a felony unless their rights are restored and (2) that persons convicted of murder or felony sexual assault are disqualified from voting unless their rights are restored.

because that subsection encompasses the entire purpose of the Amendment. Thus, the third factor also weighs in favor of inseverability.

Finally, although it is clear that Article VI § 4 stood on its own as an act complete in itself prior to amendment, it cannot do so as amended if the automatic rights restoration provision of subsection (a) is severed. *See id.* at 1281 (laying out the fourth factor). The first provision of subsection (a) and the provision in subsection (b), standing alone, do not constitute a complete act absent the provision distinguishing between persons convicted of felonies other than murder and felony sexual offenses and those convicted of the enumerated crimes for purposes of automatic rights restoration. *See supra*, n.17. Nor can the first provision of subsection (a) stand on its own without contravening the purpose of ending permanent disenfranchisement.

In contrast, subsection (b) can and does stand on its own, fulfilling the purpose of the voters in establishing permanent disenfranchisement for only those voters convicted of murder and felony sexual offenses. Thus, if an implicit LFO requirement cannot be severed from the rights restoration provision, the only way to both effectuate the purpose of voters' amendment of Article VI § 4 and to ensure a complete act is to sever all of Article VI § 4(a) and leave only the provision in § 4(b) permanently disenfranchising individuals convicted of the enumerated offenses.

## CONCLUSION

The Court should deny the motion to dismiss because Plaintiffs' claims are redressable, and abstention is inappropriate.

As to the question posed by the Court, an unconstitutional LFO provision could easily be enjoined without impacting the remaining provisions of Article VI § 4 of the Florida Constitution. But, if the LFO provision cannot be severed from those provisions, then Florida's felony disenfranchisement scheme must be voided as a whole, except as to the permanent disenfranchisement of persons convicted of murder or felony sexual offenses.

**Date: August 29, 2019**

Respectfully submitted,

*/s/ Sean Morales-Doyle*

Wendy Weiser
Myrna Pérez
Sean Morales-Doyle*
Eliza Sweren-Becker*
Brennan Center for Justice at NYU
School of Law
120 Broadway, Suite 1750
New York, NY 10271
Tel: (646) 292-8310
wendy.weiser@nyu.edu
myrna.perez@nyu.edu
sean.morales-doyle@nyu.edu
eliza.sweren-becker@nyu.edu

Julie A. Ebenstein, Fla. Bar No. 91033

R. Orion Danjuma*
Jonathan S. Topaz*
Dale E. Ho**
American Civil Liberties Union
Foundation, Inc.
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 284-7332
Fax: (212) 549-2654
jebenstein@aclu.org
odanjuma@aclu.org
jtopaz@aclu.org
dho@aclu.org

Daniel Tilley, Fla. Bar No. 102882
Anton Marino**
American Civil Liberties Union of
Florida
4343 West Flagler St., Suite 400
Miami, FL 33134
Tel: (786) 363-2714
dtilley@aclufl.org
amarino@aclufl.org

Jimmy Midyette, Fla. Bar No.
0495859
American Civil Liberties Union
Foundation of Florida
118 W. Adams Street, Suite 510
Jacksonville, FL 32202
Tel: (904) 353-8097
jmidyette@aclufl.org

Leah C. Aden*
John S. Cusick*
NAACP Legal Defense and
Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
Tel: (212) 965-2200

33

laden@naacpldf.org
jcusick@naacpldf.org

*Counsel for Gruver Plaintiffs*

Danielle M. Lang*
Mark P. Gaber*
Molly E. Danahy*
Jonathan M. Diaz*
Blair Bowie*
Campaign Legal Center
1101 14th Street, Ste. 400
Washington, DC 20005
(202) 736-2200
dlang@campaignlegal.org
mgaber@campaignlegal.org
mdanahy@campaignlegal.org
jdiaz@campaignlegal.org
bbowie@campaignlegal.org

Chad W. Dunn (Fla. Bar No. 119137)
Brazil & Dunn
1200 Brickell Ave, Ste. 1950
Miami, FL 33131
(305) 783-2190
chad@brazilanddunn.com

*Counsel for Raysor Plaintiffs*

Nancy G. Abudu (Fla. Bar No.
111881)
Caren E. Short*
SOUTHERN POVERTY LAW
CENTER
P.O. Box 1287
Decatur, GA 30031-1287
Tel: 404-521-6700
Fax: 404-221-5857
*nancy.abudu@splcenter.org*
*caren.short@splcenter.org*

*Counsel for Plaintiffs Rosemary
Osborne McCoy &
Sheila Singleton*

Michael A. Steinberg
Fla. Bar No. 340065
4925 Independence Pkwy, Suite 195
Tampa, Fl 33634
Tel: (813) 221-1300
frosty28@aol.com

*Counsel for Plaintiffs Kelvin Leon
Jones
& Luis A. Mendez*

\* Admitted Pro Hac Vice
\*\* Pro Hac Vice applications
forthcoming

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULES</u>

The undersigned certifies that the foregoing complies with the size, font, and formatting requirements of Local Rule 5.1(C). and the foregoing complies with the word limit in Local Rule 7.1(F); the foregoing contains 7,795 words, excluding the case style, signature block, and certificates.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was served

to all counsel or parties on record through the Court's CM/ECF system on this 29th

day of August 2019.


*/s/   Sean Morales Doyle*
Counsel for *Gruver* Plaintiffs