1

2           IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF FLORIDA

3

4

KELVIN LEON JONES, et al.,          |

5                                    |

      Plaintiffs,                    |

6                                    |          Consolidated Case No.

vs.                                  |          4:19-cv-00300-RH-MJF

7                                    |

RON DeSANTIS, in his official        |

8  capacity as the Governor of       |

Florida, an Indispensable            |

9  Party, et al.,                    |

                                     |

10      Defendants.                   |

_____|

11

12               D E P O S I T I O N

13                      o f

14              MARY JANE ARRINGTON

15          taken on behalf of Plaintiffs

16

        DATE:          July 31, 2019

17

        TIME:          9:03 a.m. to 12:15 p.m.

18

        PLACE:         Offices of the Osceola County

19                     Supervisor of Elections

                       2509 E. Irlo Bronson Highway

20                     Kissimmee, Florida  34744

21      BEFORE:        Dawn A. Hillier, RMR, CRR, CLR

                       Notary Public - State of

22                     Florida, at Large

23      JOB NO:        165469

24

25

1
2  APPEARANCES:
3  ATTORNEYS FOR RAYSOR PLAINTIFFS
4          DANIELLE LANG, ESQUIRE
           MOLLY DANAHY, ESQUIRE
5          CAMPAIGN LEGAL CENTER
           1101 14th Street NW
6          Washington, DC  20011
7
8
9  ATTORNEY FOR GRUVER PLAINTIFFS
10          JIMMY MIDYETTE, ESQUIRE
           AMERICAN CIVIL LIBERTIES UNION FOUNDATION
11          118 West Adams Street
           Jacksonville, Florida  32202
12
13
14  ATTORNEY FOR GRUVER PLAINTIFFS
15          SEAN MORALES-DOYLE, ESQUIRE (via telephone)
           ELIZA SWEREN-BECKER, ESQUIRE (via telephone)
16          BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW
           120 Broadway
17          New York, New York  10271
18
19
20  ATTORNEYS FOR GRUVER PLAINTIFFS
21          LEAH ADEN, ESQUIRE (via telephone)
           JOHN CUSICK, ESQUIRE (via telphone)
22          NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.
           40 Rector Street
23          New York, New York  10006
24
25

APPEARANCES:  (continued)

ATTORNEY FOR DEFENDANT GOVERNOR RON DeSANTIS

     NICHOLAS PRIMROSE, ESQUIRE (via telephone)
     DEPUTY GENERAL COUNSEL
     EXECUTIVE OFFICE OF THE GOVERNOR
     400 South Monroe Street
     Tallahassee, Florida  32399


ATTORNEY FOR SECRETARY OF STATE

     ASHLEY DAVIS, ESQUIRE (via telephone)
     DEPUTY GENERAL COUNSEL
     FLORIDA DEPARTMENT OF STATE
     500 South Bronough Street
     Tallahasee, Florida  32399


ATTORNEY FOR DEFENDANT OSCEOLA COUNTY

     R. MILES, ESQUIRE
     OVERSTREET, MILES, et al.
     100 Church Street
     Kissimmee, Florida  34741


ATTORNEY FOR DEFENDANT BROWARD COUNTY

     ADAM KATZMAN, ESQUIRE (via telephone)
     ASSISTANT BROWARD COUNTY ATTORNEY
     115 S. Andrews Avenue
     Fort Lauderdale, Florida  33301

1

2    APPEARANCES:  (continued)

3    ATTORNEY FOR DEFENDANTS MANATEE COUNTY AND SARASOTA
     COUNTY

4

         CAROLEEN BREJ, ESQUIRE (via telephone)
5        BENTLEY & BRUNING
         783 South Orange Avenue
6        Sarasota, Florida  34236

7

8

     ATTORNEY FOR DEFENDANT HILLSBOROUGH COUNTY
9

         STEPHEN TODD, ESQUIRE (via telephone)
10       SENIOR ASSISTANT COUNTY ATTORNEY
         HILLSBOROUGH COUNTY ATTORNEY'S OFFICE
11       601 E. Kennedy Boulevard
         Tampa, Florida  33602

12

13

14   ATTORNEY FOR DEFENDANT ALACHUA COUNTY

15       GEENA CESAR, ESQUIRE (via telephone)
         CORBIN HANSON, ESQUIRE (via telephone)
16       ALACHUA COUNTY ATTORNEY'S OFFICE
         12 SE 1st Street
17       Gainesville, Florida  32601

18

19   ATTORNEY FOR DEFENDANT INDIAN RIVER COUNTY

20       DYLAN REINGOLD, ESQUIRE
         INDIAN RIVER COUNTY
21       1801 27th Street
         Vero Beach, Florida  32960

22

23

24

25

1

2      APPEARANCES: (continued)

3      ATTORNEY FOR LEON COUNTY

4            MARK HERRON, ESQUIRE
            MESSER CAPARELLO
5            2618 Centennial Place
            Tallahassee, Florida  32308

6

7

8      ATTORNEY FOR OSCEOLA COUNTY

9            FRANK TOWNSEND, ESQUIRE
            OSCEOLA COUNTY ATTORNEY
10           1 Courthouse Square
            Kissimmee, Florida  34741

11

12

13

14

       ALSO PRESENT:
15
            Julie Evanstein, Esq. (via telephone)
16               For Gruver Plaintiffs
17           Oren Rosenfeld, Esq. (via telephone)
                 For Miami-Dade County
18
            Rosa Cruz
19

20

21

22

23

24

25

1
2                            INDEX
3                                              PAGE

4    WITNESS - MARY JANE ARRINGTON                 10
     DIRECT EXAMINATION BY MS. LANG                10
5    CROSS EXAMINATION BY MR. PRIMROSE            129
     REDIRECT EXAMINATION BY MS. LANG             134
6    CERTIFICATE OF OATH                          138
     REPORTER'S CERTIFICATE                       139
7

8                          EXHIBITS
9    Exhibit 1    FDOC Corrections Offender        43
        Network, Supervised Population
10       Information Detail
11   Exhibit 2    Florida Rights Restoration       59
        Coalition Letter
12

     Exhibit 3    "Vote Osceola" Website printout  59
13

     Exhibit 4    Amendment 4 FAQ                  61
14

     Exhibit 5    February 11, 2019               64
15      Matthews/Brown, et al. email
16   Exhibit 6    June 7, 2019 Matthews/Brown, et  67
        al. email
17

     Exhibit 7    June 2019 email string with     70
18      attachment
19   Exhibit 8    July 2, 2019 Matthews/Brown, et  81
        al. email
20

     Exhibit 9    SB 7066                          86
21

     Exhibit 10   "old" Florida Voter Registration 91
22      Application
23   Exhibit 11   "new" Florida Voter Registration 91
        Application
24

     Exhibit 12   "Register to Vote In Your State  93
25      By Using This Postcard Form and Guide"

1

2

Exhibit 13   Certification of Eligibility      128

3       Records Maintenance

4

5           REPORTER'S KEY TO PUNCTUATION:

6     --  At end of question or answer references

7         interruption.

8     ...  References a trail-off by the speaker.

9         No testimony omitted.

10    "Uh-huh" "Um-hum" References affirmative sound.

11    "Huh-uh" "Um-um"  References negative sound.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    MARY JANE ARRINGTON

2        MS. LANG:  We thought that it might make sense

3   for us to go defendant by defendant, just to, you

4   know, have some sort of order to go by.

5        So is anyone -- sorry.  Is anybody --

6        MS. ADEN:  This is Leah Aden with the Gruver

7   plaintiffs.  So maybe some of the plaintiffs can

8   introduce themselves and then --

9        MS. LANG:  Sure.

10        MS. ADEN:  -- and then who are on the call.

11        MS. LANG:  So let's start with any plaintiffs'

12   attorneys who are on the phone.  Leah Aden.  Who

13   else?

14        Okay.  Is anyone here representing -- on the

15   phone representing Governor DeSantis?

16        MR. PRIMROSE:  This is Nick Primrose on behalf

17   of Governor Ron DeSantis.

18        MS. LANG:  Okay.  And the Supervisor of

19   Elections of Hillsborough County?

20        The Secretary of State's office?

21        MS. DAVIS:  Ashley Davis on behalf of the

22   Secretary of State.

23        MS. LANG:  Okay.  And for Alachua County

24   Supervisor of Elections?

25        THE WITNESS:  Alachua.

1          MARY JANE ARRINGTON

2          MR. HANSON:  Corbin Hanson on behalf of Ken

3  Barton, Supervisor of Elections for Alachua County.

4          MS. LANG:  Thank you.  Supervisor of Elections

5  Broward County?

6          MR. KATZMAN:  Adam Katzman on behalf of the

7  Broward SoE.

8          MS. LANG:  Duval County SoE?

9          Indian River County SoE?

10          MR. REINGOLD:  Indian River County is present.

11  Also note that Stephen Todd from Hillsborough

12  County is trying to call in.

13          MS. LANG:  Thank you.

14          COURT REPORTER:  Can we get a name for the

15  attorney?

16          MS. LANG:  Oh, yes.  What's the attorney for

17  Indian River?

18          MR. REINGOLD:  Dylan Reingold.

19          MS. LANG:  And Leon County SoE?

20          MR. HERRON:  Leon County represented by Mark

21  Herron.

22          MS. LANG:  Manatee County SoE.

23          MS. BREJ:  Manatee County is represented by

24  Caroleen Brej.

25          MS. LANG:  Miami-Dade County.

1              MARY JANE ARRINGTON

2          MR. ROSENFELD:  Oren, O-r-e-n, Rosenfeld.

3          MS. LANG:  Orange County?

4          And Sarasota County?

5          MS. BREJ:  Again, Sarasota County represented

6      by Caroleen Brej.

7          MS. LANG:  And I think I heard someone join,

8      perhaps from Hillsborough County.  Whoever joined

9      late, could you introduce yourself?

10         MS. EVANSTEIN:  Hi, this is Julie Evanstein

11     with the Gruver plaintiffs.

12         MS. LANG:  Okay.  Anyone else?

13         MR. CUSICK:  Good morning.  This is John with

14     the Gruver plaintiffs, John Cusick.

15         MS. LANG:  And anyone else?

16         Okay.

17              MARY JANE ARRINGTON,

18     was called as a witness, and having first been duly

19     sworn, was examined and testified as follows:

20         THE WITNESS:  Yes, ma'am.

21         COURT REPORTER:  Thank you.

22              DIRECT EXAMINATION

23     BY MS. LANG:

24     Q    Good morning, Ms. Arrington.

25     A    Good morning.

1                    MARY JANE ARRINGTON

2        Q     Have you ever been deposed before?

3        A     Yes.

4        Q     Okay.  How many times?

5        A     Two or three.

6        Q     And in what -- in what kind of capacity were

7    you deposed?

8        A     As a suit with the Justice Department against

9    the County Commission of Osceola County.  And then

10   another suit with the County.

11       Q     Okay.  So you're pretty familiar with the

12   process.  But I'm going to go over a few quick

13   instructions.  I'm going to ask questions and you'll

14   provide answers.  It's important for us to provide --

15   for you to provide verbal answers, yes or no, rather

16   than nodding your head or shaking it or uh-huhs because

17   all of that is difficult for the court reporter to take

18   down.

19             For the same reason, we'll try not to speak

20   over each other.  In normal conversation, we often will

21   kind of interrupt one another, finish one's sentences.

22   But let's do our best to kind of -- I'll let you finish

23   your answer and you let me finish my question.

24             From time to time, your counsel may object to

25   my questions.  Unless he instructs you not to answer,

MARY JANE ARRINGTON

1  you can go ahead and answer the question and that

2  objection will just be preserved for the record.  If you

3  don't understand a question, please ask me to clarify.

4  Unless you say otherwise, I'll assume that you

5  understood the question.

6      A    Um-hum.

7      Q    We will probably take a couple of breaks, and

8  that's perfectly fine.  And you can ask for a break

9  whenever you'd like.  All I ask is that if I've already

10  asked you a question, that you answer that question, and

11  then we can take a break.

12          Does all of that sound okay to you?

13      A    Um-hum.

14      Q    Are you taking any medication today that would

15  affect your ability to answer truthfully?

16      A    Not that I'm aware of.

17      Q    And is there any other reason you can think of

18  that you wouldn't be able to answer my questions

19  truthfully today?

20      A    No, ma'am.

21      Q    Okay.  Can you state your name and position

22  for the record?

23      A    Mary Jane Arrington, Osceola County Supervisor

24  of Elections.

1                    MARY JANE ARRINGTON

2       Q     And can you tell me what your educational

3   background is?

4       A     I have a BA from University of Central Florida

5   in public administration and have completed all course

6   work for a master's for urban and regional planning for

7   Florida State.

8       Q     And prior to your position as Supervisor of

9   Elections now, what was your previous employment?

10      A     I worked as an urban planner with a private

11  firm.  And I also served as an Osceola County

12  commissioner.

13      Q     Okay.  And from when to when did you -- during

14  what periods did you serve as County Commissioner?

15      A     I was elected in '94 and went out of office in

16  2002.

17      Q     Okay.  And can you tell me just a little bit

18  about what your role was as County Commissioner and what

19  your responsibilities were?

20      A     I was one of five commissioners who made --

21  set policy and made decisions for Osceola County

22  government.

23      Q     And how long have you served as Supervisor of

24  Elections here in Osceola County?

25      A     I took office in January 2009.

MARY JANE ARRINGTON

1

2     Q     What did you do to prepare for this deposition

3   today?

4     A     I looked for some emails and some work that

5   you had requested.  And that was it.

6     Q     Okay.  And I don't want you to tell me

7   anything you talked to your attorney about.  But did you

8   meet with your attorney to prepare?

9     A     No.

10    Q     Okay.  Did you review the documents that you

11  were able to provide to us?

12    A     Um-hum.

13    Q     Did you have any conversations with anyone

14  else about this deposition?

15    A     Other than I just asked staff some questions

16  about things.

17    Q     Okay.  Which staff members did you talk to

18  about...

19    A     I mean, just some of the staff members that

20  worked the front area, just questions about -- I'm not

21  real sure what the deposition is about, so, I mean, they

22  were just general questions.

23    Q     Okay.  And that's a fair-enough question

24  (sic).

25          We'll get into this.  But, you know, the

1                    MARY JANE ARRINGTON

2    deposition is basically just an attempt to try to

3    understand how Supervisors of Elections are trying to

4    implement both Amendment 4 and SB 7066.

5          So we're just trying to get a basic

6    understanding from people like you that know best about

7    how the system is currently functioning.

8          What process did you go through to look for

9    the documents that you provided to us?

10   A    I did a personal search of my emails and

11   records.  And then we also had county IT do a thorough

12   search, word search of documents.  So we came up with

13   about the same things.

14   Q    Okay.  Do you know what kind of search terms

15   you used?

16   A    I used Amendment 4, felons, persons like Maria

17   Matthews that may have sent me things.

18   Q    Great.  Thank you.

19        MS. LANG:  And we'll just take a break -- or

20        we'll just note for a moment that somebody here has

21        joined us.

22        MR. MIDYETTE:  Hi, Jimmy Midyette,

23        M-i-d-y-e-t-t, counsel for the Gruver plaintiffs.

24        MS. LANG:  And I think somebody may have

25        joined on the phone.

1                  MARY JANE ARRINGTON

2          Could you introduce yourself, if you have not

3      yet?

4          MR. TODD:  Yes.  Stephen Todd from

5      Hillsborough County Supervisor of Elections.

6          MS. LANG:  Thank you.

7  BY MS. LANG:

8      Q    So before I launch into questions about --

9  that are the reason we are here today, I wanted to ask

10  you some more general questions so I can have an

11  understanding of your job and your office and how it all

12  works.  So can you tell me a little bit about the job

13  responsibilities of Supervisor of Elections?

14      A    I am responsible for conducting all elections

15  within the county, both for special districts and

16  cities.  I am responsible for keeping an accurate voter

17  role in registering individuals to vote.  I am

18  responsible for education of residents, both future

19  voters.  I am responsible for making sure that all of

20  our records are, you know -- that are accessible to the

21  public.  I also oversee candidates who run for public

22  office within the county, and that includes both cities.

23      Q    And you mentioned keeping an accurate voter

24  roll.  So does that include a list maintenance

25  activities to remove ineligible voters?

1

2    A    Right.  Correct.

3    Q    And does that also include ensuring that all

4 eligible voters that register get registered and remain

5 on the rolls?

6    A    Right.

7    Q    And do you have primary responsibility when

8 someone registered to vote for determining whether or

9 not they are eligible to vote?

10    A    It is the -- the final decision lies within

11 this office, yes.

12    Q    Okay.  And can you tell me about how the

13 statewide voter registration system in Florida

14 functions?  And by that, I mean, is it a top-up,

15 top-down system or a bottom-up system?

