1                UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF FLORIDA
2

3     KELVIN LEON JONES, ET AL.,

4          Plaintiffs,

5     vs.                    CASE NO:  4:19-CV-300-MW-CAS

6     RON DESANTIS, IN HIS OFFICIAL
      CAPACITY AS GOVERNOR OF THE
7     STATE OF FLORIDA, ET AL.,

8          Defendants.
      _____/
9

10

11

12                      VOLUME I of II
                    (Pages 1 through 191)
13

                 DEPOSITION OF MARK EARLEY
14          (Taken on behalf of the Plaintiffs)

15    DATE TAKEN:        August 22, 2019
      TIME:              9:30 a.m. - 4:00 p.m.
16    PLACE:             Messer Carpello, PA
                         2618 Centennial Place
17                       Tallahassee, Florida 32308

18

19

20

21

22          Examination of the witness taken before:

23              JESSICA RENCHEN, Court Reporter
                        On Behalf of
24              For The Record Reporting

25

1    APPEARANCES OF COUNSEL:

2    On behalf of the Plaintiffs:

3    R. ORION DANJUMA, ESQ.
     American Civil Liberties Union
4    Foundation, Inc.
     125 Broad Street, 18th Floor
5    New York, NY 10004
     Phone:  212-284-7332
6    E-mail:  Odanjuma@aclu.org

7    On behalf of Defendants:

8    NICHOLAS PRIMROSE, ESQ.
     Executive Office of the Governor
9    400 S. Monroe Street, # 209
     Tallahassee, FL 32399
10   Phone:  850-717-9310
     E-mail:  Nicholas.primrose@eog.myflorida.com
11
     MARK HERRON, ESQ.
12   Messer Carpello, PA
     2618 Centennial Place
13   Tallahassee, Florida 32308
     Phone:  850-222-0720
14   E-mail:  Mherron@lawfla.com

15

16

17

18

19

20

21

22

23

24

25

3

1                    INDEX OF WITNESS

2

3    WITNESS                                          PAGE

4       MARK EARLEY
           Examination by Mr. Danjuma            06
5
                          ****
6
                    INDEX OF EXHIBITS
7
     NUMBER      DESCRIPTION                      PAGE
8    1           Notice of Deposition            12
     2           Interrogatories                 16
9    3           SB 7066                         19
     4           Old Registration Form           38
10   5           Number of Felon Matches         46
     6           9/27/12 Memorandum              50
11   7           LCSEO 000403                    54
     8           Felon Documentation             58
12   9           LCSEO 00075                     74
     10          LCSEO 01399                     77
13   11          LCSEO 01386                     80
     12          LCSEO 01578                     82
14   13          LCSEO 00684                     94
     14          LCSEO 00422                     97
15   15          PowerPoint Presentation         99
     16          LCSEO 00299                     110
16   17          New Voter Registration Form     118
     18          LCSEO 0067                      126
17   19          LCSEO 00032                     131
     20          LCSEO 00040                     137
18   21          Meeting Agenda                  145
     22          LCSEO 00058                     150
19   23          LCSEO 00017                     157
     24          LCSEO 00046                     161
20   25          LCSEO 00051                     169
     26          LCSEO 00037                     171
21   27          LCSEO 1156                      173
     28          July 2nd E-mail                 179
22
                          ****
23
     CERTIFICATE OF OATH                         188
24   REPORTER'S PAGE                             189
     READ & SIGN LETTER                          190
25   ERRATA SHEET                                191
                          ****

     FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

D E P O S I T I O N

MR. DANJUMA:  So good morning to everyone. My name is Orion Danjuma.  I'm an attorney on behalf of the Gruver plaintiffs with the ACLU, and thank you very much, Mr. Earley, for being with us today.  I think it makes sense for us to start with a roll call of individuals who are in the room first and then go through folks who are on the phone.

So, again, I'm Orion Danjuma with plaintiffs' counsel for Gruver.

MR. TOPAZ:  This is Jonathan Topaz for Gruver plaintiffs.

MS. EBENSTEIN:  Julie Ebenstein with the Gruver plaintiffs.

MS. ADEN:  Leah Aden for the Gruver plaintiffs.

MR. CUSICK:  John Cusick for the Gruver plaintiffs.

MR. LONDA:  John Londa (phonetic).  I represent the Association of (inaudible).

MR. PRATT:  My name is Joshua Pratt.  I'm assistant general counsel to the governor, but I'm not making an appearance or asking questions at this time.

1          MR. HERRON:  Mark Herron here on behalf of

2     Mark Earley.

3          MR. EARLEY:  And I'm Mark Earley, supervisor

4     in Leon County.

5          MR. HERRON:  Okay.  Folks on the phone.

6          MR. TODD:  Stephen Todd for Hillsborough

7     County Supervisor of Elections.

8          MS. DAVIS:  Ashley Davis for the secretary of

9     state.

10          MS. BRAVE:  Caroline Brave (phonetic) for the

11     Sarasota and Manatee County Supervisor of

12     Elections.

13          MS. CAESAR:  Tina Caesar (phonetic) for

14     Alachua County.

15          MR. VALDEZ:  Mike Valdez for Miami-Dade.

16          MR. DANJUMA:  So folks who are on the phone,

17     if you wouldn't mind announcing your name first

18     before you -- when you speak on the phone or raise

19     an objection or begin any question, that I think

20     would be much easier for the court reporter.

21     Because folks are trying to participate online, I

22     will do my best to -- when we introduce exhibits

23     that have Bates-stamp numbers, to provide those,

24     so if you'd like, you can access them from any

25     documents you have.  Obviously, some of the

1    documents don't have that, but obviously we'll

2    have a copy for the -- from the court reporter

3    that everyone will get after that.

4         So I think we're ready to begin.

5         All right.  So good morning, Mr. Earley --

6    excuse me.  I guess right as we're starting we

7    have one more addition.

8         MR. MORALES-DOYLE:  Sean Morales (inaudible)

9    is on the phone as well.  I didn't get a chance to

10   announce myself.

11        THE COURT REPORTER:  Say your name again.

12        MR. MORALES-DOYLE:  Sean Morales-Doyles for

13   the Gruver plaintiff.

14        MR. DANJUMA:  And do you want to announce

15   yourself for the record?

16        MR. PRIMROSE:  Nick Primrose for Governor Ron

17   DeSantis.

18   Whereupon,

19                     MARK EARLEY

20        Was called as a witness, having been first

21   duly sworn to speak the truth, the whole truth, and

22   nothing but the truth, was examined and testified as

23   follows:

24                    EXAMINATION

25   BY MR. DANJUMA:

1      Q.   So good morning, Mr. Earley.  Thank you very

2   much again for joining us today.

3           I wanted to start by asking have you ever

4   been deposed before?

5      A.   Yes.

6      Q.   Okay.  About how many times have you been

7   deposed, approximately?

8      A.   It's getting to be a habit.  Three or four, I

9   guess.

10     Q.   All right.  So while you're familiar, I

11   assume, with some of the ground rules, I'll go over

12   them again with you now.

13          So I will be asking questions.  You'll be

14   providing answers.  It's important to provide verbal

15   answers rather than nodding.  And if at all possible,

16   we'll try to wait for my question to end before you

17   begin a response.  It's often unnatural, but it will

18   be much more helpful to our colleague here, the court

19   reporter.

20          In addition to that, from time to time, your

21   counsel or other counsel for the defendants here may

22   raise an objection, and that's fine, but unless your

23   counsel instructs you not to answer, you should go

24   ahead and answer the question, but his objection will

25   be preserved for the record.

1          Perhaps most importantly, if you don't

2     understand a question that I ask, please feel free to

3     ask me, and I will do my best to clarify.  But unless

4     you say something to the contrary, I'll assume that

5     you understand the question that I've presented to

6     you.

7          In addition to that, we'll be taking some

8     breaks throughout the deposition.  If you need to take

9     a break, we're happy to accommodate that.  If at

10    all -- however, I'd ask one thing.  If you could

11    answer the question -- any question that's pending

12    before you take a break, then we could -- we could

13    move to a break right after that.

14         A.   Certainly.

15         Q.   Does all of that make sense?

16         A.   Yes, yes.

17         Q.   Okay.  And are you taking any medication that

18    would affect your ability to answer truthfully today?

19         A.   No.

20         Q.   Is there any other reason why you might not

21    be able to testify truthfully today?

22         A.   No.  I will testify to the best of my

23    knowledge and recollection.

24         Q.   Thank you.

25              All right.  So, Mr. Earley, could you please

1  provide me with your full name and position for the

2  record.

3      A.   Mark Shannon Earley, E-A-R-L-E-Y, the Leon

4  County Supervisor of Elections here in Leon County.

5      Q.   All right.  And could you provide me with

6  your educational background.

7      A.   My educational background.  I attended

8  elementary school and through, I guess, eighth grade

9  in West Virginia.  I graduated West Springfield High

10  School in Northern Virginia in 1982, attended 9th

11  through 12 there, and spent my first two years at

12  Cornell and then I had some time at Northern Virginia

13  Community College.  I did not graduate Cornell,

14  engineering program there.  I came and got my

15  associate's at TCC in the early '90s and I got my

16  mechanical engineering degree at FSU in, I guess, '97.

17      Q.   All right.  And, again, that -- your degree

18  was in engineering; is that right?

19      A.   Mechanical engineering.

20      Q.   Mechanical engineering?

21      A.   Yes.  And I've had some education throughout

22  my career in elections since '86 in election law and

23  things like that.  I've got a national certification,

24  state certifications.

25      Q.   Great.  Okay.  And before you became the

1     supervisor of elections in Leon County, could you tell

2     us briefly what your previous employment was with

3     supervisor of elections' office?

4         A.   Certainly.  In 1986, I started with a temp

5     agency, I think it was Manpower, working at the

6     elections office, in their warehouse, preparing their

7     lever voting machines for elections.  I was soon

8     thereafter hired as the full-time employee to be their

9     voting machine custodian, and I was responsible for

10    programming the old lever machines, and then in the

11    early '90s -- that was I guess in '96 -- or '86, '87.

12    Early '90s, we switched to paper ballots, and I was in

13    charge of programming those and also preparing polling

14    places for election delivery, all the logistical

15    aspects.  I've also done voter registration in that

16    job, voter outreach, some candidate qualifying

17    petition verification, lots -- most of the different

18    positions in the office.  In -- went through the 2000

19    elections.

20          In the late '90s, I would go out and assist

21    other county offices in Florida with upgrading their

22    machines or installing or even training because I've

23    been doing it for a while.  And in 2001, after the

24    2000 elections, I -- well, late 2001, I went to work

25    for a vendor.  It was -- used to be Global Election

1    Management Systems.  It was bought by Diebold, I

2    worked for Diebold, and then they changed -- I guess

3    they changed the name essentially to Premier Elections

4    from two thousand -- late 2001, early 2002, through

5    mid-2008, about six and a half years, at which time,

6    June of 2008, I came back to work with the supervisor

7    of elections, resumed my old job, which at some point

8    in the '90s had been changed from voting systems

9    custodian to voting systems manager.  Continued in

10   that job through twenty -- I guess early 2017.  I had

11   run for supervisor of elections when Ion retired in

12   2016, won the election, and was sworn in I think

13   January 3rd of 2017, and such time since then I've

14   been the supervisor of elections in Leon County.

15        Q.   Great.  And just to clarify the record, your

16   predecessor is Ion -- and could you give me his last

17   name?

18        A.   Yeah, Ion Sancho, S-A-N-C-H-O.

19        Q.   Right.  And you were in your old position

20   from 2008 as -- in the -- and you said it was the

21   machine system; is that correct?

22        A.   Voting systems manager.

23        Q.   The voting systems manager --

24        A.   That was the official title.

25        Q.   -- before you ran for the supervisor --

1    A.    Correct.

2          MR. DANJUMA: Excellent. Okay. Great.

3          All right. So at this point, I'd like to

4    mark as Exhibit 1 plaintiffs' notice of deposition

5    of Supervisor Earley.

6          (Whereupon, Plaintiffs' Exhibit No. 1 was

7    marked for identification.)

8    BY MR. DANJUMA:

9    Q.    And, Mr. Earley, this is a copy of the

10   deposition notice that we sent to your counsel for

11   today.

12   A.    Okay.

13   Q.    I'd like to ask first, what did you do to

14   prepare for this deposition?

15   A.    To prepare for this? Let's see. Reviewed

16   with my staff the procedures and the status of felons

17   or ex-felons, returning citizens that have

18   presented -- been presented to us from the Division of

19   Elections as potential ineligible voters. I reviewed

20   the deposition of Mary Jane Errington (phonetic). I

21   reviewed the deposition, at least in part, of Jermaine

22   Miller. I reviewed some of the e-mails that Maria

23   Matthews had sent to my office relating to Amendment 4

24   and, I guess, Bill 7066, and really more along the

25   lines of the pause of the information they were

1    sending to us.

2         Q.   And, I'm sorry, I didn't hear the last part,

3    the what that they were sending to you, the pause?

4         A.   They were sending -- you know, they've --

5    throughout, I don't know, years, they've sent felon

6    packets.

7         Q.   The packets, okay.

8         A.   Yeah, and so they paused that --

9         Q.   I see, sorry.

10        A.   -- in January.

11        Q.   Understood.  I'm sorry, I just didn't hear.

12   So you said that you reviewed the documents related to

13   the pause and the sending of the packets?

14        A.   Yeah, just trying to get a fuller

15   understanding of, you know, when we essentially halted

16   removing felons -- any felons that were still in the

17   chain of eligibility review and the removal process,

18   because we essentially had stopped processing those in

19   early January --

20        Q.   Great.

21        A.   -- late December.

22        Q.   And I'll return to some of that a little bit

23   later, but just in terms of the preparation for the

24   documents, you mentioned that you had conversations

25   with members of your own staff; is that correct?

1     A.   Uh-huh.

2     Q.   Do you recall which members of your staff you

3  spoke to in preparation --

4     A.   Sure.  Mostly the front office staff, Stephen

5  Usztok, Cory Logan, Laurina -- and for some reason,

6  I'm drawing a blank on her last name, although I value

7  Laurina as an employee.  Sorry, Laurina, when you read

8  this.  And Chris Moore.  I guess that's primarily it.

9  Also some of our IT staff when we were doing the --

10  going through the discovery process, trying to make

11  sure that we had the right filters to try to pull up

12  the data you all had requested.

13     Q.   Yes, and thank you for providing all that

14  data.

15     Did you review any of the documents beyond

16  the ones you already mentioned that you produced to

17  us?

18     A.   Not a whole lot, no, not necessarily.  Trying

19  to think if I reviewed -- I didn't really look at any

20  of the discovery documents we provided.

21     Q.   Understood.  Okay.

22     A.   And, of course, I did my whole discovery

23  interrogatory answers.

24     Q.   Yes.  The -- and just on the subject of

25  production of documents, who collected those

1    documents?  Did you -- well, let me back up.

2         Did you generate the search criteria to

3    collect those documents?

4         A.   I think Thomas James initiated some of that,

5    probably consulting with Chris Moore and my staff and

6    Johnny To (phonetic), who's one of our IT guys --

7         Q.   Okay.

8         A.   -- and maybe some of the front office staff,

9    and then I helped clarify that --

10        Q.   Got it.  Do you recall -- and, sorry, I'll

11   try not to talk over you.  Do you recall what search

12   terms you instructed your staff to use, or if you

13   modified it?

14        A.   Okay.  That's a good question.  Certainly

15   "Amendment 4."  Probably "felons."  I think we did

16   "SB, space, 7066," "SB, no space, 7066."

17        Q.   Great.

18        A.   That was probably the majority of it.  I

19   think we might have just searched in general for

20   communications with the Division of Elections also and

21   then just kind of visually went through those to see

22   which ones pertain to the case.

23        Q.   Okay, understood.  That's helpful.

24             Okay.  Now, have you ever testified in court

25   in your capacity as a supervisor of elections?

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

1    A.   Yes.

2    Q.   And what was the subject of your testimony,

3  if you recall?

4    A.   It's hard to keep it all straight,

5  depositions versus court appearance, but, let's see, I

6  testified, I believe, in the ballot rotation case or

7  the ballot order case, the vote-by-mail cure process

8  case.  I can't remember, frankly, if I testified in

9  the early vote on campus case or not.  And I can't

10  remember, frankly, if I testified in the Spanish

11  language case, but I certainly gave depositions in

12  those.

13        MR. DANJUMA:  Okay.  At this time, I'd like

14        to mark as Exhibit 2 your answers to the first set

15        of interrogatories that we -- and thank you for

16        producing those answers.  We'll return to them at

17        various parts of the deposition, but I just wanted

18        to put it in as an exhibit right now.

19        (Whereupon, Plaintiffs' Exhibit No. 2 was

20  marked for identification.)

21  BY MR. DANJUMA:

22    Q.   Can I ask, what do you -- what do you

23  understand the lawsuit for which this deposition is

24  being taken to be about?

25    A.   In general terms, I would say it's about the

1     application of Amendment 4 and how that was modified

2     by Senate Bill 7066 and primarily as both of those

3     might or might not relate to the financial obligations

4     of returning citizens or registered voters with

5     felonies -- felony convictions in their past.

6          Q.   And just to clarify, you can feel comfortable

7     to use terms that you use in your office to refer

8     to --

9          A.   Sure.

10         Q.   -- returning citizens or ex-offenders or

11    ex-felons, whatever is easiest for you.

12              And so you've mentioned already Amendment 4,

13    and can you just describe to me what you understand

14    Amendment 4 to have changed in terms of voter

15    registration and eligibility in Florida?

16         A.   Okay, yeah.  As far as what it changed, it --

17    with some exceptions in murder and felony sexual

18    offense -- provided for the automatic restoration of a

19    felon's voting rights upon completion of the terms of

20    their sentence.

21         Q.   Okay.  And you also mentioned Senate Bill

22    7066.  Can you tell me what your understanding is of

23    how that law changed voter registration eligibility

24    and eligibility in Florida?

25         A.   Okay.  That could take several days, but yes.

1    Q.   Actually, let me back up because I should

2    perhaps clarify.  You understand that the lawsuit that

3    we're deposing you for today is -- involves

4    provision -- well, let me withdraw that.

5        There are many provisions that are at -- that

6    are in SB 7066 that are not at issue in the lawsuit

7    today.

8    A.   That don't relate to Amendment 4 --

9    Q.   Yes.

10   A.   -- I think is what you're saying.  Yes.

11   Q.   That's right.  And do you have -- what is

12   your understanding of how SB 7066 changed voter

13   registration eligibility with regard to Amendment 4?

14   A.   And changed or clarified, I guess, or gave us

15   more specific guidelines as supervisors of elections,

16   and probably the Division of Elections also, and I

17   think maybe the intent was even voters, but primarily

18   it clarified who still had to go through the clemency

19   process, because I believe there was five statutes

20   regarding to murder and I think 11 statutes regarding

21   felony sexual offense that were, I guess, codified as

22   requiring executive clemency, which was the old

23   process, and then it certainly went in-depth about the

24   need to have financial obligations met and fulfilled

25   and some of the ways that voter -- felons, I guess,

1    returning citizens can potentially get the

2    obligations -- the financial obligations changed over

3    to community service or be forgiven essentially by the

4    court and some of their problems -- or restrictions

5    against doing that as in protecting victims' rights

6    and things like that.

7        Q.   Okay.  So at this time, I'd like to introduce

8    the text of SB 7066.  And as you mentioned, the bill

9    is quite long so we have provided copies for counsel

10   of the relevant provision that are largely from page

11   46 to 56.

12       A.   Yeah, it's roughly 10 pages.

13            MR. DANJUMA:  Mark this as 3.  Thank you.

14            (Whereupon, Plaintiffs' Exhibit No. 3 was

15   marked for identification.)

16   BY MR. DANJUMA:

17       Q.   So I'd like to talk to you about the

18   structure of your office, if possible.  Can you tell

19   me your job responsibilities as supervisor of

20   elections.

21       A.   I always leave out parts of this.  Basically

22   it's administering all aspects of elections within

23   Leon County from registering voters to determining

24   eligibility or ineligibility of voters, certainly

25   overseeing the logistics of conducting elections,

1    overseeing the programming and voting systems and
2    making sure the testing is thorough, overseeing local
3    candidate filing, qualifying, reporting of treasurers'
4    information, treasury reporting, I mean, voter
5    outreach certainly, voter education, some aspects,
6    especially around elections, producing all kinds of
7    materials for voter education and making the public
8    and candidates aware of upcoming elections and what
9    the different parameters are surrounding that.  Also
10   it seems to be lately testifying in court as it
11   relates to various challenges to election law, and
12   providing sometimes guidance or at least an
13   understanding of what this job entails and how we do
14   it.  Also, I'm part of the executive committee for our
15   association, so I help establish policy for our
16   association of supervisors of elections.
17        Q.   And that is the FSASE association?
18        A.   It is.
19        Q.   Can you tell me a little bit about your role
20   in that capacity actually?
21        A.   Sure, yeah.  Currently, I'm the secretary.
22   Previously I was the treasurer.  There's a general
23   progression through that where I would, I guess, be
24   vice-president and then president-elect and then
25   president at some point.  And we -- as the committee,

1    we help field questions and provide guidance to the

2    association in some fashion.  Certainly there has to

3    be a committee to kind of vet questions, and we have

4    conferences and set up those conferences.  We have

5    education.  There's lots of committees that are within

6    FSASE.

7        Q.   Okay.  And you mentioned that one of your

8    roles is to set policy.  What does that entail?

9        A.   Yeah, and I wouldn't say it's strict policy,

10   but really it's more policy about how we administer

11   our association as opposed to how elections are

12   administered without a doubt, yeah.

13       Q.   And does FSASE have any authority over other

14   supervisors of elections, or is it sort of voluntary?

15       A.   Yeah, I wouldn't say there's any authority

16   over any supervisors of elections at all.  We try

17   and -- maybe our clearing house, we have an attorney

18   who sometimes answers questions, Ron Labasky.

19       Q.   Okay.

20       A.   I guess one of the big areas we work in is

21   trying to effect elections legislation.

22       Q.   I see.  Okay.  So there's a lobbying

23   component from --

24       A.   There is.

25       Q.   -- the -- the --

1    A.    Yes.

2    Q.    -- FSASE itself?

3          Okay.  So back to your role as the supervisor

4    of elections for Leon County.  I think you

5    mentioned -- well, or does your role include updating

6    voter registration information?

7    A.    Certainly, yes, yes.

8    Q.    And maintaining voter registration rolls?

9    A.    Absolutely.

10   Q.    Okay.  And is part of your responsibility

11   entering new registrations into the voter registration

12   database for the state?

13   A.    Yes, it is.  My staff primarily does that,

14   but yes.

15   Q.    And is one of your responsibilities -- or I

16   believe you testified that one of your

17   responsibilities is eligibility determinations?

18   A.    Yes, yes, eligibility and potentially

19   ineligibility and progressing through 98.075.

20   Q.    Uh-huh.  And we may come back to that in just

21   a bit, but, first, are you the final decision-maker on

22   a given voter's eligibility?

23   A.    Yes.  Yes.

24   Q.    Okay.

25   A.    Let me say I have a well-trained staff, and

1    if they have any slight question, they'll bring it to

2    me.  There are instances where they will see that --

3    you know, in their view and through their training,

4    that they see that the evidence presented by the

5    Division of Elections does represent the correct voter

6    and they may initiate the eligibility letters going

7    out to those voters.

8        Q.   Okay.  And, actually, just to follow up on

9    that -- that point, so some members of your staff do

10   have authority to cancel a voter registration without

11   your review or --

12       A.   I wouldn't say cancel it, but they initiate

13   the proceedings.  And so, yes, if then -- if we send

14   out a certified letter, which is part of the process,

15   and then there's no answer, or that voter responds and

16   says yes, I -- I -- my status is as the division

17   reported and as you're stating as either -- like

18   recently there was a gentleman -- or a person, I'm not

19   sure if it was a gentleman -- who had -- was still

20   under supervision, I believe, for probation.  Clearly,

21   their rights hadn't been restored because they had not

22   fulfilled the terms of their sentence.  My front

23   office manager is empowered to go ahead and make him

24   ineligible.

25       Q.   Okay.  And just to go back to that, the front

1    office, the employees of the front office are the ones

2    with authority to initiate this proceeding under

3    98.075 and to potentially, after making a

4    determination based on the evidence or response from

5    the individual, remove them from the rolls?

6         A.   I delegated some of that authority to them,

7    yes.  Like I say, if there's any question, they

8    present it to me and they present a lot of it to me,

9    especially this year we've had a lot of back and forth

10   with information received from the Division of

11   Elections.

12        Q.   Yeah, right.  Some of that I'd like to speak

13   with you about later.

14        A.   Sure.

15        Q.   Can you describe to me what the front office

16   is first, though?

17        A.   Yeah.  When I say "the front office," that's

18   our -- that's primarily the staff charged with

19   interacting directly with voters.  So anybody that

20   comes in the office, they meet the front office staff

21   there at the front counter.  They do a lot of voter

22   registration input for new registrations, updates.

23   Online voter registration, they take that information

24   and enter it into the -- into our databases.  They

25   receive -- pertinent to this, I guess -- the

1    information from the Department of State Division of

2    Elections relating to the felon packets that we

3    receive, and they do the -- I would say fairly

4    extensive review of that to look -- you know, it has

5    to be credible and reliable, but we're also looking

6    for any ambiguity or uncertainty, and we don't

7    hesitate to send something back to the state for

8    clarification if we see a problem.

9        Q.    Yes, I've noted.

10           So do you have a -- and is the front office

11   the same as the voter services team?

12       A.    It is, it is, yes, yes.

13       Q.    And how many people are part of that team?

14       A.    Let's see.  I think five at this point.

15       Q.    Okay.  Do you recall their names at the

16   moment?

17       A.    Yes.

18       Q.    But it's --

19       A.    Stephen, Cory, Laurina, Alessandra, and

20   Ingrid.

21       Q.    All right.  Great.  Thank you.

22       A.    And Stephen manages the group, Stephen

23   Usztok.

24       Q.    Right.  Okay.  Do you expect that your staff

25   composition would change as SB 7066 continues to be

1    implemented?

2        A.    I don't expect it to too much.  Around

3    election time, we add temporary employees to the front

4    office staff.  They generally don't do eligibility

5    reviews, but we bring temporary employees on

6    frequently to help with workloads, especially like the

7    petition load that has hit us this year.  We've been

8    very, very busy this year.

9        Q.    Okay.  All right.  And are any members of

10   your staff lawyers admitted to the Florida Bar?

11       A.    No.

12       Q.    Do any of the members of your front office or

13   voter services team, have they been previously

14   employed within the criminal justice system?

15       A.    I could not say for sure actually.  Not to my

16   recollection, but --

17       Q.    Have any of them worked in an extensive -- to

18   an -- for instance, as staff of a clerk of court that

19   you know?

20       A.    Not that I know of.

21       Q.    Okay.  All right.  So I'd like to ask you a

22   series of questions to understand how the ordinary

23   voter registration process takes place in Leon County.

24   Right now this is maybe just the initial questions,

25   putting aside the issue of individuals with felony

1    convictions.

2        A.    Sure.

3        Q.    So can you just tell me, what are the voter

4    qualifications for registering in Florida?

5        A.    To register in Florida, you have to be a U.S.

6    citizen.  In general, you should be a resident of

7    Florida, over the age of 18, and as it says on the

8    voter registration application, not adjudicated

9    mentally incompetent.  And if you are a convicted

10   felon, then your rights should be restored.

11       Q.    Okay.  And can you briefly explain the

12   process by which a Florida resident would register to

13   vote?

14       A.    Yes.  They fill out the Florida Voter

15   Registration Application, DS-DE-39, or they can do the

16   version that's online, and we receive these

17   applications, we look for completeness.  The main

18   obstacle to someone who has filled out a registration

19   application but does not actually get registered is

20   the form is not complete.  There's a few key, specific

21   items that need to be completed.  They're highlighted

22   on the form.  But for most other people, if they fill

23   out the document, the voter registration application,

24   we look at the four corners and they've checked off

25   the right boxes that they have not -- they're not

1    mentally -- adjudicated mentally incompetent, if

2    they -- they're not a convicted felon, or if they are,

3    their rights have been restored, they are a U.S.

4    citizen, and over the age of 18 and they sign on the

5    line and they become a registered voter.

6         There is a small, initial vetting process.

7    One of the required pieces of data is either the

8    Florida identification number, which is the Florida

9    state ID or driver's license, or the last four of

10   their social security number, and so there's a very

11   cursory match, I think, between either the last four

12   or that Florida ID, that it matches up with the name

13   that's printed on the form.

14        Q.   Okay.

15        A.   So that's really the only vetting that's

16   done.

17        Q.   Okay.  And just to -- on that subject, I

18   wanted to direct you to Exhibit 2, which is your

19   interrogatory responses.  On page 6, you note that as

20   you testified to me now, that you rely on the four

21   corners of a complete voter registration application

22   document, and that the only caveat to that is a simple

23   validation that's run by the Florida Division of

24   Elections.  Is that what you were just describing as

25   the cross-checking with the last four of the social

1    security number --

2        A.    That is.

3        Q.    -- or driver's license?

4        A.    Is that No. 7?

5        Q.    Yes, I apologize.

6        A.    Not a problem.  Yeah.

7        Q.    So -- so when the form is complete, you send

8    the form to the Florida Division of Elections and they

9    run that check and --

10       A.    We enter the data in the database, and I

11   believe they -- they have an automated process, I

12   think, that does that because it happens pretty

13   quickly, and then the -- when everything is cleared --

14   and generally it is, it's very rare that that is not

15   corroborated -- then the person becomes a registered

16   voter.

17       Q.    Got it.  And how fast are we talking about?

18       A.    A day.

19       Q.    Okay.

20       A.    We generally get voter information cards in

21   the mail in less than a week, and we do those in

22   batches, so it happens quickly.

23       Q.    And what do you do if a voter registration

24   application, as you mentioned, isn't complete?

25       A.    We try and notify the voter based on the

1    information on the form.  Sometimes that's a

2    problematic endeavor because they haven't put a very

3    good address and sometimes the address is part of the

4    problem.

5        Q.    Okay.  So as you mentioned -- and correct me

6    if -- is it correct to say that once a voter

7    registration application is complete and the

8    validation that you've just explained is completed, at

9    that point an individual is registered to vote?

10       A.    Absolutely.

11       Q.    Okay.  Okay.  Do you know, beyond the simple

12   validation that you mentioned earlier, whether the

13   secretary of state's office takes any steps to

14   identify voters who might be ineligible because

15   they're too young or they're in the wrong residency at

16   the application stage before -- while it's pending?

17       A.    I think -- repeat that question again, the

18   last part.

19       Q.    Does the secretary of state's office take

20   steps to identify ineligible voters while the

21   application is pending?

22       A.    And then you said some parameters such as how

23   old they were, but the last part of that I didn't

24   hear.

25       Q.    Such as are they under the age of 18 or are

1    they the -- a resident -- are they applying -- are

2    they not a resident of the State of Florida.

3        A.   Oh, okay.  I don't think they actually do

4    review that, I guess potentially if their Florida ID

5    or their social security number matched.  I'm not sure

6    if they do a date of birth check on that.  My staff

7    would certainly do a date of birth check as they're

8    registering the voter.  And 16 and 17-year-olds can

9    pre-register, so we input their data into the

10    database, and then once they turn 18, they

11    automatically become a registered voter.  So their --

12    we do have people in our database that are under 18.

13        Q.   Okay.  So how does your office, in

14    conjunction with the secretary of state's office,

15    review if there are ineligible individuals on the

16    voter rolls, setting aside the issue of individuals

17    with felony convictions?

18        A.   How do we -- okay.  How do we review if

19    they're on the voter rolls and not eligible?

20        Q.   Yes.

21        A.   Well, there's different categories.  There's

22    people that are deceased, there's people that move out

23    of our jurisdiction, or out of Florida.  They would

24    become ineligible in Florida if they moved out of

25    Florida.  They would become -- they would just have an

1  address change if they moved somewhere else in

2  Florida.  Certainly we get records of mental

3  incompetence determinations.  And primarily the other

4  issue is whether someone has been convicted of a

5  felony, and that data primarily comes from the state.

6      Q.   Okay.

7      A.   There's very rare instance when someone will

8  be challenged by another outside entity, and if I see

9  compelling -- I don't know the proper term for that,

10  but if I see something that says yeah, there's reason

11  to investigate this, then I'm -- really compelled, but

12  required to investigate in those instances also.

13      Q.   On the -- on the bases for ineligibility,

14  besides having a felony conviction or related to that

15  issue, does the secretary of state's office provide

16  you information about, for instance, mental

17  incompetence?

18      A.   I don't believe it comes from the secretary

19  of state's office.  There's -- the deceased comes from

20  the Bureau of Vital Statistics primarily.  We just --

21  as a state, it looks like we're about to join ERIC,

22  we'll get data from there.  So there's -- the DAVID

23  files give us some information.

24      Q.   And for the record, could you explain what

25  the DAVID system is?

1    A.   Yeah, that's the Highway Safety and Motor

2    Vehicle -- it's really the motor vehicle database,

3    yeah, for address changes and things like that.

4    Q.   So is it correct to say, then, that the

5    secretary of state's communications to your office

6    about the eligibility of voter -- of individuals on

7    the voter rolls is largely restricted to whether or

8    not they may be ineligible based on a felony

9    conviction?

10    A.   I would agree with that statement, yes.

11    Q.   Okay.  So you mentioned in your testimony

12    previously 98.075 --

13    A.   Uh-huh.

14    Q.   -- and I wanted to return to that.  If you

15    could describe to me the process as you understand it

16    for notifying an individual that they may be

17    ineligible.

18    A.   Certainly, yes.  And let me state that I

19    frequently refer back to 98.075 as I'm working through

20    this, so this is off the top of my head.  I'm pretty

21    familiar with it.  We get the information from the

22    state on a specific registered voter -- these are

23    voters who are already registered -- based on their

24    periodic review, matching the various felons list that

25    they have access to with the voter registration

1    records of Florida.  And I guess if they find a match

2    within Leon County only, then they'll send it to my

3    office.  The staff there tries to accumulate data, I

4    guess making sure that it's the right voter, and then

5    the status of the felony conviction.  The information

6    changed a little bit recently since it was

7    reinitiated -- the process was reinitiated in early

8    June.  But basically we get information as to the type

9    of felony and whether their rights have been restored

10    or not, and that used to take the form of whether they

11    had received executive clemency, pretty

12    straightforward process, not a lot of ambiguity there,

13    except for the identity of the voter.  Now it goes

14    deeper, much deeper, as to the type of felony and in

15    the status of completion of their -- whether they're

16    still being supervised.  That's the primary data we've

17    received to this point.

18         So, then, once we get that, my staff reviews

19    that, I would say as extensively as we can, very

20    deeply.  We've joined some databases to try and do

21    more thorough research, I think what's called CCIS or

22    something along those lines.  Certainly we can look up

23    within our local clerk of court's database.  And we

24    may have joined a few other county -- the front office

25    staff, I gave them the authority to go ahead and do

1    that if they need to get access to other county clerks

2    of courts' databases to kind of review the packets and

3    corroborate the information we receive from the

4    Department of State.

5         If during that review we find, okay, this is

6    credible and reliable, we will initiate a certified

7    letter to the voter; again, all per 98.075, I think

8    it's under 7 at this point, Sub 7.  And so we send out

9    the letter.  If they don't respond and we don't

10   receive a notice that that was not deliverable

11   essentially, then I -- and within 30 days after that,

12   I believe we advertise in the paper that there's going

13   to be a hearing scheduled at such-and-such date, and

14   if the date comes along and they don't appear, then we

15   remove them from the rolls.  And this is all detailed

16   pretty specifically in 98.075, and hopefully if I

17   misspeak here a little bit, we'll default to what the

18   statute says because that's what we do.

19        Q.   I promise we --

20        A.   Like I say, we review this very carefully

21   every time.

22        If we -- if we get a return notice, I believe

23   we set up the hearing also and proceed with, you know,

24   removal if they don't show up.  In general, if we

25   schedule the hearing, it's very rare that someone

1    shows up to contest.

2        Q.    Okay.  Just so I quickly understand that, if

3    you get a return notice, meaning it was returned as --

4        A.    Undeliverable, yes.

5        Q.    -- undeliverable, you still will set a

6    hearing in case they --

7        A.    I believe we do, yeah, yeah.

8        Q.    Okay.  And you send one notice or more than

9    one notice?

10       A.    Good question.  We may actually mail a -- and

11   I think we even -- if we have an e-mail address and

12   even a -- there's also the cure process.  That's why I

13   refer to it a lot.  There's a lot of details here.  We

14   try and contact them as many different ways as we can.

15       Q.    Okay.  Okay.  And if I have any other

16   follow-up questions that are -- because it is a

17   complicated process, I'll zero in on them.

18             Just a background question.  When is the next

19   election for Leon County?

20       A.    For Leon, it's March 17th, presidential

21   preference primary of 2020.

22       Q.    And what's the registration deadline for that

23   election?

24       A.    Twenty-nine days out.  It's usually the

25   fourth Monday out.  So it's -- I think it's February

1    11th, but I can't really remember exactly.

2        Q.    Okay.  Great.

3            All right.  So I want to just go back to the

4    issue beyond the process question under 98.075 about

5    eligibility determinations related to individuals with

6    felony convictions.  Before -- and I want to start by

7    talking about the regime that was in place before

8    Amendment 4 was passed, if that's all right.

9            Under -- prior to Amendment 4, can you tell

10   me what -- can you remind me what the felony -- the

11   qualifications related to felony convictions were?

12       A.    The qualifications related to felony

13   convictions.  If you were convicted of a felony, your

14   rights could only be restored by the executive

15   clemency process.

16       Q.    Okay.  And how did voters with past

17   convictions affirm their eligibility on the voter

18   registration form?

19       A.    They signed -- I believe it was Check Box 2.

20   It was more of a generic statement that kind of

21   encompassed all possibilities as I saw it.  It said "I

22   am not a convicted felon, or if I am, my rights have

23   been restored."

24            MR. DANJUMA:  And I suppose -- why don't I

25        introduce this Exhibit 4, the old registration

1    form.

2         (Whereupon, Plaintiffs' Exhibit No. 4 was

3    marked for identification.)

4    BY MR. DANJUMA:

5         Q.    And if you just want to read Box 3 there.  I

6    shouldn't have tried to test you on it first, but --

7         A.    Actually, it is Box 2.  Yeah.  "I affirm that

8    I am not a convicted felon, or if I am, my right to

9    vote has been restored."

10        Q.    Okay.  Right.  Okay.  And you described to us

11   in explaining the process under 98 -- or the process

12   of determining eligibility based on potential felony

13   convictions, that the secretary's office sends you

14   what's called as a felon packet; is that right?  Did

15   I --

16        A.    Yes.

17        Q.    So can you explain to me and for the record

18   what a felon packet is and what's included in it?

19        A.    Well, there's lots of different sets of data,

20   and I'll probably leave some of it out.  In the

21   previous time period before January, I guess,

22   basically, they would send us a sentencing document

23   that kind of detailed in great detail the requirements

24   imposed by the court, the terms of the sentence I

25   guess you would say.  And for the most part, that

1    seemed to be time that they needed to serve, and it

2    did include -- and I haven't looked at a lot of these,

3    but, frankly, in my review of Jermaine Miller's

4    deposition, I saw that there was a lot of information

5    there about the financial obligations.  And then they

6    would send us information from, I guess, a negative

7    match with the clemency -- there's the big, long name

8    of that agency -- any information from the Department

9    of Corrections, again, DAVID information.  So it was a

10   pretty extensive packet of information.

11        Q.   Okay.  And the negative match is basically an

12   indication that they ran the individual's information

13   against the list of individuals who have received

14   clemency to ensure --

15        A.   Yes, yes.

16        Q.   -- that there's no match?

17        A.   To validate that there was no clemency given.

18        Q.   Okay.  And you mentioned they also checked

19   the DOC.  Is that the Department of Corrections

20   database?

21        A.   Yes.

22        Q.   And the DAVID system which you already

23   mentioned?

24        A.   Uh-huh.  I think -- and primarily I think to

25   make sure it was the right person, validating the ID.

1    Q.   Okay.  And how do you validate the ID through

2    --

3    A.   We would look through all these different

4    databases, validating, you know, or trying to

5    corroborate addresses, date of birth, certainly name,

6    of course, race and sex if that was available, gender,

7    just to try and make sure we had the right voter.

8    Q.   Okay.  So of the databases that you've

9    mentioned, do you know whether those databases are

10   limited in terms of dates they reach or not that --

11   the Department of Corrections database or the DAVID

12   database, for instance?

13   A.   Yeah, I can't say too much about the reach of

14   the dates within those two you mentioned.  I've heard

15   from several sources that the clerk of courts' data

16   only goes back, I don't know, a decade or two.  I

17   think it probably varies by individual clerk's office.

18   Q.   Right.  And do you know the extent to which

19   data from the felony packet includes information for

20   out-of-state convictions, and could you tell us about

21   that if you know?

22   A.   Yeah, that's a tougher one.  We get

23   information about out-of-state felon convictions, and

24   I think our ability to research that is much more

25   limited.

1     Q.   Okay.  And can you explain why?

2     A.   Because we don't really have access to too

3   many of the databases that might pertain to out of

4   state.

5     Q.   Do you know the type of information that the

6   secretary's office is sending you on an out-of-state

7   conviction?  Do you know what data they've provided in

8   that?

9     A.   I can't say with detail, actually.  We did

10   receive, I think, at least one out-of-state conviction

11   in June of this year, a notice of that, and I believe

12   we had difficulty corroborating some of that, but I

13   can't remember the specifics of that, so I can't

14   really say.

15     Q.   And I apologize -- I mean, I would -- it

16   would be nice to walk through a specific form.

17   Defense counsel in this case has withheld documents

18   that are specific to an individual because of

19   identifying information.  We are -- we understand that

20   there's not a protective order in place --

21     A.   Right.

22     Q.   -- but that's the reason why I'm sort of

23   asking generally to the extent that you know rather

24   than can walk through a specific example.

25     A.   Yeah, and, frankly, that's, I think, some of

1    the confusion surrounding this is that the data for

2    out-of-state convictions is tough to come by, tough to

3    corroborate, and certainly tough to research on our

4    part.

5        Q.    Okay.  And, then, just any information on

6    federal records, records of federal convictions that

7    you've obtained, do you know what databases those come

8    from if you've received --

9        A.    I can't say with any specificity.

10       Q.    Okay.  Do you have access when you're

11   reviewing felon packets to restitution records, for

12   instance?

13       A.    Generally, we have not had to research that

14   at all --

15       Q.    Okay.

16       A.    -- because none of the data we've received

17   after Amendment 4 relates to financial obligations,

18   which is how I would categorize restitution.  So I

19   have not actually seen that specific data, except for

20   my review of the deposition and the documents provided

21   with Jermaine Miller's, but in the normal course of

22   business, I have not seen any of those, nor has my

23   staff.

24       Q.    Okay.

25       A.    And prior to Amendment 4, we didn't have any

1    need to look at that because we were only looking at

2    whether a clemency had been provided.

3        Q.    Okay.  And in the -- the 98 -- in the process

4    where you receive the felon packet and review it,

5    you've mentioned that the information needs to be

6    credible and reliable, and I believed you mentioned

7    unambiguous.  Is that -- could you explain those

8    terms?

9        A.    Yeah, credible and reliable, from my

10   perspective, is -- well, if that's what's -- the

11   wording that's used in 98.075.

12       Q.    Yes.  Uh-huh.

13       A.    And so, for me, from my perspective, for it

14   to be credible and reliable, I guess past history has

15   shown that being human, the division staff can

16   sometimes make mistakes.  So we look for -- we don't

17   just take it, I guess, at face value is what I would

18   say.  And so if we see -- especially lately, instead

19   of sending us the sentencing documents, we're getting

20   screen shots form the Division of Elections of, I

21   guess, the data that's being presented during their

22   research on their computer screens, and we've seen

23   instances where someone was charged with a felony, but

24   we couldn't validate specifically that they were

25   actually convicted of that felony, and, to me, that's

1    somewhat ambiguous as to, okay, here's the charge for

2    felony, is that credible.  I mean, yeah, it's credible

3    they were charged, but I can't really tell for certain

4    that they were convicted, so I don't know if that goes

5    to reliability or credibility.  That's why I say

6    ambiguous or -- we don't want it to be ambiguous.

7           And some of our deeper research has found a

8    few vote -- well, a few -- more than a few, maybe 20,

9    25, roughly, that general area, where people had been

10   presented to us since June as convicted felons who

11   were still under supervision in some form, because

12   that's the only data we're receiving right now, where

13   it did -- it turned out that we either could not

14   corroborate that or it looked like maybe they had been

15   charged with a felony, but were actually convicted,

16   pled down maybe to a misdemeanor and were now on

17   probation, I believe -- probation, parole, curve balls

18   to me.  But, yeah, were still -- were serving

19   probation because of a misdemeanor plea as opposed to

20   a felony.

21        Q.   Yes, and I'd like to ask you a few more

22   questions about the specific examples that you've

23   raised because I think those are important.  I just

24   wanted to ask generally up front, though, that you --

25   you require credible and reliable evidence in your

1    review because it's required by the statute?

2        A.    Yes.

3        Q.    Okay.  The --

4        A.    Well, and I want to protect people's right to

5    vote.  I think it's morally required too, yes.

6        Q.    Excellent.  Okay.  That's very helpful.

7              So -- oh, and you just mentioned at the end

8    of your last statement, I believe, that you weren't an

9    expert in parole or probation?  Am I mischaracterizing

10   what you said?

11       A.    I just get those two terms confused, and I'm

12   certainly not an expert in that.  I am not a lawyer or

13   a judge, I guess.

14       Q.    And none of your office or staff is an expert

15   or a trained expert in parole or probation or --

16       A.    I would say that is correct.

17       Q.    Okay.  But you clearly are doing the best you

18   can with the information you have available to you to

19   make eligibility determinations that you can?

20       A.    Absolutely, yes, yes.  I think we do a good

21   job.

22       Q.    All right.  Okay.  And after you send a

23   notice under -- to an individual because you do

24   determine initially that the evidence you've received

25   is credible and reliable, initially reliable, is the

1    voter registered during that period to vote?

2         A.   Yes.

3         Q.   Okay.  And they can vote during that term, or

4    no?

5         A.   Yes.  If an election is underway, yes.  Until

6    we actually take them off the rolls, they are a

7    registered voter.

8         Q.   Okay.  All right.  Would you say in the

9    pre-Amendment 4 universe, approximately how many

10   individuals were removed from the rolls in a year

11   would you have as a rough estimate?

12        A.   I would say in my county, several hundred.

13             MR. DANJUMA:  Okay.  And I'd like to

14        introduce as Exhibit 5, the number of felon

15        matches.  This is correspondence we received from

16        your office.

17             THE WITNESS:  I hope I'm right with my

18        numbers, but I think it's in the ballpark.

19             (Whereupon, Plaintiffs' Exhibit No. 5 was

20   marked for identification.)

21   BY MR. DANJUMA:

22        Q.   Yes.  So this is material -- this is an

23   e-mail from Amber Marconnet to Karen Williams who's --

24   who is Karen Williams?

25        A.   She was our previous front office manager

1    or -- I can't remember the title.  She had Steve

2    Usztok's job at the time.

3         Q.    Okay.  And in this e-mail, Amber Marconnet is

4    e-mailing the number of matches provided in Leon

5    County versus Miami-Dade.  And could you just --

6         MR. HERRON:  Excuse me just for a second.  I

7         just want to help the people that might be

8         listening on the phone.  If you could do the Bates

9         stamp number so they might want to find it.

10        MR. DANJUMA:  Yes, I apologize, and thank you

11        for reminding me.  Please do that again if I

12        forget.  So for folks on listening on the phone,

13        we are -- we've marked as Exhibit 5 an e-mail from

14        Amber Marconnet to Karen Williams, and that's

15        Bates-stamped LCSEO 1378.

16   BY MR. DANJUMA:

17        Q.    And the matches that are listed as being

18   provided in Leon County for the first half of the

19   year, I believe January 1st through June 30th, is 378;

20   is that correct?

21        A.    Let me look.  There's that second paragraph

22   there.  So I think DS-DE 118 is the timeframe you're

23   talking about.  It says -- you also asked how many

24   eligible maintenance -- eligibility maintenance files

25   were forwarded to Leon and Miami between October 1 of

1    '17 and June 30th of '18.  So --

2        Q.   I see.

3        A.   -- that's roughly eight or nine months, and

4    that was the 378 versus 1,094.

5        Q.   Thank you very much for that clarification.

6    Unfortunately, with the production, there was an

7    initial error, so we didn't actually receive the

8    attachments, and I think we've received them yesterday

9    and have tried to review as many as we could.  But I

10   think your explanation does make sense.  Between

11   October 2017 to June 30th, that's the period when

12   there were 378 matches provided.

13            What is a match provided?  What does that

14   mean?

15       A.   I think that's matching the felon data that

16   the division receives with our voter registration

17   list.  So it's people who appear to be on both lists.

18       Q.   Okay.  Now, you mentioned in the eligibility

19   review process, that there are mistakes that have

20   inevitably made by the supervisor's office -- or,

21   excuse me, by the secretary of state; is that right?

22       A.   Yeah, the Division of Elections who work

23   underneath the authority, I guess, of the secretary of

24   state.

25       Q.   Do you have examples of where the Division of

1    Elections or other parties provided incorrect

2    information beyond -- beyond the post Amendment 4

3    period, but in the pre-Amendment 4 period where they

4    provided incorrect information about the eligibility

5    of individuals based on a prior felony conviction?

6        A.   Of a specific registered voter?  Yes,

7    certainly we had a few of those.  There weren't very

8    many.  There was a gentleman in -- I think it was the

9    prior -- May of 2018, I think, I'm pretty sure that's

10   right -- who was a local attorney, actually, in Leon

11   County and we had removed inadvertently from the

12   rolls.  The data we received from the state seemed to

13   match up, and so -- but it was a mistaken identity.

14   It was not the correct gentleman.

15       Q.   And are there examples where there were

16   broader lists of felons that were circulated in the

17   state that you were aware of from prior to your time

18   as a supervisor or --

19       A.   Well, certainly, yeah.  I can't remember the

20   exact year, but I think it was in the early 2000s,

21   there was the whole felons list issue where there was

22   a lot of attempts to match up felons and there was a

23   lot of ambiguity.  I think there was like potentially

24   18,000 people on the list who were not felons.  So

25   there was concern back then that sometimes these

1    matches were not adequate.  That was, I think, under a

2    different process, or the attempt to do a different

3    process.  Again, I wasn't real involved with that at

4    that time.

5          Q.   Okay.

6          A.   I don't even think I was working with the

7    county.  I'm not sure of the date, but I'm not sure I

8    was working with the elections office at the time.  I

9    might have been with the vendor.

10          MR. DANJUMA:  Okay.  I'd like to introduce

11          now as 6, Exhibit 6, a memorandum dated September

12          27, 2012.  This memorandum -- and this

13          Bates-stamped LCSEO 00080.  This is a memorandum

14          produced by your office in response to discovery.

15          (Whereupon, Plaintiff's Exhibit No. 6 was

16    marked for identification.)

17    BY MR. DANJUMA:

18          Q.   Now, this memorandum is dated from before

19    your time as the supervisor of elections, but I wanted

20    to ask you about a portion of it and give you a moment

21    to review it.

22          A.   Yeah, let me read this through.

23          Q.   Yes, please.

24          A.   (Reviews document.)

25          Okay.  Yeah, certainly, this is before I was

1    supervisor, yes.

2        Q.    And can you just explain your understanding

3    of the memorandum?

4        A.    I can say that essentially it's a -- I guess

5    you could say a warning that the information that was

6    in this list appeared to be fraught with error

7    potentially, and that before you initiated any removal

8    process, you should submit any names that you were

9    considering removing back to the Division of Elections

10   for further review before we enacted any procedures to

11   remove someone from the rolls.

12       Q.    And in your review of whether information

13   about an individual with a prior felony conviction

14   might be credible or reliable, you -- you have

15   typically been talking about information that you

16   received from the secretary of state's office; is that

17   correct?

18       A.    Yeah, as I -- I usually refer to the Division

19   of Elections.

20       Q.    Division of Elections.

21       A.    Yes, yes.

22       Q.    Excuse me, I'll try not to step over you.

23   But, yes, when I refer to the secretary of state in

24   this context, I usually mean the Division of

25   Elections, but I'll try to refer to that directly.

1          And you've mentioned there are errors that

2     occur with information that you've received from

3     Division of Elections.  This memo appears to relate to

4     a different list, and I wanted to ask if there was

5     information that was provided by a third party or

6     another county or some other state entity?  How would

7     you treat material that you receive on potential

8     ineligibility from that other party?

9          A.   In general, I haven't had much circumstance

10    to deal with that.  I can't say exactly where this

11    list came from.  I'm not sure if it came from the

12    state or from a third party or from whom, I'm not sure

13    where, and I frankly can't remember.  I was really

14    involved with running the elections of 2012, which

15    were pretty complex.

16         So -- but, in general, if I receive

17    communication from someone that a potential voter

18    might have a felony conviction or be ineligible for

19    some other reason such as residency or mentally -- you

20    know, being adjudicated mentally incompetent, I would

21    review the information they present.  If it seemed, I

22    guess, on its face to be somewhat credible, you

23    know -- and I think I'm required by statute to dig

24    deeper, if it looks like it's just somebody trying to

25    be a nuisance or cause problems with a voter without

1    any real credibility, I would not really move forward

2    with that.

3        Q.    Okay.  And I recognize that this memorandum

4    is from before your time in your current position,

5    but, generally speaking, would you agree that there

6    are errors which have incorrectly flagged individuals

7    as ineligible simply on the basis of a felony

8    conviction, not anything beyond that, but people were

9    mistakenly identified as having a felony conviction

10   when they, in fact, did not?

11       A.    Essentially the identification of a convicted

12   felon didn't match that registered voter that they

13   were -- whose eligibility they were putting in

14   question?

15       Q.    Yes.

16       A.    Yes, I would say that happens, yes.

17       Q.    Or even, for instance, when the identity

18   match is correct, a record has may have been flagged

19   by the Division of Elections or another party as being

20   a felony conviction when, in fact, it was not?

21       A.    Yes, I think we've seen evidence of that in

22   the last several months.

23       Q.    And that is the threshold question of whether

24   or not an individual might be ineligible based on a

25   felony conviction at all, right?

1    A.   If they weren't convicted of a felony, their

2    voting rights would not be in jeopardy.  Similarly, if

3    they were charged with a felony, but not subsequently

4    convicted of that felony, that's when I've seen these

5    kind of errors.  Maybe they pled down.

6    Q.   And you just testified recently that your

7    office, despite your best efforts, has on occasion

8    made errors where you have removed individuals from

9    the rolls based on a felony conviction in spite of the

10   fact that they were, in fact, eligible?

11   A.   That is correct.  Unfortunate, but true, yes.

12   Q.   Okay.  And I'd like --

13   A.   And it's been a very small number.  As far as

14   I know, there's one since I've been in office, yeah.

15        MR. DANJUMA:  Okay.  And I'd like to just

16        introduce for the record as 7 an e-mail from --

17        oh, from Karen Williams to Stephen -- Usztok, is

18        that correct?

19        THE WITNESS:  Uh-huh.

20        MR. DANJUMA:  -- on November 1st, 2018.  And

21        this Bates stamp is LCSEO 00403.

22        (Whereupon, Plaintiffs' Exhibit No. 7 was

23   marked for identification.)

24   BY MR. DANJUMA:

25   Q.   And I'd like to direct your attention to the

1     second paragraph --

2          A.    On the front page?

3          Q.    Yes, on the front page.

4                -- where Ms. Williams writes to an

5     individual:  "In 2009, after moving to Leon County,

6     Florida, our office received notice from the

7     Department of State of a prior felony conviction.  Our

8     office attempted to notify you via certified mail of

9     the prior felony conviction in September of 2009;

10    however, our office did not receive a response.  Per

11    98.075, Subsection 7, Florida Statute, since there was

12    no response to our correspondence or notification of

13    clemency for the felony conviction, in December of

14    2009 you were removed from the Florida registration

15    rolls.  During the eligibility maintenance process,

16    you were granted a certification of restoration of

17    civil rights, which restores your right to vote.  And

18    then the certificate was issued on October 26, 2009,

19    after the felony conviction; however, our office did

20    not receive notice of you being issued a certificate

21    of restoration of civil rights, which is why your

22    record progressed through the eligibility maintenance

23    process and resulted in you being removed from the

24    voter registration rolls.  A PDF copy of the

25    certificate is attached for your records."

1         Is this the individual you were mentioning

2    before, or is this a different individual?

3         A.   I believe this actually is a different

4    individual.  Yes, I think it is.

5         Q.   Okay.  And this is another example of a

6    circumstance where someone had actually received

7    clemency --

8         A.   Kind of in --

9         Q.   -- but because it had fallen through the

10   cracks, they weren't actually -- your office removed

11   them pursuant to following all of the requirements of

12   98.075, even though they were, in fact, eligible?

13        A.   I would say that's in general correct, yeah.

14   It appears, and I would have to plot this out a little

15   bit, but that during our review process they actually

16   had received clemency, and we weren't notified of that

17   clemency during our review process.  And that's

18   somewhat of a -- I wouldn't say unique occurrence, but

19   it's unusual for that timeline to fall as it does.

20   So, yeah, they were removed.

21        Q.   And I just would like to ask one follow-up

22   question.  One of the bases of their removal was that

23   they didn't respond to the letter, the notification

24   letter, right?

25        A.   Yes.  Yes.

1      Q.   If they had, they might have been able to

2   contest the fact by showing that they were in clemency

3   or they were in the process of receiving clemency?

4      A.   True, true.

5      Q.   Would you agree that it is important for you

6   to only initiate the process under 98.075(7) with

7   credible and reliable information because putting that

8   burden on voters might be something that they're not

9   able to shoulder even if they're, in fact, eligible?

10      A.   I would say that statute places some burden

11   on them.  I won't characterize whether -- the fairness

12   of that.  We initiate a process as outlined in 98.075,

13   Sub 7, and if they don't return that -- if they don't

14   respond, then it's prescribed how we must continue.

15   So I don't necessarily want to comment on whether

16   that's just or not.  It's the law we have to follow.

17      Q.   Yes, and to clarify -- and thanks for that

18   question.  I didn't mean to ask whether or not it's

19   just or fair, but perhaps to put the question more

20   simply, there are voters who may not respond to a

21   notice, not because they're not eligible, but for many

22   other reasons, such as the fact that they didn't see

23   it or understand it, is that -- would you say that's

24   fair?

25      A.   True, true.

1    Q.   And some of those voters are, in fact,

2    eligible even under the pre-Amendment 4 situation; is

3    that right?

4    A.   Yeah.  I think it was rare, but this is --

5    sounds like an instance where it was -- that was the

6    case, without a doubt, yes.  So certainly it can

7    potentially happen.

8    Q.   Okay.

9    A.   I would hope it would be rare.

10         MR. DANJUMA:  And I would like to now

11         introduce as Exhibit 8, a document we received

12         from your office titled "Felon Documentation

13         Received from Another SOE," and the Bates stamp

14         for this is LCSEO 00274.

15         (Whereupon, Plaintiffs' Exhibit No. 8 was

16    marked for identification.)

17    BY MR. DANJUMA:

18    Q.   And I'd like to direct you to the first two

19    paragraphs of that document, if you have a moment to

20    look at it.

21    A.   Yeah.  Where did this originate from?  Is

22    this from my office?

23    Q.   This is from your office.  Unfortunately, it

24    was produced without a connection to another document.

25    So I was going to ask you --

1      A.    Okay.

2      Q.    -- if you know where it derived from.  If you

3    read the first paragraph, it says, "It is illegal for

4    a convicted felon to knowingly register to vote in

5    Florida, and one of the responsibilities of

6    supervisors of election is to remove registered felons

7    from the voter registration rolls."

8            And so I assume that this derived from the

9    period before Amendment 4 was in effect.  But you have

10   not seen this document before?

11     A.    I don't recognize it.  Let me look through it

12   here.

13           (Reviews document.)

14           Okay.  I've read it.  Yeah, I have not seen

15   this before.  It appears to be something written --

16   and it appears, I cannot say for sure -- likely by

17   someone on my staff or maybe even maybe written prior

18   to me taking office, I'm not sure the time period of

19   this, that was setting office procedures for the

20   instance when we would receive felon documentation

21   from another supervisor of elections office.

22     Q.    Okay.  And did that -- has that occurred in

23   your term, that you've received this documentation

24   from another supervisor of elections office?

25     A.    It may have.  I don't recollect that

1    happening.

2        Q.   And I want to just read the second paragraph,

3    if I may.  It says, "Some counties have different

4    standards for how they handle convicted felons.  Our

5    office requires court documentation, usually a

6    judgment page, clearly and obviously indicating that

7    the voter was judged guilty of a felony offense.  We

8    require this documentation in packets from the state

9    Division of Elections.  Other counties do not require

10   proof of the felony conviction or notice from the

11   division, and they'll remove voters based on simpler

12   report lists from the county clerk of court."

13           In your experience, is that paragraph

14   correct?

15       A.   I would certainly not have approved that last

16   sentence if it was going on an official document.  I

17   would say that's an opinion of someone.

18       Q.   I see.

19       A.   I cannot attest to the truthfulness of that

20   sentence or not.

21       Q.   Do you -- are you aware of whether or not

22   other supervisors of elections require court

23   documentation or a judgment page -- excuse me, let me

24   withdraw that.

25           Are you aware of whether other supervisors of

1  election during the pre-Amendment 4 period required a

2  court documentation or a judgment page in order to

3  initiate the removal process?

4      A.   I cannot say with any certainty except to

5  state that as far as I know, they've all -- all the --

6  my colleagues, supervisors of elections, follow

7  98.075, specifically (5) and (7), and that is

8  generally credible and reliable information about a

9  felony conviction.  So I would tend to think that

10  would be court documents.  But, again, I don't know

11  the exact procedures that every single office follows,

12  just as I did not know about this document here.

13      Q.   I understand, and I understand that you

14  haven't seen this document.  I wanted to ask about the

15  general principle.

16          I guess a follow-up question is, do you think

17  that the policies and procedures you've put in place

18  in your office to review materials are exceptional in

19  terms of their detail and -- of review, or not?

20      A.   I don't -- I can't say whether they're

21  exceptional or not.  I think we probably go further

22  than some supervisors, but I don't know how to

23  categorize them as being exceptional or not.  I -- we

24  do what I -- you know, since I'm responsible for

25  determining eligibility, I want to do what makes me

1    feel comfortable before I take those rights away from

2    someone --

3         Q.   And you --

4         A.   -- and so I make sure that we go the extra

5    mile certainly.

6         Q.   Okay.

7         A.   And yet we have still made mistakes, and I'm

8    sure other supervisors have too.

9         Q.   Under 98.075, it is up to the individual

10   supervisor to make their own determination about the

11   amount of evidence that would be required to -- to

12   initiate removal proceedings?

13        A.   I think that's correct, but as the statute

14   specifies, it should be credible and reliable.

15        Q.   Uh-huh.  All right.

16        A.   I believe the state is tasked with presenting

17   evidence to us that is credible and reliable too.

18        Q.   All right.  So I'd like to talk -- now I'd

19   like to switch a little bit focus and now talk about

20   the period between the passage of Amendment 4 and SB

21   7066.  Prior to the passage of Amendment 4, did your

22   office take any steps to plan for the implementation

23   of the provision if it passed?

24        A.   So prior to the election date?

25        Q.   Yes, prior to November 2018.  The answer can

1    be no, it's just --

2        A.    Yeah, I can't say for sure, not that I really

3    recollect.

4        Q.    Okay.  Do you know if the supervisor -- I'm

5    sorry.  Do you know if the DOE took steps to plan for

6    implementation prior to the November election?

7        A.    I couldn't say.

8        Q.    Okay.  And did the DOE communicate anything

9    to SOEs, supervisors of elections, about the

10   implementation of Amendment 4 in the lead-up to the

11   2018 election?

12       A.    Not that I recollect.

13       Q.    Between the passage of Amendment 4 and its

14   effective date -- well, let me back up.

15             When did Amendment 4 become effective, if you

16   recall?

17       A.    January 8th of '19 -- 2019.

18       Q.    And between the November 2018 election date

19   and January 8th, did your office take steps to plan

20   for the implementation of the constitutional

21   amendment?

22       A.    I would say yes, we did.  We discussed what

23   steps we would take.  We coordinated with local groups

24   to get people registered to vote, specifically people

25   with felony convictions on their record.  We developed

1    information, documents, that we presented to the

2    public and to groups trying to register people to

3    vote, I guess detailing my understanding of Amendment

4    4 and essentially what our policies would be.  A lot

5    of that was, I think, geared towards making sure

6    people were not afraid to get registered to vote who

7    had a prior felony conviction.  And as I said in

8    public many times, it was very rare for someone to be

9    prosecuted for registering to vote who had a felony

10    conviction, but their rights were not restored prior

11    to the passage of Amendment 4.  It was rare for

12    someone to be pros- -- I see your quizzical look.

13    Q.  I'm sorry, I didn't quite understand the last

14    sentence you said.  Could you say it again?  I

15    apologize.

16    A.  It was rare prior to the passage of Amendment

17    4 for a person who registered to vote who was a prior

18    felony -- was priorly and convicted of a felony, but

19    yet registered to vote, it would be rare for them to

20    be prosecuted when actually the facts surrounding

21    their restoration of rights was very straightforward,

22    did they receive clemency.  And so now under the more

23    confusing situation, as was in the news everywhere at

24    the time, it would be much less likely even with the

25    passage of Amendment 4 for someone to be convicted.

1    So we were trying to allay that fear that we were

2    hearing was very prevalent in the community from -- of

3    people that were convicted of felonies to get

4    registered.  They were very fearful that they might be

5    in error about their status, whether they completed

6    the terms of their sentence or not, and would

7    therefore be prosecuted, and I was trying to allay

8    that fear.  And we talked with the clerk of courts and

9    state attorney.

10        Q.   If I can stop you there, because there's a

11   little bit to unpack in what you just mentioned.

12             So part of your reaction I want to

13   understand.  I heard you to say to the passage of

14   Amendment 4 was to allay individuals' fears that they

15   could be prosecuted if they sought to register to vote

16   and were, in fact, ineligible; is that right?

17        A.   I would just say instead of "could" would be

18   "would."

19        Q.   Would, okay.

20        A.   Would be prosecuted.

21        Q.   The -- so -- and why are you making that?

22   Because it is possible they could be prosecuted; is

23   that right?

24        A.   Sure.  Statutorily, if there was a clear

25   intent to defraud, then they could be prosecuted as --

1    and that's why I was explaining in my communications

2    with State Attorney Jack Campbell and County Clerk

3    Gwen Marshall, it was -- it would be very unlikely --

4    first of all, that was a high bar to prove.  The lack

5    of prosecutions under the old regime, which was much

6    less confusing, resulted in very few prosecutions,

7    referrals for prosecutions, and under this new regime,

8    as state attorney I think enunciated pretty clearly,

9    it was much less likely that they would be able to

10   prove that burden.  So he was unlikely to take anyone

11   to court on that or prosecute someone for that.

12       Q.   Okay.  So I think I understand what you said.

13   And part of the -- the -- what you did to allay that

14   fear was highlight how rare prosecutions were even

15   when eligibility arguably is much clearer, right?

16       A.   I should have used those words.  Yes, that

17   was very clearly stated, yes.

18       Q.   No, and --

19       A.   But that's right.  That is correct.

20       Q.   You've clarified me more than once, so I

21   think we'll do this together.

22            But -- so basically you said even though

23   you've testified that an individual could be

24   prosecuted regardless, that the rarity of those

25   prosecutions occurring should allay some fears?

1      A.   As long as people were operating without the

2   intent to defraud and progressing and registering to

3   vote with the assurance in their own mind that they

4   were -- they had their rights restored by completing

5   terms of their sentence, they should get registered,

6   yes.

7      Q.   And you referenced when you were talking to

8   the community groups that you reached out to, a lot of

9   fear in the community about this concern.

10     A.   Uh-huh.

11     Q.   Can you tell me a little bit more about that?

12     A.   Yeah.  We've got close relationships with a

13   lot of the different community groups that are in Leon

14   County, and we were hearing from them and just voters

15   calling our office concerned -- you know, this was in

16   November, December, in the buildup to January 8th --

17   concerned about whether they should get registered.

18   They were fearful, they weren't 100 percent certain,

19   they thought they had completed the terms of their

20   sentence, they were not -- they didn't have very good

21   resources to validate that, and so I wanted to help

22   alleve [sic] those fears.  I said, "If you believe

23   your rights are restored and you've completed your

24   sentence, you should come get registered."

25     Q.   I understand.

1    A.   I said, "The worst that can happen is you'll

2    later -- at a later time may be removed from the rolls

3    if it turns out your belief was in error."

4    Q.   Do you recall like approximately how many

5    calls you were receiving?  And if not, that's all

6    right.

7    A.   I can't really state exactly.  I would say a

8    dozen or two over the few months.

9    Q.   But enough for you to get an impression that

10   this was a concern in the community generally?

11   A.   Certainly, and it was reported in the news,

12   and the community groups I was talking to were, you

13   know, absolutely saying that that was the case, that

14   there was a lot of fear.

15   Q.   Okay.

16   A.   And uncertainty.  I wouldn't always say it

17   was fear, but just uncertainty about the meaning of

18   Amendment 4.

19   Q.   And you also mentioned that you spoke to Gwen

20   Marshall, who's the clerk of courts --

21   A.   Yes.

22   Q.   -- as well as -- and I'm forgetting --

23   A.   State Attorney Jack Campbell.

24   Q.   State Attorney Jack Campbell.  Who is Jack

25   Campbell?

1    A.   He's the state attorney for -- his district

2   contains Leon County.

3    Q.   Okay.  And he provided you -- he corroborated

4   your view that although it is possible for an

5   individual to be prosecuted, it would be rare and it

6   might be hard to prove?

7    A.   Yes.

8    Q.   The -- and that was the opinion of Jack

9   Campbell, the state attorney for Leon County.  Is it

10   possible that other state attorneys would take a

11   different view?

12    A.   It's possible.  However, I was reassured by

13   State Attorney Campbell that in speaking with his

14   association, similar to how we have an association, at

15   least the prevailing view or the impression I got from

16   him was that as a group, the state attorneys for

17   Florida agreed with his take on the whole likelihood

18   of prosecution.

19    Q.   And I believe in your interrogatories, you

20   note -- well, why don't I ask you without reference to

21   the interrogatories -- that you would not refer an

22   individual for prosecution unless you had clear

23   evidence of an intent to defraud; is that correct?

24    A.   Correct.

25    Q.   Have you ever referred anyone for

1  prosecution, either --

2      A.   No.

3      Q.   Okay.  The fact that you wouldn't refer them

4  for prosecution would not mean that an individual

5  wouldn't be prosecuted; is that correct?

6      A.   I think it would be very unlikely that

7  someone else would take up a prosecution without me

8  referring it to the state attorney.  So --

9      Q.   Uh-huh.

10     A.   -- yeah, I'm not sure --

11     Q.   And why do you say that, just out of

12 curiosity?

13     A.   I'm the one that would take the -- you know,

14 make the determination that as I see it, that someone

15 had registered to vote with an intent to fraud because

16 we get their registration forms.  So I guess it's

17 possible for someone else to be refer- -- to refer

18 someone for prosecution.  I'm not sure who that would

19 be.

20     Q.   Okay.  You do not have authority to immunize

21 any particular voter from prosecution?

22     A.   Correct.  Correct.

23     Q.   Okay.

24     A.   And in all of our documents, there was always

25 a caveat, you have the final decision-making of

1    whether to register to vote or not.

2        Q.   Okay.

3        A.   Yeah.

4        Q.   All right.  Oh, and I wanted to go back to

5    your general discussion of the plans that you had made

6    for the implementation of Amendment 4.  You said that

7    you gave presentations and provided documents

8    detailing your understanding of Amendment 4.  What was

9    the understanding of Amendment 4 that you communicated

10   to the public at that time?

11       A.   It was that upon -- unless you were convicted

12   of murder or a felony sexual offense, upon Jan- -- you

13   know, the arrival of January 2019, if you had

14   completed the terms of your sentence, then your right

15   to vote would automatically be restored.  And

16   certainly as was in the news and everywhere, the big

17   question was what does "terms of sentence" mean?  And,

18   frankly, I took that to be primarily supervision or

19   incarceration.

20       Q.   Okay.  So in your understanding of the -- of

21   Amendment 4, an individual would be eligible to

22   register to vote after they had completed an

23   incarcerated sentence and had completed their

24   probation?

25       A.   Correct.  Now, certainly, in my research --

1    and I didn't do a huge amount, but in talking to

2    people, I understood that sometimes restitution was a

3    term of the sentence.  I did, for what it's worth,

4    some review of Florida Statutes, and the only time I

5    could see a differentiation between the two was in the

6    definition -- or there was a section of statutes, I

7    can't remember the exact number, 984 or something like

8    that, where it talks about the terms and conditions of

9    parole or probation, and there it seemed to

10   differentiate between the term of a sentence, which

11   was supervision, versus the conditions, which would be

12   restitution -- all of the financial obligations seemed

13   to be conditions.

14       Q.   And did you communicate the understanding of

15   Amendment 4 that you just described to me, which,

16   again, I'll summarize as saying you are eligible to

17   register after you complete your incarcerated sentence

18   and your probation -- you're out -- you're off of

19   supervision, did you communicate that generally to

20   voters in your community?

21       A.   I would say yes.  Again, I said that, you

22   know, if you're uncertain, then you should either talk

23   to your probation officer or, you know, the clerk of

24   courts where you were convicted -- in which county you

25   were convicted, and the final decision was certainly

1    up to the voter.

2         Q.    Understood.  And in terms of eligibility and

3    the felon packets that you'd received, is it -- you

4    reference -- you testified earlier that there was a

5    pause in those packets after the passage of Amendment

6    4.  Can you tell me what -- when and how you stopped

7    processing felony -- removals for felony convictions

8    after the passage of Amendment 4?

9         A.    Yes.  So with the passage of Amendment 4, we

10   had some felon packets that were al- -- that were in

11   process from the state.  Some of those had already

12   received the letters and were due for removal, and

13   that would have taken place, I believe, before January

14   8th, for the most part, although even after January

15   8th, some of them were still in process and were taken

16   off at a later time.  But anybody that we had not sent

17   a letter to or that we would make a determination of

18   after January 8th essentially that were not for murder

19   or felony sexual assault, and I believe even were

20   not -- who may have been still under supervision, we

21   halted the process on that, for the most part.

22        Q.    Okay.  And I'd like to introduce as Exhibit

23   9 -- I'd actually like to go to --

24        A.    Let me go back to the previous question, if I

25   may.

1    Q.   Oh, please.

2    A.   Yeah.  I don't know that I actually said

3    publicly or in any of our documentation that you did

4    not have to complete the -- any financial aspects of

5    your sentencing.  I don't think I put that out

6    publicly --

7    Q.   Understood.

8    A.   -- but that was my take on it.

9    Q.   That was your understanding --

10   A.   Yes.

11   Q.   -- internally even if that wasn't submitted

12   in a kind of written, official --

13   A.   Right.

14   Q.   -- documentation?

15   A.   Yes, exactly.

16        MR. DANJUMA:  Okay.  That's helpful.  So I'd

17        like to introduce now as Exhibit 9, an e-mail

18        correspondence with the Bates No. LCSEO 00075.

19        (Whereupon, Plaintiffs' Exhibit No. 9 was

20   marked for identification.)

21   BY MR. DANJUMA:

22   Q.   And I apologize for the lengthy -- the manner

23   in which these e-mails were produced to us are in

24   longer chains, which is helpful because it reduces the

25   documents, but I'm actually interested in the very

1    last one, which is the e-mail from Monday, February

2    11th, from Maria Matthews to the SOE list regarding

3    Amendment 4.  And can you just review that last --

4    that last e-mail?

5         A.   Certainly, yeah.  Monday, February 11th at

6    10:05 in the morning from Maria.

7              MR. HERRON:  You don't have to read it out

8    loud, just review it.  He didn't say read it.

9              THE WITNESS:  Okay, yes.

10   BY MR. DANJUMA:

11        Q.   Yeah, no need to read it all entirely.  I'm

12   just --

13        A.   (Reviews document.)

14             Okay.

15        Q.   And what was this e-mail from Ms. Matthews,

16   if you want to summarize the direction in that e-mail

17   to supervisors of election?

18        A.   Yeah, and that's why I was looking at the

19   date so carefully in the beginning.  It is, I think,

20   the initial communication from the Division of

21   Elections, Maria Matthews, Director Matthews, making

22   sure that supervisors of elections who had received

23   felon packets in the lead-up to January 8th

24   essentially did not move forward on those until the

25   division was able to do a review under their

1    understanding as of Amendment 4.  So essentially

2    "invalidate" means stop the process.

3        Q.    Okay.

4        A.    And I -- that's essentially what we had

5    already done back in late December.

6        Q.    I see.  So you did that on your own

7    initiative, understanding Amendment 4 to change

8    eligibility requirements, so you paused your

9    processing of felony packets in December because some

10   of those individuals might, in fact, be eligible under

11   the new law and should remain registered to vote?

12       A.    Correct, and we would likely not institute

13   that or initiate that process until after January 8th.

14   So we didn't want to put into process something that

15   was then going to be midstream, have a change to it.

16       Q.    Understood.  And that was -- you didn't know

17   yet whether some of those individuals were, in fact,

18   still on probation or supervision and, in fact, should

19   be removed from the rolls, but you wanted to pause

20   that process at the time until you had more

21   information from your own internal review and from

22   the --

23       A.    And from the state.

24       Q.    -- Division of Elections?

25       A.    Correct, correct.

1    Q.   All right.  And the -- okay.  Do you recall

2    reaching out to the Division of Elections or other

3    supervisors of elections to determine what you should

4    do during this period regarding individuals with

5    pending felon packets?

6    A.   I don't really remember reaching out.  It was

7    basically a decision we made in-house, I made

8    in-house.

9    Q.   Uh-huh.  The -- okay.

10        MR. DANJUMA:  I'd like to introduce LCSEO

11        01399.  This is e-mail correspondence from -- the

12        relevant correspondence is from Mr. Earley to his

13        staff.

14        (Whereupon, Plaintiffs' Exhibit No. 10 was

15   marked for identification.)

16   BY MR. DANJUMA:

17   Q.   And, again, I want to direct you -- in this

18   chain that we received is a composite to the section

19   that starts on October -- or November 29th.  It looks

20   to be -- can you confirm that's an e-mail to Tashia

21   and Amber in the Division of Elections?  Can you tell

22   me who Tashia and Amber are?

23   A.   They worked for -- Tashia Brown and Amber

24   Marconnet, they worked for the Division of Elections.

25   And it looks like I was drafting a letter to them

1    about Amendment 4.  The date was November 29th of 2018

2    when I was at least considering this letter.

3         Q.   All right.  And do you recall if you sent

4    that letter and whether or not -- and if so, whether

5    or not you got a response from the --

6         A.   I can't recall, but I can certainly look

7    through this and it might help refresh my memory.

8    It's been a long time since I've seen this.  So if I

9    may?

10        Q.   Please, please.

11        A.   Okay.

12             (Reviews document.)

13             Okay.  It looks -- I do not know if I sent

14   this.  I was certainly contemplating asking the

15   division about two things.  One is whether -- you

16   know, I was already looking at putting on hold the

17   removal process because we knew January 8th was coming

18   up.  I can't remember if I actually sent this or not.

19             And the second question was asking about the

20   division's readiness to handle and preparations for

21   Amendment 4 passing and with regards to the January 8,

22   2019, deadline.  And so I was at least contemplating

23   asking a whole batch of questions.

24        Q.   Okay.  The reason I raise this and the

25   question that I wanted to raise for you was did you

1  get a response -- did you reach out and get a response

2  from the Division of Elections on any of the pending

3  questions that you had about the implementation of

4  Amendment 4 before the --

5      A.    Right, right.

6      Q.    -- February e-mail that we just reviewed?

7      A.    Let me read the rest of this chain here.  I

8  can't remember specifically.

9      Q.    Okay.

10     A.    I definitely remember we were considering it,

11  but there was also debate as to whether they would

12  actually be able to answer and --

13     Q.    Right.

14     A.    -- putting people in difficult situations.

15  So --

16     Q.    So I guess setting aside this e-mail

17  correspondence, because I understand that there are

18  some documents that due to an error we didn't get

19  until yesterday, so it's possible there's a different

20  e-mail that I didn't yet see --

21     A.    I was going to say potentially, if we did,

22  I'm sure it's in the discovery documents we sent you,

23  but I can't say off the top of my head.  I did not

24  review all of those documents.

25     Q.    The broader question that I'm asking is did

1      the supervisor of elections provide you -- sorry --

2      did the Division of Elections provide any guidance on

3      Amendment 4 or its implementation that you recall

4      generally after its passage, before the February

5      e-mail?

6          A.   No.

7          Q.   Okay.

8          A.   Not that I recollect.

9              MR. DANJUMA:  Okay.  All right.  And I would

10             like to introduce -- just one moment.  And then

11             I'd like to -- to introduce as Exhibit 11 an

12             e-mail correspondence that starts LCSEO 01386.

13             (Whereupon, Plaintiff's Exhibit No. 11 was

14     marked for identification.)

15     BY MR. DANJUMA:

16         Q.   And I'd like to just direct you to the third

17     paragraph where Karen Williams is e-mailing you

18     regarding Amendment 4, and in the third -- well, I

19     suppose it's the fourth paragraph that starts, "What

20     do we do now?"  I want to give you an opportunity to

21     read it with the understanding that I don't want to

22     bog us down too long in some of the correspondence,

23     but do you want to take a moment to review?

24         A.   Sure.  Let me see the beginning.

25             (Reviews document.)

1        Okay.  Yeah, I've read it through.  I vaguely

2    remember this.  Yeah, this was all part of the

3    discussions about how we were going to proceed with

4    our internal procedures, and really specifically about

5    people that were in the pipeline who were already

6    registered but we were getting packets from, and then

7    also anybody that registered essentially after

8    November, but before January 8th, November election,

9    and how they would be treated.

10       Q.   I just wanted to direct you to the fourth

11   paragraph where Karen Williams writes, "What we do now

12   as I see it is to begin looking into how we verify a

13   person's case status.  We have gotten questionable and

14   invalid felony cases from the division before, so I

15   expect this to continue as they adjust their processes

16   as well.  I think our first move is to get access to

17   the clerk of courts database, both statewide and

18   locally."

19       Do you agree with Ms. Williams' statement

20   that you have previously to Amendment 4 gotten

21   questionable and invalid felony cases from the

22   division and that that would mean that you would need

23   to sort of direct careful scrutiny at what the DOE was

24   sending you in this period?

25       A.   Yes, yes, yes.

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

1           MR. DANJUMA:  Okay.  And I'd like to mark as

2      Exhibit 12, a document that, unfortunately, we

3      don't have copies of because it was one that we

4      just received yesterday, but this document starts

5      LCSEO 01578, and it's e-mail correspondence

6      between Mr. Steve Usztok and Chris Moore and

7      yourself.

8           (Whereupon, Plaintiffs' Exhibit No. 12 was

9      marked for identification.)

10   BY MR. DANJUMA:

11      Q.   And I would like you, if you have a moment,

12   to review the first and second pages.  It's -- the

13   formatting is a little weird.

14      A.   Okay, yeah, if I could see where it starts.

15           (Discussion off the record.)

16   BY MR. DANJUMA:

17      Q.   It starts -- this is the -- this is the

18   initial e-mail from Mr. Usztok and your response here.

19      A.   Okay.  Thanks.

20           MR. HERRON:  Off the record for a minute.

21           (Discussion off the record.)

22           MR. HERRON:  We're going to take about five

23   minutes, folks on the phone.

24           (Brief recess.)

25   BY MR. DANJUMA:

1      Q.   Okay.  Thanks for reviewing that e-mail.  I

2   mostly wanted to draw your attention to Mr. Usztok's

3   e-mail to you about a visit in January 2019 from Amber

4   Marconnet.

5      A.   Yes.

6      Q.   And Amber Marconnet, again, she's -- she is

7   one of the staff members of the DOE.  Do you know

8   her -- her job responsibilities, by any chance, or --

9      A.   I can't say exactly.  Obviously, she's taken

10   some role in the felons processing.  She has roles in

11   other aspects of what we do.

12      Q.   Okay.  And I wanted to direct your attention

13   to the third paragraph first of what Mr. Usztok's

14   e-mail was about -- or, actually, I'm sorry.  Do you

15   recall -- let me ask you first:  Do you recall Amber

16   visiting your office at this time?  Did she meet with

17   you at all during this time, or no?

18      A.   I don't think I was at the office when she

19   came, yes, yes.

20      Q.   Okay.

21      A.   But I do remember that she was -- I remember

22   this after reading the e-mail.

23      Q.   Okay.  And do you remember why she visited?

24      A.   According to the e-mail, and that's really

25   the basis of my knowledge, was to kind of see the --

1    what it looked like on our end when we receive packets

2    from the Division of Elections.

3         Q.    Okay.  And I wanted to direct your attention

4    to the third paragraph where Mr. Usztok writes that

5    "Amber asked about county-initiated felon matches" --

6    and I'm quoting this -- "Amber asked about

7    county-initiated felon matches.  Some counties do

8    their own search of FDLE, DOC, clerk of courts, and

9    DAVID to build their own matches and initiate their

10   own removals.  I confirmed that our office does not do

11   this."  Right?  Did I --

12        A.    Yes, that's what it says.

13        Q.    -- read that correctly?

14        A.    Yes.

15        Q.    So when you describe the process under 98 --

16   or the removal process that we discussed, from -- in

17   your county's perspective, that's a -- responsive

18   process is -- might be the right way to describe it --

19   you respond to information provided by the DOE and

20   then verify if that information is credible or

21   reliable?

22        A.    That's the way we undertake it unless there's

23   a third party that actually brings us information.  We

24   don't really institute any of these searches ourselves

25   unless we, like I say, receive some kind of

1    information from an outside source.  But it's not a

2    standard procedure.

3         Q.   But under -- at least what Amber mentioned to

4    your staff, other counties don't follow that practice

5    and, in fact, do their own searches of FDLE databases,

6    DOC, or clerk of courts' databases?

7         A.   That is what this says and that appears to be

8    the case, yes.

9         Q.   Okay.  Have you talked to any supervisors

10   about when they -- do you know how or why they might

11   initiate these types of processes?

12        A.   I've heard relatively recently that some

13   counties get information from the clerks of courts, I

14   think directly --

15        Q.   Okay.

16        A.   -- about a potential felony.  My perspective

17   on that knowledge was that that will eventually, and I

18   would expect relatively soon, make its way up to the

19   state and they'll get that information coming down to

20   us also.  If there's a felony that a local county

21   clerk of court is knowledgeable of, it will percolate

22   through the process and the state will become aware of

23   it and send us that packet through their processes

24   because it's -- the state gets -- as my knowledge has

25   it, they have access to these overall databases.  So

1    it might potentially be a duplication of effort or

2    something along those lines.

3        Q.   Okay.  I think I understand, but from your

4    knowledge, you can only say -- you can only testify

5    about the procedure that you have in place --

6        A.   Correct.

7        Q.   -- and your understanding that -- is that

8    some counties don't have a passive procedure, they

9    actually initiate removal proceedings themselves

10   through their own investigations?

11       A.   That is my understanding, yes.

12       Q.   Okay.  And you don't know the type of

13   evidence that they used to decide whether or not to

14   initiate that process?

15       A.   True, I do not.

16       Q.   Okay.  The -- and then I'd also -- I'd like

17   to just direct your attention to the fifth paragraph

18   where it starts, "I asked Amber," and I'm going to

19   quote that as saying, "I asked Amber about what will

20   happen with Amendment 4 at DOE.  She confirmed that

21   they still have their freeze in place for new packets,

22   which is true, we haven't received any new packets."

23   And then "She said that they do not have a fixed date

24   yet to resume sending packets, though their tentative

25   timeline was within the next month or so hopefully."

1          So is this a reference to what you

2     described -- you testified earlier about the DOE's

3     pause that didn't recommence until June of this year?

4     Is that right?

5          A.   Correct, yes.

6          Q.   Okay.

7          A.   And this, of course, was dated January 17th,

8     so I think that was their expectation of when the

9     pause might end.

10          Q.   Understood.  And then the -- I want to direct

11     your attention to the end of that paragraph where it

12     starts with this sentence, "Open questions."

13          A.   I see it, yes.

14          Q.   You see it?  Okay.  "Open questions for DOE,

15     according to Amber, whether attempted murder is

16     reinstated or exempt from Amendment 4, how to best

17     determine that terms of probation or parole have been

18     completed, this information is more difficult to

19     ascertain than just their conviction status, whether

20     fines/restitution are included in terms, if fines and

21     restitution must be paid, how to determine that

22     information."  Then the next point, "Amber said there

23     is not a single reliable source of information on

24     whether former felons have paid all financial

25     obligations."

1      Did you have any discussion -- or you were

2  out of the office at the time that this --

3      A.   Uh-huh.

4      Q.   -- meeting was -- was held, but did you have

5  discussions with your staff about Amber's statement

6  that "there's not a single reliable source of

7  information on whether former felons have paid all

8  financial obligations"?

9      A.   I can't remember specifically if we discussed

10  that exact point, but it certainly fell in line -- and

11  I think that's what I stated in my response, which was

12  obviously written maybe when I was sitting at a

13  stoplight, stopped in traffic, not driving, because --

14      Q.   I trust you.  Put that on the record.  I

15  believe it.

16      A.   This is Jack Campbell.  That's why it says,

17  "Are you good report Stephen."  That was complimenting

18  on his thorough eval- -- or reporting of the meeting.

19      But my key point is that it fell in line with

20  what we had been hearing with -- from clerks of courts

21  and just the general discussion in the media and

22  everywhere that, as Amber was reported to have said --

23  again, this is second-hand --

24      Q.   Right.

25      A.   -- "there's not a single reliable source of

1    information whether former felons have paid all their

2    financial obligations."  And, to me, that could be

3    understood two ways:  There's not any single source

4    anywhere, or there's not a single point source, you

5    know, a one-stop shop, and I think that was along the

6    lines of a one-stop shop kind of place where you can

7    go and get a reliable accounting of the, you know,

8    obligations incurred by the court and the status of

9    their completion.

10        Q.   Uh-huh.  But what Mr. Usztok -- that makes

11   sense to me.  What Mr. Usztok wrote about the single

12   reliable source of information is consistent with what

13   you understood about the system at that time; is that

14   correct?

15        A.   Yes.

16        Q.   And you mentioned in your interrogatories, I

17   believe, that you spoke with the clerk of court for

18   Leon County is about financial obligations as well.

19   Is that statement consistent with what the clerk of

20   the court for Leon County said as well?

21        A.   It is.  It is.

22        Q.   Okay.  And I may come back to that

23   conversa- -- did you speak with -- and the clerk of

24   the court's name is Gwen --

25        A.   Marshall.

1       Q.    Gwen Marshall.

2            Did you speak with Gwen Marshall about

3    financial obligations during this period, or no?

4       A.    Yes.  Yes.

5       Q.    And what -- do you recall the conversations

6    that you had with Ms. Marshall at the time?

7       A.    Yes.  I had known from her background that

8    she had served in some capacity with her association

9    of clerks of courts, so she had a bit of -- at least

10   my understanding of her background and experience was

11   she had an understanding of the courts in general

12   throughout the state in some fashion because they have

13   an association and she had served there, and that what

14   I gleaned from our discussions was that there was a

15   lot of variation on how records were kept from one

16   clerk of courts' office to another, how far back that

17   data went, how accessible the data was relative to

18   whether it was digitized and online in a searchable

19   manner, you know, whether -- and I can't give complete

20   details, but, you know, just all -- all aspects of

21   that, conversion to civil liens and whether they track

22   that.  You know, there were lots of discussions in the

23   media that were bringing questions to my mind and kind

24   of an understanding that this was going to be a

25   difficult determination.

1      Q.  Okay.  So your understanding and the

2    understanding of the clerk of court for Leon County

3    would be that it would be a difficult endeavor to

4    determine how much financial obligations an individual

5    with a former felony conviction would have?

6      A.  Especially in a reliable manner, yes.

7      Q.  Got it.

8      Did you discuss with Ms. -- with the clerk of

9    the court, Ms. Marshall, what types of documents she

10   would have available that would provide that

11   information, or not?

12     A.  I don't remember the specific details of

13   that, no.

14     Q.  Okay.

15     A.  I think she had a little bit better records

16   than some counties, or maybe even a lot better

17   records, but I don't know the specifics of any of

18   those records, no.

19     Q.  Just so that I understand the way that the

20   state systems interact with each other, does Ms.

21   Marshall as a clerk of court have better access to

22   information held in other clerks of courts than you do

23   as the supervisor of elections, or do you have access

24   to the sort of same systems?

25     A.  I could not say.

1     Q.   Okay.  And I just want to go back to the

2     e-mail from Ms. Usztok about Amber saying that one of

3     the open issues was "how to best determine the terms

4     of probation and parole have been completed, this

5     information is more difficult to ascertain than just

6     their conviction status."

7          Do you agree that it is more difficult to

8     determine someone's -- whether someone has completed

9     probation or parole than simply to determine their

10    conviction status?

11    A.   I think, in general, I would agree with that.

12    Q.   Okay.  I just wanted to go back really

13    briefly to our discussion that you were raising with

14    individuals about allaying their fears of potentially

15    registering after the passage of Amendment 4 and after

16    January 8th.  Do you recall the groups that you spoke

17    to about that issue?  Do you remember what

18    organizations?

19    A.   Yeah, pri- -- the main organization -- and I

20    always have trouble with the name of this.  It's I

21    think the Big Bend Voting Rights something.  Bob

22    Rackleff is one that Greg James is on it.

23    Q.   Okay.

24    A.   And I went to several of their meetings, but

25    it's kind of a long acronym.

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

1          Q.   I think that's enough for us to understand.

2          A.   Yes, that will get us to them, yes.

3          Q.   Okay.  Are there any other orgs that you met

4    with or gave speeches in front of?

5          A.   Yeah.  I think I outlined quite a few in my

6    discovery interrogatory.

7          Q.   Okay.

8          A.   I was on the radio several ti- -- or at least

9    once, maybe twice on this, various groups, the Capital

10   Conservatives, the democratic -- various democratic

11   groups had asked me to come and speak, so -- but

12   there's a whole list there.  I could read down them.

13         Q.   No, that's all right.  I just wanted to

14   review -- you were -- in May 25, 2019, which is a

15   little later than the time period we're talking about,

16   you were a speaker at the Tallahassee NAACP event

17   regarding SB 7066 and voter registration?

18         A.   Yes.

19         Q.   Do you remember what you said in that

20   meeting, by any chance?

21         A.   I think it was kind of a repeat of what we've

22   gone over here today.

23         Q.   Okay.  And by that, you mean trying to

24   explain the -- the requirements as you understand the

25   law and addressing fears that were expressed by

1  individuals in the community?

2      A.    Absolutely.  This is one of those groups

3  where I was kind of sitting in a panel and there was a

4  room full of people, I was hearing their concerns and

5  I was trying to make sure that unless it was obvious

6  intent to defraud, we were not going to refer anybody

7  to the state attorney for prosecution if it turned out

8  after they were registered to vote that their -- they

9  had not fulfilled all terms of their sentence.

10     MR. DANJUMA:  Okay.  All right.  Just give me

11         one moment.  And I'd like to mark this as 13, and

12         this is LCSEO 00684.  This is a brief e-mail

13         exchange we received from your office.

14         (Whereupon, Plaintiffs' Exhibit No. 13 was

15  marked for identification.)

16  BY MR. DANJUMA:

17     Q.    You just want to review and let me know when

18  --

19     A.    Yes.

20         (Reviews document.)

21         Okay.  I've read it.

22     Q.    Okay.  And the initial e-mail is from Rachel

23  Matz to Susan Caplowe.  These are employees in your

24  office; is that right?

25     A.    Correct.  Rachel was more of a temporary, but

1    very long-term temporary employee that we still have

2    on staff.

3        Q.    Okay.

4        A.    And Susie is one of our voter outreach staff.

5        Q.    She's following in your footsteps.  Rachel is

6    going to become the supervisor of elections.  Sorry.

7    Anyway --

8        A.    Hopefully she's smarter than that.

9        Q.    So the initial e-mail says, "Hi, Susie.  Did

10   we ever get some guidance on how incarcerated voters

11   can check their eligibility for this election since

12   only some Leon County voters are affected?  I think I

13   remember you were making a phone call about it

14   recently."  And then the response from Susan Caplowe

15   is, "I never got an answer, and my 2 cents, I think we

16   can put in instructions and keep the 'see your

17   counselor.'"

18        Do you know what she was referencing by "see

19   your counselor," what --

20       A.    Yeah.  I don't think this has anything to do

21   with Amendment 4.

22       Q.    Okay.

23       A.    Yeah.  I think there was -- we had a small

24   election for House 7.  It affected part of Leon

25   County.  I think this was -- since it was only part of

1    Leon County.  And counselor was pro- -- I'm not

2    sure -- I hadn't seen this e-mail before, but I think

3    it was just trying to get information out to the

4    public that there was an election going on for a very

5    small part of Leon County.  I --

6         Q.   But it is about guidance on how incarcerated

7    voters can check their eligibility, or is it --

8         A.   Okay.  Yeah, you're right.  Actually I

9    skipped over that word, yeah.  Yeah, again, the only

10   upcoming election we had then, unless they -- since

11   Rachel was leaving the office and preparing some

12   information for future -- she was social media, she

13   was preparing social media information, and doing some

14   of that ahead of time.  So I don't know -- I can't say

15   exactly what this was really about.

16        Q.   Okay.  I guess --

17        A.   But I do agree I see the "incarcerated."  I'm

18   sorry for missing that.

19        Q.   What I wanted to ask, is this confirmation

20   that your office was reaching out for guidance on

21   whether incarcerated voters can check their

22   eligibility and were reaching out to the Division of

23   Elections, but didn't at that time get a response?

24        A.   I think actually I remember some of this now

25   because we were talking about people that were

1    incarcerated in the Leon County Jail, because we do

2    have an outreach to them.

3        Q.    I see.

4        A.    So I think this was not necessarily felon

5    specifically.  And the post -- it's coming back to me

6    a little bit now.  We were -- I was instructing them

7    make sure you get something up in the jail for this

8    election, because it was kind of a special election

9    and I didn't want that to fall through the cracks.

10        Q.    I see.

11        A.    So I think that's what it was referring to.

12        Q.    So it's people who were held pretrial in jail

13    maybe would be eligible --

14        A.    Yes.

15        Q.    -- and -- okay, understood.

16        A.    Yes.

17        Q.    Okay.

18        A.    And I'm not sure who the counselor was, but

19    maybe someone at the jail.

20            (Whereupon, Plaintiffs' Exhibit No. 14 was

21    marked for identification.)

22    BY MR. DANJUMA:

23        Q.    Okay.  I want to mark as Exhibit 14 -- it's

24    hard to read the Bates stamp here.  LCSE 00422.

25        A.    (Reviews document.)

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

1          Okay.

2     Q.   Okay.  And this is an e-mail from Michael

3 Ertel to the supervisors of elections list.  And

4 Michael Ertel -- who is Michael Ertel?

5     A.   He was previously the supervisor of Seminole

6 County -- supervisor of elections in Seminole County.

7 He had been appointed to be the secretary of state by

8 Governor DeSantis in early January, I believe, or late

9 December, somewhere in that timeframe.

10     Q.   And at the end of that e-mail, he says in the

11 second to last paragraph, "I want to send a very clear

12 message to you and all Floridians.  If you receive a

13 voter registration application today, do as you have

14 always done, accept it."

15     A.   Yes.

16     Q.   And you complied with that message to say if

17 individuals were registering, having had a prior

18 felony conviction, you should accept their application

19 and process it?

20     A.   Yeah, I guess you could say I complied.  I

21 mean, that was our plan and we established that plan

22 and we didn't really have a good way and we weren't

23 asking if someone was a felon.  So if anybody showed

24 up, as Mike Ertel said -- he was secretary of state at

25 the time -- if you receive a voter registration

1    application today, do as you've always done, accept it

2    and apply the four corners doctrine to it, and that

3    was our process.

4        Q.   So maybe it's better to say that that's

5    confirmation that your process that you developed is

6    the one that the state wanted to --

7        A.   I would say that's true, yes.

8        Q.   -- wanted to happen?  Okay.

9        A.   True.

10           MR. DANJUMA:  All right.  I want to mark as

11       Exhibit 15 -- sorry.  This is a document we

12       received, a PowerPoint presentation from you, and

13       it's titled, "Legislative Changes, Rule-Making,

14       and Election Administration."

15           (Whereupon, Plaintiffs' Exhibit No. 15 was

16       marked for identification.)

17   BY MR. DANJUMA:

18       Q.   Was this a PowerPoint presentation from the

19   May 2019 FSASE conference?

20       A.   Yes, that what this looks like.

21       Q.   Okay.  Did you attend that conference?

22       A.   I did.

23       Q.   And you -- well, sorry.  One moment, please.

24           Here we go.  I want to also direct you to

25   your interrogatory responses, Interrogatory No. 4.

1        A.    Okay.  Let me dig through.

2        Q.    I can show you on mine.  That -- your first

3    sentence said -- the interrogatory is whether you

4    received information about voter eligibility pursuant

5    to Amendment 4 and SB 7066, and you said other than

6    information received at the FSASE conference covering

7    aspects of SB 7066, including a presentation from

8    Maria Matthews, your office has not yet received

9    guidance.  Is that the gist of what you say in your --

10       A.    Yes.

11       Q.    -- in response?

12       A.    Yes.

13       Q.    Okay.  Is -- this PowerPoint is a summary of

14   the presentation that Ms. Matthews made at that

15   conference; is that right?

16       A.    Yes.  I think she followed it pretty closely.

17       Q.    Okay.  The -- I wanted to return to -- and

18   this is essentially the -- the total guidance you've

19   received from the Division of Elections to this point

20   on --

21       A.    Yeah, I guess with that caveat of what

22   Secretary Ertel at the time had sent out, just

23   register people as normal, and I guess some of this

24   little interaction between my staff a little bit, but

25   confirming kind of what our take of it was.

1    Q.   Okay.  Can I ask -- and the -- there were a

2    number of issues that Ms. Matthews presented on at

3    this conference.

4    A.   Yes.

5    Q.   The PowerPoint goes well beyond the issues

6    at -- at issue in this particular case.  But do you

7    recall her presentation on the implementation of

8    Constitutional Amendment 4 and SB 7066, which starts

9    at page 56 of the document?

10   A.   I do.

11   Q.   What does she say about the plan for

12   implementa- -- what -- what was her presentation

13   about?

14   A.   I guess my take on it was -- I would

15   certainly say it was a complicated matter, it was

16   going to be difficult for -- well, complicated and

17   somewhat of a challenge for them to implement all

18   aspects of it, espe- -- for "them," meaning the

19   Division of Elections and their staff, given all of

20   the other statutory changes that were coming out of

21   the legislative session, and that they had a plan

22   going forward, and the plan essentially was going to

23   be phased in in three different phases.  The first

24   phase was going to be -- I would characterize it as

25   the easiest for them to validate or verify a felon

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

1    match with a registered voter, whether the person in

2    question was still under supervision or not.

3        Q.    Uh-huh.

4        A.    And that would be either still incarcerated,

5    I guess in prison, or under supervision through

6    probation and/or parole, as the case may be, and that

7    we would start getting that around June 1st, the

8    beginning of June, and, you know, the packets would be

9    coming to us and we would start processing.

10   Essentially the pause was going to be phased out and

11   we -- the resumption of these felons packets was going

12   to be phased in, with this being Phase 1.

13        Phase 2 would be people who were convicted of

14   murder or felony sexual offenses as detailed in 7066,

15   the five statutes regarding murder in the 11, I think

16   it was, if I remember correctly, about felony sexual

17   offense, kind of regardless of whether they were still

18   incarcerated or not, but those people would have to

19   get executive clemency.  So it would be a fairly easy

20   match for them also to determine that.  Again, they

21   were phasing this in.

22        And, then, my -- I can't remember the

23   specifics and I don't know if it was stated in here

24   specifically, but my take on it was that the larger

25   and more difficult hurdle of the financial obligations

1    for them to determine the sta- -- "them" being the

2    Division of Elections -- to determine the status of

3    someone's completion of financial obligations as part

4    of the terms of sentence.  Again, my take on it -- I

5    don't know that she essentially said this exactly --

6    was that that would likely resume after they received

7    maybe more guidance or were able to assimilate, put

8    together a plan, bring all these different data

9    sources together.

10          And so my understanding of that was likely it

11    would not happen until after November 1st because

12    that's when that work group was going to be

13    presenting -- or finishing their work, presenting it

14    in their first report.  And probably likely it would

15    not happen even until after that because the report

16    would have to be acted on and likely there would have

17    to be money and -- you know, put towards that effort.

18    So --

19    Q.   Okay.  That's super helpful, and there's a

20    few different things I wanted to unpack and address in

21    that.

22          So it sounds as if in addition to -- she --

23    Ms. Matthews did describe some of the terms of the

24    statute as it relates to financial obligations, is

25    that correct, and other provisions of SB 7066?

1    A.    Yeah, I think it was their understanding of

2    SB 7066 and how they were hoping to proceed.

3    Q.    Okay.

4    A.    But they -- I don't remember them going very

5    much in-depth, and maybe when I look at these pages I

6    will be proven wrong, but I don't think they went real

7    in-depth about the financial obligations because that

8    was still pretty much up in the air, and in some

9    aspects, how they were going to validate the status.

10   Q.    Understood.  Okay.  And the plan that you

11   mentioned, these three phases, I just want to go back

12   to clarify.  Phase 1 would be to initiate sending

13   felon packets for individuals who had felony

14   convictions, but were still in an incarcerated

15   sentence or on -- under supervision, on probation --

16   A.    Yes.

17   Q.    -- or parole?

18         And you mentioned that Ms. Matthews said that

19   they believe they could recommence that because that

20   would be the easiest thing to verify under the new

21   system?

22   A.    I don't know that she actually said the word

23   "easiest," but that that would be -- you know, for all

24   intents and purposes, yes, the easiest.  I don't

25   remember her saying those exact words though --

1          Q.    Right.

2          A.    -- whether she did or not.

3          Q.    It would be the logical starting point was

4     your recollection for them to start with something

5     that would be relatively straightforward in comparison

6     to more complex access of SB 7066?

7          A.    Correct.

8          Q.    That's a fair characterization?

9          A.    Yes.

10          Q.    All right.  And then the second phase would

11     be the slightly more complicated issue of determining

12     whether someone had a murder offense or a sexual

13     offense or one of the -- one of the -- one of the

14     excluded categories?

15          A.    The exemption, yeah.

16          Q.    The exempted categories.  That would be the

17     second phase.

18              And then the third phase of implementation

19     would be determining if individuals still had

20     outstanding financial obligations?

21          A.    Correct.

22          Q.    And did Ms. Matthews mention the working

23     group completing its report on November 1st, or no?

24          A.    I don't know that she did actually.  That

25     was, I think, more my take-away from it, getting the

1    understanding and, you know, just the general

2    knowledge of the confusing aspects of this.  And, for

3    me, what I understood to be the purpose of the work

4    group was to kind of, I think, focus on that aspect of

5    it.

6        Q.   And just describe a little bit more about

7    that.  Did the members of the conference and Ms.

8    Matthews say that the financial obligations portions

9    was a confusing aspect?

10       A.   I can't pin anyone down to have said, but

11   certainly, without a doubt, everyone involved, I

12   think, saw that as a tough determination to make.

13       Q.   Okay.

14       A.   I think that would be very justified in

15   making that statement.

16       Q.   And by "everyone involved," you'd say that

17   includes the DOE staff, including Ms. Matthews?

18       A.   Yes, and I think that Stephen Usztok's report

19   of conversations with Amber Marconnet clarify that

20   too.

21       Q.   So in light of the fact that this phase

22   program wouldn't start until after November 1st, what

23   would -- under your view or under anything Ms.

24   Matthews had said, should voters do for the fall

25   elections in 2019 in light of the fact that they

1    weren't planning to produce any recommendations until

2    after that point?

3         A.   Okay.  Repeat the first part of that

4    question.

5         Q.   Yeah, no problem.  The -- if I can rephrase,

6    what should voters who are interested in -- sorry.

7    Let me withdraw that.

8              What should individuals with felony

9    convictions who would either like to register to vote

10   or were already registered to vote, but may have

11   outstanding financial obligations, what should they

12   have done in the lead-up to this November's election

13   in light of the fact that Ms. Matthews and DOE didn't

14   have any plan to provide guidance before that date?

15        A.   I don't know that there was any plan or

16   expectation presented of what a voter should do.  I

17   don't remember anything of that nature coming from the

18   division.  Coming from my office, it was kind of

19   keeping in process the plan that we kind of outlaid, I

20   guess, in -- through -- from December through the

21   ongoing months that if you believe your status is --

22   if your right to vote has been restored, then you

23   should go ahead and get registered to vote.  And if

24   you think you have outstanding financial obligations,

25   then try and validate that.  Go to the clerk of the

1    courts where you were convicted, maybe Department of

2    Corrections, your probation officer, anybody that

3    might know something about that.  But, again, don't be

4    fearful that you're going to be prosecuted if it turns

5    out that you registered to vote incorrectly, or you

6    were registered to vote, but, you know, your

7    eligibility hadn't been called into question yet.

8         Q.   Okay.  And so to understand that, though --

9    and you just testified that everyone involved,

10   including the DOE's office, agreed that this

11   determination would be quite complicated to determine

12   how to evaluate outstanding financial obligations; is

13   that right?

14        A.   Yes.

15        Q.   But the plan coming from the director's

16   office as of May and June was not to provide any

17   further guidance to you or to voters until after the

18   November --

19        A.   Again, I wouldn't say that that was what they

20   stated specifically, but I -- the way I heard it was

21   that I think when they gave this presentation, they

22   said that in early June, or roughly June 1st, early

23   June, they would start that first phase, in a month or

24   two later we would start getting data on the second

25   phase, and that the financial obligation status as it

1    related to completing terms of sentence, we would not

2    be getting information -- well, they couldn't really

3    give a determination of when they were going to give

4    us information.  They did not give us a determination

5    of that, and I guess within my own understanding of

6    the work group or -- which was not a complete

7    understanding certainly, but they were tasked, I

8    understood it, to be tasked with finding a good

9    process for the division and others, including

10   convicted felons, to kind of determine their status.

11        Q.   Okay.  Okay.  But -- and the Division of

12   Elections didn't give you a concrete timeframe in this

13   presentation?

14        A.   They did not.  They did not.

15        Q.   They didn't tell you when they would provide

16   additional information?

17        A.   It appeared it would be after Phase 2, which

18   was projected to be a couple of mon- -- a month or two

19   or roughly that area.

20        Q.   Okay.  And we're not yet in Phase 3 --

21        A.   Phase 2.  We are not yet in Phase 2, but,

22   yes, and we're certainly not in Phase 3.

23        Q.   That is really helpful.  We are -- in the

24   phase plan that you've provided, while they've

25   initiated Phase 1 as of June 1st, we have not yet

1    gotten to Phase 2; is that correct?

2        A.   I think that is correct.  I have not been

3    told by my staff that they've received a packet that

4    would not be how I would classify it as a Phase 1.

5    Certainly some of the Phase 1 were for murder and

6    felony sexual assault, but they were still

7    incarcerated or supervised.  So I don't believe that

8    we've received any details about people in murder or

9    felony sexual assault who are outside of their

10   supervisory period, which would be what I would

11   consider Phase 2.  If that changed, it would be in the

12   last few days or so.

13       Q.   Understood.  And in the same vein, you

14   haven't received any additional information from the

15   DOE that you are -- related to Phase 3 as you

16   described it?

17       A.   Correct.

18            MR. DANJUMA:  Okay.  I want to introduce as

19       Exhibit 16, a document that is entitled LCSEO

20       00299.

21            (Whereupon, Plaintiffs' Exhibit No. 16 was

22   marked for identification.)

23   BY MR. DANJUMA:

24       Q.   And do you recognize this document?

25       A.   Yes.  I wrote this up.

1    Q.   Okay.  And what is it?

2    A.   Basically these are talking points that I

3    carried around to some of the different groups when I

4    was speaking kind of later in the spring.  I -- let me

5    think if I remember it -- I believe this was

6    essentially my interpretation of the presentation

7    given by Director Matthews and maybe some other

8    thoughts that I gleaned from other sources just, you

9    know, in my own work or hearing the news media.

10    Q.   Okay.  And I just want to refer you to pages

11    2 and 3, which refer to a January 8 -- July -- excuse

12    me -- to pages 2 and 3, which talk about "reality for

13    the immediate future," and then talk about a June --

14    approximately June 1st, 2019, date, and then another

15    date this summer and a longer term period.  Are those

16    the three phases that you were just testifying about

17    that are outlined here?

18    A.   Yes, yes.

19    Q.   Okay.  And if I can bring you back to the

20    first page if that's all right.

21    A.   Uh-huh.

22    Q.   I wanted to ask you about the second main

23    paragraph, which starts "Changes," and it mentions

24    that SB 7066 changes FVRA to include new check boxes

25    related to felonies, and then in parenthesis,

1    "problematic," and then in a bracket after that, "old

2    FVRA forms still okay to use."  Could you just explain

3    what you meant by this note?

4        A.   Yes.  So FVRA is the Florida Voter

5    Registration Application, and just to clarify the

6    timeline on this, this -- as it says at the top, this

7    was a changing document.  This was after the session,

8    but before the governor had signed this into law, but

9    the expectation he likely would, and part of 7066

10   included -- or altered Check Box 2, which was "I am

11   not a convicted felon, or if I am" -- and we all know

12   that --

13       Q.   Right.

14       A.   -- to having three different categories.  The

15   first -- I can't remember them exactly, but the first

16   was "I have not been convicted of a felony."  I think

17   the second was "I have been convicted of a felony, but

18   my rights have been restored by executive clemency,"

19   or something along -- I may have the second and third

20   one mixed up.  And the third one was that, "I am a

21   convicted felon, but I have satisfied all the terms of

22   my sentence commensurate with Florida Statute" such

23   and such.

24       Q.   Okay.  And you noted that the propo- -- and I

25   take your point that this was not yet signed into law,

1    but that the new check boxes related to felonies were

2    problematic.  Why did you say they were problematic?

3         A.   Yes, I had been involved in a discussion

4    panel a week or two -- actually, maybe a couple months

5    before that, might have been back in February, at the

6    Florida Law School, and one of my statements there

7    was -- and this was before 7066 had really even been

8    crafted, I believe -- was that going forward, one of

9    my big concerns was that the legislature might pass

10   something where it started differentiating between

11   different types of voters on the voter registration

12   form, and that, to me, a big red flag would be if the

13   voter registration form changed and there was a

14   differentiation between people who were convicted of

15   felonies, who were not, and I didn't anticipate even

16   more of a breakdown, but, to me, that would be the big

17   red flag because potentially, then, people could be

18   tracked and handled in a different manner, and that,

19   to me, was not something I felt good about.

20        Q.   And --

21        A.   That's why I said it was problematic.

22        Q.   Understood.  And the concern with people

23   being tracked or treated differently, why would that

24   be a concern in your view?

25        A.   Because if someone's rights had been

1    restored, then they should not be treated differently,

2    you know, and there was no mechanism to do that in the

3    past.  Within the four corners, we registered people

4    to vote, and then the 98.075 would kick in when the

5    state or we'd received information that maybe they

6    were ineligible.  I just don't like treating people

7    differently when it comes to registering to vote, and

8    that was the problematic aspect.

9        Q.   So if I can summarize, the new form forces

10   people to disclose a part of their criminal history in

11   a way that other voters who are eligible in exactly

12   the same way wouldn't have to do?

13       A.   Correct.

14       Q.   And in some ways, that might invade their

15   privacy in order to have to --

16       A.   Invade their privacy, yes, a -- or

17   delay their registration, because now there could be a

18   pre-vetting process that would be implementable,

19   whereas in the past -- and a lot of your questions or

20   the questions I received as part of my interrogatory

21   were referencing what are our standards for

22   essentially, in my own terms, vetting voter

23   registration applicants, and my response to those are

24   there's no way for us to do that under the old form.

25   And I think that was a good thing because people are

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

1    handled the same way.

2         Q.   I see.  I understand.  So in some ways, a

3    problem in addition to the ones we've identified is

4    that it provides a sort of spotlight on some specific

5    applicants and maybe pulls them out for extra scrutiny

6    that's unfair given the fact that they may be equally

7    eligible?

8         A.   Correct.  There's a filter in place that,

9    first of all, I think raises fears, and I've been told

10   that that's exactly what it's doing --

11        Q.   Okay.

12        A.   -- from people that are deep in that

13   community and talk to these people every day.  It

14   heightens the fear factor of getting registered.  As I

15   said in my interrogatories, getting registered to vote

16   should be something that you celebrate and not

17   something that causes great fear because you're

18   partaking in the democratic process.

19        Q.   I appreciate that.

20        A.   So that's a bad thing.

21        Q.   The -- and you mentioned that there are fears

22   that some people -- that people in the community

23   expressed about this issue.  Can you explain a little

24   bit more -- that there were like -- excuse me, I'll

25   withdraw that.

1          You mentioned that there were individuals who

2     were afraid of this specific issue of the three

3     different boxes.  Were those specific individuals who

4     were interested in registering or groups that you were

5     speaking with or both?

6          A.    Both, both.  Yeah, from what I'm

7     understanding from statements directly from people who

8     are afraid to get registered to vote because they've

9     been previously convicted and aren't certain of their

10    status, this is an indicator or a method by which they

11    can be singled out and handled differently, treated

12    differently, and that raises great concern.

13         Q.    Do you remember the name of any of the

14    organizations that you spoke to on this, and it's okay

15    if --

16         A.    I spoke just a week and a half ago.  I can't

17    remember -- I can find that for you, but I don't

18    remember off the top of my head.  It's probably in my

19    calendar.

20         Q.    No worries.  We can follow up.

21              And why do you think some of those

22    individuals might have been afraid if, in your view,

23    there was no risk of prosecution?

24         A.    Because they don't believe that there's no

25    risk of prosecution.  It's been stated to me, and was

1    just the other night repeatedly, that even in

2    instances when I've been present with the state

3    attorney and I'm the supervisor who registers people,

4    the state attorney is the one who prosecutes, we

5    essentially guarantee that if you think you're

6    qualified and your rights have been restored, so

7    therefore qualified to register to vote, and it turns

8    out you're mistaken, you will not be prosecuted for

9    that.  Yet there is a large and great hesitation based

10   upon the experience of people in the system, in

11   quotes, that they can't al- -- at least in their

12   perspective, they can't always trust those kind of

13   reassurances.

14       Q.   And by "in the system," you mean in the

15   criminal justice system?

16       A.   Yes, people who have been processed through

17   the criminal justice system.

18       Q.   Understood.

19       A.   And I can't give you any more reasons for

20   that except that that's pretty a tough process they go

21   through.

22            MR. DANJUMA:  Absolutely.  So it might make

23       sense to actually introduce the new form now,

24       which I -- give us one moment.

25            THE WITNESS:  Thank you.

1          (Whereupon, Plaintiffs' Exhibit No. 17 was

2     marked for identification.)

3     BY MR. DANJUMA:

4          Q.    And the notes we were just discussing were

5     your concerns related to SB 7066 before it was signed

6     into law.  Of course, it now has been, and I just

7     wanted to have for the record, this is the final --

8     this is the new voter registration form, Exhibit 17?

9          A.    Yes.  I would say the status of this is

10    somewhat uncertain --

11         Q.    Okay.

12         A.    -- but it is the one that's been promulgated

13    by the division as the replacement for DS-DE-39.  It

14    was promulgated, I don't know, a month or two ago,

15    roughly.

16         Q.    Okay.

17         A.    The authorization for this is handled by a

18    specific rule, and the current version of the rule

19    that has been accepted references directly the 2013

20    version of DS-DE-39.  So it was a bit of a surprise

21    that it was promulgated as the new form before the

22    rule-making process had started.

23         Q.    Right.

24         A.    And rule-making has commenced.  It is not

25    complete.  And in the first rule-making session that I

1    attended and spoke about, and several other

2    supervisors were either on the phone or present, I

3    spoke up about some potential changes.  So I don't

4    know that this is the exact version, but certainly

5    Check Box 2, which is really three check boxes now

6    about felons status, is, I think, not going to be

7    changed because it's in 7066 and part of statute now.

8         Q.   Thank you.  That is a lot of helpful

9    information.  So just to back up on some of it, the --

10   you mentioned that there -- well, that this form has

11   not undergone formal rule-making.  Is it possible for

12   people to register to vote using this form at this

13   point, or not?

14        A.   I think essentially it is because I think

15   this is the form the division is giving out, and I

16   believe that the digital version of this on the online

17   voting registration in Florida asks the three

18   questions posed, or the -- has the three check boxes

19   presented in Section 2.

20        Q.   Got it.  So the online form that the DOE is

21   responsible for has been updated to this version,

22   or --

23        A.   Yes.

24        Q.   -- an online model of this; is that correct?

25        A.   Both of those are correct, yes.

1   Q. Okay. The -- and is it proper for DOE

2 to promul- -- I'm sorry -- to circulate an updated

3 registration form and update its online form before

4 the notice in comment rule-making process has been --

5   MR. HERRON: Objection to the form of the

6   question, but you can still answer.

7   THE WITNESS: Well, I would say that question

8   was posed at the first rule-making hearing, and

9   their response was that in their -- they

10   considered that, and in their view, it was okay

11   for them to commence, and I can't remember if it

12   was stated exactly, but the key change that had

13   been done so far was what was in statute.

14 BY MR. DANJUMA:

15   Q. Okay.

16   A. So, you know, I can't comment on whether that

17 was proper or not, but --

18   Q. Do you know any other examples since you've

19 worked at the supervisors of elections or an election

20 administration generally where a form has been updated

21 before rule-making has occurred?

22   A. I can't think of any with the possible

23 exception -- and, again, with no specific details --

24 in an emergency situation, like a hurricane or

25 something like that.

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

1      Q.   Understood.  And the -- I just want to return

2   to the notes from your prior -- your -- the prior

3   Exhibit 16.  You have in brackets "old FVRA forms

4   still okay to use."  By "old FVRA forms," you mean the

5   old form that said you -- you either -- you either

6   have not been convicted of a felony or you have and

7   your rights have been restored?

8      A.   Yes, it was similar to -- it was the version

9   from 2013.

10      Q.   Okay.

11      A.   Yes.

12      Q.   And you -- why did you reach the conclusion

13   that the old FVRA forms are still okay to use?

14      A.   I had asked the division, and they told me

15   they absolutely were, or maybe there was an e-mail

16   about it, but I believe that question may have come up

17   during Director Matthews' presentation.

18      Q.   Okay.  Does your office use the old FVRA form

19   or the new one?

20      A.   We'd initially put out the new one, but we

21   pulled it back when I realized, wait a second, the

22   rule-making process hasn't happened.  So we're now

23   putting out the old version on our digital -- on our

24   website, and we are still using our relatively large

25   inventory of old paper forms for our outreach drives.

1      Q.   Okay.  Understood.  So I just want to return

2   to the notes in Exhibit 16.  This is not about the

3   form, but I wanted to check the last paragraph on the

4   third page, which says, "How do you know or check your

5   status?"  And I'm reading from this:  "New law

6   requires release documents to spell out checklist of

7   remaining terms of sentence, including monetary.  For

8   previously released offenders, check case online with

9   court of court, find the financial obligation section.

10   Fines and fees should show zero, but that may not be

11   everything."

12         Just so that I understand, where did you get

13   this information?  Was this from Ms. Matthews'

14   presentation?

15      A.   Yeah, let me think.  I don't think it was.

16   Let me read this through.  Give me a second to find

17   it.

18         (Reviews document.)

19         Yeah, this is pretty specific advice.  I

20   believe I got that from -- I believe I got that from

21   one of the lawyers of the Big Bend --

22      Q.   Okay.

23      A.   -- Felons Rights Outreach or whatever,

24   whatever that group was.

25         I can't remember specifically.  I did not get

1    this from the division specifically, although I

2    believe also that that first sentence that says, "For

3    previously" -- I'm sorry -- "New law requires release

4    documents to spell out a checklist of remaining terms

5    of sentence, including monetary," I think that's in

6    7066, but the rest is actually more detailed than I

7    would normally know, and I think I got that from an

8    attorney who deals with this.

9        Q.   Okay.  By -- when you ask about whether

10   "fines and fees should show zero," I want to

11   understand what that means.  Do you know what that

12   means, or was that just -- what did you mean by "fines

13   and fees should show zero"?

14       A.   My understanding was that for them to be

15   eligible for registering to vote, somewhere within the

16   documentation at the clerk of courts' websites or the

17   data they have or the records they keep, there is a

18   financial obligation section, and within that you

19   can -- there's an area that hopefully shows that there

20   are -- there's a zero balance essentially.  But that

21   may not everything they need to check.

22       Q.   Okay.  And just to clarify, have you reviewed

23   this financial obligation sections on --

24       A.   I have not seen that, no.

25       Q.   Understood.  And do you -- you understand

1    that -- from SB 7066, that an individual is not

2    responsible for payment of financial obligations that

3    accrue after a sentence, including, say, interest or

4    fees; is that correct?  Are you aware of that

5    provision?

6         A.    Yes, yes.

7         Q.    The -- so in order to show fines and fees

8    being zero, that might be a requirement that someone

9    would have to pay interest or other charges on the

10    account beyond --

11        A.    I cannot say for sure.  I was trusting, I

12    guess, the opinion, and trying to get more detailed

13    information, and, frankly, it could have been from the

14    previous group, like say there were various iterations

15    of this, I don't know if this was the very first one.

16    I don't think it was.  So I think actually my memory

17    is that when I was presenting this to another group,

18    either a lawyer or someone that works with folks

19    almost every day said, "Okay, here's what you need to

20    do.  Tell them to go look at this and, you know, check

21    and see if your fines and fees are zero," but that may

22    not be the whole story.  I believe that's the

23    guidance.  So I was trying to -- because I'm always

24    asked to speak about this -- give some more

25    information out to folks.

1        Q.   Understood.  Okay.  But you can't -- at this

2    point, even the information you're giving, you can't

3    be 100 percent confident that it's accurate because

4    you haven't --

5        A.   That is not first-hand knowledge of my --

6    yes.

7        Q.   Understood.  The --

8        A.   And, frankly, this document is not something

9    I put out to everybody.  This is my talking notes to

10   generate conversation, and get input from -- usually

11   there was experts there to get that conversation

12   started.

13       Q.   All right.  I want to just return to the

14   form, Exhibit 17, if that's all right, and the three

15   check boxes.  Based on the experiences you've had

16   discussing with potential voters -- discussing their

17   potential fear of registering and maybe checking some

18   of these boxes, are you confident that voters will

19   necessarily understand what Box 3 is saying, "If I

20   have been convicted of a felony, I affirm my voting

21   rights have been restored pursuant to s. 4, Art. VI of

22   the state constitution upon the completion of all

23   terms of my sentence, including parole or probation"?

24   Do you -- Sorry.

25       A.   No.

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

1          Q.   Thank you.  Do you think --

2          A.   Not sure you can read it all the way very

3     well.  Yes.

4          Q.   It is very difficult to read.  Do you think

5     an ordinary person will understand what they're

6     swearing to if they check that box?

7          A.   I do not think they would know for sure.

8          Q.   Thank you.  Okay.  Okay.

9          MR. DANJUMA:  I'd like to mark as Exhibit 18

10         e-mail correspondence we received from your

11         office, starting with the Bates stamp LCSEO 0067.

12         (Whereupon, Plaintiffs' Exhibit No. 18 was

13    marked for identification.)

14    BY MR. DANJUMA:

15         Q.   And, again, this is a chain of e-mails we

16    received.  I would like to draw your attention to the

17    last e-mail in the chain -- or the -- the one on page

18    1.  Obviously, feel free to review the entire

19    correspondence to the extent you want, but I'd like to

20    ask you about the last bullet that Ms. Alessandra

21    Shurina has written here.  Do you want to review it

22    first?

23         A.   Yeah, let me look at the whole string to see

24    what the basis of this is.

25         (Reviews document.)

1        It's a very long e-mail.  Just so I can maybe

2    cut through some of this, mostly you're going to be

3    asking about anything relating to felony?

4        Q.    Yes, exactly.

5        A.    I'll skip some of this other stuff then.

6        Q.    Ms. Shurina is writing about a number of

7    issues --

8        A.    Here we go.  I see it.  Okay, here we go.

9              (Reviews document.)

10             Okay.  Finished reading.

11       Q.    Okay.  I wanted to ask you about the last

12   bullet on the first page -- and that's totally fine,

13   take your time -- the one that starts "proof of felony

14   conviction."

15       A.    Uh-huh.

16       Q.    And Ms. Shurina writes here, "I think the

17   state will be transparent as well, but I'm skeptical

18   that they'll be capable of providing us with the proof

19   that we will determine necessary to remove a voter.  I

20   know some counties will accept whether the state or

21   anyone else gives them" -- excuse me.  "I know some

22   counties will accept whatever the state or anyone else

23   gives them and force the voter prove their innocence

24   if they want to stay registered, but that's not really

25   our approach.  Prior to Amendment 4, we needed to

1 conclusively see that the voter was adjudicated guilty

2 of a felony conviction and did not receive clemency,

3 which covers every avenue for removal restoration.

4 Now what do we need to conclusively see?  There are a

5 lot more factors involved post Amendment 4, so maybe

6 separately from the state's processes we will need to

7 sort out when we will go forward with a removal and

8 when we will need to contact Amber for more

9 information."

10    Did I read that correctly?

11  A. Yes.  Yes.

12  Q. So I wanted to ask you whether you agree that

13 some counties do accept what the Division of Election

14 produces regarding an individual's eligibility due to

15 a felony conviction and then puts the burden on the

16 voter to establish that they're eligible?

17  A. Do I agree with that?  Yes, certainly

18 that's -- some of this is opinion and operating from a

19 very -- somewhat justified understanding of how we

20 move and they're proud of that.  But, yeah,

21 specifically to that -- let me read it.  I believe

22 there are counties that take what they're given from

23 the Division of Elections with the division's

24 directive that it be credible and reliable before they

25 send it to us, being supervisors of elections offices,

1    and that those counties then take that and initiate

2    the certification letter, potentially with less review

3    than my staff typically does.

4        Q.   Okay.

5        A.   I'm not sure I can give specific instances,

6    but certainly there are counties out there with

7    smaller staff and much less resources than we have.

8        Q.   And to address that point specifically, it's

9    much harder for a smaller county to do extensive

10   research if they don't have staff available, so they

11   may be in a position where they would need to rely on

12   the Division of Elections' information in a way that

13   other counties might not need to?

14       A.   I would agree with that, yes.

15       Q.   Okay.  And I also wanted to ask -- Ms.

16   Shurina write that "there are a lot more factors

17   involved post Amendment 4," which would -- do you

18   agree with that, and do you agree that it would make

19   it more complicated to determine what you'd

20   conclusively need to see to determine if a voter was

21   eligible?

22       A.   Yes.

23       Q.   Okay.

24       A.   I wouldn't necessarily agree with the

25   statement, "and force the voter to prove their

1    innocence if they wanted to stay registered."

2        Q.    I understand, and I think your staff is quite

3    exceptional in their -- their public service mind.  I

4    guess what I'd ask is, what is your opinion -- even if

5    that is an opinion, what is your opinion of how other

6    counties operate in this sphere?

7        A.    I would say, as I just finished saying, that

8    many counties don't have the resources we have and may

9    not be able to go as deep in the review of the packets

10   that they receive from the Division of Elections.  And

11   I know that we sometimes make mistakes even with the

12   careful review, and so I think that at times, it will

13   become a burden to a voter to -- and that burden will

14   be to conclusively show to a supervisor in a hearing

15   that the evidence that has been presented for them

16   being ineligible is incorrect.  So that may have the

17   effect of proving their innocence, I can understand

18   that, but I wouldn't necessarily characterize it that

19   way, yes.  But it can be tough for the voter, without

20   a doubt.

21       Q.    And it's tough for the voter in what ways?

22       A.    That if they are -- in several.  One is they

23   aren't lawyers and they're being presented with

24   documentation that probably appears to be very legal

25   in nature, and their ability to -- or even inclination

1    that they have an ability to present countermanding

2    evidence or evidence to the contrary, it may be beyond

3    their internal capacity to even undertake.  So I have

4    heard that people, when they're faced with these types

5    of letters, they just -- you know, they choose not to

6    contest it any way and they just go off the rolls.

7        Q.   So is it right to say that some voters who

8    maybe don't have the sophistication of either being a

9    lawyer or being involved in election administration

10   would sort of give up in the face of a challenge even

11   if, in fact, they might be eligible?

12       A.   I have certainly heard that anecdotally,

13   without a doubt.

14       Q.   And for that reason -- we discussed this a

15   bit earlier -- it's important that information that's

16   provided to the voter initially to start the removal

17   process be credible and reliable in light of that

18   concern?

19       A.   Absolutely.

20           MR. DANJUMA:  Okay.  I'd like to move to

21       Exhibit 19.  And this is Bates-stamp LCSEO 00032.

22           (Whereupon, Plaintiffs' Exhibit No. 19 was

23   marked for identification.)

24   BY MR. DANJUMA:

25       Q.   The -- okay.  And I would like you to be able

1    to review this for a moment.  This is e-mails we

2    received from your office in a chain, a June 7th

3    e-mail from Maria Matthews to the supervisors of

4    election, and from Amber Marconnet, a follow-up e-mail

5    on June 18 to the supervisor of election staff.

6         A.    Okay.  Let me review, but yes.

7         Q.    Yes, please.

8         A.    (Reviews document.)

9         Okay.

10        Q.    Okay.  And I'd like to direct you to the

11   Maria Matthews' e-mail from June 7th.  You testified

12   earlier about Phase 1 beginning.  And is this the

13   e-mail that she sent to sort of indicate to you that

14   she was beginning Phase 1 of the proceeding?

15        A.    I believe it is, yes, yes.

16        Q.    So through this e-mail, the DOE would

17   recommence sending felon packets to you for the

18   purpose of identifying individuals with felony

19   convictions who may be ineligible because they're

20   still on -- they're still incarcerated or on

21   supervised release?

22        A.    Correct.

23        Q.    Okay.  And in that e-mail, in the second

24   paragraph of Ms. Matthews' e-mail, she notes, "In each

25   case file, you will find a copy of a screen shot of

1    the inmate or of the person as supervised based on

2    information from the Florida Department of Corrections

3    officials web page.  See attached examples.  These

4    official screen shots will take the place of a copy of

5    the judgment and will constitute the documentation

6    upon which the potential ineligibility is based

7    pursuant to Section 98.075, Subsection 7, of Florida

8    Statute.  Therefore, a judgment will not be included

9    in the case file."

10          Did I read that right?

11     A.   Yes.

12     Q.   So in this e-mail and instituting Phase 1 of

13    the proceeding, the DOE adopted a new policy where the

14    information and evidence they would provide to you

15    would be in the form of screen shots of the

16    individual's information from the Florida Department

17    of Correction page rather than a judgment

18    documentation; is that right?

19     A.   Correct.

20     Q.   And that's a change from the prior policy

21    from before Amendment 4 where the DOE did send you a

22    copy of the -- of the judgment?

23     A.   Correct.  That's what I was referring to

24    earlier.  I called it sentencing documents, but that's

25    what I was referring to, the judgment documents, yes.

1       Q.   Is there a difference in your mind between

2   the sentencing document and the judgment document when

3   you reviewed the felon packets in the past?

4       A.   No, to me, those are basically the same

5   concept in my head, yeah, the order from the judge

6   defining everything that was part of the sentencing,

7   which I guess is -- since I'm not a lawyer, but that's

8   the judgment, the sentencing posed by the court.

9       Q.   And I'll have some follow-up questions on

10  this specific issue, but an initial question for you

11  is, do you know why DOE changed its policy not to

12  provide judgment documentations and to provide to

13  supervisors of elections simply screen shots at the

14  Florida Department of Corrections web page?

15      A.   I can't say that I do know.  I believe we

16  asked if we could get the sentencing, and I -- like

17  y'all have the e-mails, because I thought we did it in

18  the form of an e-mail for the sentencing documents or

19  the judgment documents, because to us it seemed to be

20  more complete.  But we were told that was not going to

21  be the procedure.

22      Q.   Understood.  And -- but -- and they didn't

23  tell you why that was not going to be --

24      A.   I don't remember them telling us why.

25      Q.   Okay.  And the -- when you raised questions

1    about specific case files, did DOE send you -- excuse

2    me.  Did you raise questions about individual case

3    files that were provided to you by DOE?

4        A.   Upon the resumption of the case packets

5    coming to us, yes, we found a number that we had

6    questions about.

7        Q.   And when you raised those questions, did DOE

8    provide you with the judgment or sentencing document

9    or additional information?

10        A.   I can't remember that they did actually

11    present the judgment documentation.  I think that they

12    did not, but I can't be 100 percent certain on that.

13    I think for the responses we did receive, because we

14    did not receive a response to all the ones that we

15    referred back to them for more information --

16    essentially I believe that means they were invalidated

17    pending more information -- invalidating means they

18    weren't moving through the process to becoming

19    eligible -- that for the ones we did receive a

20    response on, either -- and, again, this is a little

21    sketchy in my head, but they were certain that these

22    people were convicted, and I -- for some reason in my

23    head, that's for out-of-state people because we

24    couldn't really get more information.  Or maybe in --

25    or in some instances, I think they gave deeper screen

1    shots because each screen shot doesn't hold a whole

2    lot of data.  And I believe sometimes our research by

3    looking up the case numbers they suggest we do -- I

4    believe it's the case number, but whatever that number

5    was, when we did that -- yeah, the DC number -- we

6    found in our research instances where someone was

7    potentially convicted of -- I mean charged with a

8    felony, but convicted -- pled down or convicted of a

9    misdemeanor, and, therefore, they were still under

10   supervision, but for a misdemeanor offense officially.

11   And so we -- there was some back and forth about that,

12   and we -- I think there's a significant number, a

13   dozen or two, where we have not received information

14   back on those persons in question, which tends to make

15   me think that we were right in our assessment that

16   they were not convicted of a felony.

17        Q.   Understood.  Okay.  I think I'd like to ask

18   follow-ups with some additional documentation and

19   correspondence on those.  Just to pause for a moment,

20   we're getting towards one, and this might be a larger

21   chunk of stuff because the e-mails relate to one

22   another.  So can we go off the record?

23             (Discussion off the record.)

24             (Lunch recess.)

25   BY MR. DANJUMA:

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

1      Q.   All right.  Mr. Earley, I thank you for

2    rejoining us after the break.  The -- before our

3    break, I believe we were discussing the new felon

4    packets that the DOE started sending you after June

5    7th and the fact that they no longer included the

6    document, the -- sorry, the judgment of conviction and

7    some of the issues -- you described some of the issues

8    and concerns that that generated for your staff.

9         There's a series of e-mail exchanges that

10   your office produced to us that kind of details some

11   of those issues, and I wanted to talk through a few of

12   them with you now.

13        MR. DANJUMA:  So I'd like to mark as Exhibit

14        20 the e-mail correspondence we received that

15        starts LCSEO 00040, and if you could review this

16        e-mail.  There's about four e-mail chains that

17        we'll try to get through.

18        (Whereupon, Plaintiffs' Exhibit No. 20 was

19   marked for identification.)

20   BY MR. DANJUMA:

21     Q.   And just so you know, obviously review to the

22   extent that you need to, but I'm interested in

23   essentially the discussion on page 3 and 4, the

24   message by Stephen Usztok on Friday, June 7th, 11:40

25   a.m., in the wake of Maria Matthews' e-mail to all of

1    you.  So just let me know when you've had an

2    opportunity to review some of that.

3          A.   Let me get my bearings on this.

4               (Reviews documents.)

5               Okay.

6          Q.   All right.  So as I mentioned, I wanted to

7    focus on Mr. Usztok's e-mail to you and his other

8    colleagues.  And is it correct to say that this e-mail

9    raises concerns about the DOE's policy of only

10   including screen shots of the Department of

11   Corrections database?

12         A.   Yes.

13         Q.   And one of the reasons that Mr. Usztok raises

14   is that the offenses are listed on the DOC page, but

15   they don't specify the severity of the offense in the

16   same way.  "Official judgment pages will list that

17   something is a first, second, or third degree felony

18   or a misdemeanor, which makes the felony conviction

19   unambiguously clear to our team, which lacks formal

20   legal training and to the voter."

21               Is this -- when you were describing

22   earlier -- I believe you testified earlier that a

23   Department of Corrections screen shot can show that

24   something was charged as a felony when, in fact, in

25   reality, it was adjudicated as a misdemeanor or only

1  was sentenced to some version of probation; is that

2  right?

3      A.   That's my understanding, yes, yes.

4      Q.   And if you only have the screen shot, you're

5  not able to tell if there even was a qualifying felony

6  that would determine whether or not someone was

7  ineligible?

8      A.   Yeah, I think as part of this screen capture

9  that's part of this e-mail shows, and that's -- I'm

10  not super familiar with what the screen shots look

11  like -- I don't see an indication here of the offense,

12  whether it's a felony or a misdemeanor.  So

13  potentially for each one of these, my staff would

14  either have to research individually to get to the

15  bottom of that, and that leaves some ambiguity.

16  Certainly the documents presented, if they don't say

17  that specifically -- and, again, it could be that

18  maybe there's part of this screen shot missing, but I

19  agree with the concern that Stephen Usztok and my

20  staff raised.

21      Q.   And can I follow up on one thing that you

22  noted here?  There's an offense that's listed -- so I

23  raised an earlier issue that there could be something

24  that can be charged as a felony but might actually be

25  adjudicated as a misdemeanor.  But it sounds like

1    you're also raising a separate second issue, which is

2    that there's no indication on the DOC website whether

3    the offense is even a felony in the first place; is

4    that right?

5        A.   I can't say that specifically because I don't

6    have that document right here in front of me.  This is

7    a partial screen shot that they're showing.

8        Q.   Okay.

9        A.   But based upon the wording from Stephen, and

10   he's very good, he definitely had doubts and was not

11   sure based upon the screen shots what the status of

12   that crime was, what type of crime that was.

13       Q.   And can I ask more generally, in reviewing

14   these screen shots, would your staff have been

15   required to look at the Florida code to determine what

16   level an offense was to --

17       A.   That's -- yes, I think that's the case.  And

18   as he points out at least once or twice, the -- the

19   screen shots themselves say "The offense descriptions

20   are truncated, do not necessarily reflect the crime of

21   conviction."

22       Q.   Yes.  So --

23       A.   So it refers you to the Florida Statutes for

24   further information or definition.  That's why we

25   prefer the judgment documents or the sentencing

1    documents, however you refer to it.

2        Q.   So the section that you just read that the

3    DOC website itself warns that "the offense

4    descriptions are truncated and do not necessarily

5    reflect the crime of conviction," is it fair to say

6    that the evidence that DOE was providing to you was by

7    its own terms not reliable because, in fact, it

8    doesn't necessarily reflect the crime of conviction?

9        A.   Yes.  It has its own caveat there that --

10   don't base any decisions specifically on this screen,

11   what's being presented on the screen.  But that's what

12   we were being presented.

13       Q.   So your -- the staff of your front office

14   then took the next step to try to actually look at the

15   Florida Statutes to determine the severity of offenses

16   that might be available; is that correct?

17       A.   I think that's one of the several steps they

18   undertook.

19       Q.   And they did that without having any

20   particular training as lawyers, they're not admitted

21   to the Bar as lawyers; is that correct?

22       A.   Correct.

23       Q.   And they are not experts in the Florida

24   criminal code?

25       A.   Correct.

1    Q.   Is there a risk of error, either human,

2    legal, or otherwise, when performing that type of

3    research -- even if your office didn't commit such

4    errors, do you think that there's a significant risk

5    of error if that's what's required to make a

6    determination?

7    A.   Certainly if you're only going from those

8    screen presentations that were presented to us through

9    a screen capture, I think there is a risk of not fully

10   understanding what the person was charged or convicted

11   of, and then what they were still potentially

12   incarcerated or under supervision for.

13   Q.   Now, we discussed earlier in your prior

14   testimony some of the practices and policies that were

15   in place before Amendment 4 when you were sent full

16   judgment pages by DOE, and we discussed the fact that

17   under that system, there is still a risk of error; is

18   that correct?

19   A.   Correct.

20   Q.   Is it fair to say that the risk of error is

21   significantly increased in the policy that -- is it

22   fair to say that the risk of error is increased for

23   the felony packets that DOE sent you beginning in June

24   2019?

25   A.   I think that's this -- the feeling of my

1    staff, and I tend to agree with that, yes, yes.

2        Q.   All right.  And you testified earlier that

3    your staff -- you have the resources for your staff to

4    do second-level research beyond what DOE provides you.

5    But would you agree that some counties may be too

6    small to devote staff time to researching the Florida

7    code?

8        A.   I would agree with that statement, and I

9    would say that since this was a departure from

10   previous present packets and how it was presented,

11   that the potential need to do further research may not

12   have fully been appreciated by all offices.

13       Q.   Okay.  And I had a background question for

14   you on the sentencing document itself that you

15   received in the -- in the prior felony packets before

16   June.  Do you -- what is your understanding what a

17   sentencing document is as part of that felon packet?

18   What does that entail?

19       A.   I believe it's something generated by the

20   court at or immediately after the sentencing is

21   completed and the trial is completed and the person is

22   found guilty, detailing very specifically what the

23   person's convicted of and what their obligations are

24   to satisfy the court, such as incarceration, I guess

25   probation, any pleadings, certainly, as I've since

1    learned, some of the financial obligations at least.

2    Q.   Okay.  So before I move on, I'd like to ask

3    an unrelated question that is not about this, if I

4    may.

5         The -- you mentioned that you attended at the

6    FSASE conference in May that Maria Matthews presented

7    at.  Is there a video recording of that presentation

8    by any chance, do you know?  Did you --

9    A.   I have not seen one.  I -- there often is

10   someone filming it.  I don't know if there is a

11   video -- I can't say for sure.  There may be.

12   Q.   Okay.  Was there -- but there was no official

13   notetaker that you were aware of?

14   A.   Not that I know of.

15   Q.   Okay.  And beyond -- how did you get access

16   to the PowerPoint?  Was that --

17   A.   They provide that to us.

18   Q.   But they --

19   A.   I think it's actually probably on the

20   division's website.

21        MR. DANJUMA:  Got it.

22        Okay.  All right.  So to return to the felon

23        packets you started receiving in June of this

24        year, I want to mark as Exhibit 21 a meeting

25        agenda that we received from your office, and the

1          Bates stamp for this is LCSEO 00079.

2               (Whereupon, Plaintiffs' Exhibit No. 21 was

3     marked for identification.)

4     BY MR. DANJUMA:

5          Q.   And there are some markings on that page that

6     are from the original, they're not from us.

7          A.   Okay.  Can I review this?

8          Q.   Yes, please.

9          A.   (Reviews documents.)

10              Okay.  I've read it.

11         Q.   Okay.  And 1.3, as part of this agenda --

12    well, excuse me.  Let me back up.

13              Is it fair to say that this agenda involves,

14    amongst a few other things, the new packets that you

15    started receiving from the secretary of state's

16    office?

17         A.   Yes, it does.  That's the main topic, I would

18    think.

19         Q.   And Agenda Item 1.3 involves a direct action

20    item, which asks "Do we need judgment pages"; is that

21    correct?

22         A.   Yes.  I think we were debating what we would

23    -- how we would move forward.  I can't remember if

24    this was -- I think this was before I requested the

25    judgment pages, but I'm not 100 percent certain, from

1    the state.

2         Q.   Right.  And to refresh my memory, when you

3    requested them, they said the policy is not to provide

4    them at present?

5         A.   Correct.

6         Q.   Okay.  And is it fair to say that the check

7    marks after the "yes" on this agenda is a conclusion

8    from your team -- you and your team that you do want

9    the judgment pages?

10        A.   Yeah, I think that's basically the stance we

11   took there.  Yes, so that one that's checked, do we --

12   if we want the judgment pages, do we want our staff to

13   actually do the look-up, I think that was where we

14   determined we would do that, but it's certainly more

15   work.  And then, also, a little bit of the

16   middle-of-the-road selection.

17        Q.   Yeah.  So before I ask about the

18   middle-of-the-road selection, I did want to ask about

19   the burden on you of getting the judgment pages.  Can

20   you explain or quantify the -- the amount of burden it

21   would cause your office to do this?

22        A.   Yes.  We were now -- if we wanted to look at

23   the judgment pages, we'd have to find them, and we

24   were going to be doing more research, as it's

25   specified on that key bullet point there.  There were

1   log-ins for potentially each of the different clerk of

2   courts' website.  I had one for the local website.  So

3   that question is do we want to have a separate secure

4   log-in for the front office except for mine so

5   everybody's not using my log-in.  I think the answer

6   was yes, I had them do that.  And I think we were

7   going with individual log-ins for each team member.  I

8   don't think that there's a fee for some of that, at

9   least in Leon County, but in other counties, there may

10  be.  Some counties don't really require log-ins --

11        Q.   Okay.

12        A.   -- I know that's the case, but I think some

13  counties don't even have websites where you can do

14  this type of research very effectively.

15        Q.   And in those counties, how would you get a

16  judgment page if you contacted the clerk?

17        A.   I guess we would have to request an e-mail

18  copy or a fax copy through some process there.

19        Q.   Okay.  And just so I understand, you would

20  need to find a judgment page for any conviction that

21  was presented to you as part of the felony packet and

22  engage in this process for anyone with any county?

23        A.   I think that was at least our first blush

24  expectation of how we would proceed.

25        Q.   Okay.

1     A.   This could be tempered later on by -- some

2  screen captures may be very obvious in what they

3  present to our staff.  So I don't know that we

4  actually got a judgment page for every single one, but

5  I think that there were certainly many areas or

6  situations where we would have to do this deeper

7  research.

8     Q.   Do you know how you'd get an out-of-state

9  judgment page if you wanted them?

10    A.   No.

11    Q.   So then you mentioned the middle road

12 suggestion at the bottom here, which I'm just going to

13 read:  "Middle road suggestion:  Initiate process with

14 packet contents as delivered by the division, then

15 only pull judgment pages or other documentation from

16 the clerk of court's office as needed, i.e., someone

17 contests their ineligibility."

18         And am I right to say that this is an option

19 your office was considering to kind of balance the

20 significant burden on your staff of trying to find

21 this information with administrating the many other

22 things you must do as --

23    A.   I would say that's probably a fair

24 distinction.  My deputy wrote this up, and I think his

25 "i.e." was an example of what he's kind of thinking

1     about.  I'm not sure that that was the exact situation

2     where we would wait for that.  Knowing my staff,

3     that's probably not what we would tend to do, you

4     know, present something we didn't believe to be full

5     and then only look it up later on.

6          But I can see potentially, like I said, if

7     there's a screen shot that definitely appears to be

8     full and complete and we can glean from it that the

9     person is still, as in these situations, incarcerated

10    or being supervised because of a felony conviction,

11    and the staff, just looking at that, maybe it just

12    said murder, I don't know every instance, and that

13    they were convicted and there's a date, we may not

14    need the judgment page in their estimation, but later

15    on someone contests it and said, "Wait a second, that

16    was not what I was convicted of," then we would

17    certainly proceed that way.

18    Q.    Okay.  And just so I understand, there are a

19    number of June felon packets that you sent back to the

20    DOE without initiating a letter entirely, right?

21    A.    Yes.  Yes.

22    Q.    So you have not proceeded with the policy of

23    initiating the process solely based on the DOE's

24    evidence at present; is that fair?

25    A.    There may be some instances where we did,

1    absolutely, because we didn't send them all back.  I

2    think we sent about a third roughly back.

3        Q.   And some of those might have been -- some of

4    the ones where you did initiate the process for

5    removal may have been solely on the basis of the

6    screen shot?

7        A.   Absolutely, yes.

8            MR. DANJUMA:  Okay.  I'd like to now move

9        to -- halfway through the exhibits on this, which

10       is Exhibit 22, and that is Bates stamp LCSEO

11       00058.

12           (Whereupon, Plaintiffs' Exhibit No. 22 was

13   marked for identification.)

14   BY MR. DANJUMA:

15       Q.   And this is an e-mail from Alessandra Shurina

16   to the front office team and you on June 21st, 2019.

17       A.   Yep, very good write-up.  Alessandra is

18   great, as is Stephen.

19       Q.   She definitely seems talented.  And,

20   actually, perhaps most conveniently, she's summarized

21   concerns --

22       A.   Convenient for who?

23       Q.   -- in bolded blitz on each of the points on

24   the e-mail, and I wanted to review those with you, if

25   I may.

1          The first bullet she addresses is that just

2     because someone -- the type of supervision on a given

3     record is listed as probation felony doesn't mean that

4     the person in question was found guilty of a

5     felony-level offense.  Is it true that in their

6     review, they saw that an initial determination that

7     said "probation felony" actually had been

8     adjudicated -- actually had a record where

9     adjudication was withheld and the individual was not

10    found guilty of a felony?

11         A.   That appears to be what her researchers

12    found, yes.

13         Q.   So that top-level information, even though it

14    says "felony," is not reliable or credible in light of

15    the fact that the reality underlying that description

16    may be very different?

17         A.   I believe that's correct, yes.

18         Q.   And the second bullet is -- she explains that

19    your office had to do a lot of extra research, which

20    we've already discussed to some extent.

21         A.   Uh-huh.

22         Q.   Is that research that is necessary in most of

23    the felon packets you reviewed in June, or some

24    fraction?  Do you know --

25         A.   I think that the majority.  So the ones we

1    held back, in other words, did not proceed moving

2    forward on.  There was a lot of research there, and

3    that was at least -- or roughly a third, and with some

4    that we ultimately sent, when she says that, that at

5    least a portion of the ones we did start proceeding on

6    and still involved a lot of extra research before our

7    staff could be sure, based on all of our

8    conversations, that they were moving forward with a

9    true felony conviction and the person that was still

10   under some form of supervision due to that felony

11   conviction.

12       Q.   And Ms. Shurina's third bullet notes that

13   some of the information contradicts itself; is that

14   right?

15       A.   Uh-huh.

16       Q.   She writes in one of the packets, it listed

17   an offense under the heading "criminal felony," but on

18   the clerk of court's website, they listed the same

19   offense as a first-degree misdemeanor.  How do you

20   resolve contradictions in evidence when you receive

21   them from the same felon packet?

22       A.   Well, we err on the side of the registered

23   voter.  And in this case, I'm sure we would send that

24   back to the state for clarification and say, look,

25   we're seeing a discrepancy here, this is not credible

1    or reliable.

2         Q.   Okay.

3         A.   The next bullet point is why I have good

4    staff, because I was saying the sentencing documents

5    and judgment documents are roughly the same, but,

6    obviously, they are not.  I defer to staff on that

7    one.

8         Q.   Yes, I wanted -- and I asked a prior question

9    to you on this very issue, but to check this again,

10   the -- Ms. Shurina's e-mail, is it fair to say,

11   clarifies that a sentencing document is different but

12   just as important as the judgment page in part because

13   it can tell you what sentence is currently being

14   served as a -- that an individual is currently serving

15   and whether or not the sentence that they're currently

16   serving is a felony?

17        A.   Yes.  Yes.

18        Q.   And I realize that was a complicated

19   question.  If you don't understand --

20        A.   Yeah, let me reread this, but I think the

21   answer is yes.

22        Q.   Yeah.

23        A.   You had another very complicated question

24   that I jumped the gun on earlier on Paragraph 1, but

25   let's see here...

1          (Reviews document.)

2          Okay.

3          Q.    And the reason why I ask that question --

4    which I believe was accurate, but definitely correct

5    me if you misunderstood the question -- is that I read

6    the point that your staff raised to mean that just

7    because someone's currently incarcerated or on

8    probation, it doesn't actually mean that they're

9    ineligible, because they could be on probation for a

10   misdemeanor offense even if they had a prior felony

11   which they've completed?

12         A.    Yes.  Exactly.

13         Q.    So for that reason, the judgment page itself

14   may not be enough, you might need an additional

15   document beyond that to make clear that the probation

16   being served by a person is on a felony that would

17   make them ineligible?

18         A.    I think that's accurate, yes.  In the past,

19   before Amendment 4, if you're convicted of a felony,

20   really all you have to look at -- the judgment page

21   would tell you that and then the executive clemency

22   information would tell you whether they were absolved

23   of that -- you know, their rights were restored based

24   on that felony.

25              Here it's an issue of supervision, and as you

1    said, they may not be under supervision for the felony

2    itself.

3         Q.   Okay.  And then your staff's final concluding

4    point is that this is much harder than the prior

5    system that you used to have in place before the

6    passage of SB 7066 or the change in the eligibility

7    criteria; is that right?

8         A.   Uh-huh.

9              THE COURT REPORTER:  Is that yes?

10             THE WITNESS:  Yes.  Sorry.

11             MR. DANJUMA:  We'll do our best to affirm

12        verbally.

13   BY MR. DANJUMA:

14        Q.   And Ms. Shurina notes that "It took three

15   eyes on each these files to catch everything."

16             You testified before that some counties may

17   not have those resources available to dedicate that

18   amount of attention; is that correct?

19        A.   Correct.

20        Q.   And I want to note that this is in the period

21   when Leon County doesn't have an upcoming election,

22   such as in March or a presidential election year in

23   November; is that right?

24        A.   Correct.  Correct.

25        Q.   Would the resources that staff have available

1    to dedicate this be even less in advance of a major

2    upcoming election?

3        A.   Yes.

4        Q.   And would you receive more applications that

5    would require -- excuse me, let me withdraw that.

6             Would you receive a greater number of felon

7    packets because more individuals were registering to

8    vote closer to an election?

9        A.   I would say no to that last point.  I think

10    the registration load or the new registration load

11    doesn't immediately impact the information we're

12    getting back from the state.

13        Q.   Okay.  So the flow of information that DOE

14    sends you on whether or not individuals have a

15    conviction that might make them ineligible is not

16    connected to overall registration rates?

17        A.   Not very directly.  I mean, somewhat it is,

18    but a lot of times the division's ability to process

19    this becomes less around election time too.  So we

20    don't seem to get a big flood of these prior to an

21    election.

22        Q.   Okay.  And just so I understand, do you think

23    it's -- obviously this system is quite new, but in the

24    past have felon packets come in at a relatively even

25    rate throughout the year, or no, it's just random?

1          A.    Somewhat even, but I would tend to

2    characterize it, at least in my recent experience as

3    being supervisor, that it may decrease around election

4    time actually.

5          Q.    Okay.  Thanks.  So now I'd like to move on to

6    the third to last --

7          (Discussion off the record.)

8          MR. DANJUMA:  And I'm marking as Exhibit 23

9          an additional e-mail correspondence that is

10         Bates-stamped LCSEO 00017, and this is

11         correspondence --

12         (Interruption occurred.)

13         (Whereupon, Plaintiffs' Exhibit No. 23 was

14    marked for identification.)

15    BY MR. DANJUMA:

16         Q.    And this is an e-mail correspondence from

17    Amber -- between Amber Marconnet and Alessandra

18    Shurina.  And I just have a brief question about this,

19    but please take a look.

20         A.    (Reviews documents.)

21         Okay.

22         Q.    Okay.  In the e-mail that Ms. Shurina sent to

23    Amber Marconnet on June 21st, she identifies several

24    categories -- well, let me withdraw that question.

25         In the e-mail Ms. Shurina sends, she

1    identifies several concerns about the felon packets

2    that were provided by DOE.  Is that a fair

3    characterization?

4         A.   Yes.

5         Q.   And she groups those into four different

6    groups.  One is that adjudication was withheld.  Do

7    you know what that means?

8         A.   Not exactly, actually.  I think it means they

9    were not necessarily convicted of a felony or of

10   whatever they were charged with, but they still may

11   get some sentencing.  But I'm not a legal expert on

12   that.

13        Q.   Okay.  And the -- it looks like Ms. Shurina

14   concluded that based on the evidence provided, there's

15   no reason to believe that the following voters were

16   found guilty of a felony offense because the CCIS

17   pages state that the court withheld adjudication.  Is

18   that -- did I read that correctly?

19        A.   Yes.  There's some additional comments there.

20        Q.   Yes, and I want to emphasize that some of

21   this is complicated, so I don't want you to -- I don't

22   want to oversimplify it in a way that is in any way

23   confusing, but do you know -- could you summarize like

24   approximately how many of the packets were sent back

25   in this round, and do you know the reasons why they

1    were sent back?  Could you explain that?

2        A.   I think in -- as a general way to say it, my

3    staff, through their research, found good reason to be

4    uncertain in the reliability or credibility of these

5    packets presenting evidence that the people who are

6    registered voters were actually under supervision for

7    a felony.

8        Q.   Okay.  And in response to that, to the

9    concerns raised by Ms. Shurina, Amber Marconnet sends

10    a response e-mail on Thursday, June 27th, that says,

11    "We will be reworking the following.  You may need to

12    invalidate on your side in the interim so it does not

13    show in your queue a list of redacted individuals'

14    names."

15        Do you know the ultimate results of the --

16    the DOE's reworking of those felon packets?

17        A.   I can't say with specificity because a lot is

18    redacted here.

19        Q.   Right.

20        A.   I am fairly certain that a good portion of

21    the ones we sent back for reworking have not -- did

22    not come back as potentially ineligible.

23        Q.   And from that fact, you infer that the

24    concerns you raised about the fact that these

25    individuals actually were not on -- incarcerated or on

1    probation for a felony conviction were accurate?

2         A.   Were borne out, those concerns were borne

3    out, yes.

4         Q.   Your concerns were borne out.

5              Okay.  Did you -- aside from this e-mail --

6    and I understand and agree it's hard for us to piece

7    through this too without -- with some of the --

8         A.   There's a lot of detail missing.

9         Q.   -- identifying information redacted.  But can

10   I ask the broader question, did you have any

11   information that DOE has altered or changed its

12   practices in response to the concern that you raised

13   in this e-mail?

14        A.   In general, I -- my perception is that yes,

15   they have changed somewhat.  Maybe they are -- I can't

16   say exactly what they're doing.  It seems that we're

17   receiving fewer errors or things of concern to my

18   staff.

19        Q.   And can you explain what that means -- from

20   June to this date, is that the difference?

21        A.   Correct, in that time period.

22        Q.   And have you received a different number of

23   felon packets in that interim period?

24        A.   I'm not sure how to judge the number

25   variation because they -- we got a group and then we

1    since had subsequent mailings -- or not mailings, but

2    received subsequent packets.  I think, though, that

3    the number that we had concerns about has decreased.

4         Q.   The percentage of --

5         A.   Right.  Yes, yes, yes.

6         Q.   All right.

7         A.   And the number, yes.

8         Q.   Okay.  The --

9         A.   But, yes, the percentage.

10        Q.   Do you have any official statement or an

11   unofficial statement from DOE that they have

12   adopted -- that they have changed their policies?

13        A.   None that I can remember.

14        Q.   Okay.  And it is still not their policy to

15   send you the judgment document or sentencing document;

16   is that correct?

17        A.   I believe that is correct, yes.

18             MR. DANJUMA:  Okay.  I'd like to move to

19        Exhibit 24, and that is Bates stamp LCSEO 00046.

20             (Whereupon, Plaintiffs' Exhibit No. 24 was

21   marked for identification.)

22   BY MR. DANJUMA:

23        Q.   And if you could review this, this is

24   information that Alessandra Shurina has sent to you

25   and her colleagues regarding concerns about DOE's

1    felon packets, and I'm interested particularly on the

2    e-mail she sent on June 27th.

3         A.    Uh-huh.

4              (Reviews document.)

5              Okay.  I remember this e-mail well, yes.

6         Q.    Yes, and thank you for reviewing it.

7              So I think you'd agree that there's -- the

8    e-mail summarizes a lot of complex data --

9         A.    It does, it does.  I think there's a few

10   conclusions that Alessandra is making that aren't

11   necessarily 100 percent factual or -- or certain, let

12   me say, certain.

13        Q.    All right.  Do you --

14        A.    But, in general, I think her concerns are

15   well-based, well-founded.

16        Q.    Maybe we should start with some of your

17   hesitations, if that's true, if any of them are --

18   what are your -- if there's --

19        A.    I think she's making a conclusion -- and if I

20   remember this correctly, because we also had some

21   discussion about this -- that the -- I'm not sure how

22   to exactly term it, but the -- she found 38 percent of

23   the people in the database that the DOS is -- the

24   Department of State is using as proof of felony

25   conviction have not been found guilty of a felony

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

1    event -- offense; therefore, in the data that's being

2    sent to us, it likely has that same, in quotes, error

3    rate.  It could be that they're vetting it more

4    closely and they've seen those same anomalies and they

5    aren't sending us that data.  So that would be one way

6    I would temper her conclusions here, or some of the --

7        Q.   Great.

8        A.   -- concerns she's generating.  But, again, I

9    still think her concerns are founded.

10       Q.   Yes.  So maybe we should -- and I think I

11   understand what you're saying and let me try to get

12   that out so that it's on the record.

13           Is it fair to say that Ms. Shurina identified

14   an issue with interstate felon packets the Division of

15   Elections was sending to your office?  Is that

16   correct?

17       A.   Yes.

18           MR. HERRON:  Interstate or intrastate?

19           MR. DANJUMA:  Interstate, I-N-T-E-R.

20           MR. HERRON:  Out of state.

21           MR. DANJUMA:  Like basically being sent

22       from -- people with felonies in other states --

23           MR. HERRON:  My ears.

24           MR. DANJUMA:  No, totally.  I'm happy to try

25       to clarify.

1    BY MR. DANJUMA:

2    Q.   And in the instance where the -- well,

3    actually, Mr. Earley, could you describe to me what

4    you understand an interstate felon packet to be?

5    A.   Yeah, as Alessandra says in the next

6    sentence, "In these cases, the voter's offense happen

7    in another state."  I'm not 100 percent certain that

8    everything that she is then talking about down here,

9    the 155,000 people are all interstate.  It seems like

10   that's the case, but I can't remember specifically if

11   that's what that database from the Department of

12   Corrections is all about.  I'm not sure.

13   Q.   Do you know what the database that the

14   Department of Correction is using here, the raw

15   database that they have available for interstate

16   offenders is?

17   A.   I cannot say for certain, no.

18   Q.   You're not familiar with that?

19   A.   Yes, yes.

20   Q.   But is it fair to say that Ms. Shurina's

21   conclusion was that the data that's obtained from the

22   DOC's database in order to produce the results it

23   displays on its website have a relatively high

24   percentage of individuals in state supervision where

25   the adjudication for all charges was withheld, where

1    they were not found guilty of any felony?

2        A.    Yes, it looks like a little over a third if

3    you look at that 59,265 are in state supervision and

4    their adjudication for all charges was withheld.

5        Q.    Yes.  And as you noted, Ms. Shurina's

6    conclusion is that the database that DOE is relying on

7    has -- means that a solid 38 percent of people in that

8    database that DOE is using as proof of a felony

9    conviction have not been found guilty of a felony

10   offense, that's the overall number?

11       A.    That's, I think, part of her concern, yes,

12   assuming that that's the only source they're relying

13   on.  That's why I temper that conclusion.

14       Q.    And so what your tempered conclusion is to

15   say, the fact that the database has what we might call

16   as an error rate of 38 percent doesn't necessarily

17   mean that the DOE's felon packets have an error rate

18   of 38 percent?

19       A.    It may not translate and hopefully would not

20   translate directly over to that.

21       Q.    It just means that the source of information

22   that they're sending you as the final arbiter on

23   whether or not someone is eligible has a rate of

24   uncertainty of 38 percent; is that fair?

25       A.    If that is the only source, then I would say

1      that that is fair.  I don't know necessarily that

2      that's the only source.  It seems that they are hoping

3      or relying upon us digging deeper and finding some of

4      our own information.  And I think that they do provide

5      more information in the data packets than solely

6      what's here.

7          Q.   Okay.

8          A.   So I don't think that that's the sole basis

9      for a determination.  Certainly within our office,

10     it's not.

11         Q.   And just so that I understand what you're

12     saying, in sending you the felon packet with this

13     database, which you and Ms. Shurina have raised

14     concerns about, am I understanding you to be saying

15     they're expecting you to do follow-up research to

16     ensure that what they send you is accurate and

17     credible?

18         A.   It seems to me that, especially based on one

19     of the earlier e-mails that we've reviewed where it's

20     kind of stated that we're providing the information,

21     and essentially if you want to dig deeper, here's the

22     links that you can follow to do that research.

23              (Interruption occurred.)

24              MR. DANJUMA:  Can we go off the record for a

25         moment?

1       (Discussion off the record.)

2   BY MR. DANJUMA:

3       Q.   So just a couple more documents that are left

4   on this.  The -- I just want to -- Mr. Earley, I just

5   wanted to double-check, I think the last questions

6   were about basically DOE sending you information and

7   the understanding that it's possible that supervisors

8   of elections will do follow-up research beneath that

9   to see if it's -- if it's more credible than the

10  top-level information you receive --

11      A.   Yes.

12      Q.   -- right?

13      A.   And whether that was the expectation, I

14  guess, from the -- by the state.

15      Q.   Yes.  And I just want to confirm again that

16  this is a departure from their prior practice where

17  they did provide you more of the underlying

18  documentation on which you could --

19      A.   It's certainly a departure in the type of

20  information because they gave us the judgment

21  documents previously.  I think there was less data

22  likely needed previously --

23      Q.   Okay.

24      A.   -- because it was conviction of a felony

25  and -- what am I trying to say -- executive clemency.

1    Q.   Right.

2    A.   Yeah.

3    Q.   I guess my question basically is that you

4    mentioned that DOE may be providing -- may be doing

5    its own research underneath the DOC spreadsheet --

6    screen shot, excuse me, in order to determine if it's

7    based on a disqualifying felony, but a supervisor of

8    elections that receive that information wouldn't know

9    one way or another whether or not DOE had done that

10   underlying data research or not; is that fair?

11   A.   I think that's fair, yes, yes.

12   Q.   And so while I think we, and I presume

13   Alessandra Shurina agree, that the 38 percent error

14   rate in the database doesn't mean that DOE's felon

15   packets have a 38 percent error rate, the reality that

16   this is a concern is because you can't know one way or

17   the other with the information that you've received

18   what DOE based its conclusion on?

19   A.   I would say that's true, and I would also

20   say, unfortunately, that the first sets of data we

21   got, which seemed to lessen in the percentage, did

22   have a high percentage of packets that did seem to be

23   incorrect.

24        MR. DANJUMA:  All right.  And so let's

25        address that specific concern.  I'd like to

1     introduce Exhibit 25, and that's LCSEO 00051.

2          (Whereupon, Plaintiffs' Exhibit No. 25 was

3     marked for identification.)

4     BY MR. DANJUMA:

5     Q.   And this is another relatively lengthy e-mail

6     chain, but I just want you to know that I'd like to

7     focus on Stephen Usztok's July 9th e-mail on the

8     second page.

9     A.   Okay.

10    Q.   But please feel free to review.

11    A.   Sure.  Okay.

12         (Reviews document.)

13         Okay.  I see the yellow highlighted, and

14    that's kind of what I've been alluding to also.

15    Q.   Right.  And in that highlighted section,

16    basically Mr. Usztok notes that we've -- that your

17    office received 66 felon packets so far from the

18    division since they restarted sending those felon

19    packets?

20    A.   Uh-huh.

21    Q.   And he writes, "Of those 66, we've contacted

22    Amber and invalidated 24."

23         So 36.4 percent is what Mr. Usztok quotes as

24    the current rate that are being sent back to be

25    invalidated; is that right?

1    A.    Yes.

2    Q.    And of those that were invalidated, I

3  understand you to be testifying that DOE did not send

4  them back to you again suggesting that they were --

5  the individuals had been wrongfully flagged as

6  potentially ineligible?

7    A.    That's my understanding, yes, because I asked

8  about that, and if I'm remembering correctly, the vast

9  majority of those 24 did not come back.  There might

10  have been one or two, because I know some that we sent

11  back, whether it's part of these 24 or if there were

12  other ones that we sent back, did come back with their

13  affirmation that yes, and better evidence to support

14  that this was someone who was very likely ineligible.

15    Q.    Okay.  And Mr. Usztok goes on to state that

16  "It includes cases both of we think this person is not

17  a felon and we don't have enough information to

18  determine whether this person is a felon"; is that

19  correct?

20    A.    Correct.

21    Q.    All right.  Do you think that information

22  being sent by the DOE that has roughly a 36.4 percent

23  error rate is sufficient for supervisors of election

24  across the state to initiate removal proceedings on?

25    A.    If you're relying only on that information, I

1    would say that could be very problematic, and that's

2    why we are not.

3        Q.   Okay.  And you have the resources to try to

4    do additional research to determine this, whereas some

5    supervisors of election may not have those resources?

6        A.   True.  Yes.

7        MR. DANJUMA:  Okay.  There are two additional

8        e-mails that I'd like to introduce mostly for the

9        record.  I have very short questions for -- on

10       them, but I'd like to introduce them.  One is

11       Exhibit 26, LCSE 00037.

12       THE WITNESS:  Thanks.

13       (Whereupon, Plaintiffs' Exhibit No. 26 was

14    marked for identification.)

15    BY MR. DANJUMA:

16        Q.   And just so you know, I'm interested in the

17    Friday, July 12th, e-mail, a question about that

18    e-mail.

19        A.   Okay.

20       (Discussion off the record.)

21       THE WITNESS:  (Reviews document.)

22       Okay.

23    BY MR. DANJUMA:

24        Q.   Okay.  And I'd just like to start with the --

25    by reading the second paragraph from Ms. Alessandra

1    Shurina's July 12th e-mail.  And it says, "I forwarded

2    Amber's response to you below.  The most striking part

3    of it, in my opinion, is that the basis for starting

4    the ineligibility process for a felony conviction is

5    that the state is only to receive felony match

6    information for those individuals who have been

7    adjudicated guilty of a felony charge, but we know,

8    and she knows we know, that this is not true.  We were

9    able to locate the judgment page on one of the packets

10   we previously sent to Amber to confirm that the

11   offense the voter was adjudicated guilty for was a

12   misdemeanor.  We've only been able to confirm the

13   misinformation in that one instance, but I'm sure that

14   at least one more of the 20 plus packets we've sent

15   back to her were sent in error.  So the fact that

16   they're only supposed to receive matches for those

17   adjudicated guilty of a felony charge doesn't seem

18   sufficient to begin the removal process."

19          Did I read that accurately?

20   A.   Yes.

21   Q.   The reason I ask about that is that DOE --

22   and obviously DOE's staff are not here to discuss

23   this, but DOE's representatives are stating to you and

24   presumably other supervisors of elections that they

25   are supposed to be only receiving felony match

1    information for individuals who have been adjudicated

2    guilty of a felony charge, but isn't it true that

3    according to the research of your staff, that system

4    wasn't working, whatever system they had in place,

5    and, in fact, they were sending you information of

6    individuals who had only been adjudicated with

7    misdemeanors?

8         A.   I would say yes.  I'd say their search or

9    match expectation was that these were folks --

10   whatever their search or matching criteria were, it

11   should only have returned people adjudicated guilty

12   and still under supervision for a felony, but our

13   research showed that that was not always the case.

14              MR. DANJUMA:  Understood.

15              I'm going to now introduce as Exhibit 27,

16         LCSEO 1156, and I'd like you to review this.

17              (Whereupon, Plaintiffs' Exhibit No. 27 was

18   marked for identification.)

19   BY MR. DANJUMA:

20        Q.   I'm introducing this as part of the record.

21   I don't have specific questions on it because I think

22   some of them we've already covered, but I -- if you

23   could review it briefly and let me know if you have

24   any response beyond what you've already stated.

25        A.    Yeah, and this was an earlier in the process

1    e-mail about a month before the one we just went over,

2    but --

3          Q.   Yes.

4          A.   -- let me dive into here.

5          Q.   My understanding is it was Ms. Shurina

6    explaining why it was important to have the -- the

7    judgment page.

8          A.   I believe that's correct, yes.  Let me dig

9    through though.

10         (Reviews document.)

11         Okay.

12         Q.   Okay.  So does the information in that

13   summary e-mail confirm your office's -- or, sorry --

14   your opinion that you do need more information than

15   DOE was providing you to make a reliable and credible

16   determination about someone's eligibility?

17         A.   Yes.

18         Q.   Okay.  I want to -- so that is the close of

19   the many e-mail documents.  I want -- I would like

20   to -- thank you for bearing with us.

21         I'd like to just briefly go back to -- I

22   believe we marked this as Exhibit 25.  It starts with

23   Christopher Moore's July 9th e-mail.

24         Okay.  If -- I just want to direct your

25   attention to Mr. Moore's correspondence to you in the

1    first paragraph of his e-mail there.  And he says, "A

2    couple of key points I will highlight below that Mark

3    might need to make with the DOE.  This process is not

4    off to a very accurate start, and we are playing with

5    people's eligibility to vote.  We just happen to be at

6    a point in time locally that there are not any

7    elections in the immediate horizon."

8            I want to raise that issue because when we

9    were discussing earlier, Mr. Earley, you described Ms.

10   Matthews and the DOE's planned implementation of SB

11   7066 as three phases where the initial phase would be

12   to send felony packets based on whether or not an

13   individual had a felony conviction and was on

14   probation or supervision, Phase 2 was whether or not

15   they had a disqualifying felony of murder or sexual

16   assault, et cetera, and Phase 3 were legal/financial

17   obligations which would at some later date be -- it

18   would be implemented for you.  Is that accurate,

19   roughly accurate, about the --

20       A.   That's my understanding of how the process

21   would be phased in, yes.

22       Q.   And I believe you testified that Phase 1, the

23   initial phase of determining whether or not someone

24   had a felony conviction for which they were on

25   probation or supervised release, was the most

1    straightforward one of those three phases; is that

2    true?

3        A.    That is what I said.

4        Q.    And isn't it true that your office determined

5    that of the 66 felon packets that you received in this

6    Phase 1 period, there was an error rate of

7    approximately 36.4 percent?

8        A.    24 out of 66.

9        Q.    So do you agree with Mr. Moore's concern that

10   the process is not off to a very accurate start?

11       A.    Yes.

12       Q.    Okay.

13       A.    Emphatically.

14           MR. DANJUMA:  All right.  I'd like to take a

15           brief break, if that's all right.  But I know that

16           it's late in the day, so I want to move this along

17           as fast as possible, so I'll try to keep that to

18           five minutes.

19           MR. HERRON:  Take five.

20           (Brief recess.)

21   BY MR. DANJUMA:

22       Q.    All right.  So, Mr. Earley, thank you so much

23   for bearing with us thus far.  I wanted to switch

24   focus and talk now -- ask you a few questions about

25   the financial obligation portion of the -- of SB 7066.

1          Thus far, just to recap, we have been

2     discussing review of individuals' eligibility not

3     related to financial resources at all, just whether or

4     not they're on probation or in an incarcerated

5     sentence for a felony; is that right?

6          A.   Correct.

7          Q.   So it's fair to say that what we've been

8     discussing is the threshold eligibility question.

9     Even after you determine correctly that someone has

10    completed probation or supervision and has a

11    qualifying felony, you would then need to determine if

12    they have outstanding financial obligations that they

13    would need to pay?

14         A.   I would agree to that, yes.

15         Q.   Okay.  So I want to ask a background

16    question.  You mentioned that as part of your role as

17    FSASE, there's a lobbying component of that entity; is

18    that right?

19         A.   Uh-huh.

20         Q.   When SB 7066 was being debated by the

21    legislature, did legislators ever inquire with you or

22    speak with you about what could or couldn't be

23    implemented, the -- what would be realistic to

24    implement?

25         A.   Not with me specifically.  I don't think I

1    weighed in on any of the Amendment 4 issues.  We had

2    already set up our legislative agenda prior to the

3    election cycle, and the Amendment 4 hadn't been

4    passed, so it was not really part of our agenda.  I

5    think that some of the legislative committee members

6    and our lobbyist may have been asked some questions,

7    but I don't think they were consulted very deeply

8    about Senate Bill 7066 or the preceding iterations of

9    that.

10        Q.  So your understanding is that to some extent,

11    the law was passed without a full understanding of the

12    impact it would play on supervisors of election; is

13    that fair, or no?

14        A.  To my knowledge, and it may not be complete,

15    I don't know how in-depth various supervisors were

16    consulted.  Yes, I would have to say I don't really

17    know for sure.

18        Q.  Okay.  And while -- did you voice any

19    concerns that you had about the implementation of SB

20    7066 while it was being debated?

21        A.  Not in front of any committees, not myself.

22        Q.  Okay.

23        A.  I had stated prior to the session starting

24    that I didn't think there needed to be any

25    implementing language except for funding to provide

1    for an amalgamation of the various databases about the

2    financial resources if that was going to be a

3    component of sentencing completion.

4        Q.   So you did -- you did express that view that

5    there would need to be funding --

6        A.   Not to the legislature, but, yes, in some of

7    my comments to the press and others, yes.

8        Q.   Okay.  And there is no such funding that is

9    provided?

10       A.   Not that I've seen, no.

11       Q.   Yeah.

12            MR. DANJUMA:  Okay.  I'd like to introduce as

13            Exhibit 28, e-mail correspondence we received from

14            your office, and this is a e-mail dated July 2nd

15            by Maria Matthews.

16            (Whereupon, Plaintiffs' Exhibit No. 28 was

17    marked for identification.)

18   BY MR. DANJUMA:

19       Q.   Could you just review that briefly.

20       A.   (Reviews document.)

21            Okay.

22       Q.   And in the last paragraph, Ms. Matthews

23    writes, "As in the past, we plan to provide a memo

24    outlining all the key provisions of election-related

25    laws and providing clarification as needed."

1        Ms. Matthews is referring to information that

2   you might need to implement SB 7066; is that correct?

3        A.   That is my assumption from the e-mail, yes.

4        Q.   And beyond this e-mail, she has not provided,

5   or anyone from the secretary of state's office has not

6   provided any further guidance on the implementation of

7   SB 7066; is that correct?

8        A.   Cor- -- not as far as I know, with a possible

9   exception of maybe some of these back and forths with

10   my staff that may have occurred after the July 2nd

11   date based on our questions.

12        Q.   Okay.  All right.  Just to back up for a

13   moment, when we were discussing the -- the funds that

14   you were suggesting would be necessary to aggregate

15   databases that would provide access to information

16   about people's financial obligations, do you have a

17   sense of how much that would cost to do that?

18        A.   No, it would be -- I wouldn't expect it to be

19   a trivial expense.  I know that like (inaudible) voter

20   registration, there was significant time and monies,

21   and I couldn't really quantify the amount, but that

22   was a large-scale effort that took some time to get up

23   and running.

24        Q.   And can you explain -- my understanding is

25   that you spoke with Gwen Marshall about some of the

1    difficulties that one might have in implementing the

2    financial obligation portion of SB 7066.  Do you --

3    can you explain what databases would need to be

4    aggregated in order to have kind of a central -- in

5    your understanding, in order to have an accessible,

6    centralized way for people to determine the balance of

7    their financial obligations?

8        A.    Yeah.  At a minimum, based on conversations

9    with Clerk Marshall, the -- each of the 67 clerk of

10   courts' data would have to be brought into -- you

11   know, if they were trying to make a centralized

12   database, they would all have to be aggregated, and

13   there would be some counties, I'm not sure what

14   percentage, who may not even have computerized

15   records, or at least certainly a portion of their

16   records would not be comput- -- in a digital format,

17   and so that would have to be likely brought in over

18   time, but it would be a big effort, lots of -- at

19   least 67 different sources of data.

20       Q.    Okay.  All right.  So I'd like to direct your

21   attention to the text of SB 7066.  This is way back at

22   the beginning, it's Exhibit 3 that we provided to you.

23   And if you -- if I can direct your attention to page

24   46.

25       A.    Uh-huh.

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

1    Q.   At the bottom of that page, on Line 1333, the

2    statute reads, "Completion of all terms of sentence

3    mean any portion of a sentence that is contained in

4    the four corners of the sentencing document, including

5    but not limited to release from any term of

6    imprisonment ordered by the court as part of a

7    sentence, termination from any term of probation or

8    community control, fulfillment of any term ordered by

9    the court as a part of the sentence" -- and then I'm

10   going to skip to 5 where it says, "full payment of

11   restitution ordered to a victim by the court as part

12   of a sentence," and then 5B says, "full payment of

13   fines or fees ordered by the court as a part of the

14   sentence or that are ordered by the court as a

15   condition of any form of supervision, including but

16   not limited to probation, community control, or

17   parole."

18        And I recognize that this is a complicated

19   statute that I skipped some portions of.  Have you

20   reviewed the text of that statute before, this text

21   before?

22   A.   I have.

23   Q.   What is your understanding of what SB 7066

24   requires in terms of its financial obligation

25   component?

1          A.    That anything ordered in the sentencing

2    document must be fulfilled, any financial obligations,

3    you have to pay any costs ordered by the court as part

4    of the sentencing document, but not beyond the

5    sentencing document.  And potentially there are

6    avenues for those to be satisfied by a court order.

7    You know, you can substitute community service or

8    maybe some of these obligations can be waived.

9          Q.    Right.

10         A.    I think with the restitution part, not --

11   can't waive that without essentially the authorization

12   of the victim --

13         Q.    Okay.

14         A.    -- (inaudible) their rights.

15         Q.    And when the statute uses the terminology

16   "the four corners of the sentencing document," do you

17   know which court documents -- do you authoritatively

18   know which court documents fall within that

19   requirement and which fall outside of that

20   requirement?

21         A.    Authoritatively, I would guess I would say

22   no, I don't.  But I would as- -- no, I won't make an

23   assumption here.  So I would just say no.

24         Q.    Okay.  So at this point, you haven't received

25   guidance on what that means, what "the four corners of

1  the sentencing document" means?

2      A.   I would -- correct.  I haven't received

3  explicit guidance.  I believe there is a document

4  titled "The Sentencing Order" that can be many pages

5  long that has explicit detail.  I've seen some

6  examples of that in the documentation provided by

7  the defen- -- or the plaintiff from Leon County.

8      Q.   Uh-huh.  And we -- you testified earlier, we

9  discussed a bit, about the difference between the

10  judgment and the sentencing document before.

11      A.   Yes, yes, yes.

12      Q.   Do you have a sense now whether or not the

13  judgment and sentencing document would be part of the

14  term that's included in the four corners of the

15  sentencing document, or not?

16      A.   I can't say whether the judgment

17  documentation would be part of the sentencing

18  document.  It sounds like it would not, but it sounds

19  that the -- my interpretation would be the judgment

20  document details what they were convicted of, and the

21  sentencing document are the obligations that have to

22  be fulfilled based upon what you're found guilty of in

23  the judgment document.  So you need kind of both of

24  those really, one to ascertain where there was a

25  felony and the type of felony likely, whether it was

1    murder or felony sexual offense or something that's

2    not one of those, and then refer to the sentencing

3    document to see what the obligations were.

4        Q.   Okay.  I'd like to direct you back to the

5    statute and 1353 on that same page, which is C:  "The

6    financial obligations required under Subparagraph A or

7    Subparagraph B include only the amount specifically

8    ordered by the court as part of the sentence and do

9    not include any fines, fees, or costs that accrue

10   after the date the obligation is ordered as part of

11   the sentence."

12       Do you know what fines, fees, or costs are

13   not included in sentencing but accrue after the date

14   of the sentence?

15       A.   For a long time -- or for quite a while, I

16   was confused by that.  I first read that to mean

17   that -- my assumption was that restitution would be

18   part of the sentencing documents, but fines and fees

19   would be part of the financial obligations that might

20   accrue afterwards.  But then I have -- I guess I -- I

21   believe I actually looked that up and saw that fines

22   and fees actually became -- it seems to be part of the

23   sentencing document, at least that seems to be my

24   understanding now.  I could be in error about that,

25   but that's how I understand it currently.  And the

1    stuff that would come later would be, I guess, maybe

2    if you were ordered for parole possibly or probation,

3    you have to, I believe, pay as part of that program,

4    I'm not 100 percent certain, or interest on any of

5    your obligations, that would not be part of what was

6    ordered by the judge.

7        Q.   And so in Section B, if we read this below

8    that says, "full payment of fines or fees ordered by

9    the court as part of the sentence or that are ordered

10   by the court as a condition of any form of

11   supervision, including but not limited to probation,

12   community control, or parole," would that include the

13   parole obligations you're referring to now that accrue

14   afterwards?

15       A.   I would not know for certain.  I don't know

16   exactly what different monetary obligations accrue at

17   what time for those various facets.

18       Q.   Okay.  And do you know what kinds of fines

19   and fees are ordered by individuals on probation or

20   supervision?  You mentioned one.  Do you know any

21   others?

22       A.   I do not.

23       Q.   Okay.  Do the staff of your office have an

24   authoritative or informed understanding of what fines

25   and fees would be covered under SB 7066 versus those

1    that would not be?

2         A.    I would say in general, no.  No.

3         Q.    All right.  Give me just one moment.

4               (Brief Pause.)

5               (Proceedings continued in Volume II.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF OATH

STATE OF FLORIDA )

COUNTY OF LEON)

    I, the undersigned authority, certify that MARK
EARLEY, personally appeared before me and was duly
sworn on the 22nd day of August, 2019.

    Signed this 22nd day of August, 2019.

_____
JESSICA RENCHEN, Court Reporter
Notary Public - State of Florida

1                CERTIFICATE OF REPORTER

2

3    STATE OF FLORIDA)

4    COUNTY OF LEON)

5

6        I, JESSICA RENCHEN, Registered Professional

7    Reporter, certify that I was authorized to and did

8    stenographically report the deposition of MARK EARLEY,

9    pages 1 through 187; that a review of the transcript

10   **WAS REQUESTED**; and that the transcript is a true and

11   complete record of my stenographic notes.

12

13       I further certify that I am not a relative,

14   employee, attorney, or counsel of any of the parties,

15   nor am I a relative or employee of any of the parties'

16   attorney or counsel connected with the action, nor am

17   I financially interested in the action.

18

19           DATED this 22nd day of August, 2019.

20

21       _____

         JESSICA RENCHEN, Court Reporter.
22

23

24

25

TO:  MARK EARLEY
C/O MARK HERRON, ESQ.
Messer Carpello, PA
2618 Centennial Place
Tallahassee, Florida 32308
Phone:  850-222-0720
E-mail:  Mherron@lawfla.com


IN RE:  KELVIN LEON JONES, ET AL., VS RON DESANTIS, IN
HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF
FLORIDA, ET AL.
CASE NO.:  4:19-CV-300-MW/CAS

Please take notice that on the 22nd day of August,
2019, you gave a deposition in the above cause.  At
that time, you did not waive your signature.

Please make arrangements with For The Record Reporting
at 850-222-5491 to exercise your right to read and
sign the transcript.

If you do not read and sign the deposition within 30
days or at such other time as instructed by counsel,
the original, which has already been forwarded to the
ordering attorney, may be filed with the Clerk of the
Court and your reading and signing may be considered
waived.

If you wish to waive your signature now, please sign
your name in the blank at the bottom of this letter
and return it to the address listed below.

Very truly yours,


_____
JESSICA RENCHEN, Court Reporter

For The Record Reporting


I do hereby waive my signature.

_____

1
                          ERRATA  SHEET
              DO NOT WRITE ON TRANSCRIPT ~ ENTER CHANGES
2   IN RE:  KELVIN LEON JONES, ET AL., VS RON DESANTIS, IN
    HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF
3   FLORIDA, ET AL.
    CASE NO:  4:19-CV-300-MW/CAS
4   DATE TAKEN:  August 22, 2019
    DEPONENT:  MARK EARLEY
5

6   PAGE_____ LINE_____ SHOULD BE_____

7   PAGE_____ LINE_____ SHOULD BE_____

8   PAGE_____ LINE_____ SHOULD BE_____

9   PAGE_____ LINE_____ SHOULD BE_____

10  PAGE_____ LINE_____ SHOULD BE_____

11  PAGE_____ LINE_____ SHOULD BE_____

12  PAGE_____ LINE_____ SHOULD BE_____

13  PAGE_____ LINE_____ SHOULD BE_____

14  PAGE_____ LINE_____ SHOULD BE_____

15  PAGE_____ LINE_____ SHOULD BE_____

16  PAGE_____ LINE_____ SHOULD BE_____

17  PAGE_____ LINE_____ SHOULD BE_____

18  PAGE_____ LINE_____ SHOULD BE_____

19  PAGE_____ LINE_____ SHOULD BE_____

20  PAGE_____ LINE_____ SHOULD BE_____

21

22  Under penalties of perjury, I declare that I have read
    the foregoing document and that the facts stated in it
23  are true.

24  _____
    DATE                          MARK EARLEY
25

**'**

**'17** [1] - 48:1
**'18** [1] - 48:1
**'19** [1] - 63:17
**'86** [2] - 9:22, 10:11
**'87** [1] - 10:11
**'90s** [5] - 9:15, 10:11, 10:12, 10:20, 11:8
**'96** [1] - 10:11
**'97** [1] - 9:16
**'see** [1] - 95:16

# 0

**00017** [2] - 3:19, 157:10
**00032** [2] - 3:17, 131:21
**00037** [2] - 3:20, 171:11
**00040** [2] - 3:17, 137:15
**000403** [1] - 3:11
**00046** [2] - 3:19, 161:19
**00051** [2] - 3:20, 169:1
**00058** [2] - 3:18, 150:11
**00075** [2] - 3:12, 74:18
**00079** [1] - 145:1
**00080** [1] - 50:13
**00274** [1] - 58:14
**00299** [2] - 3:15, 110:20
**00403** [1] - 54:21
**00422** [2] - 3:14, 97:24
**0067** [2] - 3:16, 126:11
**00684** [2] - 3:14, 94:12
**01386** [2] - 3:13, 80:12
**01399** [2] - 3:12, 77:11
**01578** [2] - 3:13, 82:5
**06** [1] - 3:4

# 1

**1** [18] - 1:12, 3:8, 12:4, 12:6, 47:25, 102:12, 104:12, 109:25, 110:4, 110:5, 126:18, 132:12, 132:14, 133:12, 153:24, 175:22, 176:6, 189:9
**1,094** [1] - 48:4
**1.3** [2] - 145:11, 145:19
**10** [3] - 3:12, 19:12, 77:14
**100** [1] - 67:18, 125:3, 135:12, 145:25, 162:11, 164:7, 186:4
**10004** [1] - 2:5
**10:05** [1] - 75:6
**11** [5] - 3:13, 18:20, 80:11, 80:13, 102:15
**110** [1] - 3:15
**1156** [2] - 3:21, 173:16
**118** [2] - 3:16, 47:22
**11:40** [1] - 137:24
**11th** [1] - 37:1, 75:2, 75:5
**12** [5] - 3:8, 3:13, 9:11, 82:2, 82:8
**125** [1] - 2:4
**126** [1] - 3:16
**12th** [2] - 171:17, 172:1
**13** [3] - 3:14, 94:11, 94:14
**131** [1] - 3:17
**1333** [1] - 182:1
**1353** [1] - 185:5
**137** [1] - 3:17
**1378** [1] - 47:15
**14** [3] - 3:14, 97:20, 97:23
**145** [1] - 3:18
**15** [3] - 3:15, 99:11, 99:15
**150** [1] - 3:18
**155,000** [1] - 164:9
**157** [1] - 3:19
**16** [7] - 3:8, 3:15, 31:8, 110:19, 110:21, 121:3, 122:2
**161** [1] - 3:19
**169** [1] - 3:20
**17** [4] - 3:16, 118:1, 118:8, 125:14
**17-year-olds** [1] - 31:8
**171** [1] - 3:20
**173** [1] - 3:21
**179** [1] - 3:21
**17th** [2] - 36:20, 87:7
**18** [3] - 3:16, 27:7, 28:4, 30:25, 31:10, 31:12, 126:9, 126:12, 132:5
**18,000** [1] - 49:24

**187** [1] - 189:9
**188** [1] - 3:23
**189** [1] - 3:24
**18th** [1] - 2:4
**19** [4] - 3:9, 3:17, 131:21, 131:22
**190** [1] - 3:24
**191** [2] - 1:12, 3:25
**1982** [1] - 9:10
**1986** [1] - 10:4
**1st** [9] - 47:19, 54:20, 102:7, 103:11, 105:23, 106:22, 108:22, 109:25, 111:14

# 2

**2** [19] - 3:8, 16:14, 16:19, 28:18, 37:19, 38:7, 95:15, 102:13, 109:17, 109:21, 110:1, 110:11, 111:11, 111:12, 112:10, 119:5, 119:19, 175:14
**20** [5] - 3:17, 44:8, 137:14, 137:18, 172:14
**2000** [1] - 10:18, 10:24
**2000s** [1] - 49:20
**2001** [3] - 10:23, 10:24, 11:4
**2002** [1] - 11:4
**2008** [2] - 11:6, 11:20
**2009** [4] - 55:5, 55:9, 55:14, 55:18
**2012** [2] - 50:12, 52:14
**2013** [2] - 118:19, 121:9
**2016** [1] - 11:12
**2017** [3] - 11:10, 11:13, 48:11
**2018** [6] - 49:9, 54:20, 62:25, 63:11, 63:18, 78:1
**2019** [16] - 1:15, 63:17, 71:13, 78:22, 83:3, 93:14, 99:19, 106:25, 111:14, 142:24, 150:16, 188:11, 188:13, 189:19, 190:8, 191:4
**2020** [1] - 36:21
**209** [1] - 2:9
**21** [3] - 3:18, 144:24, 145:2
**212-284-7332** [1] -

**2:5**
**21st** [2] - 150:16, 157:23
**22** [5] - 1:15, 3:18, 150:10, 150:12, 191:4
**22nd** [4] - 188:11, 188:13, 189:19, 190:8
**23** [3] - 3:19, 157:8, 157:13
**24** [7] - 3:19, 161:19, 161:20, 169:22, 170:9, 170:11, 176:8
**25** [6] - 3:20, 44:9, 93:14, 169:1, 169:2, 174:22
**26** [4] - 3:20, 55:18, 171:11, 171:13
**2618** [2] - 1:16, 2:12, 190:2
**27** [4] - 3:21, 50:12, 173:15, 173:17
**27th** [2] - 159:10, 162:2
**28** [3] - 3:21, 179:13, 179:16
**29th** [2] - 77:19, 78:1
**2nd** [3] - 3:21, 179:14, 180:10

# 3

**3** [13] - 3:9, 19:13, 19:14, 38:5, 109:20, 109:22, 110:15, 111:11, 111:12, 125:19, 137:23, 175:16, 181:22
**30** [2] - 35:11, 190:12
**30th** [3] - 47:19, 48:1, 48:11
**32308** [3] - 1:17, 2:13, 190:3
**32399** [1] - 2:9
**36.4** [3] - 169:23, 170:22, 176:7
**378** [3] - 47:19, 48:4, 48:12
**38** [8] - 3:9, 162:22, 165:7, 165:16, 165:18, 165:24, 168:13, 168:15
**3rd** [1] - 11:13

# 4

**4** [65] - 3:9, 12:23, 15:15, 17:1, 17:12, 17:14, 18:8, 18:13, 37:8, 37:9, 37:25, 38:2, 42:17, 42:25, 46:9, 49:2, 49:3, 58:2, 59:9, 61:1, 62:20, 62:21, 63:10, 63:13, 63:15, 64:4, 64:11, 64:17, 64:25, 65:14, 68:18, 71:6, 71:8, 71:9, 71:21, 72:15, 73:6, 73:8, 73:9, 75:3, 76:1, 76:7, 78:1, 78:21, 79:4, 80:3, 80:18, 81:20, 86:20, 87:16, 92:15, 95:21, 99:25, 100:5, 101:8, 125:21, 127:25, 128:5, 129:17, 133:21, 137:23, 142:15, 154:19, 178:1, 178:3
**400** [1] - 2:9
**46** [3] - 3:10, 19:11, 181:24
**4:00** [1] - 1:15
**4:19-CV-300-MW-CAS** [1] - 1:5
**4:19-CV-300-MW/CAS** [2] - 190:7, 191:3

# 5

**5** [6] - 3:10, 46:14, 46:19, 47:13, 61:7, 182:10
**50** [1] - 3:10
**54** [1] - 3:11
**56** [2] - 19:11, 101:9
**58** [1] - 3:11
**59,265** [1] - 165:3
**5B** [1] - 182:12

# 6

**6** [5] - 3:10, 28:19, 50:11, 50:15
**66** [4] - 169:17, 169:21, 176:5, 176:8
**67** [2] - 181:9, 181:19

# 7

**7** [11] - 3:11, 29:4, 35:8, 54:16, 54:22, 55:11, 57:13, 61:7, 95:24, 133:7
**7066** [38] - 3:9, 12:24, 15:16, 17:2, 17:22, 18:6, 18:12, 19:8, 25:25, 62:21, 93:17, 100:5, 100:7, 101:8, 102:14, 103:25, 104:2, 105:6,

111:24, 112:9, 113:7, 118:5, 119:7, 123:6, 124:1, 155:6, 175:11, 176:25, 177:20, 178:8, 178:20, 180:2, 180:7, 181:2, 181:21, 182:23, 186:25
**74** [1] - 3:12
**77** [1] - 3:12
**7th** [4] - 132:2, 132:11, 137:5, 137:24

**8**

**8** [5] - 3:11, 58:11, 58:15, 78:21, 111:11
**80** [1] - 3:13
**82** [1] - 3:13
**850-222-0720** [2] - 2:13, 190:3
**850-222-5491** [1] - 190:10
**850-717-9310** [1] - 2:10
**8th** [11] - 63:17, 63:19, 67:16, 73:14, 73:15, 73:18, 75:23, 76:13, 78:17, 81:8, 92:16

**9**

**9** [4] - 3:12, 73:23, 74:17, 74:19
**9/27/12** [1] - 3:10
**94** [1] - 3:14
**97** [1] - 3:14
**98** [3] - 38:11, 43:3, 84:15
**98.075** [15] - 22:19, 24:3, 33:12, 33:19, 35:7, 35:16, 37:4, 43:11, 55:11, 56:12, 57:12, 61:7, 62:9, 114:4, 133:7
**98.075(7** [1] - 57:6
**984** [1] - 72:7
**99** [1] - 3:15
**9:30** [1] - 1:15
**9th** [3] - 9:10, 169:7, 174:23

**A**

**a.m** [2] - 1:15, 137:25
**ability** [5] - 8:18, 40:24, 130:25, 131:1, 156:18
**able** [12] - 8:21, 57:1, 57:9, 66:9, 75:25,

79:12, 103:7, 130:9, 131:25, 139:5, 172:9, 172:12
**Absolutely** [7] - 22:9, 30:10, 45:20, 94:2, 117:22, 131:19, 150:7
**absolutely** [3] - 68:13, 121:15, 150:1
**absolved** [1] - 154:22
**accept** [6] - 98:14, 98:18, 99:1, 127:20, 127:22, 128:13
**accepted** [1] - 118:19
**access** [12] - 5:24, 33:25, 35:1, 41:2, 42:10, 81:16, 85:25, 91:21, 91:23, 105:6, 144:15, 180:15
**accessible** [2] - 90:17, 181:5
**accommodate** [1] - 8:9
**According** [1] - 83:24
**according** [2] - 87:15, 173:3
**account** [1] - 124:10
**accounting** [1] - 89:7
**accrue** [6] - 124:3, 185:9, 185:13, 185:20, 186:13, 186:16
**accumulate** [1] - 34:3
**accurate** [9] - 125:3, 154:4, 154:18, 160:1, 166:16, 175:4, 175:18, 175:19, 176:10
**accurately** [1] - 172:19
**ACLU** [1] - 4:4
**acronym** [1] - 92:25
**acted** [1] - 103:16
**action** [3] - 145:19, 189:16, 189:17
**add** [1] - 26:3
**addition** [5] - 6:7, 7:20, 8:7, 103:22, 115:3
**additional** [9] - 109:16, 110:14, 135:9, 136:18, 154:14, 157:9, 158:19, 171:4, 171:7
**address** [9] - 30:3, 32:1, 33:3, 36:11, 103:20, 129:8,

168:25, 190:16
**addresses** [2] - 40:5, 151:1
**addressing** [1] - 93:25
**ADEN** [1] - 4:16
**Aden** [1] - 4:16
**adequate** [1] - 50:1
**adjudicated** [13] - 27:8, 28:1, 52:20, 128:1, 138:25, 139:25, 151:8, 172:7, 172:11, 172:17, 173:1, 173:6, 173:11
**adjudication** [5] - 151:9, 158:6, 158:17, 164:25, 165:4
**adjust** [1] - 81:15
**administer** [1] - 21:10
**administered** [1] - 21:12
**administering** [1] - 19:22
**administrating** [1] - 148:21
**administration** [2] - 120:20, 131:9
**Administration** [1] - 99:14
**admitted** [2] - 26:10, 141:20
**adopted** [2] - 133:13, 161:12
**advance** [1] - 156:1
**advertise** [1] - 35:12
**advice** [1] - 122:19
**affect** [1] - 8:18
**affected** [2] - 95:12, 95:24
**affirm** [4] - 37:17, 38:7, 125:20, 155:11
**affirmation** [1] - 170:13
**afraid** [4] - 64:6, 116:2, 116:8, 116:22
**afterwards** [2] - 185:20, 186:14
**age** [3] - 27:7, 28:4, 30:25
**agency** [2] - 10:5, 39:8
**Agenda** [2] - 3:18, 145:19
**agenda** [6] - 144:25, 145:11, 145:13, 146:7, 178:2, 178:4
**aggregate** [1] - 180:14
**aggregated** [2] -

168:25, 190:16
**ago** [2] - 116:16, 118:14
**agree** [22] - 33:10, 53:5, 57:5, 81:19, 92:7, 92:11, 96:17, 128:12, 128:17, 129:14, 129:18, 129:24, 139:19, 143:1, 143:5, 143:8, 160:6, 162:7, 168:13, 176:9, 177:14
**agreed** [2] - 69:17, 108:10
**ahead** [5] - 7:24, 23:23, 34:25, 96:14, 107:23
**air** [1] - 104:8
**AL** [1] - 1:3, 1:7, 190:5, 190:6, 191:2, 191:3
**al** [2] - 73:10, 117:11
**Alachua** [1] - 5:14
**Alessandra** [10] - 25:19, 126:20, 150:15, 150:17, 157:17, 161:24, 162:10, 164:5, 168:13, 171:25
**allay** [5] - 65:1, 65:7, 65:14, 66:13, 66:25
**allaying** [1] - 92:14
**alleve** [1] - 67:22
**alluding** [1] - 169:14
**almost** [1] - 124:19
**altered** [2] - 112:10, 160:11
**amalgamation** [1] - 179:1
**Amber** [27] - 46:23, 47:3, 47:14, 77:21, 77:22, 77:23, 83:3, 83:6, 83:15, 84:5, 84:6, 85:3, 86:18, 86:19, 87:15, 87:22, 88:22, 92:2, 106:19, 128:8, 132:4, 157:17, 157:23, 159:9, 169:22, 172:10
**Amber's** [2] - 88:5, 172:2
**ambiguity** [4] - 25:6, 34:12, 49:23, 139:15
**ambiguous** [3] - 44:1, 44:6
**Amendment** [59] - 12:23, 15:15, 17:1, 17:12, 17:14, 18:8, 18:13, 37:8, 37:9, 42:17, 42:25, 46:9,

181:4, 181:12

49:2, 49:3, 58:2, 59:9, 61:1, 62:20, 62:21, 63:10, 63:13, 63:15, 64:3, 64:11, 64:16, 64:25, 65:14, 68:18, 71:6, 71:8, 71:9, 71:21, 72:15, 73:5, 73:8, 73:9, 75:3, 76:1, 76:7, 78:1, 78:21, 79:4, 80:3, 80:18, 81:20, 86:20, 87:16, 92:15, 95:21, 100:5, 101:8, 127:25, 128:5, 129:17, 133:21, 142:15, 154:19, 178:1, 178:3
**amendment** [1] - 63:21
**American** [1] - 2:3
**amount** [6] - 62:11, 72:1, 146:20, 155:18, 180:21, 185:7
**anecdotally** [1] - 131:12
**announce** [2] - 6:10, 6:14
**announcing** [1] - 5:17
**anomalies** [1] - 163:4
**answer** [11] - 7:23, 7:24, 8:11, 8:18, 23:15, 62:25, 79:12, 95:15, 120:6, 147:5, 153:21
**answers** [6] - 7:14, 7:15, 14:23, 16:14, 16:16, 21:18
**anticipate** [1] - 113:15
**Anyway** [1] - 95:7
**apologize** [5] - 29:5, 41:15, 47:10, 64:15, 74:22
**appear** [2] - 35:14, 48:17
**appearance** [2] - 4:24, 16:5
**APPEARANCES** [1] - 2:1
**appeared** [3] - 51:6, 109:17, 188:10
**applicants** [2] - 114:23, 115:5
**Application** [2] - 27:15, 112:5
**application** [12] - 17:1, 27:8, 27:19, 27:23, 28:21, 29:24, 30:7, 30:16, 30:21,

98:13, 98:18, 99:1
**applications** [2] -
27:17, 156:4
**apply** [1] - 99:2
**applying** [1] - 31:1
**appointed** [1] - 98:7
**appreciate** [1] -
115:19
**appreciated** [1] -
143:12
**approach** [1] -
127:25
**approved** [1] - 60:15
**arbiter** [1] - 165:22
**area** [3] - 44:9,
109:19, 123:19
**areas** [2] - 21:20,
148:5
**arguably** [1] - 66:15
**arrangements** [1] -
190:10
**arrival** [1] - 71:13
**Art** [1] - 125:21
**AS** [3] - 1:6, 190:6,
191:2
**ascertain** [3] - 87:19,
92:5, 184:24
**Ashley** [1] - 5:8
**aside** [4] - 26:25,
31:16, 79:16, 160:5
**aspect** [3] - 106:4,
106:9, 114:8
**aspects** [10] - 10:15,
19:22, 20:5, 74:4,
83:11, 90:20, 100:7,
101:18, 104:9, 106:2
**assault** [4] - 73:19,
110:6, 110:9, 175:16
**assessment** [1] -
136:15
**assimilate** [1] -
103:7
**assist** [1] - 10:20
**assistant** [1] - 4:23
**associate's** [1] - 9:15
**Association** [1] -
4:21
**association** [9] -
20:15, 20:16, 20:17,
21:2, 21:11, 69:14,
90:8, 90:13
**assume** [3] - 7:11,
8:4, 59:8
**assuming** [1] -
165:12
**assumption** [3] -
180:3, 183:23, 185:17
**assurance** [1] - 67:3
**attached** [2] - 55:25,
133:3

**attachments** [1] -
48:8
**attempt** [1] - 50:2
**attempted** [2] - 55:8,
87:15
**attempts** [1] - 49:22
**attend** [1] - 99:21
**attended** [4] - 9:7,
9:10, 119:1, 144:5
**attention** [11] -
54:25, 83:2, 83:12,
84:3, 86:17, 87:11,
126:16, 155:18,
174:25, 181:21,
181:23
**attest** [1] - 60:19
**Attorney** [4] - 66:2,
68:23, 68:24, 69:13
**attorney** [15] - 4:3,
21:17, 49:10, 65:9,
66:8, 69:1, 69:9, 70:8,
94:7, 117:3, 117:4,
123:8, 189:14,
189:16, 190:13
**attorneys** [2] - 69:10,
69:16
**August** [6] - 1:15,
188:11, 188:13,
189:19, 190:8, 191:4
**authoritative** [1] -
186:24
**authoritatively** [1] -
183:17
**Authoritatively** [1] -
183:21
**authority** [9] - 21:13,
21:15, 23:10, 24:2,
24:6, 34:25, 48:23,
70:20, 188:9
**authorization** [2] -
118:17, 183:11
**authorized** [1] -
189:7
**automated** [1] -
29:11
**automatic** [1] - 17:18
**automatically** [2] -
31:11, 71:15
**available** [8] - 40:6,
45:18, 91:10, 129:10,
141:16, 155:17,
155:25, 164:15
**avenue** [1] - 128:3
**avenues** [1] - 183:6
**aware** [7] - 20:8,
49:17, 60:21, 60:25,
85:22, 124:4, 144:13

**B**

**background** [7] -
9:6, 9:7, 36:18, 90:7,
90:10, 143:13, 177:15
**bad** [1] - 115:20
**balance** [3] - 123:20,
148:19, 181:6
**ballot** [2] - 16:6, 16:7
**ballots** [1] - 10:12
**ballpark** [1] - 46:18
**balls** [1] - 44:17
**Bar** [2] - 26:10,
141:21
**bar** [1] - 66:4
**base** [1] - 141:10
**Based** [1] - 125:15
**based** [26] - 24:4,
29:25, 33:8, 33:23,
38:12, 49:5, 53:24,
54:9, 60:11, 117:9,
133:1, 133:6, 140:9,
140:11, 149:23,
152:7, 154:23,
158:14, 162:15,
166:18, 168:7,
168:18, 175:12,
180:11, 181:8, 184:22
**bases** [2] - 32:13,
56:22
**basis** [6] - 53:7,
83:25, 126:24, 150:5,
166:8, 172:3
**batch** [1] - 78:23
**batches** [1] - 29:22
**Bates** [14] - 5:23,
47:8, 47:15, 50:13,
54:21, 58:13, 74:18,
97:24, 126:11,
131:21, 145:1,
150:10, 157:10,
161:19
**Bates-stamp** [2] -
5:23, 131:21
**Bates-stamped** [3] -
47:15, 50:13, 157:10
**BE** [15] - 191:6,
191:7, 191:8, 191:9,
191:10, 191:11,
191:12, 191:13,
191:14, 191:15,
191:16, 191:17,
191:18, 191:19,
191:20
**bearing** [2] - 174:20,
176:23
**bearings** [1] - 138:3
**became** [2] - 9:25,
185:22
**become** [8] - 28:5,

31:11, 31:24, 31:25,
63:15, 85:22, 95:6,
130:13
**becomes** [2] - 29:15,
156:19
**becoming** [1] -
135:18
**begin** [5] - 5:19, 6:4,
7:17, 81:12, 172:18
**beginning** [7] -
75:19, 80:24, 102:8,
132:12, 132:14,
142:23, 181:22
**Behalf** [1] - 1:23
**behalf** [5] - 1:14, 2:2,
2:7, 4:4, 5:1
**belief** [1] - 68:3
**below** [4] - 172:2,
175:2, 186:7, 190:16
**Bend** [2] - 92:21,
122:21
**beneath** [1] - 167:8
**best** [5] - 5:22, 8:3,
8:22, 45:17, 54:7,
87:16, 92:3, 155:11
**better** [5] - 91:15,
91:16, 91:21, 99:4,
170:13
**Between** [2] - 48:10,
63:13
**between** [13] - 28:11,
47:25, 62:20, 63:18,
72:5, 72:10, 82:6,
100:24, 113:10,
113:14, 134:1,
157:17, 184:9
**beyond** [15] - 14:15,
30:11, 37:4, 49:2,
53:8, 101:5, 124:10,
131:2, 143:4, 144:15,
154:15, 173:24,
180:4, 183:4
**big** [8] - 21:20, 39:7,
71:16, 113:9, 113:12,
113:16, 156:20,
181:18
**Big** [2] - 92:21,
122:21
**bill** [1] - 19:8
**Bill** [4] - 12:24, 17:2,
17:21, 178:8
**birth** [3] - 31:6, 31:7,
40:5
**bit** [19] - 13:22,
20:19, 22:21, 34:6,
35:17, 56:15, 62:19,
65:11, 67:11, 90:9,
91:15, 97:6, 100:24,
106:6, 115:24,
118:20, 131:15,

146:15, 184:9
**blank** [2] - 14:6,
190:16
**blitz** [1] - 150:23
**blush** [1] - 147:23
**Bob** [1] - 92:21
**bog** [1] - 80:22
**bolded** [1] - 150:23
**borne** [2] - 160:2,
160:4
**bottom** [4] - 139:15,
148:12, 182:1, 190:16
**bought** [1] - 11:1
**box** [1] - 126:6
**Box** [6] - 37:19, 38:5,
38:7, 112:10, 119:5,
125:19
**boxes** [8] - 27:25,
111:24, 113:1, 116:3,
119:5, 119:18,
125:15, 125:18
**bracket** [1] - 112:1
**brackets** [1] - 121:3
**BRAVE** [1] - 5:10
**Brave** [1] - 5:10
**break** [6] - 8:9, 8:12,
8:13, 137:2, 137:3,
176:15
**breakdown** [1] -
113:16
**breaks** [1] - 8:8
**Brief** [3] - 82:24,
176:20, 187:4
**brief** [3] - 94:12,
157:18, 176:15
**briefly** [10] - 10:2,
27:11, 92:13, 173:23,
174:21, 179:19
**bring** [4] - 23:1, 26:5,
103:8, 111:19
**bringing** [1] - 90:23
**brings** [1] - 84:23
**Broad** [1] - 2:4
**broader** [3] - 49:16,
79:25, 160:10
**brought** [2] - 181:10,
181:17
**Brown** [1] - 77:23
**build** [1] - 84:9
**buildup** [1] - 67:16
**bullet** [7] - 126:20,
127:12, 146:25,
151:1, 151:18,
152:12, 153:3
**burden** [9] - 57:8,
57:10, 66:10, 128:15,
130:13, 146:19,
146:20, 148:20
**Bureau** [1] - 32:20
**business** [1] - 42:22

**busy** [1] - 26:8
**BY** [40] - 6:25, 12:8, 16:21, 19:16, 38:4, 46:21, 47:16, 50:17, 54:24, 58:17, 74:21, 75:10, 77:16, 80:15, 82:10, 82:16, 82:25, 94:16, 97:22, 99:17, 110:23, 118:3, 120:14, 126:14, 131:24, 136:25, 137:20, 145:4, 150:14, 155:13, 157:15, 161:22, 164:1, 167:2, 169:4, 171:15, 171:23, 173:19, 176:21, 179:18

### C

**C/O** [1] - 190:1
**CAESAR** [1] - 5:13
**Caesar** [1] - 5:13
**calendar** [1] - 116:19
**Campbell** [7] - 66:2, 68:23, 68:24, 68:25, 69:9, 69:13, 88:16
**campus** [1] - 16:9
**cancel** [2] - 23:10, 23:12
**candidate** [2] - 10:16, 20:3
**candidates** [1] - 20:8
**cannot** [5] - 59:16, 60:19, 61:4, 124:11, 164:17
**capable** [1] - 127:18
**CAPACITY** [3] - 1:6, 190:6, 191:2
**capacity** [4] - 15:25, 20:20, 90:8, 131:3
**Capital** [1] - 93:9
**Caplowe** [2] - 94:23, 95:14
**capture** [2] - 139:8, 142:9
**captures** [1] - 148:2
**cards** [1] - 29:20
**career** [1] - 9:22
**careful** [2] - 81:23, 130:12
**carefully** [2] - 35:20, 75:19
**Caroline** [1] - 5:10
**Carpello** [3] - 1:16, 2:12, 190:2
**carried** [1] - 111:3
**case** [27] - 15:22, 16:6, 16:7, 16:8, 16:9,

16:11, 36:6, 41:17, 58:6, 68:13, 81:13, 85:8, 101:6, 102:6, 122:8, 132:25, 133:9, 135:1, 135:2, 135:4, 136:3, 136:4, 140:17, 147:12, 152:23, 164:10, 173:13
**CASE** [3] - 1:5, 190:7, 191:3
**cases** [4] - 81:14, 81:21, 164:6, 170:16
**catch** [1] - 155:15
**categories** [5] - 31:21, 105:14, 105:16, 112:14, 157:24
**categorize** [2] - 42:18, 61:23
**causes** [1] - 115:17
**caveat** [4] - 28:22, 70:25, 100:21, 141:9
**CCIS** [2] - 34:21, 158:16
**celebrate** [1] - 115:16
**Centennial** [3] - 1:16, 2:12, 190:2
**central** [1] - 181:4
**centralized** [2] - 181:6, 181:11
**cents** [1] - 95:15
**certain** [13] - 44:3, 67:18, 116:9, 135:12, 135:21, 145:25, 159:20, 162:11, 162:12, 164:7, 164:17, 186:4, 186:15
**Certainly** [14] - 8:14, 10:4, 15:14, 21:2, 22:7, 32:2, 33:18, 34:22, 68:11, 75:5, 110:5, 139:16, 142:7, 166:9
**certainly** [34] - 16:11, 18:23, 19:24, 20:5, 31:7, 40:5, 42:3, 45:12, 49:7, 49:19, 50:25, 58:6, 60:15, 62:5, 71:16, 71:25, 72:25, 78:6, 78:14, 88:10, 101:15, 106:11, 109:7, 109:22, 119:4, 128:17, 129:6, 131:12, 143:25, 146:14, 148:5, 149:17, 167:19, 181:15
**certainty** [1] - 61:4

**CERTIFICATE** [3] - 3:23, 188:1, 189:1
**certificate** [3] - 55:18, 55:20, 55:25
**certification** [2] - 9:23, 55:16, 129:2
**certifications** [1] - 9:24
**certified** [3] - 23:14, 35:6, 55:8
**certify** [3] - 188:9, 189:7, 189:13
**cetera** [1] - 175:16
**chain** [7] - 13:17, 77:18, 79:7, 126:15, 126:17, 132:2, 169:6
**chains** [2] - 74:24, 137:16
**challenge** [2] - 101:17, 131:10
**challenged** [1] - 32:8
**challenges** [1] - 20:11
**chance** [4] - 6:9, 83:8, 93:20, 144:8
**change** [7] - 25:25, 32:1, 76:7, 76:15, 120:12, 133:20, 155:6
**changed** [17] - 11:2, 11:3, 11:8, 17:14, 17:16, 17:23, 18:12, 18:14, 19:2, 34:6, 110:11, 113:13, 119:7, 134:11, 160:11, 160:15, 161:12
**Changes** [2] - 99:13, 111:23
**CHANGES** [1] - 191:1
**changes** [4] - 33:3, 101:20, 111:24, 119:3
**changing** [1] - 112:7
**characterization** [2] - 105:8, 158:3
**characterize** [4] - 57:11, 101:24, 130:18, 157:2
**charge** [5] - 10:13, 44:1, 172:7, 172:17, 173:2
**charged** [10] - 24:18, 43:23, 44:3, 44:15, 54:3, 136:7, 138:24, 139:24, 142:10, 158:10
**charges** [3] - 124:9, 164:25, 165:4
**Check** [3] - 37:19, 112:10, 119:5

**check** [20] - 29:9, 31:6, 31:7, 95:11, 96:7, 96:21, 111:24, 113:1, 119:5, 119:18, 122:3, 122:4, 122:8, 123:21, 124:20, 125:15, 126:6, 146:6, 153:9, 167:5
**checked** [3] - 27:24, 39:18, 146:11
**checking** [2] - 28:25, 125:17
**checklist** [2] - 122:6, 123:4
**choose** [1] - 131:5
**Chris** [3] - 14:8, 15:5, 82:6
**Christopher** [1] - 174:23
**chunk** [1] - 136:21
**circulate** [1] - 120:2
**circulated** [1] - 49:16
**circumstance** [2] - 52:9, 56:6
**citizen** [2] - 27:6, 28:4
**citizens** [4] - 12:17, 17:4, 17:10, 19:1
**Civil** [1] - 2:3
**civil** [3] - 55:17, 55:21, 90:21
**clarification** [4] - 25:8, 48:5, 152:24, 179:25
**clarified** [3] - 18:14, 18:18, 66:20
**clarifies** [1] - 153:11
**clarify** [11] - 8:3, 11:15, 15:9, 17:6, 18:2, 57:17, 104:12, 106:19, 112:5, 123:22, 163:25
**classify** [1] - 110:4
**clear** [5] - 65:24, 69:22, 98:11, 138:19, 154:15
**cleared** [1] - 29:13
**clearer** [1] - 66:15
**clearing** [1] - 21:17
**clearly** [4] - 45:17, 60:6, 66:8, 66:17
**Clearly** [1] - 23:20
**clemency** [20] - 18:18, 18:22, 34:11, 37:15, 39:7, 39:14, 39:17, 43:2, 55:13, 56:7, 56:16, 56:17, 57:2, 57:3, 64:22, 102:19, 112:18, 128:2, 154:21, 167:25

**Clerk** [3] - 66:2, 181:9, 190:13
**clerk** [25] - 26:18, 34:23, 40:15, 60:12, 65:8, 68:20, 72:23, 81:17, 84:8, 85:6, 85:21, 89:17, 89:19, 89:23, 90:16, 91:2, 91:8, 91:21, 107:25, 123:16, 147:1, 147:16, 148:16, 152:18, 181:9
**clerk's** [1] - 40:17
**clerks** [5] - 35:1, 85:13, 88:20, 90:9, 91:22
**close** [2] - 67:12, 174:18
**closely** [2] - 100:16, 163:4
**closer** [1] - 156:8
**code** [3] - 140:15, 141:24, 143:7
**codified** [1] - 18:21
**colleague** [1] - 7:18
**colleagues** [3] - 61:6, 138:8, 161:25
**collect** [1] - 15:3
**collected** [1] - 14:25
**College** [1] - 9:13
**comfortable** [2] - 17:6, 62:1
**Coming** [1] - 107:18
**coming** [8] - 78:17, 85:19, 97:5, 101:20, 102:9, 107:17, 108:15, 135:5
**commence** [1] - 120:11
**commenced** [1] - 118:24
**commensurate** [1] - 112:22
**comment** [3] - 57:15, 120:4, 120:16
**comments** [2] - 158:19, 179:7
**commit** [1] - 142:3
**committee** [4] - 20:14, 20:25, 21:3, 178:5
**committees** [2] - 21:5, 178:21
**communicate** [3] - 63:8, 72:14, 72:19
**communicated** [1] - 71:9
**communication** [2] - 52:17, 75:20
**communications** [3]

- 15:20, 33:5, 66:1
**Community** [1] - 9:13
**community** [15] - 19:3, 65:2, 67:8, 67:9, 67:13, 68:10, 68:12, 72:20, 94:1, 115:13, 115:22, 182:8, 182:16, 183:7, 186:12
**comparison** [1] - 105:5
**compelled** [1] - 32:11
**compelling** [1] - 32:9
**complete** [14] - 27:20, 28:21, 29:7, 29:24, 30:7, 72:17, 74:4, 90:19, 109:6, 118:25, 134:20, 149:8, 178:14, 189:11
**completed** [15] - 27:21, 30:8, 65:5, 67:19, 67:23, 71:14, 71:22, 71:23, 87:18, 92:4, 92:8, 143:21, 154:11, 177:10
**completeness** [1] - 27:17
**completing** [3] - 67:4, 105:23, 109:1
**Completion** [1] - 182:2
**completion** [6] - 17:19, 34:15, 89:9, 103:3, 125:22, 179:3
**complex** [3] - 52:15, 105:6, 162:8
**complicated** [10] - 36:17, 101:15, 101:16, 105:11, 108:11, 129:19, 153:18, 153:23, 158:21, 182:18
**complied** [2] - 98:16, 98:20
**complimenting** [1] - 88:17
**component** [4] - 21:23, 177:17, 179:3, 182:25
**composite** [1] - 77:18
**composition** [1] - 25:25
**comput** [1] - 181:16
**computer** [1] - 43:22
**computerized** [1] - 181:14
**concept** [1] - 134:5
**concern** [14] - 49:25,

67:9, 68:10, 113:22, 113:24, 116:12, 131:18, 139:19, 160:12, 160:17, 165:11, 168:16, 168:25, 176:9
**concerned** [2] - 67:15, 67:17
**concerns** [18] - 94:4, 113:9, 118:5, 137:8, 138:9, 150:21, 158:1, 159:9, 159:24, 160:2, 160:4, 161:3, 161:25, 162:14, 163:8, 163:9, 166:14, 178:19
**concluded** [1] - 158:14
**concluding** [1] - 155:3
**conclusion** [8] - 121:12, 146:7, 162:19, 164:21, 165:6, 165:13, 165:14, 168:18
**conclusions** [2] - 162:10, 163:6
**conclusively** [4] - 128:1, 128:4, 129:20, 130:14
**concrete** [1] - 109:12
**condition** [2] - 182:15, 186:10
**conditions** [3] - 72:8, 72:11, 72:13
**conducting** [1] - 19:25
**conference** [7] - 99:19, 99:21, 100:6, 100:15, 101:3, 106:7, 144:6
**conferences** [2] - 21:4
**confident** [2] - 125:3, 125:18
**confirm** [5] - 77:20, 167:15, 172:10, 172:12, 174:13
**confirmation** [2] - 96:19, 99:5
**confirmed** [2] - 84:10, 86:20
**confirming** [1] - 100:25
**confused** [2] - 45:11, 185:16
**confusing** [5] - 64:23, 66:6, 106:2, 106:9, 158:23
**confusion** [1] - 42:1
**conjunction** [1] -

31:14
**connected** [2] - 156:16, 189:16
**connection** [1] - 58:24
**Conservatives** [1] - 93:10
**consider** [1] - 110:11
**considered** [2] - 120:10, 190:14
**considering** [4] - 51:9, 78:2, 79:10, 148:19
**consistent** [2] - 89:12, 89:19
**constitute** [1] - 133:5
**constitution** [1] - 125:22
**Constitutional** [1] - 101:8
**constitutional** [1] - 63:20
**consulted** [2] - 178:7, 178:16
**consulting** [1] - 15:5
**contact** [2] - 36:14, 128:8
**contacted** [2] - 147:16, 169:21
**contained** [1] - 182:3
**contains** [1] - 69:2
**contemplating** [2] - 78:14, 78:22
**contents** [1] - 148:14
**contest** [3] - 36:1, 57:2, 131:6
**contests** [2] - 148:17, 149:15
**context** [1] - 51:24
**continue** [2] - 57:14, 81:15
**Continued** [1] - 11:9
**continued** [1] - 187:5
**continues** [1] - 25:25
**contradictions** [1] - 152:20
**contradicts** [1] - 152:13
**contrary** [2] - 8:4, 131:2
**control** [3] - 182:8, 182:16, 186:12
**Convenient** [1] - 150:22
**conveniently** [1] - 150:20
**conversa** [1] - 89:23
**conversation** [2] - 125:10, 125:11
**conversations** [5] -

13:24, 90:5, 106:19, 152:8, 181:8
**conversion** [1] - 90:21
**convicted** [44] - 27:9, 28:2, 32:4, 37:13, 37:22, 38:8, 43:25, 44:4, 44:10, 44:15, 53:11, 54:1, 54:4, 59:4, 60:4, 64:18, 64:25, 65:3, 71:11, 72:24, 72:25, 102:13, 108:1, 109:10, 112:11, 112:16, 112:17, 112:21, 113:14, 116:9, 121:6, 125:20, 135:22, 136:7, 136:8, 136:16, 142:10, 143:23, 149:13, 149:16, 154:19, 158:9, 184:20
**conviction** [46] - 32:14, 33:9, 34:5, 41:7, 41:10, 49:5, 51:13, 52:18, 53:8, 53:9, 53:20, 53:25, 54:9, 55:7, 55:9, 55:13, 55:19, 60:10, 61:9, 64:7, 64:10, 87:19, 91:5, 92:6, 92:10, 98:18, 127:14, 128:2, 128:15, 137:6, 138:18, 140:21, 141:5, 141:8, 147:20, 149:10, 152:9, 152:11, 156:15, 160:1, 162:25, 165:9, 167:24, 172:4, 175:13, 175:24
**convictions** [17] - 17:5, 27:1, 31:17, 37:6, 37:11, 37:13, 37:17, 38:13, 40:20, 40:23, 42:2, 42:6, 63:25, 73:7, 104:14, 107:9, 132:19
**coordinated** [1] - 63:23
**copies** [2] - 19:9, 82:3
**copy** [8] - 6:2, 12:9, 55:24, 132:25, 133:4, 133:22, 147:18
**Cor** [1] - 180:8
**Cornell** [2] - 9:12, 9:13
**corners** [8] - 27:24, 28:21, 99:2, 114:3, 182:4, 183:16, 183:25, 184:14

**correct** [43] - 11:21, 13:25, 23:5, 30:5, 30:6, 33:4, 45:16, 47:20, 49:14, 51:17, 53:18, 54:11, 54:18, 56:13, 60:14, 62:13, 66:19, 69:23, 70:5, 76:25, 89:14, 103:25, 110:1, 110:2, 119:24, 119:25, 124:4, 138:8, 141:16, 141:21, 142:18, 145:21, 151:17, 154:4, 155:18, 161:16, 161:17, 163:16, 170:19, 174:8, 180:2, 180:7, 184:2
**Correct** [28] - 12:1, 69:24, 70:22, 71:25, 76:12, 76:25, 86:6, 87:5, 94:25, 105:7, 105:21, 110:17, 114:13, 115:8, 132:22, 133:19, 133:23, 141:22, 141:25, 142:19, 146:5, 155:19, 155:24, 160:21, 170:20, 177:6
**Correction** [2] - 133:17, 164:14
**Corrections** [9] - 39:9, 39:19, 40:11, 108:2, 133:2, 134:14, 138:11, 138:23, 164:12
**correctly** [7] - 84:13, 102:16, 128:10, 158:18, 162:20, 170:8, 177:9
**correspondence** [18] - 46:15, 55:12, 74:18, 77:11, 77:12, 79:17, 80:12, 80:22, 82:5, 126:10, 126:19, 136:19, 137:14, 157:9, 157:11, 157:16, 174:25, 179:13
**corroborate** [4] - 35:3, 40:5, 42:3, 44:14
**corroborated** [2] - 29:15, 69:3
**corroborating** [1] - 41:12
**Cory** [2] - 14:5, 25:19
**cost** [1] - 180:17
**costs** [3] - 183:3, 185:9, 185:12

**COUNSEL** [1] - 2:1
**counsel** [11] - 4:11,
4:23, 7:21, 7:23,
12:10, 19:9, 41:17,
189:14, 189:16,
190:12
**counselor** [4] -
95:17, 95:19, 96:1,
97:18
**counter** [1] - 24:21
**countermanding** [1]
- 131:1
**counties** [23] - 60:3,
60:9, 84:7, 85:4,
85:13, 86:8, 91:16,
127:20, 127:22,
128:13, 128:22,
129:1, 129:6, 129:13,
130:6, 130:8, 143:5,
147:9, 147:10,
147:13, 147:15,
155:16, 181:13
**county** [13] - 10:21,
34:24, 35:1, 46:12,
50:7, 52:6, 60:12,
72:24, 84:5, 84:7,
85:20, 129:9, 147:22
**County** [34] - 5:4,
5:7, 5:11, 5:14, 9:4,
10:1, 11:14, 19:23,
22:4, 26:23, 34:2,
36:19, 47:5, 47:18,
49:11, 55:5, 66:2,
67:14, 69:2, 69:9,
89:18, 89:20, 91:2,
95:12, 95:25, 96:1,
96:5, 97:1, 98:6,
147:9, 155:21, 184:7
**COUNTY** [2] - 188:4,
189:4
**county's** [1] - 84:17
**county-initiated** [2] -
84:5, 84:7
**couple** [4] - 109:13,
113:4, 167:3, 175:2
**course** [5] - 14:22,
40:6, 42:21, 87:7,
118:6
**court** [40] - 5:20, 6:2,
7:18, 15:24, 16:5,
19:4, 20:10, 26:18,
38:24, 60:5, 60:12,
60:22, 61:2, 61:10,
66:11, 85:21, 89:8,
89:17, 89:20, 91:2,
91:9, 91:21, 122:9,
134:8, 143:20,
143:24, 158:17,
182:6, 182:9, 182:11,
182:13, 182:14,

183:3, 183:6, 183:17,
183:18, 185:8, 186:9,
186:10
**COURT** [3] - 1:1,
6:11, 155:9
**Court** [5] - 1:23,
188:17, 189:21,
190:14, 190:19
**court's** [4] - 34:23,
89:24, 148:16, 152:18
**courts** [11] - 65:8,
68:20, 72:24, 81:17,
84:8, 85:13, 88:20,
90:9, 90:11, 91:22,
108:1
**courts'** [7] - 35:2,
40:15, 85:6, 90:16,
123:16, 147:2, 181:10
**covered** [2] - 173:22,
186:25
**covering** [1] - 100:6
**covers** [1] - 128:3
**cracks** [2] - 56:10,
97:9
**crafted** [1] - 113:8
**credibility** [3] - 44:5,
53:1, 159:4
**credible** [23] - 25:5,
35:6, 43:6, 43:9,
43:14, 44:2, 44:25,
45:25, 51:14, 52:22,
57:7, 61:8, 62:14,
62:17, 84:20, 128:24,
131:17, 151:14,
152:25, 166:17,
167:9, 174:15
**crime** [5] - 140:12,
140:20, 141:5, 141:8
**criminal** [6] - 26:14,
114:10, 117:15,
117:17, 141:24,
152:17
**criteria** [3] - 15:2,
155:7, 173:10
**cross** [1] - 28:25
**cross-checking** [1] -
28:25
**cure** [2] - 16:7, 36:12
**curiosity** [1] - 70:12
**current** [3] - 53:4,
118:18, 169:24
**cursory** [1] - 28:11
**curve** [1] - 44:17
**CUSICK** [1] - 4:18
**Cusick** [1] - 4:18
**custodian** [2] - 10:9,
11:9
**cut** [1] - 127:2
**cycle** [1] - 178:3

**D**

**Dade** [2] - 5:15, 47:5
**DANJUMA** [79] - 2:3,
4:2, 5:16, 6:14, 6:25,
12:2, 12:8, 16:13,
16:21, 19:13, 19:16,
37:24, 38:4, 46:13,
46:21, 47:10, 47:16,
50:10, 50:17, 54:15,
54:20, 54:24, 58:10,
58:17, 74:16, 74:21,
75:10, 77:10, 77:16,
80:9, 80:15, 82:1,
82:10, 82:16, 82:25,
94:10, 94:16, 97:22,
99:10, 99:17, 110:18,
110:23, 117:22,
118:3, 120:14, 126:9,
126:14, 131:20,
131:24, 136:25,
137:13, 137:20,
144:21, 145:4, 150:8,
150:14, 155:11,
155:13, 157:8,
157:15, 161:18,
161:22, 163:19,
163:21, 163:24,
164:1, 166:24, 167:2,
168:24, 169:4, 171:7,
171:15, 171:23,
173:14, 173:19,
176:14, 176:21,
179:12, 179:18
**Danjuma** [3] - 3:4,
4:3, 4:10
**data** [36] - 14:12,
14:14, 28:7, 29:10,
31:9, 32:5, 32:22,
34:3, 34:16, 38:19,
40:15, 40:19, 41:7,
42:1, 42:16, 42:19,
43:21, 44:12, 48:15,
49:12, 90:17, 103:8,
108:24, 123:17,
136:2, 162:8, 163:1,
163:5, 164:21, 166:5,
167:21, 168:10,
168:20, 181:10,
181:19
**database** [22] -
22:12, 29:10, 31:10,
31:12, 33:2, 34:23,
39:20, 40:11, 40:12,
81:17, 138:11,
162:23, 164:11,
164:13, 164:15,
164:22, 165:6, 165:8,
165:15, 166:13,
168:14, 181:12

**databases** [14] -
24:24, 34:20, 35:2,
40:4, 40:8, 40:9, 41:3,
42:7, 85:5, 85:6,
85:25, 179:1, 180:15,
181:3
**date** [21] - 31:6, 31:7,
35:13, 35:14, 40:5,
50:7, 62:24, 63:14,
63:18, 75:19, 78:1,
86:23, 107:14,
111:14, 111:15,
149:13, 160:20,
175:17, 180:11,
185:10, 185:13
**DATE** [3] - 1:15,
191:4, 191:24
**DATED** [1] - 189:19
**dated** [4] - 50:11,
50:18, 87:7, 179:14
**dates** [2] - 40:10,
40:14
**DAVID** [6] - 32:22,
32:25, 39:9, 39:22,
40:11, 84:9
**DAVIS** [1] - 5:8
**Davis** [1] - 5:8
**days** [5] - 17:25,
35:11, 36:24, 110:12,
190:12
**DC** [1] - 136:5
**DE** [1] - 47:22
**deadline** [2] - 36:22,
78:22
**deal** [1] - 52:10
**deals** [1] - 123:8
**debate** [1] - 79:11
**debated** [2] - 177:20,
178:20
**debating** [1] - 145:22
**decade** [1] - 40:16
**deceased** [2] -
31:22, 32:19
**December** [7] -
13:21, 55:13, 67:16,
76:5, 76:9, 98:9,
107:20
**decide** [1] - 86:13
**decision** [4] - 22:21,
70:25, 72:25, 77:7
**decision-maker** [1] -
22:21
**decision-making** [1]
- 70:25
**decisions** [1] -
141:10
**declare** [1] - 191:22
**decrease** [1] - 157:3
**decreased** [1] -
161:3

**dedicate** [2] -
155:17, 156:1
**deep** [2] - 115:12,
130:9
**deeper** [8] - 34:14,
44:7, 52:24, 135:25,
148:6, 166:3, 166:21
**deeply** [2] - 34:20,
178:7
**default** [1] - 35:17
**defen** [1] - 184:7
**Defendants** [1] - 2:7
**defendants** [2] - 1:8,
7:21
**Defense** [1] - 41:17
**defer** [1] - 153:6
**defining** [1] - 134:6
**definitely** [5] - 79:10,
140:10, 149:7,
150:19, 154:4
**definition** [2] - 72:6,
140:24
**defraud** [4] - 65:25,
67:2, 69:23, 94:6
**degree** [4] - 9:16,
9:17, 138:17, 152:19
**delay** [1] - 114:17
**delegated** [1] - 24:6
**deliverable** [1] -
35:10
**delivered** [1] -
148:14
**delivery** [1] - 10:14
**democratic** [3] -
93:10, 115:18
**Department** [15] -
25:1, 35:4, 39:8,
39:19, 40:11, 55:7,
108:1, 133:2, 133:16,
134:14, 138:10,
138:23, 162:24,
164:11, 164:14
**departure** [3] -
143:9, 167:16, 167:19
**DEPONENT** [1] -
191:4
**deposed** [2] - 7:4,
7:7
**deposing** [1] - 18:3
**Deposition** [1] - 3:8
**deposition** [13] - 8:8,
12:4, 12:10, 12:14,
12:20, 12:21, 16:17,
16:23, 39:4, 42:20,
189:8, 190:8, 190:12
**DEPOSITION** [1] -
1:13
**depositions** [2] -
16:5, 16:11
**depth** [4] - 18:23,

104:5, 104:7, 178:15
**deputy** [1] - 148:24
**derived** [2] - 59:2, 59:8
**DeSantis** [2] - 6:17, 98:8
**DESANTIS** [3] - 1:6, 190:5, 191:2
**describe** [8] - 17:13, 24:15, 33:15, 84:15, 84:18, 103:23, 106:6, 164:3
**described** [6] - 38:10, 72:15, 87:2, 110:16, 137:7, 175:9
**describing** [2] - 28:24, 138:21
**description** [1] - 151:15
**DESCRIPTION** [1] - 3:7
**descriptions** [2] - 140:19, 141:4
**despite** [1] - 54:7
**detail** [5] - 38:23, 41:9, 61:19, 160:8, 184:5
**detailed** [5] - 35:15, 38:23, 102:14, 123:6, 124:12
**detailing** [3] - 64:3, 71:8, 143:22
**details** [7] - 36:13, 90:20, 91:12, 110:8, 120:23, 137:10, 184:20
**determination** [13] - 24:4, 62:10, 70:14, 73:17, 90:25, 106:12, 108:11, 109:3, 109:4, 142:6, 151:6, 166:9, 174:16
**determinations** [4] - 22:17, 32:3, 37:5, 45:19
**determine** [25] - 45:24, 77:3, 87:17, 87:21, 91:4, 92:3, 92:8, 92:9, 102:20, 103:1, 103:2, 108:11, 109:10, 127:19, 129:19, 129:20, 139:6, 140:15, 141:15, 168:6, 170:18, 171:4, 177:9, 177:11, 181:6
**determined** [2] - 146:14, 176:4
**determining** [6] - 19:23, 38:12, 61:25,

105:11, 105:19, 175:23
**developed** [2] - 63:25, 99:5
**devote** [1] - 143:6
**Diebold** [2] - 11:1, 11:2
**difference** [3] - 134:1, 160:20, 184:9
**different** [30] - 10:17, 20:9, 31:21, 36:14, 38:19, 40:3, 50:2, 52:4, 56:2, 56:3, 60:3, 67:13, 69:11, 79:19, 101:23, 103:8, 103:20, 111:3, 112:14, 113:11, 113:18, 116:3, 147:1, 151:16, 153:11, 158:5, 160:22, 181:19, 186:16
**differentiate** [1] - 72:10
**differentiating** [1] - 113:10
**differentiation** [2] - 72:5, 113:14
**differently** [5] - 113:23, 114:1, 114:7, 116:11, 116:12
**difficult** [9] - 79:14, 87:18, 90:25, 91:3, 92:5, 92:7, 101:16, 102:25, 126:4
**difficulties** [1] - 181:1
**difficulty** [1] - 41:12
**dig** [4] - 52:23, 100:1, 166:21, 174:8
**digging** [1] - 166:3
**digital** [3] - 119:16, 121:23, 181:16
**digitized** [1] - 90:18
**direct** [18] - 28:18, 54:25, 58:18, 77:17, 80:16, 81:10, 81:23, 83:12, 84:3, 86:17, 87:10, 99:24, 132:10, 145:19, 174:24, 181:20, 181:23, 185:4
**direction** [1] - 75:16
**directive** [1] - 128:24
**directly** [7] - 24:19, 51:25, 85:14, 116:7, 118:19, 156:17, 165:20
**Director** [3] - 75:21, 111:7, 121:17
**director's** [1] - 108:15

**disclose** [1] - 114:10
**discovery** [6] - 14:10, 14:20, 14:22, 50:14, 79:22, 93:6
**discrepancy** [1] - 152:25
**discuss** [2] - 91:8, 172:22
**discussed** [8] - 63:22, 84:16, 88:9, 131:14, 142:13, 142:16, 151:20, 184:9
**discussing** [8] - 118:4, 125:16, 137:3, 175:9, 177:2, 177:8, 180:13
**discussion** [7] - 71:5, 88:1, 88:21, 92:13, 113:3, 137:23, 162:21
**Discussion** [6] - 82:15, 82:21, 136:23, 157:7, 167:1, 171:20
**discussions** [4] - 81:3, 88:5, 90:14, 90:22
**displays** [1] - 164:23
**disqualifying** [2] - 168:7, 175:15
**distinction** [1] - 148:24
**district** [1] - 69:1
**DISTRICT** [2] - 1:1, 1:1
**dive** [1] - 174:4
**division** [16] - 23:16, 43:15, 48:16, 60:11, 75:25, 78:15, 81:14, 81:22, 107:18, 109:9, 118:13, 119:15, 121:14, 123:1, 148:14, 169:18
**Division** [36] - 12:18, 15:20, 18:16, 23:5, 24:10, 25:1, 28:23, 29:8, 43:20, 48:22, 48:25, 51:9, 51:18, 51:20, 51:24, 52:3, 53:19, 60:9, 75:20, 76:24, 77:2, 77:21, 77:24, 79:2, 80:2, 84:2, 96:22, 100:19, 101:19, 103:2, 109:11, 128:13, 128:23, 129:12, 130:10, 163:14
**division's** [4] - 78:20, 128:23, 144:20, 156:18
**DO** [1] - 191:1

**DOC** [7] - 39:19, 84:8, 85:6, 138:14, 140:2, 141:3, 168:5
**DOC's** [1] - 164:22
**doctrine** [1] - 99:2
**document** [63] - 27:23, 28:22, 38:22, 50:24, 58:11, 58:19, 58:24, 59:10, 59:13, 60:16, 61:12, 61:14, 75:13, 78:12, 80:25, 82:2, 82:4, 94:20, 97:25, 99:11, 101:9, 110:19, 110:24, 112:7, 122:18, 125:8, 126:25, 127:9, 132:8, 134:2, 135:8, 137:6, 140:6, 143:14, 143:17, 153:11, 154:1, 154:15, 161:15, 162:4, 169:12, 171:21, 174:10, 179:20, 182:4, 183:2, 183:4, 183:5, 183:16, 184:1, 184:3, 184:10, 184:13, 184:15, 184:18, 184:20, 184:21, 184:23, 185:3, 185:23, 191:22
**documentation** [18] - 59:20, 59:23, 60:5, 60:8, 60:23, 61:2, 74:3, 74:14, 123:16, 130:24, 133:5, 133:18, 135:11, 136:18, 148:15, 167:18, 184:6, 184:17
**Documentation** [2] - 3:11, 58:12
**documentations** [1] - 134:12
**documents** [41] - 5:25, 6:1, 13:12, 13:24, 14:15, 14:20, 14:25, 15:1, 15:3, 41:17, 42:20, 43:19, 61:10, 64:1, 70:24, 71:7, 74:25, 79:18, 79:22, 79:24, 91:9, 122:6, 123:4, 133:24, 133:25, 134:18, 134:19, 138:4, 139:16, 140:25, 141:1, 145:9, 153:4, 153:5, 157:20, 167:3, 167:21, 174:19, 183:17, 183:18, 185:18
**DOE** [40] - 63:5,

63:8, 81:23, 83:7, 84:19, 86:20, 87:14, 106:17, 107:13, 110:15, 119:20, 120:1, 132:16, 133:13, 133:21, 134:11, 135:1, 135:3, 135:7, 137:4, 141:6, 142:16, 142:23, 143:4, 149:20, 156:13, 158:2, 160:11, 161:11, 165:6, 165:8, 167:6, 168:4, 168:9, 168:18, 170:3, 170:22, 172:21, 174:15, 175:3
**DOE's** [11] - 87:2, 108:10, 138:9, 149:23, 159:16, 161:25, 165:17, 168:14, 172:22, 172:23, 175:10
**done** [8] - 10:15, 28:16, 76:5, 98:14, 99:1, 107:12, 120:13, 168:9
**DOS** [1] - 162:23
**double** [1] - 167:5
**double-check** [1] - 167:5
**doubt** [5] - 21:12, 58:6, 106:11, 130:20, 131:13
**doubts** [1] - 140:10
**down** [8] - 44:16, 54:5, 80:22, 85:19, 93:12, 106:10, 136:8, 164:8
**DOYLE** [2] - 6:8, 6:12
**Doyles** [1] - 6:12
**dozen** [2] - 68:8, 136:13
**drafting** [1] - 77:25
**draw** [2] - 83:2, 126:16
**drawing** [1] - 14:6
**driver's** [2] - 28:9, 29:3
**drives** [1] - 121:25
**driving** [1] - 88:13
**DS** [1] - 47:22
**DS-DE** [1] - 47:22
**DS-DE-39** [3] - 27:15, 118:13, 118:20
**due** [4] - 73:12, 79:18, 128:14, 152:10
**duly** [2] - 6:21, 188:10
**duplication** [1] - 86:1

**during** [11] - 35:5, 43:21, 46:1, 46:3, 56:15, 56:17, 61:1, 77:4, 83:17, 90:3, 121:17
**During** [1] - 55:15

# E

**E-mail** [5] - 2:6, 2:10, 2:14, 3:21, 190:4
**e-mail** [80] - 36:11, 46:23, 47:3, 47:13, 54:16, 74:17, 75:1, 75:4, 75:15, 75:16, 77:11, 77:20, 79:6, 79:16, 79:20, 80:5, 80:12, 82:5, 82:18, 83:1, 83:3, 83:14, 83:22, 83:24, 92:2, 94:12, 94:22, 95:9, 96:2, 98:2, 98:10, 121:15, 126:10, 126:17, 127:1, 132:3, 132:4, 132:11, 132:13, 132:16, 132:23, 132:24, 133:12, 134:18, 137:9, 137:14, 137:16, 137:25, 138:7, 138:8, 139:9, 147:17, 150:15, 150:24, 153:10, 157:9, 157:16, 157:22, 157:25, 159:10, 160:5, 160:13, 162:2, 162:5, 162:8, 169:5, 169:7, 171:17, 171:18, 172:1, 174:1, 174:13, 174:19, 174:23, 175:1, 179:13, 179:14, 180:3, 180:4
**e-mailing** [2] - 47:4, 80:17
**e-mails** [8] - 12:22, 74:23, 126:15, 132:1, 134:17, 136:21, 166:19, 171:8
**Earley** [15] - 4:5, 5:2, 5:3, 6:5, 7:1, 8:25, 9:3, 12:5, 12:9, 77:12, 137:1, 164:3, 167:4, 175:9, 176:22
**EARLEY** [10] - 1:13, 3:4, 5:3, 6:19, 9:3, 188:10, 189:8, 190:1, 191:4, 191:24
**Early** [1] - 10:12
**early** [11] - 9:15,

10:11, 11:4, 11:10, 13:19, 16:9, 34:7, 49:20, 98:8, 108:22
**ears** [1] - 163:23
**easier** [1] - 5:20
**easiest** [5] - 17:11, 101:25, 104:20, 104:23, 104:24
**easy** [1] - 102:19
**EBENSTEIN** [1] - 4:14
**Ebenstein** [1] - 4:14
**education** [4] - 9:21, 20:5, 20:7, 21:5
**educational** [2] - 9:6, 9:7
**effect** [3] - 21:21, 59:9, 130:17
**effective** [2] - 63:14, 63:15
**effectively** [1] - 147:14
**effort** [4] - 86:1, 103:17, 180:22, 181:18
**efforts** [1] - 54:7
**eight** [1] - 48:3
**eighth** [1] - 9:8
**either** [16] - 23:17, 28:7, 28:11, 44:13, 70:1, 72:22, 102:4, 107:9, 119:2, 121:5, 124:18, 131:8, 135:20, 139:14, 142:1
**elect** [1] - 20:24
**Election** [3] - 10:25, 99:14, 128:13
**election** [39] - 9:22, 10:14, 11:12, 20:11, 26:3, 36:19, 36:23, 46:5, 59:6, 61:1, 62:24, 63:6, 63:11, 63:18, 75:17, 81:8, 95:11, 95:24, 96:4, 96:10, 97:8, 107:12, 120:19, 131:9, 132:4, 132:5, 155:21, 155:22, 156:2, 156:8, 156:19, 156:21, 157:3, 170:23, 171:5, 178:3, 178:12, 179:24
**election-related** [1] - 179:24
**elections** [45] - 9:22, 10:1, 10:6, 10:7, 10:19, 10:24, 11:7, 11:11, 11:14, 15:25, 18:15, 19:20, 19:22, 19:25, 20:6, 20:8, 20:16, 21:11, 21:14,

21:16, 21:21, 22:4, 50:8, 50:19, 52:14, 59:21, 59:24, 60:22, 61:6, 63:9, 75:22, 77:3, 80:1, 91:23, 95:6, 98:3, 98:6, 106:25, 120:19, 128:25, 134:13, 167:8, 168:8, 172:24, 175:7
**Elections** [38] - 5:7, 5:12, 9:4, 11:3, 12:19, 15:20, 18:16, 23:5, 24:11, 25:2, 28:24, 29:8, 43:20, 48:22, 49:1, 51:9, 51:19, 51:20, 51:25, 52:3, 53:19, 60:9, 75:21, 76:24, 77:2, 77:21, 77:24, 79:2, 80:2, 84:2, 96:23, 100:19, 101:19, 103:2, 109:12, 128:23, 130:10, 163:15
**Elections'** [1] - 129:12
**elections'** [1] - 10:3
**elementary** [1] - 9:8
**eligibility** [37] - 13:17, 17:15, 17:23, 17:24, 18:13, 19:24, 22:17, 22:18, 22:22, 23:6, 26:4, 33:6, 37:5, 37:17, 38:12, 45:19, 47:24, 48:18, 49:4, 53:13, 55:15, 55:22, 61:25, 66:15, 73:2, 76:8, 95:11, 96:7, 96:22, 100:4, 108:7, 128:14, 155:6, 174:16, 175:5, 177:2, 177:8
**eligible** [19] - 31:19, 47:24, 54:10, 56:12, 57:9, 57:21, 58:2, 71:21, 72:16, 76:10, 97:13, 114:11, 115:7, 123:15, 128:16, 129:21, 131:11, 135:19, 165:23
**emergency** [1] - 120:24
**emphasize** [1] - 158:20
**Emphatically** [1] - 176:13
**employed** [1] - 26:14
**employee** [5] - 10:8, 14:7, 95:1, 189:14, 189:15

**employees** [4] - 24:1, 26:3, 26:5, 94:23
**employment** [1] - 10:2
**empowered** [1] - 23:23
**enacted** [1] - 51:10
**encompassed** [1] - 37:21
**end** [6] - 7:16, 45:7, 84:1, 87:9, 87:11, 98:10
**endeavor** [2] - 30:2, 91:3
**engage** [1] - 147:22
**engineering** [5] - 9:14, 9:16, 9:18, 9:19, 9:20
**ensure** [2] - 39:14, 166:16
**entail** [2] - 21:8, 143:18
**entails** [1] - 20:13
**ENTER** [1] - 191:1
**enter** [2] - 24:24, 29:10
**entering** [1] - 22:11
**entire** [1] - 126:18
**entirely** [2] - 75:11, 149:20
**entitled** [1] - 110:19
**entity** [3] - 32:8, 52:6, 177:17
**enunciated** [1] - 66:8
**equally** [1] - 115:6
**ERIC** [1] - 32:21
**err** [1] - 152:22
**ERRATA** [2] - 3:25, 191:1
**Errington** [1] - 12:20
**error** [19] - 48:7, 51:6, 65:5, 68:3, 79:18, 142:1, 142:5, 142:17, 142:20, 142:22, 163:2, 165:16, 165:17, 168:13, 168:15, 170:23, 172:15, 176:6, 185:24
**errors** [6] - 52:1, 53:6, 54:5, 54:8, 142:4, 160:17
**Ertel** [5] - 98:3, 98:4, 98:24, 100:22
**espe** [1] - 101:18
**especially** [5] - 20:6, 24:9, 26:6, 43:18, 166:18
**Especially** [1] - 91:6

**ESQ** [4] - 2:3, 2:8, 2:11, 190:1
**Essentially** [2] - 53:11, 102:10
**essentially** [24] - 11:3, 13:15, 13:18, 19:3, 35:11, 51:4, 64:4, 73:18, 75:24, 76:1, 76:4, 81:7, 100:18, 101:22, 103:5, 111:6, 114:22, 117:5, 119:14, 123:20, 135:16, 137:23, 166:21, 183:11
**establish** [2] - 20:15, 128:16
**established** [1] - 98:21
**estimate** [1] - 46:11
**estimation** [1] - 149:14
**et** [1] - 175:16
**ET** [6] - 1:3, 1:7, 190:5, 190:6, 191:2, 191:3
**eval** [1] - 88:18
**evaluate** [1] - 108:12
**event** [2] - 93:16, 163:1
**eventually** [1] - 85:17
**everywhere** [3] - 64:23, 71:16, 88:22
**evidence** [19] - 23:4, 24:4, 44:25, 45:24, 53:21, 62:11, 62:17, 69:23, 86:13, 130:15, 131:2, 133:14, 141:6, 149:24, 152:20, 158:14, 159:5, 170:13
**ex** [3] - 12:17, 17:10, 17:11
**ex-felons** [2] - 12:17, 17:11
**ex-offenders** [1] - 17:10
**exact** [7] - 49:20, 61:11, 72:7, 88:10, 104:25, 119:4, 149:1
**Exactly** [1] - 154:12
**exactly** [16] - 37:1, 52:10, 68:7, 74:15, 83:9, 96:15, 103:5, 112:15, 114:11, 115:10, 120:12, 127:4, 158:8, 160:16, 162:22, 186:16
**EXAMINATION** [1] - 6:24

**Examination** [1] - 3:4

**examination** [1] - 1:22

**examined** [1] - 6:22

**example** [3] - 41:24, 56:5, 148:25

**examples** [6] - 44:22, 48:25, 49:15, 120:18, 133:3, 184:6

**Excellent** [2] - 12:2, 45:6

**except** [6] - 34:13, 42:19, 61:4, 117:20, 147:4, 178:25

**exception** [2] - 120:23, 180:9

**exceptional** [4] - 61:18, 61:21, 61:23, 130:3

**exceptions** [1] - 17:17

**exchange** [1] - 94:13

**exchanges** [1] - 137:9

**excluded** [1] - 105:14

**excuse** [10] - 6:6, 48:21, 60:23, 111:11, 115:24, 127:21, 135:1, 145:12, 156:5, 168:6

**Excuse** [2] - 47:6, 51:22

**executive** [8] - 18:22, 20:14, 34:11, 37:14, 102:19, 112:18, 154:21, 167:25

**Executive** [1] - 2:8

**exempt** [1] - 87:16

**exempted** [1] - 105:16

**exemption** [1] - 105:15

**exercise** [1] - 190:10

**Exhibit** [60] - 12:4, 12:6, 16:14, 16:19, 19:14, 28:18, 37:25, 38:2, 46:14, 46:19, 47:13, 50:11, 50:15, 54:22, 58:11, 58:15, 73:22, 74:17, 74:19, 77:14, 80:11, 80:13, 82:2, 82:8, 94:14, 97:20, 97:23, 99:11, 99:15, 110:19, 110:21, 118:1, 118:8, 121:3, 122:2, 125:14, 126:9, 126:12,

131:21, 131:22, 137:13, 137:18, 144:24, 145:2, 150:10, 150:12, 157:8, 157:13, 161:19, 161:20, 169:1, 169:2, 171:11, 171:13, 173:15, 173:17, 174:22, 179:13, 179:16, 181:22

**exhibit** [1] - 16:18

**EXHIBITS** [1] - 3:6

**exhibits** [2] - 5:22, 150:9

**expect** [5] - 25:24, 26:2, 81:15, 85:18, 180:18

**expectation** [6] - 87:8, 107:16, 112:9, 147:24, 167:13, 173:9

**expecting** [1] - 166:15

**expense** [1] - 180:19

**experience** [4] - 60:13, 90:10, 117:10, 157:2

**experiences** [1] - 125:15

**expert** [5] - 45:9, 45:12, 45:14, 45:15, 158:11

**experts** [2] - 125:11, 141:23

**explain** [14] - 27:11, 32:24, 38:17, 41:1, 43:7, 51:2, 93:24, 112:2, 115:23, 146:20, 159:1, 160:19, 180:24, 181:3

**explained** [1] - 30:8

**explaining** [3] - 38:11, 66:1, 174:6

**explains** [1] - 151:18

**explanation** [1] - 48:10

**explicit** [2] - 184:3, 184:5

**express** [1] - 179:4

**expressed** [2] - 93:25, 115:23

**extensive** [4] - 25:4, 26:17, 39:10, 129:9

**extensively** [1] - 34:19

**extent** [6] - 40:18, 41:23, 126:19, 137:22, 151:20, 178:10

**extra** [4] - 62:4,

115:5, 151:19, 152:6

**eyes** [1] - 155:15

---

# F

**face** [3] - 43:17, 52:22, 131:10

**faced** [1] - 131:4

**facets** [1] - 186:17

**fact** [30] - 53:10, 53:20, 54:10, 56:12, 57:2, 57:9, 57:22, 58:1, 65:16, 70:3, 76:10, 76:17, 76:18, 85:5, 106:21, 106:25, 107:13, 115:6, 131:11, 137:5, 138:24, 141:7, 142:16, 151:15, 159:23, 159:24, 165:15, 172:15, 173:5

**factor** [1] - 115:14

**factors** [2] - 128:5, 129:16

**facts** [2] - 64:20, 191:22

**factual** [1] - 162:11

**fair** [20] - 57:19, 57:24, 105:8, 141:5, 142:20, 142:22, 145:13, 146:6, 148:23, 149:24, 153:10, 158:2, 163:13, 164:20, 165:24, 166:1, 168:10, 168:11, 177:7, 178:13

**fairly** [3] - 25:3, 102:19, 159:20

**fairness** [1] - 57:11

**fall** [5] - 56:19, 97:9, 106:24, 183:18, 183:19

**fallen** [1] - 56:9

**familiar** [4] - 7:10, 33:21, 139:10, 164:18

**far** [9] - 17:16, 54:13, 61:5, 90:16, 120:13, 169:17, 176:23, 177:1, 180:8

**fashion** [2] - 21:2, 90:12

**fast** [2] - 29:17, 176:17

**fax** [1] - 147:18

**FDLE** [2] - 84:8, 85:5

**fear** [9] - 65:1, 65:8, 66:14, 67:9, 68:14, 68:17, 115:14, 115:17, 125:17

**fearful** [3] - 65:4, 67:18, 108:4

**fears** [7] - 65:14, 66:25, 67:22, 92:14, 93:25, 115:9, 115:21

**February** [6] - 36:25, 75:1, 75:5, 79:6, 80:4, 113:5

**federal** [2] - 42:6

**fee** [1] - 147:8

**fees** [14] - 122:10, 123:10, 123:13, 124:4, 124:7, 124:21, 182:13, 185:9, 185:12, 185:18, 185:22, 186:8, 186:19, 186:25

**fell** [2] - 88:10, 88:19

**Felon** [3] - 3:10, 3:11, 58:12

**felon** [52] - 13:5, 25:2, 27:10, 28:2, 37:22, 38:8, 38:14, 38:18, 40:23, 42:11, 43:4, 46:14, 48:15, 53:12, 59:4, 59:20, 73:3, 73:10, 75:23, 77:5, 84:5, 84:7, 97:4, 98:23, 101:25, 104:13, 112:11, 112:21, 132:17, 134:3, 137:3, 143:17, 144:22, 149:19, 151:23, 152:21, 156:6, 156:24, 158:1, 159:16, 160:23, 162:1, 163:14, 164:4, 165:17, 166:12, 168:14, 169:17, 169:18, 170:17, 170:18, 176:5

**felon's** [1] - 17:19

**felonies** [6] - 17:5, 65:3, 111:25, 113:1, 113:15, 163:22

**Felons** [1] - 122:23

**felons** [22] - 12:16, 12:17, 13:16, 15:15, 17:11, 18:25, 33:24, 44:10, 49:16, 49:21, 49:22, 49:24, 59:6, 60:4, 83:10, 87:24, 88:7, 89:1, 102:11, 109:10, 119:6

**felony** [126] - 17:5, 17:17, 18:21, 26:25, 31:17, 32:5, 32:14, 33:8, 34:5, 34:9, 34:14, 37:6, 37:10, 37:11, 37:12, 37:13,

38:12, 40:19, 43:23, 43:25, 44:2, 44:15, 44:20, 49:5, 51:13, 52:18, 53:7, 53:9, 53:20, 53:25, 54:1, 54:3, 54:4, 54:9, 55:7, 55:9, 55:13, 55:19, 60:7, 60:10, 61:9, 63:25, 64:7, 64:9, 64:18, 71:12, 73:7, 73:19, 76:9, 81:14, 81:21, 85:16, 85:20, 91:5, 98:18, 102:14, 102:16, 104:13, 107:8, 110:6, 110:9, 112:16, 112:17, 121:6, 125:20, 127:3, 127:13, 128:2, 128:15, 132:18, 136:8, 136:16, 138:17, 138:18, 138:24, 139:5, 139:12, 139:24, 140:3, 142:23, 143:15, 147:21, 149:10, 151:3, 151:5, 151:7, 151:10, 151:14, 152:9, 152:10, 152:17, 153:16, 154:10, 154:16, 154:19, 154:24, 155:1, 158:9, 158:16, 159:7, 160:1, 162:24, 162:25, 165:1, 165:8, 165:9, 167:24, 168:7, 172:4, 172:5, 172:7, 172:17, 172:25, 173:2, 173:12, 175:12, 175:13, 175:15, 175:24, 177:5, 177:11, 184:25, 185:1

**felony-level** [1] - 151:5

**felt** [1] - 113:19

**few** [16] - 27:20, 34:24, 44:8, 44:21, 49:7, 66:6, 68:8, 93:5, 103:20, 110:12, 137:11, 145:14, 162:9, 176:24

**fewer** [1] - 160:17

**field** [1] - 21:1

**fifth** [1] - 86:17

**file** [2] - 132:25, 133:9

**filed** [1] - 190:13

**files** [5] - 32:23, 47:24, 135:1, 135:3, 155:15

**filing** [1] - 20:3
**fill** [2] - 27:14, 27:22
**filled** [1] - 27:18
**filming** [1] - 144:10
**filter** [1] - 115:8
**filters** [1] - 14:11
**final** [6] - 22:21, 70:25, 72:25, 118:7, 155:3, 165:22
**financial** [39] - 17:3, 18:24, 19:2, 39:5, 42:17, 72:12, 74:4, 87:24, 88:8, 89:2, 89:18, 90:3, 91:4, 102:25, 103:3, 103:24, 104:7, 105:20, 106:8, 107:11, 107:24, 108:12, 108:25, 122:9, 123:18, 123:23, 124:2, 144:1, 176:25, 177:3, 177:12, 179:2, 180:16, 181:2, 181:7, 182:24, 183:2, 185:6, 185:19
**financially** [1] - 189:17
**fine** [2] - 7:22, 127:12
**fines** [13] - 87:20, 123:10, 123:12, 124:7, 124:21, 182:13, 185:9, 185:12, 185:18, 185:21, 186:8, 186:18, 186:24
**Fines** [1] - 122:10
**fines/restitution** [1] - 87:20
**finished** [1] - 130:7
**Finished** [1] - 127:10
**finishing** [1] - 103:13
**first** [41] - 4:8, 5:17, 6:20, 9:11, 12:13, 16:14, 22:21, 24:16, 38:6, 47:18, 58:18, 59:3, 66:4, 81:16, 82:12, 83:13, 83:15, 100:2, 101:23, 103:14, 107:3, 108:23, 111:20, 112:15, 115:9, 118:25, 120:8, 123:2, 124:15, 125:5, 126:22, 127:12, 138:17, 140:3, 147:23, 151:1, 152:19, 168:20, 175:1, 185:16

**first-degree** [1] - 152:19
**first-hand** [1] - 125:5
**five** [6] - 18:19, 25:14, 82:22, 102:15, 176:18, 176:19
**fixed** [1] - 86:23
**FL** [1] - 2:9
**flag** [2] - 113:12, 113:17
**flagged** [3] - 53:6, 53:18, 170:5
**flood** [1] - 156:20
**Floor** [1] - 2:4
**FLORIDA** [6] - 1:1, 1:7, 188:3, 189:3, 190:6, 191:3
**Florida** [44] - 1:17, 2:13, 10:21, 17:15, 17:24, 26:10, 27:4, 27:5, 27:7, 27:12, 27:14, 28:8, 28:12, 28:23, 29:8, 31:2, 31:4, 31:23, 31:24, 31:25, 32:2, 34:1, 55:6, 55:11, 55:14, 59:5, 69:17, 72:4, 112:4, 112:22, 113:6, 119:17, 133:2, 133:7, 133:16, 134:14, 140:15, 140:23, 141:15, 141:23, 143:6, 188:18, 190:3
**Floridians** [1] - 98:12
**flow** [1] - 156:13
**focus** [5] - 62:19, 106:4, 138:7, 169:7, 176:24
**folks** [8] - 4:8, 5:16, 5:21, 47:12, 82:23, 124:18, 124:25, 173:9
**Folks** [1] - 5:5
**follow** [3] - 28:8, 36:16, 56:21, 57:16, 61:6, 61:16, 85:4, 116:20, 132:4, 134:9, 136:18, 139:21, 166:15, 166:22, 167:8
**follow-up** [7] - 36:16, 56:21, 61:16, 132:4, 134:9, 166:15, 167:8
**follow-ups** [1] - 136:18
**followed** [1] - 100:16
**following** [4] - 56:11, 95:5, 158:15, 159:11
**follows** [2] - 6:23, 61:11
**footsteps** [1] - 95:5
**force** [2] - 127:23,

129:25
**forces** [1] - 114:9
**foregoing** [1] - 191:22
**forget** [1] - 47:12
**forgetting** [1] - 68:22
**forgiven** [1] - 19:3
**Form** [2] - 3:9, 3:16
**form** [36] - 27:20, 27:22, 28:13, 29:7, 29:8, 30:1, 34:10, 37:18, 38:1, 41:16, 43:20, 44:11, 113:12, 113:13, 114:9, 114:24, 117:23, 118:8, 118:21, 119:10, 119:12, 119:15, 119:20, 120:3, 120:5, 120:20, 121:5, 121:18, 122:3, 125:14, 133:15, 134:18, 152:10, 182:15, 186:10
**formal** [2] - 119:11, 138:19
**format** [1] - 181:16
**formatting** [1] - 82:13
**former** [4] - 87:24, 88:7, 89:1, 91:5
**forms** [6] - 70:16, 112:2, 121:3, 121:4, 121:13, 121:25
**forth** [2] - 24:9, 136:11
**forths** [1] - 180:9
**forward** [8] - 53:1, 75:24, 101:22, 113:8, 128:7, 145:23, 152:2, 152:8
**forwarded** [3] - 47:25, 172:1, 190:13
**Foundation** [1] - 2:4
**founded** [2] - 162:15, 163:9
**four** [14] - 7:8, 27:24, 28:9, 28:11, 28:20, 28:25, 99:2, 114:3, 137:16, 158:5, 182:4, 183:16, 183:25, 184:14
**fourth** [3] - 36:25, 80:19, 81:10
**fraction** [1] - 151:24
**frankly** [8] - 16:8, 16:10, 39:3, 41:25, 52:13, 71:18, 124:13, 125:8
**fraud** [1] - 70:15
**fraught** [1] - 51:6

**free** [3] - 8:2, 126:18, 169:10
**freeze** [1] - 86:21
**frequently** [2] - 26:6, 33:19
**Friday** [2] - 137:24, 171:17
**front** [23] - 14:4, 15:8, 23:22, 23:25, 24:1, 24:15, 24:17, 24:20, 24:21, 25:10, 26:3, 26:12, 34:24, 44:24, 46:25, 55:2, 55:3, 93:4, 140:6, 141:13, 147:4, 150:16, 178:21
**FSASE** [8] - 20:17, 21:6, 21:13, 22:2, 99:19, 100:6, 144:6, 177:17
**FSU** [1] - 9:16
**fulfilled** [5] - 18:24, 23:22, 94:9, 183:2, 184:22
**fulfillment** [1] - 182:8
**full** [10] - 9:1, 10:8, 94:4, 142:15, 149:4, 149:8, 178:11, 182:10, 182:12, 186:8
**full-time** [1] - 10:8
**fuller** [1] - 13:14
**fully** [2] - 142:9, 143:12
**funding** [3] - 178:25, 179:5, 179:8
**funds** [1] - 180:13
**future** [2] - 96:12, 111:13
**FVRA** [7] - 111:24, 112:2, 112:4, 121:3, 121:4, 121:13, 121:18

## G

**geared** [1] - 64:5
**gender** [1] - 40:6
**general** [20] - 4:23, 15:19, 16:25, 20:22, 27:6, 35:24, 44:9, 52:9, 52:16, 56:13, 61:15, 71:5, 88:21, 90:11, 92:11, 106:1, 159:2, 160:14, 162:14, 187:2
**Generally** [1] - 42:13
**generally** [12] - 26:4, 29:14, 29:20, 41:23, 44:24, 53:5, 61:8, 68:10, 72:19, 80:4, 120:20, 140:13

**generate** [2] - 15:2, 125:10
**generated** [2] - 137:8, 143:19
**generating** [1] - 163:8
**generic** [1] - 37:20
**gentleman** [4] - 23:18, 23:19, 49:8, 49:14
**gist** [1] - 100:9
**given** [7] - 22:22, 39:17, 101:19, 111:7, 115:6, 128:22, 151:2
**glean** [1] - 149:8
**gleaned** [2] - 90:14, 111:8
**Global** [1] - 10:25
**GOVERNOR** [3] - 1:6, 190:6, 191:2
**governor** [2] - 4:23, 112:8
**Governor** [3] - 2:8, 6:16, 98:8
**grade** [1] - 9:8
**graduate** [1] - 9:13
**graduated** [1] - 9:9
**granted** [1] - 55:16
**Great** [8] - 9:25, 11:15, 12:2, 13:20, 15:17, 25:21, 37:2, 163:7
**great** [5] - 38:23, 115:17, 116:12, 117:9, 150:18
**greater** [1] - 156:6
**Greg** [1] - 92:22
**ground** [1] - 7:11
**group** [10] - 25:22, 69:16, 103:12, 105:23, 106:4, 109:6, 122:24, 124:14, 124:17, 160:25
**groups** [13] - 63:23, 64:2, 67:8, 67:13, 68:12, 92:16, 93:9, 93:11, 94:2, 111:3, 116:4, 158:5, 158:6
**Gruver** [7] - 4:4, 4:11, 4:12, 4:15, 4:16, 4:18, 6:13
**guarantee** [1] - 117:5
**guess** [50] - 6:6, 7:9, 9:8, 9:16, 10:11, 11:2, 11:10, 12:24, 14:8, 18:14, 18:21, 18:25, 20:23, 21:20, 24:25, 31:4, 34:1, 34:4, 38:21, 38:25, 39:6, 43:14, 43:17, 43:21,

45:13, 48:23, 51:4, 52:22, 61:16, 64:3, 70:16, 79:16, 96:16, 98:20, 100:21, 100:23, 101:14, 102:5, 107:20, 109:5, 124:12, 130:4, 134:7, 143:24, 147:17, 167:14, 168:3, 183:21, 185:20, 186:1

**guidance** [15] - 20:12, 21:1, 80:2, 95:10, 96:6, 96:20, 100:9, 100:18, 103:7, 107:14, 108:17, 124:23, 180:6, 183:25, 184:3

**guidelines** [1] - 18:15

**guilty** [15] - 60:7, 128:1, 143:22, 151:4, 151:10, 158:16, 162:25, 165:1, 165:9, 172:7, 172:11, 172:17, 173:2, 173:11, 184:22

**gun** [1] - 153:24

**guys** [1] - 15:6

**Gwen** [6] - 66:3, 68:19, 89:24, 90:1, 90:2, 180:25

## H

**habit** [1] - 7:8

**half** [3] - 11:5, 47:18, 116:16

**halfway** [1] - 150:9

**halted** [2] - 13:15, 73:21

**hand** [2] - 88:23, 125:5

**handle** [2] - 60:4, 78:20

**handled** [4] - 113:18, 115:1, 116:11, 118:17

**happy** [2] - 8:9, 163:24

**hard** [4] - 16:4, 69:6, 97:24, 160:6

**harder** [2] - 129:9, 155:4

**head** [6] - 33:20, 79:23, 116:18, 134:5, 135:21, 135:23

**heading** [1] - 152:17

**hear** [3] - 13:2, 13:11, 30:24

**heard** [6] - 40:14, 65:13, 85:12, 108:20,

131:4, 131:12

**hearing** [11] - 35:13, 35:23, 35:25, 36:6, 65:2, 67:14, 88:20, 94:4, 111:9, 120:8, 130:14

**heightens** [1] - 115:14

**held** [4] - 88:4, 91:22, 97:12, 152:1

**help** [6] - 20:15, 21:1, 26:6, 47:7, 67:21, 78:7

**helped** [1] - 15:9

**helpful** [8] - 7:18, 15:23, 45:6, 74:16, 74:24, 103:19, 109:23, 119:8

**here..** [1] - 153:25

**hereby** [1] - 190:21

**HERRON** [13] - 2:11, 5:1, 5:5, 47:6, 75:7, 82:20, 82:22, 120:5, 163:18, 163:20, 163:23, 176:19, 190:1

**Herron** [1] - 5:1

**hesitate** [1] - 25:7

**hesitation** [1] - 117:9

**hesitations** [1] - 162:17

**Hi** [1] - 95:9

**high** [3] - 66:4, 164:23, 168:22

**High** [1] - 9:9

**highlight** [2] - 66:14, 175:2

**highlighted** [3] - 27:21, 169:13, 169:15

**Highway** [1] - 33:1

**Hillsborough** [1] - 5:6

**hired** [1] - 10:8

**HIS** [3] - 1:6, 190:6, 191:2

**history** [2] - 43:14, 114:10

**hit** [1] - 26:7

**hold** [2] - 78:16, 136:1

**hope** [2] - 46:17, 58:9

**hopefully** [4] - 35:16, 86:25, 123:19, 165:19

**Hopefully** [1] - 95:8

**hoping** [2] - 104:2, 166:2

**horizon** [1] - 175:7

**house** [3] - 21:17, 77:7, 77:8

**House** [1] - 95:24

**huge** [1] - 72:1

**human** [2] - 43:15, 142:1

**hundred** [1] - 46:12

**hurdle** [1] - 102:25

**hurricane** [1] - 120:24

## I

**I-N-T-E-R** [1] - 163:19

**i.e** [2] - 148:16, 148:25

**ID** [5] - 28:9, 28:12, 31:4, 39:25, 40:1

**identification** [30] - 12:7, 16:20, 19:15, 28:8, 38:3, 46:20, 50:16, 53:11, 54:23, 58:16, 74:20, 77:15, 80:14, 82:9, 94:15, 97:21, 99:16, 110:22, 118:2, 126:13, 131:23, 137:19, 145:3, 150:13, 157:14, 161:21, 169:3, 171:14, 173:18, 179:17

**identified** [3] - 53:9, 115:3, 163:13

**identifies** [2] - 157:23, 158:1

**identify** [2] - 30:14, 30:20

**identifying** [3] - 41:19, 132:18, 160:9

**identity** [3] - 34:13, 49:13, 53:17

**II** [2] - 1:12, 187:5

**illegal** [1] - 59:3

**immediate** [2] - 111:13, 175:7

**immediately** [2] - 143:20, 156:11

**immunize** [1] - 70:20

**impact** [2] - 156:11, 178:12

**implement** [3] - 101:17, 177:24, 180:2

**implementa** [1] - 101:12

**implementable** [1] - 114:18

**implementation** [12] - 62:22, 63:6, 63:10, 63:20, 71:6, 79:3, 80:3, 101:7, 105:18, 175:10, 178:19, 180:6

**implemented** [3] -

26:1, 175:18, 177:23

**implementing** [2] - 178:25, 181:1

**important** [6] - 7:14, 44:23, 57:5, 131:15, 153:12, 174:6

**importantly** [1] - 8:1

**imposed** [1] - 38:24

**impression** [2] - 68:9, 69:15

**imprisonment** [1] - 182:6

**IN** [4] - 1:6, 190:5, 191:2

**in-depth** [4] - 18:23, 104:5, 104:7, 178:15

**in-house** [2] - 77:7, 77:8

**inadvertently** [1] - 49:11

**inaudible** [3] - 6:8, 180:19, 183:14

**inaudible)** [1] - 4:21

**Inc** [1] - 2:4

**incarcerated** [17] - 71:23, 72:17, 95:10, 96:6, 96:17, 96:21, 97:1, 102:4, 102:18, 104:14, 110:7, 132:20, 142:12, 149:9, 154:7, 159:25, 177:4

**incarceration** [2] - 71:19, 143:24

**inclination** [1] - 130:25

**include** [6] - 22:5, 39:2, 111:24, 185:7, 185:9, 186:12

**included** [7] - 38:18, 87:20, 112:10, 133:8, 137:5, 184:14, 185:13

**includes** [2] - 40:19, 106:17, 170:16

**including** [12] - 100:7, 106:17, 108:10, 109:9, 122:7, 123:5, 124:3, 125:23, 138:10, 182:4, 182:15, 186:11

**incompetence** [2] - 32:3, 32:17

**incompetent** [3] - 27:9, 28:1, 52:20

**incorrect** [4] - 49:1, 49:4, 130:16, 168:23

**incorrectly** [2] - 53:6, 108:5

**increased** [2] - 142:21, 142:22

**incurred** [1] - 89:8

**INDEX** [2] - 3:1, 3:6

**indicate** [1] - 132:13

**indicating** [1] - 60:6

**indication** [3] - 39:12, 139:11, 140:2

**indicator** [1] - 116:10

**individual** [25] - 24:5, 30:9, 33:16, 40:17, 41:18, 45:23, 51:13, 53:24, 55:5, 56:1, 56:2, 56:4, 62:9, 66:23, 69:5, 69:22, 70:4, 71:21, 91:4, 124:1, 135:2, 147:7, 151:9, 153:14, 175:13

**individual's** [3] - 39:12, 128:14, 133:16

**individually** [1] - 139:14

**individuals** [33] - 4:7, 26:25, 31:15, 31:16, 33:6, 37:5, 39:13, 46:10, 49:5, 53:6, 54:8, 76:10, 76:17, 77:4, 92:14, 94:1, 98:17, 104:13, 105:19, 107:8, 116:1, 116:3, 116:22, 132:18, 156:7, 156:14, 159:25, 164:24, 170:5, 172:6, 173:1, 173:6, 186:19

**individuals'** [3] - 65:14, 159:13, 177:2

**ineligibility** [7] - 19:24, 22:19, 32:13, 52:8, 133:6, 148:17, 172:4

**ineligible** [22] - 12:19, 23:24, 30:14, 30:20, 31:15, 31:24, 33:8, 33:17, 52:18, 53:7, 53:24, 65:16, 114:6, 130:16, 132:19, 139:7, 154:9, 154:17, 156:15, 159:22, 170:6, 170:14

**inevitably** [1] - 48:20

**infer** [1] - 159:23

**information** [109] - 12:25, 20:4, 22:6, 24:10, 24:23, 25:1, 29:20, 30:1, 32:16, 32:23, 33:21, 34:5, 34:8, 35:3, 39:4, 39:6, 39:8, 39:9, 39:10, 39:12, 40:19, 40:23, 41:5, 41:19, 42:5, 43:5, 45:18, 49:2,

49:4, 51:5, 51:12, 51:15, 52:2, 52:5, 52:21, 57:7, 61:8, 64:1, 76:21, 84:19, 84:20, 84:23, 85:1, 85:13, 85:19, 87:18, 87:22, 87:23, 88:7, 89:1, 89:12, 91:11, 91:22, 92:5, 96:3, 96:12, 96:13, 100:4, 100:6, 109:2, 109:4, 109:16, 110:14, 114:5, 119:9, 122:13, 124:13, 124:25, 125:2, 128:9, 129:12, 131:15, 133:2, 133:14, 133:16, 135:9, 135:15, 135:17, 135:24, 136:13, 140:24, 148:21, 151:13, 152:13, 154:22, 156:11, 156:13, 160:9, 160:11, 161:24, 165:21, 166:4, 166:5, 166:20, 167:6, 167:10, 167:20, 168:8, 168:17, 170:17, 170:21, 170:25, 172:6, 173:1, 173:5, 174:12, 174:14, 180:1, 180:15
**informed** [1] - 186:24
**Ingrid** [1] - 25:20
**initial** [1] - 26:24, 28:6, 48:7, 75:20, 82:18, 94:22, 95:9, 134:10, 151:6, 175:11, 175:23
**Initiate** [1] - 148:13
**initiate** [17] - 23:6, 23:12, 24:2, 35:6, 57:6, 57:12, 61:3, 62:12, 76:13, 84:9, 85:11, 86:9, 86:14, 104:12, 129:1, 150:4, 170:24
**initiated** [5] - 15:4, 51:7, 84:5, 84:7, 109:25
**initiating** [2] - 149:20, 149:23
**initiative** [1] - 76:7
**inmate** [1] - 133:1
**innocence** [3] - 127:23, 130:1, 130:17
**input** [3] - 24:22, 31:9, 125:10

**inquire** [1] - 177:21
**installing** [1] - 10:22
**instance** [11] - 26:18, 32:7, 32:16, 40:12, 42:12, 53:17, 58:5, 59:20, 149:12, 164:2, 172:13
**instances** [8] - 23:2, 32:12, 43:23, 117:2, 129:5, 135:25, 136:6, 149:25
**instead** [2] - 43:18, 65:17
**institute** [2] - 76:12, 84:24
**instituting** [1] - 133:12
**instructed** [2] - 15:12, 190:12
**instructing** [1] - 97:6
**instructions** [1] - 95:16
**instructs** [1] - 7:23
**intent** [6] - 18:17, 65:25, 67:2, 69:23, 70:15, 94:6
**intents** [1] - 104:24
**interact** [1] - 91:20
**interacting** [1] - 24:19
**interaction** [1] - 100:24
**interest** [3] - 124:3, 124:9, 186:4
**interested** [7] - 74:25, 107:6, 116:4, 137:22, 162:1, 171:16, 189:17
**interim** [2] - 159:12, 160:23
**internal** [3] - 76:21, 81:4, 131:3
**internally** [1] - 74:11
**interpretation** [2] - 111:6, 184:19
**interrogatories** [5] - 16:15, 69:19, 69:21, 89:16, 115:15
**Interrogatories** [1] - 3:8
**interrogatory** [6] - 14:23, 28:19, 93:6, 99:25, 100:3, 114:20
**Interrogatory** [1] - 99:25
**Interruption** [2] - 157:12, 166:23
**interstate** [4] - 163:14, 164:4, 164:9, 164:15

**Interstate** [2] - 163:18, 163:19
**intrastate** [1] - 163:18
**introduce** [19] - 5:22, 19:7, 37:25, 46:14, 50:10, 54:16, 58:11, 73:22, 74:17, 77:10, 80:10, 80:11, 110:18, 117:23, 169:1, 171:8, 171:10, 173:15, 179:12
**introducing** [1] - 173:20
**invade** [1] - 114:14
**Invade** [1] - 114:16
**invalid** [2] - 81:14, 81:21
**invalidate** [2] - 76:2, 159:12
**invalidated** [4] - 135:16, 169:22, 169:25, 170:2
**invalidating** [1] - 135:17
**inventory** [1] - 121:25
**investigate** [2] - 32:11, 32:12
**investigations** [1] - 86:10
**involved** [10] - 50:3, 52:14, 106:11, 106:16, 108:9, 113:3, 128:5, 129:17, 131:9, 152:6
**involves** [3] - 18:3, 145:13, 145:19
**Ion** [3] - 11:11, 11:16, 11:18
**issue** [19] - 18:6, 26:25, 31:16, 32:4, 32:15, 37:4, 49:21, 92:17, 101:6, 105:11, 115:23, 116:2, 134:10, 139:23, 140:1, 153:9, 154:25, 163:14, 175:8
**issued** [2] - 55:18, 55:20
**issues** [8] - 92:3, 101:2, 101:5, 127:7, 137:7, 137:11, 178:1
**IT** [2] - 14:9, 15:6
**Item** [1] - 145:19
**item** [1] - 145:20
**items** [1] - 27:21
**iterations** [2] - 124:14, 178:8
**itself** [6] - 22:2,

141:3, 143:14, 152:13, 154:13, 155:2

**J**

**Jack** [6] - 66:2, 68:23, 68:24, 69:8, 88:16
**Jail** [1] - 97:1
**jail** [3] - 97:7, 97:12, 97:19
**James** [2] - 15:4, 92:22
**Jan** [1] - 71:12
**Jane** [1] - 12:20
**January** [22] - 11:13, 13:10, 13:19, 38:21, 47:19, 63:17, 63:19, 67:16, 71:13, 73:13, 73:14, 73:18, 75:23, 76:13, 78:17, 78:21, 81:8, 83:3, 87:7, 92:16, 98:8, 111:11
**jeopardy** [1] - 54:2
**Jermaine** [3] - 12:21, 39:3, 42:21
**JESSICA** [5] - 1:23, 188:17, 189:6, 189:21, 190:19
**job** [8] - 10:16, 11:7, 11:10, 19:19, 20:13, 45:21, 47:2, 83:8
**John** [3] - 4:18, 4:20
**Johnny** [1] - 15:6
**join** [1] - 32:21
**joined** [2] - 34:20, 34:24
**joining** [1] - 7:2
**Jonathan** [1] - 4:12
**JONES** [3] - 1:3, 190:5, 191:2
**Joshua** [1] - 4:22
**judge** [4] - 45:13, 134:5, 160:24, 186:6
**judged** [1] - 60:7
**judgment** [43] - 60:6, 60:23, 61:2, 133:5, 133:8, 133:17, 133:22, 133:25, 134:2, 134:8, 134:12, 134:19, 135:8, 135:11, 137:6, 138:16, 140:25, 142:16, 145:20, 145:25, 146:9, 146:12, 146:19, 146:23, 147:16, 147:20, 148:4, 148:9, 148:15, 149:14, 153:5, 153:12,

154:13, 154:20, 161:15, 167:20, 172:9, 174:7, 184:10, 184:13, 184:16, 184:19, 184:23
**Julie** [1] - 4:14
**July** [8] - 3:21, 111:11, 169:7, 171:17, 172:1, 174:23, 179:14, 180:10
**jumped** [1] - 153:24
**June** [32] - 11:6, 34:8, 41:11, 44:10, 47:19, 48:1, 48:11, 87:3, 102:7, 102:8, 108:16, 108:22, 108:23, 109:25, 111:13, 111:14, 132:2, 132:5, 132:11, 137:4, 137:24, 142:23, 143:16, 144:23, 149:19, 150:16, 151:23, 157:23, 159:10, 160:20, 162:2
**jurisdiction** [1] - 31:23
**justice** [3] - 26:14, 117:15, 117:17
**justified** [2] - 106:14, 128:19

**K**

**Karen** [6] - 46:23, 46:24, 47:14, 54:17, 80:17, 81:11
**keep** [4] - 16:4, 95:16, 123:17, 176:17
**keeping** [1] - 107:19
**KELVIN** [3] - 1:3, 190:5, 191:2
**kept** [1] - 90:15
**key** [6] - 27:20, 88:19, 120:12, 146:25, 175:2, 179:24
**kick** [1] - 114:4
**Kind** [1] - 56:8
**kind** [30] - 15:21, 21:3, 35:2, 37:20, 38:23, 54:5, 74:12, 83:25, 84:25, 89:6, 90:23, 92:25, 93:21, 94:3, 97:8, 100:25, 102:17, 106:4, 107:18, 107:19, 109:10, 111:4, 117:12, 137:10, 148:19, 148:25,

166:20, 169:14, 181:4, 184:23
**kinds** [1] - 20:6, 186:18
**Knowing** [1] - 149:2
**knowingly** [1] - 59:4
**knowledge** [8] - 8:23, 83:25, 85:17, 85:24, 86:4, 106:2, 125:5, 178:14
**knowledgeable** [1] - 85:21
**known** [1] - 90:7
**knows** [1] - 172:8

**L**

**Labasky** [1] - 21:18
**lack** [1] - 66:4
**lacks** [1] - 138:19
**language** [2] - 16:11, 178:25
**large** [3] - 117:9, 121:24, 180:22
**large-scale** [1] - 180:22
**largely** [2] - 19:10, 33:7
**larger** [2] - 102:24, 136:20
**last** [25] - 11:16, 13:2, 14:6, 28:9, 28:11, 28:25, 30:18, 30:23, 45:8, 53:22, 60:15, 64:13, 75:1, 75:3, 75:4, 98:11, 110:12, 122:3, 126:17, 126:20, 127:11, 156:9, 157:6, 167:5, 179:22
**late** [7] - 10:20, 10:24, 11:4, 13:21, 76:5, 98:8, 176:16
**lately** [2] - 20:10, 43:18
**Laurina** [4] - 14:5, 14:7, 25:19
**Law** [1] - 113:6
**law** [12] - 9:22, 17:23, 20:11, 57:16, 76:11, 93:25, 112:8, 112:25, 118:6, 122:5, 123:3, 178:11
**laws** [1] - 179:25
**lawsuit** [3] - 16:23, 18:2, 18:6
**lawyer** [4] - 45:12, 124:18, 131:9, 134:7
**lawyers** [5] - 26:10, 122:21, 130:23,

141:20, 141:21
**LCSE** [2] - 97:24, 171:11
**LCSEO** [36] - 3:11, 3:12, 3:12, 3:13, 3:13, 3:14, 3:14, 3:15, 3:16, 3:17, 3:17, 3:18, 3:19, 3:19, 3:20, 3:20, 3:21, 47:15, 50:13, 54:21, 58:14, 74:18, 77:10, 80:12, 82:5, 94:12, 110:19, 126:11, 131:21, 137:15, 145:1, 150:10, 157:10, 161:19, 169:1, 173:16
**lead** [3] - 63:10, 75:23, 107:12
**lead-up** [3] - 63:10, 75:23, 107:12
**Leah** [1] - 4:16
**learned** [1] - 144:1
**least** [21] - 12:21, 20:12, 41:10, 69:15, 78:2, 78:22, 85:3, 90:9, 93:8, 117:11, 140:18, 144:1, 147:9, 147:23, 152:3, 152:5, 157:2, 172:14, 181:15, 181:19, 185:23
**leave** [2] - 19:21, 38:20
**leaves** [1] - 139:15
**leaving** [1] - 96:11
**left** [1] - 167:3
**legal** [4] - 130:24, 138:20, 142:2, 158:11
**legal/financial** [1] - 175:16
**legislation** [1] - 21:21
**legislative** [3] - 101:21, 178:2, 178:5
**Legislative** [1] - 99:13
**legislators** [1] - 177:21
**legislature** [3] - 113:9, 177:21, 179:6
**lengthy** [2] - 74:22, 169:5
**Leon** [30] - 5:4, 9:3, 9:4, 10:1, 11:14, 19:23, 22:4, 26:23, 34:2, 36:19, 36:20, 47:4, 47:18, 47:25, 49:10, 55:5, 67:13, 69:2, 69:9, 89:18, 89:20, 91:2, 95:12,

95:24, 96:1, 96:5, 97:1, 147:9, 155:21, 184:7
**LEON** [5] - 1:3, 188:4, 189:4, 190:5, 191:2
**less** [9] - 29:21, 64:24, 66:6, 66:9, 129:2, 129:7, 156:1, 156:19, 167:21
**lessen** [1] - 168:21
**letter** [12] - 23:14, 35:7, 35:9, 56:23, 56:24, 73:17, 77:25, 78:2, 78:4, 129:2, 149:20, 190:16
**LETTER** [1] - 3:24
**letters** [3] - 23:6, 73:12, 131:5
**level** [5] - 140:16, 143:4, 151:5, 151:13, 167:10
**lever** [2] - 10:7, 10:10
**Liberties** [1] - 2:3
**license** [2] - 28:9, 29:3
**liens** [1] - 90:21
**light** [5] - 106:21, 106:25, 107:13, 131:17, 151:14
**likelihood** [1] - 69:17
**likely** [14] - 59:16, 64:24, 66:9, 76:12, 103:6, 103:10, 103:14, 103:16, 112:9, 163:2, 167:22, 170:14, 181:17, 184:25
**limited** [5] - 40:10, 40:25, 182:5, 182:16, 186:11
**line** [3] - 28:5, 88:10, 88:19
**LINE** [15] - 191:6, 191:7, 191:8, 191:9, 191:10, 191:11, 191:12, 191:13, 191:14, 191:15, 191:16, 191:17, 191:18, 191:19, 191:20
**Line** [1] - 182:1
**lines** [4] - 12:25, 34:22, 86:2, 89:6
**links** [1] - 166:22
**list** [13] - 33:24, 39:13, 48:17, 49:21, 49:24, 51:6, 52:4, 52:11, 75:2, 93:12,

98:3, 138:16, 159:13
**listed** [7] - 47:17, 138:14, 139:22, 151:3, 152:16, 152:18, 190:16
**listening** [2] - 47:8, 47:12
**lists** [3] - 48:17, 49:16, 60:12
**load** [3] - 26:7, 156:10
**lobbying** [2] - 21:22, 177:17
**lobbyist** [1] - 178:6
**local** [6] - 20:2, 34:23, 49:10, 63:23, 85:20, 147:2
**locally** [2] - 81:18, 175:6
**locate** [1] - 172:9
**log** [5] - 147:1, 147:4, 147:5, 147:7, 147:10
**log-in** [2] - 147:4, 147:5
**log-ins** [3] - 147:1, 147:7, 147:10
**Logan** [1] - 14:5
**logical** [1] - 105:3
**logistical** [1] - 10:14
**logistics** [1] - 19:25
**LONDA** [1] - 4:20
**Londa** [1] - 4:20
**long-term** [1] - 95:1
**look** [26] - 14:19, 25:4, 27:17, 27:24, 34:22, 40:3, 43:1, 43:16, 47:21, 58:20, 59:11, 64:12, 78:6, 104:5, 124:20, 126:23, 139:10, 140:15, 141:14, 146:13, 146:22, 149:5, 152:24, 154:20, 157:19, 165:3
**look-up** [1] - 146:13
**looked** [4] - 39:2, 44:14, 84:1, 185:21
**looking** [7] - 25:5, 43:1, 75:18, 78:16, 81:12, 136:3, 149:11
**looks** [8] - 32:21, 52:24, 77:19, 77:25, 78:13, 99:20, 158:13, 165:2
**loud** [1] - 75:8
**Lunch** [1] - 136:24

**M**

**machine** [2] - 10:9, 11:21
**machines** [3] - 10:7, 10:10, 10:22
**mail** [89] - 2:6, 2:10, 2:14, 3:21, 16:7, 29:21, 36:10, 36:11, 46:23, 47:3, 47:13, 54:16, 55:8, 74:17, 75:1, 75:4, 75:15, 75:16, 77:11, 77:20, 79:6, 79:16, 79:20, 80:5, 80:12, 82:5, 82:18, 83:13, 83:14, 83:22, 83:24, 92:2, 94:12, 94:22, 95:9, 96:2, 98:2, 98:10, 121:15, 126:10, 126:17, 127:1, 132:3, 132:4, 132:11, 132:13, 132:16, 132:23, 132:24, 133:12, 134:18, 137:9, 137:14, 137:16, 137:25, 138:7, 138:8, 139:9, 147:17, 150:15, 150:24, 153:10, 157:9, 157:16, 157:22, 157:25, 159:10, 160:5, 160:13, 162:2, 162:5, 162:8, 169:5, 169:7, 171:17, 171:18, 172:1, 174:1, 174:13, 174:19, 174:23, 175:1, 179:13, 179:14, 180:3, 180:4, 190:4
**mailing** [2] - 47:4, 80:17
**mailings** [2] - 161:1
**mails** [8] - 12:22, 74:23, 126:15, 132:1, 134:17, 136:21, 166:19, 171:8
**main** [4] - 27:17, 92:19, 111:22, 145:17
**maintaining** [1] - 22:8
**maintenance** [4] - 47:24, 55:15, 55:22
**major** [1] - 156:1
**majority** [3] - 15:18, 151:25, 170:9
**maker** [1] - 22:21
**Management** [1] - 11:1

manager [5] - 11:9, 11:22, 11:23, 23:23, 46:25
manages [1] - 25:22
Manatee [1] - 5:11
manner [4] - 74:22, 90:19, 91:6, 113:18
Manpower [1] - 10:5
March [2] - 36:20, 155:22
Marconnet [11] - 46:23, 47:3, 47:14, 77:24, 83:4, 83:6, 106:19, 132:4, 157:17, 157:23, 159:9
Maria [10] - 12:22, 75:2, 75:6, 75:21, 100:8, 132:3, 132:11, 137:25, 144:6, 179:15
Mark [6] - 5:1, 5:2, 5:3, 9:3, 19:13, 175:2
MARK [10] - 1:13, 2:11, 3:4, 6:19, 188:9, 189:8, 190:1, 190:1, 191:4, 191:24
mark [9] - 12:4, 16:14, 82:1, 94:11, 97:23, 99:10, 126:9, 137:13, 144:24
marked [30] - 12:7, 16:20, 19:15, 38:3, 46:20, 47:13, 50:16, 54:23, 58:16, 74:20, 77:15, 80:14, 82:9, 94:15, 97:21, 99:16, 110:22, 118:2, 126:13, 131:23, 137:19, 145:3, 150:13, 157:14, 161:21, 169:3, 171:14, 173:18, 174:22, 179:17
marking [1] - 157:8
markings [1] - 145:5
marks [1] - 146:7
Marshall [10] - 66:3, 68:20, 89:25, 90:1, 90:2, 90:6, 91:9, 91:21, 180:25, 181:9
Mary [1] - 12:20
match [15] - 28:11, 34:1, 39:7, 39:11, 39:16, 48:13, 49:13, 49:22, 53:12, 53:18, 102:1, 102:20, 172:5, 172:25, 173:9
matched [1] - 31:5
Matches [1] - 3:10
matches [10] - 28:12, 46:15, 47:4, 47:17,

48:12, 50:1, 84:5, 84:7, 84:9, 172:16
matching [3] - 33:24, 48:15, 173:10
material [2] - 46:22, 52:7
materials [1] - 20:7, 61:18
matter [1] - 101:15
Matthews [22] - 12:23, 75:2, 75:15, 75:21, 100:8, 100:14, 101:2, 103:23, 104:18, 105:22, 106:8, 106:17, 106:24, 107:13, 111:7, 132:3, 144:6, 175:10, 179:15, 179:22, 180:1
Matthews' [5] - 121:17, 122:13, 132:11, 132:24, 137:25
Matz [1] - 94:23
mean [23] - 20:4, 41:15, 44:2, 48:14, 51:24, 57:18, 70:4, 71:17, 81:22, 93:23, 98:21, 117:14, 121:4, 123:12, 136:7, 151:3, 154:6, 154:8, 156:17, 165:17, 168:14, 182:3, 185:16
meaning [3] - 36:3, 68:17, 101:18
means [12] - 76:2, 123:11, 123:12, 135:16, 135:17, 158:7, 158:8, 160:19, 165:7, 165:21, 183:25, 184:1
meant [1] - 112:3
mechanical [1] - 9:16
Mechanical [2] - 9:19, 9:20
mechanism [1] - 114:2
media [5] - 88:21, 90:23, 96:12, 96:13, 111:9
medication [1] - 8:17
meet [2] - 24:20, 83:16
Meeting [1] - 3:18
meeting [4] - 88:4, 88:18, 93:20, 144:24
meetings [1] - 92:24
member [1] - 147:7
members [8] - 13:25,

14:2, 23:9, 26:9, 26:12, 83:7, 106:7, 178:5
memo [2] - 52:3, 179:23
Memorandum [1] - 3:10
memorandum [6] - 50:11, 50:12, 50:13, 50:18, 51:3, 53:3
memory [3] - 78:7, 124:16, 146:2
mental [2] - 32:2, 32:16
mentally [5] - 27:9, 28:1, 52:19, 52:20
mention [1] - 105:22
mentioned [35] - 13:24, 14:16, 17:12, 17:21, 19:8, 21:7, 22:5, 29:24, 30:5, 30:12, 33:11, 39:18, 39:23, 40:9, 40:14, 43:5, 43:6, 45:7, 48:18, 52:1, 65:11, 68:19, 85:3, 89:16, 104:11, 104:18, 115:21, 116:1, 119:10, 138:6, 144:5, 148:11, 168:4, 177:16, 186:20
mentioning [1] - 56:1
mentions [1] - 111:23
message [3] - 98:12, 98:16, 137:24
Messer [3] - 1:16, 2:12, 190:2
met [2] - 18:24, 93:3
method [1] - 116:10
mherron@lawfla.com [2] - 2:14, 190:4
Miami [3] - 5:15, 47:5, 47:25
Miami-Dade [2] - 5:15, 47:5
Michael [2] - 98:2, 98:4
mid-2008 [1] - 11:5
middle [3] - 146:16, 146:18, 148:11
Middle [1] - 148:13
middle-of-the-road [2] - 146:16, 146:18
midstream [1] - 76:15
might [43] - 8:20, 15:19, 17:3, 30:14, 41:3, 47:7, 47:9, 50:9,

51:14, 52:18, 53:24, 57:1, 57:8, 65:4, 69:6, 76:10, 78:7, 84:18, 85:10, 86:1, 87:9, 108:3, 113:5, 113:9, 114:14, 116:22, 117:22, 124:8, 129:13, 131:11, 136:20, 139:24, 141:16, 150:3, 154:14, 156:15, 165:15, 170:9, 175:3, 180:2, 181:1, 185:19
Mike [2] - 5:15, 98:24
mile [1] - 62:5
Miller [1] - 12:22
Miller's [2] - 39:3, 42:21
mind [5] - 5:17, 67:3, 90:23, 130:3, 134:1
mine [2] - 100:2, 147:4
minimum [1] - 181:8
minute [1] - 82:20
minutes [2] - 82:23, 176:18
mischaracterizing [1] - 45:9
misdemeanor [11] - 44:16, 44:19, 136:9, 136:10, 138:18, 138:25, 139:12, 139:25, 152:19, 154:10, 172:12
misdemeanors [1] - 173:7
misinformation [1] - 172:13
missing [3] - 96:18, 139:18, 160:8
misspeak [1] - 35:17
mistaken [2] - 49:13, 117:8
mistakenly [1] - 53:9
mistakes [4] - 43:16, 48:19, 62:7, 130:11
misunderstood [1] - 154:5
mixed [1] - 112:20
model [1] - 119:24
modified [2] - 15:13, 17:1
moment [14] - 25:16, 50:20, 58:19, 80:10, 80:23, 82:11, 94:11, 99:23, 117:24, 132:1, 136:19, 166:25, 180:13, 187:3
mon [1] - 109:18
Monday [3] - 36:25,

75:1, 75:5
monetary [3] - 122:7, 123:5, 186:16
money [1] - 103:17
monies [1] - 180:20
Monroe [1] - 2:9
month [5] - 86:25, 108:23, 109:18, 118:14, 174:1
months [5] - 48:3, 53:22, 68:8, 107:21, 113:4
Moore [3] - 14:8, 15:5, 82:6
Moore's [3] - 174:23, 174:25, 176:9
MORALES [2] - 6:8, 6:12
Morales [2] - 6:8, 6:12
MORALES-DOYLE [2] - 6:8, 6:12
Morales-Doyles [1] - 6:12
morally [1] - 45:5
morning [4] - 4:2, 6:5, 7:1, 75:6
most [10] - 8:1, 10:17, 27:22, 38:25, 73:14, 73:21, 150:20, 151:22, 172:2, 175:25
Mostly [1] - 14:4
mostly [3] - 83:2, 127:2, 171:8
Motor [1] - 33:1
motor [1] - 33:2
move [13] - 8:13, 31:22, 53:1, 75:24, 81:16, 128:20, 131:20, 144:2, 145:23, 150:8, 157:5, 161:18, 176:16
moved [2] - 31:24, 32:1
moving [4] - 55:5, 135:18, 152:1, 152:8
MR [99] - 4:2, 4:12, 4:18, 4:20, 4:22, 5:1, 5:3, 5:5, 5:6, 5:15, 5:16, 6:8, 6:12, 6:14, 6:16, 6:25, 12:2, 12:8, 16:13, 16:21, 19:13, 19:16, 37:24, 38:4, 46:13, 46:21, 47:6, 47:10, 47:16, 50:10, 50:17, 54:15, 54:20, 54:24, 58:10, 58:17, 74:16, 74:21, 75:7, 75:10, 77:10, 77:16, 80:9, 80:15, 82:1,

82:10, 82:16, 82:20, 82:22, 82:25, 94:10, 94:16, 97:22, 99:10, 99:17, 110:18, 110:23, 117:22, 118:3, 120:5, 120:14, 126:9, 126:14, 131:20, 131:24, 136:25, 137:13, 137:20, 144:21, 145:4, 150:8, 150:14, 155:11, 155:13, 157:8, 157:15, 161:18, 161:22, 163:18, 163:19, 163:20, 163:21, 163:23, 163:24, 164:1, 166:24, 167:2, 168:24, 169:4, 171:7, 171:15, 171:23, 173:14, 173:19, 176:14, 176:19, 176:21, 179:12, 179:18

**MS** [5] - 4:14, 4:16, 5:8, 5:10, 5:13

**murder** [13] - 17:17, 18:20, 71:12, 73:18, 87:15, 102:14, 102:15, 105:12, 110:5, 110:8, 149:12, 175:15, 185:1

**must** [4] - 57:14, 87:21, 148:22, 183:2

## N

**NAACP** [1] - 93:16
**name** [15] - 4:3, 4:22, 5:17, 6:11, 9:1, 11:3, 11:17, 14:6, 28:12, 39:7, 40:5, 89:24, 92:20, 116:13, 190:16
**names** [3] - 25:15, 51:8, 159:14
**national** [1] - 9:23
**nature** [2] - 107:17, 130:25
**necessarily** [13] - 14:18, 57:15, 97:4, 125:19, 129:24, 130:18, 140:20, 141:4, 141:8, 158:9, 162:11, 165:16, 166:1
**necessary** [3] - 127:19, 151:22, 180:14
**need** [30] - 8:8, 18:24, 27:21, 35:1, 43:1, 75:11, 81:22,

123:21, 124:19, 128:4, 128:6, 128:8, 129:11, 129:13, 129:20, 137:22, 143:11, 145:20, 147:20, 149:14, 154:14, 159:11, 174:14, 175:3, 177:11, 177:13, 179:5, 180:2, 181:3, 184:23
**needed** [6] - 39:1, 127:25, 148:16, 167:22, 178:24, 179:25
**needs** [1] - 43:5
**negative** [2] - 39:6, 39:11
**never** [1] - 95:15
**New** [4] - 2:5, 3:16, 122:5, 123:3
**new** [20] - 22:11, 24:22, 66:7, 76:11, 86:21, 86:22, 104:20, 111:24, 113:1, 114:9, 117:23, 118:8, 118:21, 121:19, 121:20, 133:13, 137:3, 145:14, 156:10, 156:23
**news** [4] - 64:23, 68:11, 71:16, 111:9
**next** [6] - 36:18, 86:25, 87:22, 141:14, 153:3, 164:5
**nice** [1] - 41:16
**NICHOLAS** [1] - 2:8
**nicholas.primrose @eog.myflorida.com** [1] - 2:10
**Nick** [1] - 6:16
**night** [1] - 117:1
**nine** [2] - 36:24, 48:3
**NO** [3] - 1:5, 190:7, 191:3
**None** [1] - 161:13
**none** [2] - 42:16, 45:14
**normal** [2] - 42:21, 100:23
**normally** [1] - 123:7
**NORTHERN** [1] - 1:1
**Northern** [2] - 9:10, 9:12
**NOT** [1] - 191:1
**Notary** [1] - 188:18
**note** [4] - 28:19, 69:20, 112:3, 155:20
**noted** [4] - 25:9, 112:24, 139:22, 165:5

**notes** [9] - 118:4, 121:2, 122:2, 125:9, 132:24, 152:12, 155:14, 169:16, 189:11
**notetaker** [1] - 144:13
**nothing** [1] - 6:22
**Notice** [1] - 3:8
**notice** [15] - 12:4, 12:10, 35:10, 35:22, 36:3, 36:8, 36:9, 41:11, 45:23, 55:6, 55:20, 57:21, 60:10, 120:4, 190:8
**notification** [2] - 55:12, 56:23
**notified** [1] - 56:16
**notify** [2] - 29:25, 55:8
**notifying** [1] - 33:16
**November** [14] - 54:20, 62:25, 63:6, 63:18, 67:16, 77:19, 78:1, 81:8, 103:11, 105:23, 106:22, 108:18, 155:23
**November's** [1] - 107:12
**nuisance** [1] - 52:25
**Number** [1] - 3:10
**number** [23] - 28:8, 28:10, 29:1, 31:5, 46:14, 47:4, 47:9, 54:13, 72:7, 101:2, 127:6, 135:5, 136:4, 136:5, 136:12, 149:19, 156:6, 160:22, 160:24, 161:3, 161:7, 165:10
**NUMBER** [1] - 3:7
**numbers** [3] - 5:23, 46:18, 136:3
**NY** [1] - 2:5

## O

**OATH** [2] - 3:23, 188:1
**Objection** [1] - 120:5
**objection** [3] - 5:19, 7:22, 7:24
**obligation** [8] - 108:25, 122:9, 123:18, 123:23, 176:25, 181:2, 182:24, 185:10
**obligations** [39] - 17:3, 18:24, 19:2, 39:5, 42:17, 72:12,

87:25, 88:8, 89:2, 89:8, 89:18, 90:3, 91:4, 102:25, 103:3, 103:24, 104:7, 105:20, 106:8, 107:11, 107:24, 108:12, 124:2, 143:23, 144:1, 175:17, 177:12, 180:16, 181:7, 183:2, 183:8, 184:21, 185:3, 185:6, 185:19, 186:5, 186:13, 186:16
**obstacle** [1] - 27:18
**obtained** [2] - 42:7, 164:21
**obvious** [2] - 94:5, 148:2
**Obviously** [3] - 5:25, 83:9, 126:18
**obviously** [7] - 6:1, 60:6, 88:12, 137:21, 153:6, 156:23, 172:22
**occasion** [1] - 54:7
**occur** [1] - 52:2
**occurred** [5] - 59:22, 120:21, 157:12, 166:23, 180:10
**occurrence** [1] - 56:18
**occurring** [1] - 66:25
**October** [4] - 47:25, 48:11, 55:18, 77:19
**odanjuma@aclu. org** [1] - 2:6
**OF** [18] - 1:1, 1:6, 1:7, 1:13, 2:1, 3:1, 3:6, 3:23, 188:1, 188:3, 188:4, 189:1, 189:3, 189:4, 190:6, 191:2
**offenders** [3] - 17:10, 122:8, 164:16
**offense** [25] - 17:18, 18:21, 60:7, 71:12, 102:17, 105:12, 105:13, 136:10, 138:15, 139:11, 139:22, 140:3, 140:16, 140:19, 141:3, 151:5, 152:17, 152:19, 154:10, 158:16, 163:1, 164:6, 165:10, 172:11, 185:1
**offenses** [3] - 102:14, 138:14, 141:15
**office** [91] - 10:3, 10:6, 10:18, 12:23, 14:4, 15:8, 17:7,

19:18, 23:23, 24:1, 24:15, 24:17, 24:20, 25:10, 26:4, 26:12, 30:13, 30:19, 31:13, 31:14, 32:15, 32:19, 33:5, 34:3, 34:24, 38:13, 40:17, 41:6, 45:14, 46:16, 46:25, 48:20, 50:8, 50:14, 51:16, 54:7, 54:14, 55:6, 55:8, 55:10, 55:19, 56:10, 58:12, 58:22, 58:23, 59:18, 59:19, 59:21, 59:24, 60:5, 61:11, 61:18, 62:22, 63:19, 67:15, 83:16, 83:18, 84:10, 88:2, 90:16, 94:13, 94:24, 96:11, 96:20, 100:8, 107:18, 108:10, 108:16, 121:18, 126:11, 132:2, 137:10, 141:13, 142:3, 144:25, 145:16, 146:21, 147:4, 148:16, 148:19, 150:16, 151:19, 163:15, 166:9, 169:17, 176:4, 179:14, 180:5, 186:23
**Office** [1] - 2:8
**office's** [1] - 174:13
**officer** [2] - 72:23, 108:2
**offices** [3] - 10:21, 128:25, 143:12
**Official** [1] - 138:16
**official** [6] - 11:24, 60:16, 74:12, 133:4, 144:12, 161:10
**OFFICIAL** [3] - 1:6, 190:6, 191:2
**officially** [1] - 136:10
**officials** [1] - 133:3
**often** [2] - 7:17, 144:9
**Old** [1] - 3:9
**old** [16] - 10:10, 11:7, 11:19, 18:22, 30:23, 37:25, 66:5, 112:1, 114:24, 121:3, 121:4, 121:5, 121:13, 121:18, 121:23, 121:25
**ON** [1] - 191:1
**once** [6] - 30:6, 31:10, 34:18, 66:20, 93:9, 140:18
**one** [71] - 6:7, 8:10,

15:6, 21:7, 21:20, 22:15, 22:16, 36:8, 36:9, 40:22, 41:10, 54:14, 56:21, 59:5, 70:13, 75:1, 80:10, 82:3, 83:7, 89:5, 89:6, 90:15, 92:2, 92:22, 94:2, 94:11, 95:4, 99:6, 105:13, 112:20, 113:6, 113:8, 117:4, 117:24, 118:12, 121:19, 121:20, 122:21, 124:15, 126:17, 127:13, 136:20, 136:21, 138:13, 139:13, 139:21, 141:17, 144:9, 146:11, 147:2, 148:4, 152:16, 153:7, 163:5, 166:18, 168:9, 168:16, 170:10, 172:9, 172:13, 172:14, 174:1, 176:1, 181:1, 184:24, 185:2, 186:20, 187:3

**One** [7] - 28:7, 56:22, 78:15, 99:23, 130:22, 158:6, 171:10

**one-stop** [2] - 89:5, 89:6

**ones** [11] - 14:16, 15:22, 24:1, 115:3, 135:14, 135:19, 150:4, 151:25, 152:5, 159:21, 170:12

**ongoing** [1] - 107:21

**online** [8] - 5:21, 27:16, 90:18, 119:16, 119:20, 119:24, 120:3, 122:8

**Online** [1] - 24:23

**open** [1] - 92:3

**Open** [2] - 87:12, 87:14

**operate** [1] - 130:6

**operating** [2] - 67:1, 128:18

**opinion** [9] - 60:17, 69:8, 124:12, 128:18, 130:4, 130:5, 172:3, 174:14

**opportunity** [2] - 80:20, 138:2

**opposed** [2] - 21:11, 44:19

**option** [1] - 148:18

**Order** [1] - 184:4

**order** [11] - 16:7, 41:20, 61:2, 114:15, 124:7, 134:5, 164:22,

168:6, 181:4, 181:5, 183:6

**ordered** [14] - 182:6, 182:8, 182:11, 182:13, 182:14, 183:1, 183:3, 185:8, 185:10, 186:2, 186:6, 186:8, 186:9, 186:19

**ordering** [1] - 190:13

**ordinary** [2] - 26:22, 126:5

**organization** [1] - 92:19

**organizations** [2] - 92:18, 116:14

**orgs** [1] - 93:3

**original** [2] - 145:6, 190:13

**originate** [1] - 58:21

**Orion** [2] - 4:3, 4:10

**ORION** [1] - 2:3

**otherwise** [1] - 142:2

**ourselves** [1] - 84:24

**out-of-state** [7] - 40:20, 40:23, 41:6, 41:10, 42:2, 135:23, 148:8

**outlaid** [1] - 107:19

**outlined** [3] - 57:12, 93:5, 111:17

**outlining** [1] - 179:24

**outreach** [5] - 10:16, 20:5, 95:4, 97:2, 121:25

**Outreach** [1] - 122:23

**outside** [4] - 32:8, 85:1, 110:9, 183:19

**outstanding** [5] - 105:20, 107:11, 107:24, 108:12, 177:12

**overall** [3] - 85:25, 156:16, 165:10

**overseeing** [3] - 19:25, 20:1, 20:2

**oversimplify** [1] - 158:22

**own** [17] - 13:25, 62:10, 67:3, 76:6, 76:21, 84:8, 84:9, 84:10, 85:5, 86:10, 109:5, 114:9, 114:22, 141:7, 141:9, 164:4, 168:5

## P

**p.m** [1] - 1:15

**PA** [3] - 1:16, 2:12,

190:2

**packet** [13] - 38:14, 38:18, 39:10, 40:19, 43:4, 85:23, 110:3, 143:17, 147:21, 148:14, 152:21, 164:4, 166:12

**packets** [54] - 13:6, 13:7, 13:13, 25:2, 35:2, 42:11, 60:8, 73:3, 73:5, 73:10, 75:23, 76:9, 77:5, 81:6, 84:1, 86:21, 86:22, 86:24, 102:8, 102:11, 104:13, 130:9, 132:17, 134:3, 135:4, 137:4, 142:23, 143:10, 143:15, 144:23, 145:14, 149:19, 151:23, 152:16, 156:7, 156:24, 158:1, 158:24, 159:5, 159:16, 160:23, 161:2, 162:1, 163:14, 165:17, 166:5, 168:15, 168:22, 169:17, 169:19, 172:9, 172:14, 175:12, 176:5

**PAGE** [18] - 3:3, 3:7, 3:24, 191:6, 191:7, 191:8, 191:9, 191:10, 191:11, 191:12, 191:13, 191:14, 191:15, 191:16, 191:17, 191:18, 191:19, 191:20

**page** [32] - 19:10, 28:19, 55:2, 55:3, 60:6, 60:23, 61:2, 101:9, 111:20, 122:4, 126:17, 127:12, 133:3, 133:17, 134:14, 137:23, 138:14, 145:5, 147:16, 147:20, 148:4, 148:9, 149:14, 153:12, 154:13, 154:20, 169:8, 172:9, 174:7, 181:23, 182:1, 185:5

**Pages** [1] - 1:12

**pages** [17] - 19:12, 82:12, 104:5, 111:10, 111:12, 138:16, 142:16, 145:20, 145:25, 146:9, 146:12, 146:19, 146:23, 148:15,

158:17, 184:4, 189:9

**paid** [4] - 87:21, 87:24, 88:7, 89:1

**panel** [2] - 94:3, 113:4

**paper** [2] - 10:12, 35:12, 121:25

**paragraph** [19] - 47:21, 55:1, 59:3, 60:2, 60:13, 80:17, 80:19, 81:11, 83:13, 84:4, 86:17, 87:11, 98:11, 111:23, 122:3, 132:24, 171:25, 175:1, 179:22

**Paragraph** [1] - 153:24

**paragraphs** [1] - 58:19

**parameters** [2] - 20:9, 30:22

**parenthesis** [1] - 111:25

**parole** [14] - 44:17, 45:9, 45:15, 72:9, 87:17, 92:4, 92:9, 102:6, 104:17, 125:23, 182:17, 186:2, 186:12, 186:13

**part** [55] - 12:21, 13:2, 20:14, 22:10, 23:14, 25:13, 30:3, 30:18, 30:23, 38:25, 42:4, 65:12, 66:13, 73:14, 73:21, 81:2, 95:24, 95:25, 96:5, 103:3, 107:3, 112:9, 114:10, 114:20, 119:7, 134:6, 139:8, 139:9, 139:18, 143:17, 145:11, 147:21, 153:12, 165:11, 170:11, 172:2, 173:20, 177:16, 178:4, 182:6, 182:9, 182:11, 182:13, 183:3, 183:10, 184:13, 184:17, 185:8, 185:10, 185:18, 185:19, 185:22, 186:3, 186:5, 186:9

**partaking** [1] - 115:18

**partial** [1] - 140:7

**participate** [1] - 5:21

**particular** [3] - 70:21, 101:6, 141:20

**particularly** [1] - 162:1

**parties** [2] - 49:1, 189:14

**parties'** [1] - 189:15

**parts** [2] - 16:17, 19:21

**party** [5] - 52:5, 52:8, 52:12, 53:19, 84:23

**pass** [1] - 113:9

**passage** [13] - 62:20, 62:21, 63:13, 64:11, 64:16, 64:25, 65:13, 73:5, 73:8, 73:9, 80:4, 92:15, 155:6

**passed** [4] - 37:8, 62:23, 178:4, 178:11

**passing** [1] - 78:21

**passive** [1] - 86:8

**past** [9] - 17:5, 37:16, 43:14, 114:3, 114:19, 134:3, 154:18, 156:24, 179:23

**Pause** [1] - 187:4

**pause** [9] - 12:25, 13:3, 13:13, 73:5, 76:19, 87:3, 87:9, 102:10, 136:19

**paused** [2] - 13:8, 76:8

**pay** [4] - 124:9, 177:13, 183:3, 186:3

**payment** [4] - 124:2, 182:10, 182:12, 186:8

**PDF** [1] - 55:24

**penalties** [1] - 191:22

**pending** [6] - 8:11, 30:16, 30:21, 77:5, 79:2, 135:17

**people** [52] - 25:13, 27:22, 31:12, 31:22, 44:9, 47:7, 48:17, 49:24, 53:8, 63:24, 64:2, 64:6, 65:3, 67:1, 72:2, 79:14, 81:5, 94:4, 96:25, 97:12, 100:23, 102:13, 102:18, 110:8, 113:14, 113:17, 113:22, 114:3, 114:6, 114:10, 114:25, 115:12, 115:13, 115:22, 116:7, 117:3, 117:10, 117:16, 119:12, 131:4, 135:22, 135:23, 159:5, 162:23, 163:22, 164:9, 165:7, 173:11, 181:6

**people's** [3] - 45:4,

175:5, 180:16
**per** [1] - 35:7
**Per** [1] - 55:10
**percent** [17] - 67:18,
125:3, 135:12,
145:25, 162:11,
162:22, 164:7, 165:7,
165:16, 165:18,
165:24, 168:13,
168:15, 169:23,
170:22, 176:7, 186:4
**percentage** [6] -
161:4, 161:9, 164:24,
168:21, 168:22,
181:14
**perception** [1] -
160:14
**percolate** [1] - 85:21
**performing** [1] -
142:2
**Perhaps** [1] - 8:1
**perhaps** [3] - 18:2,
57:19, 150:20
**period** [19] - 38:21,
46:1, 48:11, 49:3,
59:9, 59:18, 61:1,
62:20, 77:4, 81:24,
90:3, 93:15, 110:10,
111:15, 155:20,
160:21, 160:23, 176:6
**periodic** [1] - 33:24
**perjury** [1] - 191:22
**person** [15] - 23:18,
29:15, 39:25, 64:17,
102:1, 126:5, 133:1,
142:10, 143:21,
149:9, 151:4, 152:9,
154:16, 170:16,
170:18
**person's** [2] - 81:13,
143:23
**personally** [1] -
188:10
**persons** [1] - 136:14
**perspective** [5] -
43:10, 43:13, 84:17,
85:16, 117:12
**pertain** [2] - 15:22,
41:3
**pertinent** [1] - 24:25
**petition** [2] - 10:17,
26:7
**phase** [10] - 101:24,
105:10, 105:17,
105:18, 106:21,
108:23, 108:25,
109:24, 175:11,
175:23
**Phase** [21] - 102:12,
102:13, 104:12,

109:17, 109:20,
109:21, 109:22,
109:25, 110:1, 110:4,
110:5, 110:11,
110:15, 132:12,
132:14, 133:12,
175:14, 175:16,
175:22, 176:6
**phased** [4] - 101:23,
102:10, 102:12,
175:21
**phases** [5] - 101:23,
104:11, 111:16,
175:11, 176:1
**phasing** [1] - 102:21
**phone** [10] - 4:9, 5:5,
5:16, 5:18, 6:9, 47:8,
47:12, 82:23, 95:13,
119:2
**Phone** [4] - 2:5, 2:10,
2:13, 190:3
**phonetic** [3] - 5:10,
5:13, 15:6
**phonetic)** [2] - 4:20,
12:20
**piece** [1] - 160:6
**pieces** [1] - 28:7
**pin** [1] - 106:10
**pipeline** [1] - 81:5
**PLACE** [1] - 1:16
**place** [14] - 26:23,
37:7, 41:20, 61:17,
73:13, 86:5, 86:21,
89:6, 115:8, 133:4,
140:3, 142:15, 155:5,
173:4
**Place** [3] - 1:16,
2:12, 190:2
**places** [2] - 10:14,
57:10
**plaintiff** [2] - 6:13,
184:7
**Plaintiff's** [2] - 50:15,
80:13
**plaintiffs** [6] - 1:4,
4:4, 4:13, 4:15, 4:17,
4:19
**Plaintiffs** [2] - 1:14,
2:2
**plaintiffs'** [2] - 4:10,
12:4
**Plaintiffs'** [26] - 12:6,
16:19, 19:14, 38:2,
46:19, 54:22, 58:15,
74:19, 77:14, 82:8,
94:14, 97:20, 99:15,
110:21, 118:1,
126:12, 131:22,
137:18, 145:2,
150:12, 157:13,

161:20, 169:2,
171:13, 173:17,
179:16
**plan** [16] - 62:22,
63:5, 63:19, 98:21,
101:11, 101:21,
101:22, 103:8,
104:10, 107:14,
107:15, 107:19,
108:15, 109:24,
179:23
**planned** [1] - 175:10
**planning** [1] - 107:1
**plans** [1] - 71:5
**play** [1] - 178:12
**playing** [1] - 175:4
**plea** [1] - 44:19
**pleadings** [1] -
143:25
**pled** [3] - 44:16,
54:5, 136:8
**plot** [1] - 56:14
**plus** [1] - 172:14
**point** [26] - 11:7,
12:3, 20:25, 23:9,
25:14, 30:9, 34:17,
35:8, 87:22, 88:10,
88:19, 89:4, 100:19,
105:3, 107:2, 112:25,
119:13, 125:2, 129:8,
146:25, 153:3, 154:6,
155:4, 156:9, 175:6,
183:24
**points** [4] - 111:2,
140:18, 150:23, 175:2
**policies** [4] - 61:17,
64:4, 142:14, 161:12
**policy** [2] - 20:15,
21:8, 21:9, 21:10,
133:13, 133:20,
134:11, 138:9,
142:21, 146:3,
149:22, 161:14
**polling** [1] - 10:13
**portion** [7] - 50:20,
152:5, 159:20,
176:25, 181:2,
181:15, 182:3
**portions** [2] - 106:8,
182:19
**posed** [3] - 119:18,
120:8, 134:8
**position** [4] - 9:1,
11:19, 53:4, 129:11
**positions** [1] - 10:18
**possibilities** [1] -
37:21
**possible** [13] - 7:15,
19:18, 65:22, 69:4,
69:10, 69:12, 70:17,

79:19, 119:11,
120:22, 167:7,
176:17, 180:8
**possibly** [1] - 186:2
**post** [4] - 49:2, 97:5,
128:5, 129:17
**potential** [10] -
12:19, 38:12, 52:7,
52:17, 85:16, 119:3,
125:16, 125:17,
133:6, 143:11
**potentially** [20] -
19:1, 22:18, 24:3,
31:4, 49:23, 51:7,
58:7, 79:21, 86:1,
92:14, 113:17, 129:2,
136:7, 139:13,
142:11, 147:1, 149:6,
159:22, 170:6, 183:5
**PowerPoint** [6] -
3:15, 99:12, 99:18,
100:13, 101:5, 144:16
**practice** [2] - 85:4,
167:16
**practices** [2] -
142:14, 160:12
**PRATT** [1] - 4:22
**Pratt** [1] - 4:22
**pre** [6] - 31:9, 46:9,
49:3, 58:2, 61:1,
114:18
**pre-Amendment** [4]
- 46:9, 49:3, 58:2,
61:1
**pre-register** [1] -
31:9
**pre-vetting** [1] -
114:18
**preceding** [1] - 178:8
**predecessor** [1] -
11:16
**prefer** [1] - 140:25
**preference** [1] -
36:21
**Premier** [1] - 11:3
**preparation** [2] -
13:23, 14:3
**preparations** [1] -
78:20
**prepare** [2] - 12:14,
12:15
**preparing** [4] - 10:6,
10:13, 96:11, 96:13
**prescribed** [1] -
57:14
**present** [12] - 24:8,
52:21, 117:2, 119:2,
131:1, 135:11,
143:10, 146:4, 148:3,
149:4, 149:24

**presentation** [12] -
99:12, 99:18, 100:7,
100:14, 101:7,
101:12, 108:21,
109:13, 111:6,
121:17, 122:14, 144:7
**Presentation** [1] -
3:15
**presentations** [2] -
71:7, 142:8
**presented** [19] - 8:5,
12:18, 23:4, 43:21,
44:10, 64:1, 101:2,
107:16, 119:19,
130:15, 130:23,
139:16, 141:11,
141:12, 142:8,
143:10, 144:6, 147:21
**presenting** [5] -
62:16, 103:13,
124:17, 159:5
**preserved** [1] - 7:25
**president** [3] - 20:24,
20:25
**president-elect** [1] -
20:24
**presidential** [2] -
36:20, 155:22
**press** [1] - 179:7
**presumably** [1] -
172:24
**presume** [1] - 168:12
**pretrial** [1] - 97:12
**pretty** [12] - 29:12,
33:20, 34:11, 35:16,
39:10, 49:9, 52:15,
66:8, 100:16, 104:8,
117:20, 122:19
**prevailing** [1] - 69:15
**prevalent** [1] - 65:2
**previous** [6] - 10:22,
38:21, 46:25, 73:24,
124:14, 143:10
**Previously** [1] -
20:22
**previously** [10] -
26:13, 33:12, 81:20,
98:5, 116:9, 122:8,
123:3, 167:21,
167:22, 172:10
**pri** [1] - 92:19
**primarily** [10] - 14:8,
17:2, 18:17, 22:13,
24:18, 32:3, 32:5,
32:20, 39:24, 71:18
**primary** [2] - 34:16,
36:21
**PRIMROSE** [2] - 2:8,
6:16
**Primrose** [1] - 6:16

**principle** [1] - 61:15
**printed** [1] - 28:13
**priorly** [1] - 64:18
**prison** [1] - 102:5
**privacy** [2] - 114:15, 114:16
**pro** [1] - 96:1
**probation** [35] - 23:20, 44:17, 44:19, 45:9, 45:15, 71:24, 72:9, 72:18, 72:23, 76:18, 87:17, 92:4, 92:9, 102:6, 104:15, 108:2, 125:23, 139:1, 143:25, 151:3, 151:7, 154:8, 154:9, 154:15, 160:1, 175:14, 175:25, 177:4, 177:10, 182:7, 182:16, 186:2, 186:11, 186:19
**problem** [5] - 25:8, 29:6, 30:4, 107:5, 115:3
**problematic** [7] - 30:2, 112:1, 113:2, 113:21, 114:8, 171:1
**problems** [2] - 19:4, 52:25
**procedure** [4] - 85:2, 86:5, 86:8, 134:21
**procedures** [6] - 12:16, 51:10, 59:19, 61:11, 61:17, 81:4
**proceed** [6] - 35:23, 81:3, 104:2, 147:24, 149:17, 152:1
**proceeded** [1] - 149:22
**proceeding** [4] - 24:2, 132:14, 133:13, 152:5
**Proceedings** [1] - 187:5
**proceedings** [4] - 23:13, 62:12, 86:9, 170:24
**process** [70] - 13:17, 14:10, 16:7, 18:19, 18:23, 23:14, 26:23, 27:12, 28:6, 29:11, 33:15, 34:7, 34:12, 36:12, 36:17, 37:4, 37:15, 38:11, 43:3, 48:19, 50:2, 50:3, 51:8, 55:15, 55:23, 56:15, 56:17, 57:3, 57:6, 57:12, 61:3, 73:11, 73:15, 73:21, 76:2, 76:13, 76:14,

76:20, 78:17, 84:15, 84:16, 84:18, 85:22, 86:14, 98:19, 99:3, 99:5, 107:19, 109:9, 114:18, 115:18, 117:20, 118:22, 120:4, 121:22, 131:17, 135:18, 147:18, 147:22, 148:13, 149:23, 150:4, 156:18, 172:4, 172:18, 173:25, 175:3, 175:20, 176:10
**processed** [1] - 117:16
**processes** [4] - 81:15, 85:11, 85:23, 128:6
**processing** [5] - 13:18, 73:7, 76:9, 83:10, 102:9
**produce** [2] - 107:1, 164:22
**produced** [5] - 14:16, 50:14, 58:24, 74:23, 137:10
**produces** [1] - 128:14
**producing** [2] - 16:16, 20:6
**production** [2] - 14:25, 48:6
**Professional** [1] - 189:6
**program** [3] - 9:14, 106:22, 186:3
**programming** [3] - 10:10, 10:13, 20:1
**progressed** [1] - 55:22
**progressing** [2] - 22:19, 67:2
**progression** [1] - 20:23
**projected** [1] - 109:18
**promise** [1] - 35:19
**promul** [1] - 120:2
**promulgated** [3] - 118:12, 118:14, 118:21
**proof** [5] - 60:10, 127:13, 127:18, 162:24, 165:8
**proper** [3] - 32:9, 120:1, 120:17
**propo** [1] - 112:24
**pros** [1] - 66:11
**prosecute** [1] - 66:11
**prosecuted** [12] -

64:9, 64:20, 65:7, 65:15, 65:20, 65:22, 65:25, 66:24, 69:5, 70:5, 108:4, 117:8
**prosecutes** [1] - 117:4
**prosecution** [10] - 69:18, 69:22, 70:1, 70:4, 70:7, 70:18, 70:21, 94:7, 116:23, 116:25
**prosecutions** [5] - 66:5, 66:6, 66:7, 66:14, 66:25
**protect** [1] - 45:4
**protecting** [1] - 19:5
**protective** [1] - 41:20
**proud** [1] - 128:22
**prove** [5] - 66:4, 66:10, 69:6, 127:23, 129:25
**proven** [1] - 104:6
**provide** [23] - 5:23, 7:14, 9:1, 9:5, 21:1, 32:15, 80:1, 80:2, 91:10, 107:14, 108:16, 109:15, 133:14, 134:12, 135:8, 144:17, 146:3, 166:4, 167:17, 178:25, 179:23, 180:15
**provided** [26] - 14:20, 17:18, 19:9, 41:7, 42:20, 43:2, 47:4, 47:18, 48:12, 48:13, 49:1, 49:4, 52:5, 69:3, 71:7, 84:19, 109:24, 131:16, 135:3, 158:2, 158:14, 179:9, 180:4, 180:6, 181:22, 184:6
**provides** [2] - 115:4, 143:4
**providing** [9] - 7:14, 14:13, 20:12, 127:18, 141:6, 166:20, 168:4, 174:15, 179:25
**proving** [1] - 130:17
**provision** [4] - 18:4, 19:10, 62:23, 124:5
**provisions** [3] - 18:5, 103:25, 179:24
**Public** [1] - 188:18
**public** [6] - 20:7, 64:2, 64:8, 71:10, 96:4, 130:3
**publicly** [2] - 74:3, 74:6
**pull** [2] - 14:11,

148:15
**pulled** [1] - 121:21
**pulls** [1] - 115:5
**purpose** [2] - 106:3, 132:18
**purposes** [1] - 104:24
**pursuant** [4] - 56:11, 100:4, 125:21, 133:7
**Put** [1] - 88:14
**put** [11] - 16:18, 30:2, 57:19, 61:17, 74:5, 76:14, 95:16, 103:7, 103:17, 121:20, 125:9
**puts** [1] - 128:15
**putting** [6] - 26:25, 53:13, 57:7, 78:16, 79:14, 121:23

## Q

**qualifications** [3] - 27:4, 37:11, 37:12
**qualified** [2] - 117:6, 117:7
**qualifying** [4] - 10:16, 20:3, 139:5, 177:11
**quantify** [2] - 146:20, 180:21
**questionable** [2] - 81:13, 81:21
**questions** [28] - 4:24, 7:13, 21:1, 21:3, 21:18, 26:22, 26:24, 36:16, 44:22, 78:23, 79:3, 87:12, 87:14, 90:23, 114:19, 114:20, 119:18, 134:9, 134:25, 135:2, 135:6, 135:7, 167:5, 171:9, 173:21, 176:24, 178:6, 180:11
**queue** [1] - 159:13
**quickly** [3] - 29:13, 29:22, 36:2
**quite** [7] - 19:9, 64:13, 93:5, 108:11, 130:2, 156:23, 185:15
**quizzical** [1] - 44:12
**quote** [1] - 86:19
**quotes** [3] - 117:11, 163:2, 169:23
**quoting** [1] - 84:6

## R

**race** [1] - 40:6
**Rachel** [4] - 94:22, 94:25, 95:5, 96:11

**Rackleff** [1] - 92:22
**radio** [1] - 93:8
**raise** [6] - 5:18, 7:22, 78:24, 78:25, 135:2, 175:8
**raised** [10] - 44:23, 134:25, 135:7, 139:20, 139:23, 154:6, 159:9, 159:24, 160:12, 166:13
**raises** [4] - 115:9, 116:12, 138:9, 138:13
**raising** [2] - 92:13, 140:1
**ran** [1] - 11:25, 39:12
**random** [1] - 156:25
**rare** [11] - 29:14, 32:7, 35:25, 58:4, 58:9, 64:8, 64:11, 64:16, 64:19, 66:14, 69:5
**rarity** [1] - 66:24
**rate** [12] - 156:25, 163:3, 165:16, 165:17, 165:23, 168:14, 168:15, 169:24, 170:23, 176:6
**rates** [1] - 156:16
**rather** [3] - 7:15, 41:23, 133:17
**raw** [1] - 164:14
**RE** [2] - 190:5, 191:2
**reach** [4] - 40:10, 40:13, 79:1, 121:12
**reached** [1] - 67:8
**reaching** [4] - 77:2, 77:6, 96:20, 96:22
**reaction** [1] - 65:12
**read** [33] - 14:7, 38:5, 50:22, 59:3, 59:14, 60:2, 75:7, 75:8, 75:11, 79:7, 80:21, 81:1, 84:13, 93:12, 94:21, 97:24, 122:16, 126:2, 126:4, 128:10, 128:21, 133:10, 141:2, 145:10, 148:13, 154:5, 158:18, 172:19, 185:16, 186:7, 190:10, 190:12, 191:22
**READ** [1] - 3:24
**readiness** [1] - 78:20
**reading** [5] - 83:22, 122:5, 127:10, 171:25, 190:14
**reads** [1] - 182:2
**ready** [1] - 6:4
**real** [3] - 50:3, 53:1,

104:6
**realistic** [1] - 177:23
**reality** [4] - 111:12,
138:25, 151:15,
168:15
**realize** [1] - 153:18
**realized** [1] - 121:21
**really** [33] - 12:24,
14:19, 21:10, 28:15,
32:11, 33:2, 37:1,
41:2, 41:14, 44:3,
52:13, 53:1, 63:2,
68:7, 77:6, 81:4,
83:24, 84:24, 92:12,
96:15, 98:22, 109:2,
109:23, 113:7, 119:5,
127:24, 135:24,
147:10, 154:20,
178:4, 178:16,
180:21, 184:24
**reason** [13] - 8:20,
14:5, 32:10, 41:22,
52:19, 78:24, 131:14,
135:22, 154:3,
154:13, 158:15,
159:3, 172:21
**reasons** [4] - 57:22,
117:19, 138:13,
158:25
**reassurances** [1] -
117:13
**reassured** [1] - 69:12
**recap** [1] - 177:1
**receive** [30] - 24:25,
25:3, 27:16, 35:3,
35:10, 41:10, 43:4,
48:7, 52:7, 52:16,
55:10, 55:20, 59:20,
64:22, 84:1, 84:25,
98:12, 98:25, 128:2,
130:10, 135:13,
135:14, 135:19,
152:20, 156:4, 156:6,
167:10, 168:8, 172:5,
172:16
**Received** [1] - 58:13
**received** [50] - 24:10,
34:11, 34:17, 39:13,
42:8, 42:16, 45:24,
46:15, 48:8, 49:12,
51:16, 52:2, 55:6,
56:6, 56:16, 58:11,
59:23, 73:3, 73:12,
75:22, 77:18, 82:4,
86:22, 94:13, 99:12,
100:4, 100:6, 100:8,
100:19, 103:6, 110:3,
110:8, 110:14, 114:5,
114:20, 126:10,
126:16, 132:2,

136:13, 137:14,
143:15, 144:25,
160:22, 161:2,
168:17, 169:17,
176:5, 179:13,
183:24, 184:2
**receives** [1] - 48:16
**receiving** [7] - 44:12,
57:3, 68:5, 144:23,
145:15, 160:17,
172:25
**recent** [1] - 157:2
**recently** [5] - 23:18,
34:6, 54:6, 85:12,
95:14
**recess** [3] - 82:24,
136:24, 176:20
**recognize** [4] - 53:3,
59:11, 110:24, 182:18
**recollect** [4] - 59:25,
63:3, 63:12, 80:8
**recollection** [3] -
8:23, 26:16, 105:4
**recommence** [3] -
87:3, 104:19, 132:17
**recommendations**
[1] - 107:1
**record** [27] - 6:15,
7:25, 9:2, 11:15,
32:24, 38:17, 53:18,
54:16, 55:22, 63:25,
82:15, 82:20, 82:21,
88:14, 118:7, 136:22,
136:23, 151:3, 151:8,
157:7, 163:12,
166:24, 167:1, 171:9,
171:20, 173:20,
189:11
**Record** [3] - 1:24,
190:10, 190:20
**recording** [1] - 144:7
**records** [13] - 32:2,
34:1, 42:6, 42:11,
55:25, 90:15, 91:15,
91:17, 91:18, 123:17,
181:15, 181:16
**red** [2] - 113:12,
113:17
**redacted** [3] -
159:13, 159:18, 160:9
**reduces** [1] - 74:24
**refer** [15] - 17:7,
33:19, 36:13, 51:18,
51:23, 51:25, 69:21,
70:3, 70:17, 94:6,
111:10, 111:11,
141:1, 185:2
**reference** [3] - 69:20,
73:4, 87:1
**referenced** [1] - 67:7

**references** [1] -
118:19
**referencing** [2] -
95:18, 114:21
**referrals** [1] - 66:7
**referred** [2] - 69:25,
135:15
**referring** [6] - 70:8,
97:11, 133:23,
133:25, 180:1, 186:13
**refers** [1] - 140:23
**reflect** [3] - 140:20,
141:5, 141:8
**refresh** [2] - 78:7,
146:2
**regard** [1] - 18:13
**regarding** [9] -
18:20, 75:2, 77:4,
80:18, 93:17, 102:15,
128:14, 161:25
**regardless** [2] -
66:24, 102:17
**regards** [1] - 78:21
**regime** [3] - 37:7,
66:5, 66:7
**register** [13] - 27:5,
27:12, 31:9, 59:4,
64:2, 65:15, 71:1,
71:22, 72:17, 100:23,
107:9, 117:7, 119:12
**Registered** [1] -
189:6
**registered** [39] -
17:4, 27:19, 28:5,
29:15, 30:9, 31:11,
33:22, 33:23, 46:1,
46:7, 49:6, 53:12,
59:6, 63:24, 64:6,
64:17, 64:19, 65:4,
67:5, 67:17, 67:24,
70:15, 76:11, 81:6,
81:7, 94:8, 102:1,
107:10, 107:23,
108:5, 108:6, 114:3,
115:14, 115:15,
116:8, 127:24, 130:1,
152:22, 159:6
**registering** [12] -
19:23, 27:4, 31:8,
64:9, 67:2, 92:15,
98:17, 114:7, 116:4,
123:15, 125:17, 156:7
**registers** [1] - 117:3
**registration** [40] -
10:15, 17:15, 17:23,
18:13, 22:6, 22:8,
22:11, 23:10, 24:22,
24:23, 26:23, 27:8,
27:18, 27:23, 28:21,
29:23, 30:7, 33:25,

36:22, 37:18, 37:25,
48:16, 55:14, 55:24,
59:7, 70:16, 93:17,
98:13, 98:25, 113:11,
113:13, 114:17,
114:23, 118:8,
119:17, 120:3,
156:10, 156:16,
180:20
**Registration** [4] -
3:9, 3:16, 27:15,
112:5
**registrations** [2] -
22:11, 24:22
**reinitiated** [2] - 34:7
**reinstated** [1] - 87:16
**rejoining** [1] - 137:2
**relate** [4] - 17:3,
18:8, 52:3, 136:21
**related** [12] - 13:12,
32:14, 37:5, 37:11,
37:12, 109:1, 110:15,
111:25, 113:1, 118:5,
177:3, 179:24
**relates** [3] - 20:11,
42:17, 103:24
**relating** [3] - 12:23,
25:2, 127:3
**relationships** [1] -
67:12
**relative** [3] - 90:17,
189:13, 189:15
**relatively** [7] - 85:12,
85:18, 105:5, 121:24,
156:24, 164:23, 169:5
**release** [5] - 122:6,
123:3, 132:21,
175:25, 182:5
**released** [1] - 122:8
**relevant** [2] - 19:10,
77:12
**reliability** [2] - 44:5,
159:4
**reliable** [26] - 25:5,
35:6, 43:6, 43:9,
43:14, 44:25, 45:25,
51:14, 57:7, 61:8,
62:14, 62:17, 84:21,
87:23, 88:6, 88:25,
89:7, 89:12, 91:6,
128:24, 131:17,
141:7, 151:14, 153:1,
174:15
**rely** [2] - 28:20,
129:11
**relying** [4] - 165:6,
165:12, 166:3, 170:25
**remain** [1] - 76:11
**remaining** [2] -
122:7, 123:4

**remember** [41] -
16:8, 16:10, 37:1,
41:13, 47:1, 49:19,
52:13, 72:7, 77:6,
78:18, 79:8, 79:10,
81:2, 83:21, 83:23,
88:9, 91:12, 92:17,
93:19, 95:13, 96:24,
102:16, 102:22,
104:4, 104:25,
107:17, 111:5,
112:15, 116:13,
116:17, 116:18,
120:11, 122:25,
134:24, 135:10,
145:23, 161:13,
162:5, 162:20, 164:10
**remembering** [1] -
170:8
**remind** [1] - 37:10
**reminding** [1] -
47:11
**removal** [16] - 13:17,
35:24, 51:7, 56:22,
61:3, 62:12, 73:12,
78:17, 84:16, 86:9,
128:3, 128:7, 131:16,
150:5, 170:24, 172:18
**removals** [2] - 73:7,
84:10
**remove** [6] - 24:5,
35:15, 51:11, 59:6,
60:11, 127:19
**removed** [9] - 46:10,
49:11, 54:8, 55:14,
55:23, 56:10, 56:20,
68:2, 76:19
**removing** [2] - 13:16,
51:9
**RENCHEN** [1] - 1:23,
188:17, 189:6,
189:21, 190:19
**Repeat** [1] - 107:3
**repeat** [2] - 30:17,
93:21
**repeatedly** [1] -
117:1
**rephrase** [1] - 107:5
**replacement** [1] -
118:13
**report** [7] - 60:12,
88:17, 103:14,
103:15, 105:23,
106:18, 189:8
**reported** [3] - 23:17,
68:11, 88:22
**REPORTER** [3] -
6:11, 155:9, 189:1
**Reporter** [5] - 1:23,
188:17, 189:7,

189:21, 190:19
**reporter** [3] - 5:20, 6:2, 7:19
**REPORTER'S** [1] - 3:24
**Reporting** [3] - 1:24, 190:10, 190:20
**reporting** [2] - 20:3, 20:4, 88:18
**represent** [2] - 4:21, 23:5
**representatives** [1] - 172:23
**request** [1] - 147:17
**requested** [3] - 14:12, 145:24, 146:3
**REQUESTED** [1] - 189:10
**require** [6] - 44:25, 60:8, 60:9, 60:22, 147:10, 156:5
**required** [10] - 28:7, 32:12, 45:1, 45:5, 52:23, 61:1, 62:11, 140:15, 142:5, 185:6
**requirement** [2] - 124:8, 183:19, 183:20
**requirements** [4] - 38:23, 56:11, 76:8, 93:24
**requires** [4] - 60:5, 122:6, 123:3, 182:24
**requiring** [1] - 18:22
**reread** [1] - 153:20
**research** [30] - 34:21, 40:24, 42:3, 42:13, 43:22, 44:7, 71:25, 129:10, 136:2, 136:6, 139:14, 142:3, 143:4, 143:11, 146:24, 147:14, 148:7, 151:19, 151:22, 152:2, 152:6, 159:3, 166:15, 166:22, 167:8, 168:5, 168:10, 171:4, 173:3, 173:13
**researchers** [1] - 151:11
**researching** [1] - 143:6
**residency** [2] - 30:15, 52:19
**resident** [4] - 27:6, 27:12, 31:1, 31:2
**resolve** [1] - 152:20
**resources** [10] - 67:21, 129:7, 130:8, 143:3, 155:17, 155:25, 171:3, 171:5,

177:3, 179:2
**respond** [5] - 35:9, 56:23, 57:14, 57:20, 84:19
**responds** [1] - 23:15
**response** [22] - 7:17, 24:4, 50:14, 55:10, 55:12, 78:5, 79:1, 82:18, 88:11, 95:14, 96:23, 100:11, 114:23, 120:9, 135:14, 135:20, 159:8, 159:10, 160:12, 172:2, 173:24
**responses** [3] - 28:19, 99:25, 135:13
**responsibilities** [5] - 19:19, 22:15, 22:17, 59:5, 83:8
**responsibility** [1] - 22:10
**responsible** [4] - 10:9, 61:24, 119:21, 124:2
**responsive** [1] - 84:17
**rest** [2] - 79:7, 123:6
**restarted** [1] - 169:18
**restitution** [8] - 42:11, 42:18, 72:2, 72:12, 87:21, 182:11, 183:10, 185:17
**restoration** [5] - 17:18, 55:16, 55:21, 64:21, 128:3
**restored** [18] - 23:21, 27:10, 28:3, 34:9, 37:14, 37:23, 38:9, 64:10, 67:4, 67:23, 71:15, 107:22, 112:18, 114:1, 117:6, 121:7, 125:21, 154:23
**restores** [1] - 55:17
**restricted** [1] - 33:7
**restrictions** [1] - 19:4
**resulted** [2] - 55:23, 66:6
**results** [2] - 159:15, 164:22
**resume** [2] - 86:24, 103:6
**resumed** [1] - 11:7
**resumption** [2] - 102:11, 135:4
**retired** [1] - 11:11
**return** [12] - 13:22, 16:16, 33:14, 35:22, 36:3, 57:13, 100:17, 121:1, 122:1, 125:13,

144:22, 190:16
**returned** [2] - 36:3, 173:11
**returning** [4] - 12:17, 17:4, 17:10, 19:1
**review** [55] - 13:17, 14:15, 23:11, 25:4, 31:4, 31:15, 31:18, 33:24, 35:2, 35:5, 35:20, 39:3, 42:20, 43:4, 45:1, 48:9, 48:19, 50:21, 51:10, 51:12, 52:21, 56:15, 56:17, 61:18, 61:19, 72:4, 75:3, 75:8, 75:25, 76:21, 79:24, 80:23, 82:12, 93:14, 94:17, 126:18, 126:21, 129:2, 130:9, 130:12, 132:1, 132:6, 137:15, 137:21, 138:2, 145:7, 150:24, 151:6, 161:23, 169:10, 173:16, 173:23, 177:2, 179:19, 189:9
**Reviewed** [1] - 12:15
**reviewed** [11] - 12:19, 12:21, 12:22, 13:12, 14:19, 79:6, 123:22, 134:3, 151:23, 166:19, 182:20
**reviewing** [4] - 42:11, 83:1, 140:13, 162:6
**Reviews** [20] - 50:24, 59:13, 75:13, 78:12, 80:25, 94:20, 97:25, 122:18, 126:25, 127:9, 132:8, 138:4, 145:9, 154:1, 157:20, 162:4, 169:12, 171:21, 174:10, 179:20
**reviews** [2] - 26:5, 34:18
**reworking** [3] - 159:11, 159:16, 159:21
**rights** [23] - 17:19, 19:5, 23:21, 27:10, 28:3, 34:9, 37:14, 37:22, 54:2, 55:17, 55:21, 62:1, 64:10, 64:21, 67:4, 67:23, 112:18, 113:25, 117:6, 121:7, 125:21, 154:23, 183:14
**Rights** [2] - 92:21,

122:23
**risk** [8] - 116:23, 116:25, 142:1, 142:4, 142:9, 142:17, 142:20, 142:22
**road** [4] - 146:16, 146:18, 148:11, 148:13
**role** [5] - 20:19, 22:3, 22:5, 83:10, 177:16
**roles** [2] - 21:8, 83:10
**roll** [1] - 4:7
**rolls** [17] - 22:8, 24:5, 31:16, 31:19, 33:7, 35:15, 46:6, 46:10, 49:12, 51:11, 54:9, 55:15, 55:24, 59:7, 68:2, 76:19, 131:6
**Ron** [2] - 6:16, 21:18
**RON** [3] - 1:6, 190:5, 191:2
**room** [2] - 4:8, 94:4
**rotation** [1] - 16:6
**rough** [1] - 46:11
**roughly** [11] - 19:12, 44:9, 48:3, 108:22, 109:19, 118:15, 150:2, 152:3, 153:5, 170:22, 175:19
**round** [1] - 158:25
**rule** [10] - 118:18, 118:22, 118:24, 118:25, 119:11, 120:4, 120:8, 120:21, 121:22
**Rule** [1] - 99:13
**rule-making** [8] - 118:22, 118:24, 118:25, 119:11, 120:4, 120:8, 120:21, 121:22
**Rule-Making** [1] - 99:13
**rules** [1] - 7:11
**run** [3] - 11:11, 28:23, 29:9
**running** [2] - 52:14, 180:23

## S

**S-A-N-C-H-O** [1] - 11:18
**Safety** [1] - 33:1
**Sancho** [1] - 11:18
**Sarasota** [1] - 5:11
**satisfied** [2] - 112:21, 183:6
**satisfy** [1] - 143:24

**saw** [5] - 37:21, 39:4, 106:12, 151:6, 185:21
**SB** [29] - 3:9, 15:16, 18:6, 18:12, 19:8, 25:25, 62:20, 93:17, 100:5, 100:7, 101:8, 103:25, 104:2, 105:6, 111:24, 118:5, 124:1, 155:6, 175:10, 176:25, 177:20, 178:19, 180:2, 180:7, 181:2, 181:21, 182:23, 186:25
**scale** [1] - 180:22
**schedule** [1] - 35:25
**scheduled** [1] - 35:13
**school** [1] - 9:8
**School** [2] - 9:10, 113:6
**screen** [25] - 43:20, 132:25, 133:4, 133:15, 134:13, 135:25, 136:1, 138:10, 138:23, 139:4, 139:8, 139:10, 139:18, 140:7, 140:11, 140:14, 140:19, 141:10, 141:11, 142:8, 142:9, 148:2, 149:7, 150:6, 168:6
**screens** [1] - 43:22
**scrutiny** [2] - 81:23, 115:5
**Sean** [2] - 6:8, 6:12
**search** [5] - 15:2, 15:11, 84:8, 173:8, 173:10
**searchable** [1] - 90:18
**searched** [1] - 15:19
**searches** [2] - 84:24, 85:5
**second** [24] - 47:6, 47:21, 55:1, 60:2, 78:19, 82:12, 88:23, 98:11, 105:10, 105:17, 108:24, 111:22, 112:17, 112:19, 121:21, 122:16, 132:23, 138:17, 140:1, 143:4, 149:15, 151:18, 169:8, 171:25
**second-hand** [1] - 88:23
**second-level** [1] - 143:4
**Secretary** [1] -

100:22
**secretary** [16] - 5:8, 20:21, 30:13, 30:19, 31:14, 32:15, 32:18, 33:5, 48:21, 48:23, 51:16, 51:23, 98:7, 98:24, 145:15, 180:5
**secretary's** [2] - 38:13, 41:6
**Section** [3] - 119:19, 133:7, 186:7
**section** [6] - 72:6, 77:18, 122:9, 123:18, 141:2, 169:15
**sections** [1] - 123:23
**secure** [1] - 147:3
**security** [3] - 28:10, 29:1, 31:5
**See** [1] - 133:3
**see** [43] - 12:15, 13:9, 15:21, 16:5, 21:22, 23:2, 23:4, 25:8, 25:14, 32:8, 32:10, 43:18, 48:2, 57:22, 60:18, 64:12, 70:14, 72:5, 76:6, 79:20, 80:24, 81:12, 82:14, 83:25, 87:13, 87:14, 95:18, 96:17, 97:3, 97:10, 115:2, 124:21, 126:23, 127:8, 128:1, 128:4, 129:20, 139:11, 149:6, 153:25, 167:9, 169:13, 185:3
**seeing** [1] - 152:25
**seem** [3] - 156:20, 168:22, 172:17
**selection** [2] - 146:16, 146:18
**Seminole** [2] - 98:5, 98:6
**Senate** [3] - 17:2, 17:21, 178:8
**send** [20] - 23:13, 25:7, 29:7, 34:2, 35:8, 36:8, 38:22, 39:6, 45:22, 85:23, 98:11, 128:25, 133:21, 135:1, 150:1, 152:23, 161:15, 166:16, 170:3, 175:12
**sending** [18] - 13:1, 13:3, 13:4, 13:13, 41:6, 43:19, 81:24, 86:24, 104:12, 132:17, 137:4, 163:5, 163:15, 165:22, 166:12, 167:6, 169:18, 173:5

**sends** [4] - 38:13, 156:14, 157:25, 159:9
**sense** [7] - 4:6, 8:15, 41:10, 89:11, 117:23, 180:17, 184:12
**sent** [30] - 12:10, 12:23, 13:5, 73:16, 78:3, 78:13, 78:18, 79:22, 100:22, 132:13, 142:15, 142:23, 149:19, 150:2, 152:4, 157:22, 158:24, 159:1, 159:21, 161:24, 162:2, 163:2, 163:21, 169:24, 170:10, 170:12, 170:22, 172:10, 172:14, 172:15
**sentence** [42] - 17:20, 23:22, 38:24, 60:16, 60:20, 64:14, 65:6, 67:5, 67:20, 67:24, 71:14, 71:17, 71:23, 72:3, 72:10, 72:17, 87:12, 94:9, 100:3, 103:4, 104:15, 109:1, 112:22, 122:7, 123:2, 123:5, 124:3, 125:23, 153:13, 153:15, 164:6, 177:5, 182:2, 182:3, 182:7, 182:9, 182:12, 182:14, 185:8, 185:11, 185:14, 186:9
**sentenced** [1] - 139:1
**Sentencing** [1] - 184:4
**sentencing** [34] - 38:22, 43:19, 74:5, 133:24, 134:2, 134:6, 134:8, 134:16, 134:18, 135:8, 140:25, 143:14, 143:17, 143:20, 153:4, 153:11, 158:11, 161:15, 179:3, 182:4, 183:1, 183:4, 183:5, 183:16, 184:1, 184:10, 184:13, 184:15, 184:17, 184:21, 185:2, 185:13, 185:18, 185:23
**separate** [2] - 140:1, 147:3
**separately** [1] - 128:6
**September** [2] -

50:11, 55:9
**series** [2] - 26:22, 137:9
**serve** [1] - 39:1
**served** [4] - 90:8, 90:13, 153:14, 154:16
**service** [3] - 19:3, 130:3, 183:7
**services** - 25:11, 26:13
**serving** [3] - 44:18, 153:14, 153:16
**session** [4] - 101:21, 112:7, 118:25, 178:23
**set** [6] - 16:14, 21:4, 21:8, 35:23, 36:5, 178:2
**sets** [2] - 38:19, 168:20
**setting** [3] - 31:16, 59:19, 79:16
**several** [11] - 17:25, 40:15, 46:12, 53:22, 92:24, 93:8, 119:1, 130:22, 141:17, 157:23, 158:1
**severity** [2] - 138:15, 141:15
**sex** [1] - 40:6
**sexual** [11] - 17:17, 18:21, 71:12, 73:19, 102:14, 102:16, 105:12, 110:6, 110:9, 175:15, 185:1
**Shannon** [1] - 9:3
**SHEET** [2] - 3:25, 191:1
**shop** [2] - 89:5, 89:6
**short** [1] - 171:9
**shot** [9] - 132:25, 136:1, 138:23, 139:4, 139:18, 140:7, 149:7, 150:6, 168:6
**shots** [10] - 43:20, 133:4, 133:15, 134:13, 136:1, 138:10, 139:10, 140:11, 140:14, 140:19
**SHOULD** [15] - 191:6, 191:7, 191:8, 191:9, 191:10, 191:11, 191:12, 191:13, 191:14, 191:15, 191:16, 191:17, 191:18, 191:19, 191:20
**shoulder** [1] - 57:9
**show** [9] - 35:24, 100:2, 122:10,

123:10, 123:13, 124:7, 130:14, 138:23, 159:13
**showed** [2] - 98:23, 173:13
**showing** [2] - 57:2, 140:7
**shown** [1] - 43:15
**shows** [3] - 36:1, 123:19, 139:9
**Shurina** [16] - 126:21, 127:6, 127:16, 129:16, 150:15, 155:14, 157:18, 157:22, 157:25, 158:13, 159:9, 161:24, 163:13, 166:13, 168:13, 174:5
**Shurina's** [5] - 152:12, 153:10, 164:20, 165:5, 172:1
**sic** [1] - 67:22
**side** [2] - 152:22, 159:12
**sign** [4] - 28:4, 190:11, 190:12, 190:15
**SIGN** [1] - 3:24
**signature** [3] - 190:9, 190:15, 190:21
**signed** [4] - 37:19, 112:8, 112:25, 118:5
**Signed** [1] - 188:13
**significant** [4] - 136:12, 142:4, 148:20, 180:20
**significantly** [1] - 142:21
**signing** [1] - 190:14
**similar** [2] - 69:14, 121:8
**Similarly** [1] - 54:2
**simple** [2] - 28:22, 30:11
**simpler** [1] - 60:11
**simply** [4] - 53:7, 57:20, 92:9, 134:13
**single** [8] - 61:11, 87:23, 88:6, 88:25, 89:3, 89:4, 89:11, 148:4
**singled** [1] - 116:11
**sitting** [2] - 88:12, 94:3
**situation** [4] - 58:2, 64:23, 120:24, 149:1
**situations** [3] - 79:14, 148:6, 149:9
**six** [1] - 11:5

**skeptical** [1] - 127:17
**sketchy** [1] - 135:21
**skip** [2] - 127:5, 182:10
**skipped** [2] - 96:9, 182:19
**slight** [1] - 23:1
**slightly** [1] - 105:11
**small** [5] - 28:6, 54:13, 95:23, 96:5, 143:6
**smaller** [2] - 129:7, 129:9
**smarter** [1] - 95:8
**social** [5] - 28:10, 28:25, 31:5, 96:12, 96:13
**SOE** [2] - 58:13, 75:2
**SOEs** [1] - 63:9
**sole** [1] - 166:8
**solely** [3] - 149:23, 150:5, 166:5
**solid** [1] - 165:7
**someone** [35] - 27:18, 32:4, 32:7, 35:25, 43:23, 51:11, 52:17, 56:6, 59:17, 60:17, 62:2, 64:8, 64:12, 64:25, 66:11, 70:7, 70:14, 70:17, 70:18, 92:8, 97:19, 98:23, 105:12, 124:8, 124:18, 136:6, 139:6, 144:10, 148:16, 149:15, 151:2, 165:23, 170:14, 175:23, 177:9
**sometimes** [8] - 20:12, 21:18, 30:3, 43:16, 49:25, 72:2, 130:11, 136:2
**Sometimes** [1] - 30:1
**Somewhat** [1] - 157:1
**somewhat** [8] - 44:1, 52:22, 56:18, 101:17, 118:10, 128:19, 156:17, 160:15
**somewhere** [3] - 32:1, 98:9, 123:15
**soon** [2] - 10:7, 85:18
**sophistication** [1] - 131:8
**sorry** [16] - 13:2, 13:9, 13:11, 15:10, 63:5, 64:13, 80:1, 83:14, 96:18, 99:11, 99:23, 107:6, 120:2,

123:3, 137:6, 174:13
**Sorry** [4] - 14:7, 95:6, 125:24, 155:10
**sort** [8] - 21:14, 41:22, 81:23, 91:24, 115:4, 128:7, 131:10, 132:13
**sought** [1] - 65:15
**sounds** [5] - 58:5, 103:22, 139:25, 184:18
**source** [11] - 85:1, 87:23, 88:6, 88:25, 89:3, 89:4, 89:12, 165:12, 165:21, 165:25, 166:2
**sources** [4] - 40:15, 103:9, 111:8, 181:19
**space** [2] - 15:16
**Spanish** [1] - 16:10
**speaker** [1] - 93:16
**speaking** [4] - 53:5, 69:13, 111:4, 116:5
**special** [1] - 97:8
**specific** [21] - 18:15, 27:20, 33:22, 41:16, 41:18, 41:24, 42:19, 44:22, 49:6, 91:12, 115:4, 116:2, 116:3, 118:18, 120:23, 122:19, 129:5, 134:10, 135:1, 168:25, 173:21
**specifically** [21] - 35:16, 43:24, 61:7, 63:24, 79:8, 81:4, 88:9, 97:5, 102:24, 108:20, 122:25, 123:1, 128:21, 129:8, 139:17, 140:5, 141:10, 143:22, 164:10, 177:25, 185:7
**specificity** [2] - 42:9, 159:17
**specifics** [3] - 41:13, 91:17, 102:23
**specified** [1] - 146:25
**specifies** [1] - 62:14
**specify** [1] - 138:15
**speeches** [1] - 93:4
**spell** [2] - 122:6, 123:4
**spent** [1] - 9:11
**sphere** [1] - 130:6
**spite** [1] - 54:9
**spotlight** [1] - 115:4
**spreadsheet** [1] - 168:5
**spring** [1] - 111:4

**Springfield** [1] - 9:9
**sta** [1] - 103:1
**staff** [65] - 12:16, 13:25, 14:2, 14:4, 14:9, 15:5, 15:8, 15:12, 22:13, 22:25, 23:9, 24:18, 24:20, 25:24, 26:4, 26:10, 26:18, 31:6, 34:3, 34:18, 34:25, 42:23, 43:15, 45:14, 59:17, 77:13, 83:7, 85:4, 88:5, 95:2, 95:4, 100:24, 101:19, 106:17, 110:3, 129:3, 129:7, 129:10, 130:2, 132:5, 137:8, 139:13, 139:20, 140:14, 141:13, 143:1, 143:3, 143:6, 146:12, 148:3, 148:20, 149:2, 149:11, 152:7, 153:4, 153:6, 154:6, 155:25, 159:3, 160:18, 172:22, 173:3, 180:10, 186:23
**staff's** [1] - 155:3
**stage** [1] - 30:16
**stamp** [10] - 5:23, 47:9, 54:21, 58:13, 97:24, 126:11, 131:21, 145:1, 150:10, 161:19
**stamped** [3] - 47:15, 50:13, 157:10
**stance** [1] - 146:10
**standard** [1] - 85:2
**standards** [2] - 60:4, 114:21
**start** [15] - 4:6, 7:3, 37:6, 102:7, 102:9, 105:4, 106:22, 108:23, 108:24, 131:16, 152:5, 162:16, 171:24, 175:4, 176:10
**started** [7] - 10:4, 113:10, 118:22, 125:12, 137:4, 144:23, 145:15
**starting** [5] - 6:6, 105:3, 126:11, 172:3, 178:23
**starts** [13] - 77:19, 80:12, 80:19, 82:4, 82:14, 82:17, 86:18, 87:12, 101:8, 111:23, 127:13, 137:15, 174:22
**state** [65] - 5:9, 9:24,

22:12, 25:7, 28:9, 32:5, 32:21, 33:18, 33:22, 40:20, 40:23, 41:4, 41:6, 41:10, 42:2, 48:21, 48:24, 49:12, 49:17, 51:23, 52:6, 52:12, 60:8, 61:5, 62:16, 65:9, 66:8, 68:7, 69:1, 69:9, 69:10, 69:16, 70:8, 73:11, 76:23, 85:19, 85:22, 85:24, 90:12, 91:20, 94:7, 98:7, 98:24, 99:6, 114:5, 117:2, 117:4, 125:22, 127:17, 127:20, 127:22, 135:23, 146:1, 148:8, 152:24, 156:12, 158:17, 163:20, 164:7, 164:24, 165:3, 167:14, 170:15, 170:24, 172:5
**State** [10] - 25:1, 31:2, 35:4, 55:7, 66:2, 68:23, 68:24, 69:13, 162:24, 188:18
**state's** [10] - 30:13, 30:19, 31:14, 32:15, 32:19, 33:5, 51:16, 128:6, 145:15, 180:5
**statement** [11] - 33:10, 37:20, 45:8, 81:19, 88:5, 89:19, 106:15, 129:25, 143:8, 161:10, 161:11
**statements** [2] - 113:6, 116:7
**STATES** [1] - 1:1
**states** [1] - 163:22
**statewide** [1] - 81:17
**stating** [2] - 23:17, 172:23
**Statistics** [1] - 32:20
**status** [20] - 12:16, 23:16, 34:5, 34:15, 65:5, 81:13, 87:19, 89:8, 92:6, 92:10, 103:2, 104:9, 107:21, 108:25, 109:10, 116:10, 118:9, 119:6, 122:5, 140:11
**statute** [13] - 35:18, 45:1, 52:23, 57:10, 62:13, 103:24, 119:7, 120:13, 182:2, 182:19, 182:20,

183:15, 185:5
**Statute** [3] - 55:11, 112:22, 133:8
**Statutes** [2] - 72:4, 140:23, 141:15
**statutes** [4] - 18:19, 18:20, 72:6, 102:15
**Statutorily** [1] - 65:24
**statutory** [1] - 101:20
**stay** [2] - 127:24, 130:1
**stenographic** [1] - 189:11
**stenographically** [1] - 189:8
**step** [2] - 51:22, 141:14
**Stephen** [13] - 5:6, 14:4, 25:19, 25:22, 54:17, 88:17, 106:18, 137:24, 139:19, 140:9, 150:18, 169:7
**steps** [7] - 30:13, 30:20, 62:22, 63:5, 63:19, 63:23, 141:17
**Steve** [2] - 47:1, 82:6
**still** [37] - 13:16, 18:18, 23:19, 34:16, 36:5, 44:11, 44:18, 62:7, 73:15, 73:20, 76:18, 86:21, 95:1, 102:2, 102:4, 102:17, 104:8, 104:14, 105:19, 110:6, 112:2, 120:6, 121:4, 121:13, 121:24, 132:20, 136:9, 142:11, 142:17, 149:9, 152:6, 152:9, 158:10, 161:14, 163:9, 173:12
**stop** [4] - 65:10, 76:2, 89:5, 89:6
**stoplight** [1] - 88:13
**stopped** [3] - 13:18, 73:6, 88:13
**story** [1] - 124:22
**straight** [1] - 16:4
**straightforward** [4] - 34:12, 64:21, 105:5, 176:1
**Street** [2] - 2:4, 2:9
**strict** [1] - 21:9
**striking** [1] - 172:2
**string** [1] - 126:23
**structure** [1] - 19:18
**stuff** [3] - 127:5, 136:21, 186:1
**Sub** [2] - 35:8, 57:13
**subject** [3] - 14:24,

16:2, 28:17
**submit** [1] - 51:8
**submitted** [1] - 74:11
**Subparagraph** [2] - 185:6, 185:7
**Subsection** [2] - 55:11, 133:7
**subsequent** [2] - 161:1, 161:2
**subsequently** [1] - 54:3
**substitute** [1] - 183:7
**such-and-such** [1] - 35:13
**sufficient** [2] - 170:23, 172:18
**suggest** [1] - 136:3
**suggesting** [2] - 170:4, 180:14
**suggestion** [2] - 148:12, 148:13
**summarize** [4] - 72:16, 75:16, 114:9, 158:23
**summarized** [1] - 150:20
**summarizes** [1] - 162:8
**summary** [2] - 100:13, 174:13
**summer** [1] - 111:15
**super** [2] - 103:19, 139:10
**supervised** [6] - 34:16, 110:7, 132:21, 133:1, 149:10, 175:25
**supervision** [25] - 23:20, 44:11, 71:18, 72:11, 72:19, 73:20, 76:18, 102:2, 102:5, 104:15, 136:10, 142:12, 151:2, 152:10, 154:25, 155:1, 159:6, 164:24, 165:3, 173:12, 175:14, 177:10, 182:15, 186:11, 186:20
**supervisor** [27] - 5:3, 10:1, 10:3, 11:6, 11:11, 11:14, 11:25, 15:25, 19:19, 22:3, 49:18, 50:19, 51:1, 59:21, 59:24, 62:10, 63:4, 80:1, 91:23, 95:6, 98:5, 98:6, 117:3, 130:14, 132:5, 157:3, 168:7
**Supervisor** [4] - 5:7, 5:11, 9:4, 12:5

**supervisor's** [1] - 48:20

**supervisors** [27] - 18:15, 20:16, 21:14, 21:16, 59:6, 60:22, 60:25, 61:6, 61:22, 62:8, 63:9, 75:17, 75:22, 77:3, 85:9, 98:3, 119:2, 120:19, 128:25, 132:3, 134:13, 167:7, 170:23, 171:5, 172:24, 178:12, 178:15

**supervisory** [1] - 110:10

**support** [1] - 170:13

**suppose** [2] - 37:24, 80:19

**supposed** [2] - 172:16, 172:25

**surprise** [1] - 118:20

**surrounding** [3] - 20:9, 42:1, 64:20

**Susan** [2] - 94:23, 95:14

**Susie** [2] - 95:4, 95:9

**swearing** [1] - 126:6

**switch** [2] - 62:19, 176:23

**switched** [1] - 10:12

**sworn** [3] - 6:21, 11:12, 188:11

**system** [15] - 11:21, 26:14, 32:25, 39:22, 89:13, 104:21, 117:10, 117:14, 117:15, 117:17, 142:17, 155:5, 156:23, 173:3, 173:4

**Systems** [1] - 11:1

**systems** [7] - 11:8, 11:9, 11:22, 11:23, 20:1, 91:20, 91:24

## T

**take-away** [1] - 105:25

**TAKEN** [2] - 1:15, 191:4

**talented** [1] - 150:19

**talks** [1] - 72:8

**Tallahassee** [5] - 1:17, 2:9, 2:13, 93:16, 190:3

**Tashia** [3] - 77:20, 77:22, 77:23

**tasked** [3] - 62:16, 109:7, 109:8

**TCC** [1] - 9:15

**team** [8] - 25:11, 25:13, 26:13, 138:19, 146:8, 147:7, 150:16

**temp** [1] - 10:4

**temper** [2] - 163:6, 165:13

**tempered** [2] - 148:1, 165:14

**temporary** [4] - 26:3, 26:5, 94:25, 95:1

**tend** [4] - 61:9, 143:1, 149:3, 157:1

**tends** [1] - 136:14

**tentative** [1] - 86:24

**term** [12] - 32:9, 46:3, 59:23, 72:3, 72:10, 95:1, 111:15, 162:22, 182:5, 182:7, 182:8, 184:14

**termination** [1] - 182:7

**terminology** [1] - 183:15

**terms** [34] - 13:23, 15:12, 16:25, 17:7, 17:14, 17:19, 23:22, 38:24, 40:10, 43:8, 45:11, 61:19, 65:6, 67:5, 67:19, 71:14, 71:17, 72:8, 73:2, 87:17, 87:20, 92:3, 94:9, 103:4, 103:23, 109:1, 112:21, 114:22, 122:7, 123:4, 125:23, 141:7, 182:2, 182:24

**test** [1] - 38:6

**testified** [6] - 6:22, 15:24, 16:6, 16:8, 16:10, 22:16, 28:20, 54:6, 66:23, 73:4, 87:2, 108:9, 132:11, 138:22, 143:2, 155:16, 175:22, 184:8

**testify** [3] - 8:21, 8:22, 86:4

**testifying** [3] - 20:10, 111:16, 170:3

**testimony** [3] - 16:2, 33:11, 142:14

**testing** [1] - 20:2

**text** [4] - 19:8, 181:21, 182:20

**THE** [13] - 1:6, 6:11, 46:17, 54:19, 75:9, 117:25, 120:7, 155:9, 155:10, 171:12, 171:21, 190:6, 191:2

**themselves** [2] -

**86:9, 140:19**

**thereafter** [1] - 10:8

**therefore** [4] - 65:7, 117:7, 136:9, 163:1

**Therefore** [1] - 133:8

**they've** [10] - 13:4, 13:5, 27:24, 41:7, 61:5, 109:24, 110:3, 116:8, 154:11, 163:4

**thinking** [1] - 148:25

**third** [17] - 52:5, 52:12, 80:16, 80:18, 83:13, 84:4, 84:23, 105:18, 112:19, 112:20, 122:4, 138:17, 150:2, 152:3, 152:12, 157:6, 165:2

**Thomas** [1] - 15:4

**thorough** [3] - 20:2, 34:21, 88:18

**thoughts** [1] - 111:8

**thousand** [1] - 11:4

**Three** [1] - 7:8

**three** [12] - 101:23, 104:11, 111:16, 112:14, 116:2, 119:5, 119:17, 119:18, 125:14, 155:14, 175:11, 176:1

**threshold** [2] - 53:23, 177:8

**throughout** [5] - 8:8, 9:21, 13:5, 90:12, 156:25

**Thursday** [1] - 159:10

**ti** [1] - 93:8

**TIME** [1] - 1:15

**timeframe** [3] - 47:22, 98:9, 109:12

**timeline** [3] - 56:19, 86:25, 112:6

**Tina** [1] - 5:13

**title** [2] - 11:24, 47:1

**titled** [3] - 58:12, 99:13, 184:4

**TO** [1] - 190:1

**today** [10] - 4:6, 7:2, 8:18, 8:21, 12:11, 18:3, 18:7, 93:22, 98:13, 99:1

**TODD** [1] - 5:6

**Todd** [1] - 5:6

**together** [3] - 66:21, 103:8, 103:9

**took** [6] - 63:5, 71:18, 141:14, 146:11, 155:14, 180:22

**top** [6] - 33:20,

**79:23, 112:6, 116:18, 151:13, 167:10**

**top-level** [2] - 151:13, 167:10

**TOPAZ** [1] - 4:12

**Topaz** [1] - 4:12

**topic** [1] - 145:17

**total** [1] - 100:18

**totally** [2] - 127:12, 163:24

**tough** [7] - 42:2, 42:3, 106:12, 117:20, 130:19, 130:21

**tougher** [1] - 40:22

**towards** [3] - 64:5, 103:17, 136:20

**track** [1] - 90:21

**tracked** [2] - 113:18, 113:23

**traffic** [1] - 88:13

**trained** [2] - 22:25, 45:15

**training** [4] - 10:22, 23:3, 138:20, 141:20

**transcript** [3] - 189:9, 189:10, 190:11

**TRANSCRIPT** [1] - 191:1

**translate** [2] - 165:19, 165:20

**transparent** [1] - 127:17

**treasurer** [1] - 20:22

**treasurers'** [1] - 20:3

**treasury** [1] - 20:4

**treat** [1] - 52:7

**treated** [4] - 81:9, 113:23, 114:1, 116:11

**treating** [1] - 114:6

**trial** [1] - 143:21

**tried** [2] - 38:6, 48:9

**tries** [1] - 34:3

**trivial** [1] - 180:19

**trouble** [1] - 92:20

**true** [15] - 54:11, 57:4, 57:25, 86:22, 99:7, 151:5, 152:9, 162:17, 168:19, 172:8, 173:2, 176:2, 176:4, 189:10, 191:23

**True** [5] - 57:4, 57:25, 86:15, 99:9, 171:6

**truly** [1] - 190:17

**truncated** [2] - 140:20, 141:4

**trust** [2] - 88:14, 117:12

**trusting** [1] - 124:11

**truth** [3] - 6:21, 6:22

**truthfully** [2] - 8:18, 8:21

**truthfulness** [1] - 60:19

**try** [17] - 7:16, 14:11, 15:11, 21:16, 29:25, 34:20, 36:14, 40:7, 51:22, 51:25, 107:25, 137:17, 141:14, 163:11, 163:24, 171:3, 176:17

**Trying** [1] - 14:18

**trying** [17] - 5:21, 13:14, 14:10, 21:21, 40:4, 52:24, 64:2, 65:1, 65:7, 93:23, 94:5, 96:3, 124:12, 124:23, 148:20, 167:25, 181:11

**turn** [1] - 31:10

**turned** [2] - 44:13, 94:7

**turns** [3] - 68:3, 108:4, 117:7

**twenty** [1] - 11:10

**Twenty** [1] - 36:24

**Twenty-nine** [1] - 36:24

**twice** [2] - 93:9, 140:18

**two** [27] - 9:11, 11:4, 40:14, 40:16, 45:11, 58:18, 68:8, 72:5, 78:15, 89:3, 108:24, 109:18, 113:4, 118:14, 136:13, 170:10, 171:7

**type** [10] - 34:8, 34:14, 41:5, 86:12, 140:12, 142:2, 147:14, 151:2, 167:19, 184:25

**types** [4] - 85:11, 91:9, 113:11, 131:4

**typically** [2] - 51:15, 129:3

## U

**U.S** [2] - 27:5, 28:3

**ultimate** [1] - 159:15

**ultimately** [1] - 152:4

**unambiguous** [1] - 43:7

**unambiguously** [1] - 138:19

**uncertain** [3] - 72:22, 118:10, 159:4

**uncertainty** [4] - 25:6, 68:16, 68:17,

**Undeliverable** [1] - 36:4

**undeliverable** [1] - 36:5

**under** [37] - 23:20, 24:2, 30:25, 31:12, 35:8, 37:4, 38:11, 44:11, 45:23, 50:1, 57:6, 58:2, 64:22, 66:5, 66:7, 73:20, 75:25, 76:10, 84:15, 85:3, 102:2, 102:5, 104:15, 104:20, 106:23, 114:24, 136:9, 142:12, 142:17, 152:10, 152:17, 155:1, 159:6, 173:12, 185:6, 186:25

**Under** [3] - 37:9, 62:9, 191:22

**undergone** [1] - 119:11

**underlying** [3] - 151:15, 167:17, 168:10

**underneath** [2] - 48:23, 168:5

**undersigned** [1] - 188:9

**Understood** [18] - 13:11, 14:21, 73:2, 74:7, 76:16, 87:10, 104:10, 110:13, 113:22, 117:18, 121:1, 122:1, 123:25, 125:1, 125:7, 134:22, 136:17, 173:14

**understood** [7] - 15:23, 72:2, 89:3, 89:13, 97:15, 106:3, 109:8

**undertake** [2] - 84:22, 131:3

**undertook** [1] - 141:18

**underway** [1] - 46:5

**unfair** [1] - 115:6

**Unfortunate** [1] - 54:11

**Unfortunately** [2] - 48:6, 58:23

**unfortunately** [2] - 82:2, 168:20

**Union** [1] - 2:3

**unique** [1] - 56:18

**UNITED** [1] - 1:1

**universe** [1] - 46:9

**unless** [8] - 7:22, 8:3, 69:22, 71:11, 165:24

84:22, 84:25, 94:5, 96:10

**unlikely** [1] - 66:3, 66:10, 70:6

**unnatural** [1] - 7:17

**unofficial** [1] - 161:11

**unpack** [2] - 65:11, 103:20

**unrelated** [1] - 144:3

**unusual** [1] - 56:19

**up** [50] - 14:11, 15:1, 18:1, 21:4, 23:8, 28:12, 34:22, 35:23, 35:24, 36:1, 36:16, 44:24, 49:13, 49:22, 56:21, 61:16, 62:9, 63:10, 63:14, 70:7, 73:1, 75:23, 78:18, 85:18, 97:7, 98:24, 104:8, 107:12, 110:25, 112:20, 116:20, 119:3, 119:9, 121:16, 131:10, 132:4, 134:9, 136:3, 139:21, 145:12, 146:13, 148:24, 149:5, 150:17, 166:15, 167:8, 178:2, 180:12, 180:22, 185:21

**upcoming** [4] - 20:8, 96:10, 155:21, 156:2

**update** [1] - 120:3

**updated** [3] - 119:21, 120:2, 120:20

**updates** [1] - 24:22

**updating** [1] - 22:5

**upgrading** [1] - 10:21

**ups** [1] - 136:18

**uses** [1] - 183:15

**Usztok** [15] - 14:5, 25:23, 54:17, 82:6, 82:18, 84:4, 89:10, 89:11, 92:2, 137:24, 138:13, 139:19, 169:16, 169:23, 170:15

**Usztok's** [6] - 47:2, 83:2, 83:13, 106:18, 138:7, 169:7

## V

**vaguely** [1] - 81:1

**VALDEZ** [1] - 5:15

**Valdez** [1] - 5:15

**validate** [7] - 39:17, 40:1, 43:24, 67:21,

101:25, 104:9, 107:25

**validating** [2] - 39:25, 40:4

**validation** [3] - 28:23, 30:8, 30:12

**value** [2] - 14:6, 43:17

**variation** [2] - 90:15, 160:25

**varies** [1] - 40:17

**various** [9] - 16:17, 20:11, 33:24, 93:9, 93:10, 124:14, 178:15, 179:1, 186:17

**vast** [1] - 170:8

**Vehicle** [1] - 33:2

**vehicle** [1] - 33:2

**vein** [1] - 110:13

**vendor** [2] - 10:25, 50:9

**verbal** [1] - 7:14

**verbally** [1] - 155:12

**verification** [1] - 10:17

**verify** [4] - 81:12, 84:20, 101:25, 104:20

**version** [9] - 27:16, 118:18, 118:20, 119:4, 119:16, 119:21, 121:8, 121:23, 139:1

**versus** [5] - 16:5, 47:5, 48:4, 72:11, 186:25

**vet** [1] - 21:3

**vetting** [5] - 28:6, 28:15, 114:18, 114:22, 163:3

**VI** [1] - 125:21

**via** [1] - 55:8

**vice** [1] - 20:24

**vice-president** [1] - 20:24

**victim** [1] - 182:11, 183:12

**victims'** [1] - 19:5

**video** [2] - 144:7, 144:11

**view** [9] - 23:3, 69:4, 69:11, 69:15, 106:23, 113:24, 116:22, 120:10, 179:4

**Virginia** [3] - 9:9, 9:10, 9:12

**visit** [1] - 83:3

**visited** [1] - 83:23

**visiting** [1] - 83:16

**visually** [1] - 15:21

**Vital** [1] - 32:20

**voice** [1] - 178:18

**VOLUME** [1] - 1:12

**Volume** [1] - 187:5

**voluntary** [1] - 21:14

**vote** [40] - 16:7, 16:9, 27:13, 30:9, 38:9, 44:8, 45:5, 46:1, 46:3, 55:17, 59:4, 63:24, 64:3, 64:6, 64:9, 64:17, 64:19, 65:15, 67:3, 70:15, 71:1, 71:15, 71:22, 76:11, 94:8, 107:9, 107:10, 107:22, 107:23, 108:5, 108:6, 114:4, 114:7, 115:15, 116:8, 117:7, 119:12, 123:15, 156:8, 175:5

**vote-by-mail** [1] - 16:7

**Voter** [3] - 3:16, 27:14, 112:4

**voter** [80] - 10:15, 10:16, 17:14, 17:23, 18:12, 18:25, 20:4, 20:5, 20:7, 22:6, 22:8, 22:11, 23:5, 23:10, 23:15, 24:21, 24:23, 25:11, 26:13, 26:23, 27:3, 27:8, 27:23, 28:5, 28:21, 29:16, 29:20, 29:23, 29:25, 30:6, 31:8, 31:11, 31:16, 31:19, 33:6, 33:7, 33:22, 33:25, 34:4, 34:13, 35:7, 37:17, 40:7, 46:1, 46:7, 48:16, 49:6, 52:17, 52:25, 53:12, 55:24, 59:7, 60:7, 70:21, 73:1, 93:17, 95:4, 98:13, 98:25, 100:4, 102:1, 107:16, 113:11, 113:13, 114:22, 118:8, 127:19, 127:23, 128:1, 128:16, 129:20, 129:25, 130:13, 130:19, 130:21, 131:16, 138:20, 152:23, 172:11, 180:19

**voter's** [2] - 22:22, 164:6

**voters** [31] - 12:19, 17:4, 18:17, 19:23, 19:24, 23:7, 24:19, 30:14, 30:20, 33:23, 37:16, 57:8, 57:20, 58:1, 60:11, 67:14, 72:20, 95:10, 95:12,

96:7, 96:21, 106:24, 107:6, 108:17, 113:11, 114:11, 125:16, 125:18, 131:7, 158:15, 159:6

**voting** [10] - 10:7, 10:9, 11:8, 11:9, 11:23, 17:19, 20:1, 54:2, 119:17, 125:20

**Voting** [2] - 11:22, 92:21

**vs** [1] - 1:5

**VS** [2] - 190:5, 191:2

## W

**Wait** [1] - 149:15

**wait** [7] - 7:16, 121:21, 149:2

**waive** [4] - 183:11, 190:9, 190:15, 190:21

**waived** [2] - 183:8, 190:14

**wake** [1] - 137:25

**walk** [2] - 41:16, 41:24

**warehouse** [1] - 10:6

**warning** [1] - 51:5

**warns** [1] - 141:3

**WAS** [1] - 189:10

**ways** [6] - 18:25, 36:14, 89:3, 114:14, 115:2, 130:21

**web** [2] - 133:3, 134:14

**website** [8] - 121:24, 140:2, 141:3, 144:20, 147:2, 152:18, 164:23

**websites** [2] - 123:16, 147:13

**week** [3] - 29:21, 113:4, 116:16

**weighed** [1] - 178:1

**weird** [1] - 82:13

**well-based** [1] - 162:15

**well-founded** [1] - 162:15

**well-trained** [1] - 22:25

**West** [2] - 9:9

**whereas** [2] - 114:19, 171:4

**whole** [10] - 6:21, 14:18, 14:22, 49:21, 69:17, 78:23, 93:12, 124:22, 126:23, 136:1

**Williams** [7] - 46:23, 46:24, 47:14, 54:17, 55:4, 80:17, 81:11

**Williams'** [1] - 81:19

**wish** [1] - 190:15

**withdraw** [6] - 18:4, 60:24, 107:7, 115:25, 156:5, 157:24

**withheld** [6] - 41:17, 151:9, 158:6, 158:17, 164:25, 165:4

**WITNESS** [10] - 3:1, 3:3, 46:17, 54:19, 75:9, 117:25, 120:7, 155:10, 171:12, 171:21

**witness** [2] - 1:22, 6:20

**won** [1] - 11:12

**word** [2] - 96:9, 104:22

**wording** [2] - 43:11, 140:9

**words** [3] - 66:16, 104:25, 152:1

**workloads** [1] - 26:6

**works** [1] - 124:18

**worries** [1] - 116:20

**worst** [1] - 68:1

**worth** [1] - 72:3

**write** [2] - 129:16, 150:17

**WRITE** [1] - 191:1

**write-up** [1] - 150:17

**writes** [7] - 55:4, 81:11, 84:4, 127:16, 152:16, 169:21, 179:23

**writing** [1] - 127:6

**written** [5] - 59:15, 59:17, 74:12, 88:12, 126:21

**wrongfully** [1] - 170:5

**wrote** [3] - 89:11, 110:25, 148:24

---

## Y

**y'all** [1] - 134:17

**year** [11] - 24:9, 26:7, 26:8, 41:11, 46:10, 47:19, 49:20, 87:3, 144:24, 155:22, 156:25

**years** [3] - 9:11, 11:5, 13:5

**yellow** [1] - 169:13

**yesterday** [3] - 48:8, 79:19, 82:4

**York** [1] - 2:5

**young** [1] - 30:15

**yourself** [2] - 6:15,

82:7

---

## Z

**zero** [7] - 36:17, 122:10, 123:10, 123:13, 123:20, 124:8, 124:21

1          UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF FLORIDA
2

3    KELVIN LEON JONES, ET AL.,

4         Plaintiffs,

5    vs.                    CASE NO:  4:19-CV-300-MW-CAS

6    RON DESANTIS, IN HIS OFFICIAL
     CAPACITY AS GOVERNOR OF THE
7    STATE OF FLORIDA, ET AL.,

8         Defendants.
     _____/
9

10

11

12                    VOLUME II of II
                 (Pages 192 through 217)
13
                  DEPOSITION OF MARK EARLEY
14          (Taken on behalf of the Plaintiffs)

15   DATE TAKEN:        August 22, 2019
     TIME:              9:30 a.m. - 4:00 p.m.
16   PLACE:             Messer Carpello, PA
                        2618 Centennial Place
17                      Tallahassee, Florida 32308

18

19

20

21

22        Examination of the witness taken before:

23             JESSICA RENCHEN, Court Reporter
                       On Behalf of
24             For The Record Reporting

25

```
1    APPEARANCES OF COUNSEL:

2    On behalf of the Plaintiffs:

3    R. ORION DANJUMA, ESQ.
     American Civil Liberties Union
4    Foundation, Inc.
     125 Broad Street, 18th Floor
5    New York, NY 10004
     Phone:  212-284-7332
6    E-mail:  Odanjuma@aclu.org

7    On behalf of Defendants:

8    NICHOLAS PRIMROSE, ESQ.
     Executive Office of the Governor
9    400 S. Monroe Street, # 209
     Tallahassee, FL 32399
10   Phone:  850-717-9310
     E-mail:  Nicholas.primrose@eog.myflorida.com
11
     MARK HERRON, ESQ.
12   Messer Carpello, PA
     2618 Centennial Place
13   Tallahassee, Florida 32308
     Phone:  850-222-0720
14   E-mail:  Mherron@lawfla.com

15

16

17

18

19

20

21

22

23

24

25
```

194

INDEX OF WITNESS

WITNESS                                                    PAGE

MARK EARLEY
        Continued Examination by Mr. Danjuma      195
****
INDEX OF EXHIBITS
NUMBER      DESCRIPTION                       PAGE
29          Amendment 4 FAQs                  206
     30          News Article                      208
****
CERTIFICATE OF OATH                           214
REPORTER'S PAGE                               215
     READ & SIGN LETTER                            216
ERRATA SHEET                                  217

****

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

1    D E P O S I T I O N

2    (Proceedings continued from Volume I.)

3    CONTINUED EXAMINATION

4  BY MR. DANJUMA:

5    Q.   I'd like to ask a follow-up question about

6  your concerns with the new form, if that's possible.

7        MR. DANJUMA:  Can we go off the record for

8    just a moment?

9        (Discussion off the record.)

10  BY MR. DANJUMA:

11    Q.   So we've described the three boxes that you

12  must now complete under the new version of the form,

13  which is still undergoing notice and comment review.

14  I wanted to ask if someone has an out-of-state

15  conviction, a felony conviction, and has already been

16  restored in another state and then moves into Florida

17  as someone whose rights have been restored, is there a

18  box on that form that they're able to check?  Do you

19  know what box they should check if that applies to

20  them?

21    A.   I do not know authoritatively.  No, I don't.

22    Q.   Okay.

23    A.   I would guess the third box, but I can't say

24  for sure, yes.

25    Q.   And can you read the text of the third box.

1    Sorry.

2       A.   I'll give it the same effort you did.

3            "If I have been convicted of a felony, I

4    affirm my voting rights have been restored pursuant to

5    Section 4, Article VI, of the state constitution upon

6    the completion of all terms of my sentence, including

7    parole or probation."

8       Q.   Okay.  Even if someone has been restored not

9    through operation of the Florida Constitution, but

10   through a procedure that's occurred in a different

11   state, that would be the closest to --

12      A.   Right --

13      Q.   -- the correct box?

14      A.   -- because my understanding of at least 7066,

15   and that's not exactly what's being referred to in the

16   third document -- or the third portion, it does go

17   into some detail in some form or another about

18   out-of-state convictions and how they correspond to

19   convictions in Florida, but it's very much a gray

20   area, yes.

21      Q.   And do you mean out-of-state convictions as

22   to whether or not murder or sexual assault is

23   disqualifying?  Is that the issue?

24      A.   That's part of what I'm saying, yes, yes,

25   yes.

1     Q.   Okay.

2     A.   That's the closest I can come.

3     Q.   Okay.  Okay.  Okay.  And I also wanted to
4  return to your discussion with Ms. Gwen Marshall about
5  the difficulties of complying with -- the difficulties
6  of implementing the financial obligation components of
7  that.  Could we refer back to your interrogatory for
8  just a moment?

9     A.   Certainly.

10    Q.   Okay.  In Interrogatory 4 on page 5, the
11  interrogatory asks, "Have you sought or received
12  guidance, advice, or instructions or opinions
13  regarding voter eligibility pursuant to Amendment 4
14  and SB 7066 from a variety of individuals?"  And you
15  mentioned that you conferred with Leon County Clerk of
16  Courts Gwen Marshall about how a felon's financial
17  obligations could be determined to be complete.  What
18  did you learn in the process of those conferrals with
19  Ms. Marshall?

20    A.   I guess the main fact I learned was that it's
21  not easy to make that determination authoritatively or
22  reliably, at least in many instances.  As I stated
23  earlier, each clerk of court's office has information
24  pertaining -- or some information pertaining to a
25  person convicted of a felony and their financial

1    obligations.  There is oftentimes, but not always

2    information there somewhat relative to whether they've

3    made some payments, but that's not always guaranteed

4    that those records are up to date or complete,

5    especially for older ones or if they've been converted

6    to a civil lien, or if they've ordered to be paid

7    directly to a victim, the victim may not tell the

8    clerk of court that they've received these payments,

9    and so there could be lots of instances where the

10   clerk's office does not have complete information.

11       Q.   Okay.  And I'd like to direct you to your

12   response to Interrogatory 9, which says -- and that's

13   beginning on page 6 and going to page 7.  The

14   interrogatory is, "Please state your policies and

15   practices regarding your communication to voters who

16   have been convicted of a felony and ask you whether

17   they are eligible to vote."

18       I wanted to direct your attention to the

19   third paragraph of your response on the top of page 7.

20   And you say sort of in a run-up to this that -- well,

21   maybe we should actually start at the bottom of the

22   second paragraph, if that's okay.  You note that if

23   voters -- "If prospective voters are uncertain as to

24   the completion of their sentencing guidelines, then

25   they should try to learn more about their status.  See

1    below for more."

2          And the next paragraph, you say -- you write

3    is, "This was our policy before the passage of SB

4    7066, and it has not been altered much since the

5    signing of SB 7066 into law.  Certainly SB 7066 states

6    that all financial obligations arising from the felony

7    sentencing must be completed, and we make this known

8    to people thinking of becoming a registered voter if

9    they ask us.  But even for government administrators

10   with all the tools at our disposal, this looks to be a

11   difficult assessment.  This assessment will likely be

12   very difficult and confusing for someone with less

13   resources at their disposal.  My office will not refer

14   for prosecution an applicant based on a mistaken

15   belief that the applicant completed all the terms of

16   his or her sentence."

17          What I'd like to ask -- and you mentioned

18   earlier that you reviewed the declaration of Jermaine

19   Miller; is that correct?

20      A.   Yes.  Not, I guess, completely, but to a

21   large extent.  I got into some of the appendices or

22   the added documentation, but I think I probably read

23   all of his declaration.

24      Q.   Right.  And if you recall from that review,

25   would you agree that it would be -- that it would be

1    very difficult for Mr. Miller, and confusing, to

2    determine the amount of legal financial obligations he

3    may owe under SB 7066?

4        A.   I would say that based on the multiple data

5    sources and the varying amounts listed in those, that

6    it would be tough to know specifically, yes.  I think

7    the sentencing document gave one specific amount -- or

8    I guess two.  One was restitution, one was the

9    summation of all the fines, fees, and all of that.

10   But I think even that number was -- given as the total

11   was somewhat in doubt, and it certainly did not agree

12   with the other sources of financial information

13   available.

14       Q.   So -- and I understand and I appreciate sort

15   of your forthright response to this that this is a

16   difficult assessment for both you to make and

17   especially for voters without any education or

18   election knowledge or knowledge of the criminal

19   justice system.

20            My question for you is, in advance of a

21   pending election, what should individuals do if they

22   have outstanding debt and they don't know the extent

23   to which it is disqualifying?  What should they do?

24       A.   That's a tough question.  If you are

25   absolutely intent on following the word of law, which

1    people who are registering to vote need to be doing,

2    that needs to be their modis of moving forward, they,

3    I guess, should endeavor to try and determine that,

4    but it's going to be a tough thing for them to do.

5        Q.    And if they can't determine that, what should

6    they do, in your view, if they're uncertain?

7        A.    What should they do?  Get a good lawyer.

8        Q.    What if they hire the ACLU, the Legal Defense

9    Fund, and the Brennan Center and their colleagues and

10   that counsel can't definitively advise them of the

11   amount of legal/financial obligations they owe under

12   the statute, what should they do in advance of an

13   upcoming election?

14       A.    In general, I would -- I would be tempted to

15   say that they should get registered and let the state

16   help them figure it out with their resources, because

17   they are supposed to have the resources available to

18   ascertain from all different databases.  But there is

19   that oath that they have to sign stating that they

20   have fulfilled all of their obligations, and if

21   they've enjoined legal representation because they are

22   pretty certain that they have not fulfilled all their

23   legal obligations or financial obligations, then it

24   would be tough for them to sign the oath saying that

25   they have done so.

1    Q.   Okay.

2    A.   So I don't know that they could get

3    registered.  I can't really advise them to do that.

4    Q.   And let's say, for instance, that -- and

5    you're aware that a number of individuals, including

6    some of the individual plaintiffs in this case, were

7    registered prior to SB 7066 becoming law -- were you

8    aware of that, I should ask, or no?

9    A.   Say that again.

10   Q.   Let me -- sorry, I apologize.

11        The individual plaintiffs in the lawsuit at

12   issue here, Gruver v. Barton, as well as the

13   associated lawsuits, the majority of those individual

14   plaintiffs are currently registered to vote because

15   they registered before SB 7066 was passed into law and

16   became effective.  So at least with our current

17   understanding, they are on the voter registration

18   rolls and the secretary of state has not initiated --

19   or has not sent a felon packet to request that they be

20   removed.

21        Should individuals who are already registered

22   vote in an upcoming election if they cannot determine

23   if they have financial obligations that would be

24   disqualifying?

25   A.   That's a good question.  That's a very good

1    question.  I can't say for certain.  My gut feeling is

2    they are on the voter rolls until taken off and they

3    are, therefore, eligible to vote until they are

4    removed.  So if there was an election coming up and it

5    was me -- and I'm not going to advise them because I'm

6    not a lawyer for them -- but if it was me, I would

7    probably vote and -- because from what I've seen in

8    previous instances, until you're taken off the rolls,

9    you are an eligible voter.

10        Q.   Is it your understanding that Florida law

11   does not impose a penalty on registered voters voting

12   if they're, in fact, ineligible or --

13        MR. HERRON:  Objection to form of the

14        question.

15   BY MR. DANJUMA:

16        Q.   You can answer.

17        A.   Okay.  Repeat the question.

18        Q.   Sure.  Just maybe his suggestion.

19        Do you understand Florida law to -- do you

20   know if there's any criminal liability for a

21   registered voter casting a ballot in an election if

22   they are ineligible?

23        A.   I can't say.  I don't think there is.  I

24   think there is a prohibition against registering to

25   vote, and I know there's certainly prohibition against

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

1    voting more than once.  As soon as I leave here, I may

2    find out that I'm wrong in this, but as I sit here

3    now, I do not know of any explicit prohibition that if

4    you are a registered voter but it turns out you were

5    not eligible at the time of voting, you will be deemed

6    to have been in violation of law for having voted.

7        Q.   That's fine, and I want to clarify.  I'm not

8    expecting you to be an expert on the code or a lawyer.

9    I'm just asking as someone who has more information

10   than the average voter about their circumstances, and

11   that answer is completely fine from my perspective.

12   Just one second.

13        I had a practical question that's slightly

14   unrelated, if you may allow me to ask it.  After the

15   Department of Elections sends you a felon packet, is

16   there a time period in which you need to make a

17   determination about whether or not to continue with

18   the removal process and send a notice to the

19   individual that triggers their need to respond within

20   30 days or request a hearing?

21        A.   Yeah, I believe it's seven days.  Within

22   receipt of the packet, we have seven days to send off

23   the certificate -- I mean the certified mail.

24        Q.   And just so that I understand the background

25   here, the Department of Elections is not bound by a

1      seven-day period for alerting you to the fact that

2      there may be an individual on the registration rolls

3      who is ineligible due to a felony conviction; is that

4      right?

5           A.   I think, yes, that that's correct, yes.

6           Q.   They can review the rolls sort of at any

7      point that they need to and send you information at

8      that point, right?

9           A.   Correct.

10          Q.   But at the point you receive it, you need to

11     make a determination relatively quickly, within seven

12     days, about whether or not to continue with the

13     removal process?

14          A.   Correct, or invalidate it and send it back to

15     the state.  That's how I read that part, yes.

16          Q.   And we have already discussed and you

17     testified at length about the difficulties your office

18     faced in evaluating whether or not felon packets that

19     were submitted based on people with a felony who were

20     still on -- incarcerated or probation, how much effort

21     it took for them to review those materials.  Do you

22     believe that seven days is enough for supervisors of

23     elections generally to evaluate an individual's

24     financial obligations and determine if they've been

25     correctly flagged as ineligible due to SB 7066?

1      A.   In general, no, I would not think so.

2      Q.   If you don't have -- well, no, let me

3  withdraw that.

4           Okay.  Okay.  Just -- we're really getting

5  close.

6           MR. HERRON:  You keep promising that.  It

7           never comes to pass.  You're not getting another

8           break.

9           MR. DANJUMA:  I just have like one or two

10          more exhibits.  We're on 29.  And this is

11          Amendment 4 FAQs that are posted on your website.

12          They don't have a -- we retrieved them from the

13          web.  They're not -- they're not Bates-stamped or

14          produced by your office.

15          (Whereupon, Plaintiffs' Exhibit No. 29 was

16  marked for identification.)

17  BY MR. DANJUMA:

18     Q.   And is this an accurate reflection of the

19  FAQs, if you'd like to review it and let me know?

20     A.   Looks like it, yes.

21     Q.   Okay.  And can you tell me how, if in any

22  way, you adjusted Amendment 4 after your -- I'm sorry,

23  let me start from the beginning again.  I'm getting

24  mixed up.

25          Can you advise me how you adjusted the FAQs

1    between the adoption of Amendment 4 and the passage of

2    SB 7066, if in any way?  What did you do to change the

3    FAQs posted on your website?

4        A.    We did adjust them, not in a large way, but

5    we certainly tweaked it.  After all this, if I can

6    remember those specifics, I'll be amazed.

7             So I -- certainly with 7066 coming into play

8    and being signed into law, there were some slight

9    differences in our understanding of eligibility, but I

10   think we were very general in our advice in the

11   beginning, and so there weren't really dramatic

12   changes after 7066.  So I don't remember any real

13   specific changes in relation to like, say, the

14   financial obligations, which is the key part.  So I

15   don't really remember any detailed changes.

16       Q.    Do you know if an average voter would read

17   the terms of the FAQ and understand if they have to

18   pay probation fees or interest that accrued on their

19   accounts by reference to the FAQ or to any other

20   public document on your website?

21       A.    Likely not, no.  It goes into stating that

22   "Certain convicted felons that have completed their

23   sentences, including parole and probation, will have

24   their voting rights automatically restored."  But,

25   again, I did not want to provide explicit legal advice

1     here because every situation is different and it's

2     very tough, as we've --

3          Q.   Yes.

4          A.   -- demonstrated through these discussions, to

5     give a blanket statement for everyone on this.

6          Q.   Absolutely.  And I --

7          A.   My main goal was to make them not afraid to

8     get registered if they thought that they were -- had

9     fulfilled their obligations by the court.

10         Q.   I understand.  And I think we've already

11    covered -- you'd agree that even if you provided the

12    full text of a statute, which most people wouldn't be

13    able to read, it'd be very difficult for people at

14    that point to determine whether or not they were

15    eligible either; is that correct?

16         A.   That would become more problematic than

17    clearer.

18         Q.   Right.  Okay.

19              MR. DANJUMA:  Could you give me one minute?

20              (Discussion off the record.)

21              (Whereupon, Plaintiffs' Exhibit No. 30 was

22    marked for identification.)

23    BY MR. DANJUMA:

24         Q.   All right.  I'd like to mark as nearly the

25    last exhibit, Exhibit 30, and this is a news article

1    from WPTV.com that includes some interview information

2    that you provided to a reporter, if you would like to

3    review that for a moment.

4        A.   Sure.

5             (Reviews document.)

6             It looks like there's part missing probably

7    in the middle there, but --

8        Q.   Oh, no.  Oh, yep, you're right.  Sorry.

9        A.   Part of what I said seems to be in there.

10       Q.   I apolo- --

11       A.   So we'll leave it right at that.

12       Q.   Right.  Okay.  It does appear that part of

13   the second page is cut off.  Why don't I -- if you

14   wouldn't mind, the reporter quoted you as speaking on

15   SB 7066 and stating that "The statute really requires

16   the Division of Elections to do the majority of the

17   heavy lifting, but, frankly, they don't have the

18   staffing resources or central location to gather this

19   data."

20            Do you continue to believe that's accurate

21   and do you want to sort of expand on that and explain

22   what you meant?

23       A.   I think, in general, that's my view from the

24   local level, that really to get this done effectively,

25   the division's going to have to do a lot of this

1    research because most offices don't have the resource

2    to do it.  So I think that if it's going to be done

3    effectively, they're going to have to be the ones to

4    bring the resources to bear, and that like I said

5    earlier and from my earliest thoughts on any actions

6    the legislature might take, primarily what would be

7    required would be funding to bring help -- bring all

8    this data together if financial obligation fulfillment

9    is going to be a requirement to get registered to

10    vote.  And that has not happened.

11         But then I go on to say, and I still believe

12    the state doesn't have the staffing resources or that

13    central location or repository of financial

14    obligations and the status of fulfillment on those for

15    them to do a very good job at that either.

16         Q.   All right.

17              (Discussion off the record.)

18    BY MR. DANJUMA:

19         Q.   I just want to ask, do you feel based on your

20    knowledge today that you could authoritatively answer

21    a voter who came to you to ask if they were eligible

22    to vote under SB 7066?

23         A.   Depending on what their circumstances were, I

24    would -- there's certainly circumstances where I would

25    not be able to say authoritatively, yes.

```
1        Q.   Okay.  That's fair enough.  So just to close,
2   is there anything in your -- in my questions that you
3   would -- that thinking back, you'd like to clarify any
4   of your answers on?  Just want to give you that
5   opportunity.
6        A.   Probably.  Not that I can recollect up to
7   this point.  Yeah, I guess we'll stay where we're at.
8        MR. DANJUMA:  Okay.  So I just want to pause,
9        and obviously --
10        MR. HERRON:  I want to ask if anybody on the
11        phone wants to ask any questions.
12        Anybody on the phone want to ask any
13        questions?
14        UNKNOWN SPEAKER:  No, thank you.
15        MR. HERRON:  Secretary of State, anything?
16        Guess not.
17        I've got no questions, and we'll read if you
18        get it transcribed.
19        MR. DANJUMA:  Okay, great.  Sounds good.
20        Thank you very much for bearing with us this
21        afternoon.
22        THE WITNESS:  You're welcome.  One quick
23        question:  If I do read through and see there's
24        something I need to clarify, there's an
25        opportunity for that?
```

1          MR. HERRON:  Actually, I'll advise you, yes.

2          MR. DANJUMA:  Yes.  And just a quick note,

3     there are some documents that we received last

4     night.  We tried to review as many of them as

5     possible.  It's possible we'll follow up with your

6     counsel if we have a question about a document we

7     didn't get a chance to review.  All right.

8          MR. HERRON:  Okay.  We're done here, guys.

9     Thank you.

10          MR. DANJUMA:  Thanks.

11          THE COURT REPORTER:  Do you know if you want

12     to order yet?

13          MR. DANJUMA:  We do want to order.  Is there

14     a way to get a rush?

15          THE COURT REPORTER:  Tell me a date that's

16     good for you.

17          MR. DANJUMA:  Is Monday possible?

18          THE COURT REPORTER:  Monday, okay.

19          Do you want to order a copy?

20          MR. HERRON:  Yeah.  I know I'd still want to

21     read it, though, too.

22          THE COURT REPORTER:  Right.  And they want it

23     by Monday.

24          MR. HERRON:  I understand.

25          (Whereupon, the deposition was concluded at

1       4:00 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF OATH

STATE OF FLORIDA )

COUNTY OF LEON)

I, the undersigned authority, certify that MARK EARLEY, personally appeared before me and was duly sworn on the 22nd day of August, 2019.

Signed this 22nd day of August, 2019.

_____
JESSICA RENCHEN, Court Reporter
Notary Public - State of Florida

1    CERTIFICATE OF REPORTER

2

3    STATE OF FLORIDA)

4    COUNTY OF LEON)

5

6       I, JESSICA RENCHEN, Registered Professional

7    Reporter, certify that I was authorized to and did

8    stenographically report the deposition of MARK EARLEY,

9    pages 1 through 213; that a review of the transcript

10   **WAS REQUESTED**; and that the transcript is a true and

11   complete record of my stenographic notes.

12

13      I further certify that I am not a relative,

14   employee, attorney, or counsel of any of the parties,

15   nor am I a relative or employee of any of the parties'

16   attorney or counsel connected with the action, nor am

17   I financially interested in the action.

18

19       DATED this 22nd day of August, 2019.

20

21       _____

22       JESSICA RENCHEN, Court Reporter.

23

24

25

```
 1    TO:  MARK EARLEY
      C/O MARK HERRON, ESQ.
 2    Messer Carpello, PA
      2618 Centennial Place
 3    Tallahassee, Florida 32308
      Phone:  850-222-0720
 4    E-mail:  Mherron@lawfla.com

 5
      IN RE:  KELVIN LEON JONES, ET AL., VS RON DESANTIS, IN
 6    HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF
      FLORIDA, ET AL.
 7    CASE NO.:  4:19-CV-300-MW/CAS

 8    Please take notice that on the 22nd day of August,
      2019, you gave a deposition in the above cause.  At
 9    that time, you did not waive your signature.

10    Please make arrangements with For The Record Reporting
      at 850-222-5491 to exercise your right to read and
11    sign the transcript.

12    If you do not read and sign the deposition within 30
      days or at such other time as instructed by counsel,
13    the original, which has already been forwarded to the
      ordering attorney, may be filed with the Clerk of the
14    Court and your reading and signing may be considered
      waived.
15
      If you wish to waive your signature now, please sign
16    your name in the blank at the bottom of this letter
      and return it to the address listed below.
17
      Very truly yours,
18
      _____
19    JESSICA RENCHEN, Court Reporter

20    For The Record Reporting

21
      I do hereby waive my signature.
22
      _____
23

24

25
```

ERRATA  SHEET
DO NOT WRITE ON TRANSCRIPT ~ ENTER CHANGES
IN RE:  KELVIN LEON JONES, ET AL., VS RON DESANTIS, IN
HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF
FLORIDA, ET AL.
CASE NO:  4:19-CV-300-MW/CAS
DATE TAKEN:  August 22, 2019
DEPONENT:  MARK EARLEY

1
2
3
4
5

6   PAGE_____ LINE_____ SHOULD BE_____

7   PAGE_____ LINE_____ SHOULD BE_____

8   PAGE_____ LINE_____ SHOULD BE_____

9   PAGE_____ LINE_____ SHOULD BE_____

10  PAGE_____ LINE_____ SHOULD BE_____

11  PAGE_____ LINE_____ SHOULD BE_____

12  PAGE_____ LINE_____ SHOULD BE_____

13  PAGE_____ LINE_____ SHOULD BE_____

14  PAGE_____ LINE_____ SHOULD BE_____

15  PAGE_____ LINE_____ SHOULD BE_____

16  PAGE_____ LINE_____ SHOULD BE_____

17  PAGE_____ LINE_____ SHOULD BE_____

18  PAGE_____ LINE_____ SHOULD BE_____

19  PAGE_____ LINE_____ SHOULD BE_____

20  PAGE_____ LINE_____ SHOULD BE_____

21

22  Under penalties of perjury, I declare that I have read
the foregoing document and that the facts stated in it
23  are true.

24  _____
DATE                          MARK EARLEY
25

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA 850.222.5491

## 1

**1** [1] - 215:9
**10004** [1] - 193:5
**125** [1] - 193:4
**18th** [1] - 193:4
**192** [1] - 192:12
**195** [1] - 194:4

## 2

**2019** [6] - 192:15,
214:11, 214:13,
215:19, 216:8, 217:4
**206** [1] - 194:8
**208** [1] - 194:8
**209** [1] - 193:9
**212-284-7332** [1] -
193:5
**213** [1] - 215:9
**214** [1] - 194:10
**215** [1] - 194:11
**216** [1] - 194:11
**217** [2] - 192:12,
194:12
**22** [2] - 192:15, 217:4
**22nd** [4] - 214:11,
214:13, 215:19, 216:8
**2618** [3] - 192:16,
193:12, 216:2
**29** [3] - 194:8,
206:10, 206:15

## 3

**30** [5] - 194:8,
204:20, 208:21,
208:25, 216:12
**32308** [3] - 192:17,
193:13, 216:3
**32399** [1] - 193:9

## 4

**4** [7] - 194:8, 196:5,
197:10, 197:13,
206:11, 206:22, 207:1
**400** [1] - 193:9
**4:00** [2] - 192:15,
213:1
**4:19-CV-300-MW-
CAS** [1] - 192:5
**4:19-CV-300-MW/
CAS** [2] - 216:7, 217:3

## 5

**5** [1] - 197:10

## 6

**6** [1] - 198:13

## 7

**7** [2] - 198:13, 198:19
**7066** [14] - 196:14,
197:14, 199:4, 199:5,
200:3, 202:7, 202:15,
205:25, 207:2, 207:7,
207:12, 209:15,
210:22

## 8

**850-222-0720** [2] -
193:13, 216:3
**850-222-5491** [1] -
216:10
**850-717-9310** [1] -
193:10

## 9

**9** [1] - 198:12
**9:30** [1] - 192:15

## A

**a.m** [1] - 192:15
**able** [3] - 195:18,
208:13, 210:25
**Absolutely** [1] -
208:6
**absolutely** [1] -
200:25
**accounts** [1] -
207:19
**accrued** [1] - 207:18
**accurate** [2] -
206:18, 209:20
**ACLU** [1] - 201:8
**action** [2] - 215:16,
215:17
**actions** [1] - 210:5
**added** [1] - 199:22
**address** [1] - 216:16
**adjust** [1] - 207:4
**adjusted** [2] -
206:22, 206:25
**administrators** [1] -
199:9
**adoption** [1] - 207:1
**advance** [2] -
200:20, 201:12
**advice** [3] - 197:12,
207:10, 207:25
**advise** [3] - 201:10,
202:3, 203:5, 206:25,
212:1
**affirm** [1] - 196:4
**afraid** [1] - 208:7
**afternoon** [1] -
211:21
**agree** [3] - 199:25,
200:11, 208:11
**AL** [6] - 192:3, 192:7,
216:5, 216:6, 217:2,
217:3
**alerting** [1] - 205:1
**allow** [1] - 204:14
**altered** [1] - 199:4
**amazed** [1] - 207:6
**Amendment** [5] -
194:8, 197:13,
206:11, 206:22, 207:1
**American** [1] - 193:3
**amount** [3] - 200:2,
200:7, 201:11
**amounts** [1] - 200:5
**answer** [3] - 203:16,
204:11, 210:20
**answers** [1] - 211:4
**apolo** [1] - 209:10
**apologize** [1] -
202:10
**appear** [1] - 209:12
**APPEARANCES** [1] -
193:1
**appeared** [1] -
214:10
**appendices** [1] -
199:21
**applicant** [2] -
199:14, 199:15
**applies** [1] - 195:19
**appreciate** [1] -
200:14
**area** [1] - 196:20
**arising** [1] - 199:6
**arrangements** [1] -
216:10
**article** [1] - 208:25
**Article** [2] - 194:8,
196:5
**AS** [3] - 192:6, 216:6,
217:2
**ascertain** [1] -
201:18
**assault** [1] - 196:22
**assessment** [3] -
199:11, 200:16
**associated** [1] -
202:13
**attention** [1] - 198:18
**attorney** [3] - 215:14,
215:16, 216:13
**August** [6] - 192:15,
214:11, 214:13,
215:19, 216:8, 217:4
**authoritatively** [4] -
195:21, 197:21,
210:20, 210:25
**authority** [1] - 214:9
**authorized** [1] -
215:7
**automatically** [1] -
207:24
**available** [2] -
200:13, 201:17
**average** [2] - 204:10,
207:16
**aware** [2] - 202:5,
202:8

## B

**background** [1] -
204:24
**ballot** [1] - 203:21
**Barton** [1] - 202:12
**based** [4] - 199:14,
200:4, 205:19, 210:19
**Bates** [1] - 206:13
**Bates-stamped** [1] -
206:13
**BE** [17] - 217:6,
217:7, 217:8, 217:9,
217:10, 217:11,
217:12, 217:13,
217:14, 217:15,
217:16, 217:17,
217:18, 217:19,
217:20
**bear** [1] - 210:4
**bearing** [1] - 211:20
**became** [1] - 202:16
**become** [1] - 208:16
**becoming** [2] -
199:8, 202:7
**beginning** [3] -
198:13, 206:23,
207:11
**behalf** [3] - 192:14,
193:2, 193:7
**Behalf** [1] - 192:23
**belief** [1] - 199:15
**below** [2] - 199:1,
216:16
**between** [1] - 207:1
**blank** [1] - 216:16
**blanket** [1] - 208:5
**bottom** [2] - 198:21,
216:16
**bound** [1] - 204:25
**box** [5] - 195:18,
195:19, 195:23,
195:25, 196:13
**boxes** [1] - 195:11
**break** [1] - 206:8
**Brennan** [1] - 201:9
**bring** [3] - 210:4,
210:7
**Broad** [1] - 193:4
**BY** [6] - 195:4,
195:10, 203:15,
206:17, 208:23,
210:18

## C

**C/O** [1] - 216:1
**cannot** [1] - 202:22
**CAPACITY** [3] -
192:6, 216:6, 217:2
**Carpello** [3] -
192:16, 193:12, 216:2
**case** [1] - 202:6
**CASE** [3] - 192:5,
216:7, 217:3
**casting** [1] - 203:21
**Centennial** [3] -
192:16, 193:12, 216:2
**Center** [1] - 201:9
**central** [2] - 209:18,
210:13
**certain** [2] - 201:22,
203:1
**Certain** [1] - 207:22
**Certainly** [2] - 197:9,
199:5
**certainly** [5] -
200:11, 203:25,
207:5, 207:7, 210:24
**CERTIFICATE** [3] -
194:10, 214:1, 215:1
**certificate** [1] -
204:23
**certified** [1] - 204:23
**certify** [3] - 214:9,
215:7, 215:13
**chance** [1] - 212:7
**change** [1] - 207:2
**CHANGES** [1] -
217:1
**changes** [3] -
207:12, 207:13,
207:15
**check** [2] - 195:18,
195:19
**circumstances** [3] -
204:10, 210:23,
210:24
**civil** [1] - 198:6
**Civil** [1] - 193:3
**clarify** [3] - 204:7,
211:3, 211:24
**clearer** [1] - 208:17
**Clerk** [2] - 197:15,

**clerk** [2] - 197:23, 198:8
**clerk's** [1] - 198:10
**close** [2] - 206:5, 211:1
**closest** [2] - 196:11, 197:2
**code** [1] - 204:8
**colleagues** [1] - 201:9
**coming** [2] - 203:4, 207:7
**comment** [1] - 195:13
**communication** [1] - 198:15
**complete** [5] - 195:12, 197:17, 198:4, 198:10, 215:11
**completed** [2] - 199:7, 199:15, 207:22
**completely** [2] - 199:20, 204:11
**completion** [2] - 196:6, 198:24
**complying** [1] - 197:5
**components** [1] - 197:6
**concerns** [1] - 195:6
**concluded** [1] - 212:25
**conferrals** [1] - 197:18
**conferred** [1] - 197:15
**confusing** [2] - 199:12, 200:1
**connected** [1] - 215:16
**considered** [1] - 216:14
**constitution** [1] - 196:5
**Constitution** [1] - 196:9
**continue** [3] - 204:17, 205:12, 209:20
**continued** [1] - 195:2
**Continued** [1] - 194:4
**CONTINUED** [1] - 195:3
**converted** [1] - 198:5
**convicted** [4] - 196:3, 197:25, 198:16, 207:22
**conviction** [3] -

**convictions** [3] - 196:18, 196:19, 196:21
**copy** [1] - 212:19
**Correct** [2] - 205:9, 205:14
**correct** [4] - 196:13, 199:19, 205:5, 208:15
**correctly** [1] - 205:25
**correspond** [1] - 196:18
**counsel** [5] - 201:10, 212:6, 215:14, 215:16, 216:12
**COUNSEL** [1] - 193:1
**COUNTY** [2] - 214:4, 215:4
**County** [1] - 197:15
**COURT** [5] - 192:1, 212:11, 212:15, 212:18, 212:22
**court** [2] - 198:8, 208:9
**Court** [5] - 192:23, 214:17, 215:21, 216:14, 216:19
**court's** [1] - 197:23
**Courts** [1] - 197:16
**covered** [1] - 208:11
**criminal** [2] - 200:18, 203:20
**current** [1] - 202:16
**cut** [1] - 209:13

## D

**DANJUMA** [16] - 193:3, 195:4, 195:7, 195:10, 203:15, 206:9, 206:17, 208:19, 208:23, 210:18, 211:8, 211:19, 212:2, 212:10, 212:13, 212:17
**Danjuma** [1] - 194:4
**data** [3] - 200:4, 209:19, 210:8
**databases** [1] - 201:18
**date** [2] - 198:4, 212:15
**DATE** [3] - 192:15, 217:4, 217:24
**DATED** [1] - 215:19
**days** [6] - 204:20, 204:21, 204:22, 205:12, 205:22,
**debt** [1] - 200:22
**declaration** [2] - 199:18, 199:23
**declare** [1] - 217:22
**deemed** [1] - 204:5
**defendants** [1] - 192:8
**Defendants** [1] - 193:7
**Defense** [1] - 201:8
**definitively** [1] - 201:10
**demonstrated** [1] - 208:4
**Department** [2] - 204:15, 204:25
**DEPONENT** [1] - 217:4
**deposition** [4] - 212:25, 215:8, 216:8, 216:12
**DEPOSITION** [1] - 192:13
**DESANTIS** [3] - 192:6, 216:5, 217:2
**described** [1] - 195:11
**DESCRIPTION** [1] - 194:7
**detail** [1] - 196:17
**detailed** [1] - 207:15
**determination** [3] - 197:21, 204:17, 205:11
**determine** [6] - 200:2, 201:3, 201:5, 202:22, 205:24, 208:14
**determined** [1] - 197:17
**differences** [1] - 207:9
**different** [3] - 196:10, 201:18, 208:1
**difficult** [5] - 199:11, 199:12, 200:1, 200:16, 208:13
**difficulties** [3] - 197:5, 205:17
**direct** [2] - 198:11, 198:18
**directly** [1] - 198:7
**discussed** [1] - 205:16
**Discussion** [3] - 195:9, 208:20, 210:17
**discussion** [1] - 197:4
**discussions** [1] -

**debt** ... 216:12
**disposal** [2] - 199:10, 199:13
**disqualifying** [3] - 196:23, 200:23, 202:24
**DISTRICT** [2] - 192:1, 192:1
**Division** [1] - 209:16
**division's** [1] - 209:25
**DO** [1] - 217:1
**document** [6] - 196:16, 200:7, 207:20, 209:5, 212:6, 217:22
**documentation** [1] - 199:22
**documents** [1] - 212:3
**done** [4] - 201:25, 209:24, 210:2, 212:8
**doubt** [1] - 200:11
**dramatic** [1] - 207:11
**due** [2] - 205:3, 205:25
**duly** [1] - 214:10

## E

**E-mail** [4] - 193:6, 193:10, 193:14, 216:4
**EARLEY** [7] - 192:13, 194:4, 214:10, 215:8, 216:1, 217:4, 217:24
**earliest** [1] - 210:5
**easy** [1] - 197:21
**education** [1] - 200:17
**effective** [1] - 202:16
**effectively** [2] - 209:24, 210:3
**effort** [2] - 196:2, 205:20
**either** [2] - 208:15, 210:15
**election** [6] - 200:18, 200:21, 201:13, 202:22, 203:4, 203:21
**Elections** [3] - 204:15, 204:25, 209:16
**elections** [1] - 205:23
**eligibility** [2] - 197:13, 207:9
**eligible** [5] - 198:17, 203:3, 203:9, 204:5, 208:15, 210:21

**employee** [2] - 215:14, 215:15
**endeavor** [1] - 201:3
**enjoined** [1] - 201:21
**ENTER** [1] - 217:1
**ERRATA** [2] - 194:12, 217:1
**especially** [2] - 198:5, 200:17
**ESQ** [4] - 193:3, 193:8, 193:11, 216:1
**ET** [6] - 192:3, 192:7, 216:5, 216:6, 217:2, 217:3
**evaluate** [1] - 205:23
**evaluating** [1] - 205:18
**exactly** [1] - 196:15
**Examination** [1] - 194:4
**examination** [1] - 192:22
**EXAMINATION** [1] - 195:3
**Executive** [1] - 193:8
**exercise** [1] - 216:10
**exhibit** [1] - 208:25
**Exhibit** [3] - 206:15, 208:21, 208:25
**EXHIBITS** [1] - 194:6
**exhibits** [1] - 206:10
**expand** [1] - 209:21
**expecting** [1] - 204:8
**expert** [1] - 204:8
**explain** [1] - 209:21
**explicit** [2] - 204:3, 207:25
**extent** [2] - 199:21, 200:22

## F

**faced** [1] - 205:18
**fact** [3] - 197:20, 203:12, 205:1
**facts** [1] - 217:22
**fair** [1] - 211:1
**FAQ** [2] - 207:17, 207:19
**FAQs** [5] - 194:8, 206:11, 206:19, 206:25, 207:3
**fees** [2] - 200:9, 207:18
**felon** [3] - 202:19, 204:15, 205:18
**felon's** [1] - 197:16
**felons** [1] - 207:22
**felony** [7] - 195:15, 196:3, 197:25,

198:16, 199:6, 205:3, 205:19

**figure** [1] - 201:16
**filed** [1] - 216:13
**financial** [12] - 197:6, 197:16, 197:25, 199:6, 200:2, 200:12, 201:23, 202:23, 205:24, 207:14, 210:8, 210:13
**financially** [1] - 215:17
**fine** [2] - 204:7, 204:11
**fines** [1] - 200:9
**FL** [1] - 193:9
**flagged** [1] - 205:25
**Floor** [1] - 193:4
**FLORIDA** [6] - 192:1, 192:7, 214:3, 215:3, 216:6, 217:3
**Florida** [9] - 192:17, 193:13, 195:16, 196:9, 196:19, 203:10, 203:19, 214:18, 216:3
**follow** [2] - 195:5, 212:5
**follow-up** [1] - 195:5
**following** [1] - 200:25
**foregoing** [1] - 217:22
**form** [5] - 195:6, 195:12, 195:18, 196:17, 203:13
**forthright** [1] - 200:15
**forward** [1] - 201:2
**forwarded** [1] - 216:13
**Foundation** [1] - 193:4
**frankly** [1] - 209:17
**fulfilled** [3] - 201:20, 201:22, 208:9
**fulfillment** [2] - 210:8, 210:14
**full** [1] - 208:12
**Fund** [1] - 201:9
**funding** [1] - 210:7

## G

**gather** [1] - 209:18
**general** [4] - 201:14, 206:1, 207:10, 209:23
**generally** [1] - 205:23
**given** [1] - 200:10

**goal** [1] - 208:7
**government** [1] - 199:9
**GOVERNOR** [3] - 192:6, 216:6, 217:2
**Governor** [1] - 193:8
**gray** [1] - 196:19
**great** [1] - 211:19
**Gruver** [1] - 202:12
**guaranteed** [1] - 198:3
**guess** [6] - 195:23, 197:20, 199:20, 200:8, 201:3, 211:7
**Guess** [1] - 211:16
**guidance** [1] - 197:12
**guidelines** [1] - 198:24
**gut** [1] - 203:1
**guys** [1] - 212:8
**Gwen** [2] - 197:4, 197:16

## H

**hearing** [1] - 204:20
**heavy** [1] - 209:17
**help** [2] - 201:16, 210:7
**hereby** [1] - 216:21
**HERRON** [10] - 193:11, 203:13, 206:6, 211:10, 211:15, 212:1, 212:8, 212:20, 212:24, 216:1
**hire** [1] - 201:8
**HIS** [3] - 192:6, 216:6, 217:2

## I

**identification** [2] - 206:16, 208:22
**II** [2] - 192:12
**implementing** [1] - 197:6
**impose** [1] - 203:11
**IN** [4] - 192:6, 216:5, 217:2
**Inc** [1] - 193:4
**incarcerated** [1] - 205:20
**includes** [1] - 209:1
**including** [3] - 196:6, 202:5, 207:23
**INDEX** [2] - 194:1, 194:6
**individual** [5] - 202:6, 202:11,

202:13, 204:19, 205:2
**individual's** [1] - 205:23
**individuals** [4] - 197:14, 200:21, 202:5, 202:21
**ineligible** [4] - 203:12, 203:22, 205:3, 205:25
**information** [8] - 197:23, 197:24, 198:2, 198:10, 200:12, 204:9, 205:7, 209:1
**initiated** [1] - 202:18
**instance** [1] - 202:4
**instances** [3] - 197:22, 198:9, 203:8
**instructed** [1] - 216:12
**instructions** [1] - 197:12
**intent** [1] - 200:25
**interest** [1] - 207:18
**interested** [1] - 215:17
**interrogatory** [3] - 197:7, 197:11, 198:14
**Interrogatory** [2] - 197:10, 198:12
**interview** [1] - 209:1
**invalidate** [1] - 205:14
**issue** [1] - 196:23, 202:12
**it'd** [1] - 208:13

## J

**Jermaine** [1] - 199:18
**JESSICA** [5] - 192:23, 214:17, 215:6, 215:21, 216:19
**job** [1] - 210:15
**JONES** [3] - 192:3, 216:5, 217:2
**justice** [1] - 200:19

## K

**keep** [1] - 206:6
**KELVIN** [3] - 192:3, 216:5, 217:2
**key** [1] - 207:14
**knowledge** [3] - 200:18, 210:20
**known** [1] - 199:7

## L

**large** [2] - 199:21, 207:4
**last** [2] - 208:25, 212:3
**law** [8] - 199:5, 200:25, 202:7, 202:15, 203:10, 203:19, 204:6, 207:8
**lawsuit** [1] - 202:11
**lawsuits** [1] - 202:13
**lawyer** [3] - 201:7, 203:6, 204:8
**learn** [2] - 197:18, 198:25
**learned** [1] - 197:20
**least** [3] - 196:14, 197:22, 202:16
**leave** [2] - 204:1, 209:11
**legal** [4] - 200:2, 201:21, 201:23, 207:25
**Legal** [1] - 201:8
**legal/financial** [1] - 201:11
**legislature** [1] - 210:6
**length** [1] - 205:17
**LEON** [5] - 192:3, 214:4, 215:4, 216:5, 217:2
**Leon** [1] - 197:15
**less** [1] - 199:12
**LETTER** [1] - 194:11
**letter** [1] - 216:16
**level** [1] - 209:24
**liability** [1] - 203:20
**Liberties** [1] - 193:3
**lien** [1] - 198:6
**lifting** [1] - 209:17
**likely** [1] - 199:11
**Likely** [1] - 207:21
**LINE** [15] - 217:6, 217:7, 217:8, 217:9, 217:10, 217:11, 217:12, 217:13, 217:14, 217:15, 217:16, 217:17, 217:18, 217:19, 217:20
**listed** [2] - 200:5, 216:16
**local** [1] - 209:24
**location** [2] - 209:18, 210:13
**Looks** [1] - 206:20
**looks** [2] - 199:10, 209:6

## M

**mail** [5] - 193:6, 193:10, 193:14, 204:23, 216:4
**main** [2] - 197:20, 208:7
**majority** [2] - 202:13, 209:16
**mark** [1] - 208:24
**MARK** [9] - 192:13, 193:11, 194:4, 214:9, 215:8, 216:1, 216:1, 217:4, 217:24
**marked** [2] - 206:16, 208:22
**Marshall** [3] - 197:4, 197:16, 197:19
**materials** [1] - 205:21
**mean** [2] - 196:21, 204:23
**meant** [1] - 209:22
**mentioned** [2] - 197:15, 199:17
**Messer** [3] - 192:16, 193:12, 216:2
**mherron@lawfla.com** [2] - 193:14, 216:4
**middle** [1] - 209:7
**might** [1] - 210:6
**Miller** [2] - 199:19, 200:1
**mind** [1] - 209:14
**minute** [1] - 208:19
**missing** [1] - 209:6
**mistaken** [1] - 199:14
**mixed** [1] - 206:24
**modis** [1] - 201:2
**moment** [2] - 195:8, 197:8, 209:3
**Monday** [2] - 212:17, 212:23
**monday** [1] - 212:18
**Monroe** [1] - 193:9
**most** [2] - 208:12, 210:1
**moves** [1] - 195:16
**moving** [1] - 201:2
**MR** [23] - 195:4, 195:7, 195:10, 203:13, 203:15, 206:6, 206:9, 206:17, 208:19, 208:23, 210:18, 211:8, 211:10, 211:15, 211:19, 212:1, 212:2, 212:8, 212:10,

212:13, 212:17, 212:20, 212:24
**multiple** [1] - 200:4
**murder** [1] - 196:22
**must** [2] - 195:12, 199:7

## N

**name** [1] - 216:16
**nearly** [1] - 208:24
**need** [6] - 201:1, 204:16, 204:19, 205:7, 205:10, 211:24
**needs** [1] - 201:2
**never** [1] - 206:7
**New** [1] - 193:5
**new** [2] - 195:6, 195:12
**news** [1] - 208:25
**News** [1] - 194:8
**next** [1] - 199:2
**NICHOLAS** [1] - 193:8
**nicholas.primrose @eog.myflorida.com** [1] - 193:10
**night** [1] - 212:4
**NO** [3] - 192:5, 216:7, 217:3
**NORTHERN** [1] - 192:1
**NOT** [1] - 217:1
**Notary** [1] - 214:18
**note** [2] - 198:22, 212:2
**notes** [1] - 215:11
**notice** [3] - 195:13, 204:18, 216:8
**number** [2] - 200:10, 202:5
**NUMBER** [1] - 194:7
**NY** [1] - 193:5

## O

**OATH** [2] - 194:10, 214:1
**oath** [2] - 201:19, 201:24
**Objection** [1] - 203:13
**obligation** [2] - 197:6, 210:8
**obligations** [13] - 197:17, 198:1, 199:6, 200:2, 201:11, 201:20, 201:23, 202:23, 205:24, 207:14, 208:9, 210:14

**obviously** [1] - 211:9
**occurred** [1] - 196:10
**odanjuma@aclu. org** [1] - 193:6
**OF** [18] - 192:1, 192:6, 192:7, 192:13, 193:1, 194:1, 194:6, 194:10, 214:1, 214:3, 214:4, 215:1, 215:3, 215:4, 216:6, 217:2
**office** [5] - 197:23, 198:10, 199:13, 205:17, 206:14
**Office** [1] - 193:8
**offices** [1] - 210:1
**OFFICIAL** [3] - 192:6, 216:6, 217:2
**oftentimes** [1] - 198:1
**older** [1] - 198:5
**ON** [1] - 217:1
**once** [1] - 204:1
**one** [5] - 200:7, 200:8, 204:12, 206:9, 208:19
**One** [2] - 200:8, 211:22
**ones** [2] - 198:5, 210:3
**operation** [1] - 196:9
**opinions** [1] - 197:12
**opportunity** [2] - 211:5, 211:25
**order** [3] - 212:12, 212:13, 212:19
**ordered** [1] - 198:6
**ordering** [1] - 216:13
**original** [1] - 216:13
**ORION** [1] - 193:3
**out-of-state** [3] - 195:14, 196:18, 196:21
**outstanding** [1] - 200:22
**owe** [2] - 200:3, 201:11

## P

**p.m** [2] - 192:15, 213:1
**PA** [3] - 192:16, 193:12, 216:2
**packet** [3] - 202:19, 204:15, 204:22
**packets** [1] - 205:18
**PAGE** [18] - 194:3, 194:7, 194:11, 217:6, 217:7, 217:8, 217:9,

217:10, 217:11, 217:12, 217:13, 217:14, 217:15, 217:16, 217:17, 217:18, 217:19, 217:20
**page** [5] - 197:10, 198:13, 198:19, 209:13
**pages** [1] - 215:9
**Pages** [1] - 192:12
**paid** [1] - 198:6
**paragraph** [3] - 198:19, 198:22, 199:2
**parole** [2] - 196:7, 207:23
**Part** [1] - 209:9
**part** [5] - 196:24, 205:15, 207:14, 209:6, 209:12
**parties** [1] - 215:14
**parties'** [1] - 215:15
**pass** [1] - 206:7
**passage** [2] - 199:3, 207:1
**passed** [1] - 202:15
**pause** [1] - 211:8
**pay** [1] - 207:18
**payments** [2] - 198:3, 198:8
**penalties** [1] - 217:22
**penalty** [1] - 203:11
**pending** [1] - 200:21
**people** [5] - 199:8, 201:1, 205:19, 208:12, 208:13
**period** [2] - 204:16, 205:1
**perjury** [1] - 217:22
**person** [1] - 197:25
**personally** [1] - 214:10
**perspective** [1] - 204:11
**pertaining** [2] - 197:24
**Phone** [4] - 193:5, 193:10, 193:13, 216:3
**phone** [2] - 211:11, 211:12
**PLACE** [1] - 192:16
**Place** [1] - 192:16, 193:12, 216:2
**plaintiffs** [4] - 192:4, 202:6, 202:11, 202:14
**Plaintiffs** [2] - 192:14, 193:2
**Plaintiffs'** [2] - 206:15, 208:21

**play** [1] - 207:7
**point** [5] - 205:7, 205:8, 205:10, 208:14, 211:7
**policies** [1] - 198:14
**policy** [1] - 199:3
**portion** [1] - 196:16
**possible** [4] - 195:6, 212:5, 212:17
**posted** [2] - 206:11, 207:3
**practical** [1] - 204:13
**practices** [1] - 198:15
**pretty** [1] - 201:22
**previous** [1] - 203:8
**primarily** [1] - 210:6
**PRIMROSE** [1] - 193:8
**probation** [4] - 196:7, 205:20, 207:18, 207:23
**problematic** [1] - 208:16
**procedure** [1] - 196:10
**Proceedings** [1] - 195:2
**process** [3] - 197:18, 204:18, 205:13
**produced** [1] - 206:14
**Professional** [1] - 215:6
**prohibition** [3] - 203:24, 203:25, 204:3
**promising** [1] - 206:6
**prosecution** [1] - 199:14
**prospective** [1] - 198:23
**provide** [1] - 207:25
**provided** [2] - 208:11, 209:2
**Public** [1] - 214:18
**public** [1] - 207:20
**pursuant** [2] - 196:4, 197:13

## Q

**questions** [4] - 211:2, 211:11, 211:13, 211:17
**quick** [2] - 211:22, 212:2
**quickly** [1] - 205:11
**quoted** [1] - 209:14

## R

**RE** [2] - 216:5, 217:2
**READ** [1] - 194:11
**read** [11] - 195:25, 199:22, 205:15, 207:16, 208:13, 211:17, 211:23, 212:21, 216:10, 216:12, 217:22
**reading** [1] - 216:14
**real** [1] - 207:12
**really** [6] - 202:3, 206:4, 207:11, 207:15, 209:15, 209:24
**receipt** [1] - 204:22
**receive** [1] - 205:10
**received** [3] - 197:11, 198:8, 212:3
**recollect** [1] - 211:6
**Record** [3] - 192:24, 216:10, 216:20
**record** [3] - 195:7, 195:9, 208:20, 210:17, 215:11
**records** [1] - 198:4
**refer** [2] - 197:7, 199:13
**reference** [1] - 207:19
**referred** [1] - 196:15
**reflection** [1] - 206:18
**regarding** [2] - 197:13, 198:15
**registered** [12] - 199:8, 201:15, 202:3, 202:7, 202:14, 202:15, 202:21, 203:11, 203:21, 204:4, 208:8, 210:9
**Registered** [1] - 215:6
**registering** [2] - 201:1, 203:24
**registration** [2] - 202:17, 205:2
**relation** [1] - 207:13
**relative** [3] - 198:2, 215:13, 215:15
**relatively** [1] - 205:11
**reliably** [1] - 197:22
**remember** [3] - 207:6, 207:12, 207:15
**removal** [1] - 204:18, 205:13
**removed** [2] - 202:20, 203:4

RENCHEN [5] - 192:23, 214:17, 215:6, 215:21, 216:19
Repeat [1] - 203:17
report [1] - 215:8
Reporter [5] - 192:23, 214:17, 215:7, 215:21, 216:19
reporter [2] - 209:2, 209:14
REPORTER [5] - 212:11, 212:15, 212:18, 212:22, 215:1
REPORTER'S [1] - 194:11
Reporting [3] - 192:24, 216:10, 216:20
repository [1] - 210:13
representation [1] - 201:21
request [2] - 202:19, 204:20
REQUESTED [1] - 215:10
required [1] - 210:7
requirement [1] - 210:9
requires [1] - 209:15
research [1] - 210:1
resource [1] - 210:1
resources [6] - 199:13, 201:16, 201:17, 209:18, 210:4, 210:12
respond [1] - 204:19
response [3] - 198:12, 198:19, 200:15
restitution [1] - 200:8
restored [5] - 195:16, 195:17, 196:4, 196:8, 207:24
retrieved [1] - 206:12
return [2] - 197:4, 216:16
review [9] - 195:13, 199:24, 205:6, 205:21, 206:19, 209:3, 212:4, 212:7, 215:9
reviewed [1] - 199:18
Reviews [1] - 209:5
rights [3] - 195:17, 196:4, 207:24
rolls [5] - 202:18, 203:2, 203:8, 205:2, 205:6
RON [3] - 192:6, 216:5, 217:2
run [1] - 198:20
run-up [1] - 198:20
rush [1] - 212:14

**S**

SB [11] - 197:14, 199:3, 199:5, 200:3, 202:7, 202:15, 205:25, 207:2, 209:15, 210:22
second [3] - 198:22, 204:12, 209:13
Secretary [1] - 211:15
secretary [1] - 202:18
Section [1] - 196:5
see [1] - 211:23
See [1] - 198:25
send [4] - 204:18, 204:22, 205:7, 205:14
sends [1] - 204:15
sent [1] - 202:19
sentence [2] - 196:6, 199:16
sentences [1] - 207:23
sentencing [3] - 198:24, 199:7, 200:7
seven [5] - 204:21, 204:22, 205:1, 205:11, 205:22
seven-day [1] - 205:1
sexual [1] - 196:22
SHEET [2] - 194:12, 217:1
SHOULD [15] - 217:6, 217:7, 217:8, 217:9, 217:10, 217:11, 217:12, 217:13, 217:14, 217:15, 217:16, 217:17, 217:18, 217:19, 217:20
sign [5] - 201:19, 201:24, 216:11, 216:12, 216:15
SIGN [1] - 194:11
signature [3] - 216:9, 216:15, 216:21
signed [1] - 207:8
Signed [1] - 214:13
signing [2] - 199:5, 216:14
sit [1] - 204:2
situation [1] - 208:1
slight [1] - 207:8
slightly [1] - 204:13
someone [5] - 195:14, 195:17, 196:8, 199:12, 204:9
somewhat [2] - 198:2, 200:11
soon [1] - 204:1
Sorry [2] - 196:1, 209:8
sorry [2] - 202:10, 206:22
sort [4] - 198:20, 200:14, 205:6, 209:21
sought [1] - 197:11
Sounds [1] - 211:19
sources [2] - 200:5, 200:12
SPEAKER [1] - 211:14
speaking [1] - 209:14
specific [2] - 200:7, 207:13
specifically [1] - 200:6
specifics [1] - 207:6
staffing [2] - 209:18, 210:12
stamped [1] - 206:13
start [2] - 198:21, 206:23
state [11] - 195:14, 195:16, 196:5, 196:11, 196:18, 196:21, 198:14, 201:15, 202:18, 205:15, 210:12
STATE [5] - 192:7, 214:3, 215:3, 216:6, 217:2
State [2] - 211:15, 214:18
statement [1] - 208:5
states [1] - 199:5
STATES [1] - 192:1
stating [3] - 201:19, 207:21, 209:15
status [2] - 198:25, 210:14
statute [3] - 201:12, 208:12, 209:15
stay [1] - 211:7
stenographic [1] - 215:11
stenographically [1] - 215:8
still [4] - 195:13, 205:20, 210:11, 212:20
Street [2] - 193:4, 193:9
submitted [1] - 205:19
suggestion [1] - 203:18
summation [1] - 200:9
supervisors [1] - 205:22
supposed [1] - 201:17
sworn [1] - 214:11
system [1] - 200:19

**T**

TAKEN [2] - 192:15, 217:4
Tallahassee [4] - 192:17, 193:9, 193:13, 216:3
tempted [1] - 201:14
terms [3] - 196:6, 199:15, 207:17
testified [1] - 205:17
text [2] - 195:25, 208:12
THE [8] - 192:6, 211:22, 212:11, 212:15, 212:18, 212:22, 216:6, 217:2
therefore [1] - 203:3
they've [6] - 198:2, 198:5, 198:6, 198:8, 201:21, 205:24
thinking [2] - 199:8, 211:3
third [5] - 195:23, 195:25, 196:16, 198:19
thoughts [1] - 210:5
three [1] - 195:11
TIME [1] - 192:15
TO [1] - 216:1
today [1] - 210:20
together [1] - 210:8
took [1] - 205:21
tools [1] - 199:10
top [1] - 198:19
total [1] - 200:10
tough [5] - 200:6, 200:24, 201:4, 201:24, 208:2
transcribed [1] - 211:18
transcript [3] - 215:9, 215:10, 216:11
TRANSCRIPT [1] - 217:1
tried [1] - 212:4
triggers [1] - 204:19
true [2] - 215:10, 217:23
truly [1] - 216:17
try [2] - 198:25, 201:3
turns [1] - 204:4
tweaked [1] - 207:5
two [2] - 200:8, 206:9

**U**

uncertain [2] - 198:23, 201:6
Under [1] - 217:22
under [2] - 195:12, 200:3, 201:11, 210:22
undergoing [1] - 195:13
undersigned [1] - 214:9
Union [1] - 193:3
UNITED [1] - 192:1
UNKNOWN [1] - 211:14
unrelated [1] - 204:14
up [7] - 195:5, 198:4, 198:20, 203:4, 206:24, 211:6, 212:5
upcoming [2] - 201:13, 202:22

**V**

variety [1] - 197:14
varying [1] - 200:5
version [1] - 195:12
VI [1] - 196:5
victim [2] - 198:7, 209:23
view [2] - 201:6, 209:23
violation [1] - 204:6
VOLUME [1] - 192:12
Volume [1] - 195:2
vote [9] - 198:17, 201:1, 202:14, 202:22, 203:3, 203:7, 203:25, 210:10, 210:22
voted [1] - 204:6
voter [10] - 197:13, 199:8, 202:17, 203:2, 203:9, 203:21, 204:4, 204:10, 207:16, 210:21
voters [5] - 198:15,

198:23, 200:17, 203:11

**voting** [5] - 196:4, 203:11, 204:1, 204:5, 207:24

**VS** [2] - 216:5, 217:2

**vs** [1] - 192:5

## W

**waive** [3] - 216:9, 216:15, 216:21

**waived** [1] - 216:14

**wants** [1] - 211:11

**WAS** [1] - 215:10

**web** [1] - 206:13

**website** [3] - 206:11, 207:3, 207:20

**welcome** [1] - 211:22

**wish** [1] - 216:15

**withdraw** [1] - 206:3

**WITNESS** [3] - 194:1, 194:3, 211:22

**witness** [1] - 192:22

**word** [1] - 200:25

**WPTV.com** [1] - 209:1

**write** [1] - 199:2

**WRITE** [1] - 217:1

## Y

**York** [1] - 193:5