**Governor of the State of Florida**

```
 1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF FLORIDA
 2                  TALLAHASSEE DIVISION

 3
       KELVIN LEON JONES, et al.,
 4
                            Plaintiffs,
 5
       vs.                                Case No.
 6                                        4:19-cv-300-RH/MJF
       RON DESANTIS, in his official
 7     capacity as Governor of the State
       of Florida, et al.,
 8
                            Defendants.
 9     _ _ _ _ _ _ _ _ _ _ _ _ _ _  /

10

11          DEPOSITION OF:    CRAIG LATIMER

12          DATE:             August 26, 2019

13          TIME:             2:02 p.m. to 4:36 p.m.

14          PLACE:            601 East Kennedy Boulevard
                              27th Floor
15                            Tampa, Florida

16          PURSUANT TO:      Notice by counsel for
                              Plaintiffs for purposes of
17                            discovery, use at trial
                              or such other purposes
18                            as are permitted under
                              the Florida Rules
19                            of Civil Procedure

20          BEFORE:           PAMELA KINGSBURY, RPR
                              Notary Public, State of
21                            Florida at Large

22
                              Pages 1 to 106
23

24

25
```

**Governor of the State of Florida**

```
 1   APPEARANCES:

 2        JOHN CUSICK, ESQUIRE
          LEAH ADEN, ESQUIRE
 3        NAACP Legal Defense and Educational Fund, Inc.
          40 Rector Street
 4        5th Floor
          New York, New York 10006
 5        (212) 965-2200
               and
 6        JIMMY MIDYETTE, ESQUIRE (via telephone)
          American Civil Liberties Union Foundation of
 7        Florida
          118 West Adams Street
 8        Suite 510
          Jacksonville, Florida 32202
 9        (904) 353-8097
               Attorneys for Plaintiffs
10

11        STEPHEN TODD, ESQUIRE
          Hillsborough County Attorney's Office
          601 East Kennedy Boulevard
12        27th Floor
          Tampa, Florida 33602
13        (813) 272-5670
               Attorney for Craig Latimer
14

15   APPEARING TELEPHONICALLY FOR DEFENDANTS:

16        GEENA CESAR, ESQUIRE
          Alachua County Attorney's Office
17        12 SE 1st Street
          Gainesville, Florida 32601
18        (352) 374-5218

19        MARK HERRON, ESQUIRE
          Messer Caparello, P.A.
20        2618 Centennial Place
          Tallahassee, Florida 32308
21        (850) 222-0720

22        MORGAN BENTLEY, ESQUIRE
          Bentley & Bruning, P.A.
23        783 South Orange Avenue
          Suite 300
24        Sarasota, Florida 34236
          (941) 556-9030
25
```

**Governor of the State of Florida**

1  APPEARING TELEPHONICALLY FOR DEFENDANTS (CONTINUED):

2       ASHLEY DAVIS, ESQUIRE
        Florida Department of State
3       500 South Bronough Street
        Suite 100
4       Tallahassee, Florida 32399
        (850) 245-6531
5
        DYLAN REINGOLD, ESQUIRE
6       Indian River County
        1801 27th Street
7       Vero Beach, Florida 32960
        (772) 226-1427
8
        OREN ROSENTHAL, ESQUIRE
9       Miami-Dade County Attorney's Office
        111 NW 1st Street
10      Suite 2810
        Miami, Florida 33128
11      (305) 375-5151

12

13  ALSO PRESENT:  PEG REESE, ESQUIRE
                   MARY HELEN FARRIS, ESQUIRE
14                 GERRI KRAMER

15

16

17        INDEX                                      PAGE

18  DIRECT EXAMINATION BY MR. CUSICK                  7

19  CERTIFICATE OF OATH                             103

20  REPORTER'S CERTIFICATE                          104

21  READ AND SIGN LETTER                            105

22  ERRATA SHEET                                    106

23

24

25

**Governor of the State of Florida**

| | EXHIBITS | MARKED |
|---|---|---|
| 1 | | |
| 2 | 1 – Plaintiffs' First Notice of Deposition | 11 |
| 3 | 2 – Plaintiffs' First Amended Notice of | |
| 4 | Deposition | 11 |
| 5 | 3 – Plaintiffs' Second Amended Notice of Deposition | 11 |
| 6 | 4 – Senate Bill 7066 | 17 |
| 7 | 5 – Defendant's Answers to Interrogatories | 18 |
| 8 | 6 – Plaintiffs' First Request for Production | |
| 9 | Of Documents | 18 |
| 10 | 7 – Supplemental Response to Plaintiffs' First Request For Production | 18 |
| 11 | 8 – E-mail Search Terms List | 19 |
| 12 | 9 – News Article | 29 |
| 13 | 10 – Florida Voter Registration Application | 43 |
| 14 | 11 – 9/27/12 Memorandum | 55 |
| 15 | 12 – E-mail Chain | 62 |
| 16 | 13 – E-mail Chain | 71 |
| 17 | 14 – E-mail Chain | 90 |
| 18 | 15 – Politico Article | 100 |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

**Governor of the State of Florida**

1          CRAIG LATIMER,

2    the witness herein, being first duly sworn on oath, was

3    examined and deposed as follows:

4          THE WITNESS:  I do.

5          MR. CUSICK:  Good afternoon, Mr. Latimer.

6      My name is John Cusick, and I'm an attorney with

7      the NAACP Legal Defense and Educational Fund.  I'm

8      one of the attorneys representing the Gruver

9      plaintiffs in the consolidated case of

10     Jones v. DeSantis.

11          Before going any further, though, can

12     everybody who is making an appearance in the room

13     state their name for the record.  We'll start with

14     Plaintiffs' counsel in the room.

15          MS. ADEN:  Leah Aden with the Gruver

16     plaintiffs.

17          MR. TODD:  Stephen Todd for Mr. Latimer.

18          MR. CUSICK:  Great.  And then we're going to

19     turn to anybody making an appearance by phone.  If

20     you can state your name for the record starting

21     with Plaintiffs' counsel.  Is anyone there for the

22     McCoy plaintiffs?

23          Hearing none, we'll move to the Razor

24     plaintiffs?

25          For the Jones plaintiffs?

1      Mendez plaintiffs or any other plaintiff for

2      the Gruver plaintiffs?

3            MR. MIDYETTE:  Yes.  This is Jimmy Midyette

4      from the ACLU of Florida for the Gruver plaintiffs.

5            MS. CESAR:  This is Geena Cesar for Alachua

6      County.

7            MR. HERRON:  This is Mark Herron for Leon

8      County.

9            MR. BENTLEY:  This is Morgan Bentley for

10     Sarasota and Manatee Supervisors of Elections.

11           MR. CUSICK:  Any other counsel on the phone?

12     Anybody for Defendant Secretary of State?

13           MS. DAVIS:  Yes.  Ashley Davis on behalf of

14     the Secretary.

15           MR. CUSICK:  Anybody for Defendant -- go

16     ahead.

17           MR. REINGOLD:  Dylan Reingold on behalf of

18     Indian River County Supervisor of Elections,

19     Leslie Rossway Swan.

20           MR. CUSICK:  And any counsel for the defendant

21     for the Governor's office?

22           And is there anybody else for Defendants for

23     any of the Supervisors of Elections who might have

24     not had a chance to speak?

25           MR. ROSENTHAL:  Oren Rosenthal, Supervisor

**Governor of the State of Florida**

1    White.

2         MR. CUSICK:  Great.  Hearing none else, I

3    think we will move forward.

4              DIRECT EXAMINATION

5    BY MR. CUSICK:

6    Q.   Mr. Latimer, as I believe you know, the

7    plaintiffs are challenging certain portions of SB 7066.

8    I'll use that as shorthand for Senate Bill 7066 under

9    portions of the U.S. Constitution.

10        Can you please spell your name for the record.

11   A.   Sure.  Craig, C-r-a-i-g, Latimer,

12   L-a-t-i-m-e-r, Hillsborough County Supervisor of

13   Elections.

14   Q.   Great.  And you're testifying under oath

15   today, which means you're testifying with the same duty

16   to answer truthfully as you would before a court or

17   judge.  The court reporter is transcribing.  Over the

18   course of the deposition, I'll ask you questions.  If

19   you don't mind, if you would let me fully state the

20   question before answering, I'll do the same.  I'll wait

21   until you answer fully before asking another follow-up

22   question.

23        Please answer questions audibly, so no shaking

24   of the head so we can have a record of it.  Let me know

25   if you don't understand any questions that I say.  I'll

1  try to rephrase them or clarify to make sure we're on
2  the same page.
3          Are you represented by counsel today?
4      A.  I am.
5      Q.  Who is your counsel?
6      A.  Mr. Todd.
7      Q.  Great.  And so the only people talking during
8  the deposition should be you, me, or the court reporter
9  if needed.  You may hear your attorney, Mr. Todd, make
10 an objection.  If so, the objection will be noted by the
11 court reporter, but you must still answer the question.
12 You are required to answer all questions unless
13 specifically instructed by Mr. Todd not to.
14         Are there any reasons why you're unable to
15 understand or answer any questions today?
16     A.  Not that I'm aware of.
17     Q.  Are you currently taking any medications?
18     A.  I do take blood pressure medicine, yes.
19     Q.  Anything else that might influence or --
20     A.  No.
21     Q.  -- impair your ability to answer any
22 questions?
23         Any alcoholic beverages in the past 12 hours?
24     A.  No.
25     Q.  And if you need at any point to take a break,

1    just let your attorney know.  We can go off record.

2    Just if you're in the middle of answering a question and

3    you need to take a break, if you would just finish

4    answering, and then we can take a break afterwards.

5           Do you have any questions for me?

6    A.    I do not.

7    Q.    Great.

8           MR. CUSICK:  And then just one stipulation

9           before we begin.  I think I would like to say for

10          the record, I've been working with Mr. Todd right

11          now on resolving some discovery production

12          requests.  The current documents that we received

13          don't have Bates stamps, which are just like a

14          numbering system for ease of reference.  So for

15          that, we inputted our own Bates stamping for

16          today's record, and we'll work with Mr. Todd

17          afterwards to get additional Bates stamps.  It's

18          mainly for us to know how to say things and what to

19          reference during the call.

20          In addition to that, we're also using exhibits

21          from previous depositions that already have Bates

22          stamps on them so for anyone on the phone that's

23          listening can refer to those as well.  We just

24          wanted to see if that was okay with you.

25          MR. TODD:  That's fine.

**Governor of the State of Florida**

1          MR. CUSICK:  Great.

2     BY MR. CUSICK:

3          Q.    So to begin, how did you learn about today's

4     deposition?

5          A.    I was told by my attorney.

6          Q.    Sure.  And I'm giving the reporter a document

7     beginning with Bates Stamp HCSE 000001 entitled,

8     "Plaintiffs' First Notice of Deposition of Defendant

9     Supervisor of Elections."  A copy to your counsel,

10    Mr. Todd.

11         MR. TODD:  Thank you.

12    BY MR. CUSICK:

13         Q.    Do you recognize this document, Mr. Latimer?

14         A.    I do.

15         Q.    What is it?

16         A.    It's Plaintiffs' first notice of deposition of

17    me.

18         Q.    Is this how you initially learned about

19    today's deposition?

20         A.    It is.

21         Q.    Great.  And then just a couple more --

22              MR. TODD:  Excuse me, counsel.  For purposes

23         of labeling, are you going to stick with the Bates

24         label, or are you going to put an Exhibit 1 on it?

25              MR. CUSICK:  This is Exhibit 1.  I'm

**Governor of the State of Florida**

1    introducing two more.  These were two amended

2    notices, so this is Exhibit 2 that I'm introducing.

3    It's Bates Stamp HCSE 00004.  It's Exhibit 2.  I'm

4    giving it to Mr. Latimer, a copy to Mr. Todd.

5         Then there's one more as Exhibit 3.  This was

6    the second amended notice of deposition to

7    accommodate the scheduling for today's purposes.

8    It's labeled Exhibit 3, handing a copy to

9    Mr. Latimer followed by his counsel, Mr. Todd.

10   (Plaintiffs' Exhibit Nos. 1, 2, and 3 were marked for

11   identification.)

12   BY MR. CUSICK:

13        Q.    Mr. Latimer, do you recognize Exhibits 2 or 3?

14        A.    I do.

15        Q.    Great.  So I want to talk a little bit about

16   how you prepared for today's deposition.  Without saying

17   the substance of the conversations, did you meet with

18   your attorney to prepare for today?

19        A.    I did.

20        Q.    Did you meet with any other attorneys or

21   counsel before?

22        A.    Not that I'm aware of, no.

23        Q.    How many times did you meet -- was it with

24   Mr. Todd?

25        A.    Yes.

**Governor of the State of Florida**

1    Q.   How many times did you meet?

2    A.   We probably met two or three times.

3    Q.   For how long?

4    A.   I don't remember the exact amount.  An hour,

5 hour and a half.

6    Q.   And was anyone else present in those meetings?

7    A.   Yes.

8    Q.   Who?

9    A.   Peg Reese and Gerri Kramer, maybe not all at

10 the same time.  One might have been at one meeting, two

11 at another.

12    Q.   But no one else besides those two potentially?

13    A.   Not that I recall.

14    Q.   And did you review any documents to prepare

15 for today's deposition?

16    A.   I reviewed one of the previous supervisor's

17 deposition, Ms. Arrington.

18    Q.   Did you bring any documents with you today?

19    A.   I did not.

20    Q.   And aside from your attorney, did you discuss

21 your deposition with anyone else?

22    A.   I did not.

23    Q.   I'm going to talk a little bit about whether

24 you've been deposed before.  Have you in your personal

25 or professional capacity?

**Governor of the State of Florida**

1      A.    Yes, I have.

2      Q.    And what was the name of the case in which you

3  were deposed, or cases?

4      A.    Several hundred.

5      Q.    Hundred.  And any recent cases in the last

6  five years relating to a voting rights case?

7      A.    No.

8      Q.    And were those in a combination of both your

9  personal and professional capacities?

10     A.    Mainly professional.

11     Q.    Professional as Supervisor of Elections?

12     A.    No.

13     Q.    What were the cases where you were deposed?

14     A.    I'm retired from Hillsborough County Sheriff's

15  Office, spent 35 years in law enforcement.  I've been

16  deposed on everything from homicides to traffic

17  accidents.

18     Q.    And do you understand why you're here for this

19  deposition today?

20     A.    I do.

21     Q.    And in any of these cases that you were

22  deposed for, were there any claims of racial

23  discrimination?

24     A.    No.

25     Q.    When did you first learn about today's

1  lawsuit?

2      A.    I can't give you the exact date.  It was

3  shortly after it was filed.

4      Q.    Aside from speaking with your counsel,

5  Mr. Todd, have you spoken about this lawsuit with other

6  members of your staff or other individuals?

7      A.    Absolutely.

8      Q.    And who?

9      A.    Several different supervisors just in general

10 conversation, no facts, just, Have you been deposed yet,

11 are you involved in the case.  It was just general.

12     Q.    And for the Supervisors of Elections that

13 you've spoken to, what were their names?

14     A.    Bill Cowles in Orange County; Wesley Wilcox,

15 Marion County; Pete Antonacci, Broward County;

16 Lori Edwards, Polk County, off the top of my head.

17     Q.    Great.  And were those conversations over the

18 phone?

19     A.    No.  They were in person.

20     Q.    In person.

21           Did you have any conversations with any

22 Supervisors of Elections over the phone that you recall?

23     A.    Not that I recall.

24     Q.    What about any E-mail correspondence?

25     A.    I don't recall.  I may have sent an E-mail

**Governor of the State of Florida**

1  that I got served a subpoena today or something like

2  that.

3      Q.   And have you read the complaint that was filed

4  in this case?

5      A.   I have.

6      Q.   And when was that?

7      A.   Several weeks ago.

8      Q.   And are you aware there is a preliminary

9  injunction that has been filed to stop portions of this

10  law from going into effect?

11      A.   I am aware of that.

12      Q.   And have you read that?

13      A.   I have not.

14      Q.   Okay.  In your own words, what do you

15  understand the reason for the lawsuit?

16      A.   I think in a nutshell, what it does is, it

17  sets up two classes of voters.

18      Q.   Could you expand upon that.  What do you mean

19  by that?

20      A.   Those with money and those without.

21      Q.   And when you say "it sets up," are you

22  referring to SB 7066?

23      A.   No.  I'm referring to the lawsuit.

24      Q.   The lawsuit sets up --

25      A.   The lawsuit points out that it sets up two

**Governor of the State of Florida**

1   classes of voters or citizens.

2       Q.   When you say "two classes," is that based on

3   wealth?

4       A.   Yes.

5       Q.   And are you familiar with Amendment 4 that was

6   passed on November 6th --

7       A.   I am.

8       Q.   -- 2018?

9       And what is your understanding of how

10  Amendment 4 changed voter registration eligibility in

11  Florida?

12      A.   Amendment 4 was to allow people that had

13  felony convictions that had met the terms of their

14  sentence to be able to register to vote.

15      Q.   We'll touch base a little bit more about some

16  questions later on.

17      Are you familiar with SB 7066?

18      A.   Yes, I am.

19      Q.   And what is your understanding how that law

20  changed voter registration and eligibility in Florida?

21      A.   I don't know how it changed it.  I think that

22  the law expanded greatly.  It named all of the offenses

23  that you couldn't register to vote for, for sexual

24  offenses and homicides, and also talks about having to

25  pay all the fines and fees prior to being able to

**Governor of the State of Florida**

1   register.

2        Q.   And do you understand that this lawsuit is

3   only challenging certain portions of SB 7066, not the

4   entire?

5        A.   I am.

6        Q.   Great.

7             MR. CUSICK:   I'm going to introduce as

8        Exhibit 4 -- this is the text of 7066.  I'm handing

9        a copy to Mr. Latimer, one to his counsel,

10  Mr. Todd.

11  (Plaintiffs' Exhibit No. 4 was marked for

12  identification.)

13  BY MR. CUSICK:

14       Q.   We'll primarily, later in the deposition,

15  focus on pages 45 to 56, which are the portions of the

16  bill that we're challenging dealing with, as you

17  mentioned, fines and fees.  Do you recognize this

18  document?

19       A.   I do.

20       Q.   And have you read SB 7066 before?

21       A.   I have.

22       Q.   And I'm going to first turn to documents that

23  were provided to us through your counsel in response to

24  our first set of interrogatories.

25            MR. CUSICK:   I'm marking this as Exhibit 5,

**Governor of the State of Florida**

1    and these are answers to the interrogatories that

2    we served.  I'm handing a copy to Mr. Todd, and

3    this begins with Bates Stamp HCSE 000073.

4        I'm also going to introduce as Exhibit 6 --

5    this is the first set of production documents in

6    response to our request for production.  Sorry for

7    the housekeeping.  We just want to introduce these

8    for the record.  This is Bates Stamp HCSE 00089.

9    I'm handing a copy to Mr. Todd.

10       And then the final set, this was a

11   supplemental discovery request.  I'm labeling this

12   as Exhibit 7.  That was produced to us by your

13   counsel, Mr. Todd.  I'm handing a copy --

14       THE WITNESS:  Did you want to put a number on

15   this one?

16       MR. CUSICK:  Yes.  I'll put this as 5, 6, and

17   7.

18   (Plaintiffs' Exhibit Nos. 5, 6, and 7 were marked for

19   identification.)

20   BY MR. CUSICK:

21   Q.   Do you recognize these three documents?

22   A.   I do.

23   Q.   And what are they?

24   A.   5, 6, and 7?  Are you asking me about 5, 6,

25   and 7?

**Governor of the State of Florida**

1    Q.    Correct.

2    A.    So 5 is the response that we gave to the

3  interrogatories.  6 was the request for the

4  interrogatories, and 7 is copies of some text messages

5  between myself and Representative Jamie Grant.

6    Q.    And for Exhibits 6 and 7, who in your office

7  collected those documents?

8          MR. TODD:  Object to the form, "collected."

9    Go ahead and answer if you can.

10          THE WITNESS:  It was compiled mainly by

11    Peg Reese, Gerri Kramer, and myself.

12  BY MR. CUSICK:

13    Q.    And what process did you use to compile those

14  documents?

15    A.    Went through the requests and saw if we had

16  records to be able to answer those.

17  (Plaintiffs' Exhibit No. 8 was marked for

18  identification.)

19  BY MR. CUSICK:

20    Q.    I'm introducing as Exhibit 8 -- this is an

21  E-mail correspondence with your counsel, Mr. Todd,

22  regarding the -- regarding the search terms.  This is

23  Exhibit 8.  These were the search terms that were used

24  during the request for production that was produced by

25  your counsel.  I'm handing it over to Mr. Todd.

**Governor of the State of Florida**

1              Do you recognize this document?

2        A.    I have never seen that.

3        Q.    Do you know if these were the search terms

4    that individuals in your office used to compile the

5    documents that were requested?

6        A.    Yes, they were.

7        Q.    I'd like to briefly discuss your background

8    and employment history.  Where do you currently live?

9        A.    Hillsborough County.

10             MR. TODD:  I'd like to keep his address off

11        the record, if we could, please.

12             THE WITNESS:  My address is protected.

13             MR. CUSICK:  That's fine.

14             MR. TODD:  Under state law.

15   BY MR. CUSICK:

16       Q.    Okay.  How long have you lived there?

17       A.    20 years -- 30 years.  I'm sorry.

18       Q.    Did you attend college?

19       A.    I did, University of South Florida.

20       Q.    What did you study?

21       A.    I have a Bachelor of Arts in industrial

22   technical education.

23       Q.    Any other educational degrees?

24       A.    No.

25       Q.    Where do you work now?

**Governor of the State of Florida**

1    A.    I'm Supervisor of Elections for Hillsborough

2    County.

3    Q.    How long were you in this position?

4    A.    I originally started in the office in 2009 as

5    a chief of staff, and I was elected in '12 and reelected

6    in 2016.

7    Q.    And I know you mentioned before that you had

8    worked in law enforcement.  Was that your job previously

9    working for the Supervisor of Elections office?

10    A.    That is correct.

11    Q.    And do you have any other employment outside

12    of that prior to working for the Hillsborough Sheriff's

13    Department?

14    A.    Some minor consulting working with nonprofit

15    organizations to develop executive directors and also

16    help identify board members.

17    Q.    And do you have any other work right now

18    outside of your Supervisor of Elections job?

19    A.    I do not.

20    Q.    Are you a member of any community groups or

21    organizations?

22    A.    I am.

23    Q.    Which ones are those?

24    A.    I'm on the board of the Central Florida

25    Behavioral Health Network, which is a managing entity

1  here in Florida.  I'm chair emeritus of BAYS Florida,

2  and I'm on the Tampa Catholic Board of Trustees.

3      Q.   I'll turn to just discuss some of the

4  responsibilities that your office holds as Supervisor of

5  Elections.  What are your job responsibilities as

6  Supervisor of Elections here in Hillsborough County?

7      A.   I conduct federal, state, county, municipal

8  elections, also have a duty to maintain voter rolls and

9  also accurate street indexes.

10     Q.   When you mention maintain voter rolls, does

11  that include updating voter registration information?

12     A.   Yes, it does.

13     Q.   Does it include maintaining the rolls are

14  accurate?

15     A.   Yes, it does.

16     Q.   Does it include entering new registration into

17  the statewide registration system?

18     A.   Yes.

19     Q.   And determining the eligibility of new

20  registrants or applicants?

21     A.   Yes and no.  The State is the one that makes

22  the match on the information as far as the driver's

23  license or Social Security number.  So they make the

24  final determination if the person is, in fact, who they

25  say they are.

**Governor of the State of Florida**

1    Q.   In your capacity, are you the final

2  decision-maker of a voter's eligibility?

3         MR. TODD:  Object to the form.  Vague.

4  BY MR. CUSICK:

5    Q.   You can answer.

6    A.   Could you repeat it.

7    Q.   In your capacity, are you the final

8  decision-maker on a voter's eligibility?

9         MR. TODD:  Same objection.

10        THE WITNESS:  Not necessarily.  As I said, the

11        State is the one that makes the match to ensure

12        that the person is who they say they are.  So the

13        State can definitely turn around and say this is

14        not the right person.

15  BY MR. CUSICK:

16   Q.   And if someone is applying with a felony

17  conviction, you receive that application.  Where do you

18  send it next?

19   A.   So let's try and be a little bit more

20  specific.  Somebody is applying with a felony --

21   Q.   Conviction.

22   A.   -- conviction?

23   Q.   Yes.

24   A.   Have they met the terms of Amendment 4?

25   Q.   They've sworn on the voter registration

**Governor of the State of Florida**

1 application.

2     A.   But they do.  You check the box, just as you

3 check the box that you're a citizen, just as you check

4 the box that you haven't been found mentally incompetent

5 in voting; and you sign the oath at the bottom of the

6 application.

7     Q.   And what's the next step once your office

8 receives that?

9     A.   So our office, if it was -- again, we need to

10 be more specific here.  Is it online voter registration

11 or with a paper copy?

12     Q.   Let's say a paper copy.

13     A.   Okay.  We would input the information.  That

14 voter would be held in a suspense file while we forward

15 the information to the State for verification and to be

16 able to make the match with the driver's license, Social

17 Security.

18     Q.   Is it the same process for online, online

19 application?

20     A.   Actually, it comes to us in suspense from the

21 State that it's been verified already.

22     Q.   How many staff work in your office?

23     A.   I have about 46 full-time employees.  We also

24 have, at any given time, probably 15 to 20 full-time

25 temporary employees.  And the closer we get to an

**Governor of the State of Florida**

1  election, that number could rise to 200.

2      Q.    And do you know when Amendment 4 went into

3  effect, went into law?

4      A.    January 8th.

5      Q.    And following when it went into effect, was

6  there any staff composition change to accommodate for

7  any new responsibilities under Amendment 4?

8      A.    No.

9      Q.    Do you know when SB 7066 went into effect?

10     A.    July 1st.

11     Q.    Were there any staff composition changes to

12 accommodate for the new requirements of that law?

