1                    TOSHIA BROWN

2            IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF FLORIDA
3                   TALLAHASSEE DIVISION

4        CONSOLIDATED CASE NO. 4:19-cv-300-MW-MJF

5

   KELVIN LEON JONES, et al.,
6
               Plaintiffs,
7     vs.

8     RON DeSANTIS, in his official
   capacity as Governor of
9     Florida, et al.,

10               Defendants.
   _____
11

12

13             DEPOSITION OF TOSHIA BROWN

14            Friday, August 23, 2019

15            9:10 a.m. -  3:12 p.m.

16            119 South Monroe Street

17         Tallahassee, Florida 32301

18

19         STENOGRAPHICALLY REPORTED BY:

20             SANDRA L. NARGIZ
          RPR, CM, CRR, CRC, FPR, CCR
21

22

23

24

25    Job No. 166564

1                          TOSHIA BROWN

2     APPEARANCES:

3

4             ON BEHALF OF THE PLAINTIFFS:

5

6             CAMPAIGN LEGAL CENTER
              1101 14th Street, #400
              Washington, DC  20005
7             BY: DANIELLE LANG, ESQUIRE

8

9             AMERICAN CIVIL LIBERTIES UNION FOUNDATION:
              125 Broad Street
10            New York, NY  10004
              BY:  JONATHAN TOPAZ, ESQUIRE
11                 JULIE EBENSTEIN, ESQUIRE

12

13            -AND-

14
              AMERICAN CIVIL LIBERTIES UNION FOUNDATION
15            118 W Adams Street, #510
              Jacksonville, FL 32202
16            BY:  JIMMY MIDYETTE, ESQUIRE (by phone)

17

18            DEFEND EDUCATE EMPOWER
              40 Rector Street
19            New York, NY  10006
              BY: LEAH ADEN, ESQUIRE
20

21

22            SOUTHERN POVERTY LAW CENTER
              403 Washington Avenue
              Montgomery, AL  36104
23            BY:  CAREN SHORT, ESQUIRE (by phone)

24

25

1             TOSHIA BROWN

2

3          ON BEHALF OF THE DEFENDANTS:

4

5          FLORIDA DEPARTMENT OF STATE
           500 S Bronough Street, #100
           Tallahassee, FL  32399
6          BY: ASHLEY DAVIS, ESQUIRE

7

8

9          ON BEHALF OF DEFENDANT MARK EARLY,
           SUPERVISOR OF ELECTIONS, LEON COUNTY:

10

11         MESSER CAPARELLO
           2618 Centennial Place
           Tallahassee, FL 32308
12         BY:  MARK HERRON, ESQUIRE (by phone)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    TOSHIA BROWN

2                   I N D E X

3    WITNESS                                    PAGE
     TOSHIA BROWN                                  5
4        Direct Examination by Ms. Lang            5
         Direct Examination by Ms. Ebenstein     163
5

6

7

8

9

10                  INDEX OF EXHIBITS

11

     NO.         DESCRIPTION                     ID
12
     Exhibit 1   2-11-19 Director Matthews e-mail  56
13               to supervisors of elections
     Exhibit 2   6-7-19 Director Matthews e-mail   64
14               to supervisors of elections
     Exhibit 3   E-mail chain                      76
15   Exhibit 4   E-mail chain                      81
     Exhibit 5   E-mail chain                      89
16   Exhibit 6   7-9-19 E-mail chain               96
     Exhibit 7   6-27-19 E-mail chain              96
17   Exhibit 8   7-1-19 Florida voter             108
                 registration application
18   Exhibit 9   SB7066                           127
     Exhibit 10  Sentencing documents             128
19   Exhibit 11  Answers to Interrogatories       160

20

21
     CERTIFICATE OF OATH                         174
22   CERTIFICATE OF REPORTER                     175
     READ AND SIGN LETTER                        176
23   ERRATA SHEET                                177

24

25

1                        TOSHIA BROWN

2              The following proceedings began at 9:10 a.m.

3                           *  *  *

4              THE STENOGRAPHER:  Do you swear or affirm

5         to tell the truth, the whole truth, and nothing

6         but the truth?

7              THE WITNESS:  I do.

8    Thereupon,

9                         TOSHIA BROWN

10   having been first duly sworn or affirmed, as

11   hereinafter certified testified as follows:

12                     DIRECT EXAMINATION

13   BY MS. LANG:

14        Q     Good morning, Ms. Brown.

15        A     Good morning.

16        Q     Can you introduce yourself with your full

17   name and position for the record.

18        A     Yes, I am Toshia Brown, Toshia H., Harley

19   Brown, and my position is Chief of the Bureau of

20   Voter Registration Services.

21        Q     And Ms. Brown, have you ever been deposed

22   before?

23        A     Not professionally.

24        Q     Okay.  But you have been deposed before?

25        A     Yes.

                         TOSHIA BROWN

1

2      Q     Okay.  How many times?

3      A     One.

4      Q     Okay.  And that was in a personal case?

5      A     Yes.

6      Q     Okay.  So you might remember some of the

7  instructions, but I am going to go over some of the

8  basic ground rules for today.

9           The most important thing is that we allow

10 the court reporter to take a nice clean record,

11 which means that we need to be careful not to speak

12 over each other.  In ordinary parlance when we are

13 having a conversation, we'll often finish each

14 other's sentences or anticipate what the other

15 person is going to say.  In order to make it easier

16 for the court reporter to take down the record, I

17 ask that you wait until I fully finish my question

18 and then I will do my very best to wait until you

19 fully finished your answer before I start speaking.

20           Okay?

21     A     Okay.

22     Q     It's also important that we not -- that we

23 provide verbal answers, yes or no, rather than

24 uh-huh or uh-uh, or nodding our head or shaking our

25 head for the same reasons.  Does that make sense?

1                    TOSHIA BROWN

2        A    Yes.

3        Q    And from time to time your attorney may

4   make objections to my questions and she's preserving

5   those objections for the record.  Unless she

6   instructs you not to answer, you should just go

7   ahead and answer the question after she's made her

8   objection on the record.

9        A    Okay.

10       Q    If you like to make -- if you'd like to

11  take a break at any point today, I imagine we will,

12  that's perfectly fine.  All I ask is that if I've

13  already asked you a question, you answer that

14  question and then we can go ahead and take a break.

15       A    Okay.

16       Q    If you don't understand a question that I

17  ask, please ask me to clarify.  If you don't ask me

18  to clarify, I will assume you understood the

19  question.

20       A    Okay.

21       Q    Are you taking any medications today that

22  would affect your ability to answer my questions

23  truthfully?

24       A    No.

25       Q    Any other reason you might not be able to

1                          TOSHIA BROWN

2     answer my questions truthfully?

3          A     No.

4          Q     Okay.  Ms. Brown, what's your educational

5     background?

6          A     I have a bachelor's degree in family and

7     consumer science from FSU.

8          Q     And how long have you held this position

9     with the Department of State?

10         A     The bureau chief position, I believe it

11    was in 2011 when I accepted this position.

12         Q     Okay.  And were you working for the

13    Department before that?

14         A     Yes.

15         Q     And can you kind of explain to me your

16    history with the Department of State in your various

17    positions there?

18         A     Yes.  I joined the Department in 1998 as

19    an OPS employee.

20         Q     What's OPS?

21         A     It's -- I am not sure what the acronym

22    stands for.  It is a position where you do not

23    receive benefits and your hours can be flexible.

24         Q     Okay.  That was in 1998?

25         A     1998.

TOSHIA BROWN

1

2    Q    Okay.  What type of work were you doing
3  then?

4    A    I was working in election records, just
5  data entry.

6    Q    And when did you change positions
7  approximately?

8    A    Approximately, probably about November of
9  '98 I went to Department of -- Division of
10  Corporations, which is in the Department of State,
11  and that was also an OPS position.

12    Q    And how long were you there?

13    A    Approximately two months.

14    Q    Okay.  What did you do next?

15    A    Then I came back to the Division of
16  Elections in the director's office and I worked for
17  the notary section.

18    Q    And how long were you in that position?

19    A    Approximately a year, if I remember
20  correctly.

21    Q    What did you do next?

22    A    Then I went to the Department of
23  Corrections.

24    Q    Okay.

25    A    And was there approximately two months.

1                      TOSHIA BROWN

2       Q     Okay.  Go ahead.

3       A     Then I left and came back to the Division

4  of Elections and the voting system certification

5  bureau.  And I remained in that bureau until

6  approximately May of 2005.  And that's when the

7  Bureau of Voter Registration Services was being

8  created.

9       Q     Okay.  And when the bureau was created,

10  did you join the bureau right away?

11       A     Yes, in approximately May 2005.

12       Q     What was your position at the bureau when

13  you first started at the bureau?

14       A     I believe it was a senior management

15  analyst II.

16       Q     Okay.  And can you just list for me the

17  positions you have had within the bureau up until

18  you became the bureau chief.

19       A     It would be that position and then went

20  straight into the chief.

21       Q     Okay.  It seems as though you spent most

22  of your career at the Department --

23       A     I actually missed one, I just realized.  I

24  am sorry.

25       Q     That's okay.

1                    TOSHIA BROWN

2      A     When I was in the Bureau of Voter

3  Registration Services as a senior management

4  analyst II, I left and went to the Supervisor of

5  Elections in Wakulla County and that was in 2007.

6  And I was there about three months, and then

7  returned back to the Department of State in the

8  Bureau of Voter Registration Services as senior

9  management analyst II.

10     Q     It seems as though you spent most of your

11  career at the Department of State; is that right?

12     A     Correct.

13     Q     Did you have any kind of significant

14  professional background before 1998 when you joined,

15  when you joined the Department of State?

16     A     What kind of background?

17     Q     What were you doing before you joined the

18  Department of State in 1998?

19     A     In 1998 I was graduating from college.

20     Q     Okay.

21     A     Actually graduated in December of '97.

22     Q     Got it.  What did you do to prepare for

23  this deposition, Ms. Brown?

24     A     Well, I met yesterday with my attorney,

25  and they went over protocol and --

1                      TOSHIA BROWN

2       Q    I just want to interrupt you.  You don't

3  have to tell me anything that your attorney told

4  you.  I am interested in knowing how long you spent

5  with them but not what they told you.

6       A    Okay.  Approximately an hour and

7  15 minutes.

8       Q    Did you do anything else to prepare?

9       A    Yes.  I went through two or three e-mails.

10      Q    Which e-mails?

11      A    E-mails when we were notifying the

12  counties of some procedural changes and staff.

13      Q    Anything else?

14      A    No.

15      Q    Have you talked to anybody about this

16  deposition other than your attorneys?

17      A    Yes.

18      Q    Who?

19      A    My second in command, Amber Marconnet.

20      Q    What did you two discuss?

21      A    We were discussing some of the procedures,

22  processes and procedures.

23      Q    Okay.  When was that conversation?

24      A    We spoke last night, we also spoke this

25  morning.

1                      TOSHIA BROWN

2        Q     Ms. Brown, have you been involved with the

3    preparation of production of documents for this case

4    at all?

5        A     The production of documents?  No.

6        Q     Okay.  Were you involved in the answering

7    of interrogatories for this case, questions that the

8    plaintiffs have asked of the defendants?

9        A     No.

10       Q     Were you consulted about any questions by

11   Ms. Brown or anyone else in order to provide answers

12   to various questions posed by this -- by the

13   plaintiffs in this case?

14       A     You said Ms. Brown?

15       Q     Yes.  Sorry.  Ms. Matthews.

16       A     Who was it?

17       Q     Ms. Matthews?

18       A     Ms. Matthews and I didn't discuss any of

19   that.

20       Q     Okay.  Can you tell me a little bit about

21   your job responsibilities as bureau chief.

22       A     Yes.

23       Q     Generally.

24       A     Yes.  I oversee all of the procedures,

25   processes, in the bureau.  I work very closely with

1                    TOSHIA BROWN

2   my second in command, Amber Marconnet, who

3   supervises two of our main supervisors over both

4   sections of the bureau.  Any procedural changes, any

5   processes changes, they all come to Amber and

6   then -- they all will come to me as well.  I always,

7   if it's a procedure change and something like that,

8   I always go to my director and get approval.

9        Q    And that's Ms. Matthews?

10       A    Yes, Director Matthews.

11            We -- in the bureau we also oversee

12  election night reporting, attend various meetings

13  throughout just about every day, every other day if

14  not every day; and they can be IT support meetings,

15  meetings that involve vendors, just various

16  meetings.

17            I currently supervise five direct reports.

18  One is Amber Marconnet and then my administrative

19  assistant, which is currently an open position, and

20  three career service employees.

21       Q    Who are those career service employees?

22       A    Lewis Berger, Mary Ann Monroe, and Jason

23  Merrick.

24       Q    Okay.  You mentioned different sections of

25  the bureau.  Can you explain to me the office

1                    TOSHIA BROWN

2   structure for the bureau.

3        A    Yes.  We have one section that is called

4   the compliance and regulations section.  And then we

5   have the voter services section.

6             Both staff in both bureaus are cross

7   trained.

8             Primarily the compliance and regulation,

9   their primary job is to create and to review

10  eligibility case files.  However, the voter services

11  section, their primary job is to handle mail,

12  incoming mail.

13            We currently have OPS as well that work

14  the cancellations.  These are cancellation -- people

15  who are getting canceled in state or out of state.

16  But they also, when those jobs are done, they do

17  create case files.

18       Q    Okay.  Can you explain to me what you mean

19  by eligibility case files.

20       A    Yes.  We have -- eligibility case files

21  can consist of felon case files; it can be mental

22  incapacitated case files.  And we also work daily

23  death matches, and the whole bureau works those each

24  morning, the death matches that are received.  We

25  get those from SSA and vital stats.

1                          TOSHIA BROWN

2        Q     How many employees approximately are there

3    in the bureau?

4        A     Currently we have 21 and that includes

5    myself and Amber Marconnet.  We have six OPS, but

6    seven positions, so we have one vacant position

7    currently.  And the OPS positions vary depending on

8    workload.

9        Q     And how many of those folks are in the

10   compliance and regulation section?

11       A     Off the top of my head, I'm not positive.

12   I know we have five, we have five final reviewers in

13   the compliance and regulation.  If you will give me

14   a moment, I can count them if you want me to kind

15   of --

16       Q     Sure.  But I don't want you to feel any

17   pressure.  It's not important for me to know the

18   exact amount.  I am just trying to get a sense of

19   the office.

20       A     It's probably maybe nine, ten.

21       Q     Okay.  Thank you.  And you report directly

22   to Director Matthews; is that right?

23       A     Yes.

24       Q     And who does Director Matthews report to?

25       A     I believe Christie Fitzpatrick, deputy

Page 17

1                    TOSHIA BROWN

2    secretary.

3        Q    This is going to be a very simple question

4    or very background, but could you describe the voter

5    registration system in Florida and particularly

6    whether or not it's bottom up or top down, the

7    database that you use for voter registration?

8            MS. DAVIS:  Objection.

9        A    Can you rephrase that question, please?

10   BY MS. LANG:

11       Q    Yeah.  She actually helped me out there.

12            Does Florida have a unified electronic

13   voter registration database?

14       A    Yes.

15       Q    And is that database maintained by your

16   office?

17       A    By IT.

18       Q    And is that database controlled by the

19   Secretary of State's office, Department of State?

20       A    Yes.

21       Q    And how does that voter registration

22   database interact with data that the county

23   supervisors of elections collect?

24            MS. DAVIS:  Objection.

25       A    From my understanding, you have a -- you

1                    TOSHIA BROWN

2   have FRS, which is the voter registration system,

3   and each county has a local system and they

4   interface.

5   BY MS. LANG:

6        Q    Okay.  And do they interface automatically

7   in real time or do they kind of on a daily or weekly

8   basis share information?

9        A    I am uncertain if it's real time, if it's

10  immediate.  I am not positive, that would be

11  something I would -- we would need to get with IT

12  on, but they do interface.

13       Q    Would you say at least on a daily basis?

14       A    Yes.

15       Q    The Secretary of State is the chief

16  election official in the state; is that right?

17       A    Yes.

18       Q    And what responsibilities do you

19  understand the Secretary of State to have in that

20  role?

21       A    They oversee and maintain like all of the

22  elections within the state.

23       Q    And is one of the responsibilities to

24  maintain uniformity across the counties?

25       A    I am not positive on that.

1                              TOSHIA BROWN

2       Q     Okay.  What type of guidance does the

3    Secretary of State's office provide to supervisors

4    of elections?

5       A     I'm really not sure what kind of guidance

6    they provide.

7       Q     Okay.  Does the Secretary of State issue

8    directives?

9       A     Yes, yes.

10      Q     And must the supervisors of elections

11   follow those directives?

12      A     It's my understanding, yes, they should.

13      Q     And what kind of guidance does your office

14   provide to supervisors of elections?

15      A     We provide guidance on procedures, we

16   offer -- there is a certification that some of the

17   supervisors and their staff take, and it's a course

18   that's offered in Orlando that I have presented at,

19   Maria's presented at, or Director Matthews and some

20   other division staff.

21      Q     What's the name of that certification?

22      A     FSCEP.

23      Q     What does that stand for?

24      A     It's Florida Supervisor Certification

25   Education Program, I believe.

Page 20

                        TOSHIA BROWN

1

2       Q     Okay.  Does your office ever issue

3  memoranda or other formal guidance to supervisors of

4  elections on voter registration procedures?

5       A     Director Matthews may have.

6       Q     And does your office provide more informal

7  guidance through e-mail communication or by phone?

8       A     Yes.

9       Q     How often does your office do that?

10      A     We can get calls daily, and the guidance

11 from the supervisors comes from either myself or

12 Amber Marconnet.

13      Q     Is the only training that your office

14 provides the certification course?

15      A     That is -- that, and then there is the new

16 supervisor training.

17      Q     Is that mandatory?

18      A     I don't know.

19      Q     And does that happen on an annual basis or

20 when does that occur?

21      A     It could happen annual; it could happen

22 every two years.

23      Q     Okay.  Are you involved in that training?

24      A     I have been involved once or twice.

25      Q     Okay.  What methods of voter registration

1                          TOSHIA BROWN

2     are available to Florida voter registrations?

3          A     When you say methods, like how can you

4     register to vote?

5          Q     Yes.

6          A     You can go online.

7          Q     Okay.

8          A     You can submit a paper voter registration

9     application.  You can go into the Highway Safety and

10    Motor Vehicle, they have a GoRenew, it's called

11    GoRenew is one of their sites.  And you can -- they

12    also -- Department of Safety always mails out their

13    renewals for the driver's license which has an

14    application attached to it.

15         Q     Putting aside the issue of elections which

16    we'll get into later, what are -- outside of felony

17    convictions, what are the general voter

18    qualifications for registering to vote in Florida?

19         A     You need to be 18 years of age; a U.S.

20    citizen; not a felon; if you've ever been convicted

21    of a felony, that you had your rights restored; if

22    you've ever been mentally incapacitated with respect

23    to voting, you would not be eligible.  And then we

24    have preregistrants as well.  You can preregister.

25    You are not an active voter, but you can preregister

1                    TOSHIA BROWN

2    at age 16.

3         Q     And you have to be a U.S. citizen?

4         A     Yes.

5         Q     What are the residency requirements?

6         A     Florida resident.

7         Q     For how long?

8         A     I don't believe there is a time frame.

9         Q     When a voter applies to register to vote,

10   at the application stage, what systems are in place

11   to ensure that that voter is a qualified voter?

12        A     The individual submits their application

13   with a paper or electronic.  As long as that

14   application at that time is complete, not

15   incomplete, all the fields are filled out, at that

16   point it goes against Highway Safety, for a

17   first-time voter against Highway Safety and Motor

18   Vehicles, and that's where the identifiable number

19   is validated, and that could be your last four or

20   your DL or a ID.

21              If it is validated, that person becomes

22   active.

23        Q     So that system can check both the SSA

24   database and the driver's license database?

25        A     Say that again.

TOSHIA BROWN

1

2        Q    Can that database check both the SSA

3    database and the driver's license database?

