IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA

KELVIN LEON JONES, et al.,

    Plaintiffs,

vs.

    Consolidated Case No.
    4:19-cv-00300-RH-MJF

RON DeSANTIS, in his official
capacity as Governor of
Florida, et al.,

    Defendants.
_____

ROSEMARY McCOY, et al.,

    Plaintiffs,

vs.

RON DeSANTIS, in his official
capacity as Governor of
Florida, et al.,

    Defendants.
_____

D E P O S I T I O N

o f

MIKE HOGAN

taken on behalf of Plaintiffs

August 28, 2019

Job No. 166566

1

2

3                    D E P O S I T I O N

4                          o f

5                      MIKE HOGAN

6            taken on behalf of Plaintiffs

7

   DATE:           August 28, 2019
8

   TIME:           10:03 a.m. to 3:39 p.m.
9

   PLACE:          Office of the General Counsel
10                  City Hall
                    117 West Duval Street, Suite 480
11                  Jacksonville, Florida  32202

12 BEFORE:          Dawn A. Hillier, RMR, CRR, CLR
                    Notary Public - State of
13                  Florida, at Large

14 JOB NO:          166566

15

16

17

18

19

20

21

22

23

24

25

APPEARANCES:

ATTORNEYS FOR PLAINTIFFS OSBORNE McCOY & SHEILA
SINGLETON

     NANCY ABUDU, ESQUIRE
     CAREN SHORT, ESQUIRE (via telephone)
     SOUTHERN POVERY LAW CENTER
     150 East Ponce de Leon Ave.
     Decatur, Georgia  30030


ATTORNEY FOR GRUVER PLAINTIFFS

     JIMMY MIDYETTE, ESQUIRE  (via telephone)
     AMERICAN CIVIL LIBERTIES UNION FOUNDATION
     118 West Adams Street
     Jacksonville, Florida  32202


ATTORNEYS FOR GRUVER PLAINTIFFS

     LEAH ADEN, ESQUIRE
     JOHN CUSICK, ESQUIRE  (via telephone)
     NAACP Legal Defense and Educational Fund
     40 Rector Street
     New York, New York  10006


ATTORNEYS FOR MIKE HOGAN

     JASON TEAL, ESQUIRE
     CRAIG FEISER, ESQUIRE
     REGULATORY & CONSTITUTIONAL LAW DEPARTMENT
     117 W. Duval Street
     Jacksonville, Florida  32202

1

2    APPEARANCES:  (continued)

3    ATTORNEY FOR SECRETARY OF STATE

4         ASHLEY DAVIS, ESQUIRE (via telephone)
          DEPUTY GENERAL COUNSEL
5         FLORIDA DEPARTMENT OF STATE
          500 South Bronough Street
6         Tallahasee, Florida  32399

7


8
     ATTORNEY FOR DEFENDANTS MANATEE COUNTY AND SARASOTA
9    COUNTY

10        MORGAN BENTLEY, ESQUIRE (via telephone)
          BENTLEY & BRUNING
11        783 South Orange Avenue
          Sarasota, Florida  34236
12


13

14   ATTORNEY FOR DEFENDANT ALACHUA COUNTY

15        ROBERT SWAIN, ESQUIRE (via telephone)
          ALACHUA COUNTY ATTORNEY'S OFFICE
16        12 SE 1st Street
          Gainesville, Florida  32601
17


18

19   ATTORNEY FOR LEON COUNTY

20        MARK HERRON, ESQUIRE  (via telephone)
          MESSER CAPARELLO
21        2618 Centennial Place
          Tallahassee, Florida  32308
22

23

24

25

INDEX

                                                    PAGE

WITNESS - MIKE HOGAN                                   6
DIRECT EXAMINATION BY MS. ABUDU                        6
CERTIFICATE OF OATH                                  209
REPORTER'S CERTIFICATE                               210

EXHIBITS

Exhibit 1    Florida State Constitution        104
             Article VI Suffrage and Elections

Exhibit 2    February 11, 2019 Matthews/SOE    140
             List email

Exhibit 3    May 6th, 2019 email string        145

Exhibit 4    June 7, 2019 Matthews/SOE List    152
             email

Exhibit 5    June 2019 email string            161

Exhibit 6    "new" Florida Voter Registration  192
              Application

REPORTER'S KEY TO PUNCTUATION:

    --  At end of question or answer references

        interruption.

    ...  References a trail-off by the speaker.

         No testimony omitted.

    "Uh-huh" "Um-hum" References affirmative sound.

    "Huh-uh" "Um-um"  References negative sound.

1                    MIKE HOGAN

2                    MIKE HOGAN,

3     was called as a witness, and having first been duly

4     sworn, was examined and testified as follows:

5               THE WITNESS:  Yes, ma'am.

6               COURT REPORTER:  Thank you.

7                    DIRECT EXAMINATION

8     BY MS. ABUDU:

9          Q     All right.  Well, good morning, again,

10    Mr. Hogan.

11         A     Good morning.

12         Q     Just so we can get it on the record, my name

13    is Nancy Abudu.  I represent the McCoy set of plaintiffs

14    in this case, as I know we have a number of parties.  So

15    Rosemary McCoy and Sheila Singleton.  And we are here to

16    take your deposition.

17               Now, I understand you received a copy of the

18    notice of deposition; is that correct?

19         A     Yes, ma'am.

20         Q     All right.  Have you ever been deposed before?

21         A     You know, I'm trying to think back.  I don't

22    think so.  I may have attended one, but I wasn't the one

23    answering the questions, but I think I would remember it

24    if I had one.

25         Q     Okay.  All right.  Well, just some basic

1                    MIKE HOGAN

2  instructions, then.  Obviously I'm going to be asking

3  you a series of questions.  And you are expected to

4  answer those questions as fully, as comprehensively as

5  you can.

6        A    Okay.

7        Q    It's very important that you allow me to

8  finish my question and then I will make sure I don't

9  interrupt you when you answer the question because, as

10 you know, this is being recorded by the court reporter.

11       A    Okay.

12       Q    So, again, in terms of verbal answers, yes,

13 no, full statements.  No "uh-huh" noises.  That doesn't

14 really transcribe very well.  Okay, sir?

15            During the questioning, I wouldn't be

16 surprised if your attorney objects to some of the

17 questions.  Unless those questions involve anything that

18 would be considered attorney-client privilege for the

19 most part, he will note his objection for the record,

20 but you are still expected to answer the question as

21 fully as possible.

22       A    Okay.

23       Q    If I ask a question that you don't understand,

24 just let me know.  I'll do my best to clarify the

25 question so that your answer, again, can be as

MIKE HOGAN

1
responsive to my question as possible.

3     A     Okay.

4     Q     All right.  And unless you state otherwise,

5 I'm going to assume that you understood the question as

6 I asked it.  Okay?

7     A     All right.

8     Q     Now, we talked about taking some breaks during

9 the deposition.  If at any time you're feeling tired or

10 you want to consult with counsel, you can let me know

11 and we will make some accommodations for that.

12     A     Okay.

13     Q     But I do imagine that during the day, we will

14 take some breaks.  And, of course, if we're nearing the

15 lunch hour, we can make sure that you get some food in

16 your belly.  I don't want you here starving for the day.

17     A     All right.  I have plenty of reserve, I think.

18     Q     Okay.  Good.

19           So as we get underway, did you take any

20 medication today before --

21     A     No, ma'am.

22     Q     All right.  Are you under any medication that

23 might affect your ability to understand and respond to

24 my questions?

25     A     No, ma'am.

MIKE HOGAN

1   

2     Q   Okay.  Did you review any documents in

3 preparation for your deposition today?

4     A   Reread all the documents that were sent to us

5 earlier by you.

6     Q   Okay.  And what documents were those, please?

7     A   The interrogatories and any mail, any email

8 from you, yeah.

9     Q   And because there are a number of other

10 parties in this case, did you read any documents

11 provided from any other party to the lawsuit?

12     A   No.  Um-um.  No, ma'am.

13     Q   So just the documents that I sent to you?

14     A   Yes.  Um-hum.

15     Q   Any documents reviewed from someone who was

16 not a party to this lawsuit?

17     A   No.

18     Q   Okay.  Any documents that were in your

19 possession that, again, not provided by me, not provided

20 by anybody in this case, but that you otherwise

21 reviewed?

22     A   No, ma'am.

23     Q   Okay.  Did you discuss, in preparation for

24 your deposition, any issues related to this deposition

25 with someone other than your attorneys?

1                       MIKE HOGAN

2       A      Staff.

3       Q      And your staff?

4       A      Um-hum.

5       Q      Okay.  And can you identify which members of

6  your staff with whom you spoke?

7       A      Yes, ma'am.  Arzada Haynes.  Bobbie Henry, and

8  Robert Phillips.

9       Q      Okay.  Henry and Phillips.  And what is

10 Ms. Haynes' title, please?

11      A      She is the supervisor over our records

12 department.  And Bobbie Henry is our specialist on

13 felons.

14      Q      Okay.

15      A      And Robert is the chief assistant to the

16 supervisor.

17      Q      Okay.  All right.  And can you provide me some

18 information as to generally what you all discussed?

19      A      Just went over the facts that -- of our

20 procedures.

21      Q      And what procedures in particular?

22      A      Dealing with felons.  Any issue dealing with

23 felons.

24      Q      Okay.  All right.  Well, let's start a little

25 bit with your personal and professional background.  Can

MIKE HOGAN

1  you, again, just state your full name and title for the

2  record.

3  A    Sure.  It's Mike Hogan, Joseph Michael Hogan.

4  And I'm Supervisor of Elections for Duval County.

5  Q    All right.  And what is your education

6  background?

7  A    I have a degree in zoology from the University

8  of South Florida.  So if you want to talk about frogs,

9  I'm ready.

10 Q    Okay.  Well, that is not today's topic, but I

11 appreciate that.  Any other degrees that you hold?

12 A    I had an AA degree from junior college here.

13 And I have a certification from the State of Florida as

14 a supervisor.  I'm not sure that's a degree, but it does

15 carry letters at the back of my name.

16 Q    Okay.  And when you say "supervisor," can you

17 be more specific?

18 A    Supervisor of Elections.

19 Q    Okay.  And where were you born and raised?

20 A    Right here.

21 Q    Okay.  From Jacksonville?

22 A    Yes, ma'am.

23 Q    All right.  And have you lived anywhere else

24 in the United States?

MIKE HOGAN

1

2    A    Only when I was away at school.

3    Q    Okay.  And where was that, again?  I

4 apologize.

5    A    Went to the University of South Florida to

6 graduate.  But my first year, I went to Memphis State

7 University [sic].  So I was in Tennessee for about nine

8 months.

9    Q    And have you lived anywhere outside of the

10 United States?

11   A    No.

12   Q    Okay.  So never in the military or anything

13 like that?

14   A    No, ma'am.  Um-um.

15   Q    All right.  So let's talk a little bit about

16 your employment history before you became the Supervisor

17 of Elections.

18   A    My gosh.

19   Q    Dating back as far as you can go.

20   A    I worked for A&P as a bag boy for seven years

21 while in high school and college.  I also worked for a

22 trucking company loading trucks.  Back then, there was

23 no weight limit, so it was, you know, very heavy work.

24        My first real job was -- I was a

25 schoolteacher.  After I graduated, I taught science at a

1    MIKE HOGAN

2  private school.  Then I went to work trying to use my

3  degree with the State of Florida, the health department.

4  And so I was with the Duval County, and later the Clay

5  County Health Department.

6        And then I went to work with Southern Bell.

7  And I was there 23 years.  And I had -- I went in in

8  sales and rose through the rank, and went to about five

9  different departments and came out a manager in --

10  actually, 1997.  They had -- it's when my last official

11  day was there.  But I went on a sabbatical leave, and

12  went to work for Holmes Lumber.  It's now called

13  Builders FirstSource.  I was there about three years.

14  Then I worked for W.W. Gay for about a year and a half.

15        During that time, I served eight years on the

16  Jacksonville City Council and then was in the Florida

17  Legislature for three years.  And I came back home and

18  ran for tax collector.  I was tax collector for two

19  terms, eight years.  And then I was appointed by

20  Governor Scott to be the chairman of the Florida Public

21  Employees Relation Commission, PERC.  And then I came

22  back home and ran for Supervisor of Elections in 2015.

23  And was just re-elected unopposed in 2019.

24      Q    Okay.  So when you were with the Jacksonville

25  City Council, my understanding is that's divided into

MIKE HOGAN

1
2    districts; right?

3        A    Yes, ma'am.

4        Q    So which district --

5        A    At that time, it was District 12.

6        Q    Okay.  What is it now?

7        A    I'm not sure that the numbers changed.

8        Q    Okay.

9        A    But of course the boundaries have changed

10   pretty significantly.

11       Q    And did you ever have to go through any kind

12   of a special election during that -- during your tenure

13   on the council while you were running?  Or did you do --

14       A    No, ma'am.  When it ran, it was regular time.

15       Q    Okay.  And while you were with the House of

16   Representatives, you say you were there for three years?

17       A    Um-hum.

18       Q    Is that correct?  Okay.

19            Did you ever introduce any bills during your

20   time there?

21       A    Yes, I did.

22       Q    Okay.  Can you remember some of them?

23       A    Goodness gracious.  I've passed five in my

24   first session and I can't -- I can't tell you all of

25   them.  But a lot of them had do with health.  I was --

MIKE HOGAN

because of my background in science, I was vice chairman
of the committee on health. I'm trying to think of the
name. They keep changing the names of all their
committees. But I introduced a bill dealing with taking
tests with infants, newborn infants for certain diseases
and potential for cancer and that type of thing.

I had a bill on -- it was really a carry-over.
If you recall, back in the early -- in late 1990s, in
the early 2000s, there were a lot of children being left
in a trash can or on a porch or whatever. And the
legislature came up with an idea of allowing people to
drop off a baby without any questions at certain sites,
typically hospitals and clinics and that type of thing.

The sites were limited and therefore,
inadvertently, there's never a good, perfect bill the
first time out, it seems like. Some counties didn't
have any of those facilities. And so I introduced a
bill that allowed them to drop off at a fire station and
where we have first aid, typically. And so that was --
those were two.

I had -- when I was on the City Council, I had
a problem with flooding in one of my districts. And it
should have taken two to three years to get this fixed.
Because of all the crazy things in the law, it took us

1                MIKE HOGAN

2 almost eight years.  And so I introduced a bill that

3 would accelerate the permitting process when houses had

4 been damaged by floods as a result of these creeks that

5 have silted over time and lost their capacity to hold

6 water.

7         And right now, I couldn't tell you.  I can't

8 think of all the others.  I had five in the first year,

9 I think two in the second year, and then I was chairman

10 of ethics in elections my third year.

11         And I carried the HAVA bill and some of the

12 election changes that took place for the state.  And I

13 can't claim the bill.  I was a chairman.  It was my job

14 to shepherd it through my committee and then also work

15 with my Senate counterpart, so...

16     Q    Okay.

17     A    That's a thumbnail sketch.

18     Q    Yeah.  No.  So in addition to the Help America

19 Vote Act bill that you helped at least to pass, were

20 there any other election-related bills that you were

21 involved in?

22     A    No, I don't think so.

23     Q    Okay.  You might -- I believe you said you

24 were also a tax collector at some point?

25     A    Yes, ma'am.  Um-hum.

1                            MIKE HOGAN

2       Q     Okay.  So what would you say were the main

3  sources or are the main sources of revenue for the City

4  of Jacksonville?

5       A     Property taxes.

6       Q     Property?

7       A     Yes.  Um-hum.

8       Q     Any other source?

9       A     Well, there's -- someone sent me -- I wish I

10 had it, it's about 40 different taxes that are around.

11 But there are multiple taxes.  Of course, you've got

12 business taxes that relates to local businesses.  You

13 have tangibles.  You have personal property.  You have

14 service tax, public service tax.

15            I also collected everything from meter --

16 parking meter receipts to payments for renting a City

17 facility.  So in Duval, because we're consolidated, the

18 tax collector collects a lot more than most of the other

19 states -- I mean, other counties in the state.

20      Q     Okay.

21      A     More items, more specific items.

22      Q     And did you touch or deal with any revenue

23 that what was generated from the criminal courts?

24      A     No, ma'am.  All that money goes through the

25 clerk of the courts.

1                    MIKE HOGAN

2    Q   Okay.  So did you ever work with the clerk of

3 the courts in your capacity as a tax collector?

4    A   No.

5    Q   Now, were you -- I didn't hear you say this.

6 Were you ever appointed to the statewide constitutional

7 commission at some point?

8    A   I'm sorry.  Yes, ma'am, I was.  I didn't

9 consider that a job.  A privilege.  But that was the

10 taxation budget review commission.  They meet every

11 20 years.

12    Q   Okay.  And so what were your responsibilities

13 on the commission?

14    A   I was a commissioner.  I did chair the

15 drafting committee.  And that's after we had voted on

16 all the bills.  Then we had to take -- take up each of

17 those bills and draft it so that the language would be

18 permissible by the courts and be allowed to be used on

19 the ballot.

20       I had three or four items that I had presented

21 to the committee as a -- I mean, to the commission as a

22 commissioner.

23       That's about it.

24    Q   Okay.  Did you deal with any election-related

25 proposals during your time on the commission?

MIKE HOGAN

1

2     A     Don't think so.  I don't remember anything

3     that was election-related.

4     Q     Okay.  All right.  Well, let's focus a little

5     bit on your current job --

6     A     Okay.

7     Q     -- as Supervisor of Elections.  Is that the

8     only employment position that you have?  Or is it a --

9     A     Right.  Yes, ma'am.

10    Q     All right.  So it's a full-time job?

11    A     Full-time job.

12    Q     All right.  And you said you were elected in

13    2015.

14    A     That's correct.

15    Q     All right.  Unopposed.

16    A     No.  In 2019, I was elected unopposed for --

17    re-elected, actually.

18    Q     Okay.  Re-elected --

19    A     In 2015, I had an opponent.

20    Q     Okay.  Got it.

21          Now, had you had any previous experience

22    running elections?

23    A     The Public Employees Relations Commissions

24    [sic] ran elections for representation of unions.  And

25    very similar, not on the same scale, obviously.  I think

1                    MIKE HOGAN

2  our largest election involved 9,000 voters.  But we

3  had -- we had voter record lists and we had, you know,

4  precincts, basically, and so forth and so on.  But that

5  was, I would say, comparing a cherry to a watermelon as

6  it relates to 650,000 voters in Duval County.  But the

7  structure itself was there.  It just was on a much

8  smaller scale.

9       Q    So what made you decide to run as Supervisor

10 of Elections?

11      A    Actually, several supervisors in the past were

12 good friends and they all wanted me to run for

13 supervisor.  In fact, Tommie Banks, who was tax -- I

14 mean the supervisor for a long time, called me before

15 she had made the public announcement that she was not

16 going to seek re-election, and asked me to run for her

17 seat.  And that's what sparked that idea.

18      Q    Okay.  Now, how big is your current staff?

19      A    Well, it depends on the cycle.  On election

20 day, it's over 2,000.  But for most of the year, it's

21 around 31 to 39.

22      Q    Okay.

23      A    We have a lot of part-time and seasonal.

24      Q    And can you describe some of the actual

25 positions within your department?  I mean, earlier, you

MIKE HOGAN

1

2  said you have a felon specialist, you've got a chief

3  assistant.  What are some of the positions within the

4  department?

5     A    Well, some specialize in mail ballots.  Some

6  of them -- most of the work is records.  Obviously we're

7  not in election cycle every year and every month.  And

8  so the records are very important.  And that's the bulk

9  of our organization.

10        Then we have an IT department, which is

11  becoming, obviously, based on the last few years, more

12  and more important about protecting us from

13  cybersecurity attacks.  And everything is done, you

14  know, with computers now, everything.  Tabulations and

15  data are very important to us.  And so that's probably

16  the second-largest department.  And it only has three in

17  it.

18        And then I have outreach, about three people

19  working.  And then they pull in poll workers to go with

20  them when we do voter drives.  And we have to visit the

21  schools every year, the Duval County public schools, and

22  also we go to the private high schools and colleges.

23  And we encourage 16 and 17 year olds to preregister and

24  register, you know, anyone that's eligible and offer

25  applications to vote.

MIKE HOGAN

1

2      Q      Okay.  So you mentioned that you have an

3      in-house felon specialist.  And again, apologies, can

4      you repeat that person's name?

5      A      That's Bobbie Henry.

6      Q      Okay.  And how long has he been with your

7      office?

8      A      She has been with us way before me.  So I'm

9      not sure how many years.  Maybe 20.

10     Q      Okay.  And to your knowledge, has she always

11     held this particular position?

12     A      Well, she held it when I got there.  I don't

13     know how long she had held that position.  But she's

14     excellent.

15     Q      And is that her primary responsibility?

16     A      Yes.  Um-hum.

17     Q      Meaning that's all that she does?

18     A      Well, no.  There's nothing in our office that

19     is singular.  I mean, everybody has to put on different

20     hats, depending on what cycle we're in.  Bobbie

21     probably, though, is the most homogenized in her work in

22     that she does probably 90 percent of the time, she's

23     dealing in records and felon issues.

24     Q      So is Ms. Henry the main point of contact for

25     the Secretary of State when it comes to felon records?

MIKE HOGAN

1

2     A     Well, she interfaces with Amber.  I never can

3  pronounce Amber's last name.  And if I did, you would

4  probably enter it wrong in the record.  But she's the

5  primary contact, yes.

6     Q     Okay.  Now, just to be clear, all of the

7  members of your staff are hired?  Or are there any who

8  are elected?

9     A     All are hired.  None are elected.

10     Q     Okay.  And hired by you?

11     A     Yes, ma'am.

12     Q     All right.

13     A     Now, for -- I deal with and through the City

14  HR Department.  And so we'll get -- you know, many of

15  our candidates will be coming through that process.

16     Q     So how would you describe the onboarding of

17  your staff in terms of the training?  They get hired,

18  it's their first day or their first week.  What is that

19  process like for them as they get to know what their job

20  responsibilities are?

21     A     Well, we move them in very slowly.  You know,

22  we give them -- typically, we'll start with

23  applications.  That's one of the things that people will

24  walk in and ask to do.  And so we go over the rules.

25  Not only the rules, the statutes and what has to be

1  MIKE HOGAN

2  done, how it has to be prepared.  They don't do that the

3  first day.  There's an orientation period which goes

4  into everything from their benefits to pensions and all

5  that good stuff.

6  And then we find out where they're going to be

7  best suited.  But most of them are movable parts.  They

8  can do anything.  They can register.  They can answer

9  questions.  So we have to explain them through that

10  process.

11  One of the things I did when I got there was

12  to -- instead of using poll workers, we had a little

13  small election in Atlantic Beach.  I decided to use my

14  staff because I wanted them to know what the poll

15  workers were doing and what they faced with in every

16  election.  So everybody worked in a precinct.  And they

17  really enjoyed that work.  But it gave them a much

18  better understanding of what the voter is facing and

19  what poll worker was facing on election day.

20  Q    Do you prepare training manuals as part of the

21  orientation?

22  A    There are training manuals.  There are

23  instructions that are -- we have backups for every

24  position so that -- in our line of work, there is no

25  tomorrow.  So you have to have reserve ready.

MIKE HOGAN

So, yes, our ultimate goal is to give them the
discipline, all the disciplines in training.

In the past, they were not sent to -- there's
a -- I'm trying to think of the actual name.  Our
association of supervisors has a certification process.
And in the past, evidently, only a couple people in.
I'm sending everybody.  That gives them a broader view
of the entire organization statewide.

It presents them with colleagues in other
counties that they can use as a resource.  And of
course, in the City of Jacksonville, if you get
certified, you get a little more money in your paycheck.
So we started that in the last year.  Of course, we
can't do it in an election year because there's no time.
But my goal is everybody will be certified.

Q    And do you review all of the -- those training
manuals in terms of the --

A    I've already taken the course myself, yes,
ma'am.

Q    Okay.  And so --

A    I'm sorry.  I interrupted you.

Q    No.  That's okay.

A    I didn't -- that was all.

Q    Okay.  Well, my question again was, do you

MIKE HOGAN

prepare all of the training manuals?  Or who prepares
those training manuals?

     A    Well, some training manuals are from the
State.  Some are created in-house.  We do a great job of
plagiarizing.  As supervisors, we are not selfish with
our best practices.

     Q    And so would it be fair to say that any
training manuals that exist in your office, you have
reviewed?

     A    Yes.  Um-hum.

     Q    Okay.  And you have approved those training
manuals, then?

     A    I'm not sure what you're saying, "approved."
If I read the training manual and it's from the
standpoint of ease of understanding and matches up with
the law, yeah, I guess if that's approval.

     Q    And how often are these training manuals,
let's say, updated?

     A    Whenever the law changes or whenever a rule
changes.

     Q    Uh-huh.  And what is the time lag between a
rule or legal change and when that training manual is
updated?

