1        IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF FLORIDA
2             TALLAHASSEE DIVISION

3     Consolidated Case No.  4:19-cv-00300-RH-MJF

4

5  KELVIN LEON JONES, et al.,

6             Plaintiffs,

7    v.

8  RON DeSANTIS, in his official
   capacity as Governor of Florida,
9  et al.,

10           Defendants.
  ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
11

12

13        DEPOSITION OF MARIA MATTHEWS

14

             Pages:  1-223
15

16

        Friday, September 13, 2019
17        9:02 a.m. - 4:06 p.m.

18

19       Hopping Green & Sams, P.A.
        119 South Monroe Street
20
       Tallahassee, Florida 32301
21

22

23  Job No: 167639

24       STENOGRAPHICALLY REPORTED BY:

25    Tamra K. Piderit, FPR, RPR, RMR, RDR, CRR

```
 1    APPEARANCES:

 2    ON BEHALF OF THE GRUVER PLAINTIFFS:

 3              AMERICAN CIVIL LIBERTIES UNION FOUNDATION
                125 Broad Street
 4              New York, New York 10004

 5
                BY: Julie Ebenstein, Esquire
 6                  Jonathan Topaz, Esquire

 7

 8              NAACP LEGAL DEFENSE AND EDUCATIONAL FUND
                40 Rector Street
 9              New York, New York 10006

10
                BY: Leah Aden, Esquire (Via telephone)
11                  John Cusick, Esquire (Via telephone)

12

13    ON BEHALF OF THE SECRETARY OF STATE:

14              HOPPING GREEN & SAMS
                119 South Monroe Street
15              Tallahassee, Florida 32301

16              BY: Mohammad Jazil, Esquire

17

18    ON BEHALF OF HILLSBOROUGH COUNTY:
      (Via telephone)
19
                HILLSBOROUGH COUNTY ATTORNEY'S OFFICE
20              601 East Kennedy Boulevard

21              Tampa, Florida 33602

22              BY: Stephen Todd, Esquire

23

24

25
```

1    APPEARANCES, Continued:

2    ON BEHALF OF ALACHUA COUNTY:
     (Via telephone)
3
              ALACHUA COUNTY ATTORNEY'S OFFICE
4             12 Southeast First Street
              Gainesville, Florida 32601
5
              BY: Geena Cesar, Esquire
6                 Robert Swain, Esquire

7

8    ON BEHALF OF LEON COUNTY:
     (Via telephone)
9
              MESSER CAPARELLO
10            2618 Centennial Place
              Tallahassee, Florida 32308
11
              BY: Denay Brown, Esquire
12

13   ON BEHALF OF MARION COUNTY CLERK OF COURT CAROLYN TIMMANN:

14            GREENBURG TRAURIG
              101 East College Avenue
15            Tallahassee, Florida 32301

16            BY: John Londot, Esquire

17

     ON BEHALF OF ORANGE COUNTY:
18   (Via telephone)

19            SHANNIN LAW FIRM
              214 East Lucerene Circle
20            Orlando, Florida 32801

21
              BY: Nicholas Shannin, Esquire
22

23

24   ALSO PRESENT:

25   Jennifer Holmes, NAACP (Via telephone)

1                         I N D E X

2    Testimony of Maria Matthews

3         Direct Examination By Ms. Ebenstein         7
          Certificate of Oath                         220
4         Certificate of Reporter                     221
          Errata Sheet                                222
5         Witness Review Letter                       223

6

7

8

9

                            EXHIBITS
10
     NO.              DESCRIPTION                    PAGE
11
     Exhibit 1    FCEP Records Maintenance             36
12                DOSG-0000463 - 0000510

13   Exhibit 2    Constitutional Amendment Petition    65
                  Form
14
     Exhibit 3    12/04/18 email to Amber Marconnet    69
15                from Toshia Brown; RE:  Amendment 4
                  and current felon's facing removal
16                from voter rolls
                  DOSG-0013257
17
     Exhibit 4    11/07/18 email to DOEBVRS from       74
18                Toshia Brown; Subject:  Amendment 4
                  DOSG-0027126
19
     Exhibit 5    11/27/18 email to Maria Matthews     76
20                from Mike Bennet; Subject:
                  Processing potential ineligibility -
21                Felon

22   Exhibit 6    02/11/19 email to DOEList from       84
                  Maria Matthews; Subject:  Time-
23                Sensitive Notice:  Pending FDLE
                  Felon Files

24

25

 1                              EXHIBITS

 2       NO.                  DESCRIPTION                    PAGE

3       Exhibit 7    03/29/19 email to Maria Matthews         99
                      from Alexander Mosca; Subject:
 4                    FW:  Please review SB 7086 -
                      Voting Rights Restoration
 5                    DOSMcC-0001025

 6       Exhibit 8    03/29/19 email to Toshia Brown          99
                      from Maria Matthews; Subject:
 7                    Fwd:  SB 7086 - Voting Rights
                      Restoration
 8                    DOSG-0002805

 9       Exhibit 9    04/04/10 email to Maria Matthews        99
                      from Toshia Brown; Subject:
10                    FW:  7086 Bill Analysis
                      DOSG-0000349 - 0000357
11
         Exhibit 10   Committee on Criminal Justice          110
12                    Draft SB 7086

13       Exhibit 11   Draft of SB 7066                       113

14       Exhibit 12   08/29/19 email to Richard and          122
                      others from Maria Matthews;
15                    Subject:  RE:  Voter registration
                      and the Clerks of Court
16
         Exhibit 13   Bureau of Voter Registration           149
17                    Services Processing Felon Match
                      Files Pursuant to 2018
18                    Constitutional Amendment 4
                      DOSG-0000244 - 0000248
19
         Exhibit 14   06/07/19 email to SOEList from          156
20                    Maria Matthews; Subject:  Felon
                      File Processing
21
         Exhibit 15   06/07/19 email to Mark Earley          162
22                    from Maria Matthews; Subject:
                      RE:  Felon File Processing
23                    LCSEO001691 - 001695

24

25

1                           EXHIBITS

2       NO.                 DESCRIPTION                PAGE

3       Exhibit 16   07/02/19 email to Christopher Moore   171
                     from Mark Earley; Subject:  FW:
4                    Florida Voter Registration
                     Application/OVR
5                    LCSEO00010

6       Exhibit 17   Bureau of Voter Registration         173
                     Services Processing Felon Match
7                    Files Pursuant to 2018 Constitutional
                     Amendment 4
8                    DOSG-0000291 - 0000296

9       Exhibit 18   05/01/19 Voter Assistance Hotline     191
                     Manual
10

        Exhibit 19   08/08/19 email to Christie            200
11                   Fitz-Patrick from Maria Matthews;
                     Subject:  Stats - Felon Match
12                   Records/Registration 2019 -
                     Component of SB 7066
13                   DOSG-0000055 - 0000056

14      Exhibit 20   08/07/19 email to Maria Matthews      200
                     from Toshia Brown; Subject:
15                   FW:  Assignment:  Legislative
                     request for State on Felon Component
16                   of SB 7066
                     DOSG-0004953 - 0000004958
17

        Exhibit 21   Florida Voter Registration            209
18                   Application - Part 1

19

20

21

22

23

24          (Exhibits were retained by the stenographer.)

25

TSG Reporting - Worldwide - 877-702-9580

1                          MARIA MATTHEWS

2      Thereupon,

3      The following proceedings began at 9:02 a.m.:

4                              * * * * *

5                          DIRECT EXAMINATION

6      BY MS. EBENSTEIN:

7          Q.   Good morning, Director Matthews.  Could you please

8      state and spell your name for the record?

9          A.   My name is Maria Matthews, M-a-r-i-a

10     M-a-t-t-h-e-w-s.

11             THE STENOGRAPHER:  Did you want me to swear the

12         witness?

13             MS. EBENSTEIN:  Yes.

14             THE STENOGRAPHER:  Do you solemnly swear or affirm

15         that the testimony you are about to give in the matter

16         before you will be the truth, the whole truth, and

17         nothing but the truth?

18             THE WITNESS:  Yes.

19     THEREUPON,

20                          MARIA MATTHEWS,

21     having been duly sworn, was examined and testified as

22     follows:

23     BY MS. EBENSTEIN:

24         Q.   My name is Julie Ebenstein.  I'm an attorney for

25     the Gruver plaintiffs in this case.  I'm going to be asking

1                          MARIA MATTHEWS

2       you some questions today.  First, have you ever been

3       deposed before?

4            A.   Yes.

5            Q.   And approximately how many times have you been

6       deposed?

7            A.   More than five.

8            Q.   Okay.  Do you recall in which matters you were

9       deposed or just the general nature of the case at issue?

10           A.   It would all be related to elections

11      administration.

12           Q.   When is the last time that you were deposed for

13      litigation?

14           A.   I believe it was in July for a ballot order case.

15           Q.   I am going to ask you a series of questions.  At

16      any point if you don't understand my question, please let

17      me know, and I will try to clarify or rephrase it.  If you

18      don't say that you don't understand, I will assume that you

19      understood my question.  Is that all right?

20           A.   Okay.

21           Q.   As you know, the court reporter is writing down

22      everything that we say today.  For that reason, please give

23      verbal responses to my questions since she cannot pick up a

24      nod, an um-hm, and I will endeavor to do the same.

25                Please wait until I finish asking a question

MARIA MATTHEWS

2  before you answer so that we don't speak over each other.

3  And, likewise, I will wait until you finish an answer

4  before I ask the next question.

5      A.   Okay.

6      Q.   Do you understand that you are under oath today?

7      A.   Yes.

8      Q.   And that your answers in this deposition will have

9  the same effect as though you were testifying in court?

10     A.   Yes.

11     Q.   Is there anything that would prevent you from

12  testifying fully and truthfully today?

13     A.   No.

14     Q.   If you need a break at any point during the

15  deposition, please just let me know.  I would only ask that

16  if I've asked a question, you answer the question before we

17  pause for a break.

18     A.   Okay.

19     Q.   At some point during the deposition, your attorney

20  may make objections to my questions.  Please go ahead and

21  answer them unless he instructs you not to answer.

22     A.   Okay.

23     Q.   Ms. Matthews, please tell me everything you did to

24  prepare for today's deposition.

25     A.    I reviewed my notebook that I have, my materials

1                    MARIA MATTHEWS

2  relating to the Constitutional Amendment 4 and its

3  implementation.  I also spoke with my attorneys.

4       Q.   Which materials were included in what you reviewed

5  today?

6            MR. JAZIL:  Counsel, for the record, we have a

7            copy of Ms. Matthews' notebook that she reviewed in

8            preparation for the deposition.  We note that you had

9            a notice for deposition duces tecum.  No documents

10           were identified.

11               However, in the spirit of good faith and

12           cooperation, we have provided Ms. Matthews' binder

13           related to Amendment 4.  We have, however, taken out

14           material that is privileged as attorney-client

15           privilege.

16           MS. EBENSTEIN:  Okay.  I will just take a moment

17           to look at the flags.  From the size of this, we are

18           looking at a few hundred pages of documents, so I'm

19           just going to go through and get a quick sense.

20  BY MS. EBENSTEIN:

21       Q.   Can you tell me the primary documents that you

22  reviewed in preparation?

23       A.   This notebook contains resources that I might have

24  referred to in relation to this Constitutional Amendment 4.

25  It can contain briefing documents, it contains flow charts,

MARIA MATTHEWS

1

2    it contains screenshots of websites that were relevant for

3    me.  It contains procedures and draft procedures that we

4    have been working on for implementation.  It contains some

5    emails.  It contains -- it might contain the law that was

6    enacted during the 2019 legislative session.  It may

7    contain copies of the constitutional amendment.  That's a

8    minimum.

9         MS. EBENSTEIN:  I am going to note that just

10        glancing at these, a number of documents I don't

11        believe were produced.  Do you have the Bates stamp

12        numbers or can you confirm that they have all been

13        produced?

14        MR. JAZIL:  These are the physical files that she

15        had, and they are -- the physical documents that she

16        had in her possession which are separate and distinct

17        from the email correspondence.  So this is the

18        physical file that she refers to.

19        There was a concern noted in the email

20        correspondence last night about not providing physical

21        copies, and this is the physical copies of the

22        documents she has.

23        MS. EBENSTEIN:  Okay.  Again, we are looking at a

24        few hundred pages, many of which have not been

25        produced to Plaintiffs' counsel before the deposition.

1                    MARIA MATTHEWS

2          We are obviously on the record in the deposition, and

3          it's difficult to sort through hundreds of new

4          documents to ask about those.  So perhaps we can move

5          forward and then take a break in the middle of the day

6          to come back to the new documents that we have just

7          received after the deposition started.

8    BY MS. EBENSTEIN:

9          Q.   Did you consult with anyone aside from your legal

10   team in preparation of the deposition?

11         A.   Staff.  I would have talked to staff just about

12   certain procedures for clarification.

13         Q.   Which staff members did you speak with?

14         A.   Toshia Brown and Amber Marconnet.

15         Q.   Anyone else?

16         A.   Janet Madrow, who is our IT individual designated.

17         Q.   Anyone aside from those three people?

18         A.   Not that I can recall.  Those are the primary

19   ones.

20         Q.   Okay.  What is your general understanding of what

21   this case is about?

22         A.   That this case is about trying to determine what

23   the terms of a sentence are and what they include.

24         Q.   Okay.  I'm going to ask a few questions about your

25   employment history.  Where are you currently employed?

1                          MARIA MATTHEWS

2       A.    I'm currently employed at the Florida Department

3   of State.  I serve as the division director for elections.

4       Q.    And how long have you been employed by the

5   Secretary of State's Office?

6       A.    I have been employed since 2002.

7       Q.    And you said that your current position is the

8   director of the Division of Elections.  How long have you

9   held that position?

10      A.    I have held that position since January 2013.

11      Q.    In your current role as the director of the

12  Division of Elections, what are your primary job

13  responsibilities?

14      A.    As the director of the Division of Elections, I

15  oversee the Division which serves as the administrative arm

16  to the Secretary of State in support of her role as the

17  chief election official for the state.

18      Q.    And how is your division structured, if you can

19  just give me a brief overview?

20      A.    The Division of Elections has the directors

21  office, which consists of the administrative assistant, the

22  budget personnel.  It then has three primary units or

23  bureaus.  One is the Bureau of Election Records, the other

24  is the Bureau of Voter Registration Services, the third one

25  is the Bureau of Voting Systems Certification.

MARIA MATTHEWS

1

2          Then there is a Program Administration Unit that

3     handles and oversees special programs like the special

4     salary program, mail ballot request program, et cetera.

5          Q.    The Program Administration Unit, how many

6     employees are in that unit?

7          A.    There are four.

8          Q.    Okay.  And do they handle matters related to

9     elections, or are they separate from the Bureau of Voter

10    Registration Services?

11         A.    The Division of Elections is entirely about

12    elections.

13         Q.    So the Program Administration Unit is within that

14    division, it's not a separate entity?

15         A.    Correct.

16         Q.    What is the role of the bureau chiefs within the

17    Division of Elections?

18         A.    The role of the bureau chiefs are to oversee the

19    administrative or operational duties that fall within those

20    units.

21         Q.    And how would you describe your role in relation

22    to the bureau chiefs?

23         A.    My role as the director is to oversee their role

24    and that they fulfill the duties that have been -- that

25    fall within the jurisdiction of the bureaus.

MARIA MATTHEWS

1

2    Q.    So is it accurate to say that you supervise the

3    bureau chiefs in their day-to-day or in the programatic

4    work?  How would you describe it?

5    A.    My job or duty is to oversee their duties as

6    supervisors within their units to ensure that the

7    operations are being conducted.

8    Q.    Okay.  What was your position immediately prior to

9    holding your current position?

10    A.    I served as the bureau chief for the Bureau of

11    Voter Registration Services.

12    Q.    And what was your -- what were your primary job

13    responsibilities as the bureau chief to BVRS for short?

14    A.    As the chief for the Bureau of Voter Registration

15    Services, I oversaw the program units duties, which were

16    processing voter registration applications at that time,

17    identifying potentially ineligible voters, all the absentee

18    ballot file requests, election results reporting for

19    election night.  Those are the high-level duties that fall

20    within that unit.

21    Q.    When you were bureau chief, did you supervise the

22    day-to-day operation of the staff within your bureau?

23    A.    I would oversee and connect as needed with the

24    supervisors.  So I am not involved every day with the staff

25    operations unless there is something that I need from them

MARIA MATTHEWS

1

2    or there is a question that comes up and I need to be

3    consulted.

4        Q.   And that's in your current position?

5        A.   That's in my current position.

6        Q.   When you were bureau chief and the current

7    position of bureau chief, did you supervise the day-to-day

8    operation of those working within your bureau?

9        A.   At that time we had two floor supervisors that

10   oversaw the daily operations.  So my contact would be

11   primarily through them.

12       Q.   Okay.  Who currently holds the position of bureau

13   chief of BVRS?

14       A.   Toshia Brown.

15       Q.   And you manage Ms. Brown's position?

16       A.   Yes.

17       Q.   Has the job responsibilities, the primary

18   responsibilities, changed since your tenure as the bureau

19   chief until her tenure now?

20       A.   No, they are relatively the same.

21       Q.   And has the structure changed or are there still

22   two floor supervisors in BVRS?

23       A.   There are two floor supervisors now.  One has a

24   vacancy.

25       Q.   Okay.  And who is the current floor supervisor?

1                    MARIA MATTHEWS

2        A.    Tiffany Morley.

3        Q.    When did the second floor supervisor leave that

4    position?

5        A.    In August.

6        Q.    Just last month?

7        A.    Yes.

8        Q.    And who was that?

9        A.    Virgie Madrigal.

10       Q.    I'm sorry?

11       A.    Virgie Madrigal, V-i-r-g-i-e M-a-d-r-i-g-a-l.

12       Q.    Okay.  And what is Amber Marconnet's position

13   within the Bureau of Voter Registration Services currently?

14       A.    She is the second in command.

15       Q.    So is she a deputy to Ms. Brown?

16       A.    Her official title is senior management analyst

17   supervisor, but she is like the sous chef.

18       Q.    Thank you.

19             Could you give me a brief description of your

20   other positions held prior to your work in the Secretary of

21   State's Office?

22       A.    Prior to serving as the bureau chief for the

23   Bureau of Voter Registration Services, I served as an

24   assistant general counsel in the General Counsel's Office

25   in the Department of State.

1                         MARIA MATTHEWS

2       Q.   And when was that?

3       A.   That was prior to June 2012.

4       Q.   You were general counsel -- when did you serve as

5   the bureau chief?

6       A.   June 2012 until January 2013.

7       Q.   Okay.  And then prior to that you were at the

8   General Counsel's Office?

9       A.   Correct.

10      Q.   I see.

11           So you are an attorney?

12      A.   Yes.

13      Q.   And are you currently a member of the Florida Bar?

14      A.   Yes.

15      Q.   What position did you hold before you worked in

16  the Office of General Counsel?

17      A.   I served as a senior attorney with the Florida

18  Senate.

19      Q.   How long were you in that position?

20      A.   I was there for at least five to seven years.

21      Q.   Okay.  Did you serve under a specific legislature

22  or in a different capacity?

23      A.   During my time at the legislature, I served on

24  several Senate committees.

25      Q.   Which ones?

MARIA MATTHEWS

2    A.    I served on the Senate committee on commerce and
3    economic opportunities, I served on the Senate committee on
4    regulated industries, and I last served on the Senate
5    committee on judiciary.
6    Q.    And did you serve on all of those committees in
7    your legal capacity in the same position?
8    A.    Yes.
9    Q.    Okay.  Just a few questions about your educational
10   background.  What's your highest level of education?
11   A.    Juris doctorate.
12   Q.    And where did you attend law school?
13   A.    Florida State.
14   Q.    Where did you attend undergraduate?
15   A.    University of Central Florida.
16   Q.    You mentioned earlier the Secretary of State's
17   role with regard to elections.  How would you describe that
18   role?
19   A.    Bylaws in Chapter 97, which she serves as the
20   chief election official, and the law sets out what her
21   duties are with respect to that.
22   Q.    And what do you view as her primary duties with
23   respect to elections?
24   A.    By reference to the law, it would be to ensure
25   uniform interpretation and application of the election

MARIA MATTHEWS

laws, providing assistance to Supervisors of Elections,

issuing advisory opinions, ensuring the statewide voter

registration system contains only eligible voters.  Those

are just a few.

    Q.   And are you the primary person that would carry

out many of those initiatives in day-to-day practice?

    A.   Yes.  As I stated earlier, the Division of

Elections serves as the administrative arm to her role in

that capacity.

    Q.   Okay.  You mentioned that she provides assistance

to Supervisors of Elections and issues advisory opinions.

What role does Supervisors of Elections play with regard to

elections in Florida?

    A.   Supervisors of Elections conduct the elections at

the local level.

    Q.   And what does that entail?

    A.   That entails everything from getting the ballots

ready and putting correct races and contests on those

ballots to setting up the polling locations and early

voting to conducting -- doing testing on -- preelection

testing of voting systems to running the elections during

early voting period and election day, including any

recounts if there are any, to reporting postelection

results.

1                        MARIA MATTHEWS

2       Q.    Have you ever served as a Supervisor of Elections?

3       A.    No.

4       Q.    Along with issuing advisory opinions, does the

5   Secretary of State's Office offer any additional guidance

6   to the Supervisors of Elections?

7       A.    The Secretary has authority to issue directives.

8   We also on a daily basis have communications with

9   Supervisors of Elections.

10      Q.    And who is the primary contact for Supervisors of

11  Elections on a daily basis?

12      A.    I'm not sure I understand your question.

13      Q.    If a Supervisor of Elections had a question or an

14  inquiry related to interpreting or administering the law,

15  who would they contact in your division?

16      A.    Depending on what the question is, if it's an

17  operational question, they would pose the question to the

18  Division.  If it's a legal question, it would be referred

19  or their call would go to the legal office.

20      Q.    Okay.  And as a -- do they have a single first

21  contact point, a call line or a help line or something like

22  that, or do they just contact the folks they know who work

23  in your division?

24      A.    They contact the folks they know in the division

25  with respect to whatever the topic or subject area may be.

MARIA MATTHEWS

1

2     Q.   All right.  And when you mention issuing advisory

3   opinions, is that the only sort of formal guidance that the

4   Secretary of State's Office gives to the Supervisors of

5   Elections?

6     A.   That's the formal request process regarding any

7   interpretation of law that might affect them in terms of

8   their duties.  There are also times that the Division will

9   provide some guidance regarding reference to a law.

10    Q.   So you said the formal request process.  Does that

11  mean that formal guidance is always requested by the

12  supervisors, or is it offered in some other manner or

13  context?

14    A.   If a Supervisors of Elections asks for an advisory

15  opinion, that's the process to follow.

16    Q.   And you also mentioned formal guidance that the

17  Division offers.  Under what circumstances would the

18  Division offer formal guidance?

19    A.   If there is a question about something that all

20  the supervisors would warrant needing to know or if there

21  is a notice about something that's happened that is

22  relevant or useful for them in terms of election -- local

23  election administration.

24    Q.   So if you receive questions from multiple or

25  numerous supervisors, is that the sort of circumstance

MARIA MATTHEWS

2    under which you would -- the Division would offer guidance?

3    A.    It might be.

4    Q.    And the second category that you mentioned, if

5    there is something that they need to know if there is a

6    change in circumstance, what are some of the changes in

7    circumstance that would warrant issuing formal guidance?

8    A.    Right now I can't think of those.  You could look

9    at the advisory opinions, our advisory opinions and our

10   directives, and that can give you an idea.

11   Q.    As far as informal guidance, then, is there -- at

12   what points do you issue informal guidance to all

13   Supervisors of Elections?

14   A.    That would be after consultation internally about

15   whether it is something that needs to be relayed to all

16   supervisors.

17   Q.    And who would you consult with about that?

18   A.    I would consult with my staff, make sure I have

19   all the facts and circumstances, and then I would consult

20   with my superiors.

21   Q.    So you would generally consult with your superiors

22   before you issued a guidance to the full group of

23   Supervisors of Elections?

24   A.    Correct, unless it's an issue that is pretty

25   straightforward and can be addressed by reference to the

1                    MARIA MATTHEWS

2    law.

3         Q.   Okay.  When there is a change in the law, either

4    by way of new legislation -- well, let's start with new

5    legislation.  When new legislation is passed, what is the

6    Division's policy as far as issuing formal guidance?

7         A.   There are conferences that are held -- there is a

8    summer conference that is held typically every year after

9    the legislative session.  That's our opportunity to review

10   and present to the supervisors the changes in law.

11        Q.   When is that conference held in the summer?

12        A.   Typically it's either May or June.

13        Q.   Okay.  And so that summer conference, would there

14   be materials distributed or discussion of different changes

15   in law that legislative session?

16        A.   By reference to this past year, it was a

17   PowerPoint that would have just gone over each of the

18   sections or the primary or highlights of the law.

19        Q.   Okay.  And, of course, that's just in a single

20   session or over a couple of days.  Is there additional

21   written guidance that the Division would typically issue to

22   all Supervisors of Elections after a change in law?

23        A.   Not this circle, no.

24        Q.   The legislative session in this cycle ended in

25   May.  There was no written guidance issued to all

1                    MARIA MATTHEWS

2    supervisors related to any of the, I believe, numerous

3    changes in elections laws?

4        A.   Supervisors of Elections were informed at the

5    conference about the legislative changes that had been

6    enacted as a result of the 2019 legislative session and

7    what rules would need to be amended or were being

8    considered for further implementation.

9        Q.   Okay.  But you -- I believe you said you didn't

10   distribute any materials at the summer 2019 supervisors

11   conference?

12       A.   That's correct.  We talked about it.

13       Q.   Okay.  And you haven't distributed -- you

14   didn't -- have you distributed any materials since that

15   conference related to the changes in election law during

16   the 2019 legislative session?

17       A.   The supervisors have access to the chapter law as

18   well as the legislative analyses that go with that, and

19   there is election summaries that the Senate and House put

20   out for further explanation.

21       Q.   Okay.  But did your office issue any written

22   materials related to the changes in law this past

23   legislative session?

24       A.   I can't recall.  If we would have put anything

25   out, it would have been here is the law that passed, here

MARIA MATTHEWS

1

2     is some sections or links to the staff analysis and the

3     election summary.

4          Q.   Did you typically provide guidance beyond just the

5     statutory language or the legislative documents?

6          A.   We have in the past.

7          Q.   But you didn't provide any guidance beyond the

8     statutory language or the legislative documents for

9     election laws passed in 2019; is that correct?

10          A.   We provided -- I am pretty sure that we provided

11     reference that the chapter law had been enacted and then

12     links to the legislative analyses as well as the election

13     summaries.

14          Q.   Okay.  Was there anything beyond that that you

15     provided?

16          A.   Not that I can recall at this time.

17          Q.   Okay.  Could you please walk me through the voter

18     registration process in Florida?  First, what are the

19     qualifications to register to vote and to vote?

20          A.   The qualifications to register to vote are that

21     you must be at least 18 years old, a U.S. citizen, not be

22     convicted of a felony conviction, or if you have, had your

23     rights restored, not be adjudicated mentally incapacitated,

24     or if you have that you have had your rights restored, have

25     legal residence here in Florida.  There are circumstances

MARIA MATTHEWS

2   where 16- and 17-year-olds can preregister if they satisfy

3   those other requirements.  I think that's it.

4        Q.   That sounds fairly comprehensive.

5        A.   Yeah.

6        Q.   Walk me through the process, please, of how a

7   voter applies for registration.

8        A.   In Florida, there are a number of ways that an

9   individual can submit an application.  It can be by in

10  person paper, it can be by mail, which can come either

11  directly from the voter or through a third-party group that

12  might have collected an application.  It can come in

13  through the online voter registration system which we

14  launched in October of 2017.  It can come in through

15  electronic intake information that is taken at the tax

16  collector's office and is submitted to the State nightly,

17  or it can also come in through the Department of Highway

18  Safety driver's license renewal program, online program,

19  and it can also come in through a driver's license mail-in

20  renewal form or a voter registration agency under the

21  National Voter Registration Act.

22       Q.   And are those applications submitted to your

23  office at the Department of State or to individual

24  Supervisors of Elections?

25       A.   Paper applications are forwarded if not directly

1                    MARIA MATTHEWS

2    submitted to the Supervisors of Elections office.

3    Electronic information captured either through the online

4    voter registration system, which the Department of State

5    oversees, or electronic information captured by the

6    Department of Highway Safety and Motor Vehicles in

7    conjunction with the tax collector's office support

8    submitted to the State, and we act as a pass-through to get

9    that to the Supervisors of Elections.

