**EXHIBIT 25**



Page 1

1        IN THE UNITED STATES DISTRICT COURT
         NORTHERN DISTRICT OF FLORIDA
2
             CASE NO.:  4:19cv300
3            CIVIL ACTION NO.:  4:19-cv-00302

4   JEFF GRUVER, et al.,

5        Plaintiffs,

6   vs.

7   KIM A. BARTON, in her official
    capacity as Supervisor of Elections
8   for Alachua County, et al.,

9        Defendants.

10   _____/

11               305 N.E. 1st Street
                 Gainesville, Florida
12               Thurs., Sept. 19th, 2019
                 11:04 a.m.
13
                 - - -
14
         D E P O S I T I O N
15
                 of
16
         DANIEL A. SMITH, Ph.D.
17
         Taken on behalf of the Defendant
18   Pursuant to Notice of Taking Deposition

19

20

21

22
         REPORTED BY NANCY D. STEPHENSON
23        JOHNS, STEPHENSON & BIERY
         ADVANTAGE COURT REPORTERS
24        305 Northeast 1st Street
         Gainesville, Florida  32601
25            (352) 373-7778

Page 2

1  APPEARANCES:

2

        JULIE A. EBENSTEIN, ESQUIRE, ORION DANJUMA,
3  ESQUIRE (via telephone), and JONATHAN S. TOPAZ,
   ESQUIRE (via telephone), American Civil Liberties
4  Union Foundation, Inc. 125 Broad Street, 18th Floor,
   New York, New York  10004.  Jebenstein@aclu.org,
5  odanjuma@aclu.org, and jtopaz@aclu.org.  Appearing on
   behalf of the Plaintiffs.
6
        LEAH C. ADEN, ESQUIRE (via telephone), and
7  JOHN S. CUSICK, ESQUIRE (via telephone), NAACP Legal
   Defense and Educational Fund, Inc., 40 Rector Street,
8  5th Floor, New York, New York  10006.
   Laden@naacpldf.org and jcusick@naacpldf.org.
9  Appearing on behalf of the Plaintiffs.

10        ROBERT CHARLES SWAIN, ESQUIRE, and GEENA M.
   CESAR, ESQUIRE, Alachua County Attorney's Office, 12
11  Southeast First Street, Post Office Box 2877,
   Gainesville, Florida  32602.  Bswain@alachuacounty.us
12  and gcesar@alachuacounty.us.  Appearing on behalf of
   Defendant KIM A. BARTON.
13
        GARY V. PERKO, ESQUIRE, Hopping, Green &
14  Sams, P.A., 119 South Monroe Street, Suite 300,
   Tallahassee, Florida 32301.  Gperko@hgslaw.com.
15  Appearing on behalf of Defendant Florida Secretary of
   State Laurel M. Lee.
16
        AMANDA KISON, ESQUIRE, Bentley & Bruning,
17  P.A., 783 South Orange Avenue, Third Floor, Sarasota,
   Florida  34236.  Akison@bentleyandbruning.com.
18  Appearing on behalf of Defendants MICHAEL BENNETT and
   RON TURNER.
19

20

21

22

23

24

25

Page 3

1                   I N D E X

2  WITNESS:                          PAGE

3  DAVID A. SMITH, Ph.D.

4  Direct Examination by Mr. Perko          4

5  Direct Examination by Mr. Swain          57

6  Cross-Examination by Ms. Ebenstein          63

7  Certificate of Oath          72

8  Certificate of Reporter          73

9  Errata Sheet (to be attached upon completion)   74

10

11                 E X H I B I T S

12                                PAGE

13  (Exhibit Nos. 1, 2 and 3 were premarked
    before start of deposition)
14
    Defendant's Exhibit No. 1
15  (Subpoena)                      5

16  Defendant's Exhibit No. 2
    (Report of 8/2/19)              10
17
    Defendant's Exhibit No. 3
18  (Report of 9/17/19)             11

19  Defendant's Exhibit No. 4
    (FDOC report)                   37
20

21

22

23

24

25

1  Thereupon,

2           DAVID S. SMITH, Ph.D.

3  Having been first duly sworn, testified as follows:

4         THE DEPONENT:  I do.

5               DIRECT EXAMINATION

6  BY MR. PERKO:

7      Q.   Could you please state your full name for

8  the record?

9      A.   Sure.  Daniel A. Smith.

10     Q.   And that's Dr. Smith?

11     A.   Professor Smith, Dr. Smith, yes.

12     Q.   And by whom are you employed?

13     A.   The University of Florida.

14     Q.   Okay.  What position are you employed in?

15     A.   I am a professor of political science.  I

16  also am the chair of the political science

17  department.

18     Q.   Dr. Smith, I understand that you've been

19  deposed before; is that correct?

20     A.   Yes.

21     Q.   How many times have you been deposed?

22     A.   Off the top of my head, probably between

23  half a dozen and a dozen times.

24     Q.   Okay.  So you generally know the ground

25  rules.  I'll be asking you questions about your

1  opinions in this case and any factual knowledge that

2  you may have that's relevant to the issues in this

3  case.  I am not a political scientist or a

4  statistician so at times my questions may not make

5  sense to you, and if that's the case please tell me

6  and I'll try to rephrase them.  Otherwise we'll

7  assume that you understood my questions; is that

8  fair?

9      A.   Yes.

10     Q.   If at any time you need a break -- I don't

11  expect to go very long today, but if at any time you

12  need a break, just let us know, get a drink of water,

13  go to the restroom, what have you, just let us know

14  and we'll accommodate you.

15     A.   Thank you.

16     Q.   With that I guess I'll start with by

17  showing you what has been marked as Exhibit No. 1

18  and ask if you could identify that document.

19     A.   Sure.  This is a subpoena for me to testify

20  at this deposition that I received from counsel a

21  couple days ago.

22     Q.   And have you gone through this and reviewed

23  it with your counsel?

24     A.   I have reviewed it with counsel, yes.

25     Q.   Okay.  At the end of the deposition notice

1  there's an exhibit, the very last page labeled page

2  eight.  If you could take a look at that.  It asks

3  for you to bring documents to this deposition.  The

4  first one is a current professional resume or

5  curriculum vitae summarizing your professional

6  qualifications and a list of publications you

7  authored or to which you have contributed to date.

8  And I know that your supplemental report dated

9  September 17th includes a curriculum vitae that

10  includes that information.  Is that true and accurate

11  as you sit here today?

12      A.   At the time that I produced it and provided

13  it to counsel, yes.

14      Q.   Okay.  Are you aware of anything else that

15  -- any developments since you prepared that document

16  that you would want to list?

17      A.   I mean, I'm an active scholar, I present

18  papers at conferences.  I honestly would have to go

19  and look to see whether or not --

20      Q.   Fair enough.

21      A.   -- what I presented in late August or early

22  September would be on there.

23      Q.   Okay.  Number two is a list of cases and/or

24  matters wherein you testified before a governmental

25  entity or judicial branch.  And I believe your CV

1  attached to your September 17th report includes such

2  a list.  To the best of your knowledge, is that list

3  up to date?

4      A.   Yes.

5      Q.   Three is a list of grants and/or awards for

6  any work performed.  I believe that information is

7  also contained on your CV attached to your September

8  17th report.  To the best of your recollection, is

9  that list up to date?

10     A.   That is correct.

11     Q.   Number four, same with amicus briefs?

12     A.   That's correct.

13     Q.   And then number five asks for your complete

14  file in connection with your investigation and

15  evaluation of the issues involved in this lawsuit

16  including, but not limited to, all documents

17  furnished to you by anyone.  Have you brought any

18  documents fitting that description with you today?

19     A.   No, I have not.

20     Q.   Are there documents that were provided to

21  you by anyone in connection with the issues in this

22  lawsuit?

23     A.   I think they are listed in my reports.

24  They are going to be publicly available with the

25  appropriate citations to them, so...

Page 8

1    Q.   Okay.  Paragraph 5-B of Exhibit A states

2  or asks for all documents you received, prepared,

3  referred to, or relied upon in arriving at your

4  opinions or conclusions concerning the issues

5  involved in this lawsuit including, but not limited

6  to, all texts, periodicals, articles, books, or

7  similar information.

8         Is all that -- all those documents

9  identified in your expert report?

10     A.   They should all be available in a

11  footnote.  If you need any particular citation that

12  is available to me but maybe not to you, I'm happy to

13  provide it.

14     Q.   Great.

15         5-C asks for any notes, e-mails, reports,

16  letters, memoranda, or written documentation prepared

17  and/or received by you relating to this matter.

18     A.   (Nods head in the affirmative.)

19     Q.   Have you received any notes, e-mails,

20  reports, or letters, memoranda, relating to this

21  matter?

22     A.   I am sure I have, and my assumption is that

23  counsel is being able to provide that to you.

24     Q.   But you have not brought those documents

25  here today?

1    A.   No, I have not brought those documents.

2       MR. PERKO:  Counsel, are you going to

3    provide those?

4       MS. EBENSTEIN:  Sure.  I think the entirety

5    of those would be the public records requests

6    for public documents, but we can provide that.

7    A.   (Continuing)  My understanding, since I was

8    requesting public records, that these agencies that

9    are public agencies would be able to provide those to

10   you as a state agency.

11      Q.   Okay.  Did your counsel provide you any

12   records or memoranda relating to the issues in this

13   case?  I'm not asking for any substance of that, just

14   if --

15      A.   I can't recall anything substantive that

16   they provided me.

17      Q.   5-D asks for all models, illustrations,

18   photographs, exhibits, or documents of any kind which

19   you intend or contemplate using to explain,

20   illustrate, or support testimony at trial.  Is all

21   that information provided in your reports?

22      A.   Yes.  And I think you'll see in the

23   supplement to my September report additional

24   information, yeah.

25      Q.   Okay.  As far as models, did you utilize

1  any models, computer models or mathematical models,

2  in preparing your expert reports?

3      A.   There are actually no models in my report.

4  It's all basic descriptive statistics.

5      Q.   And then finally 5-E asks for any documents

6  or materials that you relied upon in forming your

7  expert opinions.  Are all those documents or

8  materials referenced in your reports?

9      A.   They should be in either my first report or

10  my second report, correct.

11      Q.   Okay.  Well, let's get to those.

12          I'll show what has been marked as Exhibit

13  No. 2 and ask if that is a copy of your initial

14  expert report dated August 2nd, 2019.

15      A.   Yes.  This looks, without going through

16  line by line, as if it's the one that I provided,

17  correct.

18          MR. PERKO:  And just for the record,

19          counsel, I believe the top says page two of 46.

20          Page one was a single page identifying Exhibit

21      A.   So to avoid confusion I took that off.

22          MS. EBENSTEIN:  Yes.

23  BY MR. PERKO:

24      Q.   And then, Dr. Smith, I'd like to show you

25  what has been marked as Exhibit No. 3 and ask if that

1  is expert report that was -- that you prepared and

2  was submitted to the court and us on or about

3  September 17th, 2019.

4      A.   Yes.  This looks like the materials I

5  provided.  The ink is still wet.

6      Q.   Okay.  Just so I understand, and I think I

7  do but I want to confirm, my understanding is that

8  your supplemental report dated September 17th

9  essentially updates, for the most part, section four,

10  the data and analysis section of your August 2nd

11  report; is that correct?  I believe that's on page 26

12  of your original report.

13      A.   Yes, that is correct.

14      Q.   And the reason why you did that is because

15  you got information from ten additional states and

16  incorporated that information into your analyses; is

17  that fair?

18      A.   I received information from ten additional

19  county clerks of court which I've supplemented to the

20  original 48.

21      Q.   Okay.  Other than the additional

22  information that you received for those two counties,

23  were there any changes to the data relied upon for

24  the original 48 counties that you analyzed?

25      A.   So just to clarify, ten additional county

1  clerks, not two.

2       No, the other data underlying is

3  consistent, with the exception of possibly the

4  analysis.  And I'm happy to talk about why that might

5  change with the addition of additional counties.

6       Q.   Yeah, I'm just trying to understand as far

7  as the data from those original 48 counties, that

8  data set did not change; is that correct?

9       A.   Correct.  The data set from the original 48

10  has been appended to.

11       Q.   Okay.

12       A.   That that might lead to different results

13  at the margins, I'm happy to explain why that might

14  be.

15       Q.   Okay.  If I could get you to look at

16  paragraph 23 of Exhibit No. 1, your initial expert

17  report.

18       At the, I guess, second to last sentence of

19  that statement or that paragraph it states that there

20  are also numerous instances of missing data, data

21  entry errors, and inconsistent or illogical data

22  entries, all of which complicate the analysis.

23       And you're referring to there data that you

24  received from the clerks; is that correct?

25       A.   That is correct, from the 48 clerks that I

1  received data from.

2      Q.   Okay.  Just so I understand, when you refer

3  to missing data, could you give me some examples of

4  missing data that you encountered?

5      A.   Sure.  Off the top of my head, again,

6  dealing with now over half a million individual

7  cases, things such as missing first names; or data

8  that has a date that is not a typical month, day of

9  month, year format; letters where there should be

10  numbers; other types of either data entry error or

11  some form of processing error from the clerks on raw

12  data.

13          When I say numerous instances, is it tens,

14  hundreds?  I can't tell you off the top of my head.

15  But there are certainly instances when processing the

16  data where the processing gets hung up because

17  there's an entry that is not what should be expected.

18      Q.   Okay.  When you encounter that missing

19  data, let's say missing first name, the first example

20  that you provided, what did you do with that data

21  entry or --

22      A.   So the data is processed very

23  conservatively in that I am not imputing

24  information.  So what does imputing mean?  It means

25  taking other available data and running some type of

1  algorithm that is going to assume that you are white,

2  or of a certain age, or a certain type of crime.   It

3  is effectively dropping those cases from my universe

4  when there's missing data coming from the raw files

5  from the clerks.

6      Q.   So if there was an entry from Alachua

7  County that just said Smith, no first name, you did

8  not analyze that record or include it in your

9  analysis?

10      A.   Correct.   That record would be dropped from

11  the analysis.

12      Q.   And you said -- you referred to running

13  some sort of algorithm.   Just so I understand, you

14  did not run any type of algorithm?

15      A.   There are no algorithms used in my

16  analysis.   It is using what we would call an exact

17  match.

18      Q.   Okay.

19      A.   Meaning it has to be exactly, when I'm

20  comparing two different databases, the information in

21  there.

22      Q.   Okay.   And that's true across the board, if

23  there was a missing name, first name, you just did

24  not consider that data point?

25      A.   Correct.

1    Q.   Is the same true for when there was a date

2  that was not typical date, month, year format?

3    A.   Correct.  Again, having dealt with lots of

4  large, very large, data sets, inevitably there will

5  be issues having to do with data entry error that I

6  am not in a position to determine whether a date of,

7  say, January 10th, 1898, is really January 10th,

8  1998.

9    Q.   Okay.

10    A.   And so I made no effort to massage the data

11  through some type of algorithm process to do that.

12    Q.   So were there any instances where you

13  exercised judgment to include a data point that may

14  have looked a little fishy?

15    A.   Yes, yeah.  There are certainly cases in

16  which data that was received from certain clerks, and

17  after understanding the architecture of these data

18  sets, it was clear that they had missing leading

19  zeros or issues with a date that could be easily

20  corrected with a standard patch, as opposed to a

21  one-off interpretation of that date and making some

22  assumption of what it actually is.

