# Exhibit 1

EXHIBIT 2
DATE 10-3-19
WITNESS Barber
ROCKIE DUSTIN, CSR, RPR

# Report in Response to Report of Dr. Daniel Smith

Dr. Michael Barber
Assistant Professor
Department of Political Science
Brigham Young University
724 Spencer W. Kimball Tower
Provo, UT 84604
barber@byu.edu

# 1 Introduction

I have been retained by counsel for the Secretary of State of Florida in Kelvin Jones, et al., Plaintiffs, v. Ron DeSantis, et al., Defendants, Consolidated Case No. 4:19-cv-300, currently pending in the U.S. District Court for the Northern District of Florida. I have been asked to review and respond to the report submitted by Dr. Daniel Smith for the plaintiffs. The documents produced by Dr. Smith describe his opinion of the impact of SB 7066, which was adopted by the Florida state legislature and signed into law by Governor DeSantis on June 28, 2019. Dr. Smith makes the argument that among the population of former felons in Florida, approximately 18% would be eligible under SB 7066 for restoration of their voting rights. In this report I outline several ways in which the claims of Dr. Smith are based on incomplete or inaccurate data for a subset of the state of Florida. As such, his conclusions do not apply to many counties throughout the state.

# 2 Background and Qualifications

I am an assistant professor of political science at Brigham Young University and faculty fellow at the Center for the Study of Elections and Democracy in Provo, Utah. I received my PhD in political science from Princeton University in 2014. In my position as a professor of political science, I have conducted research on a variety of election-related topics in American politics and public opinion. Much of this research has been published in peer-reviewed journals, including many of our discipline's top journals. My c.v., which details my publication record, is attached to this report as Appendix A. Much of my research uses advanced statistical methods for the analysis of quantitative data. I have worked on a number of research projects that use "big data" that include millions of observations, including a number of state voter files and campaign contribution lists, including in Florida. The data and methods I use here are consistent with my training in statistical analysis and are well-suited for this type of analysis in political science and quantitative analysis more

generally. My complete c.v. with a complete listing of my education and publications is appended to the end of this document.

I teach a number of undergraduate courses in American politics and quantitative research methods.[1] These include classes about political representation, Congressional elections, statistical methods, and research design.

I have worked as an expert witness in a number of election-related cases, including in Florida. Cases in which I have testified at trial or by deposition are listed in my cv, which is attached to the end of this report.

# 3 Summary of Dr. Smith's Conclusions

The intent of Dr. Smith's report is to quantify the number of former felons who would be eligible for re-enfranchisement under SB 7066, which allows for re-enfranchisement of former felons who have not committed murder or a sexual offense and who have paid off all of their legal financial obligations (LFOs). Using two different data sources (which I discuss later) he finds that a minority of former felons would be eligible for re-enfranchisement under SB 7066 because of unpaid legal financial obligations. In the first dataset approximately 20% of former felons would be eligible for re-enfranchisement under SB 7066 and in the second dataset approximately 11% of former felons would be eligible for re-enfranchisement under SB 7066.

Dr. Smith then compares the proportion of former felons who would be eligible for re-enfranchisement under SB 7066 by ethnicity. He specifically compares the proportion of White former felons and Black former felons who have no legal financial obligations and would therefore be eligible for re-enfranchisement under the law. He does this county by county, again using two different sources of data, for 48 of the 67 counties in Florida. The remaining counties are not included because of data availability, which I discuss in more detail below. In nearly all counties in both datasets, he finds that the proportion of White former felons

---

[1] The political science department at Brigham Young University does not offer any graduate degrees.

who have no outstanding legal financial obligations is higher than the proportion of Black former felons who have no outstanding legal financial obligations. The rates of former felons who are eligible for re-enfranchisement ranges dramatically across counties, from single digits to more than 20 percent. As well, the difference between the rate for White former felons and Black former felons ranges across counties between a few percentage points and more than 15 percentage points.

