IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


KELVIN LEON JONES et al.,

      Plaintiffs,

                                        CONSOLIDATED
v.                                   CASE NO.  4:19cv300-RH/MJF

RON DeSANTIS et al.,

      Defendants.

_____/


**ORDER DENYING THE MOTION TO DISMISS OR ABSTAIN
AND GRANTING A PRELIMINARY INJUNCTION**


These consolidated cases arise from a voter-initiated amendment to the

Florida Constitution that automatically restores the right of most felons to vote, but

only "upon completion of all terms of sentence including parole or probation." The

Florida Supreme Court will soon decide whether "all terms of sentence" means not

only terms of imprisonment and supervision but also fines, restitution, and other

financial obligations imposed as part of a sentence. The Florida Legislature has

enacted a statute that says the phrase *does* include these financial obligations.

The principal issue in these federal cases is whether the United States

Constitution prohibits a state from requiring payment of financial obligations as a

condition of restoring a felon's right to vote, even when the felon is unable to pay. A secondary issue is whether the state's implementation of this system has been so flawed that it violates the Constitution.

## I. Background: the Cases and the Pending Motions

The constitutional amendment at issue is popularly known as "Amendment 4" based on its placement on the November 2018 ballot. The amendment has given rise to state-law issues of interpretation and implementation and also to substantial federal constitutional issues. The statute that purports to interpret and implement Amendment 4 is often referred to as SB7066.

The plaintiffs in these five consolidated federal actions are 17 individuals and three organizations. The individuals have been convicted of felonies, have completed their terms of imprisonment and supervision, and would be entitled to vote based on Amendment 4 and SB7066 but for one thing: they have not paid financial obligations imposed when they were sentenced. All but two of the individual plaintiffs have sworn that they are unable to pay the financial

obligations; the other two have alleged, but not sworn, that they are unable to pay.[1]
The organizational plaintiffs are the Florida State Conference of the NAACP, the
Orange County Branch of the NAACP, and the League of Women Voters of
Florida. They have associational standing to represent individuals whose eligibility
to vote is affected by Amendment 4 and SB7066.

The plaintiffs assert that conditioning the restoration of a felon's right to
vote on the payment of financial obligations violates the United States
Constitution, both generally and in any event when the felon is unable to pay. The
plaintiffs rely on the First Amendment, the Fourteenth Amendment's Equal
Protection and Due Process Clauses, and the Twenty-Fourth Amendment, which
says the right to vote in a federal election cannot be denied by reason of failure to
pay "any poll tax or other tax." The plaintiffs also allege that the state's
implementation of this system for restoring the right to vote has been so flawed
that this, too, violates the Due Process Clause. The plaintiffs seek declaratory and
injunctive relief.

---

[1] *See* Gruver Decl., ECF No. 152-2; Mitchell Decl., ECF No. 152-3; Riddle
Decl., ECF No. 152-4; Leitch Decl., ECF No. 152-5; Ivey Decl., ECF No. 152-6;
Wrench Decl., ECF No. 152-7; Wright Decl., ECF No. 152-8; Phalen Decl., ECF
No. 152-9; Miller Decl., ECF No. 152-10; Tyson Decl., ECF No. 152-11; McCoy
Decl., ECF No. 152-12; Singleton Decl., ECF No. 152-13; Raysor Decl., ECF No.
152-14; Sherrill Decl., ECF No. 152-15; Hoffman Decl., ECF No. 152-16; Compl.
in 4:19-cv-300, ECF No. 1 at 5-6 (plaintiff Kelvin Jones); Compl. in 4:19-cv-272,
ECF No. 1 at 5-6 (plaintiff Luis Mendez).

The defendants, all in their official capacities, are the Secretary of State and Governor of Florida, the Supervisors of Elections of the counties where all but two of the individual plaintiffs reside, and the Supervisor of Elections of Orange County, where no individual plaintiff resides but one of the organizational plaintiffs is based. The counties where an individual plaintiff resides but the Supervisor is not a defendant are Broward and Pinellas.

The officials who are primarily responsible for administering the state's election system and registering voters are the Secretary at the state level and the Supervisors of Elections at the county level. They are proper defendants in an action of this kind. *See Ex parte Young*, 209 U.S. 123 (1908).

The Secretary and Governor are the defendants who speak for the state in this litigation. They have consistently taken the same positions. For convenience, and because the Secretary, not the Governor, has primary responsibility for elections and voting, this order usually refers to the Secretary as shorthand for both of these defendants, without also mentioning the Governor.

The Secretary has moved to dismiss or abstain. The plaintiffs have moved for a preliminary injunction. The motions have been fully briefed and orally argued. The record consists of live testimony given at an evidentiary hearing as well as deposition testimony, declarations, and a substantial number of exhibits.

## II. Background: Felon Disenfranchisement, Amendment 4, and SB7066

Florida has disenfranchised felons going back to at least 1845. Its authority

to do so is beyond question. In *Richardson v. Ramirez*, 418 U.S. 24 (1974), the

Supreme Court read an apportionment provision in section 2 of the Fourteenth

Amendment as authority for states to disenfranchise felons. As Justice O'Connor,

speaking for the Ninth Circuit, later said, "it is not obvious" how the section 2

apportionment provision leads to this result. *Harvey v. Brewer*, 605 F.3d 1067,

1072 (9th Cir. 2010). But one way or the other, *Richardson* is the law of the land.

Recognizing this, in *Johnson v. Governor of Florida*, 405 F.3d 1214 (11th

Cir. 2005) (en banc), the court explicitly upheld Florida's then-existing

disenfranchisement provisions. The bottom line: Florida's longstanding practice of

denying an otherwise-qualified citizen the right to vote on the ground that the

citizen has been convicted of a felony is not, without more, unconstitutional.

Florida has long had an Executive Clemency Board with authority to restore

an individual's right to vote. The Board has operated without articulated standards,

*see Hand v. Scott*, 285 F. Supp. 3d 1289, 1293-94, 1306-08 (N.D. Fla. 2018), and,

as shown by the testimony in this record, has moved at glacial speed. *See, e.g.,*

Hr'g Tr., ECF No. 204 at 170-71. The issue in *Hand*, which is now on appeal, was

whether the Executive Clemency Board was operating in an unconstitutional

manner. Both sides have told the Eleventh Circuit that Amendment 4 has rendered *Hand* moot because all the plaintiffs in that case are now eligible to vote.

Florida's Constitution allows voter-initiated amendments. To pass, a proposed amendment must garner 60% of the vote in a statewide election. Fla. Const. art XI, § 5(e). Amendment 4, which passed with 64.55% of the vote, added a provision automatically restoring the voting rights of some—not all—felons. The new provision became effective on January 8, 2019 and was codified as part of Florida Constitution article VI, section 4. SB7066 purports to implement the Amendment.

The full text of section 4, with the new language underlined, follows:

> (a) No person convicted of a felony, or adjudicated in this or any other state to be mentally incompetent, shall be qualified to vote or hold office until restoration of civil rights or removal of disability. <u>Except as provided in subsection (b) of this section, any disqualification from voting arising from a felony conviction shall terminate and voting rights shall be restored upon completion of all terms of sentence including parole or probation.</u>
>
> <u>(b) No person convicted of murder or a felony sexual offense shall be qualified to vote until restoration of civil rights.</u>

Fla. Const. art. VI, § 4 (emphasis added). The exclusion of felons convicted of murder or sexual offenses is not at issue in these cases, and references in this order to "felons" should be read to mean felons convicted only of other offenses, when the context makes this appropriate.

SB7066 includes a variety of provisions. Two are the most important for purposes of this litigation. First, SB7066 explicitly provides that "all terms of sentence" within the meaning of Amendment 4 includes financial obligations imposed as part of the sentence—that is, "contained in the four corners of the sentencing document." Fla. Stat. § 98.0751(2)(a). Second, SB7066 explicitly provides that this also includes financial obligations that the sentencing court converts to a civil lien. *Id*. Conversion to a civil lien, usually at the time of sentencing, is a longstanding Florida procedure that courts often use for obligations a criminal defendant cannot afford to pay. *See* Fla. Stat. § 938.30(6)-(9); Hr'g Tr., ECF No. 204 at 94; Timmann Dep., ECF No. 194-1 at 31; Haughwout Decl., ECF No. 167-103 at 5-6; ECF No. 167-20 at 48.

