# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA

CASE NO.: 4:19-CV-300-RH-MJF

KELVIN LEON JONES, et al.,

Plaintiffs,

vs.

RON DeSANTIS, in his official capacity as Governor of Florida, et al.,

Defendants.
________________________________/

CONTINUED DEPOSITION OF

MARIA MATTHEWS

VOLUME 2 (Pages 223 - 342)

Monday, January 27, 2020
9:13 a.m. - 12:25 p.m.

HOLLAND & KNIGHT
315 South Calhoun Street
Tallahassee, Florida 32301

Stenographically Reported By:
JUDY LYNN MARTIN, NOTARY PUBLIC

Job No.: 175837

APPEARANCES:

On behalf of the Raysor Plaintiffs:
CAMPAIGN LEGAL CENTER
1101 14th Street, Northwest
Washington, DC 20005
BY: Mark Gaber, Esquire
Jonathan Diaz, Esquire

On behalf of the Gruver Plaintiffs:
AMERICAN CIVIL LIBERTIES UNION OF FLORIDA
118 West Adams Street
Jacksonville, Florida 32202
BY: Jimmy Midyette, Esquire (Via telephone)

-and-

NAACP LEGAL DEFENSE AND EDUCATIONAL FUND
40 Rector Street
New York, New York 10006
BY: John Cusick, Esquire (Via telephone)

-and-

AMERICAN CIVIL LIBERTIES UNION OF FLORIDA
4343 West Flagler Street
Miami, Florida 33134
BY: Anton Marino, Esquire (Via telephone)

Appearances (Continued)

On behalf of Secretary of State:
FLORIDA DEPARTMENT OF STATE
500 South Bronough Street
Tallahassee, Florida 32399
BY: Ashley Davis, Esquire

-and-

HOLLAND & KNIGHT
315 South Calhoun Street
Tallahassee, Florida 32301
BY: Tara Price, Esquire

On behalf of Hillsborough County:
HILLSBOROUGH COUNTY ATTORNEY'S OFFICE
601 East Kennedy Boulevard
Tampa, Florida 33602
BY: Stephen Todd, Esquire (Via telephone)

On behalf of Leon County:
MESSER CAPARELLO
2618 Centennial Place
Tallahassee, Florida 32308
BY: Mark Herron, Esquire (Via telephone)

On behalf of Alachua County:
ALACHUA COUNTY ATTORNEY'S OFFICE
12 Southeast First Street
Gainesville, Florida 32601
BY: Corman Hanson, Esquire (Via telephone)

I N D E X

| Testimony of MARIA MATTHEWS | |
| --- | --- |
| Direct Examination by MR. GABER | 227 |
| CERTIFICATE OF OATH | 339 |
| CERTIFICATE OF REPORTER | 340 |
| Errata Sheet | 341 |

EXHIBITS

| Matthews Exhibits | | |
| --- | --- | --- |
| Exhibit No. 22 | Notice of Deposition | 230 |
| Exhibit No. 23 | Email Chain dated 10/28/2019 | 274 |
| Exhibit No. 24 | Email dated 12/20/2019 | 276 |
| Exhibit No. 25 | Restoration of Voting Rights Work Group Report | 302 |

MARIA MATTHEWS

Proceedings began at 9:13 a.m.:

THE STENOGRAPHER: Do you swear or affirm that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

MARIA MATTHEWS,

having been first duly sworn or affirmed, as hereinafter certified, testified as follows:

DIRECT EXAMINATION

BY MR. GABER:

Q Good morning, Ms. Matthews. My name is Mark Gaber. I represent the Raysor plaintiffs in this action.

Could you please state your name for the record?

A Maria Matthews.

Q What is your position with the Secretary of State's Office?

A I'm the director for the Division of Elections with the Florida Department of State.

Q You previously testified in a deposition in this litigation; is that right?

A Yes.

Q You are testifying now as the corporate

representative for the Secretary of State; is that right?

A Yes.

Q So the record is clear, is it your understanding as well that your previous testimony is also being taken as testimony on behalf of the Secretary of State as corporate representative?

A Yes.

Q I know that you are an attorney and you've been deposed before, so I won't spend a lot of time on the intro things, but we should both make an effort to speak slowly and clearly so the reporter can get the information down and not talk over one another. And if I ask a question that you don't understand, please ask for clarification. Unless you say otherwise, we'll presume that you understood the question.

Does that work for you?

A Yes.

Q If at any time you need a break, please let me know. I just ask that you answer the question that's pending on the table before taking the break. Okay?

A Yes.

Q Is there any reason that you cannot answer my questions truthfully today?

A No.

Q Did you bring any materials with you today?

A No.

Q What did you do to prepare for today's deposition?

A I reviewed some documentation, just my depo that I did before, and I talked to my attorneys.

Q Any other documents that you looked at in preparation for today's deposition?

A Again, it would just be documents kind of related to this and -- and the discovery documents.

Q Any in particular?

A Admissions, request for production of documents.

Q Did you look at any other documents that were produced by the Secretary of State's Office to plaintiffs?

A I don't believe so.

Q Have you read the October 2019 order of the district court granting preliminary injunction?

A I have read it in the past.

Q Have you also read the decision of the Florida Supreme Court -- the advisory opinion decision of the Florida Supreme Court, Amendment 4?

A I have read that in the past.

MR. GABER: I'm going to mark Exhibit 22.

(Marked for Identification is Matthews Exhibit Number 22.)

BY MR. GABER:

Q This is the Notice of Deposition of Defendant Laurel M. Lee In Her Official Capacity as Secretary of State of Florida, Pursuant to Rule 30(b)(6).

Have you seen this notice?

A Yes.

Q Are you familiar with the eight topics that are listed on the notice?

A Just refreshing, yes.

Q Do you feel like you are the appropriate person to answer questions about these topics in the Department of State?

A Yes.

Q Have you testified as the corporate representative for the Department of State before?

A I believe so.

Q Do you have a sense of how many times?

A It's not something I like to keep track of.

Q Hopefully this isn't that painful. I just want to -- for purposes of today's deposition, the

questions that I ask will be focused on the time period after your last deposition. So to the extent that's not clear from the question itself, that is the time frame that we are looking at. I think that was September 13, 2019.

Since that time, since September 13, 2019, what steps has the Secretary of State's Office taken to implement SB 7066?

A We continued to review -- conduct automated matches, review those matches, create files that are credible and reliable in accordance with the law. It encompasses those matches that relate to those individuals who appear to be in prison or under supervision with the Department of Corrections or who have a felony conviction adjudication for murder or a conviction for felony sexual offense adjudicated.

Q Are those the only categories of matches that are currently being conducted?

A Those are the only categories of matches that we are reviewing and for which if we determine that they are credible and reliable are sending down. We are reviewing cases, or matches rather, that relate to those who don't fall in those categories, but we are not sending those down yet.

Q When you say matches for those who don't fall into these categories, what categories are you reviewing?

A Those would be individuals who -- well, don't fall into those categories. It could be people who have outstanding legal financial obligation or otherwise have not completed the terms of their sentence.

Q One clarification. When you say sending down, do you mean to the Supervisors of Elections?

A That is correct.

Q When you say that it would be people who have outstanding legal financial obligations, I mean, are you actually matching for people with outstanding legal financial obligations?

A We are currently working with our legal counsel on that process, but we're reviewing those kinds of matches.

Q What system do you have in place to determine whether someone has outstanding LFOs?

A Just as with any other match, we consult the resources that we have available, so that could be the CCIS, which is the Comprehensive Case Information System that the Clerk of Court has, which is their single database for documents, court documents; it can also be

the Department of Corrections' data online; it can also be the Federal Commission on Offender Review, their clemency database; all the sources that we use to determine that we have been and continue to do to determine whether somebody is eligible and whether that match is credible and reliable.

Q When did you begin identifying matches based on LFOs?

A It's a review. It's an ongoing review that we're doing at this point. Certainly once the advisory opinion from the Florida Supreme Court that is -- felt like it was appropriate to move forward with that, but, again, I'm working with the attorneys on this, because it's a complicated...

Q Were there any other -- prior to the advisory opinions issuance, was there review being done of matches that showed outstanding LFOs?

A Yeah. We were still doing it, but, again, working with our attorneys. Nothing is being sent down that doesn't fall into the categories that I mentioned earlier.

Q So are you collecting like a list of registrants who have, in your view, outstanding LFOs and can -- storing that somewhere?

A No. I think it's just a matter of us looking at potential matches as -- that may -- that fall into that category and then working with our attorney to determine if that is how -- how to best create a match that we can feel comfortable that is credible and reliable.

Q Who is the attorney that you work with on this?

A It's the legal -- it's our General Counsel's Office.

Q Is there any policy that's been created in the office or that's been drafted about how to determine whether someone has outstanding LFOs?

A We have procedures that were last amended in December that discuss how to go about creating a credible and reliable match, depending on whether the person's in prison or under supervision, murder, felony sexual offense, as well as noncompletion of a sentence.

Q That was amended in December of 2019?

A Correct.

Q Is December of 2019 the first version of that document that includes the noncompletion of sentence?

A No, I believe other prior versions included reference to it, but haven't been acted on again. As I

said, we have not sent any files down to the Supervisors relative to that category.

Q When did the noncompletion of sentence aspect -- and that relates generally to the LFOs; is that your understanding?

A It could be. There are other aspects to a sentence.

Q Right. But the completion of the LFOs aspect of this, which is new to your office's review falls under the noncompletion of sentence part of that description; is that fair?

A Yes.

Q When did that aspect begin to appear in the procedures?

A I would defer to the record in terms of the documents that have been handed over.

Q When this litigation first started, you understand that some of your documents were provided to the plaintiffs in the case; is that right?

A Yes.

Q Since that happened, has any additional update been done to provide documents after that period of time to your attorneys to provide over to the plaintiffs?

A I trust that my attorneys would -- our

attorneys would have handed over anything that had been requested personally to discovery.

Q Do you know how many copies of these procedures or how many different versions there have been since the time of when you first turned your documents over and today?

A Again, I would defer to the record and the only -- the last version I know of right now is the one in December.

Q That's the version that you're currently using?

A Correct.

Q What's the name of that document?

A It's BVRS procedures for felony matches, something like that.

Q Is that a document that's provided to the Supervisors of Elections as well?

A No. That's an internal document for our staff, but for the Division of Elections, Bureau of Voter Registration Services, to use to process these files.

Q Since the time of your last deposition, has any written guidance or instructions been provided to Supervisors of Elections regarding how to determine

whether someone has outstanding LFOs?

A No.

Q How about any sort of informal emails with Supervisors of Elections on that topic?

A It's possible that there may have been individual emails. If there was a question regarding that, quite frankly we would defer to our General Counsel's Office to reply.

Q Have you received any questions personally related to determining if someone has outstanding LFOs if they're eligible to register to vote?

A No, I haven't.

Q Are you aware of any that members of your staff have received?

A I don't recall at this time. Again, their direction would be to refer the matter to the General Counsel's Office.

Q How do you determine whether an individual who you see has an outstanding LFO whether you believe that person is eligible to vote?

MS. DAVIS: Objection. Calls for -- well, this -- be careful, because your answer could impact attorney/client privilege.

