UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

KELVIN LEON JONES, *et al.,*

      Plaintiffs,

v.                                    Case No. 4:19-cv-300-RH/MJF

RON DeSANTIS, *et al.*,

      Defendants.

_____/

**MEMORANDUM IN SUPPORT OF**
**GOVERNOR AND SECRETARY OF STATE'S**
**<u>OMNIBUS MOTION FOR SUMMARY JUDGMENT</u>**

1

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ........................................................................ 1

INTRODUCTION ............................................................................... 3

PROCEDURAL HISTORY .................................................................. 5

STATEMENT OF MATERIAL FACTS ............................................... 10

LEGAL STANDARD .......................................................................... 11

ARGUMENT ...................................................................................... 12

I.    THE PLAINTIFFS LACK STANDING BECAUSE THEIR INJURY CANNOT BE
      REDRESSED EVEN IF THE COURT STRIKES SENATE BILL 7066. ...................... 12

II.   SENATE BILL 7066 DOES NOT VIOLATE THE U.S. CONSTITUTION. .................. 14

      A.    Senate Bill 7066 does not violate the Equal Protection Clause of the
            Fourteenth Amendment. ........................................................... 16

            i.     Senate Bill 7066 does not unconstitutionally discriminate on the
                   basis of wealth. ............................................................. 17

            ii.    Senate Bill 7066 was not an act of intentional race
                   discrimination. ............................................................. 26

            iii.   Senate Bill 7066 does not violate any statewide uniformity
                   requirement articulated in *Bush v. Gore*. ................................... 31

      B.    Senate Bill 7066 does not impose any tax on the right to vote, in
            violation of the Twenty-Fourth Amendment. ................................. 33

            i.     Because the Plaintiffs have surrendered their right to vote by
                   virtue of their felonies, the Twenty-Fourth Amendment does
                   not apply to them. .......................................................... 35

            ii.    Requiring the Plaintiffs to satisfy their legal financial
                   obligations does not constitute imposition of a "tax." ............. 37

      C.    Senate Bill 7066 does not violate the Due Process Clause of the
            Fourteenth Amendment. ........................................................... 41

            i.     Senate Bill 7066 provides felons with all the process they are
                   due under the Fourteenth Amendment. ................................... 41

            ii.    Senate Bill 7066 is not unconstitutionally vague. ................... 42

            iii.   Senate Bill 7066 does not violate any notions of fundamental
                   fairness. ...................................................................... 42

1

D.    Senate Bill 7066 does not violate the Nineteenth Amendment. ................................................................ 44

E.    Because, under Amendment 4, felons have no right to vote until they satisfy their legal financial obligations, Senate Bill 7066 does not burden their right to vote and, accordingly, does not fail the *Anderson-Burdick* balancing test. ...................................................................... 45

F.    Senate Bill 7066 does not violate the First Amendment core political or associational rights of any organization. ........................................ 47

G.    Because Senate Bill 7066 inflicts no punishment, it does not violate either the *Ex Post Facto* Clause or the Eighth Amendment. ............. 47

III.    SENATE BILL 7066 DOES NOT VIOLATE ANY OTHER LEGAL PROVISION. ......... 50

    A.    The Voting Rights Act does not apply to Senate Bill 7066. .............. 50

    B.    Senate Bill 7066 does not violate the National Voter Registration Act, 52 U.S.C. §§ 20501 *et seq.* ................................................................ 52

        i.    The *Raysor* Plaintiffs failed to comply with the notice requirement and otherwise lack standing to pursue their claims under the National Voter Registration Act, 52 U.S.C. §§ 20501 et seq. ("NVRA"). .................................................................. 52

        ii.    The *Gruver* individual Plaintiffs, with the exception of Curtis D. Bryant, Jr., lack Article III standing to pursue their claims under the National Voter Registration Act, 52 U.S.C. §§ 20501 et seq. ...................................................................................... 58

    C.    Because Senate Bill 7066 and Amendment 4 both require that felons satisfy their legal financial requirements before they regain their right to vote, Senate Bill 7066 does not violate Article 4, Section 4 of the Florida Constitution. ........................................................................ 59

IV.    THE COURT CANNOT ISSUE A WRIT OF MANDAMUS AGAINST STATE OFFICERS. ........................................................................... 60

CONCLUSION ................................................................................... 61

**INTRODUCTION**

Consistent with the express terms of the Fourteenth Amendment, Florida had long "exclude[d] from the franchise convicted felons," *Richardson v. Ramirez*, 418 U.S. 24, 56 (1974), allowing them to vote only if their rights were restored through the clemency process, *see* Fla. Stat. § 940.01(1) (2018). Fla. Const. art. VI, § 4. The Florida Electorate changed that default rule in the 2018 General Election. Specifically, Amendment 4 appeared on the ballot and proposed to restore the voting rights of most felons (save for those convicted of murder or certain sexual-assault offenses), but only if the felons completed "all terms of sentence." As the Florida Supreme Court has now confirmed, "'all terms of sentence' encompasses not just durational periods but also all [legal financial obligations] imposed in conjunction with an adjudication of guilt." *See Advisory Opinion to the Governor Re: Implementation of Amendment 4, The Voting Restoration Amendment*, 45 Fla. L. Weekly S10, 2020 WL 238556, at *1 (Fla. Jan. 16, 2020).

Conditioning re-enfranchisement on completion of "all terms of sentence"— including legal financial obligations—was no accident. According to Desmond Meade, the Executive Director of the Florida Rights Restoration Coalition (Amendment 4's sponsor), there was "stronger support among voters for restoring voting rights to people after they've completed their sentence as opposed to completing incarceration." 1/14/2020 Desmond Meade Dep. Tr. 65 (Ex. A).

3

In other words (and contrary to the premise underlying virtually all Plaintiffs' claims), Amendment 4 does not "automatically" re-enfranchise felons once their period of State supervision expires. Instead it faithfully applies the will of a supermajority of Florida voters that considered "completion of *all* terms" of sentence an important element for welcoming felons back to the franchise. *Id.* And Amendment 4 does not allow a felon to re-claim the right to vote until the satisfaction of all terms of sentence—including financial terms. *Id.*

Senate Bill 7066 requires nothing more than Amendment 4 requires. Senate Bill 7066 states that "[f]ull payment of" both "restitution ordered to a victim" and "fines or fees" "ordered by the court" must be paid before a felon's voting rights are restored. Fla. Stat § 98.0751(2)(a)5.a–5.b. According to the Florida Supreme Court, so too, does Amendment 4.

If Senate Bill 7066 is unconstitutional because it requires the payment of all legal financial obligations, then so too is Amendment 4. Stripping Amendment 4 of an important element" would make all of Amendment 4 void and return the State to the pre-2018 status quo. That is *not* the relief the Governor or Secretary seek. That is an outcome the State seeks to avoid, but it can be avoided only if the Court rules for Defendants. Dismissal of Plaintiffs' Complaints for lack of Article III standing is necessary; summary judgment based on the uncontroverted facts is appropriate.

## PROCEDURAL HISTORY

**A.**  On November 6, 2018, the Florida electorate adopted Amendment 4, with 64.5 percent of them voting "yes" and 35.5 percent of them voting "no." *Fla. Dep't of State, Div. of Elections*, November 6, 2018 General Election Official Results (Constitutional Amendment).[1]  Amendment 4 made the following changes to Article VI, Section 4 of the Florida Constitution (additions shown via underline):

> Article VI, Section 4. Disqualifications.—
>
> (a) No person convicted of a felony, or adjudicated in this or any other state to be mentally incompetent, shall be qualified to vote or hold office until restoration of civil rights or removal of disability. Except as provided in subsection (b) of this section, any disqualification from voting arising from a felony conviction shall terminate and voting rights shall be restored upon completion of all terms of sentence including parole or probation.
>
> (b) No person convicted of murder or a felony sexual offense shall be qualified to vote until restoration of civil rights.

Fla. Const. art. VI, § 4(a)–(b).

In response to Governor DeSantis's request for an advisory opinion, the Florida Supreme Court instructed that the phrase "'all terms of sentence' encompasses not just durational periods but also *all* [legal financial obligations] imposed in conjunction with an adjudication of guilt," including all costs and fees.

---

[1]  *Available at* https://results.elections.myflorida.com/Index.asp?ElectionDate=11/6/2018&DATAMODE= (last visited Feb. 18, 2020).

*Advisory Opinion to the Governor Re: Implementation of Amendment 4, The Voting Restoration Amendment*, 2020 WL 238556, at *1 (emphasis added). Even Justice Labarga, the only Justice to write separately, agreed "that the phrase 'all terms of sentence,' as used in" Amendment 4, "encompasses *all* 'legal financial obligations' . . . imposed by the sentencing judge," *id.* (emphasis added).

**B.**  Governor DeSantis also signed into law Senate Bill 7066, which, among other things, created Section 98.0751, Florida Statutes. Titled "Restoration of voting rights; termination of ineligibility subsequent to a felony conviction," Section 98.0751 provides that:

> A person who has been disqualified from voting based on a felony conviction for an offense other than murder or a felony sexual offense must have such disqualification terminated and his or her voting rights restored pursuant to [§] 4, Art. VI of the State Constitution upon the completion of all terms of his or her sentence, including parole or probation.

Fla. Stat. § 98.0751(1). In accordance with Article VI, Section 4 of the Florida Constitution, Section 98.0751 clarifies that:

> [t]he voting disqualification does not terminate unless a person's civil rights are restored pursuant to [§] 8, Art. IV of the State Constitution if the disqualification arises from a felony conviction of murder or a felony sexual offense, or if the person has not completed all terms of sentence, as specified in subsection (2)

*Id.*

At issue in this case is Section 98.0751's definition of "[c]ompletion of all terms of sentence." Tracking the language of Article VI, Section 4 of the Florida

Constitution, Section 98.0751(2)(a) states, at the outset, that "'[c]ompletion of all terms of sentence' means any portion of a sentence that is contained in the four corners of the sentencing document." *Id.* § 98.0751(2)(a). The remainder enumerates a non-exclusive list of "terms of sentence" that must be "completed" before a felon's voting rights are restored. In addition to "[r]elease from any term of imprisonment," and "[t]ermination from any term of" "probation or community control" and "supervision," *id.* § 98.0751(2)(a)(1)–(4), the statute requires "full payment of":

- "restitution ordered to a victim by the court as a part of the sentence"; and

- "fines or fees ordered by the court as a part of the sentence or that are ordered by the court as a condition of any form of supervision, including, but not limited to, probation, community control, or parole."

*Id.* § 98.0751(2)(a)5.a–5.b. These "financial obligations . . . include only the amount specifically ordered by the court as part of the sentence and do not include any fines, fees, or costs that accrue after the date the obligation is ordered as a part of the sentence." *Id.* § 98.751(2)(a)5.c.

Finally, Senate Bill 7066 makes clear that the financial obligations are completed upon either (1) "[a]ctual payment of the obligation in full"; (2) "the termination by the court of any financial obligation to a payee" (assuming the payee's approval); or (3) "[c]ompletion of all community service hours, if the

court . . . converts the financial obligation to community service." *Id.* § 98.751(2)(a)5.e(I)–(III).