16    A    It's when a potential voter registers, we

17 process that application.  We can process any

18 application for any person within the state, not just

19 Osceola County residents.  Then that information is sent

20 to the State.  The State is responsible for vetting that

21 person to make sure that person is a real person, is

22 not -- you know, is who they say they are.  And that

23 information is provided through the driver's license and

24 last four of the social security.

25         And then that information is sent back to us.

                     MARY JANE ARRINGTON

1  And if there are no issues with that, that we don't need

2  to go back to the voter, then that person is added to

3  the voter rolls.

4       Q    Thank you.  That's very helpful.

5            How long does that process take?

6       A    Depends on volume --

7       Q    Um-hum.

8       A    -- and the information that we're given.

9  Sometimes we struggle because we can't read voters'

10 handwriting or they transpose numbers.  So sometimes it

11 can be challenging, but for the most part, it's a day or

12 two.

13      Q    So I'm going to recap what I understand of

14 your testimony and please tell me if I'm wrong.  You

15 receive a voter registration form.  You put that

16 information into the electronic system.

17      A    Um-hum.

18      Q    That sends all the information to the State.

19      A    Um-hum.

20      Q    The State then checks that information with

21 either the DMV or the social security database?

22      A    Or other databases.

23      Q    Or other databases and sends back either an

24 approval, yes, register this person, or here are our

1          MARY JANE ARRINGTON

2   concerns with this voter registration?

3       A    We call it, they're in suspense.  And you are

4   trying to get more information.  Maybe their name was

5   June and we entered it as Jane because we thought the U

6   was an A or something like that.  So then we try to get

7   additional -- that application is incomplete until we

8   can get additional information.

9       Q    Um-hum.  And by the State, do you mean the

10  Secretary of State's office?

11      A    Right.

12      Q    And if there are no problems, the process

13  often takes one to two days; is that right?

14      A    Um-hum.  Sometimes it's that short.

15      Q    Is there anyone in particular in the Secretary

16  of State's office that is in charge of this process?

17      A    There is someone.  Do not ask me their name

18  because it has slipped my mind.

19      Q    Okay.  Do you know what that person's position

20  is?

21      A    Head of -- there's a -- there's an acronym.

22      Q    Is it Maria Matthews?

23      A    Well, she -- yes.  She over -- yes, she is.

24      Q    Is it Toshia Brown?

25      A    Toshia Brown.

1                    MARY JANE ARRINGTON

2      Q    Toshia Brown?  Okay.  Thank you.

3           As part of that process, is it the Department

4  of State's responsibility in the first instance to flag

5  anyone who might be ineligible because of a past

6  conviction?

7      A    I would think so.  I would think they have

8  access to databases that I do not have access to.  And

9  so I would think that would be part of their

10  responsibility.

11     Q    Okay.  How many staff members work in your

12  office?

13     A    I have 16 permanent.

14     Q    And can you tell me their different positions

15  within the office?

16     A    Okay.

17          We have Alan Ortega, and he is in charge of

18  election systems which is all election equipment and all

19  IT.  And Alan, in his department, has three other

20  people:  Adam Belva, who oversees warehouse and

21  equipment; Carol Blanco-Allen (sic), who is an IT

22  person; and Jordan Durity, who also works in the IT

23  area.

24     Q    Okay.

25     A    That's four.

1          MARY JANE ARRINGTON

2          Kari Ewalt, who is in charge of community

3   outreach and poll workers and election worker training.

4   Under her, she has Tammy Smith; Caitlin Germaine who

5   oversees candidates; and Rosita Santiago who assists her

6   in community outreach and does the majority of our

7   translation in the office.

8          That's eight.

9          Rosa Cruz who is elections administration, but

10  the majority of her people are out front.  There is

11  Anabelle Hasan, Mayra Hernandez, Ashley Bryant, Lisa

12  Rosario.  Okay.

13         And then we have Queen Woods who does the

14  administration services which is accounting; and Maria

15  Ricci.  And they also are over mail ballots.

16     Q    Thank you very much.  That's very impressive.

17  That's perfect.  That's perfect.  Thank you.

18         So we've already started to talk about this.

19  But I'm going to ask a number of questions that are

20  about trying to understand how does voter registration

21  vetting work, putting aside felony convictions.  And

22  then we'll talk specifically about felony convictions.

23         Putting aside felony convictions, what are the

24  voter qualifications for registering in Florida?

25     A    You must be a resident of the state of Florida

MARY JANE ARRINGTON

1
2 and Osceola County to register in Osceola County.  You
3 must be a US citizen.  You must say -- tell us that you
4 are not -- have not been adjudicated mentally
5 incompetent, that you have not -- was that you were not
6 a convicted felon.  Now, it is you have paid your
7 restitution and you're eligible to vote.

8        So those are the -- and then there are boxes
9 at the top of an application that you are affirming that
10 you are mentally competent, that you are a citizen, and
11 that you are not a convicted felon.  And we take you at
12 your word when you give us that information.

13        A voter application is a document of trust.
14 And you sign at the bottom that you are affirming that
15 you are telling the truth.

16     Q     Yes.  And just to add to that list, you also
17 have to be 18; yes?

18     A     Oh, yes.  Well, in Florida, you may
19 preregister at 16.

20     Q     Okay.  What are the different ways in which
21 Florida residents can register to vote?

22     A     May register online.  If you have a Florida
23 driver's license or a Florida ID, then the whole process
24 can be processed online.  If you do not have those
25 documents, then you must print that application and turn

1        MARY JANE ARRINGTON

2   it in physically just like you would normally.

3        You can fill out an application at any, what

4   we call, agency, which might be a military recruiter or,

5   you know, the library, or different agencies that we

6   work with throughout the county.  And of course, the

7   majority of our registrations come through the DMV.  And

8   you can also register in our office or in, you know,

9   numerous other places.

10       Q    And you can send it by mail?

11       A    You can send it by mail.  Third parties do a

12  lot of registrations in Osceola County.

13       Q    Okay.  Under State law, you testified that

14  you're the final arbiter of whether or not someone is

15  eligible to vote; is that right?

16       A    Yes.

17       Q    In Osceola County.

18       A    Right.

19       Q    What are the ways that you determine

20  eligibility of the voter?

21       A    If it is questioned -- and I've only had that

22  happen one time in 11 years -- then we try to do

23  additional research.  And first of all, want to make

24  sure we have the right person because we all think

25  we're -- we are unique, but we are not.  Our names are

MARY JANE ARRINGTON

1

2 common. And so we make sure that we have the right

3 person. And then we try to do additional vetting of

4 that information to make sure that we are making --

5 ruling on the correct information.

6 Q And so my understanding from your testimony is

7 most people affirm their eligibility, and that is the

8 primary way in which they show their eligibility to

9 vote; is that right?

10 A Correct.

11 Q And if there is a challenge to someone's

12 eligibility, you would investigate?

13 A Right.

14 Q And what do you mean by challenge? Who

15 would -- in that one instance, who challenged the

16 eligibility of the voter?

17 A Well, I think -- I believe the State told us

18 that they needed additional information. We made sure

19 that we had the right person, because it was a common

20 name. And then we tried to get other information to

21 make sure that person was not -- that the information we

22 had allegedly for this one person was for that person.

23 Q And what kind of information was that?

24 A First of all, we need proof of residency. I

25 mean, if someone says you're not an Osceola County

MARY JANE ARRINGTON

1 resident, that you reside in Leon county, then we need

2 to know where you live.  If they say you're mentally

3 incompetent, and that's what this one was, this person

4 had been issued that they were mentally incompetent, but

5 they still had their voting rights.  And so that is what

6 we determined.  We got the actual document from the

7 court and said, well, this person -- it does say that

8 they still have their right to vote.

9 Q    Okay.  So in that case, it was the State who

10 told you this person has an adjudication of mental

11 incompetence?

12 A    I believe it was the State.

13 Q    And by the State, we're talking about the

14 Secretary of State's office?

15 A    I believe so.

16 Q    And then you -- your office identified the

17 actual court record?

18 A    Right.  We got in contact with the voter, told

19 them the issue.  And then they said, no, this is wrong,

20 and then we got the additional paperwork that it was

21 wrong.

22 Q    Okay.  It's only been the case that one voter

23 registration application in your office has ever been

24 questioned by the Secretary of State's office?

MARY JANE ARRINGTON

1

2    A    That's the only one that I've had that

3  since -- that I can recall.

4    Q    You've never gotten a notification based on a

5  felony conviction?

6    A    Oh, well, we have those that someone is --

7  usually that they are to be removed from the rolls

8  because they have complete -- you know, have been --

9  that has happened.

10    Q    Okay.  So --

11    A    So I mean, those others happened.  I mean,

12  people are removed because they're registered and they

13  become, you know, mentally incompetent.  So I mean,

14  they're usually in the process, but a new application

15  that someone gives.

16    Q    Okay.  That's helpful.

17         So there is a distinction, of course, between

18  people who register to vote and at the time --

19    A    Never appear on the rolls --

20    Q    Yes.  People who --

21    A    -- and those that are on the rolls that are

22  then researched to come off because something has

23  transpired.

24    Q    Exactly.  And so the distinction is between

25  people who are eligible at the time that they register

MARY JANE ARRINGTON

1

2 to vote versus people who become ineligible at some

3 later date?

4     A     Um-hum.

5     Q     That's yes?

6     A     Um-hum.  Oh, pardon me.  Yes, ma'am.

7     Q     That's very helpful.

8           And in your recollection, the Secretary of

9 State has only identified one person at the stage of

10 initial registration?

11     A     Right.  That is my recollection.  The others,

12 people have been on the roll and then we have researched

13 to make sure that they need to be removed.

14     Q     Okay.  With respect to this one individual

15 applicant, you said that you contacted the voter.  How

16 did you contact the voter about that problem?

17     A     Probably by mail.  That's our number one way

18 of contacting a voter.  Your phone number or email are

19 not required information, so we probably contacted them

20 by mail.

21     Q     Is there a specific notice that you send in

22 that circumstance?

23     A     There are form letters that we have that we

24 sent to voters when we need additional information.

25     Q     And does the -- after you send out the letter,

MARY JANE ARRINGTON

1

2    does the voter remain registered while that

3    investigation is ongoing?

4        A    They're in the suspense file until you're...

5        Q    And if an election occurs and they're in

6    suspense, can that person vote?

7        A    If they've never been -- no, because basically

8    it's an incomplete application at that time.  Now, if

9    someone were removing, we have to go through due process

10   to make sure that they, you know, have the adequate time

11   to prove that -- again, that this information that we

12   have are true -- is true.

13       Q    Okay.  But if someone is not registered --

14       A    They're not added until we've got the green

15   light to add them.

16       Q    So if, while you're investigating, an election

17   passes, that person will not be able to vote?

18       A    Right.  Just if you give us an address that

19   does not exist, you're not added into the roll until we

20   have that information cleared.

21       Q    And has that ever happened in your --

22       A    Oh, on a regular basis.

23       Q    So there are other --

24       A    Yes.  Right.  I mean, addresses that don't

25   exist, names that, you know, we can't, again, maybe read

MARY JANE ARRINGTON

1  

2  the person's handwriting or something like that.  It's

3  until you get that infor -- that application becomes

4  complete.  And if you are complete, we work very hard

5  prior to an election to get you to respond to us.

6     Q    Um-hum.  And what are -- to back up.  What are

7  the various reasons why a voter may be in suspense?  So

8  far we've listed mental incapacity.

9     A    An incomplete application.  Maybe that's the

10  best way to put it.

11     Q    Okay.  But I would like to drill down --

12     A    Okay.

13     Q    -- into what could cause your application to

14  be incomplete.

15        And so far, I've heard some question as to

16  your being adjudicated mentally incompetent, an

17  incorrect address --

18     A    An incomplete -- an application that's

19  incomplete.  Maybe you didn't check those boxes at the

20  top, which are required.  So if you did not check the

21  boxes at the top, so that's an incomplete application.

22  And we have to get you to check those boxes and then

23  provide that to us.

24        And Florida law allows us to combine

25  applications.  So maybe you give us partial information

1                    MARY JANE ARRINGTON

2  here and partial information there.  Then we can combine

3  those.  So mainly it is incomplete information that you

4  have given us.

5      Q    Is there ever a -- is a voter ever held in

6  suspense because of a question about their citizenship,

7  even if they checked the box indicating citizenship?

8      A    I would think they could be.  I am not

9  familiar with that --

10     Q    Okay.

11     A    -- with that happening.

12     Q    Okay.  Do you know what sources this

13 Department of State uses to identify people who may be

14 ineligible?

15     A    I would -- I would assume -- and that is a bad

16 thing to do -- that they have access to databases, just

17 as the DMV does when you have to provide real ID.  If

18 you -- I mean, I would just think they have access to

19 that.  I don't have access to that.

20     Q    Okay.  What sources do you have access to to

21 do various investigation?

22     A    We use DAVID through the DMV.  And that is --

23 then that is the main source we use to make sure that

24 someone is who they say they are.

25     Q    And what's DAVID?

MARY JANE ARRINGTON

1
2     A    Don't ask me these...

3          Don't you love acronyms?  It's through the

4     Division of Highway Vehicles (sic).  When you go on it,

5     you can see a person's record, for lack of a better

6     term, picture, if they have charges.  But you know

7     that -- we use that source very securely.  You know, you

8     only look up people you need to look up.

9     Q    Right.

10    A    I know that we use it in the process of the

11    felony.

12    Q    Okay.

13    A    And if you need to, I can get you the real

14    name.

15    Q    Okay.  So DAVID is a database run by the DMV;

16    is that right?

17    A    Yes.  Um-hum.

18    Q    And it is a database where -- that you do have

19    access to?

20    A    Right.  We do have access to.

21    Q    And that database has information -- all sorts

22    of identifying information about a person, including

23    things like felony convictions; is that right?

24    A    Um-hum.  Yes.

25    Q    Okay.  Is there any other source that you use

1                    MARY JANE ARRINGTON

2    for investigation?

3         A    Well, I mean, we use other things when we're

4    investigating.  We use the social security index,

5    especially when we're looking at deceased, trying to

6    figure out if someone is deceased.  We have -- we have

7    found that ancestry.com has a very -- has a quicker

8    update of the social security database.  So we often use

9    ancestry.com because we find it more current.

10        Q    And so might you send someone a notice of

11   removal -- of potential removal on the basis of

12   information on ancestry.com?

13        A    Well, that would be someone who is deceased.

14   We use that to --

15        Q    Determine who's deceased?

16        A    Yes.  I mean, that's just another way of

17   checking the information we have.

18        Q    Okay.  And you mentioned the social security

19   index.  Can you explain what that source is?

20        A    That is -- it tells you people who have passed

21   by ZIP code.  And so we go in and try to match those

22   with our database.  Gives you their birth date and ZIP

23   code.

24        Q    Do you ever access court records?

25        A    Yes, we do.

MARY JANE ARRINGTON

1

2      Q    And how do you do that?

3      A    Through the clerk of the court or the county

4  in which they are.

5      Q    So you don't have access to a particular

6  database of court records; is that right?

7      A    No.  I think each -- you have to do each

8  county, by county by county, is my understanding.

9      Q    And you would contact the clerk of court to

10 ask for those records?

11     A    Or you go online and you can search them.

12     Q    Okay.

13     A    But again, you have to do it county by county.

14     Q    So I think you've already testified to this,

15 but I want to make sure I'm clear.  If you identify

16 someone who has applied to vote that appears to be

17 ineligible for some reason, they will get a notice in

18 the mail, but they will not become registered until they

19 have --

20     A    Responded.  Until we have cleared up the

21 issue.

22     Q    Okay.  And so now I would like to switch gears

23 to talk about the list maintenance activity that we

24 referenced earlier.

25     A    Okay.

MARY JANE ARRINGTON

1

2      Q    So this is removal of voters rather than at

3   the application stage.  What are the primary sources

4   that you use to identify people who should be removed

5   from the rolls because they have become ineligible to

6   vote?

7      A    We're a very transient county.  We have our

8   voters move a lot.  And so we run NCOA through the post

9   office every 30 days.  That's the number one thing we

10  do.

11         We also work with -- we do a real list, like

12  maintenance every other year -- we're going through it

13  right now -- where we contact all voters that we have

14  not had any contact with in the past two years.

15         And then if a voter is -- their address

16  confirmation comes back, we send three pieces.  Then

17  they are removed to an active status where they stay for

18  two federal elections.  And if at the end of those --

19  that four-year period we still have not -- they've had

20  no activity, we've had no contact with them -- and

21  contact could be them signing a petition, the voting,

22  them calling the office updating their address.  So if

23  you have any contact, then you automatically come off

24  that inactive role.  But if you don't, then after four

25  years on inactive status, then you are removed.