13     A.    No.

14     Q.    Did any job responsibilities shift with the

15 implementation of Amendment 4?

16     A.    No.

17     Q.    Did any job responsibilities change with the

18 implementation of SB 7066?

19     A.    Not relative to the voting or the restoration

20 of rights.  7066 is very broad.  It also has redesigned

21 the return envelope for vote by mail.  It also has put a

22 tracking system into effect for ballots.  That's caused

23 extra work for us but not the parts of 7066 relating to

24 somebody with a previous felony conviction.

25     Q.    How is the Supervisor of Elections office

1  funded?

2      A.   Through the County, Board of County

3  Commissioners.

4      Q.   And do you anticipate receiving any additional

5  resources, whether it's fiscal, staffing, or guidance,

6  to implement SB 7066?

7      A.   I do not.

8      Q.   Are other Supervisors of Elections offices

9  funded equally?

10      A.   I can't answer that question.

11      Q.   Can any of your staff register an applicant to

12  vote?

13      A.   Yes.

14      Q.   And which employees have that authority?

15      A.   We've got several.  We do a lot of outreach in

16  the community, constantly out in different places in the

17  community attempting to do voter education and also

18  register voters.

19      Q.   And can anyone in your staff reject a voter

20  registrant's application without your review?

21      A.   Without supervisor review, no.

22      Q.   So to be clear, no one has authority to reject

23  a ballot without --

24      A.   A ballot?

25      Q.   Sorry.  Application, voter application?

**Governor of the State of Florida**

1    A.    Well, we don't reject an application.  It's

2  sent through to the State, and the person is either

3  eligible or ineligible to register based on the

4  information.  We don't -- if somebody gives us an

5  application, we don't say, No, we're not going to take

6  that.

7    Q.    Can any of your staff initiate removal

8  proceedings, for someone that is currently on the voter

9  registration rolls, without your approval?

10    A.    What would be the reason for removal?

11    Q.    Let's say there's a change in status, maybe a

12  felony conviction or a change in address.

13    A.    It's a process that's followed by state law,

14  then.

15    Q.    Employees can do that without your approval?

16    A.    Ultimately it's my approval.  I have senior

17  staff involved in those decisions.

18    Q.    Which senior staff?

19    A.    It could be my chief of staff, Peg Reese.  It

20  could be my head of voter services, Brett Edwards.

21    Q.    Anyone else?

22    A.    Not that I can think of.

23    Q.    Aside from you, have any of your staff worked

24  in law enforcement before?

25    A.    I have a couple of temporary employees that

**Governor of the State of Florida**

1  have.

2      Q.    Do you happen to know what roles those were,

3  where they worked in law enforcement?

4      A.    Investigative capacities.

5      Q.    What are their current titles here?

6      A.    The one I've got right now works in the

7  warehouse.  I'm not sure of the exact title.

8      Q.    And have any of your staff worked at a

9  criminal justice agency or criminal justice

10  organization?

11      A.    I can't answer that.  I don't know for

12  certain.

13      Q.    To your knowledge, has anybody worked in the

14  Clerk of Court's office?

15      A.    I don't believe I have anybody that was with

16  the Clerk's office previously.

17      Q.    I'm going to talk a little bit about the

18  Hillsborough County demographics.  Do you know what the

19  racial makeup is of Hillsborough County?

20      A.    Not off the top of my head, I don't, no.

21      Q.    Leading up to Amendment 4, did the community

22  members raise concerns about racial disparities in the

23  criminal justice system to you?

24      A.    Can you state that again, please.

25      Q.    Leading up to Amendment 4's passage, did

**Governor of the State of Florida**

1  community members express concerns about racial

2  disparities in the criminal justice system to you?

3          MR. TODD:  I'm going to object as to time

4      frame of the question.

5          THE WITNESS:  I don't recall any

6      conversations.  We were very involved with trying

7      to get the word out working closely with the Rights

8      Restoration Coalition.

9          MR. CUSICK:  I'm going to introduce as

10     Exhibit 9 an article titled, "Amendment 4 Could

11     Boost African-American Voting Block."  This is HCSE

12     000108.  I'm handing a copy to Mr. Latimer.

13         THE WITNESS:  Do you want to put a number on

14     that?

15         MR. CUSICK:  Sorry.  And one to Mr. Todd.

16         THE WITNESS:  You have two 8s.

17         MR. TODD:  This would be 9.

18         MR. CUSICK:  Sorry.

19 (Plaintiffs' Exhibit No. 9 was marked for

20 identification.)

21 BY MR. CUSICK:

22     Q.   Part of this, you'll see that there is a quote

23 in the second paragraph.  Unfortunately when printing,

24 one of the words got cut off.  I'll represent that

25 you're quoted as saying, "I think the statistics are

1   very clear.  Without a doubt, the African-American

2   population is overrepresented by the convicted felon

3   population.  So I think it is a very real situation."

4          What statistics were you referring to when you

5   made this comment?

6          A.   The statistics of how many African-Americans

7   are incarcerated.  There's been an overrepresentation

8   issue, including in the juvenile system, in Florida for

9   years and years.

10          And just to be clear, back up.  The previous

11  question you asked me was whether anybody from the

12  community had asked me anything.  I wasn't taking a

13  reporter's question at that point.

14          Q.   That's noted.

15          So you mentioned that there are statistics

16  documenting the racial disparities, and that also

17  includes here in Hillsborough County?

18          A.   Yes.

19          Q.   Why are African-American residents

20  overrepresented in Florida for people with a felony

21  conviction?

22          A.   I can't answer that.

23          Q.   And have Hillsborough County community members

24  expressed how Amendment 4 might benefit the

25  African-American community?

1      A.    Can you restate that.  I'm not sure I

2  understood that.

3      Q.    Have community members or groups you've worked

4  with spoken about the benefits that the passage of

5  Amendment 4 might benefit the African-American

6  community?

7            MR. TODD:  To him?

8  BY MR. CUSICK:

9      Q.    Correct.

10     A.    Yeah.  Again, I talk to a lot of groups in

11 this process.  We go to a great extent to try and be

12 inclusive with anybody that's eligible to be registered.

13 So there could have been conversations.  I don't recall

14 anything specific.

15     Q.    Before you mentioned that you had worked with

16 groups on Amendment 4.  You mentioned that you work with

17 the Florida Rights Restoration Coalition.  Were there

18 any other groups?

19     A.    NAACP.  That's all I can think of right now.

20     Q.    In what capacity was that?

21     A.    Again, just a community capacity.  I know who

22 the current chair of the NAACP is here, Yvette Lewis.

23 I've worked with her.  I've also previously done work

24 with Joyce Hamilton Henry from the ACLU and with the

25 Rights Restoration Coalition.

**Governor of the State of Florida**

1    Q.   And did you attend any NAACP events to speak

2    about Amendment 4?

3    A.   I don't recall.

4    Q.   What about the implementation of SB 7066?

5    A.   I mean, it's always been a general

6    conversation, but I've not made any specific

7    presentations specific to the changes.

8    Q.   And have you partnered with the NAACP or the

9    ACLU on any voter registration drives?

10   A.   NAACP for sure, yeah.

11   Q.   Any this past year?

12   A.   I couldn't answer that right off the top of my

13   head.  We're a large county.  We're the fourth largest

14   county.  I've got people that do nothing but outreach

15   all day long.

16   Q.   And how big is the -- is that a department,

17   the outreach, a specific unit?

18   A.   It's a unit, yes, that works under our

19   communications area.

20   Q.   And how many people are in that?

21   A.   We've got a couple of full time, and there's

22   several part-time people in there also.

23   Q.   And what are the names of the individuals in

24   that office?

25   A.   Xenia Sanchez, Digna Alvarez; and then a

1   temporary employee, Linda Wright, works with us quite a

2   bit.

3        Q.   I'd like to talk a little bit about the voter

4   registration and list maintenance process.  In this

5   context, it's somebody who has not had a felony

6   conviction, so the process for someone who is not

7   applying and had a felony conviction.  What are the

8   voter qualifications for registering to vote in Florida?

9        A.   18, citizen, and resident.

10       Q.   Can you briefly explain the process by which a

11  Florida resident can register to vote?

12       A.   They can either go to online voter

13  registration and register that way, or they can turn in

14  a paper application.  They also can go online and fill

15  out the application, print it out, sign it, and send it

16  in.

17       Q.   And you indicated before, whether it's a paper

18  ballot or an online ballot, that once your office

19  receives the voter registration application, you send it

20  to the Secretary of State's office?

21       A.   Yes.

22       Q.   And do you know -- do you know what processes

23  the Secretary of State uses to review that application?

24       A.   I do not.

25       Q.   Do they give you any guidance when they send

## Governor of the State of Florida

1  the application back?

2      A.   I don't understand your question.

3      Q.   Do they provide -- once they've made a

4  determination for eligibility, do they provide any

5  additional guidance, whether additional research needs

6  to be conducted or any other steps?

7      A.   If there's no issue with the eligibility, it

8  comes back to suspense, and then the person is entered

9  into the files.  If there is an incomplete

10  application -- and I don't know if that's what you're

11  referencing -- where there might not be enough

12  information on it, we would take up that task of trying

13  to communicate with the voter to get the necessary

14  information.  They might have their street name and not

15  their street number.  Those are hard ones to get ahold

16  of.  Or might be you can't read exactly what it is.

17      Q.   And after the validation is complete, is the

18  individual registered to vote?

19      A.   Yes.

20      Q.   And under state law, would you agree that

21  you're responsible for determining whether a voter

22  registration applicant is eligible?

23      A.   Yes.

24      Q.   And what are the ways your office makes that

25  determination?

**Governor of the State of Florida**

1    A.    Well, the information has come back from the
2   State that it's a match, and the person's checked the
3   box that they're 18.  They've given us their date of
4   birth.  They're a citizen.  They haven't been convicted
5   of a felony or had their rights restored are now the
6   three boxes they can check, and that they're not
7   mentally incapacitated, and sign the oath.
8    Q.    And if you get an application that is sent
9   back to you because there's incomplete information and
10   let's say you aren't able to speak with that voter
11   applicant, do you conduct or do you look at any
12   databases or other resources to assist with that
13   inquiry?
14    A.    Can you give me an example of why we would?
15    Q.    Let's say that somebody's residency, that
16   there might be a mismatch or something and you can't
17   speak with the applicant.  Are there any other data
18   searches that you might look to to make the
19   determination of where that person lives?
20    A.    The person claims what their residence address
21   is.  We don't do an investigation to ascertain that.
22   Again, it's the four corners of the page.  They've
23   signed an oath.
24    Q.    And when you conduct -- or when you reach out
25   to an individual because there is incomplete information

**Governor of the State of Florida**

1  on the application, are there any costs associated with

2  that, monetary costs?

3       A.    Minor.

4       Q.    What would those be?

5       A.    A letter, postage.

6       Q.    Postage for the letter.

7             And after somebody submits their application

8  and you're in the process of determining their

9  eligibility, are they registered at that time to vote?

10       A.    No, they aren't.

11       Q.    It's only after their application has been

12  completed or determined?

13       A.    A match has been made by the State.

14       Q.    When you conduct list maintenance, what

15  sources or databases do you rely on?

16       A.    We use NCOA.

17       Q.    Could you spell that acronym out.

18       A.    NCOA, National Change of Address.

19       Q.    Is that the only database?

20       A.    It is, that we use, yes.

21       Q.    And are there any monetary costs when you're

22  conducting list maintenance?

23       A.    Yes, there is.

24       Q.    What are those?

25       A.    Again, if it's something that requires us to

**Governor of the State of Florida**

1  begin communicating with the voter, it would be the cost

2  of the postage and the postcard or letter, whatever we

3  send them at that point.

4      Q.   And then after your office sends the notice,

5  what's the next step in the process?

6      A.   It depends on what it's for.  If we've gotten

7  a change of address that's not in our county anymore, we

8  would suspend that voter to the other county.  I

9  guess -- ask that question again.  I'm not sure I really

10  comprehended that.

11      Q.   After there's been a notice sent out by your

12  office, are there any other steps that you affirmatively

13  take, or is it on the applicant to respond back?

14      A.   So if you look in the statute, it's very clear

15  when we're doing list maintenance that we would reach

16  out with a first postcard.  If that's not responded to,

17  there's a second one sent, and then a third one is sent.

18  So yeah, there's additional steps to be taken, but it

19  depends on what the situation is.

20      Q.   And for this list maintenance process, is the

21  Secretary of State involved at all?

22      A.   No.

23      Q.   Does the Secretary of State send any guidance

24  before any steps are taken?

25      A.   It's in the statute.

**Governor of the State of Florida**

1    Q.    Does the Secretary of State send lists of
2    ineligible voters?

3    A.    They do.

4    Q.    How often is that?

5    A.    On a very regular basis.  Ineligible voters
6    are put into suspense for us to pull them out.

7    Q.    When you say "regular," is that monthly?

8    A.    Daily, weekly.

9    Q.    And do you always accept the information from
10   the Secretary's list of ineligible voters?

11   A.    What do you mean by "accept"?

12   Q.    Do you make any independent determinations, or
13   do you rely on their assessment?

14   A.    So by law, the State is required to furnish us
15   with credible, reliable information in an initial
16   determination of a person's ineligibility.

17   Q.    And so once they've sent you that information,
18   do you make a determination whether that evidence is
19   credible and reliable, or do you solely rely on the
20   Secretary of State's determination for --

21   A.    That information also comes with records from
22   the Clerk of the Court, comprehensive case information,
23   sheets that are there.  What we're looking at is to
24   ascertain that, yes, that, in fact, is our voter.

25   Q.    And how would you define "credible evidence"?

**Governor of the State of Florida**

1    A.    Something that you can look at, you can verify

2  if you wanted to.

3    Q.    What about "reliable evidence"?

4    A.    Same thing.  I could give you the opposite of

5  that, actually, where the State has maybe sent us a file

6  and there was not an adjudication of guilt; adjudication

7  was withheld.  We would then send that back to the State

8  because it obviously wasn't reliable.

9    Q.    Does your office conduct its own review or

10  investigation after any lists are sent?

11    A.    We do not.  Again, I should probably ask what

12  do you mean by "investigation"?  I told you previously,

13  we will look and make sure that that is, in fact, our

14  voter that we're speaking about.

15    Q.    And for the example that you mentioned when

16  there is a suspension of adjudication --

17    A.    Withheld.

18    Q.    Withheld.  What steps do you take to determine

19  that -- what steps do you take to verify whether, in

20  fact, there was a suspension or there was --

21    A.    It would be right on the information the State

22  sends us --

23    Q.    Gotcha.

24    A.    -- from the Clerk's office.

25    Q.    It's an error from --

1    A.   Yes.

2    Q.   It's something you can visually see?

3    A.   Yes.

4    Q.   I want to talk a little bit about elections

5  since January 8th, 2019, when Amendment 4 went into

6  effect.  Have there been any in Hillsborough County?

7    A.   Elections, yes.  We had a City of Tampa

8  election.

9    Q.   Any others?

10    A.   No.

11    Q.   Did you have any issues carrying out these

12  elections?

13    A.   No.

14    Q.   Did you receive any guidance from the

15  Secretary of State prior to the March 5th election in

16  Tampa Bay?

17    A.   Guidance in relation to --

18    Q.   How to implement Amendment 4.

19    A.   No.

20    Q.   Did you receive any guidance -- let me strike

21  that for a second.

22         Was there an April 2nd mail ballot annex

23  election?

24    A.   No, not in our county.

25    Q.   Not in the city of Plant -- or Plant City?

1        A.    We did not do a mail ballot for Plant City.

2        Q.    This past year?

3        A.    Yes.

4        Q.    Was there a runoff in Tampa?

5        A.    There was.

6        Q.    Do you happen to remember that date?

7        A.    The last part of April.

8        Q.    Did you receive any guidance from the

9    Secretary of State prior to that election on how to

10   implement Amendment 4?

11       A.    We did not.

12       Q.    Do you have any elections upcoming in

13   November 2019?

14       A.    I do not.

15       Q.    If you did have an election and there was no

16   guidance from the Secretary of State, would you have any

17   concerns on implementing Amendment 4 before that

18   election?

19       A.    I don't implement Amendment 4.

20       Q.    Carrying out Amendment 4's requirements under

21   the law.

22       A.    Those requirements have been reduced to a

23   state statute now.  And again, it's the State's

24   responsibility to furnish us with credible, reliable,

25   initial determination of an individual for a felony.

**Governor of the State of Florida**

1    Q.   Did you reach out to any other Supervisors of

2   Elections to seek guidance on how to comply with

3   Amendment 4?

4    A.   I have not.

5    Q.   Do you know when the next election is in

6   Hillsborough County?

7    A.   March 2020.

8    Q.   What election?

9    A.   March 17th, that's the presidential preference

10  primary.

11   Q.   Do you know the registration deadline for

12  that?

13   A.   Books close 29 days before the election.

14   Q.   I'd like to now talk a little bit about the

15  pre-Amendment 4 process for somebody who is applying to

16  vote with a felony conviction.  So prior to Amendment 4,

17  what were the voter qualifications related for people

18  with a felony conviction?

19   A.   They would have had to have gone through

20  clemency through the clemency board if they had an

21  adjudication of guilt.

22   Q.   What was required by new registrants to

23  participate in elections if they were applying to vote?

24   A.   When?

25   Q.   Prior to Amendment 4.

**Governor of the State of Florida**

1      A.    They would have had to have their rights

2    restored through clemency.

3            MR. CUSICK:  I'm going to introduce this.

4      It should be Exhibit 10.  This is Bates Stamp LCSE

5      000373.  I'll give one to Mr. Latimer and Mr. Todd.

6    (Plaintiffs' Exhibit No. 10 was marked for

7    identification.)

8    BY MR. CUSICK:

9      Q.    Do you recognize this document, Mr. Latimer?

10     A.    I do.

11     Q.    What is it?

12     A.    It's a Florida voter registration application.

13     Q.    Would somebody whose rights have been restored

14   through Amendment 4 be able to use this voter

15   registration form?

16     A.    Yes.

17     Q.    What would they do -- for somebody whose

18   rights have been restored through Amendment 4, what

19   checked box would they --

20     A.    I would say Number 2, where it says, "I affirm

21   that I'm not a convicted felon or if I am, my right to

22   vote has been restored."

23     Q.    Prior to Amendment 4 -- and again, we're

24   talking about somebody who is applying with a felony

25   conviction -- what happened if somebody's eligibility

1  was challenged?

2       A.   What do you mean if their eligibility was

3  challenged?

4       Q.   Let's say, for example, that you received

5  information from a third party that the person was

6  ineligible to vote.

7       A.   I would give that information to the State so

8  that they could do their investigation and furnish me

9  with a reliable, credible, initial determination.

10       Q.   When you say "the State" --

11       A.   Secretary of State, yes.

12       Q.   The Division of Elections office?

13       A.   Yes.

14       Q.   And do you -- if you receive information about

15  someone's voter eligibility being challenged, your first

16  step is to always send it to the State?

17       A.   Yes.

18       Q.   And again, prior to Amendment 4, how did your

19  office address applicants who have out-of-state

20  convictions?

21       A.   This would be furnished to us by the State in

22  some manner.  Or if it came to our attention, then we

23  would notify the State, same way with federal

24  convictions.

25       Q.   And so if someone's rights had been restored

**Governor of the State of Florida**

1   through the clemency process, you would rely on the

2   credibility determination based on the Secretary of

3   State's assessment or determination?

4        A.   You can go to the clemency Web site and put

5   their information in and see if they've received

6   clemency also.  The State is the one that would be

7   verifying that.

8        Q.   And if you identified that a voter applicant

9   appeared to be ineligible and you sent the information

10  to the Secretary of State, were there ever concerns

11  about the credibility and reliability of the information

12  from the Secretary of State's office?

13       A.   No.  I mean, there's been some office errors,

14  as I alluded to earlier, where somebody just missed

15  whether the adjudication had been withheld or not.

16       Q.   Aside from the adjudication being withheld, do

17  you remember any other errors in information you

18  received from the Secretary of State's office?

19       A.   Not that I can recall.

20       Q.   And did the voter remain registered while that

21  process was ongoing?

22       A.   I'm sorry?

23       Q.   Did somebody whose voter registration had been

24  challenged or there was an issue where you received

25  information and sent it to the Secretary of State, did

**Governor of the State of Florida**

1    they remain on the voter registration rolls?

2         A.   Yes.

3         Q.   What was the process once you received the

4    information back from the Secretary of State if you

5    determined that the information -- or relied on it as

6    being credible and reliable?  What was the next step

7    that you would take?

8         A.   Back up just a minute.  State that again,

9    please, if you can.  Tell me what I've got because we've

10   been talking about several things going in several

11   directions.

12        Q.   If after you received information that

13   someone's voter eligibility was being challenged or

14   information that might make them ineligible, after

15   sending that to the Secretary of State's office and then

16   receiving a determination, what steps would your office

17   take if the Secretary of State determined that that

18   person was ineligible to vote?

19        A.   We'd follow the law with notifications.

20        Q.   And that person would remain registered while

21   the notice and state law procedure --

22        A.   That's correct.

23        Q.   -- were in place?

24             How does your office identify voter applicants

25   who are ineligible because of a past felony conviction?

**Governor of the State of Florida**

1    A.    We don't.

2    Q.    Do you receive felony packets from --

3    A.    Uh-huh.  (Indicates affirmatively).

4    Q.    Could you describe what a felony packet is?

5    A.    It will have the voter information.  It will

6    have supporting documents from the Clerk's office,

7    Department of Corrections, whatever other assets they

8    have.

9    Q.    Since you've been Supervisor of Elections, has

10   that information stayed the same in terms of what

11   categories of documents are contained in the packet?

12   A.    I think now we're receiving more from the

13   Department of Corrections because most of the notices

14   we're getting right now are actually people that are

15   incarcerated.

16   Q.    And were there any changes in the information

17   you received after Amendment 4 went into effect?

18   A.    So originally the State was going to just send

19   us a Department of Corrections page.  It might show

20   somebody on probation, but it didn't spell out whether

21   they were adjudicated guilty of a crime.  Of course, you

22   can be on probation and have adjudication withheld; and

23   the charges then are dropped, basically, after you've

24   completed your probation.

25                So I actually had a conversation with

**Governor of the State of Florida**

1  Maria Matthews about that.  She first told me that that

2  would be good to bring up to the work group.  Then they

3  additionally started adding more information.  I told

4  them we needed the Clerk's information to continue to

5  come.

6      Q.    When was that conversation with Ms. Matthews?

7      A.    Sometime in June, I want to say.

8      Q.    Of this year?

9      A.    June or July, yeah.

10     Q.    When you say "work group," are you referring

11 to the one that was mandated by SB 7066?

12     A.    Yes, I am.

13     Q.    Have you made that recommendation to the work

14 group?

15     A.    I didn't because they've been sending more

16 information now.  We're getting more comprehensive

17 packages from them.

18     Q.    In the conversation with Ms. Matthews, was

19 that in person?

20     A.    It was an E-mail.

21     Q.    Sometime in June or July, you mentioned?

22     A.    Uh-huh.  (Indicates affirmatively).

23     Q.    And were there any changes in the information

24 you received after SB 7066 went into effect?

25     A.    The only information or the only ineligibles

**Governor of the State of Florida**

1  we've been receiving are people that are actually

2  incarcerated.  So there's been similar supporting

3  documents showing the convictions through the Clerk's

4  office, the Department of Corrections page with the

5  information on it.

6      Q.   Do you know what databases the Secretary of

7  State uses to create these packets?

8      A.   I do not.  I should clarify:  Other than it

9  says "Department of Corrections" at the top or

10 comprehensive case information system from, like, our

11 county.

12     Q.   And do you know what types of information are

13 in the Department of Corrections database?

14     A.   I don't know what level of authority they have

15 looking at the database.  Again, there's a public site.

16 I don't know if they have authority to get into other

17 areas.

18     Q.   Do you know what the information is for the

19 Florida Department of Law Enforcement?

20     A.   Again, I don't know what their level is.

21     Q.   Same for the Clerk of the Court?

22     A.   Correct.

23     Q.   And what access does your office have to

24 restitution records or records that track restitution?

25     A.   I don't know that we have any.  If it's on

**Governor of the State of Florida**

1  file at the Clerk's office, it may be there on the

2  conviction or something from the court documents.

3      Q.   Does your office have any access to

4  out-of-state records, including convictions or moneys

5  that might be owed?

6      A.   I don't know.  I've not tried to get any

7  access to any.

8      Q.   Has anybody, to your knowledge, in

9  Hillsborough County applied to vote and they have an

10  out-of-state felony conviction?

11      A.   I can't answer that.

12      Q.   What about for federal records, including

13  convictions and moneys owed, does your office have any

14  access to databases for that?

15      A.   The system, the way it's supposed to work is,

16  the federal clerks are supposed to be notifying the

17  State, is my understanding.

18      Q.   So you wouldn't have any direct access to that

19  database; you would rely on the Secretary of State?

20      A.   That is correct.

21      Q.   Before Amendment 4, did your office check

22  whether a registrant with a felony conviction owed

23  fines, fees, restitution, or court costs?

24      A.   We do not.

25      Q.   Do you have any sense of how often a voter's

**Governor of the State of Florida**

1  eligibility gets challenged or questioned because of a
2  felony conviction, because of information you received
3  about a new felony conviction?
4       A.   I don't understand your question.
5       Q.   I guess, how often does a voter's eligibility
6  get questioned if it's somebody with a felony
7  conviction?  Is there generally more information at your
8  disposal that you receive for applicants who have that
9  information?
10      A.   The way the process works is, the application
11 is turned in.  If it's verified or matched by the State,
12 the person is put on the rolls.  At a later time after
13 that is when the State then would notify us of a felony
14 conviction.  It doesn't take place at registration.
15      Q.   Have you received information from a third
16 party in the last year over some -- challenging
17 someone's voter eligibility for a person with a felony
18 conviction?
19      A.   Not that I'm aware of.
20      Q.   Anything in 2018?
21      A.   You're going to have to say that again.
22      Q.   Did you receive any information in 2018 from a
23 third party about someone's voter eligibility based on
24 a --
25      A.   No.  From a third party, that's what I was

**Governor of the State of Florida**

1  looking for.  No.