4        A    The Highway Safety?

5        Q    Yes.

6        A    Highway Safety, if they provide a last

7    four of their social, Highway Safety can go in and

8    see if they can generate a driver's license that

9    matches that individual.  If there is a last four on

10   the DL record then, yes, it can be validated.  If

11   there is not, then it would have to go to the Social

12   Security Administration.

13       Q    Okay.  So if it's validated through

14   Highway Safety, the voter becomes active.  What

15   happens if it is not validated against Highway

16   Safety?

17       A    If it's not validated against Highway

18   Safety, it would come to our bureau, to the Bureau

19   of Voter Registration Services, and my staff then

20   uses the database that we refer to as DAVID, Highway

21   Safety database.  They look at the information on

22   there to see if they can -- if they can validate it,

23   or they also look at the voter registration image,

24   if there is an application image, to validate that

25   when there was data entry, that it was not

1                    TOSHIA BROWN

2    incorrectly entered.

3         Q    Okay.

4         A    If they do see that a name was transposed

5    or numbers were transposed at that initial process,

6    at that time we can make what we call an application

7    correction and it goes back again to Highway Safety.

8              If we are unable to determine that the

9    number is accurate or determine that it's

10   inaccurate, then we will send that down to the local

11   Supervisor of Elections at that juncture.

12        Q    And what does the Supervisor of Elections

13   do with that information?

14        A    They will take -- they will notice their

15   voter.

16        Q    And what does the voter need to do in

17   order to validate their application at that stage?

18        A    The voter can come in and provide proof.

19        Q    Proof of what?

20        A    Proof of their last four or whatever their

21   identification number was, their driver's license or

22   ID.  And the supervisor at that point can mark it as

23   proof, a P in the system, and they will be active

24   because they provided proof.

25        Q    If they don't provide proof, what happens

1              TOSHIA BROWN

2    to their application?

3         A    It will be in an unverified state.

4         Q    And what does that mean?

5         A    That means that they are unverified, their

6    information has not been verified.  So until they

7    verify, it's unverified.

8         Q    Does that mean that they can't vote?

9         A    They will not be able to vote until they

10   provide some kind of proof that that's their number.

11        Q    Can they provide that proof at the polling

12   site?

13        A    Uh-huh.

14        Q    What kind of proof do they need to

15   provide?

16        A    If they provided a driver license number,

17   it would be the driver's license, or their last four

18   of their social or a ID.

19        Q    Do you know what the matching requirements

20   are for the Highway Safety matching protocol?  And

21   by that I mean -- let me back up.

22             Whenever you are checking information from

23   one set of data to another set of data, there's a

24   variety of ways in which you can match that data.

25   You can require it all to match 100 percent; you can

1                      TOSHIA BROWN

2    have what is sometimes called a soft match which is

3    that a lot of the information matches, even if not

4    all of it does.

5             Do you know what matching criteria is used

6    for Highway Safety?

7         A    What I do know is that when a record is

8    sent to Highway Safety, that there is an algorithm.

9    That algorithm is what can generate a potential DL

10   number.  But I am not for sure exactly what

11   different fields are -- in its entirety are matched

12   against.

13        Q    Okay.  So if the voter can be verified

14   either against the Highway Safety database or the

15   SSA database, they become active; is that right?

16        A    If their application is complete and they

17   go against Highway Safety, correct, and they are

18   validated, they will become an active voter.

19        Q    And a voter doesn't have to have a

20   driver's license; is that right?

21        A    Correct.

22        Q    So they can just provide a social

23   security, last four?

24        A    Yes.

25             MS. DAVIS:  If I could, for those of you

1                          TOSHIA BROWN

2          on the phone, please mute your lines.

3    BY MS. LANG:

4          Q     After a voter becomes active, are any

5    other sources used to determine whether or not that

6    applicant may be ineligible because of citizenship

7    or incapacity or some other criteria?

8          A     Once the individual becomes an active

9    voter, at that point or that juncture is when

10   there's an electronic match where they -- where

11   those records are matched against FDLE and DOC.

12         Q     What's FDLE?

13         A     Florida Department of Law Enforcement.

14   And Department of Corrections.

15         Q     And that happens immediately upon active

16   status?

17         A     That's an electronic match and that's the

18   second step that happens.  I am not sure the time

19   frame, in the evening or --

20         Q     Right.  But it happens at the application

21   stage?

22               MS. DAVIS:   Objection.

23         A     Once they become an active voter, there is

24   a -- those names are run against FDLE and DOC.

25

1                      TOSHIA BROWN

2    BY MS. LANG:

3        Q    And I imagine that's for felony

4    convictions; is that right?

5        A    Those would be for potential felony

6    convictions, yes.

7        Q    Are there any other matching protocols

8    that happen at that time?

9        A    Death matches.

10       Q    Is there any matching done to determine

11   potential non-citizenship?

12       A    No.

13       Q    Incapacity?

14       A    Not electronic matches.

15       Q    If a match comes back as positive, if you

16   receive a match with FDLE or DOC, what happens at

17   that juncture?

18       A    If there is a potential match that the

19   voter may have a felony, then that is -- it comes

20   into an application that's called BVRSA, it's an

21   internal program; and my staff then will work the

22   match.

23       Q    We'll go over what it means to work a

24   match a little bit later, but assuming that you

25   determine that this is a match for a potentially

1                    TOSHIA BROWN

2    ineligible voter with a felony conviction, what

3    happens next?

4        A    Well, every match that -- every match that

5    is made, we will work every match.

6        Q    Right.

7        A    So my staff will begin working the

8    matches.

9        Q    But after you've worked a match and

10   determined to your satisfaction that it's a match,

11   what happens then?

12       A    If it is an invalid match, then it would

13   be deemed invalid.  That's the end of that, the

14   invalid match.

15           If it was deemed to be a valid match, it

16   would be sent to the Supervisor of Elections and it

17   is at their discretion.  They review the match and

18   then determine whether to notice a voter.

19       Q    If they decide to send a notice to a

20   voter, what does that process look like?

21       A    If they deem the match, you know, to

22   notice the voter, they would take -- they would mail

23   the voter a notice and the notice goes to the

24   address on record.  They have, I believe 30 days, to

25   respond.

1                      TOSHIA BROWN

2              They can respond with -- by requesting a

3     hearing to provide proof if they have proof that

4     they are not a convicted felon, they can come back

5     with a -- there is a form that they send out and

6     they can come back and say this information that you

7     provided is correct, just summarizing that, and,

8     yes, you can remove me from the rolls.

9              If the -- if it's mailed to that address

10    and it's undeliverable, then the supervisor must

11    publish in the newspaper and that is there for, I

12    believe, 30 days as well.  And if no -- if nothing

13    comes back, no voter comes, then the -- at the

14    discretion of the supervisor, they can remove that

15    individual.

16        Q    So the process we just went over was about

17    determining eligibility at the application stage

18    when a voter applies.  But your office also engages

19    in list maintenance to see if voters that are

20    already on the rolls remain eligible; is that

21    correct?

22        A    Can you rephrase that, please?

23        Q    Yeah.  Your office engages in list

24    maintenance procedures to make sure everyone on the

25    rolls remains eligible to vote; is that correct?

1                     TOSHIA BROWN

2        A     I am still unclear what you are trying to

3   ask, sorry.

4        Q     Okay.  Does your office engage in list

5   maintenance procedures?

6        A     Our procedures that we would engage in

7   would be procedures of reviewing credible and

8   reliable eligibility information.  That would be

9   what we do for -- regarding list maintenance.

10       Q     Okay.  And can you explain to me the

11  general types of list maintenance procedures that

12  your office engages in?

13       A     Yes.  We match against the OC and FDLE,

14  that would be the felon matches.  We receive from

15  the clerk of courts reports for the mental

16  incapacitated in respect to voting.  We work death

17  matches.  We also receive cancellations from other

18  states and provide that information to the

19  Supervisor of Elections.

20             Those are all those maintenance things

21  that we provide to the supervisors because we do not

22  remove anybody.

23       Q     Right.  What types of list maintenance

24  does your office do with respect to residency?  Do

25  you use the NCOA database?

Page 32

TOSHIA BROWN

1

2      A      No.

3      Q      Are you a member of ERIC?

4      A      We just -- from what I've heard, we just

5      entered -- I don't know if we are in that -- where

6      we are in the agreement, but --

7      Q      Do you send out notices under the NVRA?

8      A      No.

9      Q      So right now you have no list maintenance

10     procedures related to residency?

11     A      At the state level, we do not.

12     Q      Okay.  Are there county level procedures?

13     A      Yes.

14     Q      Do you know what those are?

15     A      They do -- from what I have heard that

16     they do, they send out voter registration cards

17     to -- on off election years to their voters.  I know

18     some supervisors have reported that they use the

19     NCOA.  Those are just a couple that I know.

20     Q      Okay.  You've explained -- you've

21     mentioned at various times the kind of interplay

22     between your office and the SOEs with respect to

23     list maintenance or removal of voters.  Can you

24     explain what your office's role is in the potential

25     removal of ineligible voters and what the SOE's role

1                    TOSHIA BROWN

2   is?

3        A    Our role is to examine these matches and

4   if determined to be a valid match, we would forward

5   that to the Supervisor of Elections.  The Supervisor

6   of Elections then will look at the information that

7   was provided to them and will -- then they will

8   decide whether to notice the voter or not.

9        Q    And does your office ever remove voters

10  directly?

11       A    No.

12       Q    Okay.  How often does your office run

13  matches against FDLE and DOC?

14       A    Daily.

15       Q    Daily?

16       A    Daily.

17       Q    And just to make sure I understand this

18  correct.  Your office runs the whole voter

19  registration roll against the FDLE and DOC databases

20  daily?

21       A    FDLE, yes.  DOC, it's ran against DOC,

22  too, it's just FDLE is done electronically

23  automatically and DOC is ran automatically but

24  there's also some manual processes as well by IT.

25       Q    Can you explain what the manual processes

1                          TOSHIA BROWN

2    are for DOC and why they are necessary?

3        A    I think it would be better for IT to

4    explain.  I know that we have -- DOC does have their

5    mainframe and they have a web service and we match,

6    from my understanding, against the mainframe, but

7    then there's a match done against the web service

8    and I am not sure why that is.  That would be a

9    question for IT.

10       Q    Okay.  What are the differences in the

11   types of data that FDLE has versus DOC?

12       A    When it comes in to our bureau, it all

13   looks -- it all appears -- it looks the same, the

14   matches that come in.  So you are getting case

15   numbers, you are getting names, you are getting date

16   of birth, you are getting dates.  So the information

17   that comes to us looks the same.

18       Q    Okay.

19       A    But we are getting matches from DOC, we

20   get matches from FDLE because we may get different

21   matches from each agency.

22       Q    And do you know why that would be?

23       A    It could be for a variety of reasons.

24   FDLE, if FDLE does not have fingerprints on an

25   individual, we will not receive a match.

1                    TOSHIA BROWN

2      Q    Okay.  Prior to the passage of

3  Amendment 4, what was the way that people with

4  felony convictions could have their rights restored?

5      A    Clemency, executive clemency.

6      Q    If someone had their rights restored, did

7  your office receive that information about the

8  clemency?

9      A    We do have -- IT gets information from

10  clemency and they run -- they run the records

11  against the clemency database.  But we also, when we

12  are creating case files, we check every case file or

13  every match against -- executive clemency -- FCOR

14  database and we have an internal one and an external

15  one that we use.

16      Q    An internal and external database?

17      A    Uh-huh.

18      Q    And that's FCOR?

19      A    Yes, it's the Florida -- offender review.

20  I can't remember.  It's executive clemency.

21      Q    Sure.  And that database has information

22  about who has had their voting rights restored; is

23  that correct?

24      A    Yes.

25      Q    Okay.  And so if somebody had had their

Page 36

1                         TOSHIA BROWN

2     voting rights restored, they register to vote, I

3     imagine that a match will come up against DOC or

4     FDLE; is that correct?

5          A    If someone's had their rights restored?

6          Q    Yes.

7          A    Yes.  Yes.

8          Q    Then what would happen with their

9     application once that match appeared?

10               MS. DAVIS:   Objection.

11          A    We would review the match, we would look

12    at the case numbers and the conviction dates, and

13    check clemency because you may have -- they may have

14    received clemency, but they could have had

15    convictions after receiving clemency.

16    BY MS. LANG:

17          Q    Okay.  So prior to Amendment 4, the voter

18    did not have to provide evidence of their clemency

19    to the -- to register to vote?

20          A    Correct.  Correct.

21          Q    Prior to Amendment 4, did you use the same

22    databases to check for felony convictions, the FDLE

23    and DOC databases?

24          A    Yes.

25          Q    And did you check those daily?

1                         TOSHIA BROWN

2        A     The matches?

3        Q     Yes.

4        A     Yes.

5        Q     And at that time, prior to Amendment 4,

6   what -- if you determined that there was a valid

7   match for a felony conviction, what documentation

8   did you send to the supervisors of elections?

9        A     We would send a case file and the case

10  file would have a copy of a -- of the BVRSA

11  certificate, it would have a copy of DAVID, copy of

12  CCIS, a copy of the judgment, possibly the arrest

13  report, clemency, DOC if they were in DOC.

14       Q     So what kind of information would be

15  included on the DAVID information?

16       A     You have addresses, they have address

17  arrays.  They also have -- you will have a name

18  array so they've had their names changed, they got

19  married.  You have demographic such as date of

20  birth, last four of their social, so we use it for

21  demographical purposes.

22       Q     What's the CCIS?

23       A     CCIS is the clerk's site, Clerk of Court's

24  website, and that site we also will obtain

25  demographical information.  It will have the case

Page 38

1                        TOSHIA BROWN

2    number so that you can match the case number to the

3    case number that was matched; the judgment, if the

4    judgment has been scanned by the Clerk of Courts, it

5    will also be within CCIS.  So that's the kind of

6    stuff we get from there.

7                Then the arrest report we get from the

8    Clerk of Court, that would be something that we have

9    to put in a request for.  The reason we would get

10   that is if we need additional demographics.

11       Q    Okay.  And the clemency report would show

12   whether or not this person had been granted

13   clemency?

14       A    If we are sending this to the county, it

15   will show that they had not.

16       Q    Okay.  Did the packet that you sent to the

17   SOE always include the judgment?

18       A    Yes, it did.

19       Q    How did your office collect information

20   about federal convictions?

21       A    Federal convictions come in either

22   reports, sometimes you may get a judgment in.  But

23   they are not electronic matches.

24       Q    Okay.  How often would you get these

25   reports?

                        TOSHIA BROWN

1

2     A    It varies.  It could be a few times a

3 month, it could be every other month.  It varies

4 amongst --

5     Q    What does your office do with those

6 reports when it receives the federal conviction

7 reports?

8     A    We create a manual case file and use some

9 of these databases like the DAVID system.  We check

10 for -- for federal reports, for the federal we used

11 a database called -- there is one called ProCon -- a

12 database we also use called ProCon I believe is the

13 name of it.  But they create a case file and it goes

14 for review as well.  It is scanned in and then those

15 are sent through the SOE file utility,

16 electronically.

17     Q    What's the SOE file utility?

18     A    It is a secure site where we can put the

19 documents in and then send them to the supervisors

20 so they are not going through the mail; they don't

21 have paper, it's electronic.

22     Q    What's the documentation that would go to

23 the SOE with respect to federal convictions?

24     A    You would have all demographical

25 information that matches the voter.  Since it's not

1                    TOSHIA BROWN

2    an electronic match, you are going to have a copy of

3    the voter focus as well.

4        Q    What's the voter focus?

5        A    Voter focus is the database that we use

6    that you can look up voters.

7        Q    Where do you get those judgments from?

8        A    Sometimes the agencies will provide those

9    to us directly.  If they don't, they just send us a

10   report.  We will see if we can locate one or we will

11   have to go to the -- request from the agency, can we

12   get a copy?

13       Q    But it always includes the judgment when

14   it goes to the SOE?

15       A    Yes.

16       Q    What criteria does your office use to

17   match voters when it's done manually rather than

18   electronically?

19       A    What criteria?

20       Q    Uh-huh.

21       A    We like to have three demographics:  Name,

22   date of birth and address, name, date of birth, last

23   four of the social.

24       Q    Any others?

25       A    Those are the ones that we use.

1                    TOSHIA BROWN

2       Q    What, if any, processes do you have for

3   identifying people with out-of-state convictions?

4       A    It's a manual review as well.  And we may

5   get a list in, report, so we'll have to reach out to

6   the other state to get a copy of the judgment.

7       Q    Where would this list come from?

8       A    It would come from the other states.  It

9   could be any other state, they just provide us with

10   this information.

11       Q    Do you have a formal agreement with any

12   states to provide those lists?

13       A    No.

14       Q    How often do you get lists from out of

15   state?

16       A    It can be weekly, it can be monthly, it

17   can be daily.  It just depends.

18       Q    What states do you tend to get reports

19   from?

20       A    Off the top of my head, I can't -- I think

21   Georgia is one of them.  I am not sure exactly.

22       Q    Okay.  And how do the states know to send

23   those convictions to your office?  Is it when that

24   voter or is it when the offender has a Florida

25   address but was convicted in that state?

1                      TOSHIA BROWN

2       A    I am not positive, but -- I am not sure

3  how they actually determine it, but I would assume

4  it would be from an address.

5       Q    Okay.  For -- was the rule for -- prior to

6  Amendment 4, was the rule for federal convictions

7  the same as the rule for in-state Florida

8  convictions as to eligibility to vote?

9       A    As to eligibility?  Can I expand?

10      Q    Please.

11      A    Yes.  Yes.  You cannot be a convicted

12  felon without having your rights restored, but other

13  states' -- they go by the other states' law.  But

14  regardless, you could not be a convicted felon; if

15  you had, you had to have your rights restored for

16  both of those.

17      Q    Could people with federal convictions get

18  their rights restored by the Florida clemency board?

19      A     We use ProCon and we also use the FCOR

20  when we are determining whether or not they had

21  their rights restored.  So yes.

22      Q    And what is ProCon?

23      A    ProCon is a database that staff uses for

24  federal felonies.

25      Q    Do you know who runs that database?

Page 43

```
 1                        TOSHIA BROWN
 2        A    I am not positive, no.
 3        Q    I guess what I am trying to get at is, if
 4   you have a federal conviction, do you have to have
 5   had a federal pardon or can your rights be restored
 6   by the Florida clemency board?
 7        A    If you have Florida clemency, then we
 8   would invalidate that match.
 9        Q    And for out-of-state convictions, I think
10   you said that your office would follow the law of
11   the state of conviction; is that correct?
12        A    That's what we were doing, yes, that would
13   be the state of conviction.
14        Q    So if someone was from Pennsylvania where
15   you have your rights restored after you leave
16   prison, you would consider that person to be an
17   eligible voter so long as they were no longer
18   incarcerated?
19        A    Incarcerated, correct.  We would go by
20   their state law.
21        Q    Okay.  So would your office look up the
22   laws of various states?
23        A    Yes.
24        Q    Is that still your office's policy with
25   respect to out-of-state convictions?
```

1                          TOSHIA BROWN

2        A     No.

3              MS. DAVIS:   Objection.

4   BY MS. LANG:

5        Q     What is your office's policy now with

6   respect to out-of-state convictions?

7        A     Currently that -- I have been advised by

8   Director Matthews that we are not to work those at

9   this present time.

10       Q     So right now you are not doing anything

11  with out-of-state conviction lists?

12       A     Not currently, no.

13       Q     And when was that advice given?

14       A     I don't know the exact time.  I am

15  thinking January, February.

16       Q     Okay.  And has your office changed their

17  policy with respect to federal convictions?

18       A     Yes, we are currently not working those as

19  well.

20       Q     And was that advice given at the same time

21  as that --

22       A     Yes.

23       Q     Is there any written -- is there any

24  written policy about that change?

25       A     I am not positive.  There could have been

1                    TOSHIA BROWN

2   an e-mail that went out regarding that, but I am

3   not --

4        Q    Okay.  Prior to Amendment 4, did your

5   office ever encounter difficulties with

6   misidentifying people as ineligible for conviction?