     A    It's indiscernible.  I don't know when I'll

1          MIKE HOGAN

2  get the data.  You know, there may be a rule change and

3  there's going to be, you know, some time for it

4  obviously to be circulated for everybody to make

5  comments.  It may change during the comments section.  A

6  law may pass that may require some enabling language for

7  the -- you know, or policy how to implement.  When it's

8  final, we get it in pretty quick.  But it's a process.

9      Q    So once it's final, then how long does that

10  law change -- how long does it take you to update your

11  training manuals to reflect that change in the law?

12      A    If we're not in the middle of an election,

13  it's done right away.  If we're in the middle of an

14  election, everything sets aside.

15      Q    And, apologies, but trying to be as specific

16  as possible, what does "right away" mean?

17      A    Well, it could mean side of the road.  But I'm

18  not referring it in that way.  As soon as we have the

19  opportunity, we're going to update the manual.

20          Because it may -- it depends on what it's

21  going to impact, what work it's going to impact.  You

22  know, I'm not going to be able to tell you how quickly,

23  other than we get it done.

24      Q    Okay.  So if a law were to be changed, let's

25  say in May, around how long would it take for that

1                    MIKE HOGAN

2  change to be reflected in your training manual?

3      A    I can't answer that.

4      Q    Okay.  So if a law is changed in May, let's

5  say by May 1st, the law is changed May 1st, by June 1st,

6  would it be reasonable to expect that your training

7  manual would reflect that change?

8              MR. TEAL:  Object to form.

9              You can answer, if you can.

10             THE WITNESS:  Hmm?

11             MR. TEAL:  You can answer, if you can.

12             THE WITNESS:  I have no way to tell you, you

13        know.  We're going to get it in there as soon as we

14        can.  That's all I can tell you.

15  BY MS. ABUDU:

16     Q    Okay.  Until you get that change reflected in

17  your training manual, what advice are you giving your

18  staff members in terms of what to do with that law

19  change, then?

20     A    That is such a broad question.  It all would

21  depend on what is being changed.  It may not have any

22  impact right away.  But if it's something that we're

23  doing every day, then it's -- you know, that change

24  occurs very rapidly.

25     Q    Okay.  All right.  Well, we'll revisit the

MIKE HOGAN

1
2    timing a little bit later with more of a specific

3    example.

4         A    Okay.

5         Q    What about team meetings?  Do you meet

6    regularly with your team?

7         A    When you say "regularly," like once a quarter?

8    No.  Do we meet regularly, yes, when we have new issues,

9    concerns, a shout-out, those types of things.

10        Q    Okay.  So do you have standing meetings with

11   your teams?  Meaning, do you meet biweekly?  Do you meet

12   every once a month?

13        A    No.

14        Q    You don't have anything set in terms --

15        A    We don't meet just to have a meeting.  We meet

16   if there's a purpose.

17        Q    Okay.  So let me finish my question.

18        A    I'm sorry.

19        Q    That's okay.  So do you have monthly set

20   meetings with your team or biweekly meetings set with

21   your team?

22        A    No.

23        Q    So how do you send notices of a meeting?  How

24   do your team members know --

25        A    I wouldn't give notices monthly, number one.

MIKE HOGAN

Typically, what we're, when we're looking at changes,
it's right after the legislative activity takes place.
So everything is ratcheted up because we know they're
new laws.  Those things, like I say, get out very
quickly.  They have to be.  But for the rest of the
year, you know, there's not a lot of changes that come
about.

Q    So if there's information that you want to
share with your members of your staff, how do you
communicate that to them?

A    I share -- any email that I receive that I
think would be of interest to them, not only personally,
but professionally.  So I have a code, SE1, and
everybody gets it.  And I'll put a little note at the
top, "This is something you need to read and incorporate
in your business.  This is something that may be coming
down the road."

So I do that just about every day, if I get
it; if I get something that I think they needed to see.

Q    And, I'm sorry, you said a code, SE1?

A    It has all 31 of my standard either full-time
or full-time/part-time people will get that notice.

Q    Got it.  What about notices to the public?
How do you communicate with the public in terms of

1                    MIKE HOGAN

2  information you believe should be shared with them from

3  your office?

4       A    Website and we do have a Facebook.

5       Q    And who's responsible for updating the

6  website?

7       A    Right now, it's Lana Self.  And she does that

8  in conjunction with some support.  And then -- but we're

9  looking at segueing that from her.  She's also the

10  candidate coordinator.  So I'm trying to move that into

11  really the outreach department.

12       Q    And what about your Facebook page?

13       A    The outreach department handles that.

14       Q    And is there any other method of communication

15  with the public from your office?

16       A    Well, all emails from the public come to me

17  first.  I try to answer all the questions that I can.

18  If there's going to be an activity like they want a

19  voter information card sent to them, then I'll forward

20  that to a colleague and say, you know, "Handle this with

21  this person and copy me on your reply."  So there's

22  that.

23            Phone calls.  And we speak at a lot of

24  different -- to a lot of different organizations.  Some

25  request it, and some we request, "We'd like to come out;

MIKE HOGAN

1 
2 would you let us come talk to your folks?"  So those are
3 the ways that we get out the information.
4     Q   So just to clarify, you said if a member of
5 the public sends an email to your office, it literally
6 comes directly to you?
7     A   Um-hum.
8     Q   Individually?
9     A   Um-hum.
10     Q   And you respond or direct it to someone else?
11     A   Yes.
12     Q   Wow.
13     A   I never stop working, on my vacation, in the
14 evenings, on the weekends.  If I get an email, I'll
15 respond.
16     Q   And you indicated that you also speak to
17 community groups; correct?
18     A   Yes.  Um-hum.
19     Q   Can you list some of those community groups?
20     A   Oh, let's see.  Churches, Rotary, Civitan,
21 exchange club, schools.  We have several contacts with
22 the University of North Florida student body, the
23 Hispanic -- there's a couple of Hispanic organizations
24 that we have -- that we had not only meetings with, but
25 have supported them in some of their events.

1                        MIKE HOGAN

2          We go to the -- what is that -- I don't know

3    if I can ask you.

4          Q    No, he can't answer.

5          A    There's a -- I'm trying to think of the --

6    World of Nations or something like that.  We have that

7    once a year.  And we set up a tent there to try to

8    register people and give them information about voting.

9    Any place -- now, senior citizens.  I was going to all

10   the senior citizen centers and speaking to them.

11   Typically, we do it in an election year, just to make

12   sure that it's -- the word is getting out, this one's

13   coming up.  Radio commercials.  That's about it.

14         Q    Okay.  Do you get any -- or have you gotten

15   any requests to speak that you declined?

16         A    Yes.  We'll decline, from time to time.  If

17   the request is -- let's say that the Republican Club

18   wants me to come and talk about candidates, I don't do

19   that.  I'll talk about our process and how you can vote

20   and how you can register.  But we don't talk about

21   anything that's partisan.

22         And the same thing with issues.  If someone's

23   wanting to talk to us about an issue in their group

24   that's either a proponent or whatever, we will talk

25   about the process, but we will not talk about the issue.

1    MIKE HOGAN

2    So, yes, occasionally, we decline.

3        Q    Okay.  Now, you talked a little bit about your

4    responsibilities in terms of communicating with staff

5    members.  I wanted to get a little bit more specific in

6    terms of your particular job responsibilities.

7            So can you describe for me the -- I guess the

8    universe of what all falls under your title as

9    Supervisor of Elections.

10       A    Registration, list maintenance, database.

11   Obviously elections, election day, early voting, mail

12   ballots.  Military, which is we call it military and

13   overseas is UOCAVA.  Hiring, training, public outreach.

14   Interface with city council, mayor's office, council

15   auditor, interface with the Secretary of State.

16           I think that's about it.

17       Q    And in terms of your interface with the

18   Secretary of State, how do you receive information from

19   the Secretary of State?

20       A    Email, primarily.  Phone calls.

21       Q    Okay.  And in terms of emails, do you keep

22   copies of those written communications?

23       A    Yes.

24       Q    How long do you hold on to those copies?

25       A    There's -- I don't think on -- I don't think

MIKE HOGAN

1  there's a time limit on that.  I think they're -- I

2  don't delete anything.  There are certain things,

3  personal emails and stuff like that, advertisements,

4  those things can be.  But public records laws is pretty

5  broad.

6      Q    Now, in your role as Supervisor of Elections,

7  are you a member of the Florida State Association of

8  Supervisor of Elections?

9      A    Um-hum.  Yes, ma'am, we are.

10      Q    Is that a mandatory membership?

11      A    No.  In fact, at one time, there was only 66

12  members.  I think just recently, the Seminole County

13  supervisor, there was a change and the new supervisor

14  joined the association.  The old one had pulled out.

15      Q    And during your tenure as supervisor, have you

16  always been a member of this --

17      A    Yes.  Um-hum.

18      Q    -- association?

19          What do you understand to be the purpose of

20  the association?

21      A    Well, the tax collectors have an association.

22  The clerk of the courts have an association.  I'm sure

23  the sheriffs do.  I know they do.

24          It's when you have a common -- a goal, and a

1                    MIKE HOGAN

2   commonality in work, it's great to be able to associate

3   with others doing the same thing and sharing best

4   practices, as I mentioned a little while ago.  In my

5   case, because I was a brand-new supervisor in 2015, they

6   assigned to me a big brother, if you will.  And so I had

7   someone that I could go to to ask questions because,

8   yes, I didn't come in with knowing everything about the

9   office.

10          And then so as a result of going to the

11  conferences, I've made friends.  So I have people that I

12  can turn to if I have a problem with a question,

13  something I have not encountered before and my office

14  hasn't encountered before.

15          The association also does a little bit of

16  lobbying for bills before the House and the Senate.  And

17  I've served in that capacity because I had served in the

18  House.  So, yes.  An association of supervisors that

19  have the same job and the same laws to follow.  And so,

20  yeah, that's what the association's about.

21      Q    Okay.  And you said that, you know, part of

22  the association is to help advance the same goal or

23  common goal, I think was your phrase.

24      A    Um-hum.

25      Q    What do you understand the association's

1

2  common goal to be?

3     A    We want everybody that's eligible to vote to

4  vote.  We want everybody to vote if they're registered.

5  So we want it to be understandable.  We want our process

6  to be clear and transparent.  We want to be accurate.

7  And we want consistency statewide.  Those are the things

8  that I think are concerning us.

9     Q    And when it comes to achieving those common

10  goals, what is the process?  I mean, with 67 separate

11  counties being members, I don't want to assume that

12  sometimes there might be a difference of opinion.  So

13  how do you all come to accord or consensus?

14     A    On legislative issues, we come to accord in

15  our conferences.

16          We'll have a vote on what we want to present

17  or not to present, what we want to encourage or

18  discourage.  And there are differences because we're all

19  different.  Sizes are different.

20          For instance, I have 199 precincts.  I thought

21  that's a lot.  I met Katrina [sic] down in Miami-Dade.

22  She has 800-plus precincts.  And she has more precincts

23  than the state of Connecticut.  So I'm a small county

24  next to her.  But then I have a county that's got 16

25  precincts.

MIKE HOGAN

So you have that medium-sized county, small
counties, and super large counties.  So, yeah, we all
have a little bit of differences on some of these
things.

When some things are passed that are going to
create a cost, it doesn't typically hurt the large
county, but it does -- it's a big dent in a small
county's budget.  So but because we know that, and
because we don't care if you're from a large county or a
small county, we get along very well.  But we'll have
differences just like families have differences on
opinions and different issues, but we resolve them with
a vote.

Q   And in terms of that vote, is it 50 percent
plus one or two-thirds?  What's the numerical -- what's
the number that needs to be satisfied?

A   50 percent plus one.

Q   Okay.  And in terms of lobbying, can you
describe kind of the association's role when it comes to
lobbying?

A   The role, primarily, is for us to encourage
each supervisor to get in touch with their own state rep
or senator and share our vision or our opinion on a
particular item.  That's the best lobbying.

MIKE HOGAN

1

2    Q    Okay.  And let's say that you were the

3  49 percent who didn't vote in favor of a particular

4  position, do you still lobby your legislator in support

5  of whatever that measure was that got the majority vote?

6    A    No.  And we don't -- we don't expect people to

7  have to change their position on that.  There's -- you

8  can take your own position and everybody's still an

9  individual.  And so we respect that.  That's not a

10  problem.

11    Q    How often does the association meet?

12    A    Two times a year.

13    Q    And do you always attend those meetings?

14    A    I've missed maybe one or two in the last four

15  or five years.

16    Q    And when you personally were unable to attend,

17  did you send a representative from your office?

18    A    Some of them -- sometimes you can do that.

19  One of the -- I think it's the summer, is you can take

20  staff.  You can take a number of staff members.  The

21  winter is just for supervisors.

22    Q    So if you --

23    A    But I could have -- I could have sent someone.

24    Q    Okay.  So if you, as a supervisor, miss a

25  winter meeting, no one else from your staff can go; is

MIKE HOGAN

1   
2   that correct?

3       A    I could send -- no.  I could send a

4   representative.

5       Q    Okay.

6       A    And they could vote.

7       Q    Okay.  When was the last time the association

8   met?

9       A    Just I think June.

10      Q    June 2019?

11      A    Um-hum.

12      Q    Do you remember what was on the agenda?

13      A    Cybersecurity.  And there was a feedback on

14  the items that were in -- that passed the legislature.

15  Supervisor -- I mean the Secretary of State always has

16  the last day, and sometimes the day before, they'll

17  spend a half a day on each of those days covering us on

18  anything that changed, rule changes, statute changes.

19  So that would have been discussed in June.

20      Q    And do you remember whether or not Senate

21  Bill 7066 was part of that agenda?

22      A    Yes, it was.  Yes, it was.

23      Q    And what was discussed in relation to Senate

24  Bill 7066 during that June 2019 meeting?

25      A    I can't tell you that I remember specifics

1                    MIKE HOGAN

2    about what was being covered.  I don't recall.

3        Q    Okay.  All right.  Well, we'll get a chance to

4    revisit that a little bit later.

5        A    Okay.

6        Q    Let's talk more about your role in terms of

7    voter registration and list maintenance.  And these

8    questions are putting aside, you know, the felon voting

9    status.  So I'm just trying to get an understanding of

10   what an ordinary voter registration process is, how your

11   office handles this process.

12            So what, to your understanding, are the

13   qualifications in order to be able to vote in Florida?

14       A    To be able to vote, you have to be 18.  In a

15   county, you have to have a residential address.  And you

16   can't be incompetent, been declared incompetent or a

17   felon.  I guess that's pretty much it.

18       Q    Okay.  So what are the various methods someone

19   in Florida can register to vote?

20       A    You can register online.  You can register, in

21   Jacksonville, by picking up an application at the

22   library, filling it out and leaving it there.  And then

23   we circle back and pick those up every week.  You can

24   pull a registration form off the website and fill it out

25   and send it in.  You could scan it and email it so that

MIKE HOGAN

1  there's a signature there.  You could -- at one of our

2  locations, when we're supporting an event, you can

3  register there.  There are third-party registrations

4  that go on and we approve those parties and we give them

5  a little bit of training when they come in and ask for

6  those -- that permission.  There's a host of ways to

7  register.

8      Q    Okay.  And as part of the voter registration

9  process, there is a deadline -- correct? -- by when

10  somebody needs to register in order to be eligible to

11  vote in an upcoming election; is that correct?

12      A    Right.  That's 29 days, then the books close.

13      Q    Now what happens if someone tries to register

14  and be eligible to vote in an upcoming election, but

15  their registration is outside of that 29 days?  Is there

16  any way that they can still get on the roles and be able

17  to vote in this upcoming election?

18      A    Well, they can vote provisionally.  But then

19  that provisional ballot will go to the canvassing board

20  and then they would decide whether or not that was

21  valid.

22      Q    So in terms of the enforcement of the

23  deadline, are there any -- is it strict?  Or can there

24  be any allowances made for someone who votes -- who

MIKE HOGAN

1

2  registers after the registration deadline?

3     A    Ask the question again.

4     Q    So, for example, if someone brings in their

5  registration form on the 31st day, for whatever reason,

6  is there any way that they could still be eligible to

7  vote in the upcoming election, even though their

8  registration form was out after the deadline?

9     A    No.

10    Q    Any --

11    A    Other than -- you said vote, they can go to a

12  poll and ask for a ballot.  And they would be -- we'd

13  allow them to vote provisionally.

14    Q    Okay.  So once you receive a voter

15  registration form, what does your office do with it?

16    A    We have to process that and digitize it,

17  basically, or electronically, then send that to the

18  Secretary of State's office.

19    Q    Okay.

20    A    We make sure it's complete.

21    Q    And can you be more specific in terms of

22  making sure it's complete?

23    A    Everything is checked off or signed off.  The

24  data has to be there, name, residential address, social

25  security number or a portion of it, driver's license

MIKE HOGAN

1  number, and the questions answered.

3      Q    And other than reviewing the form to make sure

4  all of the boxes are checked, let's say, is there

5  anything else you do before sending it to the Secretary

6  of State's office?

7      A    No, ma'am.  We do no vetting.  We accept the

8  document at face value in the four corners.

9      Q    Okay.  And if the form is not complete, what

10 do you do then?

11     A    We let them know that the form is not complete

12 and they're going to have to either give us their

13 signature or their driver's license number, or whatever

14 it is that's not there.

15     Q    And "them" meaning the voter?

16     A    Yes.

17     Q    Or the person submitting --

18     A    The applicant.

19     Q    The applicant?  And how do you communicate

20 with that applicant?

21     A    If they've given us the information and the

22 address to contact them with, we'll contact them in

23 either of those -- with either of those sources.

24 Sometimes they won't -- that's what they left off, is

25 their address.  And most registrants or applicants are

MIKE HOGAN

2  very leery of giving you their email address and their

3  phone number because they don't want to be hounded by a

4  lot of solicitors.  So sometimes we don't have any data

5  except the name.

6      Q    Okay.  And is there a deadline by when they

7  have to get back to you to, let's say, cure that form?

8      A    The 29.  The 29.

9      Q    Just for the court reporter, is there a

10 deadline by when the applicant has to get back to you to

11 cure that form?

12     A    If there's an election coming up, 29 days

13 before the election.

14     Q    Now, let's say the form is complete, your

15 office has approved it in terms of its -- of it being

16 complete, and then you said you send it to the Secretary

17 of State's office?

18     A    That's correct.

19     Q    What is your understanding as to what the

20 Secretary of State's office then does with that

21 registration form?

22         MR. TEAL:  Object to form.

23         You can answer.

24         THE WITNESS:  They do what I would consider as

25     vetting and they verify the data that's on there.

1                    MIKE HOGAN

2       If they find something that's irregular, they'll

3       tell us.

4  BY MS. ABUDU:

5       Q    And so would that include determining whether

6  or not the applicant is actually eligible to vote?

7       A    That's correct.

8       Q    So prior to sending it to the Secretary of

9  State, just to confirm, you don't do any vetting related

10 to eligibility to register; is that correct?

11      A    That's correct.

12      Q    Okay.  Now, in terms of the Secretary of

13 State -- well, then just to take that a step further,

14 would you agree, then, that it is the Secretary of

15 State's responsibility to determine voter eligibility?

16      A    As far as the application, yes.

17      Q    Well, would there be anything other than the

18 application that would --

19      A    I don't know.  But speaking specifically to

20 the application?

21      Q    Speaking specifically to the application, it

22 is the Secretary of State's responsibility to determine

23 voter eligibility?

24      A    To vet the data as accurate, yes.

25      Q    Okay.  Now, what is your understanding in

MIKE HOGAN

terms of the steps that the Secretary of State takes in
order to determine a voter or an applicant's
eligibility?

MR. TEAL:  Object to form.

THE WITNESS:  I'm sure they have resources
that they interface with to determine eligibility.
If there's not a -- they may probably check with
the DMV on the driver's license number and those
types of things.  But, you know, I'm not sure I
know all their processes.

BY MS. ABUDU:

Q    Okay.  Well, then, let me back up because you
indicated or testified that you have a felon voting
specialist; correct?

A    Um-hum.

Q    So then what is that person's job?

A    When she receives a notice from the Secretary
of State or from the clerk of the court in Duval County
or from FDLE -- typically they don't contact us, we
contact them if we're doing any research.

In the past, prior to November 6th, if a
person came in to apply and filled out an application
and that person shows up in our record, they were
already on our record as a felon, at that point in time,

MIKE HOGAN

1  prior to November 6th -- is that the election date?  I

2  can't ask you -- we would do an in-house investigation.

3  And to determine if the eligibility should be denied or

4  that there had been some kind of clearance.

5          And there's a process that Bobbie would go

6  through to determine whether or not to accept that

7  application.  That was prior to November 6th.  Since

8  November 6th, we do -- we don't do any vetting, even in

9  that situation.

10     Q    Okay.  So prior to November 6th, which is when

11  the ballot initiative commonly known as Amendment 4 was

12  passed, prior to that date, it was your office's

13  responsibility to determine a voter's eligibility?

14     A    If they were already on the roll and listed as

15  a felon.

16     Q    Okay.  And since passage of Amendment 4, your

17  office is no longer responsible --

18     A    That's correct.

19     Q    -- for determining eligibility for people with

20  criminal convictions?

21     A    We accept it just like a brand-new

22  application.

23     Q    Okay.  You accept it like a brand-new

24  application.  Other than reviewing, as you said, I think

MIKE HOGAN

1

2 your term was the four corners of the document, you

3 don't do anything else to the form or you don't do

4 anything else in terms of determining eligibility?

5     A   That's correct.

6     Q   You send it directly to the Secretary of

7 State's office?

8     A   That's correct.

9     Q   All right.  Now, just to be clear, again,

10 let's talk about prior to November 6th election, then,

11 when Amendment 4 was passed, what steps did Ms. Henry

12 take to determine a voter's eligibility?

13     A   She would then contact, as I mentioned, the

14 clerk of the court to see if this person had -- the

15 felony had been cleared or if their rights had been

16 restored or their felony still exists.  And then she

17 would notify -- if it still existed, she would notify

18 the applicant that, you know, "Your rights have not been

19 restored.  According to our records, you're still

20 classified as a felon, and therefore, you know, here's

21 the information that we received."

22     We send a copy of the information we received

23 that shows that they were ineligible.  And we also send

24 a letter -- we send a certified letter and we also

25 include in that letter how they could appeal to -- an

MIKE HOGAN

1    application to appeal to the clemency board to gets

2    their rights restored.

3        If it's determined that the -- when she

4    contacts, say, the clerk of the court, that the felony

5    has been cleared, their rights have been restored, then

6    the application would be processed the normal way and be

7    sent over to Tallahassee and be processed.  That was

8    prior to November 6th.

9    Q   Okay.  I believe you said that some of the

10   agencies that Ms. Henry would let's say interface with,

11   included the Secretary of State's office; correct?

12   A   Um-hum.  Well, no.  She does interface with

13   them.  But when she was doing her review with an

14   applicant that shows up, he's already on the rolls as a

15   felon.  She doesn't go to the Secretary of State.  She

16   goes to the clerk of the court.  Let me think.  There's

17   a list of them.  That may -- that may be on the list.

18   Board of clemency, clerk of the court, FDLE.

19       I don't know if I need a sidebar.  I think the

20   Secretary of State is included in that.  That could be

21   one of her calls.

22   Q   Okay.  And when you say "that list," is that a

23   written list that appears somewhere?

24   A   She would have it and I would have it.  But I

MIKE HOGAN

1  can't -- I really can't remember if the Secretary of

2  State's on that list.  I think it is.

3

4      Q    All right.  So you're not sure about the

5  Secretary of State, but you know the Florida

6  department --

7      A    She's going to do what she can to determine

8  whether or not that person is still a felon or has been

9  cleared.  She's going to do that investigation.  That

10  it's the right individual, the identification is

11  correct, all those things, she would do and vet prior to

12  November 6th.

13      Q    Okay.

14      A    If there was -- if the record was -- had been

15  expunged and they were no longer a felon, then she would

16  process the application.  If it had not, her

17  investigation showed that this person was still a felon,

18  then she would send a certified letter saying that your

19  application can't be processed because you're

20  ineligible, these are the reasons, a copy is in part of

21  this document that we're sending to you.  And if you --

22  if it's true and you want to get your rights restored,

23  here's how you can get that done and give them that

24  application as well.

25      Q    Okay.  So first, in terms of the list, is

MIKE HOGAN

1  there a written document with an exhaustive list of all

2  of the different agencies that Ms. Henry would reach out

3  to?

4     A    She just -- she knows the ones that she

5  reaches out to.  They're the only ones that would have

6  the data.

7     Q    Right.  I'm trying to understand where that

8  list is in terms -- because you couldn't remember

9  everyone on the list and I don't fault you for that.

10  But I'm just wondering how we can confirm who all is on

11  that list.  So that would be a document in her

12  possession?

13     A    Well, actually, it's a document in your

14  possession.  I think it's answered in the

15  interrogatories.

16     Q    To the McCoy plaintiffs?  Because I know you

17  got two sets at least of interrogatories in request for

18  production.

19          MR. TEAL:  Would you mind if I helped him on

20     this?

21          MS. ABUDU:  To locate it?

22          MR. TEAL:  It's in response to the Gruver

23     interrogatories.  It's Interrogatory No. 15.