10        Q.   So in the first instance before it's entered into

11   the system, it would go through the Supervisors of

12   Elections; is that correct?

13        A.   Repeat your question.

14        Q.   For a new voter registration application, the

15   entry point into FERS, the voter registration system, is

16   that through the supervisors or through your office?

17        A.   The Supervisors of Elections, if they receive an

18   application, a paper application, their offices enter the

19   information into the Florida Voter Registration System.  If

20   the data is captured electronically in those other methods

21   that I mentioned, then that information is electronically

22   forwarded to the supervisors who then at their end do their

23   processing to accept the application and whether it's a new

24   application or an update.

25        Q.   Okay.  Is there a time frame within which it needs

MARIA MATTHEWS

1

2    to be entered into the statewide voter registration

3    database?

4        A.    If the Supervisors of Elections are entering the

5    information, they have 13 days from the date of receipt to

6    enter that information.  If the information is captured

7    electronically, then the information is pretty much always

8    processed within a much shorter time frame.

9        Q.    Once that data is entered into the system, is

10   there any determination of the voter's eligibility at that

11   point?

12       A.    Based on the law, if an applicant -- a new

13   applicant completes an application form and provides all

14   the information necessary for the supervisor to make that

15   determination, i.e., they check the requisite boxes

16   regarding eligibility, they sign the application, they

17   provide the information, in essence, that is necessary for

18   the supervisor based on the four corners of that

19   application to be able to make that call.

20       Q.    Then what happens if that occurs?

21       A.    If that occurs, then the supervisor is the one

22   that determines and adds that individual to the rolls.

23       Q.    At that point when the individual is first added

24   to the rolls, is that individual's information checked

25   against any other databases?

MARIA MATTHEWS

1

2      A.    Once an applicant is added to the rolls as a

3  registered voter, at the Department of State level, within

4  24 hours information regarding any new registered voter,

5  any changes to an existing registered voter's record, or

6  any new felony record created and introduced into the

7  Florida Department of Law Enforcement's database, the

8  Florida Department of Law Enforcement compares two data

9  sets, the voter registration records that we provide them

10  and their criminal records to determine if any of these

11  records will present a potential match of ineligibility

12  based on a felony conviction.

13      Q.    And that's within the first 24 hours of entry of

14  an individual's voter registration application; is that

15  correct?

16      A.    Correct.  The individual is already registered by

17  that point.

18      Q.    What if the Division finds that there is a match

19  between, for example, a conviction record and a new voter

20  registration application, what is the next step?

21      A.    Then that triggers the process under

22  Chapter 98. -- well, Section 98.075, in which we are then

23  tasked with determining whether the information is credible

24  and reliable.

25      Q.    Okay.  So am I correct that supervisors generally

MARIA MATTHEWS

2   have five days to notify an applicant about whether their

3   initial application is approved or denied?

4       A.   Correct.

5       Q.   And the check against other databases is done by

6   the Division within 24 hours?

7       A.   Correct.

8       Q.   So just to make sure that I understand the

9   chronology, if somebody submits a voter registration

10  application, and within those first 24 hours there is a

11  match, is it correct that the supervisor would still

12  approve their registration application, and then they would

13  go through a separate process to be removed?

14      A.   There are two processes operating in parallel

15  track here.  One is the registration.  So as you noted,

16  within five days of an application being accepted, the

17  individual will be notified.  If they have been accepted,

18  they will be sent a voter information card.

19          If they have been denied for any reason,

20  application is incomplete, therefore, they can't proceed

21  with it, and recognize also that there is a verification

22  process that has to occur as well, which is part of the

23  completed application, and that is that the individual's

24  personal identifying number has to be verified.

25          So you have an application that is complete,

1              MARIA MATTHEWS

2    meaning it has all the requisite information to determine

3    if the person is eligible.  But the last piece is that they

4    have to go and verify the driver's license number or the

5    Social Security number that was provided on that

6    application.  If that gets verified, then, yes, then that

7    is at the juncture that the individual is registered to

8    vote.

9        Q.    Just to make sure I understand it correctly, the

10   only reason that an individual's application is denied is

11   either they did not complete the four corners of the

12   application adequately or that the Division is unable to

13   verify their identity; is that correct?

14       A.    The Division -- the application has to be complete

15   so that all the information there is -- is there for the

16   supervisor to be able to determine if that person is

17   eligible to be registered.  One of those main fields is

18   providing personal identifying number, which can be either

19   the driver's license number -- Florida driver's license

20   number, Florida ID number, or the last four digits of the

21   Social Security number.  That number has to also be

22   verified as to whether it exists, it's authentic, it

23   belongs to that person with that name.

24             We send that information on to the Department of

25   Highway Safety and Motor Vehicles which verifies that.  If

MARIA MATTHEWS

1

2    that information comes back as confirmed, yes, it belongs

3    to that person, then that is the juncture at which the

4    person becomes registered.

5        Q.    Okay.  And just to go back to the 24 -- the

6    database check within 24 hours of registration.  So am I

7    understanding it correctly that somebody could submit a

8    complete application, their identity is verified based on,

9    let's say, their driver's license number, they are then

10   registered.  Within 24 hours their records are matched to,

11   for example, conviction records, but they still receive a

12   voter registration card from the Supervisors of Elections.

13   Is that the way it works?

14       A.    If the application is deemed complete, the

15   personal identifying number is verified as valid, the

16   individual is registered to vote.  That is one track.

17           Meanwhile, once that record is -- that person is

18   added to the rolls as a registered voter, that record is

19   then cross-checked against felony conviction records within

20   the Florida Department of Law Enforcement as well as the

21   Department of Corrections.  And if a match, a potential

22   match, that's all it is at this point is an automated

23   potential match, that then begins our process for beginning

24   to gather the information to determine if this match, this

25   data match, is credible and reliable.  Do we have the right

1          MARIA MATTHEWS

2  person?  Is it, indeed, a felony conviction?  And then do

3  we have the supporting documentation to support that?  And

4  that develops the case file, which is then if we determine

5  that it is credible and reliable, we then forward it to the

6  Supervisors of Elections.

7      Q.  And I will ask you for some more details on that

8  process momentarily, but just so I understand the time

9  frame, could somebody potentially submit their application,

10 within five days receive an approval and a voter

11 registration card from the Supervisors of Elections, and

12 then because of a match within those first 24 hours, within

13 days receive a cancellation notice because of a match with

14 a conviction?

15     A.  Under Florida law no one receives an automatic

16 notice of cancellation at that point.  What the law

17 requires is that the supervisor upon receipt of credible

18 and reliable information issue within seven days actual

19 notice to the voter that they are potentially ineligible.

20 So it's this due process where they are given notice of

21 this potential ineligibility and then provided the

22 opportunity to say, no, this is not me; no, this is a

23 felony conviction, but it's adjudication withheld; or, no,

24 it was downgraded or this is not correct, this information

25 is incorrect.

                          MARIA MATTHEWS

1

2          So that's what it -- that due process has to play

3    out before anybody is determined to be ineligible and

4    removed from the rolls, which the Supervisors of Elections

5    are the only election official authorized to do that.

6        Q.    We will go into those specifics in a moment, but

7    as far as the timing, a new registration applicant could

8    receive approval and a voter registration card within those

9    first five days after submitting their application, and

10   then you said there is a seven-day process after the

11   supervisor receives additional evidence from you of

12   potential ineligibility.

13         My question is could a voter receive approval and

14   a voter registration card and within a week or ten days

15   then receive notification that they may be ineligible

16   according to the process that you just described?

17       A.    Yes, they could potentially receive a notice of

18   potential ineligibility as a registered voter at that

19   point, yes.

20       Q.    All right.  So there is not a -- there is not an

21   eligibility check within those first 24 hours that would

22   have their application rejected?  Their application would

23   be accepted and approved potentially, and then there would

24   be a separate removal proceeding; is that correct?

25       A.    The process contemplated under the law right now

1                    MARIA MATTHEWS

2    is that that cross-check occurs after someone becomes a

3    registered voter.

4        Q.    You said contemplated under the law.  Is that how

5    it's carried out in law between the Division of Elections

6    and the supervisors?

7        A.    Under 98.075, correct.

8        Q.    I am going to hand you an exhibit that we will

9    mark as Exhibit 1.

10                    (Document marked as Exhibit 1

11                        for identification)

12   BY MS. EBENSTEIN:

13       Q.    If you want to take a moment to look at it, but do

14   you recognize this document?

15       A.    (Witness reviewing document.)

16             Yes.

17       Q.    And what is this document?

18       A.    This document was a presentation that was prepared

19   for the Florida certification -- Certified Election

20   Professionals, FCEP program, and the topic covered was list

21   maintenance.

22       Q.    This was a preparation from your office?

23       A.    Yes.

24       Q.    And is this a presentation that would have been

25   made to Supervisors of Elections?

1                    MARIA MATTHEWS

2       A.   It would have been made to Supervisors of

3  Elections who attended that particular program.

4       Q.   I see.  And when was that program?

5       A.   Based on the date on this presentation, it is July

6  2017.

7       Q.   Okay.  If you could go by the Bates number, I

8  don't have the page numbers, DOSG-0000487.  It's a page

9  entitled "Information Sources For Convicted Felon Without

10  Rights Restored."

11            Again, just for the record, since we did not have

12  many of the documents setting out the procedures in your

13  office, I am at this point limited to questioning you about

14  the documents we do have.

15            Do you recognize the information contained in this

16  document?

17       A.   Yes.

18       Q.   And does this -- what does this include?  What

19  does this document set out?

20       A.   This page of the PowerPoint indicates the

21  information sources that we may receive access or obtain

22  for convicted felony convictions for those who have not had

23  their rights restored.

24       Q.   Okay.  Before November 2018, were these the

25  sources or databases from which you received information on

1                          MARIA MATTHEWS

2    felony convictions?

3         A.    Yes, and they still remain.

4         Q.    Were there any other sources from which you

5    received felony convictions?

6         A.    I believe these cover it.

7         Q.    And you said "they still remain."  Is this still

8    the complete list of sources from which you -- your office

9    receives information on felony convictions as of today?

10        A.    Yes.

11        Q.    Okay.  If you could turn to the next two pages

12   later, DOSG-0000489.  That page is entitled "BVRS

13   ineligibility file transfer method."  Can you summarize

14   what this sets out?

15        A.    This document shows the various sources of

16   information received about felons, whether it's a state

17   felon or registered sexual offender, out-of-state felon, or

18   fed felon or out-of-state and fed felons and the various

19   ways in which that information may come into our office and

20   then the way that we would provide it to the Supervisors of

21   Elections.

22        Q.    Okay.  I would like to ask first about the way

23   that it comes into your office.  We can just go through

24   them one by one.  All the way on the far left for FDLE, the

25   way that it comes into your office is listed as "Automated

MARIA MATTHEWS

1

2    Run."  What does that mean exactly?

3         A.    As referenced earlier, voter registration records

4    are provided to the Florida Department of Law Enforcement

5    who then conducts a match process against criminal records

6    in their database looking for matches between voters and

7    convicted felons in their records.  That generates an

8    automated run of data regarding potential matches.

9         Q.    And what do you mean exactly by an automated run?

10        A.    It means that it's programatic.

11        Q.    Do you know how many match points for the data

12   there needs to be for it to be a hit?  Do you understand

13   what I mean by "a hit"?

14        A.    I do understand.

15             The criteria is set out in a Memorandum of

16   Agreement, and I don't have that criteria that I can share

17   right now with you in my head.

18        Q.    Do you know when that Memorandum of Agreement, I

19   assume between the Division of Elections and FDLE, when

20   that was entered into by both departments?

21        A.    We would have started this back in 2006, and I

22   think the most recent update was done 2015, and we are

23   currently working on a revised memorandum.

24        Q.    Just to go through those different dates, is that

25   when the FERS system came into play?

MARIA MATTHEWS

1

2      A.    That is when the State launched the statewide

3  voter registration system for which it's responsible and

4  now serves as the single statewide voter registration

5  system.  Up until then, there were 67 county voter

6  registration systems.

7      Q.    And you said the last update was in 2015.  You

8  were the director of Division of Elections at that point,

9  correct?

10      A.    I was during 2015, correct.

11      Q.    Was there an event that precipitated the update in

12  the Memorandum of Agreement between the Department of State

13  and FDLE?

14      A.    As with any process regarding automation, we are

15  constantly reviewing how the automation is done.  So I

16  would have to compare the 2006 and 2015 and go back through

17  records to determine what it was that might have triggered

18  that.

19      Q.    Okay.  The 2015 agreement is still operative; is

20  that correct?

21      A.    Yes.

22          MS. EBENSTEIN:  Counsel, we would like a copy, if

23       possible, of that agreement.

24          MR. JAZIL:  Okay.

25

MARIA MATTHEWS

1

2  BY MS. EBENSTEIN:

3      Q.    And you mentioned a moment ago that you are

4  currently discussing an update to that agreement with FDLE;

5  is that correct?

6      A.    Correct.

7      Q.    Who are those discussions with or between?

8      A.    It's with staff from the Florida Department of Law

9  Enforcement.

10     Q.    And yourself or others in your office?

11     A.    It would involve me, it would involve the bureau

12  chief and the second in command, as well as our IT.

13     Q.    Okay.  And the staff from FDLE, is that mostly

14  programatic staff or IT-related staff?

15     A.    It's operational and IT.

16     Q.    When did you begin those discussions regarding a

17  new Memorandum of Agreement with FDLE?

18     A.    We have regular meetings with FDLE, if not

19  monthly, twice a month.  And we have had that pretty much

20  since 2006 over time as needed to discuss whatever the

21  files are showing.  So it would have been primarily on the

22  file specs.

23     Q.    Okay.  So you have regular meetings with FDLE, but

24  there has not been a new Memorandum of Understanding in the

25  past four years, correct?

1                          MARIA MATTHEWS

2        A.    If there wasn't anything to update, then we

3   wouldn't have had to.

4        Q.    And is it correct that there wasn't anything to

5   update, so you didn't for the last four years?

6        A.    We may have had things to update.  Until we figure

7   out exactly what those things are that need to be updated,

8   that's why we are working on it right now.

9        Q.    When did these discussions specific to a new

10  Memorandum of Agreement with FDLE begin, the current

11  conversations?

12       A.    I don't remember when they would have started.  I

13  do know that we definitely need to now as a result of

14  Constitutional Amendment 4.

15       Q.    Did they -- okay.  So if they started related to

16  Constitutional Amendment 4, it would have been after

17  November; is that correct?

18       A.    No, I can't say that.

19       Q.    What precipitated the new discussions about the

20  Memorandum of Agreement?

21       A.    At this point, I know that we have been talking

22  about updating the Memorandum of Agreement for a while, and

23  the Constitutional Amendment 4 has added another sense of

24  urgency to getting that amendment done.

25       Q.    Okay.

MARIA MATTHEWS

1

2     A.    Because it relates to file specs.

3     Q.    So you are discussing an update to the agreement

4     with FDLE before the Constitutional Amendment 4 passed; is

5     that right?

6     A.    Yes.

7     Q.    And Amendment 4's passage has changed the nature

8     of the terms of that prospective agreement; is that

9     correct?

10    A.    It has made us revisit the file specs that we were

11    wanting to change to gather more information -- to

12    determine what information FDLE has and what information

13    they can get to us that will help us implement the law

14    better.

15    Q.    Okay.  Are there draft agreements with FDLE that

16    were created before Amendment 4's passage?

17    A.    I do not have the latest -- I believe the draft is

18    with FDLE right now.  They are charged with making those

19    changes.

20    Q.    In that back-and-forth negotiation I assume?

21    A.    Correct.

22    Q.    But were there drafts created either by your

23    division or you received by FDLE before November 2018?

24    A.    I can't recall right now.

25    Q.    Have there been draft agreements created since

MARIA MATTHEWS

1

2    November 2018 either by your division or shared with you by

3    FDLE?

4        A.    I can't recall having seen the latest revision to

5    the agreement.  I do know there have been changes to the

6    file specs that is an attachment to the agreement.

7        Q.    So currently there is no agreement, there is no

8    new agreement in place since 2015, but there are draft

9    agreements created after November 2018 and changes to the

10   file specs; is that correct?

11       A.    I can't speak to the time frame.  All I know is

12   that there are efforts underway to revise the agreement,

13   and it includes changing or expanding upon the file specs.

14       Q.    But neither the file specs nor the agreement have

15   been changed yet; is that correct?

16       A.    No.  There have been back-and-forth about the file

17   specs.

18       Q.    So there have been --

19       A.    That much I do know, yes.

20       Q.    How would that back-and-forth take place?

21       A.    Through email and also through conference calls

22   that we have had or face-to-face meetings.

23       Q.    So there has been email communication between FDLE

24   and your division changing the file specs related to the

25   file -- the match transfers; is that correct?

MARIA MATTHEWS

1

2     A.    Correct.

3     Q.    Do you recall approximately which month that would

4  have been communicated between FDLE and your division?

5     A.    As I stated, we have at least monthly meetings

6  scheduled with them regularly, so I'm sure the conversation

7  would have covered these topics to some extent.

8     Q.    But the actual change in file specs I assume would

9  have been significant.  It would change the criteria or the

10  way in which the data is matched between those two offices,

11  correct?

12     A.    Not necessarily.  File specs could mean that they

13  are adding additional fields.  It may not necessarily mean

14  that the criteria or the basic matching process has

15  changed, but rather that we are getting additional

16  information that may be helpful for us to implement the

17  law.

18     Q.    And is that what occurred in the last -- this

19  year?

20     A.    That is the primary focus, yes.

21     Q.    Do you know what additional fields were added?

22     A.    No.  That would be in the documentation.  I don't

23  have that committed to memory.

24     Q.    Was there -- aside from back-and-forth email

25  communications, were there memoranda created that your

1                          MARIA MATTHEWS

2    offices shared laying out those additional fields?

3        A.    Again, emails would have contained the information

4    that we were sharing and what our processes were and what

5    we were looking for in terms of additional information.

6        Q.    Okay.  All the way on the left of this particular

7    page it says "State felons."  Moving one column to the

8    right it says "Felons - Registered Sexual Offenders."  I

9    believe based on this chart, that is transferred through a

10   secured FTP site.  How is that different than the automated

11   run related to all state felons?

12       A.    The Florida Department of Law Enforcement is

13   responsible for tracking registered sexual offenders, and

14   this information up until now, as far as I know, is that

15   it's captured separately.  So that information is shared

16   with us, and then we use that information to see if we can

17   find the -- a registered voter with that name and whatever

18   match -- the three matching criteria, basic matching

19   criteria that we use, which it has to match on three

20   things, either name -- three of the following, any three of

21   the following:  The name, the date of birth, driver's

22   license, Social Security number, and an address.

23           So that is not an automated process.  That is just

24   information that comes over to us, and then we look on the

25   voter registration rolls to see if we can find a match.

MARIA MATTHEWS

Q.   And just to be clear on how those two groups of databases are different, felons who are registered sexual offenders, does that include both people with a Florida state conviction and people with convictions from other states who are required to register as sex offenders in Florida?

A.   My understanding is that, yes.

Q.   And you said that's shared with your office.  Does that -- what does that mean exactly?

A.   What I mean is that it is available through this secure FTP site, that the Florida Department of Law Enforcement uploads that information, and then we are able to access that information.

Q.   Would your office need to affirmatively seek out that information, or would there be an automatic match between those two data sets?

A.   There is no automated match during that data set. There is one data set coming over to us saying here is a list of registered sexual offenders.

Q.   So, for example, I'm trying to ask questions in a nontechnical way for my own sake really.  Is there a website where you can input a name and see if there is -- input a name into the felony registered sexual offenders database and see if that's a match?

1                        MARIA MATTHEWS

2        A.    No.  The information that is accessible through

3    the secured FTP site is in manually.  So we take that

4    information and we go and search the voter registration

5    rolls to see if we can find someone with that name, that

6    date of birth.

7        Q.    So it's a regularly updated set of files?

8        A.    It is regularly provided to us, yes.  I don't

9    remember the frequency in which that information is

10   uploaded.

11       Q.    Approximately every day or every year?  Just

12   ballpark.

13       A.    It's not once a year and it's not daily.

14       Q.    Would you say once a month?

15       A.    Again, I think it may be monthly.

16       Q.    Okay.  Going to state felons -- out-of-state

17   felons with the Department of Corrections, first of all, do

18   you have a Memorandum of Agreement with FDOC related to

19   data sharing?

20       A.    Yes, we have an agreement with the Department of

21   Corrections.

22       Q.    And when was that agreement entered into?

23       A.    I can't remember the last date of that agreement,

24   but it would have been around the same time as when we

25   launched the Florida Voter Registration System.

MARIA MATTHEWS

1

2      Q.    So around 2006?

3      A.    That was our initial -- I believe that was our

4    initial agreement date.

5      Q.    And when was it last updated?

6      A.    I can't recall.  We also are in the midst of

7    revising that agreement to also look at additional fields

8    of information that the Department of Corrections may have

9    that may be helpful to us in fulfilling our duty under the

10   law.

11     Q.    Okay.  When did those revisions with -- revisions

12   of the Memorandum of Agreement between your division and

13   the Department of Corrections begin?

14     A.    It was last year.  Again, we have regular meetings

15   with the Department of Corrections regarding felon

16   processes.  So we would have as part of and in anticipation

17   of Constitutional Amendment 4, as well as the state law

18   that was enacted, we would have reached out to Department

19   of Corrections and started asking them what information

20   fields do you have.  We know what we are getting.  Now what

21   can we do to -- do you have additional fields that may be

22   helpful for us or that can be tweaked that would enhance

23   the quality of whatever the match and also give us

24   information that can help us implement the law.

25     Q.    So those discussions I believe you just said would

1                    MARIA MATTHEWS

2    have begun before November 2018?

3        A.    I don't know if they started exactly on this point

4    beforehand, but, again, we have regularly scheduled

5    meetings with the Department of Corrections.

6        Q.    Okay.

7        A.    Yes.

8        Q.    Beyond just the conversations, when did you begin

9    the process of updating the Memorandum of Agreement with

10   FDOC?

11       A.    We would have started talking about the file specs

12   sometime around November or December and then also

13   recognize that we would have to revise the Memorandum of

14   Agreement in order to incorporate those changes.

15       Q.    So unlike with FDLE, you have not yet changed the

16   file specs with FDOC; is that correct?

17       A.    Those are ongoing right now, those revisions.

18       Q.    But they have -- I assume when the file specs

19   change, it changes what sort of information is used for --

20   to match files.  They have not changed yet; is that

21   correct, while the discussions are ongoing?

22       A.    The new agreement has not been adopted or signed

23   yet, no.

24       Q.    The new agreement hasn't been adopted.

25   Separately, have new file specs been put in place?

MARIA MATTHEWS

2      A.    No.

3      Q.    So the only -- of the three databases that we have

4    discussed so far, the only database where the file specs

5    has changed since November 2018 is the FDLE database?

6      A.    No.  No file specs have changed formally yet.  We

7    are all in discussions regarding that to make sure that we

8    are all in agreement as to what each agency has in terms of

9    information that is valuable and useful for us to be able

10   to implement the law.  So there is a lot of back and forth

11   that goes on to make sure, and then there has to be testing

12   of those files that make sure that the data does get

13   pulled.

14         You are talking about agencies that each have

15   systems that are created and need to be able to talk to

16   each other and share data.  That is ongoing right now.

17     Q.    So nothing has changed yet on the file specs

18   between your division and these departments; is that

19   correct?

20     A.    We are getting felony information, but we are

21   getting it under the existing criteria and file specs.

22     Q.    Okay.  As far as the next column, federal felons,

23   what access does the Division of Elections currently

24   have -- sorry, let me start that again.

25         The next column lists U.S. Attorneys' offices, and

MARIA MATTHEWS

at the top it says federal felons, and it lists paper

(mail, email, fax) as the means of file transfer.  What

sort of agreement does the Division have with U.S.

Attorneys' Offices as far as accessing conviction records?

A.   We do not have any formal agreement.  This is

governed by federal and state law.

Q.   And the state law governs only the transfer of

records with U.S. Attorneys' offices within federal

jurisdictions within Florida; is that correct?

A.   No.  By federal law the National Voter

Registration Act, as well as under the state law 98.093,

U.S. Attorneys' Offices are required to report federal

felon information to the State.  We have three, of course,

federal district courts in Florida, the north, the middle,

and the southern, but we periodically also receive

quarterly reports from other federal jurisdictions

regarding felons that they believe have some connection

with Florida.  It could be that they were previously from

Florida, it could be that they have moved to Florida, and

these are all received by paper, you know, by mail, email,

or fax, and we just deal with them as we get them.

Q.   So to make sure I understand, all U.S. Attorneys'

Offices nationwide are required by federal law to send you

quarterly reports on everybody with a felony conviction who

1                    MARIA MATTHEWS

2    has some connection to Florida; is that correct?

3         A.    That is -- that's how we believe that information

4    is getting to us, because we don't know otherwise that they

5    feel that that information is relevant to Florida.

6         Q.    And so you receive those sorts of quarterly

7    reports from every U.S. Attorneys' Office nationwide?

8         A.    I don't know if I have received it from every.  We

9    mostly receive it from Pennsylvania, North Carolina,

10   Virginia, Michigan.  All across the country, but it's not

11   consistent.

12        Q.    Is it your understanding that those U.S.

13   Attorneys' Offices are required to send the State of

14   Florida, and presumably other states, that information?

15        A.    If there is a connection, I imagine, between the

16   felon and Florida, yes.

17        Q.    Does that go directly to the Division of

18   Elections?

19        A.    Yes, we receive that, and then we process that

20   manually.

21        Q.    Okay.  So would you be alerted to new federal

22   felon convictions immediately -- not immediately, but

23   quarterly from every federal jurisdiction in the country?

24        A.    I'm only going to know those that submit

25   something.

MARIA MATTHEWS

Q.    But your understanding is all are required to
submit something to Florida if there is a conviction if the
person convicted has some relation to Florida; is that
correct?

A.    I believe that's their duty to do.

Q.    Okay.  Ballpark, approximately how many states'
federal jurisdictions do that?

A.    I would assume all 50 do it, but we may not
necessarily be a state to which they have information that
is supposed to be reported to us.

Q.    Okay.  Because there is no connection to Florida
with their convictions in, say, North Dakota or something
like that?

A.    Correct.

Q.    And you receive those by -- individually by mail,
email, or fax?

A.    They can come in in a variety of ways.  It can be
an email, for example, with a single record, or it could be
an email with a quarterly report that lists a number of
individuals.

Q.    Do you ever request individual records from
U.S. Attorneys' Offices?

A.    What do you mean by "individual"?

Q.    Make an affirmative request as opposed to wait to

1                          MARIA MATTHEWS

2    get records from them?

3        A.    The three districts in Florida are the ones that

4    we periodically check to make sure that we are getting

5    information from their offices.

6        Q.    All right.  The final category, federal and state

7    court clerks, what information do you receive from those

8    entities?

9        A.    From the state court clerks, that, again, is

10   random in terms of whether a state sends us that

11   information.  It can also be triggered by information that

12   we may have gotten that someone is potentially ineligible,

13   and we reach out to that out-of-state clerk.  It can also

14   be if it's a person who is a convicted felon and within the

15   custody of the Department of Corrections for an

16   out-of-state conviction, then we will reach out to the

17   clerk of court to obtain whatever documents, supporting

18   documents, regarding that conviction.

19       Q.    Okay.  So the other out-of-state court clerks are

20   not required to send you -- to send the State of Florida

21   conviction records; is that correct?

22       A.    No.

23       Q.    And you said your office receives some randomly

24   from out-of-state court clerks?

25       A.    Sometimes we will receive it.  It's interim.  It's

1                           MARIA MATTHEWS

2    periodic.  It also would be if we reach out because of

3    information we may have heard that someone is ineligible

4    based on an out-of-state conviction.

5         Q.   Is that the primary -- the primary point of access

6    with out-of-state court clerks, your department

7    affirmatively reaching out to obtain court records?

8         A.   If we receive information that suggests that there

9    might be credible and reliable information that someone has

10   an out-of-state conviction.  We do not have access to

11   national convictions across the country.

12        Q.   Okay.  So those are the circumstances under which

13   you would reach out, but you are only -- your primary

14   access to records is when you reach out affirmatively to

15   others such as out-of-state clerks; is that correct?