23        So I think I describe that pretty clearly

24  in the supplement, which I'm happy to walk you

25  through on some of those technical issues from some

Page 16

1  of the clerks.

2      Q.   Okay.  I'm sorry to bounce back, but in

3  those instances where you did not include a data

4  point because of missing entry or data entry error,

5  did you keep a record of those data points that you

6  did not include?

7      A.   I don't have a, quote, unquote, record of

8  that, but it could be created by including that in my

9  analysis.  Right now the way the data is processed

10  those cases would be left out of the final reports

11  that I create.

12      Q.   Okay.

13          Just a housekeeping matter, it's my

14  understanding that there were no attachments to your

15  original report as filed with the court.  Is that

16  your understanding?

17      A.   You would have to ask counsel on that.

18      Q.   We did receive two reports associated with

19  your original report that I do not believe were filed

20  with the court, but that doesn't really matter here.

21  Let me just show you those two documents and ask you

22  if those are reports that you utilized in developing

23  the opinions expressed in your August 2nd initial

24  report.

25      A.   Correct.  And I think if you look at the

1  date from the screen shot creating a PDF that it's

2  around the time of that August filing, I think, from

3  late July.

4      Q.   Yes.  One of them is labeled individual

5  county reports, date and time of July 31st, 2019.

6  The other one refers to July, it's an FDOC report,

7  summary of released and freed individuals, and it

8  references July 2019.  Does that --

9      A.   That sounds about correct.

10      Q.   And just so I understand correctly, if you

11  can look at Exhibit No. 3, which is your supplemental

12  report of September 17th, it includes two reports.

13  Is it fair to say that those are updated versions of

14  what was submitted to us with your initial report?

15      A.   Absolutely.

16      Q.   Okay.

17      A.   They are formatted slightly differently for

18  readability.

19      Q.   Fair enough.

20          Now, is my understanding correct that you

21  prepared those reports that are attached to your

22  September 2nd report?

23      A.   Correct.  My team that I work with has

24  produced this, yes.

25      Q.   Yeah, I'm just trying to understand.  So

1  it's not something that you downloaded; it's your

2  compilation of the data that you utilized?

3      A.   Correct.

4      Q.   Okay.  You mentioned your team.  Who's on

5  your team that worked on this project?

6      A.   So this has been a large effort to collect

7  public records.  So I have three people who are --

8  four people who I've independently contracted with

9  to collect data and to help process the data.

10     Q.   Can you give me -- I don't need names, but

11  can you give me an idea of those people's

12  backgrounds?  How did you select those people?

13     A.   Yeah, they are former students of mine or

14  colleagues, yes.

15     Q.   Going back to paragraph 23, that sentence

16  that we talked about earlier where you talk about the

17  missing data, data entries, et cetera, at the end of

18  that sentence you say "all of which complicate the

19  analysis."

20         Can you tell me what you meant by that,

21  complicating the analysis?

22     A.   Sure.  Any time you're trying to compile a

23  data set from various agencies, all of which may have

24  their own particular data entry, data archiving

25  processes, it makes it difficult to create a uniform

Page 19

1  database that one can then analyze.  This is true not

2  only in this case, but in many different research

3  projects that I'm involved with.

4          Looking at absentee ballots in Florida,

5  every one of the 67 counties' supervisors of

6  elections has a separate process in which they

7  account for absentee ballots that come in that may

8  have a problem with a signature, or a missing

9  signature, with the curing process of reaching out to

10  voters, it's all not standardized, about the return,

11  cured absentee ballots.  And the processing to try to

12  understand what's going on statewide across these 67

13  disparate entities with respect to their record

14  keeping is a heavy lift.

15          I have found the exact same thing looking

16  at the clerks of court, perhaps with the exception of

17  those that were working with the association, but

18  even there there were some discrepancies across

19  this.

20          So all I'm saying is that it complicates

21  the analysis with respect to a lot of effort goes

22  into taking those records and trying to standardize

23  them to do a statewide assessment, or in this case a

24  58-county assessment.  I would love to have a

25  67-county assessment, but I have not yet received

1  records from all the clerks.

2      Q.   Okay.  So just so I understand, and I'm not

3  trying to put words in your mouth, but based on our

4  discussion earlier, when there was a clear missing

5  data point or data entry you did not utilize those

6  data in your analysis?

7      A.   (Nods head in the affirmative.)

8      Q.   And is that essentially why you say in

9  paragraph 23, the first sentence, "There are

10  certainly limits to the estimates, all of which are

11  conservative, that is they are biased against

12  inflating the numbers of persons with felony

13  convictions who are likely eligible to have voting

14  rights under SB 7066"?

15     A.   Yeah.  I mean, I guess there could be a

16  couple examples in which it's not the case, but

17  generally it's conservative with respect to being

18  able to process these individuals to get a sense of

19  what ultimately they might owe if they have completed

20  their sentence.

21     Q.   Or, conversely, if someone hired a private

22  investigator to look at the entry that had a missing

23  data point, it's conceivable that you could do

24  additional investigation and determine ultimately

25  that person had satisfied any financial obligation of

1  their sentence.  Is that fair to say?

2      A.   I think that's a fair statement.  And I

3  would be happy to include any results from that

4  investigation in my analysis.

5      Q.   But essentially that's why you're saying

6  that your estimates are biased against inflating the

7  numbers; is that right?

8      A.   Correct.

9      Q.   Okay.

10         The next paragraph, paragraph 24, you talk

11  about your analysis of the July 2019 snapshot of the

12  database made available by the FDC.  FDC refers to

13  the Florida Department of Corrections; is that

14  correct?

15     A.   Correct.

16     Q.   And that's referred to as the Offender

17  Based Information System or OBIS; is that correct?

18     A.   Correct.

19     Q.   About halfway down that paragraph you

20  state, "For the FDC regular updates are every three

21  months.  As a result, the quarterly snapshots of the

22  OBIS database made available for public likely

23  introduce error into the findings of this report."

24     A.   (Nods head in the affirmative.)

25     Q.   What did you mean by "introduce error into

1  the findings of this report"?

2      A.   So any time you're dealing with large

3  databases that are snapshots in time there's a

4  possibility that you're going to have data that is

5  not accurate with respect to the timing of one of

6  those snapshots.  As we sit here today, there have

7  been people released from supervision from the

8  Department of Corrections, one can assume, since July

9  1st.  If you gave me a list of information that was

10  dated, say, June from the clerks of court, there

11  might be a discrepancy with respect to those two

12  snapshots.

13          The same thing is going on here.  I have a

14  snapshot provided by the Department of Corrections

15  that goes through June 30th of 2019.  There might be

16  individuals identified in there who have not yet

17  completed their sentence as of June 30th and have not

18  -- would not therefore be in the released file that

19  I'm using for my analysis.  And if a clerk of court

20  provides me data, say, in mid August about all the

21  individuals and their LFOs, I would have a false

22  match there because the data are truncated as of July

23  1st even though the new data I've gotten might have

24  additional information.

25      Q.   Okay.

1    A.   And it goes both ways.  It's just one of

2  those issues when you're dealing with large databases

3  and data rolling in over time that will have

4  different endpoints or start points when you're doing

5  some type of exact link.

6    Q.   Is it fair to say that the other limits

7  to the data that you reference in paragraph 23 also

8  introduce error into your estimates?

9    A.   Again, I think there is no way that you're

10  going to avoid some error at the margins on this.

11  It's just the fact of the matter when you're dealing

12  with these disparate agencies in terms of their

13  record keeping.  It would be lovely if we had a

14  uniform system that I had access to that had

15  everyone's conviction, their sentence, their time

16  served, their release date, and their legal financial

17  obligations broken down in the many categories that

18  there are.  To my knowledge, that database doesn't

19  exist.

20         And so whenever you are trying to join

21  different systems together there are things that a

22  scholar should be aware of.  And so I'm pretty

23  particular in terms of being able to document those

24  type of potential instances of missing data, data

25  entry errors, inconsistent or illogical data entries.

1      Q.   So it's sort of the nature of the beast

2  that any time you're dealing with a database like

3  this there is error associated with your estimates.

4  Is that a fair statement?

5      A.   Again, I have been toiling away as a

6  scholar for well over a decade looking at very large

7  data sets, and even in ones that have a centralized

8  database, such as the secretary of state's and the

9  voter registration file, there are inconsistencies

10  and errors in there, and I have identified them, I've

11  passed on that information.  It's something that you

12  just take as a grain of salt, you acknowledge it, and

13  realize that when you're dealing with 14 million

14  people there are going to be problems with some of

15  the data entry or the merging of county level data to

16  a statewide voter system.

17      Q.   So there's going to be error in any

18  estimates that you developed based on a database of

19  this nature?

20      A.   Right.  And so at the margins I think

21  that's a given.  It's -- we don't have a centralized

22  database and so that complicates things even more.

23  But what I would say is that even if we did have one

24  I would be very surprised if there weren't some

25  errors within that system.

1    Q.   Have you attempted to calculate the level

2  of error in your analysis, the margin of error, I

3  guess?

4    A.   No, I haven't.

5    Q.   So can you put a confidence level on your

6  estimates at this point, say 95 percent, 90 percent?

7    A.   No, I can't.

8    Q.   Just out of curiosity, who is Michael

9  Morse?

10    A.   Michael Morse is a recent graduate of Yale

11  law school and, to my knowledge, is a current Ph.D.

12  student at Harvard working on his dissertation in

13  their government department.  I believe he is also a

14  clerk for a federal judge now.

15    Q.   Do you know what familiarity he has with

16  the FDC OBIS database?

17    A.   I've spoken with him at a conference and I

18  think he has a fairly knowledgeable understanding,

19  although, you know, in conversations there are a lot

20  of unknown unknowns.

21    Q.   Do you know what the basis of his knowledge

22  might be of the OBIS database?

23    A.   I would assume it's similar to mine as a

24  scholar accessing the publicly available data, but

25  that's just an assumption.

1     Q.   In paragraph 35 of your initial report,

2  Exhibit No. 2, you talk about false positives here.

3  Go ahead and familiarize yourself with that paragraph

4  if you'd like, but I just want to explore this notion

5  of false positive.

6          As I understand it, and I think you say it

7  here in the third sentence, false positive, that is

8  making a determination that a given condition has

9  been fulfilled when it actually has not been

10  fulfilled.

11     A.   Uh-huh, that's correct.

12     Q.   So you discuss that issue.  Is there also

13  the possibility of false negatives that -- where

14  you're making a determination that a condition has

15  not been fulfilled when it actually has been

16  fulfilled?

17     A.   Yes.

18     Q.   Have you made any -- done any analysis to

19  try to determine the extent that you might have

20  either false positives or false negatives?

21     A.   So I think it's important, again, to state

22  that I'm not using any algorithmic formula to do

23  matching across the Florida Department of

24  Corrections' release database and the county clerks'

25  information which provides legal financial obligation

1  information.  That is the only reason why I'm doing a

2  matching, is to be able to get the legal financial

3  obligations, one of the main reasons, of the people

4  who are in the Department of Corrections database,

5  because that field doesn't exist for public

6  consumption, what an individual who has been released

7  from state custody owes.  So that is the nature of

8  why that match has to be done.

9          One could do an algorithm that takes D.A.

10  Smith, or Dan A. Smith, or Daniel A. Smith, or D. Art

11  Smith, and take my birth date, maybe my race and

12  gender, maybe not, maybe the county name, and run an

13  algorithm that is going to match one database with

14  another and within a realm of confidence tell me that

15  the D. Arthur Smith in one database is actually the

16  same as Daniel A. Smith in the other.  That would

17  take an algorithm to do that.  And there is a lot of

18  scholarly literature that relies on using

19  algorithms.

20          For this case I didn't want to do that for

21  the possibility of creating a false positive, finding

22  a D. Art Smith in one database and assuming that that

23  was the same person as the Daniel A. Smith.  As

24  someone with a very common name who has been flagged

25  by various agencies as having credit problems or, you

1  know, liens against my house, --

2      Q.   I was going to ask you about that.

3      A.   -- where it's a different Daniel Smith with

4  the same birth date, these things happen.  And so I

5  made a very conservative effort not to do that, to do

6  an exact match with respect to the information I had

7  in these two databases.  The false positive would be

8  that.  The false negative would be having someone,

9  Daniel Art Smith in one and a D. Arthur Smith in the

10  other, who's the same person who I miss.

11          So that is certainly a possibility when

12  you're using an exact match as opposed to an

13  algorithm.  Both of those are possible.  They can

14  create over or under inclusiveness.  I want to be

15  incredibly cautious in my analysis.  It's very

16  conservative that I'm only finding individuals who

17  have the exact same string of name, birth date,

18  gender, and race.

19      Q.   It's conservative in the sense that they're

20  biased against inflating the numbers --

21      A.   Correct.

22      Q.   -- of persons with felony convictions who

23  are likely eligible to have voting rights under

24  Senate Bill 7066?

25      A.   Correct.

1    Q.   Okay.  I think I understand.

2         Just conceptually, I understand the use --

3   potential use of algorithms if you're trying to do

4   this big data study of the overall percentages of

5   eligible -- of voters eligible to -- or felons

6   eligible to vote.  But as far as an individual, there

7   are other steps.  If an individual wanted to

8   determine whether he or she was eligible, there are

9   other steps other than using an algorithm.  You could

10  do some investigations actually looking at the files

11  within the clerk's office or what have you; is that

12  fair?

13    A.   Not being a former felon I have not fully

14  investigated all the options and alternatives and

15  barriers.  I have certainly dug into many of the

16  clerks' websites to figure out information,

17  especially when it comes to some of these anomalies,

18  and trying to figure out what's going on.

19         Look, it's -- an individual could be

20  adjudicated guilty of a felony in multiple counties.

21  I don't think there's a one-stop shop to go and

22  figure out whether or not all your LFOs in Collier

23  County have been paid off and also in Alachua County,

24  say.  So there are some barriers to that.  But,

25  again, having not experienced and having to go

1  through that process as an individual, it's more

2  voyeuristic in terms of trying to understand some of

3  this.

4        Q.   As an academician it wouldn't be possible

5  to do that on a comprehensive basis?

6        A.   Well, and that's the other point I was

7  going to make, is that right now we're talking about

8  over half a million individuals that I or some team

9  would have to enter in not only in one county, but in

10  67 counties.  So we could do the math, if you'd like,

11  about the possibilities that there are.

12        Q.   Fair enough.

13             Okay.  I would like to go now and just make

14  sure I understand what's changed between your August

15  2nd report and your September 17th report.  And so,

16  let's see, if I could return your attention to figure

17  one in your supplemental report.

18        A.   Sure.

19        Q.   And I believe that's on page ten.  Yes.

20             And just so I understand conceptually what

21  you've done here, I believe this corresponds to

22  figure one in your August 2nd report, correct, which

23  was on page 31; is that correct?

24        A.   Correct.

25        Q.   So if I understand correctly -- let's refer

1  to the supplemental, since that's the latest and

2  greatest, on page ten of your supplemental report.

3  So basically this shows the fraction of black and

4  white individuals in the now 58 counties that you

5  analyzed with estimates of zero dollar LFOs owed who

6  are not in the Department of Corrections' OBIS

7  database, okay?

8      A.   Correct.

9      Q.   So let's take, for example -- let's find

10  one that's close to the lines here to make sure, Lake

11  County, up around 40 percent there.

12      A.   Uh-huh.

13      Q.   The size of that circle is reflective of

14  the number of data points for Lake County that you

15  have; is that correct?