## 4  Problems with data used by Dr. Smith

The critical assumption of the section above, however, is accepting the veracity of the data used by Dr. Smith. On this, there is much less certainty, and Dr. Smith is upfront in his report about many of these concerns. That doesn't, however, negate the need to summarize them collectively and discuss how they may lead to different results if he were able to conduct the same analysis on a more complete dataset.

Throughout his report, Dr. Smith notes difficulties in obtaining the data he used in his report. It would be useful to collect those various concerns and present them together to consider the degree to which the data deviate from the ideal. Furthermore, it is important to consider what the ideal dataset would include. This is true of any empirical project because, while there are errors and variability inherent in any dataset, it is important to fully discuss the degree of those errors and the limitations of the interpretation of any results derived from those data so that undue confidence is not given to the resulting analysis. In this case, to make accurate statements of the number of people who would be eligible for re-enfranchisement under SB 7066, we would need a comprehensive database of former felons who reside in Florida. This would include people who have committed felonies not only in Florida but in other locations who have since moved to Florida. Furthermore, the dataset would include information about the type of felony they committed as SB 7066 carves out particular felonies that are not eligible for re-enfranchisement (broadly murder and certain

4

sexual offenses). Finally, it would include information about any outstanding legal financial obligations that the person faces as a result of their conviction, including LFOs that have been converted into civil liens.

The actual data that Dr. Smith uses in his report are far from this ideal in a number of ways.

## 4.1 Dr. Smith uses two different data sources that yield different results

Dr. Smith conducts his analysis on two different datasets. The first is a database of former felons "who were not in the Florida Department of Corrections (FDC) custody or supervision but have been released from county custody or supervision" [pg. 5]. My understanding of these individuals is that they are former felons who were processed through the criminal justice system entirely by the county and did not interact with state-level officials at the Florida Department of Corrections. The other database is a list of former felons "who have been released in FDC custody or supervision" [pg. 5]. In these cases these individuals are included in the Offender Based Information System (OBIS) database maintained by the Florida Department of Corrections. In both cases the data are incomplete in that there are only data for 48 of the 67 counties in Florida.

Here I note that the proportion of former felons who have no outstanding LFOs is dramatically different depending on the database you look at. Among those persons who were entirely processed by the counties and not the Florida Department of Corrections, twenty percent of them have no outstanding LFOs according to Dr. Smith's data. However, among those who were in the FDC's OBIS database, indicating that they were processed through the state rather than only the county, only 11.3 percent of these former felons have no outstanding LFOs according to Dr. Smith's data. It is interesting that there is such a difference — nearly double between those who are only in the county database versus those who are in the state database. This suggests that the application, amount, payment, and/or

5

tracking of LFOs could vary dramatically depending on whether the person is a former felon from a county-level or state-level crime. However, because of missing data in Dr. Smith's report, we do not know if the proportions of former felons in these two databases is a correct measure of the proportion of felons statewide who have been processed though the county versus through the Florida Department of Corrections. And given the dramatic differences in the proportion of people who have outstanding LFO's in these different databases, this would be important information to have when considering the total population of former felons in the state and the overall share of this population that would be eligible for re-enfranchisement under SB 7066.

These rates also differ across databases when comparing the proportion of former felons with no LFOs across ethnicities. In the county database approximately 13.5% of African Americans have no outstanding LFOs while in the state database approximately 8% of African Americans have no outstanding LFOs. Among former felons who are White, 23.6% have no outstanding LFOs in the county database while 13.5% have no outstanding LFOs in the county database. While the two databases tell a similar story in Dr. Smith's report – that Whites are more likely to have paid off their LFOs than are African Americans – the degree to which that inequality exists is different in the two different databases. This raises a number of questions about how these LFOs are applied, how their application and tracking may differ at the county versus state level, and whether either dataset is entirely accurate. At the least, the differences across databases suggest that there are important variables that predict these differences that have not been accounted for or measured that could shed light on the process by which LFOs are assessed and paid off by former felons, including the type of crime, the severity of the sentence, and the amount of money assessed to the felon as an LFO.