### III. The Motion to Dismiss: Redressability

The Secretary's motion to dismiss asserts that the plaintiffs lack standing. This is so, the Secretary says, because the plaintiffs' claims are not redressable in this action. The Secretary's theory is this: the plaintiffs explicitly challenge only SB7066, not Amendment 4, but if Amendment 4 is construed to require payment of financial obligations—an issue for the Florida Supreme Court, not this court— the plaintiffs will still be unable to vote, and no declaration or injunction could be entered in this action that would change this. The Secretary is of course correct that a plaintiff cannot pursue a claim in federal court that even if successful would

make no difference. *See, e.g.*, *Fla. Family Policy Council v. Freeman*, 561 F.3d 1246 (11th Cir. 2009).

The flaw in the Secretary's position is that she reads the plaintiffs' claims too narrowly. The individual plaintiffs assert, among other things, that the State cannot preclude them from voting just because they lack the financial resources to pay financial obligations. And the plaintiffs assert the State's process for restoring the right to vote is so flawed that it violates the Due Process Clause. The organizational plaintiffs make the same claims on behalf of felons whose rights they assert. If the plaintiffs are correct, the constitutional violations can be remedied through an appropriate injunction. Indeed, this order issues an injunction, though not one as broad as the plaintiffs request. That the plaintiffs do not assert Amendment 4 is itself unconstitutional on its face does not change this.

### IV. Abstention

As an original matter, one could reasonably argue both sides of the question whether "all terms of sentence including parole or probation" includes fines, restitution, and other financial obligations imposed at the time of sentencing. This is an issue of Florida, not federal, law. And it is a question of Florida *constitutional* law. The Legislature's view, as set out in SB7066, is not controlling.

At least as against the Secretary of State and Governor, if not also the Supervisors of Elections, this court's jurisdiction to resolve the issue is subject to

doubt. *See, e.g.*, *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121

(1984) (holding that the Eleventh Amendment bars any claim for injunctive relief

based on state law against a state or against a state officer); *but see Harvey*, 605

F.3d at 1080-81 (resolving state-law felon-disenfranchisement issues on the

merits). In any event, any resolution of this issue in these consolidated federal

cases would be short-lived; the Florida Supreme Court, whose view on this will be

controlling, has oral argument on this very issue scheduled just three weeks hence.

*See* ECF No. 148-14 at 2.

    The Secretary says the proper manner of dealing with this uncertainty in

these federal cases is to abstain. The Secretary first invokes *Railroad Commission*

*of Texas v. Pullman Co.*, 312 U.S. 496 (1941), under which a federal court abstains

from deciding a federal constitutional question when there exists an unclear issue

of state law whose resolution might moot the federal constitutional question or

present it in a substantially different light.

    But for two circumstances, the Secretary would be correct. Indeed, but for

the two circumstances, this is the very paradigm of a proper case for *Pullman*

abstention. A decision by the Florida Supreme Court that Amendment 4 does not

require payment of financial obligations as a condition of restoring voting rights

would moot the constitutional questions presented in this case.

The first of the two countervailing circumstances is that this is a voting-rights case and elections are upcoming; delay would decrease the chance that this case can be properly resolved both in this court and on appeal in time for eligible voters—and only eligible voters—to be able to vote. There are local elections on November 5, almost surely before the Florida Supreme Court will rule, and a presidential primary in March, already leaving little time for a preliminary-injunction ruling in this court and appellate review before the voting begins.[2]

The Supreme Court has squarely held that a district court does not abuse its discretion by declining to abstain under *Pullman* in circumstances like these. *See Harman v. Forssenius*, 380 U.S. 528, 537 (1965) ("Given the importance and immediacy of the problem [the right to vote], and the delay inherent in referring questions of state law to state tribunals, it is evident that the District Court did not abuse its discretion in refusing to abstain.") (footnote omitted). The Eleventh Circuit en banc has reached the same conclusion. *See Siegel v. LePore*, 234 F.3d 1163, 1174 (11th Cir. 2000) (en banc) ("[V]oting rights cases are particularly inappropriate for abstention.").

---

[2] *See* Fla. Dep't of State, *Dates for Local Elections All 2019 Election Dates*, https://dos.elections.myflorida.com/calendar/. At least one named plaintiff wishes to vote in a local election on November 5. Wright Decl., ECF No. 152-8 at 6.

The Secretary says these decisions apply only in voting-rights cases and do not apply here because the plaintiffs are felons who have no right to vote—that this case involves only *restoration* of the right to vote, not an already-existing right to vote. But voting is no less important to these plaintiffs than to others, and a ruling on the plaintiffs' constitutional rights is no less urgent than it would be for individuals who have never been convicted. Moreover, the Secretary's proposed distinction assumes she is right on the merits—that, as she contends on the merits, the plaintiffs still have no right to vote. A court does not properly decide to abstain by first accepting a defendant's position on the merits.

The second circumstance that makes abstention inappropriate here is that the Florida Supreme Court's ruling on the most important part of the unclear issue of state law can be predicted with substantial confidence. This is addressed in the next section of this order.

The Secretary also invokes other abstention doctrines, but they are inapplicable based on these same two circumstances and for additional reasons. A preliminary injunction of proper scope will not interfere with a complex state regulatory scheme of the kind that sometimes makes abstention proper under *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943). The proceeding that is pending in the Florida Supreme Court was initiated by the Governor's request for an advisory opinion on state-law issues, but the Governor explicitly asked the court *not* to

address the federal constitutional issues pending in this court. *See* ECF No. 148-13 at 4-5. Because no proceeding is pending in state court that will address the constitutional issues in these consolidated cases, and for other reasons as well, abstention is not warranted under *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976). Finally, this case does not involve eminent domain, as did *Louisiana Power & Light Co. v. City of Thibodaux*, 360 U.S. 25 (1959), nor any similar prerogative of the sovereign.

For all these reasons, this order denies the Secretary's motion to abstain.

### V. Does Amendment 4 Require Payment of Financial Obligations?

The Florida Supreme Court has said that construction of a voter-initiated constitutional amendment properly begins with the provision's text and takes into account the intent of both the framers and the voters. *See Zingale v. Powell*, 885 So. 2d 277, 282 (Fla. 2004). A court properly follows "principles parallel to those of statutory interpretation." *Id*.

Amendment 4 automatically restores voting rights "upon completion of all terms of sentence including parole or probation." As the Secretary emphatically notes, "all" means "all." But the question is not whether "all" means "all"; it obviously does. The question is all *of what*. This order divides the discussion of this issue into four parts: (a) fines and restitution; (b) other financial obligations

imposed at the time of sentencing; (c) amounts converted to civil liens; and (d) the

bottom-line treatment of these issues for purposes of this order.

### A. *Fines and Restitution*

Fines and restitution imposed at the time of sentencing—announced in open

court or included in the sentencing document—are part of the sentence. On one

reading, provisions that are part of a sentence are "terms" of the sentence.

This is consistent with one dictionary definition, under which "terms" are

"provisions that determine the nature and scope of an agreement." "Term,"

*Merriam-Webster's Online Dictionary 2019*, available at https://www.merriam-

webster.com/dictionary/term.[3] A sentence is not an agreement, but close enough.

Other dictionaries probably articulate the same concept in ways more clearly

applicable to a sentence. It is no stretch to suggest that the "terms" of a sentence

are everything in the sentence, including fines and restitution.

On the other side, it is at least curious that Amendment 4 says "including

parole or probation" but not "including fines and restitution." At least literally,

---

[3] The United States Supreme Court, the Eleventh Circuit, and the Florida Supreme Court have all cited Merriam-Webster's in construing texts. *See, e.g.*, *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 553-54 (2014); *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 611 (2009); *United States v. Undetermined Quantities of All Articles of Finished & In-Process Foods*, 936 F.3d 1341, 1346 (11th Cir. 2019); *United States v. Zuniga-Arteaga*, 681 F.3d 1220, 1224 (11th Cir. 2012); *Arriaga v. Fla. Pac. Farms, LLC*, 305 F.3d 1228, 1242 (11th Cir. 2002); *Raymond James Fin. Servs., Inc. v. Phillips*, 126 So. 3d 186, 190 n.4 (Fla. 2013).

"including" means "including but not limited to." *See* "Include," *Black's Law Dictionary* (11th ed. 2019). The word is usually, but not always, construed this way. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 132-33 (2012). Under the negative-implication canon of construction, listing one thing but not others sometimes suggests the others are not included. *See id*. at 107-11. There is even a Latin phrase for this, confirming it must be true, at least sometimes: "*expressio unius est exclusio alterius*." *See id.* at 107-11, 428.