BY MR. GABER:

Q To be clear, I'm not intending any of my questions to do that, so please just let me know if --

A Can you reword, please, or restate what you asked?

Q Sure. How do you determine whether an individual who you believe has outstanding LFOs is eligible to vote or not?

MS. DAVIS: Same objection.

A What we determine is we have a potential match and we look to the records that are available to determine if that is the correct individual, if it's definitely a felony conviction of adjudication but no circumstances have changed to alter that determination, we create and collect the documents to support that.

And once we believe that that is credible and reliable, we then send that match down to the Supervisors of Elections. Supervisors of Elections then have an obligation under the law to notify the voter that there is a potential ineligible match.

That voter then has due process under the law to counter that in any way or to say, no, that's not me, no, that's not a felony conviction, and any other evidence they wish to put forward to the Supervisor of Elections -- Supervisor of Elections. Person went to

98.075(7), determines whether an individual remains on the roles or not.

BY MR. GABER:

Q I guess my question is focused on LFOs in particular. So what specific LFOs does your office view as disqualified?

MS. DAVIS: Objection, form and attorney/client.

A Again the same process that we use to determine whether someone is -- whether a potential match is credible and reliable is used regardless of whether it's an LFO or any other -- I guess I don't -- I'm not quite sure I understand.

BY MR. GABER:

Q What is your understanding of the specific LFOs that do disqualify a registrant?

MS. DAVIS: Objection.

A Right now my understanding is -- our understanding is that if a sentence has --

MS. DAVIS: Careful of attorney/client privilege.

A That goes to the heart of completion of the sentence.

BY MR. GABER:

Q Does the Secretary of State's Office have a position as to which specific LFOs are disqualifying for voters in Florida?

A Not at this time.

Q Does the Secretary of State's Office have a plan, or a timeline, for when it intends to have a position as to which specific LFOs are disqualifying?

MS. DAVIS: Objection, attorney/client.

MR. GABER: Again I'm not -- I'm not asking for any privileged communications with your attorneys, but is that instruction not to answer?

MS. DAVIS: That's an instruction not to answer. The answer to that question is attorney/client privilege.

BY MR. GABER:

Q If a voter -- you have a hotline for voters to ask questions; is that right?

A Yes.

Q If a voter called, or voters call, what are they currently being told with respect to which LFOs are disqualifying?

A If an individual calls on the line, they are currently directed to contact the Clerk of Court regarding their -- their conviction and their sentence

and/or the Department of Corrections in terms of supervision and prison terms. We don't offer any other information.

Q You said that the -- your office is currently reviewing matches that indicate LFOs but not sending down to Supervisors of Elections those files right now; is that right?

A Each match is case by case, so if we get a case in which this is an issue or the terms of the sentence, we examine that, put documents together, and then we consult with the -- with our General Counsel's Office.

Q But at the moment if the only reason that you would send the file down is because of the LFO issue within the umbrella of completion of terms, at the moment those are not being sent to the Supervisors; is that right?

A That's correct.

Q Is your office making determinations about whether the information is credible and reliable?

A We're reviewing case by case to determine a process for that, to feel comfortable about what's credible and reliable.

Q Have you identified -- among that subset of

files that are currently under review, are there some where the determination has been made that the information is credible and reliable?

A Not yet.

Q What is the process of coming to that conclusion?

A I --

Q Let me specify. Is there -- when you go through these determinations to determine whether information is credible and reliable, do you set the credible and reliable ones aside and have like a these are done, these are ready to go when we send them, and then there's some that you're unsure of yet; have you segregated these files in any way for the range of your comfort with the credibility and reliability of information?

A If a determination is made about credible and reliable that it's valid, then it will be sent down, but that has not been made yet with any of these other cases.

Q When you say "valid," do you mean valid -- the information that there is outstanding LFOs is correct; is that right?

A Valid in that it is a credible and reliable

match, whatever the basis would be for it.

Q In this case, I'm asking about the match to the outstanding LFOs.

A Correct. We have not made any determination. Obviously legislation and litigation is ongoing right now.

Q Other than the December 20 procedures, is there any other written guidance or memos or information in your office for how the staff should collect information and review it to determine whether that information about outstanding LFOs is credible and reliable?

A That would be the source document.

Q What does that document -- I don't believe we've received that document, so you'll have to forgive my ignorance about it, but what does that document set out as the procedure for determining whether there are outstanding LFOs?

A The document covers the whole process for how a credible and reliable match is determined, regardless of the basis. And there's a section in there relating to looking to CCIS, which is the Clerk's single source for documents as well as Clerk of Courts websites and any other sources that a staff member can go to to

support the match.

At this time, the procedure indicates that if they come across a case like that, they work it like any other providing -- determining that it's the same person, that it's truly a felony conviction, and collecting all documents that would support both the identity match, the felony record match, as well as anything else but for these LFOs, and I put in quote. Those are set aside for further research later and that's what the document indicates.

Q Are you contacting -- is your office contacting Clerk of Courts to obtain individual sentencing files in addition to using CCIS and the other sources you mentioned?

A Yes. That is a -- there are frequently documents that are not on -- or not frequently, just documents that may not be online, and it's a case-by-case basis. So if the documents aren't there or if the documents are insufficient to be able to make that credible and reliable match, then we reach out to the Clerk of Courts.

Q As your staff are reviewing these documents for outstanding LFOs, have you asked them to document or keep track of issues that they encounter in determining

whether or not someone has outstanding LFOs?

A With the files that are being created if that -- I'm not aware of many, but it's just case by case. If they have difficulty obtaining a document or determining something, that is what's being bumped up for further review with our legal counsel's office.

Q Has that further review -- what's the status of that with respect to these files?

A I expect that probably within the next week or so we will start crystallizing that process and maybe even do, I'm speculating now, but test cases and, you know, of matched files.

There's a lot involved. We have to make sure we have staff properly trained, we have to make sure that the Supervisors of Elections are also familiar with, because these cases -- these types of cases will involve a lot more documentation, so there's an education process to that, making sure that everybody is on board and comfortable with -- with that new aspect of matches.

Q Have you conducted training in your office for how to collect these documents, how to understand them?

A That's an ongoing process, yes.

Q Does that involve -- do you have written

training materials, PowerPoints, things like that?

A I believe that there were some training materials initially, yes, and then there will be more developed as we finalize this particular process.

Q At what point do you anticipate actually sending to the Supervisors of Elections files?

MS. DAVIS: Objection, attorney/client privilege. Don't answer that.

BY MR. GABER:

Q I'd like to show you what is already an exhibit in your depositions, so we don't need to mark it again. This is Exhibit 17 from your first deposition.

Do you recognize this document?

A Yes.

Q What is this document?

A This is the internal procedure documents for processing felon match files.

Q Is this the document that's been updated with the December version?

A Yes.

Q This version is August 7, 2019; right?

A Correct.

Q On page 3 of the document, you see a screenshot from CCIS; is that right?

A Yes.

Q There's two examples, one example of paid and one -- I suppose there's three examples, example of paid, example of no info available, and example of outstanding fees; do you see that?

A Yes.

Q Now, when you last testified you spoke about the fact that -- the fact that it says restitution zero -- balance due zero, that -- you weren't sure whether or not that meant that in fact there was no restitution, because restitution may not be tracked in the system; is that correct?

A I would defer to the record, my deposition, on that.

Q Do you have a -- do you have a further understanding of what this screenshot within CCIS means with respect to restitution than you did at your last deposition?

A We've been working with the Clerks of the Court to try to understand what these numbers reflect and mean. You would still have to look to the sentencing documents.

Q In the process of working with the Clerk of Courts, what have you learned as to what these numbers

mean?

A That they are what they are.

Q What does that mean?

A That they may have recorded that there's no restitution and that may or may not be relied upon, depending on what the court records indicate.

Q So is the -- have you developed a process based upon your discussions with the Clerk of Courts as to how you should proceed if you see restitution total zero in CCIS?

A Again, we've been working with our attorneys to determine what the screenshot, which is just one piece of the documentation that may or may not support a credible and reliable match, still have to go to the sentencing documents and whatever court records are available to indicate whether this screenshot has information that is current and accurate.

Q If the underlying sentencing documents shows restitution zero, then would you view this as credible and reliable that there is no restitution?

MS. DAVIS: Objection, form.

A Again, each of these is a case-by-case basis, so I don't want to make a blanket statement about it.

BY MR. GABER:

Q What if the underlying documents shows that there was a restitution order but the CCIS screen reports zero -- total zero, balance due zero, what -- since you last testified, do you have further policies or procedures or understanding of how you should proceed in that instance?

A Again, we're working with our attorney to determine what -- what additional steps may need to be taken to reconcile that difference. In the end, I am not going to allow a record to go down if there's an inconsistency or inability to be able to make that credible and reliable match.

Q You mentioned you've been working with your attorney, is there any -- as of today, is there any plan or policy for how to proceed if the CCIS reports zero balance due and the -- or zero restitution and the underlying documents shows restitution?

MS. DAVIS: Objection, attorney/client.

MR. GABER: Are you instructing her not to answer that?

MS. DAVIS: Don't answer.

BY MR. GABER:

Q In general, it's your understanding that restitution may not be tracked as accurately as some

other LFOs; is that fair?

MS. DAVIS: Objection to form.

BY MR. GABER:

Q I'm speaking about whether restitution has been paid.

A I believe it's been reported in the work group report, Clerk of Courts, that restitution is not always captured in CCIS.

Q Some other areas are if LFOs have been converted to civil liens, old records that maybe weren't electronically recorded, and debts that have been turned over to credit agencies; is that correct?

MS. DAVIS: Objection, form.

A Yeah, I think I need you to restate.

BY MR. GABER:

Q Are those other categories of potential LFOs that may not accurately be contained within CCIS, is that still your understanding?

MS. DAVIS: Objection to form.

A Can you repeat that, I'm sorry?

BY MR. GABER:

Q So restitution is one category where there might be problems with the electronic tracking; is that fair?

MS. DAVIS: Objection, form.

BY MR. GABER:

Q Within CCIS, the reporting -- is it your understanding that the reporting of restitution owed is still today not completely accurate for all of the files that are kept in CCIS?

A I can't speak to that. All I can speak to is case by case. Once we get one, then we'll be making that determination whether restitution information is credible and reliable in the -- in the system.

Q Have you had cases since your last deposition where it appeared that the restitution was not accurately reported in CCIS?

A We haven't made that call yet, no.

Q When you say that, you mean you haven't made the determination, the final determination, about whether the information in CCIS is inaccurate; is that correct?

A We are working on reviewing what potential scenarios may arise with these types of cases. I can't make a blanket statement about how -- whether the information is inaccurate or completely incomplete. At this time, it would just be on a case-by-case basis.

Q Right. So have there been cases where there's

a question as to whether the restitution reporting in CCIS is accurate in your review thus far?
A Is accurate?
Q Is not accurate.
A I believe that we have seen some indication that the information there may not be consistent with the court records.
Q Is there a way with the CCIS information to determine whether there are outstanding civil liens; is that reported in CCIS to your understanding?
A It's part of the court record.
Q Have you encountered files in your review since your last deposition where there's questions as to whether or not someone owes outstanding civil liens for their LFOs?
MS. DAVIS: Objection, form.
A I don't recall any.
BY MR. GABER:
Q Have you had -- in the files that you have been reviewing, have you had files that it's unclear whether there are LFOs that were sent to a credit agency to collect if those have been completed and paid?
MS. DAVIS: Objection, form.
A I don't know.