**C.** Five federal lawsuits challenge the constitutionality of Senate Bill 7066 (but not Amendment 4). Each of the five lawsuits allege that Senate Bill 7066 violates either the United States Constitution, the Florida Constitution, federal statutes, or a combination of all three. The Defendants include Governor Ron DeSantis, Secretary of State Laurel M. Lee, and a number of County Election Supervisors (collectively, the "Defendants"). On June 30, 2019, the Court consolidated all cases on a common docket (4:19-cv-300). *See* ECF No. 3.

*In toto*, the Plaintiffs ask the Court to invalidate Senate Bill 7066's legal financial obligation payment mandate based on the following theories:

(1)  Senate Bill 7066 unconstitutionally discriminates on the basis of wealth, in violation of the Equal Protection Clause;

(2)  Senate Bill 7066 intentionally discriminates on the basis of race, in violation of the Equal Protection Clause;

(3)  Senate Bill 7066 violates the Equal Protection Clause because it fails to provide adequate guidance for uniform statewide implementation, in contravention of *Bush v. Gore*, 531 U.S. 98, 104-05 (2000);

(4)  Senate Bill 7066 imposes a tax on the right to vote, in violation of the Twenty-Fourth Amendment;

(5)  Senate Bill 7066 does not provide felons with the process they are due to restore their voting rights, in violation of the Fourteenth Amendment;

(6)  Senate Bill 7066 is unconstitutionally vague, in violation of the Due Process Clause;

(7)  Senate Bill 7066 discriminates against women, in violation of the Nineteenth Amendment;

(8)  Senate Bill 7066 violates notions of fundamental fairness by punishing individuals for failing to satisfy legal financial obligations that they cannot satisfy (and for failing to provide notice and an opportunity to be heard), in violation of the Fourteenth Amendment;

(9)  The burden Senate Bill 7066 imposes on felons' fundamental right to vote is not outweighed by any State interest and, accordingly, it violates the Fourteenth Amendment;

(10)  Senate Bill 7066 burdens the core political speech and associational rights" of certain organizations, in violation of the First and Fourteenth Amendments;

(11)  Senate Bill 7066 inflicts retroactive punishment, in violation of the Ex Post Facto Clause;

(12)  Senate Bill 7066 imposes excessive fines and cruel and unusual punishment, in violation of the Eighth Amendment;

(13)   Senate Bill 7066 violates the Voting Rights Act, 52 U.S.C. §§ 10301 *et seq.*, because it has a disproportionate impact on the voting rights of certain minority groups;

(14)   Senate Bill 7066 does not comply with the National Voter Registration Act, 52 U.S.C. §§ 20501 *et seq.*, because it requires more than the minimum amount of information needed; and

(15)   Senate Bill adds criteria beyond those listed in Article VI, Section 4 of the Florida Constitution (Amendment 4).

**D.**  The Defendants filed an omnibus motion to dismiss arguing, among other things, that the Plaintiffs lacked Article III standing because Senate Bill 7066 and Amendment 4 imposed the same legal-financial-obligation repayment requirement and, accordingly, enjoining Senate Bill 7066 would not redress their purported injuries. *See* ECF No. 97, at 8-11. The Plaintiffs then moved for a preliminary injunction. *See* ECF No. 98-1. On October 18, 2019, the Court denied the Defendants' motion to dismiss and granted, in part, the Plaintiffs' request for a preliminary injunction. *See* ECF No. 207.

## STATEMENT OF MATERIAL FACTS

**1.** Senate Bill 7066 and Amendment 4 each require payment of all outstanding financial obligations before re-enfranchising a felon. The corporate representative for Florida Restoration Rights Coalition ("FRRC"), Desmond Meade, agrees. Meade Tr. pg. 112:9-10; *see also id.* pg. 113:18-24.

**2.** None of the Plaintiffs challenge the constitutionality of Amendment 4.

**3.** Only the *Gruver* Plaintiffs allege that Senate Bill 7066 is the product of intentional discrimination.

**4.** The *McCoy* Plaintiffs allege a claim under the Nineteenth Amendment for discrimination against women, they allege no intentional discrimination.

**5.** The legislative record for Senate Bill 7066 includes no evidence of discrimination. ECF 132-1 at 107-21. Mr. Meade, who was instrumental drafting Amendment 4 and Senate Bill 7066, does not know of any who acted with discriminatory intent against racial minorities or women. 1/14/2020 Desmond Meade Dep. Tr. 119:4-9 (Ex. A). He further specifically testified that the House Sponsor (Rep. Grant) and the Senate Sponsor (Sen. Brandes) both had a "genuine intent to try to get this right." *Id.* at 119:13-17. He saw no evidence of any discrimination against women either in the passage of Senate Bill 7066. *Id.* at 119:19-120:3.

## LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

# ARGUMENT

## I. THE PLAINTIFFS LACK STANDING BECAUSE THEIR INJURY CANNOT BE REDRESSED EVEN IF THE COURT STRIKES SENATE BILL 7066.

**A.** The Florida Supreme Court has now confirmed that former felons must satisfy all legal financial obligations "imposed in conjunction with an adjudication of guilt" to satisfy Amendment 4. *Advisory Opinion to the Governor Re: Implementation of Amendment 4, The Voting Restoration Amendment*, 2020 WL 238556, at *1. Because Amendment 4 imposes the same repayment requirement that the Plaintiffs challenge in Senate Bill 7066, striking the requirement in Senate Bill 7066 will not redress their purported injury. *See Fla. Family Policy Council v. Freeman*, 561 F.3d 1246 (11th Cir. 2009). The repayment requirement is also not severable from the rest of Amendment 4. Consistent with the Court's admonition against repeating arguments made in earlier papers, however, the Governor and Secretary simply incorporate that argument made in the Motion to Dismiss and Reply in Support of the Motion to Dismiss. *See* ECF No. 97 and 163.

**B.** A response to the Court's denial of the Motion to Dismiss is necessary however. The Court explained that the Plaintiffs need not allege that "Amendment 4 is unconstitutional on its face" to seek an injunction against the State for "preclud[ing] them from voting just because they lack the financial resources to pay financial obligations" or for putting in place a "process for restoring the right to vote [that is] so flawed that it violates the Due Process Clause." ECF No. 207, at 8.

*First*, none of the Plaintiffs are challenging Amendment 4 on its face or as-applied to them. Amendment 4 remains the law in Florida until it is challenged and enjoined by a court for violating the federal constitution. Neither of those two things has happened.

*Second*, to the extent the Court must enjoin some portion of Amendment 4 to provide facial or as-applied relief to the Plaintiffs as part of their sought-after injunction, the Court must undertake a severability analysis under Florida law. Neither Florida nor federal law provides a basis to side-step this requirement.

*Third*, to the extent the Plaintiffs have standing to challenge the alleged wealth-based discrimination caused by Senate Bill 7066 (despite Amendment 4's imposition of the same requirements) or the State's alleged failure to provide due process of law, this does not give the Plaintiffs standing to raise other claims. For instance, the Plaintiffs still have not overcome the redressability hurdle for their Twenty-Fourth Amendment claim against Senate Bill 7066 for requiring the satisfaction of legal financial obligations, especially after the Florida Supreme Court explained that Amendment 4 requires the same thing. The Supreme Court has made "clear that 'standing is not dispensed in gross.'" *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (quoting *Davis v. Federal Election Comm'n*, 554 U. S. 724, 734 (2008)). "To the contrary, 'a plaintiff must demonstrate standing for

each claim he seeks to press and for each form of relief that is sought.'" *Id.* (quoting *Davis*, 554 U. S. at 734).

Thus, the Plaintiffs lack Article III standing to maintain each of their challenges, except *some* of the Plaintiffs *might* have standing to pursue the National Voter Registration Act claim discussed below.[2]

## II.    SENATE BILL 7066 DOES NOT VIOLATE THE U.S. CONSTITUTION.

In ruling on the Plaintiffs' motion for a preliminary injunction, the Court believed that the Defendants were arguing that, because "a felon has no right to vote at all, . . . a state can restore the right to vote or not in the state's unfettered discretion." ECF No. 207, at 24. Our position is a bit more nuanced, however, and, correctly explicated, affects the resolution of all the Plaintiffs' claims.

The right to vote is fundamental, but it can be forfeited. *Richardson*, 418 U.S. 24. Under the Fourteenth Amendment, the State of Florida may decide (and has decided) that those convicted of felonies surrender their right to vote. This forfeiture can, constitutionally, be permanent. *Id.* Or, as the Court has already recognized, ECF No. 207, at 28, re-enfranchisement can be limited to those former felons who satisfy certain conditions.

---

[2] The Defendants expect that the current legislative session will culminate in action that will moot the National Voter Registration Act claim.

Thus, the Plaintiffs, all former felons who have *not* satisfied the re-enfranchisement criteria in *either* Senate Bill 7066 *or* Amendment 4, cannot claim the fundamental right to vote. *See Wesley v Collins*, 791 F.2d 1255, 1261 (6th Cir. 1986) ("It is undisputed . . . that the right of felons to vote is not fundamental.") Their challenge, instead, is to "the denial of" the "benefit of re-enfranchisement that [Florida] confers upon certain felons," *Harvey v. Brewer*, 605 F.3d 1067, 1070 (9th Cir. 2010) (O'Connor, J.), and which it confers only upon completion of "'all terms of sentence,'" *See* Fla. Const. art. VI, § 4(a). This includes "not just durational periods but also *all* [legal financial obligations] imposed in conjunction with an adjudication of guilt." *Advisory Opinion to the Governor Re: Implementation of Amendment 4, The Voting Restoration Amendment*, 2020 WL 238556, at *1, (Fla. Jan. 16, 2020) (emphasis added).

Because the Plaintiffs challenge the denial of re-enfranchisement, the U.S. Constitution protects them—but only to the same extent it protects them with respect to any other discretionary benefit program, and not by virtue of the effect on any fundamental right. The constitutional calculus, therefore, changes dramatically in a way that permeates the analyses governing each of the Plaintiffs' challenges. This premise underscores why the Defendants are entitled to summary judgment.

**A.    Senate Bill 7066 does not violate the Equal Protection Clause of the Fourteenth Amendment.**

Courts have uniformly recognized that "[e]qual protection . . . does not forbid legislative classifications. *Lofton v. Sec'y of the Dep't of Children & Family Servs.*, 358 F.3d 804, 816-18 (11th Cir. 2004) (citing *Nordlinger v. Hahn*, 505 U.S. 1, 10, 112 (1992)). "Unless the challenged classification burdens a fundamental right or targets a suspect class, the Equal Protection Clause requires only that the classification be rationally related to a legitimate state interest." *Id.* (citation omitted).

The Plaintiffs bring three distinct Equal Protection Challenges against Senate Bill 7066. *First*, they argue that Senate Bill 7066 unconstitutionally discriminates based on wealth; *second*, they argue that Senate Bill 7066 was an act of intentional race discrimination; and *third*, they argue that it arbitrarily and irrationally treats differently former felons from different counties.[3] But their wealth-discrimination claim fails because is it subject only to rational-basis review, the State had a rational basis in re-enfranchising only those felons who had entirely paid their debt to society, and in any event, Eleventh Circuit precedent requires a showing of purposeful discrimination to maintain an Equal Protection challenge in the context of re-enfranchisement, which the Plaintiffs have not alleged. *See Hand v. Scott*, 888

---

[3] The Plaintiffs' intentional gender-discrimination claim, which they premise on the Nineteenth Amendment, is discussed below.