MARY JANE ARRINGTON

1

2    Q    Okay.  So you send out notices to everyone.

3    A    Three notices -- well, one notice.  If it, you

4 know, it comes back undeliverable, then we begin our --

5 we send the second notice.  And then if it comes back

6 undeliverable again, then we send the third, the third

7 and final.  And then when we get that final notice, then

8 we move them to the inactive status.

9    Q    But only those who are -- whose notices are

10 returned as undeliverable --

11    A    Right.

12    Q    -- go into that process?

13    A    Right.

14    Q    Okay.  Thank you.

15         So does the Secretary of State ever send you

16 lists of voters that may be ineligible?

17    A    I think we do get lists, time to time, for

18 different reasons.  One might be duplicates where the

19 Secretary feels that maybe these are duplicate records.

20 That is one, something like that.  So we do get lists

21 from time to time.

22         And then when we get those lists, we work

23 them, is what we call it.  We investigate them and make

24 sure that these, you know...

25         We also receive jury notices that people tell

MARY JANE ARRINGTON

1

2  us that they can't serve on a jury because they no

3  longer live in the county or they're not a citizen.  And

4  we investigate all of those.

5      Q    Okay.  Do you ever get notices from the

6  Secretary of State, or lists from the Secretary of State

7  of people who may not be citizens?

8      A    I believe yes.

9      Q    And we'll talk about this in greater detail

10 later.  But do you get lists of people with convictions

11 that may be ineligible?

12     A    Yes.  And I don't think they come as lists.

13 They come with backup paperwork information.

14     Q    And can you describe to me what the process of

15 working those lists...

16     A    We try to -- if it is a duplicate, we -- let's

17 just use that.  We try to compare the two registrations,

18 make sure they are the same person, maybe they have the

19 same birth date, the same signature, you know.  The

20 address may be totally different.  But in our county,

21 that's -- that is the norm because of the transient, you

22 know, nature of the county.

23     Q    Okay.  If you receive some question about

24 someone's citizenship, either from the Secretary of

25 State or from a jury notice, how would you work that?

MARY JANE ARRINGTON

1

2     A     Well, we contact the individual and say that

3  it has been brought to our attention that you may not be

4  a citizen.  If you live in Kenansville, that was

5  probably a way to get out of serving on a jury.

6          And, you know, they'll say, I must have

7  checked the wrong box.  You know, people are wonderful

8  with their explanations.  So I mean, that's what we --

9  we just send them a contact saying, you know, this has

10  been brought to our attention, you know, so...

11     Q     Okay.  And so do you have -- so the first step

12  in this process of removal would be to send a voter a

13  notice; is that right?

14     A     Um-hum.  Right.  To contact the voter.

15     Q     And is that notice something that your office

16  drafts?

17     A     Yes.  I mean, it would be, again, a form-type

18  letter.

19     Q     Are any of these form-type letters provided by

20  the Secretary of State?

21     A     No.  We do our own.

22     Q     Okay.  So the temp -- you create your own

23  template?

24     A     Yes.

25     Q     Does the Secretary of State provide any

1                    MARY JANE ARRINGTON

2   guidance about what should go in a form letter?

3        A    They may.  I am not familiar with it, if they

4   do.

5             Remember, everything we do in this office, we

6   do in two languages.  So if you receive a letter from

7   us, you receive it in two languages.

8        Q    And so what is the process after you send a

9   voter a notice?

10       A    Well, we wait to hear from them.  And then if

11  we -- you know, we then wait for that response, and then

12  take it from there.  Sometimes someone may have

13  registered by mistake because of -- our system is

14  confusing.

15       Q    What do you mean by that?

16       A    My son-in-law tells me, who was not a

17  citizen -- he is now a citizen -- that you go places,

18  you go to get your driver's license, and they encourage

19  you to register to vote.  And you tell them you can't,

20  and they tell you you can.  DMV is not in the business

21  of registering people to vote.  They're in the business

22  of issuing driver's licenses.

23            You go to a third party.  They approach you at

24  a festival.  They encourage you to register to vote.

25       Q    Um-hum.

MARY JANE ARRINGTON

1

2     A     You tell them you can't.  They tell you they

3  can -- you can.  So it is confusing because many

4  countries, if you're from the government, you have --

5  you're respected, you have authority.  And they believe

6  you.

7     Q     Okay.

8     A     So sometimes people register in error,

9  believing -- they've been told you can, and they take

10  you at your word.

11     Q     How long does a voter have to respond to those

12  notices?

13     A     As long as you want, darlin'.

14     Q     Okay.

15     A     If you don't answer, we'll send you another

16  one, and another one.

17     Q     But does the voter remain registered during

18  that time?

19     A     I believe so.

20     Q     Okay.  And so if there's a question about

21  someone's citizenship, for example, on a jury notice,

22  and you send them a letter asking for more information,

23  if the voter never responds, how will that registration

24  be dealt with?

25     A     I do not know.  I mean, usually if they are a

1                    MARY JANE ARRINGTON

2    citizen, they are here quickly with their passport or

3    their birth certificate or something saying, I'm a

4    citizen, I don't know where you got this information.

5         Q    Um-hum.

6         A    I would have to ask staff because I don't

7    know.

8         Q    Okay.  So do you ever -- you may not know the

9    answer to this question, based on your prior testimony.

10   But do you ever remove voters because you have received

11   information they may be ineligible and they don't

12   respond to a notice?

13        A    I don't think we would remove them without due

14   process.  I mean, we would notify them that -- you know,

15   we do ads for mentally incompetent and felons in the

16   paper, that you need to contact us.

17        Q    Um-hum.

18        A    You know, we send you a certified letter, when

19   we keep going down this road.

20        Q    Of course.

21        A    And then you need to contact us.  And so we

22   never would remove anyone without going through that due

23   process.

24        Q    I understand that.  But let's say somebody

25   doesn't get back to you.  What would happen to that

1                    MARY JANE ARRINGTON

2    voter's registration?

3         A    Well, depending on the reason.  I mean, they

4    could be removed.

5         Q    Right.

6         A    But prior to that, we have made numerous

7    attempts to contact you.

8         Q    Um-hum.  And with respect to convictions,

9    might someone be removed if they don't respond?

10        A    Yes.

11        Q    Does that happen?

12        A    Yes.

13        Q    And about how many notices would you get

14   before you're removed because of the conviction?

15        A    Well, I believe it takes about 60 days.

16        Q    Okay.

17        A    And if you -- usually it's people -- they will

18   contact us if they're in question, if they have

19   questions.  A lot of our notices are returned --

20        Q    Um-hum.

21        A    -- for return mail.  So then we do have to

22   place notices in the paper.

23        Q    Um-hum.

24        A    And again, we place them in both the Spanish

25   newspaper in the county and the local newspaper.  So

MARY JANE ARRINGTON

1  it's published in two newspapers of general circulation.

2      Q    So you send out these notices.  If they get

3  returned to you undeliverable, that's when you put it in

4  the paper; is that right?

5      A    Yes.  Um-hum.  And it's certified, so, you

6  know, we have return receipt.  We know that you received

7  your letter.

8      Q    Okay.

9      A    Someone signed for it.

10     Q    Got it.

11         If you send a certified letter based on a past

12  conviction and it is received and there's no response,

13  do they receive a second notice?

14     A    I mean, if they don't respond -- I mean,

15  respond, I assume, we are assuming they agree with the

16  information that we have found.

17     Q    Okay.  So if a certified letter goes out and

18  there's no -- and it's received --

19     A    Received.

20     Q    -- how long until they're removed?

21     A    The whole process I believe takes about 60

22  to -- 60 to 90 days.

23     Q    Okay.  And if it's not received, then you

24  send -- put a notice in the paper?

MARY JANE ARRINGTON

1

2     A     If it's returned to us undeliverable or not

3   accepted.

4     Q     Okay.  How, if at all, is the Secretary of

5   State involved in that removal process?

6     A     In their office, they send us the initial

7   paperwork that they have identified these people.  And

8   then we are expected to -- we reinvestigate the

9   information that they have sent us.  And then we

10  determine from that reinvestigation if we should

11  proceed.

12    Q     Do you know what sources the Secretary uses to

13  create the lists that are sent to you?

14    A     I would assume they would use the clerk of the

15  court.  I mean, I would assume that is where you would

16  receive convictions.

17    Q     If you receive a name from the Secretary of

18  State as potentially ineligible, do you always act on

19  that information?

20    A     Right.  I mean, we receive a -- you know,

21  something like this from them, (indicating).

22    Q     We'll mark as Exhibit 1 the document that had

23  been --

24    A     Redacted.

25    Q     -- referred to that is a copy of a Corrections

1    MARY JANE ARRINGTON

2  Offender Network paperwork redacted for a specific

3  offender.

4          (Exhibit 1 was marked.)

5          THE WITNESS:  So I mean, we receive

6      information like this.  And then again, we

7      reinvestigate.  We just don't take it at face

8      value.  We, again, research this information.

9  BY MS. LANG:

10     Q    Did you have any elections in 2019 thus far?

11     A    We had a special election.

12     Q    When was that?

13     A    May or March?  May; right?

14         MR. MILES:  It was in the spring.  I'm not

15     sure.

16         THE WITNESS:  That's awful.

17  BY MS. LANG:

18     Q    That's okay.  What was the special election

19  for?

20     A    It was for a tax initiative.

21     Q    Okay.

22         MR. TOWNSEND:  I think it was May.

23         THE WITNESS:  Before school was out; right?

24     Because it was right before Memorial Day.  So it

25     was May.  May 18th or something.

MARY JANE ARRINGTON

1

2   BY MS. LANG:

3       Q    Thank you.  And when will be the next election

4   you'll be holding?

5       A    Presidential preference in March of next year.

6       Q    And what will be the registration deadline for

7   that?

8       A    Twenty-nine days before the -- I think it's on

9   the 17th, isn't it?  17th of March.  So 29 days before

10  that.

11      Q    So sometime in February of 2020?

12      A    Um-hum.  Yes.

13      Q    Prior to the passage of Amendment 4 in

14  November 2018, what were the voter qualifications

15  related to a felony conviction?

16      A    I don't understand.

17      Q    What were the rules prior to Amendment 4 about

18  who could vote if they had a prior felony conviction?

19      A    You had to have your rights restored through

20  clemency.  And there was -- we were not very active in

21  processing -- I mean, there was a state of a lot of

22  people who had gone through clemency.

23      Q    Okay.

24      A    So when people would come to us and asked us,

25  what would we do, we gave them a packet of information

MARY JANE ARRINGTON

1  and then suggest they contact the clemency board.

2      Q    And what was in that packet of information?

3      A    Information that we had put together from the

4  clemency board as to what you needed to do to have your

5  rights restored.

6      Q    Okay.  And you didn't see a lot of folks --

7      A    Very, very, very few.

8      Q    Very few folks with clemency?

9      A    Right.  Or who were trying to apply for it.

10     Q    Okay.  And if a voter did have clemency, how

11 did they prove their eligibility to vote?

12     A    I don't ever recall.  That doesn't mean it

13 didn't happen, someone bringing that in to us.

14          When Governor Crist was in office, people were

15 having their rights restored.  So I think that may have

16 been -- I don't recall anything after Governor Crist

17 leaving office.

18     Q    Okay.  And when Governor Crist was in office,

19 if someone had had their rights restored, would they

20 just affirm that on their voter registration form?

21     A    Yes.

22     Q    Would they be required to do anything more

23 than that?

24     A    No.

MARY JANE ARRINGTON

1

2     Q     Okay.

3     A     Not with us.

4     Q     Okay.  And do you know if the Department of

5 State tracked who had clemency and who did not?

6     A     I do not know if they tracked.

7     Q     Okay.  So would your office affirmatively ask

8 people to prove their clemency if they said they had

9 their rights restored?

10     A     The application said -- that you checked that

11 you were not a convicted felon or that you had your

12 rights restored, if you checked that box -- again, this

13 is a faith, that -- you're affirming at the bottom of

14 that application that everything you've given me is the

15 truth.

16     Q     Thank you.

17           But you don't know if the Secretary of State

18 tracked clemency?

19     A     I didn't have a database to check to see if

20 Joe had his rights restored.  I do not know if they have

21 that database.

22     Q     And so you don't know if the Secretary of

23 State, when it sent potential ineligible voters, may

24 have included people who actually had --

25     A     I do not know that.

MARY JANE ARRINGTON

1

2          Q     Okay.  Did you have any access to records of

3   who had had their clemency -- their rights restored

4   through clemency?

5          A     Not that I was aware of.

6          Q     Okay.  So if you received a name of someone

7   with a past conviction, you would have no way to know

8   they had received clemency; is that right?

9          A     I don't know how -- I don't -- again, how

10  would I receive that?

11         Q     Fair enough.

12               So if the Secretary of State sent you a name

13  of somebody with a past conviction --

14         A     I do not know -- I may be -- I may not know

15  this.  But I personally do not know of any record that

16  was sent back to us and said, Joe can't register because

17  he's -- he has not had his rights restored.

18         Q     Okay.

19         A     That may have happened.

20         Q     Do you know -- did you ever receive lists of

21  individuals who'd had federal convictions?

22         A     I know that there are separate groups, but I

23  would think they would all be through the clerk of the

24  court.  I mean, I don't know.  But I do know there are

25  both groups and we process both groups.  I don't know if

1         MARY JANE ARRINGTON

2   they came separately or how that happened.

3       Q    And do you know how the Secretary of State or

4   your office would identify people who had out-of-state

5   convictions?

6       A    I do not.  I don't think our office would.  I

7   mean, I think that would have to come from the

8   Secretary's office.

9       Q    Do you know if the Secretary of State did

10  provide that kind of information to your office?

11      A    I do not.

12      Q    Okay.

13      A    Can I -- I want someone to come in and just

14  listen.

15      Q    Sure.  We'll go off the record for one moment.

16  Yeah.

17           (Off the stenographic record.)

18           MS. LANG:  We'll go back on the record.

19           So just for the record, can we identify you as

20      someone who's joined just as a witness?

21           MS. CRUZ:  Yes.  Rosa Cruz.

22  BY MS. LANG:

23      Q    Thank you.

24           You mentioned earlier that there was a packet

25  of information about clemency that you would give out.

1                    MARY JANE ARRINGTON

2       A     Um-hum.

3       Q     Was this packet something your office created?

4       A     No.  It came from the clemency board.  I think

5    it was the application at the time that you filled out,

6    instructions on how to fill it out.  It was lengthy

7    or...

8             It wasn't, you know, a one-page application

9    that you filled out.  You know, this was information

10   that we put together to try to help people understand

11   what they needed to do to have their rights restored.

12      Q     So the documents were from the clemency board,

13   but you were the one -- your office gathered them?

14      A     Right.  Yeah.  I mean, we went online, got

15   this information, and because we find that often people

16   feel better when you give them something to start them

17   on their route.

18      Q     And it wasn't the Secretary of State that sent

19   you this packet?

20      A     No.  We just did it on our own.

21      Q     Um-hum.  And are you aware of any other

22   counties giving out similar information?

23      A     No.  No.

24      Q     Okay.

25      A     I don't think we gave it out before I was

1                     MARY JANE ARRINGTON

2   here, but we may have.  But it's -- it was just to help

3   the individual in what they needed to do.

4        Q    Are you aware of any times when your office

5   has encountered issues misidentifying people as

6   ineligible because of past convictions?

7        A    In my tenure here, in 11 years, we've only had

8   one questioned.  And when we did our research, we gave

9   this person a hearing, which we're required to by law.

10  It was her conviction.

11       Q    And have you ever encountered problems with

12  identity matches where the identity of the person with

13  the felony conviction is erroneously matched up with a

14  voter?

15       A    I don't believe I recall that happening.  I

16  mean, I see it could.  But again, not only does the

17  State go through this information.  When they send it to

18  us, we go through it again to make sure this person is

19  the right person.

20       Q    Right.  Are you aware of the State having

21  problems misidentifying people --

22       A    I am not --

23       Q    -- not in Osceola County?

24       A    I am not aware of that.

25       Q    Has your office ever identified, through your

1                    MARY JANE ARRINGTON

2  investigation, that the person identified by the

3  Secretary of State is, in fact, not ineligible?

4          Let me rephrase.

5      A    Okay.

6      Q    That was a confusing question.

7          You mentioned that the Secretary of State does

8  the first identification, and then you investigate the

9  records again; is that right?

10     A    Right.  I mean, we don't know who these -- we

11 don't begin this process ourselves without them

12 notifying us that this person may be ineligible.

13     Q    But have you ever had the circumstance where

14 the Secretary says this person may be ineligible because

15 of a felony conviction, but upon your investigation, you

16 determine they are not?

17     A    I think so, once or twice.  You know, again,

18 names are common, you know.