2     Q.   So the only information challenging someone's

3  eligibility, then, would have been any list you received

4  from the Secretary of State's office?

5     A.   Correct.  You say "challenging their

6  eligibility."  They're, again, furnishing us with that

7  information.  It's not a challenge to their eligibility.

8  It's telling us they're ineligible.

9     Q.   Are there any reasons why you would be

10 concerned about the Secretary of State's determination

11 or assessment of their eligibility?

12    A.   No.  I think they're giving us very

13 comprehensive packages, able to identify the individual,

14 addresses match and different things.  I think they're

15 giving us good packages.

16    Q.   Do you know of any examples, aside from the

17 suspended adjudication, where your office found errors

18 in a package you received that forced you to do your

19 own -- I guess "investigation" is the wrong term, as you

20 mentioned.

21    A.   You previously asked me that, and the answer

22 is "no" still.

23    Q.   When SB 7066 went into effect, were there any

24 changes that took place in your office for procedures if

25 somebody's eligibility with a felony conviction was

**Governor of the State of Florida**

1    challenged?  Any procedures in your office that changed

2    once SB 7066 went into effect?

3         A.   No.

4         Q.   Once SB 7066 went into effect, did you have

5    any concerns about getting access to information about

6    out-of-state convictions?

7         A.   Again, that would come from the State, not

8    from me.

9         Q.   Do you have any sense of the rate for how

10   often somebody is removed from the voter registration

11   rolls because they didn't respond to a notice that they

12   received relating to their changed status?

13        A.   Can you be more specific than that.

14        Q.   Do you have a general sense of whether people

15   who -- once the Secretary of State has given you

16   information about their status and your office initiates

17   steps to send a notice, do you have any sense of how

18   often people respond to those notices?

19        A.   I don't have anything but anecdotal

20   information.  They're given an opportunity to have a

21   hearing.  We do hearings.  We do get some back where the

22   people check that they agree with our findings.

23        Q.   Do you have any sense of how many people were

24   removed from the voter rolls because of a felony

25   conviction pre-Amendment 4 in 2017?

1    A.    In 2017?

2    Q.    Yeah, before Amendment 4.

3    A.    Not off the top of my head.  We file those

4  reports with the State.  That's readily available from

5  the Secretary of State's office.

6    Q.    Has your office removed any registrants since

7  July 1st, 2019, when SB 7066 went into effect?

8    A.    We have.

9    Q.    How many, if you know off the top of your

10  head?

11    A.    I think we've done 107 from July 1st until

12  this last Friday or today.

13    Q.    And were any due to a felony conviction?

14    A.    That was due to a felony conviction.

15    Q.    107, you said?

16    A.    107.

17    Q.    Were any of those reasons because they owed

18  moneys related to their felony conviction?

19    A.    I believe all the ones we have right now are

20  incarcerated.

21         MR. CUSICK:  I'm going to introduce this.

22         It should be Exhibit 11.  This is a memorandum to

23         the Supervisors of Elections from Ron Labasky dated

24         September 27th, 2012.  I'm giving a copy to

25         Mr. Latimer, Mr. Todd.  The Bates Stamp number is

**Governor of the State of Florida**

1    LCSE 000080.

2    (Plaintiffs' Exhibit No. 11 was marked for

3    identification.)

4    BY MR. CUSICK:

5        Q.    If you want to take a moment to just review

6    that.  I'm going to turn your attention to -- strike

7    that.

8            Do you recognize this document?

9        A.    I vaguely remember it, yes.

10       Q.    And what is it?

11       A.    It was a memo that came from Ron Labasky, who

12   is general counsel to the Florida Supervisors of

13   Elections.

14       Q.    And are you familiar with what was entitled in

15   here as "The Felon List" that's referenced in the memo?

16       A.    So my recollection is that there was some

17   individuals that were trying to compare Department of

18   Correction records with voter records and may not have

19   been very thorough in their comparison.  They would send

20   lists of what they termed potential ineligibles to the

21   supervisors, and we would send that on to the State.

22       Q.    And is that the reason why Ms. Matthews

23   concluded that this list was of limited accuracy?

24            MR. TODD:  Object to the form.

25            THE WITNESS:  You'd have to ask her that

**Governor of the State of Florida**

1    question.

2   BY MR. CUSICK:

3       Q.   Was this list sent by your office to the

4   Secretary of State?

5       A.   I have sent a list to him before.  I don't

6   know if it was in that time frame or not.

7       Q.   So in the memo on the second page, when it

8   says, "Maria Matthews response dated September 14th,

9   2012 to Mary Helen Farris concerning the felon list sent

10  by Hillsborough County to the Department explains the

11  Department's concerns," did that list -- was that list

12  sent by someone in your office or by you?

13      A.   I can't fully answer that.  You'll note in

14  here that it was response to Mary Helen Farris, who is

15  our legal counsel.  And I don't recall whether she sent

16  the list or we sent the list or exactly how that

17  happened.

18      Q.   Do you know if it was from a third party?

19      A.   It was.

20      Q.   Do you know who that third party was?

21      A.   An individual by the name of Greg Prentice,

22  P-r-e-n-t-i-c-e.

23      Q.   Do you know how you received that information?

24  Was it via E-mail?

25      A.   I don't recall that.

**Governor of the State of Florida**

1    Q.    Did you make any initial determinations based

2    on that list, or did you forward it straight --

3    A.    No.  I sent it straight to the State.

4    Q.    Since SB 7066 went into effect, have you sent

5    any other lists from third parties to the Secretary of

6    State?

7    A.    I have notified them in E-mail of one, but it

8    wasn't from a third party; it was from me.

9    Q.    You created a list?

10    A.    It wasn't a list.  It was one individual.

11    Q.    And you made a determination that --

12    A.    I did not make a determination.  It came to my

13    attention that the individual had possibly been

14    convicted on federal fraud charges, served six years in

15    prison, and had $8 million in restitution.  I notified

16    the State.  They did their investigation.  We've since

17    received back notice and accompanying documents, and

18    we've begun the removal process.

19    Q.    How did it come to your attention for that

20    individual?

21    A.    It was an individual that wanted to come to my

22    office to sell me some software.

23    Q.    And have you sent any similar lists, whether

24    single, individual, or from a third party, before SB

25    7066 went into effect but after Amendment 4?  So from

**Governor of the State of Florida**

1  the time frame -- let me rephrase.

2          From January 8th until July 1st, did you send

3  any lists to the Secretary of State's office?

4      A.   Not that I'm aware of, no.

5      Q.   And do you recollect, aside from this list

6  that's referenced here, any pre-Amendment 4 that you

7  sent to the Secretary of State?

8      A.   I don't recall any others.

9      Q.   Generally when these lists are sent, do you

10  also -- do you ever share them with other Supervisors of

11  Elections, or is it straight to the Secretary?

12      A.   Straight to the State.

13      Q.   Do you ever receive lists or information from

14  other Supervisors of Elections for applicants or voters

15  in Hillsborough County?

16      A.   No.

17          MR. TODD:  It's been a little over an hour.

18      You're entitled to a break if you want.

19          THE WITNESS:  I'm good right now.

20          MR. CUSICK:  Can we finish this?

21          THE WITNESS:  I don't need a break.  I said

22      after this I will.

23  BY MR. CUSICK:

24      Q.   Sure.  So turning back to that individual

25  example that you mentioned, you mentioned that there was

**Governor of the State of Florida**

1   a federal fraud conviction --

2        A.    Uh-huh.  (Indicates affirmatively).

3        Q.    -- and that the person owed restitution?

4        A.    That's correct.

5        Q.    And what was the basis -- did you rely on both

6   those bases for concerns about their eligibility, or was

7   it just the federal conviction?

8        A.    It came to my attention through a newspaper

9   article that this individual had a felony conviction.  I

10  gathered his information, and I sent it directly to the

11  State and told them that I had seen a newspaper article

12  that outlined that.

13       Q.    Did you know if the person was under

14  supervision by the Department of Corrections?

15       A.    I have no idea.  Well, it was a federal crime,

16  so it wouldn't have been the Department of Corrections.

17  It has would have been the Federal Department of

18  Corrections.

19       Q.    You didn't know if they were under parole or

20  probation?

21       A.    I did not.

22       Q.    If they weren't under parole or probation and

23  they just owed restitution, would you still have sent

24  that individual's information to the Secretary of State?

25       A.    It was my indication that they had been

**Governor of the State of Florida**

1    convicted of a felony and that they served time in

2    federal prison.  I gave that information to the State.

3    It would be their responsibility then to further

4    investigate that and see if they could come up with

5    credible, reliable information for an initial

6    determination.

7         Q.    And so if you come across information for

8    anybody with a federal conviction, felony conviction

9    that served time, would you conduct additional research

10   to see if they had restitution; or would you send their

11   names as well?

12        A.    I would send their names.

13        Q.    And you haven't sent any other individual

14   names?

15        A.    I have not.

16        Q.    Have you come across any -- do you know of any

17   individual since Amendment 4 who have federal felony

18   convictions that you read about and sent their names to

19   the Secretary of State?

20        A.    Just the one.

21        Q.    Just the one.

22              You mentioned -- did the determination of

23   their eligibility come back?

24        A.    It did.

25        Q.    Did your office initiate any removal

**Governor of the State of Florida**

1  proceedings?

2        A.    We have.

3        Q.    Including sending a notice to that person?

4        A.    We have sent the notice.

5        Q.    And was that determination from the Secretary

6  of State because they were still on parole or probation?

7        A.    I can't answer that.

8        Q.    If you received information that somebody had

9  a felony conviction and they still owed restitution and

10 you received that information and the information was

11 accurate that they did have a federal felony conviction

12 and they owed restitution, would you send that

13 information to the Secretary of State's office?

14       A.    If it comes to my attention that somebody has

15 a felony conviction, be it local or federal, I would

16 give that information to the State and let them

17 investigate it.

18       Q.    What about if you know they're not on

19 probation or parole and the only thing is that they owe

20 restitution?

21       A.    I would send the information to the State and

22 let the State ascertain that information and make the

23 determination.

24       Q.    Is that the same if they owed fees or fines

25 that you knew of?

**Governor of the State of Florida**

1      A.   I would have no reason to know that.  If there

2   was a felony conviction, I would send it to the State to

3   let them do their initial determination, and then they

4   could notify me if that information was credible and

5   reliable.

6      Q.   Do you know if all counties solely rely on the

7   Secretary of State packets, or do other offices conduct

8   additional research once they receive those packets?

9           MR. TODD:  Object to the form.  Speculation.

10          THE WITNESS:  I can't answer that.

11          MR. CUSICK:  Let's go off record for a moment

12      to take a five-minute break.

13               (Brief recess taken.)

14   (Plaintiffs' Exhibit No. 12 was marked for

15   identification.)

16   BY MR. CUSICK:

17      Q.   I'm going to introduce into the record

18   Exhibit 12, and this is an E-mail regarding felon

19   packets that were received by the Leon County Supervisor

20   of Elections, an assessment based by their office on

21   those packets.  It's Bates Stamp LCSE 000058.  Do you

22   want to take a moment to review that.

23           So in the document in the first bullet point,

24   it mentions, as we've discussed earlier, issues where

25   someone's adjudication was suspended.  But if you look

**Governor of the State of Florida**

1    at the second bullet point, if you want to take a

2    moment, Leon County Supervisor of Elections office

3    representative indicates that we had to conduct extra

4    research based on packets that they received from the

5    Supervisor of Elections' office.  Knowing this

6    information, does that change any of your concerns about

7    how reliable and credible the packets might be?

8              MR. TODD:  Object to foundation.  Answer if

9         you can.

10             THE WITNESS:  No, not necessarily.  In

11        retrospect, I mentioned before about adjudication

12        withheld.  We've also had some where the name

13        didn't match, and we've sent those back.  But

14        again, it's things that are on the surface that you

15        can readily see.

16   BY MR. CUSICK:

17        Q.   In any of the packets, did evidence

18   potentially ever contradict itself; or were there

19   differences in data represented in the documents, for

20   example, if someone's restitution was different in two

21   portions or --

22        A.   Could you restate that.  I didn't understand

23   that.

24        Q.   Were there any contradictions in evidence that

25   you received?  So maybe on one document it indicated one

1  source of someone's restitution or fines or fees and

2  another document indicated a different amount?

3      A.   Are you talking prior to the implementation of

4  Amendment 4 or before?

5      Q.   After the implementation of Amendment 4.

6      A.   We haven't received anything except

7  incarcerated individuals since Amendment 4.

8      Q.   What about prior to Amendment 4 then?

9      A.   Well, fees and restitution wouldn't have

10 mattered.  That wasn't part of it.  It was just a felony

11 adjudication of guilt.

12     Q.   What about inconsistencies with conviction

13 information?  Say it was, like, first degree where it

14 should have been second degree.

15     A.   The paperwork would notice adjudication on a

16 felony; so it wouldn't matter whether it was first-,

17 second-, or third-degree felony.

18     Q.   In those packets, do you get the official

19 judgment page?

20     A.   Sometimes.  Sometimes you get what's in the

21 Clerk's summary page, so it doesn't necessarily have the

22 official court document where the judge went down and

23 checked off the $300 to Crime Stoppers and stuff like

24 that.

25     Q.   If you don't have that information now under

**Governor of the State of Florida**

1  SB 7066, what would you do to get information from the
2  Clerk of Courts if it's not included in the packet?
3      A.   That would be the State's responsibility to
4  get that information.
5      Q.   So if someone in your office notices that,
6  they would reach back out to the Secretary of State, or
7  would you --
8      A.   Yes.
9      Q.   So there's no contact for these packets
10  related to the Hillsborough County Clerk of Court?
11      A.   If we noticed some discrepancy on the face of
12  the pages that they supply us with, we would bring that
13  to their attention.
14      Q.   Clerk of the Court?
15      A.   No.  The Secretary of State.
16      Q.   So there's no interaction for these packets.
17  What about any other county agencies that might contain
18  information?
19      A.   It's the State's responsibility.
20      Q.   In this Bullet Point Number 2, it was
21  represented in the last sentence, "Ultimately though" --
22  and this is in reference to the extra research -- "it
23  stopped us from removing people who are likely
24  ineligible, so I think it was time well spent."
25          If you receive information that other counties

**Governor of the State of Florida**

1  are encountering errors with the felon packets, would

2  that force you to reevaluate whether you conduct

3  additional research after receiving that packet?

4      A.   I think maybe you're making an assumption

5  here.  Because it also says that the State sent us the

6  wrong page, and we were able to locate the correct

7  information online through the Clerk's Web site.  If

8  they sent the wrong page, they should have just sent it

9  back to them and told the State to do their job.

10      Q.   Good point.

11      A.   I don't know what time frame this is

12  discussing.  I notice it was in June that this was

13  written.  But are we talking two years, three years,

14  five years that this took place?

15      Q.   I'm going to talk a little bit about the time

16  frame from Amendment 4, when it went into effect, so

17  January 8th until SB 7066 went into effect.

18      A.   July 1st.

19      Q.   Yeah, July 1st.  Did the Secretary of State's

20  office communicate anything to you about the

21  requirements of Amendment 4 under this time period?

22      A.   There were several times we had our -- I think

23  it was in December at our association meeting.

24  Maria Matthews just gave a quick overview that it had

25  passed, and there was some discussion that took place.

**Governor of the State of Florida**

1  I actually asked her at that point to please tell all

2  the supervisors what they do when they get a potential

3  ineligible and what steps they go through; and she did,

4  which I think was very helpful.  Some of the other

5  supervisors had no idea how they really did it.

6      Q.   You asked that question during the -- you said

7  the December Florida State Association?

8      A.   Yes.

9      Q.   Did any Supervisors of Elections raise

10 concerns about resources for complying with Amendment 4,

11 whether any concerns --

12     A.   I don't recall any.

13     Q.   You mentioned that Ms. Matthews briefly

14 discussed Amendment 4.  Did any of that discussion talk

15 about how the State planned to comply and implement

16 Amendment 4?

17     A.   I'm paraphrasing.  I think she mentioned that

18 it looked like the legislature felt the need to have

19 implementing language.

20     Q.   Was it just Supervisors of Elections who were

21 in attendance at that conference?

22     A.   I think there was press there, too.

23     Q.   Any state legislatures?

24     A.   Not that I recall.

25     Q.   Did any staff attend the event?

**Governor of the State of Florida**

1      A.    No.   The midwinter is supervisors only.

2      Q.    And so again, during the same time period, did

3  you receive any questions from the public about

4  Amendment 4 and changes that it might make to the voter

5  registration process from the public?

6      A.    Again, just in general conversation.

7  Presentations have been pretty clear that the amendment

8  says that you must complete all the terms of your

9  sentence.  Go ahead.

10      Q.    And before SB 7066 D6 or the predecessor

11  bills, which were House Bill 7089 and Senate Bill 7086,

12  if somebody asked what steps do I need to take to comply

13  with terms or completion of sentence under Amendment 4,

14  what was your response?

15      A.    I would refer them to the Rights Restoration

16  Coalition or the Clerk's office to try and determine

17  that information.

18      Q.    And why to the Rights Restoration Coalition?

19      A.    Because they offered to assist individuals

20  that were in that situation.

21      Q.    And the Clerk's office?

22      A.    They have official records.

23      Q.    Do you know how far back the records in the

24  Clerk's office go to?

25      A.    I do not.

1    Q.   And then if somebody did not get information

2  from either of those two sources and still had

3  questions, who would you refer them to?

4    A.   I think the Rights Restoration Coalition could

5  help them adequately.

6    Q.   Again, before any of the predecessor bills or

7  Senate Bill 7066 were discussed, if somebody completed

8  probation and parole but had restitution, fines, and

9  fees, would they have been eligible to vote under

10  Amendment 4?

11    A.   Are those terms of their sentence?

12    Q.   Is that how you -- would that be your

13  definition?

14    A.   It very clearly to me states the terms of your

15  sentence.  I told you before I was in law enforcement.

16  Most people that have been convicted of a felony are

17  fully aware of what the terms of their sentence are.

18    Q.   When you say "most people are fully aware," is

19  that based on interactions when you were in law

20  enforcement or during your capacity as Supervisor of

21  Elections?

22    A.   Both.

23    Q.   And is that because you attended sentencing

24  hearings of individuals where they were notified of that

25  information, or was it after the fact that you had

1  conversations and they would know that?

2      A.   Both.

3      Q.   Have you attended any sentencing hearings

4  since you have been Supervisor of Elections?

5      A.   I have.

6      Q.   When was the last sentencing hearing you

7  attended?

8      A.   It was about three years ago.

9      Q.   And from -- now to shift time periods a little

10  bit, from July 1st, 2019, when SB 7066 went into effect,

11  until, let's say, July 31st, were you checking or

12  getting information from the Secretary of State on

13  fines, fees, restitution?

14      A.   You're going to have to rephrase that.  About

15  what?

16      Q.   About somebody's eligibility, whether they --

17      A.   I think I've stated this numerous times.  The

18  only files we've received from the State so far are

19  people that are incarcerated in prison.  That's the only

20  files we've gotten in my office.

21      Q.   You mentioned before that completion of

22  sentence includes fines, fees, and restitution; is that

23  correct?

24      A.   Terms of sentence.

25      Q.   Terms of sentence.

**Governor of the State of Florida**

1    Did you seek any clarification or guidance

2  from the Secretary of State on how you should be

3  conveying that information to community members or

4  guidance on how to provide information to community

5  members on that portion?

6    A.   No.  The State hasn't given us any guidance in

7  that arena.

8    MR. CUSICK:  I'm going to introduce as

9    Exhibit 13 an E-mail from -- the initial one is

10    from Michael Ertel to the SOE list on January 8th,

11    2019, as Exhibit 13.  I'm handing a copy to you and

12    a copy to Mr. Todd.

13  (Plaintiffs' Exhibit No. 13 was marked for

14  identification.)

15  BY MR. CUSICK:

16    Q.   Do you recognize this document?

17    A.   I do.

18    Q.   What is it?

19    A.   It was an E-mail from then Secretary of State

20  Mike Ertel sent out on January 8th advising us that if

21  we receive a voter registration application today, do as

22  you've always done:  Accept it.

23    Q.   And did you speak to any individuals who were

24  applying, let's say, the first week, January 8th, when

25  Amendment 4 went into effect?  Did anybody you speak to

**Governor of the State of Florida**

1  indicate that they had any outstanding fines, fees, or

2  restitution?

3      A.   No.

4      Q.   If they had, would you have made a

5  determination that they wouldn't have been eligible

6  under Amendment 4?

7      A.   I would not have made that determination.  If

8  they filled out the application and signed the oath, it

9  would go to the State for verification, and then

10  ultimately the State would do their investigation to

11  determine their initial determination whether they were

12  eligible or ineligible.

13      Q.   In this case, there are individuals who affirm

14  that they have outstanding fines, fees, or restitution

15  but they've completed probation and parole.  Knowing

16  that information, would you send their information for

17  people who are registered in Hillsborough County to the

18  Secretary of State?

19      A.   Any application that comes in, we don't ask

20  anybody if they're a felon when they register.  They do

21  check the boxes, and we note what box they check.  That

22  information is sent to the State.  The State makes the

23  match based on their identification of the driver's

24  license, Florida ID card, or last four of their Social.

25  At a later date, the State then does research and

**Governor of the State of Florida**

1  ascertains if they may be a felony adjudicated guilty

2  and might not have met the terms of their sentence; but

3  that would be on the State again.

4      Q.   As part of your list maintenance practices --

5  and you know people who publicly -- court filings or in

6  the media indicate that they have outstanding LFOs are

7  registered in Hillsborough County --

8      A.   I'm sorry.  What's an LFO?

9      Q.   Sorry.  For shorthand, any fines, fees, or

10 restitution -- and you have that information for your

11 list maintenance practice or purposes.  Would you send

12 that to the Supervisor of Elections -- or to the

13 Secretary of State?

14     A.   We wouldn't have that information in list

15 maintenance.

16     Q.   As part of your list maintenance?

17     A.   That's not part of list maintenance.  List

18 maintenance is using NCOA, sending to all registered

19 voters or sending to voters who haven't voted for two

20 years.  It has nothing to do with felons.

21     Q.   You indicated earlier that someone's

22 restitution was a reason that you sent their information

23 to the Secretary of State.

24     A.   I did not.  That is not correct.  I said that

25 I saw a newspaper article where the individual was

**Governor of the State of Florida**

1  convicted in federal court and served six years in
2  federal prison.  In addition, he had restitution.  I
3  sent the information to the State solely because he was
4  convicted of a felony.  It would be the State's job to
5  determine whether his terms of his sentence had been
6  met.
7      Q.   You've indicated you read the complaint,
8  correct?
9      A.   Uh-huh.  (Indicates affirmatively).
10     Q.   And so in the complaint, there are people who
11 indicate that they have a felony conviction but they
12 still owe fines, fees, or restitution.  Why wouldn't you
13 send their information to the Secretary of State?
14     A.   I would if they've checked the box and signed
15 the oath.
16     Q.   Let's say they're already applicants.  You
17 know that they're already registered voters and you're
18 doing list maintenance.
19     A.   We don't do list maintenance on felonies.
20     Q.   No list maintenance on felonies?
21     A.   That's correct.  The only thing we do with
22 felons is when we've been notified by the State and they
23 have furnished us with credible, reliable information
24 and initial determination.
25     Q.   I know we've spoken a lot about the credible

**Governor of the State of Florida**

1    and reliable information.  When you mentioned that they

2    furnish credible and reliable information, unless

3    there's anything facially wrong with that information,

4    it's your practice that it's credible and reliable, or

5    do you do any additional steps?

6         A.   The additional steps we do is begin the

7    removal process where we attempt to communicate through

8    certified letter with the voter giving them an

9    opportunity for a hearing.  If that is not responded to,

10   we also publish their name in a newspaper, a general

11   circulation.  In that newspaper ad, we also reference

12   phone numbers for the NAACP, the Rights Restoration

13   Coalition, and some other -- I don't remember who the

14   other one is.  So if the person doesn't want to deal

15   with us, they can always go to one of these other

16   organizations to try to assist them.

17        Q.   I'm going to turn your attention back just

18   briefly to Exhibit 5.  These are the interrogatories.

19   Number 3 was the interrogatory, which I believe is on

20   page 4, for the purposes of the Bates Stamp, 76.

21   Without getting into any privileged information, you

22   attended a meeting led by County Commissioner Les Miller

23   to discuss the impact of Amendment 4 in Hillsborough

24   County?

25        A.   That is correct.

**Governor of the State of Florida**

1      Q.    Again, without going into any privilege, what
2   was discussed at that meeting relating to Amendment 4?
3      A.    Actually -- okay.  So Commissioner Miller
4   called the meeting.  At the meeting was Chief Judge
5   Ficarrotta, State Attorney Andrew Warren, Public
6   Defender Julie Hull, Clerk of Court Pat Frank, myself,
7   other staff there, and Representative James Grant.
8      Q.    And Commissioner Miller --
9      A.    And the Sheriff of Hillsborough County,
10  Ted Cronister.
11     Q.    And Commissioner Miller was the one who sent
12  out the invites?
13     A.    Yes.
14     Q.    Did he also set -- Les Miller?
15     A.    Commissioner Miller, yes.
16     Q.    Set the agenda?
17     A.    Yes, he did.
18     Q.    You indicated that Representative James Grant
19  was there?
20     A.    Yes.
21     Q.    There were no other representatives that were
22  invited?
23     A.    There was not.  He had staff there, as most of
24  the constitutionals had other staff there.
25     Q.    You said "constitutionals"?

1    A.   Constitutional officers:  Sheriff, myself,

2  Clerk of the Court.

3    Q.   Why was Representative Grant invited to the --

4    A.   You would have to ask Commissioner Miller that

5  question.