7        A    Prior?

8        Q    Yes.

9        A    I am sorry, you said did we ever

10  misidentify --

11       Q    I will reask.  Did your office ever

12  encounter difficulties with misidentifying people as

13  ineligible for past convictions when, in fact, they

14  were eligible to vote?

15       A    Possibly, yes.

16       Q    Okay.  Did your office ever run into

17  difficulties identifying the wrong person, as the

18  felony match was matched to a voter who was not the

19  person who committed the felony conviction?

20       A    Yes.

21       Q    When was that?

22       A    I recall something back in 2018 maybe.

23       Q    And what happened there?

24       A    From my recollection, it was an individual

25  and I believe they had the same names, but they were

1                          TOSHIA BROWN

2     different -- I think they were different races.  And

3     the notice was actually sent to another county other

4     than the county of residence.  So the individual

5     that was identified as the felon was noticed and not

6     the voter because of the address it was sent to.

7     That person was reinstated.

8          Q     Fair enough.  So that sounds like that was

9     an isolated incident; is that right?

10         A     That one, yes.

11         Q     Have you ever run into kind of more

12    systemic problems where a large number of people

13    were misidentified?

14         A     No.

15         Q     Are you aware of that ever happening --

16         A     No.

17         Q     -- in Florida?

18         A     No.

19         Q     Okay.  Are you aware of any lawsuits about

20    misidentifying people based on --

21         A     Not to my knowledge.

22         Q     -- prior conviction?

23               Did you ever run into difficulties

24    misidentifying people as having felony convictions

25    when their conviction was actually a misdemeanor?

1                    TOSHIA BROWN

2      A     Yes, we have.  Yes.

3      Q     And when was that?

4      A     And I don't have a date.  I don't have a

5 date to give you for that.  But, yes.

6      Q     How often?

7      A     Very rare.

8      Q     Okay.  And how does that happen?

9      A     We have gotten judgments -- we get the

10 judgment from the Clerk of Court.  And we have seen

11 sometimes where CCIS and the judgment may be --

12 there may be conflictual information, such as

13 adjudication guilty versus adjudication withheld.

14 They could have violated probation.

15           And if they violated probation, it may not

16 be reflective or the court doc -- or adjudication

17 like overturned may not be available.  So when we

18 get the court docket, it shows adjudicated of a

19 felony, and then the voter is noticed, and they have

20 brought like proof in saying, no, this was

21 downgraded to a misdemeanor, but the information we

22 had accessible to us only showed it adjudicated

23 guilty.

24      Q     Okay.  Prior to Amendment 4's passage but

25 while Amendment 4 was going to be on the ballot, did

1                    TOSHIA BROWN

2    your office take any steps in anticipation of its

3    potential passage?

4         A    I would say no.

5         Q    Okay.

6         A    This is prior to it getting on the ballot?

7    I mean, being on the ballot but -- is that what you

8    said?

9         Q    Yes.

10        A    No.

11        Q    Did your office discuss what steps might

12   need to be taken if the amendment passed?

13        A    At a high level, we had some discussion,

14   yes.

15        Q    And what was the nature of that

16   discussion?

17        A    Just what -- how would we obtain

18   information, what changes may take effect with

19   Amendment 4 passing; but again, it was at such a

20   high level because we didn't really at that point,

21   at that juncture we didn't really know all the ins

22   and outs about murder, sexual offense, felony sexual

23   offense, and fees and fines.

24        Q    At a high level, what kinds of information

25   was your office thinking they would need to obtain

1                        TOSHIA BROWN

2    that would be different?

3        A    We didn't at that juncture know where to

4    obtain that information.  We were just kind of

5    troubleshooting amongst ourselves, and that would

6    have been Director Matthews, Amber, and myself.

7        Q    After Amendment 4 passed in November 2018

8    but before January 8, what steps did your office

9    take to ensure the implementation of Amendment 4 on

10   January 8?

11       A    Prior, you said prior to January 8?

12       Q    Prior to January 8 but after passage.

13       A    Okay.  At that juncture we were told by

14   Director Matthews -- we being myself and Amber

15   Marconnet -- that we needed to do -- we call them

16   silos, but basically identify the match as either

17   a -- to the best of our ability, as a sexual

18   offense, felony sexual offense, a murder, or not a

19   murder, not a sexual offense.

20       Q    Okay.

21       A    And so we were siloing the matches at that

22   time.  We were not -- to my recollection, we were

23   not sending down these valid case files, the

24   matches, electronic matches to the supervisors.  We

25   were invalidating -- if it was clear that it was a

1                     TOSHIA BROWN

2    misdemeanor, nolle prossed, adjudication withheld,

3    they had received clemency or anything like that, we

4    could go ahead and invalidate, but we were not

5    sending to the county.

6        Q    When did you stop sending lists to the

7    county?

8        A    I believe it was the first of December.

9        Q    Okay.  So on December 1 you stopped

10   sending lists.  But internally, you were sifting the

11   matches between those that were sexual offenses and

12   murders and those that were not; is that correct?

13       A    Sexual -- yeah, felony sexual offense,

14   felony, a murder, and then not a murder, not a

15   felony, you know, drug charges and such.

16       Q    And then what steps, if any, did you take

17   to assess those that fell into the not murder, not

18   felony sexual offense category?

19       A    We were not -- we were not looking at

20   those.  We were putting them into these silos, but

21   we were not going back and looking at those at that

22   time.  We were just working the matches and putting

23   them in the silos.

24       Q    Okay.  And invalidating ones that were

25   misdemeanors nolle prossed?

1                          TOSHIA BROWN

2        A     If they were clearly invalidated, yes.

3   But at that time we did not have definitions for

4   sexual offense and murder and fines and fees.

5        Q     So what general category -- strike that.

6              What rules were you using for putting

7   people into the felony sexual offense or murder

8   categories, given the lack of guidance at that time?

9        A     We were -- staff would use the statutes

10  and, you know -- because it's unclear is attempted

11  murder murder?  There were certain terms, but -- we

12  would just -- that's kind of what we are doing, is

13  just using statutes and just siloing them.

14       Q     Did you put attempted murder in the murder

15  category at that time?

16       A     I am not sure that they did because -- I

17  am not positive.  I can't answer that.

18       Q     Fair enough.

19             MS. DAVIS:  We have been going about an

20        hour.  If we can take a little break.

21             MS. LANG:  Sure.

22             (A recess took place from  10:15 a.m. to

23        10:25 a.m.)

24  BY MS. LANG:

25       Q     Prior to the break you testified as of

1                      TOSHIA BROWN

2    December 1 you stopped sending matches for felony

3    convictions and you were sorting them according to

4    the various categories.

5              What other steps did your office take to

6    implement Amendment 4 prior to January 8?

7        A    At that juncture, we were -- we came up

8    with those procedures and that's what we were doing,

9    we were siloing.

10       Q    Did your office provide any guidance to

11   the SOEs about how they should handle the

12   registration of voters with past convictions come

13   January 8?

14       A    We did get some calls on that, nothing

15   formal, but just that the individual who was

16   registering to vote needed to know if they had

17   received executive clemency or if they had met all

18   terms of their sentence.  That's it.  We were not

19   determining that and that's what we said.

20       Q    Okay.  And who called?

21       A    We had some counties call.  I don't know

22   the specific counties.

23       Q    Does the Secretary of State and the

24   supervisors of elections get together for

25   conferences on an annual basis?

1                          TOSHIA BROWN

2      A     They do have a conference, yes.

3      Q     One or two?

4      A     I believe two.

5      Q     Okay.  And was there a conference this

6 past December?

7      A     Yes, I believe there was.

8      Q     And were you at that conference?

9      A     No.

10      Q     So after January 8th, it was the position

11 of your office that a person who had completed their

12 sentence and did not have a felony or sexual offense

13 could go ahead and register to vote; is that

14 correct?

15            MS. DAVIS:  Objection.

16      A     A person who had a -- who had a sexual

17 felony offense or murder charge must have -- must

18 receive clemency from the executive clemency board.

19 If the person had another charge, drug charge, not a

20 murder or sexual offense, that they would have to

21 complete all terms of their sentence.

22 BY MS. LANG:

23      Q     And did those voters have to provide any

24 documentation proving that their rights had been

25 restored or that they had completed their sentence?

1                       TOSHIA BROWN

2        A     No.

3        Q     They could just register to vote through

4   the ordinary process; is that correct?

5        A     Yes, ma'am.

6        Q     And many did?  Many people with past

7   convictions did?

8        A     I don't know the number, but yes, people

9   did.

10       Q     Does your office have estimates of how

11   many disenfranchised people have registered since

12   Amendment 4?

13       A     When you say disenfranchised --

14       Q     Does your office have estimates of how

15   many people with past convictions have registered

16   since the implementation of Amendment 4?

17       A     I am not sure.  We have, our IT department

18   has ways of querying and obtaining information.  So

19   that would be a question for IT, what they've run

20   and what they have and you can get how many people

21   registered since January 8.  Even if they are an

22   active voter, they have affirmed on the voter

23   registration application.

24       Q     Right.  Are you aware of any estimates of

25   how many people are registered since January 8 that

1                     TOSHIA BROWN

2   have past convictions?

3        A    I am not right now, no, I am not aware of

4   the number.

5        Q    Okay.  Do you know if that's something

6   your office or anyone in the Secretary of State has

7   investigated?

8        A    They could have.  They could have.

9        Q    But you don't know for sure?

10       A    I am not positive.

11       Q    Have you heard any estimates in your

12  office with respect to how many people have

13  registered since Amendment 4?

14       A    Yes.

15       Q    And what are those estimates?

16       A    I can't remember.  I don't recall.

17       Q    Were they in the thousands, in the

18  hundreds?  What's your best recollection?

19       A    I don't recall exactly how many people

20  have registered since January 8.  My best

21  recollection would be maybe hundreds.

22       Q    Okay.  Those are people with past

23  convictions?

24       A    I don't know that.

25       Q    Okay.

1                         TOSHIA BROWN

2              MS. LANG:  I am going to mark an e-mail as

3         Exhibit 1.

4              (Exhibit 1 was marked for identification.)

5    BY MS. LANG:

6         Q    This is a February 11 e-mail from Director

7    Matthews to all of the supervisors of elections.  Is

8    that correct?

9         A    Yes.

10        Q    And you are copied on this e-mail as well?

11        A    Yes.

12        Q    And the first sentence says, as you all

13   know, Amendment 4 went into effect on January 8 and

14   there's been no delay in implementation.

15             So is it correct that your office

16   considered Amendment 4 to be self-executing?

17             MS. DAVIS:  Objection.

18        A    Can you rephrase?

19   BY MS. LANG:

20        Q    Yes.  The word self-executing is a bit of

21   a specific term.  But Amendment 4 went into effect

22   regardless of the lack of specific legislation

23   related to Amendment 4; is that right?

24        A    Yes.

25        Q    Okay.  And your office made sure that it

1                      TOSHIA BROWN

2    would be implemented as of January 8; is that

3    correct?

4            MS. DAVIS:  Objection.

5       A    At that juncture we were still working on

6    procedures, plus the legislature was fixing to go

7    in -- was fixing to begin, and we were trying to

8    figure out what, again, the sexual offense was

9    referring to and what's felony or murder and fines

10   and fees.

11   BY MS. LANG:

12      Q    Nothing in this e-mail discusses fines and

13   fees; is that correct?

14           MS. DAVIS:  Give her a minute to review

15      it.

16      A    (Examining document.)

17           Okay.  No, fine and fees.

18   BY MS. LANG:

19      Q    Are you aware of any communications from

20   the Secretary of State's office to the supervisors

21   of elections that discussed the consideration of

22   fines and fees and implementing Amendment 4?

23      A    There could have been discussion, but I am

24   not aware of anything specifically with fines and

25   fees.

                    TOSHIA BROWN

1

2       Q     Okay.  So you are not aware of any

3    guidance that was given to the supervisors of

4    elections about including fines and fees in the

5    implementation of Amendment 4?

6       A     No.

7       Q     Can you explain to me, there's a good

8    amount of jargon in this e-mail that I don't

9    understand, so could you explain to me in general

10   what your office did with respect to kind of pulling

11   back a number of matches that had already been sent

12   to the supervisors of elections?

13      A     Right.  What this e-mail is saying is the

14   counties could go ahead -- they had files that were

15   in a pending status, pending means they could be

16   anywhere in the process of notice to the voter,

17   maybe they hadn't even touched it yet.  So it was up

18   to them if they wanted us to pull those back.  We

19   could, but they would need to invalidate them on

20   their side.

21           If they chose to continue with the process

22   of removal, or whatever juncture, whatever phase

23   they were in in that process, they could do that.

24           So that's what this -- that's what this

25   was about.

1                          TOSHIA BROWN

2       Q     Okay.  And how many counties did have you

3  recall their files?

4       A     I don't have a number.  I don't have a

5  number.

6       Q     Was it the majority of counties?

7       A     Yes.  Yes.

8       Q     Were there more than five counties that

9  did not have you pull back their records?

10      A     I don't recall that number.

11      Q     Okay.  Were there any counties that had

12  you -- that did not have you recall --

13      A     Yes, I recall one.

14      Q     And what county was that?

15      A     I believe it was Okaloosa.

16      Q     Okay.  When did your office begin sending

17  matches for felony convictions to the supervisors of

18  elections again?

19      A     After January 8?

20      Q     Yes.

21      A     We began sending matches June 6, 7 -- 6th,

22  I believe.

23      Q     And did the initial set of matches go out

24  to every county at the same time?

25      A     I can't answer whether it went out one

1                          TOSHIA BROWN

2    time because as you get a match, you work that match

3    and it's not set that you get four for one county,

4    four for the next.  It's random.  So...

5        Q    You started sending them to all counties

6    at the same time, but they could have gone at

7    different rates?

8        A    Correct.

9        Q    I am just trying to get a sense of

10   whatever, you were kind of rolling -- we are just

11   going to start sending to this set of counties and

12   then --

13       A    No, it's random; as you get the match and

14   if you validate the match, you send it.  There's no

15   reason, rhyme or reason of what county gets.  You

16   are not doing to all one county.

17       Q    Do you send matches on a daily basis, or

18   do you send them on a longer list, you know, collect

19   a list for a county and then send it?

20       A    We send it on a daily basis.

21       Q    You started doing that early June?

22       A    Yes.

23       Q    Okay.  And I imagine that you had some

24   backlog of matches, given that you were not sending

25   out matches from December until June; is that right?

1                          TOSHIA BROWN

2        A     Correct.

3        Q     Okay.  So are you caught up on that

4   backlog or are you still working through matches

5   from earlier this year?

6        A     No.  We are not -- no, we still have

7   matches out there, so we are not.

8        Q     Where are you in the process of working

9   through that backlog?

10       A     We are currently working incarcerated

11   individuals that are currently in custody or

12   incarcerated in prison.  So the others are on hold

13   at this juncture.

14       Q     Okay.  Just to make sure I am

15   understanding you correctly, the only matches you

16   are sending out are of individuals that you believe

17   are currently serving time in prison?

18       A     Correct.  These are individuals that DOC

19   shows as currently incarcerated.

20       Q     Okay.  That's very helpful, but I also

21   want to get a sense -- and I might be thinking about

22   this wrong, so feel free to correct me.  But I

23   imagine you get matches on a daily basis; is that

24   right?

25       A     Right.

1                       TOSHIA BROWN

2        Q    And you were not working matches or you

3   were not sending out matches until June; is that

4   correct?

5        A    Correct.

6        Q    So did you start back with the matches

7   that you received in December and work

8   chronologically, or how are you working those

9   matches?

10       A    Currently -- I will try to explain this as

11  well as I can.

12       Q    Fair enough.

13       A    IT could maybe explain it better.  But

14  currently when we get matches in, our IT is pushing

15  through for us to work from DOC, Department of

16  Corrections, people who are incarcerated.  So right

17  now we are currently only receiving those.  These

18  other ones are on hold currently.

19       Q    Okay.  Are you caught up on processing the

20  incarcerated matches?

21       A    We complete that daily with the

22  incarcerated, yes.

23       Q    Okay.  About how many of those matches do

24  you process per day?

25       A    It varies.  It could be as little as

Page 63

TOSHIA BROWN

1  
2 five -- three, five; it can be up to 20.

3     Q    Okay.  Who was involved in the decision to

4 focus only on incarcerated matches at this time?

5     A    We were told by Director Matthews.

6     Q    Okay.  Were you involved in that decision

7 with Director Matthews?

8     A    We were in discussion, but that was a

9 decision made from her.  And I am not sure if upper

10 management made that decision with her, but it was

11 something she told myself and Amber Marconnet we

12 needed to focus on those.

13     Q    And when did she tell you that?

14     A    It would have been prior to when we began,

15 so maybe the end of May.

16     Q    Okay.

17     A    Because we had to come up with procedures.

18     Q    Right.  And just to be clear, when we say

19 incarcerated, we mean actually in prison as opposed

20 to parole or probation; is that right?

21     A    Currently, yes, they are actually in

22 prison.

23     Q    Okay.  And with respect to those matches,

24 how has the documentation that you -- or let me back

25 up.

1                    TOSHIA BROWN

2         How does IT determine who is or is not in

3    prison and, therefore, should be pushed to your

4    office to work the match?

5         A    IT -- from what I have been told, IT,

6    there is codes that come through the file specs

7    through DOC and they -- so they are pulling from

8    some type of code that shows incarcerated.  And then

9    those are the ones that we work.

10             MS. LANG:  I am going to mark Exhibit 2.

11             (Exhibit 2 was marked for identification.)

12   BY MS. LANG:

13        Q    This is an e-mail from Director Matthews

14   from June 7 to all the supervisors of elections; is

15   that right?

16        A    Correct.

17        Q    And you are cc:'d on this e-mail?

18        A    Yes.

19        Q    And it appears this e-mail is kind of

20   announcing the starting of sending out felon matches

21   again as you --

22        A    Yes.

23             MS. DAVIS:  Let her take a minute to just

24        review what it is, if she can.

25             MS. LANG:  Okay.

                    TOSHIA BROWN

1

2       A    (Examining document.)

3  BY MS. LANG:

4       Q    So this e-mail is announcing the

5  restarting of sending felon matches to the

6  supervisors of elections; is that correct?

7       A    Yes.

8       Q    And explaining the process?

9       A    Yes.

10      Q    What documents are included in the case

11 file that you send to the supervisors of elections

12 now?

13      A    We would send the DAVID screen.  We

14 send -- we check clemency, we send the DOC, we

15 actually send two DOC screens.  One of them is the

16 public site and the other comes from the web

17 service.  Web service has more demographical

18 information, Chapter 119.

19           Okay.  So I said DAVID.

20      Q    Clemency, DOC.

21      A    And DOC.  The BVRSA match screen.

22      Q    Is that just an internal -- what is the

23 BVRSA?

24      A    It shows the voter information and the

25 felon information, so it's like our initial screen

                        TOSHIA BROWN

1   when we start working a case file.

3       Q     Is that all?

4       A     And I believe the CCIS for demographical

5   purposes.

6       Q     Your office no longer includes judgments?

7       A     No.

8       Q     Why not?

9       A     I was directed that we did not need to by

10  Director Matthews, that we did not need to include

11  the judgments because these people were incarcerated

12  or under supervision.  And so if they are

13  incarcerated, currently incarcerated or under

14  supervision, they have not completed all terms of

15  their sentence.

16      Q     Okay.  But previously, when sending out

17  non-matches, your office would include both DOC and

18  the judgment; is that right?

19      A     Correct.

20      Q     Do you know why Director Matthews decided

21  no longer to use the judgments in addition to the

22  DOC material?

23      A     Again, we were told that if they were

24  incarcerated, they had not completed all terms of

25  their sentence, and DOC was only sending us -- per

1                    TOSHIA BROWN

2    DOC, they were only sending us felony convictions.

3        Q    Okay.  If you could turn to the second and

4    third page of -- I see here that the supervision

5    type listed on this DOC screenshot is drug offender,

6    probation; is that right?

7        A    Yes.

8        Q    So this is not someone who is currently

9    incarcerated; is that right?

10       A    This is someone who is under supervision,

11   supervised population.