24  BY MS. ABUDU:

MIKE HOGAN

Q    Okay.  Can you please take a look at that,
Mr. Hogan.

A    Yes.  It's the clerk of the court, executive
clemency board, department of state, FDLE, State
attorney's office, and Department of Corrections.  And
that's why I couldn't remember all of them.

Q    Okay.  And just to clarify, is that an
exhaustive list, meaning that there are no other
agencies or offices --

A    Right.  That we had any contact with.

Q    That's okay.  So just to clarify, that the
answer to that particular interrogatory is exhaustive,
meaning that there are no other offices or agencies that
Ms. Henry or someone in her position would reach out to
to confirm whether or not someone has a felony
conviction?

A    That's correct.

Q    All right.  Now, you provided the process if
they think that, you know, if they want to get
restoration of their voting rights.

       But what if the applicant believes that you
have wrong information, they've never been convicted of
a crime, let alone a felony conviction?

A    The applicant can provide the evidence that

MIKE HOGAN

either their rights have been restored.  Or if it's an

identification problem, they can provide that and we

would do the research with the Secretary of State's

office.

    Q    Okay.  Now, what if there continues to be a

dispute as to the evidence they provided?  You don't

trust it, or you were unable to independently verify it.

Is there another process or step in the process in terms

of that person challenging their identification as

having a felony conviction?

    A    I have never been to that stage so I don't --

I couldn't answer that.

    Q    Okay.  Are you aware of whether or not they

would have an opportunity for a hearing to meet with --

to actually physically challenge or orally challenge

their designation as having a felony conviction?

    A    Again, I've never been to that stage.  There's

never been a hearing, that I'm aware of.

    Q    Okay.  So you might not have ever been to that

stage, but are you aware that a hearing process exists?

    A    No.

    Q    Okay.  Now, have there ever been situations

where -- let's say Ms. Henry.  I'm only saying Ms. Henry

given that she's held this position so long, as the

MIKE HOGAN

1
2  in-house felon specialist.

3          Has there ever been a situation where she has
4  approved a person's application and then the Secretary
5  of State actually says, no, we've determined that this
6  person actually has a felony conviction?

7          MR. TEAL:  Object to form.

8          You can answer if you know.

9          THE WITNESS:  I don't know.  I've never heard.

10  BY MS. ABUDU:

11      Q    So to your knowledge, that situation or
12  scenario has never occurred?

13      A    Um-um.

14          MR. TEAL:  You have to answer --

15          THE WITNESS:  No.

16  BY MS. ABUDU:

17      Q    So assuming that it did, so for example,
18  Ms. Henry does her vetting, she doesn't identify the
19  person or the applicant as having a felony conviction,
20  she goes ahead and processes it for the applicant to be
21  placed on the rolls.  And then the Secretary of State
22  says, no, this person has a felony conviction, what is
23  that person's or what would be that person's
24  registration status during that period?  Your office has
25  registered them, but the Secretary of State says, no,

1                    MIKE HOGAN

2  they shouldn't be registered?

3      A    Again, I haven't faced that, so I can't tell

4  you.

5      Q    Well, you haven't faced it.  But let's assume

6  that that situation or scenario does occur.  What, as a

7  supervisor, would be your instruction to your staff in

8  terms of that person's registration status?

9      A    Well, instructions to the staff are if they're

10 in conflict with the Secretary of State's office, then

11 they bring it to me or to Arzada.  And then we try to

12 resolve it.

13     Q    Okay.  And, again, remind me.  Arzada's job

14 title?

15     A    She is records management.

16     Q    Okay.  So that scenario is brought to you.

17 And then what would you do?

18     A    I haven't been there.  I would be looking at

19 the evidence that the Secretary of State's providing and

20 why it's contrary to what we're seeing, and try to make,

21 you know, some sense out of it.

22     Q    Let's say that during this period where

23 there's a question about the person's eligibility,

24 there's an election.  Would that person be able to go

25 ahead and vote in that election during that time?

MIKE HOGAN

1

2      A     That person would be able to vote a

3  provisional ballot.

4      Q     So they would show up to the vote -- the

5  polling place and there would be information -- so they

6  show up at the polling place.  What happens to them?

7      A     They would -- if they were not on the roll or

8  they were shown as ineligible, they would say that

9  you're not eligible.  But if you want to vote, you can

10  vote by provisional ballot.

11      Q     So in that scenario as I described it, that

12  person --

13      A     And they will explain what a provisional

14  ballot is.

15            I didn't finish my statement.

16      Q     Oh, I'm sorry.

17      A     I'm all right now.

18      Q     So in that scenario, the person would not even

19  be on the voter rolls, they would not be viewed as a

20  registered voter?

21      A     There's a lot of speculation here.  And I'm

22  not sure I know how to answer your question on that

23  other than the way I directly answered it a minute ago.

24  That person would be able to vote.  I can't tell you

25  exactly the status because I'm not sure exactly where we

MIKE HOGAN

1 would be at that point with the Secretary of State's

2 office, since it's in a dispute.  So I don't know which

3 came first, the chicken or the egg, on this one.

5      Q    Is there any guidance from the Secretary of

6 State that you're aware of that could help you figure

7 out how to handle a scenario like that?  Again, a person

8 who your office has determined is eligible to vote, but

9 the Secretary of State's office says is ineligible to

10 vote.

11      A    I can only tell you this:  Both the Secretary

12 of State's office and the supervisor's office is going

13 to want to let the voter vote.  And so there would be

14 some -- there would be a work in progress trying to

15 figure out why is there this conflict, why are the

16 records so different.  But this is speculative.  I

17 don't -- I can't tell you how it would be resolved.  I

18 don't know what the facts of the case are.

19      Q    Okay.  All right.  Well, I have a couple of

20 more questions.  And then maybe we can take a break,

21 unless you're -- you want to keep going.

22      A    Keep going is fine.

23      Q    Okay.  All right.  In terms of voter

24 eligibility, just to clarify, can a person with a

25 misdemeanor still vote, misdemeanor conviction?

MIKE HOGAN

1

2     A     It's felony, not misdemeanor.

3     Q     Okay.  And so anyone in pretrial detention

4  therefore could still vote?

5     A     Um-hum.  Until they're adjudicated a felon.

6     Q     Does your office do any voter registration in

7  the jails, then?

8     A     No.

9     Q     Why not?

10     A     We send ballots to them.

11     Q     I'm sorry.

12     A     We send ballots, mail ballots to voters in

13  jail.  And if they call and request, we get it to them.

14     Q     Okay.  And you mail them directly to the jail?

15     A     Um-hum.

16           MR. TEAL:  Yes?

17           THE WITNESS:  Yes.  Sorry.

18  BY MS. ABUDU:

19     Q     And you address it to the inmate?

20     A     Yes.

21     Q     And then in terms of that inmate casting the

22  ballot and then returning it to your office, what is

23  that process?

24     A     We, in Duval, pay return postage so they have

25  the envelope and they put their ballot in the return

MIKE HOGAN

1

2  envelope with a secrecy sleeve which also covers up

3  their signature.  And send it back.  It comes back to us

4  in the mail.

5      Q    All right.  Let's talk a little bit about the

6  election season for 2019.  Just, again, for the record,

7  did you have any elections in 2019 in Duval County?

8      A    Yes.  We had a March and a May election.

9      Q    Okay.  And those were primary? general?

10         Be more specific.

11     A    We have -- Duval's different in every way.

12  You know, we're consolidated and we have unitary

13  elections.  So it's a first election and a second

14  election.

15     Q    Okay.  Any special elections?

16     A    Everybody -- by that, anyone can vote for

17  anyone on the ballot regardless of their party.

18     Q    Okay.

19     A    It's not a closed primary.

20     Q    Got it.  Okay.  But you did have a primary;

21  correct?

22     A    We don't call it a primary.  But we had a

23  first election in March.  And depending on how many

24  candidates are for each seat, it may have been, quote,

25  unquote, the general for some because there would not be

1                    MIKE HOGAN

2  a May election for them.  So basically you would say the

3  runoff was in May for those.

4           But if you had -- let's say you had three

5  Democrats and two Republicans running for a seat and the

6  top two vote getters were Democrats, the two Democrats

7  would go to the May election for a decision.  I

8  understand there's not any other city that has that.

9       Q    That's why I'm asking.  I'm just trying to be

10 clear.  Okay.  So you had this first election, as you

11 call it.  When you say "first election," is that like an

12 official description?

13      A    Um-hum.

14      Q    Okay.  First election.  And then you had a

15 second election in May.

16      A    Um-hum.

17      Q    Any other elections --

18      A    No, ma'am.

19      Q    -- in 2019?  Any upcoming elections for 2019?

20      A    No, ma'am.

21      Q    All right.  Are you aware that there has been

22 discussion about a special election in Duval County

23 related to a tax referendum?

24      A    Are you aware the City council voted it down

25 last night?

1                    MIKE HOGAN

2        Q    Okay.  Well, that's what we're getting on the

3   record.

4             Okay.  So I guess the direct answer to my

5   question, then, is, yes, you were aware?

6        A    We were aware that there was a request by the

7   school board, yes.

8        Q    Okay.  And so to your knowledge, there will be

9   no special election?

10       A    They withdrew the bill last night.

11       Q    Okay.  So that just happened yesterday?

12       A    Yes, ma'am.

13       Q    Correct?  All right.  So then when is the next

14  scheduled election for Duval County?

15       A    The March PPP in 2020.

16       Q    Can you please state what PPP is.

17       A    Presidential preference primary.

18       Q    And do you have a specific date in March for

19  that?

20       A    Oh, boy.  I should know.  I think it's the

21  14th, but there's too many dates been running in my

22  head.

23       Q    Okay.  Well, one is, of course, in trying to

24  figure out the registration deadline for that.  So are

25  you aware of the deadline?

MIKE HOGAN

A    Yes, ma'am.  We have -- all that's on our calendar.  I'm just -- right now, we've been looking at being prepared for a special election in this year.  And we've also got a lot to do to prepare for 2020.  We have to -- we're hardening all of our tabulators and our EVIDS.  And we are swamped in work right now.  And yet we have to actually stand in mud for a while because we couldn't move until we found out if we were going to have to pull off an election as well.  So we've been focused on those things.

And not getting too far off of watching what's going on in March, but we already know that at the end of January, we're going to have to send out the military and overseas ballots for the March PPP.

So, yeah, it's on our radar, but I'm not familiar with the date right now.  I apologize.

Q    That's okay.  Now, just to go back to the special election issue for 2019.  So there was a point when you were actually preparing for the special election to take place?

A    Well, we don't know if it was going to happen or not.  So you have to be prepared.  So one of the problems that we had is the school board never decided or made the decision as to what kind of election they

1                    MIKE HOGAN

2    wanted.  Was it going to be an all mail, because it

3    could be, since it was just a referendum, there were no

4    candidates?  What date?  Did you want an election day?

5    Did you want election day and early voting?  None of

6    that has ever been, you know, shared with us, to this

7    point in time.

8            But we had to prepare for all three

9    occurrences.  So, yes, we've been working in case we had

10   to pull this off.

11       Q    So what was that preparation in a little bit

12   more detail?  What were you working on?

13       A    Resources.  The laws change as it relates to

14   English and Spanish.  And normally, we would have some

15   stock that we could use, some ballots and some envelopes

16   and that type of thing.

17           Well, everything has to be in English and

18   Spanish now.  So we're designing all the new -- all the

19   literature, all the mailings that we have to do.  We

20   have to also bring in a group that can proofread all of

21   our Spanish and verify that it's accurate and all that

22   stuff.

23           So it's -- all that stuff has to be done

24   because you're going to send out mail ballots, 700,000

25   of them.  You know, they've got to be printed and

1          MIKE HOGAN

2   delivered to us.

3          If we're going to have an election day, do I

4   have poll workers?  We're getting into holidays.  It

5   wasn't expected, so we sent out an email blast to our --

6   all of our poll workers to see who might be available.

7          At one point, we knew that it wasn't going to

8   be in November, it was going to have to be in December,

9   if it was an election.  And so we got feedback from them

10  as to who could come.  About 1200 said they could come.

11  Of course, we didn't give them a day.  We just said in

12  December.  But we need about 1700.  So that's not

13  looking good.

14         And one of the statutes that changed had to do

15  with private property when we rent a precinct.  As you

16  know, probably, there's a -- I'm twisting my mind.  Let

17  me clear it here right quick.  I'm trying to think of

18  the name of the zone.  No-soliciting zone, 100 feet.

19  They moved it to 150.  That's okay.

20         But the other thing that's going to be

21  required is, in the past, anything beyond that

22  non-solicitation zone a 100, 150 feet, doesn't matter,

23  was still the property owner's control.  Okay?  So the

24  property owner could say, you know, "Protesters,

25  campaigners, you can't be on my property, you have to

MIKE HOGAN

1 leave."

2        Now, in our contracts, we have to secure the

3 fact that on election day, they must let anybody come on

4 their property, all the way up to the solicitation zone.

5 And most supervisors believe we'll lose a lot of

6 precincts because most of our precincts are churches.

7 And there's a lot of activity they probably would not

8 want on their property.  And so we've been out visiting

9 all our 199 -- trying to visit 199 precincts to make

10 sure we'd have enough precincts to run the election.

11        So we've been doing all those things in

12 preparation if the council voted to put that into law

13 and hold a special election.

14    Q    Okay.  All right.  Well, let's talk about in

15 terms of the March and the May elections and the

16 ballots, how those ballots get treated.  So if a

17 person's ballot is accepted, are they notified in any

18 way?  How do they know that they cast a ballot and it

19 was accepted?

20        For example, I'm a voter.

21    A    Um-hum.

22    Q    I go to the polling place.  I cast a ballot.

23 I want to know, did my ballot count.  How do I find that

24 information out?

MIKE HOGAN

1

2      A     You placed it in the tabulator.  Number one,

3  we tell the person that's getting ready to place their

4  ballot in there to look at the screen, what's the count.

5  And after you place yours in and it says it's taken, did

6  the count go up.  That's how you know you cast your

7  ballot.

8      Q     Okay.  So is there a way that a person's

9  ballot could be rejected?

10      A     When you say rejected, there's a definition

11  issue here.  What our tabulator will do, a lot of

12  people, when they are voting, will vote for more than

13  one of the candidates in a race.  So let's say you had a

14  three-man race and two ovals are circled in or colored

15  in.  That's an overvote.

16           Our ballot tabulator, when the voter attempts

17  to insert that into the tabulator, it will see that

18  there's an overvote and reject it.  And then that person

19  will get another ballot and will tell them, you know,

20  you've overvoted here, and you -- so we'll spoil the

21  ballot and give them another ballot.  And then they get

22  a chance to come back and vote again correctly.

23           That's the only quote, unquote, rejection, if

24  you will.

25      Q     Okay.  What if a person casts a ballot and

1                      MIKE HOGAN

2  then it's later determined that they were ineligible to

3  vote, what happens to that ballot?

4      A    We don't -- there's no identification on the

5  ballot.  There's no way for us to know which ballot that

6  particular voter cast.  So if that happens, it's just

7  history.

8      Q    Okay.  All right.  Well, I want to move into

9  the kind of prior to, or the period prior to the

10  November 6th election when Amendment 4 was still pending

11  before in terms of, you know, before the vote.  It had

12  already been approved to be on the ballot, but before

13  the actual November election when it was voted upon.

14          But before I get to that section, do you want

15  to take a little five-minute break?

16          THE WITNESS:  You want to take a break?

17          MR. TEAL:  Up to you.

18          THE WITNESS:  I'm ready to keep going.

19          MS. ABUDU:  Okay.  All right.

20          Are you okay?

21          COURT REPORTER:  I'm okay.

22  BY MS. ABUDU:

23      Q    So we talked earlier about what Ms. Henry

24  would do in terms of her verification process with

25  respect to a person having a criminal conviction.

MIKE HOGAN

1

2      A      Um-hum.

3      Q      It's her primary responsibility when prior to

4  November 6th to determine whether or not a person was

5  eligible to vote based on a criminal conviction.

6      A      A new applicant.  Yeah.  Okay.

7      Q      Is that correct?

8      A      If you'll say it again.

9      Q      Okay.  Prior to November 6th, it was

10  Ms. Henry's responsibility to determine whether or not a

11  person was eligible to vote based on their criminal

12  status to determine whether or not they had a criminal

13  or a felony conviction for purposes of determining

14  whether they were eligible to vote.  And I can try that

15  again.

16      A      Yeah.  I'm...

17      Q      Okay.  Why don't you say it.  Prior to

18  November 6th, to restate, what was the process for

19  determining whether or not a person was eligible to

20  vote?

21      A      Well, my example was they were coming in to

22  apply another application -- okay? -- and that they were

23  already listed as a felon.  That was the situation that

24  I was describing to you.

25      Q      Right.  And you made reference to a list of

1          MIKE HOGAN

2   people -- a list that Ms. Henry would receive of people

3   who had felony convictions; is that correct?

4       A    You need to ask that again.  Are you asking

5   for a list of people that are felons, or a list of

6   people that can give her information regarding whether

7   or not they're a felon?

8       Q    The latter.  How would she even -- so how

9   would she even know -- or what would she use to

10  determine whether or not someone had a felony

11  conviction?

12      A    If you get an application and you're starting

13  to put it in and then you realize that there's an

14  already -- they're already on the roll listed as a

15  felon.  Okay.  So now she's got to figure out, is this

16  still good information or has this person's rights been

17  restored and they're eligible to vote?

18           So that would kick out and that would go to

19  Ms. Henry.  And Ms. Henry then would use that list that

20  I shared with you to go to see if this person is or is

21  not a felon still.  And if -- again, if she finds out

22  that he's clear, then he's going to be eligible to vote.

23      Q    Okay.  So where does that original list come

24  from?  Because you mentioned two lists.  So the original

25  list in terms of people --

MIKE HOGAN

1

2      A     One is the Florida voter registration

3 database.

4      Q     Okay.

5      A     Okay?  And the other list is just a list of

6 those that can give you that information about the

7 felon.

8      Q     Okay.  And we talked a little bit earlier

9 about misidentifying individuals as being ineligible

10 based on a criminal conviction.

11           And would you agree that that has happened,

12 that people have been flagged as having a criminal

13 conviction when they really didn't?

14      A     Yes.  That happens.  And that could happen in

15 an abundance of sources.  It could be in the clerk of

16 the court's office.  It could be in FDLE.  It could be

17 somewhere with a typo.  It could be, you know, a host of

18 different things.

19           But that can happen.  It's not common, and I

20 would call it rare, but it does happen.

21      Q     Okay.  And just to clarify, then, prior to

22 November 6th, what roll did the Secretary of State's

23 office play when it came to determining eligibility with

24 respect to a criminal conviction?

25      A     They were the ones that would have received

MIKE HOGAN

the application, vetted it, and found out that that

person was a felon or was incompetent or was -- you

know, the driver's license doesn't match, this is not

the person.

So that would have all come from the Secretary

of State.

Q    Okay.  I'm sorry.  Maybe I'm confused.  I

thought prior to November 6th, it was Ms. Henry's

responsibility to determine eligibility.

A    If it was an application, they were making an

application, they're already on the roll.

Q    Okay.  And so she -- Ms. Henry would still be

the one, prior to November 6th, to vet for a felony

conviction; correct?

A    If there was -- if the record was already in

the file that this person was a felon and they made a

new application, then Ms. Henry would get that and she

would do the research to see whether or not this

person's rights had been restored or they were still

classified as a felon.

Q    Okay.

A    That would be Ms. Henry.

Q    All right.  So if she decided that someone had

not been identified -- she got an application --

1              MIKE HOGAN

2      A    Um-hum.

3      Q    -- she didn't identify the person as having a

4  felony conviction, she would then pass that on to the

5  Secretary of State's office; correct?

6      A    That's correct.

7      Q    So in terms of the Secretary of State's

8  responsibility, are you saying that the Secretary of

9  State would still independently...

10     A    No.  Um-um.

11     Q    Okay.  That's what I'm trying to understand.

12 So prior to November 6th, what was the Secretary of

13 State's responsibility with respect to a person's

14 eligibility with respect to a criminal conviction?

15     A    In the specific incident that we described,

16 she didn't -- she would not have to go to them other

17 than maybe get the information, what do you have,

18 because she's on the list, or the Secretary of State's

19 on the list, but they would look at clerk of court,

20 whatever records she chose to look at.  And she would

21 probably research as much as she possibly can.

22     Q    Okay.  But, again, and apologies if I'm not

23 being clear, if Ms. Henry determined that a person

24 didn't have a felony conviction or was not ineligible

25 based on a felony conviction, and then passed that

MIKE HOGAN

1  application on to the Secretary of State, did the

2  Secretary of State do anything, to your knowledge,

3  independently to verify?

4      A    Um-um.

5      Q    No?

6      A    Um-um.

7      Q    That person was just on the voter rolls?

8      A    Um-hum.

9      Q    So if Ms. Henry, let's say, by accident, made

10  a mistake and determined that someone was eligible, who

11  actually did have a felony conviction that was

12  ineligible, that person could just -- would be on the

13  rolls regardless?

14      A    That's correct.

15      Q    Okay.  So there, you could have a scenario

16  where you had people with felony convictions and who

17  were ineligible to vote, but were still on your voter

18  registration?

19      A    That's correct.

20      Q    Okay.  Now, in terms of the felony convictions

21  that Ms. Henry would review, what kind of felony

22  convictions?  Just state?  I mean, you have state

23  convictions, you have federal convictions, and you have

24  out-of-state convictions.

1                         MIKE HOGAN

2            Was she reviewing all three of those

3     categories?

4       A     I don't think we get -- I can't answer that.

5       Q     And just for the record, why can't you answer

6     that question?

7       A     Well, as you note, she could get that

8     information from FDLE, yes.

9       Q     She could get information regarding federal

10    convictions from FDLE?

11      A     Um-hum.

12      Q     And she could get information regarding

13    out-of-state conviction from the --

14      A     I'm sorry to even interrupt.  But really, I

15    cannot answer your question because I don't know the

16    answer to that question.  That's what I need to say.

17    Because I'm speculating, and I'm not going to speculate

18    in here.  I don't know.

19      Q     Okay.  So just again, for the record, so

20    before your response when it came to the various

21    categories of felony convictions, your first response

22    was you didn't know.  Then your second response was FDLE

23    would have that.

24            What is your ultimate response?

25      A     I'm not going to guess.

1                          MIKE HOGAN

2       Q    Okay.

3       A    So I'm going to say I don't know.

4       Q    And so, then, I repeat one of my previous

5  questions, which is why don't you know?

6       A    I don't have an answer for that.

7       Q    Are you --

8       A    It's not come up, but I don't have an answer

9  for that.  If the issue would have been -- had been

10 brought to me, I would know the answer, but I've not --

11 that's -- I've not encountered that.

12      Q    So you've never encountered a voter applicant

13 with an out-of-state conviction?

14           MR. TEAL:  Object to form.

15           THE WITNESS:  Not that I'm aware of, no.

16 BY MS. ABUDU:

17      Q    Okay.  And you've never encountered a scenario

18 involving someone with a federal conviction?

19           MR. TEAL:  Object to form.

20           THE WITNESS:  Not that I'm aware of.

21 BY MS. ABUDU:

22      Q    Okay.  Now, let's say someone had a felony

23 conviction, but their rights had been restored, how

24 would Ms. Henry know that information?

25      A    She could look at the records from those --

1                    MIKE HOGAN

2   that list of organizations.  The voter could present

3   that data to her.  Those are the ways that she would

4   know.

5        Q    Okay.  And so prior to Amendment 4's passage,

6   what is your understanding in terms of the registration

7   formats that existed at that time when it came to

8   someone -- when it came to the question of eligibility

9   based on a criminal conviction?  How would someone with

10  a criminal conviction who had gotten their rights

11  restored, they would they fill out that form?

12       A    Any way that they want to because I'm -- we're

13  going to accept whatever they place on that document.

14       Q    Okay.

15       A    We don't ask any questions.

16       Q    So then in terms of someone who had a felony

17  conviction, but their rights restored, when would they

18  have to present that proof of restoration?

19       A    If they filled out the form and it was

20  complete, that form would go to Tallahassee.  If

21  Tallahassee, in vetting that form, finds that they are

22  still a felon, then they would notify us.

23       Q    Okay.  So prior to November 6th -- okay.  I'm

24  sorry because I'm confused because my understanding is

25  that Ms. Henry would be the one to determine eligibility

MIKE HOGAN

1

2    based on a criminal conviction.

3        A    Um-hum.

4        Q    And so that the Secretary of State played no

5    role in that process prior to November 6th; correct?

6        A    If the person was in the database, already

7    showing up as a felon, and filed a new application, and

8    Mrs. Henry received it from -- it could have been

9    anybody that was processing it, that said, whoops, the

10   system is showing that this is a felon, Ms. Henry would

11   take charge to find out if that person was still a

12   felon.