16        A.   Correct.

17        Q.   As far as your sharing of that information with

18   the Supervisors of Elections, if you can turn one page back

19   to DOSG-000488, what's on that page?

20        A.   This page is entitled "Process for identifying and

21   removing."  And what it shows is the initial process for

22   information that we receive or have access to regarding a

23   potential ineligibility and then based on cross-checking,

24   of course, with the voter registration rolls.

25             The Bureau of Voter Registration Services is

1                           MARIA MATTHEWS

2      primarily responsible for reviewing the information that is

3      received or accessed to determine if it's credible and

4      reliable.  If it's not credible or reliable, it could be

5      reasons that it's an identity mismatch, it's then deemed

6      invalid.  If it's not credible and reliable because it's

7      actually not a felony conviction, it's deemed invalid.  If

8      it's because it was a felony conviction but its

9      adjudication withheld, it will be deemed invalid.  If it's

10     a felony conviction but initially charged that way but it

11     ended up that it got downgraded, it will also be invalid.

12             If there is insufficient information to be able to

13     be comfortable with it in any way, we don't feel that it's

14     credible and reliable, we are going to mark it as invalid,

15     and that's the end of the line right there.  That file

16     doesn't go anywhere else.  The individual remains on the

17     rolls.

18        Q.   Okay.  So you said BVRS is responsible for

19     reviewing automated matches when they come into your

20     office?

21        A.   They are responsible for reviewing automated

22     matches as well as any paper information that comes along.

23     They then begin the manual process of creating a case file

24     that builds the case on whether this is a credible and

25     reliable match so they can determine whether it's valid or

1                         MARIA MATTHEWS

2    invalid.

3         Q.    How many employees in BVRS are tasked with doing

4    the reviews you just described?

5         A.    We have 21 individuals that are in the bureau.

6    Nine are primarily examiners, five are reviewers, although

7    the reviewers can also serve as examiners based on whatever

8    the workload is at that time.  We also have at this time

9    six OPS.

10        Q.    What's OPS?

11        A.    OPS is Other Personnel Services, that's the

12   abbreviation.  It just means temporary staff.  They work --

13   it's sort of a misnomer because they do work -- they don't

14   work any more than 25 hours a week.

15        Q.    Okay.  And that's quite a few staff members

16   involved in this process.  Is the process standardized in

17   any way?

18        A.    Yes, it is.  They have to follow procedures

19   regarding -- that are laid out for how to make a credible

20   and reliable match record building that case file.

21        Q.    And are those procedures memorialized anywhere?

22        A.    Yes.

23        Q.    Where?  Where would we find those procedures?

24        A.    Those procedures are laid out in a manual.

25        Q.    Has that manual been updated in the last six

1                          MARIA MATTHEWS

2    months?

3         A.    Yes.

4         Q.    When was it last updated?

5         A.    It has been updated a couple of times as relative

6    to this process regarding felon matching.

7         Q.    Okay.  And I will ask you in a moment about an

8    update in June of 2019.

9              Do you recall when it was updated prior to June of

10   2019?  To restate the question, how long were the prior

11   procedures in place before June 2019?

12        A.    I know that we -- in December, we revised the

13   procedures particular to felons since we were now in this

14   period of a month between the constitutional amendment

15   being adopted and it becoming effective in January.

16        Q.    Were there any other revisions made to these

17   internal match procedures between December of 2018 and

18   June of 2019?

19        A.    There are various drafts, but then the next final

20   one is the one in June.

21        Q.    Okay.  And prior to December 2018, when was the

22   last time that the procedures were updated?

23        A.    That I don't recall.

24        Q.    Approximately months earlier or years earlier?

25        A.    The manual always is undergoing updates to reflect

1                         MARIA MATTHEWS

2    practices and cleanup or anything like that, so I do not

3    know.

4         Q.   Okay.  So, again -- well, this manual that was

5    revised in 2018, are you talking about a general practices

6    for the Division -- for BVRS manual or a manual specific to

7    identifying and removing individuals from the voter rolls?

8         A.   The manual is an internal procedures manual that

9    governs all the activities within the Bureau of Voter

10   Registration Services.  In particular what I'm talking

11   about are these felon-matching processes.

12        Q.   Just to go back a moment regarding the staff

13   tasked with identifying and -- sorry, the staff tasked with

14   the process for identification and removing people with a

15   conviction.  What is the role of an examiner?

16        A.   The examiner is the person who has the information

17   and then is charged with creating and gathering the

18   information to determine whether it's credible and

19   reliable, and they build the case file.

20        Q.   Okay.  And a reviewer, how is a reviewer's role

21   different from an examiner?

22        A.   A reviewer is an individual who then takes the

23   examiner's file, whether they have deemed it valid or

24   invalid, and reviews it to determine whether they agree

25   with it or they find there is some deficiency in the file

1                    MARIA MATTHEWS

2    or some inconsistency or anything to review it.  It's a

3    secondary level review.

4        Q.   If those two positions agree, if the examiner and

5    the reviewer agree that they have identified a match

6    between a conviction and a registered voter and should

7    begin the process for removal, I assume the process then

8    begins.  But my question is what if the examiner and the

9    reviewer do not agree?

10       A.   So once the examiner creates the file and the file

11   is sent on to a reviewer, the reviewer looks at it, and if

12   they agree that it is invalid, they both agree it's

13   invalid, end of story, registered voter stays on the rolls.

14            If the file is that they believe it is a valid

15   match but one -- the reviewer doesn't agree, then it gets

16   sent back and discussion about why they don't agree as to

17   whether it's valid or not.

18       Q.   Discussion between who?

19       A.   The examiner and the reviewer.

20       Q.   And who makes the final say on whether it's a

21   valid match?

22       A.   The match will then be bumped up to the supervisor

23   to determine.  If there cannot be any agreement, then,

24   again, we will not proceed with the match.

25       Q.   So I think there might be -- I might be

1                    MARIA MATTHEWS

2   misunderstanding.  It's bumped up to who is the supervisor?

3        A.   The supervisor, the floor supervisor that I spoke

4   of.

5        Q.   And that is -- what was the name of that person?

6        A.   Tiffany Morley.

7        Q.   Okay.  And does she make the final determination

8   if there is disagreement between an examiner and a

9   reviewer?

10       A.   It depends on whether it can be resolved at that

11  point.  If it's because they need more documentation --

12  it's a case-by-case basis.

13       Q.   What kind of training does an examiner have for

14  that position?

15       A.   Examiners are provided training regarding if there

16  is any changes, they will have a workshop, and they will be

17  given -- they will be -- it's a face-to-face workshop.

18  They will discuss the procedures, ask them if they have

19  anything, if they have any questions or anything like that,

20  and then they will -- we have them sign a document that

21  says that they understand the procedures and that if they

22  have any questions they need to be asking them.

23       Q.   And for reviewers, what sort of training do they

24  receive?

25       A.   Same.

1                          MARIA MATTHEWS

2        Q.    Okay.

3        A.    They are all conducted in one workshop.

4        Q.    Okay.  And I will ask you momentarily about that

5   reviewing process.  Once that process is complete, how

6   often are those files identified as matching and valid, and

7   valid means identifying a voter as potentially ineligible,

8   how often are those sent to the Supervisors of Elections?

9        A.    Over the course of the years, we see that it's

10  probably about 22 to 25 percent of the initial potential

11  matches are deemed invalid.

12       Q.    Okay.  The initial potential matches.  Explain to

13  me at what stage in that match process is it considered

14  initial.

15       A.    It's always initial until the supervisor gets it

16  and determines -- gives the voter the opportunity to

17  contest it or have that opportunity to be heard and

18  determines that the person is, indeed, ineligible.  For me

19  they are until that point potentially ineligible.

20       Q.    Does that mean that 22 to 25 percent of the files

21  that you send to Supervisors of Elections are --

22       A.    No.  Twenty-two to 25 percent are the ones that we

23  determine at our point that the information is not credible

24  and reliable, so we don't forward that on.

25       Q.    So does that mean that 22 to 25 percent of the

MARIA MATTHEWS

1

2   initial automated matches are over the course of the

3   process in your office deemed to be not credible and

4   reliable and never sent to the Supervisors of Elections?

5        A.   Correct.

6        Q.   Okay.  Does your office track -- among the records

7   that you send to the Supervisors of Elections, does your

8   office, first of all, track the numbers sent to each

9   supervisor in each county?

10       A.   Yes.

11       Q.   Do you track the number that are removed from the

12  rolls?

13       A.   Only when we are asked for statistical

14  information.  Supervisors of Elections are required to

15  record their determination, whether they are going to

16  determine that it's valid or invalid once it has gone

17  through the entire due process.

18       Q.   So you aggregate the information from supervisors,

19  but you don't have a way of collecting it independently; is

20  that correct?

21       A.   That information can be gathered based on the

22  supervisors recording what action they took in the Florida

23  Voter Registration System.

24       Q.   Are they required to record and provide that

25  within your division?

                    MARIA MATTHEWS

1

2    A.    It's within the Florida Voter Registration System.

3    Q.    I see.

4    A.    If we need to collect that information, we can

5    extract it.

6    Q.    So you have access to those records of how many

7    people were removed versus how many times files were sent

8    from the Secretary of State's Office to the Supervisors of

9    Elections office?

10   A.    Yes.

11   Q.    Okay.  I am going to show you a document that I

12   will mark as Exhibit 2.

13              (Document marked as Exhibit 2

14                  for identification)

15   BY MS. EBENSTEIN:

16   Q.    We have been going for about an hour and a half,

17   so we will discuss this document and then take a short

18   break.

19              Do you recognize this document?

20   A.    Yes.

21   Q.    What is this document?

22   A.    This document is entitled the "Constitutional

23   Amendment Petition Form."  It is the approved form for

24   Serial No. 14-01, the initiative petition that was approved

25   on October 31, 2014, for what would become Constitutional

1                              MARIA MATTHEWS

2    Amendment 4.

3         Q.    Okay.  So the voting restoration amendment is

4    commonly referred to as Amendment 4; is that correct?

5         A.    Yes.

6         Q.    And how did that constitutional amendment get onto

7    the ballot for November 2018?

8         A.    By law any initiative to change the constitutional

9    amendment requires a sponsoring committee to submit their

10   initiative petition language to the Division of Elections.

11   The Division of Elections is required to review it solely

12   as to format.

13         The initiative petition has to be submitted using

14   a prescribed petition form.  That form includes space that

15   the voter can sign once it's approved for circulation.  It

16   includes the ballot title, the ballot summary, the article

17   and section being created or amended, and then the full

18   text of the proposed constitutional amendment so that once

19   a sponsoring political committee, which has to form in

20   order to be able to do this, can then circulate this

21   petition and gather signatures.

22         The law requires certain thresholds to be met as

23   part of the process.  The first is once they meet -- well,

24   first of all, they have to meet a signature threshold in

25   order to get on the ballot, and that is based on the number

                        MARIA MATTHEWS

1
2    of registered voters, based on Congressional districts, and
3    right now I believe the signature threshold is somewhere
4    around 766,000.
5          In the interim while they are gathering those
6    signatures, there is also a process where if they meet the
7    10 percent of the signatures, that then triggers judicial
8    review as well as fiscal impact review.
9          Assuming everything goes well for the sponsoring
10   political committee, they obtain their requisite
11   signatures, the judicial review, which is, you know, is the
12   ballot summary, you know, plain and understandable, I
13   suppose -- I forget the exact statement.
14   Q.   That's the single subject rule?
15   A.   Yeah.
16         And the fiscal impact.  Then they are approved and
17   they get a ballot position, which we issue that ballot
18   position.
19   Q.   Who undertakes the fiscal impact review?
20   A.   That's done by the Joint -- I believe it's the
21   Joint Office of Economic Demographics.  It's a legislative
22   office.
23   Q.   Do you recall the fiscal impact of Amendment 4
24   contained in that fiscal impact review that came with the
25   constitutional amendment?

1                         MARIA MATTHEWS

2      A.   I know that there was one at that time, but I

3 don't have the -- I don't recall the exact impact that they

4 said.

5      Q.   Okay.

6           MS. EBENSTEIN:  Let's go off the record and just

7       take a short five-minute break.

8           (Recessed at 10:33 a.m.)

9           (Resumed at 10:53 a.m.)

10 BY MS. EBENSTEIN:

11      Q.   We just went through the provisions of Amendment 4

12 which we said passed in November of 2018.  After passage of

13 Amendment 4, did the Division of Elections receive

14 inquiries regarding Amendment 4 from Supervisors of

15 Elections?

16      A.   Yes.

17      Q.   And did the Division of -- how many inquiries

18 would you say the Division received?

19      A.   I don't recall.

20      Q.   Do you recall whether it was closer to 10 or 100?

21      A.   I don't recall.

22      Q.   Did the Division of Elections -- you mentioned

23 earlier that the Division provides guidance, even if it's

24 informal guidance, when an issue is coming up repeatedly by

25 way of Supervisor of Elections inquiries.  Did the Division

1                     MARIA MATTHEWS

2   provide any guidance to Supervisors of Elections in

3   November of 2018?

4        A.   We would provide guidance as needed, so I don't

5   know if specifically in November.

6        Q.   Do you recall late 2018 whether you provided

7   guidance, either in November or December, immediately after

8   the passage of Amendment 4?

9        A.   I would have to look at emails.

10       Q.   Okay.  I mean, it was in Florida and nationally a

11   rather large change to the voter registration process.

12       A.   I understand.  I just don't recall specifics,

13   so...

14       Q.   I'm going to give you a document Bates stamped

15   DOSG-0013257 that we will mark as Exhibit 3.

16                 (Document marked as Exhibit 3

17                     for identification)

18   BY MS. EBENSTEIN:

19       Q.   What is this document?

20       A.   This appears to be an email from Toshia Brown to

21   Amber Marconnet, Toshia Brown being the chief of the voter

22   registration service and Amber Marconnet being her second

23   in command.  It's dated 12/4/2018, and it seems to be

24   referring to an email that was sent initially by

25   Supervisors of Elections Mark Earley, who is the

1                         MARIA MATTHEWS

2      Supervisors of Elections for Leon County, regarding

3      questions about Constitutional Amendment 4.

4          Q.   If you look halfway down the page to the content

5      of Supervisors of Elections Earley's email, I will give you

6      a moment just to read through that.

7          A.   (Witness reviewing document.)

8               Okay.

9          Q.   Okay.  Supervisor Earley inquires about what to do

10     with voters whose removal is pending.  It says, "First

11     question:  If a voter was registered before the January 8th

12     date, and they are currently in process for being removed,

13     can we put those removals on hold?"

14              How did you answer Supervisor Earley's question

15     about pending removals at that time in late November?

16         A.   I don't recall how we answered.

17         Q.   What was the Division's policy in late November

18     after the amendment passed with regard to removals that

19     were pending at the Supervisors of Elections' offices?

20         A.   At that time, although the constitutional

21     amendment had been adopted, it didn't take effect until

22     January 8th, so whatever the current processes were in

23     place still applied.

24         Q.   So the position of the Division was not to put the

25     pending removals on hold in December of 2018; is that

1                           MARIA MATTHEWS

2      correct?

3           A.    If Supervisors of Elections had files in their

4      possession, they would have been at various stages of the

5      due process, so they are still obligated to follow that law

6      and follow it all the way through.  So at this point there

7      would have been no reason for them to have put them on

8      hold.

9           Q.    And would you have advised Supervisor Earley that

10     that was the Division's position?

11          A.    I don't recall what our response was.

12          Q.    But generally -- but that was the Division's

13     position at the time.  Is it safe to assume for those

14     supervisors who asked a question regarding the Division's

15     position that you would have told them?

16          A.    This email from Supervisor Earley is dated

17     November 30th.  A week later there was the mid-winter

18     conference with Supervisors of Elections.  We would have

19     told them, and I believe that we did tell them, at that

20     point our intent was not to send any further felon files at

21     that juncture, but any that were in their possession or

22     process at that point were to be continued under the

23     existing law.

24          Q.    Okay.  Along with inquiries from supervisors, did

25     you receive direct -- did your division receive direct

1                       MARIA MATTHEWS

2    inquiries from voters regarding the requirements of

3    Amendment 4?

4         A.    We did receive calls on the Voter Assistance

5    Hotline.

6         Q.    What is the Voter Assistance Hotline?

7         A.    The Voter Assistance Hotline is the hotline that

8    the Bureau of Voter Registration Services primarily

9    supports, and it takes calls in from whoever calls through

10   that line regarding a variety of questions ranging from

11   voting, voter registration, primary elections, any issues

12   related to elections.

13        Q.    And who staffs that hotline?

14        A.    The Bureau of Voter Registration Services.

15        Q.    Which members of the bureau in particular?

16        A.    Pretty much everyone except OPS.

17        Q.    Okay.  Did you direct the staff of BVRS as to what

18   they should tell people who inquired about standards under

19   Amendment 4 when they were answering the Voter Assistance

20   Hotline?

21        A.    At that point it would have been whatever law is

22   in effect at that point applies and the same requirements

23   for eligibility have to be satisfied, and that is if you --

24   you cannot be a convicted felon without having your rights

25   restored.

1                        MARIA MATTHEWS

2      Q.   So is that how you instructed that the staff of

3   the Voter Assistance Hotline, how they should answer

4   inquiries about Amendment 4?

5      A.   It would have been however it's in the Voter

6   Assistance Hotline manual.

7      Q.   Did you receive inquiries from legislators in

8   November of 2018 related to Amendment 4?

9      A.   I don't recall that I got inquiries from

10  legislators in November.  I do know that before the

11  legislative session started, I was asked to participate in

12  panel discussions.

13     Q.   Aside from the panel discussions, did you receive

14  direct inquiries from legislators or their staff?

15     A.   I don't recall.

16     Q.   Do you recall receiving any communication from

17  individual legislators?

18     A.   I just don't recall.

19     Q.   Who in the Division of Elections -- does the

20  Division of Elections have staff members that focus on the

21  legislature, on the legislative processes?

22     A.   The Florida Department of State has a legislative

23  director, so any inquiries that come in that would come in

24  from a legislator, or even if a legislator calls within our

25  office, we will refer them to the legislative director, and

MARIA MATTHEWS

1

2    then it's funneled through that person.

3        Q.   Who is the person who currently holds that

4    position?

5        A.   The person who holds that position right now is

6    Brittany Dover, I think.  I'm blanking out.

7        Q.   It's all right.  It's a lot of information at

8    once.

9        A.   Yeah.

10       Q.   So if you had incoming inquiries from legislators

11   related to Amendment 4, they would have been directed to

12   Brittany Dover or someone else in the Department of State's

13   legislative office?

14       A.   Correct.

15       Q.   Did you have any communication with the Governor

16   about the passage of Amendment 4 in late 2018?

17       A.   I don't recall.

18       Q.   I am going to give you another document,

19   DOSG-0027126, and mark it as Exhibit 4.

20                     (Document marked as Exhibit 4

21                       for identification)

22   BY MS. EBENSTEIN:

23       Q.   Please have a look at that document.

24       A.   (Witness reviewing document.)

25       Q.   What is this document?

1                    MARIA MATTHEWS

2       A.    This appears to be an email from Toshia Brown to

3  the staff regarding any questions about Amendment 4.  The

4  instruction is if there are any calls that come in, they

5  should be directed to the office of the Governor, and then

6  it provides a phone number.

7       Q.    And that email was sent from the chief of BVRS to

8  the entire BVRS staff, correct?

9       A.    Correct.

10      Q.    Why would BVRS or why would Division of Elections

11 route inquiries about Amendment 4 to the Governor?

12      A.    I don't recall what the facts would have been

13 other than perhaps they have the citizens office that they

14 oversee as well as that the Governor serves on the

15 Executive Clemency Board.

16      Q.    And is that phone number for the citizens

17 information line?

18      A.    I don't know.

19      Q.    Okay.  So it's your understanding of this email

20 that the chief of BVRS was instructing people to call the

21 citizens information line at the Governor's office?

22      A.    All I can say is that email says to direct the

23 calls to the office of the Governor, and I don't know what

24 that number goes to in the office of the Governor.  There

25 is various suboffices in the Governor's office.

1                       MARIA MATTHEWS

2        Q.   Okay.  I am going to give you another document

3    that we will mark Exhibit 5.

4                    (Document marked as Exhibit 5

5                         for identification)

6    BY MS. EBENSTEIN:

7        Q.   These documents were not produced until during

8    your deposition, so we have not had time to look at them,

9    and we don't even have a copy of it.  You and I will have

10   to share this copy, unfortunately.  It's a two-page

11   document, if you can read through it.

12       A.   (Witness reviewing document.)

13       Q.   Let me know when you have had a chance to review.

14       A.   Okay.

15       Q.   If I can also take a look at that document?

16       A.   Sure.

17       Q.   This document is an email from Mike Bennett, the

18   Supervisor of Elections of Manatee County, to yourself; is

19   that correct?

20       A.   Yes.

21       Q.   And it's dated November 27, 2018.  This email

22   requests guidance for newly registered voters and files for

23   currently registered voters who have been convicted of

24   felonies; is that correct?

25       A.   Yes.

1                          MARIA MATTHEWS

2          Q.    And attached to that email is a memorandum from

3     the Supervisor of Elections of Manatee County dated

4     November 27, 2018.  I'm just going to read this and then

5     hand the document back to you.  The memo says in part,

6     "Until rulemaking is established to clarify and define the

7     new eligibility criteria, please process voter registration

8     applications for those potentially ineligible due to a

9     felony conviction as follows.  The same will apply to files

10    sent by the Division of Elections for those who are

11    currently registered.

12            "Determine whether or not the applicant or

13    registered voter is likely to meet the new criteria for

14    automatic restoration of civil rights basing this

15    determination primarily on the date of the felony

16    conviction.  Process those not likely to meet the new

17    criteria as you have been doing.  Hold all others until

18    further notice."

19            This appears to be a document from the Manatee

20    County Supervisor of Elections to his staff.  My

21    understanding of it, just reading it briefly, is that he

22    has instructed his staff to determine eligibility based on

23    the time of conviction; is that correct?

24          A.    The email attaches his memo that he addressed to

25    his staff addressing the issue of, you know, registration,

1                              MARIA MATTHEWS

2    which Amendment 4 didn't change anything about that.  You

3    still have to be eligible in order to register.

4           The process for identification whether somebody is

5    ineligible, and, if so, has had his or her rights restored

6    at the time of this memo also would not have changed yet

7    until Constitutional Amendment 4.  So it would have

8    affected January 8th, then, the process for determining

9    whether a person was ineligible and could be removed would

10   be based on Constitutional Amendment 4.

11          This was his decision to proceed and offer

12   guidance to his staff as to what to do with the files that

13   were for voter registration, with nothing changed, with

14   files that were pending, which, again, the new law or

15   restoration means had not yet changed, and then his

16   determination of how he was going to handle those based on

17   date of felony conviction.

18          A Supervisor of Elections can receive information

19   from us and process it about a potential ineligibility.

20   They also have authority independent of ours upon

21   information that they receive to act on processing a

22   potential ineligible file.

23          Within a week, I believe it was a week or week and

24   a half, we had the mid-winter or winter conference with the

25   Supervisors of Elections, and we would have offered

1                          MARIA MATTHEWS

2      guidance at that point about how to handle felon files.

3           Q.    Okay.   This memo applies not only to the files.

4      So my understanding of this memo is that it applies to both

5      files that the County could have tracked down

6      independently, and the same will apply to files sent by the

7      Division of Elections for those who are currently

8      registered.

9           So this appears to be Manatee County's memo to

10     staff not only related to voter registration but how to

11     process removal -- names sent as part of the removal

12     process from the Division of Elections; is that correct?

13     The bottom of paragraph 2.   Again, we are learning this

14     together.

15          A.    (Witness reviewing document.)

16          Honestly, I don't understand paragraph 2, because

17     nothing changed about Constitutional Amendment 4 regarding

18     voter registration application.   If someone completed the

19     application, all the information was there that would allow

20     the supervisor to determine whether that person was

21     eligible within the four corners of that document.   That

22     did not change with Constitutional Amendment 4, so I'm not

23     sure what he is talking about voter registration

24     applications, because at that point that is not where a

25     determination of ineligibility after a person is

1                          MARIA MATTHEWS

2    registered.

3         Q.    The last sentence of paragraph 2, does that relate

4    to registrations or removals?

5         A.    What he is saying there is until rulemaking --

6    "Until rulemaking is established to clarify and define the

7    new eligibility criteria, please process voter registration

8    applications for those potentially ineligible due to a

9    felony conviction."

10             Honestly, I think you would have to ask Mike

11   Bennett what he tried to say there.

12        Q.    Did you respond to Mr. Bennett with regard to at

13   least the section that speaks to files sent by Division of

14   Elections for those who are currently registered?

15        A.    We were continuing to send files at that point,

16   and then within a week we had the mid-winter conference so

17   there wouldn't have been a point to address them in the

18   email.

19        Q.    Okay.  When did the winter conference with the

20   supervisors -- am I correct that the organization is called

21   FSASE for short?

22        A.    That's correct.  It's the Florida State

23   Association of Supervisors of Elections, and it's

24   abbreviated down to FSASE.  They hold two conferences a

25   year, one in the winter period and another during the

1                          MARIA MATTHEWS

2    summer months.  So the conference typically in the winter,

3    it has been at least in the last couple years, the first or

4    second week of December.

5         Q.   Okay.  Did you speak at that conference this past

6    December?

7         A.   Yes.

8         Q.   In early December, did the Division of Elections

9    at that point suspended sending felon files to the

10   Counties?

11        A.   It was around when we announced it at the

12   conference that we were no longer going to be sending files

13   down.  We were still examining the matches and

14   invalidating -- invalidating those that were -- go back.

15             If a match -- we were still examining matches.  If

16   a match was determined to be invalid, we were making that

17   determination.  If a match was valid or appeared to be

18   valid, we were looking at the felony, the underlying

19   felony, to get an idea of how many of these matches could

20   potentially fall into these categories of being murder,

21   felony sexual offense, and all others.  So we would put

22   them into buckets, but we weren't -- we were looking at

23   them, but we weren't sending anything down to the County.

24        Q.   Just to be clear on the terminology, invalid, when

25   you say "invalid," you mean that your office determines the

1                              MARIA MATTHEWS

2    voter is still eligible.  So valid means potentially

3    ineligible voter, invalid means voter remaining eligible?

4         A.   That's correct.

5         Q.   Okay.  Who made the decision to suspend sending

6    match files to the counties?

7         A.   That was a decision that after consultation with

8    my staff and then consultation with my superiors regarding

9    the fact that we were now one month away from the

10   implementation of Constitutional Amendment 4, or the

11   effective date of Constitutional Amendment 4, and anything

12   that we would send down would now be caught between the

13   transition, and we didn't want to -- we wanted to see -- we

14   were doing our research, reaching out to our stakeholders.

15        We expected and anticipated that perhaps the

16   legislature would also be taking some action, so we didn't

17   feel it was appropriate to send something down that would

18   have to in the end be suspended or stopped in the middle.

19   We wanted a consistent process to be in place when we

20   started sending files down.

21        Q.   Okay.  So one of your concerns was that you might

22   send -- sorry.  Scratch that.

23        You said you consulted with your superiors.  Who

24   were your superiors at that time in December of 2018?

25        A.   Deputy Secretary Wes Underwood.

1                           MARIA MATTHEWS

2        Q.    Anyone else?

3        A.    It's the executive team.  It's Jennifer Kennedy is

4   the assistant.  The legal office, we would just discuss to

5   make sure that they were okay with my decision about that.

6        Q.    And who was the Secretary of State at that time?

7   Still Secretary Detzner?

8        A.    That's correct.

9        Q.    Did you consult with anyone outside the Department

10  of State in the decision to suspended transferring these

11  files?