16      A.   Close to that.

17      Q.   Okay.

18      A.   It's actually the number of black and white

19  felons from Lake County who are not in FDC and scaled

20  proportionately.  So there are some residual

21  individuals in Lake County that that's not sized to.

22      Q.   Fair enough.  But the Lake County circle is

23  larger than St. Johns because you have more data for

24  Lake County than you did in St. Johns?

25      A.   There are more match black and white former

1  felons in Lake County.

2      Q.   Fair enough, fair enough.

3      A.   Yes.

4      Q.   So if I understand you correctly, the X

5  axis is on the left?

6      A.   X axis is on the bottom.

7      Q.   On the bottom.  And the Y axis is on the

8  left?

9      A.   Uh-huh.

10     Q.   So the Y axis is fraction zero balance

11  white individuals.  So if you look at Lake County,

12  for example, roughly 40 percent of white individuals

13  with --

14     A.   Uh-huh, that's correct.

15     Q.   -- with zero balance.  And then for black

16  individuals with zero balance it would be roughly 34

17  or 33 percent?

18     A.   Yeah, I think that's correct.

19     Q.   Okay.  I just wanted to make sure I

20  understood that correctly.

21     A.   Yeah, you've got it.

22     Q.   So -- and I just want to confirm, if you

23  look at Pasco County --

24     A.   Uh-huh.

25     Q.   -- it seems to almost straddle a line here

1  on figure one on Exhibit No. 3, whereas it was

2  slightly to the left of the line in figure one of

3  your original report.  That's not because the data

4  changed; it's because you increased the scale from --

5      A.   So two things.  One, you're absolutely

6  right, the scale changed and the 50 percent is a much

7  better fraction than the 30 percent.

8      Q.   Right.

9      A.   But the other thing to note is with the

10  addition of ten counties we are picking up

11  individuals who may in Pasco County have not owed

12  anything in an LFO, --

13      Q.   Okay.

14      A.   -- but because they're in the FDC database

15  we're now matching it up to the additional ten

16  counties and that individual, again, at the margin,

17  could also owe money in one of those additional ten

18  counties.  And that is going to be different for both

19  black and white, which could lead to that circle

20  adjusting.

21      Q.   Getting smaller?

22      A.   It could be smaller or it could be moving

23  away from the axis because a fraction of those might

24  actually owe money in a different county.

25          So it's -- in that sense the underlying

1  data are the same from those initial 48 counties, but

2  the analysis does change at the margins every time we

3  add more counties into the system, into the

4  database.  Does that make sense?  I know it's

5  really --

6      Q.   Thank you.  That does.

7      A.   I have to say that when I was doing this I

8  was trying to understand what those slightly marginal

9  shifts were.  And then I realized of course it's

10  because we are adding these other counties not just

11  independently, but also in terms of individuals who

12  might have multiple sentences across counties.

13      Q.   I understand.

14          So if I were to look at, compare, I guess,

15  it would be -- this would be the county report,

16  right, the individual county report?

17      A.   Yeah, so this is the individual county so

18  they're not in the FDC, correct.  So in this case, to

19  clarify, you're absolutely right.  This is comparing

20  Pasco, where we are now looking across Pasco and a

21  new county that we got as opposed to the FDC.

22          So, yes, it's the same principle for both

23  the FDC, figure two -- thank you for correcting me.

24  Figure one, it's Pasco County.  Now we have ten

25  additional counties that that individual might have

1  another conviction in with either owed or not owed,

2  which could adjust white and black proportionate have

3  zero dollars owed or some other --

4      Q.   Gotcha.

5      A.   So thank you for correcting that, yes.

6      Q.   So I just want to make sure I understand --

7  so let's -- conceptually.  If I look at Pasco County,

8  perhaps in figure one of August report it was 25 --

9  the circle represented 25 individuals, 15 white, ten

10  black.  And it's conceivable if I look -- and that

11  number would be reflected in your individual county

12  report that was associated with your initial report.

13      A.   (Nods head in the affirmative.)

14      Q.   Then if I were to look at Pasco County for

15  the supplemental report, it could be 20, ten and ten,

16  I don't know, I'm just throwing --

17      A.   Those numbers should be the same.

18      Q.   They should be the same.  Okay.

19      A.   They should be the same.  What should be

20  different is that individual may owe something in a

21  different county.

22      Q.   That's what I'm trying to understand.  So

23  you wouldn't have subtracted them from the circle in

24  Pasco County?

25      A.   No.

1   Q.   It would just affect where they are --

2   A.   Yes.  And we do have individuals --

3   Q.   -- in relation to the 45 percent line?

4   A.   That's right.

5   Q.   I understand.

6   A.   I do note in one of the supplemental

7  appendices that there are individuals with

8  multiples.  So, yes.

9   Q.   Okay.  Is there anything that I could look

10  at comparing the reports, either the -- the -- your

11  expert report or this underlying county report or

12  what have you, that would give me an indication of

13  how many of those individuals there were?

14   A.   Well, again, this is kind of on the fly,

15  but I'm happy to do it with you.  We could look at,

16  say, Alachua County.

17   Q.   Okay.

18   A.   Let's just start alphabetically.  We can

19  look at Alachua County in the supplemental report

20  and --

21   Q.   Okay.

22   A.   -- take a look at balances due.  And then

23  look at -- I believe you have one of the -- so I'm

24  looking at the FDOC.

25   Q.   FDOC.

1      A.   It really doesn't matter, it's the same

2   logic in both.

3      Q.   Sure.

4      A.   But we could look at this and then we could

5   look at -- you have showed me, but I don't think you

6   introduced it --

7          MR. PERKO:  Let's go ahead and introduce

8       this.  If you could mark this -- I apologize, I

9       don't have extra copies.  I'd be happy to get

10       you one.  If we could mark this as Exhibit

11       No. 4.

12          MS. EBENSTEIN:  If you could give me a

13       moment to just open it on my laptop.

14          MR. PERKO:  Sure.

15          (Thereupon, Defendant's Exhibit No. 4 was

16       marked for identification.)

17   BY MR. PERKO:

18      Q.   And if I could ask you to look at Exhibit

19   No. 4 and just let me know if that appears to be the

20   FDOC report associated with your initial August 2nd

21   expert report.

22      A.   Yes, it is.

23      Q.   Okay.  So that is analogous to what's

24   attached to your supplemental report?

25      A.   Correct.  And I'm sorry, you don't have a

1 copy that we can look at.  Again, I'm flying blind

2 here in terms of --

3     Q.   Sure, I understand.  Go ahead, Doctor.

4     A.   I'm sorry that I'm flying blind in terms of

5 comparing these two documents at this pretty refined

6 level, but when I look at the July report that was in

7 my August filing and the one that was created in

8 early September that's part of my September

9 supplement, when I go down these lists, 462

10 individuals in both owe zero, 112 owe up to a hundred

11 for more than zero.

12         That figure that we've been talking about

13 basically is collapsing zero versus anyone above

14 zero, all right?

15     Q.   Okay.

16     A.   And so in this case it looks pretty clean,

17 they're both the same, 527.  So we're not seeing any

18 difference there.

19         Are we seeing any difference with respect

20 to balances due?  Let's take a look.

21     Q.   Okay.

22     A.   I'm not seeing any differences moving down

23 the figure here.  And I'm not seeing any differences

24 in whites -- oh, no, no -- 65, 64 -- so these look

25 identical for Alachua.

1    Q.   For Alachua?

2    A.   Yeah.

3    Q.   But it's conceivable for other counties

4  because the number of balances due, they, I guess,

5  increase based on your inclusion of the ten

6  additional counties because that -- an individual may

7  have a balance due in another county?

8    A.   Correct.

9    Q.   Okay, I think I understand you.

10    A.   Yeah.  That I -- it's complicated, but I

11  think -- I think we've got it sorted out.

12    Q.   Great.

13        If I could refer you to paragraph 19 of

14  your supplemental report.

15    A.   Yes.

16    Q.   You state, "In my opinion, it is clear from

17  table three --" which is the estimates of balance due

18  of eligible persons with felony convictions not in

19  FDC's OBIS database across 58 counties by race, so

20  you say, "In my opinion, it is clear from table three

21  that across the 58 counties for which data from the

22  county clerks are available, black individuals who

23  have otherwise met all the terms of their felony

24  conviction are significantly less likely to be able

25  to gain or regain voting rights under Senate Bill

1  7066 as compared to similar white individuals because

2  of outstanding LFOs tied to their felony conviction."

3      Do you see that?

4   A.   Correct.

5   Q.   What did you mean by the use of the term

6  "significantly less"?

7   A.   Well, I'm looking at raw numbers, but also

8  percentages.  So not in a statistical significance

9  sense, but in terms of looking at one in four whites

10  owes zero dollars in LFOs, according to my analysis

11  across the 58 counties, and therefore should be able

12  to have their voting rights restored, where it's only

13  16.7 percent of blacks.  And so when you look at the

14  raw numbers, sure, there are more whites who have

15  been released, but as a percentage it's one out of

16  four whites who owe zero dollars, whereas it's about,

17  what, one in six blacks who have been not in the

18  FDC's release database in the 58 counties who would

19  be similarly eligible.

20  Q.   I guess I'm trying to understand how you

21  determine what's significant and what's not.  Is

22  there a difference that you would -- let's say it was

23  12 and a half percent for blacks and 15 percent for

24  whites.  Would you consider that significant?

25  A.   Again, there are ways that I could run

1  statistically significant tests on these

2  populations.  I chose not to do that.  This is an

3  interpretation where three out of four I would like

4  my odds much better than, say, -- let me flip that

5  around.

6          I would much rather like to have the odds

7  of one in four to have my rights restored than one

8  out of six.

9      Q.   Okay.  But there's error associated with

10  both those estimates; is that correct?

11      A.   There's error associated with the raw data

12  here as we've already discussed at length.

13      Q.   But you have not calculated the margin of

14  error of those two estimates; is that correct?

15      A.   Part of the reasons I haven't done that is

16  because of the underlying concerns with the data,

17  so...

18      Q.   But as a political scientist you can't tell

19  me as you sit here today that the number of whites

20  not in the FDC OBIS database across the 58 counties

21  with balances of zero is 25 percent categorically?

22      A.   I don't think I have ever expressed that

23  type of certainty, and that is one of the reasons why

24  I would not want a statistical test on data where I

25  have done my darnedest to collect data from 58 of the

1   counties, I would love to have all 67, but there are

2   certainly underlying concerns, as we've talked about,

3   in terms of some of the quality of the data.

4          But I think notwithstanding that, we can

5   see pretty clearly that the fraction of whites who

6   under 7066 are going to get their rights back is

7   greater than blacks.

8       Q.   Now, turning to, let's see, paragraph 28,

9   you essentially make the same statement but with

10  respect to table four, which reflects the balance due

11  of eligible persons with felony convictions in FDC's

12  OBIS database.  So, again, you say it's, in your

13  opinion, significantly less likely for black

14  individuals in these 58 counties who have been

15  released from custody and supervision of FDC are able

16  to regain their voting rights as compared to whites.

17  And in that table the number is ten percent -- 10.3

18  percent of black that have zero balance compared to

19  15.7 percent of whites with zero balance; is that

20  correct?

21      A.   That is correct.

22      Q.   Okay.  And, again, you have not calculated

23  the margin of error associated with those two

24  estimates?

25      A.   That's correct.

1      Q.   And just to be clear, when you say

2   "significantly less likely" in paragraph 28, again,

3   that's just based on your view of the absolute

4   numbers and percentages and not a statistical test?

5      A.   Again, I would like my odds of getting my

6   rights restored, if it's more than one in ten, which

7   is for blacks, as opposed to for whites, which is one

8   in seven.

9      Q.   But just so the record is clear, you have

10   not done a test of statistical significance for those

11   two estimates, have you?

12      A.   That's correct.

13      Q.   Now, going back to where we started sort

14   of, I note that if you compare section four of the

15   original -- your initial report with your

16   supplemental report it essentially reads the same

17   other than you've updated the numbers; is that fair?

18      A.   Yes.  I think for clarity purposes I moved

19   some of the overall summaries up front in the

20   supplement --

21      Q.   Up front --

22      A.   -- and took them out of section four of the

23   original, yes.

24      Q.   Okay.  So you're referring to section 4-E,

25   I believe, of your initial report?

Page 44

1    A.   Let me verify that.

2        MS. EBENSTEIN:  Can you give us a page

3    number, counsel?

4        MR. PERKO:  Yeah.  41.

5    A.   (Continuing)  Yes, I effectively tried to

6    take that summary and move it to the front of my

7    supplement since I thought it was more important.

8    Q.   Okay.  And if you could just take a look

9    for me, I believe in paragraph -- paragraph eight of

10   your original report was sort of your overall summary

11   statewide; is that fair?

12   A.   Yes.

13   Q.   And that is essentially updated in

14   paragraph seven of your supplemental?  If you could

15   just take a look and check.

16   A.   Without giving it terribly great attention,

17   I think that's consistent where I've gone and

18   increased, you know, the denominator by adding these

19   additional ten counties, yes.

20   Q.   Okay.  So as we sit here today, the

21   estimates stated in your supplemental report are your

22   most current and up-to-date estimates?

23   A.   Correct.

24   Q.   Okay.  And you explain in your report what

25   the ten additional counties were, but you're still

1  missing four counties; is that correct?

2      A.   That's correct -- no, I'm missing ten

3  counties.

4      Q.   Correct, you're missing -- but --

5      A.   I'm sorry.  I'm missing nine counties.

6      Q.   Nine counties, right.

7      A.   I've added ten, I'm missing nine.

8      Q.   Okay, thank you.  And the nine that you are

9  missing include Miami-Dade?

10     A.   Correct.

11     Q.   Broward?

12     A.   Correct.

13     Q.   Hillsborough?

14     A.   Correct.

15     Q.   Pinellas?

16     A.   Correct.

17     Q.   And do you recall what the other ones are?

18     A.   Yes.  Clay, Bay, Escambia, Hernando, and

19  Osceola.  That should be nine, I hope.

20     Q.   That's my count.

21     A.   (Nods head in the affirmative.)

22     Q.   Do you know what percentage of the total

23  population of Florida those nine counties comprise?

24     A.   It's sizable.  I don't know off the top of

25  my head, but when you take Miami-Dade, Broward,

1  Hillsborough, in particular, Pinellas is a good size

2  county, Escambia is growing, I don't know if it's

3  half the population of the state, but there are some

4  outstanding individuals here that I would like to get

5  information from those clerks of court to add to my

6  analysis, without question.

7      Q.   And just to be clear, the reason why you

8  don't have those is because you have not received

9  that information from the individual clerks; is

10  that --

11     A.   The individual clerks were requested by my

12  team in early June.  I'm in daily negotiations with

13  the delivery of the data or with data that comes back

14  with missing fields, for instance -- so, for

15  instance, a sentencing date or something along those

16  lines.  I'm optimistic, given the amount of effort

17  that we've put in, that I will have all 67 or close

18  to 67.  At this time I do not have them all.

19     Q.   Okay.

20          If I could refer you to your CV, which I

21  believe is attached to your supplemental report.

22     A.   Sure.

23     Q.   On page -- on page seven you list Outside

24  Activities:  Boards/Expert Witness/Political

25  Consultant/Invited Testimony/Miscellaneous.  And then

1  within that you list Domestic Consulting.   Do you see

2  that?