## 4.2   Dr. Smith's data are not comprehensive of the state of Florida and cannot be relied upon to make statewide conclusions

Dr. Smith notes in his report that the data he uses include records of former felons for 48 of the 67 counties in the state. Furthermore, these counties are not representative of the state overall and are biased towards the less populous counties of the state. For example, of the ten most populous counties in the state, Dr. Smith's report includes data from only four of these counties. This is important because in Section E of his report, Dr. Smith uses the results he obtains from the 48-county sample to extrapolate to the entire state of Florida. For example, he says "My preliminary analysis extrapolating from the 48 counties for which the clerks of court have provided LFO data is..." He then goes on to provide estimates of the proportion of former felons statewide who would be eligible for re-enfranchisement under SB 7066 and further breaks these estimates down by the ethnicity of the former felon.

The problem with such extrapolation is that the 48 counties upon which the extrapolation is based are not representative of the entire state. A simple example would be to extrapolate the temperature for October, November, and December based on temperature data from the previous nine months. Such projections, of course, would dramatically overstate the temperature of these remaining months of the year. Likewise, these 48 counties are likely different from the omitted nineteen counties in a number of ways that could be related to population demographics, crime rates, enforcement of the criminal code, sentencing, and the application of legal fees to felons involved in the legal system. While we don't have data on many of these factors (if we did Dr. Smith would have simply included these counties in his analysis), we do have data on the overall population of these counties that shows how the omitted counties are systematically more likely to be the urban and more populous portions of the state. Table 1 below shows a list of the 67 counties of Florida and the estimated population of each county. The final column indicates if that county was included in the data used in Dr. Smith's report. Note that of the ten most populous counties, only four are included. On the other hand, of the ten least populous counties in the state, eight are

7

included in his analysis. Furthermore, if we consider the entire population of the counties included in Dr. Smith's report, they collectively account for less than half of the overall population of the state. While the more relevant measure would be the overall population of former felons in these counties, we do not have this measure at hand. However, among the counties that are included in Dr. Smith's report, the correlation between the population of former felons and the overall population of the county is very high (0.81). This relationship suggests that there are also other factors that are related to county population that also relate to these measures of felon population, those who have outstanding legal fees, and the relationship between these fees and the ethnicity of those who owe them. Together this suggests that extrapolating the results found in these 48 counties is not wise and is likely to lead to incorrect estimates of former felon statistics in the state.

## 4.3  Dr. Smith's data contain numerous errors

Dr. Smith's report is upfront about the number of possible errors in the data he is using. He notes them throughout the report. However, it is useful to consider them together to get a better sense of the many ways in which error is introduced into the dataset and how those errors obscure the conclusions reached in the report. Dr. Smith takes much of his data from the database of "Comprehensive Case Information System" which is maintained by the ____ Court of Clerks and Comptrollers. Of this database, he notes, "There are also numerous instances of missing data, data entry errors, and inconsistent or illogical data entries, all of which complicate the analysis" [pg. 15]. We are not provided any estimate of the proportion of entries that suffer from these errors, so this problem could be very large, while it is also possible that it could only affect a small number of the observations. At this juncture, we simply do not know. Dr. Smith also notes that the data do not include people who may have committed a felony in one county but have moved to another county since the completion of their sentence. These people would also be omitted from the analysis as would those with felonies from outside of Florida who have since moved to the state. We do not