In any event, another dictionary definition of "term" is "a limited or definite extent of time." "Term," *Merriam-Webster's Online Dictionary 2019*, available at https://www.merriam-webster.com/dictionary/term. A period of imprisonment is a "term," as is a period on parole or probation. But this meaning of "term" has no application to financial obligations imposed as part of a sentence. So "all terms of sentence including probation or parole" could mean only all "terms"—periods of time—in prison or under supervision. Not financial obligations.

This reading also fits more comfortably with Amendment 4's reference to "completion" of the terms of sentence. It is commonplace to say a prison term has been completed. So also a term of supervision. A fine or restitution, in contrast, may be *paid*, and one could say, rather inartfully, that a *payment* has been completed. But without a reference to payment, it is at least somewhat awkward to say a fine or other financial obligation has been "completed." Nobody would say,

"I completed my student loan" or "completed my car loan" or "completed my credit-card account."

In sum, Amendment 4's language, standing alone, could be read to include, or not to include, fines and restitution. This brings us to considerations beyond just the amendment's language.

Under Florida law, a voter-initiated constitutional amendment may go on the ballot only if its language and its ballot summary are approved in advance by the Florida Supreme Court. *See* Fla. Const. art. IV § 10; *see id.* art. X, § 3(b)(10). When the proponents of Amendment 4 sought the Florida Supreme Court's approval to place the amendment on the ballot, the issues of fines and restitution were explicitly addressed.

The only speaker at the oral argument in the Florida Supreme Court was the proponents'—that is, the framers'—attorney. He said the critical language "all terms of sentence" means "anything that a judge puts into a sentence." ECF No. 148-1 at 9. A justice asked, "So it would include the full payment of any fines"? *Id.* The attorney responded, "Yes, sir." *Id.* Another justice asked, "Would it also include restitution when it was ordered to the victim . . . as part of the sentence?" *Id.* at 17-18.  The attorney answered, "Yes." *Id.* Yet another justice suggested this might "actually help the State" by providing an incentive for payment. *Id.* at 19.

The intended meaning of Amendment 4 cannot be determined based only on what the proponents' attorney said at oral argument or what three justices thought at that time. A critical question—even more important—is what a reasonable *voter* would have understood the amendment's language to mean. But the Florida Supreme Court has said that in construing amendments, the framers' views are relevant. *Zingale*, 885 So. 2d at 282-83; *see also Gray v. Bryant*, 125 So. 2d 846, 851 (Fla. 1960). The court will surely take into account the proponents' assertions at oral argument. The proponents of an amendment ought not be able to tell the Florida Supreme Court that the amendment means one thing but later, after adoption, assert the amendment means something else.

In any event, voters might well have understood the amendment to require felons to meet all components of their sentence—whatever they might be—before automatically becoming eligible to vote. The plaintiffs say the voters' intent was to restore the right of felons to vote and that all doubts should be resolved accordingly—that is, in favor of otherwise-disenfranchised felons. But that goes too far. The theory of most voters might well have been that felons should be allowed to vote only when their punishment was complete—when they "paid their debt to society."

If, based on this theory, a felon must serve a prison sentence or finish a term of supervision as a condition of voting, it is difficult to argue that a felon who is

able to pay a fine should not be required to do so, also as a condition of voting. Fines are imposed as punishment, sometimes instead of, sometimes in addition to, imprisonment. Inability to pay raises different issues, not only of policy but of constitutional law, but those are issues bearing only a little, if at all, on the proper interpretation of "all terms of sentence." If that phrase is read to exclude fines, it will mean that a felon who is able to pay a fine but chooses not to do so will nonetheless automatically become eligible to vote. There is no evidence that this is what Florida voters intended.

The analysis of voters' intent for restitution is similar, though on at least one view, restitution is imposed not so much as punishment as to provide just compensation to a victim. If voters intended "all terms of sentence" to mean punishment, restitution is not as clearly covered as fines. But voters might still have deemed restitution part of a felon's "debt to society."

In arguing that payment of financial obligations is not required, the plaintiffs note the widely publicized assertion that if adopted, Amendment 4 would immediately make roughly 1.4 million felons eligible to vote. Indeed, the state officials responsible for estimating in advance the likely financial impact of Amendment 4 used a similar figure, and the proponents' attorney referred to it during oral argument in the Florida Supreme Court. Citing the financial-impact analysis, the attorney said the experience in other states has been that the

registration rate for felons who become eligible to vote is roughly 20% and that, for Amendment 4, this would mean about 270,000 people.[4] Curiously, the attorney said this would put the total number of eligible felons at 700,000, but better arithmetic—270,000 divided by .20—would put the eligible number at 1,350,000, in line with the widely publicized figure of roughly 1.4 million.

As it turns out, many of Florida's otherwise-eligible felons have unpaid fines and restitution and many more owe fees of various kinds that are addressed in the next subsection of this order. The record does not show the percentage of otherwise-eligible felons who have unpaid fines and restitution, but the record shows that roughly 80% of otherwise-eligible felons have unpaid fines, restitution, *or other financial obligations* imposed at the time of sentencing. *See* Smith Report, ECF No. 153-1 at 4; *see also* Hr'g Tr., ECF No. 204 at 49. If payment of all these obligations is a prerequisite to eligibility, the estimate of the number of felons who would become eligible under Amendment 4 was wildly inaccurate.

Even so, this provides only slight support for the plaintiffs' assertion that Amendment 4 was not intended to require payment of these obligations. Recall that a critical question is the understanding of the voters who adopted the amendment. Surely many of those voters, probably most, were unaware of the 1.4 million estimate. And even voters who *were* aware of the 1.4 million estimate usually had

---

[4] ECF No. 148-1 at 9.

no reason to know how it was calculated—no reason to believe the estimate included felons with unpaid financial obligations. More important than the estimated number of affected felons was the assertion, readily derived from the text of the amendment, that felons would become eligible only after completing "all terms of sentence." The estimated raw number says little if anything about what the voters understood this language to mean.

Indeed, the estimate does not even show what those who came up with the estimate or embraced it understood the amendment to mean. The state's financial analysts may have lacked familiarity with the state's criminal-justice system and may have failed even to spot the issue. Those who embraced the estimate likely had no idea how many felons would be affected by a requirement to pay fines and restitution, let alone by a requirement to pay other financial obligations. The plaintiffs have tendered no evidence that anyone who made or embraced the estimate actually considered this issue, knew that a substantial number of Florida sentences include fines and restitution, knew that *all* Florida sentences include other financial obligations, or knew that most felons who have finished their time in prison and under supervision have not paid all these financial obligations. The erroneous estimate of the effect of the amendment, even if widely accepted, does not show that most voters thought the right to vote would be restored to those whose sentences included unpaid fines or restitution.

## B. *Other Financial Obligations*

Quite apart from a sentencing judge's decision about the proper punishment for a given felony—punishment that may include a fine—Florida law requires the judge to impose fees whose primary purpose is to raise revenue, sometimes for a specific purpose. The fees often bear no apparent relationship to culpability. The fees for a violent felony that produces substantial bodily injuries may be the same as the fees for a comparatively minor, nonviolent felony, including, for example, shoplifting items of sufficient value.[5]

The fees are ordinarily the same for a defendant who is convicted by a jury or pleads guilty, on the one hand, as for a defendant who denies guilt and pleads no contest, on the other hand.[6] The fees are ordinarily the same whether a defendant is adjudicated guilty or adjudication is withheld.[7]

---

[5] *See* Fla. Stat. § 938.05(1); *see also* ECF No. 152-10 at 15; ECF No. 152-20 at 14.

[6] *See* Fla. Stat. § 938.05(1).

[7] *See, e.g.,* Fla. Stat. § 938.29(1)(a) (imposing fees on a "convicted person" and stating that, for this purpose, convicted means "a determination of guilty, or of violation of probation or community control, which is result of a plea, trial, of violation proceeding, regardless of whether adjudication is withheld").