BY MR. GABER:
Q How many files have been going through the review process for LFOs since your last deposition?
A What we're doing is -- the primary process right now is focusing on those in prison, those in supervision, murder, or felony sexual offense. What we're doing on the side is occasionally reviewing files that are -- that don't fall into that and seeing what it yields, and then I'm working with the general counsel -- we're working with the General Counsel's Office to determine how to handle that to develop a process.
Q Are you running a search against the entire registration list, how are you identifying the sort of universe of potential voters that you should look at for this purpose?
MS. DAVIS: Objection, form.
A Right now the process involves anybody who registers to vote, anybody who changes their address, anybody -- any time that a new felony record is created, it's -- whether you affirm that you're not a felon or not, every -- all those records are matched against criminal records to create these potential automated matches, so that's happening on a daily basis.
And then for purposes of being able to focus

on the those in prison in supervision, murder, and felony sexual offense, we worked with the respective criminal justice agencies to add additional information that would help to be able to refine those and anything else presumably. We don't know for a fact whether they are LFOs or anything else. We just know they don't fall into those four categories.
BY MR. GABER:
Q So is the only thing you're doing right now the ongoing process when there's a new registration application or have you gone backwards to look at registrants within say the past year to see whether any of them who may have passed the -- they're not in prison, they're not under supervision to determine whether those people have potentially outstanding LFOs?
A Every day it's the whole -- the whole registration system whether you've been in there -- you've been registered since, you know, 1990 or you just registered yesterday.
Q I guess the question is how -- how would you identify the people who are subject now to this review for LFOs, did you take steps to -- because presumably they made it through whatever your review system is without being flagged up until the point in time when

you started reviewing for LFOs. So I'm just --
MS. DAVIS: Objection.
BY MR. GABER:
Q -- I'm trying to get to how you went back and how you determined.
A I don't know that those are LFOs. All I know is they don't fall into these other categories.
Q So there are people who have a conviction based on this -- how you match and they're everyone who doesn't have a murder conviction, a sexual offense conviction, and isn't currently incarcerated or under supervision; is that correct?
MS. DAVIS: Object to form.
THE WITNESS: Yeah, I lost you.
BY MR. GABER:
Q What I'm trying to get at: Are you confident that -- maybe confident's not the right word. The system you have in place to do these matches, will it have, today for example, captured all of the people based on the information you have that could potentially have outstanding LFOs?
MS. DAVIS: Objection to form.
A It captures -- or at least initially captures all voter registration records that match up with a

felony conviction record regardless of whether they're in prison, in supervision, murder, felony sexual offense, or anything else that falls outside it. That's -- that's been the -- that hasn't changed.

What's changed is now once you go into a case or match, then you have to determine whether it's one of these -- you know, whether there is legal financial obligations outstanding or any other term of the sentence.

BY MR. GABER:

Q Is that review -- that review is not solely forward looking with new registrations; is that correct?

A Correct.

Q So now you're going back and looking at people who might not have earlier been flagged but now will potentially be because of the outstanding LFOs; is that fair?

MS. DAVIS: Objection, form and attorney/client privilege. Be careful of that.

A I'm not sure I quite understand that question.

BY MR. GABER:

Q Let me try a different way. If I -- there was a sunset period in SB 7066, is that your understanding, where if someone registered to vote, they wouldn't be

viewed as having unlawfully affirmed their eligibility because of outstanding LFOs?

MS. DAVIS: Objection, attorney/client. Don't answer.

BY MR. GABER:

Q Well, you've read SB 7066; right?

A Yes.

Q At your last deposition you testified about the sunset provision; do you recall that?

A If you point me to it.

Q Are you familiar with the fact that if someone registered to vote on say February 5, 2019, when SB 7066 was enacted, a provision was included to ensure that those folks who registered between Amendment 4's effective date and the effective date of SB 7066 would not be subject to prosecution for having registered; that's a fact in the --

MS. DAVIS: Objection.

BY MR. GABER:

Q Are you familiar with that fact?

A I'm aware that there's a provision in Senate Bill 7066 in chapter law that was enacted that allowed some grace period between the effective date of constitutional amendment and the effective date of the

bill.

Q So if someone registered during that grace period, someone who has outstanding LFOs, now that your office is collecting and reviewing those files, would that person who registered during the grace period be among the people who would be captured by this new review process?

MS. DAVIS: Objection, form.

A Anybody who registers, anybody who's already registered, any time a new felony conviction record is created or corrected such that it allows for a match to be made, there is the potential for you to be identified as a convicted felon.

BY MR. GABER:

Q I understand there's a potential. Are people who registered during the grace period having their registrations now reviewed to determine whether they have outstanding LFOs?

A That I can't answer. I mean, it would be until the case-by-case review. Again, we are not actively reviewing and sending those kinds of case files down. We're still working through to make sure we're comfortable with what is a credible and reliable packet relating to those people that don't fall into the other

four categories.

Q Is it your -- is the Secretary of State's Office collecting the files or working through the files of everyone who your information shows has outstanding LFOs who's registered at any point say from 2019 to present?

MS. DAVIS: Objection, form.

A We are working with the General Counsel's Office on these types of case files to determine and finalize a process and comfort level regarding these kinds of cases without actively sending anything down right now.

MR. GABER: Let's take a short break.

(Recessed at 10:00 a.m. to 10:12 a.m.)

BY MR. GABER:

Q Ms. Matthews, we were talking about the matching process, and I want to just clarify a few things, but your office determines whether to review a file when the matching process occurs based on new information that happens on a given day; is that a correct statement?

MS. DAVIS: Objection, form.

A The match process begins primarily with a match of voter registration records, which can consist

of new registered voters as well as existing registered voters against criminal record database.

So any time someone registers new and any person that is currently registered and anything that changes in that record would trigger that. And then any time there's a change in criminal record that -- that might change the demographic matching or that I might have been -- when I first registered I wasn't a felon, a convicted felon, but something has happened since then and now I've got this record it's going -- and this is a daily process, seven days a week, over and over and over again.

BY MR. GABER:

Q If there's no -- if a person on the registration list hasn't previously been flagged and there's no new conviction information, no new driver's license application, or change in their location of their registration, if there's nothing new that happens, will that person be reviewed for outstanding LFOs?

A Only if it creates a felony match to begin with, an automated match, which is data. Then we -- the Division of Elections is responsible for doing the manual review of determining whether that automated match is credible and reliable based on sources of

information that are available to us.

Q After the Florida Supreme Court's advisory opinion, that's when your office started to add to the criteria for what you look at whether or not the person has outstanding LFOs; is that correct?

MS. DAVIS: Objection to form and be careful, attorney/client privilege.

A Anybody who is matched up for a felony conviction, regardless of whether it's because they're in prison, supervision, murder, felony sexual offense, or all others which may be LFO or not, that process is ongoing, that never stopped.

What is new is making these distinctions between are they in prison, are they in supervision, are they -- is it a conviction for murder or felony sexual offense or any other.

BY MR. GABER:

Q What additional information does your office need to make to be able to start sending down to the Supervisors of Elections' files based on someone's outstanding LFOs?

MS. DAVIS: Objection, attorney/client privilege.

BY MR. GABER:

Q Roughly how many files are currently being -- are caught in this sort of category where they've been reviewed for LFOs but your office has not yet made a credible and reliable determination in order to send them down to the Supervisors of Elections?

MS. DAVIS: Objection to form.

A I don't have that information.

BY MR. GABER:

Q Do you have a rough sense of how large this population is?

MS. DAVIS: Same objection.

A Can you restate the question again?

BY MR. GABER:

Q Sure. So it sounds to me like there is a group or a collection of voters for whom your office has begun to review to determine whether they have outstanding LFOs but are not yet sending those files to the Supervisors of Elections, because you don't feel comfortable making a credible and reliable determination about that information; is that correct?

A We are currently not sending documents -- matches down that don't fall into those four categories.

Q Are you keeping those -- are you keeping like a list of those files or is there like physical files

for those people so that when you do begin to send them down, if you do, you'll know who they are?

A There are automated matches at this point, some of which may have a case file built for them.

Q Do you have a sense for how many case files there are on -- solely on the basis of LFOs?

MS. DAVIS: Objection to form.

A I believe that it's about upwards of 65,000 or more.

BY MR. GABER:

Q Is that case files that have been created on the basis of LFOs?

A No. Those are just automated matches.

Q Is there a distinction between automated matches and case files?

A An automated match is the data. A case file will be when you start building and doing your manual review.

Q Do you have a sense for how many are in that process, the case file manual review process?

A No.

Q Is there a way that you could learn that information?

A I -- perhaps.

Q What would you do to learn that information?

A I'd have to consult with staff and possibly IT staff.

Q What is the policy with respect to determining whether an LFO was imposed at the time of the sentence versus accrued -- an accrued obligation after the sentence?

MS. DAVIS: Objection, form and attorney/client privilege.

MR. GABER: Is that an instruction not to answer?

MS. DAVIS: Correct. Director Matthews, you know, I try to keep it as succinct as possible. If I say attorney/client privilege, then just don't answer the question.

Will that be more clear?

MR. GABER: Yeah, yeah, thanks.

BY MR. GABER:

Q Whether or not a voter is eligible because their LFO accrued after their sentence or ineligible because it was imposed at sentencing time is not information that you're willing to share with a voter, for example, who asks?

MS. DAVIS: Objection to form.

A That is not information that we would answer for the voter.

BY MR. GABER:

Q Have you given any -- given any guidance or answered any questions from clerks -- or Supervisors of Elections about the distinction between LFOs accrued after the sentence and those imposed at sentence?

A No.

Q No one has asked you about that?

A No one has -- any -- any questions regarding that would be referred to the General Counsel's Office.

Q So you've spoken to no one other than your attorneys about whether an LFO accrued after the sentence or was imposed at sentence; is that what you're saying?

A That I recall, yes.

Q If a voter called the hotline asking for information about that issue, what would they be told?

A Again, staff would be directed to follow the responses in the hot -- hotline manual that says that the individual needs to contact either the Clerk of Court in which the conviction was made and/or the Department of Corrections to determine anything relative to their sentence.

Q Does the update to the procedure -- the December update to the procedure manual, does it address the issue of accrued versus imposed at sentence?

MS. DAVIS: Objection to form.

A I actually don't have the document before me. I -- again, we're working on those processes, so I don't believe that is covered in there, no.

BY MR. GABER:

Q Are you actually working on a new update that would address this issue?

A In consult with the General Counsel's Office, yes.

Q Is there a timeline for when that new update -- the new update to the procedure manual will be ready?

MS. DAVIS: Objection.

A Again, that's in consult with our attorney and also the Secretary of State.

BY MR. GABER:

Q So there is not -- there is not a planned timeline or there is?

MS. DAVIS: Objection, attorney/client privilege.

MR. GABER: The date of the release is

privilege, is that --

MS. DAVIS: Yes.