F.3d 1206, 1207 (11th Cir. 2018). Their intentional-discrimination claim fails because the record is devoid of any evidence whatsoever suggesting that the passage of Senate Bill 7066 was motivated by racial animus. And their uniformity claim fails because the Secretary of State is actively working towards a system that harmonizes and routinizes the way in which the State identifies the legal financial obligations owed by former felons seeking restoration of their voting rights.

Thus, the Defendants are entitled to summary judgment on all the Plaintiffs' Equal Protection claims.

### i.    Senate Bill 7066 does not unconstitutionally discriminate on the basis of wealth.

**A.** The Plaintiffs have not, and cannot, dispute that Florida may "exclude from the franchise convicted felons who have completed their sentences and paroles." *Richardson*, 418 U.S. at 55. And as discussed above, it follows that, "[h]aving lost their voting rights, [the] Plaintiffs lack any fundamental interest to assert." *Bredeson*, 624 F.3d at 746; *see also Owens v. Barnes*, 711 F.2d 25, 27 (3d Cir. 1983) ("[T]he right of felons to vote is not 'fundamental.'"). Indigency, moreover, is not a protected class for purposes of equal protection. *See Harris v. McRae*, 448 U.S. 297, 323 (1980); *see also Papasan v. Allain*, 478 U.S. 265, 283-84 (1986); *Maher v. Roe*, 432 U.S. 464, 471 (1977) (Supreme Court has "never held that financial need alone identifies a suspect class for purposes of equal protection analysis").

17

Because the Plaintiffs can claim neither a fundamental right nor suspect-class status, their wealth-discrimination claims are subject to rational-basis review.[4] Indeed, the former Fifth Circuit has held that "selective disenfranchisement or re-enfranchisement of convicted felons . . . must bear" only "a rational relationship to the achieving of a legitimate state interest." *Shepherd v. Trevino*, 575 F.2d 1110, 1114-15 (5th Cir. 1978).[5] Senate Bill 7066 (and Amendment 4) is thus "presumed to be valid," *Cook v. Bennett*, 792 F.3d 1294, 1301 (11th Cir. 2015), and it "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification," *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993).[6] Every court to address former-felon re-enfranchisement requirements that include satisfaction of some legal financial

---

[4] Rational-basis review applies for the independent reason that neither Senate Bill 7066 nor Amendment 4 disenfranchise anyone. Instead, they re-enfranchise former felons who have fully paid their debt to society. Because the Plaintiffs take issue with a reform measure that, in their view, should be available to a broader group, "the principle that calls for the closest scrutiny of distinctions in laws denying fundamental rights, is inapplicable." *Katzenbach v. Morgan*, 384 U.S. 641, 657 (1966).

[5] This case remains binding in the Eleventh Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981).

[6] *Accord Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) (holding that "every reasonable construction must be resorted to, in order to save a statute from unconstitutionality"); *Vance v. Bradley*, 440 U.S. 93, 97 (1979) (court will not strike down a statute under rational-basis review "unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [the court] can only conclude that the legislature's actions were irrational").

18

obligations agree. *See, e.g.*, *Bredesen*, 624 F.3d at 746; *see also Harvey*, 605 F.3d at 1079; *Owens*, 711 F.2d at 27. That includes the dissenting opinion in *Bredesen*.[7]

**B.** Contrary to the Plaintiffs' arguments, rational-basis review applies generally to *all* felons who seek re-enfranchisement, and not as-applied either to a sub-class of felons who cannot afford to pay their legal financial obligations or to the seventeen individual Plaintiffs here. "[A] *classification* does not violate the Equal Protection Clause so long as there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Estrada v. Becker*, 917 F.3d 1298, 1310 (11th Cir. 2019) (emphasis added).[8] Classifications, in turn, can be "significantly over-inclusive or under-inclusive." *Williams v. Pryor*, 240

---

[7] *See Bredesen*, 624 F.3d at 755 (Moore, J., dissenting) ("I agree with the majority as to some components of its equal-protection analysis. I agree that the Plaintiffs in this case have no fundamental right to vote under existing case law. *See Wesley v. Collins*, 791 F.2d 1255, 1261 (6th Cir. 1986) (citing, among other cases, *Richardson v. Ramirez*, 418 U.S. 24, 26 (1974)). I also agree that the Plaintiffs' membership in 'a class of less wealthy individuals is not a suspect class' under prevailing precedent. *Molina-Crespo v. United States MSPB*, 547 F.3d 651, 660 (6th Cir. 2008) (citing *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 29 (1973)). Given these two conclusions, I must also agree that, because the Tennessee provisions neither burden a fundamental right nor discriminate against a suspect class, the Plaintiffs bear the burden to show that § 40-29-202(b) and (c) bear no rational relationship to any legitimate government end. *See FCC v. Beach Communications*, 508 U.S. 307, 315 (1993).").

[8] *See also Estrada*, 917 F.3d at 1310-11 ("[A] *classification* must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification. . . . We assume the *classification* is constitutional, and the appellants—as the challengers—must negative every conceivable basis which might support the *classification*." (emphases added) (internal citations and quotation marks omitted)).

F.3d 944, 948 (11th Cir. 2001). Indeed, "[n]early any statute which classifies people may be irrational as applied in particular cases," *Beller v. Middendorf*, 632 F.2d 788, 808 n.20 (9th Cir. 1980) (Kennedy, J.). But, so long as the generally applicable classification they draw is rational, rational-basis review is met.

**C.** On its face, the classification created by Senate Bill 7066 (really, Amendment 4 itself) is not between the indigent and the wealthy; instead, it is between those felons who have satisfied their *entire* debt to society and those who have not yet done so. As Justice O'Connor recognized, a state may reasonably conclude that "only those who have satisfied their debts to society through fulfilling the terms of a criminal sentence are entitled to restoration of their voting rights." *Harvey*, 605 F.3d at 1079. And as the Sixth Circuit observed, states have legitimate interests in requiring criminals "to fulfill their sentences." *Bredesen*, 624 F.3d at 747.

Florida also has a legitimate interest, a "valid interest[]," in "encouraging payment" of legal financial obligations. *Bredesen*, 624 F.3d at 747.[9] Justice Pariente echoed that consideration during oral argument in the Florida Supreme Court to determine whether Amendment 4 satisfied the conditions for placement on the 2018

---

[9] Even if, as the Plaintiffs' expert's testified at the preliminary injunction hearing, analysis, over 60 percent of former felons owe $1,000 or less in legal financial obligations, and over 95 percent owe $5,000 or less in legal financial obligations, making one lump-sum payment is not the only option. Felons can work towards satisfying these legal financial obligations over time. The legislature did not act irrationally by incentivizing gradual repayment of debts incurred due to felony convictions.

General Election ballot, remarking that "maybe this would actually help the state because if fines, costs, and restitution are a requirement for those who want to vote there's a big motivation to pay unpaid fines, costs, and restitution."[10] "The legislature," moreover, "may have been concerned . . . that a specific exemption for indigent felons would provide an incentive to conceal assets and would result in the state being unable to compel payments from some nonindigent felons." *Bredesen*, 624 F.3d at 748.

Senate Bill 7066 (and Amendment 4 itself) was "not aimed at encouraging the collection of payment from *indigent* felons, but from *all* felons." *Bredesen*, 624 F.3d at 748 (emphases in original); *see also Madison*, 163 P.3d at 759 (Washington re-enfranchisement law "does not distinguish between rich or poor felons" and instead requires "all felons to complete all of the terms of their sentences before they may seek reinstatement of their civil rights"). Thus, Senate Bill 7066 "does not classify based on wealth." *id.*

**D.**  The cases on which the Plaintiffs rely do not change this analysis.

In *Bearden v. Georgia*, the "question presented" was "whether a sentencing court can *revoke* a defendant's probation for failure to pay the imposed fine and restitution, absent evidence and findings that the defendant was somehow responsible for the failure or that alternative forms of punishment were inadequate."

---

[10] Oral Arg., eSC16-1785, Video at 17:50-18:08 (Mar. 6, 2017).

461 U.S. 660, 665 (1983) (emphasis added). In other words, the defendant in *Bearden* had already received, and therefore had a protected interest in, a vested right to be free from incarceration. That vested right, in turn, could not be "revoked" based solely on an inability to pay. *See id.* As discussed above, however, the Plaintiffs here, all of whom surrendered their right to vote, have no claim to a fundamental right that would levy up the constitutional scrutiny beyond rational basis, a fact that Justice O'Connor, who authored both *Bearden* and *Harvey*, recognized: The Plaintiffs here however, all surrendered their right to vote, and therefore have no fundamental right that would levy up the constitutional scrutiny beyond rational basis.  This is a fact that Justice O'Connor, who authored both *Bearden* and *Harvey*, recognized—"What plaintiffs are really complaining about is the denial of the statutory benefit of re-enfranchisement . . . ." *Harvey*, 605 F.3d at 1079;[11] *see also Bredesen*, 624 F.3d at 759 ("With its differing standard of review, *Bearden* bears little on our analysis here."). In any event, the Eleventh Circuit has since interpreted *Bearden* as a case that drew a distinction between imprisonment and other forms of punishment. *See United States v. Johnson*, 983 F.2d 216, 220 (11th Cir. 1993).[12]

---

[11] Although *Harvey* did not address whether requiring payment of fines and restitution from those unable to do so would be constitutional, Justice O'Connor's opinion made plain that the "*rational basis test*" would nonetheless apply. *Harvey*, 605 F.3d at 1080.

[12] *Griffin v. Illinois*, 351 U.S. 12 (1956), another case on which the Plaintiffs rely, has similarly been limited to the narrow context in which it arose—access to the judicial process—and no court has ever extended it beyond this arena. To the

The Plaintiffs' reliance on *M.L.B. v. S.L.J.*, 519 U.S. 102 (1996), does not help them either. In dicta,[13] *M.L.B.* stated that "[t]he basic right to participate in political processes as voters and candidates cannot be limited to those who can pay for a license." *Id.* at 124. But neither Senate Bill 7066 nor Amendment 4 create a voting-licensure scheme; instead, these provisions limit re-enfranchisement to those felons who have paid their entire debt to society, which only incidentally makes it more difficult for those with higher legal financial obligations to qualify. The cases on which *M.L.B.* relied for this dictum, all involved a generally applicable fee directly tied to voting or ballot access. These include *Harper v. Virginia Board of Elections*, 383 U.S. 663, 664, 666 (1966), which invalidated, "as a denial of equal protection, an annual $1.50 poll tax"; *Bullock v. Carter*, 405 U.S. 134, 135, 145, 149 (1972), which invalidated a Texas scheme under which candidates for local office had to pay fees "as high as $8,900" to get on the ballot; and *Lubin v. Panish*, 415 U.S. 709, 710, 718 (1974), which invalidated a "California statute requiring payment of a ballot-

---

contrary, numerous Supreme Court cases have cabined its application to the judicial-process access. *See, e.g.*, *Christopher v. Harbury*, 536 U.S. 403, 413 (2002); *Lewis v. Casey*, 518 U.S. 343, 354 (1996); *Kadrmas v. Dickinson Pub. Schs.*, 487 U.S. 450, 460 (1988); *accord Bush v. Sec'y, Fla. Dep't of Corr.*, 888 F.3d 1188, 1197 (11th Cir. 2018).