19     Q    Okay.  So you have identified times when the

20 Secretary of State flagged someone --

21     A    Right.  But that's why we do the second

22 investigation, is to make sure we have the right

23 information and the right person.

24     Q    Yeah.  Okay.  So switching to Amendment 4 --

25     A    Okay.

1                        MARY JANE ARRINGTON

2        Q    -- and the real reason we're all here today,

3   to talk about how we're going to implement that new

4   system.

5            When Amendment 4 was going to be on the

6   ballot, but prior to its passage, did your office take

7   any steps to prepare for the potential implementation of

8   Amendment 4?

9        A    No, we did not.

10       Q    Okay.  Are you aware of the Secretary of State

11  taking any steps to plan for potential implementation of

12  Amendment 4 prior --

13       A    No, I am not.

14       Q    Okay.  In the lead-up to the election, did the

15  Secretary of State communicate with the SoEs about these

16  potential changes coming down the pike?

17       A    The first time I was aware of them addressing

18  it, it was at our winter conference, which would have

19  been the first week in December after the election.  And

20  Maria Matthews addressed to us, you know, you know, it

21  is what it is, you know, this is what we're going to do.

22       Q    And what did she tell you?

23       A    It said that we registered these people to

24  vote.  And we, again, registered -- you know, this

25  registration is a faith exercise.  And if they check the

MARY JANE ARRINGTON

1

2  box that their rights had been restored, then we were to

3  register them.

4      Q    And in December, during that winter

5  conference, did Ms. Matthews explain who was eligible

6  under Amendment 4?

7      A    Well, anyone who had had their rights

8  restored.  And by "this," by this act.  I mean, if

9  you're still in jail, you're still -- you can't -- you

10 can't register to -- or you could register to vote from

11 jail, but...

12          I mean, if your rights had been restored,

13 everyone, that was my take-away.

14     Q    Right.  And so Amendment 4's language says you

15 have to complete your sentence.

16     A    Right.

17     Q    Including probation and parole?

18     A    Right.  And if you had done that, then you

19 were eligible.

20     Q    And Ms. Matthews, did she explain what that

21 meant?  If you were off parole and probation, then that

22 person would be eligible to vote?

23     A    I don't know if she explained it.  I don't

24 know if it needed explaining.

25     Q    Okay.  So it seemed clear to you that if

MARY JANE ARRINGTON

1

2  someone was done with parole and probation, they were

3  eligible to vote; is that right?

4      A    Right.  Correct.  I mean, if you're still

5  going to see your parole officer every week, then you're

6  not off parole.  But we take the potential voter's word

7  for it.

8      Q    Right.  Was there any discussion at the winter

9  conference about payment of fines and fees?

10     A    There was definitely some discussion from

11 individuals wanting more direction.

12     Q    Do you remember anyone in particular?

13     A    I do not.

14     Q    Okay.  Did Ms. Matthews provide any direction?

15     A    No.  We were given the basic, this is what it

16 says, this is what you do.

17     Q    Did she say anything that suggested that

18 payment of fines and fees should be part --

19     A    Not that I recall.

20     Q    Okay.  When was the next time you remember

21 getting any information from the Secretary of State's

22 office about implementing Amendment 4?

23     A    I don't...

24          I mean, it was implemented in the first part

25 of January.  And, I mean, since then, you know, there

MARY JANE ARRINGTON

1
2  was -- because there was sort of a pause, for lack of a

3  term -- better term, of us receiving felony convictions

4  to process.  And the main information I remember -- and

5  it wasn't Amendment 4, per se, it was the processing of

6  those felony convictions that we normally would receive.

7  It was -- they sort of stopped sending them and they

8  were -- I think I was under the assumption they were

9  trying to figure out how we're going to handle these.

10      Q    Um-hum.

11      A    And so for maybe 60 days, 90 days, we received

12  very few, if any.

13      Q    Okay.  And so there was -- when you talk about

14  a pause, you're talking about receiving lists of felony

15  convictions --

16      A    Receiving these (indicating), from the State.

17          MS. LANG:  And I'll have the record reflect

18      she referred to Exhibit 1.

19  BY MS. LANG:

20      Q    So if you could just let me ask -- let's try

21  to not finish each other's sentences.  It's very hard

22  not to -- hard to do.  But it's hard for the record to

23  properly reflect my full question.  I know you know what

24  I mean, but...

25          So there was a 60- to 90-day pause and you

MARY JANE ARRINGTON

1

2    were receiving information from the Secretary of State

3    about people who should be removed --

4         A    Right.

5         Q    -- from the rolls, based on convictions; is

6    that right?

7         A    Yes.

8         Q    Okay.  When did that pause begin?

9         A    I would think in December.

10        Q    Okay.  And when did you start receiving names

11   for removal again?

12        A    Really, I think we -- it's -- we really, in

13   the past 30 days, maybe, it's been like the normal flow.

14        Q    Okay.

15        A    Or the normal, you know, not...

16        Q    During the period between passage of Amendment

17   4 and January 8th, did you receive questions about voter

18   registration under Amendment 4?

19        A    Yes.

20        Q    What kind of questions did you receive?

21        A    What do I need to bring, what do I need to do,

22   what happens.  You know, those, just -- from a potential

23   voter who was ready to register, you know, those -- just

24   generic questions.

25        Q    And what was the volume of those questions

MARY JANE ARRINGTON

1

2 during that period?

3     A    Not substantial, but we would -- we would get

4 calls from, you know, voters saying, you know, I want to

5 register to vote, or do I need to register to vote, I

6 used to be registered, you took me off, do I need to

7 reregister, that type of stuff.

8     Q    And with -- what was the answer to the

9 question about do you need to reregister?

10    A    Yes.

11    Q    And what was the question about what do you

12 need to bring?

13    A    Nothing.

14    Q    Okay.  And did anybody ever ask, how do I know

15 if I'm eligible under Amendment 4?

16    A    Yes, they did.

17    Q    And what guidance did you provide?

18    A    In the beginning, we asked them to check maybe

19 with the clerk of the court.  We -- you know, I don't

20 know where you go.  And then we had a group contact us

21 that said they were -- they were helping people.

22    Q    Is that the Florida Rights Restoration

23 Coalition?

24    A    Right.  And they sent us this letter.  And it

25 has an 800 number in it.  And so we gave them this 800

                    MARY JANE ARRINGTON

1

2  number to call if they needed additional help with the

3  questions that they had that we couldn't answer.

4      Q    Okay.

5      A    And so, you know, that was very helpful that

6  we had this group that was willing to help, so...

7           And we still give out that number.

8      Q    Great.

9           The letter that you received from the Florida

10  Rights Restoration Coalition --

11      A    Yes.

12      Q    -- when did you receive that letter?

13      A    I do not know.  And I was looking for a date

14  on it and there is not one.

15      Q    Was it before the passage of this new law, SB

16  7066, or after?

17      A    Yes.  It was before.  I mean, we've been using

18  this for a while.

19      Q    Okay.  Let's mark the letter that you have as

20  Exhibit 2.

21           (Exhibit 2 was marked.)

22  BY MS. LANG:

23      Q    And if you don't mind, I would like to take a

24  quick gander at it.

25      A    And all staff out front has that posted on

1          MARY JANE ARRINGTON

2     their -- you know, so they can use it.

3          Q     Thank you.  So I'm going to mark as Exhibit 3

4     some information that I just printed out from your

5     website.

6               (Exhibit 3 was marked.)

7               THE WITNESS:  Okay.

8     BY MS. LANG:

9          Q     And the court reporter will give you the

10    marked copy to look at.

11              And this is the information that your office

12    has currently, about restoration of voting rights, on

13    your website; is that right?

14         A     Yes, ma'am.

15         Q     It indicates -- I printed this out yesterday

16    on July 30th.

17         A     Okay.

18         Q     Up on the top, left corner.

19              And number two says "If I'm on probation, may

20    I vote in Florida?"  And the answer is "Felony probation

21    must be completed before civil rights may be restored."

22              Is that right?

23         A     Yes.

24         Q     Is there any information anywhere here that

25    suggests that you have to complete payment of all fines

MARY JANE ARRINGTON

1
2  and fees and legal financial obligations in order to

3  register to have your rights restored?

4       A     No, ma'am.  No, ma'am.

5       Q     Okay.  And who prepared this information?

6       A     Kari Ewalt.

7       Q     And when was this information prepared, to

8  your knowledge?

9       A     I do not know.

10      Q     Okay.

11      A     It is the same -- basically the same

12  information we prepared for staff -- I think I saw you

13  had a copy of this also -- to answer questions to help

14  them navigate the process.

15      Q     And have you changed any of this information

16  since the passage of this new law, SB 7066?

17      A     I do not know the last time this was updated.

18  I would have to ask Kari.

19      Q     Okay.  And I'm going to mark as Exhibit 4 this

20  Amendment FAQ that you have in front of you as well.

21            (Exhibit 4 was marked.)

22  BY MS. LANG:

23      Q     And here, your office explains that Amendment

24  4 means that people who have completed all terms of

25  their sentence, including parole and probation, and were

MARY JANE ARRINGTON

1

2  not convicted of murder or sexual offenses are eligible

3  to register to vote; is that correct?

4      A    Right.

5      Q    And anywhere on this FAQ does your office

6  indicate that you have to pay legal financial

7  obligations, fines and fees, in order to be eligible to

8  restore your right to vote?

9      A    It does not.  This was prepared prior to the

10  passage of the law.

11      Q    Okay.  So this was your office's

12  interpretation of Amendment 4 on its face?

13      A    Right.  Beginning January 8th.

14      Q    And it didn't include a financial component at

15  that time?

16      A    No.  At that time, no.

17      Q    I just want to make sure I got that clear on

18  the record.

19          So at the time that Amendment 4 passed, your

20  office did not include a financial obligation --

21      A    No.  And this document was prepared prior to

22  January 8th to help staff, as I said, navigate the

23  procedure.

24      Q    And that was because Amendment 4 doesn't

25  include any information about payment of fines and fees;

MARY JANE ARRINGTON

2  is that right?

3      A      That's my understanding.

4      Q      Okay.  And the Secretary of State never sent

5  any guidance prior to the passage of SB 7066 that your

6  office should require payment of fines and fees before

7  rights restoration?

8      A      No.  I mean, we were aware that that is

9  included in this bill.  But again, it's -- I mean, I

10  don't know how we do that.

11      Q      Um-hum.  And at the time, there was nothing in

12  the law.

13      A      Right.

14      Q      Right?

15      A      Right.  Yeah.

16      Q      Okay.  During the period between January 8th

17  and July 1, how did you identify people with past

18  convictions who may not be eligible to either register

19  or needed to be removed from the rolls?

20      A      I don't understand the question.

21      Q      Thank you.  Thank you for asking.

22          During the period between January 8th and

23  July 1, what, if anything, did your office do to

24  identify people who were ineligible because of past

25  convictions?

1                    MARY JANE ARRINGTON

2        A     When they registered?

3        Q     When they registered.

4        A     I mean, nothing.  I mean, they -- again,

5   it's -- it is a faith application that you are

6   submitting an oath, that you are providing me true

7   information.

8        Q     Great.

9              And with respect to people who were on the

10  rolls between the period between January 8th and July 1,

11  what, if anything, did you do to identify people who

12  needed to be removed from the rolls?

13       A     We do not identify them.  That information

14  comes from the State.

15       Q     Right.  And between the period of January 8th

16  and July 1, did you receive any additional guidance from

17  the Secretary of State?

18       A     No, not that I recall.

19       Q     Okay.

20       A     Again, I researched my emails.  And the

21  information mainly were how to process the information

22  they're sending us.

23       Q     Great.  I'm going to mark as Exhibit 5 one of

24  the emails that you provided to me.

25              (Exhibit 5 was marked.)

MARY JANE ARRINGTON

1

2    BY MS. LANG:

3        Q    So this is an email from Maria Matthews; is

4    that right?

5        A    Yes, ma'am.

6        Q    And what's Maria Matthews' position at the

7    Secretary of State?

8        A    She is the Division of Elections director.

9        Q    Is she the kind of primary contact for the

10   Secretary?

11       A    Yes.  Yes.  Yes.

12       Q    Okay.  So she is the primary contact for

13   Supervisors of Elections at the Secretary of State's

14   office?

15       A    Well, we often contact other people in the

16   division that we know handled certain areas.

17       Q    Okay.

18       A    So if I had an issue like a candidate issue, I

19   wouldn't contact Maria first.  But she, like, oversees

20   the operation of elections, under the Secretary of

21   State.

22       Q    Okay.  And does official guidance often come

23   from her?

24       A    Yes, often.

25       Q    And you testified earlier that there's another

MARY JANE ARRINGTON

1

2 woman who handles many of these issues whose name is

3 Toshia Brown; is that right?

4     A     Right.

5     Q     What is her position so far as you understand

6 it?

7     A     She is, like, over FVRS, Florida Voter

8 Registration.

9     Q     Um-hum.  She oversees Florida Registration

10 System (sic)?

11     A     (No verbal response.)

12     Q     Is that a yes?

13     A     Yes.  Pardon me.  I believe so.

14     Q     Okay.  And so Ms. Matthews' writes [as read]:

15 As you all know, Amendment 4 went into effect on

16 January 8th and there has been no delay in

17 implementation.

18         Is that right?

19     A     Yes, ma'am.

20     Q     And does that accord with your general

21 understanding that Amendment 4 became operative on

22 January 8th?

23     A     Yes, ma'am.

24     Q     And the Secretary of State, in fact, you know,

25 indicated that you should start implementing Amendment 4

                    MARY JANE ARRINGTON

1   on January 8th?

3       A    January 8th.  Right.

4       Q    Okay.  And here she indicates that she's going

5   to pull back some felony match files in order to make

6   sure that you aren't removing anyone who's eligible

7   under Amendment 4; is that right?

8       A    Yes, ma'am.

9       Q    Okay.  And I'll mark as Exhibit 6 another

10  email that you provided to us.

11          (Exhibit 6 was marked.)

12  BY MS. LANG:

13      Q    And this one is another email from Ms.

14  Matthews dated June 7th, 2019; is that right?

15      A    Yes, ma'am.

16      Q    And in this email, she said she's going to

17  start resending information about people who may be

18  ineligible to vote, even under Amendment 4, based on

19  their past convictions; is that right?

20      A    Right.

21      Q    And here she identified that the only people

22  that she will be sending along are people who are,

23  quote, currently in prison or under supervision with the

24  Department of Corrections as part of their sentence; is

25  that right?

MARY JANE ARRINGTON

1

2    A    Yes, ma'am.

3    Q    And does that accord with your understanding

4  that Amendment 4 restored the right to vote to people

5  with convictions so long as they were not under

6  supervision?

7    A    Right.

8    Q    With the exception, of course, of --

9    A    The certain groups.

10    Q    With the exception of felony, murder, or

11  sexual offenses; is that right?

12    A    Yes, ma'am.

13    Q    All right.  So would it be fair to say that

14  your office and the Secretary of State were aligned that

15  Amendment 4 meant people in prison or under supervision

16  were not eligible under Amendment 4?

17    A    Correct.

18    Q    And people that were not in prison, under

19  supervision, were eligible if they did not have the

20  specific disqualifying convictions?

21    A    Correct.

22    Q    Okay.

23         MR. PRIMROSE:  Object to form.

24         COURT REPORTER:  Who's the speaker?

25         MR. PRIMROSE:  Nick Primrose from the

MARY JANE ARRINGTON

1

2      Governor's office.

3    BY MS. LANG:

4      Q    Did Ms. Matthews communicate to your office

5    that the people they wouldn't identify as ineligible

6    under Amendment 4 would be people in prison or under

7    supervision with the Florida Department of Corrections?

8      A    Can you ask that again?  I'm sorry.

9      Q    Did Ms. Matthews communicate to you, to your

10   office, that they would identify people who were

11   potentially ineligible only if they were in prison or

12   under supervision with the Florida Department of

13   Corrections?

14     A    Yes, ma'am.  And she also gave us -- you know,

15   gave us places to search online for us to determine if

16   that person was still incarcerated or under -- or on

17   probation.

18     Q    And the databases that she gave you to search,

19   they show if somebody is still incarcerated or under

20   supervision?

21     A    Yes.  Yes.  That's our understanding.

22     Q    And the databases that she gave you, do they

23   show whether or not someone still owes money?

24     A    I don't believe so.

25     Q    Okay.  And did Ms. Matthews ever mention

MARY JANE ARRINGTON

1

2    sending out -- sending you information of potentially

3    ineligible voters under Amendment 4 because of failure

4    to pay fines, fees, or the like?

5         A    No, ma'am.

6         Q    Okay.  And in fact, if you could turn to the

7    second page of Exhibit 6, is this a copy of the type of

8    document that Ms. Matthews -- is this a copy of the type

9    of document that the Secretary of State would send to

10   show that someone may be ineligible to vote?