6    Q.   Did he offer any insight into the impact of

7  Amendment 4?

8    A.   He basically did the closing that he did on

9  the floor of the house when they passed the bill and

10  gave us his reasoning for what they were looking at.

11    Q.   To the extent you can remember, that was --

12  this was on June 6th, so it would have already passed?

13    A.   It hadn't gone into effect yet.

14    Q.   Hadn't gone into effect yet.

15         Did he have any other discussion about

16  concerns he had with Amendment 4, or did he -- strike

17  that.

18         Did he mention anything else was needed in

19  addition to SB 7066?

20    A.   I don't recall any offerings of anything he

21  said needed to be -- that was needed.

22    Q.   Did he raise any concerns about access to

23  databases throughout the state?

24    A.   He did voice that there wasn't a central

25  location for databases, and I remember Clerk Pat Frank

**Governor of the State of Florida**

1  was talking about how it's common practice for the

2  Clerks to assign fines and fee collection to collection

3  agencies and that she had no records of restitution or

4  anything.

5      Q.   Do you remember why Representative Grant

6  indicated that was a concern?

7      A.   I don't.

8      Q.   Do you have any notes from that meeting?

9      A.   I do not.

10     Q.   Was there any recording?

11     A.   There was not to my knowledge.

12     Q.   Did you offer any comments about Amendment 4

13  during that meeting or the impact?

14     A.   It was a general conversation.  We weren't

15  talking about impact.  We were talking about how it

16  would be implemented.  I think that it was a little bit

17  of an education for my fellow constitutional officers

18  because they didn't know how we'd come to get this

19  information from the State.  So it was just general

20  conversation.  There was no solutions being suggested.

21     Q.   Were there any presentations or --

22     A.   No.

23     Q.   Did anybody indicate a need to have -- did any

24  of the other constitutional officers inquire about

25  getting guidance from the Secretary of State on SB 7066?

**Governor of the State of Florida**

1        A.    No.

2        Q.    I know in the interrogatory response you

3    mentioned you had spoken at a number of community events

4    in the Tampa Bay area.  During any of the events since

5    SB 7066 either was first passed by the Florida

6    legislature or since it went into effect, have any

7    community members shared concerns about SB 7066's impact

8    on voting rights?

9        A.    I think there was concern around the fines and

10   fees part of it that was implemented.  A lot of these

11   people have had their fines converted to civil liens,

12   and that was included in it also.  There was concerns.

13       Q.    And do you remember any specific events that

14   you went to where these were raised or groups?

15       A.    I don't.

16       Q.    Did they share any other concerns outside of

17   the fines and fees related to SB 7066's impact?

18       A.    Not that I recall.

19       Q.    I know that we spoke a little bit before, but

20   I want to talk about the concerns -- whether anybody was

21   concerned about being prosecuted because they believed

22   their rights were restored under Amendment 4 but they

23   have fines and fees that are owed.

24       A.    What's the question?

25       Q.    Did anybody express concerns about prosecution

**Governor of the State of Florida**

1  if they vote and they're registered but have outstanding

2  fines and fees?

3      A.   Not to me directly.  I've heard that out there

4  from different groups, but I didn't have it directly

5  stated to me.

6      Q.   Do you know if it was directed at all to

7  anybody in your office?

8      A.   I don't.  Again, we would have referred the

9  individual to the Rights Restoration Coalition or the

10  NAACP.

11      Q.   What would prompt you to refer someone for

12  prosecution in the context if their rights were restored

13  under Amendment 4 but they're ineligible because they

14  have outstanding fines and fees?

15      A.   So you need to be more specific with me.  So

16  at what point in the process are we?

17      Q.   Let's say that somebody comes to you with -- I

18  guess after the fact in one of these -- in an upcoming

19  election after the safe harbor period from January 8th,

20  2019, to July 1st, before SB 7066 went into effect, and

21  that somebody voted -- maybe it's the presidential

22  primary in March 2020 and they had outstanding fines and

23  fees.  You know they voted.  You read in the paper or

24  received information from a third party that they have

25  these.  It could be the person directly.

**Governor of the State of Florida**

1     A.    If I can just stop you right there because
2   that information would go to the State or come from the
3   State.  It wouldn't be in my shop.
4     Q.    Have you ever referred someone for
5   prosecution?
6     A.    I have.
7     Q.    When?
8     A.    I think in the 2016 election.
9     Q.    Without going into the details, the reasons
10  why?
11     A.    Felony conviction.
12     Q.    So the person knowingly voted with a felony
13  conviction?
14     A.    I don't know that they knowingly voted.  I
15  don't know what their intent was.  I just know that we
16  noted that they were a convicted felon adjudicated
17  guilty, and I forwarded the information to law
18  enforcement.
19     Q.    And how did you come across that information?
20     A.    It would have been that they either -- I'm
21  trying to think now how I did get it.  I think we
22  received notification from the State that they were a
23  convicted felon, and they had filled the form out after
24  the conviction, voter registration application.
25     Q.    And then so for upcoming elections, if someone

**Governor of the State of Florida**

1    knows they have LFOs, for example, plaintiffs in this

2    consolidated lawsuit, someone in Hillsborough County,

3    and they vote in the presidential primary, will you make

4    a referral to the Secretary of State?

5        A.   I'm not following your question again here.

6    Let's try it again.

7        Q.   If somebody knows they have outstanding fines,

8    fees, or restitution and they're registered --

9        A.   They're a registered voter?

10       Q.   Yes, registered under Amendment 4.

11       A.   When did they register?

12       Q.   Post-Amendment 4.  They registered, say,

13   January 8th.  They showed up.  They registered.  They

14   know they have fines, fees, restitution, for example,

15   individuals in this lawsuit.  They vote in the

16   presidential primary.  You receive and you know that

17   they voted.  Would you then refer that information to

18   the Secretary of State?

19       A.   How did I know that they had fines and fees

20   outstanding?

21       Q.   Because you read the complaint.  So a voter in

22   Hillsborough County affirms that they have fines and

23   fees.

24       A.   So yes.  If it comes to my attention that

25   somebody has been adjudicated guilty of a felony, I'm

1  going to send the information to the State and let the

2  State do their investigation to determine whether they

3  meet the requirements to be able to register to vote.

4       Q.   What if they're unsure if they have LFOs, does

5  it matter then?

6       A.   Unsure?  I don't understand the question.

7  They're unsure?

8       Q.   Let's say that in a hypothetical that the

9  Clerk of Court's records don't go far enough back.  It's

10 a conviction from the '80s.  They remember they have

11 LFOs but didn't pay those.  They again January 8th

12 register to vote.  They register to vote.  They're

13 unsure if they have LFOs.  Would you send that

14 person's -- or that information --

15      A.   See, you're giving me a hypothetical situation

16 here, so let me make sure I understand it.  So are you

17 alleging, then, that the court records don't go back far

18 enough that they can determine at that meeting that we

19 had with James Grant, Representative Grant?  He clearly

20 stated that if the State can't prove there's outstanding

21 fines or fees, then there are none.

22      Q.   Would you still refer that information

23 initially, though?

24      A.   I don't know how I would get the information.

25 That's my next question.  That information wouldn't come

**Governor of the State of Florida**

1   to me unless it came from the State, and they would have

2   to do their investigation.

3        Q.   At a community event, would someone ask you

4   that question -- could someone ask you that question or

5   a community group, saying we have -- let's say an

6   organization says we have members who are unsure if they

7   have LFOs.  They're registered to vote.  What's your

8   advice for them to do in an upcoming election?

9        A.   Again, I would refer them to the Rights

10  Restoration Coalition or NAACP or some other

11  organization.  We don't give legal advice in my office.

12       Q.   Before, you had testified that you're only

13  receiving, in the packets, people who are still

14  currently either incarcerated or under supervision from

15  the Secretary of State information.

16       A.   Incarcerated.

17       Q.   Incarcerated.

18            During the conference you attended -- did you

19  attend the May conference for the Florida Supervisors of

20  Elections?

21       A.   I did.

22       Q.   And during that conference, did Ms. Matthews

23  or anyone from the Secretary of State's office provide

24  any advice on complying with SB 7066?

25       A.   My recollection is that they told us that we

**Governor of the State of Florida**

1  would be receiving guidance in the future.

2      Q.   Was there any discussion about receiving

3  information in different phases from the Supervisor of

4  Elections?  For example, you'd get information about

5  fines and fees at a later date, but in the beginning you

6  might just get information about if someone is still

7  incarcerated?

8      A.   I was in and out of that presentation, quite

9  frankly.  I had other business I was attending to, so I

10  don't have all the specifics of it.  I do remember that

11  we were going to get guidance.

12      Q.   Have you received that guidance yet?

13      A.   We have not.

14      Q.   Do you know when to expect it?

15      A.   Well, I don't know what kind of guidance

16  they're going to give us because it's the State's job to

17  do this investigation.  So by the time they give us

18  somebody that's a potential ineligible, they've

19  conducted their investigation on it.  They have either

20  established the facts to be able to provide credible and

21  reliable information and make an initial determination,

22  or they don't.

23      Q.   When you say they make an initial

24  determination, is that because the final determination

25  rests with the Supervisor of Elections under SB 7066?

**Governor of the State of Florida**

1    A.   Yes.  They make an initial determination; we
2  make the final.  By the way, it was that way before 7066
3  also.
4    Q.   Since SB 7066 has gone into effect, do you
5  believe the State has provided enough guidance to
6  Supervisors of Elections?
7    A.   They haven't provided any guidance.  They've
8  provided packages of people that are incarcerated, and
9  we're following state statute for the removal process.
10   Q.   Are you concerned that elections continue to
11 happen without the State offering guidance that it's
12 indicated it would provide?
13   A.   I don't know what kind of guidance they're
14 going to give to us.  If they're doing their initial
15 determination and establish that the individual has been
16 adjudicated guilty of a felony and they're able to
17 substantiate that they owe fines and fees by the
18 statute, that would be a reason for ineligibility.  They
19 would send that information to us, and we would follow
20 the state law on the removal process.
21   Q.   Do you think there is any benefit to getting
22 guidance on how -- let's say the State does an initial
23 determination that there are some fines and fees that
24 might be owed and they send it back to you.  Do you
25 think there's any benefit for coordination among

**Governor of the State of Florida**

1  counties -- maybe it's Clerk of Courts -- just to verify

2  that the information that's in the -- that the Secretary

3  of State is relying on is accurate?

4       A.   Which one of those was a question?  You kind

5  of lost me on that whole --

6       Q.   To rephrase, do you think there's any benefit

7  now that fines, fees, and restitution are going to at

8  some point be given to Supervisors of Elections as part

9  of this packet, guidance on how Supervisors of Elections

10  should conduct additional research to make sure that the

11  information is credible and reliable?

12       A.   The information that they're furnishing us is

13  court records.  It's pretty reliable, credible stuff.

14  To me, the big thing is to make sure we match that

15  that's the correct voter that's in our files.

16       Q.   Is it your understanding that court records

17  are always accurate?

18       A.   No, not always.  But I go back to the process

19  where the individual has an opportunity to have a

20  hearing.

21       Q.   Do you have any concerns that you might be

22  relying on inaccurate information -- strike that.

23            From your conversations with individuals, is

24  it burdensome for somebody to go through a proceeding

25  when they're trying to fight whether their voter

**Governor of the State of Florida**

1  eligibility status has been initiated, a removal

2  proceeding?  Are there any burdens on the individual?

3       A.   I don't know that there is, if they come in

4  and they are able to present additional information that

5  we may not have.  I guess the bigger question would be,

6  what's your definition of "burdensome"?  That might be

7  where it goes.

8       Q.   Sure.  If court records aren't always

9  accurate, do you think there's a benefit for policy

10  guidance for additional steps after the Secretary of

11  State's sent a packet back that includes sentencing

12  documents or sentencing guidance for additional steps

13  for the Supervisors of Elections to conduct to verify?

14       A.   I think that responsibility lies with the

15  State.  They're the ones that need to have the policy.

16       Q.   Do you ever receive communications from the

17  Secretary of State acknowledging errors or potential

18  errors in their data packets or their felon packets?

19       A.   Yeah.  As I stated before, it's a two-way

20  process.  If we notice something, we'll send it back to

21  them.  They'll, what they call, rework the case and

22  communicate back with us.

23       Q.   In the exhibit before from the Leon County

24  Supervisor of Elections -- let's say in a hypothetical,

25  if other counties are finding errors in the data packets

1    that they're receiving from the Secretary of State,

2    would you be less inclined to solely rely on that

3    information if there are no errors on the face of the

4    document, or would that prompt you to think about doing

5    additional research?

6         A.    I'm not real big on hypotheticals.  Can we be

7    factual?

8         Q.    Let's say that several counties indicate that

9    they receive fines, fees, and restitution and that there

10   are errors in those data from the Secretary of State

11   because they conduct additional research.  If that's

12   true, would that make you less inclined to solely rely

13   on information from the Secretary of State's office,

14   unless they are facial errors, which you indicate is

15   what you -- is the baseline for what you check?

16        A.    What was the exact question on that now?  I

17   got the scenario.

18        Q.    Would that prompt you to do additional

19   research about fines, fees, and restitution if other

20   counties are experiencing error rates with the data

21   they're receiving from the Secretary of State?

22        A.    It would not.

23        Q.    And why not?

24        A.    We're not an investigative agency.  That

25   responsibility lies with the State.  They're staffed for

**Governor of the State of Florida**

1    it; I'm not.

2        Q.   What would you need to conduct that type of

3    necessary investigation?

4        A.   I have no idea.  Training, additional

5    personnel, access to other files.

6        Q.   If the Secretary of State did issue guidance

7    to conduct additional investigation, at the current

8    moment, is it your statement that your office does not

9    have the capacity to comply with that and would need

10   additional resources for training?

11       A.   First, they would have to change the state law

12   because right now the state statute forces them the

13   responsibility to make the initial determination.  So

14   they're the ones that need to be doing that.

15           MR. CUSICK:  I want to go off record for a

16       moment.

17               (Brief recess taken.)

18           MR. CUSICK:  Back on the record now.  I'm

19       going to introduce into the record Exhibit 14,

20       Bates Stamp LCSE 000032.  Here you go, Mr. Latimer

21       and Mr. Todd.

22   (Plaintiffs' Exhibit No. 14 was marked for

23   identification.)

24   BY MR. CUSICK:

25       Q.   If you want to take a moment to read it.

**Governor of the State of Florida**

1    On the first page in the last paragraph, from

2    Ms. Amber Marconnet, June 18th, it indicates that

3    documentation you would include in the notice to the

4    vote is the public portrait orientation, DOC screen

5    shots of the Correction's Offender Network, which should

6    be in the case file that is sent to you.

7    So here, the Secretary of State is indicating

8    that screen shots are going to be sent as part of the

9    packet rather than the underlying sentencing documents.

10   Do you have any concerns with just relying on screen

11   shots rather than receiving the actual documents

12   themselves?

13   A.   This E-mail from Ms. Matthews on the 7th is

14   what sparked me to communicate with her about the

15   possibility of sending us somebody that was under

16   Department of Correction's supervision but hadn't been

17   adjudicated guilty.  That's why they needed to send the

18   additional information from the Clerk's office.

19   Q.   Was that a -- did you communicate to

20   Ms. Matthews through E-mail?

21   A.   Yes, I did.

22   Q.   Was that E-mail produced as part of discovery?

23   A.   I'm sure it was.  If you can't find it, we'll

24   be more than happy to give it to you, but I think it

25   was.

**Governor of the State of Florida**

1      Q.    Now I'm going to refer back to Exhibit 7,

2    which was the supplemental answer to the interrogatory,

3    which included screen shots of a text message chain

4    between you and Representative Grant.

5      A.    Yes.

6      Q.    And how do you know Representative Grant?

7      A.    He's in our legislative delegation.  I've

8    known him for several years.

9      Q.    Did you speak with him during this past

10   legislative session?

11     A.    I did.

12     Q.    Did you speak to him about SB 7066 or the

13   predecessor bills to that?

14     A.    Yes.  As indicated in here, I told him I had

15   some ideas about it.  You can see what he sent back.  He

16   said he would like to get together.  Then we did, in

17   fact, run into each other at an event.  I believe it was

18   at the Chamber of Commerce downtown.  I told him that I

19   thought that responsibility really rested with the State

20   to conduct these investigations because they were the

21   ones charged with it by statute and staffed, and he took

22   my input and that was it.

23     Q.    And did you propose specific solutions on how

24   that would be workable or just the general concern that

25   it should rest with the Secretary of State?

**Governor of the State of Florida**

1    A.   Both, including that the Department of

2 Corrections had a tremendous amount of records that were

3 available.  As you can see from that previous E-mail,

4 there's confidential areas that can be accessed, again,

5 depending on what your level of access is.

6    Q.   Did you watch the legislative sessions for

7 committee hearings on House Bill 7089, which was the

8 predecessor bill which he was the sponsor of?

9    A.   I don't remember if I watched any of the

10 hearings.  I was getting regular updates through our

11 association and our lobbyists as to what was going on.

12    Q.   Do you share Representative Grant's concern

13 that Amendment 4 in the text is an administrative

14 nightmare/opportunity?

15    A.   Those are his opinions.  You would have to --

16    Q.   Do you share those?

17    A.   I don't know that I do.

18    Q.   Were there any other exchanges, outside of

19 that time you ran into each other and this text message

20 during the legislative session, with Representative

21 Grant?

22    A.   You can see that I texted him asking --

23 telling him I strongly supported House Bill 689 and 281

24 hoping that he would support it.  It was being heard in

25 his committee.

1    Q.    So you had no other communications with him

2  outside of the text and the meeting?

3    A.    I don't believe so.  I didn't have any

4  official.  I might have run into him at an event

5  somewhere in passing.  I had no appointments with him or

6  anything.

7    Q.    Did you watch the legislative session for SB

8  7066 or at least the end of SB 7066?

9    A.    I watched the closing on the floor.

10    Q.    During the legislative session, did you speak

11  to anybody from the Governor's office, again, about the

12  predecessor bills or --

13    A.    I did not.

14    Q.    -- from the Secretary of State's office?

15    A.    I did not.

16    Q.    Did you voice any concerns about SB 7066 or

17  its predecessor bills during the legislative session?

18    A.    To who?

19    Q.    To other Supervisors of Election.

20    A.    I did not.

21    Q.    I think you mentioned there's a lobbyist

22  that's part of the association, the lobbyist who

23  represents --

24    A.    I don't recall any conversation.

25    Q.    To any elected officials?

**Governor of the State of Florida**

1    A.   I don't recall any conversation about it.

2    Q.   At any community events?

3    A.   Like, in the newspaper article, I made some

4  comments in there.  That was pretty much the theme of

5  it.

6    Q.   Did anybody else from your office express

7  concerns to any elected officials or representatives?

8    A.   Not that I'm aware of.

9    Q.   I want to turn back to Exhibit 4.  This is SB

10  7066, the text, just for reference.  It's on the page of

11  the PDF itself 46 and 47.  If you turn to line 1335 on

12  page 47, it includes the term "sentencing document."

13  What do you understand a sentencing document to be?

14    A.   I have no idea what the official definition of

15  it is.

16    Q.   Putting aside the official definition, how do

17  you interpret "sentencing document" under SB 7066?

18         MR. TODD:  Calls for a legal conclusion.

19      Answer if you can.

20         THE WITNESS:  I haven't seen a sentencing

21      document recently, so I don't really know what it

22      is.

23  BY MR. CUSICK:

24    Q.   What about based on your experience?

25    A.   I recall seeing sentencing documents 20 years

1   ago, and it was a checklist that the judge would fill

2   out.

3       Q.   So the last time, again, to your recollection

4   that you reviewed sentencing documents was a couple of

5   decades ago?

6       A.   At least a decade.

7       Q.   Do you remember whether those documents were a

8   single document or were they multiple?

9       A.   I don't recall.

10      Q.   Do you recall if they included any moneys

11  owed:  Fines, fees, restitution?

12      A.   Yes, they did.

13      Q.   All the documents you reviewed included those?

14      A.   I recall seeing fines and fees on there.

15      Q.   Do you consider an entire judgment to be a

16  sentencing document, the judgment that's ordered by the

17  court?

18      A.   I'm not sure I follow your question.

19      Q.   Do you consider the judgment entered by the

20  judge to be a part of the sentencing document?

21      A.   I don't have an opinion on that.

22      Q.   Turning back to page 46, lines 1332 through

23  1334, on 1333 it indicates completion of all terms of

24  the sentence means any portion of a sentence that is

25  contained in the four corners of the sentencing

**Governor of the State of Florida**

1    document.  How do you determine what's in the four

2    corners of the sentencing document?

3        A.   Well, I don't know what a sentencing document

4    looks like.  So again, I couldn't give you an opinion on

5    that.

6        Q.   If an original -- strike that.

7            As part of the package you receive from the

8    Secretary of State's office, if you received sentencing

9    documents -- that comes back to the point we're at.

10           Have you received any guidance from the

11   Secretary of State what a sentencing document is?

12       A.   No.

13       Q.   Under SB 7066, do you plan to receive guidance

14   on how to interpret what a sentencing document is?

15           MR. TODD:  Form.

16           THE WITNESS:  This clearly states that this is

17       the State's job to do this.  It's not my job to do

18       it.  The statute clearly points out that they have

19       to do an initial determination.

20   BY MR. CUSICK:

21       Q.   At the meeting you attended with Commissioner

22   Miller, were there any considerations about the County

23   implementing some sort of solution to address fines and

24   fees, like a rocket docket that's been indicated in

25   other counties?

**Governor of the State of Florida**

1    A.    Yes.   State Attorney Andrew Warren discussed

2   the possibility that they were researching it.

3    Q.    Have you spoken with other Supervisors of

4   Elections about similar --

5    A.    I have not.

6    Q.    Do you encourage people with felony

7   convictions who believe they've completed their

8   sentences to register to vote?

9    A.    I don't give legal advice.

10    Q.    Do you know what the Restoration Voting Rights

11   Working Group is under SB 7066?

12    A.    I do.

13    Q.    Have you been approached to serve on that

14   working group?

15    A.    I was contacted by the Governor's office, and

16   I filled out an application.

17    Q.    And what did the application consist of?

18    A.    Quite a bit.   Background, reasons why you

19   should be in the group, mainly a lot of personal

20   background information.

21    Q.    And were you nominated or recommended, or what

22   was the -- I guess, do you know why the Governor's

23   office reached out to you?

24    A.    It was my understanding the president of our

25   association, Tammy Jones, was dealing with them and

1    recommended me based on my law enforcement background.

2       Q.   Why did Tammy --

3       A.   Tammy Jones.

4       Q.   Why did Ms. Jones think you would be

5    beneficial to be on the working group because of the law

6    enforcement background?

7            MR. TODD:  Object to the form.

8            THE WITNESS:  Because in law enforcement you

9       deal with arresting people and going to trial and

10      sentencing.

11   BY MR. CUSICK:

12      Q.   Do you know whether they plan to issue

13   guidance on Amendment 4?

14      A.   It's my understanding the work group is still

15   in session.

16      Q.   Do you know when they're going to issue their

17   guidance by or their report?

18      A.   I think it's in the statute that they have to

19   be completed by October.  It's in there somewhere.

20           Can I have a moment with counsel?

21      Q.   Sure.

22      A.   Thank you.

23      Q.   Has the association that you are a member of

24   weighed in on Amendment 4?

25      A.   We have not.

**Governor of the State of Florida**

1    Q.   What about for SB 7066?

2    A.   We have not.  Let me back up on that.  We had

3  several things that were addressed in 7066 that we had

4  input on that had to do with the -- we could start

5  processing vote-by-mail ballots, different glitch

6  things, if you will, that are in there but not

7  specifically on felons.  That was the -- there was other

8  bills that this ended up -- this ended up getting

9  attached to this bill instead of the other way around.

10   Q.   I'm going to introduce as Exhibit 15 --

11        MR. TODD:  Counsel, can we mark a different

12   document as -- a different version of Exhibit 7?

13        THE WITNESS:  I made some marks on this one.

14        MR. CUSICK:  Sure.  Is that okay?

15        MS. ADEN:  Yes.

16        MR. CUSICK:  This is Exhibit 15.

17        MR. TODD:  I'll take that one.

18        MR. CUSICK:  It's a Politico article.

19        MR. TODD:  Thank you.

20  (Plaintiffs' Exhibit No. 15 was marked for

21  identification.)

22  BY MR. CUSICK:

23   Q.   Do you recognize this document?

24   A.   I do.

25   Q.   Take a moment to review it.

**Governor of the State of Florida**

1     A.   Can you tell me what date this was written?

2     Q.   This was written -- I believe it's March 19th,

3  but I can follow up afterwards.

4          MR. TODD:  It makes reference to March 5th in

5          the future, so it must be before March 5th but

6          after January 8th.

7  BY MR. CUSICK:

8     Q.   I can look it up in a second.

9          Here on the last page, it's quoted, "But Hogan

10 and Latimer agree that some procedural changes are

11 necessary to ensure the amendment here, Amendment 4, is

12 properly executed.  The State just needs to do a little

13 bit more due diligence and check with the Department of

14 Corrections to make sure they have completed all the

15 terms of their sentence."

16    A.   That's pretty much what I've told you several

17 times today.

18    Q.   I just wanted to introduce it.

19         MR. CUSICK:  Do you mind going off record for

20         a moment?

21                   (Brief recess taken.)

22 BY MR. CUSICK:

23    Q.   Mr. Latimer, do you have any data sharing

24 agreements with any other counties or Supervisors of

25 Elections?

1    A.   I have no data sharing with other supervisors.

2    Q.   Or any state agencies?

3    A.   I mean, the voter registration information.

4         MR. CUSICK:  This concludes the deposition

5    for today.  As we discussed, we'll adjourn until

6    next month.  Then we're going to work with Mr. Todd

7    to --

8         MR. TODD:  It might not be the 11th, but we'll

9    cooperate with you.

10        MR. CUSICK:  Great.

11        MR. TODD:  I know the time frame is

12   accelerated compared to your normal lawsuits.  We

13   understand the urgency of this.