12       Q    Okay.  So does this refresh your

13   recollection that the screens that you are doing are

14   not just for incarcerated people but for people

15   under supervision more broadly?

16           MS. DAVIS:  Objection.

17       A    Currently -- currently as of the 26th of

18   June or 27th, we only are doing incarcerated.

19   Prior, as of June 6, we were doing the supervision.

20   BY MS. LANG:

21       Q    Why did you make that switch?

22       A    And the -- we had received information

23   from Department of Corrections, our IT department,

24   that there was some issues with -- and I can't

25   remember if it was the web service, which database;

TOSHIA BROWN

and so we felt that the incarcerated, we knew that was accurate, the incarcerated, so we wanted to make sure. We didn't want to send anything down that -- to err on the voter at this juncture until everything was resolved. So we are only doing incarcerated right now.

Q Did you pull back all of the matches that you sent to probation or parole?

A No, we did not.

Q What issues were there with the DOC database?

MS. DAVIS: Objection.

A I am not -- it would be speculation on my part because I haven't been in all the conversations with IT. From what I recall from hearing from IT and the way that I interpreted it, was that we were receiving -- we are still receiving felony convictions from DOC, but what was on either the web service or the public, and I am not positive at this juncture which one, that the case number may show a misdemeanor, but it did not mean that the person didn't have a felony.

So they are working on resolving that. I don't know where they are with it. I don't know any

1                      TOSHIA BROWN
2     more details.
3     BY MS. LANG:
4          Q     Was your office assured that those issues
5     did not affect anyone who was incarcerated?
6          A     Yes, it did not affect the incarcerated.
7     It was just, from what IT was told, it was just
8     supervision.   That's why we stopped doing
9     supervision.
10         Q     Okay.  Do you see -- it's in somewhat
11    small font, but underneath, at the bottom, the small
12    font on the bottom of the first -- of the first DOC
13    screenshot there is some text here, and the first
14    paragraph reads, the Florida Department of
15    Corrections updates this information regularly to
16    ensure that it's complete and accurate.  However,
17    this information can change quickly.  Therefore, the
18    information on this site may not reflect the true
19    current location, status, scheduled termination
20    date, or other information regarding an offender.
21              Do you see that?
22         A     I do.
23         Q     Given that information, what other
24    checks -- or given that information, does your
25    office still consider these screenshots to be

TOSHIA BROWN

1

2  credible and reliable information?

3      A    Yes, because we have been told by DOC

4  these are felonies now incarcerated.

5      Q    But the documentation that you received

6  actually indicates that it's not necessarily

7  reflecting the true current location, status,

8  scheduled termination date, or other information

9  regarding the offender; is that right?

10         MS. DAVIS:  Objection.

11     A    It says it may not reflect.

12  BY MS. LANG:

13     Q    Okay.  Does your office do anything to

14  confirm the information that's on this DOC

15  screenshot other than using the web service and

16  public site?

17     A    We use the other databases for

18  demographical purposes, but we take this -- as DOC

19  has said, it's a felony conviction, that they are

20  incarcerated, so that's what we are forwarding them.

21     Q    Do you all have a contract with the DOC

22  for data sharing purposes?

23     A    There is an interagency agreement, yes.

24     Q    Was that interagency agreement updated

25  after passage of Amendment 4?

1                          TOSHIA BROWN

2          A     Actually we received a few weeks ago an

3    update regarding some of the file specs that legal

4    has reviewed and it's in IT.   I am having IT right

5    now review it.

6          Q     Okay.  And what changes are in that

7    update?

8          A     It was file format and different fields

9    that were being sent over to us that were requested

10   by IT.

11         Q     Okay.  Prior to Amendment 4, the

12   information that was sent to the voter with a notice

13   of potential ineligibility included both the

14   judgment and the DOC information; is that right?

15         A     I am not sure exactly what every county

16   sends out.  I know that counties usually send the

17   judgment, they may send the DOC.  I am not positive

18   they were doing both of those at the time.

19         Q     Okay.  And what was -- I think your

20   testimony there was that they definitely sent the

21   judgment and maybe sent the DOC information; is that

22   correct?

23         A     Correct.

24         Q     Okay.  But the counties are no longer

25   receiving the judgments; is that correct?

```
1                      TOSHIA BROWN

2        A    At this time, no.

3        Q    Okay.  Was it administratively difficult

4   to gather the judgments for every potentially

5   ineligible voter?

6        A    Some of the Clerk of Court sites, most of

7   them will have a judgment on it.  When you start

8   getting into older cases, then we have to reach out

9   to the Clerk of Courts to receive those judgments.

10  There is no problem with the Clerk of Courts

11  providing those to us; they do provide them to us.

12  So sometimes it was an extra step to obtain that

13  information.

14       Q    What information have the -- what guidance

15  have the SOEs been given as to what information they

16  should send to the voter with the felon packet now?

17       A    I believe there was some communication on

18  what to send, and I believe they were directed to

19  send the public DOE, not the web service DOE,

20  because they're getting -- excuse me, not DOE --

21  DOC, because they are getting both of those.  One of

22  those has a lot of demographic information on it.

23       Q    Okay.  You mentioned that sometimes felony

24  convictions are older, you have to call the Clerk of

25  Courts to get that information; is that right?
```

1                    TOSHIA BROWN

2          MS. DAVIS:   Objection.

3     A     Sometimes when they are, sometimes they

4 are not available online.  If they are not available

5 online, we would have to reach out to the Clerk of

6 Court to obtain it.

7 BY MS. LANG:

8     Q     And about how old would a conviction have

9 to be for -- to sometimes require a phone call?

10    A      It varies because it can be in the early

11 '90s, it could be in the '80s, it could be in the

12 '70s.  It varies amongst the Clerk of Courts what

13 they actually have scanned in.

14    Q     Okay.  And is the database that -- the

15 Clerk of Courts database that you used to download

16 judgments online, is that available to the public?

17    A      Well, we -- I don't -- I am not sure.  I

18 don't believe -- because what we have, we do -- some

19 of our sites do have like last four of the social.

20 Some of them have changed policy and they don't

21 include that anymore, and that's why I said we

22 reached out to get the arrest record to get more

23 demographical information.  So I don't know what is

24 available to the public.

25    Q     Okay.  Does your office have an agreement

Page 74

1                    TOSHIA BROWN

2   with the Clerk of Courts, like an interagency

3   agreement like you have with the DOC?

4        A    No, we do not have one with the Clerk of

5   Courts.  We do have -- there is a form for, I

6   believe it's Polk County Clerk of Court, where we

7   had to sign a form because we were needing to

8   receive more demographical information such as

9   socials.  And there's also more information in that

10  site than just going into CCIS.  But it wasn't an

11  interagency agreement.

12       Q    Do you have an interagency agreement with

13  FDLE?

14       A    Yes.

15       Q    And has that agreement been updated since

16  the passage of Amendment 4?

17       A    That has not been updated.  There has been

18  discussion about updating that, but it has not to

19  date.

20       Q    Is the judgment database that you -- is

21  the database that you use to find judgments

22  available to the SOEs?

23       A    The Clerk of Court databases?  Some of

24  them have -- well, I don't want to answer yes to

25  that because I am not sure.  I know that in

1                    TOSHIA BROWN

2   conversation with a lot of the -- not a lot, but

3   with some of the supervisors, they actually reach

4   out to their Clerk of Court in their county to

5   obtain those.

6        Q    You mentioned that the DOC alerted your

7   office to potential problems with the data that your

8   office was using for people on supervision.  When

9   did the DOC reach out about those issues?

10       A    And I am not positive that DOC actually

11  initiated that or if our IT department, but there

12  was conversation and I am not sure what the date

13  was.  I mean, I would say it was between the 6th

14  when we implemented to when we stopped, sometime in

15  between there.

16       Q    Okay.  You said you stopped around late

17  June?

18       A    We stopped, I think the -- I think we

19  started back on the 26th or 27th not including --

20       Q    Okay.  Did you inform the SOEs of this

21  change?

22       A    That we would not be including the -- no.

23       Q    Or did you inform the SOEs of the problems

24  you encountered with the DOC information you had

25  sent out between June --

Page 76

                    TOSHIA BROWN

1

2        A     Not to my knowledge, no.

3        Q     Since the passage and implementation of

4    Amendment 4 in the year 2019, have you gone to visit

5    any of the counties to talk about the felon match

6    process?

7        A     No.

8        Q     Has Amber gone out to any of the counties

9    to talk to them about the felon process?

10       A     No.

11       Q     Do you know if Amber may have gone out to

12   Leon County to talk about the felon match process?

13       A     No.  Not to talk about the felon, not

14   after amendment.

15       Q     Okay.  Have you -- has -- have you or

16   Amber visited counties to talk to them about voter

17   registration more generally in 2019?

18       A     We have -- in 2019?

19       Q     Yes.

20       A     I don't recall if we went in 2019 or not.

21             MS. LANG:  Let me mark as Exhibit 3.

22             (Exhibit 3 was marked for identification.)

23   BY MS. LANG:

24       Q     This is an e-mail chain that we received

25   from Leon County.  Do you know who Stephen Usztok

Page 77

TOSHIA BROWN

1
2    is?

3         A    I know the name.

4         Q    And who is he?

5         A    I know he works for Leon County, but I am

6    not sure which section.

7         Q    It looks like he is voter services

8    specialist II according to his e-mail signature on

9    the second page.

10        A    Okay.

11        Q    If you look at the second page of this

12   exhibit, you will see an e-mail from Stephen Usztok

13   on January 17, 2019, in which he says, just finished

14   up speaking with Amber.  Amber and Toshia are

15   visiting nearby counties to see how the felon

16   process looks and works on our end at the SOE.

17             Does this refresh your recollection?

18        A    It does.  It does.

19        Q    Can you tell me about those visits?

20        A    Yes.  I am not really -- I can't really

21   discuss what Amber's was all about, but mine, I went

22   to Wakulla SOE office and I did not meet the

23   supervisor, I met with one of the staff members

24   because the local systems versus the statewide

25   system are different.  They have -- we have

1                    TOSHIA BROWN

2    different functionalities on our system versus they

3    do; and had her print out some letters like what

4    they provide the felon, what they -- potential felon

5    when they are noticing them, so we would have an

6    idea of what their office does because we don't

7    notice voters.

8              I did not advise anything about

9    Amendment 4.  So that was pretty much my thing.  I

10   was there probably about 30, 40 minutes and she

11   printed me out some of the letters that go -- like

12   it kind of showed me this is what it looks like when

13   it comes in, this is our notification.  It was more

14   of an educational type thing.  So what conversations

15   Amber had with Steve, I am not positive.

16        Q    Right.  What led you to decide to go on

17   these visits?

18        A    Director Matthews.  Just -- yeah, it was

19   Director Matthews.

20        Q    Did she tell you why she wanted you to do

21   that?

22        A    Just to see what it looks like when the

23   counties receive a match, what's the notification,

24   kind of have a visual, what they are seeing.

25        Q    Was that related to the Secretary's plans

1                    TOSHIA BROWN

2   for implementing Amendment 4?

3        A    I don't have any idea.

4        Q    Okay.  In this e-mail, they talk about

5   county-initiated felon matches.

6        A    Yes.

7        Q    Can you tell me what you know about

8   county-initiated felon matches?

9        A    Some of the counties, not all the

10  counties, but some of the counties will -- the Clerk

11  of Courts provide the supervisors with a list from

12  the Clerk of Court of people who have been convicted

13  in that county.  Some counties choose to initiate

14  the removal, and so they will create their own

15  files.  And that was another discussion, just what

16  do they put in their files versus what do we put in

17  our files.

18            And so then they will notice the voter

19  from the information because -- they get a list,

20  they have to go to the Clerk of Court to get

21  information; and some of them have access to DAVID

22  and some of them don't.  So they will initiate it,

23  they get the information, they feel it's credible

24  and reliable and they will initiate.

25        Q    Do you know what counties do that?

1                        TOSHIA BROWN

2        A    No, not off the top of my head, I don't.

3        Q    Do you know any counties that do that off

4   the top of your head.  Does Wakulla County?

5        A    I know Wakulla has done it before.  I am

6   not sure about Leon, I am not positive about Leon.

7        Q    He writes, I confirm that our office does

8   not do this.

9        A    Okay.

10       Q    Do you know any other counties?

11       A    Not off the top of my head, I don't.  But

12   there are some counties.  They notify us when they

13   do.  That is -- we keep that information, we put

14   that in a spreadsheet, so that we don't duplicate

15   efforts.

16       Q    So you have a spreadsheet of SOE-initiated

17   felon matches and removals?

18       A    We have, yes, it's a database.

19       Q    Do you know if counties are still doing

20   that after the passage of Amendment 4?

21       A    Yes, we have received some.

22       Q    Do you recall where you received those

23   from this year?

24       A    No.

25       Q    Okay.  Was your office made aware of

1                      TOSHIA BROWN

2    potential problems with the reliability of the DOC

3    information from any of the counties?

4        A    Yes, there were some concerns.

5        Q    Which counties?

6        A    I think we got a couple calls.  I don't

7    recall.

8        Q    From Leon County?

9        A    I don't recall that.

10       Q    Okay.  Do you remember any of the counties

11   that have contacted you about the DOC information?

12       A    Not specific.  We have had -- we had some

13   calls, but I can't be --

14       Q    What were the concerns?

15       A    Well, we had a concern that the judgment

16   was not included.

17       Q    What else?

18       A    That was their concern, that it was

19   different from the prior packages we had sent.

20            MS. LANG:  I will mark Exhibit 4.

21            (Exhibit 4 was marked for identification.)

22   BY MS. LANG:

23       Q    So if we look at page 4 of this exhibit,

24   in an e-mail chain from Leon County, Stephen Usztok

25   writes that the DOC screenshot that your office is

1                    TOSHIA BROWN

2  sending itself notes that the offense descriptions

3  are truncated and do not necessarily reflect the

4  crime of conviction.

5           And so he writes, so how is the Division

6  going to argue that screenshots from a website with

7  a warning not to interpret its contents as final or

8  accurate to be, quote, documentation upon which the

9  potential ineligibility is based?

10          And he says, I think they should

11  reconsider this and continue to send us judgment

12  pages.

13          Given the concerns raised about not

14  including the judgment, is your office reconsidering

15  the decision not to include judgments in the felon

16  packets?

17          MS. DAVIS:   Objection.

18      A    We are currently, at this time, we are

19  still working the incarcerated and just including

20  the DOC.  We have a draft of procedures, future

21  procedures, a draft that will be implementing some

22  other phases that will include the judgment.

23  BY MS. LANG:

24      Q    Okay.

25      A    But at this juncture we are including the

                           TOSHIA BROWN

1    DOC.

2        Q    Who drafted that new set of procedures?

3        A    That procedure was drafted by Amber

4    Marconnet and it has gone to Director Matthews.

5    Director Matthews has made some changes and it's

6    still in the review process.

7        Q    When do you expect those procedures to be

8    brought up?

9        A    I don't have a date.

10       Q    One month, two months, six months?

11       A    Soon, but I don't know.  It's got to go

12   through review, through Director Matthews, and then

13   management.

14       Q    Okay.  So your office is going to switch

15   from DOC screenshots only to including the judgment?

16            MS. DAVIS:  Objection.

17       A    Our draft procedures have that in that,

18   but they have not been approved.

19   BY MS. LANG:

20       Q    Okay.  And why did Amber decide to include

21   that in her draft procedures?

22            MS. DAVIS:  Objection.

23       A    It was just discussion that we had with

24   Director Matthews on moving forward with other types

1                    TOSHIA BROWN

2    of the felonies.  To keep it -- since we are going

3    to be introducing eventually the murder, the sexual

4    offense, and then the ones that they have to meet

5    all their terms at some point after the work group

6    probably, we want to keep it uniform and consistent,

7    staff -- it's just easier when you have a consistent

8    procedure for our staff so they know that you do

9    this with every file.

10   BY MS. LANG:

11       Q    Okay.  Would you agree with the statement

12   in this e-mail on page 1, it's in the first

13   paragraph, it's the last statement.  It says,

14   ultimately a screenshot from the DOC --

15       A    Wait, where?

16       Q    I am sorry.

17            MS. DAVIS:  Which exhibit?

18            MS. LANG:  The exhibit we were just on.  I

19       think 3.

20       A    Four.

21   BY MS. LANG:

22       Q    Four.  First paragraph, the last phrase

23   that says, but ultimately, a screenshot from the DOC

24   is less authentic and authoritative than a scan of

25   an official court document.

<center>TOSHIA BROWN</center>

1
2        MS. DAVIS:  Is there a question?

3  BY MS. LANG:

4    Q   I did ask a question.  It was would you

5  agree with that statement?

6    A   I am sorry, I am still looking for

7  ultimately.

8    Q   Ultimately, a screenshot from the DOC is

9  less authentic and authoritative than a scan of an

10  official court document.

11       MS. DAVIS:  Objection.

12    A   We were told by DOC that the matches that

13  we were receiving were felony convictions.

14  BY MS. LANG:

15    Q   Right.

16    A   And that the person was incarcerated.

17    Q   I understand that.  But your office has a

18  responsibility to ensure that the documentation is

19  credible and reliable; is that right?

20    A   Correct.

21    Q   So outside of the promise of the DOC, the

22  actual documentation you receive has several

23  warnings that its information is not necessarily

24  accurate or complete; is that right?

25    A   That there was some issues with the files

1                    TOSHIA BROWN

2    that were transferred.

3        Q    And on the documents itself, there are

4    warnings that it may not be accurate or complete; is

5    that correct?

6        A    The DOC does have a statement that it may

7    not be reflective or up to date, correct.

8        Q    And it also has a statement that the

9    descriptions of the offenses may not be correct or

10   up to date?

11            MS. DAVIS:  Objection.

12       A    DOC has told us and by statute they are

13   required to provide us with felony information, and

14   they have assured us that that's what they were

15   providing us with, was felony information.

16   BY MS. LANG:

17       Q    But nothing in the documentation that you

18   received actually shows a definitive felony

19   conviction in the documentation itself?

20            MS. DAVIS:  Objection.

21       A    What documentation you are talking about?

22   BY MS. LANG:

23       Q    The DOC screenshots that you receive and

24   rely upon do not actually have definitive proof of

25   felony convictions on them?

1                    TOSHIA BROWN

2          MS. DAVIS:  Objection.

3     A    We are taking the documents and the

4 matches that DOC gave us, stating that these are

5 felony convictions, so that's what we are going by

6 and providing.

7 BY MS. LANG:

8     Q    I understand.  I just want to make sure

9 the record is clear.  The DOC has advised you that

10 the information they are giving you is for people

11 with felony convictions, yes?

12    A    The information, yes, is felony

13 conviction.

14    Q    But the documents themselves do not have

15 any definitive proof of felony convictions?

16         MS. DAVIS:  Objection.

17    A    Can I see the DOC screenshot?  Do you

18 mind?

19 BY MS. LANG:

20    Q    Please do.  I believe it's Exhibit 2.

21    A    (Examining document.)

22         Okay.  So the DOC information provides you

23 with a case number, the offense.  It does not have

24 on there the degree of the felony.

25    Q    Right.  It says the offense descriptions

Page 88

1                    TOSHIA BROWN

2   are truncated and do not necessarily reflect the

3   kind of conviction.  Is that right?

4       A    I don't understand what he's talking about

5   there because here is -- like on this one here is

6   the crime.

7       Q    Right.  But there's a note underneath that

8   says, current prison sentence history, and it says,

9   note, the offense descriptions are truncated and do

10  not necessarily reflect the kind of conviction.

11          Do you see that there?

12      A    Okay.

13      Q    There's no indication of whether or not

14  something was a felony or misdemeanor here; is that

15  correct?

16      A    I don't see where it says MM or CF.

17      Q    And is it possible that when it says the

18  offense descriptions do not necessarily reflect the

19  crime of conviction, that they might reflect only

20  the charge and not the actual conviction crime?

21          MS. DAVIS:  Objection.

22  BY MS. LANG:

23      Q    Are you aware of that possibility?

24      A    No.

25          MS. DAVIS:  Just to be clear, we are

Page 89

1                    TOSHIA BROWN

2        referring to part of Exhibit 3?