13       Q    Okay.

14       A    Or if that person's rights had been restored.

15   And she would then use the list I shared with you to

16   verify that information.  If the rights had been

17   restored or the person was not the felon, then the

18   application would be processed and approved.  If not,

19   she'd send a certified letter saying that we show that

20   you're still a felon, that your rights have not been

21   restored, and here's the data that we have.  And along

22   with that, she would give a copy of an application to

23   the clemency board to -- for that person to try to

24   secure their rights.

25       Q    Okay.  So, then, what about someone who had

MIKE HOGAN

registered to vote and then was convicted of a crime

after their voter registration?  What process would

Ms. Henry be involved in at that point?

    A    If we're notified that this person has now --

is now a felon, then we would take that person -- take

the information and then contact that person and say,

you've been identified as being a felon, this is the

source of information that we have, and send a certified

letter and ask them if this information is accurate.

        If they reply in 30 days that it's accurate,

they're taken off the roll.  If they don't reply,

they're taken off the roll.

        If the certified letter is returned to us

undeliverable, then we will post in the newspaper a

notice that they should be classified as a felon and

their rights have not be restored and they have 30 days

to contact our office.  If they don't contact our

office, then they're removed from the roll.

    Q    Okay.  So during that 30-day window from when

you send the notice to when hopefully they respond, what

is that person's registration status?

    A    Let's take a break.

    Q    Okay.

    A    I want to think about that one.

MIKE HOGAN

1

2          MS. ABUDU:  Let's do a ten-minute break.  Is

3      that okay?

4          MR. TEAL:  Um-hum.

5          MS. ABUDU:  All right.

6          (A brief recess is had from 11:46 a.m. to

7      12:06 p.m.)

8          (The Court Reporter is directed to read back

9      the previous question and/or answer.)

10         THE WITNESS:  They stay on the roll until the

11         30 days has lapsed.  And then they're removed.

12     BY MS. ABUDU:

13         Q    So that person remains eligible to vote during

14     that time?

15         A    Yes, ma'am.

16         Q    Okay.  Now, in terms of information that you

17     receive from the Secretary of State's office, you

18     indicated that you keep copies of whatever you get from

19     the Secretary of State; correct?

20         A    Any emails, yes, ma'am.

21         Q    Any emails.  Would you get --

22         A    And letters or whatever, they mail -- by snail

23     mail, we keep all the records.  Everything's a public

24     record.

25         Q    All right.  There were a couple of questions

MIKE HOGAN

that I have, just to kind of finish up a few of the

sections that we already covered.

So one was when you talked about your time in

the legislature, in the Florida House, you indicated or

testified that there were a number of bills that you

shepherded through the process.

A    Um-hum.

Q    Your own bill that you sponsored and got

passed.

A    Right.

Q    When those bills were before various

committees, did you all do any impact studies or impact

assessments related to those bills to determine, again,

what the impact would be?

A    Well, if there's financial impact, then you

know, we have staff, and they would identify that.  They

give a summary of the bill as well as anything that --

where it may touch, yes, ma'am.

Q    Okay.  And since you were elected as

Supervisor of Elections, you indicated that when you

joined the Florida Association of Supervisor of Election

[sic], you were given a big brother, kind of like a

mentor; correct?

A    Yes.

MIKE HOGAN

1

2     Q    Who was that person?

3     A    Chris Chambliss, Clay County.

4     Q    All right.  And just to go back real quick, in

5  terms of legislation, when you -- well, we'll get back

6  to that as we wrap up and make sure that we tied up any

7  loose ends.

8          So Chris Chambliss from Clay County.

9     A    Um-hum.

10    Q    Okay.  Now, you also indicated that you have

11 attended most of the association meetings; correct?

12    A    Yeah.  I think there's one that missed.  I

13 think there was one conference that I missed, yes,

14 ma'am.

15    Q    Do you remember which one that was?

16    A    No.

17    Q    All right.  Is there always a winter

18 conference?

19    A    Winter and summer.  Um-hum.

20    Q    Winter and summer?  Okay.

21         Did you attend the winter 2018 association

22 conference?

23    A    Yes.  Um-hum.

24    Q    And do you remember what was on that agenda?

25    A    Oh, not specific, no.  We were all talking

MIKE HOGAN

1

2  about the recount.  You know, that was a big deal.  And

3  we lost two associates as a result of some of that.

4  Yeah.  That was kind of a surreal one.  I mean, who's

5  had three statewide recounts?  So we were exhausted by

6  the time we got there.

7       Q    Okay.  Well, you also had a historic ballot

8  initiative in terms of Amendment 4 passed.  So was

9  Amendment 4 on the agenda for that winter 2018 meeting?

10      A    I can't remember if it was on the agenda.  You

11 know, we would talk about everything in breaks and so

12 forth, but not -- I mean, the whole host of discussions.

13 But I can tell you, the biggest discussion for us was

14 not Amendment 10, it was the recount and the fallout

15 from the recount.

16           It was devastating.  There were some great

17 stories of success.  And then you learn so much in that

18 situation.  And because the eyes of the country were on

19 us.  And we're always wary of another 2000.

20           So, yeah, that was a big deal.

21      Q    Okay.  Well, earlier, you just referred to

22 Amendment 10.  Did you mean Amendment 10 or you meant

23 Amendment 4?

24      A    Amendment 4.

25      Q    Okay.  So you remember Amendment 4 being part

MIKE HOGAN

1   of the agenda, but you don't remember --

3   A   I don't know that it was listed on the agenda.
4   I'm sure -- Maria makes a presentation, Maria Matthews
5   of the Division of Elections.  And there are questions,
6   a host of questions, typically that the people go up to
7   the mic.

8           I can't tell you everything that went on.

9   Q   Okay.  Do you remember the substance of
10  Ms. Matthews' presentation to the association?

11  A   It's all about what we just did, what we're
12  going to be facing, and, you know, multiple subjects.
13  It's not typically just one.

14  Q   Did you ask any questions related to
15  Amendment 4 during that winter 2018 meeting?

16  A   No.

17  Q   Do you remember questions from your colleagues
18  about Amendment 4 during that meeting?

19  A   There could have been.  Like I said, 20, 30,
20  40 questions.  I don't know how many she handled, but...

21  Q   Okay.  Earlier when we talked about
22  Ms. Henry's job responsibilities in terms of her review
23  of various databases and agencies, does your office have
24  any information-sharing agreements with any other
25  agencies?

MIKE HOGAN

A    The only, if you want to call it an agreement,
is that the clerk of court sends over on a regular
basis, you know, any new felons.  I asked a few
questions the other day.  And they average about 400
felony adjudications a month, something like that.  They
send us that information.  If they're on the voter roll,
then obviously we sent that to Tallahassee and let them
know.

Q    And in terms of the clerk sending that
information, is that pursuant to a formal agreement?

A    To the clerk?  I don't know that there's a
formal agreement.  I have not signed one.  I don't know
if it preexisted me, so I couldn't answer that question.

Q    Okay.  In terms of the information you get
from the various agencies, what are the limitations of
that information, to your knowledge?

A    I don't understand that question at all.

Q    Is it always accurate?  Is the information you
receive always accurate?

MR. TEAL:  Object to form.

THE WITNESS:  I accept it as accurate.  I
didn't create the document.

BY MS. ABUDU:

Q    So -- go ahead.

1                         MIKE HOGAN

2         A     That's it.

3         Q     So you accept it as accurate, meaning when you

4    receive the information from an agency, you don't do any

5    independent analysis as to whether or not the

6    information you're receiving and relying upon is

7    correct?

8         A     No, unless it doesn't match.  For instance,

9    they give us a name that doesn't match the name that we

10   have on file.  Then we might ask a question, "Is this a

11   typo, this record?  We have something close to it, but

12   not exactly what you have."

13             But, yes, we accept it at face value.

14        Q     Do you know if the information is always

15   complete?  Meaning, for example, do you have all of the

16   names of the people who have been convicted of a felony

17   within a particular period of time?  Do you know that?

18        A     No.  Um-um.

19        Q     Do you do any independent analysis to

20   determine whether or not the information is complete?

21        A     I would think the independent analysis would

22   be to call that agency that just gave me the data.  Who

23   else would have that data?

24        Q     And do you do that?

25        A     No.

1                    MIKE HOGAN

2      Q    Do you -- so you just accept it as complete?

3      A    Um-hum.

4           MR. TEAL:  Yes?

5           THE WITNESS:  Yes.  I'm sorry.

6  BY MS. ABUDU:

7      Q    Has it come to your attention ever that the

8  information is incomplete?

9      A    No.

10     Q    If it -- if indeed it were incomplete, would

11 that information -- would you be made aware of that?

12     A    I don't know how to answer that question.

13 That's speculative.  I don't -- I don't have an answer

14 for you.

15     Q    If the information were incomplete, would

16 Ms. Henry be informed of that?

17          MR. TEAL:  Object to form.

18          THE WITNESS:  Since it's never happened, I

19     can't speculate.  It's not...

20 BY MS. ABUDU:

21     Q    So when you say it has never happened, meaning

22 that you have never received incomplete information from

23 any of these agencies?

24          MR. TEAL:  Object to form.

25          THE WITNESS:  I don't have an answer for you,

1         MIKE HOGAN

2      ma'am.

3   BY MS. ABUDU:

4      Q    Okay.  Well, now you've given two different

5   answers.

6      A    What do you mean, I've given you two answers?

7      Q    I believe you said before, it's never

8   happened.  And so --

9      A    That's -- so I'm being consistent.  I can't

10  answer your question.  I don't know if it's complete or

11  incomplete.

12     Q    Well, if it's never happened -- so you don't

13  know if the information is complete -- is that

14  correct? -- because you've done no independent analysis?

15          You can't say whether or not it's never

16  happened.  It's just you don't know because you've never

17  done any independent analysis.

18     A    At this point, I think you're twisting it a

19  little bit, to me.  I'll be as clear as I can be.  I

20  don't know that it's ever happened, but I have never

21  searched to see if it's complete or incomplete because

22  the record is coming from the record keeper.

23     Q    Okay.

24     A    Where would I go other than the record keeper?

25     Q    And that also is your response in terms of

MIKE HOGAN

1  whether the information is accurate, you -- that has

2  never happened in terms of you receiving inaccurate

3  information?

4          MR. TEAL:  Object to form.

5          THE WITNESS:  I don't know of any record that

6      came inaccurate.  I can't say that.  And we did not

7      research.

8  BY MS. ABUDU:

9      Q    So are you aware of instances where you

10 received a record from an agency and then they followed

11 up with you to say, what we sent you was inaccurate?

12 Are you aware of a situation --

13     A    I'm not aware of that happening.

14     Q    Okay.  Would that have happened without your

15 knowledge?

16         MR. TEAL:  Object to form.

17         THE WITNESS:  There no way for me to know

18     that.  I would suspect that Bobbie would share that

19     with me or Arzada would share that with me.  But

20     I've not -- that's not been shared with me.

21 BY MS. ABUDU:

22     Q    Okay.  So Ms. Henry would inform you if an

23 agency had followed up with her to say, "The information

24 we sent you was inaccurate"?

MIKE HOGAN

1

2     A     I believe she would if she thought it was a

3     serious issue.

4     Q     Well, and which -- and what scenario would it

5     not be a serious enough issue to inform you?

6     A     I don't know.  I mean, I don't know.

7     Q     And if Ms. Henry were to receive information

8     from an agency saying that "The information we had sent

9     to you was incomplete," she would inform you of that as

10    well?

11    A     I would expect that she would, yes.

12    Q     Okay.  Does the clerk of court, in sending you

13    information, also include information for other counties

14    in terms of criminal convictions?

15    A     Just Duval County is reporting to us.

16    Q     Okay.  So Duval County wouldn't send you

17    information that they might have about a conviction from

18    another county?

19    A     I can't tell you if that takes place, but...

20          I don't know.  It's my understanding it's

21    Duval County.

22    Q     Okay.  So all of the information you received

23    from the clerk of court for Duval County related to

24    convictions pertain only to Duval County convictions?

25    A     Um-hum.

1                        MIKE HOGAN

2       Q    That information does not pertain to your

3   knowledge to any out-of-state convictions?

4       A    To my knowledge, no.

5       Q    To your knowledge, that information from the

6   clerk would not pertain to any federal convictions?

7       A    To my knowledge, no.

8       Q    Okay.  To your knowledge, would that

9   information related to a criminal conviction contain

10  information related to financial obligations?

11      A    Never have received anything about financial

12  obligations.

13      Q    So meaning you never received --

14      A    From anybody.

15      Q    So you never received anything related to

16  victim restitution being owed by a person?

17      A    No.

18      Q    You never received any information related to

19  court fines --

20      A    No.

21      Q    -- or fees?

22           You never received any information related to

23  court fines or fees being owed by a person?

24      A    No.

25      Q    Okay.  In terms of, again, just to wrap this

MIKE HOGAN

1

2  part up, when we talked about the legislation that you

3  introduced, and you said you did some kind of fiscal

4  impact statements; is that correct?

5      A    If there was a fiscal impact, it would have

6  been noted in the summary of the bill.

7      Q    Is that the only type of impact that you would

8  research or analyze?

9      A    The research would be done by staff.  And

10  there are requirements in the rules of the House as to

11  how a bill is presented to House members.  And so they

12  would follow those instructions.  Those folks are not --

13  do not report directly to me.  They are full-time

14  employees.

15      Q    So if you were -- if you had introduced a bill

16  and were interested in the impact on your constituents,

17  for example, would you be able to request that

18  information?

19      A    I could request research on that, I sure

20  could.

21      Q    Okay.  Did you ever do that in your capacity

22  as a state legislator, request information related to

23  the impact of a particular bill on your constituents?

24      A    I would say that the majority of the bills

25  that I had introduced came from my constituents.  So

MIKE HOGAN

1

2   other than the required research, I can't think of

3   anything specific.

4       Q    Okay.

5       A    And I'm reaching back in time, 15 years.

6       Q    Okay.  Now, you also, when we were talking

7   about the voter registration form, you indicated that

8   whatever the person fills out in the four corners, you

9   accept it; is that correct?

10      A    Um-hum.  Yes.

11      Q    Thank you.  Does your office provide

12  assistance to individuals in filling out the voter

13  registration form?

14      A    No.

15      Q    So if someone asks, I'm not sure how to answer

16  this particular question, what is the instruction or

17  training to your staff on how to deal with that

18  question?

19      A    The training to the staff is if they ask a

20  specific question about how they fill out the form, they

21  are to give them assistance, you know, do I put my full

22  name or partial name, that type of thing.

23          When it comes to if they ask a question about

24  "I'm not sure if my rights have been restored," we tell

25  them who they would need to contact to know that.  But

                    MIKE HOGAN

1  we don't tell them or instruct them how to answer those

3  three boxes.

4      Q    Okay.  What if --

5      A    Now it's --

6      Q    Okay.

7      A    -- more boxes, I think.

8      Q    Yeah.  A lot more boxes.

9           What if there's language on the form that the

10  person just doesn't understand?  Not because English is

11  not their first language, but they really just don't

12  understand the question?  What training have you given

13  to your staff in terms of how to deal with those

14  situations?

15      A    Well, there's a lot of things on that

16  application.  So do you have a specific portion of the

17  application that you're asking a question about?

18      Q    Have my rights been restored?  What if they

19  don't understand what restoration -- what that language

20  means?

21      A    Again, we share with them, if they need that

22  information, who to contact.  And we'll give them a

23  phone number or an address.

24      Q    Okay.  What if their question is, "I don't

25  know if I have a felony conviction"?

MIKE HOGAN

     A     We give them that form and we give them the
name of an organization to call, a state organization.

     Q     And who do you direct them to in terms of who
to contact if they want to know if their rights have
been restored?

     A     We recommend to State Board of Clemency or
Department of Corrections.

     Q     Okay.  Okay.  All right.  Let's talk a little
bit about the demographics in your county.  So first we
talked about the fact that -- or you testified that your
website contains a lot of information for voters;
correct?

     A     It does.

     Q     All right.  So what's some of that information
on the website, please.

     A     How to vote, where to vote, how to register,
how to find out your individual status.  You can search
prior elections.  You can search future election dates.

          Just about any question you can think of that
a voter may need, the answer is contained within our
website somewhere.

     Q     Okay.  And do you regularly go to your
website --

     A     I do it all the time, yes, ma'am.

MIKE HOGAN

1

2     Q   All right.  So you are very familiar, then,

3 with the information contained on your website?

4     A   Yes.

5     Q   And do you review the information before it

6 gets posted on the website?

7     A   Yes.

8     Q   Okay.  So that would include, in terms of your

9 review, demographic information on your website?

10     A   What are you referring to, "demographic"?

11     Q   Party affiliation.

12     A   There is a -- on the home page, there is a

13 standard position that's in the upper, right-hand corner

14 how many registered voters that we have in the

15 breakdown.

16     Q   Race demographics?  Are you familiar with that

17 on your website?

18     A   It's -- there's not a race demographic.  On

19 the home page, you can -- for those that want to go --

20 there's deeper searches.  They can do a demographic

21 analysis, yes.  And most of the campaigns do use our

22 database for that.

23     Q   And what about gender demographics?

24     A   Same.

25     Q   Meaning, can --

MIKE HOGAN

1

2      A     It's available on the website.

3      Q     Okay.  And do you also have voter turnout

4  information on that website for elections?

5      A     Yes.  Everything about elections is there.

6  The turnout, the dates, and when future elections are

7  going to be held.

8      Q     Okay.  So that would include election results?

9      A     Oh, yes.

10     Q     Correct?  Okay.  For candidates?

11     A     Yes.

12     Q     And for ballot initiatives?

13     A     Yes.

14     Q     Do you know how many people in Duval County

15  are registered as Democrats?

16     A     Well, the number changes every day.  So I

17  would go to my home page to give you that information.

18  But I would -- it's -- I'm guessing on this.  I know

19  there's a few more Democrats than Republicans.  But the

20  party that seems to be growing is the NPAs.

21     Q     So would it surprise you, that as of today,

22  August 28, 2019, your website reports that there are

23  40.89 percent registered voters who identify as

24  Democrats in Duval County?

25     A     That's probably -- yeah, I would say that's

MIKE HOGAN

1
2  probably close to the number.

3      Q    And with respect to Republicans, again, today,
4  your website reports 36.3 percent?

5      A    I would believe that.

6      Q    Okay.  And the no-party affiliation, you're
7  reporting as 21.99 percent.  Does that sound about
8  right?

9      A    Yes, it does.

10     Q    Okay.  Now, in terms of your -- the race
11 statistics, do you know how many are registered as white
12 voters in Duval County?

13     A    No.

14     Q    Would it surprise you to know that as of
15 today, your website shows 58.52 percent?

16     A    Wouldn't surprise me.

17     Q    And for those who identify as black,
18 27.96 percent?

19     A    That doesn't surprise me.  I would think it's
20 a little higher than that, but no.

21     Q    Okay.  And in terms of those who identify as
22 Hispanic, your website says 5.2 percent.

23     A    Um-hum.

24     Q    And why do you believe that those who identify
25 as black would be actually higher?

MIKE HOGAN

A    I thought that I had heard that the percentage had increased.  And I thought it was closer to 30.

Q    Who told you that?

A    John Libby.

Q    And just for the record, who is he?

A    He works -- he worked for the poll workers. And he is a former pollster.  He's been working in elections and demographics in elections for 40 years.

Q    And in what context did this information in terms of the increase in black voter registration in your county come up?

A    We talk about that kind of stuff all the time. Not just blacks.  We talk about where the growth in the county is.  I mean, all kinds of -- John is a thesaurus of demographic minutia and trivia.  And so when you talk with John, you're going to be talking about all kinds of things.  He predicts our turnouts.  He does those predictions for the office.  So we talk about those things all the time.

Q    Okay.  And as Supervisor of Elections, why, if at all, would the racial demographics be important to you?

A    Well, to us, it's only important from the standpoint that we -- it is a data point that we

1    MIKE HOGAN

2   capture.  It's used by government to create the

3   districts and the boundaries.  So those are the factors.

4        Q    Okay.  So in the redistricting context?

5        A    Um-hum.  John has done redistricting.  And he

6   did redistricting for the City of Jacksonville.  So like

7   I say, he's into all that.

8        Q    Now, in terms of voter registration and gender

9   statistics, do you know how many in your county identify

10  as female versus male?

11       A    No.  And I can tell you off the top of my

12  head, I would say there's probably a few more females

13  than males.

14       Q    Okay.  Would it surprise you again, according

15  to your website, as of today, there are 53.32 percent of

16  registered voters who identify as female?

17       A    No.  Wouldn't surprise me.

18       Q    And in terms of male identified voters,

19  44.16 percent?

20       A    I would believe that.

21       Q    Okay.  What about statistics in your county in

22  terms of those with criminal convictions?  Do you know

23  what that information is?

24       A    No.  Never looked at that.

25       Q    Okay.  In terms of the information that you've

MIKE HOGAN

2  been receiving from the clerk of courts, have you

3  noticed an increase in the number of individuals who are

4  reported as having criminal convictions?

5      A    I never really looked at that statistic.  I

6  don't know.  Um-um.

7      Q    Do you review the data that the clerk of court

8  sends to your office, though?

9      A    No.  It doesn't even come to me.  It goes

10 directly to Arzada or Bobbie.

11     Q    Okay.  Would you be surprised to know that

12 Duval County has a significant number of individuals as

13 compared to other counties who have a criminal

14 conviction?

15     A    Well, we're one of the large counties, I don't

16 know who -- where the ranks are as far as convicted

17 felons.  No, I wouldn't know that number.

18     Q    Would you be surprised to know that, in terms

19 of the racial breakdown of those with criminal

20 convictions, there's a racial disparity when it comes to

21 black or African Americans being convicted of crimes at

22 higher rates than whites?

23     A    No.

24     Q    It would not surprise you?

25     A    No.

1                    MIKE HOGAN

2       Q    And why is that?

3       A    Because that statistic is everywhere in the

4   country.

5       Q    Are you aware of any steps that Duval County

6   has taken to address that disparity?

7            MR. TEAL:  Object to form.

8            THE WITNESS:  Yeah.  I wouldn't -- no.

9   BY MS. ABUDU:

10      Q    Would it surprise you to know that when it

11  comes to sentencing disparities, that African Americans

12  or blacks are sentenced at higher rates than whites?

13      A    I've heard that.

14      Q    Does that surprise you?

15      A    No.

16      Q    And why is that?

17      A    Because it's kind of a statistic I've heard

18  for a long time.

19      Q    Okay.

20      A    But, you know...

21      Q    When you were a legislator in the House of

22  Representatives, did you do anything to address racial

23  disparities in the criminal justice system in your

24  county?

25      A    No.  I never served on a criminal justice

1          MIKE HOGAN

2    committee.  And I stayed in my lane as far as my

3    background.  So I handled -- one of the committees that

4    I was in was utilities.  I worked for the telephone

5    company for 25 years.  So power and electric and the

6    oversight that the government has, those were the things

7    I was interested in.

8          I worked in the health department, as I

9    mentioned, so I was co-chair -- or vice chair of the

10   health promotions committee.  So I stayed in those

11   areas.  I didn't get involved in education.

12         You know, there are a host of issues that the

13   legislature takes up.  And so you typically stay in an

14   area that you're comfortable with, but you're going to

15   be voting on a menagerie of issues.

16   Q    Do you remember voting on issues related to

17   criminal justice reform during your time in the House?

18   A    Yes, ma'am.  Everything from funding to the

19   Department of Corrections reforms in there.  I can't --

20   I can't be specific with you.  Again, that was not my

21   focus.

22   Q    Okay.  All right.  Well, let's talk a little

23   bit about the passage of Amendment 4.  And just for the

24   record, were you in charge of elections during the

25   November 2018 election cycle?

1                    MIKE HOGAN

2       A    Yes.

3       Q    Okay.  And you reviewed those election results

4  in terms of the candidates who won?

5       A    Yes.

6       Q    And the election results for Amendment 4 in

7  terms of rate of passage in your county?

8       A    Yes.

9       Q    Do you remember what the rate of passage of

10 Amendment 4 was for Duval County?

11      A    I think it was 62 or '3 percent.  I'm not

12 sure.

13      Q    Over 60 percent, though?  Would you feel

14 confident saying that?

15      A    Yes, ma'am.  I'm sure it was over 60 percent.

16      Q    Okay.  So I'm going to show you -- we've made

17 it this far without looking at a piece of paper, for the

18 most part.  But I'm going to show you a copy of the

19 language that was passed and commonly known as

20 Amendment 4.  This is for you.

21           I guess I'm technically supposed to give it to

22 your attorney first.  And this is a copy for you as

23 well.

24           (Exhibit 1 was marked.)

25 BY MS. ABUDU:

1                        MIKE HOGAN

2      Q    And while you can surely take your time, sir,

3 and read the whole thing, I would specifically direct

4 your attention to section 4, Article VI, section 4 of

5 the Florida State Constitution.

6           So please let me know when you've had a chance

7 to review that language.

8           Just let me know for the record, when you've

9 read --

10     A    I've read four.

11          MR. TEAL:  And you characterize this document

12     as the language in Amendment 4.  It's actually more

13     than the language in Amendment 4.