12       A.    I don't believe so.

13       Q.    Okay.  So you made the announcement in December of

14  2018 at the FSASE conference that you were going to suspend

15  sending files.  When was the next communication related to

16  these ineligibility files that you had with all the

17  Supervisors of Elections?

18       A.    The first that I can recall, but there may have

19  been one in the interim, is February when we asked the

20  supervisors for any -- if they had any matches that we had

21  sent down that were pending that we wanted to pull those

22  back so that at that point it was clear that the

23  legislature was going to take some sort of legislative

24  action, and we wanted to pull those back so that we could

25  review them once procedures were finalized and based on

MARIA MATTHEWS

 1
 2    whatever the outcome of the legislative session was, that
 3    we could review them under the new appropriate standards.
 4         Q.   I am going to give you a document.  This was
 5    produced to us by your counsel responsive to Interrogatory
 6    No. 3, so there is not a Bates stamp number on it.  I am
 7    marking it as Exhibit 6, and it's the email that you just
 8    referenced from you to all the Supervisors of Elections on
 9    February 11, 2019.
10                   (Document marked as Exhibit 6
11                      for identification)
12    BY MS. EBENSTEIN:
13         Q.   You said a moment ago that it was clear in January
14    that the legislature would take action.  How was that made
15    clear in January?
16         A.   I had already been -- I think at that point been
17    asked to testify before a committee.
18         Q.   In January of 2019?
19         A.   Yes.
20         Q.   And how was it made clear that that legislature
21    would take action related to Amendment 4?
22         A.   When I say "take action," I mean they are at least
23    actively looking and researching the matter.  I don't
24    necessarily mean at that point that they had any
25    legislation, just that they were wanted -- I was one of

MARIA MATTHEWS

1
2    several on a panel to discuss the Constitutional Amendment
3    4 implementation.
4        Q.    How does that relate to whether or not the
5    legislature will take action?
6        A.    Well, at that point it appeared to me that they
7    were addressing the issue, and I did not want to step on
8    their toes in terms of they are the policymakers as to
9    these things.
10            I mean, my job is just to implement the law.  I
11   didn't want to establish procedures that might in any way
12   conflict with or be contrary to whatever the legislature
13   might be addressing because they were showing interest in
14   the amendment.
15       Q.    Okay.  And you said in part that you suspended
16   transfer of files to Supervisors of Elections to avoid
17   transferring a file of someone who you believe might be
18   ineligible until legislation went into effect.  Was the
19   concern that they would be ineligible in January but become
20   eligible through legislation?
21       A.    The concern was when the notice in due process
22   under our state law takes time.  So if I send a file down
23   to a Supervisor of Elections, within seven days, if they
24   agree with the file, they have to send notice.  But that
25   individual then has 30 days to reply.  By then, that would

1                        MARIA MATTHEWS

2    have been the effective date of the constitutional

3    amendment.  And I didn't want to create any confusion as to

4    the process that now we have Constitutional Amendment 4,

5    which has created another way by which you can have your

6    rights restored depending on what your felony conviction

7    was.

8         Q.   Okay.  So that makes sense from the passage of the

9    amendment to the effective date.  Following the effective

10   date, January 8th, you said that you suspended sending

11   these files because someone's eligibility may be

12   determined -- because you understood that legislature would

13   take action.  What would be the problem with sending a file

14   to the supervisor, let's say January 9th, because somebody

15   was ineligible even if there was pending legislation?

16        A.   The files that are pending at the local level at

17   that juncture would have been sent pursuant to

18   pre-Constitutional Amendment 4, which means that we have

19   not looked at it in terms of whether if -- whether it's a

20   felony that's not a murder or a felony sexual offense.  We

21   also had questions about what constituted murder, what

22   constituted felony sexual offense, and what constituted

23   completion of the terms of a sentence and what those terms

24   meant.

25        Q.   Who did you ask those questions to at that point?

MARIA MATTHEWS

1

2    A.   When I served on the panel, that was one of the

3    issues that was addressed.

4    Q.   Okay.  Did you express those concerns to

5    legislators or legislative staff at any point aside from

6    that single panel?

7    A.   I don't recall.

8    Q.   As of the date of the panel, which I believe was

9    in early February 2019, what information did you have about

10   the content of potential legislation that you -- that was

11   clear that you believed it was clear would come up during

12   the legislative session?

13   A.   I wasn't aware of any legislation yet drafted at

14   that point.

15   Q.   There is committee weeks before the legislative

16   session; is that right?

17   A.   Legislative session is 60 days formally, but they

18   do meet well in advance.

19   Q.   Okay.  And did any legislators consult you during

20   those committee weeks or consult anyone in your division

21   regarding legislation that relates to rights restoration?

22   A.   Only insofar as they asked us to appear on a

23   panel.

24   Q.   That would have been the only point of contact or

25   communication between yourself and the legislators?

1                        MARIA MATTHEWS

2          A.    And any other legislator who would have asked to

3     meet with us.

4          Q.    Did individual legislators ask to meet with you?

5          A.    I believe there were.

6          Q.    How many legislators approximately?

7          A.    I don't recall.

8          Q.    Which legislators asked to meet with you before

9     the legislative session?

10         A.    Again, I'm not going to remember the legislator.

11    I would have to look in my files.

12         Q.    Do you remember any of the legislators who asked

13    to meet with your office?

14         A.    Do I remember?

15         Q.    The names of any of the legislators who asked to

16    meet with your office --

17         A.    No.

18         Q.    -- between January and the start of the

19    legislative session?

20         A.    No.

21         Q.    Would they have made that request by phone, by

22    email, or some other way?

23         A.    Any request with the legislature or legislative

24    staff we would funnel that though our legislative director.

25    So it's a way of just ensuring that we don't miss a request

MARIA MATTHEWS

2  and we deal with them very respectfully.

3       Q.   Okay.  Would those requests have gone to the

4  legislative director in the first instance or it would have

5  come to you and you would refer it to the legislative

6  director?

7       A.   It could have come either way.

8       Q.   All right.  But you said you did have meetings

9  with legislators during that time?

10      A.   I do recall that we met with individual

11  legislators at some point, but I don't recall when.

12      Q.   But during that time frame between January 8th and

13  the start of the legislative session?

14      A.   Again, I'm not sure about the date.

15      Q.   What was the content of that communication with

16  the legislators before the legislative session?

17      A.   I think they were asking -- they were asking about

18  Constitutional Amendment 4 and any challenges.

19      Q.   So is it safe to assume that that communication

20  would have come up after Constitutional Amendment 4 went

21  into effect?

22      A.   It's possible, but I just don't recall.

23      Q.   Was it before the 2019 legislative session or a

24  different legislative session?

25      A.   No, it would have been 2019.

1                        MARIA MATTHEWS

2      Q.   And the committee weeks are two months before

3   legislative session or so?

4      A.   My understanding is they can meet as early as

5   January and sometimes even December, but I don't believe

6   that they did in this particular cycle.

7      Q.   Any of those requests from legislators who you met

8   with in between January and March of 2019 would have gone

9   through the legislative policy -- I'm missing the name of

10  the office, but the legislative policy office?

11     A.   Legislative affairs director.

12     Q.   Those requests would have gone through the

13  legislative affairs director; is that correct?

14     A.   Correct.

15     Q.   Okay.  Looking back at your email of

16  February 14th, I believe you said a moment ago that this

17  was the first communication between your office and all of

18  the Supervisors of Elections since the verbal

19  communications that you had with them in the December FSASE

20  conference; is that correct?

21     A.   February 14th?

22     Q.   I'm sorry, February 11th.

23     A.   This is the one I recall.  I can't recall if we

24  have sent something in the interim between then.

25     Q.   Were there communications about the implementation

MARIA MATTHEWS

1     of Amendment 4 between the Division of Elections and the

2     new Governor's office after January 8th but before the

3     legislative session began?

4     A.   I'm sorry, can you restate your question?

5     Q.   Sure.  Were there communications between your

6     office and the Governor's office after January 8th but

7     before this email on February 11th?

8     A.   I don't recall the communications.  I really don't

9     recall.  I'm sorry.

10    Q.   That's okay.

11    Who was the Secretary of State during that time

12    period from the time between when the amendment became

13    effective and when this email was sent on February 11th?

14    A.   I believe at this time it was Michael Ertel.

15    Q.   Was he a Supervisor of Elections before he became

16    Secretary of State?

17    A.   Yes.

18    Q.   For how long approximately?  For more than a

19    decade?

20    A.   For how long for which office?

21    Q.   How long was he a Supervisor of Elections?

22    A.   I don't know how long he was.

23    Q.   Does it sound familiar that he was a long-standing

24    Supervisor of Elections for over ten years perhaps?

1                        MARIA MATTHEWS

2       A.   Correct.

3       Q.   Did he -- did you have conversations with him

4  during his tenure as Secretary of State related to

5  Amendment 4?

6       A.   It would not have been unusual for me to have, no.

7       Q.   Would he have solicited advice from Supervisors of

8  Elections related to implementation of Amendment 4?

9       A.   I don't know.

10       Q.   But you don't recall sending any guidance,

11  directives or other communications with the Supervisors of

12  Elections during Mr. Ertel's tenure as Secretary of State;

13  is that correct?

14       A.   He may have sent something out, but I don't

15  recall, and it was a very short-term that he served as

16  Secretary of State.

17       Q.   Is it common practice for the Secretary of State

18  to communicate directly with all the Supervisors of

19  Elections or to go through your office?

20       A.   I believe it's the Secretary of State's

21  prerogative to do so.

22       Q.   Is that the normal flow of information to the

23  Supervisors of Elections from the Department of State?

24       A.   It depends on what the topic is, and, again, the

25  prerogative of the Secretary of State.

MARIA MATTHEWS

1

2      Q.   Are you aware of any communications directly

3   between Secretary Lee and the full list of Supervisors of

4   Elections since her tenure?

5      A.   No, that I don't have -- I don't recall that.

6      Q.   Okay.  And Secretary Ertel resigned from office at

7   some point, correct?

8      A.   Yes.

9      Q.   Why did he resign?

10     A.   The particulars of that I think are well

11  documented in the news and whatnot as to his reasons.

12     Q.   Okay.  You say in his email "Amendment 4 went into

13  effect on January 8th and there has been no delay in

14  implementation."

15         What do you mean by that, "no delay in

16  implementation"?

17     A.   That registration continues like it has before.

18  There is nothing changed as a result of that.  An

19  individual still has to affirm on their application form

20  that they are eligible.  The law is that a person who is

21  convicted of a felony, adjudicated of a felony for murder

22  or felony sexual offense has to obtain clemency, and all

23  others have to complete the terms of their sentence,

24  including probation and parole.

25     Q.   Implementation of Amendment 4 would relate to not

MARIA MATTHEWS

1

2   just new registrations but removals as well; is that

3   correct?

4       A.   Well, it has nothing to do with registrations.  It

5   didn't affect that part at all.  What it affected was it

6   now provided another means, depending on what your felony

7   offense was, by which you could have your rights restored.

8       Q.   Right.  So process-wise, it doesn't affect the

9   registration process, but it heavily affects who is

10  eligible to register and who is eligible to remain on the

11  rolls; is that correct?

12      A.   It affects the person who has to affirm how he or

13  she got her rights restored.

14      Q.   Right, at the registration point.  Does it affect

15  who may remain on the rolls as a registered voter based on

16  eligible or ineligible?

17      A.   It does at that point once we do the

18  identification of a potentially ineligible voter.

19      Q.   Is it true that it affects a registered voter --

20  it affects somebody's eligibility whether or not you are

21  processing applications?

22      A.   It suggests if we get a match that suggests that

23  you are not eligible, and it affects our analysis of being

24  able to determine whether you have had your rights restored

25  or not.

1                          MARIA MATTHEWS

2      Q.   Right.  That's the procedural side.  But somebody

3  can become eligible or ineligible based on Amendment 4,

4  right?

5           To restate the question, however your office

6  process removals, a voter or a Floridian could become

7  eligible because of Amendment 4; is that correct?

8      A.   If they have satisfied -- because of the

9  introduction of satisfying the terms of the sentence, that

10  person could now affirm if they have completed the terms of

11  their sentence that they have had their rights restored.

12     Q.   Right.  I may not be asking the question in a

13  straightforward way.  I understand how this would affect

14  somebody's actual registration.  But according to the terms

15  of Amendment 4, it changed the standard by which someone

16  becomes eligible to vote or not; is that correct?  So

17  Amendment 4 affects somebody's eligibility potentially?

18          MR. JAZIL:  Object to form.  You have asked the

19     question several times, Counsel, and she has responded

20     that it affects how the rights are restored.

21          MS. EBENSTEIN:  I believe she has answered as to

22     whether someone can register.

23  BY MS. EBENSTEIN:

24     Q.   Just to clarify, is it your response that it does

25  affect whether somebody's rights are restored?

1                        MARIA MATTHEWS

2        A.    My understanding of the law is that you still

3   cannot register if you are a convicted felon without having

4   your rights restored.  Constitutional Amendment 4 added

5   another way, depending on what your felony offense was,

6   that you could have your rights restored.

7             So if you were convicted of a murder or felony

8   sexual offense, it was still the same way.  The only way

9   you can get your rights restored is through clemency.  If

10  you have been convicted of any other felony and adjudicated

11  as such, you can get your rights restored once you complete

12  your sentence, the terms of your sentence.

13       Q.    Okay.  And once your rights are restored, assuming

14  you meet the other criteria for eligibility, then you can

15  register to vote, correct?

16       A.    If you can affirm that you are eligible.  I mean,

17  that hasn't changed.  You still have to affirm regardless

18  of how you got your rights back.

19       Q.    And once your rights are restored, you can remain

20  on the rolls as a registered voter; is that correct?

21       A.    If you are registered, if you are already

22  registered and you have had your rights restored, then,

23  yeah, you can stay on the rolls.

24       Q.    Okay.  We looked a moment ago at an email and

25  policy from Manatee County.  Were you aware of the

MARIA MATTHEWS

1

2    different policies that were in place between the passage

3    of Amendment 4 and February 11th when you sent this email?

4            Sorry.  I will restate that question.  Do you know

5    what the policy was in each of the 67 counties for

6    processing removals for ineligible voters between

7    November 2018 and February 11th when you sent this email?

8        A.   It's still governed by Section 98.075, and that is

9    if you have information that is credible and reliable that

10   someone is a convicted felon without having their rights

11   restored, then you initiate -- you initiate the due process

12   and afford that person, the registered voter, the

13   opportunity to contest that.  If the record and

14   documentation, whatever the registered voter has provided

15   you, is not -- still shows that that person is ineligible,

16   they would be removed.  That hadn't changed.

17           Again, the reference would be to the

18   Constitutional Amendment 4, and that is if it was a murder

19   or felony sexual offense, then the only way you could get

20   your rights restored is through clemency.  If it was any

21   other kind, then you have to have completed your sentence.

22       Q.   On February 11th you instruct the supervisor to

23   invalidate the felony matches that they received from the

24   Division of Elections.  You said that you would like us to

25   reexamine under the scope of Amendment 4.  Was that

1                          MARIA MATTHEWS

2     instruction to invalidate pending felony matches mandatory

3     for the supervisors or discretionary?

4          A.   It was discretionary.  The supervisor -- the

5     reason why they had to invalidate is once a felony match is

6     sent to a County, we cannot pull it back.  The supervisors

7     have to take some action on it.  So by invalidating it, it

8     allowed us to be able to pull back those felony matches.

9     So it was a programatic thing that was necessary.

10         But some supervisors might not have just because

11    they were already wrapped up with the process or close to

12    being wrapped up and had determined based on the law that

13    the individual was either eligible or not eligible.

14         Q.   Just so I understand, if the Division of Elections

15    stopped sending matches in early December, and I believe a

16    supervisor has seven days to act on a match, why would

17    there still be pending open matches?

18         A.   So in December we stopped sending new ones, but

19    there were ones already in the County.  Based under the due

20    process law under 98.075(7), a supervisor has seven days to

21    initiate notice, actual notice.  That's mail.  If that mail

22    is deliverable, the individual has 30 days to respond.  If

23    the mail is undeliverable, then the supervisor has to

24    publish notice.  Again, that individual gets 30 days for

25    that.

                        MARIA MATTHEWS

1
2          Some counties, they will group their notices and
3   wait to publish, so the process can take up to 120 days
4   before it's completed.  So they could have been still in
5   the midst of that three-month, four-month period.
6       Q.   Okay.  I'm going to give you a series of documents
7   that we will mark as exhibits now.  The first is Bates No.
8   DOSMCC-0001025, which I'm marking as Exhibit 7.
9               (Document marked as Exhibit 7
10                 for identification)
11  BY MS. EBENSTEIN:
12      Q.   The next is Bates stamp DOSG-002805 that I'm
13  marking as Exhibit 8.
14              (Document marked as Exhibit 8
15                 for identification)
16  BY MS. EBENSTEIN:
17      Q.   The following document is Bates stamped
18  DOSG-0000349 that I am marking as Exhibit 9.
19              (Document marked as Exhibit 9
20                 for identification)
21  BY MS. EBENSTEIN:
22      Q.   That goes from that Bates stamp number to 356.
23  It's going to be easier for me to give you these all at
24  once, trust me.
25              I will give you a moment just to look through

1                    MARIA MATTHEWS

2    those documents.

3         A.    (Witness reviewing documents.)

4         Q.    Just to go through the shorter document, in

5    Exhibit 7, this is an email from Alexander Mosca to you on

6    March 29, 2019; is that correct?

7         A.    Yes, this appears to be an email that he sent to

8    me on March 29, 2019.

9         Q.    What does that email request?

10        A.    The email request is to review a bill analysis for

11   Senate Bill 7086.

12        Q.    And is 7086 the precursor of -- that relates to

13   the same topics of what eventually passed as 7066?

14        A.    Correct.  There was some -- I don't remember the

15   exact overlap, but, yes.

16        Q.    Okay.  And then the next, DOSG-0002805, what is

17   that email?

18        A.    This is an email from me to Toshia regarding the

19   bill analysis and the fiscal impact.  What we are obligated

20   to do is to provide fiscal impact, that's what we mean by

21   bill analysis, fiscal impact on what potential legislation

22   is coming.

23        Q.    Who do you provide that to?

24        A.    We provide that to OPB.  We provide it to the

25   legislative affairs director who then gets it to the Office

MARIA MATTHEWS

1    of Planning and Budget and the Governor's office, I believe

3    it is, or the legislature.

4    Q.   So does your office provide input on the fiscal

5    impact of all bills related to -- that fall within your

6    area of responsibility?  Do you provide information for the

7    fiscal impact analysis that the legislature does on all of

8    those bills?

9    A.   The request is, which we do typically for

10    legislation, is to provide fiscal impact as to operations

11    and IT of whatever legislation is being proposed as well as

12    any that might have an impact on election administration at

13    the state or local level.

14    Q.   Okay.  And if you look at the document Bates

15    stamped DOSG-0000350, please start on 353.  It's page 4 of

16    that document.

17    A.   I'm sorry, which one?

18    Q.   You are going to DOSG-0000353.

19    A.   Okay.

20    Q.   Does this look familiar to you?

21    A.   Yes.

22    Q.   Am I correct based on the emails that this is the

23    draft fiscal analysis or information related to the fiscal

24    analysis that you provided to legislative affairs in late

25    March or early April of 2019?

1                    MARIA MATTHEWS

2        A.    I don't believe this is the final version, but

3    this is a summary of what we were laying out in terms of

4    impact on operations within the Division.

5        Q.    Okay.  And based on document 349, this was the

6    version that was sent around April 4th; is that correct?

7        A.    Right, at that time it's just a draft and we are

8    circulating around for input.

9        Q.    Did you submit a final draft to the legislature?

10       A.    Yes.

11       Q.    Thank you.  We just needed to sort out the

12   documents.

13            The content of this, then, is that your fiscal

14   analysis of SB 7066 in early April, correct?

15       A.    This particular one, yes.

16       Q.    If you could look at that page 353, about

17   two-thirds down the page -- I meant SB 7086 at this point,

18   not 66.

19       A.    Okay.  Can you say the number again?

20       Q.    Sure.  You have the correct page, but this

21   references the bill that at the time was SB 7086?

22       A.    Correct.

23       Q.    All right.  About two-thirds down the page, in

24   your description of how SB 7086 as it was drafted in early

25   April would affect the operations of your department, you

1                          MARIA MATTHEWS

2    say it may take an additional three to five days from that

3    time to complete a file; is that correct?

4        A.   Yes.  I can tell that this is definitely not the

5    final draft because we are talking about -- we had the

6    abbreviation CJIS, which is the wrong database.  It should

7    have been CCIS referring to the Comprehensive Court

8    Information System.

9            So, in essence, what we are talking about here is

10   when a match is made, as many as four or five felony

11   convictions can be wrapped up into that particular match.

12   So based on our prior experience, which up until

13   Constitutional Amendment 4 our main duties were to verify

14   identity and just make sure that someone had definitely

15   been convicted of a felony and that it was definitely

16   adjudicated as a felony conviction.

17           So we were using what our average processing time

18   was under the old process to try to project going forward.

19   So an examiner, based on performance measures that we have,

20   at a basic level is supposed to be able to process about

21   20 to 24 matches a day.  And a reviewer is supposed to be

22   able to review created files between 30 to 40 files a day.

23   Pre-Constitutional Amendment 4, it takes 15 to 20 minutes

24   to create a case file assuming the criminal records are

25   available from CCIS.  That's the online court record

1                    MARIA MATTHEWS

2    system.

3            If a record cannot be found on CCIS, then we have

4    to do outreach to the courts.  We will search, like, the

5    clerk of courts website if that's possible, if there is

6    information there, and if we can't do it there, then we

7    have to do outreach to the clerk of court.

8            We believed that now with having to look at the

9    underlying nature of the felony conviction, it would

10   probably take additional time as well as gathering more

11   additional documentation as in the sentence document, which

12   up until this point all we would have needed was the

13   judgment.

14           So about 20 percent of our cases require more

15   subsequent follow-up with the clerk of courts because there

16   is -- these documents come in a variety of forms or they

17   might be difficult to read the case number or the quality

18   or whatever.  Clerk of courts might not have enough staff

19   to be able to turn around the time, so that's why, again,

20   coming back to that 120 days magic number.

21       Q.   Okay.

22       A.   So that's my answer to that.

23       Q.   Just to go through some of the details how you

24   predicted in early April that Amendment 4 -- well,

25   Amendment 4 was already in effect, but how this would

1                    MARIA MATTHEWS

2    affect your division's workload, as you just said.  And

3    looking at 353, about 20 percent of the cases, so that's,

4    in fact, one in every five cases, requested require

5    multiple requests to clerks, that there can be poor quality

6    of scanned -- sorry, difficulty identifying the case

7    number, poor quality of scanned images, delays due to

8    understaffing at the clerks, or clerks waiting to bundle

9    responses.  That's just discussing the process and the

10   delays when you did need to make a request to clerks'

11   offices for documentation; is that correct?

12        A.   Correct.

13        Q.   Moving to the next page, 354, on the first full

14   paragraph where you say it begins after Constitutional

15   Amendment 4.

16        A.   (Witness reviewing document.)

17        Q.   So was it your view at the time that the process

18   would require much more involved research by your staff?

19        A.   As I stated before, we would now have to be

20   looking at the underlying offense so we would know what to

21   look for in terms of how that person had their rights

22   restored.  It would also require us to be looking at when

23   that felony was committed and whether the -- when the

24   clemency was obtained and when the terms of the sentence

25   were satisfied.

MARIA MATTHEWS

1

2      Q.   All right.  And you say in that paragraph that

3      "Staff would need to be trained in criminal terminology and

4      what terms of a sentence."

5           I assume "are" may have been missing there.

6      A.   Correct.  Prior to that point, if a felony came

7      in, number one, the charge is on the criminal justice

8      agencies to identify what is a felony conviction.  The

9      documents that come in, the felony, if there is, like, a

10     judgment, if the judgment says felony, that pretty much

11     tells you what you need to know.

12          But with Constitutional Amendment 4, you now need

13     to look at the underlying felony offense, and not all

14     felony offenses are using the words "felony" or are clear,

15     which is why we felt that there had to be further guidance

16     as to what constituted murder and felony sexual offenses,

17     what would fall under those as well as what are the terms

18     of the sentence.

19          My staff will have to dig deeper into these

20     documents, these court records, in a way that they had not

21     had to before.

22     Q.   Just to summarize, the terms of SB 7066 would

23     impose on or burden your staff resources in a few different

24     ways.  It looks like one is that staff would need to be

25     trained in criminal terminology; is that right?

1                           MARIA MATTHEWS

2       A.   As with anything, staff has to be trained no

3  matter what, but it would involve them being more familiar

4  with criminal terminology as well as what's a sentence

5  document, what's -- and being able to find the information

6  that they need to be able to make that call about whether

7  it's a credible and reliable match.

8       Q.   Okay.  When you say "find the information that

9  they need," you mean that they need to know, as you put it

10 here, where to look in various places to piece together

11 what all the terms of the sentence were for each conviction

12 and whether those terms had been completed; is that right?

13      A.   The court records, yes -- the information is out

14 there.  It's going to be in the court records, it's going

15 to possibly be in the Department of Corrections.  It's

16 training them -- retraining them so they know where to look

17 for and to be able to understand the documents that they

18 are looking at so that we don't, you know, accidentally

19 misidentify somebody as being ineligible when they are

20 eligible.

21      Q.   Okay.  And that would take up staff resources,

22 correct?

23      A.   It certainly adds another element to their

24 research, yes.

25      Q.   And that would take up staff time to undertake

1               MARIA MATTHEWS

2    these new steps?

3         A.   It will.  This is relating to 7086, so I don't

4    have the staff analysis as we finalized it, if we did, for

5    7066.  But based on what was presented in this one, of

6    course, again, this is a draft, so I don't have the final

7    one --

8         Q.   I don't have it either.

9         A.   -- I don't disagree with the analysis here.  It

10   would significantly add time to process a file.

11        Q.   And you already mentioned that there would need to

12   be additional staff training, right?

13        A.   And there is always -- yes.

14        Q.   Okay.  And you mentioned here that -- at the

15   bottom of that paragraph on 354, "no single source exists

16   that confirms for the Department or for the convicted felon

17   that he or she has completed all terms of the sentence for

18   every felony."

19             Do you mean by that there is no single database

20   where either your staff or an individual with a felony

21   conviction can go to determine or to confirm that they have

22   completed all terms of their sentence?

23        A.   We consult a variety of databases and sources.

24   The information is out there, it's just not consolidated,

25   which is one of the duties and charge of the work group,

MARIA MATTHEWS

1
2    the restoration of voting rights work group, to look at,

3    how that information can be consolidated.  That's what we

4    are trying to improve and be able to do that.

5          Q.   A single source existed before, primarily the

6    clemency records; is that right?

7          A.   Up until that point, Constitutional Amendment 4,

8    the only way someone could get their rights restored was --

9    for felony conviction was through clemency.

10         Q.   Okay.  And now they can.  Now there is multiple

11   sources.  Somebody would need to check multiple sources,

12   right?

13         A.   Now we still need to look at the Florida

14   Commission on Offender Review that maintains the clemency

15   database, online clemency database, for murder and felony

16   sexual offense, but for all other felony convictions, we

17   will have to consult at a minimum the clerk of court

18   records and identify all other sources that might have

19   information that can help us make our call.

20         Q.   Okay.  And, again, this is for the fiscal

21   analysis, so what the cost would be and staff resources.

22   You estimate "at a minimum, the bill will quadruple the

23   amount of staff needed to timely process these felony

24   automated matches alone," and that's without regard to

25   out-of-state and federal felon offenses; is that correct?

1                    MARIA MATTHEWS

2   That is the second full paragraph on 354.

3       A.   Yeah, that was the best rough estimate I think

4   that we could do based on our information that we had about

5   how long it takes to compile a match and how many matches

6   can be done in a day.

7       Q.   Okay.  I'm going to give you a document marked as

8   Exhibit 10.

9                (Document marked as Exhibit 10

10                    for identification)

11  BY MS. EBENSTEIN:

12      Q.   I will represent to you that this is SB 7086, the

13  version that was before the legislature beginning

14  March 27th, so the one that you would have reviewed during

15  this email exchange in late March and early April.

16           If you look at line 315, and that's on page 11,

17  until 328, that sets forth what, according to this proposed

18  bill, what financial obligations would need to be satisfied

19  before restoration.

20           The line -- on line 327 to 28, in this version of

21  the bill it says that a financial obligation is deemed

22  completed if such obligation has been converted to a civil

23  lien; is that correct?

24      A.   That's what it says, yes.

25      Q.   So in this version of the bill, your office would

1                           MARIA MATTHEWS

2    not need to do research on outstanding financial

3    obligations for those debts converted to a civil lien,

4    correct?

5         A.    Based on this, we would have researched -- we

6    still would have had to research it to make sure that it

7    hadn't been converted to a civil lien or if it had.  I

8    mean, we still have to do that research.

9         Q.    So what you describe here as far as what your

10   staff would need to do and the time it would need to take,

11   in this version of the bill, it would need to determine

12   that a financial obligation had been converted to a civil

13   lien, but your staff would not need to then research or

14   determine whether that civil lien has been paid, correct?