3      A.   Yes.

4      Q.   So I just want to see if I -- we could go

5  through these cases that you've provided expert

6  services.

7          The first one is Gruver, et al., v. Barton,

8  Case No. 1:19-cv-121.   I believe that's this case; is

9  that correct?

10     A.   I am not sure how it's been consolidated,

11 but, yes, I think that's referring to this case.

12     Q.   Okay.   Consultant, Andrew Goodman

13 Foundation (Analysis of on-campus voting in Florida),

14 2019.   Did you develop an expert report in that for

15 that consulting work?

16     A.   No.

17     Q.   Okay.

18     A.   That was a report, but not, quote, unquote,

19 an expert report for any litigation.

20     Q.   The next one, Consultant ACLU-Florida (Data

21 Analysis of Ex-Felons in Florida), 2019.   Was that

22 related to this case?

23     A.   At the time that I had my agreement, no.

24     Q.   Okay.   So you worked for the ACLU in

25 Florida in that case or for that project?

Page 48

1    A.   Correct, for that project.  It's a project.

2    Q.   Did you develop a report of some sort?

3    A.   I have not developed any reports for them.

4    Q.   Who retained you for this case?

5    A.   The ACLU.  And I believe the contract was

6  specifically with the ACLU, but there may have been

7  other named legal counsel in that.  But it was the

8  national ACLU.

9    Q.   National.  Okay.  And do you recall

10  approximately when you were retained?

11    A.   Sometime probably in July, June.  June,

12  July, somewhere around there.

13    Q.   Okay.

14    A.   I really don't remember.  Maybe late June,

15  early July.  I don't recall.

16    Q.   Okay.  The next one, Expert (Written

17  Declaration), DNC Services Corp versus Lee.  And you

18  can see the case number.

19    A.   Which one is this?

20    Q.   It's the fourth one down.

21    A.   Oh, yes.

22    Q.   That was the vote-by-mail case?

23    A.   I believe that is correct, yes.

24    Q.   I actually worked on that case and I didn't

25  see where you submitted an expert report to the

1  court.  Do you recall if you did?

2      A.   I don't know if -- again, many of these

3  things are out of my --

4      Q.   Sure.

5      A.   -- realm.  I certainly wrote a report for

6  them.

7      Q.   Okay.

8      A.   Whether they filed it, I don't know.  But I

9  wrote a report for legal counsel.

10      Q.   Do you recall when you wrote that report?

11      A.   It would have been sometime in the spring,

12  March, April, somewhere around there, I believe.

13      Q.   Okay.

14          Same for the next case, MOVE Texas Civic

15  Fund versus Whitley?

16      A.   Uh-huh.

17      Q.   Do you know if your written report for the

18  plaintiffs was actually submitted to the court?

19      A.   Again, I have no idea.  I had a deadline, I

20  met the deadline, I provided a report.  What legal

21  counsel does with that is usually not conveyed.

22      Q.   Fair enough.

23          Can you tell me, based on a review of this,

24  and take your time, which of these cases you actually

25  testified before the court?

Page 50

1    A.   Sure, we can walk down.

2         Well, I definitely -- let's see.  I

3    definitely -- when you mean -- testified before the

4    court or was in deposition, you're distinguishing

5    between those two?

6    Q.   Yeah.

7    A.   So when I was actually before a federal

8    judge or a state judge?

9    Q.   Correct.

10   A.   So I may be missing one, but certainly on

11   that same page at the bottom, I testified in federal

12   court in ACRU v. Snipes.

13   Q.   Okay.

14   A.   And I can probably continue to go down.  My

15   recollection gets fuzzier in terms of trying to

16   remember going back several years --

17   Q.   Sure.

18   A.   -- of when I was in front of a judge.  But

19   definitely that case.  And then I can't -- you know,

20   honestly I can't remember the difference between

21   depositions sometimes and being in front of a judge.

22   Q.   Sure.  Do you see on the next page, second

23   page of this listing, a little more than halfway down

24   the Arcia versus Detzner case?

25   A.   Sure.

1      Q.   Do you recall if you testified in that case

2   before the court?

3      A.   I don't think I had to.  I think my report

4   was filed and I don't recall testifying in it.

5      Q.   Do you recall if you were deposed in that

6   case?

7      A.   I don't recall if I was deposed in that

8   case either.

9      Q.   Do you recall a case in Florida that you

10   were deposed?

11      A.   Besides the one that I've already

12   mentioned?

13      Q.   Yeah, yes.

14      A.   That I was just deposed or that I was --

15      Q.   Just deposed.

16      A.   Oh, I mean, we could go back up and look at

17   some of these where I was deposed.

18      Q.   Sure.  Would you like to take a break?  I

19   don't think we're going to be much longer.

20      A.   No.  I mean, I remember working for the

21   secretary of state and was deposed in that case,

22   working with Ashley Davis.  That was here in Florida,

23   that was in federal court.  I'm sure it's listed

24   here.  It may have been Worley v. Detzner.

25      Q.   Okay.

1     A.   I am sure that I was deposed in that

2   case --

3     Q.   Okay.

4     A.   -- because I remember working with -- with

5   her.  Let's see.  I was deposed in several federal

6   cases in Ohio.  But I also want to say that there was

7   another fairly recent one that I was deposed in in

8   Florida, but sometimes they meld together.

9     Q.   Fair enough.

10        Okay, if we could just take a little bit of

11  a break --

12    A.   Oh, I see another one that I was deposed

13  in.

14    Q.   Okay.

15    A.   Sorry.  The Sullivan -- because it was in

16  this room, Sullivan v. Sawinsky, I was deposed in

17  that case.

18    Q.   Which page?

19    A.   That's on the second page about halfway

20  down.

21    Q.   Okay.

22    A.   I was deposed in the case right above that,

23  that's in Ohio federal court.

24    Q.   Okay.

25    A.   Let me just keep looking here in case I

1  find anything else.

2      Q.   Sure.

3      A.   Oh, of course, I was deposed in the Larsh

4  Romo redistricting litigation four times in that

5  case.  These are things that experts often try to

6  forget if we want to sleep well at night.

7      Q.   As do lawyers.

8      A.   So, yes, I apologize.   That was four

9  different depositions, I want to say, in the Romo

10  Detzner, I think it was called.

11      Q.   Fair enough.

12          MR. PERKO:  Why don't we take a five-minute

13      break.

14          (Thereupon, a brief recess was held.)

15  BY MR. PERKO:

16      Q.   Dr. Smith, I asked you a number of

17  questions about figure one of your supplemental

18  report.  And then you have a very similar figure two

19  which refers to the fraction of black and white

20  individuals in the 58 counties with estimates of zero

21  dollar LFOs owed who are in the FDC's OBIS database

22  by county.  And I guess at the risk of being

23  imprecise, but if I were to ask you the same

24  questions related to that figure would they be the

25  same insofar as how you developed the circles that

1  are reflected for the individual counties and how

2  they relate to one another?

3      A.   Well, I'm not sure precisely what you're

4  referring to.  In our previous conversation there was

5  a lot -- but I'm assuming the circle size, yes, are

6  related to the number of black and white individuals

7  who are in the Florida Department of Corrections

8  release database who was able to match with the 58

9  counties in figure two.

10      Q.   So you utilized the same methodology,

11  developed this table, but just based on a different

12  database?

13      A.   I wouldn't call it a different database.

14  I would call it an extended database in that ten

15  additional counties' information has been added in

16  terms of the LFOs.

17      Q.   I was speaking in terms of how you

18  developed figure one as compared to figure two.

19  The same methodology was utilized?

20  A.   Yes.

21  Q.   Okay, okay.

22          But, again, with respect to figure two, you

23  did not calculate the margin of error associated with

24  the individual figures noted for the counties; is

25  that correct?

1    A.   No.

2    Q.   Okay.  If I could refer you to paragraph 29

3  of your supplemental report, September 17th.

4    A.   (Complies.)

5    Q.   The very last paragraph -- or sentence of

6  that paragraph, and feel free to read the whole

7  paragraph, but in the very last sentence you say,

8   "The rate --" I believe I think you're referring to

9  the rate of convicted felons likely to be qualified

10  to register under Senate Bill 7066, "The rate is

11  significantly less for black individuals with felony

12  conviction in nearly all the counties for which I

13  have obtained data."  Do you see that?

14    A.   Yes.

15    Q.   Again, I think I know the answer to this

16  question but I just want to make it clear, when you

17  say "significantly less" what do you mean by

18  "significant"?

19    A.   Again, I'm just looking at the overall

20  rates of individuals who have zero LFOs outstanding

21  in the database who are white or black and the

22  fraction of each of those relative to the total

23  numbers of whites or blacks in the database.

24    Q.   But if I understand you correctly, you did

25  not perform a statistical test of significance with

1  respect to the rate that you're referring to there?

2      A.   Correct.

3      Q.   Would you consider yourself to be a

4  statistician?

5      A.   I'm a political scientist who uses

6  statistics.

7      Q.   What type of statistics do you commonly

8  utilize?

9      A.   I use a wide range of statistics depending

10  on what questions I'm asking.

11     Q.   What courses have you taken during the

12  course of your education that involve statistics or

13  quantitative methods?

14     A.   Well, you're going to date me because it's

15  now close to 30 years ago since I took my graduate

16  courses in statistical training at the University of

17  Wisconsin, Madison.  I took the battery of methods

18  courses there.

19     Q.   Do you teach any courses currently that

20  involve quantitative methods or other statistical

21  techniques?

22     A.   Currently I'm not teaching.  I'm chair of

23  the department.

24     Q.   Okay.  Have you in the past?

25     A.   All the classes I teach involve statistical

1 methods, correct.

2     Q.   And what type of statistical methods have

3 you taught before?

4     A.   Every academic paper is going to have some

5 type of statistic methods.  And so whether it's from

6 cross-sectional time series, to some type of

7 hierarchical modeling, to case studies, the

8 qualitative and quantitative methods in the studies

9 that I teach in my graduate and undergraduate classes

10 are asking substantively interesting questions that I

11 want my students to look at so it's -- you can look

12 at anyone of my syllabi and look at the articles, and

13  -- I can't sit here and tell you all the different

14 methods because it's hundreds of studies that I've

15 taught in dozens of classes, but they are all

16 rigorous studies that I have to be able to convey to

17 them how to understand them.

18        MR. PERKO:  Okay.  I think I'm finished.  I

19     don't believe I have any more questions.

20        MR. SWAIN:  I have a couple, if I can.

21              DIRECT EXAMINATION

22 BY MR. SWAIN:

23     Q.   Doctor, it's been 41 years since I had any

24 statistics courses in Peabody Hall so I may seem like

25 a bigger idiot than counsel asking the questions.

Page 58

1 What exactly was the data that you got from the

2 clerks?

3      A.   So I asked specifically for information

4 that I'm happy to walk you through one of the

5 footnotes so that I'm not leaving anything out, but

6 in one of the footnotes in the original report -- it

7 may not have been in a footnote.  It may have been

8 directly in the text.

9           Yes, paragraph 32 in my original report we

10 asked the 67 clerks of court for individual level

11 data for every person in their county from 1980 to

12 the present with a felony conviction, a guilty or

13 no-contest plea, requested all the information in all

14 the available fields maintained in a county's case

15 management system, including full name, Department of

16 Corrections number, the Florida Department of Law

17 Enforcement's OBTS number, address, date of birth,

18 gender, race, charges, including the offense

19 category, convictions, including the prior and

20 current convictions within the county, the current

21 status of supervision, including parole, probation,

22 release, et cetera, any outstanding legal financial

23 obligations, fines, fees, restitution, civil liens,

24 other costs, et cetera, and the expected date of

25 completion of supervision -- or the sentencing

1 effective date, and the length of incarceration or

2 community supervision.

3     Q.   And what format was that received in?

4     A.   From the clerks themselves?

5     Q.   Yes.

6     A.   If memory serves, of the 58 county clerks,

7 50 came through their association, the FCCC, all in

8 electronic format, sent primarily on flash drives in

9 batches of counties.

10         The other eight counties have come directly

11 from the clerks themselves.  I think all of them --

12 most of them electronically delivered through either

13 FTP secure sites or otherwise.

14     Q.   When I think of electronic format that's a

15 wide -- there are a lot of sins under that term.  It

16 could be a graphic file, it could be like a CSV

17 file.  What were the files you received?

18     A.   Generally CSV files in a standard matrix

19 form with rows and columns.  There were some

20 differences across some of the counties which

21 required some extra coding to try to figure out

22 individuals, when the data was aligned with cases,

23 for instance.  So there's a lot of loops in the code

24 to be able to find an individual who might have

25 multiple cases and to make sure all those are grouped

1  together to figure out what the maximum sentence is

2  and what the legal -- the legal financial obligations

3  and what has been paid off would be.

4      Q.   Have you had any training in criminal

5  procedure?

6      A.   No.

7      Q.   Have you ever -- are you an attorney?

8      A.   No.

9      Q.   So you haven't practiced criminal law?

10     A.   No.

11     Q.   What's a sentencing document?

12     A.   Well, that's outside the scope of my

13  report.  I can tell you my understanding if you'd

14  like, but it's outside both of my reports.

15     Q.   So you don't know as you sit here what a

16  sentencing document is?

17     A.   Oh, I am very familiar with what a

18  sentencing document is.

19     Q.   Well, then why don't you tell me what you

20  believe a sentencing document is.

21     A.   A sentencing document is what the judge

22  is signing with respect to the sentence after a

23  conviction or a guilty plea.

24     Q.   And are they uniform across the 67 counties

25  of Florida?

1     A.   I have looked at many.  I would say the

2  answer to that is no.

3     Q.   Is there a standard form the Supreme Court

4  requires every county to use?

5          MS. EBENSTEIN:   Objection, calls for a

6      legal conclusion.

7     A.   I don't know what the standard is from the

8  state.  All I can say is from pulling up many

9  sentencing documents from many counties that there

10  are different formats.

11    Q.   So you've never looked at the rules of

12  criminal procedure?

13    A.   I don't think that's necessarily true.

14  I've certainly looked at the rules of criminal

15  procedure as well as the criminal code to figure out

16  which crimes were included or excluded from Senate

17  Bill 7066, for instance.

18    Q.   Have you looked at the forms attached to

19  the rules of criminal procedure which are promulgated

20  by the Supreme Court?

21    A.   I've looked at some forms from the Supreme

22  Court, for instance, in the late 1990s when they were

23  coming up with uniform case numbers and documents

24  like that to try to get a better understanding of

25  what the UCN numbers referred to.  And those were

Page 62

1  promulgated by the Supreme Court or produced by the

2  Supreme Court.

3      Q.   Did you look at the sentencing document for

4  all the individuals listed in your -- in the -- your

5  figures that you've presented?

6      A.   No.

7      Q.   Did you look at the sentencing document for

8  any of them?

9      A.   Yes.

10      Q.   How many did you look at the sentencing

11  document for?

12      A.   Dozens and dozens.

13      Q.   And in those cases was there only one

14  sentencing document?

15      A.   It varied.

16      Q.   And generally -- or are you able to say

17  what a sentencing document is called?

18      A.   Every county clerk website that I have

19  accessed pulling up individual documents are slightly

20  different.  It is very clear that many of the clerks

21  use different software so there's different portals

22  that one needs to go through, different tabs that one

23  needs to pull down.  I would not be surprised if the

24  nomenclature differed in terms of what those

25  documents are called.  It is not easy because of that

1  variation.  Can I answer specifically your question

2  is there a standard name?  I can't recall the detail

3  of whether the name was the same.