8

Table 1: Florida Counties, Population, and Inclusion in Dr. Smith's Report

| Population Rank | County | Population | Included in Dr. Smith Report |
|---|---|---|---|
| 1 | Miami-Dade | 2,761,581 | |
| 2 | Broward | 1,951,260 | |
| 3 | Palm Beach | 1,485,941 | x |
| 4 | Hillsborough | 1,436,888 | |
| 5 | Orange | 1,380,645 | x |
| 6 | Pinellas | 975,280 | |
| 7 | Duval | 950,181 | x |
| 8 | Lee | 754,610 | x |
| 9 | Polk | 708,009 | |
| 10 | Brevard | 596,849 | |
| 11 | Volusia | 547,538 | x |
| 12 | Pasco | 539,630 | x |
| 13 | Seminole | 467,832 | x |
| 14 | Sarasota | 426,718 | x |
| 15 | Manatee | 394,855 | |
| 16 | Collier | 378,488 | x |
| 17 | Osceola | 367,990 | |
| 18 | Marion | 359,977 | x |
| 19 | Lake | 356,495 | |
| 20 | St. Lucie | 321,128 | x |
| 21 | Escambia | 315,534 | |
| 22 | Leon | 292,502 | |
| 23 | Alachua | 269,956 | x |
| 24 | St. Johns | 254,261 | |
| 25 | Clay | 216,072 | |
| 26 | Okaloosa | 207,269 | x |
| 27 | Hernando | 190,865 | |
| 28 | Bay | 185,287 | |
| 29 | Charlotte | 184,998 | x |
| 30 | Santa Rosa | 179,349 | x |
| 31 | Martin | 160,912 | |
| 32 | Indian River | 157,413 | x |
| 33 | Citrus | 147,929 | x |
| 34 | Sumter | 128,754 | |
| 35 | Flagler | 112,067 | x |
| 36 | Highlands | 105,424 | x |
| 37 | Nassau | 85,832 | x |
| 38 | Monroe | 75,027 | x |
| 39 | Putnam | 74,163 | x |
| 40 | Walton | 71,375 | x |
| 41 | Columbia | 70,503 | x |
| 42 | Jackson | 48,305 | x |
| 43 | Gadsden | 45,894 | x |
| 44 | Suwannee | 44,191 | x |
| 45 | Hendry | 41,556 | x |
| 46 | Okeechobee | 41,537 | x |
| 47 | Levy | 40,770 | x |
| 48 | DeSoto | 37,489 | x |
| 49 | Wakulla | 32,461 | x |
| 50 | Baker | 28,355 | x |
| 51 | Bradford | 27,732 | x |
| 52 | Hardee | 27,245 | x |
| 53 | Washington | 24,880 | x |
| 54 | Taylor | 21,623 | x |
| 55 | Holmes | 19,477 | x |
| 56 | Madison | 18,529 | x |
| 57 | Gilchrist | 18,256 | x |
| 58 | Dixie | 16,700 | x |
| 59 | Gulf | 16,164 | |
| 60 | Union | 14,940 | x |
| 61 | Calhoun | 14,587 | x |
| 62 | Hamilton | 14,310 | x |
| 63 | Jefferson | 14,288 | x |
| 64 | Glades | 13,724 | |
| 65 | Franklin | 11,736 | x |
| 66 | Lafayette | 8,732 | x |
| 67 | Liberty | 8,457 | x |

`https://www.florida-demographics.com/counties_by_population`

have any information about the proportion of these people who have outstanding LFOs, nor whether the proportion of these people without LFOs is larger or smaller than the sample analyzed by Dr. Smith. Finally, Dr. Smith's data also do not include persons with former federal felonies because the database from which he obtains his data are from county and

state records and not federal databases. Thus, former federal felons are also omitted from his analysis. Dr. Smith notes that these omissions lead him to have less confidence in his results and he states that "my findings should be taken as preliminary estimates, due to limited available data" [pg. 44].

Finally, I note one last omission in Dr. Smith's analysis, which is that he only considers the rates of outstanding LFOs among White and Black former felons in the state. There is no mention of other ethnicities, particularly Latinos, in his analysis. This is curious since Latinos make up a large proportion of the state population (nearly 25%) and are therefore likely to also represent a large proportion of the former felon population. This leads to the question of where these individuals are in the data. Are they coded as White? Are they not included in the analysis at all? In Tables 1 and 2 of Dr. Smith's report it is the case that the White and Black populations do not exactly sum to the total population, which might suggest that the remaining population of former felons is Latino. However, the remaining population is not nearly large enough to reflect the likely share of former felons who are Latino given Florida's substantial Latino population overall. For example, in the last row of Table 1, Dr. Smith notes that the FDC database includes 258,938 total former felons. 84,910 of those are identified as Black by his accounting. 166,344 of those people are identified as White in the table. The remaining population that are neither Black nor White is 7,684 ($258{,}938 - 84{,}910 - 166{,}344 = 7{,}684$), which is only slightly more than 2% of the total population in this database. If these 2% of former felons who are neither Black nor White represent the Latino population of former felons, then I would be highly suspicious of the ethnicity classification in this database since an ethnicity that represents nearly 25% of the state population should certainly reflect more than 2% of the population of former felons. This is also the case for the data used in Table 2 of Dr. Smith's report which uses data that matches to the FDC's OBIS database. Here the remaining population of former felons that are neither Black nor White is 565 ($116{,}318 - 44{,}071 - 71{,}682 = 565$), which is less than one percent of the total population of former felons in this database. Overall, this