The fees include $50 for applying for representation by a public defender;[8] $100 for actual representation by a public defender;[9] at least $100 for the state attorney's "costs" (though these are not court costs of the kind ordinarily taxed in favor of a prevailing party in litigation);[10] $225 as "additional court costs" (though again unrelated to court costs of the traditional kind), of which $25 is remitted to the Department of Revenue for deposit in the General Revenue Fund; and additional amounts whose ostensible purpose, other than to raise revenue, is not always clear.[11]

A state of course must provide an attorney for an indigent defendant. *See Gideon v. Wainwright*, 372 U.S. 335 (1963). Even so, a state may be able to require a convicted defendant to pay the state back for the expense of providing the attorney. *See, e.g.*, *James v. Strange*, 407 U.S. 128 (1972). It is a stretch, though, to say that when the voters adopted Amendment 4 restoring the right of felons to vote upon "completion of all terms of sentence," the intent was to condition the right to

---

[8] *See* Fla. Stat. §§ 938.29(1), 27.52(1)(b); *see also* ECF No. 152-10 at 15; ECF No. 152-20 at 12.

[9] *See* Fla. Stat. § 938.29(1); *see also* ECF No. 152-10 at 15.

[10] *See* Fla. Stat. § 938.27(8); *see also* ECF No. 152-10 at 15.

[11] *See* Fla. Stat. § 938.05; *see also* ECF No. 152-10 at 15; ECF No. 152-20 at 14.

vote on the payment of fees for representation by a public defender. And the same could be said of some if not all of the other fees.

At the very least, the analysis of whether Amendment 4 conditions restoration of the right to vote on the payment of financial obligations may be different for fines and restitution, on the one hand, and for the various fees imposed without regard to culpability, on the other hand. The former were explicitly discussed at the oral argument in the Florida Supreme Court; the latter were not. But whatever might be said of Amendment 4, it apparently is clear that SB7066 conditions the right to vote on the payment of the fees, so long as they are included in the sentencing document, as they usually are.[12]

### C. *Conversion to Civil Liens*

Florida law allows a judge to convert a financial obligation imposed at the time of sentencing to a civil lien. *See* Fla. Stat. § 938.30(6)-(9). Judges often do this when they know the defendant is unable to pay the amount being assessed. *See* Hr'g Tr., ECF No. 204 at 94; Timmann Dep., ECF No. 194-1 at 31; Haughwout Decl., ECF No. 167-103 at 5-6; ECF No. 167-20 at 48. Conversion to a civil lien takes the obligation out of the criminal-justice system and allows collection through the same civil processes available to ordinary creditors.

---

[12] *See, e.g.*, ECF No. 152-10 at 15.

The analysis of whether Amendment 4 conditions restoration of the right to vote on the payment of financial obligations may be different for amounts that have or have not been converted to civil liens. The oral argument at the Florida Supreme Court did not explicitly address this issue. But again, whatever might be said of Amendment 4, it is clear that SB7066 conditions the right to vote on the payment even of amounts that have been converted to civil liens. *See* Fla. Stat. §98.0751(2)(a).

### D. *The Treatment of These Issues for Purposes of This Order*

On this issue of whether Amendment 4 requires payment of financial obligations imposed at the time of sentencing—and if so, which financial obligations—the last word will belong to the Florida Supreme Court. This order assumes, subject to revision as the litigation progresses, that "all terms of sentence" includes fines and restitution, fees even when unrelated to culpability, and amounts even when converted to civil liens, so long as the amounts are included in the sentencing document. This is what SB7066 provides.

The Florida Supreme Court's anticipated ruling on fines and restitution can be predicted with substantial confidence. The ruling on the other amounts cannot be predicted as confidently but will not affect the ruling on the preliminary-injunction motion of these individual plaintiffs.

## VI. The Standards Governing Preliminary Injunctions

This brings us to the plaintiffs' constitutional claims—the claims on which they base their motion for a preliminary injunction. As a prerequisite to a preliminary injunction, a plaintiff must establish a substantial likelihood of success on the merits, that the plaintiff will suffer irreparable injury if the injunction does not issue, that the threatened injury outweighs whatever damage the proposed injunction may cause a defendant, and that the injunction will not be adverse to the public interest. *See*, *e.g.*, *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1354 (11th Cir. 2005); *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). The burden of proof is on the plaintiff.

## VII. Reenfranchisement Must Comply with the Constitution

When a state decides to restore the right to vote to some felons but not others, the state must comply with the United States Constitution, including the First, Fourteenth, and Twenty-Fourth Amendments. It is no answer to say, as the Secretary does, that a felon has no right to vote at all, so a state can restore the right to vote or not in the state's unfettered discretion. Both the Supreme Court and the en banc Eleventh Circuit have squarely rejected that assertion.

In *Richardson v. Ramirez*, 418 U.S. 24 (1974), the plaintiffs were felons who had completed their terms in prison and on parole but who, under California

law, were still denied the right to vote. The Supreme Court rejected their claim that this, without more, violated the Equal Protection Clause.

Even so, the Court did *not* say that because a state could choose to deny all felons the right to vote and to restore none of them, the state's decision to restore the vote to some felons but not others was beyond the reach of the Constitution. Quite the contrary. The Court remanded the case to the California Supreme Court to address the plaintiffs' separate contention that California had not treated all felons uniformly and that the disparate treatment violated the Equal Protection Clause. *Id.* at 56. The remand was appropriate because when a state allows some felons to vote but not others, the disparate treatment must survive review under the Equal Protection Clause. The same is true here.

Similarly, in *Johnson v. Governor of Florida*, 405 F.3d 1214 (11th Cir. 2005) (en banc), the court upheld Florida's decision to disenfranchise all felons, subject to restoration of the right to vote by the Florida Executive Clemency Board. Again, though, the court did *not* say that a state's decision to restore the vote to some felons but not others was beyond constitutional review. Instead, citing an equal-protection case, the court made clear that even in restoring the right of felons to vote, a state must comply with other constitutional provisions. *See id.*, 405 F.3d at 1216-17 n.1 (citing *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 668 (1966)).

An earlier decision to the same effect is *Shepherd v. Trevino*, 575 F.2d 1110 (5th Cir. 1978). There the court said a state's power to disenfranchise felons does not allow the state to restore voting rights only to whites or otherwise to "make a completely arbitrary distinction between groups of felons with respect to the right to vote." *Id*. at 1114. As a decision of the Old Fifth Circuit, *Shepherd* remains binding in the Eleventh. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

Other courts, too, have recognized that provisions restoring the voting rights of felons are subject to constitutional review. *See, e.g.*, *Harvey v. Brewer*, 605 F.3d 1067, 1079 (9th Cir. 2010) (O'Connor, J.) (holding the Equal Protection Clause applicable to Arizona's felon-restoration statute but rejecting the plaintiffs' claim on the merits; noting that a state could not restore the vote only to felons of a specific race or only to those over six feet tall); *Johnson v. Bredesen*, 624 F.3d 742, 746-50 (6th Cir. 2010) (holding the Equal Protection Clause applicable to Tennessee's felon-restoration statute but rejecting the plaintiffs' claim on the merits); *Owens v. Barnes*, 711 F.2d 25, 26-27 (3d Cir. 1983) (holding the Equal Protection Clause applicable to Pennsylvania's felon-restoration statute but rejecting the plaintiff's claim on the merits).

## VIII. The Constitution Allows a State to Condition Reenfranchisement on Payment of At Least Some Financial Obligations

Leaving aside for the moment claims based on inability to pay or the Twenty-Fourth Amendment, it is clear that a state can deny restoration of a felon's right to vote based on failure to pay financial obligations included in a sentence. This is so regardless of the level of scrutiny deemed applicable—whether rational-basis scrutiny, as the Secretary contends, or strict scrutiny tempered by the holding in *Richardson* that the Fourteenth Amendment affirmatively allows felon disenfranchisement.

*Harvey* applied rational-basis scrutiny and upheld the Arizona requirement to pay fines and restitution. No plaintiff claimed indigency, so the court did not address that issue or the level of scrutiny it would trigger. *See Harvey*, 605 F.3d at 1080.) *Johnson v. Bredesen* applied rational-basis scrutiny and upheld a requirement to pay restitution and unrelated child-support obligations, even as applied to felons unable to pay. *Madison v. State*, 163 P.3d 757 (Wash. 2007), with no majority opinion, upheld a requirement to pay fines, costs, and restitution, even as applied to felons unable to pay.

As an original matter, one might take issue with this treatment of a felon's right to vote. The Declaration of Independence holds it "self-evident" that men—today we would add women—are endowed with unalienable rights, including life, liberty, and the pursuit of happiness. The Declaration says that to secure these

rights, governments are instituted, "deriving their just powers from the consent of the governed." *Declaration of Independence* para. 2 (U.S. 1776). Felons, no less than others, are "governed."