MR. GABER: That's because there's some legal advice that goes into the date?

MS. DAVIS: The process, the bases, when, under what circumstances, that's all attorney/client privilege information.

BY MR. GABER:

Q If a voter asks any of these questions, are they told that you can't answer it because it's privileged?

A When a person calls on a hotline, staff is directed to follow the script that's in the hotline manual and that...

Q Are Supervisors of Elections entitled to initiate the due process and potential removal process if someone is potentially ineligible due only to outstanding LFOs.

A Supervisors of Elections are supposed to follow that process, 98.075(7), regardless of what the nature of the match is.

Q What is the Secretary of State's position with respect to a person who has had their sentence modified such that they still owe LFOs but the LFOs are no longer

MARIA MATTHEWS

part of the criminal sentence?

MS. DAVIS: Objection, legal conclusion, form.

A Again, Secretary of State as well as the Division of Elections is going to just follow what the law says, and we're working with the General Counsel's Office in terms of determining what is a credible and reliable match regardless of what -- or at least for that category of individuals that don't fall into the four other ones.

BY MR. GABER:

Q The four other ones being the murder, sexual offense --

A Correct.

Q But there are people -- is it your understanding that there are people who have had their -- had a modification done such that their outstanding LFOs are no longer considered part of the sentence; is that your understanding?

MS. DAVIS: Objection, form.

A Again, it's a case by case. So until we actually encounter a case like that, I cannot answer that question.

BY MR. GABER:

Q My question is are you aware that that is

MARIA MATTHEWS

happening in the state of Florida?

A I can't speak to that.

Q You're not familiar with any news stories about that or...

A It's news and I'm going to -- I still have to do my process regardless of what's reported in the news.

Q So does the Secretary of State not have a position with respect to whether voters are eligible once their -- once there's a modification that removes the LFOs from the criminal sentence?

MS. DAVIS: Objection, form.

A I believe the Secretary's position is going to be to enforce the law, and she will consult with her attorneys regarding what that means in terms of these types of cases.

BY MR. GABER:

Q Is there a current position that you're aware of as to whether or not the Secretary views those voters as eligible?

MS. DAVIS: Objection, form.

A Again, she's going to enforce the law and follow the law in consult with her attorneys.

BY MR. GABER:

Q Right, but that doesn't quite answer my

MARIA MATTHEWS

question. So what is the Secretary of State's position as to what that law says for someone who has had their -- a modification to remove their LFOs from the criminal sentence?

A I can't answer that question. I think it calls for a legal conclusion. I can't answer it.

Q So if a voter asks that question who had had their sentence modified, you would not be able to answer that question for them; is that --

A We would not answer that question on the hotline or -- again, we would direct them to speak to the Clerk of Court, their attorneys. We would not answer that question.

Q Would the Secretary -- once you do start sending these files down to the supervisors, if that happens, would someone who's in this scenario having had their -- a modification done, would the Secretary consider it credible and reliable information that they were ineligible, that there was once LFOs but they've been modified to be taken out of the sentence?

A Again, we would follow what the law is and if it's consistent with what the law says, then that's what would be followed, but I can't -- until we come up with -- it's going to case-by-case basis.

MARIA MATTHEWS

Q So it sounds like there's no policy with respect to those people at this point; is that --

MS. DAVIS: Objection.

A Again, this process involving those that don't fall into that category is still in state of we're working on developing and understanding the variety of cases that might come up in scenarios. It's very fact specific case by case.

BY MR. GABER:

Q So you can't tell me, am I right, whether or not any additional guidance will be available or updates to the procedures prior to the registration deadline for the March 2020 primary; is that --

MR. GABER: That might actually be a question for you. Given that the date is privileged -- or you're asserting privilege over the date, is that the case that she can't answer whether or not there will be additional guidance or updates to the procedures before the registration deadline?

MS. DAVIS: Objection to form really.

THE WITNESS: Are you referring to these procedures?

BY MR. GABER:

Q There's going to be -- you were discussing

that you're working with your attorneys to update the procedures and determine what information is credible and reliable; is that correct?

A Yes.

Q Is there a plan to have that -- more clarity on that before the registration deadline for the March 2020 primary?

A I can't speak to that right now. We're -- it's still -- we're working on that.

Q When is the registration deadline for the March 2020 primary?

A It's February 18th I believe, so it's 29 days before.

Q So that's about three weeks from now?

A Correct.

Q So at this point, you can't tell me whether or not there will be more clarity before that deadline?

A That -- no. At this point, I can't.

Q Does that apply too with respect to which LFOs are disqualifying?

A It applies to anything that's not already covered in this procedure, and, yes, relative to LFOs or any of those that do not fall into those other categories and are -- whether their sentence is complete

or not.

Q Since your last deposition, have you done any research to determine whether or not for federal convictions PACER will report to you the accurate amount of restitution that is still owed?

A That falls also in line with working with the General Counsel's Office. PACER obviously provides court documents and we're working to see what available documents are made available. If we can't find something on a clerk's database, we will reach out to the jurisdiction itself.

Q Have you done that since the last deposition?

A We have reached out to Clerks of Courts for federal felonies but relative to those four categories that I was talking to you about.

Q What about with respect to LFOs?

A I don't know if we've done any of those or not.

Q What about for out-of-state convictions, have you -- since your last deposition, have you reached out to those jurisdictions to determine if outstanding LFOs are owed?

A Same thing would apply.

Q So that's no?

A Same thing as with federal felony.

Q I'm forgetting what the answer was. You're working with the attorneys to determine a process; is that --

A Right. If we have a case file from out of state or a federal felony and if -- if it happens to fall into that category or if there's any question about it, we're dealing with different courts, we regularly consult with our counsel.

Q Did the Department of State take any steps to implement the district court's October 18, 2019, preliminary injunction order?

A The judge directed -- we did share the email -- we did email and sent the order to the Supervisors of Elections.

Q What other -- or did you take any other steps to implement the judge's preliminary injunction order beyond sending an email and the order to the Secretary -- to the Supervisors?

A No, I don't believe so.

MR. GABER: I'll mark as Exhibit 23 an October 28, 2019, email.

(Marked for Identification is Matthews Exhibit Number 23.)

BY MR. GABER:

Q Is this the email that you sent to the Supervisors of Elections attaching the district court's preliminary injunction order?

A Correct. This appears to be the email dated October 28th.

Q It says on the bottom that you will offer subsequent guidance as may be needed. Did you offer any subsequent guidance since October 28, 2019?

A When there was a subsequent order, we did. And primarily the guidance that has been provided is if they had any specific questions regarding compliance to contact us. And if they did contact us, we would -- we would have referred it to the General Counsel's Office.

Q Did any Supervisors contact you in response to this email?

A I think there might have been one or two.

Q Do you recall what their questions were?

A It was about the order and just being clear on it, and I referred them to the General Counsel's Office.

Q Are you aware of whether their questions were answered by the General Counsel's Office?

A I trust that our attorneys answered their questions to the best that they could consistent with

whatever the order -- what the order was and what the law is.

Q Were these supervisors who had in their jurisdiction some of the individual-named plaintiffs or were they Supervisors of other counties?

A The one I most recall is that there I believe was that they had someone in their jurisdiction. It was Duval County.

Q When you say "someone," is it one of the plaintiffs?

A Correct.

Q Was the question about the individual plaintiff or was it a more general question?

A I don't recall.

Q Did the question come to you?

A Yes, the call came to me.

Q It was a phone call?

A Yes.

MR. GABER: We'll mark Exhibit 24.

(Marked for Identification is Matthews Exhibit Number 24.)

BY MR. GABER:

Q This is a December 20, 2019, email that you sent. Is this the other email that you sent about the

subsequent order that the district court issued?

A Correct.

Q Other than these two emails, are there any other guidance that you sent out to all the supervisors in this manner about Amendment 4 or SB 7066 or this litigation?

A I honestly can't recall at this moment if we sent another email to the Supervisors regarding match files, regarding prisoners -- folks in prison, supervision, murder, or felony sexual offense.

Q Do you think that you may have done that with respect to those categories?

A I may have.

Q What about with respect to legal financial obligations?

A No.

Q Has the Secretary of State's Office taken any steps to establish a mechanism for voters who assert an inability to pay outstanding LFOs for them to be able to vote?

A No.

Q Is that an issue -- has -- has there been discussions about what a potential mechanism might be?

A No. I believe the position is that the Clerk

of Courts are working on this, but that would be something within their purview.

Q The position is that it's within the purview of the Clerks of Courts to develop a mechanism for voters who assert an inability to pay their outstanding LFOs and are thus eligible?

MS. DAVIS: Objection to form.

A It would be a matter for either the Clerks of the Court or the legislature to determine what inability to pay would look like.

BY MR. GABER:

Q How did you come to the conclusion that it was for the Clerks of Courts or the legislature to determine a process for ascertaining who is unable to pay?

MS. DAVIS: Objection, form.

A I would say it's because the Courts are the ones that impose the sentence and the Clerks of Court are the ones that are monitoring or maintaining, tracking the outstanding sentence components.

So they would be best that -- they would be the best body to be able to provide a means or mechanism for these individuals to be able to show that they cannot pay.

BY MR. GABER:

Q Do you know if they are in the process of creating such a process, a mechanism, for those orders?

A I don't know for certain. I'm sure that they are aware of these issues so that they are -- that they may be doing that.

Q Have you had conversations with Clerks of Courts to suggest that there is in fact a process underway to create such a mechanism?

A I do believe that we've reached out to the Clerks of Courts to ask them what, if any, forms or processes they have developed that would help us to -- to look for these documents that might be in the Clerk of Courts, you know, database, so that we know what to look for.

Q When you say "look for," are you referring to information that would suggest someone is unable to pay their outstanding LFOs?

A Any -- any documentation that would help us to determine if this is a credible and reliable match, meaning that the individual definitely is a felon, definitely has -- has -- whatever the terms were that we can figure out what's happened to that sentence.

Q So I'm asking about -- setting aside the

matching process, I'm asking now about the district court's preliminary injunction and the discussion about creating a procedure whereby a voter can prove that they have an inability to pay and are therefore eligible to vote.

Have you had discussions with the Clerks of Courts that leads you to believe that they are developing standards or a mechanism through which voters could make that showing?

A I don't know if they have.

Q But the Secretary of State's Office has not taken any steps to create such a process; is that right?

A No.

Q Have you given any guidance to any Supervisors of Elections about whether they should create a process that would prevent voters to prove that they have an inability to pay their outstanding LFOs?

A Ultimately the Supervisor of Elections is the one that determines based on whatever we sent them or whatever they created -- because they could get matches themselves directly and bypass the State.

And once that due process plays out, if an individual comes in and provides whatever evidence, it could be just their statement alone, I can't afford to

pay this, that -- the Supervisor is required to take all of that and adjudicate whether they believe that individual, whether that's enough for them to say, okay, you don't have to -- we believe you're still eligible to be registered.

What that might look like, whether it's actually a form, an affidavit, whether it's just a statement under oath, in an oral hearing, that really is for the Supervisors to -- that determination.

And that -- that has been the case regardless whether -- for any basis if someone were to say, no, I did get clemency and there was no evidence to support that but they believe that individual, maybe they would accept that.