[13] As the Court recognized, ECF No. 207, at 31, dictum is a statement unnecessary to the decision in a case. *M.L.B.*'s stray sentence related to the level of scrutiny in voting cases was plainly not necessary to determine the standard of review for purposes of the parental-rights question at issue in that case. *See* 519 U.S. at 106-07; *see also United States v. Birge*, 830 F.3d 1229, 1231 (11th Cir. 2016) (obligation to follow earlier decisions "applies only to holdings, not dicta").

access fee fixed at a percentage of the salary for the office sought." None of these cases involved felons who had surrendered their right to vote.

This distinction also demonstrates why Senate Bill 7066 (and Amendment 4) differs from the hypothetical in the Court's October 18, 2019 Order, which asked whether it would be constitutional to re-enfranchise felons "with a net worth of $100,000 or more but no other felons." ECF No. 207, at 34. The answer is no, but Senate Bill 7066 (or Amendment 4) does not suffer from the same defect. The hypothetical posed by the Court would explicitly and directly impose a condition on felon re-enfranchisement that is both wholly divorced from satisfaction of a criminal sentence and bears no relationship to any legitimate state interest. Senate Bill 7066 (and Amendment 4), in contrast, demands only that a felon satisfy each part of his criminal sentence before he regains his right to vote, including the punitive (in the case of fines) and compensatory (in the case of restitution) financial aspects of it. Based on the analysis above, this demand is rational, and the indirect, incidental, felon-specific financial imposition does not render Senate Bill 7066 (or Amendment 4) irrational.

Finally, footnote 1 from the Eleventh Circuit's *en banc* opinion in *Johnson* cannot bear the weight the Plaintiffs thrust upon it. The *Johnson* footnote states that "[a]ccess to the franchise cannot be made to depend on an individual's financial resources." *Johnson*, 405 F.3d at 1216 (citing *Harper*, 383 U.S. at 668). But neither

24

Senate Bill 7066 nor Amendment 4 makes a person's ability to exercise the fundamental right to vote contingent upon financial resources. Instead, by requiring felons to comply with each part of their criminal sentences before regaining a right they all have forfeited, both Senate Bill 7066 and Amendment 4 condition a State re-enfranchisement upon satisfaction of the full measure of justice they owe based on the felonies they have committed. For this reason, the Plaintiffs' reliance on the *Johnson* footnote is as misplaced as their reliance on *Harper*'s poll-tax holding (which is the sole precedent cited in the *Johnson* footnote). At any rate, *Johnson* expressly disclaimed deciding whether Florida's clemency process would be constitutional if it *did* condition access on payment of restitution, so it cannot compel a ruling in favor of the Plaintiffs here.

**E.** In any event, a felon facing difficulty in satisfying his legal financial obligations has other avenues through which he may regain access to the franchise. A criminal defendant who, for example, attests under oath that he lacks the "financial ability to pay [an] obligation" may request that a court "convert the statutory financial obligation into a court-ordered obligation to perform community service." Fla. Stat. § 938.30(2) And the Florida Statutes expressly allow courts to "terminat[e] . . . any financial obligation to a payee" (assuming the payee approves). Fla. Stat § 98.751(2)(a)5.e(I)–(III).

Most critically, though, felons may avail themselves of Florida's clemency process. Indeed, the Court recognized that "[t]he process available to the *Johnson* plaintiffs was an application to the Executive Clemency Board." ECF No. 207, at 36. And since the time of the Court's order, the Executive Clemency Board has voted to remove a pre-existing requirement that felons satisfy any outstanding restitution before they may seek restoration of their civil rights, including the right to vote. *See* FLA. R. EXEC. CLEMENCY 5(E), 10(A) (Jan. 21, 2020), *available at* https://bit.ly/30JlFBm. The State's clemency rules now mirror those in *Johnson* in all meaningful respects, which led the Eleventh Circuit to hold that Florida "does not deny access to the restoration of the franchise based on ability to pay." 405 F.3d at 1216-17 n.1.

Thus, the Plaintiffs' wealth-based discrimination claims fail.

### ii.    Senate Bill 7066 was not an act of intentional race discrimination.

Next, the *Gruver* Plaintiffs (but no others) allege that Senate Bill 7066 "was enacted, at least in part, with a racially discriminatory intent to discriminate against Black returning citizens in violation of the U.S. Constitution." *See* Compl. ¶ 171, *Gruver v. Barton*, No. 4:19-cv-302 (N.D. Fla.). In their view, "[t]he history underlying Florida's felony disenfranchisement regime, the known and reasonably foreseeable discriminatory impact of" Senate Bill "7066, the sequence of events and substantive departures from the normal legislative process which resulted in the

enactment of" Senate Bill "7066, and the tenuousness of the state justifications for" Senate Bill "7066 raise a strong inference of a discriminatory purpose in violation of the Fourteenth and Fifteenth Amendments." *Id.* ¶ 172.

To prevail on an intentional-discrimination equal-protection challenge to a facially neutral law, the Plaintiffs "must prove both discriminatory impact and discriminatory intent or purpose." *Lewis v. Governor of Ala.*, 896 F.3d 1282, 1294 (11th Cir. 2018) (citing *I.L. v. Alabama*, 739 F.3d 1273, 1286 (11th Cir. 2014)). In this context, "[d]iscriminatory intent means that racial discrimination was a substantial or motivating factor behind enactment of the law." *Id.* "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). The Eleventh Circuit has instructed that courts "may consider the racial impact of the official action, the historical background of the decision, the specific sequence of events leading up to the challenged decision, procedural or substantive departures from the normal sequence, and legislative or administrative history." *Stout v. Jefferson Cty. Bd. of Educ.*, 882 F.3d 988, 1006 (11th Cir. 2018) (quoting *Vill of Arlington Heights*, 429 U.S. at 266-68) (internal quotation marks omitted).

The evidentiary record reveals that the enactment of Senate Bill 7066 was not motivated in any part by invidious racial discrimination. Because there is no genuine

issue of material fact with regard to this claim, the Defendants are entitled to judgment as a matter of law.

*First*, the impact of Senate Bill 7066 is precisely the same as the impact of Amendment 4 itself—previously, former felons could only regain their right to vote through the clemency process, and now they can regain their right to vote by satisfying all the terms of their criminal sentence. Because Senate Bill 7066 imposes the same requirement that all former felons satisfy their legal financial obligations, and because nothing in the record even suggests that Amendment 4 was motivated by intentional race discrimination,[14] it follows that the impact of Senate Bill 7066 does not suggest that its passage was motivated by racial animus.

*Second*, nothing in the record suggests that either "the historical background" of Senate Bill 7066, "the specific sequence of events leading up to" Senate Bill 7066, or the "Legislative history" of Senate Bill 7066 evidences intentional race discrimination. In fact, the opposite is true. As discussed above, Desmond Meade, who was instrumental in passage of Amendment 4 and lobbied for the FRCC before the Florida Legislature, does not know of any person who acted with discriminatory intent against racial minorities. 1/14/2020 Desmond Meade Dep. Tr. 119:4-9 (Ex.

---

[14] In fact, some of the organizations involved on the Plaintiffs' side in this lawsuit implored voters to support Amendment 4 while acknowledging that Amendment 4 itself would only re-enfranchise former felons upon repayment of restitution. Those organizations were presumably not motivated by racial animus, despite the claims brought here.

A). He further testified that the House Sponsor (Rep. Grant) and the Senate Sponsor (Sen. Brandes) had a "genuine intent to try to get this right." *Id*. at 119:13-17 (Ex. A).

A number of corporate representatives from the Plaintiffs organizations also provided deposition testimony, and not one could name any person or provide any direct evidence to support their belief that Senate Bill 7066's passage was motivated by racial animus. Beverlye Neal, the President of the NAACP's Orange County Branch, testified that she could not speak to the intentions of the Florida Senate President, its Speaker of the House, or any particular State legislator. *See* ECF No. 264-5The same is true of Marsha Ellison, the Treasurer for the Florida State NAACP Conference. *See* 1/24/2020 Marsha Ellison Dep. Tr. 26:19-3; 27:10-23; 28:3-10 (Ex. B). The testimony of Cecile Scoon, who testified on behalf of the League of Women Voters, is in accord. *See* 1/24/2020 Cecile Scoon Dep. Tr. 82; 83:14-24; 85:11-18; 90:1-8 (Ex. C).

*Third*, there have been no "[p]rocedural or substantive departures from the normal sequence" as Senate Bill 7066 was progressing through the legislative process. Discovery reveals no deviation from the way in which any other legislation of moment percolated through the lawmaking branch of Florida government.

In the end, the Plaintiffs' real issue is with the felony disenfranchisement carried forward in Article VI, Section 4 of the Florida Constitution, rather than the

conditional re-enfranchisement that Amendment 4 and Senate Bill 7066 implement. To varying degrees, the amended complaints imply that the provisions of Senate Bill 7066 (and by extension, Amendment 4) somehow carry forward a "history" of alleged discrimination that led to felony disenfranchisement in the first place. *See, e.g.*, Am. Compl. ¶ 2, *McCoy v. DeSantis*, No. 4:19-cv-304 (N.D. Fla.) (alleging that "[t]he State of Florida has a very long and storied history of denying poor people, racial minorities, and women the right to vote.").[15] But such generalized allegations fail as a matter of law to prove their intentional-discrimination claim. As the Eleventh Circuit recognized in *Johnson*, "Florida's felon disenfranchisement provision [in Article VI, Section 4] is constitutional because it was substantively altered and reenacted in 1968 in the absence of any evidence of racial bias." 405 F.3d at 1225. There is no basis—historical or otherwise—to suggest that Amendment 4 and Senate Bill 7066, which serve to ameliorate the effects of felony disenfranchisement in Florida, are the products of discriminatory intent.

Thus, an analysis of the foregoing factors establishes that Senate Bill 7066 was not enacted, in whole or in part, to intentionally discriminate against anyone. Because there exists no genuine issue of material fact as to this claim, summary judgment in favor of the Defendants is appropriate.

---

[15] *See also* 1/24/2020 Cecile Scoon Dep. Tr. 74-81 (Ex. C).

### iii. Senate Bill 7066 does not violate any statewide uniformity requirement articulated in *Bush v. Gore*.

Finally, the *Gruver* Plaintiffs (but no others) argue that Senate Bill 7066 "fails to provide adequate guidance for uniform statewide implementation by Florida counties," and, accordingly, it violates the Equal Protection Clause because the question whether former felons "are allowed to vote will rely on arbitrary decisions made county by county." Am. Compl. ¶ 130, *Gruver v. Barton*, No. 4:19-cv-302 (N.D. Fla.). There only support for this claim is the U.S. Supreme Court's *Bush v. Gore* decision. *See* 531 U.S. 98. It fails as a matter of law.