11        A    Yes, ma'am.

12        Q    And does this document anywhere show fines and

13   fees status?

14        A    No, ma'am.

15        Q    Okay.  Okay.  I'm going to mark as Exhibit 7

16   another document that you gave to us.

17             (Exhibit 7 was marked.)

18   BY MS. LANG:

19        Q    And this is an email from Amber Marconnet at

20   the Secretary of State's office; is that right?

21        A    Yes, ma'am.

22        Q    Do you know who Ms. Marconnet is?

23        A    She's a staff member with the Division of

24   Elections.

25        Q    Okay.  Have you ever communicated with

1  MARY JANE ARRINGTON

2  Ms. Marconnet?

3      A    I believe maybe on election day, but not in

4  her capacity with the felon issue.

5      Q    Okay.  And copied on there is Ms. Matthews and

6  Toshia Brown; is that right?

7      A    Yes, ma'am.

8      Q    Okay.  And this email is dated June 18, 2019?

9      A    Yes, ma'am.

10     Q    Okay.  And this email indicates that there

11  were questions about what should be included in the

12  notice of ineligibility; is that right?

13     A    Yes, ma'am.

14     Q    She indicates that the law requires

15  documentation --

16     A    Be sent with your notice.

17     Q    Okay.  And is that your understanding of the

18  law as well?

19     A    Yes, ma'am.

20     Q    Okay.  And has that always been the case, that

21  you need --

22     A    Yes.  Yes, ma'am.

23     Q    And she indicates that you should use the

24  Corrections Offender Network documentation that we

25  looked at a moment ago and that is attached to this

MARY JANE ARRINGTON

1

2  exhibit as well on pages three and four; is that right?

3      A    Yes.

4      Q    And we've already established that those

5  documents don't include anything related to fines and

6  fees; is that right?

7      A    Correct.

8      Q    Okay.  But it does indicate whether or not

9  someone is still on parole or probation?

10     A    Right.

11     Q    And it does indicate if someone's still

12 incarcerated?

13     A    Correct.

14     Q    Okay.  Refers to a copy of the DOC-BVRS

15 screenshot and she says not to include that because it

16 contains confidential information.

17          Do you see that?

18     A    Yes, I do.

19     Q    Do you know what that document is?

20     A    I am not familiar, specifically with that

21 document.  I assume that it is a document that we use in

22 researching the information that we've been given.

23     Q    Would someone in your office likely have that

24 document?

25     A    Well, or have access to it.

MARY JANE ARRINGTON

Q    Okay.  And would Toshia Brown or Ms. Matthews know what that document is --

A    Yes.

Q    -- and how it's used?

A    I'm sure Toshia would.

Q    Beyond the emails we've discussed and the conversation in December in person at the winter conference, has the Secretary of State's office provided your -- you any guidance about the implementation of Amendment 4 prior to the passage of SB 7066?

A    No, ma'am.

Q    So based on the sum of the documents that we've looked at, was it your understanding that Amendment 4 did not involve any requirement related to fines and fees?

A    Yes.  When it was implemented in January, that was about a portion of it.

Q    Okay.  When you began to receive lists from the Secretary of State, again, of potentially ineligible voters, how did your office work those lists?

A    Like we normally do, we begin the process.  We reinvestigate them.  Then we would notify the voter.  We agreed, in our office, that if it looked like they were going to be off probation within 30 to 60 days, that we

1                    MARY JANE ARRINGTON

2    would not process them because it's a 60- to 90-day

3    process.  And those people would be off of probation by

4    the time we -- and that, we just discussed that last

5    week because we were starting to get some of the -- in

6    ten days they were going to be -- from the time we

7    received them, they were going to be off of probation.

8         Q    So that continues to be your office's policy?

9         A    Yes.

10        Q    Okay.  And when you were investigating these

11   potentially ineligible voters, you were checking to see

12   if they were still incarcerated?

13        A    Um-hum.

14        Q    Or --

15        A    Or just on probation.

16        Q    Or still on parole?

17        A    Right.  Or parole.

18        Q    Were you also checking to see if they had one

19   of those disqualifying offenses such as murder, felony

20   sexual --

21        A    I believe we would.

22        Q    Okay.  Were you looking at fines and fees at

23   that time?

24        A    I don't believe we were.

25        Q    Okay.  I know I'm being a little repetitive.

MARY JANE ARRINGTON

1

2      A      But I don't know how we go about doing that.

3      Q      But it wasn't your understanding that that was

4  a requirement under Amendment 4?

5      A      Right.

6      Q      Okay.

7      A      Because we have had potential voters asking us

8  how they researched them.

9      Q      Um-hum.

10      A      And we're not real helpful because we just

11  don't know the answers.

12      Q      Um-hum.  But prior to July 1, that was not a

13  requirement, in your view?

14      A      Right.  Right.  No.  And it wasn't what we

15  would tell someone, if they called us, they needed to

16  do.

17      Q      Okay.  And it's not something the Secretary of

18  State said was required?

19      A      Right.

20      Q      Okay.  Prior to July 1 -- between January 8th

21  and July 1, do you know about how many people you sent

22  notices to about removal due to past convictions?

23      A      I do not.  The number was greatly reduced from

24  our normal amount of traffic we had in that area.

25      Q      And I know that this is a very rough

1          MARY JANE ARRINGTON

2   approximation, but by "greatly reduced," could you give

3   me a sense of if it was cut in half or a third?

4        A    Oh, I would think significantly more than

5   that.  I looked at a -- you know, the ads we put in the

6   paper.  Normally and historically, we would have 15- to

7   20-plus people every two weeks.  And there were two

8   people for a month.

9        Q    The notices that you were sending out during

10  that period between January 8th and July 1, were they

11  drafted by your office?

12       A    Yes.  I mean, it's information -- yes.  We put

13  the letters together.

14       Q    Okay.  Did the Secretary of State provide a

15  template letter?

16       A    If they have, we may have used a portion of

17  it, but we try to make our correspondence user friendly

18  as possible.  Again, we do everything in two languages,

19  so we translate that letter.

20       Q    Do you find that sometimes the documents that

21  are provided by the Secretary of State are not as user

22  friendly as you like?

23       A    Yes, ma'am.

24       Q    And that's why you draft your own?

25       A    Yes, ma'am.

MARY JANE ARRINGTON

1

2      Q    Okay.  When you sent the notice during this

3  period between January 8th and July 1, you would send a

4  notice to the voter, potential removal, and include the

5  documentation from the --

6      A    Right.

7      Q    -- Corrections Offender Network; is that

8  right?

9      A    Yes, ma'am.

10     Q    Was there anything else included in that

11  mailing to the voter?

12     A    No.  I mean, just, it's the letter to get in

13  contact with us.

14     Q    And did the letter include any information

15  about Amendment 4?

16     A    I don't believe so.

17     Q    Okay.  And you previously testified that when

18  you send out a notice, people remain on the rolls for 60

19  to 90 days thereafter; is that correct?

20     A    Till we go through the process, their due

21  process.

22     Q    Okay.

23     A    They have to have the right to request a

24  hearing.  If they request a hearing, then we hold that

25  hearing.  They have the right to challenge what we've

MARY JANE ARRINGTON

1  given them and they have time limits.  So we make sure

2  we go through that whole process.

3      Q    And that process lasts how long?

4      A    Usually 60 to 90 days by the time we get it

5  all done.

6      Q    Okay.

7      A    In real life.  I mean, that's what it...

8      Q    I understand.  Do you have any sense of how

9  many people with past convictions registered in your

10 county between January 8th and --

11     A    No, ma'am.

12     Q    -- July 1?

13          Was there an increase in voter registration

14 activity in your office in the month of January or

15 February?

16     A    Certainly not significant, no.

17     Q    Okay.  Did you receive calls, though, about

18 Amendment 4?

19     A    We did receive calls, questions.

20     Q    Um-hum.

21     A    People would come in and ask questions, so...

22     Q    Would there be any way in the voter

23 registration system to determine how many people with

24 convictions registered in your county?

MARY JANE ARRINGTON

1

2    A    No, ma'am.

3    Q    Okay.  Do you know if anyone was rejected

4  because your office determined that they were ineligible

5  to vote under Amendment 4?

6    A    No, ma'am.

7    Q    Okay.  I'm going to turn our attention to

8  SB 7066, which is the new law addressing rights

9  restoration for people with convictions.

10        When SB 7066 was being debated by the

11 legislature this spring, did anyone inquire with your

12 office about implementation of the law?

13   A    No, ma'am.

14   Q    Did any legislators ask you if the proposed

15 legislation would be feasible to implement?

16   A    No, ma'am.

17   Q    What about anyone from the governor's office?

18   A    No, ma'am.

19   Q    Anyone from the Secretary of State's office?

20   A    No, ma'am.

21   Q    Did you personally voice any concerns about

22 SB 7066 or any other bill and how -- and the logistics

23 of implementing such a law?

24   A    Or my other bill?

25   Q    Yes.

MARY JANE ARRINGTON

1

2    A    I mean, it was a bill going through the

3  legislature that has a grave effect on elections.

4    Q    Okay.

5    A    And so there were definitely some things that

6  I had major concerns about.

7    Q    Did you voice any concerns relating to voter

8  rights restoration or felony convictions?

9    A    No.

10    Q    And do you know if any of your colleagues in

11  other counties raised concerns about SB 7066 or any

12  other bill related to felony rights restoration?

13    A    I do not know.

14    Q    Okay.  While this bill was pending in the

15  legislature, did you have any concerns about how you

16  would implement the law?

17    A    Yes.  I mean, I don't know how someone gets

18  this information.

19    Q    Um-hum.  So at the time, you didn't know how

20  people would get information about --

21    A    Right.  Because I mean, it could be 50 years

22  old or 60.  I mean, it can be.

23    Q    Um-hum.

24    A    And the clerk of the courts have this

25  information that's accurate, that's current.  I mean,

MARY JANE ARRINGTON

1

2   there are just lots of questions.

3       Q    Um-hum.

4       A    And I don't know.

5       Q    Do you have any more clarity today than you

6   did then --

7       A    No, ma'am.

8       Q    -- about how --

9       A    No, ma'am, I do not.

10      Q    Okay.  And I'll just ask you again, try to let

11  me finish my question just for the sake of the court

12  reporter and the record.  We all here know exactly what

13  I'm saying because, colloquially, we can understand each

14  other.  But when I go back to read this, we won't be

15  able to unless I finish, so...

16          So was your understanding of when this new

17  law, SB 7066, went into effect?

18      A    When?

19      Q    Yes.

20      A    I believe it was July 1st.

21      Q    Okay.  And I'm going to mark as Exhibit 8 the

22  last email that you provided to me.

23          (Exhibit 8 was marked.)

24  BY MS. LANG:

25      Q    And this email is dated July 2nd and is from

1          MARY JANE ARRINGTON

2   Maria Matthews; is that right?

3        A    Yes, ma'am.

4        Q    Okay.  And it's sent to all Secretary -- all

5   Supervisors of Elections?

6        A    Yes, ma'am.

7        Q    Okay.  It indicates that governor Ron DeSantis

8   signed SB 7066 into law on June 28th.  And as we've

9   discussed, that law became effective on July 1; is that

10  right?

11       A    Yes, ma'am.

12       Q    Okay.  And this email primarily refers to the

13  new voter registration form that was created by SB 7066;

14  is that right?

15       A    Yes, ma'am.

16       Q    And it indicates that the voter registration

17  form will now have three different boxes for people

18  related to felony convictions; is that right?

19       A    Correct.

20       Q    And you should indicate which box is checked

21  in the statewide registration voter system; is that

22  right?

23       A    Yes, ma'am.

24       Q    Okay.  And then in the final paragraph, it

25  says [as read]:  As in the past, we plan to provide a

MARY JANE ARRINGTON

1
2    memo outlining all of the key provisions of

3    election-related laws and providing clarification as

4    needed.  We appreciate your patience as these changes

5    occur.

6             Have you received a memo about SB 7066?

7        A    No, ma'am.

8        Q    Okay.  Have you received any communications

9    from the Secretary of State's office about

10   implementation of 7066 other than this email?

11       A    No, ma'am.

12       Q    Okay.  Since July 2nd, have you received lists

13   of potentially ineligible voters under Amendment 4?

14       A    I would think we probably have.

15       Q    And do you know if those lists include people

16   who are potentially ineligible because they have not

17   paid fines and fees?

18       A    I do not.

19       Q    Okay.  Who at the Secretary of State's office

20   would be most likely to know what information is being

21   used to send you those lists?

22       A    I would think Amber, maybe, most likely.  Or

23   she would be the contact person and could direct us to

24   who sends those lists.

25       Q    And would Toshia Brown have that kind of

MARY JANE ARRINGTON

1    information as well?

3        A    I suppose she could receive it, I mean, get

4    it, receive it.

5        Q    Okay.

6        A    But I don't know if that's her responsibility.

7    I don't know.

8        Q    Okay.  It's your understanding that SB 7066 is

9    currently the law in Florida; is that right?

10       A    Yes, ma'am.

11       Q    Okay.  And what is your understanding of the

12   eligibility requirements under SB 7066?

13       A    Now, if you have had your rights restored

14   because you have served your time and your restitution,

15   that also includes paying any fines or fees, whatever

16   they might be.

17       Q    Fair enough.

18            And if someone became registered between

19   January 8th and July 1 who has outstanding fines and

20   fees, is that person eligible to vote now?

21       A    I do not know.  I know that that person has --

22   in the new law, has forgiveness for registering and not

23   paying those.  But I do not know the answer to your

24   question.

25       Q    Okay.  Under SB 7066, such a person would not

1                    MARY JANE ARRINGTON

2    be eligible to vote; is that right?

3        A    If they have outstanding fines and fees,

4    correct.

5        Q    And what are the potential consequences if

6    someone votes who is ineligible to vote?

7        A    You are removed from the voting rights rolls.

8    I assume if you've registered under false pretenses,

9    then you can be convicted of a felony.

10       Q    Okay.  What if you didn't register under false

11   pretenses, but you voted even though you knew you were

12   ineligible?  Is that a crime?

13           MR. PRIMROSE:  Objection, improper predicate.

14           THE WITNESS:  I don't know.  I mean, I'm not

15       an attorney, nor do I play one in a TV show.

16   BY MS. LANG:

17       Q    Thank you.

18           If a voter asked you for guidance about

19   whether or not they -- if a registered voter asked you

20   for guidance about whether or not they should vote, even

21   if they owe fines and fees, what would your office's

22   recommendation be?

23       A    We do not give legal opinions.  I would

24   suggest they contact an attorney or they -- I mean,

25   we're not -- this office is not in the business of

MARY JANE ARRINGTON

1  giving legal opinions.

2      Q    Okay.  Is there any way for your office to

3  know how many people with past convictions got their

4  rights restored and voted in the May election here in

5  Osceola County?

6      A    No, ma'am.

7      Q    Okay.  All right.  I'm going to mark as

8  Exhibit 9 SB 7066, which is the new law.

9          (Exhibit 9 was marked.)

10 BY MS. LANG:

11     Q    And I'll ask you to turn to page 46.

12         Is it part of your responsibilities, as the

13 Supervisor of Elections, to implement new election laws

14 such as SB 7066?

15     A    Yes, ma'am.

16     Q    Okay.  And the law states -- at the bottom of

17 page 46, it says [as read]:  For purposes of this

18 section, the term "completion of all terms of sentence"

19 means any portion of a sentence that is contained in the

20 four corners of the sentencing document, including but

21 not limited to...

22         And then it mentions imprisonment, probation,

23 and community control.  And I'm most interested in

24 section five, which says [as read]:  Full payment of

MARY JANE ARRINGTON

1

2  restitution ordered to a victim by the court as a part

3  of the sentence, full payment of fines and fees ordered

4  by the court as part of the sentence, or that are

5  ordered by the court as a condition of any form of

6  supervision, including but not limited to probation,

7  community control, or parole.

8          Is that all correct?

9      A    That's what it says, yes.

10     Q    Okay.  Have you ever seen a sentencing -- do

11 you review sentencing documents as part of your job?

12     A    No.

13     Q    And when it says four corners of the

14 sentencing document, do you know which court documents

15 fall within that requirement and which fall outside of

16 that requirement?

17     A    No, ma'am.

18     Q    Section 5C on page 47 says that [as read]:

19 Financial obligations required under subparagraph A or B

20 include only the amount specifically ordered by the

21 court as part of the sentence and do not include fines,

22 fees, or costs that accrue after the date the obligation

23 is ordered as part of the sentence.

24          Is that right?

25     A    Yes.

1                    MARY JANE ARRINGTON

2       Q    Do you have any knowledge about what types of

3  fines, fees, and costs are included in sentencing?

4       A    No, ma'am.

5       Q    And do you have any idea what fines, fees, or

6  costs are not included in sentencing but rather accrue

7  after a sentence?