14        MR. CUSICK:  Do you have any questions?

15        MR. TODD:  I do not.  Anybody on the phone?

16        MR. BENTLEY:  I do not.  This is

17   Morgan Bentley.  I do not.

18        MR. HERRON:  Mark Herron.  I don't have any

19   either.

20        MR. ROSENTHAL:  None from Miami-Dade.

21        MS. DAVIS:  None from the Secretary.

22        MR. CUSICK:  Hearing none, we're going to --

23        MR. TODD:  Read or waive?

24        THE WITNESS:  Read.

25        (Concluded at 4:38 p.m.)

**Governor of the State of Florida**

1                      CERTIFICATE OF OATH

2

3    STATE OF FLORIDA

4    COUNTY OF HILLSBOROUGH

5

6           I, the undersigned authority, certify that

7    CRAIG LATIMER personally appeared before me and was

8    duly sworn on August 26, 2019.

9

10          WITNESS my hand and official seal this 9th day

11   of September, 2019.

12

13

14

15                           _____

16                           Pamela Kingsbury, RPR

17                           Notary Public-State of Florida

18                           My Commission Expires:  7/18/22

19                           Commission No. GG 209879

20

21

22

23

24

25

**Governor of the State of Florida**

1              REPORTER'S CERTIFICATE

2

STATE OF FLORIDA

3

COUNTY OF HILLSBOROUGH

4

5          I, Pamela Kingsbury, RPR, Notary Public,
certify that I was authorized to and did
6   stenographically report the deposition of CRAIG LATIMER;
that a review of the transcript was requested; and that
7   the transcript is a true and complete record of my
stenographic notes.

8

9          I further certify that I am not a relative,
employee, attorney, or counsel of any of the parties,
10  nor am I a relative or employee of any of the parties'
attorney or counsel connected with the action, nor am I
11  financially interested in the action.

12

13

           Dated this 9th day of September, 2019.

14

15

16                        _____

17                        Pamela Kingsbury, RPR

18

19

20

21

22

23

24

25

**Governor of the State of Florida**

```
1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF FLORIDA
2                       TALLAHASSEE DIVISION
                     Case No. 4:19-cv-300-RH/MJF
3

4    KELVIN LEON JONES, et al.,

5                         Plaintiffs,
     vs.
6
     RON DESANTIS, et al.,
7
                         Defendants.
8    _____/

9

     IN RE:  DEPOSITION OF:  CRAIG LATIMER
10           TAKEN:  AUGUST 26, 2019
             DATE TRANSCRIPT DISTRIBUTED:  SEPTEMBER 9, 2019
11

     TO:  STEPHEN TODD, ESQUIRE
12

         The transcript has been completed regarding the
13   above-referenced deponent.

14       The errata page is located at page 106 where
     changes can be made.  On this errata page, please have
15   the witness note the page numbers and line numbers of
     the changes.  Kindly return to Pamela Kingsbury, Michael
16   Musetta & Associates, One Tampa City Center, Suite 3400,
     Tampa, FL 33602.
17

         The original of this transcript has been forwarded
18   to the ordering party, and the errata, once received,
     will be forwarded to all ordering parties as listed
19   below.

20       Thank you.

21
                                _____
22                              Pamela Kingsbury, RPR

23

24   cc:  JOHN CUSICK, ESQUIRE

25
```

**Governor of the State of Florida**

1  ERRATA SHEET

2  DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES

3  IN RE:  JONES, et al., v. DESANTIS, et al.
          WITNESS:  CRAIG LATIMER
4          DATE OF DEPOSITION:  AUGUST 26, 2019

5  PAGE        LINE        CHANGE                              REASON

6  _____       _____       _____     _____

7  _____       _____       _____     _____

8  _____       _____       _____     _____

9  _____       _____       _____     _____

10 _____       _____       _____     _____

11 _____       _____       _____     _____

12 _____       _____       _____     _____

13 _____       _____       _____     _____

14 _____       _____       _____     _____

15 _____       _____       _____     _____

16 _____       _____       _____     _____

17 _____       _____       _____     _____

18 _____       _____       _____     _____

19

20 Under penalties of perjury, I declare that I have read
   my deposition and that it is true and correct subject to
21 any changes in form or substance entered here.

22

   _____
23 DATE                    CRAIG LATIMER

24

25 Reporter:  Pamela Kingsbury, RPR

**Michael Musetta & Associates, Inc. (813) 221-3171**

## $

**$300 (1)**
64:23
**$8 (1)**
57:15

## A

**ability (1)**
8:21
**able (12)**
16:14,25;19:16;
24:16;35:10;43:14;
52:13;66:6;83:3;
85:20;86:16;88:4
**above-referenced (1)**
105:13
**Absolutely (1)**
14:7
**accelerated (1)**
102:12
**accept (3)**
38:9,11;71:22
**access (9)**
49:23;50:3,7,14,
18;53:5;77:22;90:5;
93:5
**accessed (1)**
93:4
**accidents (1)**
13:17
**accommodate (3)**
11:7;25:6,12
**accompanying (1)**
57:17
**accuracy (1)**
55:23
**accurate (6)**
22:9,14;61:11;
87:3,17;88:9
**acknowledging (1)**
88:17
**ACLU (3)**
6:4;31:24;32:9
**acronym (1)**
36:17
**across (3)**
60:7,16;81:19
**action (2)**
104:,11
**actual (1)**
91:11
**Actually (7)**
24:20;39:5;47:14,
25;49:1;67:1;76:3
**ad (1)**
75:11
**Adams (1)**
2:
**adding (1)**
48:3

**addition (3)**
9:20;74:2;77:19
**additional (21)**
9:17;26:4;34:5,5;
37:18;60:9;62:8;
66:3;75:5,6;87:10;
88:4,10,12;89:5,11,
18;90:4,7,10;91:18
**additionally (1)**
48:3
**address (8)**
20:10,12;27:12;
35:20;36:18;37:7;
44:19;97:23
**addressed (1)**
100:3
**addresses (1)**
52:14
**ADEN (4)**
2:,;5:15,15;100:15
**adequately (1)**
69:5
**adjourn (1)**
102:5
**adjudicated (6)**
47:21;73:1;81:16;
82:25;86:16;91:17
**adjudication (12)**
39:6,6,16;42:21;
45:15,16;47:22;
52:17;62:25;63:11;
64:11,15
**administrative (1)**
93:13
**advice (4)**
84:8,11,24;98:9
**advising (1)**
71:20
**affirm (2)**
43:20;72:13
**affirmatively (5)**
37:12;47:3;48:22;
59:2;74:9
**affirms (1)**
82:22
**African-American (5)**
29:11;30:1,19,25;
31:5
**African-Americans (1)**
30:6
**afternoon (1)**
5:5
**afterwards (3)**
9:4,17;101:3
**again (32)**
24:9;28:24;31:10,
21;35:22;36:25;37:9;
39:11;41:23;43:23;
44:18;46:8;49:15,20;
51:21;52:6;53:7;
63:14;68:2,6;69:6;
73:3;76:1;80:8;82:5,
6;83:11;84:9;93:4;

94:11;96:3;97:4
**agencies (3)**
65:17;78:3;102:2
**agency (2)**
28:9;89:24
**agenda (1)**
76:16
**ago (4)**
15:7;70:8;96:1,5
**agree (3)**
34:20;53:22;
101:10
**agreements (1)**
101:24
**ahead (3)**
6:16;19:9;68:9
**ahold (1)**
34:15
**al (4)**
105:,4;106:3,3
**Alachua (2)**
2:,;6:5
**alcoholic (1)**
8:23
**alleging (1)**
83:17
**allow (1)**
16:12
**alluded (1)**
45:14
**Alvarez (1)**
32:25
**always (8)**
32:5;38:9;44:16;
71:22;75:15;87:17,
18;88:8
**Amber (1)**
91:2
**Amended (4)**
4:,3;11:1,6
**Amendment (60)**
16:5,10,12;23:24;
25:2,7,15;28:21,25;
29:10;30:24;31:5,16;
32:2;40:5,18;41:10,
17,19,20;42:3,16,25;
43:14,18,23;44:18;
47:17;50:21;54:2;
57:25;60:17;64:4,5,7,
8;66:16,21;67:10,14,
16;68:4,7,13;69:10;
71:25;72:6;75:23;
76:2;77:7,16;78:12;
79:22;80:13;82:10;
93:13;99:13,24;
101:11,11
**American (1)**
2:
**among (1)**
86:25
**amount (3)**
12:4;64:2;93:2
**Andrew (2)**

76:5;98:1
**anecdotal (1)**
53:19
**annex (1)**
40:22
**anticipate (1)**
26:4
**Antonacci (1)**
14:15
**anymore (1)**
37:7
**appearance (2)**
5:12,19
**APPEARANCES (1)**
2:1
**appeared (2)**
45:9;103:7
**APPEARING (2)**
2:15;3:1
**applicant (6)**
26:11;34:22;35:11,
17;37:13;45:8
**applicants (6)**
22:20;44:19;46:24;
51:8;58:14;74:16
**Application (28)**
4:13;23:17;24:1,6,
19;26:20,25,25;27:1,
5;33:14,15,19,23;
34:1,10;35:8;36:1,7,
11;43:12;51:10;
71:21;72:8,19;81:24;
98:16,17
**applied (1)**
50:9
**applying (7)**
23:16,20;33:7;
42:15,23;43:24;
71:24
**appointments (1)**
94:5
**approached (1)**
98:13
**approval (3)**
27:9,15,16
**April (2)**
40:22;41:7
**area (2)**
32:19;79:4
**areas (2)**
49:17;93:4
**arena (1)**
71:7
**around (3)**
23:13;79:9;100:9
**arresting (1)**
99:9
**Arrington (1)**
12:17
**Article (8)**
4:12,18;29:10;
59:9,11;73:25;95:3;
100:18

**Arts (1)**
20:21
**ascertain (3)**
35:21;38:24;61:22
**ascertains (1)**
73:1
**ASHLEY (2)**
3:2;6:13
**aside (7)**
12:20;14:4;27:23;
45:16;52:16;58:5;
95:16
**assessment (4)**
38:13;45:3;52:11;
62:20
**assets (1)**
47:7
**assign (1)**
78:2
**assist (3)**
35:12;68:19;75:16
**associated (1)**
36:1
**Associates (1)**
105:16
**association (6)**
66:23;67:7;93:11;
94:22;98:25;99:23
**assumption (1)**
66:4
**attached (1)**
100:9
**attempt (1)**
75:7
**attempting (1)**
26:17
**attend (4)**
20:18;32:1;67:25;
84:19
**attendance (1)**
67:21
**attended (6)**
69:23;70:3,7;
75:22;84:18;97:21
**attending (1)**
85:9
**attention (9)**
44:22;55:6;57:13,
19;59:8;61:14;65:13;
75:17;82:24
**Attorney (11)**
2:,;5:6;8:9;9:1;
10:5;11:18;12:20;
76:5;98:1;104:,
**Attorneys (3)**
2:,;5:8;11:20
**Attorney's (3)**
2:,;11;3:9
**audibly (1)**
7:23
**August (3)**
103:8;105:10;
106:4

authority (5)
26:14,22;49:14,16;
103:6
authorized (1)
104:
available (2)
54:4;93:3
Avenue (1)
2:23
aware (9)
8:16;11:22;15:8,
11;51:19;58:4;69:17,
18;95:8

**B**

Bachelor (1)
20:21
back (32)
30:10;34:1,8;35:1,
9;37:13;39:7;46:4,8;
53:21;57:17;58:24;
60:23;63:13;65:6;
66:9;68:23;75:17;
83:9,17;86:24;87:18;
88:11,20,22;90:18;
92:1,15;95:9;96:22;
97:9;100:2
background (5)
20:7;98:18,20;
99:1,6
ballot (6)
26:23,24;33:18,18;
40:22;41:1
ballots (2)
25:22;100:5
base (1)
16:15
based (11)
16:2;27:3;45:2;
51:23;57:1;62:20;
63:4;69:19;72:23;
95:24;99:1
baseline (1)
89:15
bases (1)
59:6
basically (2)
47:23;77:8
basis (2)
38:5;59:5
Bates (14)
9:13,15,17,21;10:7,
23;11:3;18:3,8;43:4;
54:25;62:21;75:20;
90:20
Bay (2)
40:16;79:4
BAYS (1)
22:1
Beach (1)
3:7
begin (4)

9:9;10:3;37:1;75:6
beginning (2)
10:7;85:5
begins (1)
18:3
begun (1)
57:18
behalf (2)
6:13,17
Behavioral (1)
21:25
below (1)
105:19
beneficial (1)
99:5
benefit (6)
30:24;31:5;86:21,
25;87:6;88:9
benefits (1)
31:4
Bentley (6)
2:,22;6:9,9;102:16,
17
besides (1)
12:12
beverages (1)
8:23
big (3)
32:16;87:14;89:6
bigger (1)
88:5
Bill (12)
4:6;7:8;14:14;
17:16;68:11,11;69:7;
77:9;93:7,8,23;100:9
bills (6)
68:11;69:6;92:13;
94:12,17;100:8
birth (1)
35:4
bit (15)
11:15;12:23;16:15;
23:19;28:17;33:2,3;
40:4;42:14;66:15;
70:10;78:16;79:19;
98:18;101:13
Block (1)
29:11
blood (1)
8:18
board (5)
21:16,24;22:2;
26:2;42:20
Books (1)
42:13
Boost (1)
29:11
both (5)
13:8;59:5;69:22;
70:2;93:1
bottom (1)
24:5
Boulevard (1)

2:
box (7)
24:2,3,4;35:3;
43:19;72:21;74:14
boxes (2)
35:6;72:21
break (6)
8:25;9:3,4;58:18,
21;62:12
Brett (1)
27:20
Brief (3)
62:13;90:17;
101:21
briefly (4)
20:7;33:10;67:13;
75:18
bring (3)
12:18;48:2;65:12
broad (1)
25:20
Bronough (1)
3:3
Broward (1)
14:15
Bruning (1)
2:
bullet (3)
62:23;63:1;65:20
burdens (1)
88:2
burdensome (2)
87:24;88:6
business (1)
85:9

**C**

call (2)
9:19;88:21
called (1)
76:4
Calls (1)
95:18
came (5)
44:22;55:11;57:12;
59:8;84:1
can (52)
5:11,20;7:10,24;
9:1,4,23;19:9;23:5,
13;26:11,19;27:7,15,
22;28:24;31:1,19;
33:10,11,12,13,14;
35:6,14;39:1,1;40:2;
45:4,19;46:9;47:22;
53:13;58:20;63:9,15;
75:15;77:11;81:1;
83:18;89:6;92:15;
93:3,4,22;95:19;
99:20;100:11;101:1,
3,8;105:
capacities (2)
13:9;28:4

capacity (7)
12:25;23:1,7;
31:20,21;69:20;90:9
Caparello (1)
2:
card (1)
72:24
carrying (2)
40:11;41:20
case (11)
5:9;13:2,6;14:11;
15:4;38:22;49:10;
72:13;88:21;91:6;
105:
cases (4)
13:3,5,13,21
categories (1)
47:11
Catholic (1)
22:2
caused (1)
25:22
cc (1)
105:24
Centennial (1)
2:20
Center (1)
105:16
Central (2)
21:24;77:24
certain (3)
7:7;17:3;28:12
CERTIFICATE (4)
3:19,20;103:1;
104:1
certified (1)
75:8
certify (3)
103:6;104:,9
CESAR (3)
2:16;6:5,5
Chain (4)
4:15,16,17;92:3
chair (2)
22:1;31:22
challenge (1)
52:7
challenged (7)
44:1,3,15;45:24;
46:13;51:1;53:1
challenging (6)
7:7;17:3,16;51:16;
52:2,5
Chamber (1)
92:18
chance (1)
6:24
change (9)
25:6;17;27:11,12;
36:18;37:7;63:6;
90:11;106:5
changed (5)
16:10,20,21;53:1,

12
changes (11)
25:11;32:7;47:16;
48:23;52:24;68:4;
101:10;105:;,106:2,
21
charged (1)
92:21
charges (2)
47:23;57:14
check (10)
24:2,3,3;35:6;
50:21;53:22;72:21,
21;89:15;101:13
checked (4)
35:2;43:19;64:23;
74:14
checking (1)
70:11
checklist (1)
96:1
chief (3)
21:5;27:19;76:4
circulation (1)
75:11
citizen (3)
24:3;33:9;35:4
citizens (1)
16:1
City (5)
40:7,25,25;41:1;
105:16
Civil (2)
2:;79:11
claims (2)
13:22;35:20
clarification (1)
71:1
clarify (2)
8:1;49:8
classes (3)
15:17;16:1,2
clear (5)
26:22;30:1,10;
37:14;68:7
clearly (4)
69:14;83:19;97:16,
18
clemency (6)
42:20,20;43:2;
45:1,4,6
Clerk (11)
28:14;38:22;49:21;
65:2,10,14;76:6;77:2,
25;83:9;87:1
clerks (2)
50:16;78:2
Clerk's (12)
28:16;39:24;47:6;
48:4;49:3;50:1;
64:21;66:7;68:16,21,
24;91:18
close (1)

42:13
**closely (1)**
29:7
**closer (1)**
24:25
**closing (2)**
77:8;94:9
**Coalition (9)**
29:8;31:17,25;
68:16,18;69:4;75:13;
80:9;84:10
**collected (2)**
19:7,8
**collection (2)**
78:2,2
**college (1)**
20:18
**combination (1)**
13:8
**comment (1)**
30:5
**comments (2)**
78:12;95:4
**Commerce (1)**
92:18
**Commission (2)**
103:18,19
**Commissioner (7)**
75:22;76:3,8,11,
15;77:4;97:21
**Commissioners (1)**
26:3
**committee (2)**
93:7,25
**common (1)**
78:1
**communicate (6)**
34:13;66:20;75:7;
88:22;91:14,19
**communicating (1)**
37:1
**communications (3)**
32:19;88:16;94:1
**community (18)**
21:20;26:16,17;
28:21;29:1;30:12,23,
25;31:3,6,21;71:3,4;
79:3,7;84:3,5;95:2
**compare (1)**
55:17
**compared (1)**
102:12
**comparison (1)**
55:19
**compile (2)**
19:13;20:4
**compiled (1)**
19:10
**complaint (4)**
15:3;74:7,10;82:21
**complete (3)**
34:17;68:8;104:7
**completed (8)**

36:12;47:24;69:7;
72:15;98:7;99:19;
101:14;105:
**completion (3)**
68:13;70:21;96:23
**comply (4)**
42:2;67:15;68:12;
90:9
**complying (2)**
67:10;84:24
**composition (2)**
25:6,11
**comprehended (1)**
37:10
**comprehensive (4)**
38:22;48:16;49:10;
52:13
**concern (4)**
78:6;79:9;92:24;
93:12
**concerned (3)**
52:10;79:21;86:10
**concerning (1)**
56:9
**concerns (21)**
28:22;29:1;41:17;
45:10;53:5;56:11;
59:6;63:6;67:10,11;
77:16,22;79:7,12,16,
20,25;87:21;91:10;
94:16;95:7
**concluded (2)**
55:23;102:25
**concludes (1)**
102:4
**conclusion (1)**
95:18
**conduct (15)**
22:7;35:11,24;
36:14;39:9;60:9;
62:7;63:3;66:2;
87:10;88:13;89:11;
90:2,7;92:20
**conducted (2)**
34:6;85:19
**conducting (1)**
36:22
**conference (4)**
67:21;84:18,19,22
**confidential (1)**
93:4
**connected (1)**
104:
**consider (2)**
96:15,19
**considerations (1)**
97:22
**consist (1)**
98:17
**consolidated (2)**
5:9;82:2
**constantly (1)**
26:16

**Constitution (1)**
7:9
**Constitutional (3)**
77:1;78:17,24
**constitutionals (2)**
76:24,25
**consulting (1)**
21:14
**contact (1)**
65:9
**contacted (1)**
98:15
**contain (1)**
65:17
**contained (2)**
47:11;96:25
**context (1)**
33:5;80:12
**continue (2)**
48:4;86:10
**CONTINUED (1)**
3:1
**contradict (1)**
63:18
**contradictions (1)**
63:24
**conversation (10)**
14:10;32:6;47:25;
48:6,18;68:6;78:14,
20;94:24;95:1
**conversations (7)**
11:17;14:17,21;
29:6;31:13;70:1;
87:23
**converted (1)**
79:11
**conveying (1)**
71:3
**convicted (10)**
30:2;35:4;43:21;
57:14;60:1;69:16;
74:1,4;81:16,23
**conviction (40)**
23:17,21,22;25:24;
27:12;30:21;33:6,7;
42:16,18;43:25;
46:25;50:2,10,22;
51:2,3,7,14,18;52:25;
53:25;54:13,14,18;
59:1,7,9;60:8,8;61:9,
11,15;62:2;64:12;
74:11;81:11,13,24;
83:10
**convictions (9)**
16:13;44:20,24;
49:3;50:4,13;53:6;
60:18;98:7
**cooperate (1)**
102:9
**coordination (1)**
86:25
**copies (1)**
19:4

**copy (13)**
10:9;11:4,8;17:9;
18:2,9,13;24:11,12;
29:12;54:24;71:11,
12
**corners (1)**
35:22;96:25;97:2
**Correction (1)**
55:18
**Corrections (11)**
47:7,13,19;49:4,9,
13;59:14,16,18;93:2;
101:14
**Correction's (2)**
91:5,16
**correspondence (2)**
14:24;19:21
**cost (1)**
37:1
**costs (4)**
36:1,2,21;50:23
**counsel (22)**
5:14,21;6:11,20;
8:3,5;10:9,22;11:9,
21;14:4;17:9,23;
18:13;19:21,25;
55:12;56:15;99:20;
100:11;104:,
**counties (8)**
62:6;65:25;87:1;
88:25;89:8,20;97:25;
101:24
**County (49)**
2:,11;3:6,9;6:6,8,
18;7:12;13:14;14:14,
15,15,16;20:9;21:2;
22:6,7;26:2,2;28:18,
19;30:17,23;32:13,
14;37:7,8;40:6,24;
42:6;49:11;50:9;
56:10;58:15;62:19;
63:2;65:10,17;72:17;
73:7;75:22,24;76:9;
82:2,22;88:23;97:22;
103:4;104:
**couple (4)**
10:21;27:25;32:21;
96:4
**course (2)**
7:18;47:21
**court (21)**
7:16,17;8:8,11;
38:22;49:21;50:2,23;
64:22;65:10,14;73:5;
74:1;76:6;77:2;
83:17;87:13,16;88:8;
96:17;105:1
**Courts (2)**
65:2;87:1
**Court's (2)**
28:14;83:9
**Cowles (1)**
14:14

**Craig (7)**
2:,5:1;7:11;103:7;
104:6;105:;106:,23
**C-r-a-i-g (1)**
7:11
**create (1)**
49:7
**created (1)**
57:9
**credibility (2)**
45:2,11
**credible (16)**
38:15,19,25;41:24;
44:9;46:6;60:5;62:4;
63:7;74:23,25;75:2,
4;85:20;87:11,13
**crime (3)**
47:21;59:15;64:23
**criminal (3)**
28:9,9,23;29:2
**Cronister (1)**
76:10
**current (4)**
9:12;28:5;31:22;
90:7
**currently (4)**
8:17;20:8;27:8;
84:14
**CUSICK (62)**
2:2;3:18;5:5,6,18;
6:11,15,20;7:2,5;9:8;
10:1,2,12,25;11:12;
17:7,13,25;18:16,20;
19:12,19;20:13,15;
23:4,15;29:9,15,18,
21;31:8;43:3,8;
54:21;55:4;56:2;
58:20,23;62:11,16;
63:16;71:8,15;90:15,
18,24;95:23;97:20;
99:11;100:14,16,18,
22;101:7,19,22;
102:4,10,14,22;
105:24
**cut (1)**
29:24

### D

**D6 (1)**
68:10
**Daily (1)**
38:8
**data (8)**
35:17;63:19;88:18,
25;89:10,20;101:23;
102:1
**database (4)**
36:19;49:13,15;
50:19
**databases (3)**
35:12;36:15;49:6;
50:14;77:23,25

**date (9)**
14:2;35:3;41:6;
72:25;85:5;101:1;
105:;106:4,23
**dated (3)**
54:23;56:8;104:
**DAVIS (4)**
3:2;6:13,13;102:21
**day (3)**
32:15;103:10;104:
**days (1)**
42:13
**deadline (1)**
42:11
**deal (2)**
75:14;99:9
**dealing (2)**
17:16;98:25
**decade (1)**
96:6
**decades (1)**
96:5
**December (2)**
66:23;67:7
**decision-maker (2)**
23:2,8
**decisions (1)**
27:17
**declare (1)**
106:20
**Defendant (4)**
6:12,15,20;10:8
**DEFENDANTS (4)**
2:15;3:1;6:22;105:
**Defendant's (1)**
4:7
**Defender (1)**
76:6
**Defense (2)**
2:3;5:7
**define (1)**
38:25
**definitely (1)**
23:13
**definition (4)**
69:13;88:6;95:14,
16
**degree (2)**
64:13,14
**degrees (1)**
20:23
**delegation (1)**
92:7
**demographics (1)**
28:18
**Department (18)**
3:;21:13;32:16;
47:7,13,19;49:4,9,13,
19;55:17;56:10;
59:14,16,17;91:16;
93:1;101:13
**Department's (1)**
56:11