3               THE WITNESS:  Two.

4               MS. DAVIS:  Two.

5               MS. LANG:  Two.  Yes, we were referring to

6        the DOC screenshots in Exhibit 2.

7    BY MS. LANG:

8        Q    The advice you have given the supervisor

9    of elections is that they can rely on these DOCs as

10   the basis for sending out a notice to the voter; is

11   that right?

12       A    We provide this and tell them that this

13   is -- that DOC has said that we are only matching on

14   felony records.  It's still up to the discretion of

15   the supervisor to review the information and

16   determine whether or not they are going to notice

17   the voter.

18       Q    Okay.

19               MS. LANG:  I will mark Exhibit 5.

20               (Exhibit 5 was marked for identification.)

21   BY MS. LANG:

22       Q    I am going to give you a moment to review

23   this e-mail correspondence.  It's also from Leon

24   County.

25       A    Okay.  (Examining document.)

1                    TOSHIA BROWN

2      Q    This is an e-mail chain from Leon County

3 and the longer e-mail is from Alessandra Shurina who

4 is the voter services specialist from Leon County.

5      A    Okay.

6      Q    In this e-mail, Alessandra lists a series

7 of concerns that she has with the documentation

8 she's receiving from the Secretary of State's

9 office.

10         Are these concerns that you had previously

11 heard?

12      A    I directly did not hear any of these

13 concerns.  Amber may have heard some of these

14 concerns.

15      Q    Okay.  So one concern is that the

16 information that DOC database could indicate some

17 sort of felony level supervision even though the

18 adjudication is actually withheld.  Is that an issue

19 that you were previously aware of?

20      A    I am aware that the individual may have

21 misdemeanors, as well as felonies, but they do have

22 a felony conviction as well, I have been told by

23 DOC.

24      Q    It's not possible that they are -- they

25 have a felony charge that's been withheld?

1                        TOSHIA BROWN

2            MS. DAVIS:  Objection.

3       A    I have been told by DOC that every match

4  that we are receiving, there is a felony conviction

5  adjudicated guilty in their history.

6  BY MS. LANG:

7       Q    And have you been told by DOC that they

8  are currently serving their time in prison for that

9  felony conviction in their history?

10      A    I did not ask that question.

11      Q    Okay.  Who is your contact at the

12  Department of Corrections?

13      A    Currently Jeff Crum.

14      Q    What's his position?

15      A    He is with IT and I believe he is a bureau

16  chief.

17      Q    Anyone else that you work with at IT or at

18  DOC?

19      A    There is another -- there's some other

20  individuals, but they are IT people and it's

21  variation.  Janet Modrow, our IT, she knows -- she

22  deals with them more.

23      Q    So she is your IT person?

24      A    Janet Modrow, yes.

25      Q    Is she the chief of the IT or what's that

1                         TOSHIA BROWN

2    position title?

3         A    I am not sure what her title is, but,

4    yeah, she handles FLES.

5         Q    So this voter specialist from Leon County

6    indicates that they found individuals who your

7    office sent to them where they could not find any

8    felony convictions, even when they did separate

9    Clerk of Court searches.  Is that surprising to you?

10        A    Yes.

11             MS. DAVIS:  Objection.

12   BY MS. LANG:

13        Q    Okay.  And she indicates that she did a

14   lot of extra research and that research led her to

15   not remove people that were likely eligible.  Is

16   that also surprising to you?

17        A    That she reviewed the information and felt

18   she did not want to notice the voter?

19        Q    That she found people who she believed to

20   be eligible voters and the information provided by

21   the Secretary of State was in error.

22        A    I don't know what information she

23   actually -- I mean, I know there's documentation

24   here, but I don't know what exactly concrete she

25   found and what all she searched because, again, I

1                    TOSHIA BROWN

2    have been told that every one of these individuals

3    have a felony conviction.

4         Q    Right.

5         A    I guess I am not understanding your

6    question.

7         Q    Okay.  For example, she says sometimes the

8    information that's sent to her contradicts itself.

9    It will say criminal felony, but then the Clerk of

10   Court's website will say first degree misdemeanor.

11        MS. DAVIS:  Objection.

12   BY MS. LANG:

13        Q    Have you heard concerns from the counties

14   that they are finding these kinds of inconsistencies

15   as to whether or not the individual sent from your

16   office actually have felony convictions?

17        A    We have had some communication where the

18   counties again wanted more information.  Again, we

19   told them that, no, the information that was being

20   provided to us by DOC was reported by DOC that it

21   was a felony conviction.

22        Q    Is it possible that the DOC's databases

23   are not as reliable as you once thought?

24        MS. DAVIS:  Objection.

25        A    All I know is what they have told us and

1                       TOSHIA BROWN
2    the individual is incarcerated, the ones that we are
3    currently working, and that's what we are currently
4    doing right now, is including the ones that are
5    incarcerated.
6    BY MS. LANG:
7         Q    Is everyone that's incarcerated always
8    serving time on a felony conviction?
9         A    From what I was -- had been told, that
10   those people that are incarcerated have a felony
11   conviction.
12        Q    I understand.  That's not quite my
13   question.
14             My question is, more generally, outside
15   what the DOC has told you, is everyone who is
16   incarcerated someone who is serving time for a
17   felony?
18        A    In a prison?
19        Q    Yes.
20        A    That is my understanding.
21        Q    Okay.
22             (Discussion off the record.)
23   BY MS. LANG:
24        Q    You would agree that this e-mail suggests
25   that there are people who were sent -- felon matches

1                    TOSHIA BROWN

2   that were sent to Leon County that Leon County has

3   identified as not having a felony conviction?

4            MS. DAVIS:  Objection.

5       A    It's hard for me -- it's hard for me to

6   respond to this because I haven't had a chance to

7   look at these files or have a review, have these

8   reviewed.  So she lists things that she is saying

9   that she sees discrepancies on, but I have not -- I

10  wouldn't be able to account on these specific files.

11  BY MS. LANG:

12      Q    Has your office done any independent

13  research on the felon matches that you receive from

14  DOC with the Clerk of Court's databases?

15           MS. DAVIS:  Objection.

16  BY MS. LANG:

17      Q    Has your office taken any of these DOC

18  matches and looked for the judgment records in order

19  to independently verify that these are people with

20  felony convictions?

21      A    Not -- I am trying to think.  Not to my

22  knowledge.  I know IT has done some of their own

23  research with files but -- the file transfer, but

24  not -- no.

25      Q    But your office has access to judgments,

                              TOSHIA BROWN

1   right?

3       A    Correct, yes.

4       Q    But you haven't done anything to verify

5   that the information you were getting from DOC

6   actually has felony judgments?

7       A    No, we are just taking what DOC has said.

8       Q    Okay.  What I would like to do before we

9   break for lunch, I have two kind of lengthy exhibits

10  I would like you to take a few minutes to look at

11  it.  It will probably take us some time to look at

12  it.  And I will ask you some questions about it and

13  then we can break for lunch.

14      A    That's right.

15           MS. LANG:  I will mark these as 6 and 7.

16           (Exhibit 6 was marked for identification.)

17           (Exhibit 7 was marked for identification.)

18      A    (Examining document.)

19           MR. HERRON:  This is Mark Herron on the

20      phone.  Can you describe what 6 and 7 are so I

21      can make notes?

22           MS. LANG:  Sure.  They are both e-mail

23      chains from Leon County.  One is -- the top

24      e-mail is from June 27, 2019, from Christopher

25      Moore to Alessandra Shurina, and the top e-mail

1                  TOSHIA BROWN

2       on the second -- on Exhibit 7 is from July 9,

3       2019, again from Christopher Moore to

4       Alessandra Shurina.

5            MS. DAVIS:  Neither one contains anyone

6       from the Department of State.

7            MS. EBENSTEIN:  They were introduced

8       yesterday at Supervisor Early's deposition as

9       exhibits.

10           MR. HERRON:  I know, I am just trying to

11      correlate what you are looking at with what

12      I've got in my hands.

13      A    Do you want me to read this one first?

14 BY MS. LANG:

15      Q    The second one is a continuation of that

16 e-mail chain actually, so I think it would make

17 sense for you to look at both.

18      A    Okay.

19           (Discussion off the record.)

20 BY MS. LANG:

21      Q    I know this is a lot of information and

22 it's not from your office.  But it had some -- it

23 raised some questions about the data that I wanted

24 to ask you about.

25           First, on page 5 of Exhibit 7 -- I will

1                    TOSHIA BROWN

2    probably just work off of Exhibit 7 since that

3    includes Exhibit 6 -- is that first e-mail chain

4    about the research, and it says at the beginning

5    that the front office has been getting a lot of

6    interstate felon packets.  Earlier you testified

7    that at some point interstate felony matches had

8    been put on hold.  Did they go back --

9        A    Yes.

10       Q    -- did they go off hold at some point?

11       A    Not to my knowledge, they didn't go off

12   hold.  I know that there were some DOC that had

13   interstate on them, but when we halted this, we were

14   not supposed to be sending any interstate until we

15   got clarification.

16       Q    It seems like it was an error if Leon

17   County received interstate felon packets?

18            MS. DAVIS:  Objection.

19       A    We were sent them earlier, but then we

20   were told not to be sending them.

21   BY MS. LANG:

22       Q    Right.  But this is in June that Leon

23   County reports receiving interstate felon packets,

24   and I believe your testimony earlier was that you

25   were instructed to stop sending them back in

1                    TOSHIA BROWN
2   February.
3       A    Correct.
4       Q    So if they were receiving them in June,
5   that was in error?
6       A    An error.
7       Q    Okay.  Perhaps I've already asked this,
8   but have you heard specifically about concerns that
9   the DOC information might include people for whom
10  charges were -- are withheld?
11      A    Not specifically withheld, so no.  Maybe
12  just concerns that there was no judgment.
13      Q    Okay.  And has your office investigated at
14  all whether or not the DOC database might include
15  people for whom they have felony charges, but those
16  charges were withheld?
17      A    My direct office, no.  IT has looked at
18  file specs and had communications with DOC.
19      Q    Okay.  Is that what led to the change in
20  use of only incarcerated individuals rather than
21  under supervision more generally?
22      A    The communication between -- I believe
23  between IT and DOC is what -- where we went just for
24  incarcerated.
25      Q    And are you aware of concerns that the DOC

1                    TOSHIA BROWN

2  database might include people -- the DOC sheets that

3  you received might include people who were charged

4  with felonies but were downgraded to misdemeanors?

5          MS. DAVIS:   Objection.

6      A    I am not concerned that there is not a

7  felony conviction associated with the match.  There

8  could be misdemeanors also, part of some of their

9  charges, but I am not -- but I have been told that

10 every match we get has felony convictions.

11 BY MS. LANG:

12     Q    But I think you testified earlier that you

13 didn't ask whether or not they were currently

14 serving time for a felony offense versus a

15 misdemeanor offense.

16     A    I didn't ask that, no.

17     Q    Do you know when your office plans to

18 return to sending matches for people on probation

19 and parole as well as in prison?

20     A    I don't know a date.  I know that the work

21 group has recently started with their meetings to

22 make some determinations about the fines and

23 restitution and such.  But -- so to answer your

24 question, no, I do not have a date.

25     Q    Okay.  Do you know if your office plans to

1                          TOSHIA BROWN

2    do that within the year of 2019?

3          A     I haven't been given a time frame and,

4    again, we created draft procedures and I have given

5    them to Director Matthews and that's where we stand

6    right now.

7          Q     On page 2 of Exhibit 7, Stephen Usztok

8    writes that they had received 66 felon packets so

9    far from the Division since they restarted, and of

10   those 66 we contacted Amber and invalidated 24.

11         A     Okay.

12         Q     Were you aware of this rate of

13   invalidation from Leon County?

14         A     Not that number, no.

15         Q     Did you know that Leon County was

16   invalidating?

17         A     No, I know Amber has had discussions with

18   some of the counties and if they were not

19   comfortable with the data or did not want to proceed

20   with noticing the voter, then it was up to them

21   whether or not to invalidate.

22         Q     Does the analysis that you read in

23   Exhibit 7 cause you any concern about the current

24   procedures in place for sending felony matches to

25   the counties?

1                     TOSHIA BROWN

2            MS. DAVIS:  Objection.

3      A    No.

4  BY MS. LANG:

5      Q    Why not?

6      A    Because, again, I have been told over and

7  over again that there is a felony record in the

8  match.

9      Q    Right, but people who have independently

10 investigated this have found that not to be the

11 case.  Isn't that what Exhibit 7 shows?

12           MS. DAVIS:  Objection.

13     A    That's what it states.  I haven't seen or

14 been able to do our own review or research on this.

15 BY MS. LANG:

16     Q    You've chosen not to do any research on

17 the information given to you by DOC; isn't that

18 right?

19           MS. DAVIS:  Objection.

20     A    We have not done any research.  I have not

21 done any research.

22 BY MS. LANG:

23     Q    Your office has not done any research on

24 the DOC matches?

25     A    The DOE has not, correct.

1                     TOSHIA BROWN

2      Q     But it appears that Leon County has?

3      A     Yes.

4      Q     And when they did that research they found

5  errors?

6            MS. DAVIS:  Objection.

7      A     Yes, that's what they are saying.

8  BY MS. LANG:

9      Q     Okay.  Does that at least suggest to you

10  that your office should investigate and do research

11  on the DOC matches?

12      A     I would like to see these matches.

13      Q     And so will your office go back and check

14  the judgments to see if the DOC matches are what the

15  DOC has told you they are?

16      A     We'll utilize all our resources to do our

17  review to determine the accuracy of this.

18      Q     Is there a specific timeline that the

19  county has to send out a packet after they receive a

20  felony match from you?

21      A     Seven days.

22      Q     What happens if they don't send it within

23  seven days?

24      A     It's in statute that they send it out in

25  seven days.  I do not know of any kind of

1                      TOSHIA BROWN

2    repercussion if they do not.

3              MS. LANG:  Okay.  Let's break for lunch.

4              (A recess took place from  12:00 p.m. to

5         1:10 p.m.)

6    BY MS. LANG:

7         Q    Before break we were talking a little bit

8    about issues that Leon County had identified with

9    the records that your office was providing.  And

10   earlier you testified that your office did

11   transition from looking at everyone under DOC's

12   supervision to only doing matches for people who are

13   currently incarcerated.  Is that right?

14        A    Yes.

15        Q    Okay.  I think you already answered this

16   question, but I couldn't remember.  Did you notify

17   or pull back the DOC matches that you had sent to

18   the counties for people who were on probation or

19   parole rather than incarcerated?

20        A    No.

21        Q    And did you let the counties know of the

22   potential errors in that data?

23        A    No.

24        Q    Okay.  We talked a little bit earlier

25   about the changes in the records that go out to

1                         TOSHIA BROWN

2    voters with notices of potential ineligibility for

3    felony convictions.  Did the actual notice that goes

4    out to a voter about their potential ineligibility

5    change after Amendment 4?

6              MS. DAVIS:  Objection.

7         A    Not to my knowledge.

8    BY MS. LANG:

9         Q    Okay.  Does your office draft those

10   notices?

11        A    I don't know that it is current practice

12   whether or not they are drafted.  I do recall there

13   were some e-mails going back and forth, but I don't

14   know what the final determination was.

15        Q    When were these e-mails going back and

16   forth?

17        A    Probably around January/February.  I saw

18   some things with Maria, Director Matthews.

19        Q    Okay.  I think you testified earlier that

20   for the moment your office is not removing anyone on

21   the basis of federal or out-of-state convictions; is

22   that correct?

23        A    We don't remove anybody.

24        Q    You are not sending matches to the

25   supervisors of elections based on federal or

1                      TOSHIA BROWN

2    out-of-state convictions; is that correct?

3        A    Correct.

4        Q    But for folks who -- but as a matter of

5    eligibility, what is your position as to people with

6    federal convictions, when do they become eligible to

7    vote?

8             MS. DAVIS:   Objection.

9        A    When someone registers to vote and they

10   fill out a voter registration application, and they

11   affirm that they have not been convicted of a felony

12   or, if they have, that their rights have been

13   restored either by executive clemency or by meeting

14   all the terms and sentence requirements within

15   Amendment 4, and their application is complete, and

16   their identifiable number is verified, then they

17   become an active voter.

18   BY MS. LANG:

19       Q    Yes.

20       A    Does that answer your question?

21       Q    I don't think so.  So if someone has a

22   federal conviction, how do they know if their rights

23   have been restored pursuant to Amendment 4?

24       A    Currently we are not processing the

25   federal convictions or the interstate convictions.

1                          TOSHIA BROWN

2      That is something that Director Matthews had

3      directed me and my staff to not process any further.

4      So how would they find out if they have completed

5      all terms of their sentence?  At this juncture, I do

6      not know.

7           Q    Okay.  But sitting here today, people with

8      federal convictions become eligible to vote if they

9      complete all terms of their sentence, is that your

10     understanding?

11          MS. DAVIS:   Objection.

12          A    I can't -- I am not sure because Maria was

13     doing -- Director Matthews, excuse me, was doing

14     some research on the other state laws versus

15     Amendment 4.  I don't know where that is.  And so

16     right now I don't know.  I can't answer that.

17     BY MS. LANG:

18          Q    What is the Secretary of State's position

19     on out-of-state convictions?  I know you are not

20     processing them, but if someone has an out-of-state

21     conviction, should they still rely upon whether or

22     not their rights were restored in the state of their

23     conviction as you testified was the case prior to

24     Amendment 4?

25          A    I don't know.  At this juncture, I don't

1                    TOSHIA BROWN

2  know.  I haven't been given the position of the

3  Department or from Maria.  It's in her court right

4  now.

5       Q    So the supervisors of elections haven't

6  received any guidance on that question either?

7       A    Not to my knowledge, no.

8       Q    Okay.  Is there any information available

9  to voters about their eligibility if they have an

10 out-of-state conviction?

11      A    Not to my knowledge, not unless a

12 supervisor, local Supervisor of Elections has

13 provided something.

14      Q    Okay.  Do you know what part of the

15 constitution Amendment 4 is codified in?

16      A    What part?

17      Q    Yeah.

18      A    No.

19           MS. LANG:  Okay.  I would like to mark

20      Exhibit 8.

21           (Exhibit 8 was marked for identification.)

22 BY MS. LANG:

23      Q    This is the new Florida voter registration

24 application as of July 1; is that correct?

25      A    Yes.

1                      TOSHIA BROWN

2       Q    Okay.  And box 2 now has three potential

3  options for checking if you have a -- about

4  felonies.  Is this a change from the prior

5  application form?

6       A    Yes.

7       Q    Okay.  What did the prior application form

8  say?

9       A    The prior application asked if you had

10  ever been convicted of a felony and, if you had, had

11  your rights been restored.

12       Q    Okay.  And now you have three options.

13  You can either affirm you have not been convicted of

14  a felony; you have been convicted of a felony, but

15  you've had your rights restored by the board of

16  executive clemency; or if I have been convicted of a

17  felony, I affirm my voting rights have been restored

18  pursuant to Section 4, Article 6 of the state

19  constitution, upon the completion of all terms of my

20  sentence, including parole or probation.  Is that

21  right?

22       A    Correct.

23       Q    Given that you don't know what part of the

24  constitution Amendment 4 was in, do you think the

25  average person knows what's in Section 4, Article 6

1                    TOSHIA BROWN

2    of the state constitution?

3              MS. DAVIS:   Objection.

4       A    Can you specify or rephrase?  What are you

5    trying to ask on that one?

6    BY MS. LANG:

7       Q    Do you think that the average person who

8    reads this knows what is in Article 6, Section 4 of

9    the state constitution?

10      A    I don't know that they do.

11      Q    You don't; is that correct?

12      A    I have read Amendment 4.  But what it's

13   reading here is that anybody who has completed all

14   terms of their sentence, including probation and

15   parole, I take that at face value that then you

16   would be eligible.  Of course, there are fees and

17   fines, restitution, and they are not on here.