14          So I wanted to clarify for the record that

15     this is the entirety or you're purporting that it's

16     the entirety of Article VI of the Florida

17     Constitution.

18          MS. ABUDU:  That's correct.

19 BY MS. ABUDU:

20     Q    In terms of section 4 of this article and the

21 State Constitution, however, do you recognize this

22 language as the language that appeared in the

23 November 2018 ballot section commonly referred to as

24 Amendment 4?

25     A    Um-hum.  Yes.

MIKE HOGAN

1

2      Q    All right.  So let's talk a little bit about

3  what role in general you have played when it comes to

4  ballot initiatives, can you describe that for me,

5  please?

6           MR. TEAL:  Object to form.  Are you talking

7      about as his role of Supervisor of Elections?

8           MS. ABUDU:  Yes.  When it comes to the

9      petition to place a ballot initiative on the

10     ballot.

11          THE WITNESS:  Be more specific, please.

12  BY MS. ABUDU:

13     Q    So, for example, it's my understanding that in

14  order to place an initiative on a ballot, a certain

15  number of signatures have to be gathered; is that

16  correct?

17     A    Right.  So we're going from the amendment to

18  the petition process.

19     Q    Yes.  We're starting with the whole --

20     A    Because what you asked me to do is read this.

21  And I'm just thinking that you're going to ask me about

22  what I've read, so...

23          But you've gone to another subject entirely?

24     Q    Well, I am going to ask you about what you've

25  read.

MIKE HOGAN

1

2      A     Okay.  All right.  I just want to be clear.

3      Q     Okay.  So in terms -- because we're talking

4  about eventually how this language got on the November

5  ballot.

6            So what is -- what role do you play, for

7  example, when it comes to the gathering and verification

8  of signatures for a petition?

9      A     We are the depository for petitions.  And

10  we -- our office has to review them for their accuracy.

11  And most important thing, of course, is that it's the

12  signature of the voter.  So we do signature

13  verifications on petitions.

14      Q     And have there been instances when you

15  rejected signatures on a petition?

16      A     Yes.

17      Q     And what would be the basis for that

18  rejection?

19      A     Signature didn't match, signature was not the

20  name of the person that was presenting the petition.

21      Q     Okay.  When it came to the ballot, the rights

22  restoration ballot initiative -- again, I hope for ease,

23  I'll refer to it as Amendment 4.  Is that okay with you?

24      A     Sure.

25      Q     Okay.  So when it came to getting Amendment 4

MIKE HOGAN

1 on the ballot during the petition process, do you

2 remember receiving petitions and verifying signatures?

3 A    Oh, yes.  Um-hum.

4 Q    Okay.  Do you remember about how many

5 signatures you received?

6 A    No.  Um-um.

7 Q    Okay.

8 A    We have petitions for all the amendments.  We

9 have petitions for candidates.  So to remember and keep,

10 no, I don't keep up with all that.

11 Q    Okay.  Do you remember rejecting any

12 signatures related to Amendment 4?

13 A    I would say in every situation, every single

14 referendum, including candidates, there are rejections

15 for various reasons.

16 Q    Do you remember how many signatures related to

17 Amendment 4 you rejected?

18 A    No.  No, ma'am.

19 Q    Did you communicate with the Secretary of

20 State's office during that petition-gathering period

21 related to Amendment 4?

22 A    No.

23 Q    You had no communication with the Secretary of

24 State's office related to the petition?

MIKE HOGAN

1

2    A    When the Secretary of State would be calling

3    about amendments -- I mean petitions for amendments, it

4    was typically for all of them, unless one was going to

5    be removed or the end -- there was some kind of problem,

6    which could be.

7          We've had situations where -- in fact, I think

8    it's going on right now -- where someone's signing a lot

9    of petitions, one person.  And so that would be the only

10   time that they would single out one.  I'll get a notice

11   that this person or this group is not going to, you

12   know, be able to get to their number of petitioners and

13   they're being removed.  So we're not processing any more

14   of those.

15         Those are the types of things that the

16   Secretary of State's office would contact us about.

17   Q    Okay.  So did you receive any communications

18   from the Secretary of State related specifically to

19   Amendment 4?

20   A    I do not recall one, no.

21   Q    Okay.  So prior to Amendment 4's passage, did

22   your office take any steps relates to its potential

23   passage and therefore implementation?

24   A    No, ma'am.

25   Q    Okay.  Earlier when you were talking about the

1                         MIKE HOGAN

2  special election that might have happened in Duval, you

3  talked about a lot of preparation that your office --

4       A    Um-hum.

5       Q    -- engaged in for something that ultimately

6  didn't happen.  So when it came to Amendment 4, did your

7  office take any steps in the event that Amendment 4

8  might pass?

9       A    No, ma'am, because the Amendment 4, as far as

10  we could see, was not going to have any impact on us.

11  We do not do the eligibility.  That's done by the

12  Secretary of State.  So we expected anything in

13  Amendment 4 would have been done by the Secretary of

14  State.  We'd still be processing the applications.

15         But then we would accept everything that the

16  voter had, or the applicant had placed on their

17  application and then send it to the Secretary of State's

18  office.

19         No, ma'am, there was not any preparation

20  required in our minds.

21       Q    Well, earlier, you testified that prior to

22  Amendment 4's passage, it was Ms. Henry's responsibility

23  to determine voter eligibility with respect to someone's

24  criminal status; correct?

25       A    Um-hum.

MIKE HOGAN

Q    And that after Amendment's 4 passage, she no
longer has that responsibility; correct?

A    That's correct.  Because of the -- it's
different.  It's totally different.

Q    So prior to Amendment 4's passage, you had no
conversation with Ms. Henry as to what or how her job
might change, given Amendment 4's potential passage?

A    No.

Q    Did Ms. Henry express anything to you
regarding how her job might change with Amendment 4's
passage?

A    No.

Q    Did anybody in your office express anything
related to Amendment 4's potential passage?

A    We knew that if Amendment 4 passed, there
would be some kind of enabling language to tell us how
we were going to be impacted.  And that was all that we
knew.  Couldn't even guess what we were going to be
required to do.  Didn't know how the Secretary of State
was going to handle it.

     But we didn't vet.  They vet.  With the
exception of someone that's already on the roll being
taken off the roll, there's -- you know, that could have
been changed.

MIKE HOGAN

But again, we're looking at the records that these groups hold on the list that I shared with you. And if that person's rights had been restored, then the application was going to be accepted.  If not, the applicant would be told, we don't show that your rights have been restored.  So, again, it would go to the Secretary of State.

Q   How did you know that there would be enabling legislation associated with Amendment 4's passage?

A   I didn't know for sure.  But as a former legislator, the way that I was reading this amendment, there would have to be some enabling language for the departments to handle this.  I'm not aware of anyone keeping the kind of records that were going to have to be kept prior to the passage of Amendment 4.

Q   Okay.  Are you aware that when it came to Amendment 4, a lot of advocates concluded that the language or the amendment would be self executing, meaning no need for --

A   I heard that from many people.

Q   Okay.  So what made you conclude that enabling legislation would be necessary?

A   It's been my experience, when the law changes, there are a host of other things that have to be done to

MIKE HOGAN

1    implement it.  I didn't see this as being all part and

2    parcel in the amendment.  And I don't think anybody else

3    did.

4    Q    Um-hum.

5    A    But that's just my own personal opinion.

6    Q    Okay.  Well, first, did you receive any

7    information from the Secretary of State prior to

8    Amendment 4's passage in terms of --

9    A    No.

10   Q    -- it's --

11   A    Okay.  I'm sorry.

12   Q    It's okay.

13   A    All right.

14   Q    Did you receive any information from the

15   Secretary of State prior to Amendment 4's passage

16   related to its implementation?

17   A    No.

18   Q    Okay.  Now, when you talk about implementing

19   legislation being necessary with respect to Amendment 4,

20   can you discuss that a little bit more?  I mean, what

21   exactly did you consider would be necessary?

22        MR. TEAL:  I object to form.

23        THE WITNESS:  Well, if you look at B

24   [as read]:  No person convicted of murder or felony

1          MIKE HOGAN

2    sexual offense shall be qualified to vote until

3    restoration of civil rights.

4         What's a sexual offense?  What's murder?  I

5    thought that at least the definitions should come

6    out.

7         When I was tax collector, I got a call one day

8    from a lady that was distraught about a gentleman

9    that appeared at her home selling books, and he

10   knew her kids' names, and he knew her husband's

11   name.  And she did a research on him and he was a

12   sexual predator in Minnesota.  And she wanted to

13   know why I had given him a business license.  And I

14   didn't give him a business license.  He paid for a

15   tax.  We don't investigate and still don't

16   investigate anybody that's paying a tax.  We accept

17   their money.

18        Turns out, I found from a friend, who happened

19   to be with the same organization that this young

20   man was working for, when he was 18, he was now 20,

21   he was with some buddies and he mooned someone in

22   public.  And in Minnesota, that was a sexual

23   offense.  That's not a sexual offense, I don't

24   believe, in Jacksonville or the state of Florida.

25   I'm sure there's some kind of misdemeanor for that,

1                    MIKE HOGAN

2        depending on where you are...

3             But so those are the types of things I thought

4        would at least be defined.

5    BY MS. ABUDU:

6        Q    Doesn't Florida's criminal code provide

7    definitions for offenses?

8        A    I'm just telling you my opinion, ma'am.

9    Anybody could have another one.

10       Q    I'm not even expressing an opinion.  I'm

11   asking a question.

12       A    I know.

13       Q    Doesn't Florida's criminal code --

14       A    Obviously they could.  There are many opinions

15   as there are people.

16       Q    Right.

17       A    But that's -- we figured it would be some

18   language.

19       Q    But if Florida's criminal code defines murder,

20   why wouldn't --

21       A    I --

22       Q    So let me just finish.

23       A    Okay.

24       Q    If Florida's criminal code defines murder, why

25   would enabling legislation be necessary to define

                         MIKE HOGAN

1

2    murder?

3           MR. TEAL:  Object to form.

4           THE WITNESS:  Yeah.  And I'm not going to

5       answer that question because I don't think it's

6       pertinent, number one.

7           Number two, I'm not an expert on the law.  I'm

8       not an expert on what the criminal offenses are.

9       I've told you that it was my supposition that there

10      would be some kind of definition because that's all

11      it says.

12   BY MS. ABUDU:

13      Q    Okay.  Well, you can't not answer my question

14   unless there is a legitimate objection raised.

15      A    I'm saying I can't answer your question,

16   because I don't know how to answer your question.

17      Q    Oh, you're unable to answer the question of

18   why would you need enabling legislation to define murder

19   when Florida's criminal code defines murder?

20      A    Because I can't tell you that I know

21   everything about Florida's criminal code on murder.

22           As an individual, I know that there is several

23   degrees of murder.  I know that there's self defense and

24   I know that there is attempted murder.  But I don't know

25   how that all structured.  And it didn't say anything

1                    MIKE HOGAN

2  about that in paragraph B.

3       Q    Okay.

4       A    So that's my supposition.  Whether I was

5  correct or incorrect, you know, I was willing to accept

6  my guess, my gut.

7       Q    Okay.  So if Florida's criminal code defines

8  murder, do you still believe that you need enabling

9  legislation to define murder?

10           MR. TEAL:  Object to form.  He's already

11      answered to the best of his ability.

12           MS. ABUDU:  No, he didn't.  He just said he

13      can't answer.  But now I've tried to clarify a

14      question that he should be able to answer.

15           MR. TEAL:  You asked him the same question

16      that he already said he's unable to answer.

17  BY MS. ABUDU:

18       Q    You can't answer whether or not Florida's

19  criminal code defines murder, why you would need

20  legislation defining murder?  You can't answer that as a

21  former legislator?

22           MR. TEAL:  Object to form.  He's already given

23      you his answer.

24           THE WITNESS:  I've already given you my

25      answer.  I can't give you anything else.

MIKE HOGAN

1

2  BY MS. ABUDU:

3      Q    Is that the same when it comes to felony

4  sexual offense?  If it's already defined in Florida law,

5  you would still need enabling legislation to define it?

6          MR. TEAL:  Object to form.  He's already

7      answered.

8          MS. ABUDU:  Well, he can state for the record

9      himself.  You can't testify for him.

10          THE WITNESS:  I can't answer that.

11 BY MS. ABUDU:

12     Q    You can't answer that question?

13     A    I don't know how to answer that.  No, ma'am.

14     Q    Okay.  What other aspects of Amendment 4's

15 language do you believe required enabling legislation,

16 given your testimony that you believed enabling

17 legislation was necessary?

18     A    Once this passes, somebody's got to make a

19 decision.  And I don't see any direction as to where

20 this particular amendment states where that's going to

21 go.  I know it's going to go in the Secretary of State's

22 office, not mine.  I don't vet.  So unless the Secretary

23 of State is going then to impose this on each county, I

24 don't even know if they have the authority to do that,

25 so...

1                    MIKE HOGAN

2          But I expected that there would be some

3    enabling language.

4       Q    Okay.  Other than your experience, which I

5    believe you pointed to in your testimony as to why you

6    believed enabling legislation would be necessary, was

7    there any other source for reaching that conclusion for

8    you?

9       A    No.

10      Q    And just to clarify, since we went down the

11   criminal code route, you never -- well, first, let's go

12   back a little bit.  So you believed enabling legislation

13   would be necessary.  Was that realization before

14   Amendment 4's passage?

15      A    I can't tell you when I came upon that.  But

16   that was my position.  That's my thought.  But I can't

17   tell you exactly when that thought came to me.

18      Q    Okay.  So again, just to clarify, prior to

19   Amendment 4's passage, you didn't -- you did not reach

20   out to the Secretary of State to discuss how this

21   language would be enforced against you, as Supervisor of

22   Elections?

23      A    No.  But -- no.

24      Q    Are you aware of your colleagues, meaning

25   other Supervisors of Elections reaching out to the

MIKE HOGAN

1

2  Secretary of State seeking some guidance as to how

3  Amendment 4 would be implemented and enforced?

4      A    I've never asked that question of any of my

5  colleagues.

6      Q    For the summer 2018 meeting, when Amendment 4

7  was going to be on the ballot, do you remember any

8  questions from your colleagues during that association

9  meeting related to --

10     A    I do not.

11     Q    -- this enabling -- implementation and

12  enforcement of Amendment 4?

13     A    I didn't.  Did not.

14     Q    Okay.  All right.  Are you aware of other

15  ballot initiatives that have passed in Florida that did

16  not include or require enabling legislation?

17     A    Haven't thought of it until I became a

18  Supervisor of Elections, but, no, I can't tell you.

19     Q    You can't tell me.  You don't know, or you

20  don't remember?

21     A    I don't know.  I never thought of it in those

22  terms.

23     Q    Would it surprise you to know that there have

24  been ballot initiatives passed in Florida that did

25  not -- or that were not accompanied by enabling

1                          MIKE HOGAN

2   legislation?

3        A     No, that would not surprise me.

4        Q     And why is that?

5        A     Because I didn't look at it in that light.

6   This would have some impact in the area of work that I

7   do.  And I didn't think it was sufficient when I read it

8   to implement it either in my office or through the

9   Secretary of State's office.

10        So I assumed there would be some kind of

11   enabling language or directions or rules that may come

12   out of the Secretary of State's office.

13        Q     You read obviously the language before it was

14   passed; correct?

15        A     I voted for the bill.  So yes, I read it

16   before it passed.

17        Q     You voted in favor of Amendment 4, you mean?

18        A     I sure did.

19        Q     Okay.  So then the -- and this is just to

20   clarify your testimony.  So that means that the concern

21   about enabling legislation that you've expressed did

22   come to you before Amendment 4's passage?

23             MR. TEAL:  Object to form.

24             THE WITNESS:  I don't remember the timing of

25        when I had that thought.  I did have questions in

MIKE HOGAN

1

2     my mind about what murder and felony convictions

3     were.  And the only other thing I didn't like, that

4     I wasn't sure that it went far enough for me, but

5     it was, what I thought, the right thing to do.  So

6     that's why I voted for it.

7 BY MS. ABUDU:

8     Q    And when you say "the right thing to do," can

9 you be more specific?

10     A    No.

11     Q    The right thing to do?  I mean, we're going to

12 read the transcript and it's not going to be clear.

13 What is the right -- and I don't want to put words in

14 your mouth, even though it sounds like you're talking

15 about Amendment 4's language was the right thing to do.

16     MR. TEAL:  I'm going to object to form.

17     MS. ABUDU:  I'm asking him to clarify.

18     MR. TEAL:  I know.  But you're talking to him

19     as a personal voter, not as the Supervisor of

20     Elections.

21     MS. ABUDU:  No.  He's the one that stated that

22     he voted for the amendment.  I didn't even ask him

23     how he voted.  He volunteered that information.  So

24     now I'm asking you --

25     MR. TEAL:  You did ask him if he voted for it.

1                          MIKE HOGAN

2          And he said yes.

3               MS. ABUDU:  Well, he said, I voted for the

4          bill.  So I wanted to -- we can go back to the --

5               MR. TEAL:  Then you said, "You voted for it."

6          And he said, "Yes, I did."

7               MS. ABUDU:  Yeah, because this --

8               MR. TEAL:  My point is --

9               MS. ABUDU:  Yeah, let's focus.

10              MR. TEAL:  We're getting a little off topic in

11         terms of his personal opinions versus as a

12         Supervisor of Elections.

13    BY MS. ABUDU:

14         Q    I'm not asking you anything about your

15    personal opinion.

16              You have testified, Mr. Hogan, that you read

17    the language, it impacted the work that you do as a

18    Supervisor of Elections, and therefore, you thought that

19    enabling legislation was necessary.

20         A    Um-hum.

21         Q    I asked you when that thought came to you and

22    you say you can't remember.  But you also testified that

23    you read the language way before it went to the -- you

24    know, before it was voted upon.  Is that all correct?

25         A    No.  I read the language when we were making

1                         MIKE HOGAN

2     up the ballots.  That's when I looked at all the

3     referendums.

4         Q    Okay.  So during the petition signature

5     gathering phase related specifically to Amendment 4, you

6     had not read Amendment 4's language at that time?

7         A    Not -- no.  If I did, I don't recall.  Other

8     than what I saw in the petition form, yes.

9         Q    Do you know what the effective date for

10    Amendment 4 was after its passage?

11        A    January 8th.

12        Q    Okay.  So between November 6th, 2018, and

13    January 8th, 2019, just talking about that period of

14    time right now, did your office take any steps related

15    to Amendment 4's implementation?

16        A    No.

17        Q    Okay.  Just to unpack that a little bit, you

18    issued no public statements to the voters in Duval

19    County about Amendment 4?

20        A    Amendment 4 was all over the news.  Yes.  And

21    we published the facts of what, you know, the vote was

22    and the fact that it was accepted favorably around the

23    state and the percentages and everything.

24        Q    Okay.  Did you publish any or provide any

25    information to voters as to what that meant with respect

MIKE HOGAN

1  to voter registration?

3       A    Everything that we would have supplied was

4  already being supplied.  It was in the news.  It was

5  everywhere.

6       Q    Okay.

7       A    But no.  To answer your question directly, no.

8       Q    Did you get any invitations to attend any

9  community groups to speak specifically about

10 Amendment 4?

11      A    I met with several groups about Amendment 4.

12 One group was the NAACP.  And there were four people

13 that came to the office.  The president and three

14 others.  And it seems to me there was another group that

15 called and asked questions.  I can't remember who they

16 were at this point.  But those are the only two that I

17 know that I had conversations with at length.

18      Q    Do you remember when that meeting occurred?

19      A    No.  I don't know if it was before the

20 January 8th.  I think it was but I can't be sure.

21      Q    Did anyone else from your office attend that

22 meeting?

23      A    No.  Wait.  I think with the NCA -- NCA --

24 NAACP, I think Arzada was in that meeting, but that's

25 memory.  I'm not certain.  I think she was.  She may

MIKE HOGAN

1   have come in for a little bit.  I know that she knew one

2   or two of the people.

3       Q    Did you take any notes during that meeting?

4       A    Notes?  No.

5       Q    Did Arzada -- apologies, I don't remember her

6   last name.  Did she take any notes during the meeting?

7       A    No.

8       Q    So what did you all discuss during that

9   meeting?

10      A    They asked questions regarding how are we

11  going to make a decision.  And I explained to them that

12  we don't make the decision, that it's going to be coming

13  from the Secretary of State's office.  And that

14  surprised them.

15       And the conversation from there went to did I

16  think that we would have overwhelming crowds of people

17  on January the 8th.  And I told them I didn't think that

18  it would be overwhelming.  I said I think it would be an

19  uptick in applications.  And so we were prepared by

20  getting, you know, sufficient supply of applications on

21  hand.

22       And it was a very pleasant meeting.  Everybody

23  left happy and satisfied, as far as I'm concerned.  And

24  I talked to Isaiah since then.  Isaiah Rumlin was the

MIKE HOGAN

1
2  president at that time.  I don't know if he still is.
3  That's it.
4      Q    I believe you said that one of the topics of
5  discussion was a question about decisions and who would
6  be making those decisions.  What decisions, in
7  particular, are you referring to?
8      A    Eligibility.
9      Q    Anything else?
10     A    No.
11     Q    And just to clarify your response, was that
12  that the Secretary of State would be making that
13  decision?
14     A    Yes.
15     Q    Okay.  And so between November 4th -- I'm
16  sorry.  Between Amendment 4's passage in January 2019,
17  did you receive any guidance from the Secretary of State
18  during that period of time?
19     A    No.
20     Q    Did you reach out to the Secretary of State
21  during that period of time?
22     A    No.  No.
23     Q    I didn't know if you were going to say
24  something.
25     A    No.

MIKE HOGAN

Q    So -- and again, I don't want to put words in your mouth.  I just want to make clear.  So what did you consider your role to be during that time?  I mean, you've got -- Amendment 4's passed.  You've testified that you've got no guidance whatsoever from the Secretary of State's office.  And yet January 8th was knocking on your door.  So what did you consider your responsibility to be in terms of implementing this initiative?

A    My responsibility was already assigned.  It had not been changed.  So we do the same work that I had been doing, with the exception of the fact that we would not vet anything after that date.  Everything went to the Secretary of State's office.

Q    So --

A    So we accepted every application.

Q    Okay.  So for purposes of believing that enabling legislation was necessary, is it accurate to say that whatever that enabling legislation you considered to be necessary would not impact your job responsibilities?

MR. TEAL:  Object to form.

THE WITNESS:  Yeah.  There were a whole host of things going on then.  I think that's about the

1                    MIKE HOGAN

2       time that there was -- the governor and the

3       legislature, and they were not in session yet,

4       obviously, but they were talking about laws and

5       changing the statutes and so forth around

6       Amendment 4.  There was a lot of chatter, but

7       nothing in our hands concrete.

8  BY MS. ABUDU:

9       Q    Right.  No, I understand that.  But you

10 testified that even with Amendment 4's passage, your job

11 description wouldn't change; is that correct?

12      A    Yeah.  We do not determine -- we do not do

13 anything but accept the completed application.  We do no

14 vetting.  So we would be sending those applications, all

15 of them, including the ones that Mrs. Henry used to vet.

16 Those would all go to -- they'd be taken face value and

17 sent to the Secretary of State's office Division of

18 Elections.

19      Q    Okay.  So again, just to clarify, that means

20 that any enabling legislation that might have come out

21 of this process wouldn't change your job description, to

22 your knowledge?

23           MR. TEAL:  Object to form.

24           THE WITNESS:  That's correct.

25 BY MS. ABUDU:

1                          MIKE HOGAN

2          Q     You can repeat it for the court reporter, your

3     answer.

4          A     Yes.

5          Q     "That's correct."  Okay.

6                Now, you said that the NAACP asked you if you

7     expected a lot of people to come out January 8th.

8          A     Um-hum.

9          Q     And your answer was you didn't think so.

10         A     They said crowds.

11         Q     Crowds.  Okay.

12         A     Yes, of people.  And there was some talk of a

13    rally.  And I said, you know, I don't know, but we're

14    going to be prepared for the number that may come.  But

15    I don't think it's going to be a large number.  Some

16    were saying there were going to be 600 people there.

17    There were 15.  So that was the only thing we discussed.

18         Q     Okay.  So that sounds -- again, just to

19    clarify.  That sounds like you were talking about the

20    day of, meaning January 8th?

21         A     That's correct.

22         Q     Okay.  So -- but are you aware that it was

23    estimated that 1.4 to 1.6 million people would now be

24    eligible to vote with Amendment 4's passage?

25         A     I knew the number was large, but what that

1  MIKE HOGAN

2  number was, I don't remember.

3      Q    Did you know what the number would be in terms

4  of people impacted in Duval County by Amendment 4's

5  passage?

6      A    Again, had a rough estimate.  But knowing the

7  number of felons and knowing the number of felons that

8  are having their rights restored, that's totally

9  different animal.

10          I can tell you how many felons there are.  But

11  many of those may have been -- if they're having -- in

12  Duval County, if there's 400 adjudicated every month,

13  then that's a large number by itself, so...

14          And are they registered, even?  So the numbers

15  are -- it's not anything you can bet on.  But, yes, I

16  knew the number was large statewide.  I don't recall

17  what the number was for Duval.