15        A.    Under this it appears that if the final obligation

16   has been converted to a civil lien, then it's deemed to

17   have been paid.  So then if that converts -- if that is

18   then the final payment of all, then that would -- I mean,

19   you still have to look at the other terms of the sentence.

20        Q.    My purpose here is not to ask you to interpret the

21   legislation.  It's simply to point out one of the

22   differences between the version of SB 7086 that you were

23   analyzing in this fiscal analysis and the current bill.

24             SB 7086 once a financial obligation was converted

25   to a civil lien, it no longer affected somebody's voting

MARIA MATTHEWS

1

2      rights where now even if a debt is converted to a civil

3      lien, it still would prevent somebody from being eligible

4      to vote; is that correct?

5          A.    I don't know.  I would have to look at 7066.  If

6      that's what you say the legislation -- whatever the

7      legislation says is what it says.

8          Q.    Okay.

9          A.    Regardless of whatever the legislature passed was

10     adopted into law, that's what we would follow.

11         Q.    Okay.  Would it require more resources from your

12     office to investigate whether a civil lien had been paid

13     rather than to just determine if something had been

14     converted to a civil lien?

15         A.    Honestly, until we engage in this sort of thing,

16     I'm not going to know the exact -- we are going to research

17     as far as we can to make sure that it's credible and

18     reliable one way or the other.  Credible and reliable in

19     the sense that it's definitely a match, a credible and

20     reliable match, or if it's not.  So I don't know to what

21     extent we would have to go in order to -- until we actually

22     engage in this.

23         Q.    Okay.

24         A.    We are not doing that right now.

25         Q.    One last question about this.  If you look at

1                          MARIA MATTHEWS

2    page 329, that defines felony sexual -- or begins the

3    definition of felony sexual offenses.  And 336, that begins

4    the definition of murder.  As far as this draft of SB 7086,

5    felony sexual offenses is limited under the terms to

6    offense that serves as a predicate to registration as a

7    sexual offender; is that correct?

8         A.   They have the list here.  Again, unless I had 7066

9    in front of me, I don't know how this varies from the one

10   that was ultimately enacted.  What we would do is we would

11   go by whatever this -- whatever the legislature set out and

12   said, hey, this is a murder or this is a felony sexual

13   offense.

14        Q.   Okay.  And you don't know one way or the other

15   whether there is a more limited category of offenses than

16   what eventually passed as 7066?

17        A.   No, unless I have the document in front of me.

18        Q.   I can give you that document now.  I'm going to

19   give you as Exhibit 11 the text of what was passed as

20   SB 7066 this last legislative session.

21                 (Document marked as Exhibit 11

22                      for identification)

23   BY MS. EBENSTEIN:

24        Q.   Again, I'm not asking you to interpret the

25   legislation.  I'm just trying to compare the earlier bill

MARIA MATTHEWS

1

2     that you analyzed in your email communications in early

3     April with the current bill.

4              If you look at SB 7066, lines 1383 to 1385.

5              MR. JAZIL:  Do you have a page number by chance?

6              MS. EBENSTEIN:  Yes, 48.

7     BY MS. EBENSTEIN:

8        Q.   SB 7066 as it passed says, "The requirement to pay

9     any financial obligation specified in this paragraph is not

10    deemed completed upon conversion to a civil lien."

11             Did I read that correctly?

12       A.   Can you tell me the line number again?  I'm sorry.

13       Q.   It's 1383 to 1385.

14       A.   That's how it reads, "The requirement to pay any

15    financial obligation specified in this paragraph is not

16    deemed completed upon conversion to a civil lien."

17       Q.   So the earlier version of SB 7086 did deem the

18    financial obligation for purposes of voting rights when it

19    was converted to a civil lien, and SB 7066 does not; is

20    that correct?

21       A.   That appears to be a difference in the language,

22    yes.

23       Q.   Okay.  If you look a couple of lines down to 1386

24    on felony sexual offenses, SB 7066 lists from that line

25    until 1402 a number of categories of felony sexual

1                          MARIA MATTHEWS

2     offenses, correct?

3          A.    Lines 1386 through --

4          Q.    1386 through 1402.

5          A.    It enumerates felony sexual offenses by statutes.

6          Q.    Okay.  Whereas the SB 7086, the one that you

7     analyzed in the fiscal analysis, just categorically

8     includes an offense that serves as a predicate to

9     registration as a sexual offender; is that right?

10         A.    Correct, that's how it differs.

11         Q.    The last one that I wanted to look at briefly is

12    the definition of murder.  In 7066 it begins at line 1403,

13    and in 7086 it begins at line 336.  The definition of

14    murder in SB 7066 as it passed includes more categories of

15    offenses than 7086 as you analyzed it in your early

16    April communication; is that right?

17         A.    It appears to list out some additional statutes --

18         Q.    Okay.

19         A.    -- and subsections.

20         Q.    That's just to say in comparing the two bills,

21    there were additional provisions that you would have to

22    research by the terms of 7066 as it passed that were not

23    included in 7086; is that correct?

24         A.    Until and unless we were doing that, we are still

25    going to be looking very carefully at whatever was defined

1                              MARIA MATTHEWS

2    as murder.  The section numbers assist somewhat in knowing

3    what those -- what are the offenses that fall under that.

4    We would still be doing research.

5         Q.   All right.  And if -- would you say that here you

6    predict that at a minimum SB 7086 would quadruple the

7    amount of staff time needed to process felony convictions,

8    would you say that 70 -- let me make sure I get those bill

9    numbers right.

10             In your fiscal analysis of SB 7086 in early April,

11   you say that you expect that at a minimum the bill would

12   quadruple the amount of staff resources needed to process

13   matches.  Do you think that 7066 as passed would require

14   more or less staff resources?

15        A.   I really don't know.  Again, I don't recall if we

16   did a bill -- fiscal bill impact analysis or not.  Again,

17   information that we might have provided at that time would

18   be based on whatever information we had.  We are always

19   looking at ways to improve the process.  So as I mentioned

20   earlier, we are working with our stakeholders to see what

21   additional information they can provide that can help

22   improve that process and the accuracy of the information.

23             Having statutory numbers may be one way in which

24   it could be streamlined and help alleviate some of the

25   expectation of additional staff if the files come in more

1                        MARIA MATTHEWS

2    specific or with more information.

3         Q.    If an individual wanted to determine their own

4    eligibility to register or remain registered, they also

5    would not have a single source to confirm that they had

6    completed all terms of their steps for every felony; is

7    that correct?

8         A.    An individual who has been convicted would have to

9    go to the clerk of the court, they could go maybe to their

10   prior attorney, the Department of Corrections.  The

11   source -- the information is out there.  They may have to

12   go to a variety of sources to find that information.

13        Q.    Right, so there is no single source?

14        A.    Consolidation is one of the things that we are

15   looking to try to improve upon, and the workgroup is

16   looking to find ways to do that.

17        Q.    As of today, is there a single source?

18        A.    Not that I'm aware of.

19        Q.    So an individual trying to determine whether they

20   have completed all terms of their sentence, they may also

21   be subject to the 20 percent of cases that require multiple

22   requests to the courts, the poor quality of scanned

23   documents, to the delays due to understaffing of clerks,

24   and other difficulty identifying the case number; is that

25   right?

1                          MARIA MATTHEWS

2        A.    Well, I need to clarify.  The clerk of the court

3    has all these records, so that information should be there.

4    We are doing something different than what the individual

5    is trying to do in some ways.  We are trying to not only

6    determine if that person is ineligible but gathering all

7    the documentation to pull that together.

8            So, again, ultimately I think the clerk of the

9    court records should have this information available, and

10   that's where the person should be able to go, but there

11   could be additional places that the person might have to go

12   to piece it all together.

13       Q.    And it may take a longer time for them to access

14   those clerk of court documents according to your analysis

15   here; is that right?

16       A.    It may take additional time.

17       Q.    Looking at that final document that I gave you,

18   which is DOSG-0000349, and that is to help you identify it,

19   an email from Ms. Brown to yourself on April 4, 2019.

20       A.    I'm sorry.  Yes.

21       Q.    And I believe this is feedback that she gave you

22   on the bill analysis for 7086 based on the emails below.

23   She specifies that the 120 days usually refers to the time

24   it may take for the SOE to conduct the entire removal

25   process, and you shared that 120 day number before.

1                    MARIA MATTHEWS

2          She adds it can take up to sometimes one to two

3    months to obtain the court documents and arrest records

4    from the COC; is that correct?

5          A.    That's the 20 percent in which we are not able to

6    get the court docs from either CCIS because they are not

7    available on there or they are not available on the clerk

8    of courts website, so we conduct outreach to the clerk of

9    court directly.

10          In some of the bigger counties, they have -- they

11    will have a significant amount of requests, so they may

12    group those together, or it could be if the record is old,

13    they need to go to archives.  So, yes, it could take an

14    additional month or two to get the court docs.  If they are

15    grouping our requests together, they will bunch them and

16    wait before they will send us.

17          Q.    Okay.  So despite the Division's access to CCIS,

18    one in five days still takes an additional month or two to

19    access those records; is that right?

20          A.    I don't know that 20 percent of those take a month

21    or two, but I don't know what percentage of the 20 percent

22    take a month or two to go.

23          Q.    Okay.

24          A.    It can and that's why she was just trying to add

25    that in there.

1                          MARIA MATTHEWS

2        Q.   Do individual voters have access to the CCIS

3    system the way that the Division of Elections does?

4        A.   No.  My understanding is we have a user ID and

5    password that is given to us because there is sensitive

6    information on that site.

7        Q.   So for an individual convicted of a felony to

8    obtain court documents or arrest records, that could take a

9    significant amount of time if their records are not

10   available electronically; is that right?

11       A.   I don't know how -- what time it would take for

12   them.  They have to go to the clerk of court where they

13   were convicted or reach out to them to get that

14   information.  I think the clerk of the court is probably

15   going to be in the best position, depending on which

16   county, to be able to say how long it will take once a

17   request is submitted.

18       Q.   Okay.  And I believe you said somewhere in that

19   documentation oftentimes people have multiple convictions;

20   is that right?

21       A.   Yes.

22       Q.   And is that oftentimes in different counties or

23   the same county?

24       A.   That's true, people can be registered currently in

25   one county and have a conviction in another county or more

1                         MARIA MATTHEWS

2    than one other county.

3         Q.   Okay.  So if an individual received a notice from

4    their Supervisors of Elections that they had been a match

5    for ineligibility, based on the time frames that you give

6    here, if they were among this 20 or so percent of people

7    who could not electronically access their records, would

8    they be able to get documentation to confirm that they were

9    eligible to vote within the 30-day period that they had to

10   respond to the Supervisor of Elections?

11        MR. JAZIL:  Object to the form.

12   BY MS. EBENSTEIN:

13        Q.   I can re-ask that.

14             If it takes your office quadruple the time that it

15   did before in the prior regime before Amendment 4, and you

16   specify here it can take months to obtain court documents

17   and arrest records, do you believe -- or wouldn't it take

18   an individual voter an equal amount of time to obtain court

19   records if the holdup, as you said, is with the clerks of

20   the court?

21        MR. JAZIL:  Object to the form.

22        A.   Again, I can't speak to the individuals clerks of

23   court, how long it will take them to be responsive to

24   records from an individual who is asking for their own

25   records.

1                        MARIA MATTHEWS

2    BY MS. EBENSTEIN:

3        Q.   But in your experience this lays out --

4        A.   In our experience, we first look at CCIS if the

5    record is there, or we go to the clerk of the court web.

6    If it's not available, then we ask the clerk of the court.

7             Again, as I said, the one to two months I don't

8    believe applies to all 20 percent.  Twenty percent is

9    referring to those records that we have to do some

10   follow-up.  Some of those because they are very old

11   records, it may take a while for that to come in, but there

12   are a variety of reasons why that might be.  The clerk is

13   grouping all their responses together and they are not --

14   they are going to wait to send us back a response, so that

15   could be the reason why it's one to two months.

16       Q.   Okay.  Just to pause for a moment.

17            (Discussion held off the record.)

18   BY MS. EBENSTEIN:

19       Q.   I'm going to hand you a series of documents marked

20   Exhibit 12.  We did not receive these documents until

21   during your deposition, so we have not had the ability to

22   go through them aside from during the deposition.

23            (Document marked as Exhibit 12

24                 for identification)

25

1                          MARIA MATTHEWS

2    BY MS. EBENSTEIN:

3         Q.   I would like you to have a look at those

4    documents, please.  And this was in the binder that you

5    said you reviewed to prepare for this deposition.

6         A.   (Witness reviewing document.)

7         Q.   This is a three-page email and a three-page memo

8    from yourself to Kimberly Richard -- sorry, Richard, I'm

9    not sure of the last name.

10        A.   Herring.

11        Q.   Herring, Chris Hart, and Kimberly Renspie; is that

12   right?

13        A.   Yes.

14        Q.   Who are they?

15        A.   Kimberly and Chris are with the clerk of court.

16   Richard Herring is doing some contract work for the Florida

17   Association of Court Clerks and Comptrollers as relates to

18   the restoration of voting rights and data.

19        Q.   Do you know if he was brought in specifically to

20   do that research related to voting rights?

21        A.   All I know is what his email says on August 20th.

22        Q.   Okay.  You say here that the memo attached

23   references some of the Division's experiences with court

24   records; is that right?

25             MS. EBENSTEIN:  Whoever is on the phone, could you

1                    MARIA MATTHEWS

2        please put your phone on mute?

3   BY MS. EBENSTEIN:

4        Q.    That's in the body of that email.  We will go

5   through those experiences in a moment.  You say, "My staff

6   simply are not versed or professionally trained at this

7   level to understand court documents to this level."

8             Is that what you wrote in this email?

9        A.    This email was prompted by outreach from Richard

10  Herring to us about helping to ensure that data they have

11  related to restoration of voting rights is provided as

12  smoothly as possible as relates to how we need that

13  information.  So I asked my staff to compile some examples

14  of court records and highlights and challenges that they

15  have.  It's all part of trying to do our due diligence with

16  respect to available resources and data.  So they put

17  together something, and we shared that with the clerk of

18  the court --

19       Q.    Sure.

20       A.    -- to show some examples of what it would take

21  having to look at records and stuff.

22            As I said before, my staff has not looked at court

23  documents in the way that the law is now going to require

24  us to look at it, so we are trying to get some guidance

25  from the clerk of the courts as to what we see currently in

                         MARIA MATTHEWS

1

2    terms of court documents.

3        Q.   Sure.  I appreciate that laying this out -- laying

4    out information was for forward-looking purposes.  But at

5    the time you write this email on August 29th, your staff

6    was not versed or trained at the level to understand court

7    documents, is that what you said here?

8        MR. JAZIL:  Object to the form.

9    BY MS. EBENSTEIN:

10       Q.   Do you believe that the average Floridian who

11   doesn't do any work related to elections would be versed or

12   professionally trained at the level to understand court

13   documents?

14       A.   I think that's an individual case by case.  I

15   can't really speak to that.

16       Q.   Do you think that an individual trying to

17   determine their own eligibility would be versed or

18   professionally trained at this level to understand court

19   documents?

20       A.   Again, I can't speak to that.  I would think a

21   person who is convicted would know what their terms of

22   sentence are and where they are at in that stage of

23   complying.

24       Q.   As far as a person who has been convicted of a

25   felony, are you saying that you think they would be more

1                          MARIA MATTHEWS

2    likely to understand court documents than your staff who

3    has been trained in this matter?

4         A.    Again, if the person has been convicted, they have

5    the court records that say what their terms of their

6    sentence is.

7         Q.    How do you know they have the court documents that

8    say what the term of their sentence are?

9         A.    I guess I'm assuming the process would provide

10   them that when they were convicted.

11        Q.    Okay.  So one of the areas of difficulty you

12   mentioned are early convictions, for example, in the late

13   '90s.  Would you assume that a voter would still have from

14   20 years -- 30 years ago court records?

15        A.    I don't know.

16        Q.    But your staff doesn't have at this moment the

17   training to understand the court documents they need to

18   access to determine outstanding financial obligations from

19   court records; is that right?

20             MR. JAZIL:  Object to the form.

21        A.    What I'm saying here is that staff will now need

22   to look at court documents.  What we are trying to

23   determine is, number one, is this the person; number two,

24   is this a felony conviction; number three, what type of

25   felony conviction this is and then has their rights been

1                    MARIA MATTHEWS

2    restored.  The complexity is added when we are trying to

3    figure out whether the terms of their sentence has been

4    completed.

5              Every clerk of court has some different records

6    and format in which the sentence and judgment might appear.

7    So my staff is going to have to look at it at a

8    different -- at a more intense level than they have

9    previously.

10             MS. EBENSTEIN:  Okay.  Why don't we take a lunch

11        break now.

12             Again, to get this on the record.  We did not

13        receive these documents until during the deposition,

14        so in order to at least attempt to ask you questions,

15        it probably makes sense for me to take a few minutes

16        to read this more carefully.

17             Should we come back in 45 minutes?  Does that work

18        for you-all?

19             MR. JAZIL:  1:15?

20             MS. EBENSTEIN:  Yeah.

21             MR. JAZIL:  That's fine by us.

22             (Recessed at 12:32 p.m.)

23

24

25

MARIA MATTHEWS

AFTERNOON SESSION

3    (Resumed at 1:19 p.m.)

4  BY MS. EBENSTEIN:

5    Q.   We were looking a moment ago at a document, I

6  believe it's Exhibit 12.  It's an attachment to a memo.  I

7  would like to look at the memo page 1 of 3 to begin with.

8         This memo from your offices, I'm looking about

9  one-third down the page with regard to Duval, it catalogs

10  some of the difficulties obtaining records in counties; is

11  that correct?

12    A.   This document highlights -- is a compilation of

13  the highlights and challenges that the Division has

14  encountered in getting court records.  Number three relates

15  to Duval.

16    Q.   Okay.  You said over the year.  Does this refer to

17  your current experience getting records or from years back?

18    A.   It's a compilation of over the years, so, yes, it

19  could be currently as well.

20    Q.   With regard to Duval, the memo says Duval does not

21  often provide the judgment, they alternatively type up

22  summaries of the judgment, particularly the older cases.

23  So your office is unable to obtain a judgment from Duval in

24  some instances; is that right?

25    A.   Correct.  Sometimes they can't get the judgment.

1                          MARIA MATTHEWS

2        Q.   And a voter would also be unable to obtain a

3   judgment if the county doesn't provide it; is that correct?

4        A.   All I can speak to is our experience with the

5   clerk of the court.

6        Q.   Okay.  Would you suggest that -- if you look on

7   the next page, it says -- I'm sorry, what information is

8   contained in the typed-up summary sheet that you referred

9   to there?

10       A.   I haven't seen what an example is.  I would have

11  to get an example of a case file.

12       Q.   Members of your staff have presumably seen them?

13       A.   This could suggest that they have and it would

14  contain the information necessary for them to be able to

15  determine it's the same person, what type of felony -- not

16  a felony type, but that it's a felony conviction

17  adjudicated.  So it appears to be the substitute for the

18  judgment.  I have no idea what it would look like, though.

19  I have not seen one myself personally.

20       Q.   So you are not sure what's contained in a summary

21  sheet versus the actual court judgment?

22       A.   Correct.

23       Q.   Okay.  If you look to the following page, page 2

24  of 3, there are some notes on challenges with records from

25  counties in general.  You list out that several counties

1                          MARIA MATTHEWS

2    are either unable, they have files not found or not

3    applicable in response to a request for files; is that

4    correct?

5         A.   This part is a summary of the challenges in

6    getting court documents.  We are not necessarily only

7    limited to looking at judgments.  We sometimes in order to

8    be able to determine if the voter and the convicted felon

9    are the same, we will need additional documents, like

10   arrest records or other documents that contain information

11   that allows us to be able to do -- confirm whether the

12   match is credible and reliable.  So this just documents

13   what staff have encountered.

14        Q.   Right.  So you are talking about whether you need

15   documents in order to do an identity match.  What about

16   trying to determine financial obligations imposed by a

17   sentencing document?

18        A.   This right now does not address because we are not

19   doing that right now.

20        Q.   Right.  Your office is not doing that right now,

21   but that's what this memo addresses; is that right?

22        A.   No.  This memo addresses the challenges we have in

23   obtaining court records under our pre-Constitutional

24   Amendment 4 and our current process right now.

25        Q.   It says in your email these are example that you

1                    MARIA MATTHEWS

2    will face in trying to determine financial obligations

3    imposed by the sentencing documents; is that correct?

4         A.    This shows the challenges that we have in getting

5    court documents, so sentence documents presumably will be

6    part of court documents.  So it may be that we will

7    encounter these same challenges, but I won't know until --

8    that is why we are working with the clerk of the courts.

9         Q.    I'm sorry, I'm a bit confused.  The email with

10   this memo says that these are examples that you will face

11   in trying to determine financial obligations imposed by a

12   sentencing document; is that right?

13        A.    Because these are based on the challenges we faced

14   in obtaining court records.  So court records will include

15   sentence documents that include the terms of the sentence,

16   and terms of the sentence may include financial

17   obligations.

18        Q.    Okay.  Going back to page 2 of the memo, in

19   counties in general, you express some concerns when there

20   is a file not found or an NA as response to the request; is

21   that right?

22        A.    (Witness reviewing document.)

23              Yes.  Staff expressed concern about getting a

24   response that said that, file not found or not applicable

25   or available.

1                      MARIA MATTHEWS

2        Q.   Right.  And then it seems like in some instances

3   your staff has also gotten a response to a request to a

4   county clerk that says the file was destroyed; is that

5   right?

6        A.   Yes.

7        Q.   And your office can't obtain a sentencing record

8   if a record has been destroyed, right?

9        A.   If we can't obtain court records that will allow

10  us, if needed, to make a credible and reliable match, then

11  we will not be able to proceed, and it will be determined

12  invalid, and the registered voter stays registered.

13       Q.   Okay.  And a voter also -- a prospective voter

14  could not obtain a sentencing record that had been

15  destroyed; is that right?

16       A.   Again, I can really only speak to what our

17  experience is with the clerk of the court.  I don't know

18  what that experience may be with a particular person.

19       Q.   I appreciate that, but I think just based on the

20  language alone, if a file is destroyed and no longer

21  exists, surely someone can't obtain it; is that right?

22       A.   If a clerk of court represents that a record is

23  not available for whatever reason, then it's not available.

24       Q.   Okay.  So not available would include file not

25  found, not applicable, destroyed, those three categories of

1                              MARIA MATTHEWS

2       documents, right?

3           A.    It could be for any number of reasons.  I don't

4       know what the clerk of courts reasons are for that, but

5       those are categories of possible ways that something is not

6       available, yes.

7           Q.    And those are categories that your staff --

8       reasons for unavailability that your staff have received in

9       response to their requests; is that correct?

10          A.    We have.

11          Q.    There is a mention of Brevard County that

12      sometimes there are misplaced older cases.  Do you see that

13      in the next sentence?

14          A.    Yes.

15          Q.    I assume that a misplaced record can also not be

16      returned to your staff when they request it?

17          A.    My reading is that if they have asked for a

18      record, one of the reasons why they might not be able to

19      find the older record is because this record might have

20      been pulled multiple times and staff at the clerk's office

21      might not have put the record back where it should have

22      been.

23          Q.    Okay.  The experience that you list here that your

24      staff has had with Sarasota or Duval is that they don't

25      provide a statement when documents are not available.  Does

MARIA MATTHEWS

2  that mean that your employees can't determine if there is a

3  document or not?

4      A.   If after a request for documentation they --

5  whatever the clerk provides, if it doesn't include

6  information on the documents that will help them make that

7  credible and reliable match, they will not proceed.  It

8  will be deemed invalid and then the voter remains

9  registered.

10     Q.   No, I understand, and we will discuss more in a

11 moment the processes within your office.  I'm just asking

12 about what you have outlined here as your office's

13 experience in trying to obtain records from clerks.

14     A.   Correct.

15     Q.   So in Sarasota and Duval, based on this memo, your

16 employees have requested sentencing documents or court

17 records, and those two counties in some instances have not

18 provided a statement when documents are not available; is

19 that right?

20     A.   That's what we have stated here.

21     Q.   Okay.  In the next bullet point you write, "Many

22 counties do not send all documents requested and include no

23 response addressing the missing items."

24          Am I correct that that's a concern that you

25 haven't received documents or all documents responsive to

1                    MARIA MATTHEWS

2    your request from some of the counties for court records?

3         A.   Again, it enumerates some of the challenges we

4    find when we are asking for documents.  The clerk of the

5    court has asked how can they help us better get documents

6    to us, and so we have indicated here that when we make a

7    request for all documents related and necessary for us to

8    do our case file, that if they don't include or add

9    something in there that says is missing, we don't know

10   whether we have to reach out again or is it because there

11   wasn't anything to begin with.

12        Q.   So here the concern is that they don't -- they

13   don't inform you that an item is missing and so you have no

14   instructions on what to do; is that correct?

15        A.   Well, we know what we will have to do is we will

16   reach out again for clarification when it would have been

17   helpful to know that the reason why a document wasn't in

18   the response was because it didn't exist.  It's to -- these

19   are things to highlight how to improve efficiencies in

20   getting court documents.

21        Q.   Sure.

22             It takes more of your staff time to have to

23   determine that there might be something missing and reach

24   out for a second time; is that right?

25        A.   It does take more time if you have to reach out

1                    MARIA MATTHEWS

2  again.

3      Q.   It's more burdensome to make additional phone

4  calls?

5      A.   It just takes more time.

6      Q.   So it takes more staff resources, then?

7      A.   It does take more staff resources devoted to this

8  to work on this particular file.

9      Q.   Okay.  Going to page 3, Miami-Dade, here it

10 outlines a concern that when you have requested case

11 documents from the Miami-Dade clerk of court, they have

12 informed you that the documents are not held by the clerk

13 of court but by the Miami-Dade Police Department; is that

14 right?

15     A.   Correct.

16     Q.   And your employees are, sounds like, placed in

17 a -- that they are not comfortable reaching out to the

18 police department to obtain case documents; is that right?

19     A.   What this means is that my staff is then not able

20 to proceed.  We do not have an established relationship

21 with the police department for court records.

22     Q.   You are not able to proceed because you can't

23 obtain the court records in Miami-Dade if they are held by

24 the police, right?

25     A.   If we are not able to make a credible and reliable

1                           MARIA MATTHEWS

2      match based on the documents that we have even after we

3      have reached out to the clerk of the court, we are able to

4      proceed in the sense that we then will determine that we

5      have insufficient documentation to make a credible match.

6           Q.   Okay.  And just so I understand, basically that's

7      insufficient documentation to determine whether or not

8      somebody has outstanding financial obligations?

9           A.   At that juncture what we are talking here is just

10     whatever court documents are needed.  It could be to

11     establish identity at this juncture, because, again, we are

12     not yet doing financial.  But it would be whatever identity

13     or whether it's records needed to determine whether it was,

14     indeed, a felony.  So whatever documents are needed to

15     establish whether this match is credible and reliable.

16          Q.   Okay.  And as you say in your email, these are

17     challenges that you will face in trying to determine

18     financial obligations?

19          A.   If that is a part of the case file that we are

20     working on, which is to determine whether their terms of

21     sentence have been completed, and the term of the sentence

22     is a financial obligation, then that could potentially be

23     part of the court records that are at issue here.

24          Q.   Okay.  In the second bullet point under

25     Miami-Dade, it seems that in response to your office's

MARIA MATTHEWS

1
2    requests, that that office sometimes batches responses --
3    sorry, batches responses with case sheets in lieu of actual
4    judgments.  What is a case sheet?
5        A.    Again, it's probably like a summary sheet that
6    lists that a clerk of court, particularly maybe for
7    Miami-Dade, that summarizes the information that we are
8    probably trying to seek that is not available or that would
9    be on an actual judgment.
10       Q.    Have you seen a case sheet?
11       A.    I believe I have, and it seems -- but I can't --
12   I'm trying to visualize it right now.  It's just a cover
13   sheet that lists information relating to that convictions.
14       Q.    Do you know what information is listed?
15       A.    No, I don't recall at this time.
16       Q.    And going back to the summary sheet, have you seen
17   one of those?
18       A.    The summary sheet I don't recall.  It could be
19   case sheet and summary sheet are the same and they just use
20   two different terms to refer to it.
21       Q.    Okay.  Does Miami-Dade have a CCIS database
22   online?
23       A.    CCIS is the Comprehensive Court Information
24   System, so that's the Association's -- it's the system that
25   all clerks of court have where they enter all their

1                              MARIA MATTHEWS

2    information.  Each clerk of court can have their own

3    website and more specific court records and whatnot, so

4    they all have access to it and they all input information

5    into it.