4       Q.   In the various dozens of cases you've

5  looked at, have you seen any cases where the

6  incarceration or probation time may be in one

7  document and the financial penalties in another

8  document?

9       A.   I've seen a lot of variation and that

10  certainly could have been one of those possibilities.

11       MR. SWAIN:  That's all I have.

12       MS. EBENSTEIN:  I have a couple of quick

13       questions on redirect unless anybody on the

14       phone has additional questions.

15       MR. PERKO:  Does anybody on the phone have

16       questions for Dr. Smith?

17       (No audible response.)

18       MS. EBENSTEIN:  Okay.  Professor Smith, I

19       just have three brief questions to go over with

20       you.

21                 CROSS-EXAMINATION

22  BY MS. EBENSTEIN:

23       Q.   Counsel asked you about the change from

24  report one to report two after your addition of data

25  from, I believe it was, ten counties?

1     A.   (Nods head in the affirmative.)

2     Q.   I just want to discuss what kind of changes

3   that could include.  So if somebody had a zero

4   balance in the 48 counties, and you are able to match

5   that individual to the new data in the ten counties,

6   where there was an outstanding balance they would

7   then be shown as having a balance, right?

8     A.   That is correct.

9     Q.   So somebody who you identified in the first

10  report as having zero balance could in the second

11  report have a financial obligation balance because of

12  the data in the ten counties; is that right?

13    A.   That's correct.

14    Q.   Okay.  And am I correct that the reverse

15  does not hold true, which is to say if somebody has

16  an outstanding balance in the first report and you

17  matched their name to data in the ten additional

18  counties, they would still fall into the category of

19  persons with an outstanding balance even if their

20  data in the ten additional counties showed a zero

21  balance in those ten counties; is that correct?

22    A.   That's correct.

23    Q.   Okay.  If you could turn back to table one

24  in your supplemental report, which is between

25  paragraphs six and seven.

Page 65

1      A.   Yes.

2      Q.   You specify that this is the data across 58

3   Florida counties, right?

4      A.   Correct.

5      Q.   And the absolute numbers there, to look at

6   the second-to-the-left column, 22,213, 141,225, and

7   the total, those are hard data points, right, not

8   estimates?

9      A.   Correct.  Those are -- I think it's

10  important to clarify about the known knowns and some

11  of the unknown knowns.

12          So as of the July 1st snapshot from the

13  Florida Department of Corrections, we know that there

14  were -- I think it's -- let me get the correct

15  number.  There are 354,264 individuals beginning in

16  1997 who have been released.  Of those, according to

17  their sentencing, there were 336,108.

18          So going back to table one, we know that

19  there are individuals released from FDC who I have

20  not been able to match to the 58 counties.  So that's

21  a known quantity of individuals, and it's one that

22  when I get the other nine counties of data that total

23  eligible will certainly increase and those who owe

24  nothing or something in terms of LFOs will adjust

25  accordingly.  So that's a known quantity, and with

1  those additional counties it will have a residual

2  effect on the existing individuals if they have

3  multiple convictions.

4      Q.   Okay.  And just to understand what's in the

5  data that you -- you've now described two sets of

6  data.  Some are unmatched and so they're not analyzed

7  here.

8      A.   Correct.

9      Q.   The others who are matched and identified

10  here, those are just hard numbers and not estimates;

11  is that correct?

12         MR. PERKO:  Object to form.

13      A.   So the information that I have is as

14  reliable as the underlying data that I received from

15  the Florida Department of Corrections and from the

16  county clerks.  And in so much as I'm able to match

17  exactly the information in both of those in terms of

18  their names and birth dates and gender and race,

19  those numbers I'm very confident in.

20      Q.   Okay.  And, again, just looking at the set

21  of persons who you are able to match, those

22  percentages -- am I correct those percentages are a

23  percentage of zero balance and a percentage of more

24  than zero balance from among -- within that data set?

25      A.   Correct.  Within both of those data sets

1  where there's an exact match, those are fixed numbers

2  where we're talking less than 14 percent of those in

3  the Department of Corrections and around 22 percent

4  of those who are solely in the counties --

5      Q.   Okay.

6      A.   -- who owe zero.

7      Q.   So that's a matter of just division, not an

8  estimate; is that correct?

9      A.   There's no estimate there, there's no

10  approximation.  That's what the raw data from the

11  Department of Corrections and from the 58 counties

12  reveals.  There's no estimating, there's no

13  confidence interval that we need with respect to some

14  matching algorithm.  Those are raw data where I can

15  say confidently that there are 141,225 people who

16  have been released from the Department of Corrections

17  who owe more than zero dollars --

18      Q.   Okay.  And does the --

19      A.   -- at this time.

20      Q.   And you specified that in the chart across

21  58 Florida counties, correct?

22      A.   Correct.

23      Q.   Okay.  And does the same hold true for

24  table two, which is on page six, and table three,

25  which is on page 12, and table 18 -- sorry, excuse

Page 68

1  me, table four, which is on page 18, that those

2  percentages are from among the data that you were

3  able to match simply division but not estimates?

4        MR. PERKO:  Object to form.

5      A.   They are not estimates.   These numbers are

6  not estimates.   They are raw data that has been

7  matched with an exact match either from Department of

8  Corrections to the 58 counties or within the counties

9  themselves.   They are raw individual numbers, counts

10  of people who owe either zero dollars by race in some

11  cases or who owe more than zero dollar, again, broken

12  down by race.

13      Q.   Okay.

14      A.   And I should add, you know, that the

15  numbers of black and white don't add up to the full

16  count because there's a residual category of people

17  who didn't have a category of black or white in the

18  Department of Corrections and the counties.   That's

19  the residual amount.   If you do the math you can

20  account for those other individuals from the ones

21  that are not broken down by race to the ones that are

22  broken down by race.

23      Q.   Okay.   And if you could just turn to page

24  seven of your CV.

25      A.   Uh-huh.

1     Q.   The list of domestic consulting, four down

2   you identified that you provided -- sorry.   In DNC

3   Services Corporation versus Lee you identify that you

4   produced a written declaration; is that right?

5     A.   That's what I have written on here, yes.

6     Q.   And going one down from that to MOVE Texas

7   Civic Fund v. Whitley you identify that you produced

8   a written declaration there, right?

9     A.   That's correct.

10    Q.    If you go up from DNC Services versus Lee

11   where it's listed that you were a consultant for the

12   ACLU-Florida, you don't include a note that you

13   produced a written declaration; is that right?

14    A.   There is no written declaration.

15    Q.   And have you produced any sort of written

16   declaration or report for that listing there?

17    A.   Not at all.

18    Q.   And have you produced any report or taken

19   action beyond making public records requests to

20   counties and other state agencies in terms of that

21   listing?

22    A.   That is correct.

23       MS. EBENSTEIN:  Okay.  Those are all the

24     questions I have.

25       MR. DANJUMA:  Just before we close up the

Page 70

1   deposition I want to -- this is Orion Danjuma on

2   the phone.  I wanted to ask for a very brief

3   break if that's possible.

4       MR. PERKO:  You're deposing the witness?

5       MR. DANJUMA:  No, I'm asking for a break.

6   Is that possible to have a two-minute break?

7       MR. PERKO:  I think we're finished.

8       MS. EBENSTEIN:  If I could consult with my

9   co-counsel?

10      MR. PERKO:  Okay.  Yeah, we can take a

11  break.

12      (Thereupon, a brief recess was held.)

13      MR. PERKO:  Okay.  We're back.

14      MS. EBENSTEIN:  We have no additional

15  questions at this time.

16      MR. PERKO:  Okay.  I think we're finished.

17      Dr. Smith, you have the right to read your

18  deposition to correct any typographical errors,

19  not that there will be any.

20      THE DEPONENT:  There is a typographical

21  error that I noticed when I was reading last

22  night.

23      MR. PERKO:  Okay.  If you want to go ahead

24  and correct it, it's fine.

25      THE DEPONENT:  Yes.  On page 17.

1    MR. PERKO:  Of which report?

2    THE DEPONENT:  Of the supplemental report.

3    MR. PERKO:  Okay.

4    THE DEPONENT:  Paragraph 26, I mistyped a

5    number.  It says, "Overall I estimate that 13.6

6    percent of these individuals, some 105,941

7    individuals, owe zero dollars in LFOs tied to

8    their felony convictions."  That 105,941 is

9    actually 22,213.  I simply transposed the wrong

10   number there.  It is correct in table four, that

11   22,213 and the 13.6 percent for balance due for

12   everyone amounting to zero dollars.  So I

13   apologize for that mistake.

14   MR. PERKO:  Okay.

15   MS. EBENSTEIN:  We'll read the deposition.

16   (Thereupon, the witness was excused and the

17   deposition adjourned at 12:58 p.m.)

18

19         _ _ _

20

21

22

23

24

25

Page 72

1                   CERTIFICATE OF OATH

2  STATE OF FLORIDA

3  COUNTY OF ALACHUA

4

5          I, the undersigned authority, certify that

6  DAVID A. SMITH, Ph.D., personally appeared before me

7  on September 19th, 2019, and was duly sworn.

8

9          WITNESS my hand and official seal this 30th

10  day of September, 2019.

11

12

13

14                  _ _ _ _ _ _ _ _ _ _

15                  NANCY STEPHENSON

16                  COURT REPORTER
                    Commission # EE 183413
17                  Expires:  May 23, 2020
                    JOHNS, STEPHENSON & BIERY
18                  ADVANTAGE COURT REPORTERS

19

20

21          Professionally known

22          OR Produced identification  XX

23          Type of identification produced FL-DL

24

25

1          REPORTER'S DEPOSITION CERTIFICATE

2

3  STATE OF FLORIDA

4  COUNTY OF ALACHUA

5

6          I, Nancy Stephenson, certify that I was

7  authorized to and did report by stenograph the

8  deposition of DAVID A. SMITH, Ph.D.; that a review of

9  the transcript was requested; and that the

10  transcript, pages 3 through 71, is a true and

11  complete record of my stenograph notes.

12

13          I further certify that I am not a relative,

14  employee, attorney or counsel of any of the parties,

15  nor am I counsel connected with the action, nor am I

16  financially interested in the action.

17

18          DATED this 30th day of September, 2019.

19

20

21                _____

22                NANCY STEPHENSON
                  COURT REPORTER
23                JOHNS, STEPHENSON & BIERY
                    ADVANTAGE COURT REPORTERS

24

25

Page 74

1                       ERRATA SHEET

2          I, DANIEL SMITH, have read my deposition in
    the case of Gruver v. Barton, et al., taken on
3   September 19, 2019, and the transcript constitutes a
    true and accurate transcription of same with the
4   exception of the following amendments, additions,
    deletions, or corrections:
5
    PAGE NO.    LINE NO.    CHANGE AND REASON FOR CHANGE
6
7   _____    _____    _____

8   _____    _____    _____

9   _____    _____    _____

10  _____    _____    _____

11  _____    _____    _____

12  _____    _____    _____

13  _____    _____    _____

14  _____    _____    _____

15  _____    _____    _____

16  _____    _____    _____

17  _____    _____    _____

18  _____    _____    _____

19  _____    _____    _____
             Under the penalties of perjury, I declare
20  that I have read my deposition and that it is true
    and correct subject to any changes in the form or
21  substance entered here.

22  SIGNATURE:_____   DATE: _____

23  Court Reporter: Nancy Stephenson
    O: Perko
24  C: Ebenstein

25

**1**

**1** 5:17 12:16
**10.3** 42:17
**105,941** 71:6,8
**10th** 15:7
**112** 38:10
**12** 40:23 67:25
**12:58** 71:17
**13.6** 71:5,11
**14** 24:13 67:2
**141,225** 65:6 67:15
**15** 35:9 40:23
**15.7** 42:19
**16.7** 40:13
**17** 70:25
**17th** 6:9 7:1,8 11:3,8
   17:12 30:15 55:3
**18** 67:25 68:1
**183413** 72:16
**1898** 15:7
**19** 39:13 74:3
**1980** 58:11
**1990s** 61:22
**1997** 65:16
**1998** 15:8
**19th** 72:7
**1:19-cv-121** 47:8
**1st** 22:9,23 65:12

**2**

**2** 10:13 26:2
**20** 35:15
**2019** 10:14 11:3 17:5,8
   21:11 22:15 47:14,21
   72:7,10 73:18 74:3
**2020** 72:17

**22** 67:3
**22,213** 65:6 71:9,11
**23** 12:16 18:15 20:9
   23:7 72:17
**24** 21:10
**25** 35:8,9 41:21
**26** 11:11 71:4
**28** 42:8 43:2
**29** 55:2
**2nd** 10:14 11:10 16:23
   17:22 30:15,22 37:20

**3**

**3** 10:25 17:11 33:1
   73:10
**30** 33:7 56:15
**30th** 22:15,17 72:9
   73:18
**31** 30:23
**31st** 17:5
**32** 58:9
**33** 32:17
**336,108** 65:17
**34** 32:16
**35** 26:1
**354,264** 65:15

**4**

**4** 37:11,15,19
**4-E** 43:24
**40** 31:11 32:12
**41** 44:4 57:23
**45** 36:3
**46** 10:19
**462** 38:9
**48** 11:20,24 12:7,9,25
   34:1 64:4

**5**

**5-B** 8:1
**5-C** 8:15
**5-D** 9:17
**5-E** 10:5
**50** 33:6 59:7
**527** 38:17
**58** 31:4 39:19,21 40:11,
   18 41:20,25 42:14
   53:20 54:8 59:6 65:2,20
   67:11,21 68:8
**58-county** 19:24

**6**

**64** 38:24
**65** 38:24
**67** 19:5,12 30:10 42:1
   46:17,18 58:10 60:24
**67-county** 19:25

**7**

**7066** 20:14 28:24 40:1
   42:6 55:10 61:17
**71** 73:10

**9**

**90** 25:6
**95** 25:6

**A**

**absentee** 19:4,7,11
**absolute** 43:3 65:5
**absolutely** 17:15 33:5
   34:19
**academic** 57:4
**academician** 30:4
**access** 23:14