10

leads me to think that the way in which the ethnicity of former felons is classified in these data is either done in a way that is grouping Latinos with the White or Black population, which would cause us to question the interpretation of the disparities Dr. Smith points out in Figures 1 and 2 of his report, or is omitting this ethnic group altogether, which would cause us to question the validity and comprehensiveness of the database and the results obtained therefrom. However, we do not know the answer to this question because there is no information in Dr. Smith's report about how the ethnicity of former felons is determined.

# 5   Conclusion

Overall, Dr. Smith's report leaves a number of questions regarding how SB 7066 will affect the former felon population of Florida for a variety of reasons. First, for more than half of the state he simply does not have data about any of these variables. And extrapolations from the data he does have is risky at best and misleading at worst given the significant differences that exist among the sample of counties contained in his data and the sample of counties omitted from his analysis. Furthermore, by his own admission the data for the 48 counties that are included in his report include numerous errors and omissions that without more details likely bias the results obtained and the subsequent interpretation of those results. Furthermore, unusual statistics regarding the ethnicity of former felons leads to questions regarding how ethnicity is determined in these data. Given the prominence placed on the comparison across ethnicities in Dr. Smith's report, combined with the unanswered questions regarding how ethnicity is determined and where the state's Latino former felons are in the dataset lead me to place little weight on the results presented in his report and the conclusions he draws from that report. More comprehensive and accurate data is needed to make credible claims about how SB 7066 will impact the population of former felons and whether or not the law would impact people of different ethnicities at different rates.

# Appendix A - curriculum vitae

# Michael Jay Barber

| | | |
|---|---|---|
| CONTACT INFORMATION | Brigham Young University<br>Department of Political Science<br>724 KMBL<br>Provo, UT 84602 | barber@byu.edu<br>http://michaeljaybarber.com<br>Ph: (801) 422-7492 |

ACADEMIC APPOINTMENTS

**Brigham Young University**, Provo, UT

2014 - present    Assistant Professor, Department of Political Science
2014 - present    Faculty Scholar, Center for the Study of Elections and Democracy

EDUCATION

**Princeton University Department of Politics**, Princeton, NJ

Ph.D., Politics, July 2014

- Advisors: Brandice Canes-Wrone, Nolan McCarty, and Kosuke Imai
- Dissertation: "Buying Representation: the Incentives, Ideology, and Influence of Campaign Contributions on American Politics"
- 2015 Carl Albert Award for Best Dissertation, Legislative Studies Section, American Political Science Association (APSA)

M.A., Politics, December 2011

**Brigham Young University**, Provo, UT

B.A., International Relations - Political Economy Focus, April, 2008

- *Cum Laude*

RESEARCH INTERESTS

American politics, congressional polarization, political ideology, campaign finance, survey research

PUBLICATIONS

15. **"Campaign Contributions and Donors' Policy Agreement with Presidential Candidates"**, with Brandice Canes-Wrone and Sharece Thrower
    Forthcoming at *Presidential Studies Quarterly*

14. **"Issue Politicization and Interest Group Campaign Contribution Strategies"**, with Mandi Eatough
    Forthcoming at *Journal of Politics*

13. **"Conservatism in the Era of Trump"**, with Jeremy Pope
    Forthcoming at *Perspectives on Politics*

12. **"Legislative Constraints on Executive Unilateralism in Separation of Powers Systems"**, with Alex Bolton and Sharece Thrower
    Forthcoming at *Legislative Studies Quarterly*