This does not, however, give felons the right to vote. The Declaration of Independence is aspirational, not the law, and the majority of the governed, at least in Florida, have chosen to forgo the consent of felons, pending only the restoration of their right to vote as provided by law. *Richardson* and *Johnson v. Governor*, if not the Declaration of Independence, allow the State to take this approach.

So a state can properly disenfranchise felons, even permanently, and if the state decides to restore the right to vote to anyone, the state can exercise discretion in choosing among the candidates. Consistent with this considerable leeway, a state can rationally choose to take into account not only whether a felon has served any term of imprisonment and supervision but also whether the felon has paid any financial obligation included in the sentence. A state can rationally decide that the right to vote should not be restored to a felon who is able to pay but chooses not to do so. Indeed, a state's decision not to restore the vote to such a person survives even strict scrutiny, so long as it is recognized, as *Richardson* requires, that the Constitution affirmatively allows disenfranchisement.

### IX. *Johnson v. Governor: The Right to Vote Cannot Be Made to Depend on an Individual's Financial Resources*

The analysis to this point does not, however, resolve the claim based on inability to pay. The starting point of the analysis of this issue, and pretty much the ending point, is a succinct statement of the en banc Eleventh Circuit addressing this very issue: whether the State of Florida can deny restoration of a felon's right to vote based on failure to pay an amount the felon is unable to pay. In a case in which the financial obligation at issue was restitution, the court said:

> *Access to the franchise cannot be made to depend on an individual's financial resources*. Under Florida's Rules of Executive Clemency, however, the right to vote can still be granted to felons who cannot afford to pay restitution. . . . *Because* Florida does not deny access to the restoration of the franchise based on ability to pay, we affirm the district court's grant of summary judgment in favor of the defendants on these claims.

*Johnson v. Governor of Florida*, 405 F.3d 1214, 1216-17 n.1 (11th Cir. 2005) (en banc) (emphasis added; citation omitted to *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 668 (1966)). *Harper* held that Virginia's $1.50 poll tax for state elections violated the Equal Protection Clause.

The *Johnson* footnote is a binding, controlling statement of the en banc Eleventh Circuit addressing not an individual's right to vote in the first instance but the very issue in the case at bar: restoration of a *felon's* right to vote.

*Johnson* establishes two things.

First, the State of Florida cannot deny restoration of a felon's right to vote solely because the felon does not have the financial resources necessary to pay restitution. And because, for this purpose, there is no reason to treat restitution differently from other financial obligations included in a sentence, Florida also cannot deny restoration of a felon's right to vote solely because the felon does not have the financial resources to pay the other financial obligations. The court summed it up succinctly: "*Access to the franchise cannot be made to depend on an individual's financial resources.*" *Johnson*, 405 F.3d at 1216-17 n.1 (emphasis added).

Second, the State meets its constitutional obligation—that is, its obligation not to deny restoration of the right to vote based on lack of financial resources—if the State allows the lack of financial resources to be addressed as part of the same process through which other felons may obtain restoration of the right to vote. Further, though not addressed in *Johnson* itself, a reasonable corollary is that the State can satisfy its duty by another method of its choosing, so long as the method is equally accessible to the felon or otherwise comports with constitutional requirements.

Before going on to address further support for, and the import of, these two *Johnson* holdings, a word is in order on why *Johnson* is binding, that is, why it must be followed in this court. The Eleventh Circuit has a longstanding,

unwavering principle: the law of the circuit as established in the first case to address an issue must be followed until altered by the Eleventh Circuit en banc or the United States Supreme Court. *See, e.g.*, *United States v. Gillis*, 938 F.3d 1181, 1198 (11th Cir. Sept. 13, 2019); *United States v. Vega-Castillo*, 540 F.3d 1235, 1236 (11th Cir. 2008).  District judges in the circuit must follow course. That an issue is resolved in a footnote rather than in the text of an opinion makes no difference.

To be sure, dictum—a statement unnecessary to the decision in a case—is not binding. *See, e.g.*, *United States v. Birge*, 830 F.3d 1229, 1231 (11th Cir. 2016) (stating that the requirement to follow prior decisions "applies only to holdings, not dicta"); *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1315 (11th Cir. 1998) (Carnes, J., concurring) ("[D]icta in our opinions is not binding on anyone for any purpose."). But the *Johnson* footnote is not dictum. The footnote explains precisely why the court reached its decision on one of the issues in the case. The explanation was this: a state cannot refuse to restore a felon's right to vote because of inability to pay restitution, but the plaintiffs did not establish a violation of that principle. Their claim failed "because"—as clear a statement as one can have that this was the basis for the decision—state law allowed restoration of a felon's right to vote through the Executive Clemency Board without requiring payment of amounts the felon could not pay.

As a binding Eleventh Circuit holding, the *Johnson* footnote would be controlling even in the absence of Supreme Court decisions supporting the result. But *Johnson* does not lack Supreme Court support; it is consistent with a series of Supreme Court decisions.

In one, *M.L.B. v. S.L.J.*, 519 U.S. 102 (1996), the Court noted the "general rule" that equal-protection claims based on indigency are subject to only rational-basis review. This is the same general rule on which the Secretary places heavy reliance here. But in *M.L.B.* the Court said there are two exceptions to the general rule. *Id*. at 123-24.

The first exception, squarely applicable here, is for claims related to voting. *Id*. at 124. The Court said, "The basic right to participate in political processes as voters and candidates cannot be limited to those who can pay for a license." *Id*. at 124. The Court cited a long line of cases supporting this principle. *Id*. at 124 n.14. In asserting that the Amendment 4 and SB7066 requirement for payment of financial obligations is subject only to highly deferential rational-basis scrutiny, the Secretary ignores this exception.

The second exception is for claims related to criminal or quasi-criminal processes. Cases applying this exception hold that punishment cannot be increased because of a defendant's inability to pay. *See, e.g.*, *Bearden v. Georgia*, 461 U.S. 660 (1983) (holding that probation cannot be revoked based on failure to pay an

amount the defendant is financially unable to pay). Disenfranchisement of felons

has a regulatory component, *see, e.g.*, *Trop v. Dulles*, 356 U.S. 86, 96-97 (1958),

and when so viewed, disenfranchisement is subject only to the first *M.L.B.*

exception, not this second one. But when the purpose of disenfranchisement is to

punish, this second exception applies. If, after adoption of Amendment 4, the

purported justification for requiring payment of financial obligations is only to

ensure that felons pay their "debt to society"—that is, that they are fully

punished—this second *M.L.B.* exception is fully applicable.

　　Another case applying these principles is *Harper v. Virginia State Board of

Elections*, 383 U.S. 663 (1966), which was cited in both *M.L.B.* and the *Johnson*

footnote. In *Harper* the Supreme Court said "[v]oter qualification has no relation to

wealth." *Id.* at 666. The Court continued, "[w]ealth, like race, creed, or color, is not

germane to one's ability to participate intelligently in the electoral process." *Id.* at

668. And the Court added, "[t]o introduce wealth or payment of a fee as a measure

of a voter's qualifications is to introduce a capricious or irrelevant factor." *Id.* The

Secretary says none of this is true when the voter is a felon, but the Secretary does

not explain how a felon's wealth is more relevant than any other voter's. And

*Johnson* plainly rejected the Secretary's proposed distinction.

　　The error in the Secretary's position can be illustrated with a hypothetical.

Suppose a state adopted a statute automatically restoring the right to vote for felons

with a net worth of $100,000 or more but not for other felons. Would anyone contend this was constitutional? One hopes not. An official who adopts a constitutional theory that would approve such a statute needs a new constitutional theory.

The difference between the hypothetical, on the one hand, and Amendment 4 and SB7066, on the other hand, is that the financial condition in the hypothetical is unrelated to a felon's sentence, while the financial obligations at issue under Amendment 4 and SB7066 are part of a felon's sentence. If writing on a clean slate, one could reasonably argue both sides of the question whether this difference changes the result. But the slate is not clean. The *Johnson* footnote addressed a financial obligation that was part of the sentence and nonetheless concluded that restoration of a felon's right to vote could not constitutionally be made to depend on ability to pay the obligation.

In asserting that the State can properly condition voting on payment of an amount a felon cannot afford to pay, the Secretary makes no effort to come to grips with *Johnson*. Instead, the Secretary cites the Ninth Circuit's decision in *Harvey v. Brewer*, 605 F.3d 1067 (9th Cir. 2010), the Sixth Circuit's decision in *Johnson v. Bredesen*, 624 F.3d 742 (6th Cir. 2010), and the Washington Supreme Court's decision in *Madison v. State*, 163 P.3d 757 (Wash. 2007).