Q So your office hasn't given any guidance about whether it should accept that or what standards Supervisors should use to make a determination about inability to pay?

A We actually would refer to 98.075(7), which talks about what the Supervisor of Elections should be considering when they make a determination of whether somebody is ineligible and should be removed. It's actually set out in the statute.

Q This discussion about inability to pay, that

comes from the district court's preliminary injunction order, though, correct, that's not in the statute?

A Correct. It's not spelled out that way, but any evidence that an individual would present to the Supervisor of Elections, whether it's an inability to pay is part of that consideration of that evidence.

Q So is it the Secretary of State's position that right now a Supervisor of Election could decide that a voter should remain on the roles because they are unable to pay their outstanding LFOs?

MS. DAVIS: Objection, attorney/client privilege, form.

BY MR. GABER:

Q Well, so we just had a discussion about how a Supervisor of Election could either on the basis of an attestation or a statement, or whatever information the voter gives, that they could make that determination, they're empowered to make that determination on their own; is that --

A They're empowered by that section.

Q Are you aware of whether any Supervisors of Election are doing that currently with respect to determinations about inability to pay and voter eligibility?

A No, I am not. I know for a fact that they are not basing it on any files that we sent, because we haven't sent any. Now, they may have case files that they created and that might be an issue, but I can't -- I don't know.

Q Have you had conversations with Supervisors about these topics about inability to pay and their discretion to make the determination of whether the voter is eligible?

A These discussions, questions, things like this did arise during conferences -- conference that we had in December for the Supervisors of Elections, but we were not able to provide them any definitive answers at that time, because we are in a state of litigation, we now have legislature in session, and we're still working with our attorneys to review each case which presents unique circumstances and facts to try to develop a process that the Secretary can feel comfortable with, the Department can feel comfortable with, the Division can feel comfortable with, and that I personally can feel comfortable with about sending anything down.

Q At this point you're not comfortable sending matches for LFOs down to the Supervisors of Elections for review; is that correct?

A And when I -- yes. When I say comfort, I mean having a process that is -- is -- supports being credible and reliable.

Q Is it your understanding from the district court's partial stay order that the current state of the Court's order is that people can register if they assert that they have an inability to pay their outstanding LFOs but for the moment the part about voting is stayed but expires sometime in early February; is that your understanding?

A My understanding of the order is that it just applies to those plaintiffs.

Q Right. The injunction applies to the plaintiffs; is that what you mean?

A Yes.

Q Do you understand that the district court in his order laid out the Court's view of what the Constitution requires more generally for all voters of Florida?

A I have read the order.

Q So does the Secretary of State's Office have any plan for if the district court's partial stay expires, what process voters will undertake to show that they have an inability to pay their LFOs and are

therefore under his order eligible to vote?

MS. DAVIS: Objection, form and attorney/client privilege.

BY MR. GABER:

Q Will there be a process -- if the district court's stay expires and the order is not otherwise -- the order is still in place by the time of the registration deadline and by the time of the March 2020 election, will there be a mechanism put in place by the Secretary of State's Office for a voter to prove an inability to pay?

MS. DAVIS: Objection, attorney/client privilege and form.

MR. GABER: You're suggesting that the existence of whether -- the existence of a mechanism planned by the Secretary of State's Office is a privileged matter?

MS. DAVIS: When and under what circumstances we would institute a process, other than what Director Matthews has already testified about, about being comfortable with a credible and reliable procedure, yes, that's attorney/client privilege.

BY MR. GABER:

Q Have you talked to anyone, other than your attorneys, about whether a mechanism should be put in place by the Secretary of State's Office for voters who want to prove that they have an inability to pay and are therefore eligible to vote?

A Other than the attorneys and perhaps the work group discussions, but the report is pretty comprehensive and would kind of lay that out. That may be the only other context in which it may have come up.

Q Did the discussions with the work group involve what a potential process -- potential mechanism issued by the Secretary of State would look like for inability to pay?

A A lot of time has passed since then, so I would defer to the report, which again has the transcripts, there's audio recordings, the report itself.

Q If a voter were to call right now and ask how they can prove that they have an inability to pay and so therefore they believe they're eligible to vote, what are they told?

A Again, they would have to go to the Clerk of Court to determine if there's a process there or to speak to their Supervisor of Elections if -- assuming

there is a case file on that individual themselves.

Q Is it your view that the Supervisors of Elections are authorized now to determine that a voter is eligible because they can't afford to pay their outstanding LFOs?

A Supervisor of Elections are empowered under that section I cited earlier to consider all evidence. Evidence could be oral, it could be written, that includes the testimony of the individual and whether that information is presented to the Supervisor as part of that evidentiary consideration is -- exists right now.

Q That includes inability to pay the outstanding LFOs; is that your understanding?

A Anything that's presented to the Supervisor.

Q Is inability to pay one of the factors the Supervisor can consider in making that determination?

A I think based on this court order, yes.

Q But it's your position now that would be county to county, Supervisor-to-Supervisor discretionary determination?

MS. DAVIS: Objection.

A Case by case.

BY MR. GABER:

Q The conference you mentioned, is that the Winter FSASE Conference?
A Yes.
Q When did that happen?
A I think it was early December, maybe the second week in December.
Q Did you present at the conference?
A We did, um-hum.
Q Was the district court's preliminary injunction order part of the discussions that happened at that conference?
A I believe there was a litigation update that was provided during that conference.
Q What was sent to the Supervisors as part of the update?
A I don't recall the specifics of it. It would have been just updating on what the litigation and I'm sure that they would have stuck, I didn't do the presentation myself, that they would have stuck very closely to what the orders -- what the current status of the litigation is, what the orders said. And for any open questions that were asked, they would have been very cognizant of whether it was delving into any attorney/client privilege or preparation for litigation.

Q Who gave that presentation?
THE WITNESS: Ashley, I think it was you, now that I remember.
MS. DAVIS: That is correct.
BY MR. GABER:
Q Do you know whether there are written notes or a presentation or notes in preparation for a presentation for that conference and that specific litigation update?
A There would have been a presentation, but I don't know that -- there would have been a presentation. Notes, I don't know.
Q Were you present for that presentation?
A I was.
Q Did Supervisors ask questions in the presentation?
A Supervisors ask questions all the time in presentations. They are -- they like to ask questions.
Q Did any Supervisor ask questions about whether they could make determinations about a voter's inability to pay and their eligibility?
A I'm sorry, I cannot recall.
Q Did the work group report come up during the FSASE winter meeting?

A I believe that we mentioned it. Supervisors would have been informed about it before, because the report was due November -- it was due no later than November 1st. I think it came out October 31st or October 30th, so they would have been directed to that report.
Q Do you have any written materials or documents or emails about the winter meeting, the presentations, planning for the presentations, the litigation update?
A Again, there would be the agenda that the association puts out and indicates that we're going to be present, then there would be our PowerPoint that we had, and that's it.
Q Did you email about the presentations and planning for them with your staff or others?
A I'm sure I consulted with my staff regarding presentation if I had any particular questions.
Q How many different -- or were there sessions, other than the litigation update, that dealt with the issue of SB 7066 Amendment 4 or the district court's preliminary injunction?
A I think it would have been all covered in the litigation part, but it's possible that Supervisors might ask a question out of specific context.

Q If an individual were to affirm on their voter registration form that their rights have been restored but the Secretary determines that they have outstanding LFOs, would the Secretary refer the person for criminal prosecution?
MS. DAVIS: Objection, form.
A At this time -- until it happens, I'm not going to be able to say. There is an obligation under the law in Chapter 104 regarding if there is fraud or anything else to refer to the State Attorney's Office.
BY MR. GABER:
Q Would the Secretary of State consider registering, notwithstanding the voter having outstanding LFOs, to fall under that provision that would require referral to the state's attorney?
A I'm not sure I understand your question, but the point right now is that every individual who affirms on a voter registration application becomes a registered voter, if the application is otherwise complete. The process for identifying going behind and seeing whether that is truly the case occurs after the individual is registered.
Q When the Secretary of State refers someone to a state attorney, do -- does your office undergo any

investigation to ascertain the intent of the voter, whether they knew they were doing something that potentially violated the law?

MS. DAVIS: Objection, form.

A Right now any individual can file -- or if they allege that someone is -- shouldn't be registered or shouldn't vote because of any reason, including something like, that we direct them to go and complete an elections fraud complaint, so we can get specifics about it. The legal office will look to see if there's legal sufficiency to that. And if there is, then that matter is referred to the prosecutor -- prosecuting office, right, and it will be their -- that's going to be their job to determine whether intent is a component or whether intent was there. We won't be making that, we're just going to be looking at legal sufficiency of the fraud complaint.

BY MR. GABER:

Q Legal sufficiency is whether or not there are facts that could violate the law; is that correct?

A Um-hum.

Q Any of those complaints or reports will necessarily go to the state's attorneys in the individual counties?

MS. DAVIS: Objection to form.

A Yes.

BY MR. GABER:

Q Does that include registering when potentially ineligible because of issues surrounding a conviction?

A It can be any basis for which someone is alleging that that person is not eligible to be registered or not eligible to vote.

Q In addition to fraud complaints that you receive, does the Secretary of State's Office when it makes credible and reliable information determinations that a voter might not be eligible and sends that information to Supervisors, is there also a referral to the state's attorney if there's a belief that there is a legally sufficient potential that a violation of law happened?

MS. DAVIS: Objection to form.

A We would not do that at that point. Because at that point, the due process hasn't played itself out quite frankly. And until that Supervisor makes the determination that that person is ineligible, then that would be the juncture at which if a Supervisor -- Supervisor has that responsibility if they've made that determination whether they would go and refer that.

BY MR. GABER:

Q But if the -- if the allegation comes in through a fraud complaint, that is the determination of whether that's sufficient evidence at your office and your office sends that to the state's attorney?

MS. DAVIS: Objection, form.

A Correct. There's two processes that are happening there, so if an -- if a fraud complaint comes in, that's one angle. If we get information and it gets reviewed for legal sufficiency and if it's determined to be so, then it gets referred to the prosecutor's office.

At the same time, we will take that information and look if we've had a prior match because -- and if we have, but we couldn't determine whether it was valid at that time. It may be now that we have more information and, therefore, we will act -- so that's that administrative -- quasi judicial administrative process, so two tracks.

BY MR. GABER:

Q Does the Secretary have any written policies or procedures about criminal referrals for individuals who register or vote despite having outstanding LFOs?

A No.

Q Does the Secretary have a position with

respect to the upcoming March 2020 primary if a voter votes provisionally because they believe that they are eligible because they have an inability to pay their outstanding LFOs how those votes will be handled?

A That process -- that's the safety net in the law, so that if you go to vote and someone alleges or -- that you are ineligible, you are still allowed to vote a provisional ballot and still allowed to have the opportunity to present information that suggests that you are eligible and you have up until 5:00 p.m. the second day following the election.

MR. GABER: Can we take a short break?

(Recessed at 11:05 a.m. to 11:14 a.m.)

BY MR. GABER:

Q Ms. Matthews, when SB 7066 and its earlier versions were being considered in the legislature, your office prepared a fiscal analysis; is that right?

A Correct.