The U.S. Supreme Court has sharply limited *Bush v. Gore*'s precedential significance "to the . . . circumstances" giving rise to that case, because, among other reasons "the problem of equal protection in election processes generally presents many complexities." 531 U.S. at 109. And the Court precisely identified those circumstances as "a situation where a state court with the power to assure uniformity has ordered a statewide recount with minimal procedural safeguards." *Id.* "When a court orders a statewide remedy," the Court explained, "there must be at least some assurance that the rudimentary requirements of equal treatment and fundamental fairness are satisfied." *Id.* That is a far cry from the situation presented in this case—the Plaintiffs' challenge to a generally applicable felon re-enfranchisement statute.

31

Courts have heeded this warning and avoided expanding *Bush v. Gore*'s precedential reach. In *Lemons v. Bradbury*, 538 F.3d 1098 (9th Cir. 2008), a group of Oregon voters claimed that the state's "procedures for verifying referendum petition signatures violated their equal protection and due process rights." *Id*. at 1100. A three-judge panel of the Ninth Circuit unanimously rejected the argument that the absence of specific and objective guidance on how to determine whether two signatures match meant "that county elections officials lack[ed] uniform statewide rules for verifying referendum signatures," in violation of *Bush v. Gore*. *Id*. at 1102. The court concluded that, "[e]ven were *Bush* applicable to more than the one election to which the [Supreme] Court appears to have limited it, Oregon's standard for verifying referendum signatures would be sufficiently uniform and specific to ensure equal treatment of voters." *Id*. at 1106. This was because "[t]he Secretary uniformly instructs county elections officials to verify referendum signatures by determining whether each petition signature matches the signature on the signer's voter registration card," and "all counties refused to consider extrinsic evidence" beyond the referendum and voter card signatures. *Id*. Moreover, *Lemons* rejected the plaintiffs' argument that "differences in the number of signatures rejected by various counties" demonstrated "the absence of a uniform standard," noting that, "[m]ost importantly, uniform standards can produce different results." *Id*. at 1106-07.

The same reasoning applies here. Senate Bill 7066 imposes a standard that applies uniformly to every former felon in the State who desires to regain access to the franchise. Specifically, each and every former felon must fully pay all "restitution ordered to a victim by the court as a part of the sentence" and fully pay all fines or fees ordered by the court as a part of the sentence or that are ordered by the court as a condition of any form of supervision." Fla. Stat. § 98.0751(2)(a)5.a–5.b. At most, the *Gruver* Plaintiffs have alleged that some counties *might* apply different standards for determining whether a particular former felon has in fact repaid his or her legal financial obligations when records are less than clear. This does not establish "the absence of a uniform standard," in violation of *Bush v. Gore*. *See Lemons*, 538 F.3d at 1106-07. This is mere speculation.

Thus, the Defendants are entitled to judgment as a matter of law on the *Gruver* Plaintiffs' *Bush v. Gore* claim.

### B. Senate Bill 7066 does not impose any tax on the right to vote, in violation of the Twenty-Fourth Amendment.

Next, all the Plaintiffs allege that requiring them to satisfy their legal financial obligations before they are re-enfranchised violates the Twenty-Fourth Amendment. Section 1 of the Twenty-Fourth Amendment provides:

> The right of citizens of the United States to vote in any primary or other election for President or Vice President, for electors for President or Vice President, or for Senator or Representative in Congress, shall not be denied or abridged by the United States or any State by reason of failure to pay any poll tax or other tax.

U.S. Const. amend. XXIV.[16]

The Court has already recognized that "Florida has not . . . explicitly imposed a poll tax," ECF No. 207, at 40. It also observed that every court to consider whether a *preexisting* financial obligation, unrelated to voting, violates the Twenty-Fourth Amendment has answered that question in the negative. *Id.* (citing *Bredeson*, 624 F.3d at 751; *Harvey*, 605 F.3d at 1080; *Thompson v. Alabama*, 293 F. Supp. 3d 1313, 1332-33 (M.D. Ala. 2017); *Coronado v. Napolitano*, No. cv-07-1089-PHX-SMM, 2008 WL 191987, at *4-*5 (D. Ariz. Jan. 22, 2008)). And finally, the Court has held that some legal financial obligations (fines and restitution) "plainly are not taxes." ECF No. 207, at 42.

In the Court's view, though, "[t]he issue is much closer for other amounts routinely assessed against Florida criminal defendants," *id.*—namely, costs and fees. But because (1) the Twenty-Fourth Amendment does not apply because felons have no voting rights to infringe, and because (2) court costs and fees are not "other taxes"

---

[16] Section 2 gives Congress the "power to enforce this article by appropriate legislation," which Congress exercised by enacting 52 U.S.C. § 10306. In Section 10306, Congress defined a poll tax as one that (1) "precludes persons of limited means from voting or imposes unreasonable financial hardship upon such persons as a precondition to their exercise of the franchise," (2) "does not bear a reasonable relationship to any legitimate State interest in the conduct of elections," and (3) "in some areas has the purpose or effect of denying persons the right to vote because of race or color." 52 U.S.C. § 10306(a).

for purposes of the Twenty-Fourth Amendment, the question the Court refrained from deciding should now be decided in favor of the Defendants.

### i. Because the Plaintiffs have surrendered their right to vote by virtue of their felonies, the Twenty-Fourth Amendment does not apply to them.

The Twenty-Fourth Amendment provides that "[t]he right . . . to vote . . . shall not be *denied* or *abridged* . . . by reason of failure to pay any poll tax or other tax." U.S. Const. amend. XXIV. If the Twenty-Fourth Amendment is to apply, then, the Plaintiffs must possess a "right . . . to vote" that can "be denied or abridged." *Id.* They do not currently have this right. As the U.S. Supreme Court, the Eleventh Circuit, and this Court all recognize, they have forfeited the franchise and they may not reenter it until they satisfy the requirements the State has created.

Thus, neither Senate Bill 7066 nor Amendment 4 "den[ies] or abridge[s] any rights; it only restores them." *Bredesen*, 624 F.3d at 751. And "[h]aving lost their right to vote, [the Plaintiffs] now have no cognizable Twenty-Fourth Amendment claim until their voting rights are restored." *Harvey*, 605 F.3d at 1080. The way in which Florida has chosen to re-enfranchise felons does not condition the "right to vote" on payment of costs or fees; it conditions the "*restoration* of a felon's right to vote" on satisfaction of all debts owed by virtue of a criminal sentence. *Bredesen*, 624 F.3d at 751 (emphasis added). This is "a state regulatory arrangement the Twenty-Fourth Amendment says nothing about." *Id.*

Indeed, the existence of a preexisting right to vote permeates the U.S. Supreme Court's seminal Twenty-Fourth Amendment case. In *Harman v. Forssenius*, 380 U.S. 528, 539 (1965), the Court recounted the history leading to the Twenty-Fourth Amendment's ratification. In so doing, the Court noted that "Congressional hearings and debates indicate a general repugnance to the *disenfranchisement* of the poor occasioned by failure to pay the tax." *Id.* (emphasis added). The Court also observed that "[i]t has long been established that a State may not impose a penalty upon those who *exercise a right* guaranteed by the Constitution." *Id.* at 540. Finally, the Court announced that, "in order to demonstrate the invalidity of" an election law under the Twenty-Fourth Amendment, "it need only be shown that it imposes a material requirement solely upon those who *surrender their constitutional right to vote* in federal elections without paying a poll tax." *Id.* at 541.

Senate Bill 7066 does not run afoul of any principle announced in *Harman*. It does not "disenfranchise[] . . . the poor"; instead, it provides a way for felons to regain the franchise they lost by virtue of their felonies. It does not "impose a penalty upon those who exercise a right guaranteed by the Constitution"; the Plaintiffs do not have a right to vote that Senate Bill 7066 could infringe. Simply put, it is not forcing the Plaintiffs or any felon to "surrender their constitutional right to vote"; their forfeiture of this right occurred long before Senate Bill 7066 was enacted.

36

All courts to have addressed this issue concluded that, "[h]aving lost their right to vote, they now have no cognizable Twenty-Fourth Amendment claim until their voting rights are restored." *Harvey*, 605 F.3d at 1080.[17] The Court should agree, and grant judgment in favor of the Defendants on the Plaintiffs' Twenty-Fourth Amendment claims.

### ii. Requiring the Plaintiffs to satisfy their legal financial obligations does not constitute imposition of a "tax."

Even assuming that the Plaintiffs could avail themselves of the Twenty-Fourth Amendment, the requirement that all felons satisfy their fines, restitution, and fees does not constitute the imposition of any "other tax." As this Court has already found, fines and restitution "plainly" do not fall under the "standard definition of a tax." ECF No. 207, at 42. The primary purpose of the former "is to punish the offender"; the latter "is intended to compensate the victim, not raise revenue for the government." *Id.*

---

[17] *See also Howard v. Gilmore*, No. 99-2285, 2000 WL 203984, at *2 (4th Cir. Feb. 23, 2000) ("[I]t is not [the felon's] right to vote upon which payment of a fee is being conditioned; rather, it is the restoration of his civil rights upon which the payment of a fee is being conditioned."); *Thompson v. Alabama*, 293 F. Supp. 3d 1313, 1332–33 (M.D. Ala. 2017) (citing *Bredesen* and *Harvey* as persuasive authority in concluding that the requirement of full payment of criminal fines, court costs, fees, and restitution as a condition for re-enfranchisement did not impose a poll tax); *Coronado v. Napolitano*, No. 07-1089, 2008 WL 191987, at *4-*5 (D. Ariz. Jan. 22, 2008) (explaining that "no right to vote exists for a poll tax to abridge because Plaintiffs were disenfranchised by reason of their convictions").

The Court found the issue of fees to be "much closer." *Id.* But, as the Plaintiffs have conceded, *see* ECF No. 84, ¶ 70, the only fees that could prevent re-enfranchisement are those assessed as part of a criminal sentence. Indeed, the plain terms of Senate Bill 7066 confirm this: "'[c]ompletion of all terms of sentence' means any portion of a sentence that is contained in the four corners of the sentencing document." Fla. Stat. § 98.0751(2)(a). For this reason, there is no conceptual reason for the Court to treat the fees that need to be satisfied before re-enfranchisement occurs different from the fines or restitution that need to be satisfied.

In any event, the Plaintiffs' unpaid fees are not in any way tied to access to the franchise, and they were not imposed to exact "a penalty upon those who exercise a right guaranteed by the Constitution." *Harman*, 380 U.S. at 540. Because Plaintiffs "themselves incurred" these fees by virtue of their felonies, and these fees are assessed against every person charged and eventually held responsible for a felony, these fees do not fall under the Twenty-Fourth Amendment's prohibition on imposition of an "other tax" that prevents access to the franchise. By virtue of their convictions and sentences, the Plaintiffs would owe these financial obligations regardless of whether they ever sought to vote.

During the preliminary injunction hearing, the Court inquired whether the fees covered by Senate Bill 7066 constitute "taxes," as that word has been defined in *National Federation of Independent Business v. Sebelius*, 567 U.S. 519 (2012). In

38

that case, the U.S. Supreme Court held that the Affordable Care Act's individual mandate "penalty" bore the hallmarks of a tax because:

- "The '[s]hared responsibility payment,' as the statute entitles it, is paid into the Treasury by 'taxpayer[s]' when they file their tax returns";

- "It does not apply to individuals who do not pay federal income taxes because their household income is less than the filing threshold in the Internal Revenue Code";

- "For taxpayers who do owe the payment, its amount is determined by such familiar factors as taxable income, number of dependents, and joint filing status";

- The requirement to pay is found in the Internal Revenue Code and enforced by the IRS, which . . . must assess and collect it "in the same manner as taxes";

- "This process yields the essential feature of any tax: It produces at least some revenue for the Government."