8       A    No.  No.

9       Q    Okay.  And I'll be honest, I'm not sure I

10  understand how all of these requirements apply.

11           MR. MILES:  Nor do I.

12  BY MS. LANG:

13      Q    So section B says that [as read]:  Individuals

14  are required not only to pay fines and fees ordered as

15  part of the sentence, but also those ordered by the

16  court as a condition of any form of supervision.

17           Is that right?

18      A    Yes.

19      Q    Do you know what kinds of fines and fees are

20  ordered as conditions of supervision?

21      A    I believe -- I've never been on parole, but I

22  do know that when you go to your parole officer, you pay

23  to see them.  So that sounds like that.  But I do not

24  know.

25      Q    And you don't know all the various fines and

1                     MARY JANE ARRINGTON

2    fees?

3         A    Yes.  No.

4         Q    Okay.  And would you know which fines and fees

5    are conditions of supervision that would be included

6    under SB 7066 even though section C says that fines and

7    fees that accrue after the sentence are not included?

8         A    No, ma'am.

9         Q    Okay.  Do you have any knowledge as to what

10   legal financial obligations that result from a

11   conviction are included within the requirements of

12   SB 7066 and which ones are not?

13        A    No, ma'am.

14        Q    Okay.  Does anyone in your office have an

15   understanding of which fines and fees fall within SB

16   7066 and which ones fall outside SB 7066?

17        A    Not that I am aware.

18        Q    Okay.  Has the Secretary of State provided any

19   information about which fines and fees are disqualifying

20   under SB 7066?

21        A    No, ma'am.

22        Q    Has the Secretary of State provided any

23   information about which fines and fees fall outside the

24   scope of SB 7066?

25        A    No, ma'am.

MARY JANE ARRINGTON

1

2    Q    Okay.  Ordinarily, you said, your office

3    investigates the information provided by the Secretary

4    of State about potentially ineligible voters based on

5    past felony convictions; is that right?

6    A    Yes, ma'am.

7    Q    Does your office have any way to conduct that

8    second investigation with respect to non-payment of

9    fines and fees?

10   A    I am not aware that we have that information.

11   Q    Does your office have access to information

12   that would allow you to conduct that investigation?

13   A    I am not aware of where that -- if we have

14   access, I am not aware of it.

15   Q    At this time, is your office conducting

16   investigations into whether or not people's fines or

17   fees are outstanding?

18   A    No, ma'am.

19   Q    So if you receive a name -- what would your

20   office do if your office receives the name of a person,

21   who's potentially ineligible to vote, from the Secretary

22   of State because they owe fines and fees?

23   A    I do not know.

24   Q    My understanding is that the voting

25   registration form has changed as a result of SB 7066; is

MARY JANE ARRINGTON

1
that right?

2   A   Yes, ma'am.  It has not been printed but it is

3   available online.

4   Q   Okay.  Do you know when it's going to be

5   printed?

6   A   I checked earlier this week and they told us

7   September.

8   Q   Okay.  So right now, the printed registration

9   forms that you have are still the old registration

10  forms; is that right?

11  A   Yes, ma'am.

12  Q   So I'm going to mark as Exhibit 10 and 11 two

13  forms, the old form first and then the new form.

14          (Exhibit 10 was marked.)

15          (Exhibit 11 was marked.)

16  BY MS. LANG:

17  Q   And as we discussed, Exhibit 10 is the old

18  form and it just requires folks to affirm that they did

19  not have a felony conviction or they had their rights

20  restored; is that right?

21  A   Correct.

22  Q   Yes.  Is that right?

23  A   Yes, ma'am.

24  Q   Okay.  And the new form, instead, has three

MARY JANE ARRINGTON

1

2 boxes, one that indicates that a person has never been

3 convicted of a felony, another that affirms their rights

4 have been restored by clemency, and a third that says

5 their rights have been restored by section for Article

6 VI of the State Constitution; is that right?

7     A    Correct.

8     Q    Okay.  Is there any information in box -- the

9 third box about payment of fines and fees and

10 restitution?

11     A    No, ma'am.

12     Q    But it does include information about parole

13 and probation; is that right?

14     A    Yes, ma'am.

15     Q    Okay.  The instructions that Ms. Matthews gave

16 your office was to indicate which box was checked when

17 you received one of these new voter registration forms;

18 is that right?

19     A    Correct.

20     Q    What do you do when you receive one of the old

21 forms now?

22     A    We process it just as we always have.

23     Q    Okay.  And what do you indicate with respect

24 to the various -- what box was checked?  If you receive

25 an old form, do you put on any information about what

MARY JANE ARRINGTON

1

2  box was checked?

3      A    I don't believe so.  They just have to be

4  checked.

5      Q    Okay.

6      A    If we receive an application where nothing is

7  checked, then it's an incomplete application.

8      Q    Okay.  And right now, all of the agencies and

9  all of the paper forms that are out there in Osceola

10 County are all the old voter registration forms; is that

11 right?

12     A    We have not had the opportunity to change any

13 out because of workload.

14     Q    Has the online voter registration system been

15 updated to include --

16     A    I believe it has.  It has.  We have received

17 the new ones.  So I believe those must be mailed in from

18 the online.

19     Q    Do you know, for people who have out-of-state

20 convictions and their rights were restored in another

21 state, are they eligible to vote in Florida?

22     A    I would believe so.

23     Q    Are they eligible to vote in Florida even if

24 they have outstanding fines and fees in that state?

25     A    I do not know.

MARY JANE ARRINGTON

1

2          MS. LANG:  Okay.  I'll mark as Exhibit 12 the

3      federal voter registration form from the Election

4      Assistance Commission.

5          (Exhibit 12 was marked.)

6   BY MS. LANG:

7          Q    Does your office ever receive these types of

8   voter registration forms?

9          A    We do.  Especially during a election cycle.

10         Q    And I'll direct you to the last page of this

11  document, page six, which has State instructions for the

12  form for the state of Florida.  And these State

13  instructions just indicate that someone should -- must

14  affirm that they are not a convicted felon, or if they

15  are, they have had their civil rights restored; is that

16  right?

17         A    Yes.

18         Q    And these instructions don't include the

19  various boxes that are included on the State form; is

20  that right?

21         A    I don't believe.  I do not see that.

22         Q    Okay.  Have you received questions from voters

23  about the implementation of SB 7066?

24         A    Yes, ma'am.

25         Q    What kinds of questions have you received?

MARY JANE ARRINGTON

1

2      A     How do I know if I've paid my fines, and

3  these, is the number one.

4      Q     And about how many of those questions have you

5  received?

6      A     Not very many.  I don't know an exact number.

7  But when I ask out front, a lot of people said, I've

8  received a call or two, so...

9      Q     Okay.  More than five?

10     A     More than five, probably less than 20, so...

11     Q     Thank you.  Very helpful.

12           And what does your office tell them?

13     A     We tell them to contact the clerk of the court

14  in the county where their case was tried and hopefully

15  they can find the information there.  And then if not,

16  we also give them the number from the group that has

17  told us they're willing to help people.

18     Q     If someone has an out-of-state conviction and

19  their rights were restored out of state, do you know

20  what box they should check on the new voter registration

21  form?

22     A     No, ma'am, I do not.

23     Q     Okay.  If someone were to ask you these

24  questions that you don't know an answer to, where would

25  you refer them?

MARY JANE ARRINGTON

1

2     A     I would -- I don't know where you can refer

3   someone to.  And again, it's -- I mean, I think the

4   boxes are hard even for someone who lives in this state,

5   the difference between clemency and Amendment 4.  I

6   mean, what is Amendment 4?  I mean, you and I know

7   because I deal with this on a daily basis.  But a person

8   trying to register to vote for the first time or from

9   another state -- because a lot of our voters come from

10  other places, especially in Osceola County.  You know, I

11  think there's confusion, could be confusion there.

12     Q     Um-hum.  And it doesn't even say Amendment 4,

13  does it?  It says section four of Article VI of this

14  State Constitution?

15     A     Yes, it does, of the State Constitution.

16     Q     Okay.

17     A     Just someone moving here from Puerto Rico,

18  what does that mean?

19     Q     Um-hum.  Does your office process the

20  applications differently depending on what box of the

21  three boxes is checked?

22     A     I don't think so.

23     Q     Does your office indicate in the State voter

24  registration system which box was checked?

25     A     I don't think so.

1                    MARY JANE ARRINGTON

2        Q    Okay.

3        A    And maybe that's changed in the past couple

4    weeks.

5        Q    Okay.  Are you aware -- since July 1, has the

6    Secretary of State flagged any new voter applicant from

7    your county as potentially ineligible to register on the

8    basis of a past felony conviction?

9        A    Not that I am aware.

10       Q    Okay.  Would you be able to determine that

11   with your staff?

12       A    I mean, I can ask.  I don't know if we can

13   determine.

14       Q    Okay.  Is it still the case that the Secretary

15   of State is initially responsible for determining who is

16   ineligible to vote on the basis of a past conviction?

17       A    Yes.  That is my opinion.

18       Q    And then it is your office's responsibility to

19   investigate that?

20       A    Right.  And if there's -- we are the final

21   decision makers.

22       Q    Okay.  And if someone is flagged by the

23   Secretary of State as potentially ineligible because of

24   outstanding fines and fees, they would be held in

25   suspense; is that correct?

MARY JANE ARRINGTON

1

2     A     I'm not sure because of fines and fees.

3     Q     Um-hum.

4     A     I don't know.  They wouldn't -- would they be

5  sent through the process like a normal conviction, a

6  felony conviction?  I don't know how that would be

7  handled.

8     Q     As a general matter, if the Secretary of State

9  flagged someone as potentially ineligible, they're put

10 in suspense status; is that right?

11    A     Well, if it's an incomplete application, it

12 is.  But if they -- if they believe that they have

13 registered and they are -- have a felony, then they go

14 through the process we talked about.  They send us that

15 information.

16    Q     Um-hum.  But if that occurs at the

17 registration stage rather than at the removal stage,

18 would that person be put in suspense?

19    A     No.  Suspense is more that they're there for

20 an incomplete application or information that we don't

21 have.

22    Q     Um-hum.

23    A     I'm not real sure.  I don't know.  And I don't

24 know -- I'm trying to think how to put this -- what

25 happens if they find that someone at the registration

MARY JANE ARRINGTON

1  point is -- hasn't paid their fines and fees.

2      Q    Um-hum.

3      A    I mean, this is new.  I don't know what

4  happens.

5      Q    Um-hum.  My understanding from your earlier

6  testimony is that you put information into the system,

7  it goes up to the Secretary of State for them to verify.

8      A    Vet that person, that they are a person, that

9  they -- I don't know what systems they run those -- that

10  information through.

11     Q    And if that person is flagged, for example, as

12  potentially not a citizen at that stage, would they be

13  put in suspense?

14     A    They would -- it would be an incomplete

15  application.  And we would have to research it further.

16  What goes into suspends are these applications that are

17  in, and that we are not able to process completely.

18          And it can be anything, like I said, from a

19  box not checked to a wrong -- an address that doesn't

20  exist to a social security number that doesn't exist.

21     Q    Um-hum.  Going back to SB 7066, turning to

22  page four -- 48, sorry.

23     A    Forty-eight?

24     Q    Yes.  And 49.  There are definitions of felony

MARY JANE ARRINGTON

1    sexual offense and murder here; is that right?

2         A    What section is that in?

3         Q    It is in -- at the bottom of page 48.  It's

4    3B, I believe.

5         A    Okay.  All right.  Yes.

6         Q    B, and then C.  In section B and section C,

7    part of the definition is, quote [as read]:  Any similar

8    offense committed in another jurisdiction which would be

9    an offense listed in this paragraph if it had been

10   committed in violation of the laws of this state.

11            Is that right?

12        A    Yes.  Yes.  Yes.

13        Q    It's number 12 under B, number two under C;

14   yes?

15        A    Yes.

16        Q    Okay.  How would your office determine if a

17   certain conviction from another state would be a

18   conviction that would fall under this definition if it

19   was committed in Florida?

20        A    I have no idea.

21        Q    Um-hum.

22            MR. MILES:  Call me.

23   BY MS. LANG:

24        Q    And how would you determine if a federal

1                    MARY JANE ARRINGTON

2  offense, if committed in Florida, would fall under this

3  definition?

4        A    I have no idea.

5        Q    Do you have any way to -- if a voter asked how

6  they could determine this, what information could you

7  provide them?

8        A    I would suggest they contact an attorney --

9        Q    Um-hum.

10       A    -- because, I mean, again, we do not give

11  legal opinions.

12       Q    And do you know how the Secretary of State is

13  planning to make those determinations?

14       A    No, ma'am.

15       Q    I think I already have your testimony on this,

16  but are there any sources that are available directly to

17  you to determine whether or not somebody has outstanding

18  disqualifying legal financial obligations?

19       A    I am not aware of any.

20       Q    And so would it be your position that you

21  would have to rely on the Secretary of State for that

22  information?

23       A    Yes.  I would think so.

24       Q    Or on the voter themselves?

25       A    On the voter themselves.

1               MARY JANE ARRINGTON

2      Q    Okay.  Do you have any information about the

3  reliability of the various State databases tracking

4  legal financial obligations?

5      A    No, ma'am.

6      Q    Okay.  You mentioned earlier that some people

7  have convictions that date back 20 years or even more;

8  is that correct?

9      A    Yes, ma'am.

10     Q    Have you --

11     A    Significantly more.

12     Q    So have you encountered voters with very old

13  convictions?

14     A    Yes, I have.

15     Q    On several occasions?

16     A    Yes, ma'am.

17     Q    And do you know if the State has records going

18  back that far?

19     A    I do not.

20     Q    Do you know how far back the records for the

21  clerk of court in Osceola County go?

22     A    They're supposed to go back to 1887 but I do

23  not know if you could access that information.  I mean,

24  you know, they're supposed to have the court records

25  that go back that long.  But I don't know.

1                    MARY JANE ARRINGTON

2       Q    Is that information available online?

3       A    No, ma'am.

4       Q    Do you know how far back it goes online?

5       A    '80 something?

6            MR. TOWNSEND:  You talking the clerk of court

7       records?

8            THE WITNESS:  Yeah.

9            MR. TOWNSEND:  They should go back farther

10      than that.

11           THE WITNESS:  I thought they had only put them

12      into that system in the '80s.

13           MR. TOWNSEND:  They might have them -- yeah,

14      you're right.  Maybe they had them on hard copies

15      before.

16           THE WITNESS:  Yeah.  I think prior to sometime

17      in the '80s, you have to go back and search the

18      physical records.

19  BY MS. LANG:

20      Q    Okay.

21      A    And I don't know how organized that search is.

22      Q    Um-hum.  And you're not familiar with the kind

23  of various systems for tracking payments?

24      A    No, ma'am.  I have no idea what is out there.

25      Q    Okay.  Do you know what type of information

MARY JANE ARRINGTON

2  your colleagues in other counties have about the answer

3  to these questions about implementation of SB 7066?

4       A    No, ma'am.

5       Q    Have you heard from any of your colleagues

6  about confusion related to the implementation of

7  SB 7066?

8       A    We have had a lot of stuff, because of new law

9  changes, placed upon us, beginning the first of July.

10  And I think many of us, our workload has greatly

11  increased because of initiative petitions.  And there

12  has not been a lot of chatter back and forth because of

13  all of the issues that we're having to address right

14  now.

15       Q    Um-hum.  Will the implementation of SB 7066,

16  going forward, increase your workload in your office?

17       A    I would think it would.  I don't know to what

18  extent because I don't know how you handle it.  I don't

19  know where you go to get the information.

20       Q    So sitting here today, you just have no idea

21  how you're going to go about determining eligibility

22  under SB 7066; is that right?

23       A    Right.  And is it my responsibility to

24  determine that eligibility.

25       Q    Given that confusion, do you think it's

MARY JANE ARRINGTON

2 possible the different counties are going to implement

3 SB 7066 in different ways?

4     A    I think that's --

5     MR. PRIMROSE:  Object to form.

6     THE WITNESS:  There is that possibility.

7 BY MS. LANG:

8     Q    Do you feel, based on your knowledge today,

9 that you can authoritatively answer voter questions

10 about their eligibility under SB 7066?

11     A    Well, we have to refer them to other places.

12 We cannot tell them they're eligible.

13     Q    Ordinarily, is it your job to be able to tell

14 people whether or not they're eligible to vote based on

15 the qualifications listed?

16     A    If they give us -- I mean, we explained to

17 them that they have to -- if they can check those boxes,

18 then they're eligible to vote.

19     Q    Right.  So you're ordinarily able to explain

20 the eligibility requirements to them; is that right?