**depending (1)**
93:5
**depends (2)**
37:6,19
**deponent (1)**
105:13
**deposed (7)**
5:3;12:24;13:3,13,
16,22;14:10
**Deposition (21)**
4:,2,5;7:18;8:8;
10:4,8,16,19;11:6,16;
12:15,17,21;13:19;
17:14;102:4;104:6;
105:;106:,4
**depositions (1)**
9:21
**DeSantis (3)**
5:10;105:;106:3
**describe (1)**
47:4
**details (1)**
81:9
**determination (32)**
22:24;34:4,25;
35:19;38:16,18,20;
41:25;44:9;45:2,3;
46:16;52:10;57:11,
12;60:6,22;61:5,23;
62:3;72:5,7,11;
74:24;85:21,24,24;
86:1,15,23;90:13;
97:19
**determinations (2)**
38:12;57:1
**determine (7)**
39:18;68:16;72:11;
74:5;83:2,18;97:1
**determined (3)**
36:12;46:5,17
**determining (3)**
22:19;34:21;36:8
**develop (1)**
21:15
**differences (1)**
63:19
**different (10)**
14:9;26:16;52:14;
63:20;64:2;80:4;
85:3;100:5,11,12
**Digna (1)**
32:25
**diligence (1)**
101:13
**DIRECT (3)**
3:18;7:4;50:18
**directed (1)**
80:6
**directions (1)**
46:11
**directly (4)**
59:10;80:3,4,25
**directors (1)**

21:15
**discovery (3)**
9:11;18:11;91:22
**discrepancy (1)**
65:11
**discrimination (1)**
13:23
**discuss (4)**
12:20;20:7;22:3;
75:23
**discussed (6)**
62:24;67:14;69:7;
76:2;98:1;102:5
**discussing (1)**
66:12
**discussion (4)**
66:25;67:14;77:15;
85:2
**disparities (3)**
28:22;29:2;30:16
**disposal (1)**
51:8
**DISTRIBUTED (1)**
105:
**DISTRICT (2)**
105:,1
**Division (2)**
44:12;105:2
**DOC (1)**
91:4
**docket (1)**
97:24
**document (26)**
10:6,13;17:18;
20:1;43:9;55:8;
62:23;63:25;64:2,22;
71:16;89:4;95:12,13,
17,21;96:8,16,20;
97:1,2,3,11,14;
100:12,23
**documentation (1)**
91:3
**documenting (1)**
30:16
**Documents (24)**
4:;9:12;12:14,18;
17:22;18:5,21;19:7,
14;20:5;47:6,11;
49:3;50:2;57:17;
63:19;88:12;91:9,11;
95:25;96:4,7,13;97:9
**done (3)**
31:23;54:11;71:22
**doubt (1)**
30:1
**down (1)**
64:22
**downtown (1)**
92:18
**driver's (3)**
22:22;24:16;72:23
**drives (1)**
32:9

**dropped (1)**
47:23
**due (3)**
54:13,14;101:13
**duly (2)**
5:2;103:8
**during (14)**
8:7;9:19;19:24;
67:6;68:2;69:20;
78:13;79:4;84:18,22;
92:9;93:20;94:10,17
**duty (2)**
7:15;22:8
**DYLAN (1)**
3:;6:17

# E

**earlier (3)**
45:14;62:24;73:21
**ease (1)**
9:14
**East (1)**
2:
**education (3)**
20:22;26:17;78:17
**Educational (3)**
2:3;5:7;20:23
**Edwards (2)**
14:16;27:20
**effect (23)**
15:10;25:3,5,9,22;
40:6;47:17;48:24;
52:23;53:2,4;54:7;
57:4,25;66:16,17;
70:10;71:25;77:13,
14;79:6;80:20;86:4
**either (8)**
27:2;33:12;69:2;
79:5;81:20;84:14;
85:19;102:19
**elected (3)**
21:5;94:25;95:7
**election (14)**
25:1;40:8,15,23;
41:9,15,18;42:5,8,13;
80:19;81:8;84:8;
94:19
**Elections (47)**
6:10,18,23;7:13;
10:9;13:11;14:12,22;
21:1,9,18;22:5,6,8;
25:25;26:8;40:4,7,
12;41:12;42:2,23;
44:12;47:9;54:23;
55:13;58:11,14;
62:20;63:2;67:9,20;
69:21;70:4;73:12;
81:25;84:20;85:4,25;
86:6,10;87:8,9;88:13,
24;98:4;101:25
**Elections' (1)**
63:5

**eligibility (25)**
16:10,20;22:19;
23:2,8;34:4,7;36:9;
43:25;44:2,15;46:13;
51:1,5,17,23;52:3,6,
7,11,25;59:6;60:23;
70:16;88:1
**eligible (6)**
27:3;31:12;34:22;
69:9;72:5,12
**else (9)**
6:22;7:2;8:19;12:6,
12,21;27:21;77:18;
95:6
**E-mail (17)**
4:11,15,16,17;
14:24,25;19:21;
48:20;56:24;57:7;
62:18;71:9,19;91:13,
20,22;93:3
**emeritus (1)**
22:1
**employee (1)**
33:1;104:,10
**employees (5)**
24:23,25;26:14;
27:15,25
**employment (2)**
20:8;21:11
**encountering (1)**
66:1
**encourage (1)**
98:6
**end (1)**
94:8
**ended (2)**
100:8,8
**enforcement (11)**
13:15;21:8;27:24;
28:3;49:19;69:15,20;
81:18;99:1,6,8
**enough (4)**
34:11;83:9,18;86:5
**ensure (2)**
23:11;101:11
**ENTER (1)**
106:2
**entered (3)**
34:8;96:19;106:21
**entering (1)**
22:16
**entire (2)**
17:4;96:15
**entitled (3)**
10:7;55:14;58:18
**entity (1)**
21:25
**envelope (1)**
25:21
**equally (1)**
26:9
**ERRATA (5)**
3:22;105:,14,18;

106:1
**error (2)**
39:25;89:20
**errors (10)**
45:13,17;52:17;
66:1;88:17,18,25;
89:3,10,14
**Ertel (2)**
71:10,20
**ESQUIRE (14)**
2:,,2,6,16,19,22;3:,,
,2,13;105:,24
**establish (1)**
86:15
**established (1)**
85:20
**et (4)**
105:,4;106:3,3
**event (4)**
67:25;84:3;92:17;
94:4
**events (5)**
32:1;79:3,4,13;
95:2
**everybody (1)**
5:12
**evidence (5)**
38:18,25;39:3;
63:17,24
**exact (4)**
12:4;14:2;28:7;
89:16
**exactly (2)**
34:16;56:16
**EXAMINATION (2)**
3:18;7:4
**examined (1)**
5:3
**example (8)**
35:14;39:15;44:4;
58:25;63:20;82:1,14;
85:4
**examples (1)**
52:16
**except (1)**
64:6
**exchanges (1)**
93:18
**Excuse (1)**
10:22
**executed (1)**
101:12
**executive (1)**
21:15
**Exhibit (37)**
10:24,25;11:2,3,5,
8,10;17:8,11,25;18:4,
12,18;19:17,20,23;
29:10,19;43:4,6;
54:22;55:2;62:14,18;
71:9,11,13;75:18;
88:23;90:19,22;92:1;
95:9;100:10,12,16,20

**EXHIBITS (4)**
4:1;9:20;11:13;
19:6
**expand (1)**
15:18
**expanded (1)**
16:22
**expect (1)**
85:14
**experience (1)**
95:24
**experiencing (1)**
89:20
**Expires (1)**
103:18
**explain (1)**
33:10
**explains (1)**
56:10
**express (3)**
29:1;79:25;95:6
**expressed (1)**
30:24
**extent (2)**
31:11;77:11
**extra (1)**
25:23;63:3;65:22

**F**

**face (2)**
65:11;89:3
**facial (1)**
89:14
**facially (1)**
75:3
**fact (7)**
22:24;38:24;39:13,
20;69:25;80:18;
92:17
**facts (2)**
14:10;85:20
**factual (1)**
89:7
**familiar (3)**
16:5,17;55:14
**far (5)**
22:22;68:23;70:18;
83:9,17
**FARRIS (3)**
3:;56:9,14
**federal (16)**
22:7;44:23;50:12,
16;57:14;59:1,7,15,
17;60:2,8,17;61:11,
15;74:1,2
**fee (1)**
78:2
**fees (33)**
16:25;17:17;50:23;
61:24;64:1,9;69:9;
70:13,22;72:1,14;
73:9;74:12;79:10,17,

23;80:2,14,23;82:8,
14,19,23;83:21;85:5;
86:17,23;87:7;89:9,
19;96:11,14;97:24
**fellow (1)**
78:17
**felon (10)**
30:2;43:21;55:15;
56:9;62:18;66:1;
72:20;81:16,23;
88:18
**felonies (2)**
74:19,20
**felons (3)**
73:20;74:22;100:7
**felony (48)**
16:13;23:16,20;
25:24;27:12;30:20;
33:5,7;35:5;41:25;
42:16,18;43:24;
46:25;47:2,4;50:10,
22;51:2,3,6,13,17;
52:25;53:24;54:13,
14,18;59:9;60:1,8,17;
61:9,11,15;62:2;
64:10,16,17;69:16;
73:1;74:4,11;81:11,
12;82:25;86:16;98:6
**felt (1)**
67:18
**Ficarrotta (1)**
76:5
**fight (1)**
87:25
**file (5)**
24:14;39:5;50:1;
54:3;91:6
**filed (3)**
14:3;15:3,9
**files (5)**
34:9;70:18,20;
87:15;90:5
**filings (1)**
73:5
**fill (2)**
33:14;96:1
**filled (3)**
72:8;81:23;98:16
**final (6)**
18:10;22:24;23:1,
7;85:24;86:2
**financially (1)**
104:11
**find (1)**
91:23
**finding (1)**
88:25
**findings (1)**
53:22
**fine (2)**
9:25;20:13
**fines (34)**
16:25;17:17;50:23;

61:24;64:1;69:8;
70:13,22;72:1,14;
73:9;74:12;78:2;
79:9,11,17,23;80:2,
14,22;82:7,14,19,22;
83:21;85:5;86:17,23;
87:7;89:9,19;96:11,
14;97:23
**finish (2)**
9:3;58:20
**First (20)**
4:2,3,8,10;5:2;
10:8,16;13:25;17:22,
24;18:5;37:16;44:15;
48:1;62:23;64:13;
71:24;79:5;90:11;
91:1
**first- (1)**
64:16
**fiscal (1)**
26:5
**five (2)**
13:6;66:14
**five-minute (1)**
62:12
**FL (1)**
105:
**Floor (4)**
2:4,12;77:9;94:9
**Florida (34)**
2:,,,7,24;3:,,4,7;
4:13;6:4;16:11,20;
20:19;21:24;22:1,1;
30:8,20;31:17;33:8,
11;43:12;49:19;
55:12;67:7;72:24;
79:5;84:19;103:3,17;
104:;105:
**focus (1)**
17:15
**follow (4)**
46:19;86:19;96:18;
101:3
**followed (2)**
11:9;27:13
**following (3)**
25:5;82:5;86:9
**follows (1)**
5:3
**follow-up (1)**
7:21
**force (1)**
66:2
**forced (1)**
52:18
**forces (1)**
90:12
**form (9)**
19:8;23:3;43:15;
55:24;62:9;81:23;
97:15;99:7;106:21
**forward (3)**
7:3;24:14;57:2

**forwarded (3)**
81:17;105:,
**found (2)**
24:4;52:17
**Foundation (2)**
2:;63:8
**four (4)**
35:22;72:24;96:25;
97:1
**fourth (1)**
32:13
**frame (6)**
29:4;56:6;58:1;
66:11,16;102:11
**Frank (2)**
76:6;77:25
**frankly (1)**
85:9
**fraud (2)**
57:14;59:1
**Friday (1)**
54:12
**full (1)**
32:21
**full-time (2)**
24:23,24
**fully (5)**
7:19,21;56:13;
69:17,18
**Fund (2)**
2:3;5:7
**funded (2)**
26:1,9
**furnish (4)**
38:14;41:24;44:8;
75:2
**furnished (2)**
44:21;74:23
**furnishing (2)**
52:6;87:12
**further (3)**
5:11;60:3;104:9
**future (2)**
85:1;101:5

**G**

**Gainesville (1)**
2:
**gathered (1)**
59:10
**gave (4)**
19:2;60:2;66:24;
77:10
**GEENA (2)**
2:16;6:5
**general (10)**
14:9,11;32:5;
53:14;55:12;68:6;
75:10;78:14,19;
92:24
**generally (2)**
51:7;58:9

**GERRI (3)**
3:14;12:9;19:11
**gets (1)**
51:1
**GG (1)**
103:19
**given (6)**
24:24;35:3;53:15,
20;71:6;87:8
**gives (1)**
27:4
**giving (7)**
10:6;11:4;52:12,
15;54:24;75:8;83:15
**glitch (1)**
100:5
**goes (1)**
88:7
**Good (5)**
5:5;48:2;52:15;
58:19;66:10
**Gotcha (1)**
39:23
**Governor's (4)**
6:21;94:11;98:15,
22
**Grant (10)**
19:5;76:7,18;77:3;
78:5;83:19,19;92:4,
6;93:21
**Grant's (1)**
93:12
**Great (12)**
5:18;7:2,14;8:7;
9:7;10:1,21;11:15;
14:17;17:6;31:11;
102:10
**greatly (1)**
16:22
**Greg (1)**
56:21
**group (9)**
48:2,10,14;84:5;
98:11,14,19;99:5,14
**groups (7)**
21:20;31:3,10,16,
18;79:14;80:4
**Gruver (4)**
5:8,15;6:2,4
**guess (6)**
37:9;51:5;52:19;
80:18;88:5;98:22
**guidance (31)**
26:5;33:25;34:5;
37:23;40:14,17,20;
41:8,16;42:2;71:1,4,
6;78:25;85:1,11,12,
15;86:5,7,11,13,22;
87:9;88:10,12;90:6;
97:10,13;99:13,17
**guilt (3)**
39:6;42:21;64:11
**guilty (6)**

47:21;73:1;81:17;
82:25;86:16;91:17

**H**

**half (1)**
12:5
**Hamilton (1)**
31:24
**hand (1)**
103:10
**handing (8)**
11:8;17:8;18:2,9,
13;19:25;29:12;
71:11
**happen (3)**
28:2;41:6;86:11
**happened (2)**
43:25;56:17
**happy (1)**
91:24
**harbor (1)**
80:19
**hard (1)**
34:15
**HCSE (5)**
10:7;11:3;18:3,8;
29:11
**head (7)**
7:24;14:16;27:20;
28:20;32:13;54:3,10
**Health (1)**
21:25
**hear (1)**
8:9
**heard (2)**
80:3;93:24
**Hearing (7)**
5:23;7:2;53:21;
70:6;75:9;87:20;
102:22
**hearings (5)**
53:21;69:24;70:3;
93:7,10
**held (1)**
24:14
**HELEN (3)**
3:;56:9,14
**help (2)**
21:16;69:5
**helpful (1)**
67:4
**Henry (1)**
31:24
**herein (1)**
5:2
**HERRON (5)**
2:19;6:7,7;102:18,
18
**Hillsborough (25)**
2:11;7:12;13:14;
20:9;21:1,12;22:6;
28:18,19;30:17,23;

40:6;42:6;50:9;
56:10;58:15;65:10;
72:17;73:7;75:23;
76:9;82:2,22;103:4;
104:
**history (1)**
20:8
**Hogan (1)**
101:9
**holds (1)**
22:4
**homicides (2)**
13:16;16:24
**hoping (1)**
93:24
**hour (3)**
12:4,5;58:17
**hours (1)**
8:23
**House (4)**
68:11;77:9;93:7,23
**housekeeping (1)**
18:7
**Hull (1)**
76:6
**hundred (2)**
13:4,5
**hypothetical (3)**
83:8,15;88:24
**hypotheticals (1)**
89:6

**I**

**ID (1)**
72:24
**idea (4)**
59:15;67:5;90:4;
95:14
**ideas (1)**
92:15
**identification (12)**
11:11;17:12;18:19;
19:18;29:20;43:7;
55:3;62:15;71:14;
72:23;90:23;100:21
**identified (1)**
45:8
**identify (3)**
21:16;46:24;52:13
**impact (6)**
75:23;77:6;78:13,
15;79:7,17
**impair (1)**
8:21
**implement (5)**
26:6;40:18;41:10,
19;67:15
**implementation (5)**
25:15,18;32:4;
64:3,5
**implemented (2)**
78:16;79:10

**implementing (3)**
41:17;67:19;97:23
**inaccurate (1)**
87:22
**Inc (1)**
2:3
**incapacitated (1)**
35:7
**incarcerated (11)**
30:7;47:15;49:2;
54:20;64:7;70:19;
84:14,16,17;85:7;
86:8
**inclined (2)**
89:2,12
**include (4)**
22:11,13,16;91:3
**included (5)**
65:2;79:12;92:3;
96:10,13
**includes (4)**
30:17;70:22;88:11;
95:12
**including (5)**
30:8;50:4,12;61:3;
93:1
**inclusive (1)**
31:12
**incompetent (1)**
24:4
**incomplete (3)**
34:9;35:9,25
**inconsistencies (1)**
64:12
**independent (1)**
38:12
**INDEX (1)**
3:17
**indexes (1)**
22:9
**Indian (2)**
3:6;6:18
**indicate (6)**
72:1;73:6;74:11;
78:23;89:8,14
**indicated (10)**
33:17;63:25;64:2;
73:21;74:7;76:18;
78:6;86:12;92:14;
97:24
**Indicates (7)**
47:3;48:22;59:2;
63:3;74:9;91:2;96:23
**indicating (1)**
91:7
**indication (1)**
59:25
**individual (19)**
34:18;35:25;41:25;
52:13;56:21;57:10,
13,20,21,24;58:24;
59:9;60:13,17;73:25;
80:9;86:15;87:19;

88:2
**individuals (11)**
14:6;20:4;32:23;
55:17;64:7;68:19;
69:24;71:23;72:13;
82:15;87:23
**individual's (1)**
59:24
**industrial (1)**
20:21
**ineligibility (2)**
38:16;86:18
**ineligible (15)**
27:3;38:2,5,10;
44:6;45:9;46:14,18,
25;52:8;65:24;67:3;
72:12;80:13;85:18
**ineligibles (2)**
48:25;55:20
**influence (1)**
8:19
**information (119)**
22:11,22;24:13,15;
27:4;34:12,14;35:1,9,
25;38:9,15,17,21,22;
39:21;44:5,7,14;45:5,
9,11,17,25;46:4,5,12,
14;47:5,10,16;48:3,4,
16,23,25;49:5,10,12,
18;51:2,7,9,15,22;
52:2,7;53:5,16,20;
56:23;58:13;59:10,
24;60:2,5,7;61:8,10,
10,13,16,21,22;62:4;
63:6;64:13,25;65:1,4,
18,25;66:7;68:17;
69:1,25;70:12;71:3,
4;72:16,16,22;73:10,
14,22;74:3,13,23;
75:1,2,3,21;78:19;
80:24;81:2,17,19;
82:17;83:1,14,22,24,
25;84:15;85:3,4,6,21;
86:19;87:2,11,12,22;
88:4;89:3,13;91:18;
98:20;102:3
**initial (16)**
38:15;41:25;44:9;
57:1;60:5;62:3;71:9;
72:11;74:24;85:21,
23;86:1,14,22;90:13;
97:19
**initially (2)**
10:18;83:23
**initiate (2)**
27:7;60:25
**initiated (1)**
88:1
**initiates (1)**
53:16
**injunction (1)**
15:9
**input (3)**

24:13;92:22;100:4
**inputted (1)**
9:15
**inquire (1)**
78:24
**inquiry (1)**
35:13
**insight (1)**
77:6
**instead (1)**
100:9
**instructed (1)**
8:13
**intent (1)**
81:15
**interaction (1)**
65:16
**interactions (1)**
69:19
**interested (1)**
104:11
**interpret (2)**
95:17;97:14
**Interrogatories (6)**
4:7;17:24;18:1;
19:3,4;75:18
**interrogatory (3)**
75:19;79:2;92:2
**into (37)**
15:10;22:16;25:2,
3,5,9,22;34:9;38:6;
40:5;47:17;48:24;
49:16;52:23;53:2,4;
54:7;57:4,25;62:17;
66:16,17;70:10;
71:25;75:21;76:1;
77:6,13,14;79:6;
80:20;81:9;86:4;
90:19;92:17;93:19;
94:4
**introduce (11)**
17:7;18:4,7;29:9;
43:3;54:21;62:17;
71:8;90:19;100:10;
101:18
**introducing (3)**
11:1,2;19:20
**investigate (2)**
60:4;61:17
**investigation (13)**
35:21;39:10,12;
44:8;52:19;57:16;
72:10;83:2;84:2;
85:17,19;90:3,7
**investigations (1)**
92:20
**Investigative (2)**
28:4;89:24
**invited (2)**
76:22;77:3
**invites (1)**
76:12
**involved (4)**

14:11;27:17;29:6;
37:21
**issue (6)**
30:8;34:7;45:24;
90:6;99:12,16
**issues (2)**
40:11;62:24

**J**

**Jacksonville (1)**
2:
**James (3)**
76:7,18;83:19
**Jamie (1)**
19:5
**January (11)**
25:4;40:5;58:2;
66:17;71:10,20,24;
80:19;82:13;83:11;
101:6
**JIMMY (2)**
2:6;6:3
**job (10)**
21:8,18;22:5;
25:14,17;66:9;74:4;
85:16;97:17,17
**JOHN (3)**
2:2;5:6;105:24
**Jones (7)**
5:10,25;98:25;
99:3,4;105:4;106:3
**Joyce (1)**
31:24
**judge (5)**
7:17;64:22;76:4;
96:1,20
**judgment (4)**
64:19;96:15,16,19
**Julie (1)**
76:6
**July (11)**
25:10;48:9,21;
54:7,11;58:2;66:18,
19;70:10,11;80:20
**June (6)**
48:7,9,21;66:12;
77:12;91:2
**justice (4)**
28:9,9,23;29:2
**juvenile (1)**
30:8

**K**

**keep (1)**
20:10
**KELVIN (1)**
105:4
**Kennedy (1)**
2:
**kind (3)**
85:15;86:13;87:4

**Kindly (1)**
105:
**Kingsbury (6)**
103:16;104:5,17;
105:,22;106:25
**knew (1)**
61:25
**Knowing (2)**
63:5;72:15
**knowingly (2)**
81:12,14
**knowledge (3)**
28:13;50:8;78:11
**known (1)**
92:8
**knows (2)**
82:1,7
**KRAMER (3)**
3:14;12:9;19:11

**L**

**Labasky (2)**
54:23;55:11
**label (1)**
10:24
**labeled (1)**
11:8
**labeling (2)**
10:23;18:11
**language (1)**
67:19
**large (1)**
32:13
**largest (1)**
32:13
**last (10)**
13:5;41:7;51:16;
54:12;65:21;70:6;
72:24;91:1;96:3;
101:9
**later (5)**
16:16;17:14;51:12;
72:25;85:5
**Latimer (23)**
2:;5:1,5,17;7:6,11;
10:13;11:4,9,13;
17:9;29:12;43:5,9;
54:25;90:20;101:10,
23;103:7;104:6;105:;
106:,23
**L-a-t-i-m-e-r (1)**
7:12
**law (25)**
13:15;15:10;16:19,
22;20:14;21:8;25:3,
12;27:13,24;28:3;
34:20;38:14;41:21;
46:19,21;49:19;
69:15,19;81:17;
86:20;90:11;99:1,5,8
**lawsuit (9)**
14:1,5;15:15,23,24,

25;17:2;82:2,15
**lawsuits (1)**
102:12
**LCSE (4)**
43:4;55:1;62:21;
90:20
**Leading (2)**
28:21,25
**LEAH (2)**
2:;5:15
**learn (2)**
10:3;13:25
**learned (1)**
10:18
**least (2)**
94:8;96:6
**led (1)**
75:22
**Legal (6)**
2:3;5:7;56:15;
84:11;95:18;98:9
**legislative (7)**
92:7,10;93:6,20;
94:7,10,17
**legislature (2)**
67:18;79:6
**legislatures (1)**
67:23
**Leon (5)**
6:7;62:19;63:2;
88:23;105:4
**Les (2)**
75:22;76:14
**Leslie (1)**
6:19
**less (2)**
89:2,12
**LETTER (5)**
3:21;36:5,6;37:2;
75:8
**level (3)**
49:14,20;93:5
**Lewis (1)**
31:22
**LFO (1)**
73:8
**LFOs (6)**
73:6;82:1;83:4,11,
13;84:7
**Liberties (1)**
2:
**license (3)**
22:23;24:16;72:24
**liens (1)**
79:11
**lies (2)**
88:14;89:25
**likely (1)**
65:23
**limited (1)**
55:23
**Linda (1)**
33:1

**line (3)**
95:11;105:15;
106:5
**lines (1)**
96:22
**List (31)**
4:11;33:4;36:14,
22;37:15,20;38:10;
52:3;55:15,23;56:3,5,
9,11,11,16,16;57:2,9,
10;58:5;71:10;73:4,
11,14,16,17,17;
74:18,19,20
**listed (1)**
105:
**listening (1)**
9:23
**lists (8)**
38:1;39:10;55:20;
57:5,23;58:3,9,13
**little (14)**
11:15;12:23;16:15;
23:19;28:17;33:3;
40:4;42:14;58:17;
66:15;70:9;78:16;
79:19;101:12
**live (1)**
20:8
**lived (1)**
20:16
**lives (1)**
35:19
**lobbyist (2)**
94:21,22
**lobbyists (1)**
93:11
**local (1)**
61:15
**locate (1)**
66:6
**located (1)**
105:14
**location (1)**
77:25
**long (4)**
12:3;20:16;21:3;
32:15
**look (7)**
35:11,18;37:14;
39:1,13;62:25;101:8
**looked (1)**
67:18
**looking (4)**
38:23;49:15;52:1;
77:10
**looks (1)**
97:4
**Lori (1)**
14:16
**lost (1)**
87:5
**lot (5)**
26:15;31:10;74:25;