18      Q    Do you think that perhaps fines, fees, or

19   restitution should be included in here since the

20   state requires payment of those?

21              MS. DAVIS:   Objection.

22   BY MS. LANG:

23      Q    I am going to restart.  Do you think that

24   this form should include payment of fines, fees, and

25   restitution since that is also a requirement under

1                      TOSHIA BROWN

2   SB7066?

3            MS. DAVIS:   Objection.

4       A    I don't think that I would be able to make

5   that determination whether or not the fees and fines

6   need to be included.   Before I would answer any of

7   these questions, if I was filling out a voter

8   registration application, I would do my research

9   before affirming and whatever that research may be,

10  contacting the Clerk of Court, FCOR, et cetera.

11  BY MS. LANG:

12      Q    Do voters have access to FCOR?

13      A    If they have -- they can contact FCOR.

14  They can pick up the phone and call.   There is a

15  line that voters can get -- anybody can get

16  information.   There's also a website if they have

17  access to a computer or to their smartphone.

18      Q    So as I understand your testimony, you

19  think that reading these requirements would require

20  you to do additional research into what all terms of

21  my sentence means?

22           MS. DAVIS:   Objection.

23      A    If I was not sure that all terms of my

24  sentence have been completed, then I would reach out

25  to the different agencies and try to obtain

1                        TOSHIA BROWN

2    information or some kind of validation that I had

3    met all terms of my sentence.

4    BY MS. LANG:

5        Q    Do you think some people might think that

6    all terms of my sentence would mean parole and

7    probation and not anything else?

8        A    They could, yes.

9        Q    If you had questions about the eligibility

10   requirements based on this section, would you maybe

11   consider calling the Secretary of State's office?

12            MS. DAVIS:   Objection.

13       A    Would I consider?   A person may consider

14   that because the Division of Elections is within the

15   Secretary of State's office; so, yes, it may be a

16   place that someone may start as well.

17   BY MS. LANG:

18       Q    What advice would the Secretary of State's

19   office give as to what -- as to how to determine if

20   you are eligible under Section 4, Article 6 of the

21   state constitution?

22       A    Our voter assistance hotline, if they were

23   to contact that hotline, we would direct them to the

24   Clerk of Court within the county that they were

25   convicted or to FCOR.

1                    TOSHIA BROWN

2        Q     Okay.   If a voter checks the second or

3   third box, does that affect at all how their

4   application is processed?

5        A     The second or third?

6        Q     Yes.

7        A     No, because they are affirming that they

8   had been convicted of a felony, but either they had

9   executive clemency or --

10        Q     So voter applications are processed

11   exactly the same regardless which box they check; is

12   that correct?

13        A     Say that again.

14        Q     Are voters' applications process'd the

15   same regardless of which box they check?

16        A     Right.   Correct.   If you check that you

17   were convicted but you had your rights restored by

18   meeting all terms of your sentence, you would be

19   eligible.

20             If you've got your rights restored by

21   executive clemency, you are eligible.

22             If you say that you've never been

23   convicted of a felony, then you are eligible;

24   however, the application would have to be complete

25   as well and then you would have to be your -- your

1                    TOSHIA BROWN

2   number would have to be validated.

3       Q    What is your understanding of the purpose

4   of these three different boxes on the form?

5            MS. DAVIS:  Objection.

6       A    From what I have -- what I have -- in

7   discussions and what I have been told, in

8   discussions with Director Matthews, that that was --

9   it had to be -- it had to be in there because it was

10  required by law, and so we had to modify.  Our old

11  application, though, is still accepted as well.

12  BY MS. LANG:

13      Q    Okay.  So from your perspective, the

14  separate boxes -- the only reason that you are aware

15  of for these separate boxes is that it was required

16  by law; is that correct?

17      A    That's all I have been told, that we had

18  to add them -- that we were told we had to add them

19  to the voter application.

20      Q    And nothing about which box is checked

21  affects how you process the application?

22      A    Not -- no.

23      Q    Okay.

24           MS. DAVIS:  That's a no in the affirmative

25      of correct?

1              TOSHIA BROWN

2         THE WITNESS:  Correct.

3         MS. DAVIS:  It's a no to the --

4    A    It doesn't matter what -- which box that

5    you check.

6    BY MS. LANG:

7    Q    Okay.

8         MS. DAVIS:  Sorry, that was just a couple

9         of negatives, for the record.

10   BY MS. LANG:

11   Q    Was the Secretary of State's office

12   involved in the drafting of SB7066?

13   A    I don't think -- I am not -- I am unaware

14   if they were or were not.  I am aware that

15   Dr. Matthews went to a lot of the meetings that were

16   held.  But I am not aware if she participated in

17   that or not.  I was not.

18   BY MS. LANG:

19   Q    Do you know if the Secretary's office

20   supported SB7066?

21        MS. DAVIS:  Objection.

22   A    I do not know.

23   BY MS. LANG:

24   Q    During the process of SB7066's passage,

25   was the Secretary of State's office asked for any

1                      TOSHIA BROWN

2    information about -- during the legislative process

3    for SB7066, was the Secretary of State asked for any

4    information?

5              MS. DAVIS:  Objection.

6        A    I know that -- all I know is that Maria,

7    Director Matthews, attended meetings during the

8    legislative section.  I think she may have even --

9    maybe did a presentation, I think.  I wasn't

10   involved in those either.

11   BY MS. LANG:

12       Q    Okay.  What's the effective date of

13   SB7066?

14       A    7066.  July 1st is when it was signed.

15       Q    And that's when it went into effect; is

16   that right?

17       A    Uh-huh.  Did I say July 1st?  Yes.  Yes.

18       Q    Do you know who Director Matthews gave a

19   presentation to?

20       A    I am not sure if it was the -- I am not

21   sure if it was the House or the Senate.

22       Q    But legislators?

23       A    Yes.

24       Q    Okay.  Other than the e-mails that we have

25   already reviewed from February and June, has your

1                     TOSHIA BROWN

2    office provided any additional guidance to

3    supervisors of elections about the implementation of

4    SB7066?

5        A    Since the June e-mails and the February

6    e-mails?  You are saying since then, right?  Not to

7    my -- not to my knowledge has anybody been

8    provided -- let me think.

9             I know that there was an e-mail that was

10   done like on June 26, or June 27, and I can't recall

11   if that was sent to my staff or if that was sent to

12   the supervisors.  I am thinking it went to my staff.

13       Q    Okay.  What was the contents of that

14   e-mail?

15       A    That was when we were going to be only

16   processing the incarcerated.

17       Q    In one e-mail to the supervisors, I recall

18   a reference to an upcoming memorandum on SB7066's

19   implementation.  Do you know if the Secretary plans

20   or if the Division of Elections plans to provide a

21   memorandum to the Supervisor of Elections on the

22   implementation of SB7066?

23       A    I haven't been involved in any of those

24   conversations.

25       Q    Given that the effective date of -- let me

Page 118

1                    TOSHIA BROWN

2   back up.

3            There are elections that are going to take

4   place in 2019 in Florida; is that correct?

5       A    In 2019?

6       Q    Yes.

7       A    Yes, we may have some special elections or

8   municipals.

9       Q    Some are scheduled in November/December of

10  this year?

11      A    They could be.

12      Q    And when is the -- do you know when the

13  registration deadline is for the presidential

14  primary?

15      A    I don't have that date right in my head.

16      Q    Mid February, does that sound right?

17      A    Because it's 29 days prior, so, yeah.

18      Q    Okay.  And given that SB7066 became --

19  went into effect on July 1, 2019, if a voter who has

20  outstanding fines or restitution and who is

21  currently registered because they registered prior

22  to July 1 votes in an upcoming election, would that

23  person be voting illegally?

24            MS. DAVIS:  Objection.

25      A    You are saying that they have outstanding

1                    TOSHIA BROWN

2  fines and fees or haven't completed all terms of

3  their sentence?

4  BY MS. LANG:

5       Q    Have outstanding fines and fees.

6       A    All I know is that currently you have to

7  have completed everything in the four corners which

8  includes probation, parole, fines, and fees.  So if

9  you have not completed those, then you would not be

10  eligible at that time to vote.

11       Q    Even if you are still in the voter

12  registration rolls, if you have not completed your

13  fines and fees you are not eligible to vote; is that

14  correct?

15       A    If you registered and you had not

16  completed your fines and fees and you are still on

17  the rolls, you should not have been registered until

18  you completed all that and become an active voter.

19       Q    Well, under SB7066, there is an explicit

20  carve out for people who register before July 1.  Do

21  you recall that?

22       A    I do recall that, but -- yes, I recall

23  that.  But I have not -- I am not as familiar with

24  that portion.  But, yes, I recall some vague

25  communications on that, yes.

1                    TOSHIA BROWN

2       Q    Fair enough.  And for what it's worth, I

3  don't think we disagree, I just want to make sure I

4  am clear.  There are folks who registered to vote --

5  would you agree with me that there are folks that

6  registered to vote before July 1 believing they

7  completed all terms of their sentence because they

8  were done with parole and probation?

9            MS. DAVIS:  Objection.

10      A    It's possible, yes.

11 BY MS. LANG:

12      Q    And if those folks remain -- those folks

13 are likely to remain on the rolls because you are

14 only removing people based on incarcerated status;

15 is that correct?

16      A    Currently we are only doing, yes, only

17 doing incarcerated.

18      Q    But those individuals are not eligible to

19 vote, is that also correct, if they have not

20 completed their fines and fees?

21      A     If they have not completed their fines and

22 fees or the conditions of their sentence, then they

23 would not be eligible.

24      Q    And if they voted, that would be voting

25 illegally?

1                    TOSHIA BROWN

2          MS. DAVIS:  Objection.

3     A    They shouldn't be registered until they

4 complete all their terms of their sentence.

5 BY MS. LANG:

6     Q    But your office isn't removing them at

7 this time?

8     A    Currently just incarcerated.

9     Q    Okay.  Do you know what kind of

10 consequences face people who vote illegally?

11    A    I believe it's a third-degree felony, and

12 I believe there's also a fine, like a monetary fine,

13 and maybe even some time served.

14    Q    I think you testified about this earlier

15 but just to make sure we are clear on the record.

16 Florida has a new voter registration form, but you

17 still accept the old voter registration form as

18 well?

19    A    Yes.

20    Q    You also accept the federal form; is that

21 right?

22    A    Yes, we do.

23    Q    And the federal form doesn't include these

24 three boxes.

25    A    That's correct.

1                         TOSHIA BROWN

2        Q    Do you know if the Secretary of State's

3   office has sent any information about Amendment 4 or

4   SB7066 to the Election Assistance Commission?

5        A    I don't know.

6        Q    You mentioned earlier that Amber, your

7   second in command, has drafted a set of proposed

8   procedures; is that right?

9        A    Correct.

10       Q    Okay.  When did she complete her draft of

11  those procedures approximately?

12       A    I am guessing.  Maybe two and a half weeks

13  ago, two weeks ago.

14       Q    And have you reviewed those procedures?

15       A    Yes, I was reviewing them.  We were both

16  reviewing them and when we finally finished, then we

17  sent them to Director Matthews.

18       Q    What topics do those procedures cover?

19       A    They talk about the phase 1, which phase 1

20  was the incarcerated which we are currently doing

21  right now.

22            They talk about phase 2 is the sexual --

23  felony sexual offenses and the murder.

24            And then we also have a section that

25  pertains to the crimes that you would have to meet

1                    TOSHIA BROWN

2   all terms of your sentence instead of having

3   executive clemency or your rights restored through

4   executive clemency.

5        Q    Is that phase 3?

6        A    I believe that's phase 3, yes.

7        Q    Is there a proposed timeline in those

8   procedures for rolling out phase 2 and phase 3?

9        A    There is not a proposed timeline.  The

10  proposal was to -- when we go to those procedures,

11  to be working -- it's called phase 1, phase 2, and

12  phase 3, and you probably saw it, similar to other

13  procedures, but to be working all those.

14       Q    Can you walk me through the proposed

15  procedures for felony sexual offense and murder?

16       A    Yes.  So if -- when the individual gets

17  the match, they get a potential felon match, they

18  would create it by getting the DAVID screen, they

19  would include a judgment, it would include CCIS.  If

20  the person is in DOC, they would include that

21  screenshot.  They still would check the FCOR site

22  just to make sure they have not -- paying clemency.

23            We also have some -- some statutes that I

24  believe were in 7066 for sexual offense and murder

25  that we have drafted, and that has been sent to

1                   TOSHIA BROWN

2    Director Matthews to look at.  And she is getting

3    legal's opinion on those.

4            But we would have to use those to make

5    sure that the offense fell under those statutes.

6        Q    So you drafted a list of statutes that

7    would fall under the requirements of SB7066 for

8    felony sexual offense and murder?

9        A    And murder, yes.  And those need to be

10   reviewed to make sure that they are accurate.

11       Q    Okay.  Do those procedures cover how your

12   office will address felony sexual offenses that are

13   federal convictions?

14       A    Not currently, no, they do not.

15       Q    Does your office have any plan to develop

16   such procedures?

17       A    Currently they are in Director Matthews'

18   hands.  I don't know if she's reached out to legal

19   or not to get some direction on how to process or

20   how to handle interstate or federal offenses.

21       Q    So as of yet, your office has no guidance

22   or procedures for how to determine if a federal or

23   out-of-state offense is a disqualifying offense

24   under SB7066?

25       A    Well, let me -- currently we have not been

1                     TOSHIA BROWN

2    given any direction to move forward with those, so I

3    have not received any direction on how to process

4    them.

5         Q    And you haven't included any information

6    about that issue in proposed procedures?

7         A    Those were not in -- no, we have not

8    included those.  Those procedures are for our staff

9    to go by.

10        Q    So if a person in Florida has a federal

11   conviction that's perhaps sexually related, what

12   guidance should they look to to determine whether or

13   not they are eligible to vote?

14        A    If you -- if an individual has -- and we

15   see this where an individual, it may be even an

16   out-of-state conviction or it could be a federal

17   offense, you will find where they may have a Florida

18   offense as well.  So if they had a Florida sexual --

19   felony sexual offense that fell under one of those

20   statutes, then we could process it accordingly.

21        Q    But for folks who don't have Florida --

22        A    They don't have a Florida offense?

23        Q    Yes.

24        A    Currently, right now, what my direction

25   has been from my director is that we are not

1                          TOSHIA BROWN

2    processing fed felons or interstate.

3        Q    Right, I understand that, but people out

4    in the world still want to register to vote if they

5    have federal or out-of-state convictions, so I am

6    wondering what guidance is available to those

7    individuals to determine if their offenses are

8    disqualifying under SB7066.

9        A    Currently, I don't have -- I have not been

10   provided with any guidance to provide anybody on

11   that because Maria, Director Matthews, is still

12   trying to obtain guidance herself on what the law --

13   do the people that are in another state have to go

14   by Florida's law or do they go by the state of

15   conviction?  And there are certain questions she

16   has.  So that's in her area right now.

17       Q    So folks in those circumstances don't have

18   any guidance right now?

19       A    We haven't provided any guidance.

20       Q    It would be the Division of Elections that

21   would provide guidance on those type of eligibility

22   questions, right?

23            MS. DAVIS:  Objection.

24       A    It could be from the Division of

25   Elections, it could be from Secretary of State's

1                    TOSHIA BROWN

2   office, it could be from supervisor's office.  I

3   don't know.

4   BY MS. LANG:

5        Q    Do the supervisors usually rely upon the

6   Secretary of State to provide uniform guidance about

7   voter eligibility?

8             MS. DAVIS:  Objection.

9        A    There are -- yes, sometimes they do.  Yes.

10  BY MS. LANG:

11       Q    Okay.  I know that you've looked at a

12  number of judgments because you often put judgments

13  in the felon packets; is that right?

14       A    I look at felon packets.  I don't create

15  them.

16       Q    But you are familiar with what judgments

17  look like?

18       A    Yeah, I know what a judgment looks like.

19       Q    Okay.  I am going to introduce a copy of

20  SB7066 so we can look at some of the language and

21  this will be Exhibit 9.

22            (Exhibit 9 was marked for identification.)

23            MS. LANG:  Starting on page 47.

24  BY MS. LANG:

25       Q    SB7066 defines all terms of completion to

1                    TOSHIA BROWN

2    include -- sorry, just one moment. (Examining

3    document.)

4            Actually starting on page 46 on to

5    page 47, it says, the completion of all terms of

6    sentence means any portion of a sentence that is

7    contained in the four corners of the sentencing

8    document.

9            Do you know which specific document is

10   being referred to when they say the four corners of

11   the sentencing document?

12   A    Well, we have never -- prior to

13   Amendment 4, we never had to include the sentencing

14   document.  Just looking recently at some of the

15   things like in CCIS that may have some of this

16   information, I have seen some things that are

17   sentencing documents.  So, yes.

18           MS. LANG:  Okay.  I introduce Exhibit 10.

19           (Exhibit 10 was marked for

20       identification.)

21           MS. LANG:  It's just an example of some

22       sentencing documents that I have.

23   BY MS. LANG:

24   Q    Do the format of these documents look

25   familiar to you?  I will give you a moment to look

1              TOSHIA BROWN

2    at them.

3        A    (Examining document.)

4             MS. DAVIS:  I think you might be missing a

5        page.

6             MS. LANG:  This is how it was provided to

7        me.

8        A    I don't see any judge's or clerk's

9    signature or fingerprints, but that just may be --

10   BY MS. LANG:

11       Q    There is a judge's signature on page 2.

12       A    I see.  I am sorry.

13       Q    Page 2 again.

14       A    Okay.

15       Q    The record can reflect there appears --

16   page 3 of 3 does seem to be missing from this

17   document, but in any event.

18            The third page in the exhibit I have given

19   you is a bold sentence at the top; is that correct?

20       A    Yes, it is.  Wait, I am sorry.

21       Q    It says page 1 of 2, but in the exhibit I

22   handed to you it is the third page.  It's a sentence

23   at the top, yes?

24       A    Yes, it does.

25       Q    Is there any information about fines or

Page 130

                         TOSHIA BROWN

1
2    fees or restitution on the page that is labeled
3    sentence?
4         A    I do not see anything.  I see that the
5    person will be -- to be in prison for two -- for a
6    term of two days; I do not see anything about the
7    fines and fees on the sentence page.
8         Q    But one page earlier there is a document
9    labeled charges, costs, and fees; is that right?
10        A    That's correct.
11        Q    And there's a list of approximately 410 --
12   a list that adds up to 410 legal and financial
13   obligations; is that correct?
14        A    Correct.
15        Q    And those include payments to the Crimes
16   Compensation Trust Fund, the Local Government
17   Criminal Justice Trust Fund, the Public Defendant
18   Application fee, and so on; is that right?
19        A    Correct.
20        Q    Looking at these documents, do you know
21   which of these fines and fees fall under the
22   requirements of SB7066?
23        A    No.
24             MS. DAVIS:  Objection.
25

1                    TOSHIA BROWN

2  BY MS. LANG:

3      Q    Given that the page that says sentence has

4  no information about fines and fees, would you

5  interpret that to mean that this person does not

6  have to pay the 410 in order to be eligible to vote?

7           MS. DAVIS:   Objection.

8      A    Again, I am not familiar with the

9  sentencing pages.  I would not -- I would always err

10 on the side of the voter.  So if I -- it's unclear

11 to me whether or not these have actually been

12 completed and paid.

13 BY MS. LANG:

14     Q    Well, that's a whole -- yes, I agree.  But

15 as an initial matter, the SB7066 says that you only

16 have to complete what's in the four corners of the

17 sentencing document, right?

18     A    Correct.

19     Q    So I am just wondering if you know which

20 documents count as the sentencing documents under

21 SB7066?

22     A    Not currently, no, I do not.

23     Q    Okay.  Does anyone at the Secretary of

24 State have guidance on that at this time?

25     A    No.  And that is part of the work group.

1                    TOSHIA BROWN

2       Q    Okay.  If a voter -- if this was -- if

3  this person had not yet paid their $410, how would

4  they determine whether or not they were eligible to

5  register to vote?