18      Q    Okay.  You testified that you had a rough

19  estimate, though, in terms of the impact on Duval

20  County.  What was that estimate?

21      A    I don't recall the number.

22      Q    Okay.  Was it in the thousands?

23      A    No.

24      Q    Less than 1000?

25      A    I didn't know.  I didn't know how many --

MIKE HOGAN

1  there's no way I could even estimate it.  I just knew

2  how many felons I had, not who it might have impacted.

3  

4      Q    Okay.  At that time, how many felons did you

5  have?

6      A    I don't recall the number.

7      Q    Okay.  Do you have a rough estimate of that?

8      A    No.

9      Q    All right.  You testified earlier, and I find

10 this very impressive, that you receive personally all of

11 the emailed questions that your -- that voters in Duval

12 County have.

13     A    Um-hum.

14     Q    Okay.  So did you receive email questions

15 about Amendment 4?

16     A    I would say it would be a low number.  There

17 just weren't that many.  That's one way I predict

18 things.  Where's the community right now?  I didn't

19 get -- I didn't receive very many.

20     Q    Okay.  So of the ones you received, what were

21 those questions?

22     A    Typically they were saying, can I come in on

23 January the 8th, or how do I know if my rights have been

24 restored.  And so my response would be, you can contact

25 the State Board of Clemency, or you can contact the

MIKE HOGAN

1

2  Department of Corrections and give them either a 1-800

3  number or an email address, something like that.

4      Q    Did you specially or separately store emailed

5  questions you got about Amendment 4?

6      A    I wouldn't say that I necessarily -- do I

7  have -- my email subfolders are like this, (indicating).

8  And you have a lot of crossover.

9           I have one section just citizen questions.

10 And occasionally, I will put that into another folder

11 because I want to use that answer again because I've

12 already seen it three or four times.  And so I might put

13 that in the category of felon.  But I couldn't tell you

14 if I've got them in the felon category or in the citizen

15 response category.

16     Q    Okay.  But as a public record, you've got

17 them?

18     A    I have all my emails.

19     Q    Okay.  What about phone calls?  Did your

20 office receive any phone calls with questions related to

21 Amendment 4?

22     A    We got some.  Not very many.  Not very many.

23 There was one that stands out because he was very

24 irritated.  But I would say less than five or six calls.

25     Q    Okay.  And how do you document the receipt and

MIKE HOGAN

1    response of those kind of calls?

2    A    I don't document them.  It's not written down.

3    Q    So then how do you know -- and I realize

you're guessing a little bit, in terms of the low

number, but how do you know you even got that number?

4    A    Because there's just so few.  They stood out.

5    Q    Did you personally take those calls?

6    A    That's what I'm talking about.

7    Q    These are phone calls --

8    A    These are calls that I got.  Now, how many the

office got, I can't tell you.

9    Q    Ahh, okay.  All right.  So to your

knowledge -- so you don't know whether or not other

staff members --

10    A    No.

11    Q    -- in your office --

12    A    Um-um.

13    Q    -- received calls?

14    A    No.

15    Q    Is that true in terms of emails, that you

don't know if other staff members received emails?

16    A    They would be writing directly to that staff

member so they would know that staff member and have

some contact with them.  Because if you go to the

MIKE HOGAN

1

2   website and send an email, it comes to me.  So, yes,

3   they could go.  But I don't think there's that many.

4        Q    Okay.

5        A    You know, the back door.

6        Q    Okay.  But if your staff member had gotten an

7   email with a question about Amendment 4, would they tell

8   you?

9        A    They would -- if they didn't know the

10  answer -- it would always go to Bobbie.  If Jane got the

11  call and it's about felons, they know to transfer it to

12  Bobbie.

13       Q    Okay.  What about letters?  Some people still

14  use snail mail?

15       A    I don't remember any letters directed to me.

16       Q    Okay.  Does that mean that you don't know if

17  your office received some?

18       A    Typically when the public writes to my office,

19  they're writing to me.  Just Supervisor of Elections.

20  So I would get that.

21       Q    And you don't --

22       A    If I got one that had a question, needed some

23  research, I would give that to Bobbie.  I don't remember

24  any.

25       Q    What about in person?  Did anyone show up just

1          MIKE HOGAN

2   with questions?

3       A    I think there was -- I think there was one

4   that came in, for me.  But again, I can't tell you how

5   many may have asked questions at the counter.

6       Q    Um-hum.

7       A    The first day, November -- I mean January 8th,

8   it was an uptick, but there were no lines.  You know,

9   people were coming in and going out.

10          I think on that day, we processed about 108.

11   I think was the number of applications that day.  We

12   were constantly asked, "Were they a felon," by the

13   press.  We said, we don't know, we don't ask them that

14   question.

15          I don't know how many we got.  And I never

16   remembered until you just asked that question, I never

17   went to see how many we may have received online that

18   day.  But I know that we didn't see a real big uptick.

19   But 108 people in the office is larger than what we

20   would normally see.

21       Q    Okay.  All right.  Let's talk a little bit

22   more about after January 8th.  So now Amendment 4 is

23   passed.

24       A    Um-hum.

25       Q    Its effective date has come.  So I want to

MIKE HOGAN

1
2    show you -- or actually, I already presented the form to

3    you, which you can -- the language -- or Article VI of

4    the State Constitution, which I presented you, which of

5    course you can reference if you have any questions.

6        A    Um-hum.

7        Q    As you know, because you're here, you've been

8    sued by a number of individuals, including my clients.

9    Not in your individual capacity, but in your official

10   capacity as a Supervisor of Elections.

11           What is your understanding regarding the

12   plaintiffs' lawsuit?

13       A    I have yet to figure out why I'm here.

14       Q    Did you read the complaints?

15       A    Whenever it came in, I did, yes.

16       Q    Okay.  So just -- because I know that you

17   filed a motion to dismiss.

18       A    Um-hum.

19       Q    But that doesn't answer the question of what

20   is your understanding as to the plaintiffs' lawsuit.

21       A    I don't understand why you would include the

22   supervisor.  I don't understand why you would only

23   include eight supervisors.  If there was an

24   implementation problem, it would be statewide, I would

25   think.

1          MIKE HOGAN

2          So I'm not sure, even after reading your

3  complaint, what the complaint is against the supervisor.

4  I would think that your complaint is against the

5  Secretary of State.

6     Q    Okay.  And, again, I don't want to put words

7  in your mouth.  So, then, what do you understand the

8  complaint to be?

9     A    I'm not sure what your goal is in this -- in

10  the case.

11     Q    Okay.  You don't know what the goal is in the

12  case.

13     A    Um-hum.

14     Q    You talked about that you don't know why the

15  Supervisors of Elections have been sued.  But so then --

16  scratch that.

17          You talked about the voter registration form.

18  And we discussed that sometimes your office does provide

19  some assistance when it comes to filling out the form.

20     A    Yes.

21     Q    And are you aware that with Amendment 4's

22  passage, that there were -- were there any changes to

23  the voter registration form with Amendment 4's passage?

24     A    There is now, yes.

25     Q    Okay.  But was that as a result of

MIKE HOGAN

1

2    Amendment 4?  Because of course we're going to get into

3    the legislation.

4        A    I'm sure it's a part of because of

5    Amendment 4, yes.

6        Q    So between November 2018 when Amendment 4 was

7    passed and, let's say, May of 2018, were there any

8    changes to the voter registration form, to your

9    knowledge?

10       A    Um-um.  No.

11       Q    And you indicated that you didn't -- other

12   than the meetings that you had with some community

13   groups, there were no other steps that you took related

14   to Amendment 4's implementation?

15       A    No.

16       Q    Okay.  So there are no changes in your

17   training manual to -- earlier, you testified that when

18   there's a rule change or a law change, you update your

19   manual.  Did you do any updates to your manual after?

20       A    No.  Because we had not received any

21   information from the Secretary of State so we were --

22   it's the same for us, with the exception that we are --

23   we do not vet even someone that's listed on file already

24   as a felony -- a felon, excuse me.  We send that to the

25   Secretary of State.

1                    MIKE HOGAN

2       Q    And is that change documented in any of your

3   training manuals?

4       A    There's only one -- two people that are doing

5   it; and primarily one.  And Bobbie knows.

6       Q    She knows.

7       A    Yes.

8       Q    Okay.  So it's a verbal communication?

9       A    Yes.

10      Q    All right.  All right.  I'm going to show you

11  another document.  Most of this stuff in here is not for

12  you.  So you will not be burdened.  Okay.

13           So just for identification purposes, this is

14  an email.  It looks -- it comes from and was produced

15  from the email of a person named Kari Ewalt, E-w-a-l-t.

16  The information on the top of the email says that it

17  came from Maria Matthews.  It's dated February 11th,

18  2019.

19           And it is sent to what appears SOE list, SOE

20  staff contacts.  And I'm going to share a copy to be

21  entered into the record.  And I'm going to give this

22  first to your attorney.  And then this is for us.

23           (Exhibit 2 was marked.)

24           THE WITNESS:  Okay.

25  BY MS. ABUDU:

MIKE HOGAN

Q    Okay.  Do you recognize this document?

A    I do.  This document was given to Arzada and
we had -- we sat down with Bobbie.  And Bobbie pretty
much had already accomplished all this, and, in fact,
took care of the request and the action.

Q    Okay.  So did you ever see a copy of this
email when it was sent?

A    I believe it came to me.

Q    When you -- in the "to" line, SOE list, would
that include you?

A    Yes.

Q    Okay.  And SOE staff contacts, who in your
office would be part of that list, sir?

A    I'm not seen that term so I don't know who
that staff contact is.  If -- and I don't remember
giving Bobby's information.  But Bobbie, I think Bobbie
and Amber are the regular communicators on this issue,
so she could have been on Amber's list.

Q    Okay.  So you have a copy of this document in
your own files?

A    Um-hum.  Um-hum.

Q    Did you produce a copy of this to plaintiffs'
counsel, either Gruver or the McCoy plaintiffs?

A    I don't think so.

MIKE HOGAN

1

2      Q    Well, the McCoy plaintiffs are not in

3  possession of it.  So any reason why you didn't produce

4  this document?

5      A    No.  The Kari Ewalt is strange.  No.

6      Q    Okay.  So just so that I can understand

7  because there's language in here that I will acknowledge

8  I'm not familiar with, what is this document?  What is

9  Ms. Matthews asking you to do in this email?

10     A    I can't explain that to you.  This is -- when

11  Arzada and Bobbie understood it completely.  But this is

12  not something that I could explain to you well.

13     Q    So did you ever speak with your colleagues

14  about Ms. Arzada?

15     A    When you say "colleagues" --

16     Q    I meant the two people you identified.  I

17  think you said Ms. Henry and Arzada?

18     A    Yes.

19     Q    Again, I don't know her last name.

20     A    Haynes.

21     Q    Haynes.  Ms. Haynes.  Did they ever talk to

22  you about this email?

23     A    That's -- yes, ma'am.  That's what I shared

24  with you.

25     Q    Okay.

MIKE HOGAN

A    I remember this.  I gave it to them to handle.
And we had a brief meeting.

Q    So during that meeting -- I guess I'm just
trying to understand.  You said you don't really
understand what's being asked of you, but you passed it
on to your staff members to handle it?

A    Yes.  One's been doing it for 20 years, and
knows what a PIN is, and these other things, yes, ma'am.

Q    So do you know if they complied with this
request?

A    Yes, they did comply with the request.

Q    And in terms of knowing that they complied, is
it just that you know that they did something?  Or do
you know specifically what they did in response to this
request?

A    Again, the reason I gave it to them is I
didn't know what action they had to take.  But they did.

Q    Um-hum.  Do you know if they ever followed up
with Ms. Brown related to this request?

A    I can't tell you that, no.  I would tell you
this -- I'm sorry.

Q    You can continue.

A    I would tell you this.  If we didn't follow
up, we would have received a follow-up from the

1                    MIKE HOGAN

2    Secretary of State's office.

3         Q    Okay.  Did anyone from your office ever follow

4    up with Ms. Marconnet?

5         A    That is Bobbie's contact.

6         Q    Um-hum.

7         A    But I don't know that she's -- I can't tell

8    you because I do not know if she had contacted Amber on

9    this issue.

10        Q    Do you know --

11        A    Amber's addressed in this as well, so your

12   prior points of contact.

13        Q    That's why I asked about Ms. Brown and

14   Ms. Marconnet, because, again, they are identified as

15   the points of contact in this email.

16        A    Right.

17        Q    Do you know of any other emails that were sent

18   from the Secretary of State's office related to this

19   particular request that appears in the email?

20        A    I do not recall.

21        Q    So how would Ms. Haynes or Ms. Henry

22   communicate their compliance with this request?

23        A    If there was no compliance, I would expect --

24   I would have received an email either from Maria or from

25   Amber.  So I can't -- other than that, I don't remember

1        MIKE HOGAN

2  if Arzada said "We got that done," or...

3        It seems to me it was going to be something

4  very quick that they could do.  But again, I don't know

5  the procedure, so I don't recall.

6     Q    So kind of a "no news is a good news," meaning

7  if you didn't hear anything back, that means that your

8  staff members complied?

9     A    I would say so.

10    Q    Okay.  All right.  I'm going to show you

11 another document.  This one is much smaller print for my

12 eyeglass-needing eyes.  But it is to a bunch of people,

13 including you, your email address, MHogan@COJ.net; is

14 that right?

15    A    Um-hum.

16    Q    Okay.  And this is from Alan@lakevotes.com.

17 At the bottom, it's signed D. Alan Hays, DMD, I guess

18 Dr. Hays.  Its subject is elections update, dated

19 Monday, May 6th, 2019.  So I'm going to give this to

20 you.

21        (Exhibit 3 was marked.)

22 BY MS. ABUDU:

23    Q    Share this with your attorney first.  I ask

24 you to just read it over.  But my main question is

25 having to do with the first page of the email.

MIKE HOGAN

1

2      A     Which one?

3      Q     The first page of this document.  My

4   questions.  But I'm just saying it's a three-page

5   document.  If you want to read the whole thing, please.

6      A     What you're looking for is on the first page,

7   what you're going to ask me questions about?

8      Q     Yes.

9      A     Okay.  Let me read it again.  Does the first

10  page refer to something in the back that you want me to

11  read.  It says there's something attached.

12     Q     Not -- I mean --

13     A     Okay.

14     Q     So do you recognize this document?

15     A     I'm sure I got this document.  This was -- the

16  date's May 6th.  I'm in election mode.  That's my next

17  election, but yes.

18     Q     Okay.  And this was in your files, then, this

19  document?

20     A     Would be, um-hum.

21     Q     All right.  Did you produce a copy to any of

22  the plaintiffs in this case?

23     A     No.

24     Q     Okay.  Any reason why you would not have

25  produced a copy of this document to the plaintiffs in

1                     MIKE HOGAN

2   this case?

3        A    I'm trying to figure out where is he -- what

4   is it that would create that.

5        Q    Well, my understanding of this document --

6   well, no.  That doesn't matter.

7             What is your understanding of this document?

8   What is Dr. Hays communicating to you in this first

9   page?

10       A    Dr. Hays is talking about the legislation that

11  passed in the House and Senate.  Eric Cava, 16, 17 year

12  olds.

13       Q    And yes, maybe I spoke too soon.  Page two of

14  this document --

15       A    Yeah.

16       Q    -- makes reference to Senate Bill 7066.

17       A    That's correct.  It does mention Amendment 4,

18  but that's not -- you know, one of the searches is the

19  term "felon."  And there's not -- should have been

20  Amendment 4, should have been picked up.  I'm not sure

21  that that was a search engine request, but it should

22  have been.

23       Q    Okay.  Well, in this document on the first

24  page, Dr. Hays says [as read]:  We didn't get all we

25  desired.

1                    MIKE HOGAN

2      A     Um-hum.

3      Q     Is it safe to assume that this document is

4  relating to the Florida Association Supervisors of

5  Elections legislative agenda?

6      A     That's correct.

7      Q     Okay.  So when he says "we didn't get all that

8  we wanted," do you know what he's talking about?  Or

9  it's -- the specific language is, "we didn't get all we

10 desired."

11     A     Well, we had several things that we wanted to

12 see included that weren't; some things that were

13 included that we didn't want.

14          But the main thing was getting the primary

15 thrust of this legislative session was the express vote

16 because there was -- because of language in the statute

17 itself, there was questions whether or not it was ADA

18 compliant.  And that was the most significant thing that

19 we were looking to receive in this particular session.

20          We didn't want allowing photographs in the

21 precincts.  We didn't want a "drop your mail ballot off"

22 requirement in all early voting sites.  We wanted to

23 allow the supervisors to make that decision because

24 everybody's a little bit different as it relates to

25 dropping ballots off.

1                         MIKE HOGAN

2          The other thing was it was not any really -- I

3    think the bill said something about language -- I'm

4    trying to think what that was.  Oh.  The procedures for

5    that.  If you have it, there was no procedures in the

6    bill.  Those were the things that this was addressing.

7          Q    Okay.  Well, in this email, he also thinks --

8    I mean, his language is [as read]:  Thank you for all

9    the phone calls and contacts you individually made to

10   your specific legislators!!

11         Who are the Duval County legislators in the

12   State House and Senate?

13         A    Okay.  Cord Byrd, Clay Yarborough, Tracie

14   Davis, Wyman Duggan.  I feel like I'm missing one.

15   Senator Gibson and Senator Bean.  I think I'm missing a

16   House member.  Oh, maybe two.  Jason Fischer.

17         Q    Okay.  That's not bad.  Did you make any calls

18   to any of these legislators related to any legislation?

19   And then, if so, we can talk about what legislation that

20   was.

21         A    A lot of the legislation that came up late,

22   unfortunately, I wasn't able to get in touch with, but I

23   was already on record with the only issue that I was

24   concerned with, with them from the previous legislative

25   session.  And that was that they knew that I was not

MIKE HOGAN

1 fond of the dropping your mail ballot off at an early

2 voting site without having the language with that and

3 without making it a requirement for all supervisors.  It

4 should be something that each supervisor could choose to

5 do or not to do.

6 Q    Okay.  So making it optional.

7 A    Um-hum.

8 Q    Okay.  And as part of your membership, and the

9 association, again, referring to the Florida State

10 Association Supervisors of Elections, had you routinely

11 reached out to legislators about legislation?

12 A    If I had an issue that I was definitely

13 concerned with, or that the association asked me to call

14 specifically for, yes.  I know just about every one of

15 them, and so I'm fine with their work.  So I know that

16 they're not going to do anything to hurt us.  So

17 typically didn't have to make the call.  But I made the

18 call on the other issue.

19 Q    Okay.

20 A    But that was in the previous year.

21 Q    So then just to clarify, did you call any of

22 your -- I guess we would say State delegation related to

23 Senate Bill 7066?

24 A    I believe I talked to Audrey about it.  But

MIKE HOGAN

that's -- I think that's the only one I talked to.

Q   Okay.  When did you speak with her about
Senate Bill 7066?

A   Again, with March and May elections, I'm
not -- you know, not any other county has a spring
election like that.  So it's a major election for us in
Duval County.  So, you know, I can't -- I didn't go to
Tallahassee.  I didn't do any of the things that I would
normally do because we were in the throes of an
election.

Q   What motivated you to contact Senator Gibson?

A   I'm not sure if Audrey called me or I called
her.

Q   And what was the substance of that
conversation?

A   Again, I don't remember specifically.
Probably, in general, a bunch of things.  But I don't
remember anything specific.

Q   Did you all talk about more than Senate Bill
7066 then?

A   I don't remember.

Q   You don't remember.  Okay.

A   And I'm not even sure if that was in this time
frame or not.

1                     MIKE HOGAN

2      Q    Okay.

3      A    Sometimes we talk and get on to each other for

4  not having done something.  So I'm not sure when that

5  happened.

6      Q    Okay.  But to your recollection, she's the

7  only person that you reached out to related to Senate

8  Bill 7066?

9      A    Um-hum.  Yes.  I'm sorry.

10     Q    Okay.  All right.  Another document.  All

11 right.  This one is from Maria Matthews.  It is to SOE

12 list and SOE staff contacts.  It's -- the subject matter

13 is felon file processing.  And it is dated Friday,

14 June 7th, 2019.

15          (Exhibit 4 was marked.)

16          THE WITNESS:  Okay.  And your questions?

17 BY MS. ABUDU:

18     Q    Okay.  And you read through it, sir?

19     A    Let me read the last...

20          I do not recall this one.

21     Q    Okay.  So the first question I have is do you

22 recognize this document?

23     A    No.  I was looking at my calendar.  I was on a

24 two-and-a-half-week vacation in June, that I was even

25 getting my mail.  Although I also had my administrative

MIKE HOGAN

1

2 assistant doing that.  And she would refer it to staff.

3          I do not recall this one.

4     Q    Okay.  But SOE list at the "to" line would

5 have included you; correct?

6     A    I'm hoping I'm still on that list.

7     Q    Okay.  So you don't recognize this document?

8     A    No.

9     Q    Well, what is this document?  I mean, now that

10 you've had a chance to read it, how would you describe

11 it?

12    A    Again, because it's the first time I've seen

13 it, I don't know exactly how this would be implemented.

14 But I'm sure that Bobbie and Arzada would have handled

15 it.

16    Q    Okay.

17    A    If I had seen it and was -- I would have

18 forwarded it to Bobbie and Arzada.  But I don't recall

19 it.

20    Q    Okay.  Well, even though you don't recall it,

21 because it was sent to you, as you've acknowledged, is

22 it -- would it be in your files somewhere?

23    A    Should be, yes, ma'am.

24    Q    Okay.  Did you produce this document to any of

25 the plaintiffs?

MIKE HOGAN

1

2     A    No, I did not.

3     Q    Any reason why you didn't produce it?

4     A    I can only tell you that we didn't pick it up.

5     Q    Okay.  All right.  Did you receive an

6 electronic case file of potentially ineligible

7 registered voters in Duval County as this email

8 suggests?

9     A    I don't know.

10     Q    Why don't you know?  This is really just for

11 the record.

12     A    If I knew that, I wouldn't be telling you I

13 don't know.

14     Q    Okay.  Well, you have staff members who you

15 believed -- I mean, your testimony earlier is that if

16 the State asked you to do something and if you didn't do

17 it, the Secretary of State will let you know; correct?

18     A    Um-hum.

19     Q    Okay.  To your knowledge, did you receive any

20 other follow-up related to this email?

21     A    Again, I never saw the email.  I do not recall

22 a follow-up from the Secretary of State.

23     Q    Okay.  Would you have been involved in the

24 process with respect to your county and your office when

25 it came to electronic case files of potentially

MIKE HOGAN

1

2   ineligible registered voters?

3       A    Obviously it would apply to us, yes.

4       Q    Right.  Okay.

5            So have you received any electronic case files

6   of potentially ineligible registered voters?

7       A    I can't answer that question, if it went to

8   Bobbie or if it went to Arzada.

9       Q    Okay.  So if the Secretary of State sent you

10  the electronic case file, which from this email, it

11  appears that the State did, Ms. Haynes or Ms. Henry

12  would have received it?

13      A    That's correct.

14      Q    And is it correct that Ms. Haynes and/or

15  Ms. --

16      A    Henry.

17      Q    -- Henry would have been responsible for

18  handling this?

19      A    Handling it, yes, ma'am.

20      Q    Okay.  Do you know if this is the first time

21  that you even received such a, I guess loosely, a felon

22  packet, as this email suggests?

23      A    You know, I'd received so much, I can't tell

24  you whether or not there's anything else.  Nothing that

25  stands out in my memory though.

MIKE HOGAN

1

2    Q    Okay.  Well, you testified earlier about -- or

3  I asked you if you had received any information from the

4  Secretary of State related to the implementation of

5  Amendment 4.

6         Would you consider the subject matter of this

7  email to pertain to the implementation of Amendment 4?

8    A    Yes, I would, because it's dealing with

9  felons.

10   Q    Okay.

11   A    Um-hum.

12   Q    So this document is an example of something

13  that you received from the Secretary of State related to

14  Amendment 4?

15   A    Again, it says SOE list.  I believe it would

16  have been sent to me.  I don't recall it.

17        In the natural scheme of things, it would

18  have -- in my absence, if this is when I was gone, it

19  would have gone to Arzada and/or to Bobbie.  And I have

20  confidence in both of them.  But I can't tell you that's

21  what happened.

22   Q    Okay.

23   A    It's the first time I've seen it, to my

24  knowledge.

25   Q    So Ms. Haynes and Ms. Henry can answer the

MIKE HOGAN

1

2 question as to when the first time they received a felon

3 packet was?

4     A    I would hope that they can, yes.

5     Q    Okay.  And do you know if any of the

6 information that the Secretary of State provided

7 included information related to legal financial

8 obligations?

9     A    I can't say if I haven't seen it.  But my --

10 I've never seen anything about financial obligations,

11 that I can recall, because we don't search that.

12     Q    And when you say that you've never seen

13 anything like that, would that include even prior to

14 Amendment 4's packet -- passage?  Did the Secretary of

15 State ever send you anything related to financial

16 obligations for someone flagged as having a felony

17 conviction?