6        Q.   But it seems like, if I'm understanding this,

7    there are times that you would need information in addition

8    to the CCIS records; is that right?

9        A.   Yes, that is true, because it's dependent on that

10   information being entered by the clerk of court into that

11   system.

12       Q.   I see.  In what instances would a clerk of

13   court -- what information might be missing from CCIS?  For

14   example, judgments before a certain date, certain details

15   on a judgment, things like that, if you have a sense from

16   having worked with these documents.

17       A.   Clerks of court I believe by law are required to

18   put all their records electronically into the system, but

19   not all counties have gotten all their records in there.

20   There may be a certain date, and you would have to speak to

21   the clerk of the court to figure out, you know, by what

22   date are all records in there versus any, you know,

23   archival or backlog that they are going back through and

24   scanning and entering into the system.

25       Q.   I see.  So all clerks would have entered

MARIA MATTHEWS

1

2      information into CCIS at a specific time, but the records

3      before that could have been digitized or not depending on

4      the county?

5          A.   It depends, yeah, on the county and what their

6      resources and what they have accomplished up to this point.

7      Again, I can't speak to that, the dates of anything like

8      that.  We just know that some counties have more records

9      online than others.

10         Q.   And do you have any sense of at least which decade

11     courts started entering information into CCIS, not the

12     backwards-looking digitization, but actually entering

13     records?

14         A.   I used to, but I don't remember now --

15         Q.   Okay.

16         A.   -- when they started doing that.

17         Q.   No problem.

18              In the third bullet point under Miami-Dade, you

19     write that your staff has observed errors with the felony

20     division, including the wrong case, the wrong defendant, or

21     missing a page.  Would that prevent you from getting all of

22     the necessary documents to complete a case file?

23         A.   What that would mean is if we get the wrong

24     records and reach out to the county again and try to get

25     the correct records and yet still we don't, again, all we

1                          MARIA MATTHEWS

2    can do is mark that as an invalid match at this time, and

3    the voter just stays on the rolls.

4         Q.   Okay.  And it presumably would require more time

5    for your staff to reach back out to a county and follow up

6    on any missing documents; is that right?

7         A.   Anytime we have to reach out to the clerk of

8    court, that's additional time spent on that file, and that

9    is additional resources.

10        Q.   Further in Miami-Dade you say it can be

11   difficult -- that the staff rotates, it can be difficult to

12   circle back to the same person about the errors.  We have

13   all had this experience in different parts of life.  You

14   talk to one person, you don't get a matter resolved, and

15   when you call back you talk to somebody else; is that

16   correct?

17        A.   Yes.  It could be that you have change of staff so

18   you lose the history that you might have had or

19   communications you might have had with the previous

20   individual.

21        Q.   Okay.  So has your staff identified for you as a

22   challenge that they have to call back multiple times and

23   start again explaining what they are requesting and what

24   documents they need?

25        A.   That's what this sheet explains.

1                    MARIA MATTHEWS

2       Q.    Okay.

3       A.    That's what these things explain is what they have

4  encountered over time.

5       Q.    With regard to Palm Beach, it says here that Palm

6  Beach destroys documents after a set retention period; is

7  that correct?

8       A.    Yes.

9       Q.    And so obviously your staff can't obtain documents

10  that have been destroyed, right?

11       A.    Correct.  Records aren't available, they can't

12  provide it to us.

13       Q.    And there is no written mention of the destroyed

14  documents, so your staff would not necessarily know that

15  one of the documents they had sought had been destroyed,

16  right?

17       A.    Unless they reach out and try to find out why a

18  document wasn't provided that they had requested.

19       Q.    And that would be reaching out a second time to

20  the clerk, right?

21       A.    Correct.

22       Q.    So just to make sure that I now understand your

23  internal process, your office would not consider a case

24  sheet to be sufficiently credible and reliable to determine

25  that somebody is ineligible to vote; is that right?

MARIA MATTHEWS

1

2      A.   No, that may not be.  If that's the only

3   documentation we have and we feel comfortable with what

4   that information is because that's coming from an official

5   office, the clerk of the court, and we can -- and it has

6   the information we need, whether it's demographics or

7   specifics about the felony conviction, then, yes, we could

8   act on that.  Again, I would have to, you know, look at a

9   case-by-case basis on that.

10      Q.   Okay.  Looking specifically at cases for which you

11   are trying to determine financial obligations, as you said

12   in this email, would your office consider a case sheet

13   sufficiently credible and reliable to determine that

14   someone is ineligible?

15      A.   Depends if that case sheet looks like a sentence

16   document.  At this point, we would -- and I don't know.

17   Until I -- until we get these cases, I have no idea how

18   this information is going to appear.  It's going to be on

19   court documents.  If it doesn't have anything about

20   financial obligations on it, then a case sheet is not a

21   sentence document.

22      Q.   And a case sheet, even if it does have that

23   information, is not a sentence document.  Would you rely on

24   a case sheet in that instance?

25      A.   We can still rely on the case sheet for our

1                    MARIA MATTHEWS

2    purposes and maybe to establish identity, to establish that

3    this is a felony conviction.  That's just one of multiple

4    documents that we will be trying to collect and compile to

5    support the case.

6        Q.    Right, but a case sheet, since it's not a

7    sentencing document, if it includes financial obligations,

8    would that be considered sufficiently credible and reliable

9    to your office to determine someone's eligibility for

10   outstanding financial obligations?

11       A.    Until I see what the case sheet has, if it has

12   financial obligations -- sets out the terms of the

13   sentence, then I am going to have to look at it on a

14   case-by-case basis to determine whether that is sufficient

15   or not.

16            Our understanding with the law is that you are

17   looking at the four corners of the sentencing document to

18   determine the terms of that sentence.  So honestly at this

19   point, I don't know that a case sheet falls within a

20   sentence document or not.  It just depends on what

21   information is on there.

22       Q.    Okay.  And not to harp on this, but even if it did

23   contain the information, you would be relying on what that

24   particular county clerk's office had done to transcribe

25   information from a judgment to the summary sheet, right?

MARIA MATTHEWS

1

2    A.   It would be -- yes, we are relying on what the

3   clerk provides you.

4    Q.   I mean relying on -- if you were to rely on case

5   sheets or summary sheets, you will be relying on whatever

6   that county clerk did to transcribe sentencing or judgment

7   documents, right?

8    A.   Correct.

9        MR. JAZIL:  Object to the form.

10        MS. EBENSTEIN:  Hopefully you can give me some

11    leeway, Counsel, with the 200 documents we attempted

12    to go through during the deposition, or more than 200.

13  BY MS. EBENSTEIN:

14    Q.   Has your office ever sent matches to Supervisors

15   of Elections based on case sheets or summary sheets?  My

16   question pertains to at any point, not just following the

17   passage of SB 7066.

18    A.   I can't say.

19    Q.   You don't know?

20    A.   The law requires that you provide the supporting

21  documentation upon which the ineligibility was determined.

22  So if the case sheet is deemed credible and reliable, as

23  the information that -- as a part of the whole package,

24  there is a lot more to the case file than just a case sheet

25  or a judgment, if available.  So if the case sheet has

1                          MARIA MATTHEWS

2    information that informs the rest of the credible and

3    reliable file, then it will be included and may have been

4    sent down to the counties.

5         Q.   If that's the only record you have of financial

6    obligations, would you find that credible and reliable as

7    to outstanding financial obligations?

8         A.   Again, it would have to be on a case by case.  I

9    would have to look at it to see if that's what we would

10   deem.  We don't have that experience yet.

11        Q.   Who makes that determination on credibility and

12   reliability within the Division of Elections?

13        A.   It begins with the examiner and then the reviewer,

14   and then if it needs further questioning, it will be the

15   floor supervisor.  Then it goes up to the chief, and if

16   there is still a question about it, it would come to me.

17   But the determination of whether there is enough there to

18   be able to make that credible and reliable match would be

19   what we will set out in procedures.

20        Q.   If the examiner and the reviewer both agreed that

21   that a case sheet or summary sheet was credible and

22   reliable, that would be -- there would be no disagreement

23   to raise to the next level of supervision; is that right?

24        A.   That's correct.  And then the file would be sent

25   to the supervisor, the supervisor would then review the

1                    MARIA MATTHEWS

2    file, which they have certainly the discretion to do, and

3    determine whether they wanted to move forward with it.

4    Then again, ultimately, the voter has the opportunity to

5    go, no, this is not me.  No, this is not a felony.  No,

6    this is a felony but it was adjudication withheld, so they

7    have that opportunity to be able to contest it.

8            Even if after that the supervisor removes them

9    based on a determination of ineligibility, the voter still

10   has an opportunity to appeal that.  If the court agrees,

11   then that person can get reinstated at any time.

12       Q.   I thought you said at the beginning of the

13   deposition that if the examiner and the reviewer agree on

14   ineligibility -- that a match is valid, that ineligibility

15   has been determined, that it doesn't get elevated to the

16   supervisor; is that right?

17       A.   No.  A match that is determined to be credible and

18   reliable, it goes to the supervisor of elections, I'm

19   sorry, not their supervisor.

20       Q.   I see.  Okay.  But from your office going to the

21   Supervisors of Elections?

22       A.   Correct.

23       Q.   Let me make sure I understand it.  If the examiner

24   and the reviewer agree that information is credible and

25   reliable, they can send it to the Supervisors of Elections?

1                          MARIA MATTHEWS

2        A.    Correct.

3        Q.    Okay.  Would you suggest that an individual voter

4   who is unable to obtain their sentencing documents because

5   they have been destroyed swear under penalty -- swear under

6   oath that they are qualified to register to vote?

7        A.    Can you restate that, please?

8        Q.    Sure.  If a voter is unable to obtain their

9   sentencing document, for example, as your office has run

10  into with clerks of court, would you recommend that they

11  affirm under oath that they are qualified to register to

12  vote?

13       A.    That is up to the applicant.  If they are

14  comfortable affirming that they are, and they believe,

15  regardless of whether they have records available or not,

16  that they are eligible and that they have satisfied their

17  sentence, that's their -- that's their right to be able to

18  affirm that and fill out an application.  I would not make

19  a call about that for a person.  I just would not.

20       Q.    Okay.  And if there is information sent from your

21  office to the Supervisors of Elections, and a voter then is

22  notified -- let me start that again.

23             Would you suggest -- how would -- I will leave

24  that for now and move on to the next document.

25             I'm going to ask you to look at DOSG-0000244.

MARIA MATTHEWS

1

2 While we are looking for that document, how would a voter

3 contest a notice that they receive from a Supervisors of

4 Elections if they themselves cannot obtain documentation of

5 their outstanding financial obligations?

6     A.   The supervisor when they send notice, the

7 Supervisors of Elections, I should specify that, the

8 Supervisors of Elections when they issue notice, they tell

9 them instructions about where they need to go to find out

10 if they -- what their -- how to get their rights restored.

11         If an individual is unable to obtain records, I

12 suppose they could -- they would speak to the Supervisors

13 of Elections, and the Supervisors of Elections will have to

14 make that call on that.  I honestly don't know what would

15 happen at that point.

16     Q.   Okay.  I am going to give you marked as Exhibit 13

17 this document.

18                 (Document marked as Exhibit 13

19                     for identification)

20 BY MS. EBENSTEIN:

21     Q.   Do you recognize this document?

22     A.   Yes.

23     Q.   And you see at the bottom it says updated June 4,

24 2019?

25     A.   Yes.

MARIA MATTHEWS

1

2      Q.    What is this document?

3      A.    This document reflects the current procedures that

4   are in operation regarding the processing of felon records

5   that we receive.

6      Q.    Okay.  So just to be clear, because we have seen a

7   number of different drafts, this is the current operative

8   procedure for processing match documents?

9      A.    These are the procedures laid out for examining

10  potential matches.

11     Q.    And these are the ones that are operative?

12     A.    Yes.  We do not have -- I don't believe we have a

13  later version yet.

14     Q.    I can represent to you that there is not one that

15  I found that didn't say "draft."

16     A.    Okay.

17     Q.    So I just want to make sure we didn't miss a

18  document somewhere along the way.

19           Now, this effective June 1st document supersedes

20  previous procedures, right?

21     A.    Correct.

22     Q.    It says, "We are starting completely over with

23  processing our electronic case files," right?

24     A.    Yes.

25     Q.    So would this indicate when you began processing

1                              MARIA MATTHEWS

2    felon match files after putting those on hold in early

3    December?

4         A.   This would represent when we started sending --

5    beginning to do the review of electronic case files and

6    sending them to the supervisors.  Because we are still

7    examining all of the potential matches and invalidating --

8    working those that are invalid and taking care of those and

9    then putting the other ones in the buckets that I was

10   telling you about that we were not sending.  So this

11   represents when we are finally going to go ahead and

12   reinstitute the forwarding of valid case files.

13        Q.   Okay.  Thank you for clarifying that.

14             Was this shared with anyone outside of the

15   Secretary of State's Office?

16        A.   No, these represent internal procedures for our

17   offices.

18        Q.   Would they have been shared for input with the

19   Department of Corrections?

20        A.   No, but they would reflect our conversations with

21   Department of Corrections as to their file contents.

22        Q.   Would they be shared with any other governmental

23   agencies?

24        A.   No.  Again, I think these are representative of

25   our internal process.

1                        MARIA MATTHEWS

2        Q.    Okay.   If you look at page 2 of 5 marked

3    DOSG-0000245, it describes three phases in implementing

4    this memo.   Could you just give me a brief and general

5    explanation for what those three phases are?

6        A.    So in order to proceed with the process in a way

7    that was orderly for my staff and give time to research,

8    which we are still doing ongoing, and allow time for the

9    legislation to become effective, we determined that the

10   best approach was to implement the matching review in three

11   phases.

12            So we started with phase 1 based on discussions

13   with the Department of Corrections about receiving

14   information from them that would indicate that someone is

15   in prison or supervision for a felony conviction for which

16   adjudication had been made.   That represents phase 1.

17            Because of the way these case files come in, if

18   there were -- with phase 2, once the law became effective,

19   the idea would be we would implement phase 2 because now we

20   have terms defined for murder and felony sexual offense.

21   And because we can also more easily determine whether

22   someone has had their rights restored because the way they

23   have the rights restored if you have been convicted of a

24   murder or felony sexual offense is if you have had clemency

25   provided for the felony.

1                        MARIA MATTHEWS

2              And then the phase 3 that would be finally

3     implemented, and that is -- that's the third, really, level

4     if you get a case file and the person is not in prison or

5     is not supervised or you go to the next point, and that is

6     is it a murder or felony sexual offense.  If it's not that,

7     then you go to the next level of analysis, which is, okay,

8     now we are dealing with a felony that is neither a murder

9     nor a felony sexual offense, and now we would need to look

10    at all terms of the sentence.

11             We have not implemented phase 2 or 3 yet because

12    we are still working through, as you indicated, draft

13    procedures on that.

14        Q.   Okay.  But you did say that you were holding off

15    on the second and third phase to allow for legislation to

16    become effective.  The legislation became effective

17    July 1st, correct?

18        A.   That's correct.  And what we are trying to do is

19    gather information, even as we are in litigation, to refine

20    our procedures and the information that we are getting from

21    the Florida Department of Law Enforcement as well as the

22    Department of Corrections that will help us more easily

23    identify a match that is based on murder or felony sexual

24    offense.

25        Q.   Okay.  Thank you.

MARIA MATTHEWS

1

2        It says in phase 1 in that first bullet a judgment

3    is not required to be included with the match file; is that

4    correct?

5        A.    Correct.

6        Q.    And what is a match file?

7        A.    The match file, again, is the case file that we

8    end up creating manually to support the automated data

9    match that was made.

10        Q.    Is that match file only created internally, or is

11    that the same file that's sent to the Supervisors of

12    Elections if you do validate a match?

13        A.    That case file -- every match is going to have a

14    case file, and that case file if determined to be -- if the

15    match is determined to be valued, is an electronic record

16    of all the sources of information that we got that we use

17    to determine whether it's credible and reliable.  That

18    file, that case file, is forwarded to the supervisors via

19    electronic means.

20        Q.    So they receive the full case file that you have?

21        A.    That's correct.

22        Q.    Again, here a judgment is not required to be

23    included in the match file as of the date of this memo?

24        A.    That's correct.

25        Q.    The procedure prior to June of 2019, were those

1                          MARIA MATTHEWS

2       required to include a judgment in a match file?

3           A.   As a matter of practice we did include the

4       judgments at that point.  Of course, then we were not

5       looking to see if the person was in prison or supervision,

6       which our conversations with the Department of Corrections

7       was that someone is not going to be incarcerated or

8       supervised -- or in supervision for a felony offense -- I

9       take that back.  Let me start over.

10              Department of Corrections assured us that they

11      would be sending us information of individuals that were

12      incarcerated or in custody or supervised for felony

13      convictions only that were adjudicated.  So our assurances

14      from them is that the information that we would get

15      initially would only consist of those people who are in

16      prison or under supervision for a felony conviction

17      adjudication.

18          Q.   Okay.  Who made that assurance to your office?

19          A.   The Department of Corrections, their operational

20      and IT.  So based on that, based on that information and

21      the -- their official website and the web service for which

22      we also get additional information, a judgment -- we did

23      not believe a judgment was necessary as it showed clearly

24      that the person was in prison or in supervision for a

25      felony conviction.

1                         MARIA MATTHEWS

2        Q.   Okay.  I am going to hand you a document that we

3   will mark as 14.

4                    (Document marked as Exhibit 14

5                         for identification)

6   BY MS. EBENSTEIN:

7        Q.   What is this document?

8        A.   This document is an email from me to the

9   Supervisors of Elections and their staff regarding our

10  institution of sending down felon files to their -- to the

11  counties.  It spells out what that -- that the process

12  would begin that day and what they can expect to see in the

13  case file.

14       Q.   Okay.  So this is the -- where you indicated to

15  supervisors that you were going to begin to restart sending

16  felon files; is that right?

17       A.   Correct.

18       Q.   If you go to the second and third page of that

19  email, the attachment to that email, what are these two

20  documents?

21       A.   These two documents are the -- these represent the

22  screenshots from the Florida Department of Corrections

23  website which contains information about an individual's --

24  an offender's current status with the Department of

25  Corrections.

1                    MARIA MATTHEWS

2       Q.    Okay.  You indicated a moment ago that you

3   consider the Department of Corrections records sufficiently

4   reliable to send to the Supervisors of Elections; is that

5   right?

6       A.    Yes.

7       Q.    If you look at the unfortunately small print about

8   a little more than halfway down the page, it says, "The

9   information on this site may not reflect the true current

10  location, status, scheduled termination date, or other

11  information regarding an offender."

12            Do you see where I'm looking?

13      A.    Yes.

14      Q.    And in the next paragraph, at the end of that

15  paragraph it says, "The Department of Corrections makes no

16  guarantee as to the accuracy or completeness as to the

17  information contained herein."

18            So by the terms of these documents, the Department

19  of Corrections says that they should not be relied upon for

20  accuracy and completeness; is that right?

21      A.    You have read the statement that's on their

22  website.  We have had conversations with the Department of

23  Corrections, and we also have a web service that's separate

24  and apart from the Department of Corrections online, and it

25  was represented that the information could be relied upon,

1                    MARIA MATTHEWS

2    which is why we had the file specs specifying only

3    including those who are convicted felons adjudicated in

4    prison or under supervision.

5        Q.    So you have a -- explain to me what the different

6    web service online that you have is.

7        A.    There is the online offender network that's

8    available to the public, and then there is an established,

9    pursuant to our agreement with the Department of

10   Corrections, a web service that provides additional

11   information regarding a match.  That information is

12   compared with what is online, and that is what we use to go

13   ahead and proceed with a potential match.

14       Q.    Okay.  And this is the document that you, as you

15   state in your email, I believe this is the screenshot that

16   you would send to Supervisors of Elections, correct?

17       A.    Correct.

18       Q.    And you just said a moment ago that your felon

19   file -- the contents of your felon file is shared with

20   Supervisors of Elections, right?

21       A.    Correct.

22       Q.    So your felon file doesn't include anything more

23   than these types of documents from the Department of

24   Corrections, right?

25       A.    The felon file is going to include screenshots of

1                        MARIA MATTHEWS

2    voter registration information, it's going to include

3    screenshots of DAVID, the driver's license and motor

4    vehicle information database, it's going to include any

5    court records, judgments -- not judgments, DOC screenshot

6    in this particular case, and from our web service.  It has

7    additional information.  That is all provided to the

8    supervisors as an example -- in support of a credible and

9    reliable match.  So they have a number of documents within

10   it.  Ultimately, if they are not comfortable with what we

11   provided, they don't have to proceed on it.

12        Q.   Okay.  So what you are saying is that you provided

13   Supervisors of Elections beginning in June both the

14   documents that you gave them as examples and a separate DOC

15   document from a different web service?

16        A.   From a web service that contained information that

17   we had that we use to cross-check to make sure that the

18   information was accurate.

19             So, again, the information that we get from DOC,

20   they represented that it did include convicted felons who

21   have been adjudicated and who are currently in prison for

22   that felony conviction or under supervision.  Supervisors

23   of Elections are very used to receiving judgments, so this

24   was a departure for them, and it was a change that they

25   were not -- that they -- they like having lots of

1                    MARIA MATTHEWS

2    documents.

3         Q.   We do, too.

4              You say in this email these official screenshots

5    will take the place of a copy of a judgment and will

6    constitute the documentation upon which the potential

7    ineligibility is based.

8              I just want to understand what you are saying now

9    that as far as the DOC records, you would have included

10   both this and another DOC record to send to the Supervisors

11   of Elections beginning in June?

12        A.   I am assuming these are two different -- no, this

13   is supervising inmates.  So the case file would have

14   contained the documents that we believe would support the

15   credible and reliable.

16        Q.   Right.  This is the example of those documents

17   that you sent to the supervisor?

18        A.   Yes.  That's one.  That's not all of it.

19        Q.   I realize there is more documents in the case

20   file, but did you send the supervisors DOC documents or an

21   additional DOC document that you didn't tell them about in

22   this email?

23        A.   I believe this is the document that would be --

24   that we sent them.  I don't know if there is a screenshot

25   for the web service now that I think about it.

MARIA MATTHEWS

Q.   This was the document you would have sent them?

A.   These are examples of what they could expect to
see in terms of in lieu of the judgment.

Q.   Looking at the second attached Department of
Corrections file, about halfway through the page, again, in
small type, continues "The offense descriptions are
truncated and do not necessarily reflect the crime of
conviction."

What does that mean?

A.   That this could have been listed here for crimes
for which they are not currently in custody.

Q.   So the screenshot could reflect a felony charge
when the ultimate conviction they are in custody for was a
misdemeanor; is that right?

A.   Again, we would not have gotten the match unless
it was a felony conviction.

Q.   Based on DOC's representation?

A.   And the files that they sent us and we were able
to access.

Q.   Do you know what DOC staff did internally to
confirm that the files they were sending over were of
people who were incarcerated or on supervision?

A.   Before this went into effect, we had meetings with
the Department of Corrections to discuss the file specs

1                          MARIA MATTHEWS

2    that they were going to -- that needed to be in place in

3    order to give us the files -- to give us the matches that

4    only include convicted felons who were adjudicated.

5        Q.   But by the terms of these two documents, how could

6    a Supervisors of Elections do any additional verification

7    that these individuals had been convicted of a felony?

8        A.   They are able to go if they wanted to go to the

9    clerk of the court and reach out and obtain any additional

10   documents that they felt this was not credible and reliable

11   on its face.

12       Q.   But they would have to reach out on their own

13   initiative to the clerk of court?

14       A.   And certainly something they do now on occasion.

15       Q.   They do now because the Department is no longer

16   sending them judgments?

17       A.   No, they did that before as well.  If they look at

18   a file and they are not comfortable with it, they may feel

19   like they need to obtain additional documents, they can

20   reach out to the clerk of the court.

21       Q.   Okay.  I'm going to give you another document

22   marked Exhibit 15.

23                   (Document marked as Exhibit 15

24                       for identification)

25

1                    MARIA MATTHEWS

2   BY MS. EBENSTEIN:

3       Q.    Sorry to go back to something first.  Did the

4   Bureau of Voter Registration do any independent research to

5   verify the people identified by DOC were, in fact, serving

6   time for a felony conviction?

7       A.    I'm not sure I understand.

8       Q.    Did you rely entirely on the assurances of DOC, or

9   did BVRS go do independent research to verify the people

10  identified by DOC were, in fact, serving time for a felony

11  conviction?

12      A.    Based on the requirements of Department of

13  Corrections to identify felons, we relied on their duty to

14  identify those for us.

15      Q.    And anything more than that?  Any independent

16  research?

17      A.    We are still going to be making sure that we have

18  the right person, that it is a felony conviction.  We are

19  still going to consult CCIS.  We are not necessarily going

20  to pull a copy of the judgment.  Our position is if you are

21  in prison or in custody for a felony conviction

22  adjudication, you haven't completed the terms of your

23  sentence.

24      Q.    But specifically how would you know if somebody

25  was in -- let me restart that.

1                         MARIA MATTHEWS

2              BVRS did not do any independent research to verify

3    that the information, the people that you -- the files that

4    you were sent by DOC were, in fact, people incarcerated or

5    on supervision for a felony offense; is that correct?

6         A.   Well, the agency responsible for knowing who is in

7    their custody or prison is the Department of Corrections.

8    That's who we would consult.

9         Q.   Okay.  If you look now at that email that we have

10   marked as Exhibit 15 -- I'm sorry, yes, 15 -- this document

11   is an exchange between yourself and the Supervisor of

12   Elections of Leon County, correct?

13        A.   I'm sorry, say that again.

14        Q.   This document is an email exchange between

15   yourself and the Supervisor of Elections for Leon County,

16   Mr. Earley?

17        A.   Yes.

18        Q.   If you look at the bottom of the second page, I

19   believe it's LCSEO001692, and that's an email sent Friday,

20   June 7th from Supervisor Earley to you.  He says, "The

21   screenshot concept does not appear to provide me and my

22   staff with enough information to take someone off the voter

23   rolls."

24              Do you disagree with that statement?

25        A.   I think that's his own personal statement if he

1                    MARIA MATTHEWS

2    did not feel comfortable with the information that we

3    provided.

4         Q.   Do you -- is there a different standard for what's

5    credible and reliable used at the state level than what's

6    used at the county level?

7         A.   Credible and reliable is what we believe to be

8    credible and reliable.  If he didn't feel it was credible

9    and reliable, that's his prerogative to have felt.

10        Q.   Is the standard different at the Supervisors of

11   Elections -- at the county level than at the state level?

12        A.   Supervisors of Elections follows the same standard

13   that we do, which is is it credible and reliable.

14        Q.   So you disagree with his statement here that this

15   screenshot didn't provide him as a supervisor with enough

16   information to take someone off the rolls?

17        A.   I wouldn't have sent the information if I didn't

18   think it was credible and reliable.

19        Q.   And you said the standard is the same at the

20   county level and at the state level on what is credible and

21   reliable?

22        A.   The law simply says credible and reliable.

23        Q.   Is it up to individual discretion and whimsy?

24        A.   No.

25             MR. JAZIL:  Object to the form.

1                              MARIA MATTHEWS

2          MS. EBENSTEIN:  Fair enough.

3     BY MS. EBENSTEIN:

4          Q.   Is it applied differently in every county?  Is the

5     credible and reliable determination applied differently in

6     every county?

7          A.   I don't know.  All I can say is that the

8     Supervisors of Elections, if they have any issues with a

9     file that we have sent them, they can reach out to us, and

10    we will follow up and see if there is something that we may

11    have missed, something that we may have misdetermined, and

12    that existed before and exists now.

13         Q.   It looks like here Supervisor Earley did follow up

14    with your office?

15         A.   Correct.

16         Q.   And it appears that you reiterated that this phase

17    you were only looking at information on whether someone is

18    in prison or under DOC supervision; is that right?

19         A.   Correct.

20         Q.   And so you didn't provide him with any additional

21    information related to the matches that he was concerned

22    about; is that right?

23         A.   His email says that he has -- he was asking for

24    whether we deemed our files credible and reliable pretty

25    much, and we did.  We wouldn't have sent them if we didn't

1                           MARIA MATTHEWS

2    believe it.

3            We were just trying to give him assurance that

4    this is just phase 1 in which these are individuals that

5    have been affirmed to be in prison or in custody for a

6    felony conviction adjudication withheld.