**accessed** 62:19
**accessing** 25:24
**accommodate** 5:14
**account** 19:7 68:20
**accurate** 6:10 22:5
   74:3
**acknowledge** 24:12
**ACLU** 47:24 48:5,6,8
**ACLU-FLORIDA**
   47:20 69:12
**ACRU** 50:12
**action** 69:19 73:15,16
**active** 6:17
**Activities** 46:24
**add** 34:3 46:5 68:14,15
**added** 45:7 54:15
**adding** 34:10 44:18
**addition** 12:5 33:10
   63:24
**additional** 9:23 11:15,
   18,21,25 12:5 20:24
   22:24 33:15,17 34:25
   39:6 44:19,25 54:15
   63:14 64:17,20 66:1
   70:14
**additions** 74:4
**address** 58:17
**adjourned** 71:17
**adjudicated** 29:20
**adjust** 35:2 65:24
**adjusting** 33:20
**ADVANTAGE** 72:18
   73:23
**affect** 36:1
**affirmative** 8:18 20:7
   21:24 35:13 45:21 64:1
**age** 14:2
**agencies** 9:8,9 18:23
   23:12 27:25 69:20
**agency** 9:10

agreement 47:23

ahead 26:3 37:7 38:3 70:23

Alachua 14:6 29:23 36:16,19 38:25 39:1 72:3 73:4

algorithm 14:1,13,14 15:11 27:9,13,17 28:13 29:9 67:14

algorithmic 26:22

algorithms 14:15 27:19 29:3

aligned 59:22

alphabetically 36:18

alternatives 29:14

amendments 74:4

amicus 7:11

amount 46:16 68:19

amounting 71:12

analogous 37:23

analyses 11:16

analysis 11:10 12:4,22 14:9,11,16 16:9 18:19, 21 19:21 20:6 21:4,11 22:19 25:2 26:18 28:15 34:2 40:10 46:6 47:13, 21

analyze 14:8 19:1

analyzed 11:24 31:5 66:6

and/or 6:23 7:5 8:17

Andrew 47:12

anomalies 29:17

apologize 37:8 53:8 71:13

appeared 72:6

appears 37:19

appended 12:10

appendices 36:7

approximately 48:10

approximation 67:10

April 49:12

architecture 15:17

archiving 18:24

Arcia 50:24

arriving 8:3

Art 27:10,22 28:9

Arthur 27:15 28:9

articles 8:6 57:12

Ashley 51:22

asks 6:2 7:13 8:2,15 9:17 10:5

assessment 19:23,24, 25

association 19:17 59:7

assume 5:7 14:1 22:8 25:23

assuming 27:22 54:5

assumption 8:22 15:22 25:25

attached 7:1,7 17:21 37:24 46:21 61:18

attachments 16:14

attempted 25:1

attention 30:16 44:16

attorney 60:7 73:14

audible 63:17

August 6:21 10:14 11:10 16:23 17:2 22:20 30:14,22 35:8 37:20 38:7

authored 6:7

authority 72:5

authorized 73:7

avoid 10:21 23:10

awards 7:5

aware 6:14 23:22

axis 32:5,6,7,10 33:23

**B**

back 16:2 18:15 42:6 43:13 46:13 50:16 51:16 64:23 65:18 70:13

backgrounds 18:12

balance 32:10,15,16 39:7,17 42:10,18,19 64:4,6,7,10,11,16,19,21 66:23,24 71:11

balances 36:22 38:20 39:4 41:21

ballots 19:4,7,11

barriers 29:15,24

Barton 47:7 74:2

based 20:3 21:17 24:18 39:5 43:3 49:23 54:11

basic 10:4

basically 31:3 38:13

basis 25:21 30:5

batches 59:9

battery 56:17

Bay 45:18

beast 24:1

beginning 65:15

biased 20:11 21:6 28:20

BIERY 72:17 73:22

big 29:4

bigger 57:25

Bill 28:24 39:25 55:10 61:17

birth 27:11 28:4,17 58:17 66:18

bit 52:10

black 31:3,18,25 32:15 33:19 35:2,10 39:22 42:13,18 53:19 54:6 55:11,21 68:15,17

blacks 40:13,17,23 42:7 43:7 55:23

blind 38:1,4

board 14:22

Boards/expert 46:24

books 8:6

bottom 32:6,7 50:11

bounce 16:2

branch 6:25

break 5:10,12 51:18 52:11 53:13 70:3,5,6,11

briefs 7:11

bring 6:3

broken 23:17 68:11,21, 22

brought 7:17 8:24 9:1

Broward 45:11,25

**C**

calculate 25:1 54:23

calculated 41:13 42:22

call 14:16 54:13,14

called 53:10 62:17,25

calls 61:5

case 5:1,3,5 9:13 19:2, 23 20:16 27:20 34:18 38:16 47:8,11,22,25 48:4,18,22,24 49:14 50:19,24 51:1,6,8,9,21 52:2,17,22,25 53:5 57:7 58:14 61:23 74:2

cases 6:23 13:7 14:3 15:15 16:10 47:5 49:24 52:6 59:22,25 62:13 63:4,5 68:11

categorically 41:21

categories 23:17

category 58:19 64:18 68:16,17

cautious 28:15

centralized 24:7,21

certainty 41:23

CERTIFICATE 72:1

73:1

certify 72:5 73:6,13

cetera 18:17 58:22,24

chair 4:16 56:22

change 12:5,8 34:2 63:23 74:5

changed 30:14 33:4,6

charges 58:18

chart 67:20

check 44:15

chose 41:2

circle 31:13,22 33:19 35:9,23 54:5

circles 53:25

citation 8:11

citations 7:25

Civic 49:14 69:7

civil 58:23

clarify 11:25 34:19 65:10

clarity 43:18

classes 56:25 57:9,15

Clay 45:18

clean 38:16

clear 15:18 20:4 39:16, 20 43:1,9 46:7 55:16 62:20

clerk 22:19 25:14 62:18

clerk's 29:11

clerks 11:19 12:1,24,25 13:11 14:5 15:16 16:1 19:16 20:1 22:10 39:22 46:5,9,11 58:2,10 59:4, 6,11 62:20 66:16

clerks' 26:24 29:16

close 31:10,16 46:17 56:15 69:25

co-counsel 70:9

code 59:23 61:15

coding 59:21

collapsing 38:13

colleagues 18:14

collect 18:6,9 41:25

Collier 29:22

column 65:6

columns 59:19

Commission 72:16

common 27:24

commonly 56:7

community 59:2

compare 34:14 43:14

compared 40:1 42:16, 18 54:18

comparing 14:20 34:19 36:10 38:5

compilation 18:2

compile 18:22

complete 7:13 73:11

completed 20:19 22:17

completion 58:25

complicate 12:22 18:18

complicated 39:10

complicates 19:20 24:22

complicating 18:21

Complies 55:4

comprehensive 30:5

comprise 45:23

computer 10:1

conceivable 20:23 35:10 39:3

conceptually 29:2 30:20 35:7

concerns 41:16 42:2

conclusion 61:6

conclusions 8:4

condition 26:8,14

conference 25:17

conferences 6:18

confidence 25:5 27:14 67:13

confident 66:19

confidently 67:15

confirm 11:7 32:22

confusion 10:21

connected 73:15

connection 7:14,21

conservative 20:11,17 28:5,16,19

conservatively 13:23

consistent 12:3 44:17

consolidated 47:10

constitutes 74:3

consult 70:8

consultant 47:12,20 69:11

Consultant/invited 46:25

consulting 47:1,15 69:1

consumption 27:6

contained 7:7

contemplate 9:19

continue 50:14

Continuing 9:7 44:5

contract 48:5

contracted 18:8

contributed 6:7

conversation 54:4

conversations 25:19

conversely 20:21

convey 57:16

conveyed 49:21

convicted 55:9

conviction 23:15 35:1 39:24 40:2 55:12 58:12

60:23

convictions 20:13 28:22 39:18 42:11 58:19,20 66:3 71:8

copies 37:9

copy 10:13 38:1

Corp 48:17

Corporation 69:3

correct 4:19 7:10,12 10:10,17 11:11,13 12:8, 9,24,25 14:10,25 15:3 16:25 17:9,20,23 18:3 21:8,14,15,17,18 26:11 28:21,25 30:22,23,24 31:8,15 32:14,18 34:18 37:25 39:8 40:4 41:10, 14 42:20,21,25 43:12 44:23 45:1,2,4,10,12, 14,16 47:9 48:1,23 50:9 54:25 56:2 57:1 64:8, 13,14,21,22 65:4,9,14 66:8,11,22,25 67:8,21, 22 69:9,22 70:18,24 71:10 74:20

corrected 15:20

correcting 34:23 35:5

corrections 21:13 22:8,14 27:4 54:7 58:16 65:13 66:15 67:3,11,16 68:8,18 74:4

Corrections' 26:24 31:6

correctly 17:10 30:25 32:4,20 55:24

corresponds 30:21

costs 58:24

counsel 5:20,23,24 6:13 8:23 9:2,11 10:19 16:17 44:3 48:7 49:9,21 57:25 63:23 73:14,15

count 45:20 68:16

counties 11:22,24 12:5,7 29:20 30:10 31:4 33:10,16,18 34:1,3,10, 12,25 39:3,6,19,21 40:11,18 41:20 42:1,14 44:19,25 45:1,3,5,6,23 53:20 54:1,9,24 55:12

59:9,10,20 60:24 61:9
63:25 64:4,5,12,18,20,
21 65:3,20,22 66:1
67:4,11,21 68:8,18
69:20

counties' 19:5 54:15

counts 68:9

county 11:19,25 14:7
17:5 24:15 26:24 27:12
29:23 30:9 31:11,14,19,
21,22,24 32:1,11,23
33:11,24 34:15,16,17,
21,24 35:7,11,14,21,24
36:11,16,19 39:7,22
46:2 53:22 58:11,20
59:6 61:4 62:18 66:16
72:3 73:4

county's 58:14

couple 5:21 20:16
57:20 63:12

courses 56:11,16,18,
19 57:24

court 11:2,19 16:15,20
19:16 22:10,19 46:5
49:1,18,25 50:4,12
51:2,23 52:23 58:10
61:3,20,22 62:1,2
72:16,18 73:22,23
74:23

create 16:11 18:25
28:14

created 16:8 38:7

creating 17:1 27:21

credit 27:25

crime 14:2

crimes 61:16

criminal 60:4,9 61:12,
14,15,19

CROSS-
EXAMINATION 63:21

cross-sectional 57:6

CSV 59:16,18

cured 19:11

curing 19:9

curiosity 25:8

current 6:4 25:11 44:22
58:20

curriculum 6:5,9

custody 27:7 42:15

CV 6:25 7:7 46:20 68:24

**D**

D.A. 27:9

daily 46:12

Dan 27:10

Daniel 4:9 27:10,16,23
28:3,9 74:2

Danjuma 69:25 70:1,5

darnedest 41:25

data 11:10,23 12:2,7,8,
9,20,21,23 13:1,3,4,7,
10,12,16,19,20,22,25
14:4,24 15:4,5,10,13,
16,17 16:3,4,5,9 18:2,9,
17,23,24 20:5,6,23
22:4,20,22,23 23:3,7,
24,25 24:7,15 25:24
29:4 31:14,23 33:3 34:1
39:21 41:11,16,24,25
42:3 46:13 47:20 55:13
58:1,11 59:22 63:24
64:5,12,17,20 65:2,7,22
66:5,6,14,24,25 67:10,
14 68:2,6

database 19:1 21:12,
22 23:18 24:2,8,18,22
25:16,22 26:24 27:4,13,
15,22 31:7 33:14 34:4
39:19 40:18 41:20
42:12 53:21 54:8,12,13,
14 55:21,23

databases 14:20 22:3
23:2 28:7

date 6:7 7:3,9 13:8
15:1,2,6,19,21 17:1,5
23:16 27:11 28:4,17
46:15 56:14 58:17,24
59:1 74:22

dated 6:8 10:14 11:8
22:10 73:18

dates 66:18

DAVID 4:2 72:6 73:8

Davis 51:22

day 13:8 72:10 73:18

days 5:21

deadline 49:19,20

dealing 13:6 22:2 23:2,
11 24:2,13

dealt 15:3

decade 24:6

declaration 48:17
69:4,8,13,14,16

declare 74:19

Defendant's 37:15

deletions 74:4

delivered 59:12

delivery 46:13

denominator 44:18

department 4:17 21:13
22:8,14 25:13 26:23
27:4 31:6 54:7 56:23
58:15,16 65:13 66:15
67:3,11,16 68:7,18