11. **"Electoral Competitiveness and Legislative Productivity"**, with Soren Schmidt
    Forthcoming at *American Politics Research*

10. "Does Party Trump Ideology? Disentangling Party and Ideology in America", with Jeremy Pope
    *American Political Science Review*, 2019, 113 (1) 38–54

9. "The Evolution of National Constitutions", with Scott Abramson
    *Quarterly Journal of Political Science*, 2019, Vol. 14, No. 1: 89–114

8. "Who is Ideological? Measuring Ideological Responses to Policy Questions in the American Public", with Jeremy Pope
    *The Forum: A Journal of Applied Research in Contemporary Politics*, 2018, 16 (1) 97–122

7. "Status Quo Bias in Ballot Wording", with David Gordon, Ryan Hill, and Joe Price
    *The Journal of Experimental Political Science*, 2017, 4 (2) 151–160.

6. "Ideologically Sophisticated Donors: Which Candidates Do Individual Contributors Finance?", with Brandice Canes-Wrone and Sharece Thrower
    *American Journal of Political Science*, 2017, 61 (2) 271–288.

5. "Gender Inequalities in Campaign Finance: A Regression Discontinuity Design", with Daniel Butler and Jessica Preece
    *Quarterly Journal of Political Science*, 2016, Vol. 11, No. 2: 219–248.

4. "Representing the Preferences of Donors, Partisans, and Voters in the U.S. Senate"
    *Public Opinion Quarterly*, 2016, 80: 225–249.

3. "Donation Motivations: Testing Theories of Access and Ideology"
    *Political Research Quarterly*, 2016, 69 (1) 148–160.

2. "Ideological Donors, Contribution Limits, and the Polarization of State Legislatures"
    *Journal of Politics*, 2016, 78 (1) 296–310.

1. "Online Polls and Registration Based Sampling: A New Method for Pre-Election Polling" with Quin Monson, Kelly Patterson and Chris Mann.
    *Political Analysis* 2014, 22 (3) 321–335.

0. "Causes and Consequences of Political Polarization" In *Negotiating Agreement in Politics*. Jane Mansbridge and Cathie Jo Martin, eds., Washington, DC: American Political Science Association: 19–53. with Nolan McCarty. 2013.

   - Reprinted in *Solutions to Political Polarization in America*, Cambridge University Press. Nate Persily, eds. 2015
   - Reprinted in *Political Negotiation: A Handbook*, Brookings Institution Press. Jane Mansbridge and Cathie Jo Martin, eds. 2015

AVAILABLE WORKING PAPERS

"A Revolution of Rights in American Founding Documents" with Scott Abramson and Jeremy Pope (Under Review)

"Ideology as a Second Language" with Jeremy Pope

"Ideological Disagreement and Pre-emption in Municipal Policymaking" with Adam Dynes

"Estimating Neighborhood Effects on Turnout from Geocoded Voter Registration Records." with Kosuke Imai

| | |
|---|---|
| WORKS IN PROGRESS | "Who's the Partisan: Are Issues or Groups More Important to Partisanship?" with Jeremy Pope |

"Super PAC contributions in Congressional Elections"

"Preferences for Representational Styles in the American Public"
with Ryan Davis and Adam Dynes

"Partisanship and Trolleyology"
with Ryan Davis

INVITED PRESENTATIONS

"Are Mormons Breaking Up with Republicanism? The Unique Political Behavior of Mormons in the 2016 Presidential Election"
- Ivy League LDS Student Association Conference - Princeton University, November 2018, Princeton, NJ

"Issue Politicization and Access-Oriented Giving: A Theory of PAC Contribution Behavior"
- Vanderbilt University, May 2017, Nashville, TN

"Lost in Issue Space? Measuring Levels of Ideology in the American Public"
- Yale University, April 2016, New Haven, CT

"The Incentives, Ideology, and Influence of Campaign Donors in American Politics"
- University of Oklahoma, April 2016, Norman, OK

"Lost in Issue Space? Measuring Levels of Ideology in the American Public"
- University of Wisconsin - Madison, February 2016, Madison, WI