These out-of-circuit decisions do not carry the day for the Secretary. The *Harvey* plaintiffs did not allege inability to pay, so the court explicitly declined to address the issue. *Johnson v. Bredesen* was a 2–1 decision, and the dissent had the better of it. *Madison* was again a split decision, and again the dissent had the better of it. More importantly, a district court in the Eleventh Circuit cannot decline to follow a binding circuit precedent just because other courts have taken a different view. *Johnson* is controlling.

### X. Johnson v. Governor: The Scope of the Remedy

*Johnson* does not mean, though, that the individual plaintiffs are entitled to a preliminary injunction requiring the Secretary and affected Supervisor to allow them to vote. *Johnson* requires only that the State put in place an appropriate procedure through which an individual plaintiff may register and vote if otherwise qualified and genuinely unable to pay outstanding financial obligations.

This issue was addressed during closing argument following the evidentiary hearing. Asked whether, based on *Johnson*, it would be sufficient for the State to allow the plaintiffs to establish their inability to pay in a proceeding before the Executive Clemency Board, the plaintiffs asserted they cannot properly be forced into a different track than available to all other felons. Hr'g Tr., ECF No. 205 at 23-25. At first blush, the contention makes sense. *See, e.g.*, *Harman*, 380 U.S. at

542 (holding it unconstitutional to require indigent voters to file certificates of residency not required of voters who paid a $1.50 poll tax).

The flaw in the contention is this. As set out above, the State can condition restoration of a felon's right to vote on payment of fines and restitution the felon is able to pay. When a felon claims inability to pay, the State need not just take the felon's word for it. The State may properly place the burden of establishing inability to pay on the felon and, to that end, may put in place an appropriate administrative process. That this places a greater burden on the felon claiming inability to pay than on felons with no unpaid obligations is unavoidable and not improper.

The process available to the *Johnson* plaintiffs was an application to the Executive Clemency Board. The individual plaintiffs in the case at bar also have the right to apply to the Executive Clemency Board. If the Board operates at a pace that makes it an available remedy in fact, the State can satisfy its *Johnson* obligation through the Board, so long as the Board complies with *Johnson*. This will mean restoring the right to vote of any felon who applies and whose right to vote would be automatically restored under Amendment 4 and SB7066 but for financial obligations the applicant is genuinely unable to pay.

The Executive Clemency Board is not, however, the forum in which other felons will claim their right to vote under Amendment 4 and SB7066. Just as the

State could satisfy its obligation to the indigent *Johnson* plaintiffs by making available to them the same process available to others, so also the State may satisfy its obligation to the indigent plaintiffs in the case at bar by making available to them the same process available to others whose right to vote has been restored under Amendment 4 and SB7066. That process consists of up to six steps.

First, a felon, like any other prospective voter, submits an application to the appropriate county's Supervisor of Elections.[13] Second, if the application is sufficient on its face, the Supervisor puts the applicant on the roll of qualified voters and forwards the application to the Secretary of State, who checks for disqualifying felony convictions.[14] Third, if "credible and reliable" information indicates the applicant has a disqualifying conviction, the Secretary so notifies the Supervisor.[15] Fourth, if the Supervisor accepts the Secretary's conclusion after any further investigation the Supervisor chooses to undertake, the Secretary gives the applicant notice and an opportunity to be heard.[16] Fifth, if the applicant fails to establish eligibility to vote, the Supervisor removes the applicant from the roll of

---

[13] Matthews Decl., ECF No. 148-16 at 3.

[14] *Id.* at 5.

[15] *Id.* at 6; *see also* Fla. Stat. § 98.075(5).

[16] Matthews Decl., ECF No. 148-16 at 8, 11; *see also* Fla. Stat. § 98.075(7).

qualified voters.[17] Sixth, the applicant may challenge the Supervisor's decision through an action in state circuit court, where evidence may be presented and the decision will be made de novo, without deference to the Supervisor.[18]

Consistently with *Johnson*, the State could meet its obligation not to deny restoration of the right to vote based on lack of financial resources by requiring the Secretary to determine at step three of the process, or by allowing an otherwise-qualified felon to establish at step four, that the reason for failing to pay any outstanding financial obligation was inability to pay. That this might require a hearing does not make it unconstitutional. *See Johnson*, 405 F.3d at 1217 n.1 ("The requirement of a hearing is insufficient to support the plaintiffs' claim."). Or the State could meet its obligation by a constitutionally acceptable alternative method. What the State cannot do, under *Johnson*, is deny the right to vote to a felon who would be allowed to vote but for the failure to pay amounts the felon has been genuinely unable to pay.

## XI. *The Community-Service Option Does Not Save an Unconstitutional Requirement to Pay*

SB7066 includes a provision allowing a court to convert a financial obligation to community service. A felon may satisfy the otherwise-applicable

---

[17] Matthews Decl., ECF No. 148-16 at 11; *see also* Fla. Stat. § 98.075(7).

[18] *See* Fla. Stat. §§ 98.075(7), 98.0755.

financial obligation by performing the proper amount of community service. The Secretary says this means restoration of the right to vote is not unconstitutionally conditioned on financial resources.

The Secretary's assertion fails for three reasons.

First, the community-service option applies only to Florida convictions, not out-of-state or federal convictions. And the option applies only when a judge chooses to employ it. For many felons, including at least some of the individual plaintiffs, the option is not available at all.

Second, even for felons convicted in a Florida state court and for whom the judge chooses to employ the community-service option, the prospect of satisfying financial obligations in this way is often wholly illusory. Community service is usually credited at low hourly rates.[19] Some plaintiffs would miss many votes before they could satisfy their financial obligations in this way, even if allowed to do so, and some plaintiffs would never be able to satisfy their obligations. In the meantime, the right to vote would be lost based solely on lack of financial resources.

Third, separate and apart from the hourly rate and the near certainty that a plaintiff would miss votes even if allowed to use the community-service option, the

---

[19] Hr'g Tr., ECF No. 204 at 94, Timmann Dep., ECF No. 194-1 at 63, Haughwout Decl., ECF No. 152-20 at 8.

option does not eliminate the disparate treatment of otherwise-qualified felons based on financial resources. Those with financial resources would still be able to vote simply by paying their financial obligations, while felons without the same resources would not be able to do so. The option thus does not cure the underlying problem: "*Access to the franchise cannot be made to depend on an individual's financial resources*." *Johnson*, 405 F.3d at 1216-17 n.1 (emphasis added).

## XII. Twenty-Fourth Amendment

The Twenty-Fourth Amendment to the United States Constitution provides that a citizen's right to vote in a federal election "shall not be denied or abridged by the United States or any State by reason of failure to pay any poll tax or other tax." The State says the amendment does not apply to felons because they have no right to vote at all, but that makes no sense. A law allowing felons to vote in federal elections but only upon payment of a $10 poll tax would obviously violate the Twenty-Fourth Amendment.

Florida has not, of course, explicitly imposed a poll tax. The financial obligations at issue were imposed as part of a criminal sentence. The obligations existed separate and apart from, and for reasons unrelated to, voting. Every court that has considered the issue has concluded that such a preexisting obligation is not a poll tax. *See, e.g.*, *Johnson v. Bredesen*, 624 F.3d 742, 751 (6th Cir. 2010); *Harvey v. Brewer*, 605 F.3d 1067, 1080 (9th Cir. 2010); *Thompson v. Alabama*,

293 F. Supp. 3d 1313, 1332-33 (M.D. Ala. 2017); *Coronado v. Napolitano*, No. cv-07-1089-PHX-SMM, 2008 WL 191987 at *4-5 (D. Ariz. Jan. 22, 2008).

This does not, however, end the Twenty-Fourth Amendment analysis. The amendment applies not just to any poll tax but also to any "other tax." As the Secretary emphasizes in addressing Florida's Amendment 4, "words matter." The same principle applies to the Twenty-Fourth Amendment. The words "any . . . other tax" are right there in the amendment.

There is no defensible way to read "any other tax" to mean only any tax imposed at the time of voting or only any tax imposed explicitly for the purpose of interfering with the right to vote. "Any other tax" means "any other tax." A law prohibiting citizens from voting while in arrears on their federal income taxes or state sales or use taxes would plainly violate the Twenty-Fourth Amendment. A state could not require a voter to affirm, on the voter-registration application or when casting a ballot, that the voter was current on all the voter's taxes. The very idea is repugnant.