Q At the time -- and I think this was for an earlier version than SB 7066, but you reported that it would require quadrupling of the staff to go through the information and make determinations about the different categories that changed as a result of the legislation; is that correct?

MS. DAVIS: Objection to form. If you have the document, you can show it to her. It probably would be best.

BY MR. GABER:

Q Do you recall reporting there would be a quadrupling of staff?

A I recall there being --

MS. DAVIS: Objection. I think the deposition is supposed to be post September 13.

MR. GABER: I will get to that. I'm laying a foundation for that.

BY MR. GABER:

Q Do you recall reporting that there would be a quadrupling?

A I remember there being a report of increased staffing needs.

Q Does that sound about right that it was about quadrupling?

A Yes.

Q Has there been an increase in staff on account of SB 7066 going into effect in the Secretary's office?

A Not yet, no.

Q Does the Secretary of State have a position as to whether case sheets in addition to the actual

sentencing document can provide evidence -- sufficient evidence of what is the terms of a sentence for an individual?

A I believe that's under consideration. I think we use that as well for other case files.

Q But as of today, there's no determination as to whether that's sufficient reporting of the terms of the sentence within the sentencing document; is that correct?

MS. DAVIS: Objection to form.

A Again, I think that's under advisement with the General Counsel's Office and we have not sent any files down relative to that.

BY MR. GABER:

Q Earlier you testified that you were crystallizing a process for test cases for the matching process and that that would be happening within the next week or so; do you recall that testimony?

MS. DAVIS: Objection to form.

A It's trying to crystallize a process, but then there has to be training, there has to be messaging to the Supervisors, all of that.

BY MR. GABER:

Q Are there documents that reflect the

crystallization and the development of that matching system that you have?

MS. DAVIS: Objection to form.

A At this juncture, it's just the latest version of the procedures.

BY MR. GABER:

Q The December version of the procedures?

A Correct.

Q What did you mean when you said that a new process was being crystallized with test cases?

MS. DAVIS: Objection, form.

A Meaning that once we get -- once we're all in agreement as to what a case file will look like, what needs to be in there, then that will be memorialized in the new procedures.

BY MR. GABER:

Q Have you sent emails to anyone on this topic?

A No.

Q You have not exchanged an email with any staff or anyone involved in this process about what that procedure should look like?

A Well, I am in communication with my staff. They're in the same suite that I am. So there may be email exchange asking about this or that, but that's it.

Q Is there a plan for training to address a new procedure?

A Yes.

Q What is that plan?

A Plan would be once we crystallize a process, how we can best train staff to be able to know, and put these files together.

Q When will that training happen?

A Again, in consult with the General Counsel's Office and when the Secretary says we're ready to go.

Q Are there training materials that have been drafted?

A I don't believe we formalized any training material yet -- we have training material from previous, but not updated.

Q But are there drafts of the material whether they've been formalized or not?

A I have not seen anything.

Q Who would be in charge of that?

A It could originate from the General Counsel's Office, it could -- well, it hasn't originated from my office yet.

Q Are you aware that there are materials that are being worked on for training?

A I really don't know.
Q So you've just identified that there will need to be training?
A Correct.
Q Who would do that training?
A It would be in conjunction with the General Counsel's Office and the Division of Elections.
Q You made reference to within the next week, that the process was crystalizing in the next week, what did you mean by that?
MS. DAVIS: Objection, form.
A Well, I mean, it's a week to week, so I just said crystallizing hoping that we can start to move this along.
BY MR. GABER:
Q This means an update to the procedures for how to handle matches involving LFOs is that -- that's part of it?
A Procedures to handle those matches that don't fall into those other four categories.
Q Do you anticipate that that -- that there will be a final or near final procedure within the next week?
A Again, that's not my call to make and that's with consult with the general counsel and Secretary of

State.
Q I understand that you don't make the decision, but do you -- do you have reason to believe that that is the time frame or something like that time frame for when the new procedures will be approved?
A We're working daily to -- on this -- on this stuff. So if and when we're directed to begin, we'll hopefully be ready to start.
Q Who makes that call that you should begin?
A Again that's in consult with the General Counsel's Office and the Secretary of State.
Q Is that you that consults with Secretary of State?
A And my staff, the key leadership staff, yes.
Q Sitting here today, do you have an estimate as to when that new procedure will be approved?
A No, I don't.
Q Do you anticipate that it will happen prior to the March 2020 primary election?
A I don't know.
MR. GABER: I want to turn to the report for the Restoration of Voting Rights Work Group from November 2019, which I will mark as an exhibit, Number 25.

(Marked for Identification is Matthews Exhibit Number 25.)
BY MR. GABER:
Q Do you recognize this document?
A Yes.
Q What is it?
A This appears to be the Secretary of State's Notice of Filing the Restoration of Voting Rights Work Group Report to the federal court in the Jones v. DeSantis case.
Q And attaches as an exhibit the report itself; is that correct?
A It contains just the report part. It does not include the appendices.
Q In the interest of our environment, I did not print the unlimited appendices. Are you familiar with the work group, did you have a role in that process?
A Yes. The department -- the Division of Elections served as the administrative support for the work group, that meant we were responsible for handling the travel, if there were any out-of-county travel, setting up the meetings, the reportings, and acting at the direction of the work group.
Q What's your understanding of the purpose and

responsibilities of the work group?
A Well, I reference to the law in the executive summary, which I'm now on page 5. The work group was charged with studying the issues involving the restoration of voting rights and then specifically three main areas, the consolidation of data necessary to verify the eligibility of a registered voter, the process for informing a registered voter of the -- where they could find out about their data necessary to verify their eligibility, as well as any other relevant policies or procedures verifying the eligibility.
Q The Secretary of State was the chair of the work group; is that right?
A That's correct.
Q Did you attend the work group meetings?
A I did. I believe I attended all of them, but perhaps maybe one.
Q Who drafted the work group report?
A The -- the actual initial draft based on what was heard in the -- in the hearings was a collaborative effort between the Division of Elections and the General Counsel's Office.
Q Were you involved in writing the report?
A I was involved.

Q Were you the primary drafter of the report?
A No.
Q Who was?
A Well, it's a collaborative effort.
Q Who was responsible for shepherding the collaboration?
A Again, a collaborative effort to do that.
Q I've been in those collaborative efforts. They usually help if there's someone in charge.
A Obviously I'm -- was responsible to get -- we developed the framework, the contents, where everything had to be, where it had to fall, and getting the information in there, and then we relied on the hearing minutes as well as what we heard in attendance, and we did the initial draft, and then of course the Secretary and the work group would review through.
Q Did you send or receive emails or other documents or paper documents pertaining to the work of the work group?
A Say that again.
Q Did you send emails or receive emails that discussed the work group, the meetings, planning for the meetings, who would attend, or other subjects related to the work group during the time that it was occurring?

A Not to the entirety of the work group --
Q I mean in general.
A -- but to the Secretary -- yes, and internally the General Counsel's Office of course as well and the Secretary determining who is going to appear or needed to appear and for which meetings.
Q Did you exchange drafts of the work group report over email?
A There were definitely drafts. I just don't recall how they were shared.
Q Was anyone outside of the Secretary of State's Office given a draft report or collaborated with for drafting the report, such as the members of the work group?
A I believe the stage that the work group was was when they developed the recommendations, and then they -- there's emails seeking their input.
Q Were drafts of the report shared with members of the work group for their review?
A I believe the entire report was, I mean, with the exception of the appendices, but I believe a draft was provided to them with the recommendations -- the initial draft of the recommendations to see if that's -- and then it was presented at one of the meetings.

Q Were there changes made to those initial recommendations through the editing process in collaboration with the work group members?
A I am most certain that the members did have input and that they made some -- maybe not all of them, but they definitely -- there was input, yes.
Q Did that input come in the form of written communications to your office or to the Secretary?
A I believe -- yes. I'm just recalling Supervisor Cannon being one of the most vocal -- or having the most extensive comments.
Q Supervisor Cannon?
A Hold on, I just don't recall the name of -- yes. So, yes, if they had any edits or comments, they were asked to -- to provide those.
Q Do you have on your computer a file folder dedicated to the work group -- to your work on the work group?
A Yes.
Q What sort of documents are in the folder?
A Administrative, everything from, as I indicated before, travel, meeting minutes, anything relative to the work group.
Q Then separately in your email inbox, do you

keep -- do you organize them by folders, do you --
A I do.
Q Are you organized with your email -- I'm totally not. So do you have a folder for work group -- for this work group?
A I believe I have a folder that is marked Restoration of Voting Rights Work Group.
Q Do you have a folder for SB 7066 or Amendment 4 issues as well in your email?
A No, I did not create a specific one for that.
Q What about with respect to documents you store on your computer, do you have a folder for Amendment 4 or SB 7066?
A There may be something under legislation.
Q If you could turn to page 18 and 19 of the report, I want to talk about some of the specific recommendations that are contained. Under Recommendation A, the consolidation of all relevant data necessary to verify the eligibility of a registered voter for restoration of voting rights; do you see that section?
A Yes.
Q Among the --
MS. DAVIS: Page 18.

THE WITNESS: No, I know. I thought he was going to talk about the recommendations.

BY MR. GABER:

Q I am. The Department of State doesn't have direct authority over the Clerks; is that right, the Clerk of Courts?

A Yeah, that's a separate branch.

Q Has the Department provided the Clerks with any additional information or guidance based on these recommendations about voter registration eligibility or rights restoration?

A We did seek their input about if a call was received, to whom would we direct the individual to get help about whether they had satisfied their sentence or not.

Q When you say we sought input, was this through the work group or separately from the work group?

A No. We -- the work group sought the information as well as we were continuing to work with and try to reach out to the Clerks, as I mentioned earlier in the deposition about what documents are you developing or procedures you're developing so that we can take those into consideration as we work on our own procedures.

Q One of the -- do you know whether the five recommendations here listed under consolidating the relevant data, do you know whether any of these recommendations have been fulfilled?

MS. DAVIS: Objection to form.

A No. Definitely not fulfilled, but I do know that the legislature -- at least to Number 5, there is legislation that has been filed regarding technology system.

BY MR. GABER:

Q Is it your view that that legislation would fulfill the need that's identified by the recommendation in Number 5?

A At this juncture, I couldn't say.

Q With respect to Numbers 1 through 4, do you have any information to suggest that steps have been taken to put these recommendations into place by the -- by Clerk reports?

A No.

Q Turning to page 22, these are recommendations for Part B, which is the process of informing a registered voter of the entity or entities that are custodians of the relevant data necessary for verifying his or her eligibility for restoration, do you see that,

and then there's some findings and the recommendations?

A Yes.

Q Recommendation Number 4 is the -- that there be a designated voting rights liaison for restoration of rights to assist in interagency information sharing; do you see that?

A Yes.

Q Has someone been appointed to be that person?

A No.

Q Is there a process underway to identify a candidate for that position?

A This speaks in terms of liaison, so this would be respective to each of the stakeholders mentioned here. And at this juncture we're just speaking with the agency representatives, but there is no formalized designation that I'm aware of at this time.

Q That's for the Department of State?

A I know for the Department of State we do not have someone designated, but other than -- somebody calls on the hotline, we direct them to the Clerk of Court or the Department of Corrections.