*Id.* at 563-64.

In contrast, the fees that felons must repay are imposed against those who are adjudicated guilty of a felony or have adjudication withheld for that felony; they do not apply generally to everyone charged with a crime or tried for a crime. In other words, individual are not made to pay a fee if they are acquitted of the crime for which they are charged.

To fall under Senate Bill 7066, moreover, they must be imposed by a judge as a part of the criminal justice system and included in the sentencing document. The collection of these fees is handled by the court clerks—not state or local tax

departments. And the amount owed is not tied to any sort of taxable factors; instead, the amounts are, for the most part, set by statute and keyed to the service used by the criminal defendant. Failure to pay a fee does not trigger any tax consequence. And, of course, these fees have nothing to do with the State's elections system or voter registration. Senate Bill 7066 (and Amendment 4 itself) imposes no tax.

Thus, in short, Senate Bill 7066 (and Amendment 4, for that matter) require nothing beyond satisfaction of the criminal sentences that were imposed on the Plaintiffs before the Plaintiffs regain the right to participate in the voting process. And this point is critical in explaining why, for instance, this case differs from the hypothetical law posed by the Court in its October 18, 2019 order—"[a] law allowing felons to vote in federal elections but only upon payment of a $10 poll tax would obviously violate the Twenty-Fourth Amendment." ECF No. 207, at 40. A generally applicable $10 fee to vote, wholly divorced from anything other than access to the franchise, would be an unconstitutional arbitrary and irrational law. But because Senate Bill 7066 requires only that each felon repay their debt to society, as that debt is established by their respective sentencing documents, Senate Bill 7066's fee-repayment obligation does not run afoul of the Twenty-Fourth Amendment (even assuming it applies).

C.    **Senate Bill 7066 does not violate the Due Process Clause of the Fourteenth Amendment.**

Next, the Plaintiffs allege that, for a variety of reasons, Senate Bill 7066 violates the Fourteenth Amendment's Due Process Clause.

i.    **Senate Bill 7066 provides felons with all the process they are due under the Fourteenth Amendment.**

The Plaintiffs allege, first, that the way in which Senate Bill 7066 might be administered has the potential to cause an erroneous deprivation of the right to vote, in violation of their procedural due process rights. Procedural Due Process claims are examined under the test articulated in *Matthews v. Eldridge*, 424 U.S. 319, 335 (1976). Under the *Matthews* test, the Court must "consider the private interests at stake in a governmental decision, the governmental interests involved, and the value of procedural requirements in determining what process is due under the Fourteenth Amendment." *Washington v. Harper*, 494 U.S. 210, 229 (1990).

The Court has already recognized that, "[u]nder current Florida procedure, a felon who asserts eligibility to vote is entitled to a hearing before the Supervisor of Elections," and "[a] felon dissatisfied with the Supervisor's decision may initiate a de novo proceeding in state circuit court, complete with full due process." ECF No. 207, at 45. In the Court's view, "[t]his is constitutionally sufficient, so long as all material factual disputes are in play at the hearing," and "[t]he Due Process Clause does not preclude the State from placing the burden of going forward at the hearing, and even the burden of proof, on the felon." *Id.* Based on these conclusions

and the work that the Department of State has conducted (and is continuing to conduct), the Defendants are entitled to judgment as a matter of law on the Plaintiffs' procedural due process claims.

### ii.    Senate Bill 7066 is not unconstitutionally vague.

This Court has already considered whether Senate Bill 7066 "is unconstitutionally vague," and the Court has concluded that "[i]t is not." ECF No. 207, at 49. As discovery has progressed, nothing has changed that would counsel in favor of revisiting this determination. Thus, the Court should adhere to the earlier conclusion, and grant summary judgment in favor of the Defendants.

### iii.   Senate Bill 7066 does not violate any notions of fundamental fairness.

The *Gruver* Plaintiffs and the *McCoy* Plaintiffs allege that "[t]he Due Process and Equal Protection Clauses of the Fourteenth Amendment prohibit states from imposing punishment for non-payment of [legal financial obligations] without a prior determination that the individual was able to pay and willfully refused to do so." Compl. ¶ 93, *Gruver v. Barton*, No. 4:19-cv-302 (N.D. Fla.); *see also* Compl. ¶ 86, *McCoy v. DeSantis*, No. 4:19-cv-304 (N.D. Fla.). In their view, "[t]he Fourteenth Amendment's doctrine of fundamental fairness prevents states from punishing individuals if they fail to do the impossible—satisfy legal financial obligations when they do not have the means to do it." *Id.* ¶ 93 (citing *M.L.B.*, 519 U.S. 102; *Bearden*, 461 U.S. 660; *Tate v. Short*, 401 U.S. 395 (1971); *Mayer v. City*

*of Chicago*, 404 U.S. 189 (1971); *Williams v. Illinois*, 399 U.S. 235 (1970); *Griffin v. Illinois*, 351 U.S. 12 (1956)). Thus, they allege that Senate Bill "7066 violates the Equal Protection and Due Process Clauses of the Fourteenth Amendment by disqualifying Plaintiffs from voting solely for failure to pay outstanding" legal financial obligations "despite the fact that (1) they are unable to pay, and (2) there has been no prior determination that they willfully refuse to pay." *Id.* ¶ 97; *see also id.* ¶ 98 (Senate Bill "7066 violates the Fourteenth Amendment by conditioning Plaintiffs' right to vote on payment of" legal financial obligations "that Plaintiffs cannot pay").

This claim appears to mirror the wealth-discrimination claim addressed above. And for the reasons discussed above, cases like *M.L.B.*, *Bearden*, *Tate*, *Mayer*, *Williams*, and *Griffin* do not make it constitutionally impermissible for the State to require felons to repay the full measure of their debt to society (including their financial obligations) before they are welcomed back to the franchise, even if some individuals are not in a position to do so. In any event, Senate Bill 7066 does not "punish[]" felons "for non-payment" of their legal financial obligations; instead, it further sets out the same parameters that Amendment 4 creates for access to the

State-created benefit of felon re-enfranchisement. For these reasons, the Defendants are entitled to summary judgment on these claims.[18]

### D. Senate Bill 7066 does not violate the Nineteenth Amendment.

The *McCoy* Plaintiffs (but no others) have argued that Senate Bill 7066 violates the Nineteenth Amendment, which states that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of sex." U.S. Const. Amend. IXX. In the view of the *McCoy* Plaintiffs, Senate Bill 7066 violates this provision because "[w]omen of color who complete prison and probation have fewer employment opportunities and, therefore, lack the same economic resources and ability to satisfy [legal financial obligations] as their male and white female counterparts." Am. Compl. ¶ 98, *McCoy v. DeSantis*, No. 4:19-cv-00304 (N.D. Fla.).

Just as "[t]he Fifteenth Amendment prohibits a State from denying or abridging" the right to vote of racial minorities, "[t]he Nineteenth Amendment does the same for women." *Mobile v. Bolden*, 446 U.S. 55, 128 (1980), *superseded by statute on other grounds*.[19] And because "racially discriminatory motivation is a

---

[18] The *McCoy* Plaintiffs' allegation that they are entitled to hearing at which they "have notice and an opportunity to be heard" regarding their "ability to pay" is premised on the idea that their ability to pay has constitutional significance. *See* Compl. ¶ 90-91, *McCoy v. DeSantis*, No. 4:19-cv-304 (N.D. Fla.). Because it does not, it follows that they are not entitled to the hearing they demand.

[19] In *Mobile*, the Court held that the Voting Rights Act "was intended to have an effect no different from that of the Fifteenth Amendment itself." 446 U.S. at 61.

necessary ingredient of a Fifteenth Amendment violation," the *McCoy* Plaintiffs must demonstrate that discrimination on the basis of sex was a motivating factor in Senate Bill 7066's enactment. Nothing in the record remotely suggests that Senate Bill 7066 was enacted with the purpose of keeping women from the franchise. Thus, the *McCoy* Plaintiffs' Nineteenth Amendment claim fails as a matter of law.

> **E.    Because, under Amendment 4, felons have no right to vote until they satisfy their legal financial obligations, Senate Bill 7066 does not burden their right to vote and, accordingly, does not fail the *Anderson-Burdick* balancing test.**

The *Gruver* Plaintiffs (but no others) have alleged that Senate Bill 7066 runs afoul of the *Anderson-Burdick* balancing test, which, in certain voting-rights cases, asks a court to (1) "weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate'" against (2) "the precise interests put forward by the State as justifications for the burden imposed by its rule." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). *Anderson-Burdick*, however, applies only when evaluating "a law respecting the right to vote . . . ." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 204 (2008) (Scalia, J., concurring). Indeed, the *Gruver* Plaintiffs appear to recognize as much:

---

Congress subsequently amended the Voting Rights Act to allow discriminatory-impact claims. That does not change *Mobile*'s holding that a Fifteenth Amendment violation (and by extension, a Nineteenth Amendment violation) still requires proof of discriminatory motivation. And as discussed below, the Eleventh Circuit has foreclosed the argument that the Voting Rights Act applies to felon disenfranchisement and re-enfranchisement provisions.

"Plaintiffs are registered voters and have the fundamental right to vote." Compl. ¶ 115, *Gruver v. Barton*, No. 4:19-cv-302 (N.D. Fla.).

Their claim, however, assumes that Amendment 4 restored their right to vote before they satisfied their legal financial obligations, and that Senate Bill 7066 took their right away. That is incorrect. The Florida Supreme Court has confirmed that, under the plain text of Amendment 4, a felon's voting rights are *not* restored until he completes "'all terms of sentence'"—"not just durational periods but also *all* [legal financial obligations] imposed in conjunction with an adjudication of guilt," including fines, restitution, costs, and fees. *See Advisory Opinion to the Governor Re: Implementation of Amendment 4, The Voting Restoration Amendment*, 2020 WL 238556, at *1.

Simply put, felons in Florida have no claim of right to the franchise unless those rights are restored. Thus, Senate Bill 7066 does not "deny or abridge any rights; it only restores them." *Bredesen*, 624 F.3d at 751. Because a statute is only subject to *Anderson-Burdick* balancing if it affects the right to vote, the Plaintiffs lack of that right means that *Anderson-Burdick* does not apply, as a matter of law. Accordingly, the Defendants are entitled to summary judgment on this claim.

46

**F.      Senate Bill 7066 does not violate the First Amendment core political or associational rights of any organization.**

As an initial matter, "[i]t is well established in this Circuit that the First Amendment provides no greater protection for voting rights than is otherwise found in the Fourteenth Amendment." *Hand v. Scott*, 888 F.3d at 1210 (11th Cir. 2019). For that reason alone, the Plaintiffs' First Amendment claim must fail based on the Equal Protection analysis set out above.