21     A    You're 18, a citizen of the country, a

22 resident of Osceola County, that you -- you know, you're

23 mentally competent, you haven't been adjudicated

24 incompetent, as far as voting.  And then you're not a

25 convicted felon or your rights have been restored.

1          MARY JANE ARRINGTON

2      Q    Are the requirements of SB 7066 the -- 7066

3  the only eligible requirements that you're not able to

4  fully explain to voters?

5      A    I think I can explain it.  I can't give them

6  any -- they're going to have to research it on their

7  own, for lack of a better term.

8      Q    Right.  I hear you.

9           I think, based on your testimony, though, you

10 don't know which fines and fees --

11     A    No, I have no idea.

12     Q    And so you don't know the exact contours of

13 SB 7066's requirements?

14     A    No.

15     Q    Is there any other eligibility requirement

16 where you're not able to explain what the rules are?

17     A    No.  I think I can -- you know, are you 18

18 years of age, yes.

19     Q    Okay.

20     A    Are you a citizen of this country, so...

21     Q    But you aren't able to explain clearly --

22     A    No.  This has layers that I don't know how to

23 address.

24     Q    Okay.  I'm going to ask again, just to get it

25 on the record.

MARY JANE ARRINGTON

1
2      But you aren't able to explain clearly what
3  the contours are of eligibility under SB 7066?
4      A    No.
5      Q    Given the lack of guidance that you received
6  from the Secretary of State, are you frustrated about --
7  are you frustrated with your current -- does that make
8  you frustrated?
9      A    I mean, it's part -- I mean, it's the job,
10 it's what we have to deal with.
11     Q    Um-hum.  Has any of your staff expressed
12 frustration about the lack of guidance for implements SB
13 7066?
14     A    Well, we certainly would like more but we
15 don't have it at this point in time.
16     Q    And does the lack of guidance make your job
17 more difficult?
18     A    Well, it makes the job on the potential voter
19 more difficult because they're trying to figure out if
20 they can register to vote.
21     Q    And your office can't help them?
22     A    We can't give them guidance.
23     Q    I want to refer back to the amendment FAQ
24 document, which I believe is marked Exhibit 4.  And
25 here, there's a question that says "How do I know if my

MARY JANE ARRINGTON

1

2    voting rights have been restored."  And your office

3    indicates "It is your responsibility to affirm all

4    information submitted on your voter registration as

5    correct and accurate."  Is that right?

6        A    Yes.

7        Q    So you've testified that your office is really

8    unable to provide exact guidance on what is required

9    under SB 7066; is that right?

10       A    Correct.

11       Q    And so for the moment, it is your -- the

12   position of your office that voters need to ascertain

13   that information themselves --

14       A    If they do not know it.

15       Q    And they should not register to vote until

16   they've fully ascertained whether or not they're

17   eligible under SB 7066; is that right?

18       A    If they asked our guidance, that's what they

19   are told.

20       Q    Um-hum.  And you've testified that in a number

21   of circumstances, you would recommend that they contact

22   an attorney to figure out if they're eligible under

23   SB 7066; is that right?

24       A    Well, we first advise them when they come to

25   ask that they contact the clerk of the court where they

MARY JANE ARRINGTON

1

2   were sentenced.

3       Q    But in some circumstances, it may be too

4   confusing to determine without an attorney?

5       A    I would think when we look at the actual

6   wording in the law, yes.

7       Q    Okay.  Do you -- I'm going to ask you a series

8   of questions that I think the answer is "no" to, but I

9   want to make sure we get them on the record, so I

10  apologize.

11      A    Right.

12      Q    Would your office have any way to distinguish

13  between outstanding felony fines and fees and

14  outstanding misdemeanor fines and fees?

15      A    No, ma'am.

16      Q    And what about between those that were issued

17  at sentencing versus those that were accrued afterwards?

18      A    No, ma'am.

19      Q    And what about between those issued at

20  sentencing and various penalties such as late payment

21  penalties that might be applied?

22      A    No, ma'am.

23      Q    Would you be able to tell which fines and fees

24  are disqualifying or not if they've been converted to a

25  civil lien?

MARY JANE ARRINGTON

1

2     A     No, ma'am.

3     Q     Do you know if fines and fees that have been

4  converted to a civil lien are disqualifying?

5     A     No, ma'am.

6     Q     And so far as you're aware, if you contact the

7  clerk of court, can they tell you the balance for each

8  fine and fee, or do they only tell you a final balance?

9     A     I have no idea.

10    Q     Okay.  Would your office have any way to

11 verify whether a court had terminated a prior fine or

12 fee that was imposed?

13    A     No, ma'am.

14    Q     And would you have any way to identify whether

15 or not somebody had completed their outstanding fines

16 and fees by -- through community service?

17    A     No, ma'am.

18    Q     Would you have any way to know whether or not

19 a civil lien had been fully paid off?

20    A     No.

21    Q     And would you have any way to know whether or

22 not a sentence had been modified to remove or change a

23 fine or fee?

24    A     No, ma'am.

25    Q     Okay.  And I believe you've already answered

MARY JANE ARRINGTON

1

2  this question, but if folks are confused about whether

3  or not they have outstanding fines and fees, does your

4  office assist them in looking up those records?

5       A    No, ma'am.

6       Q    Okay.  You direct them to the --

7       A    To the place we think they can get an answer.

8       Q    Okay.  Has anyone indicated to you that they

9  were unable to get an answer from those locations?

10      A    I don't think we've heard back from anyone,

11  that I am aware of.

12      Q    You've testified about questions you've gotten

13  from voters about SB 7066.  Have you ever been contacted

14  by advocates about how SB 7066 will be implemented?

15      A    No, ma'am.

16      Q    Okay.  Has the State provided any additional

17  resources to help fund the --

18      A    No, ma'am.

19      Q    -- implementation --

20           Has the State provided any additional

21  resources to assist in the implementation of SB 7066?

22      A    No, ma'am.

23      Q    What is the financial cost of sending a voter

24  a notice of potential ineligibility to vote?

25      A    I think a registered letter is $5 and

1                    MARY JANE ARRINGTON

2    something now.

3          Q    Okay.

4          A    And then the cost of doing it, so...

5          Q    And what's the cost if you have to put it in

6    the paper?

7          A    We do an ad.  Several hundred dollars.

8          Q    For each voter?

9          A    No.  For the ad.  Remember, we do ads in two

10   papers because of the English and Spanish.  And I think

11   it's about 250 an ad.

12         Q    Okay.

13         A    So it would be 500.

14         Q    And how often do you do those?

15         A    Depending on the volume, we do a minimum of

16   once a month.

17         Q    Okay.  Has the notice that you sent out to

18   potentially ineligible voters because of conviction

19   changed since the passage of SB 7066?

20         A    I don't believe so, no, ma'am.

21         Q    Okay.  And has the type of documentation that

22   you provided changed?

23         A    No, ma'am.

24         Q    Has the Secretary of State provided any

25   template materials to send to voters about SB 7066's

MARY JANE ARRINGTON

1
2    requirements?

3        A    No, ma'am.

4        Q    We talked about the due process that voters

5    receive a little bit earlier today.  If a voter receives

6    a notification that they are potentially ineligible to

7    vote, how can they request a hearing?

8        A    They can contact our office.  They can call,

9    they can write, they can email, whatever they would like

10   to do.

11       Q    And what does that hearing look like?

12       A    It's in this conference room.  And they can

13   bring anyone they want.  And we have our staff members

14   that have researched the background information and

15   their paperwork and we ask -- you know, we present what

16   we have found and we ask them to rebut what we have

17   found.

18       Q    And who's the judge for that hearing?

19       A    I am.

20       Q    Is there an appeal process from your

21   determination?

22       A    No, ma'am.

23       Q    Okay.  Has the documentation that the

24   Secretary of State is sending your office about

25   potentially ineligible voters changed since July 1?

1                    MARY JANE ARRINGTON

2        A    Yes.

3        Q    How so?

4        A    I know that it has changed.  I'm not real sure

5   of the details.  But I do know from talking to staff

6   that it has changed some.

7        Q    And has it changed so that it reflects

8   outstanding legal financial obligations?

9        A    No, ma'am.  No.  I mean, before -- I mean, I

10  know one thing is the parole and the end-of-sentence,

11  and things like that.  If you're a convicted felon,

12  we've got paperwork on you.

13       Q    Okay.  I think I understand.

14            So the paperwork changed from prior to

15  Amendment 4 to after Amendment 4?

16       A    Right.

17       Q    Did it change again after July 1?

18       A    No, ma'am.

19       Q    Okay.  Do you know if there's any plans to

20  change the type of documentation that will be provided?

21       A    I do not.

22       Q    So you're not aware of receiving documentation

23  related to fines and fees at this time?

24       A    No, ma'am.

25       Q    Okay.  If the Secretary of State indicated

1                    MARY JANE ARRINGTON

2    that someone was potentially ineligible under SB 7066

3    because of fines and fees, would you send them a notice?

4         A    I would think we would have to.  I'm not real

5    sure how our research would proceed.  I mean, that is

6    something we haven't done yet.  But -- and we haven't

7    had guidance either.

8         Q    Um-hum.

9         A    So I'm not sure of it.  I think if and when

10   that comes, then we have to do so.

11        Q    To send a notice; is that right?

12        A    Yes.  To send a notice.  But then we have to

13   figure out how we're going to research it, so...

14        Q    Um-hum.  But absent -- if you didn't have any

15   contrary information to the information provided by the

16   Secretary of State, would you rely on the Secretary of

17   State's information?

18        A    I'm not -- I don't know what databases we can

19   get access to, where they would be getting their

20   information.  There are just a lot of unknowns that

21   today I can't answer.  But yes, we would have to take it

22   through the process.

23        Q    Um-hum.  And at that point, would the voter be

24   responsible for showing they were eligible to vote?

25        A    Yes.  Or that they had paid their fines and

MARY JANE ARRINGTON

1
2  fees.

3      Q    Um-hum.  And how would they show that they'd

4  paid their fines and fees?

5      A    I don't know.  Do they give you a receipt at

6  the end that says you're done?  I mean, we haven't

7  gotten there so I don't know.

8      Q    Since July 1, do you know how many voters

9  you've disqualified or removed from the rolls or begun

10  the process to remove because of felony convictions?

11      A    The ad that I saw in the paper last week had

12  two, so those were two that came back undeliverable.

13  And so I do not know the exact number, but I would tell

14  you the volume is greatly reduced.

15      Q    Do you know if any voter has responded to a

16  notice of potentially -- of potential ineligibility

17  since July 1?

18      A    I do not.

19      Q    And when you say the volume is reduced, do you

20  mean --

21      A    Prior to this time last year.

22      Q    Okay.

23      A    Or prior to the adoption of Amendment 4.

24      Q    So the volume has reduced since prior to

25  Amendment 4?

1          MARY JANE ARRINGTON

2     A     Um-hum.

3     Q     Do you have records through the State voter

4  registration system or otherwise previously rejected

5  voters due to felony conviction?

6     A     I don't think so.

7     Q     Is there any report you could run that would

8  identify who has been rejected because of a past

9  conviction?

10    A     Maybe.  I mean, I think maybe you could put

11 those parameters in.  And I don't know if it would be

12 statewide or just your county.  But with the

13 sophistication of our database, that might be possible.

14    Q     And does your office have any plans right now

15 to try to notify people who had been previously rejected

16 prior to Amendment 4?

17    A     No, ma'am.

18    Q     Okay.  What voter education efforts about

19 Amendment 4 has your office taken?

20    A     You know.  We put it in our newsletter.  We

21 put it on our website.  I made a couple speaking

22 engagements and I also think our community outreach has

23 also done the same.  You know, we've attended groups.

24 I've attended the NAACP and a couple other groups to

25 explain what you have to do and what's required.

MARY JANE ARRINGTON

1

2     Q     Have you made any changes in your

3  recordkeeping or data sharing with other agencies or

4  officials since Amendment 4 passed?

5     A     No, ma'am.

6     Q     What about since the effective date of

7  SB 7066?

8     A     No, ma'am.

9     Q     Do you have any knowledge of how other

10  Supervisors of Elections are handling all of this

11  uncertainty?

12     A     No, ma'am.

13     Q     Do you know what steps, if any, they've taken

14  to implement SB 7066?

15     A     No, ma'am.

16     Q     Are you aware that SB 7066 created something

17  called the voting rights working group?

18     A     No, ma'am.

19     Q     Given that answer, have you been approached to

20  work -- to be involved in any working group on these

21  issues?

22     A     No, ma'am.

23     Q     And do you know anyone who's been approached

24  to kind of participate in such a working group?

25     A     No, ma'am.

MARY JANE ARRINGTON

1

2      Q    Okay.  Would the chief of the bureau of voter

3  registration services know if there was a database -- if

4  the database could produce a report of people who'd been

5  previously removed for felony convictions?

6      A    I don't know.  I mean, I don't know if it --

7  we would pull it through what we call VVR, which is our

8  vendor for voter registration.  And that's the one where

9  we have great accessibility to put in parameters to do

10  things.  I don't know if the State has access to that.

11      Q    Okay.

12      A    I would think they would have something

13  similar or comparable or better.

14      Q    I would like to propose that we take a short

15  break.  Go off the record.

16          (A brief recess is had from 11:36 a.m. to

17  11:52 a.m.)

18  BY MS. LANG:

19      Q    Thank you so much, Ms. Arrington.  I only have

20  a few more questions.

21      A    All right.

22      Q    So you testified earlier that SB 7066 and its

23  confusing requirements will make it harder for people

24  with past convictions to register; is that right?

25      A    Yeah.  To determine if they could register.

MARY JANE ARRINGTON

1

2   Not the actual act of registering.

3       Q    And do you think it's possible, then, that

4   some people who are eligible might not register because

5   they cannot determine their eligibility?

6       A    I think that's a strong possibility.

7       Q    Um-hum.  You think that's likely?

8       A    Yes.

9       Q    There were a couple of routine procedures that

10  I asked about in the office that you weren't 100 percent

11  familiar with; is that right?

12      A    Yes, ma'am.

13      Q    One of them was, you know, the exact suspense

14  procedures and who would go into suspense.

15      A    And maybe I haven't explained it right; okay?

16  Let's back up.

17      Q    Please do.

18      A    A registration comes to -- okay -- can come to

19  us many ways.  It can come to us through an agency like

20  DMV or another county.  So when those registrations all

21  come in, they go into what we call a suspense file.

22  They're hanging there waiting for us to pull them into

23  our county.  If you come to our counter and register to

24  vote, we take that completed application, enter it into

25  the system, and then that night, at the close of

MARY JANE ARRINGTON

business, all of our work is sent to the State.

The State is the vetting agency.  I do not know who -- what systems they have access to.  But they do have access to systems I do not have access to.  And they take the information from that individual, which is the driver's license number and can be the social -- last four of the social security.  And their job is to make sure that that voter is a real person.

That information then, if it is complete, then it comes back to us and they are added to a voter -- the voter roll.  If it is incomplete, it is put in the system, but it is coded differently.  So if the election was 29 days away when Joe goes to vote, we're going to say, Your application was incomplete and so therefore you are not a registered voter.

Q     Right.  Thank you.

A     Okay.

Q     My question is if a voter turns in an application, you send it to the Secretary of State and the Secretary of State determines that that person is currently incarcerated, for example, would the Secretary of State provide that information?

A     It usually does not come at that time.

Q     Could it come at that time?

MARY JANE ARRINGTON

1

2     A     It normally does not.

3     Q     If it was provided to you at that time, would

4     that voter be put in suspense?

5     A     No, that voter would not be added to the roll

6     if they provided it at that time.  But I have no

7     recollection of them ever providing it at that time.

8     Usually person A is added to the roll.  And then a while

9     later, we will get notice that Joe might be a convicted

10    felon.

11    Q     I understand.  I also asked -- back up.

12    Strike that.

13          Are there written materials about these

14    suspense procedures within your office?

15    A     I mean, that's just where they're held until

16    we pull them into our voter rolls.

17    Q     Um-hum.

18    A     I mean, I don't think there are written

19    procedures.

20    Q     Okay.  And I asked you if you ever receive

21    information about out-of-state convictions and you said

22    you were not sure; is that right?

23    A     I am not -- I don't believe so.  I mean, I

24    don't believe that someone is convicted in Washington

25    that we get that information, I mean...

MARY JANE ARRINGTON

1
2    Q    And if you did, it would come from the

3  Secretary of State?

4    A    Yes.  It would not come from any other form.

5    Q    And if you got that kind of information, would

6  you have documentation of it in your office?

7    A    Documentation that they were a convicted felon

8  in another state?

9    Q    If the Secretary of State had sent information

10  about out-of-state convictions, would that be in your

11  files somewhere?

12    A    Yes, if we had received that.

13    Q    And similarly, with federal convictions --

14    A    Right.

15    Q    -- if you received that information, it would

16  be in your files?