79:10;98:19

# M

**mail (3)**
25:21;40:22;41:1
**mainly (4)**
9:18;13:10;19:10;
98:19
**maintain (2)**
22:8,10
**maintaining (1)**
22:13
**maintenance (14)**
33:4;36:14,22;
37:15,20;73:4,11,15,
16,17,18;74:18,19,20
**makes (5)**
22:21;23:11;34:24;
72:22;101:4
**makeup (1)**
28:19
**making (3)**
5:12,19;66:4
**managing (1)**
21:25
**Manatee (1)**
6:10
**mandated (1)**
48:11
**manner (1)**
44:22
**many (7)**
11:23;12:1;24:22;
30:6;32:20;53:23;
54:9
**March (7)**
40:15;42:7,9;
80:22;101:2,4,5
**Marconnet (1)**
91:2
**Maria (3)**
48:1;56:8;66:24
**Marion (1)**
14:15
**MARK (4)**
2:19;6:7;100:11;
102:18
**MARKED (12)**
4:1;11:10;17:11;
18:18;19:17;29:19;
43:6;55:2;62:14;
71:13;90:22;100:20
**marking (1)**
17:25
**marks (1)**
100:13
**MARY (3)**
3;:56:9,14
**match (9)**
22:22;23:11;24:16;
35:2;36:13;52:14;
63:13;72:23;87:14

**matched (1)**
51:11
**matter (2)**
64:16;83:5
**mattered (1)**
64:10
**Matthews (10)**
48:1,6,18;55:22;
56:8;66:24;67:13;
84:22;91:13,20
**may (7)**
8:9;14:25;50:1;
55:18;73:1;84:19;
88:5
**maybe (7)**
12:9;27:11;39:5;
63:25;66:4;80:21;
87:1
**McCoy (1)**
5:22
**mean (7)**
15:18;32:5;38:11;
39:12;44:2;45:13;
102:3
**means (2)**
7:15;96:24
**media (1)**
73:6
**medications (1)**
8:17
**medicine (1)**
8:18
**meet (5)**
11:17,20,23;12:1;
83:3
**meeting (11)**
12:10;66:23;75:22;
76:2,4,4;78:8,13;
83:18;94:2;97:21
**meetings (1)**
12:6
**member (1)**
21:20;99:23
**members (10)**
14:6;21:16;28:22;
29:1;30:23;31:3;
71:3,5;79:7;84:6
**memo (3)**
55:11,15;56:7
**Memorandum (2)**
4:14;54:22
**Mendez (1)**
6:1
**mentally (2)**
24:4;35:7
**mention (2)**
22:10;77:18
**mentioned (18)**
17:17;21:7;30:15;
31:15,16;39:15;
48:21;52:20;58:25,
25;60:22;63:11;
67:13,17;70:21;75:1;

79:3;94:21
**mentions (1)**
62:24
**message (2)**
92:3;93:19
**messages (1)**
19:4
**Messer (1)**
2:
**met (5)**
12:2;16:13;23:24;
73:2;74:6
**Miami (1)**
3:
**Miami-Dade (2)**
3:9;102:20
**Michael (2)**
71:10;105:
**middle (1)**
9:2
**midwinter (1)**
68:1
**MIDYETTE (3)**
2:6;6:3,3
**might (23)**
6:23;8:19;12:10;
30:24;31:5;34:11,14,
16;35:16,18;46:14;
47:19;50:5;63:7;
65:17;68:4;73:2;
85:6;86:24;87:21;
88:6;94:4;102:8
**Mike (1)**
71:20
**Miller (8)**
75:22;76:3,8,11,14,
15;77:4;97:22
**million (1)**
57:15
**mind (2)**
7:19;101:19
**minor (2)**
21:14;36:3
**minute (1)**
46:8
**mismatch (1)**
35:16
**missed (1)**
45:14
**moment (10)**
55:5;62:11,22;
63:2;90:8,16,25;
99:20;100:25;101:20
**monetary (1)**
36:2,21
**money (1)**
15:20
**moneys (4)**
50:4,13;54:18;
96:10
**month (1)**
102:6
**monthly (1)**

38:7
**more (15)**
10:21;11:1,5;
16:15;23:19;24:10;
47:12;48:3,15,16;
51:7;53:13;80:15;
91:24;101:13
**MORGAN (3)**
2:22;6:9;102:17
**most (4)**
47:13;69:16,18;
76:23
**move (2)**
5:23;7:3
**much (2)**
95:4;101:16
**multiple (1)**
96:8
**municipal (1)**
22:7
**Musetta (1)**
105:16
**must (3)**
8:11;68:8;101:5
**myself (4)**
19:5,11;76:6;77:1

# N

**NAACP (10)**
2:3;5:7;31:19,22;
32:1,8,10;75:12;
80:10;84:10
**name (9)**
5:6,13,20;7:10;
13:2;34:14;56:21;
63:12;75:10
**named (1)**
16:22
**names (6)**
14:13;32:23;60:11,
12,14,18
**National (1)**
36:18
**NCOA (3)**
36:16,18;73:18
**necessarily (3)**
23:10;63:10;64:21
**necessary (3)**
34:13;90:3;101:11
**need (12)**
8:25;9:3;24:9;
58:21;67:18;68:12;
78:23;80:15;88:15;
90:2,9,14
**needed (6)**
8:9;48:4;77:18,21,
21;91:17
**needs (2)**
34:5;101:12
**Network (2)**
21:25;91:5
**New (8)**

2:;,22;16,19;25:7,
12;42:22;51:3
**News (1)**
4:12
**newspaper (6)**
59:8,11;73:25;
75:10,11;95:3
**next (7)**
23:18;24:7;37:5;
42:5;46:6;83:25;
102:6
**nightmare/opportunity (1)**
93:14
**nominated (1)**
98:21
**none (6)**
5:23;7:2;83:21;
102:20,21,22
**nonprofit (1)**
21:14
**nor (2)**
104:,10
**normal (1)**
102:12
**NORTHERN (1)**
105:
**Nos (2)**
11:10;18:18
**Notary (2)**
103:17;104:5
**note (3)**
56:13;72:21;
105:15
**noted (3)**
8:10;30:14;81:16
**notes (2)**
78:8;104:
**Notice (18)**
4:,2,3;10:8,16;
11:6;37:4,11;46:21;
53:11,17;57:17;61:3,
4;64:15;66:12;88:20;
91:3
**noticed (1)**
65:11
**notices (4)**
11:2;47:13;53:18;
65:5
**notification (1)**
81:22
**notifications (1)**
46:19
**notified (4)**
57:7,15;69:24;
74:22
**notify (3)**
44:23;51:13;62:4
**notifying (1)**
50:16
**November (2)**
16:6;41:13
**number (10)**
18:14;22:23;25:1;

29:13;34:15;43:20;
54:25;65:20;75:19;
79:3
**numbering (1)**
9:14
**numbers (3)**
75:12;105:15,15
**numerous (1)**
70:17
**nutshell (1)**
15:16
**NW (1)**
3:

# O

**OATH (9)**
3:19;5:2;7:14;
24:5;35:7,23;72:8;
74:15;103:1
**Object (7)**
19:8;23:3;29:3;
55:24;62:9;63:8;99:7
**objection (3)**
8:10,10;23:9
**obviously (1)**
39:8
**October (1)**
99:19
**off (12)**
9:1;14:16;20:10;
28:20;29:24;32:12;
54:3,9;62:11;64:23;
90:15;101:19
**Offender (1)**
91:5
**offenses (2)**
16:22,24
**offer (2)**
77:6;78:12
**offered (1)**
68:19
**offering (1)**
86:11
**offerings (1)**
77:20
**Office (73)**
2:,11;3:9;6:21;
13:15;19:6;20:4;
21:4;9;22:4;24:7,9,
22;25:25;28:14,16;
32:24;33:18,20;
34:24;37:4,12;39:9,
24;44:12,19;45:12,
13,18;46:15,16,24;
47:6;49:4,23;50:1,3,
13,21;52:4,17,24;
53:1,16;54:5,6;56:3,
12;57:22;58:3;60:25;
61:13;62:20;63:2,5;
65:5;66:20;68:16,21,
24;70:20;80:7;84:11,
23;89:13;90:8;91:18;

94:11,14;95:6;97:8;
98:15,23
**officers (3)**
77:1;78:17,24
**offices (2)**
26:8;62:7
**official (7)**
64:18,22;68:22;
94:4;95:14,16;
103:10
**officials (2)**
94:25;95:7
**often (5)**
38:4;50:25;51:5;
53:10,18
**once (10)**
24:7;33:18;34:3;
38:17;46:3;53:2,4,
15;62:8;105:18
**one (35)**
5:8;9:8;11:5;12:10,
10,12,16;17:9;18:15;
22:21;23:11;26:22;
28:6;29:15,24;37:17,
17;43:5;45:6;48:11;
57:7,10;60:20,21;
63:25,25;71:9;75:14,
15;76:11;80:18;87:4;
100:13,17;105:16
**ones (6)**
21:23;34:15;54:19;
88:15;90:14;92:21
**ongoing (1)**
45:21
**online (7)**
24:10,18,18;33:12,
14,18;66:7
**only (13)**
8:7;17:3;36:11,19;
48:25,25;52:2;61:19;
68:1;70:18,19;74:21;
84:12
**opinion (2)**
96:21;97:4
**opinions (1)**
93:15
**opportunity (3)**
53:20;75:9;87:19
**opposite (1)**
39:4
**Orange (2)**
2:23;14:14
**ordered (1)**
96:16
**ordering (2)**
105:,18
**OREN (2)**
3:,;6:25
**organization (3)**
28:10;84:6,11
**organizations (3)**
21:15,21;75:16
**orientation (1)**

91:4
**original (2)**
97:6;105:
**originally (2)**
21:4;47:18
**others (2)**
40:9;58:8
**out (25)**
15:25;26:16;29:7;
33:15,15;35:24;
36:17;37:11,16;38:6;
40:11;41:20;42:1;
47:20;65:6;71:20;
72:8;76:12;80:3;
81:23;85:8;96:2;
97:18;98:16,23
**outlined (1)**
59:12
**out-of-state (4)**
44:19;50:4,10;53:6
**outreach (3)**
26:15;32:14,17
**outside (5)**
21:11,18;79:16;
93:18;94:2
**outstanding (9)**
72:1,14;73:6;80:1,
14,22;82:7,20;83:20
**Over (6)**
7:17;14:17,22;
19:25;51:16;58:17
**overrepresentation (1)**
30:7
**overrepresented (2)**
30:2,20
**overview (1)**
66:24
**owe (3)**
61:19;74:12;86:17
**owed (12)**
50:5,13,22;54:17;
59:3,23;61:9,12,24;
79:23;86:24;96:11
**own (4)**
9:15;15:14;39:9;
52:19

# P

**PA (2)**
2:,
**package (2)**
52:18;97:7
**packages (4)**
48:17;52:13,15;
86:8
**packet (7)**
47:4,11;65:2;66:3;
87:9;88:11;91:9
**packets (17)**
47:2;49:7;62:7,8,
19,21;63:4,7,17;
64:18;65:9,16;66:1;

84:13;88:18,18,25
**PAGE (21)**
3:17;8:2;35:22;
47:19;49:4;56:7;
64:19,21;66:6,8;
75:20;91:1;95:10,12;
96:22;101:9;105:,14,
14,15;106:5
**pages (2)**
17:15;65:12
**Pamela (6)**
103:16;104:5,17;
105:,22;106:25
**paper (5)**
24:11,12;33:14,17;
80:23
**paperwork (1)**
64:15
**paragraph (2)**
29:23;91:1
**paraphrasing (1)**
67:17
**parole (6)**
59:19,22;61:6,19;
69:8;72:15
**Part (13)**
29:22;41:7;64:10;
73:4,16,17;79:10;
87:8;91:8,22;94:22;
96:20;97:7
**participate (1)**
42:23
**parties (3)**
57:5;104:;105:
**parties' (1)**
104:10
**partnered (1)**
32:8
**parts (1)**
25:23
**part-time (1)**
32:22
**party (10)**
44:5;51:16,23,25;
56:18,20;57:8,24;
80:24;105:18
**passage (2)**
28:25;31:4
**passed (5)**
16:6;66:25;77:9,
12;79:5
**passing (1)**
94:5
**past (5)**
8:23;32:11;41:2;
46:25;92:9
**Pat (2)**
76:6;77:25
**pay (2)**
16:25;83:11
**PDF (1)**
95:11
**PEG (4)**

3:13;12:9;19:11;
27:19
**penalties (1)**
106:20
**people (25)**
8:7;16:12;30:20;
32:14,20,22;42:17;
47:14;49:1;53:14,18,
22,23;65:23;69:16,
18;70:19;72:17;73:5;
74:10;79:11;84:13;
86:8;98:6;99:9
**period (3)**
66:21;68:2;80:19
**periods (1)**
70:9
**perjury (1)**
106:20
**person (21)**
14:19,20;22:24;
23:12,14;27:2;34:8;
35:19,20;44:5;46:18,
20;48:19;51:12,17;
59:3,13;61:3;75:14;
80:25;81:12
**personal (3)**
12:24;13:9;98:19
**personally (1)**
103:7
**personnel (1)**
90:5
**person's (3)**
35:2;38:16;83:14
**Pete (1)**
14:15
**phases (1)**
85:3
**phone (7)**
5:19;6:11;9:22;
14:18,22;75:12;
102:15
**Place (6)**
2:20;46:23;51:14;
52:24;66:14,25
**places (1)**
26:16
**plaintiff (1)**
6:1
**Plaintiffs (12)**
2:,;5:9,16,22,24,25;
6:1,2,4;7:7;82:1;
105:5
**Plaintiffs' (20)**
4:,,2,3,8;5:14,21;
10:8,16;11:10;17:11;
18:18;19:17;29:19;
43:6;55:2;62:14;
71:13;90:22;100:20
**plan (2)**
97:13;99:12
**planned (1)**
67:15
**Plant (3)**

40:25,25;41:1
**please (7)**
7:10,23;20:11;
28:24;46:9;67:1;105:
11:16
**point (11)**
8:25;30:13;37:3;
62:23;63:1;65:20;
66:10;67:1;80:16;
87:8;97:9
**points (2)**
15:25;97:18
**policy (2)**
88:9,15
**Politico (2)**
4:18;100:18
**Polk (1)**
14:16
**population (2)**
30:2,3
**portion (2)**
71:5;96:24
**portions (6)**
7:7,9;15:9;17:3,15;
63:21
**portrait (1)**
91:4
**position (1)**
21:3
**possibility (2)**
91:15;98:2
**possibly (1)**
57:13
**postage (3)**
36:5,6;37:2
**Post-Amendment (1)**
82:12
**postcard (2)**
37:2,16
**potential (4)**
55:20;67:2;85:18;
88:17
**potentially (2)**
12:12;63:18
**practice (3)**
73:11;75:4;78:1
**practices (1)**
73:4
**pre-Amendment (3)**
42:15;53:25;58:6
**predecessor (6)**
68:10;69:6;92:13;
93:8;94:12,17
**preference (1)**
42:9
**preliminary (1)**
15:8
**Prentice (1)**
56:21
**P-r-e-n-t-i-c-e (1)**
56:22
**prepare (2)**
11:18;12:14
**prepared (1)**

11:16
**PRESENT (3)**
3:13;12:6;88:4
**presentation (1)**
85:8
**presentations (3)**
32:7;68:7;78:21
**president (1)**
98:24
**presidential (4)**
42:9;80:21;82:3,16
**press (1)**
67:22
**pressure (1)**
8:18
**pretty (4)**
68:7;87:13;95:4;
101:16
**previous (5)**
9:21;12:16;25:24;
30:10;93:3
**previously (5)**
21:8;28:16;31:23;
39:12;52:21
**primarily (1)**
17:14
**primary (4)**
42:10;80:22;82:3,
16
**print (1)**
33:15
**printing (1)**
29:23
**prior (10)**
16:25;21:12;40:15;
41:9;42:16,25;43:23;
44:18;64:3,8
**prison (4)**
57:15;60:2;70:19;
74:2
**privilege (1)**
76:1
**privileged (1)**
75:21
**probably (3)**
12:2;24:24;39:11
**probation (9)**
47:20,22,24;59:20,
22;61:6,19;69:8;
72:15
**procedural (1)**
101:10
**procedure (1)**
46:21
**procedures (2)**
52:24;53:1
**proceeding (2)**
87:24;88:2
**proceedings (2)**
27:8;61:1
**process (23)**
19:13;24:18;27:13;
31:11;33:4,6,10;

36:8;37:5,20;42:15;
45:1,21;46:3;51:10;
57:18;68:5;75:7;
80:16;86:9,20;87:18;
88:20
**processes (1)**
33:22
**processing (1)**
100:5
**produced (3)**
18:12;19:24;91:22
**Production (6)**
4:8,10;9:11;18:5,6;
19:24
**professional (4)**
12:25;13:9,10,11
**prompt (3)**
80:11;89:4,18
**properly (1)**
101:12
**propose (1)**
92:23
**prosecuted (1)**
79:21
**prosecution (3)**
79:25;80:12;81:5
**protected (1)**
20:12
**prove (1)**
83:20
**provide (6)**
34:3,4;71:4;84:23;
85:20;86:12
**provided (4)**
17:23;86:5,7,8
**public (6)**
49:15;68:3,5;76:5;
91:4;104:5
**publicly (1)**
73:5
**Public-State (1)**
103:17
**publish (1)**
75:10
**pull (1)**
38:6
**purposes (4)**
10:22;11:7;73:11;
75:20
**put (8)**
10:24;18:14,16;
25:21;29:13;38:6;
45:4;51:12
**Putting (1)**
95:16

**Q**

**qualifications (2)**
33:8;42:17
**quick (1)**
66:24
**quite (3)**

33:1;85:8;98:18
**quote (1)**
29:22
**quoted (2)**
29:25;101:9

**R**

**racial (5)**
13:22;28:19,22;
29:1;30:16
**raise (3)**
28:22;67:9;77:22
**raised (1)**
79:14
**ran (1)**
93:19
**rate (1)**
53:9
**rates (1)**
89:20
**rather (2)**
91:9,11
**Razor (1)**
5:23
**RE (2)**
105::106:3
**reach (4)**
35:24;37:15;42:1;
65:6
**reached (1)**
98:23
**READ (13)**
3:21;15:3,12;
17:20;34:16;60:18;
74:7;80:23;82:21;
90:25;102:23,24;
106:20
**readily (2)**
54:4;63:15
**real (2)**
30:3;89:6
**really (4)**
37:9;67:5;92:19;
95:21
**reason (7)**
15:15;27:10;55:22;
62:1;73:22;86:18;
106:5
**reasoning (1)**
77:10
**reasons (5)**
8:14;52:9;54:17;
81:9;98:18
**recall (21)**
12:13;14:22,23,25;
29:5;31:13;32:3;
45:19;56:15,25;58:8;
67:12,24;77:20;
79:18;94:24;95:1,25;
96:9,10,14
**receive (18)**
23:17;40:14,20;

41:8;44:14;47:2;
51:8,22;58:13;62:8;
65:25;68:3;71:21;
82:16;88:16;89:9;
97:7,13
**received (29)**
9:12;44:4;45:5,18,
24;46:3,12;47:17;
48:24;51:2,15;52:3,
18;53:12;56:23;
57:17;61:8,10;62:19;
63:4,25;64:6;70:18;
80:24;81:22;85:12;
97:8,10;105:18
**receives (2)**
24:8;33:19
**receiving (11)**
26:4;46:16;47:12;
49:1;66:3;84:13;
85:1,2;89:1,21;91:11
**recent (1)**
13:5
**recently (1)**
95:21
**recess (3)**
62:13;90:17;
101:21
**recognize (9)**
10:13;11:13;17:17;
18:21;20:1;43:9;
55:8;71:16;100:23
**recollect (1)**
58:5
**recollection (3)**
55:16;84:25;96:3
**recommendation (1)**
48:13
**recommended (2)**
98:21;99:1
**record (16)**
5:13,20;7:10,24;
9:1,10,16;18:8;
20:11;62:11,17;
90:15,18,19;101:19;
104:7
**recording (1)**
78:10
**records (17)**
19:16;38:21;49:24,
24;50:4,12;55:18,18;
68:22,23;78:3;83:9,
17;87:13,16;88:8;
93:2
**Rector (1)**
2:
**redesigned (1)**
25:20
**reduced (1)**
41:22
**reelected (1)**
21:5
**REESE (4)**
3:13;12:9;19:11;

27:19
**reevaluate (1)**
66:2
**refer (8)**
9:23;68:15;69:3;
80:11;82:17;83:22;
84:9;92:1
**reference (6)**
9:14,19;65:22;
75:11;95:10;101:4
**referenced (2)**
55:15;58:6
**referencing (1)**
34:11
**referral (1)**
82:4
**referred (2)**
80:8;81:4
**referring (4)**
15:22,23;30:4;
48:10
**regarding (4)**
19:22,22;62:18;
105:
**register (14)**
16:14,23;17:1;
26:11,18;27:3;33:11,
13;72:20;82:11;83:3,
12,12;98:8
**registered (16)**
31:12;34:18;36:9;
45:20;46:20;72:17;
73:7,18;74:17;80:1;
82:8,9,10,12,13;84:7
**registering (1)**
33:8
**registrant (1)**
50:22
**registrants (3)**
22:20;42:22;54:6
**registrant's (1)**
26:20
**Registration (25)**
4:13;16:10,20;
22:11,16,17;23:25;
24:10;27:9;32:9;
33:4,13,19;34:22;
42:11;43:12,15;
45:23;46:1;51:14;
53:10;68:5;71:21;
81:24;102:3
**regular (3)**
38:5,7;93:10
**REINGOLD (3)**
3:;6:17,17
**reject (3)**
26:19,22;27:1
**related (4)**
42:17;54:18;65:10;
79:17
**relating (4)**
13:6;25:23;53:12;
76:2

**relation (1)**
40:17
**relative (3)**
25:19;104:9,10
**reliability (1)**
45:11
**reliable (17)**
38:15,19;39:3,8;
41:24;44:9;46:6;
60:5;62:5;63:7;
74:23;75:1,2,4;
85:21;87:11,13
**relied (1)**
46:5
**rely (9)**
36:15;38:13,19;
45:1;50:19;59:5;
62:6;89:2,12
**relying (3)**
87:3,22;91:10
**remain (3)**
45:20;46:1,20
**remember (13)**
12:4;41:6;45:17;
55:9;75:13;77:11,25;
78:5;79:13;83:10;
85:10;93:9;96:7
**removal (8)**
27:7,10;57:18;
60:25;75:7;86:9,20;
88:1
**removed (3)**
53:10,24;54:6
**removing (1)**
65:23
**repeat (1)**
23:6
**rephrase (4)**
8:1;58:1;70:14;
87:6
**report (2)**
99:17;104:6
**reporter (5)**
7:17;8:8,11;10:6;
106:25
**REPORTER'S (3)**
3:20;30:13;104:1
**reports (1)**
54:4
**represent (1)**
29:24
**Representative (11)**
19:5;63:3;76:7,18;
77:3;78:5;83:19;
92:4,6;93:12,20
**representatives (2)**
76:21;95:7
**represented (3)**
8:3;63:19;65:21
**representing (1)**
5:8
**represents (1)**
94:23

**Request (6)**
4:8,10;18:6,11;
19:3,24
**requested (2)**
20:5;104:
**requests (2)**
9:12;19:15
**required (3)**
8:12;38:14;42:22
**requirements (5)**
25:12;41:20,22;
66:21;83:3
**requires (1)**
36:25
**research (11)**
34:5;60:9;62:8;
63:4;65:22;66:3;
72:25;87:10;89:5,11,
19
**researching (1)**
98:2
**residence (1)**
35:20
**residency (1)**
35:15
**resident (2)**
33:9,11
**residents (1)**
30:19
**resolving (1)**
9:11
**resources (4)**
26:5;35:12;67:10;
90:10
**respond (3)**
37:13;53:11,18
**responded (2)**
37:16;75:9
**Response (8)**
4:;17:23;18:6;
19:2;56:8,14;68:14;
79:2
**responsibilities (5)**
22:4,5;25:7,14,17
**responsibility (8)**
41:24;60:3;65:3,
19;88:14;89:25;
90:13;92:19
**responsible (1)**
34:21
**rest (1)**
92:25
**restate (2)**
31:1;63:22
**rested (1)**
92:19
**restitution (29)**
49:24,24;50:23;
57:15;59:3,23;60:10;
61:9,12,20;63:20;
64:1,9;69:8;70:13,
22;72:2,14;73:10,22;
74:2,12;78:3;82:8,

14;87:7;89:9,19;
96:11
**restoration (11)**
25:19;29:8;31:17,
25;68:15,18;69:4;
75:12;80:9;84:10;
98:10
**restored (8)**
35:5;43:2,13,18,
22;44:25;79:22;
80:12
**rests (1)**
85:25
**retired (1)**
13:14
**retrospect (1)**
63:11
**return (2)**
25:21;105:
**review (9)**
12:14;26:20,21;
33:23;39:9;55:5;
62:22;100:25;104:
**reviewed (2)**
12:16;96:4,13
**rework (1)**
88:21
**right (13)**
9:10;21:17;23:14;
28:6;31:19;32:12;
39:21;43:21;47:14;
54:19;58:19;81:1;
90:12
**rights (20)**
13:6;25:20;29:7;
31:17,25;35:5;43:1,
13,18;44:25;68:15,
18;69:4;75:12;79:8,
22;80:9,12;84:9;
98:10
**rise (1)**
25:1
**River (2)**
3:6;6:18
**rocket (1)**
97:24
**roles (1)**
28:2
**rolls (8)**
22:8,10,13;27:9;
46:1;51:12;53:11,24
**Ron (3)**
54:23;55:11;105:
**room (2)**
5:12,14
**ROSENTHAL (4)**
3:;6:25,25;102:20
**Rossway (1)**
6:19
**RPR (5)**
103:16;104:5,17;
105:22;106:25
**run (2)**