6            MS. DAVIS:  Objection.

7       A    At this point?  I do not know how they

8  would, unless they went to FCOR or to the Clerk of

9  Court to see if there was any information in their

10  databases that they had completed or paid all their

11  fines and fees.  I don't know --

12  BY MS. LANG:

13       Q    What if they knew they had not paid these

14  fines and fees?  How could they know if these fines

15  and fees are required to be paid under SB7066?

16       A    Well --

17            MS. DAVIS:  Objection.

18       A    I don't know how they would be able to get

19  that information.  I don't know if they would get

20  that from the Clerk of Court, if they were unsure.

21  It's in the four corners, but --

22  BY MS. LANG:

23       Q    Is part of the Secretary of State's job to

24  enforce and implement the election laws?

25       A    Yes.

1                    TOSHIA BROWN

2      Q    Is it the Clerk of Court's job to

3  interpret the election laws?

4      A    The Clerk of Court?  If it doesn't pertain

5  to them, no, I would say no.

6      Q    Okay.  Does the Clerk of Court have any

7  authority to tell voters what legal financial

8  obligations have to be paid under SB7066?

9           MS. DAVIS:  Objection.

10     A    I don't know.

11  BY MS. LANG:

12     Q    Okay.  Returning to the text of SB7066,

13  the -- as we noted earlier, completion of all terms

14  of sentence is defined as everything that's within

15  the, quote, four corners of the sentencing document

16  but SB7066 does go on to explain some things that

17  might be included.

18           And it indicates that one of those items

19  will be full payment of fines or fees as ordered by

20  the court as part of the sentence or ordered by the

21  court as a condition of any form of supervision

22  including, but not limited to probation, community

23  control, or parole.

24           And then the following section says that

25  the financial obligations acquired under

Page 134

TOSHIA BROWN

1

2   subparagraph A or subparagraph B include only the

3   amounts specifically ordered by the court as part of

4   the sentence and do not include fines, fees, or

5   costs that accrue after the date the obligation is

6   ordered as part of the sentence.

7           Did you -- did I read that correctly?

8       A   Yes.

9       Q   Okay.  So it will ultimately be the job of

10  your bureau to implement this law and determine who

11  is eligible or not eligible under these

12  requirements; is that right?

13          MS. DAVIS:   Objection.

14      A   We are currently working with other

15  agencies or the work group is working with other

16  agencies trying to determine how to determine

17  whether or not the people have paid or the

18  individuals have paid all their fines and fees,

19  where the information is kept.

20          So at this juncture, I don't know where

21  you go, a one-stop shop, to get something that says

22  you've paid all your fines and fees.  I know there

23  is a financial summary in the CCIS that has the

24  fines and fees that will show you you owe this much,

25  you've paid this much, or you've paid it at all.

1                        TOSHIA BROWN

2    However, restitution is always blank.  And I don't

3    know where that information -- where you can obtain

4    that information.

5    BY MS. LANG:

6       Q    Right.  But eventually under phase 3 it

7    will be the responsibility of the bureau to send

8    felony matches based on those who have not completed

9    their terms of sentence; is that correct?

10      A    Correct.  At some point we will be sending

11   files that do include fines and fees.

12      Q    Is there any guidance available at your

13   office yet on what payments related to conditions of

14   forms of supervision, including but not limited to

15   probation, community control, or parole will be

16   included under SB7066?

17           MS. DAVIS:  Objection.

18      A    Can you say that one more time a little

19   slower?

20   BY MS. LANG:

21      Q    Sure.  I will try to say it in more

22   laymen's terms.

23           In SB7066 in 5B here, there is inclusion

24   of fines and fees that are ordered as part of the

25   sentence, but then the second part of that phrase

Page 136

1                              TOSHIA BROWN

2    says, or that are ordered by the court as a

3    condition of supervision and conditions of probation

4    or parole and whatnot.

5              Do you know what conditions of probation,

6    parole, or community control might be included in

7    what has to be paid under SB7066?

8        A    No.

9        Q    Okay.  And do you know how that might be

10   squared with the 5C that says that SB7066 won't

11   require the payment of fines and fees that accrue

12   after the date the obligation is ordered?

13             MS. DAVIS:  Objection.

14       A    At this juncture I still -- we haven't

15   come up with procedures for this because we are

16   still trying to gather data and that's part of our

17   work group.

18   BY MS. LANG:

19       Q    Okay.  Are you on that work group?

20       A    No.

21       Q    Okay.  Who is on the work group?

22       A    The Secretary of State, Director Matthews,

23   we have two people from the Clerk of Courts, two

24   Supervisor of Elections, representative from FCOR,

25   Department of Corrections, and I believe FDLE.

1                      TOSHIA BROWN

2        Q    Do you know how many times they have met

3   so far?

4        A    They met this past Monday I believe was

5   the first time.  I believe it was this past Monday.

6   It was Monday they met.  They have three more

7   meetings.

8        Q    And when are those meetings scheduled for?

9        A    The next one, I believe, is in September.

10  I think there is one each -- I am not sure of the

11  dates of the meetings, but I know one is in

12  September, I don't know if they have two in

13  September.  I know that one of them is, so I don't

14  know the dates offhand.

15       Q    Okay.  So as far as you know, they are

16  only planning on meeting four times total?

17       A    That's what I have been told, yes, four

18  times.

19       Q    Okay.  Has your office been asked -- has

20  your bureau been asked for any information to help

21  inform the work group?

22       A    Maria, Director Matthews, has been pulling

23  all the information that she needs for her

24  presentation.  She just recently did a presentation

25  this first work group.  So she's been pulling

1                          TOSHIA BROWN

2    information.  I don't know that it was asked by the

3    work group for her to pull it or if it was just

4    information she was pulling for her presentation.

5         Q    Okay.  Did she ask you for any information

6    to inform that presentation?

7         A    No, she did not.

8         Q    Do you know if she created a PowerPoint or

9    some materials?

10        A    There was PowerPoint, yes.

11        Q    Have you seen that PowerPoint?

12        A    I did see that PowerPoint.

13        Q    Did the PowerPoint touch on the fines and

14   fees issue?

15        A    It -- what I saw on the PowerPoint and I

16   don't know if it was in final -- totally final

17   product or whatever, but there was diagrams of pre

18   Amendment 4 and post Amendment 4, the different

19   agencies that we utilize to obtain data from.  There

20   very well could have been, I am not certain, but

21   there could have been something where these are the

22   requirements for these types of crimes that she had

23   in there.

24        Q    In the procedures, the draft procedures

25   that Amber put together, I think we talked about

1                          TOSHIA BROWN

2    what is in inside of phase 2 of those procedures.

3    What is in phase 3 of those procedures?

4         A    So phase 3 would be the crimes that have

5    to complete all parts of their sentence.  And again,

6    it discusses the different documents which are the

7    same documents that we have to obtain.  Now we would

8    need to have -- I told you in the past we used to

9    not get the sentence, we needed just the judgment.

10   So we would need the judgment and the sentence.

11        Q    Okay.  So you are imagining that the

12   documents you would need would be DAVID, CCIS, DOC

13   if available, FCOR, the judgment, and the sentence?

14        A    And the sentence, as well as the summary,

15   financial summary portion that I was telling you

16   about that's in CCIS, we would need that as well.

17        Q    And that financial summary comes from

18   CCIS.  Remind me what CCIS is.

19        A    It's the Clerk of Court's site that has

20   judgments, demographics, the different case file or

21   case numbers.

22        Q    Okay.

23        A    All the information.

24        Q    Do you know how regularly CCIS is updated?

25        A    I don't know.  I am not sure.  The

1                    TOSHIA BROWN

2  documents and the information is updated by all

3  67 Clerk of Courts, so I am not sure if it's a

4  scheduled update.

5      Q    And you mentioned earlier that the number

6  for restitution is always zero in CCIS?

7      A    Yes, anything that I have seen has been

8  zero.  I was told by FCOR, I believe it was Steve

9  Hebert from FCOR that CCIS does not capture

10 restitution.

11     Q    Are you aware of any database that can

12 have up-to-date information about payment of

13 restitution?

14     A    No.

15     Q    Is there public access to CCIS?

16     A    Again, I do not know if the public can

17 utilize it.  If they can, I am sure that it's a

18 different access.  They are not going to have all

19 the personal information in it.

20     Q    Are you aware of errors or inconsistencies

21 in CCIS data about current balances owed?

22     A    Not -- no, not in the fines and fees.  At

23 this juncture, no.  My -- my knowledge with fines

24 and fees is very limited.  We are still trying to

25 find out where to obtain it and we have recently

1                     TOSHIA BROWN

2    seen that you can get the summary of the financial,

3    but I don't know about any errors.  We haven't used

4    that ever before.

5         Q    Can you describe to me a little bit what

6    the CCIS financial summary looks like?  Is it one

7    total and one balance owed or is it broken down,

8    et cetera?

9         A    No.  It's a -- it's a little rectangle and

10   it will have fines and fees, fines and fees written

11   here, and right here you will have restitution.  It

12   may say, for example, that you owe -- the fines and

13   fees are $630, so total.  The ones I have seen have

14   not been broken down.  Then it will say how much had

15   been paid.  So you may have $100 that's been paid,

16   how much is owed.  I have seen where the balance is

17   zero.

18             But when you get to the restitution, the

19   restitution is all zeros; I haven't seen anything

20   with any information in the restitution portion.

21        Q    Okay.  And the CCIS data is the only data

22   you currently have available to you about financial

23   obligations?

24             MS. DAVIS:  Objection.

25        A    CCIS is the only database that I know that

1                        TOSHIA BROWN

2    has that information in it.  I haven't been told of

3    any other databases or I am not aware of any other

4    databases.

5    BY MS. LANG:

6         Q    Do you know if fines and fees includes

7    costs as well, like court costs?

8         A    I don't know.

9         Q    Okay.

10        A    I don't know.

11        Q    Do you know if that category might also

12   include supervision fees or costs?

13        A    I don't know.

14             MS. DAVIS:  Can we take a quick break?

15             MS. LANG:  Sure.

16             (A recess took place from  2:04 p.m. to

17        2:10 p.m.)

18   BY MS. LANG:

19        Q    We are going to go back on the record.

20   Before we took a break we were talking about the

21   records that you have for in-state convictions

22   related to fines and fees, and so far all that you

23   have been able to see in your materials was the CCIS

24   financial summary.  Is that right?

25        A    Yes, that's all I have seen.

1                     TOSHIA BROWN

2        Q    And that summary has totals and total

3   balance owed, but does not have disaggregated fines

4   and fees and costs?

5        A    Correct.

6        Q    And that also does not include information

7   about restitution?

8        A    I have not seen anything on restitution.

9   It has restitution, just no totals.

10       Q    Okay.  And are you aware that the Clerk of

11   Court sometimes sends outstanding fines or fees to

12   collection agencies?

13       A    I have heard that.

14       Q    Are you aware that some clerks, at least

15   some clerks of court do not have -- do not track

16   payment of fines and fees after they are sent to

17   collection agencies?

18       A    No.

19       Q    Does CCIS show any information about fines

20   and fees that have been converted to civil liens?

21       A    Not to my knowledge.

22       Q    I want to refer back to Exhibit 3.

23       A    Did you say 3?

24       Q    Yes, on page 3.  In this e-mail Stephen

25   Usztok writes -- it's towards the top e-mail, it's

1                      TOSHIA BROWN
2    the second-to-the-last sentence, and it says Amber
3    said that there is not a single reliable source of
4    information on whether former felons have paid all
5    financial obligations.
6              Is that your current understanding of what
7    records are available for Florida convictions?
8              MS. DAVIS:   Objection.
9        A    I do not -- I do not know whether these
10   sources are reliable or not.  The only one that I am
11   aware of currently is the stuff that I told you
12   about CCIS with the financial summary.  How reliable
13   it is, I don't know.
14   BY MS. LANG:
15       Q    Okay.  So you don't know how reliable it
16   is?
17       A    No.
18       Q    But you do know that it doesn't appear to
19   have complete information about restitution?
20       A    Correct.
21       Q    Okay.  And you do know that it doesn't
22   disaggregate by individual fine or fee?
23       A    Yes, I have not seen any that were
24   itemized.
25       Q    Do you know what sources are available to

1                     TOSHIA BROWN

2    you to determine whether or not somebody with an

3    out-of-state conviction has paid all their financial

4    obligations?

5         A    No.

6         Q    Do you have any resources available to you

7    right now that would tell you whether or not

8    somebody with an out-of-state conviction had paid

9    their fines and fees?

10        A    No.

11        Q    What about for federal convictions?

12        A    No.

13        Q    Do you know what agencies the Secretary is

14   considering making data sharing agreements with to

15   implement SB7066?

16        A    I know that there has been some

17   communication with FCOR at a high level.  They are

18   part of that work group that will be discussing what

19   each agency has available.

20        Q    Okay.  Anyone else?

21        A    I am only aware of currently with FCOR.

22        Q    Under the statute, you are required to

23   determine whether or not the sources determining a

24   voter's potential ineligibility are reliable; is

25   that correct?

1                    TOSHIA BROWN

2       A    The sources where we obtain the

3   information?

4       Q    Yes.

5       A    I am trying to think.

6       Q    Sure.

7       A    Yes, we only obtain information from

8   different agencies that we feel are reliable, but we

9   still have to deem that the information -- that

10  voter is that felon by additional demographics.

11      Q    But it's your responsibility to determine

12  that the sources themselves are credible and

13  reliable?

14           MS. DAVIS:   Objection.

15      A    I do not determine whether or not they are

16  credible and reliable, but we are using sources such

17  as Department of Corrections and Florida Department

18  of Law Enforcement and Clerk of Court sites.

19  BY MS. LANG:

20      Q    And how does your office -- what criteria

21  does your office use to determine whether or not

22  sources are credible and reliable?

23      A    I am not aware of how a source is

24  determined to be credible and reliable.  We -- in my

25  area, we are determining whether they match, the

1                          TOSHIA BROWN

2     information that is matched is credible and

3     reliable.

4          Q    So who decides whether or not the sources

5     themselves are credible and reliable?

6              MS. DAVIS:  Objection.

7          A    I don't know.

8     BY MS. LANG:

9          Q    You mentioned earlier that older

10    convictions can sometimes require you to call for a

11    judgment rather than see it on CCIS; is that right?

12         A    Correct, yes.

13         Q    For those older convictions, do you know

14    how you would obtain financial information like the

15    summary that's available on CCIS?

16         A    We would put a request in to the Clerk of

17    Court.

18         Q    And do you know if the Clerk of Court has

19    that type of up-to-date financial summary

20    information for convictions that old?

21         A    I do not know because I have not ever put

22    a request in.

23         Q    Okay.  In the CCIS summary, can you tell

24    which fines or fees were assessed for felony

25    convictions versus misdemeanor convictions?

1                     TOSHIA BROWN

2      A     You are talking about the little --

3      Q     Uh-huh.

4      A     We would -- when you pull up CCIS, you are

5  looking, there will be various case numbers.  So it

6  will be under the case number for that judgment.  So

7  you will know that it goes to that judgment.

8      Q     Are there ever judgments and case numbers

9  that include both felony and misdemeanor

10 convictions?

11     A     You could have a judgment that different

12 counts on the judgment may have been one count,

13 Count I may have been downgraded to a misdemeanor,

14 and Count II and III are a felony.

15     Q     Would the financial summary disaggregate

16 which were for the misdemeanors versus the felonies?

17     A     I don't know.

18     Q     Do you know if the financial summary

19 breaks out the fines and fees that were issued at

20 sentencing from those that accrued later?

21     A     At this juncture, no, I don't know.

22     Q     Do you know if CCIS always reflects

23 changes to the sentence that have been made by the

24 judge?

25     A     I don't know that it's always reflective

1                      TOSHIA BROWN

2    and updated in CCIS.

3        Q    Okay.  Do you know how CCIS reflects fines

4    or fees or restitutions that have been converted to

5    community service?

6        A    No.

7        Q    Are you familiar with any materials or

8    databases that are available to you to determine

9    when community service has been completed?

10       A    No.

11       Q    Is it fair to say that sitting here today,

12   you and your office do not know how to determine if

13   a person with outstanding fines and fees is eligible

14   to vote or not under SB7066?

15            MS. DAVIS:  Objection.

16       A    It is correct to say that we do not know

17   where to obtain that information currently except

18   for the CCIS summary, that is the only means to

19   assist us that I am aware of at this juncture.

20   BY MS. LANG:

21       Q    Right.  But I think your testimony earlier

22   today was that you are not totally clear yet on what

23   fines and fees are required to be paid under SB7066;

24   is that right?

25       A    That's correct.

1                       TOSHIA BROWN

2        Q     And you are not entirely clear on how data

3   can or cannot be disaggregated by the fines that

4   have to be paid and the fines that don't have to be

5   paid?

6        A     Correct.

7        Q     And your office doesn't have any guidance

8   for voters about how they can determine whether or

9   not their outstanding fines and fees are

10  disqualifying at this time?

11       A     You mean like what their fines and fees

12  are that are still outstanding?  Correct, I don't

13  know how to obtain that information at this time.

14       Q     Even if they have that information, you

15  don't have the guidance to say whether or not those

16  outstanding fines are disqualifying or not?

17       A     I would not be able to say that they are

18  still outstanding from the information that I have

19  seen in CCIS because I don't know how complete or

20  what it entails.

21       Q     Right.  And even if they knew what was

22  outstanding, your office doesn't have clear guidance

23  on which fines and fees must be paid in order to be

24  eligible to vote?

25            MS. DAVIS:  Objection.

1                    TOSHIA BROWN

2       A    I know that there are some fines and fees

3  that are listed, but it's -- I am still unclear as

4  to what fines and fees have been completed.

5  BY MS. LANG:

6       Q    Right.  And we've looked earlier at a

7  sentencing document and you were not clear as you

8  sit here today on which ones of those fines and fees

9  must be paid.

10      A    Correct.

11      Q    Okay.  And so the Secretary has no

12 guidance for voters on determining which of those

13 fines and fees have to be paid?

14           MS. DAVIS:  Objection.

15      A    At this juncture, I have not been told.

16 BY MS. LANG:

17      Q    And so -- but voters who are not eligible

18 under SB7066, you testified should not be voting in

19 elections today?

20      A    Correct, if they are not eligible, yes.

21      Q    But there is not guidance on determining

22 their eligibility if they have outstanding fines and

23 fees?

24           MS. DAVIS:  Objection.

25      A    We are not given any guidance.

1                          TOSHIA BROWN

2    BY MS. LANG:

3         Q     Okay.  Would it be fair to say that

4    somebody with outstanding fines and fees, who did

5    not know if those fines and fees fell under the

6    requirements of SB7066, cannot currently register to

7    vote because they can't affirm that their rights

8    have been restored?

9         A     You are saying they -- the individual does

10   not know whether or not their fines and fees --

11        Q     Are disqualifying.

12        A     -- are disqualifying.  If they are unsure

13   whether or not there are disqualifying fines and

14   fees, because they may be eligible, they may not be

15   eligible.  But you are affirming that you know that

16   you are eligible, so I would not register to vote.

17        Q     So those individuals should not be

18   registering to vote?

19              MS. DAVIS:  Objection.

20        A     They need to find out if they are

21   eligible, if those fines and fees fall under or are

22   exempt from it.

23   BY MS. LANG:

24        Q     But the Secretary can't tell them that?

25              MS. DAVIS:  Objection.

1                        TOSHIA BROWN

2    BY MS. LANG:

3         Q    At this time.

4         A    At this time, currently.  Currently at

5    this time I have not been told.

6              MS. DAVIS:  Objection.

7    BY MS. LANG:

8         Q    Earlier you mentioned that some counties

9    initiate their own removal process for felony

10   matches; is that right?

11        A    Correct.

12        Q    And some counties are continuing to do

13   that even after the passage of Amendment 4?

14        A    Some, yes.

15        Q    Do you know if those counties are matching

16   people based on outstanding fines and fees?

17        A    I do not.

18        Q    Do you know if they are matching people

19   based on probation or parole?

20        A    No.

21        Q    Do you know what resources those counties

22   are using for determining felony matches?

23        A    I know that they -- these counties receive

24   information from the Clerk of Court, a list of

25   people that were recently convicted.  In order to

1                        TOSHIA BROWN

2    obtain the judgment, they would go to the Clerk of

3    Court and some have access to the DAVID system where

4    they can match demographics and then they would use

5    the voter registration system as well.

6         Q     Has your --

7         A     And clemency, they always check clemency.

8         Q     Right.  Has your office received questions

9    or complaints from the public about SB7066?

10        A     I know that we've had phone calls from

11   individuals, calls where -- I don't know that they

12   were really complaints, but I know that we've had

13   calls where the individual is inquiring how do I

14   find out if I've met all terms of my sentence.  And

15   if they do call or our hotline, we have been

16   directed to have them reach out to FCOR, or the

17   Clerk of Court.

18        Q     So the Secretary is not providing any

19   guidance, just sending them to FCOR or Clerk of

20   Court; is that correct?

21             MS. DAVIS:  Objection.

22        A     Director Matthews said that that was what

23   we did and how we handled or directed the

24   individuals to FCOR and Clerk of Court.

25

1                          TOSHIA BROWN

2    BY MS. LANG:

3        Q     Are calls that come into the hotline

4    documented?

5        A     Yes, they are.  We document these calls.

6    We have an internal database where they can document

7    like what type of call.  It's a -- it's not a

8    summary, but it's a --

9        Q     Do you know if your office has any costs

10   of estimates yet for the implementation of SB7066?

11       A     No, I don't know.

12       Q     Okay.  As you understand it, what are the

13   responsibilities of the work group that we

14   discussed?

15       A     Well, from what I understand, it is for

16   the organizations, the different organizations,

17   FDLE, DOC, FCOR, Department of State, to talk about

18   their processes, procedures, to offer any insight of

19   possible data they may have or information in it,

20   including fines and fees.

21            The Clerk of Court may be able to say we

22   do keep track of this or to offer insight so that

23   all the agencies know what each agency's

24   responsibility is and what they have access to or

25   accessible to maybe share.

Page 156

TOSHIA BROWN

1

2     Q     Has there been any discussion in your

3 office about what to do if it turns out there are no

4 reliable documents to show the payment of

5 restitution?

6     A     No.

7     Q     Have there been any documents as to what

8 to do if there is no reliable documentation of the

9 number of the fines and fees that have to be paid by

10 SB7066?

11     A     Not at this juncture.  They are still

12 in -- I won't call it discovery, but discovery with

13 the work group.

14     Q     Okay.  Are you aware of the work group

15 being able to identify reliable and complete sources

16 of information with respect to fines, fees, and

17 restitution?

18     A     Right now, I am not aware of.

19     Q     My understanding is that the work group is

20 supposed to come up with a set of recommendations;

21 is that right?

22     A     Correct.

23     Q     When are they supposed to do that?

24     A     I know they have the four meetings.  We've

25 had one, so they have three more meetings.  I don't

1                        TOSHIA BROWN

2   know if there will be a continuation of meetings or

3   not, but right now it's four.  I haven't been told a

4   date -- when the recommendation, there may be a date

5   but I haven't been told what the date is.

6        Q    Do you know which supervisors of elections

7   are on the work group?

8        A    Nassau County is one of them, Vicki Addis.

9        Q    Okay.

10       A    And the other one is I think one of our

11  newer supervisors, and I can't remember what his

12  name is.

13       Q    Do you know which clerks of court are on

14  the committee?

15       A    I don't know the two counties.

16       Q    It says on page 55 of SB7066 that the

17  report is due on November 1, 2019.  That's towards

18  the end of the page on page 55.  Do you see that?

19       A    Yes, I do.

20       Q    Do you have any reason to believe that

21  they are not planning to submit recommendations by

22  November 1?

23       A    No, I do not.

24       Q    Okay.  And then in that same section, it

25  says that they should submit findings, conclusions,

1                        TOSHIA BROWN

2  and recommendations for the legislature to the

3  president of the Senate and the Speaker of the House

4  of Representatives.

5          Is it your understanding that additional

6  legislation might be required in order to implement

7  this law?

8      A    I have not been told that.

9          MS. LANG:  Okay.  We are going to take

10      five minutes.

11          (A recess took place from  2:32 p.m. to

12      2:55 p.m.)

13  BY MS. LANG:

14      Q    Ms. Brown, I just have a few final

15  questions for you and then I think my colleague has

16  a few final questions for you, and then we'll turn

17  it over to your attorney and anyone on the line who

18  wishes to ask questions.

19          I would like you to refer back to

20  Exhibit 8, which is the new voter registration form.

21  I would like you to refer back to the three boxes.

22          What would you recommend that somebody --

23  what box should someone check if they have an

24  out-of-state or felony conviction for which they

25  received clemency and therefore had their rights

Page 159

1                     TOSHIA BROWN

2  restored?

3       A     An out-of-state clemency in the other --

4       Q     Other state.

5       A     In the other state?  And they receive that

6  clemency by the executive clemency board in that

7  state?

8       Q     It often isn't an executive clemency

9  board, it's often the governor's office or some

10  other agency, or someone with a federal conviction

11  who received a pardon --

12      A     If I had been convicted in another state

13  and I had received clemency, however I received it

14  in another state, then I would have said that I had

15  received clemency.

16      Q     You would check the box 2 even though that

17  says the Board of Executive Clemency?

18      A     Yes, but prior to doing that, if I was

19  unsure, because it does say the Board of Executive

20  Clemency and, like you said, it could be a governor

21  could have granted clemency that way, I would

22  probably reach out to that other state or even reach

23  out for our FCOR to see if there was any guidance

24  they could provide us.

25      Q     Okay.  So would you agree that it's a

1                          TOSHIA BROWN

2    little confusing for people with out-of-state

3    convictions that have clemency what box they should

4    check?

5          A    I would have a question.

6          Q    What if somebody with an out-of-state

7    conviction had their voting rights automatically

8    restored under law?

9          A    I would have to ask that question as well.

10         Q    So you don't know what box they should

11   check sitting here today?

12         A    I would say you are correct.

13         Q    Okay.

14              I would like to mark as Exhibit 11.

15              (Exhibit 11 was marked for

16         identification.)

17   BY MS. LANG:

18         Q    This is the Secretary of State's responses

19   to the plaintiffs in this case to a series of

20   interrogatories that we asked.

21              And I would like you to turn the page to

22   the third page, I suppose, where it says responses

23   and objections to interrogatories, number 1, and it

24   says identify people who were consulted in answering

25   these interrogatories.

1                         TOSHIA BROWN

2              And if you flip the page, you are listed

3      as one of the people that was consulted on the

4      interrogatories.  I believe you testified earlier

5      that you weren't actually involved in the answering

6      of these interrogatories.

7         A    Correct.  I was not aware that I was

8      answering it for this.

9         Q    Okay.  So you think maybe you were

10     consulted but you didn't know it was for this

11     purpose?

12        A    I don't recall being told that it was for

13     a -- is this a deposition or a case?

14        Q    That's fair enough.  These are lawyer

15     terms.  So this is a document in the case that this

16     deposition is for, and one of the forms of discovery

17     in lawsuits is you can issue questions to the other

18     side and they have to answer.  So we asked some

19     questions of the Secretary of State, the Secretary

20     of State answered, and these were the answers.

21        A    Okay.  To answer your question, I did not

22     know it was specific to this.  I talk to Director

23     Matthews daily, she has questions about all kinds of

24     things, not just Amendment 4.  So it's not abnormal

25     for me to be answering questions.  I just didn't

1                         TOSHIA BROWN

2    know it was in regards to this.

3         Q    So I would like you to turn to the

4    response to question number 8.  And question

5    number 8 it says, please state what records, data,

6    and other information are or will be provided to the

7    supervisors of elections as the basis for

8    demonstrating that a registered voter has

9    outstanding costs, fines, fees, restitution, or any

10   or financial obligation assessed by a court as part

11   of a Florida, federal, or out-of-state felony

12   conviction and therefore should be removed from the

13   list of eligible voters.

14            And the response says, the Division

15   provides and will continue to provide the

16   documentation, including judgment and sentence

17   orders and whatever other documentation upon which a

18   voter's potential ineligibility is based.

19            My understanding is that at this current

20   moment, the Division is not providing judgment and

21   sentence orders to the supervisors of elections; is

22   that true?

23        A    Correct.

24        Q    So this is incorrect as to what is

25   currently being provided?

1                       TOSHIA BROWN

2             MS. DAVIS:  Objection.

3        A    We are currently not providing the

4    judgment or the sentence.

5             MS. LANG:  I have no further questions.  I

6        believe my colleague has a few.

7                  DIRECT EXAMINATION

8    BY MS. EBENSTEIN:

9        Q    Ms. Brown, thank you for patience today.

10   I am Julie Ebenstein, I am counsel for the group of

11   plaintiffs.  I have a very small number of questions

12   I just want to follow up with.

13            You mentioned that the Department of State

14   has a voter assistance hotline?

15       A    Yes.

16       Q    Who at the Secretary of State's office

17   receives the inquiries that come in through that

18   voter assistance hotline?

19       A    The bureau of registration services, my

20   staff answer.  The OPS currently do not -- I

21   mentioned we had six OPS, seven, but six filled,

22   they do not currently answer it, but our career

23   service staff answer the voter assistance hotline.

24       Q    That would be you, Amber, and I'm

25   forgetting --

Page 164

                    TOSHIA BROWN

1

2      A    Me and Amber do not answer, we are not

3  part of the voter assistance hotline.  My

4  administrative assistant is not part of the voter

5  assistance hotline.  But all other employees within

6  the compliance and regulation and the voter services

7  section answer that.

8           I do have two supervisors.  One of those

9  positions is vacant currently.  They do not answer

10 that unless we start getting high call volume.

11     Q    Okay.  And you said those calls were

12 documented somewhere, when a call comes in, there is

13 some record of the inquiry?

14     A    Correct.

15     Q    Is there a public e-mail address that

16 voters -- where voters can submit questions?

17     A    We have the BVRS help e-mail.  That's an

18 e-mail that comes in and we have staff that monitor.

19     Q    Is it the -- which staff monitor that

20 e-mail address?

21     A    I have a staff member that monitors it,

22 J.C. Fishbough is a current staff member and he has

23 a backup in the event he is out for vacation or

24 whatever.

25     Q    And approximately how many individual

1                    TOSHIA BROWN

2    inquiries do you receive on the phone line per

3    month, let's say?

4         A    Per month?

5         Q    Or per week, if that's an easier

6    estimation.

7         A    Well, currently -- it's not an election

8    year, so it's not an election year -- daily -- and

9    it can range from right now five to 20, sometimes

10   more, sometimes less, that's daily.

11        Q    You saw -- you predicted my next question.

12   Has the volume of those inquiries by the voter

13   assistance phone line changed since Amendment 4

14   passed?

15        A    We were getting more calls initially

16   January 8 and after, it's kind of gotten normal

17   again.  I haven't gone and pulled the stats to look

18   at the incline, but I do know just that we were

19   getting more initially.

20        Q    Okay.  And do the volume of inquiries

21   change after SB7066 passed?

22        A    Not to my knowledge.

23        Q    Does the volume of inquiries usually

24   change right before book closing?

25        A    Yes.

TOSHIA BROWN

1

2     Q    And right before election day?

3     A    Yes.

4     Q    How would you characterize that change?

5     A    We get, especially during election, the
election day people are wanting to know where the
location of their Supervisor of Elections is.  If
they had any kind of issue with the polling
location, they will call to let us know.

        But most of the time it is -- probably a
couple weeks prior to an election we get calls of
what is my voter status, or I received an
application in the mail from an organization voter
participation center, am I eligible or not
eligible -- excuse me, am I an active voter, am I
currently registered, calls like that.  But a lot of
contact your supervisor of elections.

     Q    Is there a different contact point for
supervisors of elections to make queries?  I assume
they don't go through the publicly available phone
line.

     A    They -- most of the time they will --
depending on the question, they will either call
Amber Marconnet, they will call me some, some of
them have Maria's number, legal's number.  It just

1                        TOSHIA BROWN

2    depends on the type of call.  A lot of the

3    procedural type questions come to us, anything with

4    election laws goes to legal.

5         Q    Are those calls documented?

6         A    No.

7         Q    Have you seen an increase or decrease in

8    the number of calls coming from supervisors of

9    elections since Amendment 4 became effective?

10        A    Not recently.  We are not getting a lot of

11   calls.  But we do get -- I mean, daily we'll get one

12   or two calls.

13        Q    And did you see an increase or decrease in

14   the calls from supervisors of elections following

15   passage of SB7066?

16        A    No.

17        Q    You said that those calls aren't

18   documented.  Is there any way that your office

19   tracks trends in those calls; so, for instance, if a

20   number of supervisors are calling with the same

21   issue, concern, or question, is that documented

22   anywhere?

23        A    Not to my knowledge.

24        Q    You testified earlier about the felon

25   packets that you send to Supervisors of Elections.

1                    TOSHIA BROWN
2   Why did your office make the change from sending
3   full packets -- sorry, let me rephrase that.
4            Why did your office make the change from
5   sending packets that include the judgments to
6   sending only a DOC screenshot in June?
7       A    We, meaning Amber and myself, were
8   directed by Maria Matthews that we were only to
9   include the DOC screenshots because these -- DOC had
10  stated to us that these individuals are felons and
11  that they are currently incarcerated.  So there was
12  no question with that group of people whether or not
13  they had completed all the terms of their sentence
14  or not.  Even if it had been a sexual felony or a
15  murder charge, they were currently incarcerated so
16  they wouldn't have received executive clemency, even
17  though we still check.
18      Q    And a couple of questions about federal
19  convictions.  I believe you testified earlier that
20  you receive reports on federal convictions?
21      A    Uh-huh.
22      Q    Are those reports from all federal
23  jurisdictions or only federal convictions within
24  Florida courts?
25      A    We get those from the Southern and Middle

1               TOSHIA BROWN

2    and the Northern.  So those are the ones that I am

3    aware that we receive.  And then we get our

4    out-of-state.

5        Q    Just to make sure that we are using the

6    terms in the same way.  If, for example, there was a

7    conviction from the Southern District of New York,

8    so that's a federal court in New York, would you

9    have access to that federal conviction?

10       A    If they sent it to us, we would.  And I

11   don't have a list of all the courts or the

12   jurisdictions that send them to us.  But, yes, if

13   they got it to us and they had information that this

14   was a Florida person, we would work it like any

15   other one.

16       Q    Is your access to the federal convictions

17   in the Northern, Middle, and Southern districts of

18   Florida automatic?  Can you access a database?

19       A    No.

20       Q    But those three jurisdictions regularly

21   send over information?

22       A    Yes.

23       Q    Okay.  When you get information on

24   convictions from out of state, whether those are

25   state convictions in other states or federal

1                    TOSHIA BROWN

2  convictions from other federal jurisdictions, do the

3  states offer that voluntarily or is there a request

4  sent to that jurisdiction from your office?

5       A    No.  They provide those to us.  We don't

6  request it.

7       Q    Is there a way for supervisors of

8  elections to request information from an

9  out-of-state jurisdiction -- information on

10  convictions from an out-of-state jurisdiction?

11            MS. DAVIS:  Objection.

12       A    If there is -- I don't know that they are

13  doing that.

14  BY MS. EBENSTEIN:

15       Q    Do you know if any other states or federal

16  jurisdictions outside of Florida are offering

17  supervisors of elections access to information on

18  people's past convictions the way that they have

19  voluntarily offered it to the Division of Elections?

20       A    I don't know.  I am not aware.

21       Q    Okay.  And does your office have access

22  to -- I may have asked.  Does your office have

23  access to databases, to any other state's databases?

24  Is there any exchange criteria?

25       A    No.  No, we do not.

1              TOSHIA BROWN

2        MS. EBENSTEIN:  Those are all the

3   questions I have.  Thank you very much.

4        MS. DAVIS:  Anybody on the phone?

5        MR. HERRON:  This is Mark Herron, I don't

6   have any questions.

7        MS. DAVIS:  Going once, going twice.  All

8   right.  Nobody on the phone has any questions.

9   I do not have any questions for you, Ms. Brown.

10        Was there something else?

11        MS. LANG:  I just wanted to put on the

12   record, we have used about -- under five hours

13   of your deposition time.  We received 12,000

14   pages of documents yesterday that were in your

15   possession.

16        I didn't actually receive them because

17   they were only sent to one plaintiff group, so

18   I haven't seen them at all.  So we would like

19   to keep the deposition open in case we have

20   questions related to those documents.  It's not

21   guaranteed that we will, but we may.

22        MS. DAVIS:  We object to keeping it open,

23   but we'll continue to discuss that at a later

24   time.  But as far as right now, there is an

25   objection to that.

1          TOSHIA BROWN

2      MS. LANG:  Then the last thing I wanted to

3  make sure we got on the record before we close

4  up is that there are a number of documents that

5  you very helpfully identified in our deposition

6  today, things that you referenced like new

7  draft procedures, the spreadsheets of various

8  inquiries from voters about SB7066; so we are

9  happy to send a list of those documents, and

10  hopefully your office will be able to provide

11  them.

12      MS. DAVIS:  We will look at the list and

13  we will get you whatever is responsive.

14      The other thing is you've only been

15  deposed once before.  We are going to ask --

16  you have the option to read the transcript of

17  this deposition to make sure that the great

18  court reporter accurately transcribed your

19  answers and that uh-huhs were either a yes or a

20  no as appropriate and make any corrections on

21  that type of basis.

22      I would recommend that you read just to

23  make sure that everything is correct.

24      THE WITNESS:  Okay.

25      MS. DAVIS:  We'll read.

Page 173

1                    TOSHIA BROWN

2

3

4

5          (Proceedings concluded at 3:12 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   ///

25   ///

Page 174

1                        TOSHIA BROWN

2                    CERTIFICATE OF OATH

3

4   STATE OF FLORIDA            )

5   COUNTY OF LEON              )

6

7

8

9          I, the undersigned authority, certify that

10  the above-named witness personally appeared before

11  me and was duly sworn.

12

13          WITNESS my hand and official seal this

14  5th day of September, 2019.

15

16

17

18                      *Sandra Nargiz*

19          _____

20          SANDRA L. NARGIZ, RPR, RMR, CRR, CCR
            Commission #GG172788
21          EXPIRES: APRIL 18TH, 2022

22

23

24

25

Page 175

TOSHIA BROWN

CERTIFICATE OF REPORTER

STATE OF FLORIDA      )

COUNTY OF LEON       )

1    I, SANDRA L. NARGIZ, Registered
Professional Reporter, certify that the foregoing
proceedings were taken before me at the time and
place therein designated; that my shorthand notes
were thereafter translated under my supervision; and
the foregoing pages numbered 1 through 175 are a
true and correct record of the aforesaid
proceedings.

    I further certify that I am not a
relative, employee, attorney or counsel of any of
the parties, nor am I a relative or employee of any
of the parties' attorney or counsel connected with
the action, nor am I financially interested in the
action.

    DATED this 5th day of September, 2019.


*Sandra Nargiz*
_____

SANDRA L. NARGIZ, RPR, RMR, CRR, CRC
Notary Public

1                          ERRATA SHEET

2      Case Name:

3      Deposition Date:

4      Deponent:

5      Pg.  No. Now Reads      Should Read  Reason

6      ____ ____ _____     _____   _____

7      ____ ____ _____     _____   _____

8      ____ ____ _____     _____   _____

9      ____ ____ _____     _____   _____

10     ____ ____ _____     _____   _____

11     ____ ____ _____     _____   _____

12     ____ ____ _____     _____   _____

13     ____ ____ _____     _____   _____

14     ____ ____ _____     _____   _____

15     ____ ____ _____     _____   _____

16     ____ ____ _____     _____   _____

17     ____ ____ _____     _____   _____

18     ____ ____ _____     _____   _____

19     ____ ____ _____     _____   _____

20

21                            _____

22                            Signature of Deponent

       SUBSCRIBED AND SWORN BEFORE ME
23     THIS ____ DAY OF _____, 2019.

24     _____

25     (Notary Public)  MY COMMISSION EXPIRES:_____