18     A    Prior to --

19     Q    Amendment 4's passage, the information you

20 would have received from the Secretary of State, if any,

21 before?

22     A    I don't recall.

23     Q    Okay.  So that means possibly, or...

24     A    I'm saying I don't recall.

25     Q    Okay.  Well, I mean, again, if the answers to

1                     MIKE HOGAN

2  some of these questions are Ms. Haynes and/or Ms. Henry,

3  know the answer, then just please state that for the

4  record.

5           So did your office ever search the Corrections

6  Offender Network, which is referenced in this email?

7     A    Ma'am, because I don't know that I've seen the

8  email, I can't confirm that they did.  I can only assume

9  that they did.

10    Q    So do you know whether in this process of the

11 Secretary of State sending you names of potentially

12 ineligible registered voters, do you know if that

13 information included the names of Rosemary McCoy, my

14 client?

15    A    I don't know.

16    Q    Do you know if that included the name of

17 Sheila Singleton, who is also my client?

18    A    I do not know.

19    Q    Okay.  I know that there have been a number of

20 individuals who are part of this lawsuit, including one

21 complaint that's styled as a class action.  But do any

22 of the name -- do you remember seeing any names that

23 look familiar to you because they're related to this

24 lawsuit?

25    A    No, ma'am.

1          MIKE HOGAN

2      Q    Do you know if your office conducted any

3  follow-up research or analysis to determine whether or

4  not this list of potentially ineligible registered

5  voters was accurate?

6      A    No, I do not.

7      Q    Do you know how many people since passage of

8  Amendment 4 have been removed from your voter rolls as

9  having a felony conviction and being ineligible to vote?

10     A    The only number I know is that since July 1st

11 through yesterday, there have been 95 felons removed

12 from the roll.

13     Q    And I'm sorry.  Perhaps you said it.  But can

14 you clarify that time period?

15     A    July 1st --

16     Q    July 1st.

17     A    -- to yesterday.

18     Q    Okay.  Do you know how that compares to the

19 other -- to your -- the other counties in the State?

20     A    No, I do not.

21     Q    Okay.  So you don't know -- would it surprise

22 you if I told you that you have -- that Duval County has

23 the highest number of individuals removed from the voter

24 rolls based on a felony conviction?

25     A    That would surprise me, yes.

MIKE HOGAN

1

2     Q     And why is that?

3     A     Because there are larger counties.

4     Q     So given that there are larger counties in the

5     state, but assuming what I just said is fact, it would

6     surprise you that Duval would have the highest number

7     for the entire state?

8          MR. TEAL:  Objection to form.

9          THE WITNESS:  Just same answer.

10    BY MS. ABUDU:

11    Q     Okay.  One of the reasons for removal is

12    incarceration.  Do you know what records that the

13    Secretary of State or your office would review to

14    determine whether or not incarceration was a valid

15    reason for removal?

16    A     What are you referring to?

17    Q     So you just testified that Duval County has

18    removed 95 individuals related to a felony conviction

19    since July to present; is that correct?

20    A     That's correct.

21    Q     Other than having a felony conviction,

22    especially given Amendment 4's passage, what were the

23    specific reasons for removal?

24    A     I don't -- I just gave you a report, data.  I

25    did not break it down.

MIKE HOGAN

Q    Okay.  Where did --

A    It was broken down by the reason they were
removed, deceased, out of the county, out of the state,
or a felon.  There was 384 pages.  And of those 384
pages that were in the list maintenance, 95 were for
loss of their rights for felon.

Q    And where did that information come from?

A    That's the list maintenance that comes
directly from our FVRS, Florida -- Florida Voter
Registration System.

Q    And do you know what the source is of
information that makes it into that database?  The
Florida -- what he just said?

A    It's what we receive from Secretary of State.

Q    Okay.  All right.  I have another document to
show you.  And then we can take a little bit of a break,
unless you want to take a lunch break.  Is that...

        (Off the stenographic record.)

BY MS. ABUDU:

Q    All right.  Yeah.  This is a two-page
document, separate document, so that's why it's not
stapled.  But they're related to each other.  So here
you go.

        (Exhibit 5 was marked.)

MIKE HOGAN

1

2      MS. ABUDU:  And just for those on the phone,

3  this is Exhibit 4 -- 5.  It's from Amber Marconnet.

4  It's to SOE staff contacts.  The subject is "felon

5  file processing documentation," and it's dated

6  June 18th, 2019.

7      And it's a combination document.  So it's --

8  so the second related email is from Maria Matthews

9  dated June 7th, 2019.  And that is directed to SOE

10  list.

11      MR. TEAL:  Do you know whether or not the --

12  this is all part of the same email chain as opposed

13  to two separate documents?

14      MS. ABUDU:  It is my understanding from the

15  discovery responses to records request that this is

16  part of the same email chain.

17      MR. TEAL:  Okay.  So we don't need to make it

18  a composite exhibit?

19      MS. ABUDU:  Not to my knowledge.

20      THE WITNESS:  They seem the same.  It is the

21  same, except the beginning.  The date's different.

22  I don't see a date.

23  BY MS. ABUDU:

24  Q    At the bottom of the first page, sir.

25      MR. TEAL:  That's where it starts.

1                        MIKE HOGAN

2          THE WITNESS:  Oh, it's on the heading.

3    BY MS. ABUDU:

4          Q    Yeah.  That's how it goes.  Um-hum.

5          A    Okay.

6          Q    Okay?

7          A    Um-hum.

8          Q    Do you recognize this document?

9          A    No.

10         Q    But based on the -- to whom it was sent, you

11   would have received it?

12         A    I would say that I would have received it.

13   Again, it's SOE list.  I should be on the SOE list.

14   Now, the one from Amber is to the SOE staff.

15         Q    So can you describe this email chain?  I mean,

16   I have -- I don't want to speak for you in making a

17   description.

18         A    No, I can't.

19         Q    Okay.  Well, the June 18th, 2019, email starts

20   out saying [as read]:  We have received questions about

21   what can be included in your felon packet when mailing

22   the notice of ineligibility to the voter; correct?

23         A    Yes.

24         Q    Did your office send any questions to the

25   Secretary of State about what should be included in the

1                          MIKE HOGAN

2   felon packet?

3        A     I can't answer that question.

4        Q     Because you don't know?

5        A     Um-um.  I don't know.

6        Q     Okay.  Would Ms. Henry or Ms. Hays [sic] be

7   able to answer this question?

8        A     They would be able to answer the question

9   because they would have created the question.

10       Q     Okay.  But even though you don't remember this

11  document, would it be in your file somewhere?

12       A     I'm supposing that it would be.  I'm still a

13  little confused about the letter, the June 18th, did

14  they include -- are you saying that that's a chain and

15  not just a --

16       Q     Yes.  It's a chain.  So you see and we

17  discussed the June 7th email from Ms. Matthews already.

18       A     Right.  Um-hum.

19       Q     So then this, the June 18th is a follow-up

20  from Ms. Marconnet related to the subject matter of

21  felon packet --

22       A     Of June 7.

23       Q     Yeah.  So this would have been in your file

24  somewhere; correct?

25       A     I'm not sure that Ms. -- the one -- the one

MIKE HOGAN

2   from Amber would be in my file.  She's referencing one

3   that's already there, which I told you I don't recall.

4       Q    Right.

5       A    But probably is there.

6       Q    Okay.

7       A    So I give you the same answer.  Again, I don't

8   recognize this.  And nor do I recognize this.

9       Q    But again, just so that the record is as clean

10  as possible, did you produce this to any of the

11  plaintiffs in this case, this document, these emails?

12      A    No.

13      Q    Okay.  Is there any reason why you didn't

14  produce them?

15      A    I cannot tell you why that wasn't produced,

16  no, ma'am.

17      Q    Okay.

18      A    There's nothing in here that strikes me as

19  being -- trying to hide anything or...

20           It just wasn't captured.  I don't know the

21  search parameters.  Our IT guys are usually very --

22  pretty good but I can't tell you.

23      Q    Okay.  And at least for the McCoy plaintiffs,

24  you didn't produce anything, any documents to us.  I

25  mean, is that fair, accurate to say?  You didn't produce

1                    MIKE HOGAN

2   a single document?

3       A    I don't think so.

4       Q    Okay.  Well, so we know at least what the

5   subject matter is, which is this idea that you -- your

6   office received a list of names of people who were

7   determined to be ineligible to vote --

8       A    Um-hum.

9       Q    -- but registered.  So during the period of

10  time when you got those names of potentially ineligible

11  voters to when you had a full resolution as to what

12  their status really was, what was the status of -- what

13  was the voter registration status of those individuals?

14      A    I can't tell you because I've not seen that.

15      Q    Okay.  So someone who had a felony conviction

16  and believed that they could vote pursuant to

17  Amendment 4 --

18      A    Um-hum.

19      Q    -- and then that same person appears on this

20  list that you got from the Secretary of State in early

21  June, what would be that person's voter registration

22  status?  Would they remain eligible to vote?

23      A    I haven't seen a list.  I can't tell you

24  what -- the answer to your question because I don't

25  know.

MIKE HOGAN

1

2     Q     Okay.  Are you aware, during that time period

3     that I just described, are you aware of anyone being

4     removed from your list as a result of this communication

5     from the Secretary of State's office?

6     A     I can't tell you that.  I don't know.

7     Q     Okay.  Would Ms. Hays know?

8     A     Yes.  I would expect either Ms. Haynes or

9     Ms. Henry would know.

10    Q     All right.  Well, we can take a break, then.

11    And, you know, I also have to apologize to my counsel on

12    the phone because I was estimating based on how much

13    time I need.  I don't know what questions others might

14    have.

15    A     My gosh.

16    Q     Yeah.  You've got others.  So all right.

17    Well, we will take a -- I mean, do you want to -- you

18    want to do another 10 or 15 minute?  Or you feel like

19    you need a little bit more time?

20        (A brief recess is had from 2:12 p.m. to

21    2:29 p.m.)

22    BY MS. ABUDU:

23    Q     All right.  So now I want to ask you,

24    Mr. Hogan, a few questions about Senate Bill 7066.  Now,

25    I brought a full copy of the bill, but it's pretty huge,

1        MIKE HOGAN

2   so I'm going to see if your attorney and I can agree

3   that I'll present a -- you know, not a version, the

4   actual bill to you.  But that may be, since I only have

5   a question about a particular section of it, I'm not

6   sure if we need to introduce this whole thing into the

7   record.

8            MR. TEAL:  I don't think we do.

9            MS. ABUDU:  Okay.  Good.  All right.

10  BY MS. ABUDU:

11       Q    So this is, Enrolled 2019 Legislature CS for

12  SB 7066, 2nd Engrossed.

13            This is essentially referred to as Senate

14  Bill 7066.  And while, again, Mr. Hogan, you are free to

15  read the entire thing.  I am only asking you questions

16  that appear on page 46.  And that is specifically

17  section 25, 98.0751.

18       A    Can I ask my counsel a question?

19       Q    No.

20       A    Because I'm not a lawyer.  It's a lot.

21       Q    It is a lot, yeah.  But did you get through

22  that section, sir?

23       A    Which one?

24       Q    Section 98.0751, and it goes from section 1 to

25  section 4.  I think that's -- yeah.

MIKE HOGAN

1

2   A   Four?

3   Q   So it would be page 46 through 50.

4   A   Okay, yes.

5   Q   You see that?

6   A   I read through that.

7   Q   You read through that?  Okay.  All right.  So

8  just as a little bit of background, you testified

9  earlier that prior to Amendment 4's passage, it was

10 Ms. Henry's primary responsibility to determine a

11 voter's eligibility, especially when it came to criminal

12 history; correct?

13  A   If they were making application and were on

14 record already as a felon, yes.

15  Q   Okay.  And then I believe you also testified

16 that following Amendment 4's passage, you have

17 instructed her that is no longer her job responsibility;

18 correct?

19  A   Um-hum.

20  Q   So she accepts the four corners and passes it

21 on.

22  A   That's correct.

23  Q   Is that right?

24  A   That's correct.

25  Q   Okay.  So she doesn't do any verification of

                              MIKE HOGAN

1

2    any sort, today.

3        A    Um-hum.

4        Q    Is that right?

5        A    That's correct.

6        Q    Okay.

7        A    We accept the document as it is.

8        Q    Okay.  So I direct you -- again, we're talking

9    about section 98.0751 of the Florida Statute.  I direct

10   you to section 3B of that statute.

11            And I quote its language as [as read]:  A

12   local --

13       A    Excuse me.  Let me find it.

14       Q    I'm sorry.

15       A    Okay.

16       Q    Got it?

17            [As read]:  A local Supervisor of Elections

18   shall verify and make a final determination pursuant to

19   98.075 regarding whether the person who registers is

20   eligible pursuant to section 4, Article VI of the State

21   Constitution in this section.

22            Now, I showed you a copy, I believe it was

23   Exhibit 1, of Article VI, section 4, which pertains to

24   voter qualifications if you have a felony conviction,

25   which is commonly referred to as Amendment 4.

1                    MIKE HOGAN

2          Do you remember that document?  And if not, I

3    can present it to you again.

4     A    Do I have it here?

5     Q    You should.  It should be the first -- it was

6    the first exhibit, sir.

7     A    Okay.

8     Q    Okay.  So you have that language.  And you

9    agree again that that is the language of Amendment 4,

10   that particular section, section 4; correct?

11    A    Um-hum.

12    Q    All right.  And now, what I just read to you

13   from the Florida Statute, section 3B says that it is

14   your office's responsibility to verify a person's

15   eligibility in compliance with Article VI, section 4.

16          Is that not what the language of this bill

17   says, this statute provides?

18    A    Referring to...

19    Q    Section 3B, starting with "a local Supervisor

20   of Elections."

21    A    Okay.

22    Q    Do you want to read that section again?

23    A    Yes.  Um-hum.  Um-hum.

24    Q    So why is it that you have now instructed

25   Ms. Henry that she should no longer determine an

MIKE HOGAN

applicant's eligibility related to criminal history,

given the language in 3B that I just quoted?

A    I think the issue is we're talking about two

different things.

Q    Okay.

A    When we handle an application, we accept

whatever the applicant states on the document.  And we

enter that electronically into the system and forward it

to -- we don't do any investigation or vetting of what

that applicant has stated.  And we send that to the

Secretary of State.

If they find that this person is not eligible,

they will notify us with that information.  And Bobbie

is back in the loop now.

Q    Okay.

A    They will give us information.  But we're not

searching until that comes back to us from the Secretary

of State.

Q    So is it --

A    And I think -- and I probably shouldn't state

this, I think the reason for us not being able to

circumvent the process up front is that we could be --

let's say I was a Republican, I don't want too many

Democrats applying and being able to vote, so we do

MIKE HOGAN

2  something nefarious in the field and not let that pass

3  up.  They don't want us to make any decision on that

4  application, take it exactly as it sits.  And that's --

5  I think that's a good safeguard.

6         And then we refer that application to the

7  Secretary of State.

8         Q    Okay.

9         A    But I really don't know what the genesis is.

10 But I think it's to keep us from up front blocking

11 someone's ability to vote.  We just accept the

12 application, make sure it's complete.  All the i's are

13 dotted and all the t's crossed.  The name is there, the

14 boxes are checked.  And then we send it to the Secretary

15 of State's office.

16        Q    Okay.  So then what --

17        A    They vet the answers.

18        Q    Okay.  So you testified earlier that with

19 Amendment 4's passage, it changed Ms. Henry's job

20 description.

21        A    Didn't change her job description.  It changed

22 how we were set up for the investigation if the -- if

23 the applicant was already on the rolls and was listed as

24 a felon, then Bobbie would have to evaluate if that

25 felony still existed and they -- whether or not their

1                    MIKE HOGAN

2  rights has been restored.  And she would have to do the

3  investigation.  That's when they're already on the roll.

4  Not a new application for a new voter.

5      Q    Okay.  So for someone who is already on the

6  rolls, you're saying that Amendment 4 did eliminate part

7  of her job.  She didn't do the front-end vetting

8  anymore?

9      A    She did not do the front-end vetting.  That's

10  correct.

11      Q    Okay.  But for purposes of someone who is a

12  new applicant, her job description or responsibilities

13  have gone unchanged?

14      A    That's correct.  We still send them the

15  application, if it's complete, to the Secretary of

16  State's office.

17      Q    Okay.  So then what purpose does 3B serve if

18  it is -- if it is just restating what she's already

19  doing?

20          MR. TEAL:  Object to form.

21          THE WITNESS:  It says "final determination."

22      So the package has been sent.  We didn't look up

23      front to see if this person's answers were

24      accurate.  We sent it to the Secretary of State's

25      office.  They find differently.  They send that

1                    MIKE HOGAN

2          information back to us.  That's why it's termed

3          final determination.  Then we look at it and

4          address it.

5              And if it's accurate, we also give the

6          applicant, as I mentioned before, an opportunity to

7          refute the evidence.  We send a copy of the

8          evidence that we have.  And, you know, there's list

9          of steps depending on where we are in that

10         particular process.  That's the way I'm reading

11         this.

12    BY MS. ABUDU:

13         Q    So just to clarify, then, because this has

14    been described as enabling legislation, what is new is

15    that you're now making the final determination.  You

16    emphasized that phrase.

17             What is new that you're doing, then?

18         A    I'm emphasizing it because it's stated here,

19    the final determination.  So they have given us evidence

20    that this person is a felon and the rights have not been

21    restored.  Okay?  We have to examine that evidence.

22             I explain that to the applicant to give them

23    an opportunity to refute that information and/or we also

24    add to that package that certified letter how they can

25    get their rights restored, if they have not gotten their

1          MIKE HOGAN

2  rights restored and should have, how they make

3  application.  We send the application.

4      Q   So, then, in terms of voter eligibility, a

5  final determination ends with your office?

6      A   After all those things are completed, they've

7  had time to give us either evidence or not give us

8  evidence.  And that's up to the voter at that point, or

9  the voter applicant, I should say.

10     Q   And in terms of the front-end piece that you

11 said was now eliminated with Amendment 4 --

12     A   Only -- only when they're already, on

13 record --

14     Q   Right.

15     A   -- as a felon.  Now when they file, it goes to

16 the Secretary of State to confirm, again, do the

17 vetting.  We're not doing it in our office up front.

18     Q   Okay.  So --

19     A   So it's two totally different categories.

20     Q   Okay.  Well, is your office, as a result of

21 this legislation, just doing more work, less work, or

22 the same amount of work?

23     A   It's basically the same amount of work.

24     Q   Okay.  Okay.  So there are definitions in this

25 section of the bill that we're talking about.

1                    MIKE HOGAN

2      A     Right.

3      Q     98.0751.  And we talked earlier about

4  definitions and your belief that definitions are

5  important and necessary.

6      A     Yes, ma'am.  Um-hum.

7      Q     So based on this statute, what is now your

8  understanding of the meaning of "completion of

9  sentence"?

10          MR. TEAL:  Object to form.

11          THE WITNESS:  I really don't know how to

12     answer that.  I mean, it's all here under 98.0751.

13     I mean...

14  BY MS. ABUDU:

15     Q     So your office was already -- because you said

16  that the work is the same.

17     A     Um-hum.

18     Q     So your office was already reviewing

19  sentencing documents?

20     A     Those would come from the Secretary of State.

21     Q     Okay.

22     A     Depending on the financial obligations.  I

23  don't have any way of searching that.  Those things

24  are -- those documents would be provided to us by the

25  Secretary of State.

MIKE HOGAN

Q   I understand that, sir.  I understand what
you're saying in terms of where that information is
generated.  I'm talking, now you have it.

A   Uh-huh.

Q   You just testified that your office makes a
final determination.  And this statute lays out how you
do that.  So...

        And you testified that you all aren't doing
anything new.  It's the same work; correct?

A   Um-hum.

Q   So was Ms. Henry looking at sentencing
documents?

A   I can't tell you all the documents that she
looked at.

Q   So you don't know?

A   I don't know.

Q   Okay.  Was she communicating directly with
prisons in terms of incarceration status?

A   I know that she had the ability to contact the
Department of Corrections, Florida Department of Law
Enforcement, the clerk of the court, and the Secretary
of State in her reviews.  What has been defined here in
this legislation is completely different than what it
was prior to Amendment 4 in the fact that you have all

MIKE HOGAN

these other guidelines, the restitution, the community

service, and all those other things.

So there are -- these are additional points of

clearance from -- I'm not a lawyer -- for them to be

able to have their rights restored.  These things must

be accomplished.

So, in essence, she will be looking at all

this information that we receive from right now, the

Secretary of State.

Q    When you testified that her job is the same,

was she -- because -- I asked you earlier if you all

received information about legal financial obligations

from the Secretary of State.

A    Um-hum.

Q    And do you remember your response to that

question?

A    Haven't received any of that.

Q    Okay.  And now it says, in this section of the

statute, that in determining completion of sentence,

your -- you, basically, as a supervisor, need to verify

full payment of restitution ordered to a victim by the

court.  Are you saying that you all were doing that

already?

A    No.  It wasn't required then.

MIKE HOGAN

Q    Okay.  So you're not doing the same work.
You're doing -- it's a little bit more; right?

A    Her job -- her job title and her function has
not changed.  The processes have changed.

Q    Okay.

A    And I explained that those processes were
changed right after November 6th.

Q    Okay.  So processes -- okay.  I'm saying "job
duties," you're saying "processes."

A    Yeah.

Q    Let's say, what is she supposed to do?  Was
she, prior to Amendment 4's passage, researching whether
or not people had satisfied restitution?

A    No.

Q    But you would agree that this statute now
requires her to do that?

A    That's part of it, yes, ma'am.  That's what
I'm saying.

Q    And what guidance have you given Ms. Henry to
do just that, in terms of determining whether or not
restitution has been paid?

A    All the guidance is coming from the Secretary
of State's office as to where that information is going
to be gathered.  That was, as I understand it, that was

MIKE HOGAN

1

2 a problem at the very beginning.  There was no central

3 point that gathered all that data.

4          And so that's -- you know, you had all kind

5 of -- or multiple government organizations had to come

6 together and say, all right, how do we get this done.

7 And so that's part of this -- this evolved into this

8 statute.

9     Q    Okay.  So you said -- just to clarify, are you

10 saying it's coming from the Secretary of State or it has

11 to come from the Secretary of State?  And I ask because

12 the statute says that it's the supervisor's

13 responsibility to verify eligibility.  So even if it

14 doesn't come from the Secretary of State's office, how

15 do you perform your statutory obligation?

16          MR. TEAL:  I'm going to object to form.

17          That's citing to one provisions in the

18      statute.  But there are multiple provisions in the

19      statute.

20 BY MS. ABUDU:

21     Q    You rec --

22     A    All these things have to be satisfied.

23     Q    Yes.  You're the one --

24     A    We're the final.

25     Q    You're the final.  So if you don't get

MIKE HOGAN

1  guidance from the Secretary of State on any of this,

2  would you still agree that you're the one ultimately

3  responsible for the enforcement of this statute?

4      A    If we send the document unvetted to the

5  Secretary of State, and they don't say anything about

6  this person being a felon, their application is

7  approved.

8          If they, in their search for -- in their

9  vetting, they must send the data to us that, no, this

10  person isn't eligible, and these are the reasons why,

11  which would be listed in here.  And then we would get

12  that information.  And Bobbie would have to verify that

13  that information's correct.

14          If she can't find it, except from what she's

15  received from the Secretary of State, and she notifies

16  the voter, this is what -- this is the reason that

17  you're not eligible.  And the voter has an opportunity

18  to present evidence to the contrary, or to be silent and

19  say, you know, "That's right, I haven't done that."

20      Q    And if the secretary doesn't provide you any

21  information regarding the voter, your office is not

22  doing any independent analysis or investigation; is that

23  correct?

24      A    That's correct.

1                        MIKE HOGAN

2        Q    Okay.

3        A    Upfront on the application.  We accept it just

4   as it is.

5        Q    And I'm talking about on the back end now.

6   I'm talking about --

7        A    On the back end, if they don't -- if they say

8   nothing, then the voter's application is valid.

9        Q    So as the Supervisor of Elections, ultimately

10  responsible pursuant to this statute for verifying

11  eligibility, is it your testimony that you make that

12  determination solely based on the information you

13  received from the Secretary of State's office?

14       A    I'm not saying it's solely on that.  She may

15  have to search out her other options to verify.

16       Q    And under what circumstances would she go

17  outside of what the Secretary of State has provided?

18       A    I can't answer that.

19       Q    Okay.  Well, amendment --

20       A    I don't know that she would.

21       Q    So right now, you are processing voter

22  applications of people who owe financial obligations; is

23  that correct?  Meaning you are putting people on the

24  voter rolls who could owe financial obligations?

25       A    If they check the box that they're not a felon

MIKE HOGAN

1 or their rights are restored or the other two boxes, we

2 would send it to the Secretary of State's office and

3 they would vet it.  If there is nothing there, if they

4 don't find that this person is -- the answers are

5 incorrect, then, yes, it's going to be a registered

6 voter, valid registered voter.

7         If they find that this person's rights have

8 not been restored for whatever reason, that will be

9 shared with us.

10    Q    And do you -- and are you testifying that you

11 know for a fact that the Secretary of State is doing the

12 vetting you just described for every application that

13 you send them?

14    A    That's correct, because we do not vet

15 applications.

16    Q    So if the Secretary of State is not doing

17 that, then you are processing applications?

18    A    Yes, ma'am.

19    Q    Which means that if the Secretary of State is

20 not checking for financial obligations, and your office

21 is not checking for financial obligations, there are

22 people on the rolls who could owe financial obligations;

23 is that correct?

24    A    That would -- that would be correct.

MIKE HOGAN

1

2      Q    Okay.  Are you accepting any old voter

3  registration forms, meaning those that were -- the form

4  before the change related to Senate Bill 7066?

5      A    We changed out all the forms.

6      Q    I understand that.  But are you accepting any

7  owed forms?

8      A    That, I don't know.  I don't believe so, but I

9  don't know that for certain.

10     Q    Okay.  And why don't you know?  Just for the

11 record.

12     A    I've not heard that.  I don't recall anything

13 stating that.  I know that there was a date and time

14 that we had to use the new forms, but I don't know.

15     Q    Did you issue any guidance to your staff

16 related to whether or not an old form could be

17 processed?

18     A    All the guidance that I gave to my staff would

19 be the information that I would be receiving from the

20 Secretary of State's office.  I send them directly the

21 copy of the email or the letter.

22     Q    Has anyone told you not to use the old form in

23 processing voter registration applications?

24     A    It was my understanding, the last time that

25 this issue came up was months ago, was -- and there was

MIKE HOGAN

2 that period of time of getting the new forms together.

3 I don't think we're denying them.

4 Q Okay. So, again, as we wrap up this section,

5 your staff is not determining whether or not people owe

6 financial obligations; correct?

7 A It seems to be a play on words to me. We do

8 not do an investigation up front on financial

9 obligations. We accept the document as it's presented

10 to us by the applicant. And it's vetted by the

11 Secretary of State's office.

12 Q I understand that. I feel there's play on

13 words as well. I'm not talking about up front.

14 A Yeah.

15 Q I'm talking about when you get any

16 information -- that after you send it to the Secretary

17 of State's office, and you get the application back,

18 your office is not doing any independent analysis or

19 research, or investigation as to whether financial

20 obligations are owed; is that correct?

21 A I can't answer the question because I don't

22 know.

23 Q Have you directed anyone in your office to do

24 just that, to check for financial obligations?

25 A No.

1          MIKE HOGAN

2     Q    Okay.  And if they were checking for financial

3 obligations, as the Supervisor of Elections, is that

4 something you would know?

5     A    Yes.

6     Q    Okay.  Okay.  I'll take back those two copies

7 since I'm not introducing them into the record.  But

8 I'll share it with you again if I do make any reference.

9     A    All right.

10         (Off the stenographic record.)

11 BY MS. ABUDU:

12     Q    All right.  You have someone in Duval County

13 who wants to register to vote.  They might owe financial

14 obligations.

15         What advice, if any, do you give them?

16         MR. TEAL:  Object to form.

17         THE WITNESS:  We don't make any

18     recommendations other than that they would have to

19     contact the clemency board or the Department of

20     Corrections, clerk of the court.  Um-hum.

21 BY MS. ABUDU:

22     Q    So you direct them, let's say, to the clemency

23 board.  Do you know what information or advice the

24 clemency board is providing a voter like that?

25     A    No.

MIKE HOGAN

Q    Do you know what advice the Department of
Corrections might provide to a person like that?

A    No.

Q    Do you know what advice a clerk of court might
provide to a person like that?

A    No.

Q    Are you aware of any of those three agencies
developing guidance that they would tell a voter like
that?

A    No.

Q    Okay.  Have you ever, in your capacity as
Supervisor of Elections, prosecuted someone or
recommended the prosecution of someone for voter fraud?

A    The only instance of that had to do with an
investigation that we did.  There's a guy in, I want to
say Fort Lauderdale that goes through the State of
Florida's records all the time.  And he finds evidence
of people having voted in more than one state.  And he
found four or five that were in Duval.  And the
Secretary of State asked me to look into those.  And,
indeed, the individuals, at least on -- from what we
see, voted by mail in Duval and voted in person, and
they were all in New York in various municipalities.

          We received the signatures and the information

1          MIKE HOGAN

2   about that voter from the -- from my counterparts in

3   those jurisdictions and sent that information to the

4   State attorney.  And they investigated and did not

5   pursue it.

6          Q    And what was the person's or those

7   individuals' voter registration status pending those

8   criminal, I guess, investigations?

9          A    I can't remove them from the roll, so they're

10  still voters in Duval County.

11         Q    Okay.  Any issues of voter fraud related to a

12  criminal conviction of a voter?

13         A    Not that I'm aware of, no.

14         Q    Do you believe that if someone has a criminal

15  conviction and owes outstanding financial obligations,

16  that under Senate Bill 7066, they should be prosecuted

17  for voter fraud?

18              MR. TEAL:  Object to form.

19              THE WITNESS:  No.  If there's -- state your

20         question again.  If they are what?

21  BY MS. ABUDU:

22         Q    If a person has a criminal conviction and owes

23  outstanding financial obligations and is registered to

24  vote in your county, would you recommend them for

25  prosecution for voter fraud?

1          MIKE HOGAN

2          MR. TEAL:  Same objection.

3          THE WITNESS:  If I knew it, had evidence of it

4     before they voted, they would have not been able to

5     vote.

6  BY MS. ABUDU:

7     Q    So --

8     A    They would have voted provisional, and then it

9  would have been denied.

10    Q    And just to clarify for the record, what would

11 have been the basis for the denial?

12    A    If the evidence was that they were a felon and

13 hadn't made the restitution, as you just mentioned, then

14 they obviously had not had their rights restored.

15    Q    So is it accurate to say that if someone came

16 to you and they had a felony conviction and said "But I

17 owe financial obligations," you would advise them that

18 they are ineligible to vote?

19    A    No.  I would advise them to find out whether

20 or not they are.  I don't have anything to do with their

21 finances or fines in the situation that you just

22 described.

23    Q    So two-part follow-up:  One, you indicated the

24 clemency board would be one of the sources of

25 information you would advise that person to tap into.

1                         MIKE HOGAN

2          Do you have a particular person at the

3   clemency board that you're directing them to?

4          A    No.

5          Q    Okay.  And then the second piece is what

6   steps, then -- if a voter has a -- owes a financial

7   obligation and is currently registered to vote in Duval

8   County, would you remove them from the rolls once that

9   information came to your attention?

10         A    How did that information come to my attention?

11         Q    I don't know.  How would it come to your

12  attention?

13         A    Yeah.

14         Q    Because, again, I mean, you testified that if

15  somebody says "I have a conviction, I owe financial

16  obligations," you're telling them to go to the clemency

17  board or to the Department of Corrections.

18         A    Um-hum.

19         Q    But if someone feels that "Well, I'm fine,

20  even though I owe financial obligations," you would go

21  ahead and register them and keep them on the rolls?

22         That's the question.  Would you keep them on

23  the rolls, the voter rolls?

24         MR. TEAL:  Object to form.

25         THE WITNESS:  No.  I don't know how you

1                    MIKE HOGAN

2       would -- I'm not sure I understand the question.

3       If the speculation is -- I'm not understanding what

4       you're trying to ask.

5  BY MS. ABUDU:

6       Q    Well, your previous response suggests that

7  having financial obligations doesn't categorically

8  render you ineligible.  That's the reason why you're

9  saying go to the clemency board -- right? -- and find

10 out if you're eligible?

11      A    No.

12      Q    Okay.  So please clarify that response.

13      A    I don't know -- I can't address anything that

14 a voter asks me about their restoration of rights.  I

15 can only direct them to the agencies that can possibly

16 help them and tell them whether or not their rights can

17 be restored, if they haven't applied, or if they've

18 already been restored.

19      Q    So we talked about the new voter registration

20 form and the three boxes.

21           And this, I am going to introduce into the

22 record.  So this is Exhibit 6.  The current voter

23 registration form for Florida.

24           (Exhibit 6 was marked.)

25 BY MS. ABUDU:

1                        MIKE HOGAN

2       Q    And first, I would like for you, Mr. Hogan, to

3  state whether or not indeed this is, to your knowledge,

4  the current voter registration form for Florida.

5       A    Without going through every detail of it, the

6  three questions that are there, that's the -- that was

7  the guts of the change.

8       Q    Okay.  So let's look at the third box in

9  section two of this application form.  It says

10 [as read]:  If I have been convicted of a felony, I

11 affirm my voting rights have been restored pursuant to

12 section 4, Article VI of the State Constitution upon the

13 completion of all terms of my sentence, including parole

14 or probation.

15            Is that -- did I just accurately state that?

16      A    Yes.

17      Q    Okay.  So if a voter comes into your office

18 and says what's Article VI, section 4, what would you

19 respond?

20      A    We can give them a copy.

21      Q    Okay.  You would provide them a copy.

22      A    Um-hum.

23      Q    And if the voter person says "I'm not sure if

24 I've completed all terms of my sentence, but I believe I

25 have; I'm not on parole, and I'm not on probation," what

1                    MIKE HOGAN

2   would you advise them?

3      A    I would refer them to those agencies.

4      Q    Okay.  And, again, in referring them to those

5   agencies, do you have a point person?

6      A    No.

7      Q    You don't have a point person for the clerk of

8   courts?

9      A    Um-um.

10     Q    You don't have a point -- you have to say --

11          MR. TEAL:  Yes or no?

12          THE WITNESS:  No.  Yes.

13  BY MS. ABUDU:

14     Q    You don't have a point person for the

15  Department of Corrections?

16     A    No.

17     Q    And again, you don't have a point person for

18  the clemency board either?

19     A    No.

20     Q    So you're just directing them to that

21  agency --

22     A    That's correct.

23     Q    -- but no name or direct dial?

24     A    No.

25     Q    You testified earlier that, you know, in terms

MIKE HOGAN

of going through the database and all of these

documents, there was some discussion amongst the county

Supervisors of Elections; correct?

A    In regards to?

Q    In regards to just how to verify a lot of the

information that we went through in Senate Bill 7066?

A    I know you can tell me.  I don't remember

making that statement, other than there was all kinds of

chatter about all parts of it, but...

Q    Okay.  Well, maybe, can you break down what

that chatter was, then?

A    No, ma'am.  It's been so long ago.  Um-um.

There was -- you know, talking about the bill in

generalities and how it -- what's going to happen, how

is it going to be distributed, what does it change.

All those things were up in the air when the

amendment passed.

Q    Did you have any concerns about when the

amendment passed in terms of the impact on your office?

A    No.  Other than how -- what's going to be

different, what are we going to have to do differently.

Q    And in terms of financial obligations, are you

aware of how restitution is even recorded in the state

of Florida who tracks that -- how is it recorded; do you

MIKE HOGAN

1  know?

2

3     A    No.

4     Q    Do you know who tracks it?

5     A    No.

6     Q    Do you consider it to be your office's

7  responsibility with the passage of Senate Bill 7066 to

8  know how restitution is recorded in the state?

9     A    I would say yes to that.

10    Q    But you just testified that you don't know the

11 answer to that question.

12    A    No, because we're not doing that right now.

13    Q    Okay.  Does that mean, when you say "not right

14 now," does that mean you have plans to start doing that

15 in terms of tracking restitution?

16    A    No, I don't mean that.  I don't know how to

17 answer your question.

18    Q    Do you have any plans in the future from this

19 day forward to start tracking restitution or knowing

20 who's tracking restitution for purposes of voter

21 eligibility?

22    A    I'm trying to think how to answer that.  I

23 can't answer that question.

24    Q    Why not?

25    A    I can't tell you the answer.

MIKE HOGAN

1

2      Q    You don't know what your office's plans are in

3  terms of what you just acknowledged to be your

4  responsibility in terms of restitution, identifying

5  restitution obligations?

6      A    It's the same as would be prior to restitution

7  that you asked a question about, do I check the

8  checkers.  I will take the information from -- that is

9  received from the Secretary of State and the sources

10  that they used.  But I haven't seen anything on

11  restitution.

12     Q    Okay.  But would it surprise you to know that

13  there are a number of people with criminal convictions

14  who owe restitution?

15     A    Oh, yes.  That wouldn't surprise me that

16  people owe restitution.

17     Q    Okay.  And you just testified that you haven't

18  gotten anything from the Secretary of State related to

19  restitution; is that correct?

20     A    In denying someone, no.

21     Q    Okay.  But you're currently processing voter

22  registration applications.

23     A    That's correct.

24     Q    So, again, just to clarify for the record,

25  that means that when processing the applications, if you

1    MIKE HOGAN

2    don't receive any information from the Secretary of

3    State about restitution, you're not doing any

4    independent investigation about restitution?

5        A    If the Secretary of State accepts the

6    application and does not inform us that this person is a

7    felon and they've checked that they weren't, the

8    application is secured.

9        Q    Are you aware that a number of black

10   legislators in Florida opposed Senate Bill 7066?

11       A    I'm sure there were votes against it.

12       Q    And are you aware that one of the reasons for

13   opposition is that the enabling legislation that we've

14   been talking about was tacked on to a much bigger bill?

15           MR. TEAL:  Object to form.

16           THE WITNESS:  We've been talking about it.

17       So, yes, I knew that.

18   BY MS. ABUDU:

19       Q    Okay.  Given your history as a representative

20   in the state, is that unusual to tack a piece of a bill

21   on to a much larger bill?

22           MR. TEAL:  Object to form.

23           THE WITNESS:  I mean, bills get amended all

24       the time.  The laws get amended all the time,

25       whether they're new or old.

1                          MIKE HOGAN

2      BY MS. ABUDU:

3          Q    So, in answer to my question, which I can ask

4      the court reporter to repeat, if you could just answer

5      that, please.

6              (The Court Reporter is directed to read back

7      the previous question and/or answer.)

8              MR. TEAL:  Object to form.

9              THE WITNESS:  We used to call them trains.  A

10         lot of times in the legislative process, you might

11         have a bill and if there's a nexus that can be

12         attached to it, someone will come along and add an

13         amendment to your bill that you don't want and may

14         pass out in the committee.  And now you've got one

15         car to your bill.  And as it goes to other

16         committees, sometimes there's additional

17         amendments.

18              And so that happens in the legislative

19         process, yes.

20     BY MS. ABUDU:

21         Q    Okay.  I want to talk a little bit about the

22     Restoration of Voting Rights Working Group.  Are you

23     familiar with that entity?

24         A    Um-um.

25         Q    You've never heard of it?

1                    MIKE HOGAN

2        A    No.

3        Q    Okay.  Can we take a five-minute break?

4        A    Sure.

5             (A brief recess is had from 3:23 p.m. to 3:29

6   p.m.)

7   BY MS. ABUDU:

8        Q    Okay.  You said you're not familiar with the

9   Restoration of Voting Rights Working Group; is that

10  correct?

11       A    That's correct.

12       Q    Okay.  So in terms -- so you're not aware of

13  the attorney general or anyone else being part of a

14  group to figure out how to implement Senate Bill 7066?

15       A    I know that's going on, but I didn't know they

16  had a name.

17       Q    All right.  So you know that there is an

18  entity like that that's been created?

19       A    I didn't know it was an entity.  I just --

20  departments get together and pull together on a common

21  problem.

22       Q    All right.  Do you know who all, then, is part

23  of that entity?  I'll say "working group" because

24  technically that is what they're calling themselves.

25       A    No.

MIKE HOGAN

1

2      Q    Okay.  Do you know if any of the bill sponsors

3  are part of the working group, like Grant or Brandes?

4      A    No.

5      Q    Do you know any of the bill sponsors for

6  Senate Bill 7066?

7      A    No.

8      Q    You don't know any of them personally?

9      A    No.

10      Q    All right.  Do you believe that such a working

11  group is an important entity to form for purposes of

12  implementing Senate Bill 7066?

13      A    I don't have any problem with that.

14      Q    Do you believe as a Supervisor of Elections

15  that you should be consulted as to the work of this

16  group in terms of how 7066 should be implemented?

17      A    Yes.

18      Q    And why do you believe that?

19      A    It impacts the office, but I'm sure if you

20  told me who all's on there, it's probably already

21  represented.

22      Q    Okay.  Well, I can tell you that the Secretary

23  of State's office is represented.  The secretary of

24  corrections is represented.  The chairman of the Florida

25  Commission on Offender Review is represented.  And the

1                    MIKE HOGAN

2  executive director of the Department of Law Enforcement

3  is also represented.

4            So of those entities, which of those entities

5  do you believe best represents your interest?

6       A    Representing my interest is getting it done

7  and getting it done right.  So I couldn't exclude any

8  one or hold any one over the other.

9       Q    Okay.

10      A    It's all got to be done together.

11      Q    And I accidentally omitted that the working

12 group will also be comprised of two Supervisors of

13 Elections.  Were you not aware of that?

14      A    There was something that came -- again, when I

15 was out, I was out of the country for two and a half

16 weeks.  And a lot of this stuff happened during that

17 period of time, evidently.

18            And typically, if they involve a supervisor in

19 something like that, even just with the Division of

20 Elections, it's going to be our president of the

21 association.  And that's Tammy.  I don't know if she's

22 on there.  And perhaps the past president, Paul Lux.

23 And I don't know if he's on there.

24      Q    Okay.  Well, who do you believe should be on

25 there in terms of representing the Supervisors of

1          MIKE HOGAN

2    Elections?

3         A    There's 20 or 30 that could do that job very

4    well.

5         Q    Okay.  Would you put yourself in that mix?

6         A    No.

7         Q    Why is that?

8         A    Because I'm the baby on the block.

9         Q    Okay.

10        A    And we've got a lot of folks that have been

11   around here a long time.  I just made the cycle of

12   elections.  We just got through with our city election.

13   So that was my last view.  And of course, you know a lot

14   about the job from the outside, but you really don't

15   know anything until you get inside.  So there's a host

16   of things that requires my attention.  And most

17   important thing, I felt, going in, was that we do it

18   right.  And we have good elections and that we're

19   transparent and that we get the information to the

20   people that request it.  And I'm accessible.  That's why

21   chains through all the emails from the website come to

22   me.

23           It also tells me what the problems are with my

24   constituents, the voters.  I start seeing the same

25   complaint.  I know I've got a problem, let's go fix

1                    MIKE HOGAN

2      that.  What is it?  Is it an individual, is it a policy,

3      what is it?

4           And so, but, yeah, I'm a neophyte compared to

5      most of them on there.

6      Q    Okay.  Well, another member of that

7      committee -- that working group is the clerk of courts.

8      And, you know, one question that's come up is how much

9      information the legislature had when passing Senate

10     Bill 7066, particularly the racial demographics or

11     disparities in terms of the law's impact.

12          Do you believe, especially in your capacity as

13     a former legislator, that having those kind of racial

14     statistics or demographics would be important in

15     deciding whether or not a bill like 7066 should pass?

16          MR. TEAL:  Object to form.

17          THE WITNESS:  Yeah.  I couldn't tell you the

18          answer to that one.  I'm not familiar enough

19          with -- I mean, that bill is a train.  It kept

20          getting things attached to it.  But I mean,

21          demographics, you know, are -- yes, they're

22          important.  I don't have an answer for you straight

23          up.

24     BY MS. ABUDU:

25     Q    Do you feel that the Supervisors of Elections

MIKE HOGAN

1

2  were properly or adequately, let's say, consulted

3  throughout the process in terms of the consideration and

4  ultimate passage of Senate Bill 7066?

5      A    I was there.  And sometimes they don't listen.

6      Q    You were where?

7      A    In the House.

8      Q    When?

9      A    Through 2003.  I'm just saying as a

10  legislator, a former legislator.

11      Q    Oh, I see.

12      A    I know that it is a very difficult task.  It

13  looks like a lot of fun from the outside, but you're --

14  you've got 60 days, 60-plus days to do everything.  And

15  you have to be an expert in everything from safety to

16  elections.  And it's a tough job.  You know, you're

17  part-time.  So they do the best they can.  But sometimes

18  they'll make some decisions that, yeah, I wish they

19  wouldn't have, and others probably too.  Like that

20  letter you saw from Alan.  You know, the main thing

21  we're looking for we got, but there were some things

22  that we wish wouldn't have happened.

23      Q    Right.  So other than your conversation with

24  Senator Gibson, did anybody from the legislature reach

25  out to you related to Senate Bill 7066?

1                        MIKE HOGAN

2       A    No.

3       Q    Okay.  Obviously you have a very important job

4  as a Supervisor of Elections.  So would it be fair to

5  say that you consider local elections to be important?

6       A    Absolutely.

7       Q    Okay.  And the same that you consider federal

8  elections to be important as well?

9       A    Yeah.  About ten times.

10      Q    Okay.  And therefore, in performing your job

11 responsibilities, you've cited or referred to the

12 Secretary of State's office numerous times, do you view

13 the Secretary of State's office as a critical piece when

14 it comes to doing your job properly?

15      A    Yes.

16      Q    Okay.  All right.  Well, those are all the

17 questions that I have for right now.  And I think we'll

18 open it up to any maybe --

19           MR. TEAL:  Let's hear from them first.

20           MS. ABUDU:  Okay.  All right.

21           So those on the phone, I know it's a number of

22      you, but I trust that you'll figure out how to

23      coordinate in terms of any questions you all might

24      have.

25           MR. BENTLEY:  Yeah, this is Morgan down in

1                    MIKE HOGAN

2   Sarasota.  I don't have any questions.

3        MR. HERON:  Mark Heron in Tallahassee.  I have

4   no questions.

5        MS. ABUDU:  Well, maybe we should -- can you

6   repeat that?  I think that was Ashley.

7        MS. DAVIS:  This is Ashley Davis for the

8   Secretary.  No questions.

9        MS. ABUDU:  All right.

10       MR. TEAL:  And so I guess I'll wrap it up.

11  Jason Teal representing Supervisor Hogan, and we

12  have no questions.

13       MS. ABUDU:  All right.  Well, with that,

14  Mr. Hogan, I really do appreciate your time.  It

15  was nice to meet you.  And I know we kept you for a

16  long time but we -- yeah.

17       And, for sure, obviously we identified, I

18  think you'll have to acknowledge, a number of

19  documents that were in your possession that we

20  didn't receive.  So we'll be following up with you

21  about that.

22       THE WITNESS:  Right.  Okay.

23       MS. ABUDU:  All right, then.  Thank you.

24       THE WITNESS:  Already noted.

25       MS. ABUDU:  All right.  Thank you.

1                    MIKE HOGAN

2           COURT REPORTER:  Mr. Teal, did you want a copy

3      of the transcript?

4           MR. TEAL:  I don't think so.

5           (The reading and signing of this deposition is

6  waived.)

7           (At 3:39 p.m. the deposition was concluded.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MIKE HOGAN

CERTIFICATE OF OATH

STATE OF FLORIDA  )

COUNTY OF DUVAL )


    I, the undersigned authority, certify that

MIKE HOGAN personally appeared before me and was duly

sworn.

    WITNESS my hand and official seal this

3rd day of September, 2019.


_____
DAWN A. HILLIER, RMR, CRR, CLR
Notary Public - State of Florida
My Commission No.:  GG 259309
Expires:  12-15-2022

1                          MIKE HOGAN

2                           CERTIFICATE

3

4    STATE OF FLORIDA  )

5    COUNTY OF DUVAL )

6        I, DAWN A. HILLIER, RMR, CRR, CLR certify that I

7    was authorized to and did stenographically report the

8    deposition of MIKE HOGAN; that a review of the

9    transcript was not requested; and that the transcript is

10   a true and complete record of my stenographic notes.

11

12       I further certify that I am not a relative,

13   employee, attorney, or counsel of any of the parties,

14   nor am I a relative or employee of any of the parties'

15   attorney or counsel connected with the action, nor am I

16   financially interested in the action.

17

18       DATED this 3rd day of September, 2019.

19

20

21   _____

22       DAWN A. HILLIER, RMR, CRR, CLR

23

24

25

1             ERRATA SHEET

2    Case Name:

3    Deposition Date:

4    Deponent:

5    Pg.  No. Now Reads      Should Read  Reason

6    ____ ____ _____    _____   _____

7    ____ ____ _____    _____   _____

8    ____ ____ _____    _____   _____

9    ____ ____ _____    _____   _____

10   ____ ____ _____    _____   _____

11   ____ ____ _____    _____   _____

12   ____ ____ _____    _____   _____

13   ____ ____ _____    _____   _____

14   ____ ____ _____    _____   _____

15   ____ ____ _____    _____   _____

16   ____ ____ _____    _____   _____

17   ____ ____ _____    _____   _____

18   ____ ____ _____    _____   _____

19   ____ ____ _____    _____   _____

20

21                          _____

22                          Signature of Deponent

     SUBSCRIBED AND SWORN BEFORE ME
23   THIS _____ DAY OF _____, 2019.

24   _____

25   (Notary Public)  MY COMMISSION EXPIRES:_____