7        Q.   Is the Division aware that some Supervisors of

8    Elections sent notices out without doing additional

9    research and just rely entirely on the Division's credible

10   and reliable determination?

11       A.   I think that's a comfort level of each supervisor

12   if they wish to take that additional step to review.

13       Q.   Do you think that all of the counties have

14   sufficient resources to make an independent determination

15   of whether documentation is credible and reliable?

16       A.   I can't speak to that.

17       Q.   But, in fact, your office noted some of the

18   additional resources that it would take to make some of

19   these -- to make determinations that are credible and

20   reliable; is that correct?

21       A.   That is why we do what we do to the level that we

22   do, to ensure that what we are sending down is what we

23   believe to be credible and reliable.

24       Q.   But you are aware that some supervisors rely on

25   that entirely without doing independent research?

MARIA MATTHEWS

1

2     A.    Supervisors of Elections are constitutionally

3  elected officers.  They can take whatever additional action

4  they believe.  They still have to follow the law, and they

5  still have to provide notice if they are going to -- if

6  they feel that that information is credible and reliable.

7  If they don't and they make a determination that the person

8  is still eligible, they have to record it in our system and

9  that's it.

10     Q.    Okay.  Going back for a moment to the June

11  memorandum, your internal office memorandum, and looking to

12  the plans that you had, the plans in this memo regarding a

13  nonmurder, nonsexual offense, what you have as phase 3 of

14  this new process.  On top of page 3, the memo says, "At

15  this juncture, we are unable to determine completion of

16  sentence as to court fees on these matches"; is that right?

17     A.    Correct, at that time.

18     Q.    And this is still the operative memo in your -- in

19  the Bureau of Voter Registration Services, right?

20     A.    At this time we are not making determinations

21  about whether someone has completed the financial

22  obligation part of their sentence, that's correct.

23     Q.    So it's still the policy that you are unable to

24  determine completion of sentence as to court fees, right?

25     A.    Yeah, we are not making that determination.

MARIA MATTHEWS

1

2    Q.    Okay.  Going to -- did there come a time in

3    June when you stopped sending felon files for those who

4    were on supervision?

5    A.    Yes.

6    Q.    And when was that?

7    A.    I think it was two weeks after or, like, maybe

8    three weeks after.

9    Q.    And why did you decide to stop sending records for

10   individuals on supervision to the Supervisors of Elections?

11   A.    Based on feedback that we had gotten from the

12   Supervisors of Elections regarding their certain matches

13   that they had gotten on -- primarily on interstate

14   felonies.  We circled back around with the Department of

15   Corrections, and we determined that some of the information

16   that they were sending was not so clear-cut in terms of

17   making the match, so that we didn't feel comfortable -- not

18   that the information wasn't accurate, but it wasn't in a

19   way -- we just wanted more time to be able to look more --

20   further into it.  So we decided that we would pull back on

21   those supervision ones.

22   Q.    Have you restarted sending supervision files?

23   A.    No.  It's part of our revision, and we are

24   continuing our work with the Department of Corrections to

25   develop file specifications to be sure that we are --

1                    MARIA MATTHEWS

2    again, since it's their duty to identify for us those

3    individuals who are convicted felons adjudicated who are in

4    prison, in this particular instance, in prison or under

5    supervision.

6            MS. EBENSTEIN:  Can we go off the record for just

7        one moment?

8                (Resumed at 2:26 p.m.)

9                (Resumed at 2:31 p.m.)

10   BY MS. EBENSTEIN:

11       Q.   Just to recap, in late June, your office stopped

12   sending records for people on supervision; is that right?

13       A.   Yes.

14       Q.   And were the clerks alerted to that change in the

15   nature of the files that you were sending?  I'm sorry, not

16   the clerk.  Were the supervisors told that you were no

17   longer going to send records for people who were under

18   supervision?

19       A.   I can't recall if we sent an email or not.

20       Q.   Were the matches for people that were under

21   supervision already sent to the supervisors recalled?

22       A.   No.  If a Supervisor of Elections contacted us

23   about any of those, then we would work them one by one to

24   see whether there truly was a discrepancy or they were

25   reading something incorrectly.  So, no, there was no mass

1                           MARIA MATTHEWS

2    recall of any of those files.

3         Q.   Okay.  And the supervisors were never informed

4    that there were any issue with the matches of people who

5    were under supervision?

6         A.   Any supervisor who had an issue with the file for

7    supervision or in prison and reached out to us, then we

8    would have worked with them.  And if a file was one that

9    they didn't feel was credible and reliable, they could have

10   made that call right then and there and determined that the

11   match was -- that they would keep the individual on the

12   rolls.

13        Q.   Okay.  I am going to give you a document that we

14   are marking Exhibit 16.

15                  (Document marked as Exhibit 16

16                        for identification)

17   BY MS. EBENSTEIN:

18        Q.   This is your email to all of the Supervisors of

19   Elections -- I'm sorry, yes, it's an email contained within

20   an email, but this contains your email to all the

21   Supervisors of Elections on July 2nd, correct?

22        A.   Yes.

23        Q.   And it says -- can you give me a summary of the

24   nature of this email?

25        A.   This email is from me to all the Supervisors of

1                          MARIA MATTHEWS

2    Elections and their staff regarding the signing of Senate

3    Bill 7066 into law on June 28th and it taking effect on

4    July 1st.  We advised that the online voter registration

5    system and the statewide voter registration form would now

6    reflect the three new statements regarding eligibility on

7    felony status.

8         Q.   And you say in this email "We plan to provide a

9    memo outlining all the key provision of election" -- "As in

10   the past, we plan to provide a memo outlining all the key

11   provisions of election-related laws and providing

12   clarification as needed."

13        Did you -- have you provided a memo outlining the

14   key provisions of SB 7066 and providing clarification to

15   the SOEs since writing this email?

16        A.   We have not provided a memo outlining all the key

17   provisions, but we have provided clarification as needed

18   and requested of the Supervisors of Elections.

19        Q.   So does that mean that you have provided a

20   response to individual inquiries but not provided a memo to

21   all the supervisors?

22        A.   To the extent that emails exist that were sent to

23   all Supervisors of Elections that would refer to any

24   clarifying point, if they exist out there, they do.

25   Otherwise, yes, it would be just as to a supervisor asking

1                         MARIA MATTHEWS

2    for a clarification.

3         Q.   I'm sorry, I'm not sure I understand.  Were you

4    giving advice in response to individual inquiries, or did

5    you send out clarification to the group of supervisors

6    since July 2nd?

7         A.   We did not send a memo outlining all the key

8    provisions of the election-related laws.  We provided

9    clarification as needed and requested by the Supervisors of

10   Elections.

11        Q.   Okay.  I'm going to hand you a document marked

12   Exhibit 17.

13                  (Document marked as Exhibit 17

14                       for identification)

15   BY MS. EBENSTEIN:

16        Q.   Do you recognize this document?

17        A.   Yes.

18        Q.   What is it?

19        A.   This is another draft of the procedures to follow

20   for felon matching.

21        Q.   And it says in red on that first page "We are no

22   longer working in phases.  All matches will need to be

23   worked as explained below."

24             What led to the Division's decision to no longer

25   work in the three phases that are currently in place?

MARIA MATTHEWS

1

2        A.    What that meant was that we were going to take

3    each match and go through the analysis that we would

4    normally do or that we would -- should be doing, and that

5    is, first, is the person in prison or under supervision.

6    If not, then is it a felony sexual offense or murder.  And

7    if not, then the analysis would be on the financial

8    obligation, although recognizing that we would only be able

9    to go so far with that one.  Our initial focus was simply

10   on those individuals who were in prison or under DOC

11   supervision.

12       Q.    Okay.  On page 2 of this memo, just under

13   section 2 it says, "A judgment is required for all matched

14   case files.  No exceptions."

15            Does that mean that if or when this new policy in

16   this memorandum eventually goes into place that you will

17   restart collecting and sending a judgment for all matched

18   cases?

19       A.    For which it is available, yes.

20       Q.    Okay.

21       A.    That was our -- at this August 7, 2019, version.

22       Q.    And it says "No exceptions."  So I assume that any

23   finalized match file would require a judgment; is that

24   right?

25       A.    Any credible and reliable based on this version

MARIA MATTHEWS

1

2    right here, I don't know what any later version says, we

3    would -- if a judgment is available, would be required to

4    be included in the match case file.

5        Q.   But currently you don't include a judgment in the

6    case file, right?

7        A.   At this point we are still only doing persons in

8    prison.

9        Q.   And you currently don't include a judgment in that

10   case file, right?

11       A.   That's correct.

12       Q.   Okay.  I would like to look first at identifying

13   matches.  I think you said this before, that an identity

14   match requires three demographic data points for the

15   Division to consider it a hit; is that correct?  Or a

16   different word, but I use it to say for the Division to

17   consider it a match, it has to have three matching data

18   paints; is that right?

19       A.   Three demographic matching points, correct.

20       Q.   In your time with the Department, have three data

21   points, three matching data points, been sufficiently

22   reliable to determine whether a registered voter and a

23   convicted felon are the same person?

24       A.   At least during my tenure that's been the case.

25       Q.   Are you aware of a program called Crosscheck?

1                    MARIA MATTHEWS

2    Wrote out of the Kansas Secretary of State's Office?

3         A.    I am familiar with that, yes.

4         Q.    Did Florida participate in Crosscheck?

5         A.    One year.

6         Q.    And when did Florida stop participating in

7    Crosscheck?

8         A.    I think the year that we participated was either

9    2012 or 2013.

10        Q.    Why did Florida withdraw from Crosscheck?

11        A.    We did not feel that the information was credible

12   and reliable to be able to be matched because you can't use

13   personal identifying information -- you couldn't share

14   personal identifying information or get it necessarily from

15   the other states.  We had reservations about sharing

16   information for which we had not -- we felt we wanted to

17   get the legislature approval to participate in those

18   things.

19        Q.    Understood.

20              Do you know how many demographic data points

21   Crosscheck required for a match?

22        A.    No.

23        Q.    Turn now to page 2 to 3 of this document.  The

24   draft memo explains that your staff will be using the

25   financial summary information on CCIS to determine if the

1                          MARIA MATTHEWS

2    terms of sentence, including restitution, court fees, and

3    fines, have been completed for a felony nonmurder/nonsexual

4    offense conviction.  And you give some examples here on

5    page 3.  An example of paid.  Explain to me what that

6    means.

7         A.    This example of paid is a screenshot from CCIS

8    which shows two rows.  One is assessment showing a total of

9    $800, and then the next column showing something that says

10   paid $808, and then the final column showing balance due

11   zero.

12        Q.    Okay.  So even if the balance due is zero on the

13   CCIS summary, it says here these files need to be sent to

14   FCOR because restitution is not tracked by CCIS; is that

15   right?

16        A.    At this point we believe that -- we are not

17   confident that the information that no restitution may have

18   been ordered.  Now, of course, we can -- if we have

19   available documentation that shows it, then that might be

20   something different.  But, yes, if restitution -- if it

21   cannot be determined whether restitution was -- if ordered

22   was paid, then one of the proposals was to forward this to

23   the Florida Commission on Offender Review to conduct

24   further research.

25        Q.    So even if there is a CCIS balance of zero, you

1                        MARIA MATTHEWS

2    still can't rely on the fact that all financial obligations

3    are paid because they may have outstanding restitution; is

4    that correct?

5         A.    We are still in a learning process of what this

6    screen means, so this is our preliminary analysis of it.

7    But through continuing input with the clerks of court, we

8    are hoping to see what does this information mean in the

9    financial summary screen and how much it can be relied on

10   in terms of being information that is current for purposes

11   of determining whether financial obligations have been met.

12        Q.    Even if there is an outstanding balance of zero

13   with CCIS, how would you determine whether somebody still

14   owes financial obligations that have been converted to a

15   civil lien?

16        A.    That will be something we will learn in the

17   process.

18        Q.    Do you know at this point sitting here?

19        A.    No.

20        Q.    And even if the balance is zero for CCIS, do you

21   know whether that shows that there is also a zero balance

22   for debts that were sold from counties to collection

23   agencies?

24        A.    At this time I can't say that, no.

25        Q.    And even if the CCIS balance shows zero, that no

1                          MARIA MATTHEWS

2    money is owed, does that -- do you know if that reflects

3    older cases that -- if that reflects older cases?

4        A.   Again, depending on what records are available in

5    CCIS.  Ultimately the law -- if we are not able to make a

6    determination that's credible and reliable that we are

7    comfortable with, we are not going to proceed regardless of

8    what we see on here.

9        Q.   And if an individual voter is unable to make a

10   determination of their civil liens, debts to collection

11   agencies, older cases, or restitution, would you suggest

12   that they still register to vote?

13       A.   Again, I'm not going to make the call for these

14   individuals.  This is something that they have to -- they

15   are swearing under oath that they are eligible, and that's

16   only -- only they can make that.

17       Q.   And if there was a voter who was -- who had a

18   balance of zero but they were unsure whether they still had

19   obligation and civil liens, collection agency debts, older

20   cases, or restitutions, but they were on the rolls already,

21   would you suggest that they cast a vote or they abstain

22   from voting?

23       A.   Again, that is the individual.  They are the ones

24   on the hook for determining whether they are eligible or

25   not.  Only they are going to know.  If they have any doubt

1                        MARIA MATTHEWS

2   about it, they need to go to the clerk of the court and

3   look at the term of their sentence.  I would presume they

4   know what their terms are and whether they have satisfied

5   them.

6        Q.   But the clerk of court wouldn't be able to tell

7   that individual voter.  They would not be able to tell them

8   they have a balance of zero with the clerk of courts

9   record?

10       A.   I'm sorry, say that again.

11       Q.   The clerks of court do not tell that individual

12  voter whether they had outstanding financial obligations.

13  The clerk of court can simply confirm that the balance is

14  zero, right?

15       A.   I don't know what the clerk of court could tell

16  them.  A person who is registered to vote is eligible to

17  vote until such time as they are determined to be

18  ineligible and removed from the rolls.

19       Q.   You said you don't know what the clerk could tell

20  an individual voter, but you know that the clerk of court

21  records here cannot tell your office to a level that you

22  find credible and reliable that restitution is not owed or

23  that civil liens are not outstanding or that collection

24  agency debts have been paid or that obligations from older

25  cases have been satisfied; is that right?

1                          MARIA MATTHEWS

2       A.   We are still in conversations with the clerks of

3  the court to understand what this financial summary is and

4  what available documentation and data they have regarding

5  financial obligations.

6       Q.   Okay.  But sitting here today, you can't rely on

7  that data on the clerk of court information for those four

8  categories of debt; is that right?

9       A.   I could not proceed at this point, no.

10      Q.   The category here going below two steps where it

11 says "Example of outstanding fees," this appears to pertain

12 to the files for which a debt is still showing up in the

13 CCIS database.  Do I have that right?

14      A.   This appears to show that there was an assessment

15 and that there is still that same assessment outstanding.

16      Q.   So these files would be valid and sent to the

17 Supervisors of Elections for processing, right?

18      A.   That is what this particular statement says.

19 However, upon further research, we will need to know

20 whether that total, which in this particular example shows

21 $969, whether that was -- that represents the financial

22 obligation that was part of the original sentence.

23      Q.   Okay.

24      A.   We are still learning a lot about what does this

25 information mean, whether it's -- and how it relates to the

1                        MARIA MATTHEWS

2    terms of the sentence.

3        Q.    So here in this example, the CCIS data does not

4    indicate which financial obligations were ordered at

5    sentencing versus accrued later on, is that what you are

6    saying?

7        A.    That is correct.  This does not break out what the

8    original -- although we can look -- I presume we would be

9    able to look to the sentencing document to see what was

10   ordered.  But to determine whether this represents what was

11   ordered in the sentence and/or more than that after, the

12   interests that could have been accrued after, which is

13   referenced in the law.

14       Q.    Okay.  And the CCIS database does not -- does

15   aggregate misdemeanor financial obligations from felony

16   financial obligations; is that right?

17       A.    I don't know at this time.

18       Q.    Do you know whether the CCIS database

19   distinguishes between financial obligations that are

20   written into a conviction document versus a sentence

21   document?

22       A.    I do not know.

23       Q.    Do you know whether there is a difference between

24   a conviction document or a sentence document?

25       A.    If the convictions document has the terms of the

1                           MARIA MATTHEWS

2    sentence, then we would consider that to be a sentence

3    document.

4        Q.   Do you know if all 67 counties use the same format

5    for sentencing documents?

6        A.   No, I know for a fact that they do not at this

7    time.  At least from the examples of the case files that we

8    have gotten.

9        Q.   So you have looked through case files from

10   different judicial circuits really, and they use a

11   different format for what they include in the judicial

12   documents and sentencing documents; is that right?

13       A.   Again, we are working with the clerks of the

14   courts to determine the format of how these judgments or

15   sentence documents are entered.  Even if they have uniform

16   methods right now, it may not -- for older cases it may not

17   necessarily be.  So we are still researching.

18       Q.   For an individual voter, let's say someone who had

19   a local election coming up in early November, what would

20   you suggest that they consider part of the four corners of

21   the sentencing document?

22       A.   I'm sorry, say that again.

23       Q.   Sure.  I believe you just said that your office is

24   not sure and still researching which documents are

25   considered the four corners of the documents for purposes

1                         MARIA MATTHEWS

2      of financial obligations; is that right?

3           A.    Whatever document contains the terms of the

4      sentence are going to be the sentence documents.

5           Q.    So it's not the four corners of the sentencing

6      document, it's anywhere that the terms of the sentence are

7      contained?

8           A.    There is not necessarily a single document.  A

9      sentence document would be any document that has the terms

10     of the sentence.  That's the way we would look at it.

11          Q.    Okay.  And what would the Division suggest a voter

12     do?  You have a voter help line; is that right?

13          A.    Yes.

14          Q.    What would the Division suggest a voter do to

15     determine which financial obligations are included in a

16     sentencing document?

17          A.    They would need to contact the clerk of the court.

18          Q.    Okay.  So your office couldn't tell them one way

19     or another what they should look at?

20          A.    No.

21          Q.    If you look at the bottom of page 3, "Cases Not

22     being worked at this time," does the CCIS database provide

23     any information on financial obligations for federal

24     crimes?

25          A.    No.

1                    MARIA MATTHEWS

2        Q.    Determining outstanding financial obligations for

3    federal crimes for your office is a manual process, right?

4        A.    Correct, we would consult PACER for the federal

5    felonies.

6        Q.    And you would have to affirmatively go to the

7    correct database to try to identify financial obligations

8    for federal felonies, right?

9        A.    For federal felonies we will consult the PACER

10   database, and if it's not available on there, then we would

11   reach out to the clerk of the court for the jurisdictions

12   in which the conviction was made.

13       Q.    But at this point you are not making those

14   determinations?

15       A.    That's correct.

16       Q.    Why not?

17       A.    Because I am not comfortable with the information

18   that we have in terms of being able to establish a process.

19   We are letting -- we are still gathering information so

20   that we can establish a process.  Part of it is we are

21   waiting to see what the workgroup figures out on

22   consolidation of data.  At this juncture we are not

23   proceeding.

24       Q.    When does the workgroup finish its work?

25       A.    The workgroup has a report that is due to the

1                        MARIA MATTHEWS

2    legislature by November 1st of this year.

3        Q.   Okay.  And so I presume you don't expect

4    additional information from the working group until

5    November 1st at the earliest; is that correct?

6        A.   That's correct.

7        Q.   Okay.  What would somebody do to determine their

8    outstanding financial obligations if they had a felony

9    conviction before the workgroup issues its report?

10       A.   Again, we would direct them to the clerk of the

11   court in which their conviction was made.

12       Q.   I believe you just said the clerks of the courts

13   don't have information on financial obligations for

14   felonies?

15       A.   They would go to the clerk of the court to the

16   jurisdiction in which they had the felony offense.

17       Q.   Okay.

18       A.   If they were convicted in a federal district court

19   in Pennsylvania, they would have to go there.  Not

20   literally go there, but contact them.  If it's an out of

21   state, they would have to go to that state court clerk and

22   the jurisdiction in which they were convicted.

23       Q.   Okay.  And do you know whether federal courts

24   collect information on payment of, for example,

25   restitution?

1                         MARIA MATTHEWS

2          A.    No, I do not.

3          Q.    Do you know if federal courts collect information

4     on payments of fines?

5          A.    I do not.

6          Q.    Do you know if federal courts distinguish between

7     financial obligations initially made part of the sentence

8     and those accrued at a later time?

9          A.    I do not.  Until we end up handling these cases, I

10    won't know until then.

11         Q.    Do you know if federal courts distinguish between

12    those financial obligations included in a sentencing

13    document and those elsewhere in a criminal record?

14         A.    No.

15         Q.    Okay.  For out-of-state matches, similarly, this

16    document says "We will be we reworking the interstate cases

17    once the workgroup has had a chance to meet."

18                Do you know if CCIS provides information on

19    financial information for out-of-state cases?

20         A.    I believe they do not.

21         Q.    So is it correct that the Division cannot here

22    today identify credible and reliable information on whether

23    a prospective voter is ineligible if that voter has an

24    out-of-state conviction?

25         A.    I'm sorry, repeat your question.

1          MARIA MATTHEWS

2     Q.   Is it correct that the Division is unable to

3  identify credible and reliable information to determine

4  whether a prospective voter has outstanding financial

5  obligations for an out-of-state conviction?

6     A.   We have not researched a case in which we have had

7  to make that determination for whether it was a

8  nonmurder/nonfelony sexual offense as to their financial

9  obligations.

10    Q.   You haven't had to research a case with an

11  out-of-state conviction?

12    A.   We've researched out-of-state conviction cases,

13  although we are not doing any at this point.  We have not

14  done any for sure that are with a financial obligation

15  angle to it.  So if the felony is a not a murder or not a

16  felony sexual offense, we have not done a case research on

17  whether the financial obligation has been satisfied.

18    Q.   How would you suggest a voter with an out-of-state

19  conviction determine their outstanding financial

20  obligations for an out-of-state conviction?

21    A.   Same manner as any other felon, to go ahead and

22  contact the clerk of court in the jurisdiction in which

23  they were convicted.

24    Q.   What would you suggest they do if that clerk of

25  court does not keep information of outstanding financial

1                          MARIA MATTHEWS

2     obligations?

3          A.    I don't know.  That seems like they would need

4     maybe -- I don't know.

5          Q.    Would you recommend that they register to vote?

6          A.    Again, I am not going to advise anyone to register

7     that they are -- because they have to affirm whether they

8     are eligible or not.  If they are comfortable affirming

9     that and they believe that, then that's their decision to

10    make.

11         Q.    If somebody does have outstanding financial

12    obligation for an out-of-state conviction, and they are on

13    the registration rolls, would you suggest that they cancel

14    their registration?

15         A.    No.

16         Q.    Would you suggest that they cast a ballot?

17         A.    No.  Well, my point is, and I made it before, is

18    that if you are a registered voter, you are deemed eligible

19    until you are determined to be ineligible and you are

20    removed from the rolls.

21         Q.    So just to make sure that I understand how that

22    would apply to individuals voters, if an individual voter

23    knows that they have outstanding financial obligations out

24    of state, and they are on the Florida voter registration

25    rolls, should they cast a ballot, assuming that your office

1                     MARIA MATTHEWS

2    has not taken them off the rolls?

3        A.   Ultimately it's the responsibility of the voter to

4    know whether they are eligible or not, and it's their

5    decision whether they are going to vote or not.

6        Q.   If they know that they have outstanding financial

7    obligations, should they cast their ballot?

8             MR. JAZIL:  Counselor, she has answered the

9        question.  She said it's the individual voter's

10       decision.  You have asked the question a series of

11       times at this point.

12            MS. EBENSTEIN:  Okay.  I understand she answered

13       if they know they were eligible or not.

14   BY MS. EBENSTEIN:

15       Q.   I'm saying if they have outstanding financial

16   obligations, should they cast their ballot?

17            MR. JAZIL:  You have asked that same question as

18       well.

19   BY MS. EBENSTEIN:

20       Q.   You can go ahead and answer.

21       A.   Every voter is responsible for their own

22   determination of whether they are eligible or not.  They

23   are going to know.  They are the ones that are having to

24   swear under oath.  If they believe that they are eligible,

25   they have the right to vote.

1                          MARIA MATTHEWS

2        Q.   Okay.  Based on the individual voter's personal

3    belief?

4        A.   We all have to affirm whether we are -- when you

5    fill out an application, that you affirm that you are --

6    that you are eligible.

7        Q.   And for out-of-state and federal felony

8    convictions, do Supervisors of Elections have any more

9    access to those records than the Division of Elections?

10       A.   Again, Supervisors of Elections, just like the

11   Department of State, may act on receipt or access to

12   information that they may have that someone is ineligible,

13   so they can act on it if they want.  I don't know if

14   Supervisors of Elections have received directly

15   out-of-state or fed felon conviction records upon which

16   they can act or not.

17            MS. EBENSTEIN:  It's 3:00 now.  We are just going

18        to take another ten minutes if you don't mind.

19            (Recessed at 3:03 p.m.)

20            (Resumed at 3:20 p.m.)

21   BY MS. EBENSTEIN:

22       Q.   Going back on the record, Director Matthews, I'm

23   going to hand you a document that we will mark Exhibit 18.

24            (Document marked as Exhibit 18

25                 for identification)

1                    MARIA MATTHEWS

2    BY MS. EBENSTEIN:

3         Q.    Are you familiar with that document?

4         A.    Yes.

5         Q.    And what is it?

6         A.    This is the Voter Assistance Hotline manual that

7    is used by our staff to answer questions that are received

8    through the Voter Assistance Hotline.

9         Q.    If you could explain for me briefly what is the

10   Voter Assistance Hotline?

11        A.    The Voter Assistance Hotline is the statewide

12   hotline to assist voters with questions.  And this manual

13   represents some of the more frequently asked questions and

14   provides a guide for our staff to be able to answer.

15        Q.    Who among your staff answers the questions that

16   come in from the Voter Assistance Hotline?

17        A.    Primarily the staff that staff the hotline are

18   those that work in the Bureau of Voter Registration

19   Services.

20        Q.    Okay.  And do they trade off on who is staffing

21   the hotline, or is there one primary person for it?

22        A.    Everybody except I believe the OPS are the ones

23   that answer -- can receive a voter assistance call.

24        Q.    Is there documentation of the incoming calls and

25   inquiries?

MARIA MATTHEWS

1

2      A.    They do record the calls that come in for staff

3    purposes.  They have categories of -- broad categories of

4    being able to say, you know, a call came in and it was

5    related to voter registration or it was related to voting

6    or it was related to the initiative petition process or

7    something like that.  They have a menu.

8      Q.    So those records are kept electronically?

9      A.    Those are -- we have records.  I don't know how

10    they are kept, but we do have records, yes.

11      Q.    Okay.  And what's the date on the front of this

12    manual?

13      A.    This is May 1, 2019.

14      Q.    If you could go to page 25 in the manual.  On that

15    page at the top of the page it says, "I would like to

16    register to vote but I'm a convicted felon.  Who do I

17    call?"

18           Your office sets forth here that if someone is

19    convicted of a felony other than murder or felony sexual

20    offense, it explains that their right to vote is restored

21    upon completing all terms of the sentence, and it suggests

22    that they contact the clerk of court in the county where

23    they were convicted to find the documents that contain the

24    terms of their sentence or contact the FDOC or the local

25    probation or parole office for additional information about

1                      MARIA MATTHEWS

2       the terms of the sentence; is that right?

3           A.   Yes.

4           Q.   And I believe we just went through some of the

5       limitations of the clerks of court.  If somebody could not

6       access all of the information from the clerk of court, what

7       would they do?

8           A.   Again, as stated here, the clerk of court, the

9       Florida Department of Corrections, or the local probation

10      or parole officer in the jurisdiction in which they were

11      convicted.

12          Q.   So if, for example, their original case file was

13      destroyed, lost, unavailable, not applicable, or some of

14      the other difficulties that your staff has run into with

15      the county clerks of court, what would you suggest they do?

16          A.   I really don't know at that point.

17          Q.   Is there any standardized response from those who

18      receive phone calls on the Voter Assistance Hotline on what

19      they should tell somebody to do?

20          A.   No, I wouldn't have them going into that at all.

21      That would be here is your guidance, and you should be able

22      to have that information -- be able to access that

23      information from the clerk of the court or the Department

24      of Corrections or their local probation or parole officer.

25      I don't know where else to refer them.

MARIA MATTHEWS

1

2      Q.   Okay.  On page 27 of the manual, there is a note

3   to the staff that says, "If the caller wishes to report a

4   convicted felon without rights restored who is registered

5   and/or voting, refer to information to question; Who do I

6   call to file a voter fraud/elections fraud complaint?'"  Is

7   that right?

8      A.   Yes.

9      Q.   So if somebody calls up and says that an

10  individual with outstanding financial obligations is

11  voting, based on this manual, the employees who are

12  staffing the hotline should point the caller to information

13  on how to file a voter fraud complaint?

14     A.   If a staff member got a call and says, look, I

15  know somebody who is a convicted felon and they shouldn't

16  be voting or they shouldn't be registered, we would direct

17  them to you are welcome to file a voter fraud or elections

18  fraud complaint.  Because then that gets them to be

19  specific about it and what information they have, and we

20  will research it.

21     Q.   So even though your office is not sending felon

22  match files to Supervisors of Elections, a caller could

23  potentially file a voter fraud complaint if they knew

24  somebody with outstanding financial obligation was

25  registered and intended to vote; is that right?

1                          MARIA MATTHEWS

2        A.    That is the law right now, that anybody who wishes

3   to file an election fraud complaint or voter fraud

4   complaint can do so if they believe that somebody is not

5   eligible to be registered.  That election fraud complaint,

6   though, will be investigated and looked into.

7        Q.    Who does that investigation?

8        A.    The preliminary office that looks into it would be

9   the Department of State and it's filed with us.  And then

10  if there -- the Bureau of Voter Registration Services would

11  provide whatever assistance to the legal counsel to find

12  out what information we can find out.  So that would mean

13  looking up the voter registration record, looking up -- we

14  would contact Florida Department of State -- Department of

15  Corrections or the Florida Department of Law Enforcement,

16  ask them, hey, do you have any information that may suggest

17  that this registered voter is a felon, assuming we haven't

18  had a prior match on that person.

19       Q.    And is there a requirement that you respond to

20  fraud complaints?

21       A.    Yes.  This is set out I think it's in 97.12, the

22  duties of election fraud complaint investigating.

23       Q.    Is there a time frame that you have to respond to

24  an election fraud complaint?

25       A.    This fraud -- an election fraud complaint is

1                              MARIA MATTHEWS

2      incorporated by reference into an election fraud rule,

3      which is 1S-2.025.  I don't remember if we have put

4      specific time frames in there as to when we are supposed to

5      process it.

6          Q.   Okay.  So just to make sure that I understand,

7      even though your office is not affirmatively sending felon

8      matches for people who have outstanding financial

9      obligations, it would be required to investigate -- it

10     would refer a caller who said that there was an ineligible

11     registered voter voting, it would refer that voter --

12     excuse me, that caller to make a fraud complaint, and it

13     would have to investigate that fraud complaint; is that

14     right?

15         A.   All I know is that if -- most times someone is

16     probably not going to be on the call saying this person

17     hasn't paid their -- you know, I don't know.

18              The bottom line is if a person says I know that

19     there is somebody who is a convicted felon, I believe that

20     they are not -- they shouldn't be on the rolls or they

21     shouldn't have voted, that individual is directed to how

22     they can file an elections fraud if they wish to do so.  We

23     don't tell them that they have to, just simply that is the

24     way you would submit your complaint.

25         Q.   If somebody filed one, your office would

1                          MARIA MATTHEWS

2    investigate it?

3         A.    Correct.

4         Q.    What's the outcome of an investigation?  Does it

5    either get closed or acted upon or is there another option?

6         A.    No, it gets acted on.  If it's -- acted on meaning

7    we will look into it, and if we find that the individual --

8    if there was a prior match and for whatever reason it

9    couldn't be, you know, there was insufficient documentation

10   at that time, we will revisit it and see if now we have

11   credible and reliable information.  That's one course.

12         And then, of course, if we determine it to be

13   credible and reliable, we send it to the Supervisors of

14   Elections, and then that process begins, the due process

15   for notice to the voter.

16         Q.    Okay.

17         A.    Meanwhile, if it's because the person has -- we

18   determined that the -- the investigation that the person

19   voted and shouldn't have, it will depend on what

20   information we may forward to the prosecuting attorney.

21         Q.    And you would complete that investigation not only

22   for people who are incarcerated or on supervision, but for

23   any criteria of ineligibility that you found credible and

24   reliable, right?

25         A.    Right.  Now, recognizing that there was something,

1                       MARIA MATTHEWS

2    I don't remember now if it was in the law or not, about the

3    time frame between Constitutional Amendment 4 taking effect

4    and the state law taking effect that individuals would not

5    be prosecuted for registering if they thought that they

6    were eligible and then turned out not to be.

7         Q.   That's for criminal prosecution, right?

8         A.   Yes.

9         Q.   Okay.  But if somebody registered -- I believe

10   that safe harbor period was from January 8, 2019, until

11   July 1, 2019.  If somebody with outstanding financial

12   obligation registered after July 1st, your office -- and

13   your office was informed that they were a registered voter

14   who intended to vote, you would investigate and process

15   that file, let's call it, right?

16        A.   If we received information and we hadn't received

17   it through our normal sources of identifying.

18        Q.   You are not processing those, right?  You are not

19   processing the financial obligation?

20        A.   Not right now, no.

21        Q.   So if you received it through an individual

22   caller's complaint, you would process that complaint?

23        A.   I would still research it.  And if we are not

24   forwarding files based on that right now, then perhaps, no,

25   we probably wouldn't proceed further with that.  I haven't

1                         MARIA MATTHEWS

2    gotten a situation like that.

3         Q.   I'm going to give you a series of documents.  I

4    will mark this document as Exhibit 19.

5                    (Document marked as Exhibit 19

6                         for identification)

7    BY MS. EBENSTEIN:

8         Q.   I will give you a moment to review.

9         A.   (Witness reviewing document.)

10        Q.   I will give you another document now.  These are a

11   series of emails that were related, but they were produced

12   as separate documents.  It might be easier for you to look

13   at them as a group.  That's marked Exhibit 20.

14                   (Document marked as Exhibit 20

15                        for identification)

16   BY MS. EBENSTEIN:

17        Q.   For Exhibit 19, at the top of the page is an email

18   from August 9, 2019, at 8:18 a.m.  Can you just summarize

19   for me what this email is about?

20        A.   I'm sorry, can you say which one again?

21        Q.   Sure.  I believe it is Exhibit 19, the Bates stamp

22   number at the bottom right is DOSG-0007581.

23        A.   No, this is not.

24        Q.   Have I given you the --

25             MR. JAZIL:  I have 000055.

1                    MARIA MATTHEWS

2         MS. EBENSTEIN:  Let me give you one additional

3     document.

4   BY MS. EBENSTEIN:

5       Q.   We can start with what you have.  Let me just

6   check the Bates number so I don't cause additional

7   confusion.  Exhibit 19 is DOSG-0000055.  What is this

8   document?

9       A.   This document is an email from me to Deputy

10  Secretary Christie Fitz-Patrick regarding statistical

11  information on felon matching and registration in response

12  to an inquiry from the legislative staff.

13      Q.   Do you regularly receive inquiry from legislative

14  staff seeking voting-related statistics?

15      A.   Periodically we do.

16      Q.   Did you receive similar inquiries for

17  voting-related statistics between November 2018 and the

18  start of the legislative session?

19      A.   I can't recall.

20      Q.   Do you recall any other instance where you were

21  asked for statistics related to Amendment 4 implementation?

22      A.   No, I can't recall at this time.

23      Q.   And what do you set out here or relay to Christie

24  Fitz-Patrick in response to that inquiry?

25      A.   The Senate committee on criminal justice was

1                         MARIA MATTHEWS

2      asking about some statistical information regarding felon

3      matching and registration during the period of June 8 and

4      June 30th, so we compiled some statistical information on

5      the number of matches that were sent to counties based on

6      persons identified as being in prison or supervision.

7      Without the attachment right next to it -- and then the

8      second attachment -- actually, it should be three.

9            The BVRS, and that refers to the unit, matching

10     statistics so they have an idea of the amount of matches

11     that we do from those time frames comparable to the January

12     to July 30th date.  So we wanted to see -- compare how many

13     matches were made from January 2019 to June 30, 2019, and

14     how did that compare to 2017 and 2018 in that same time

15     frame.

16        Q.   Okay.  And if you could just explain for me what

17     is the 22 to 23 percent.  What does that represent?  If I'm

18     understanding it correctly, those are the percent of the

19     automated matches that your office receives from FDLE and

20     FDOC that are not in the end validated based on your own

21     research?

22        A.   Right.  As I mentioned earlier in the deposition,

23     on average we get 22 to 23 percent of the matches, the

24     automated matches that we look at, we end up determining to

25     be invalid.  Now, it could be for identity reasons,

1                    MARIA MATTHEWS

2    identity mismatch.  It could be because the felony is not

3    really a felony.  It could be that we don't even have

4    sufficient documentation to be able to make the credible

5    and reliable match.

6         Q.    Turning now to the next document I gave you,

7    Exhibit 20.  And if you wouldn't mind just confirming for

8    me on the bottom right the Bates number is DOSG-0004953?

9         A.    Correct.

10        Q.    If you look about two-thirds the way down the

11   page, that lists the matches that your office -- the 2019

12   valid and invalid matches; is that correct?

13        A.    Yes.

14        Q.    And the 2019 valid matches are about 3,264 with

15   the invalid matches 1,276; is that correct?

16        A.    Yes.

17        Q.    And that's about a 27 or 28 percent error rate.

18   Was that -- would you consider the DOC FDLE matches from

19   earlier this year to be a reliable metric?

20             Let me ask this first:  That's considerably higher

21   than in years past; is that right?

22        A.    I am just looking at the email here of 28 percent

23   versus 27 in 2018.  I can't remember what it was in 2017.

24   That's part of the reason why we are working with these

25   agencies, working with these agencies to improve the file

1                    MARIA MATTHEWS

2    specs of the information that we get.

3        Q.   And the file specs that you began receiving in

4    early June, I believe earlier you said that you relied on

5    DOC's representation that they were only sending you file

6    specs for people incarcerated or under supervision; is that

7    right?

8        A.   Yes.

9        Q.   So were the matches in this category just based on

10   misidentification or some other category?

11       A.   These do not only represent only DOC.  These would

12   have been matches that we would have also gotten from FDLE

13   which we would then compare with DOC data as well.

14       Q.   Do you have any indication of how successful your

15   office is at working matches to find these false positives

16   from the automatic data match?

17       A.   They have gotten -- over the years since we have

18   now been in the business of it since 2006, the matching has

19   gotten a lot better.  We are always also revisiting the

20   criteria and making sure that we are good with the credible

21   and reliable match.

22       Q.   It looks like it's gotten worse here, no, based on

23   the document number 4953 from 2017 until 2019.  The number

24   found to be invalid increased significantly.  Does that

25   mean that the specs with DOC have, in fact, brought more

1                        MARIA MATTHEWS

2    invalid matches?

3        A.   It just means that we are finding the match -- it

4    could be that the DOC or it could be that their court --

5    again, if the court records, we can't find records for

6    these matches -- I guess in the end it's just that those

7    are the matches that we have determined to be invalid.  The

8    percentage is what they are, and in the end that means we

9    aren't sending anything down to the counties for those

10   invalid matches.  That means 1,276 potential matches are

11   not sent down to the counties and the voter remains on the

12   rolls.

13       Q.   And do you track how many of the matches that you

14   sent to the county, separate and apart from whatever

15   research they do independently, how many of those they find

16   valid or invalid?

17       A.   No, we have not run that analysis.

18       Q.   Okay.  Do you have data sufficient to do that type

19   of analysis?

20       A.   Based on the number of matches that we send down

21   and the number they end up removing.  Essentially that's

22   what it will be.

23       Q.   Right.

24       A.   It would be those that are removed of the universe

25   that we send down.

1                    MARIA MATTHEWS

2      Q.    Right, so in the same way that you are able to

3    construct here the percentage of those matches that DOC,

4    FDLE sent to you that you validate and send on, would you

5    be able to determine how many of the universe of matches

6    that you send on to Supervisors of Elections they validate

7    and send on to the voter?

8      A.    The way it works is we send the file down to the

9    supervisors.  The supervisors could make a determination at

10   that juncture that they are not going to remove somebody.

11   So what we would have is a determination -- we would

12   compare what we have sent down and what the supervisor has

13   recorded.  It could be if a person -- even if they send

14   notice to a voter, and the voter comes back and says I have

15   additional information that shows I am eligible, that

16   doesn't mean that our match was incorrect to begin with.

17   It means that's the information that we had that we

18   believed at that point in time to be credible and reliable.

19     Q.    Right.  But in the example you just gave, the

20   information was, in fact, incorrect, right?

21     A.    Well, it's that we didn't have the information

22   that the voter now has, which is why there is that safety

23   net of that due process in law.

24     Q.    Right.  And had the voter not gone to the

25   supervisor within 30 days with documentation different from

1                          MARIA MATTHEWS

2    the documentation that your office and the supervisor's

3    office reviewed, that voter would have been removed from

4    the rolls, right?

5         A.    Correct.  And then if that voter realized that and

6    came back and goes, no, you have made a mistake, that voter

7    can be reinstated at any time.

8         Q.    Okay.  How often do voters -- how often are voters

9    able to produce documentation within 30 days in response to

10   a supervisor's request?

11        A.    I don't know because we are not involved in that

12   part of it.  That's between the Supervisors of Elections

13   and the voter.

14        Q.    So you don't track in any way how often voters

15   respond to a notice by submitting additional documentation

16   of their eligibility to a supervisor?

17        A.    No.

18        Q.    Okay.  What type of documentation would a voter

19   have to provide to a supervisor in response to a notice to

20   remain on the rolls?

21        A.    Whatever documentation they believe is necessary

22   to show that either it's not them or it's not a felony

23   conviction or that adjudication has been withheld or that

24   the felony conviction was downgraded to a misdemeanor.

25        Q.    But what kind of documentation would be sufficient

1                            MARIA MATTHEWS

2    for that?  They couldn't just show a drawing that their

3    child made, right?  An attempt at humor, but I understand.

4         A.    It sets out in law whatever they -- whatever they

5    want to bring forward to show that they are eligible is

6    what they are allowed to do.  So I don't know that there is

7    a universe that says you can only bring this or that.

8         Q.    And does that mean if there is not a concrete list

9    of documents that they could present, that Supervisors of

10   Elections would make that determination separately, as in

11   could supervisors -- different supervisors accept different

12   documentation to prove eligibility?

13        A.    Since the Supervisors of Elections are charged

14   with the responsibility, which based on my years of

15   experience with the Supervisors of Elections they take this

16   very seriously, they are not going to remove someone unless

17   they are -- they have looked at the case file, whatever

18   information that the voter has provided, and make that

19   determination about whether someone is eligible or not.

20        Q.    As far as uniformity, there is not a uniform type

21   of documentation that somebody needs to present to show to

22   a Supervisor of Elections that they are, in fact, eligible;

23   is that right?

24        A.    It may depend on what the reason is for why the

25   person believes that they are eligible or not.  Is it,

MARIA MATTHEWS

1

2     again, an identity mismatch?  No, this is not me or this is

3     not a felony conviction, or, yes, I did have a felony

4     conviction, but I have a document here what shows it was

5     adjudication withheld.  It's going to be a case-by-case

6     basis.

7          Q.   Okay.  What section of the Florida Constitution

8     did Amendment 4 amend?

9          A.   Article 6.

10         Q.   Do you know which section in Article 6?

11         A.   Section?  I'm sorry.  Section 4.

12         Q.   Okay.  I think we have one last document that we

13    will mark as Exhibit 21.

14                    (Document marked as Exhibit 21

15                         for identification)

16    BY MS. EBENSTEIN:

17         Q.   And what is this document?

18         A.   This document is the Florida Voter Registration

19    Application Form, DS-DE number 39, which is July 2019.

20         Q.   And your office is currently accepting these forms

21    for registration, right?

22         A.   We receive -- we may receive completed

23    applications, and we forward those to the Supervisors of

24    Elections.  We are the ones that prescribe the form.

25         Q.   Is your office accepting the old voter

MARIA MATTHEWS

1

2    registration forms if those come in completed?

3        A.    Through one of these emails that we previously

4    reviewed, we had told the Supervisors of Elections that the

5    old forms would be accepted as well.

6        Q.    Is that still currently the case?

7        A.    Yes.

8        Q.    If you look at question 2 on this form, what did

9    the prior form say in question 2?

10            Let me rephrase that.  How has the form changed in

11   this updated version with respect to question 2?

12       A.    The form currently has three checkboxes related to

13   felony whereas previously it had one checkbox relating to

14   felony eligibility status, and a statement that's spelled

15   out in law what the exact wording is.

16       Q.    And somebody here would have to check one of three

17   boxes, either that they were never convicted of a felony,

18   that their rights have been restored through clemency, or

19   that their rights have been restored pursuant to the

20   constitutional provision you just named upon all terms of

21   sentencing including parole and probation; is that right?

22       A.    A person can check one or more or all of the

23   boxes.

24       Q.    Wouldn't it --

25       A.    Whichever is applicable.

1                          MARIA MATTHEWS

2       Q.   Would it be valid if they checked both that they

3  have never been convicted of a felony and that they have

4  been convicted of a felony but had their rights restored?

5       A.   Yes.

6       Q.   So somebody could check --

7       A.   If they believe that they have never been

8  convicted of a felony, let's say that they -- at least for

9  one felony they were convicted but adjudication withheld,

10  they may think that statement one applies.  And then they

11  have another felony for which they were convicted of a

12  felony, but they have since had their rights restored by

13  clemency, or, again, they could have been convicted of

14  another felony after that and completed all the terms of

15  their sentence.  So all three could apply.

16       Q.   Okay.  So it would be considered a facially valid

17  form if somebody checked not one, but two or three of the

18  boxes?

19       A.   Correct.

20       Q.   Do you know if the online voter registration

21  allows people to check more than one box?

22       A.   My understanding is that there was supposed to be

23  a program change that would allow them to do that.

24       Q.   As it currently stands?

25       A.   I don't know that that change has been made yet.

1                    MARIA MATTHEWS

2    I know that we were -- they were directed to do so.

3        Q.    And do you think the average registrant looking at

4    this form can affirm that their rights have been restored

5    pursuant to Section 4 Article 6?  Would they know that

6    particular site to the Florida Constitution?

7        A.    I can't speak to the voter.  All I can see is that

8    the Florida legislature prescribed the exact statement that

9    is supposed to be included.

10       Q.    Looking at the last line within question 2, it

11   says, "upon the completion of all terms of my sentence,

12   including parole and probation."

13            That's language from SB 7066, correct, not the

14   constitutional amendment?

15       A.    In what way?

16       Q.    The added comma, which may change that from being

17   a restrictive clause to being a nonrestrictive clause.

18       A.    Again, that's the wording that is in the state

19   law.

20       Q.    Okay.  Just to confirm, it's in the state law, not

21   in the constitutional amendment?

22       A.    I don't have the constitutional amendment before

23   me.

24       Q.    If you could go back to Exhibit 1 -- sorry,

25   Exhibit 2.

MARIA MATTHEWS

1

2      A.    Anyway, this statement is as it's worded in the

3  state law.

4      Q.    Okay.  If somebody had a conviction from, for

5  example, if they were a Wisconsin resident and were

6  convicted of a crime and had their rights restored in

7  Wisconsin and moved to Florida, they couldn't affirm that

8  they had never been convicted of a felony, right?

9      A.    If they had been convicted of a felony, they would

10  not be able to affirm that.

11      Q.    And they couldn't affirm that their voting rights

12  have been restored by the Board of Executive Clemency,

13  right?

14      A.    My understanding is that at least in the past the

15  Florida Commission on Offender Review would grant sometimes

16  a Florida-only clemency.

17      Q.    For somebody who had their rights restored before

18  moving to Florida?

19      A.    I'm sorry.  I apologize.  Can you repeat again?

20      Q.    Sure.  For somebody who had their rights restored

21  before moving to Florida, they could not -- I think we

22  agree they cannot check that first box to say that they

23  have never been convicted of a felony since they had been

24  convicted of a felony.

25          Could they check that second box to say their

MARIA MATTHEWS

1
2     voting rights have been restored by the Board of Executive

3     Clemency, if, in fact, their voting rights had been

4     restored prior to moving to Florida not through the Board

5     of Executive Clemency?

6          A.   I guess.  It would depend on what the restoration

7     laws were in the state of conviction.

8          Q.   So you believe that this does not refer to the

9     Florida Board of Clemency, it just refers to a board of

10    clemency?

11         A.   I'm saying what an individual, if they are reading

12    this, they may think that's the case.

13         Q.   Okay.  If their rights were restored, in many

14    states, as I'm sure you have researched, individuals'

15    rights are restored when they are released from

16    incarceration automatically.  Presumably they couldn't

17    check the box saying their rights have been restored from a

18    Board of Executive Clemency if their rights have not been

19    restored by a Board of Executive Clemency, correct?

20         A.   Yes, if it hasn't been -- if it hasn't been

21    restored by a Board of Executive Clemency, then they would

22    not be able to affirm that.

23         Q.   As far as the third checkbox, somebody who had had

24    their rights restored before moving to Florida could not

25    affirm that their rights have been restored pursuant to the

1                          MARIA MATTHEWS

2    Florida Constitution; is that correct?

3         A.    I don't know.  I think that that's something that

4    I would have to -- I would probably consult my legal

5    counsel on that.

6         Q.    And what would a voter do if they didn't have

7    legal counsel looking at this registration form?

8         A.    Again, that's going to be their decision to make

9    about whether they feel they can affirm that statement and

10   submit this application under oath.

11        Q.    If they couldn't affirm any of those three

12   statements, what should they do?

13        A.    An individual who is unable to affirm the required

14   fields in this application are then not -- that application

15   would be deemed incomplete.

16        Q.    Okay.  And just to make sure that I'm clear, that

17   relates to their application, not their eligibility?

18        A.    Correct.

19        Q.    Okay.  Have you received feedback from any of the

20   Supervisors of Elections on this new form?

21        A.    We are currently in rulemaking, and they are

22   providing feedback through that process.

23        Q.    Have you received feedback from third-party voter

24   registration organizations about this form?

25        A.    We had a rulemaking workshop, and there were --

1                        MARIA MATTHEWS

2    there was public input.

3         Q.   Okay.  Those are written submissions usually or

4    testimony?

5         A.   They are a mix.

6         Q.   Okay.  Have you heard from individual voters on --

7    have you received feedback from individual voters on this

8    form?

9         A.   I don't know if we have off individual voters.

10   They would have been at the workshop, so they might have

11   been there as representatives within a group, or they might

12   have been there on their own.

13        Q.   Okay.  And have you received any phone calls or

14   inquiries through your hotline or otherwise from voters

15   unsure how to utilize the new form?

16        A.   I have not queried my staff on that.

17        Q.   Okay.

18             MS. EBENSTEIN:  If you will just give us one

19        moment, we may be finishing up.

20             (Discussion held off the record.)

21   BY MS. EBENSTEIN:

22        Q.   A couple more questions.

23             Are there standardized forms that the counties

24   send to voters to initiate removal, the notice that we have

25   been talking about, if somebody is matched as ineligible?

1                    MARIA MATTHEWS

2        A.    98.075(7) lays out what the notice to the voter

3   has to include, the actual notice.  And if the notice is

4   undeliverable, then it lays out what needs to be in the

5   published notice.  But there is no template that's been

6   formalized.

7        Q.    Have you received inquiries from Supervisors of

8   Elections on what they should include in a new template?

9        A.    Yes.

10       Q.    How do you respond to those inquiries?

11       A.    At this time we have not -- their inquiry, at

12  least the one that I can recall, is regarding the

13  instructions to the voter.  They developed a form, and they

14  were asking for our input.

15       Q.    Okay.  Has your office referred anyone for

16  prosecution for unlawfully registering of voting?

17       A.    Not that I'm aware of.

18       Q.    Okay.

19            MS. EBENSTEIN:  That is all the questions that I

20        have for you.  Your counsel may want to ask you -- I

21        guess we should go to the phones.

22            We are going to keep the deposition open, again,

23        because we did not receive documents that we requested

24        two and a half months ago either at all or until

25        during your deposition.  So we may want to use the

1                          MARIA MATTHEWS

2      remaining time or additional time to ask you more

3      questions once we have had a fair opportunity to go

4      through these documents.

5           Folks on the phone, are there any questions?

6           Any redirect?

7           MR. JAZIL:  We don't have any questions.  We will

8      read.

9           Just for the record, we were provided a Notice of

10     Deposition Duces Tecum.  We provided material to

11     counsel despite the fact that the notice did not

12     specify what was being asked for.  The material that

13     was provided is an up-to-date copy of Ms. Matthews'

14     own personal folder less the privileged material.

15          MS. EBENSTEIN:  Sorry, just to make one more thing

16     clear, because I do appreciate that you gave us these

17     documents now.  We did receive 14,000 documents

18     36 hours ago.  Obviously that does not provide us, as

19     we have explained by emails, maybe not with you, but

20     with your colleagues, that doesn't provide us with

21     enough time to review those documents.  Many of these

22     documents have not been produced, so we are seeing

23     them for the first time in the midst of a deposition.

24          MR. JAZIL:  Understood.  I would simply

25     incorporate by reference the response of my colleague

1                    MARIA MATTHEWS

2        sent this morning.

3             MS. EBENSTEIN:  Likewise.  Thank you.

4             THE STENOGRAPHER:  Did you need to order?

5             MS. EBENSTEIN:  Yes.

6             THE STENOGRAPHER:  Mo, did you need a copy?

7             MR. JAZIL:  Yes.

8             THE STENOGRAPHER:  John, did you need a copy?

9             MR. JAZIL:  Sure.

10            THE STENOGRAPHER:  Do you need a rough draft?

11            MR. TOPAZ:  Depends on how long it will take you

12       to get a final draft.

13            (Discussion held off the record.)

14            MS. EBENSTEIN:  We would like it expedited, early

15       Monday if that's okay.

16            THE STENOGRAPHER:  Sure.

17            (Thereupon, the proceedings were adjourned

18                      at 4:06 p.m.)

19

20

21

22

23

24

25

1                    CERTIFICATE OF OATH

2

3    STATE OF FLORIDA        )

4    COUNTY OF LEON          )

5

6

7            I, the undersigned authority, certify that the

8    above-named witness personally appeared before me and was

9    duly sworn.

10

11           WITNESS my hand and official seal this 16th day of

12   September, 2019.

13

14

15                              *Tamra K. Piderit*

16                         _____

                                    Tamra K. Piderit
17                         Florida Professional Reporter
                           Registered Professional Reporter
18                         Registered Merit Reporter
                           Registered Diplomate Reporter
19                         Certified Realtime Reporter
                           Notary Public, State of Florida
20                         My Commission #FF922382
                           Expires January 19, 2020
21

22

23

24

25

1                    CERTIFICATE OF REPORTER

2

3    STATE OF FLORIDA        )

4    COUNTY OF LEON          )

5

6            I, Tamra K. Piderit, Florida Professional

7    Reporter, Registered Diplomate Reporter, Certified Realtime

8    Reporter, and Certified LiveNote Reporter, certify that the

9    foregoing proceedings were taken before me at the time and

10   place therein designated; that my shorthand notes were

11   thereafter translated under my supervision; and the

12   foregoing pages numbered 1 through 219 are a true and

13   correct record of the aforesaid proceedings.

14            I further certify that I am not a relative,

15   employee, attorney or counsel of any of the parties, nor am

16   I a relative or employee of any of the parties' attorneys

17   or counsel connected with the action, nor am I financially

18   interested in the action.

19            DATED this 16th day of September, 2019.

20

21

22   _____

                 Tamra K. Piderit

23               Florida Professional Reporter
                 Registered Professional Reporter

24               Registered Merit Reporter
                 Registered Diplomate Reporter

25               Certified Realtime Reporter

1                        ERRATA SHEET

2              DO NOT WRITE ON THE TRANSCRIPT
                 ENTER CHANGES ON THIS PAGE
3

    Re:  Kelvin Leon Jones, et al. v. Ron DeSantis, et al.
4                     4:19-cv-00300-RH-MJF
                        Maria Matthews
5                     September 13, 2019

6   Page      Line              Change              Reason

7   _____

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20
    Under penalties of perjury, I declare that I have read the
21  foregoing document and that the facts stated in it are
    true.
22

23  _____                _____
        Date                         Maria Matthews
24

25  Job No. 167639