depending 56:9

DEPONENT 4:4 70:20,
25 71:2,4

deposed 4:19,21 51:5,
7,10,14,15,17,21 52:1,
5,7,12,16,22 53:3

deposing 70:4

deposition 5:20,25 6:3
50:4 70:1,18 71:15,17
73:1,8 74:2,20

depositions 50:21
53:9

describe 15:23

description 7:18

descriptive 10:4

detail 63:2

determination 26:8,14

determine 15:6 20:24
26:19 29:8 40:21

Detzner 50:24 51:24
53:10

develop 47:14 48:2

developed 24:18 48:3
53:25 54:11,18

developing 16:22

developments 6:15

differed 62:24

difference 38:18,19
40:22 50:20

differences 38:22,23
59:20

differently 17:17

difficult 18:25

DIRECT 4:5 57:21

directly 58:8 59:10

discrepancies 19:18

discrepancy 22:11

discuss 26:12 64:2

discussed 41:12

discussion 20:4

disparate 19:13 23:12

dissertation 25:12

distinguishing 50:4

division 67:7 68:3

DNC 48:17 69:2,10

Doctor 38:3 57:23

document 5:18 6:15
23:23 60:11,16,18,20,
21 62:3,7,11,14,17
63:7,8

documentation 8:16

documents 6:3 7:16,
18,20 8:2,8,24 9:1,6,18
10:5,7 16:21 38:5 61:9,
23 62:19,25

dollar 31:5 53:21 68:11

dollars 35:3 40:10,16
67:17 68:10 71:7,12

domestic 47:1 69:1

**downloaded** 18:1

**dozen** 4:23

**dozens** 57:15 62:12 63:4

**drink** 5:12

**drives** 59:8

**dropped** 14:10

**dropping** 14:3

**due** 36:22 38:20 39:4,7, 17 42:10 71:11

**dug** 29:15

**duly** 4:3 72:7

**E**

**e-mails** 8:15,19

**earlier** 18:16 20:4

**early** 6:21 38:8 46:12 48:15

**easily** 15:19

**easy** 62:25

**Ebenstein** 9:4 10:22 37:12 44:2 61:5 63:12, 18,22 69:23 70:8,14 71:15 74:24

**education** 56:12

**EE** 72:16

**effect** 66:2

**effective** 59:1

**effectively** 14:3 44:5

**effort** 15:10 18:6 19:21 28:5 46:16

**elections** 19:6

**electronic** 59:8,14

**electronically** 59:12

**eligible** 20:13 28:23 29:5,6,8 39:18 40:19 42:11 65:23

**employed** 4:12,14

**employee** 73:14

**encounter** 13:18

**encountered** 13:4

**end** 5:25 18:17

**endpoints** 23:4

**Enforcement's** 58:17

**enter** 30:9

**entered** 74:21

**entirety** 9:4

**entities** 19:13

**entity** 6:25

**entries** 12:22 18:17 23:25

**entry** 12:21 13:10,17,21 14:6 15:5 16:4 18:24 20:5,22 23:25 24:15

**ERRATA** 74:1

**error** 13:10,11 15:5 16:4 21:23,25 23:8,10 24:3,17 25:2 41:9,11,14 42:23 54:23 70:21

**errors** 12:21 23:25 24:10,25 70:18

**Escambia** 45:18 46:2

**essentially** 11:9 20:8 21:5 42:9 43:16 44:13

**estimate** 67:8,9 71:5

**estimates** 20:10 21:6 23:8 24:3,18 25:6 31:5 39:17 41:10,14 42:24 43:11 44:21,22 53:20 65:8 66:10 68:3,5,6

**estimating** 67:12

**et al** 47:7 74:2

**evaluation** 7:15

**everyone's** 23:15

**Ex-felons** 47:21

**exact** 14:16 19:15 23:5 28:6,12,17 67:1 68:7

**EXAMINATION** 4:5 57:21

**examples** 13:3 20:16

**exception** 12:3 19:16 74:4

**excluded** 61:16

**excuse** 67:25

**excused** 71:16

**exercised** 15:13

**exhibit** 5:17 6:1 8:1 10:12,20,25 12:16 17:11 26:2 33:1 37:10, 15,18

**exhibits** 9:18

**exist** 23:19 27:5

**existing** 66:2

**expect** 5:11

**expected** 13:17 58:24

**experienced** 29:25

**expert** 8:9 10:2,7,14 11:1 12:16 36:11 37:21 47:5,14,19 48:16,25

**experts** 53:5

**Expires** 72:17

**explain** 9:19 12:13 44:24

**explore** 26:4

**expressed** 16:23 41:22

**extended** 54:14

**extent** 26:19

**extra** 37:9 59:21

**F**

**fact** 23:11

**factual** 5:1

**fair** 5:8 6:20 11:17 17:13,19 21:1,2 23:6 24:4 29:12 30:12 31:22 32:2 43:17 44:11 49:22 52:9 53:11

**fairly** 25:18 52:7

**fall** 64:18

**false** 22:21 26:2,5,7,13, 20 27:21 28:7,8

**familiar** 60:17

**familiarity** 25:15

**familiarize** 26:3

**FCCC** 59:7

**FDC** 21:12,20 25:16 31:19 33:14 34:18,21, 23 41:20 42:15 65:19

**FDC's** 39:19 40:18 42:11 53:21

**FDOC** 17:6 36:24,25 37:20

**federal** 25:14 50:7,11 51:23 52:5,23

**feel** 55:6

**fees** 58:23

**felon** 29:13

**felons** 29:5 31:19 32:1 55:9

**felony** 20:12 28:22 29:20 39:18,23 40:2 42:11 55:11 58:12 71:8

**field** 27:5

**fields** 46:14 58:14

**figure** 29:16,18,22 30:16,22 33:1,2 34:23, 24 35:8 38:12,23 53:17, 18,24 54:9,18,22 59:21 60:1 61:15

**figures** 54:24 62:5

**file** 7:14 22:18 24:9 59:16,17

**filed** 16:15,19 49:8 51:4

**files** 14:4 29:10 59:17, 18

**filing** 17:2 38:7

**final** 16:10

**finally** 10:5

**financial** 20:25 23:16 26:25 27:2 58:22 60:2 63:7 64:11

**financially** 73:16

**find** 31:9 53:1 59:24

**finding** 27:21 28:16

findings 21:23 22:1

fine 70:24

fines 58:23

finished 57:18 70:7,16

fishy 15:14

fitting 7:18

five-minute 53:12

fixed 67:1

FL-DL 72:23

flagged 27:24

flash 59:8

flip 41:4

Florida 4:13 19:4 21:13
26:23 45:23 47:13,21,
25 51:9,22 52:8 54:7
58:16 60:25 65:3,13
66:15 67:21 72:2 73:3

fly 36:14

flying 38:1,4

footnote 8:11 58:7

footnotes 58:5,6

forget 53:6

form 13:11 59:19 61:3
66:12 68:4 74:20

format 13:9 15:2 59:3,
8,14

formats 61:10

formatted 17:17

forming 10:6

forms 61:18,21

formula 26:22

found 19:15

Foundation 47:13

fourth 48:20

fraction 31:3 32:10
33:7,23 42:5 53:19
55:22

free 55:6

freed 17:7

front 43:19,21 44:6
50:18,21

FTP 59:13

fulfilled 26:9,10,15,16

full 4:7 58:15 68:15

fully 29:13

Fund 49:15 69:7

furnished 7:17

fuzzier 50:15


G

gain 39:25

gave 22:9

gender 27:12 28:18
58:18 66:18

generally 4:24 20:17
59:18 62:16

give 13:3 18:10,11
36:12 37:12 44:2

giving 44:16

good 46:1

Goodman 47:12

Gotcha 35:4

government 25:13

governmental 6:24

graduate 25:10 56:15
57:9

grain 24:12

grants 7:5

graphic 59:16

great 8:14 39:12 44:16

greater 42:7

greatest 31:2

ground 4:24

grouped 59:25

growing 46:2

Gruver 47:7 74:2

guess 5:16 12:18 20:15
25:3 34:14 39:4 40:20

53:22

guilty 29:20 58:12
60:23


H

half 4:23 13:6 30:8
40:23 46:3

halfway 21:19 50:23
52:19

Hall 57:24

hand 72:9

happen 28:4

happy 8:12 12:4,13
15:24 21:3 36:15 37:9
58:4

hard 65:7 66:10

Harvard 25:12

head 4:22 8:18 13:5,14
20:7 21:24 35:13 45:21,
25 64:1

heavy 19:14

held 53:14 70:12

Hernando 45:18

hierarchical 57:7

Hillsborough 45:13
46:1

hired 20:21

hold 64:15 67:23

honestly 6:18 50:20

hope 45:19

house 28:1

housekeeping 16:13

hundred 38:10

hundreds 13:14 57:14

hung 13:16


I

idea 18:11 49:19

identical 38:25

identification 37:16
72:22,23

identified 8:9 22:16
24:10 64:9 66:9 69:2

identify 5:18 69:3,7

identifying 10:20

idiot 57:25

illogical 12:21 23:25

illustrate 9:20

illustrations 9:17

important 26:21 44:7
65:10

imprecise 53:23

imputing 13:23,24

incarceration 59:1
63:6

include 14:8 15:13
16:3,6 21:3 45:9 64:3
69:12

included 61:16

includes 6:9,10 7:1
17:12

including 7:16 8:5 16:8
58:15,18,19,21

inclusion 39:5

inclusiveness 28:14

inconsistencies 24:9

inconsistent 12:21
23:25

incorporated 11:16

increase 39:5 65:23

increased 33:4 44:18

incredibly 28:15

independently 18:8
34:11

indication 36:12

individual 13:6 17:4
27:6 29:6,7,19 30:1
33:16 34:16,17,25
35:11,20 39:6 46:9,11
54:1,24 58:10 59:24
62:19 64:5 68:9

**individuals** 17:7 20:18 22:16,21 28:16 30:8 31:4,21 32:11,12,16 33:11 34:11 35:9 36:2, 7,13 38:10 39:22 40:1 42:14 46:4 53:20 54:6 55:11,20 59:22 62:4 65:15,19,21 66:2 68:20 71:6,7

**inevitably** 15:4

**inflating** 20:12 21:6 28:20

**information** 6:10 7:6 8:7 9:21,24 11:15,16, 18,22 13:24 14:20 21:17 22:9,24 24:11 26:25 27:1 28:6 29:16 46:5,9 54:15 58:3,13 66:13,17

**initial** 10:13 12:16 16:23 17:14 26:1 34:1 35:12 37:20 43:15,25

**ink** 11:5

**instance** 46:14,15 59:23 61:17,22

**instances** 12:20 13:13, 15 15:12 16:3 23:24

**intend** 9:19

**interested** 73:16

**interesting** 57:10

**interpretation** 15:21 41:3

**interval** 67:13

**introduce** 21:23,25 23:8 37:7

**introduced** 37:6

**investigated** 29:14

**investigation** 7:14 20:24 21:4

**investigations** 29:10

**investigator** 20:22

**involve** 56:12,20,25

**involved** 7:15 8:5 19:3

**issue** 26:12

**issues** 5:2 7:15,21 8:4 9:12 15:5,19,25 23:2

**J**

**January** 15:7

**Johns** 31:23,24 72:17 73:22

**join** 23:20

**judge** 25:14 50:8,18,21 60:21

**judgment** 15:13

**judicial** 6:25

**July** 17:3,5,6,8 21:11 22:8,22 38:6 48:11,12, 15 65:12

**June** 22:10,15,17 46:12 48:11,14

**K**

**keeping** 19:14 23:13

**kind** 9:18 36:14 64:2

**knowledge** 5:1 7:2 23:18 25:11,21

**knowledgeable** 25:18

**knowns** 65:10,11

**L**

**labeled** 6:1 17:4

**Lake** 31:10,14,19,21, 22,24 32:1,11

**laptop** 37:13

**large** 15:4 18:6 22:2 23:2 24:6

**larger** 31:23

**Larsh** 53:3

**late** 6:21 17:3 48:14 61:22

**latest** 31:1

**law** 25:11 38:16 60:9

**lawsuit** 7:15,22 8:5

**lawyers** 53:7

**lead** 12:12 33:19

**leading** 15:18

**leaving** 58:5

**Lee** 48:17 69:3,10

**left** 16:10 32:5,8 33:2

**legal** 23:16 26:25 27:2 48:7 49:9,20 58:22 60:2 61:6

**length** 41:12 59:1

**letters** 8:16,20 13:9

**level** 24:15 25:1,5 38:6 58:10

**LFO** 33:12

**LFOS** 22:21 29:22 31:5 40:2,10 53:21 54:16 55:20 65:24 71:7

**liens** 28:1 58:23

**lift** 19:14

**limited** 7:16 8:5

**limits** 20:10 23:6

**lines** 31:10 46:16

**link** 23:5

**list** 6:6,16,23 7:2,5,9 22:9 46:23 47:1 69:1

**listed** 7:23 51:23 62:4 69:11

**listing** 50:23 69:16,21

**lists** 38:9

**literature** 27:18

**litigation** 47:19 53:4

**logic** 37:2

**long** 5:11

**longer** 51:19

**looked** 15:14 61:1,11, 14,18,21 63:5

**loops** 59:23

**lot** 19:21 25:19 27:17 54:5 59:15,23 63:9

**lots** 15:3

**love** 19:24 42:1

**lovely** 23:13

**M**

**made** 15:10 21:12,22 26:18 28:5

**Madison** 56:17

**main** 27:3

**maintained** 58:14

**make** 5:4 30:7,13 31:10 32:19 34:4 35:6 42:9 55:16 59:25

**makes** 18:25

**making** 15:21 26:8,14 69:19

**management** 58:15

**March** 49:12

**margin** 25:2 33:16 41:13 42:23 54:23

**marginal** 34:8

**margins** 12:13 23:10 24:20 34:2

**mark** 37:8,10

**marked** 5:17 10:12,25 37:16

**massage** 15:10

**match** 14:17 22:22 27:8,13 28:6,12 31:25 54:8 64:4 65:20 66:16, 21 67:1 68:3,7

**matched** 64:17 66:9 68:7

**matching** 26:23 27:2 33:15 67:14

**materials** 10:6,8 11:4

**math** 30:10 68:19

**mathematical** 10:1

**matrix** 59:18

**matter** 8:17,21 16:13, 20 23:11 37:1 67:7

**matters** 6:24

**maximum** 60:1

**Meaning** 14:19

**means** 13:24

**meant** 18:20

**meld** 52:8

**memoranda** 8:16,20 9:12

**memory** 59:6

**mentioned** 18:4 51:12

**merging** 24:15

**met** 49:20

**met all** 39:23

**methodology** 54:10, 19

**methods** 56:13,17,20 57:1,2,5,8,14

**Miami-dade** 45:9,25

**Michael** 25:8,10

**mid** 22:20

**million** 13:6 24:13 30:8

**mine** 18:13 25:23

**missing** 12:20 13:3,4, 7,18,19 14:4,23 15:18 16:4 18:17 19:8 20:4,22 23:24 45:1,2,4,5,7,9 46:14 50:10

**mistake** 71:13

**mistyped** 71:4

**modeling** 57:7

**models** 9:17,25 10:1,3

**moment** 37:13

**money** 33:17,24

**month** 13:8,9 15:2

**months** 21:21

**Morse** 25:9,10

**mouth** 20:3

**move** 44:6 49:14 69:6

**moved** 43:18

**moving** 33:22 38:22

**multiple** 29:20 34:12 59:25 66:3

**multiples** 36:8

**N**

**named** 48:7

**names** 13:7 18:10 66:18

**Nancy** 72:15 73:6,21 74:23

**national** 48:8,9

**nature** 24:1,19 27:7

**necessarily** 61:13

**negative** 28:8

**negatives** 26:13,20

**negotiations** 46:12

**night** 53:6 70:22

**no-contest** 58:13

**nods** 8:18 20:7 21:24 35:13 45:21 64:1

**nomenclature** 62:24

**note** 33:9 36:6 43:14 69:12

**noted** 54:24

**notes** 8:15,19 73:11

**notice** 5:25

**noticed** 70:21

**notion** 26:4

**notwithstanding** 42:4

**number** 6:23 7:11,13 31:14,18 35:11 39:4 41:19 42:17 44:3 48:18 53:16 54:6 58:16,17 65:15 71:5,10

**numbers** 13:10 20:12 21:7 28:20 35:17 40:7, 14 43:4,17 55:23 61:23, 25 65:5 66:10,19 67:1 68:5,9,15

**numerous** 12:20 13:13

**O**

**OATH** 72:1

**OBIS** 21:17,22 25:16,22 31:6 39:19 41:20 42:12 53:21

**Object** 66:12 68:4

**Objection** 61:5

**obligation** 20:25 26:25 64:11

**obligations** 23:17 27:3 58:23 60:2

**obtained** 55:13

**OBTS** 58:17

**odds** 41:4,6 43:5

**Offender** 21:16

**offense** 58:18

**office** 29:11

**official** 72:9

**Ohio** 52:6,23

**on-campus** 47:13

**one-off** 15:21

**one-stop** 29:21

**open** 37:13

**opinion** 39:16,20 42:13

**opinions** 5:1 8:4 10:7 16:23

**opposed** 15:20 28:12 34:21 43:7

**optimistic** 46:16

**options** 29:14

**original** 11:12,20,24 12:7,9 16:15,19 33:3 43:15,23 44:10 58:6,9

**Orion** 70:1

**Osceola** 45:19

**outstanding** 40:2 46:4 55:20 58:22 64:6,16,19

**owe** 20:19 33:17,24 35:20 38:10 40:16 65:23 67:6,17 68:10,11

71:7

**owed** 31:5 33:11 35:1,3 53:21

**owes** 27:7 40:10

**P**

**p.m.** 71:17

**pages** 73:10

**paid** 29:23 60:3

**paper** 57:4

**papers** 6:18

**paragraph** 8:1 12:16, 19 18:15 20:9 21:10,19 23:7 26:1,3 39:13 42:8 43:2 44:9,14 55:2,5,6,7 58:9 71:4

**paragraphs** 64:25

**parole** 58:21

**part** 11:9 38:8 41:15

**parties** 73:14

**Pasco** 32:23 33:11 34:20,24 35:7,14,24

**passed** 24:11

**past** 56:24

**patch** 15:20

**PDF** 17:1

**Peabody** 57:24

**penalties** 63:7 74:19

**people** 18:7,8,12 22:7 24:14 27:3 67:15 68:10, 16

**people's** 18:11

**percent** 25:6 31:11 32:12,17 33:6,7 36:3 40:13,23 41:21 42:17, 18,19 67:2,3 71:6,11

**percentage** 40:15 45:22 66:23

**percentages** 29:4 40:8 43:4 66:22 68:2

**perform** 55:25

**performed** 7:6

**periodicals** 8:6

**perjury** 74:19

**Perko** 4:6 9:2 10:18,23 37:7,14,17 44:4 53:12, 15 57:18 63:15 66:12 68:4 70:4,7,10,13,16,23 71:1,3,14 74:23

**person** 20:25 27:23 28:10 58:11

**personally** 72:6

**persons** 20:12 28:22 39:18 42:11 64:19 66:21

**Ph.d.** 4:2 25:11 72:6 73:8

**phone** 63:14,15 70:2

**photographs** 9:18

**picking** 33:10

**Pinellas** 45:15 46:1

**plaintiffs** 49:18

**plea** 58:13 60:23

**point** 14:24 15:13 16:4 20:5,23 25:6 30:6

**points** 16:5 23:4 31:14 65:7

**political** 4:15,16 5:3 41:18 56:5

**population** 45:23 46:3

**populations** 41:2

**portals** 62:21

**position** 4:14 15:6

**positive** 26:5,7 27:21 28:7

**positives** 26:2,20

**possibilities** 30:11 63:10

**possibility** 22:4 26:13 27:21 28:11

**possibly** 12:3

**potential** 23:24 29:3

**practiced** 60:9

**precisely** 54:3

**prepared** 6:15 8:2,16 11:1 17:21

**preparing** 10:2

**present** 6:17 58:12

**presented** 6:21 62:5

**pretty** 15:23 23:22 38:5,16 42:5

**previous** 54:4

**primarily** 59:8

**principle** 34:22

**prior** 58:19

**private** 20:21

**probation** 58:21 63:6

**problem** 19:8

**problems** 24:14 27:25

**procedure** 60:5 61:12, 15,19

**process** 15:11 18:9 19:6,9 20:18 30:1

**processed** 13:22 16:9

**processes** 18:25

**processing** 13:11,15, 16 19:11

**produced** 6:12 17:24 62:1 69:4,7,13,15,18 72:22,23

**professional** 6:4,5

**Professionally** 72:21

**professor** 4:11,15 63:18

**project** 18:5 47:25 48:1

**projects** 19:3

**promulgated** 61:19 62:1

**proportionate** 35:2

**proportionately** 31:20

**provide** 8:13,23 9:3,6, 9,11

**provided** 6:12 7:20 9:16,21 10:16 11:5 13:20 22:14 47:5 49:20 69:2

**public** 9:5,6,8,9 18:7 21:22 27:5 69:19

**publications** 6:6

**publicly** 7:24 25:24

**pull** 62:23

**pulling** 61:8 62:19

**purposes** 43:18

**put** 20:3 25:5 46:17

**Q**

**qualifications** 6:6

**qualified** 55:9

**qualitative** 57:8

**quality** 42:3

**quantitative** 56:13,20 57:8

**quantity** 65:21,25

**quarterly** 21:21

**question** 46:6 55:16 63:1

**questions** 4:25 5:4,7 53:17,24 56:10 57:10, 19,25 63:13,14,16,19 69:24 70:15

**quick** 63:12

**quote** 16:7 47:18

**R**

**race** 27:11 28:18 39:19 58:18 66:18 68:10,12, 21,22

**range** 56:9

**rate** 55:8,9,10 56:1

**rates** 55:20

**raw** 13:11 14:4 40:7,14 41:11 67:10,14 68:6,9

**reaching** 19:9

**read** 55:6 70:17 71:15 74:2,20

**readability** 17:18

**reading** 70:21

**reads** 43:16

**realize** 24:13

**realized** 34:9

**realm** 27:14 49:5

**reason** 11:14 27:1 46:7 74:5

**reasons** 27:3 41:15,23

**recall** 9:15 45:17 48:9, 15 49:1,10 51:1,4,5,7,9 63:2

**receive** 16:18

**received** 5:20 8:2,17, 19 11:18,22 12:24 13:1 15:16 19:25 46:8 59:3, 17 66:14

**recent** 25:10 52:7

**recess** 53:14 70:12

**recollection** 7:8 50:15

**record** 4:8 10:18 14:8, 10 16:5,7 19:13 23:13 43:9 73:11

**records** 9:5,8,12 18:7 19:22 20:1 69:19

**redirect** 63:13

**redistricting** 53:4

**refer** 13:2 30:25 39:13 46:20 55:2

**reference** 23:7

**referenced** 10:8

**references** 17:8

**referred** 8:3 14:12 21:16 61:25

**referring** 12:23 43:24 47:11 54:4 55:8 56:1

**refers** 17:6 21:12 53:19

**refined** 38:5

**reflected** 35:11 54:1

Index: reflective..sins

reflective 31:13

reflects 42:10

regain 39:25 42:16

register 55:10

registration 24:9

regular 21:20

relate 54:2

related 47:22 53:24
54:6

relating 8:17,20 9:12

relation 36:3

relative 55:22 73:13

release 23:16 26:24
40:18 54:8 58:22

released 17:7 22:7,18
27:6 40:15 42:15 65:16,
19 67:16

relevant 5:2

reliable 66:14

relied 8:3 10:6 11:23

relies 27:18

remember 48:14
50:16,20 51:20 52:4

rephrase 5:6

report 6:8 7:1,8 8:9
9:23 10:3,9,10,14 11:1,
8,11,12 12:17 16:15,19,
24 17:6,12,14,22 21:23
22:1 26:1 30:15,17,22
31:2 33:3 34:15,16
35:8,12,15 36:11,19
37:20,21,24 38:6 39:14
43:15,16,25 44:10,21,
24 46:21 47:14,18,19
48:2,25 49:5,9,10,17,20
51:3 53:18 55:3 58:6,9
60:13 63:24 64:10,11,
16,24 69:16,18 71:1,2
73:7

Reporter 72:16 73:22
74:23

REPORTER'S 73:1

REPORTERS 72:18
73:23

reports 7:23 8:15,20
9:21 10:2,8 16:10,18,22
17:5,12,21 36:10 48:3
60:14

represented 35:9

requested 46:11 58:13
73:9

requesting 9:8

requests 9:5 69:19

required 59:21

requires 61:4

research 19:2

residual 31:20 66:1
68:16,19

respect 19:13,21 20:17
22:5,11 28:6 38:19
42:10 54:22 56:1 60:22
67:13

response 63:17

restitution 58:23

restored 40:12 41:7
43:6

restroom 5:13

result 21:21

results 12:12 21:3

resume 6:4

retained 48:4,10

return 19:10 30:16

reveals 67:12

reverse 64:14

review 49:23 73:8

reviewed 5:22,24

rights 20:14 28:23
39:25 40:12 41:7 42:6,
16 43:6

rigorous 57:16

risk 53:22

rolling 23:3

Romo 53:4,9

room 52:16

roughly 32:12,16

rows 59:19

rules 4:25 61:11,14,19

run 14:14 27:12 40:25

running 13:25 14:12

S

salt 24:12

satisfied 20:25

Sawinsky 52:16

SB 20:14

scale 33:4,6

scaled 31:19

scholar 6:17 23:22
24:6 25:24

scholarly 27:18

school 25:11

science 4:15,16

scientist 5:3 41:18
56:5

scope 60:12

screen 17:1

seal 72:9

second-to-the-left
65:6

secretary 24:8 51:21

section 11:9,10 43:14,
22,24

secure 59:13

select 18:12

Senate 28:24 39:25
55:10 61:16

sense 5:5 20:18 28:19
33:25 34:4 40:9

sentence 12:18 18:15,
18 20:9,20 21:1 22:17
23:15 26:7 55:5,7 60:1,
22

sentences 34:12

sentencing 46:15

58:25 60:11,16,18,20,
21 61:9 62:3,7,10,14,17
65:17

separate 19:6

September 6:9,22 7:1,
7 9:23 11:3,8 17:12,22
30:15 38:8 55:3 72:7,10
73:18 74:3

series 57:6

served 23:16

serves 59:6

services 47:6 48:17
69:3,10

set 12:8,9 18:23 66:20,
24

sets 15:4,18 24:7 66:5,
25

SHEET 74:1

shifts 34:9

shop 29:21

shot 17:1

show 10:12,24 16:21

showed 37:5 64:20

showing 5:17

shown 64:7

shows 31:3

signature 19:8,9 74:22

significance 40:8
43:10 55:25

significant 40:21,24
41:1 55:18

significantly 39:24
40:6 42:13 43:2 55:11,
17

signing 60:22

similar 8:7 25:23 40:1
53:18

similarly 40:19

simply 68:3 71:9

single 10:20

sins 59:15

**sit** 6:11 22:6 41:19 44:20 57:13 60:15

**sites** 59:13

**sizable** 45:24

**size** 31:13 46:1 54:5

**sized** 31:21

**sleep** 53:6

**slightly** 17:17 33:2 34:8 62:19

**smaller** 33:21,22

**Smith** 4:2,9,10,11,18 10:24 14:7 27:10,11,15, 16,22,23 28:3,9 53:16 63:16,18 70:17 72:6 73:8 74:2

**snapshot** 21:11 22:14 65:12

**snapshots** 21:21 22:3, 6,12

**Snipes** 50:12

**software** 62:21

**solely** 67:4

**sort** 14:13 24:1 43:13 44:10 48:2 69:15

**sorted** 39:11

**sounds** 17:9

**speaking** 54:17

**specifically** 48:6 58:3 63:1

**spoken** 25:17

**spring** 49:11

**St** 31:23,24

**standard** 15:20 59:18 61:3,7 63:2

**standardize** 19:22

**standardized** 19:10

**start** 5:16 23:4 36:18

**started** 43:13

**state** 4:7 9:10 21:20 26:21 27:7 39:16 46:3 50:8 51:21 61:8 69:20 72:2 73:3

**state's** 24:8

**stated** 44:21

**statement** 12:19 21:2 24:4 42:9

**states** 8:1 11:15 12:19

**statewide** 19:12,23 24:16 44:11

**statistic** 57:5

**statistical** 40:8 41:24 43:4,10 55:25 56:16,20, 25 57:2

**statistically** 41:1

**statistician** 5:4 56:4

**statistics** 10:4 56:6,7, 9,12 57:24

**status** 58:21

**stenograph** 73:7,11

**Stephenson** 72:15,17 73:6,21,22 74:23

**steps** 29:7,9

**straddle** 32:25

**string** 28:17

**student** 25:12

**students** 18:13 57:11

**studies** 57:7,8,14,16

**study** 29:4

**subject** 74:20

**submitted** 11:2 17:14 48:25 49:18

**subpoena** 5:19

**substance** 9:13 74:21

**substantive** 9:15

**substantively** 57:10

**subtracted** 35:23

**Sullivan** 52:15,16

**summaries** 43:19

**summarizing** 6:5

**summary** 17:7 44:6,10

**supervision** 22:7 42:15 58:21,25 59:2

**supervisors** 19:5

**supplement** 9:23 15:24 38:9 43:20 44:7

**supplemental** 6:8 11:8 17:11 30:17 31:1,2 35:15 36:6,19 37:24 39:14 43:16 44:14,21 46:21 53:17 55:3 64:24 71:2

**supplemented** 11:19

**support** 9:20

**Supreme** 61:3,20,21 62:1,2

**surprised** 24:24 62:23

**SWAIN** 57:20,22 63:11

**sworn** 4:3 72:7

**syllabi** 57:12

**system** 21:17 23:14 24:16,25 34:3 58:15

**systems** 23:21

---

T

**table** 39:17,20 42:10,17 54:11 64:23 65:18 67:24,25 68:1 71:10

**tabs** 62:22

**takes** 27:9

**taking** 13:25 19:22

**talk** 12:4 18:16 21:10 26:2

**talked** 18:16 42:2

**talking** 30:7 38:12 67:2

**taught** 57:3,15

**teach** 56:19,25 57:9

**teaching** 56:22

**team** 17:23 18:4,5 30:8 46:12

**technical** 15:25

**techniques** 56:21

**ten** 11:15,18,25 30:19 31:2 33:10,15,17 34:24 35:9,15 39:5 42:17 43:6

44:19,25 45:2,7 54:14 63:25 64:5,12,17,20,21

**tens** 13:13

**term** 40:5 59:15

**terms** 23:12,23 30:2 34:11 38:2,4 39:23 40:9 42:3 50:15 54:16,17 62:24 65:24 66:17 69:20

**terribly** 44:16

**test** 41:24 43:4,10 55:25

**testified** 4:3 6:24 49:25 50:3,11 51:1

**testify** 5:19

**testifying** 51:4

**testimony** 9:20

**Testimony/ miscellaneous** 46:25

**tests** 41:1

**Texas** 49:14 69:6

**text** 58:8

**texts** 8:6

**thing** 19:15 22:13 33:9

**things** 13:7 23:21 24:22 28:4 33:5 49:3 53:5

**thought** 44:7

**throwing** 35:16

**tied** 40:2 71:7

**time** 5:10,11 6:12 17:2, 5 18:22 22:2,3 23:3,15 24:2 34:2 46:18 47:23 49:24 57:6 63:6 67:19 70:15

**times** 4:21,23 5:4 53:4

**timing** 22:5

**today** 5:11 6:11 7:18 8:25 22:6 41:19 44:20

**toiling** 24:5

**top** 4:22 10:19 13:5,14 45:24

total 45:22 55:22 65:7, 22

training 56:16 60:4

transcript 73:9,10 74:3

transcription 74:3

transposed 71:9

trial 9:20

true 6:10 14:22 15:1 19:1 61:13 64:15 67:23 73:10 74:3,20

truncated 22:22

turn 64:23 68:23

turning 42:8

two-minute 70:6

type 13:25 14:2,14 15:11 23:5,24 41:23 56:7 57:2,5,6 72:23

types 13:10

typical 13:8 15:2

typographical 70:18, 20

**U**

UCN 61:25

Uh-huh 26:11 31:12 32:9,14,24 49:16 68:25

ultimately 20:19,24

undergraduate 57:9

underlying 12:2 33:25 36:11 41:16 42:2 66:14

undersigned 72:5

understand 4:18 11:6 12:6 13:2 14:13 17:10, 25 19:12 20:2 26:6 29:1,2 30:2,14,20,25 32:4 34:8,13 35:6,22 36:5 38:3 39:9 40:20 55:24 57:17 66:4

understanding 9:7 11:7 15:17 16:14,16 17:20 25:18 60:13 61:24

understood 5:7 32:20

uniform 18:25 23:14 60:24 61:23

universe 14:3

University 4:13 56:16

unknown 25:20 65:11

unknowns 25:20

unmatched 66:6

unquote 16:7 47:18

up-to-date 44:22

updated 17:13 43:17 44:13

updates 11:9 21:20

utilize 9:25 20:5 56:8

utilized 16:22 18:2 54:10,19

**V**

variation 63:1,9

varied 62:15

verify 44:1

versions 17:13

versus 38:13 48:17 49:15 50:24 69:3,10

view 43:3

vitae 6:5,9

vote 29:6

vote-by-mail 48:22

voter 24:9,16

voters 19:10 29:5

voting 20:13 28:23 39:25 40:12 42:16 47:13

voyeuristic 30:2

**W**

walk 15:24 50:1 58:4

wanted 29:7 32:19 70:2

water 5:12

ways 23:1 40:25

website 62:18

websites 29:16

wet 11:5

white 14:1 31:4,18,25 32:11,12 33:19 35:2,9 40:1 53:19 54:6 55:21 68:15,17

whites 38:24 40:9,14, 16,24 41:19 42:5,16,19 43:7 55:23

Whitley 49:15 69:7

wide 56:9 59:15

Wisconsin 56:17

Witness/political 46:24

words 20:3

work 7:6 17:23 47:15

worked 18:5 47:24 48:24

working 19:17 25:12 51:20,22 52:4

Worley 51:24

written 8:16 48:16 49:17 69:4,5,8,13,14,15

wrong 71:9

wrote 49:5,9,10

**X**

XX 72:22

**Y**

Yale 25:10

year 13:9 15:2

years 50:16 56:15 57:23

**Z**

zeros 15:19