"Polarization and Campaign Contributors: Motivations, Ideology, and Policy"
- Hewlett Foundation Conference on Lobbying and Campaign Finance, October 2014, Palo Alto, CA

"Ideological Donors, Contribution Limits, and the Polarization of State Legislatures"
- Bipartisan Policy Center Meeting on Party Polarization and Campaign Finance, September 2014, Washington, DC

"Representing the Preferences of Donors, Partisans, and Voters in the U.S. Senate"
- Yale Center for the Study of American Politics Conference, May 2014, New Haven, CT

CONFERENCE PRESENTATIONS

Washington D.C. Political Economy Conference (PECO):
- 2017 discussant

American Political Science Association (APSA) Annual Meeting:
- 2014 participant and discussant, 2015 participant, 2016 participant, 2017 participant, 2018 participant

Midwest Political Science Association (MPSA) Annual Meeting:
- 2015 participant and discussant, 2016 participant and discussant, 2018 participant

Southern Political Science Association (SPSA) Annual Meeting:
- 2015 participant and discussant, 2016 participant and discussant, 2017 participant

TEACHING EXPERIENCE

Poli 315: Congress and the Legislative Process
- Fall 2014, Winter 2015, Fall 2015, Winter 2016, Summer 2017

Poli 328: Quantitative Analysis
- Winter 2017, Fall 2017

Poli 410: Undergraduate Research Seminar in American Politics
- Fall 2014, Winter 2015, Fall 2015, Winter 2016, Summer 2017

AWARDS AND GRANTS

2019 BYU Mentored Environment Grant (MEG), American Ideology Project, $30,000

2017 BYU Political Science Teacher of the Year Award

2017 BYU Mentored Environment Grant (MEG), Funding American Democracy Project, $20,000

2016 BYU Political Science Department, Political Ideology and President Trump (with Jeremy Pope), $7,500

2016 BYU Office of Research and Creative Activities (ORCA) Student Mentored Grant x 3
- Hayden Galloway, Jennica Peterson, Rebecca Shuel

2015 BYU Office of Research and Creative Activities (ORCA) Student Mentored Grant x 3
- Michael-Sean Covey, Hayden Galloway, Sean Stephenson

2015 BYU Student Experiential Learning Grant, American Founding Comparative Constitutions Project (with Jeremy Pope), $9,000

2015 BYU Social Science College Research Grant, $5,000

2014 BYU Political Science Department, 2014 Washington DC Mayoral Pre-Election Poll (with Quin Monson and Kelly Patterson), $3,000

2014 BYU Social Science College Award, 2014 Washington DC Mayoral Pre-Election Poll (with Quin Monson and Kelly Patterson), $3,000

2014 BYU Center for the Study of Elections and Democracy, 2014 Washington DC Mayoral Pre-Election Poll (with Quin Monson and Kelly Patterson), $2,000

2012 Princeton Center for the Study of Democratic Politics Dissertation Improvement Grant, $5,000

|  |  |
|---|---|
|  | 2011 Princeton Mamdouha S. Bobst Center for Peace and Justice Dissertation Research Grant, $5,000 |
|  | 2011 Princeton Political Economy Research Grant, $1,500 |
| OTHER SCHOLARLY ACTIVITIES | Expert Witness in NANCY CAROLA JACOBSON, et al., Plaintiffs, vs. LAUREL M. LEE, et al., Defendants. Case No. 4:18-cv-00262 MW-CAS |
|  | Expert Witness in COMMON CAUSE, et al., Plaintiffs, vs. LEWIS, et al., Defendants. Case No. 18-CVS-14001 (Wake County, North Carolina) |
| ADDITIONAL TRAINING | EITM 2012 at Princeton University - Participant and Graduate Student Coordinator |
| COMPUTER SKILLS | Statistical Programs: R, Stata, SPSS, parallel computing |

Updated June 26, 2019

I, Michael Barber, am being compensated for my time in preparing this report at an hourly rate of $400/hour. My compensation is in no way contingent on the conclusions reached as a result of my analysis.

*[signature]*

Michael Barber

September 16, 2019

18