The only real issue is whether the financial obligations now at issue are taxes. As the Supreme Court has made clear time and again, whether an exaction is a "tax" for constitutional purposes is determined using a "functional approach," not simply by consulting the label given the exaction by the legislature that imposed it. *See, e.g.*, *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 564-66 (2012)

(collecting cases). The Supreme Court has said the "standard definition of a tax" is an "enforced contribution to provide for the support of the government." *United States v. State Tax Comm'n of Miss.*, 421 U.S. 599, 606 (1975) (quoting *United States v. La Franca*, 282 U.S. 568, 572 (1931)). More recently, the Court has said the "essential feature of any tax" is that "[i]t produces at least some revenue for the Government." *Nat'l Fed'n*, 567 U.S. at 564 (citing *United States v. Kahriger*, 345 U.S. 22, 28 n.4 (1953)).

Some of the financial obligations at issue plainly are not taxes. Criminal fines generate revenue for the government that imposes them, but the primary purpose is to punish the offender, not to raise revenue. Fines are criminal penalties; they are not taxes. Similarly, restitution payable to the private victim of a crime— not to a government—lacks the essential feature of a tax; restitution is intended to compensate the victim, not raise revenue for the government. Restitution payable to a victim is not a tax.

The issue is much closer for other amounts routinely assessed against Florida criminal defendants, including not only those who are adjudicated guilty but also those who enter no-contest pleas that resolve their cases without an adjudication of guilt. Florida has chosen to pay for its criminal-justice system in significant measure through such fees. The record establishes that in one county, the fees total at least $698 for every defendant who is represented by a public

defender and at least $548 for every defendant who is not.[20] If, as the Supreme Court has held, a $100 assessment against a person who chooses not to comply with the legal obligation to obtain conforming health insurance is a tax, *see National Federation*, 567 U.S. at 574, it is far from clear that a $698 or $548 assessment against a person who is charged with but not adjudicated guilty of violating some other legal requirement is not also a tax, at least when, as in Florida, the purpose of the assessment is to raise money for the government. And if a fee assessed against a person who is not adjudicated guilty is a tax, then the same fee, when assessed against a person who *is* adjudicated guilty, is also a tax.

A definitive ruling on whether the Florida fees are taxes within the meaning of the Twenty-Fourth Amendment need not be made at this time because it will not affect the ruling on the preliminary-injunction motion of these specific plaintiffs.

## XIII. Due Process

The plaintiffs assert that even if a state can properly condition restoration of a felon's right to vote on payment of financial obligations included in a sentence, the manner in which the State of Florida proposes to do so violates the Due Process Clause. The argument carries considerable force. Florida's records of the financial obligations are decentralized, often accessible only with great difficulty, sometimes

---

[20] Haughwout Decl., ECF No. 152-20 at 4 ¶ 6.

inconsistent, and sometimes missing altogether. This creates administrative difficulties that sometimes are unavoidable.

The plaintiffs say the flaws in Florida's recordkeeping are especially egregious because a felon who claims a right to vote and turns out to be wrong may face criminal prosecution. A conviction for a false affirmation in connection with voting requires a showing of willfulness, *see* Florida Statutes § 104.011, and a conviction for illegally voting requires a showing of fraud, *see id.* § 104.041. At least one Supervisor of Elections and one State Attorney have said they will not pursue criminal charges against a felon who asserts in good faith that the felon has completed all terms of sentence.[21] But some supervisors and prosecutors might not be so charitable, and determining whether a felon's assertion was made in good faith will not always be easy. If Florida does not clean up its records, some genuinely eligible voters may choose to forgo voting rather than risk prosecution.

When a state chooses to restore a felon's right to vote in defined circumstances—for example, upon completion of all terms of sentence—the felon has a constitutional right to due process on the question of whether the circumstances exist—for example, on whether all terms of sentence have been completed. The contours of the process that is due turn on factors identified in

---

[21] Early Dep., ECF No. 152-52 at 68-70.

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), and *J.R. v. Hansen*, 736 F.3d 959, 966 (11th Cir. 2015). For factual disputes, a hearing is often required, and this opinion assumes that in Florida a felon has a constitutional right to a hearing on any factual dispute about whether the felon has completed all terms of sentence as required.

Under current Florida procedure, a felon who asserts eligibility to vote is entitled to a hearing before the Supervisor of Elections. A felon dissatisfied with the Supervisor's decision may initiate a de novo proceeding in state circuit court, complete with full due process. This is constitutionally sufficient so long as all material factual disputes are in play at the hearing. The Due Process Clause does not preclude the State from placing the burden of going forward at the hearing, and even the burden of proof, on the felon. That carrying the burden will be difficult does not, without more, render this process unconstitutional.

There is no need to decide at this time whether the state can constitutionally refuse to restore the right to vote based on a financial obligation that the state cannot confirm or calculate—an obligation for which essential records are missing—because that is not the circumstance faced by any of these plaintiffs.

Two circumstances do not change the conclusion that the plaintiffs have not established a violation of their right to procedural due process.

First, there are substantial inconsistencies in the records of the financial obligations owed by some of these plaintiffs. Even so, the amount actually owed is a factual issue that can be sorted out, albeit with some difficulty. This can be done through the hearing process if necessary.

Second, to make it to a hearing that satisfies due process, a felon must be able to apply to register to vote. Prior to the adoption of SB7066, Florida's standard voter-registration form required an applicant to attest that the applicant had never been convicted of a felony or, if the applicant had been convicted of a felony, the right to vote had been restored.[22] This apparently worked without difficulty and, if used now, would allow a felon who asserts a right to vote to submit an application and thus begin the process that, if there is disagreement, eventually leads to a hearing.

But SB7066 scraps the old attestation in favor of three new ones—alternatives to one another—that must be included on the application. These require the applicant to attest that the applicant has never been convicted of a felony, or that the felon's right to vote has "been restored by the Board of Executive Clemency," or that the felon's right to vote has "been restored pursuant

---

[22] *See* Matthews Decl., ECF No. 148-16 at 2; *see also* Fla. Stat.
§ 97.052(2)(t) (2018).

to s. 4, Art. VI of the State Constitution upon the completion of all terms of my sentence, including parole or probation." Fla. Stat. § 97.052(2)(t) (2019).

During closing arguments in this case, the Secretary called these required attestations "inartful," and they surely are.[23] But they are worse than that; as the Secretary acknowledged, there are eligible individuals who could not attest to any of the three new statements. Hr'g Tr., ECF No. 205 at 50. The statements do not reach felons whose rights have been restored in other states or through other methods, including executive pardons. *See, e.g.*, *Schlenther v. Dep't of State, Div. of Licensing*, 743 So. 2d 536, 537 (Fla. 2d DCA 1998) ("Once another state restores the civil rights of one of its citizens whose rights had been lost because of a conviction in that state, they are restored and the State of Florida has no authority to suspend or restore them at that point."). If Florida adopts an application form that tracks the statute and does nothing more—as did the initial draft prepared in response to SB7066[24]—the form will not only discourage eligible felons from voting but will make it impossible for some eligible felons even to apply. The Secretary says that as of now, the Supervisors of Elections in all 67 Florida counties are accepting the old form.[25]

---

[23] Hr'g Tr., ECF No. 205 at 49-50.

[24] ECF No. 148-3 at 4.

[25] Hr'g Tr., ECF No. 205 at 51.

In addition, if Florida wishes to address inability to pay through its existing six-step administrative process, *see supra* at 37-38, rather than in a functioning Executive Clemency Board or federal court, the state may wish to provide a method by which a felon can claim inability to pay on the application form.

SB7066 created a workgroup tasked with addressing these and other difficulties.[26] The workgroup may design a system improving accessibility to records, may improve the application form, and may suggest other changes. Before this case goes to trial, the Florida Legislature will meet again and may choose to address the substantial administrative and constitutional issues not resolved by SB7066. The Florida Constitution does not preclude the Legislature from restoring the right to vote beyond the minimum required by Amendment 4—an approach that could minimize, if not eliminate, the administrative and constitutional issues.

In any event, these individual plaintiffs have not yet shown a likelihood of success on the merits of the claim that they, as distinct from other affected felons, will suffer a denial of due process in the absence of an injunction broader than set out in this order. Nor have the organizational plaintiffs made this showing for any individual whose rights they assert.

---

[26] *See* ECF No. 148-46 at 33-35; *see also* ECF No. 152-116.

## XIV. Vagueness and the Risk of Prosecution

Closely related to the due-process claim is the assertion that SB7066 is unconstitutionally vague. It is not.

That a constitutional provision or statute is not clear in all its applications does not, without more, make it impermissibly vague. *See, e.g.*, *Grayned v. City of Rockford*, 408 U.S. 104, 110-11 (1972) ("Condemned to the use of words, we can never expect mathematical certainty from our language."). Concerns about ambiguity, about what a provision means, ordinarily can be resolved through judicial construction of the provision. That is true here. The issues that arise when construing Amendment 4 and SB7066 are no more difficult than issues courts resolve every day when construing other provisions.

To be sure, when First Amendment protections are involved, vagueness is of heightened concern. *See Wollschlaeger v. Governor of Fla.*, 848 F.3d 1293 (11th Cir. 2017). Even so, the language of Amendment 4 comes nowhere near the point of unconstitutional vagueness. And SB7066, while substantively controversial, is quite clear. The plaintiffs' real concern is not so much that they don't know what SB7066 means as that they do.

The plaintiffs' more substantial complaint is not the asserted facial ambiguity of Amendment 4 or SB7066 but what might be termed factual vagueness—the difficulty in determining the financial obligations included in a

sentence and what portion has been paid. These are matters that can be addressed in the hearing the State makes available. If, as this plays out, the State forces the individual plaintiffs to risk prosecution to get to an appropriate hearing, they may renew their motion for a preliminary injunction.

So far, the plaintiffs have not shown a substantial likelihood of success on any claim that Amendment 4 and SB7066 are unconstitutionally vague either on their face or as applied to these plaintiffs.

## XV. Applying the Preliminary-Injunction Standards

For the reasons set out in section IX above, the State of Florida cannot deny an individual plaintiff the right to vote just because the plaintiff lacks the financial resources to pay whatever financial obligations Amendment 4 and SB7066 require the plaintiff to pay. "*Access to the franchise cannot be made to depend on an individual's financial resources.*" *Johnson*, 405 F.3d at 1216-17 n.1 (emphasis added). The plaintiffs are likely to prevail on this claim.

This does not mean, though, that the plaintiffs are likely to prevail on their claim for an injunction requiring the Secretary and the appropriate Supervisor to register specific individuals and to allow them to vote. The appropriate remedy, at least at this stage of the litigation, is to preliminarily enjoin the defendants from interfering with an appropriate procedure through which the plaintiffs can attempt to establish genuine inability to pay. *Johnson* requires nothing more.

The Miami-Dade County Supervisor of Elections asserts that if a preliminary injunction is issued, it should take full account of the distinction between registering to vote and eligibility to vote. The point is well taken. As the Supervisor notes, if a felon applies, is registered, and is not removed from the voting roll, the felon's eligibility can still be challenged, including by any other voter. *See* Fla. Stat. § 101.111. If that occurs, the felon may cast a provisional ballot, and the county canvassing board must adjudicate the challenge. *See* Hr'g Tr., ECF No. 204 at 197-98. This order's preliminary injunction does not explicitly address any such challenge, but as should be clear from what has been said to this point, an otherwise-qualified felon who establishes genuine inability to pay—either through another process the State makes available or in connection with a challenge—cannot be prevented from casting a ballot and having it counted.

The plaintiffs have easily met the other three prerequisites to a preliminary injunction of the scope set out in this order.

When an eligible citizen misses an opportunity to vote, the opportunity is gone forever; the vote cannot later be cast. So when a state wrongly prevents an eligible citizen from voting, the harm to the citizen is irreparable. Each of these plaintiffs have a constitutional right to vote *so long as* the state's only reason for denying the vote is failure to pay an amount the plaintiff is genuinely unable to

pay. The preliminary injunction is necessary to prevent irreparable harm to any such plaintiff.

The damage the injunction may cause the Secretary and the affected Supervisor, if a plaintiff is wrongly allowed to vote, is not insubstantial. Few if any states disenfranchise as many felons as Florida, but Florida's choices must be honored, to the extent constitutional. Even so, the State's interest in *preventing* votes by *ineligible* voters is no greater than its interest in *allowing* votes by *eligible* voters. If the State puts in place an administrative process through which genuine inability to pay can be promptly addressed, the potential damage to the Secretary or a Supervisor will be minimized. And in any event, any damage that may result from the injunction does not outweigh an eligible plaintiff's interest in voting.

Finally, the injunction is in the public interest. The public interest lies in resolving this issue correctly and implementing the proper ruling without delay. Complying with the Constitution serves the public interest. Those with a constitutional right to vote should be allowed to vote. The countervailing interests do not tip the balance.

In sum, the plaintiffs are entitled to a preliminary injunction of appropriate scope. Federal Rule of Civil Procedure 65(c) requires a party who obtains a preliminary injunction to "give[] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been

wrongfully enjoined." This order requires the plaintiffs to give security for costs in a modest amount. Any party may move at any time to adjust the amount of security.

### XVI. Conclusion

For these reasons,

IT IS ORDERED:

1. The Secretary's motion to dismiss or abstain, ECF No. 97, is denied.

2. The plaintiffs' preliminary-injunction motion, ECF No. 108, is granted in part. A preliminary injunction is entered in favor of the individual plaintiffs as set out below against all defendants other than the Governor and Supervisor of Orange County.

3. The Secretary of State must not take any action that both (a) prevents an individual plaintiff from applying or registering to vote and (b) is based only on failure to pay a financial obligation that the plaintiff asserts the plaintiff is genuinely unable to pay. The plaintiffs to which this paragraph applies are Jeff Gruver, Emory Mitchell, Betty Riddle, Karen Leitch, Keith Ivey, Kristopher Wrench, Raquel Wright, Stephen Phalen, Jermaine Miller, Clifford Tyson, Rosemary McCoy, Sheila Singleton, Bonnie Raysor, Diane Sherrill, Lee Hoffman, Luis Mendez, and Kelvin Jones.

4. The Secretary of State must not take any action that both (a) prevents an individual plaintiff from voting and (b) is based only on failure to pay a financial obligation that the plaintiff shows the plaintiff is genuinely unable to pay. The plaintiffs to which this paragraph applies are the same as for paragraph 3 above.

5. This injunction does not prevent the Secretary from notifying the appropriate Supervisor of Elections that a plaintiff has an unpaid financial obligation that will make the plaintiff ineligible to vote unless the plaintiff shows that the plaintiff is genuinely unable to pay the financial obligation.

6. The defendant Supervisor of Elections of the county where an individual plaintiff is domiciled must not take any action that both (a) prevents the plaintiff from applying or registering to vote and (b) is based only on failure to pay a financial obligation that the plaintiff asserts the plaintiff is genuinely unable to pay. The Supervisors and individual plaintiffs to which this paragraph applies are the Supervisor of Alachua County for the plaintiffs Jeff Gruver and Kristopher Wrench; the Supervisor of Sarasota County for the plaintiff Betty Riddle; the Supervisor of Miami-Dade for the Plaintiff Karen Leitch; the Supervisor of Duval County for the plaintiffs Keith Ivey, Rosemary McCoy, and Sheila Singleton; the Supervisor of Indian River County for the plaintiff Raquel Wright; the Supervisor of Manatee County for the plaintiff Stephen Phalen; the Supervisor of Leon County for the plaintiff Jermaine Miller; and the Supervisor of Hillsborough

County for the plaintiffs Clifford Tyson, Lee Hoffman, Luis Mendez, and Kelvin Jones.

7. The Supervisor of Elections of the county where a plaintiff is domiciled must not take any action that both (a) prevents a plaintiff from voting and (b) is based only on failure to pay a financial obligation that the plaintiff shows the plaintiff is genuinely unable to pay. The Supervisors and individual plaintiffs to which this paragraph applies are the same as for paragraph 6 above.

8. This injunction will take effect upon the posting of security in the amount of $100 for costs and damages sustained by a defendant found to have been wrongfully enjoined. Security may be posted by a cash deposit with the Clerk of Court.

9. This injunction binds the defendants and their officers, agents, servants, employees, and attorneys—and others in active concert or participation with any of them—who receive actual notice of this injunction by personal service or otherwise.

SO ORDERED on October 18, 2019.

s/Robert L. Hinkle_____
United States District Judge