Q So you're not aware for any of these departments that are listed here whether or not -- or are you aware that they have not designated at this

point someone to be the liaison?

MS. DAVIS: Objection to form.

A I am not aware of any such designation at this time.

BY MR. GABER:

Q Recommendations 1 and 2 recommended information pertaining to the loss of rights and subsequent restoration of rights be provided during a plea colloquy and then noticed by -- and noticed by the Department of Corrections, has the Department of State provided DOC with guidance as to what information should be contained in such a notice?

A Hold on just a minute. Let me read this, please.

Q Yes.

A My understanding is that Department of Corrections is currently providing notice to their inmates at the time that they are at a certain point to let them know what their outstanding terms are as well as sharing that information with the Clerk of Court.

Q Have you seen any of those notices?

A No, but I have asked for a copy.

Q You haven't received one yet?

A Not that I recall.

Q Who did you ask?
A I asked staff to reach out to the Department of Corrections, so that we could see what those notices look like.
Q Do you know when you made that request?
A I don't recall.
Q Do you have an expectation of when you'll receive a copy of that notice?
A I'm going to follow up.
Q Today?
A Today.
Q What about the first recommendation about the colloquy, has recommendation been given to the appropriate agency to give guidance as to what that plea colloquy information should look like?
A I don't believe that we have shared anything with the Clerk of Courts on this.
Q If you turn to page 23, Recommendation Number 6, that recommends requiring uniform information on websites/handbooks for the Clerks, Supervisors, Department of Corrections, FCOR, and the Department of State regarding the restoration of civil and voting rights; do you see that?
A No. You said 23?

Q Number 6.
A Oh, we're still on the recommendations. As indicated earlier in my deposition, we did reach out to the Clerk of Court and the Department of Corrections regarding information about how to restore civil rights and voting rights. The Department of Corrections I believe is already sharing information, although I don't know if it's exactly the same language as what we have.
We have not yet shared information with the Supervisors of Elections regarding the uniform instructions that should be issued regarding restoring voting rights if it's not one of those for clemency -- other than clemency.
Q Why not?
A We're still discussing internally.
Q Do you have a sense of when that uniform information will be provided to the Supervisors?
A No, I do not.
Q Do you know whether it will be provided in time for the March 2020 primary election?
A No, I do not.
Q What about the November 2020 general election?
A No, I do not.
Q What about with respect to the Florida

Commission of Offender Review and the Florida, you are the Florida Department of -- has any guidance been provided to the Commission on Offender Review for uniform language to put this recommendation into place?
A They may have information on their website. I don't know that it was in coordination with us.
Q Has an effort been made to make sure that these various websites and handbooks of these different agencies are uniform, if they weren't in coordination?
A It would be our desire to ensure that the information is uniform across the board. We have put it on our website. Department of Corrections is doing their part and --
Q But it sounds like no steps have actually been taken to make them uniform other than --
A That process --
MS. DAVIS: Objection to form.
A -- has not been complete.
BY MR. GABER:
Q Moving to Section 4C, which begins on page 23 and carries over after that, that's any other relevant policies and procedures for verifying the eligibility of a registered voter for restoration of voting rights under Section 4, Article VI of the State Constitution;

do you see that?
A Yes.
Q On page 24, paragraph 1, this is under the recommendations. The work group recommends that FCOR and the Department should work together to create a uniform process for researching further outstanding restitution on a potential match for which information is otherwise not available or ascertainable through Clerk reports and/or DOC records or other applicable records after a diligent search; do you see that?
A Yes.
Q Has there been any communications between the Department and FCOR on creating such a process?
A Yes.
Q What do those communications entail?
A Determining what -- what FCOR can provide in terms of their ability to determine whether there is outstanding restitution.
Q Did that come in the form of email or written communications?
A It may have been an email. We've also met with them.
Q Did you exchange any documents or paper on this topic with FCOR representatives?

A I believe that we did share documents with them regarding a sample file.

Q Did you come to any conclusions in terms of how you can create a uniform process for conducting this research?

A We consulted with them based on their expertise in researching cases for clemency. We haven't reached any definitive conclusion on what their role will be and what -- what they may add to that process. It's all part of that ongoing discussion.

Q Do you have a sense for when you'll have reached a definitive conclusion to put Recommendation Number 1 into effect?

A No.

Q Do you have any sense that it will happen before the March 2020 primary?

A No.

Q What about the November 2020 general election?

A No. With that being said, we are -- there are still things outstanding. We have litigation going on, legislature, things can change.

Q On page 24, paragraph 4 recommends that each stakeholder agency, including the Department of State, continue to enhance data systems and data input

procedures with a focus on timely availability, accuracy, quality, and consistency of data; do you see that?

A Yes.

Q What steps have been taken by the Department to enhance its data systems and input procedures pursuant to this recommendation?

A By "Department" you mean Department of State?

Q Department of State.

A We've been working with the Department of Corrections, the Florida Department of Law Enforcement, the Florida Commission on Offender Review regarding their respective databases and how information that they have can be -- can be enhanced and if there's added information -- informational fields that we need for them to send to us so that it improves the quality of the matches that we are getting.

Q Have any of those recommended enhancements discussed with the various entities gone into effect?

A Pieces and parts.

Q Which pieces?

A Data, data coming from these -- from the these entities. For example, the Florida Commission on Offender Review, we've asked them for reconciliation

files on their clemency to make sure that we have the most current and has captured any changes to their database, the Florida Department of Law Enforcement is also working on their criteria and data that they send over as well as DOC, but those have -- but it's a work in progress, so it hasn't been finalized.

Q Are there new categories of data that are now being sent over that were not previously or what -- what types of changes will you see happen if the recommendation is followed through with?

A Additional field -- I can speak for the Department of Corrections' additional fields relative to the fact that whether somebody is in supervision and changes to that, because people who are in prison and in supervision, their status can change from day to day, and previously that was not of interest to us. We just needed to know whether the individual was -- had received clemency.

And now based on this additional fields of information that can determine whether it's going to fall into those four categories or whether it will fall into something else.

Q Does "something else" mean potentially that it's just outstanding LFOs?

A Correct.

Q But at this point, this is a work in progress and these enhancements have not been made to your satisfaction; is that --

A No. We're working to agree to understand each other's data. These systems were not created necessarily originally to speak to each other.

Q Has that understanding improved since the work group report was released?

A Yeah, these agencies work well with us and we work with them. It certainly has highlighted the issues and the data.

Q What types of issues have you encountered through this collaborative process that have been highlighted for you?

A Just challenges to the way data is stored in -- in a different -- in another agency and how to be able to extract that data and get that data to us in a meaningful way that we can use it to make a credible and reliable match.

Q Recommendations 5 and 7 talk about this litigation and the judge's order and the -- as well as the voter registration statement in the SB 7066 registration changes; do you see that?

A Yes.

Q What if any conversations have the Department of State had with the legislature or representatives from the legislature staff from a legislature about these two recommendations?

A I am aware that there is some legislation that is being offered in both these -- in the area -- not both these areas, I'm sorry. At least for Number 5 that there is legislation being proposed to revert to the singular question about felon status.

Any time that -- whether it's myself or the Secretary of State is asked by the legislature to speak on something, we take no position, but we are -- we're there as any other agency to offer information up.

Q Have you or your staff spoken to legislatures or legislative staff with respect to Recommendations 5 and 6?

A Say that again.

Q Have you or your staff spoken, either in written or oral form, with either legislatures or their staff with respect to Recommendations 5 and 6?

A Not to date.

Q More generally since your last deposition in this case, have you spoken with any legislatures or

legislative staff about Amendment 4, SB 7066, or the district court's preliminary injunction order?

A Again, if not me -- or if the Secretary is called up there, it would be for informational purposes, and I believe that she was asked about the statewide form, so.

Q Have any recommendations been given by the Secretary of State to legislatures or their staff about creating legislation that would create a mechanism to determine inability to pay for voters who could then be eligible?

A I'm not aware of that specific inquiry, no.

Q Does the Department regularly provide information or guidance to the legislature on issues of election law?

A Yes. If they ask, we do.

Q Is there an operating procedure for how to respond to those requests, are they done in writing or --

A Any request that comes in for assistance or from a senator or representative and/or their staff is directed through the legislative director and a determination is made whether it needs to have a visit, a phone call to provide whatever information they're

seeking to help them -- them determine what the policy is going to be.

Q Do you know whether there's been any contact with legislators or their staff by that department on the topics of Amendment 4, SB 7066, or this litigation?

A I am aware that the Secretary has gone up the Hill to speak to some legislatures I believe on this statewide voter application, just for background information, to understand how registration occurs and how felony matches occur and that she has also been in touch with legislator about -- legislation about -- I think it's with Representative Grant regarding that technology proposal that he has.

Q Which legislator -- legislators did she speak to on the topic of the registration form?

A That I don't remember. I just remember Grant.

Q Are you aware of any conversations, requests for information on the topic of the district court's preliminary injunction and potential legislation about inability to pay?

A No, and I would be surprised quite frankly, since we're in litigation, that she would talk about that.

Q Are you aware of the governor's press release

after the District court entered the preliminary injunction order saying that he agreed with the order?

A I remember seeing a tweet.

Q Do you know whether the Secretary of State shared that position?

A I don't -- you'd have to show me which tweet we're talking about.

Q The tweet that you remember. Did the Secretary of State agree with the governor with respect to the district court's preliminary injunction order after it was entered?

MS. DAVIS: Objection to form.

A Well, I remember -- I guess I should backtrack. I remember a tweet, but I'm not sure -- again, I think what I would say here is that the Secretary of State is going to agree with whatever a court says and whatever the law is. That is what her position is going to be, whether she -- yeah, that's what...

BY MR. GABER:

Q Do you know whether the Secretary of State agreed that it was appropriate to have a process in place for individuals who have -- who are unable to pay their LFOs that they should be eligible to register and

vote?

MS. DAVIS: Objection to form.

A I would think the Secretary again would uphold whatever the order -- a court order is and whatever the legislation laws are.

BY MR. GABER:

Q Are you aware of any potential legislation that would address the issue of setting up a process for voters who have an inability to pay to have a determination made for them to register and vote if they're deemed eligible?

A I wish I could say, but I haven't had time to go through all the legislation that's been filed.

Q If the district court's injunction is upheld and the legislature doesn't take action, is there a plan in place for the Secretary to issue some guidance as to how Supervisors should make determinations about a voter's inability to pay?

MS. DAVIS: Objection to form and attorney/client privilege.

BY MR. GABER:

Q Is there a plan or a draft plan for how voters should proceed if they get inconsistent information from the various law enforcement and other agencies as to

whether they owe outstanding LFOs?

A Can you repeat that?

MS. DAVIS: Objection to form.

BY MR. GABER:

Q I don't know if I can. Does the Secretary have guidance for Supervisors or for voters for how they should proceed if they get inconsistent information from the Department of Corrections or the Clerk of Courts as to whether they -- whether or not they owe outstanding LFOs?

A At this time we don't have anything, because we haven't sent anything down.

Q By sent it down, you mean sent down --

A Credible and reliable matches down to the counties based on that, yes.

Q Has the Secretary of State issued any guidance, whether formal or informal, to Supervisors or Clerks of Court regarding the State Supreme Court's advisory opinion on the meaning of one phrase in the middle of Amendment 4?

MS. DAVIS: Objection, form.

A Secretaries -- we sent the advisory opinion to the Supervisors of Elections. I don't believe we elaborated on anything.

MR. GABER: Take a short break.

(Recessed at 11:57 a.m. to 12:10 p.m.)

BY MR. GABER:

Q Just a few more questions, Ms. Matthews. At your earlier deposition, you were asked about whether the CCIS database aggregates misdemeanor financial obligations with felony financial obligations and at the time you said you didn't know. Have you learned since then whether that's the case?

A I don't know if we have specifically determined that or not.

Q Is that a question that you've had with respect to the CCIS database?

A It would certainly be a question we would explore, yes.

Q You testified previously about the matching process that it flags felony adjudications and that they then go on for manual review, does that process exclude cases where adjudication is withheld by the criminal court?

A It is supposed to. Of course, any automated process might have some, but it is supposed to exclude that, but that's why we do the manual review.

Q Is that an area that you found can be flawed

with the automated process that it will incorrectly flag folks who have had their adjudication withheld?

MS. DAVIS: Objection, form.

A We can find incomplete information or insufficient information and that's why again with the manual process it's not -- we're working initially with the automated data, but we're then trying to find the documentation to support it to help with those kinds of discrepancies that might arise.

BY MR. GABER:

Q We talked a little bit about the funding -- the projected need for more staff and resources for the Department to implement these new procedures as a result of SB 7066, does the Department plan to ask the legislature for that additional funding to have new staff and resources?

A We actually have filed an amended budget request to allocate I believe up to a million to assist with resources, including staffing and whatever other needs are in order to deal with our files.

Q Is that an additional million dollars or is it reallocated from some other part of the budget request?

A Good question and I don't recall.

Q With respect to -- we've talked today about

various documents that you have. Since September, has there been an effort to collect new documents, new emails, new paper documents, or items you have stored on your computer that relate in any way to the topic of this lawsuit?

A Any documents that have been requested through litigation, I would trust that the General Counsel's Office would be responsive and would have asked me and anyone else who might have documents responsive to it, and we would have provided it.

Q Have you asked -- have you been asked to supplement your documents since the initial request came in in September or August?

A Yes.

Q Have you provided those documents too?

A We would have provided them to the General Counsel's Office and they would have replied in accordance.

MR. GABER: I don't have any further questions, but we have not -- plaintiffs have not received any supplemental production in this case since September.

None of the documents that were discussed today, put in the procedures, and email exchanges

and documents related to the work group have been produced to us. I know that my colleague, Molly Danahy, sent an email, I think Mr. Jazil responded, and she followed up again, but we have not received any response to that.

So I guess I'm putting on the record here, but I would like to know whether or not the Secretary plans to produce these additional materials.

MS. PRICE: There will be documents produced today, absolutely.

MR. GABER: Will they include the -- you know, the items we talked about in the deposition today?

MS. PRICE: They'll include anything that's responsive to the request for which we have a duty to supplement under the federal rules.

MR. GABER: I would just ask if there are any in particular that came up today during the deposition that if someone could just take a look and make sure that those items are also among the -- that are being produced, because I think everything we talked about today would be responsive to the request. So with that, I have no further questions.

I don't know if y'all do or someone on the

phone does.

THE WITNESS: I did want to -- because something with -- I thought about this later. I don't want it -- want it to be clear that I do not know what the Supervisor of Elections are doing at the local level in terms of LFOs, but I am pretty sure that they are not doing anything regarding that, because we've still got litigation going.

And as I'm talking and, you know, it appears that we're in a state of flux is because of that. We can't do anything definitive, because the landscape keeps changing on us. And Supervisors, they do typically look to us for guidance on when new procedures come into play and law, so they're going to look to see what we do before they probably implement something.

So I'm pretty sure there isn't any Supervisor -- even though they might have the authority to do something, that they are exercising it at this point, because we're all kind of waiting how litigation, how legislature, even as we're having internal discussions and everything.

BY MR. GABER:

Q How does that interact then with the

March 2020 election that's coming up really quickly?

A People can still register to vote and if -- it's still up to the individual to affirm on a registration application form that they believe themselves to be eligible. They'll get on the roles if the application is complete. We will still be doing the cross-checking afterwards, subject to the limitations I told you about or spoke to you about today. And in terms of those who are already registered, if they are eligible, they should be able to vote.

Q So what about the folks then -- I'm sorry, you spoke so I have questions. What about the folks who might be among the people who their files are being reviewed, they're being set aside right now, they're not being sent down, they register, because they can register as you said, the March 2020 primary comes, they vote, and then afterwards it's determined that there's credible and reliable information that they were not eligible; for those people then, what's the Secretary of State's position about whether they were eligible to cast a ballot despite not having the notice that the due process provision would give them if the files had been sent down?

MS. DAVIS: Objection. That's outside the

MARIA MATTHEWS

scope of her additional comments and some of that, if not most of that, was already covered in the direct examination that you've already concluded.

MR. GABER: I think it was well within the scope of additional comments.

MS. DAVIS: The scope of the additional comments was limited to clarifying, I think, that the Supervisors -- we don't have any information that the Supervisors are acting independently as to LFOs.

BY MR. GABER:

Q I would like you to -- I would like you to answer the question, if it needs to be in your individual capacity. It's well within the topics of the notice and we're still at the deposition.

So I would like to know what the Secretary of State's position is for someone who votes in the March 2020 election because they were informed that they could register on their belief that they have an outstanding -- that they can't -- they have an inability to pay.

And if the Secretary later after the election sends down a file suggesting that they now think the information is credible and reliable, what is the

MARIA MATTHEWS

Secretary of State's position with respect whether that voter is eligible to vote in the March 2020 election?

MS. DAVIS: Objection to form.

A I think I actually talked about this earlier in the deposition and that is that determination gets made by the Supervisor of Elections. At that juncture, then the individual is removed, that's the quasi judicial administrative process, and then it's -- the Supervisor of Elections whether they -- they have a duty under Chapter 104 if they believe that there is a reason to be referring that to also refer that person to the state -- to the prosecutor or the State Attorney's Office.

BY MR. GABER:

Q But you also just offered that the Supervisors look to the Department of State and even suggested that they don't do anything until they get the guidance from -- from you. So what -- what is the guidance that you would give Supervisors with respect to the voters who are in that predicament?

MS. DAVIS: Objection to form.

A At this juncture, I don't know that I have an answer for that.

BY MR. GABER:

MARIA MATTHEWS

Q Is it possible that the state might -- that the Secretary of State or the Supervisors might refer to the -- those people to the state's attorney if after the election the Secretary of State deemed that there was credible and reliable information that they were ineligible but didn't provide that information to the voter before the next election?

MS. DAVIS: Objection to form.

A Again, the Supervisor of Elections is not going to be determined -- is not going to be referring it based on us just sending the file. It's going to be based on their determination once an individual has an opportunity to provide evidence. At that point, the Supervisor, like they always have, have a duty to refer any matter that they believe is fraudulent.

BY MR. GABER:

Q Is there any concern or effort to address this situation before the March 2020 primary, is there any plan to give notice to the voters who are currently under review but not yet being sent down to the Supervisors that there's some risk that the Secretary of State might deem that they are ineligible?

A Well, you're on notice when you fill out that application that if you're not filling it out under --

MARIA MATTHEWS

because you're supposed to fill it out under oath.

Q Right. The oath is that you believe that you are affirming that you are eligible and you've said that's the voter's responsibility to make that determination of whether they're eligible; right?

MS. DAVIS: Objection to form.

A I'm sorry, say that again.

BY MR. GABER:

Q So if the voter -- obviously if they've registered, they've obviously affirmed that they believe they're eligible. The Secretary of State's Office has a list of I think it was 65,000 or so, I don't have the exact number in front of me, people who are potentially -- who potentially -- the Secretary of State has information that they owe outstanding LFOs and that eventually might lead to files being sent down to the Supervisors; is that --

MS. DAVIS: Objection to form.

BY MR. GABER:

Q -- correct?

A Again, all I know is that those 65,000 are -- don't fall into this other four categories. I don't know if they're LFOs until we review them.

Q Among them are likely to be people who owe

LFOs; is that fair?

MS. DAVIS: Objection to form.

A Yes, there is likely.

BY MR. GABER:

Q At this point, there's no plan to send those files down to the Supervisors before the March 2020 election; is that also correct?

A We have not made a decision.

Q Is the same true with the respect to the November 2020 election?

A Correct.

Q So those voters will not have the benefit of the Secretary of State's determination about whether there's credible and reliable information that they might be ineligible before they have to make a decision of whether they should vote in the March 2020 primary; is that right?

MS. DAVIS: Objection to form.

A Again, no different than now if someone is identified as being a convicted felon. It's a potential. Until that process plays itself out, they are -- they are deemed registered and they are deemed eligible.

BY MR. GABER:

Q But they're deemed eligible, because they haven't been deemed ineligible; is that --

A They're deemed eligible to vote at that point.

Q That determination doesn't control whether or not you might later refer someone for prosecution for having been unlawfully registered or unlawfully voting, right, you don't think just because they're registered that means that they were eligible?

MS. DAVIS: Objection.

BY MR. GABER:

Q You understand the distinction I'm getting at?

A Again, until that process, that due process plays itself out, that person is deemed eligible to be registered and eligible to vote.

MR. GABER: I don't have any further questions.

MS. DAVIS: We don't have any further.

MR. GABER: Anyone on the phone? That sounds good.

THE STENOGRAPHER: Did you want to order this?

MR. GABER: Yes.

THE STENOGRAPHER: Ma'am, did y'all want to order?

MS. DAVIS: Yeah, send it to Tara.

(Thereupon, the reading and signing of this deposition was RESERVED.

The proceedings concluded at 12:25 p.m.)

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF LEON

I, JUDY LYNN MARTIN, Notary Public, State of Florida, certify that MARIA MATTHEWS personally appeared before me on January 27, 2020, and was duly sworn.

Signed this 31st day of January, 2020.

Judy Lynn Martin

JUDY LYNN MARTIN

Notary Public, State of Florida

My Commission No. GG1925542

Expires: April 9, 2022

CERTIFICATE OF REPORTER

STATE OF FLORIDA

COUNTY OF LEON

I, JUDY LYNN MARTIN, do hereby certify that I was authorized to and did stenographically report the foregoing deposition of MARIA MATTHEWS; that a review of the transcript was requested; and that the transcript is a true record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

Dated this 31st day of January, 2020.

*Judy Lynn Martin*

JUDY LYNN MARTIN

ERRATA SHEET

DO NOT WRITE ON THE TRANSCRIPT

ENTER CHANGES ON THIS SHEET

KELVIN LEON JONES, ET AL., VS. RON DESANTIS, ET AL.

Deponent: MARIA MATTHEWS

Date of : January 27, 2020

Case No.: 4:19-cv-300-RH-MJF

PAGE LINE REMARKS

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

______________________________________________________

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

Signature of Witness ____________________________

Dated this _________ day of ___________, __________.