To the extent certain Plaintiff organizations believe that their organizations' First Amendment rights have been violated, those claims also fail as a matter of law. Nothing about Senate Bill 7066 impedes their ability to recruit voters or associate with like-minded individuals; to the contrary, Senate Bill 7066 and Amendment 4 both provide a way in which *more* voters, as opposed to fewer, may access the franchise. And to the extent these Plaintiff organizations allege that it is difficult for them to identify the former felons who have satisfied their respective legal financial obligations and can register to vote, those claims fail for the same reason that the individual Plaintiffs procedural due process claims fail.

**G.      Because Senate Bill 7066 inflicts no punishment, it does not violate either the *Ex Post Facto* Clause or the Eighth Amendment.**

According to the *Gruver* and *McCoy* Plaintiffs, Senate Bill 7066 inflicts punishment that is not only unconstitutionally retroactive but also unconstitutionally cruel and unusual. A prerequisite of both claims is infliction of punishment. And

because Senate Bill 7066 inflicts no punishment, both the *Ex Post Facto* Clause claim and the Eighth Amendment Claim fail.

**A.** "[A]n *ex post facto* claim can only be successful if the law can be characterized as punishment in the constitutional sense." *Manocchio v. Kusserow*, 961 F.2d 1539, 1541 (11th Cir. 1992). Similarly, the Eighth Amendment "bans only cruel and unusual *punishment*." *Wilson v. Seiter*, 501 U.S. 294, 302 (1991) (quoting *Flemming v. Nestor*, 363 U.S. 603, 613 (1960) (emphasis added)). To determine whether a Senate Bill 7066 imposes punishment for purposes of the Ex Post Facto Clause and the Eighth Amendment the Court makes two inquires. *See Smith v. Doe*, 538 U.S. 84, 92 (2003). First, the Court looks to the legislative intent at the time of the challenged statute's passage, and if "the intention of the legislature was to impose punishment, that ends the inquiry." *Id.* To answer that question, courts assess "whether the legislature, in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other." *Hudson v. United States*, 522 U.S. 93, 99 (1997) (internal quotation marks and citation omitted). But if the legislature intended "to enact a regulatory scheme that is civil and nonpunitive," the court must consider "whether the statutory scheme is so punitive either in purpose or effect as to negate" the legislature's non-punitive intent. *Id.* (internal quotation marks omitted). " '[O]nly the clearest proof' will suffice to override legislative intent and transform what has been denominated a civil remedy

into a criminal penalty." *Hudson*, 522 U.S. at 100 (quoting *Ward*, 448 U.S. at 249). The non-exclusive and non-dispositive seven-factor analysis developed in *Kennedy v. Mendoza–Martinez*, guides this inquiry. *See* 372 U.S. 144, 168-69 (1963).

**B.** Nothing about Senate Bill 7066, by its plain terms or in the history of its enactment, suggests that the Florida legislature intended to punish anyone when it enacted Senate Bill 7066. Quite the opposite. This provision does not fall within any punitive provision of the Florida Code; instead, it is enumerated in a Title IX ("Electors and Elections"), and in Chapter 98 ("Registration Office, Officers, and Procedures"). By its plain text, it affects only voting rights—not state criminal law—and therefore is "obviously unrelated to punishment." *Bredesen*, 624 F.3d at 753. Senate Bill 7066 does no more than explicate the parameters of the re-enfranchisement provision that is now in the Florida constitution. All of the legal financial obligations the Plaintiffs need to satisfy were incurred long before Senate Bill 7066 existed, and all were imposed by virtue of their convictions for transgressing Florida's criminal statutes. Their disenfranchisement was not caused by Senate Bill 7066 either; that instead was caused by operation of Article VI, Section 4 of the Florida Constitution. The only thing that Senate Bill 7066 does is enable and articulate the way in which the Plaintiffs may avail themselves of a State-created benefit. That is, quite clearly, not punishment.

**C.** Because there is no discernable intent that Senate Bill 7066 was supposed to be punitive, the Plaintiffs' *Ex Post Facto* and Eighth Amendment claims fall if they cannot show that its operation is so punitive that it negates the Florida Legislature's intent. It does not. Neither Senate Bill 7066 nor Amendment 4 disenfranchise anyone. Instead, they re-enfranchise former felons who have fully paid their debt to society; the effect of both is restorative, not punitive.

At bottom, the Plaintiffs' *Ex Post Facto* and Eighth Amendment claims are premised on the idea that Amendment 4 "automatically restored" their voting rights, *see* Compl. ¶ 159, *Gruver v. Barton*, No. 4:19-cv-302 (N.D. Fla.), and that Senate Bill 7066 re-disenfranchised them. As discussed above, the Florida Supreme Court has made it clear that *Amendment 4* requires repayment of *all* legal financial obligations *before* voting rights are restored. For that fundamental reason, and those discussed above, Senate Bill 7066 inflicts no punishment, and it therefore cannot, as a matter of law, violate either the *Ex Post Facto* clause or the Eighth Amendment.

## III.    SENATE BILL 7066 DOES NOT VIOLATE ANY OTHER LEGAL PROVISION.

### A.    The Voting Rights Act does not apply to Senate Bill 7066.

According to the *Jones* and *Mendez* Plaintiffs (but no other Plaintiffs), Senate Bill 7066 violates the Voting Rights Act, because "it has and will have a disproportionate and negative impact on black and Hispanic citizens, and was enacted intentionally to slow down and reduce the number of black and Hispanic ex-felons from registering to vote." Count 3, *Jones v. DeSantis*, No. 4:19-cv-300 (N.D.

Fla.); Count 3, *Mendez v. DeSantis*, No. 4:19-cv-272 (N.D. Fla.). Not so. In *Johnson*, the *en banc* Eleventh Circuit concluded that "'Congress never intended the [VRA] to reach felon disenfranchisement provisions.'" *Thompson v. Alabama*, 293 F. Supp. 3d 1313, 1333 (M.D. Ala. 2017) (quoting *Johnson,* 405 F.3d at 1232 (en banc)).

*Johnson* reached this conclusion because, among other reasons, Congress's power "to enact proper enforcement legislation" under the Fourteenth and Fifteenth Amendment is conditioned on a "record of constitutional violations." *Johnson*, 405 F.3d at 1231. And "when Congress enacted the VRA and its subsequent amendments, there was a complete absence of congressional findings that felon *disenfranchisement* laws were used to discriminate against minority voters." *Id.* Because the Congressional record is similarly devoid of any findings that felon *re-enfranchisement* laws have been used to discriminate against minority voters, *Johnson*'s VRA holding controls. To the extent the *Jones* and *Mendez* Plaintiffs allege intentional race discrimination, this component of their VRA claim fails for the same reasons their Equal Protection argument fails—the record is devoid of any suggestion that Senate Bill 7066 was passed to intentionally discriminate against minority former felons. For these reasons, the Court should find that the VRA does not apply and grant judgment as a matter of law in favor of the Defendants on these counts.

51

**B.    Senate Bill 7066 does not violate the National Voter Registration Act, 52 U.S.C. §§ 20501 *et seq*.**

According to the *Raysor* and the *Gruver* Plaintiffs, Senate Bill 7066 "amended the uniform statewide voter registration form and voter registration system in a manner that violates the National Voter Registration Act," (the "NVRA"). *See* Compl. ¶¶ 46-31, *Raysor v. Lee*, No. 4:19-cv-00301 (N.D. Fla.); *Gruver v. Barton*, No. 4:19-cv-302 (N.D. Fla.). Specifically, the *Raysor* Plaintiffs allege the following three purported violations of the NVRA:

1. The form mandated by Senate Bill 7066 does not adequately instruct on voter eligibility requirements;

2. The felony affirmation questions required by Senate Bill 7066 exceed the minimum amount of information needed for the State to avoid duplicate registrations and to assess eligibility; and

3. There is lacking a meaningful and uniform process for ascertaining legal financial obligations and, as a result, eligibility.

The Defendants are entitled to judgment as a matter of law on these claims.

**i.    The *Raysor* Plaintiffs failed to comply with the notice requirement and otherwise lack standing to pursue their claims under the National Voter Registration Act, 52 U.S.C. §§ 20501 et seq. ("NVRA").**

The *Raysor* Plaintiffs not only failed to comply with the notice requirement, they also lack standing to pursue their claims under the NVRA. 52 U.S.C § 20510(b) prescribes the requisites for a private right of action under the NVRA, and those requisites include a 90-day notice period. Specifically, "[a] person who is aggrieved

by a violation of this chapter may provide written notice of the violation to the chief
election official of the State involved." Subsection (2) then provides that:

> [i]f the violation is not corrected within 90 days after receipt of a notice
> under paragraph (1) . . . the aggrieved person may bring a civil action
> in an appropriate district court for declaratory or injunctive relief with
> respect to the violation.

52 U.S.C. 20510(b)(2). Although subsection (1) at first blush utilizes the permissive
"may," read in conjunction with the remainder of the subsection (b) provisions
related to the correction period prior to suit, notice is mandatory. *See also Scott v.
Schedler*, 771 F. 3d 831, 835 (5th Cir. 2014).

The *Raysor* Plaintiffs provided their statutorily required notice via a letter
emailed on October 29, 2019, days before they filed their Second Amended
Complaint, which raised an NVRA claim for the first time. Recognizing their
noncompliance with the notice requirement of the NVRA, they sought a stipulation
from the Defendants that they were entitled to rely on separate notice provided by
the *Gruver* Plaintiffs in June of 2019. Counsel for the Secretary declined to make
such a stipulation, instead simply acknowledging that the deadline for filing
amended complaints was approaching and indicating that the Defendants would
respond to the legality of any such amended claims in due course.

Having failed to satisfy this notice requirement, the *Raysor* Plaintiffs did not
acquire standing on the NVRA claims and the Defendants are therefore entitled to
summary judgment on these claims. *See Ga. State Conference of NAACP v. Kemp*,

53

841 F. Supp 2d 1320, 1335 (N.D. Ga. 2012) ("No standing is therefore conferred if no proper notice is given, since the 90–day period never runs.").

Even if notice by the *Gruver* Plaintiffs was legally sufficient for the *Raysor* Plaintiffs to rely upon (and it is not), the record is undisputed that one of the *Raysor* Plaintiffs, Lee Hoffman, was not himself aggrieved by any of the three alleged violations of the NVRA that he asserts. This is because the alleged violations go to the registration form subsequent to Senate Bill 7066 as well as the process by which the *Raysor* Plaintiffs believe the State will ascertain outstanding legal financial obligations. However, Lee Hoffman registered to vote prior to any requirements of Senate Bill 7066 coming into effect. As such, he was not aggrieved by any new registration requirements.

The Sixth Circuit in *Schedler* held that notice under the NVRA is individually required and a plaintiff is not entitled to rely on a co-plaintiffs' notice to satisfy this requirement and acquire standing. *See Schedler*, 771 F.3d at 836. In *Schedler*, an individual and an organizational plaintiff sought to enjoin the Louisiana Secretary of State and others to comply with the NVRA. The individual alleged that he was not provided with a voter registration form when applying for food stamps and asserted related violations under the NVRA. The organizational plaintiff alleged it had to divert resources to deal with the purported violations. The organizational plaintiff sent defendants a notice letter, but the eventual individual co-plaintiff did

not. The individual plaintiff, relying on *Ass'n of Cmty. Orgs. For Reform Now v. Miller*, 129 F.3d 833 (6th Cir. 1997), successfully argued in the trial court that the remedial purposes of notice were achieved through notice by the organizational plaintiff and that he was not required to provide individual notice of the same purported violations. *Schedler*, 771 F.3d at 835-36. The appellate court disagreed and found the individual's failure to provide notice was fatal to his claim. *Id.* at 836.

The *Schedler* court found that notice under the NVRA is mandatory and without it, no standing is conferred. *Id.* at 835. The *Schedler* court vigorously disagreed with the holding of *Miller* allowing such piggybacking in some circumstances, finding it "wholly devoid of textual support in the statute." *Id.* at 836. The *Schedler* court additionally distinguished the facts of *Miller* from the facts in *Schedler*. *Id.* Most significantly factually, *Miller* involved a state that explicitly refused to comply with the then recently enacted NVRA unless and until the federal government fully funded the NVRA's mandates. *Id.*; *Miller*, 129 F.3d at 835, 837-38. The *Miller* court had relied upon such explicit refusal, made manifest through an executive order, in finding that notice by the individual would have been futile and therefore, was not required where the organizational plaintiff had already satisfied the purposes of notice. *Miller*, 129 F.3d at 837-38. In contrast, in addition to the aforementioned finding that such notice exception was nowhere to be found in the mandates of the NVRA, the *Schedler* court found that the facts in its case evidenced

a desire by the defendants to comply with the NVRA and notice would not have been futile. *Schedler*, 771 F.3d at 836.  Specifically, when the state in Schedler received notice of the violations the individual plaintiff alleged through his complaint, the state attempted to provide the individual with voter registration forms, evidencing "exactly the sort of compliance attempt that pre-litigation notice was meant to encourage." *Id.* at 836 (internal citations omitted).

Just as the facts of *Miller* were highly distinguishable in *Schedler*, here too, there is no evidence of a refusal by Defendants to comply with the NVRA. To the contrary, the record shows that Defendants, although not in any way believing that there has been a violation of the NVRA, have given Plaintiffs concerns about the new voter registration form felony affirmations substantial respect and consideration. Acting upon this consideration, the Secretary has, among other things, continued to accept the previous form of the voter registration form, undertaken rulemaking and accepted public comment on the form in the process, participated in a Restoration of Voting Rights Work Group in which a recommendation was that the Legislature consider a return to the prior singular felony affirmation statement, and is watching the progress of Senate Bill 1354, which proposes to do just that. Under such circumstances, there is no evidence that notice by the Raysor Plaintiffs would have been futile, even if futility was a basis to except notice, which *Schedler*

vigorously holds that it is not because piggybacking of notice is untethered to the plain language of the NVRA.

Finally, on this point, individual notice is not inconsequential nor a mere formality where each claim under the NVRA brings a possibility of attorney's fees, a significant consideration for Defendants when planning and responding to litigation that is ultimately born by taxpayers.

Additionally, the *Raysor* Plaintiffs have averred under oath that they owe legal financial obligations, making any process by the State of ascertaining such legal financial obligations inapplicable to them and requiring a conclusion that the *Raysor* Plaintiffs were not and will not be aggrieved by any purported ascertaining-process violations.

First, as to Plaintiff Hoffman, by his own averments, registered to vote prior to the passage of Senate Bill 7066, and thus he was unaffected by any effects of Senate Bill 7066 on the voter registration form. Additionally, all three *Raysor* Plaintiffs averred under oath that they owe legal financial obligations. Thus, pursuant to these admissions, it is undisputed that the *Raysor* Plaintiffs are unaffected by alleged non-uniformity in the process of ascertaining outstanding legal financial obligations.

Thus, the *Raysor* NVRA claim should be dismissed.

ii.     The *Gruver* individual Plaintiffs, with the exception of Curtis D. Bryant, Jr., lack Article III standing to pursue their claims under the National Voter Registration Act, 52 U.S.C. §§ 20501 et seq.

Similarly, the *Gruver* Plaintiffs, with the exception of Curtis D. Bryant, Jr., lack Article III standing to pursue NVRA claim. For the reasons set forth above regarding the *Raysor* Plaintiffs' lack of injury as to registration or ascertainment of legal financial obligations, the *Gruver* Plaintiffs, with the exception of Curtis D. Bryant, Jr., who registered to vote subsequent to the passage of Senate Bill 7066, also lack Article III standing on the NVRA claims set forth in Count XI of the Gruver Plaintiffs' First Amended Complaint.

In addition to the alleged NVRA violations asserted by the *Raysor* Plaintiffs, the Gruver Plaintiffs additionally alleged a discouraging effect upon registration in responding to a more articulated felony affirmation statement. This, like the claim that the new form violates the NVRA by requiring more than the minimal amount of information required, also goes to registration. The Gruver Plaintiffs, with the exception of Plaintiff Curtis D. Bryant, Jr., registered to vote prior to the passage of Senate Bill 7066. Stated differently, the Gruver Plaintiffs, with the exception of Curtis D. Bryant, Jr., were unaffected by any requirements of Senate Bill 7066 on the voter registration form. And just as the *Raysor* Plaintiffs did, the *Gruver* Plaintiffs have averred they owe varying amounts of legal financial obligations. Thus, taking all the *Gruver* Plaintiffs' NVRA assertions in total, just as with the

*Raysor* Plaintiffs, the *Gruver* Plaintiffs, with the exception of Plaintiff Curtis D. Bryant, Jr., can establish no injury necessary for Article III standing on these claims. *See id.*

> **C.    Because Senate Bill 7066 and Amendment 4 both require that felons satisfy their legal financial requirements before they regain their right to vote, Senate Bill 7066 does not violate Article 4, Section 4 of the Florida Constitution.**

According to the *Mendez* and the *Jones* Plaintiffs, Senate Bill 7066 "violates Article VI, Section 4 of the Florida Constitution because it prescribes qualifications for restoration of voting rights to persons convicted of felonies, in addition to those prescribed by the Florida Constitution." Count 4, *Jones v. DeSantis*, No. 4:19-cv-300 (N.D. Fla.); Count 4, *Mendez v. DeSantis*, No. 4:19-cv-272 (N.D. Fla.). The Florida Supreme Court has foreclosed this claim. On January 16, 2020, it concluded, based on Amendment 4's plain text, that "'all terms of sentence' encompasses not just durational periods but also *all* [legal financial obligations] imposed in conjunction with an adjudication of guilt," including fines, restitution, costs, and fees. *See Advisory Opinion to the Governor Re: Implementation of Amendment 4, The Voting Restoration Amendment*, 45 Fla. L. Weekly S10, 2020 WL 238556, at *1 (Fla. Jan. 16, 2020). Thus, Senate Bill 7066 adds no condition that Amendment 4 already requires, and the Defendant are, accordingly, entitled to judgment as a matter of law on these claims.

IV.    **THE COURT CANNOT ISSUE A WRIT OF MANDAMUS AGAINST STATE OFFICERS.**

Two of the complaints seek writs of mandamus compelling the Defendants to either allow the Plaintiffs to register to vote or to prevent the Defendants from removing them from the voter rolls.[20] *See Jones v. DeSantis*, No. 4:19-cv-300 (N.D. Fla.); *Mendez v. DeSantis*, No. 4:19-cv-272 (N.D. Fla.). As this Court has previously recognized, "a federal court lacks the general power to issue writs of mandamus to direct state officers in the performance of their duties when mandamus is the only relief sought." *Fox v. Detzner*, No. 4:18-cv- 529 (N.D. Fla. Nov. 16, 2018) (citing *Moye v. Clerk, DeKalb Cty. Sup. Ct.*, 474 F.2d 1275, 1276 (5th Cir. 1973). Standing alone, this principle compels dismissal of the *Jones* and the *Mendez* Complaints in their entirety.

The Eleventh Circuit, moreover, has held that courts may "issue the writ 'only in drastic situations, when no other adequate means are available to remedy a clear usurpation of power or abuse of discretion.'" *Jackson v. Motel 6 Multipurpose*, 130 F.3d 999, 1004 (11th Cir. 1997) (quoting *In re Temple*, 851 F.2d 1269, 1271 (11th Cir.1988)). As established throughout this brief, the Defendants have not acted in a way to justify mandamus relief in favor of any of the Plaintiffs, and even if they had,

---

[20] Although the *Jones* and *Mendez* Plaintiffs seek a declaration that Senate Bill 7066 is unconstitutional, they do so only to achieve their requested writ of "mandamus directing [the Defendants] to allow [them] to register to vote . . . ."

the Court has other means by which to remedy it. Thus, the Court should grant summary judgment in favor of the Defendants and dismiss the *Jones* and *Mendez* complaints. *See Moye*, 474 F.2d at 1276.

## <u>CONCLUSION</u>

For the foregoing reasons, the Defendants are entitled to judgment as a matter of law.

Respectfully submitted by:

JOSEPH W. JACQUOT
(FBN 189715)
General Counsel
joe.jacquot@eog.myflorida.com
NICHOLAS A. PRIMROSE
(FBN 104804)
Deputy General Counsel
nicholas.primrose@eog.myflorida.com
JOSHUA E. PRATT (FBN 119346)
Assistant General Counsel
joshua.pratt@eog.myflorida.com
Executive Office of the Governor
400 S. Monroe St., PL-5
Tallahassee, FL 32399
Telephone: (850) 717-9310
Fax: (850) 488-9810

*Counsel for Governor Ron DeSantis*

GEORGE N. MEROS, JR.
(FBN 263321)
george.meros@hklaw.com
TARA R. PRICE (FBN 98073)
tara.price@hklaw.com
Holland & Knight LLP
315 South Calhoun Street, Suite 600
Tallahassee, Florida 32301
Telephone: (850) 224-7000
Facsimile: (850) 224-8832

BRADLEY R. MCVAY (FBN 79034)
General Counsel
brad.mcvay@dos.myflorida.com
ASHLEY E. DAVIS (FBN 48032)
Deputy General Counsel
ashley.davis@dos.myflorida.com
Florida Department Of State
R.A. Gray Building Suite, 100
500 South Bronough Street
Tallahassee, Florida 32399-0250
Phone: (850) 245-6536
Fax: (850) 245-6127

*/s/ Edward M. Wenger*
MOHAMMAD O. JAZIL
(FBN 72556)
mjazil@hgslaw.com
GARY V. PERKO (FBN 855898)
gperko@hgslaw.com
EDWARD M. WENGER
(FBN 85568)
ewenger@hgslaw.com
Hopping Green & Sams, P.A.
119 South Monroe Street, Suite 300
Tallahassee, Florida 32301
Phone: (850) 222-7500
Fax: (850) 224-8551

*Counsel for Florida Secretary of State
Laurel M. Lee*

## **CERTIFICATE OF COMPLIANCE WITH LOCAL RULES**

The undersigned certifies that the foregoing complies with the size, font, and formatting requirements of Local Rule 5.1(C), and that the foregoing complies with the word limit requested in the Defendants' unopposed pending motion to file a summary judgment memorandum in excess of the word limit. Specifically, this memorandum contains 14,382 words, excluding the case style, signature block, and certificates.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was served

to all counsel of record via email on this 18th day of February, 2020.

*/s/ Edward M. Wenger*
Attorney