17    A    Right.  But I do know we receive federal

18  convictions from the State.  I don't know if they're any

19  different.  But we do receive those from the State.

20    Q    And the Secretary of State has been sending

21  you potentially ineligible voters since sometime in June

22  or so; is that right?

23    A    Yes.  We're pulling a report to give you the

24  numbers that we've received since the first of the year.

25    Q    Excellent.  Thank you.

1                    MARY JANE ARRINGTON

2        A     You're welcome.

3        Q     And will that report include the list of

4   voters that were --

5        A     The names that were sent to us.

6        Q     Thank you.

7        A     Or do we have to now redact those?

8        Q     I don't believe so.

9        A     The law just changed; right?

10       Q     I'll let you confer with your attorney about

11   that.

12             But you have those lists; is that right?

13       A     Yes, we do.  We'll at least give you the

14   numbers.

15       Q     Okay.

16       A     I think that the law has changed and we now

17   cannot give you that.  That has to be redacted.

18       Q     Sure.  We can work all of that out.

19       A     Okay.

20       Q     But you have those lists with those names; is

21   that right?

22       A     Right.  Yes.

23       Q     Okay.  You've testified previously that you're

24   really not familiar with the various forms of

25   documentation of legal financial obligations; is that

MARY JANE ARRINGTON

1

2  right?

3       A    Correct.

4       Q    Okay.  I will represent to you that there's

5  any number of databases and records related to

6  outstanding fines and fees.

7       A    Right.

8       Q    Would you have any knowledge of which records

9  are the most reliable?

10      A    No.  And an example would be -- and we just

11  talked about this -- I talked with a staff member during

12  the break -- that when you pull the clerk of court

13  record, there is something there about fines and fees.

14  But it doesn't tell you if they've been paid.  One of

15  our staff members tried to call the clerk of the court

16  to see if the fines and fees had been paid.  They were

17  told that it had been turned over to a collection

18  agency.  And they had no knowledge if it was paid -- if

19  it had been paid.

20      Q    Okay.

21      A    So that is a quagmire.  I mean, we just told

22  the voter, you know, we've helped you as much as we can.

23  But it had been sold to a collection agency and our

24  clerk of the court said they had no knowledge if it had

25  been paid.

MARY JANE ARRINGTON

1

2     Q     When did this voter ask about this?

3     A     It had been in the past month or so, I think.

4     Q     And you were unable to determine if that voter

5  is eligible?

6     A     Yes.

7     Q     Okay.  And so that voter has not registered

8  yet?

9     A     Not that we know of.  They may have.

10     Q     At the time you were assisting then, the

11  voter --

12     A     Well, yeah.  We were trying to help them, you

13  know, go through this process.

14     Q     And at the time, you were not able to resolve

15  the issue and therefore the voter did not register to

16  vote; is that correct?

17     A     That was my understanding.

18     Q     And which staff member was telling you about

19  this?

20     A     Mayra Hernandez.

21     Q     Okay.  If you were to receive documentation

22  from the Secretary of State about outstanding fines and

23  fees, you testified that you would put them through the

24  process to determine eligibility; is that right?

25     A     Right.  But we would have to find some way of

1    MARY JANE ARRINGTON

2    determining if the fines and fees had been paid.

3    Q    Um-hum.  And if the information you have from

4    the Secretary of State indicated that it had not been

5    paid, would you have to rely on that information?

6    A    We like to do our own investigations --

7    Q    But right now --

8    A    -- to double check.

9    Q    Right.

10    A    I mean, that's what we do now.

11    Q    But right now, you don't -- you don't have any

12    means for conducting that investigation; is that right?

13    A    No.

14    Q    And you have no means for determining which

15    outstanding fines and fees are disqualifying?

16    A    No, ma'am.

17    Q    Okay.  And so as of now, you would have to

18    rely on the Secretary of State's guidance; is that

19    right?

20    A    Yes.  But we also -- I mean, we also take

21    information from the voter.

22    Q    Okay.

23    A    The potential voter.  And if they're saying

24    that they paid them, I mean...

25         I mean, we have to hear both sides.  We have

MARY JANE ARRINGTON

1

2    to give them due process.

3        Q    And sitting here right now, you don't know how

4    you would make that determination?

5        A    No.  I haven't been there yet.

6        Q    Okay.

7        A    This is the number for the first six months of

8    the year that were removed.

9        Q    I would like to mark this as Exhibit 13.

10            (Exhibit 13 was marked.)

11   BY MS. LANG:

12       Q    And this form indicates that 33 people have

13   been removed because of a felony conviction and no

14   rights restored or clemency; is that right?

15       A    Yes, ma'am.

16       Q    And on the top of that form, it says from

17   January 1 to June 30th, 2019.  Is that the correct dates

18   for this report?

19       A    Yes, ma'am.

20       Q    So this report doesn't include the month of

21   July; is that right?

22       A    It does not.

23       Q    Okay.  Is your office unable to produce a

24   report for the month of July until after the month of

25   July closes?

1                    MARY JANE ARRINGTON

2       A      I mean, I would assume we could tell you how

3    many we have processed to date.

4       Q      Okay.

5       A      But...

6       Q      Okay.  I don't have any further questions for

7    you, Ms. Arrington.

8       A      All right.

9       Q      Thank you very much.  I think Mr. Primrose has

10   indicated that he would like to ask you a few questions.

11   So unless anyone else has questions or your counsel has

12   questions, we can turn it over to him.

13      A      All right.

14      Q      Go ahead, Mr. Primrose.

15                    CROSS EXAMINATION

16   BY MR. PRIMROSE:

17      Q      Thank you.  And good afternoon, ma'am.  I only

18   had a couple of questions on a clarification.  I want to

19   make sure that I heard you right.  Did you say that you

20   don't know whether fees and fines or restitution payment

21   of those is a requirement for voter eligibility?

22      A      No, sir.

23      Q      Okay.  And I believe that you said you're not

24   sure how you would even implement those requirements in

25   identifying whether a voter is eligible under the

1          MARY JANE ARRINGTON

2    Florida Constitution; is that right?

3         A    I don't -- I don't know how to determine if

4    they have paid their fines and fees.

5         Q    Okay.  Are you aware that the statute, the --

6    what has been referred to as Senate Bill 7066 mandates

7    that the local supervisors of elections make the final

8    determinations as to eligibility under the Florida

9    Constitution to vote?

10        A    Yes, sir.

11        Q    If the Secretary of State's office were to

12   send you their preliminary information determining

13   ineligibility due to fees, fines, or restitution, would

14   you take the next step of trying to verify that

15   information to determine eligibility?

16        A    Yes.  I mean, we're going to try to recheck

17   the information they've given us.  And I would assume

18   they're going to provide us with how they receive that

19   information.

20        Q    Okay.  As we sit here today, understanding

21   that there's a lawsuit challenging the statute in

22   relation to the Constitution, would you remove somebody

23   from the voter rolls if you have gone through the

24   process of verifying the individual has an outstanding

25   either fee, fine, or restitution and is therefore

MARY JANE ARRINGTON

1

2  ineligible?

3       A     I believe that's what the law states today.

4       Q     Okay.

5       A     I mean, as the law stands today, yes.  But we

6  would go through the process and give them their due

7  process.

8       Q     Okay.  So -- and let me ask you.  As we sit

9  here today on July 31st, have you removed anybody from

10  the voter rolls due to having an outstanding fee, fine,

11  or obligation as defined by either the Florida

12  Constitution or the Senate Bill 7066?

13       A     No, sir, because the State has not provided us

14  with that information.

15       Q     Okay.  And is it your testimony, then, that

16  it's only upon receipt of information from the Secretary

17  of State that you would actually investigate a voter to

18  determine whether they were eligible to vote?

19       A     That has been the process -- historically the

20  process.

21       Q     Okay.  What if some of the plaintiffs in the

22  consolidated complaints in this lawsuit have

23  affirmatively alleged that they have outstanding fees,

24  fines, or restitution?  And so if one of those

25  plaintiffs were a registered voter in Osceola County and

1    MARY JANE ARRINGTON

2  you were directly presented with information that the

3  voter had an outstanding fee, fine, or restitution as

4  imposed on the original sentence for their felony

5  conviction, would you begin the process of providing

6  that voter with notice and an opportunity to be heard

7  regarding their eligibility?

8      A    No, sir.  I'd probably contact the Division of

9  Elections and ask them for guidance or something of that

10  nature as to how to handle this.

11     Q    Okay.  So if you were provided -- if you were

12  directly provided information that a voter on the voter

13  rolls in Osceola County had an outstanding fee, fine, or

14  obligation related to a felony offense, you would not

15  provide a notice that they may be ineligible and they

16  have an opportunity to be heard?

17     A    I would first contact the Division of

18  Elections.  I mean, maybe they have this person in the

19  process.  I don't know.  I would think I would need

20  guidance from them to begin with.

21     Q    Okay.  But if the Secretary of State's office

22  did not provide you any guidance and you were just

23  provided information, you would not make a determination

24  on your own?

25     A    I would hope the Secretary of State would do

1                     MARY JANE ARRINGTON

2    their job and provide me with some guidance.  But if

3    they didn't, then I would probably have to start the

4    process on my own.

5         Q    Okay.  And as of today, though, you have not

6    received any information that a voter might have

7    outstanding fees, fines, or obligations under Florida

8    law?

9         A    No, sir.

10        Q    Okay.  And I want to just clarify, again.  You

11   would never remove a voter from the voter rolls for any

12   of the disqualifying offenses without first providing

13   that voter with a notice of why they may be ineligible;

14   correct?

15        A    Right.  We would always provide notice.  We

16   always take it through the process.  They can challenge

17   the information we have.  They can ask for a hearing.

18        Q    And that -- and that process of providing

19   notice was something that you would have done prior to

20   the Amendment 4 taking effect on January 8th; correct?

21        A    Yes, sir.

22        Q    And similarly, that's a process that you would

23   have done prior to Senate Bill 7066 becoming law on

24   July 1st of this year?

25        A    Yes, sir.

MARY JANE ARRINGTON

1

2    Q    Okay.  And moving forward, that's a process

3  that you intend to follow as a Constitutional officer to

4  provide written notice of potential ineligibility to a

5  voter and give them a opportunity to be heard?

6    A    Yes, sir.

7    Q    Okay.  I don't have any other questions.  I do

8  appreciate you taking the time this morning and this

9  afternoon.

10         MS. LANG:  Do any of the other attorneys on

11         the line have questions that they wish to ask at

12         this time?

13         MS. DAVIS:  This is Ashley Davis on behalf of

14         the Secretary.  We have no questions.  Thank you.

15         MS. LANG:  Thank you.  I just have two minutes

16         of questions left.

17         THE WITNESS:  Okay.

18         MS. LANG:  I have to redirect.

19                REDIRECT EXAMINATION

20  BY MS. LANG:

21    Q    Mr. Primrose asked you some questions about

22  the process of removing voters; is that right?

23    A    Yes, ma'am.

24    Q    That process only applies to people who are

25  registered and are being removed; is that right?

MARY JANE ARRINGTON

A    Yes.

Q    So that process would not apply to someone,
for example, who could not register because they did not
know if they were eligible to vote; is that right?

A    Right.

Q    And that process would not apply to somebody
who was -- who never got registered because the
Secretary of State determined they were ineligible at
the first phase; is that correct?

A    If the Secretary of State told us at the
beginning.  But historically, normally people are added
to the roll and then it is a time lapse before we're
told, this person may be mentally incompetent, this
person may not be a citizen.

Q    But if the Secretary did tell you in the first
instance?

A    Yes.  They would not -- that process would not
apply to them.

Q    And Mr. Primrose asked you if you would rely
on information provided by the Secretary of State about
outstanding legal financial obligations.  But I believe
that you testified that even if you had that
documentation, you would not know which of those fines
and fees were disqualifying under SB 7066?

MARY JANE ARRINGTON

1

2    A    That is correct.  I do not have that

3  knowledge, nor do I believe my staff has that knowledge.

4  We would have to, you know, research it further, gain

5  more information.

6    Q    And so if you were provided paperwork now that

7  showed outstanding LFOs, would you have any ability to

8  vet whether or not that information was credible or

9  reliant?

10    A    At this point in time, I do not know how we

11  would do that.  But maybe we would have information

12  provided to us that would help us.

13    Q    I don't have any further questions.

14    A    Okay.

15    Q    Thank you.

16        MR. MILES:  I have no questions.

17        MR. TOWNSEND:  Go ahead.

18        MR. MILES:  If this is transcribed, you have

19    the right to read it and go over it.  You can't

20    change anything you've said, but you can --

21        THE WITNESS:  Okay.

22        MR. MILES:  -- see if it's correct or sign it.

23        Are you going to have it transcribed?

24        MS. LANG:  We will have it transcribed.

25        Do you want to read and sign it or do you want

1                    MARY JANE ARRINGTON

2        to waive that?

3              THE WITNESS:  No.  I would prefer to do that.

4              MS. LANG:  Okay.  We will do that.

5              MR. MILES:  Okay.

6              COURT REPORTER:  Mr. Miles, are you ordering a

7        copy?

8              MR. MILES:  Yes.

9              MR. MORALES-DOYLE:  This is on the phone here,

10       Sean Morales-Doyle for the Brennan Center of

11       Justice on behalf of the Gruver plaintiffs.

12              (Off the stenographic record.)

13              (The reading and signing of the deposition is

14       not waived.)

15              (At 12:15 p.m. the deposition was concluded.)

16

17

18

19

20

21

22

23

24

25

1

2                    CERTIFICATE OF OATH

3

4    STATE OF FLORIDA  )

5    COUNTY OF OSCEOLA )

6

7         I, the undersigned authority, certify that MARY

8    JANE ARRINGTON personally appeared before me and was

9    duly sworn.

10        WITNESS my hand and official seal this 2nd day of

11   August, 2019.

12

13

14        _____

          DAWN A. HILLIER, RMR, CRR, CLR

15        Notary Public - State of Florida

          My Commission No.:  GG 259309

16        Expires:  12-15-2022

17

18

19

20

21

22

23

24

25

1

2                          CERTIFICATE

3

4    STATE OF FLORIDA   )

5    COUNTY OF OSCEOLA  )

6         I, DAWN A. HILLIER, RMR, CRR, CLR certify that I

7    was authorized to and did stenographically report the

8    deposition of MARY JANE ARRINGTON; that a review of the

9    transcript was requested; and that the transcript is a

10   true and complete record of my stenographic notes.

11

12        I further certify that I am not a relative,

13   employee, attorney, or counsel of any of the parties,

14   nor am I a relative or employee of any of the parties'

15   attorney or counsel connected with the action, nor am I

16   financially interested in the action.

17

18        DATED this 2nd day of August, 2019.

19

20                  *Dawn A. Hillier*

21        _____

                  DAWN A. HILLIER, RMR, CRR, CLR

22

23

24

25

1

2   August 2nd, 2019

3

4   IN RE:  KELVIN LEON JONES, et al v. RON DeSANTIS, et al

5

6   Dear Ms. Arrington:

7

        Herein, you will find the transcript of your
8   deposition taken on July 31, 2019, and a Errata Sheet
    for your use in entering any changes to the deposition.

9

        Please do not edit or make marks on the
10  transcript itself.  If you desire to make any changes,
    they should be noted on the Errata Sheet.  If no changes
11  are to be noted, please indicate that on the Errata
    Sheet so counsel are aware that no changes were made.

12

        After reading the transcript, please execute the
13  Errata Sheet, including date and place of signing and
    return to TSG Reporting, Inc. at the address indicated
14  below.

15      Thank you for your prompt attention.

16

17

18  Sincerely,

19          *Dawn A. Hillier*

20  _____

21  Dawn A. Hillier, RMR, CRR, CLR

22                 TSG REPORTING, INC.
             747 Third Avenue, 10th Floor
23            New York, New York   10017
                   877.702.9580

24

25

1

2                          ERRATA SHEET

3        I, MARY JANE ARRINGTON, have read the foregoing

4   pages of my deposition given on July 31, 2019 in the

5   case of KELVIN LEON JONES, et al v. RON DeSANTIS, et al,

6   Consolidated Case No. 4:19-cv-00300-RH-MJF, and wish to

7   make the following additions, deletions or corrections:

8   PAGE LINE       CHANGE AND REASON FOR CHANGE

9   ____ ____    _____

10  ____ ____    _____

11  ____ ____    _____

12  ____ ____    _____

13  ____ ____    _____

14  ____ ____    _____

15  ____ ____    _____

16  ____ ____    _____

17  ____ ____    _____

18  ____ ____    _____

19  ____ ____    _____

20  ____ ____    _____

21  ____ ____    _____

22  ____ ____    _____

23  ____ ____    _____

24       In all other respects, the transcript is true and

    accurate.

25       _____