92:17;94:4
**runoff (1)**
41:4

**S**

**safe (1)**
80:19
**same (12)**
7:15,20;8:2;12:10;
23:9;24:18;39:4;
44:23;47:10;49:21;
61:24;68:2
**Sanchez (1)**
32:25
**Sarasota (2)**
2:24;6:10
**saw (2)**
19:15;73:25
**saying (3)**
11:16;29:25;84:5
**SB (39)**
7:7;15:22;16:17;
17:3,20;25:9,18;
26:6;32:4;48:11,24;
52:23;53:2,4;54:7;
57:4,24;65:1;66:17;
68:10;70:10;77:19;
78:25;79:5,7,17;
80:20;84:24;85:25;
86:4;92:12;94:7,8,
16;95:9,17;97:13;
98:11;100:1
**scenario (1)**
89:17
**scheduling (1)**
11:7
**screen (4)**
91:4,8,10;92:3
**SE (1)**
2:17
**seal (1)**
103:10
**Search (4)**
4:11;19:22,23;20:3
**searches (1)**
35:18
**Second (9)**
4:;11:6;29:23;
37:17;40:21;56:7;
63:1;64:14;101:8
**second- (1)**
64:17
**Secretary (65)**
6:12,14;33:20,23;
37:21,23;38:1,20;
40:15;41:9,16;44:11;
45:2,10,12,18,25;
46:4,15,17;49:6;
50:19;52:4,10;53:15;
54:5;56:4;57:5;58:3,
7,11;59:24;60:19;
61:5,13;62:7;65:6,

15;66:19;70:12;71:2,
19;72:18;73:13,23;
74:13;78:25;82:4,18;
84:15,23;87:2;88:10,
17;89:1,10,13,21;
90:6;91:7;92:25;
94:14;97:8,11;
102:21
**Secretary's (1)**
38:10
**Security (2)**
22:23;24:17
**seeing (2)**
95:25;96:14
**seek (2)**
42:2;71:1
**sell (1)**
57:22
**Senate (4)**
4:6;7:8;68:11;69:7
**send (28)**
23:18;33:15,19,25;
37:3,23;38:1;39:7;
44:16;47:18;53:17;
55:19,21;58:2;60:10,
12;61:12,21;62:2;
72:16;73:11;74:13;
83:1,13;86:19,24;
88:20;91:17
**sending (6)**
46:15;48:15;61:3;
73:18,19;91:15
**sends (2)**
37:4;39:22
**senior (2)**
27:16,18
**sense (5)**
50:25;53:9,14,17,
23
**sent (40)**
14:25;27:2;35:8;
37:11,17,17;38:17;
39:5,10;45:9,25;56:3,
5,9,12,15,16;57:3,4,
23;58:7,9;59:10,23;
60:13,18;61:4;63:13;
66:5,8,8;71:20;
72:22;73:22;74:3;
76:11;88:11;91:6,8;
92:15
**sentence (15)**
16:14;65:21;68:9,
13;69:11,15,17;
70:22,24,25;73:2;
74:5;96:24,24;
101:15
**sentences (1)**
98:8
**sentencing (21)**
69:23;70:3,6;
88:11,12;91:9;95:12,
13,17,20,25;96:4,16,
20,25;97:2,3,8,11,14;

99:10
**September (5)**
54:24;56:8;103:11;
104:;105:
**serve (1)**
98:13
**served (6)**
15:1;18:2;57:14;
60:1,9;74:1
**services (1)**
27:20
**session (6)**
92:10;93:20;94:7,
10,17;99:15
**sessions (1)**
93:6
**set (5)**
17:24;18:5,10;
76:14,16
**sets (4)**
15:17,21,24,25
**Several (12)**
13:4;14:9;15:7;
26:15;32:22;46:10,
10;66:22;89:8;92:8;
100:3;101:16
**sexual (1)**
16:23
**shaking (1)**
7:23
**share (4)**
58:10;79:16;93:12,
16
**shared (1)**
79:7
**sharing (2)**
101:23;102:1
**SHEET (2)**
3:22;106:1
**sheets (1)**
38:23
**Sheriff (2)**
76:9;77:1
**Sheriff's (2)**
13:14;21:12
**shift (2)**
25:14;70:9
**shop (1)**
81:3
**shorthand (2)**
7:8;73:9
**shortly (1)**
14:3
**shots (4)**
91:5,8,11;92:3
**show (1)**
47:19
**showed (1)**
82:13
**showing (1)**
49:3
**SIGN (4)**
3:21;24:5;33:15;

35:7
**signed (3)**
35:23;72:8;74:14
**similar (3)**
49:2;57:23;98:4
**single (2)**
57:24;96:8
**site (3)**
45:4;49:15;66:7
**situation (4)**
30:3;37:19;68:20;
83:15
**six (2)**
57:14;74:1
**Social (3)**
22:23;24:16;72:24
**SOE (1)**
71:10
**software (1)**
57:22
**solely (5)**
38:19;62:6;74:3;
89:2,12
**solution (1)**
97:23
**solutions (2)**
78:20;92:23
**Somebody (26)**
23:20;25:24;27:4;
33:5;36:7;42:15;
43:13,17,24;45:14,
23;47:20;51:6;53:10;
61:8,14;68:12;69:1,
7;80:17,21;82:7,25;
85:18;87:24;91:15
**somebody's (4)**
35:15;43:25;52:25;
70:16
**someone (12)**
23:16;27:8;33:6;
56:12;65:5;80:11;
81:4,25;82:2;84:3,4;
85:6
**someone's (10)**
44:15,25;46:13;
51:17,23;52:2;62:25;
63:20;64:1;73:21
**Sometime (2)**
48:7,21
**Sometimes (2)**
64:20,20
**somewhere (2)**
94:5;99:19
**Sorry (8)**
18:6;20:17;26:25;
29:15,18;45:22;73:8,
9
**sort (1)**
97:23
**source (1)**
64:1
**sources (2)**
36:15;69:2

**South (3)**
2:23;3:3;20:19
**sparked (1)**
91:14
**speak (9)**
6:24;32:1;35:10,
17;71:23,25;92:9,12;
94:10
**speaking (2)**
14:4;39:14
**specific (6)**
23:20;24:10;31:14;
32:6,7,17;53:13;
79:13;80:15;92:23
**specifically (2)**
8:13;100:7
**specifics (1)**
85:10
**Speculation (1)**
62:9
**spell (3)**
7:10;36:17;47:20
**spent (2)**
13:15;65:24
**spoke (1)**
79:19
**spoken (6)**
14:5,13;31:4;
74:25;79:3;98:3
**sponsor (1)**
93:8
**staff (17)**
14:6;21:5;24:22;
25:6,11;26:11,19;
27:7,17,18,19,23;
28:8;67:25;76:7,23,
24
**staffed (2)**
89:25;92:21
**staffing (1)**
26:5
**Stamp (9)**
10:7;11:3;18:3,8;
43:4;54:25;62:21;
75:20;90:20
**stamping (1)**
9:15
**stamps (3)**
9:13,17,22
**start (2)**
5:13;100:4
**started (2)**
21:4;48:3
**starting (1)**
5:20
**State (131)**
3:;5:13,20;6:12;
7:19;20:14;22:7,21;
23:11,13;24:15,21;
27:2,13;28:24;33:23;
34:20;35:2;36:13;
37:21,23;38:1,14;
39:5,7,21;40:15;41:9,

16,23;44:7,10,11,16,
21,23;45:6,10,25;
46:4,8,17,21;47:18;
49:7;50:17,19;51:11,
13;53:7,15;54:4;
55:21;56:4;57:3,6,
16;58:7,12;59:11,24;
60:2,19;61:6,16,21,
22;62:2,7;65:6,15;
66:5,9;67:7,15,23;
70:12,18;71:2,6,19;
72:9,10,18,22,22,25;
73:3,13,23;74:3,13,
22;76:5;77:23;78:19,
25;81:2,3,22;82:4,18;
83:1,2,20;84:1,15;
86:5,9,11,20,22;87:3;
88:15,17;89:1,10,21,
25;90:6,11,12;91:7;
92:19,25;97:11;98:1;
101:12;102:2;103:3;
104:
**stated (4)**
70:17;80:5;83:20;
88:19
**statement (1)**
90:8
**states (3)**
69:14;97:16;105:1
**State's (23)**
33:20;38:20;41:23;
45:3,12,18;46:15;
52:4,10;54:5;58:3;
61:13;65:3,19;66:19;
74:4;84:23;85:16;
88:11;89:13;94:14;
97:8,17
**statewide (1)**
22:17
**statistics (4)**
29:25;30:4,6,15
**status (4)**
27:11;53:12,16;
88:1
**statute (9)**
37:14,25;41:23;
86:9,18;90:12;92:21;
97:18;99:18
**stayed (1)**
47:10
**stenographic (1)**
104:
**stenographically (1)**
104:6
**step (4)**
24:7;37:5;44:16;
46:6
**STEPHEN (3)**
2:;5:17;105:
**steps (14)**
34:6;37:12,18,24;
39:18,19;46:16;
53:17;67:3;68:12;

75:5,6;88:10,12
**stick (1)**
  10:23
**still (11)**
  8:11;52:22;59:23;
  61:6,9;69:2;74:12;
  83:22;84:13;85:6;
  99:14
**stipulation (1)**
  9:8
**stop (2)**
  15:9;81:1
**stopped (1)**
  65:23
**Stoppers (1)**
  64:23
**straight (4)**
  57:2,3;58:11,12
**Street (9)**
  2:,,17;3:,,3;22:9;
  34:14,15
**strike (5)**
  40:20;55:6;77:16;
  87:22;97:6
**strongly (1)**
  93:23
**study (1)**
  20:20
**stuff (2)**
  64:23;87:13
**subject (1)**
  106:
**submits (1)**
  36:7
**subpoena (1)**
  15:1
**substance (2)**
  11:17;106:21
**substantiate (1)**
  86:17
**suggested (1)**
  78:20
**Suite (5)**
  2:,8;3:,10;105:16
**summary (1)**
  64:21
**supervision (3)**
  59:14;84:14;91:16
**Supervisor (22)**
  6:18,25;7:12;10:9;
  13:11;21:1,9,18;22:4,
  6;25:25;26:21;47:9;
  62:19;63:2,5;69:20;
  70:4;73:12;85:3,25;
  88:24
**Supervisors (26)**
  6:10,23;14:9,12,
  22;26:8;42:1;54:23;
  55:12,21;58:10,14;
  67:2,5,9,20;68:1;
  84:19;86:6;87:8,9;
  88:13;94:19;98:3;
  101:24;102:1

**supervisor's (1)**
  12:16
**Supplemental (3)**
  4:;18:11;92:2
**supply (1)**
  65:12
**support (1)**
  93:24
**supported (1)**
  93:23
**supporting (2)**
  47:6;49:2
**supposed (2)**
  50:15,16
**Sure (18)**
  7:11;8:1;10:6;
  28:7;31:1;32:10;
  37:9;39:13;58:24;
  83:16;87:10,14;88:8;
  91:23;96:18;99:21;
  100:14;101:14
**surface (1)**
  63:14
**suspend (1)**
  37:8
**suspended (2)**
  52:17;62:25
**suspense (4)**
  24:14,20;34:8;38:6
**suspension (2)**
  39:16,20
**Swan (1)**
  6:19
**sworn (3)**
  5:2;23:25;103:8
**system (8)**
  9:14;22:17;25:22;
  28:23;29:2;30:8;
  49:10;50:15

---

**T**

**talk (10)**
  11:15;12:23;28:17;
  31:10;33:3;40:4;
  42:14;66:15;67:14;
  79:20
**talking (8)**
  8:7;43:24;46:10;
  64:3;66:13;78:1,15,
  15
**talks (1)**
  16:24
**Tallahassee (3)**
  2:;3:4;105:2
**Tammy (3)**
  98:25;99:2,3
**Tampa (8)**
  2:;22:2;40:7,16;
  41:4;79:4;105:,16
**task (1)**
  34:12
**technical (1)**

20:22
**Ted (1)**
  76:10
**telephone (1)**
  2:6
**TELEPHONICALLY (2)**
  2:15;3:1
**Tell (3)**
  46:9;67:1;101:1
**telling (2)**
  52:8;93:23
**temporary (3)**
  24:25;27:25;33:1
**term (2)**
  52:19;95:12
**termed (1)**
  55:20
**Terms (18)**
  4:11;16:13;19:22,
  23;20:3;23:24;47:10;
  68:8,13;69:11,14,17;
  70:24,25;73:2;74:5;
  96:23;101:15
**testified (1)**
  84:12
**testifying (2)**
  7:14,15
**text (7)**
  17:8;19:4;92:3;
  93:13,19;94:2;95:10
**texted (1)**
  93:22
**theme (1)**
  95:4
**third (11)**
  37:17;44:5;51:15,
  23,25;56:18,20;57:5,
  8,24;80:24
**third-degree (1)**
  64:17
**thorough (1)**
  55:19
**though (3)**
  5:11;65:21;83:23
**thought (1)**
  92:19
**three (5)**
  12:2;18:21;35:6;
  66:13;70:8
**throughout (1)**
  77:23
**times (6)**
  11:23;12:1,2;
  66:22;70:17;101:17
**title (1)**
  28:7
**titled (1)**
  29:10
**titles (1)**
  28:5
**today (11)**
  7:15;8:3,15;11:18;
  12:18;13:19;15:1;

54:12;71:21;101:17;
  102:5
**today's (7)**
  9:16;10:3,19;11:7,
  16;12:15;13:25
**TODD (52)**
  2:;5:17,17;8:6,9,
  13;9:10,16,25;10:10,
  11,22;11:4,9,24;14:5;
  17:10;18:2,9,13;19:8,
  21,25;20:10,14;23:3,
  9;29:3,15,17;31:7;
  43:5;54:25;55:24;
  58:17;62:9;63:8;
  71:12;90:21;95:18;
  97:15;99:7;100:11,
  17,19;101:4;102:6,8,
  11,15,23;105:
**together (1)**
  92:16
**told (11)**
  10:5;39:12;48:1,3;
  59:11;66:9;69:15;
  84:25;92:14,18;
  101:16
**took (4)**
  52:24;66:14,25;
  92:21
**top (6)**
  14:16;28:20;32:12;
  49:9;54:3,9
**touch (1)**
  16:15
**track (1)**
  49:24
**tracking (1)**
  25:22
**traffic (1)**
  13:16
**Training (2)**
  90:4,10
**transcribing (1)**
  7:17
**transcript (6)**
  104:,7;105:,,;106:2
**tremendous (1)**
  93:2
**trial (1)**
  99:9
**tried (1)**
  50:6
**true (3)**
  89:12;104:7;106:
**Trustees (1)**
  22:2
**truthfully (1)**
  7:16
**try (6)**
  8:1;23:19;31:11;
  68:16;75:16;82:6
**trying (5)**
  29:6;34:12;55:17;
  81:21;87:25

**turn (9)**
  5:19;17:22;22:3;
  23:13;33:13;55:6;
  75:17;95:9,11
**turned (1)**
  51:11
**turning (2)**
  58:24;96:22
**two (13)**
  11:1,1;12:2,10,12;
  15:17,25;16:2;29:16;
  63:20;66:13;69:2;
  73:19
**two-way (1)**
  88:19
**type (1)**
  90:2
**types (1)**
  49:12

---

**U**

**Ultimately (3)**
  27:16;65:21;72:10
**unable (1)**
  8:14
**under (25)**
  7:8,14;20:14;25:7;
  32:18;34:20;41:20;
  59:13,19,22;64:25;
  66:21;68:13;69:9;
  72:6;79:22;80:13;
  82:10;84:14;85:25;
  91:15;95:17;97:13;
  98:11;106:20
**underlying (1)**
  91:9
**undersigned (1)**
  103:6
**understood (1)**
  31:2
**Unfortunately (1)**
  29:23
**Union (1)**
  2:
**unit (2)**
  32:17,18
**UNITED (1)**
  105:1
**University (1)**
  20:19
**unless (4)**
  8:12;75:2;84:1;
  89:14
**unsure (5)**
  83:4,6,7,13;84:6
**up (17)**
  15:17,21,24,25;
  28:21,25;30:10;
  34:12;46:8;48:2;
  60:4;82:13;100:2,8,
  8;101:3,8
**upcoming (4)**

41:12;80:18;81:25;
84:8
**updates (1)**
93:10
**updating (1)**
22:11
**upon (1)**
15:18
**urgency (1)**
102:13
**use (5)**
7:8;19:13;36:16,
20;43:14
**used (2)**
19:23;20:4
**uses (2)**
33:23;49:7
**using (2)**
9:20;73:18

**V**

**Vague (1)**
23:3
**vaguely (1)**
55:9
**validation (1)**
34:17
**verification (2)**
24:15;72:9
**verified (2)**
24:21;51:11
**verify (4)**
39:1,19;87:1;88:13
**verifying (1)**
45:7
**Vero (1)**
3:7
**version (1)**
100:12
**via (2)**
2:6;56:24
**visually (1)**
40:2
**voice (2)**
77:24;94:16
**vote (24)**
16:14,23;25:21;
26:12;33:8,11;34:18;
36:9;42:16,23;43:22;
44:6;46:18;50:9;
69:9;80:1;82:3,15;
83:3,12,12;84:7;
91:4;98:8
**vote-by-mail (1)**
100:5
**voted (6)**
73:19;80:21,23;
81:12,14;82:17
**Voter (51)**
4:13;16:10,20;
22:8,10,11;23:25;
24:10,14;26:17,19,

25;27:8,20;32:9;
33:3,8,12,19;34:13,
21;35:10;37:1,8;
38:24;39:14;42:17;
43:12,14;44:15;45:8,
20,23;46:1,13,24;
47:5;51:17,23;53:10,
24;55:18;68:4;71:21;
75:8;81:24;82:9,21;
87:15,25;102:3
**voters (10)**
15:17;16:1;26:18;
38:2,5,10;58:14;
73:19,19;74:17
**voter's (4)**
23:2,8;50:25;51:5
**voting (6)**
13:6;24:5;25:19;
29:11;79:8;98:10
**vs (1)**
105:

**W**

**wait (1)**
7:20
**waive (1)**
102:23
**warehouse (1)**
28:7
**Warren (2)**
76:5;98:1
**watch (2)**
93:6;94:7
**watched (2)**
93:9;94:9
**way (7)**
33:13;44:23;50:15;
51:10;86:2,2;100:9
**ways (1)**
34:24
**wealth (1)**
16:3
**Web (2)**
45:4;66:7
**week (1)**
71:24
**weekly (1)**
38:8
**weeks (1)**
15:7
**weighed (1)**
99:24
**weren't (2)**
59:22;78:14
**Wesley (1)**
14:14
**West (1)**
2:
**what's (8)**
24:7;37:5;64:20;
73:8;79:24;84:7;
88:6;97:1

**White (1)**
7:1
**whole (1)**
87:5
**whose (3)**
43:13,17;45:23
**Wilcox (1)**
14:14
**withheld (7)**
39:7,17,18;45:15,
16;47:22;63:12
**Without (12)**
11:16;15:20;26:20,
21,23;27:9,15;30:1;
75:21;76:1;81:9;
86:11
**witness (22)**
5:2,4;18:14;19:10;
20:12;23:10;29:5,13,
16;55:25;58:19,21;
62:10;63:10;95:20;
97:16;99:8;100:13;
102:24;103:10;
105:15;106:
**word (1)**
29:7
**words (2)**
15:14;29:24
**work (13)**
9:16;20:25;21:17;
24:22;25:23;31:16,
23;48:2,10,13;50:15;
99:14;102:6
**workable (1)**
92:24
**worked (8)**
21:8;27:23;28:3,8,
13;31:3,15,23
**working (8)**
9:10;21:9,12,14;
29:7;98:11,14;99:5
**works (4)**
28:6;32:18;33:1;
51:10
**Wright (1)**
33:1
**WRITE (1)**
106:2
**written (3)**
66:13;101:1,2
**wrong (4)**
52:19;66:6,8;75:3

**X**

**Xenia (1)**
32:25

**Y**

**year (4)**
32:11;41:2;48:8;
51:16

**years (15)**
13:6,15;20:17,17;
30:9,9;57:14;66:13,
13,14;70:8;73:20;
74:1;92:8;95:25
**York (2)**
2:;
**Yvette (1)**
31:22

**0**

**000001 (1)**
10:7
**000032 (1)**
90:20
**00004 (1)**
11:3
**000058 (1)**
62:21
**000073 (1)**
18:3
**000080 (1)**
55:1
**000108 (1)**
29:12
**000373 (1)**
43:5
**00089 (1)**
18:8

**1**

**1 (4)**
4:2;10:24,25;11:10
**10 (3)**
4:13;43:4,6
**100 (2)**
3:;4:18
**10006 (1)**
2:
**103 (1)**
3:19
**104 (1)**
3:20
**105 (1)**
3:21
**106 (2)**
3:22;105:14
**107 (3)**
54:11,15,16
**11 (6)**
4:,2,5,14;54:22;
55:2
**111 (1)**
3:
**118 (1)**
2:
**11th (1)**
102:8
**12 (6)**
2:17;4:15;8:23;
21:5;62:14,18

**13 (4)**
4:16;71:9,11,13
**1332 (1)**
96:22
**1333 (1)**
96:23
**1334 (1)**
96:23
**1335 (1)**
95:11
**14 (3)**
4:17;90:19,22
**14th (1)**
56:8
**15 (5)**
4:18;24:24;100:10,
16,20
**17 (1)**
4:6
**17th (1)**
42:9
**18 (5)**
4:,7,10;33:9;35:3
**1801 (1)**
3:
**18th (1)**
91:2
**19 (1)**
4:11
**19th (1)**
101:2
**1st (10)**
2:17;3:;25:10;54:7,
11;58:2;66:18,19;
70:10;80:20

**2**

**2 (7)**
4:3;11:2,3,10,13;
43:20;65:20
**20 (3)**
20:17;24:24;95:25
**200 (1)**
25:1
**2009 (1)**
21:4
**2012 (2)**
54:24;56:9
**2016 (2)**
21:6;81:8
**2017 (2)**
53:25;54:1
**2018 (3)**
16:8;51:20,22
**2019 (12)**
40:5;41:13;54:7;
70:10;71:11;80:20;
103:8,11;104:;105:,
10;106:4
**2020 (2)**
42:7;80:22
**209879 (1)**

103:19
**212 (1)**
  2:5
**222-0720 (1)**
  2:21
**226-1427 (1)**
  3:
**245-6531 (1)**
  3:
**26 (3)**
  103:8;105:10;
  106:4
**2618 (1)**
  2:20
**272-5670 (1)**
  2:13
**27th (3)**
  2:12;3:;54:24
**281 (1)**
  93:23
**2810 (1)**
  3:10
**29 (2)**
  4:12;42:13
**2nd (1)**
  40:22

### 3

**3 (6)**
  4:;11:5,8,10,13;
  75:19
**30 (1)**
  20:17
**300 (1)**
  2:
**305 (1)**
  3:11
**31st (1)**
  70:11
**32202 (1)**
  2:
**32308 (1)**
  2:
**32399 (1)**
  3:4
**32601 (1)**
  2:
**32960 (1)**
  3:7
**33128 (1)**
  3:
**33602 (2)**
  2:;105:
**3400 (1)**
  105:16
**34236 (1)**
  2:24
**35 (1)**
  13:15
**352 (1)**
  2:18
**353-8097 (1)**

2:9
**374-5218 (1)**
  2:18
**375-5151 (1)**
  3:11

### 4

**4 (65)**
  4:6;16:5,10,12;
  17:8,11;23:24;25:2,7,
  15;28:21;29:10;
  30:24;31:5,16;32:2;
  40:5,18;41:10,17,19;
  42:3,15,16,25;43:14,
  18,23;44:18;47:17;
  50:21;53:25;54:2;
  57:25;58:6;60:17;
  64:4,5,7,8;66:16,21;
  67:10,14,16;68:4,13;
  69:10;71:25;72:6;
  75:20,23;76:2;77:7,
  16;78:12;79:22;
  80:13;82:10,12;
  93:13;95:9;99:13,24;
  101:11
**4:19-cv-300-RH/MJF (1)**
  105:
**4:38 pm (1)**
  102:25
**40 (1)**
  2:
**43 (1)**
  4:13
**45 (1)**
  17:15
**46 (3)**
  24:23;95:11;96:22
**47 (2)**
  95:11,12
**4's (2)**
  28:25;41:20

### 5

**5 (8)**
  4:7;17:25;18:16,
  18,24,24;19:2;75:18
**500 (1)**
  3:3
**510 (1)**
  2:8
**55 (1)**
  4:14
**556-9030 (1)**
  2:
**56 (1)**
  17:15
**5th (4)**
  2:4;40:15;101:4,5

### 6

**6 (8)**
  4:8;18:4,16,18,24,
  24;19:3,6
**601 (1)**
  2:
**62 (1)**
  4:15
**689 (1)**
  93:23
**6th (2)**
  16:6;77:12

### 7

**7 (11)**
  3:18;4:;18:12,17,
  18,24,25;19:4,6;92:1;
  100:12
**7/18/22 (1)**
  103:18
**7066 (45)**
  4:6;7:7,8;15:22;
  16:17;17:3,8,20;25:9,
  18,20,23;26:6;32:4;
  48:11,24;52:23;53:2,
  4;54:7;57:4,25;65:1;
  66:17;68:10;69:7;
  70:10;77:19;78:25;
  79:5;80:20;84:24;
  85:25;86:2,4;92:12;
  94:8,8,16;95:10,17;
  97:13;98:11;100:1,3
**7066's (2)**
  79:7,17
**7086 (1)**
  68:11
**7089 (2)**
  68:11;93:7
**71 (1)**
  4:16
**76 (1)**
  75:20
**772 (1)**
  3:
**783 (1)**
  2:23
**7th (1)**
  91:13

### 8

**8 (4)**
  4:11;19:17,20,23
**80s (1)**
  83:10
**813 (1)**
  2:13
**850 (2)**
  2:21;3:
**8s (1)**
  29:16
**8th (11)**
  25:4;40:5;58:2;

66:17;71:10,20,24;
80:19;82:13;83:11;
101:6

### 9

**9 (5)**
  4:12;29:10,17,19;
  105:
**9/27/12 (1)**
  4:14
**90 (1)**
  4:17
**904 (1)**
  2:9
**941 (1)**
  2:
**965-2200 (1)**
  2:5
**9th (2)**
  103:10;104: