**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

KELVIN LEON JONES, et al.,

       Plaintiffs,

v.

RON DESANTIS, in his official capacity as
Governor of Florida, et al.,

       Defendants.

Consolidated Case
No. 4:19-cv-300-RH-CAS

**PLAINTIFFS' CONSOLIDATED PRETRIAL BRIEF**

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................... 7

PLAINTIFFS' PROPOSED FINDINGS OF FACT ................................ 7

I.    Jurisdiction .................................................................................. 7

II.   Nature of the Case ...................................................................... 7

III.  Parties ........................................................................................... 8

   A.   Individual Plaintiffs ............................................................... 9

   B.   Organizational Plaintiffs ...................................................... 18

   C.   Defendants ............................................................................. 20

IV.   Experts ......................................................................................... 22

V.    Procedural History ..................................................................... 27

   A.   Filing and Consolidation of the Cases ................................ 27

   B.   Preliminary Injunction and Appeal ...................................... 29

   C.   NVRA Notice and Claims .................................................... 32

VI.   Florida Has a Long History of Disenfranchising People with Felony
      Convictions ................................................................................. 33

   A.   Before Amendment 4, Florida Had One of the Harshest Felony
        Disenfranchisement Laws in the Nation ............................... 33

   B.   Felony Disenfranchisement Was One of Many Tools Florida
        Used to Disenfranchise Black People After the Civil War ... 34

VII.  Prior to Amendment 4 Florida's Rights Restoration Process Was
      Arbitrary, Interminable, and Rarely Successful ....................... 37

VIII. Florida Voters Enacted Amendment 4 to End Permanent
      Disenfranchisement for All Floridians Except Those Convicted of
      Murder or a Felony Sexual Offense .......................................... 40

   A.   Amendment 4 Was Conceived and Enacted Against the Backdrop
        of Historical Discrimination, Legislative Failure, and the Broken
        Clemency System .................................................................. 40

2

B.     The Public Discussion of the Effects of Amendment 4 Leading Up to the Election Centered on the Large Numbers of Individuals Who Would Benefit from Automatic Rights Restoration and Rarely Touched on LFOs ........................................................................ 42

C.     A Large Majority of Floridians Voted to End Permanent Disenfranchisement ................................................................... 43

IX.    SB7066 Was Enacted To Restrict the Number Of Individuals Who Would Qualify for Rights Restoration Under Amendment 4 .................. 44

A.     Prior To the Enactment of SB7066 Florida Officials Permitted the Registration of Returning Citizens with Outstanding LFOs ................. 44

B.     Prior to and During the 2019 Legislative Session, Legislators Were Aware That an LFO Requirement Would Be Difficult If Not Impossible to Implement ................................................................ 48

C.     Legislators Intentionally Chose to Define "Completion of All Terms of Sentence" in the Most Restrictive Manner and Ignored Warnings that Doing So Would Disproportionately Impact Black Floridians ................................................................................ 53

X.    SB7066 Denies Rights Restoration to Otherwise Eligible Floridians Solely on the Basis of Their Outstanding LFOs ...................................... 65

XI.    The State of Florida Uses Revenue Generated from Payment of LFOs to Fund Its Criminal Justice System and Other State Functions. ................................................................................... 69

A.     LFOs are Designed to Fund Florida's Government ............................. 69

B.     LFOs Include Additional Fees and Charges ....................................... 75

C.     LFOs Have No Connection to Culpability ........................................... 77

XII.   The Majority of Floridians with LFOs are Genuinely Unable to Pay Them ........................................................................................... 82

XIII.  The LFO Requirement Has a Disproportionate Impact on Black Floridians ................................................................................... 90

XIV.  The LFO Requirement Has a Disproportionate Impact on Black Women ....................................................................................... 93

XV.   Floridians With LFOs Cannot Determine Their Eligibility to
      Register and Vote Under SB7066 ............................................................. 95

   A.   Voters Must Affirm their Eligibility to Register and Vote in
        Florida .................................................................................................. 95

   B.   People with Past Convictions Face Substantial Burdens in
        Determining Eligibility and Paying Disqualifying LFOs .................... 105

   C.   Defendants Will Not Assist Voters Seeking Determinations of
        Their Eligibility to Register ................................................................. 119

   D.   The Only Process Available for Determining Eligibility Occurs
        *After* Registration ............................................................................... 126

   E.   Even the Post-Registration Process Is Currently Inactive Because
        the Department Cannot Ascertain Eligibility Due to LFOs ................. 129

XVI.  Counties Are Implementing SB7066's LFO Requirement
      Differently ............................................................................................... 139

   A.   Officials in Different Counties Have Different Interpretations of
        Which LFOs Preclude Voting Under SB7066 ...................................... 141

   B.   Returning Citizens in Different Counties Have Differing Ability
        to Pay Disqualifying LFOs Without Incurring Fees ............................ 143

   C.   Counties Have Different Practices on Negotiating Payment of
        LFOs ..................................................................................................... 144

ARGUMENT ....................................................................................................... 145

   I.   The LFO Requirement Constitutes Unconstitutional Wealth
        Discrimination, and Would Not Survive Even Rational Basis
        Review .................................................................................................. 145

   A.   The Appropriate Lens For Reviewing Rational Basis is As-
        Applied to Those Unduly Burdened by the Challenged Statute .......... 146

   B.   Even When Evaluated Against the General Case, the LFO
        Requirement Lacks a Rational Basis Because Those Who Cannot
        Pay *Are* the General Case .................................................................. 149

   II.  The LFO Requirement in SB7066 Violates the Twenty-Fourth
        Amendment ........................................................................................... 153

A.     The Twenty-Fourth Amendment Prohibits Any "Price Tag" on Voting ................................................................................... 154

B.     Under the "Functional Approach" Adopted by Federal Courts, LFOs are Taxes in Florida ................................................. 158

III.    The LFO Requirement Violates the Fourteenth Amendment Because the State Is Incapable of Implementing It ................................ 161

A.     The State's Inability to Implement the LFO Requirement Demonstrates That it is Unconstitutionally Vague .............................. 163

B.     SB7066 Unduly Burdens the Right to Vote ........................................ 167

C.     SB7066's LFO Requirement Violates Due Process ............................ 172

D.     Defendants' Implementation of SB7066 Violates *Bush* v. *Gore* Requirements of Uniform Application of Election Laws .................... 176

IV.    SB7066 Violates the First Amendment Right of the League of Women Voters of Florida to Engage in Voter Registration Activities ... 183

A.     The League's Right to Engage in Voter Registration Activities is Protected by the First Amendment as "core political speech" and Expressive Association ......................................................... 184

B.     SB7066 Imposes a Severe Burden On the League's Speech and Association .......................................................................... 185

C.     The Burdens Imposed on the League by SB7066 are Unconstitutional Restrictions on "Core Political Speech" ................. 187

V.    SB7066 Violates the National Voter Registration Act .......................... 189

A.     The Amended Voter Registration Application Fails to Notify Applicants of Eligibility Requirements ............................................... 190

B.     The Amended Application Requires More Information Than is Necessary to Prevent Duplicate Voter Registrations and Assess Applicants' Eligibility ......................................................... 195

C.     The Amended Application Discourages Voter Registration Contrary to the Essential Purpose of the NVRA ................................. 196

D.     Defendants' Application of SB7066 is not Uniform nor Nondiscriminatory ................................................................. 198

VI.    SB7066 Was Enacted with a Discriminatory Purpose ............................ 203

    A.    The U.S. Constitution Forbids a Legislature from Acting with a
Discriminatory Intent ................................................................... 203

    B.    The Purpose of SB7066's LFO Requirement, at Least in Part,
Was to Minimize the Political Participation of Black Returning
Citizens ...................................................................................... 205

VII.   SB7066 Unduly Burdens the Voting Rights of Low-Income Women
of Color ................................................................................................. 231

VIII.  SB7066 Violates the Eighth Amendment's Prohibition on Excessive
Fines .................................................................................................... 233

    A.    SB7066 Is Subject to the Eighth Amendment Because It Serves
To Punish in Purpose and in Practice .................................................. 236

    B.    Denying the Right to Vote to Returning Citizens Who Have
Failed to Pay LFOs Is a Grossly Disproportionate Penalty,
Especially for Those Too Poor to Pay .................................................. 238

IX.    The Court should reject Defendants' attempts to invalidate
Amendment 4 .......................................................................................... 243

    A.    The LFO requirement is severable from Amendment 4 ..................... 243

    B.    The Court Can Grant Plaintiffs' Relief Without Implicating
Amendment 4 by Enjoining SB 7066's Definition of
"completion" With Respect to LFOs .................................................. 248

CONCLUSION ................................................................................................ 250

CERTIFICATE OF SERVICE ........................................................................... 253

## INTRODUCTION

For the reasons set forth below, based on the proposed findings of fact, and based on the evidence to be presented at trial, SB7066's LFO requirement violates the U.S. Constitution and the National Voter Registration Act.

## PLAINTIFFS' PROPOSED FINDINGS OF FACT

### I.      Jurisdiction

1.       This Court has jurisdiction over the consolidated cases pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

2.       This Court has personal jurisdiction over Defendants, each of whom is a resident of Florida.

3.       Venue is proper in this district because the offices of Defendants Governor DeSantis and Secretary Lee are located in this district.

### II.     Nature of the Case

4.       The consolidated cases allege violations of the United States Constitution with respect to Fla. Stat. § 98.0751, which requires the payment of certain legal financial obligations as a condition of rights restoration in Florida. The consolidated cases also allege violations of the National Voter Registration Act ("NVRA").

III.   **Parties**

5.      In this action, consolidated as *Jones et al. v. DeSantis et al.*, 4:19-cv-00300-RH-MJF (the "Action"), plaintiffs consist of Individual Plaintiffs, a certified class, and Organizational Plaintiffs.

6.      The Individual Plaintiffs are: Jeff Gruver, Emory Marquis Mitchell, Betty Riddle, Karen Leicht, Keith Ivey, Kristopher Wrench, Raquel L. Wright, Steven Phalen, Jermaine Miller, Clifford Tyson, Curtis D. Bryant, Jr., LaToya Moreland, Rosemary McCoy, Sheila Singleton, Bonnie Raysor, Diane Sherrill, Lee Hoffman, Kelvin Jones, and Luis Mendez.

7.      The class representatives are Bonnie Raysor, Diane Sherrill, and Lee Hoffman. The class consists of all persons who would be eligible to vote in Florida but for unpaid financial obligations. The subclass consists of all persons who would be eligible to vote in Florida but for unpaid financial obligations that the person asserts the person is genuinely unable to pay. *See* ECF 321.

8.      The Organizational Plaintiffs are the Florida State Conference of the NAACP ("Florida NAACP"), the Orange County Branch of the NAACP ("Orange County NAACP"), and the League of Women Voters of Florida ("LWVF" or "League").

### A. Individual Plaintiffs

9.       Each Individual Plaintiff is over 18 years old, a U.S. citizen, and a Florida resident. *See infra* ¶¶ 17–20 and declarations cited therein.

10.      Each Individual Plaintiff was convicted of a non-disqualifying felony, defined as any felony except for murder or a felony sexual offense. Fla. Stat. § 98.0751(2)(b), (c); *see also infra* ¶¶ 17–20 and declarations cited therein.

11.      Each Individual Plaintiff completed any term of incarceration or supervision associated with any felony conviction before the Voter Restoration Amendment ("Amendment 4") went into effect on January 8, 2019. *See infra* ¶¶ 17– 20 and declarations cited therein.

12.      Each Individual Plaintiff registered to vote after Amendment 4 went into effect and is currently registered to vote. *See infra* ¶¶ 17–20 and declarations cited therein.

13.      Individual Plaintiffs Gruver, Ivey, Tyson, McCoy, and Singleton voted in local Florida elections in Duval, Alachua, and Hillsborough Counties since registering in 2019. *See infra* ¶¶ 17–20 and declarations cited therein.

14.       Individual Plaintiffs Gruver, Ivey, Leicht, Miller, Mitchell, Moreland, Riddle, Singleton, Sherrill, Tyson, Wrench, and Wright voted in the presidential preference primary in 2020. *See infra* ¶¶ 17–20 and declarations cited therein.

15.     Each Individual Plaintiff has outstanding legal financial obligations ("LFOs"), defined as restitution, fines, fees, or costs, associated with their respective felony conviction(s). *See infra* ¶¶ 17–20 and declarations cited therein.

16.     Each Individual Plaintiff is unable to pay their outstanding LFOs in full before the next election in which they wish to participate.

17.     Individual Plaintiffs in the *Gruver* Action First Amended Complaint, *Jones* v. *DeSantis*, No. 4:19-cv-00300-MW-MJF (N.D. Fla. July 16, 2019), ECF 84 ("*Gruver* Am. Compl.") are as follows:

> a) Plaintiff Jeff Gruver is a 33-year-old white man who works at a homeless shelter in Gainesville and is pursuing a Master of Social Work at Florida State University. Mr. Gruver was assessed $801 in court costs and fees stemming from felony convictions, which he is unable to pay. PX3 ¶¶ 2, 3, 6, and 7 (Gruver Decl.). With interest and other fees incurred from collection, he owes approximately $2,000. PX24 ¶ 10 (Gruver Supp. Decl.). He sought to convert his debt to community service, but was advised by the Alachua County Clerk that he could not do so because his debt was in collections. Id. ¶¶ 4–5. He voted in the Gainesville election in March 2019 and in the March 2020 presidential primary. PX3 ¶ 7.
>
> b) Plaintiff Emory Marquis "Marq" Mitchell is a 30-year-old Black man and is the president and founder of a non-profit organization committed to reducing recidivism. Mr. Mitchell serves as a trained Peer Support Specialist at the South Florida Wellness Network, which assists young people and families with co-occurring disorders; a mentor with an employment readiness nonprofit; and a member of two subcommittees on the Broward County Reentry Coalition. He owes $4,483 in outstanding court costs and fines, which he is unable to pay. Mr. Mitchell is eligible to receive assistance under the Supplemental Nutrition Assistance Program.

He learned of some of his outstanding LFOs only when he received a notice from the Miami-Dade Clerk of Court shortly after registering to vote in March 2019, and he learned about the others only after attempting to obtain a Florida occupational license on June 28, 2019. PX4 ¶¶ 3–7, 19–21 (Mitchell Decl.). Mr. Mitchell voted for the first time in the March 2020 presidential preference primary.

c) Plaintiff Betty Riddle is a 62-year-old Black woman who works as a communications assistant for the Public Defender of Sarasota. In May 2019, the Sarasota County Clerk of Court provided her with records for her convictions going back to 1990 but told Ms. Riddle that they did not have her records from her convictions from the 1970s and 1980s. She put in a request for the Clerk to look for those records. In October 2019, she returned to the clerk's office, where she was told that they had no records from her older convictions and that the Clerk's Office did not know when they would be able to get to her request. The Clerk's office could not guarantee they still had these records, since they sometimes purge old records. In October 2019, Ms. Riddle also called the Hillsborough Clerk of Court office to get her records from a 1988 conviction in that county. She was told that they had no records for her and that she was not in their system. After the preliminary injunction hearing, the Hillsborough County Clerk's office again tried to find her records, but was unable to do so. Ms. Riddle owes approximately $1,800 in court costs and fees from her Sarasota convictions from 1990-present, which she cannot afford to pay. PX5 ¶¶ 1, 3, 15, 17 (Riddle Decl.); ECF 204 at 162:17-166:19. Ms. Riddle voted in the March 2020 presidential preference primary. She was the first person in line at her polling place.

d) Plaintiff Karen Leicht is a 62-year-old white woman who works as a senior paralegal at a civil rights law firm and is the principal caregiver for her mother, who suffers from Parkinson's disease. Ms. Leicht was convicted of a federal felony. Ms. Leicht owes approximately $58 million in outstanding restitution jointly and severally with her former co-defendants, even though she played a minor role in the crime and did not benefit financially from it. She expects that she will be unable to pay her full amount of outstanding

11

LFOs in her lifetime. Because she has a federal conviction, Ms. Leicht cannot attempt to seek community service conversion or modification of her LFOs in Florida. PX6 ¶¶ 1, 2, 6 (Leicht Decl.).

e) Plaintiff Keith Ivey is a 47-year-old Black man who manages a car dealership in Jacksonville. Mr. Ivey has conducted speaking engagements to motivate and connect with at-risk youth in Florida. Mr. Ivey owes, at least, $400 in costs stemming from a felony conviction more than 15 years ago, but he was not aware of those costs until a reporter notified him of them in 2019. On September 16, 2019, Defendants produced ECF 148-20, a document appearing to include more LFOs that Mr. Ivey was unaware of and that are not reflected in his Florida Department of Law Enforcement ("FDLE") report. Mr. Ivey does not know whether these obligations are outstanding, to whom he owes them, or how to find out this information. Mr. Ivey registered to vote after Amendment 4 went into effect and voted in the March 2019 Duval County election, the May 2019 runoff election, and the 2020 presidential preference primary. PX7 ¶¶ 1, 4–6 (Ivey Decl.).

f) Plaintiff Kristopher Wrench is a 43-year-old white man who works as a painter in Alachua County. He owes $3,000 in court costs and fees, which he is unable to pay. PX8 ¶¶ 1, 2, 6 (Wrench Decl.).

g) Plaintiff Raquel L. Wright is a 44-year-old Black woman who works part-time as a legal assistant to the Special Counsel to the Florida State Conference of the NAACP and volunteers part-time as the Assistant Secretary of the Indian River County Branch of the NAACP. Ms. Wright owes at least $50,000 in court costs and a mandatory fine from a single non-violent drug conviction from more than eight years ago, which she is unable to pay. PX9 ¶¶ 1, 5, 10–14 (Wright Decl.).

h) Plaintiff Steven Phalen is a 37-year-old white man who works in HVAC logistics and has a Ph.D. in organizational and relational communication. Mr. Phalen was convicted of a felony in the State of Wisconsin. He owes approximately $110,000 in restitution, court costs, and fees stemming from his felony conviction in Wisconsin state court. Though he makes regular monthly payments toward

these obligations, Mr. Phalen cannot afford to pay back his obligations in full. Because he has an out-of-state conviction, Mr. Phalen cannot attempt to seek community service conversion or modification of his LFOs in Florida. PX10 ¶¶ 3, 4, 6 (Phalen Decl.).

i) Plaintiff Jermaine Miller, a 29-year-old Black man, is a community advocate. Mr. Miller owes $1,221.25 in fines, fees, and costs. The Florida Department of Corrections contends that Mr. Miller owes $1.11 in restitution, though he has paid $18.20 more than the $233.80 restitution ordered. PX11 ¶¶ 2, 4, 7, 9 (Miller Decl.).

j) Plaintiff Clifford Tyson is a 63-year-old Black man and a pastor. PX12 ¶¶ 2, 3 (Tyson Decl.). Pastor Tyson has paid off all of the $1,867.97 that he was assessed for restitution. Id. ¶ 18. The exact amount of Pastor Tyson's outstanding obligations is unknown because of discrepancies and ambiguities in county and state records. Id. ¶¶ 4–17, 24; ECF 204 at 172:14–177:22. Based on his judgment and sentencing packets from his 1978, 1997, 1998 convictions, Pastor Tyson owes between $920 and $2,724 in outstanding costs. See id. at 9–11, 29–32, 55–58 (Attachments to Tyson Decl.). He cannot afford to pay the LFOs he owes. Id. ¶¶ 24–25; ECF 204 at 177:234–178:11.

k) Plaintiff Curtis D. Bryant, Jr.is a 38-year-old Black man and father who lives in Orange County with his fiancée, children, and other family. He is also a member of the Organizational Plaintiff Orange County NAACP. To the best of his knowledge, Mr. Bryant owes approximately $10,000 in LFOs. Each month Mr. Bryant makes a $30 payment to a debt collection agency with which Orange County has contracted to collect his LFOs. Based on Mr. Bryant's income and obligations, he is unable to fully pay his outstanding LFOs, now or in the future. Mr. Bryant was otherwise eligible to vote as an active registered voter in two elections in Orange County—a City of Orlando election on November 5, 2019, and a runoff election on December 3, 2019. Without the protection of the preliminary injunction, he did not vote because he feared prosecution and other negative consequences that may have resulted. PX890 ¶¶ 1–3, 6–9, 10, 14–15 (Bryant Supp. Decl.).

13

l) Plaintiff Latoya Moreland is a 39-year-old Black woman who lives in Manatee County with her four children. Ms. Moreland was last convicted more than seven years ago. To the best of her knowledge and recollection, Ms. Moreland was originally assessed $645 in court costs that she still owes. Ms. Moreland relies on disability income and family support to make ends meet. Based on her limited income, Ms. Moreland is unable to pay her outstanding LFOs. ECF 211-2 ¶¶ 1–2, 6–8, 11, 14 (Moreland Decl.). On March 10, 2020, through her lawyers' correspondence with counsel for Defendant Supervisor of Elections of Manatee County Michael Bennett, Ms. Moreland learned that she had been removed from the voter registration rolls in August 2019. PX851 (3/10/2020 Email from Leah Aden). Supervisor Bennett reinstated Moreland to active voter status on March 10, 2020. *Id.* On March 13, 2020, Supervisor Bennett stated that Ms. Moreland had been removed from the voter rolls "in the ordinary course" because she had outstanding "fines." ECF 287. As of this filing, Ms. Moreland's registration remains active. Ms. Moreland voted in Presidential Preference Primary on March 17, 2020.

18.    Individual Plaintiffs in the *McCoy* Complaint No. 4:19-cv-00304-RH-CAS, ECF 1, are as follows:

a) Plaintiff Rosemary McCoy is a Black resident of Duval County, Florida. PX13 ¶ 1 (McCoy Decl.). In July 2015, she was convicted in the Fourth Judicial Circuit Court in Duval County, Florida of three felony offenses, none of which involved a conviction for murder or a felony sexual offense. Def. SOS Ex. 17H (McCoy Sentencing & Judgment Forms). She was sentenced to serve a concurrent sentence for all three felony offenses as follows: 24 months of incarceration, including time served, and 18 months of probation. *Id.* The court also ordered her to pay costs and fees in the amount of $666 and assessed restitution, payable to the Duval County Clerk of Court. *Id.* Ms. McCoy completed her term of incarceration in March 2016 and completed probation in September 2017. PX170 (McCoy Termination of Supervision). She is no longer under the supervision of the Florida Department of Corrections. *Id.*

In April 2019, following Amendment 4's passage, Ms. McCoy registered to vote in Duval County. PX13 ¶ 6. That same month, she received a voter registration card from the Duval County Supervisor of Elections office and has since voted in a countywide election. *Id.* Upon information and belief, her ballot was counted. *Id.* ¶¶ 7, 10. On April 9, 2019, the Duval County Clerk of Court issued Ms. McCoy a "Satisfaction of Judgment" as to any and all court-ordered costs, fines, and fees associated with her criminal sentence. PX173 (McCoy's Satisfaction of Judgment). However, at that time, the clerk also informed her that she owed $7,531.84 in victim restitution, which includes interest that continues to accrue on the principal amount owed. PX13 ¶ 9. As of March 4, 2020, Ms. McCoy owed $6,400 in victim restitution and $1,406.72 in interest that has accrued since the original assessment of restitution. PX897 at 2 (Duval County Clerk of Courts Receipt – Singleton & McCoy). When Ms. McCoy's order of restitution was assessed by the sentencing court, the sentencing court did not consider the amount of the loss sustained by any victim as a result of the offense, as required by Fla. Stat. § 775.089(6)(a). *See* DX141 (Transcript of Proceedings Jun. 29, 2015). The sentencing court also did not consider Ms. McCoy's financial resources or her present and potential future financial needs and earning ability at the time of assessing the restitution order, as required by Fla. Stat. § 775.089(6)(b). DX141. Ms. McCoy's criminal record has made it extremely difficult for her to obtain gainful employment. PX13 ¶ 11. She has applied to numerous employment agencies and gone on several job interviews, but she has been unable to find a full-time job paying a livable wage since she left prison. DX23 at 42:4–50:11 (McCoy Dep.). Therefore, she lacks the financial resources to pay off the victim restitution she owes.

b) Plaintiff Sheila Singleton is an African American resident of Duval County, Florida. PX14 ¶ 1 (Singleton Decl.). In April 2011, she was convicted in the Fourth Judicial Circuit Court in Duval County of one felony offense, which did not involve a conviction for murder or a felony sexual offense. DX137 at 1 (Judgment of Singleton). She was sentenced to serve a term of imprisonment for this felony charge as follows: six months of incarceration, including time-served, and

three years of probation. *Id.* The court also ordered her to pay costs, fines, and fees in the amount of $771, and assessed restitution, payable to the Duval County Clerk of Court. *Id*. at 3; DX136 at 1 (Judgment & Restitution Order Singleton). Ms. Singleton completed her term of incarceration in June 2011 and completed probation in July 2014. PX14 ¶ 4 (Singleton Decl.); DX138 (Clerk of Courts Online Printout). She is no longer under the supervision of the Florida Department of Corrections. *Id.* Documentation received from the Duval County Clerk of Court shows that as of March 4, 2020, Ms. Singleton owes $1,028.20 in court-ordered costs, fines, and fees associated with her criminal sentence. PX897 at 2. Ms. Singleton also owes $15,355.93 in victim restitution, which includes interest that continues to accrue at the rate of 4.75 percent on the principal amount owed. *Id.* Following Amendment 4's passage, Ms. Singleton registered to vote in Duval County. PX14 ¶ 6. In February 2019, she received a voter registration card from the Duval County Supervisor of Elections office. *Id.* ¶ 7. She has since voted in a countywide election and in the 2020 Presidential Primary election. *Id.* ¶ 10. Upon information and belief, her ballots were counted. *Id.* Ms. Singleton's criminal record has made it extremely difficult for her to obtain gainful employment despite repeated efforts to find a job. PX14 ¶ 11; DX24 at 11:6–14:20) (Singleton Dep.). Therefore, she lacks the financial resources to pay off the victim restitution and court costs, fines, and fees she owes.

19.     Individual Plaintiffs in the *Raysor* Complaint No. 4:19-cv-00301, ECF

12, are as follows:

   a) Plaintiff Bonnie Raysor is a 59-year-old white resident of Boynton. Ms. Raysor currently owes $3,930 in outstanding fees and costs related to her prior convictions. She was assigned a public defender for her felony proceedings. She is unable to determine what amount of that balance is related to her misdemeanor convictions rather than her felony convictions. Ms. Raysor pays $30 per month toward her LFO balance according to a court-ordered payment plan based on her ability to pay. At this rate, she will not pay off her LFOs until 2031. Ms. Raysor wishes to vote in upcoming elections. PX15 ¶¶ 3,

5, 7, 8, 10 (Raysor Decl.) Ms. Raysor registered to vote on November 21, 2019, after this Court issued its preliminary injunction order.

b) Plaintiff Diane Sherrill is a 58-year-old white resident of St. Petersburg, Florida and active member of her church. She largely lives on a fixed Supplemental Security Income of $770 per month, lives in public housing, and receives SNAP benefits. Ms. Sherrill was assigned a public defender for her prior felony proceedings. She owes $2,279 in outstanding LFOs related to her prior convictions, which she cannot afford to pay. Ms. Sherrill wishes to vote in upcoming elections. PX16 ¶¶ 3, 6, 14, 15 (Sherrill Decl.). Ms. Sherrill registered to vote on November 22, 2019, after this Court issued its preliminary injunction order.

c) Plaintiff Lee Hoffman is a 61-year-old white resident of Plant City, Florida. He is a disabled U.S. military veteran who currently spends his time as a minister and advocate for the homeless. He lives primarily on a monthly disability benefit and seasonal work. After the passage of Amendment 4, Mr. Hoffman registered to vote on January 17, 2019, since he long ago completed all his felony sentences. Mr. Hoffman owes a total of $1,772.13 in LFOs, only some of which are associated with his felony convictions. He is unable to pay these LFOs in full prior to the 2020 election cycle. PX17 ¶¶ 3–4, 7, 11–12 (Hoffman Decl.).

20.     Individual Plaintiffs in the *Jones/Mendez* Complaints No. 4:19-cv-00300, ECF 1; No. 4:19-cv-00272-WS-CAS, ECF 1, are as follows:

a) Plaintiff Kelvin Jones is a 46-year-old Black man and a resident of the County of Hillsborough, Florida. No. 4:19-cv-00300, ECF 1 ¶¶ 10, 12. Mr. Jones has been convicted of felonies in the past and completed all terms of his sentence, including probation. *Id*. ¶ 11. He currently owes LFOs of approximately $52,596.00. *Id*. Mr. Jones currently suffers from a disability and is unable to work. *Id*. ¶ 12. Mr. Jones is also unable to perform community service due to his disability. *Id*. ¶ 13. He lacks the financial resources to pay his LFOs prior to the upcoming, or any, election. *Id*.

17

b) Plaintiff Luis Mendez is a 57-year-old Black and Hispanic man who resides in the County of Hillsborough, Florida. No. 4:19-cv-00272-WS-CAS, ECF 1, ¶¶ 10, 12. Mr. Mendez has been convicted of felonies in the past and has completed all terms of his sentence including probation. *Id*. ¶ 11. He currently owes LFOs of approximately $2,854. *Id*. Mr. Mendez presently suffers from a disability and is unable to work. *Id*. ¶ 12. His only income is a monthly $820.00 disability check. *Id*. Mr. Mendez, lacks the financial resources to pay his LFOs prior to the upcoming, or any, election. *Id*. ¶ 13.

## B. Organizational Plaintiffs

21.     Organizational Plaintiffs in the Gruver Complaint—the Florida NAACP, the Orange County NAACP, and the LWVF—are nonpartisan, not-for-profit membership organizations that conduct civil rights and voter registration work in Florida. *See* PX18 (Neal Decl.); PX 19 (Nweze Decl.); PX20 (Brigham Decl.).

22.     Members of the Florida NAACP and the Orange County NAACP include Black low-income people with felony convictions, who, in many cases, will be permanently disenfranchised by Senate Bill 7066 ("SB7066") because they are unable to pay their LFOs.

23.     Examples of members of Organizational Plaintiff Florida NAACP (beyond Individual Plaintiffs Bryant and Wright) affected by SB7066 include:

a) Anthrone J. Oats, a 40-year-old Black man and father, is a small-business owner. He is a U.S. citizen and Florida resident with a non-disqualifying felony conviction. He is also an executive member of the Marion County Branch of the NAACP. To the best of his knowledge, Mr. Oats was assessed approximately $3,107 in LFOs

which remain outstanding. However, he was told in court proceedings that he would never be required to pay absent a huge financial windfall (*e.g.*, he won the lottery). After Amendment 4 went into effect, Mr. Oats registered to vote in Marion County on January 9, 2019 and remains an active registered voter. He fears voting in light of state records indicating that he still has outstanding LFOs. Although he was otherwise eligible to vote in the September 17, 2019, City of Ocala General Election and the 2020 Presidential Preference Primary election as well other elections in 2020 and beyond, Mr. Oats is chilled from participating in upcoming elections due to SB7066 and fear of prosecution. PX19 ¶ 8 (Nweze Decl.); ECF 211-4 ¶¶ 1–4, 6–7, 10–11.

24.     The Florida NAACP had their members cease and desist from engaging in robust monthly voter registration programs throughout the state because of SB7066's LFO requirement, confusion surrounding voter information and eligibility, and the complexities surrounding the new law and trainings. ECF 286-10 at 55:15–58:14, 60:11–20, 62:12–16, 63:9–17 (Ellison Dep.).

25.     The LWVF is the Florida affiliate of the national League of Women Voters (the "National League"). LWVF is a nonpartisan, not-for-profit corporation organized under the laws of Florida, and a tax-exempt charity pursuant to section 501(c)(4) of the Internal Revenue Code. PX20 ¶ 3. The mission of LWVF is to promote political responsibility by encouraging informed and active citizen participation in government, including by registering citizens to vote and influencing public policy through education and advocacy. LWVF has thousands of members in

19

Florida and an even greater number of supporters and volunteers, who receive regular communications from the League. *Id*. ¶ 4.

26.     The National League has conducted voter registration nationwide since 1920, and LWVF has conducted voter registration in Florida since before 1939. In the past, LWVF has conducted voter registration drives through the auspices of its 29 local Leagues located in cities and counties throughout Florida. *Id*. ¶ 5.

### C. Defendants

27.      State Defendants are Ron DeSantis, in his official capacity as the Governor of Florida and Laurel M. Lee, in her official capacity as the Florida Secretary of State (the "Secretary"). Governor DeSantis signed SB7066 on June 28, 2019.

28.     Defendant Lee is the head of the Florida Department of State (the "Department") and the chief election officer of the state. Fla. Stat. §§ 15.01, 15.13; 97.012. As chief election officer, the Secretary is responsible for maintaining "uniformity in the interpretation and implementation of the election laws," and providing "uniform standards for the proper and equitable interpretation and implementation" of such laws. Fla. Stat. § 97.012(1)–(2). The Secretary is also responsible for administering the statewide voter registration system. *Id*. § 97.012(11).

29.     Under SB7066, the Department is responsible for identifying registered voters who have been convicted of a felony and whose voting rights have not been restored and for initiating the process for removing potentially ineligible individuals from the voter rolls. *See* Fla. Stat. § 98.075(5).

30.     The Department is similarly responsible for obtaining and reviewing information on new registrants' eligibility for rights restoration and for initiating the process for rejecting applications from potentially ineligible voters. Fla. Stat. § 98.0751(3)(a).

31.     Individual Defendant County Supervisors are:

    a) Craig Latimer as Hillsborough County Supervisor of Elections

    b) Kim Barton as Alachua County Supervisor of Elections

    c) Peter Antonacci as Broward County Supervisor of Elections

    d) Mike Hogan as Duval County Supervisor of Elections

    e) Leslie Rossway Swan as Indian River County Supervisor of Elections

    f) Mark S. Earley, as Leon County Supervisor of Elections

    g) Michael Bennett as Manatee County Supervisor of Elections

    h) Christina White as Miami-Dade County Supervisor of Elections

    i) Bill Cowles as Orange County Supervisor of Elections

    j) Ron Turner as Sarasota County Supervisor of Elections

IV.   **Experts**

32.      **Dr. Burch:** Dr. Traci Burch is Associate Professor of Political Science at Northwestern University and Research Professor at the American Bar Foundation. PX892 at 3 (Burch Report). She has conducted extensive quantitative and qualitative research on political participation in the United States, with a focus on how interactions with the criminal justice system can either mobilize or inhibit political participation. *Id.* at 3. Dr. Burch has authored or co-authored numerous articles on this issue, particularly related to felony disenfranchisement and the political activity of returning citizens.[1] *Id.* at 3–4, 95–102. Dr. Burch has not previously worked as a consultant or expert witness, but she has previously testified before the U.S. Commission on Civil Rights about the collateral consequences of felony convictions. *Id*. at 4.

33.      **Dr. Kousser**: Dr. J. Morgan Kousser is a professor of history and social science at California Institute of Technology (Caltech) in Pasadena, California, where he has worked for more than 50 years. PX893 at 126 (Kousser Report) (Curriculum Vitae). Dr. Kousser has extensive experience as an expert in voting rights litigation and has expertise in political history, legal history, minority voting

---

[1] This brief refers to persons with felony convictions as "returning citizens."

rights, race relations and quantitative methods. *Id*. ¶ 3. Dr. Kousser has worked as a consultant or expert witness for both plaintiffs and defendants in 37 federal voting rights or redistricting cases and 18 state cases, including in Florida. *Id*. ¶ 5; *id*. at 144–46. Dr. Kousser's expert work includes *Hunter v. Underwood*, 471 U.S. 222, 229 (1985) (affirming, consistent with Dr. Kousser's opinion, that the Alabama Constitution's felony disenfranchisement law was motivated by intentional discrimination), *N.C. State Conference of NAACP v. McCrory*, 831 F.3d 204, 215, 233 (4th Cir. 2016), *rev'g* 182 F. Supp. 3d 320, 494 (M.D.N.C. 2016), *cert. denied*, 137 S. Ct. 1399 (2017), and *Garza v. Cty. of Los Angeles, Cal.*, 756 F. Supp. 1298, 1309 (C.D. Cal. 1990) *aff'd*, 918 F.2d 763 (9th Cir. 1990), *cert. denied*, 111 S. Ct. 681 (1991). PX893 ¶ 5. He has also testified about voting rights before subcommittees of the U.S. House Judiciary Committee. *Id*. ¶ 6.

34.     **Dr. Smith**: Dr. Daniel Smith is a Professor and the Chair of the Political Science Department at the University of Florida. PX2 at 23 (Smith Supp. Report) (Curriculum Vitae). Dr. Smith is a leading expert on voting and elections in the U.S.—having published more than 80 articles or book chapters, testified before the U.S Senate and state legislatures, and co-authored a leading college textbook on those issues. *Id*. at 24–27. He has also served as an expert in many voting and elected-related cases for both plaintiffs and defendants, including recently for

successful plaintiffs in *League of Women Voters of Florida, Inc. v. Detzner*, 314 F. Supp. 3d 1205 (N.D. Fla. 2018), and for the Secretary of State of Florida in *Worley v. Detzner,* U.S. District Court, N.D. Fla (4:10-cv-00423-RH-WCS). *Id*. at 23. Dr. Smith also serves as President of a consulting firm based in Gainesville, Florida, which focuses on empirical research on U.S. election processes. PX1 ¶ 1 (Smith Report).

35.     **Dr. Donovan**: Dr. Todd Donovan is a Professor of Political Science at Western Washington University and a previous director of the university's Political Science Department. PX886 (Donovan Rebuttal Report). Dr. Donovan is one of the most-cited scholars in the fields of direct democracy and public opinion research, and he has co-authored and co-edited many academic books on ballot initiatives and electoral systems. *See id.* (Curriculum Vitae). Dr. Donovan has also served as an expert witness in election cases in several U.S. state courts, federal courts, and in the Province of British Columbia. *Id.*

36.     **Dr. Walker**: Dr. Hannah Walker is an assistant professor of political science and criminal justice at Rutgers University. PX896 ¶ 1 (Walker Report). Her area of expertise concerns the impact of contact with the criminal justice system on political attitudes and behavior and institutional barriers to the vote, and she has authored numerous published or forthcoming peer-reviewed articles on the topic of

criminal justice and voting. *Id.* ¶ 1–4, 32–37 (Curriculum Vitae). Dr. Walker has not previously served as an expert witness. *Id.* at 2.

37.     **Dr. Weinstein**: Dr. Amanda Weinstein is an assistant professor in the Department of Economics in the College of Business Administration at the University of Akron. PX895 at 2 (Weinstein Report). She has extensive experience in economics, including microeconomics, women and the economy, urban economics, the economics of natural resources and the environment, and applications of math models to economics. *Id.* She has also published numerous peer-reviewed articles and reports on topics including urban and regional economics, environmental economics, labor economics, and the economics of gender. *Id.* Dr. Weinstein has not previously served as an expert witness. *Id.*

38.     **Dr. Barber**: Dr. Michael Barber is a Professor of Political Science at Brigham Young University. Besides this case, he has been proffered as an expert by state defendants in two other cases, yet neither court found his testimony credible or reliable. In a recent case, this Court found that Dr. Barber "crumbled" on cross-examination and conceded that "almost all of [the evidence he presented] was either speculative, unsound, or both." *Jacobson v. Lee*, 411 F. Supp. 3d 1249, 1270 (N.D. Fla. 2019). This Court found "Dr. Barber's testimony emphatically not credible and his opinions offered in this case to be unreliable." *Id*. at 1274. In another recent case,

the Superior Court of North Carolina found Dr. Barber's analysis "unpersuasive" due to many "shortcomings" and gave his testimony "little weight." *Common Cause v. Lewis*, No. 18 CVS 014001, 2019 WL 4569584, at \*94 (N.C. Super. Sept. 3, 2019). Dr. Barber has no experience qualifying him to testify on racial discrimination, the criminal justice system, or criminal records. PX906 at 14:5–15:14; 46:16–48:12 (Barber Dep. Tr.). In this case, the evidence at trial will show that Dr. Barber's opinion that Amendment 4 might not have passed without an LFO requirement is entirely speculative. It is predicated on third-party, unverified, and incomplete summaries of two polls from 2013 and 2014, as well as a handful of statement by certain Amendment 4 proponents. Even the polling summaries Dr. Barber cites do not appear to have asked respondents about LFOs. *See* PX886 at 19–22 (Donovan Rebuttal Report). Indeed, Dr. Barber has conceded "I don't think anyone can say" that Amendment 4 would not have passed if not for the inclusion of the "all terms of sentence" language. PX906 at 84:23–85:1.

39.     **Dr. Adkins**: Dr. Mary Adkins is a Professor at the University of Florida Levin College of Law.

26

## V.   **Procedural History**

### A. Filing and Consolidation of the Cases

40.        On June 28, 2019, Plaintiff Kelvin Jones filed suit against Governor DeSantis, Secretary Lee, and Hillsborough County Supervisor Craig Latimer, seeking declaratory and injunctive relief, and alleging that SB7066 violates the Equal Protection Clause of the Fourteenth Amendment, the Twenty-Fourth Amendment, the Voting Rights Act, and the Florida Constitution. ECF 1 (*Jones* Compl.). Plaintiff Jones' claims under the Voting Rights Act and the Florida Constitution were voluntarily dismissed on March 30, 2020. ECF 311. Also on June 28, 2019, the *Gruver* Plaintiffs filed suit against Secretary Lee and ten individual county Supervisors of Elections, seeking declaratory and injunctive relief and alleging that SB7066 violates the First Amendment, the Equal Protection and Due Process Clauses of the Fourteenth Amendment, the Fifteenth Amendment, the Twenty-Fourth Amendment, and the Ex Post Facto Clause. Case No. 4:19-cv-302, ECF 1 (*Gruver* Compl.). On Oct. 29, 2019 the Gruver Plaintiffs filed their First Amended Complaint alleging a new claim that SB7066 violates the NVRA. *Id.* at ECF 26 (*Gruver* Amend. Compl.). On March 30, 2020, the Gruver Plaintiff's Ex Post Facto claim was voluntarily withdrawn. *Jones v. DeSantis*, 4:19-cv-300, ECF 311.

27

41.     Also on June 28, 2019, the *Raysor* Plaintiffs, on behalf of themselves and others similarly situated, filed a class action suit against Secretary Lee alleging that SB7066 violates the Fourteenth and Twenty-Fourth Amendments. *Raysor, et al. v. Lee*, 4:19-cv-00301, ECF 1 (*Raysor* Compl.). On October 29, 2019, the *Raysor* Plaintiffs filed their second Amended Complaint, alleging a new claim that SB7066 violates the NVRA. *Id.* at ECF 12 (*Raysor* Amend. Compl.).

42.     On July 1, 2019, the *McCoy* Plaintiffs filed suit against Governor DeSantis, Secretary Lee, and Supervisor of Elections Mike Hogan, alleging that SB7066 violates the Fourteenth, Eighth, and Twenty-Fourth Amendments. Case No. 4:19-cv-304, ECF 1 (*McCoy* Compl.). On October 28, 2019, the *McCoy* Plaintiffs filed their first Amended Complaint, alleging a new claim that SB7066 violates the Nineteenth Amendment by denying the right to vote on the basis of sex. *Id.* at ECF 7 (*McCoy* Amend. Compl.).

43.     On June 30, 2019, the *Jones*, *Gruver*, and *Raysor* cases were consolidated before District Court Judge Mark E. Walker in the Northern District of Florida under Case No. 4:19-cv-300. ECF 3. On July 2, 2019, the *McCoy* case was consolidated under Case No. 4:19-cv-300, *McCoy v. DeSantis*, 4:19-cv-304, ECF 3. On July 3, 2019, a fifth case, brought by Plaintiff Luis Mendez and alleging the same

claims as Plaintiff Jones, was consolidated under Case No. 4:19-cv-300. *Mendez v. DeSantis*, 4:19-cv-272, ECF 12.

44.     On July 17, 2019, Judge Walker entered an order of disqualification after Defendants Peter Antonacci and Laurel Lee retained the law firm Holland & Knight, at which Judge Walker's wife is a partner. ECF 86. The cases were reassigned to District Court Judge Robert L. Hinkle. *Id*.

### B. Preliminary Injunction and Appeal

45.     On August 2, 2019, all Plaintiffs moved for a preliminary injunction against the enforcement of SB7066's LFO requirements. ECF 98-1.

46.     Also on August 2, 2019, the Defendant Supervisors of Elections collectively filed a Motion to Dismiss on the grounds that the *Gruver*, *McCoy, Jones, and Mendez* Plaintiffs had failed to state a cause of action against the Supervisors and lacked standing to do so. ECF 96. The State Defendants, Governor DeSantis and Secretary Lee filed a Motion to Dismiss the same day, alleging that all Plaintiffs lacked standing because their claims were not redressable and that abstention was appropriate to allow the Florida Supreme Court to provide guidance as to the requirements of Amendment 4. ECF 97.

47.     On September 10, 2019, the State Defendants sought a stay pending the outcome of Governor DeSantis's petition to the Florida Supreme Court for an

advisory opinion as to whether the phrase "all terms of sentence including probation and parole" as used in Amendment 4 included LFOs as a term of sentence. ECF 138. On September 11, 2019, this Court denied the stay. ECF 140.

48.      On September 26, 2019, the *Raysor* Plaintiffs filed their motion for class certification. ECF 172.

49.      This Court held a two-day hearing on Plaintiffs' motion for a preliminary injunction on October 7-8, 2019. ECF 201–02. The Court also heard argument on Defendants' Motion to Dismiss. *Id.*

50.      On October 18, 2019, this Court denied Defendants' motion to dismiss, finding that Plaintiffs had standing, their claims were redressable, and that abstention was not appropriate under the circumstances. ECF 207. The Court granted in part the Plaintiffs' motion for preliminary relief, finding Plaintiffs had shown a substantial likelihood of success on the merits of their claim that SB7066's LFO requirement, as applied to those who showed genuine inability to pay, constituted wealth discrimination in violation of the Fourteenth Amendment. *Id.* The Court enjoined the Secretary of State and the Defendant Supervisors of Elections from taking any action that prevents an individual plaintiff from registering to vote based solely on failure to pay a financial obligation that the plaintiff asserts she is genuinely

30

unable to pay and from taking any action to prevent the individual plaintiffs from voting because of a financial obligation they are genuinely unable to pay. *Id.*

51.     On November 15, 2019, the State Defendants filed an appeal of the preliminary injunction with the Eleventh Circuit. ECF 219.

52.     On February 19, 2020, the Eleventh Circuit upheld the preliminary injunction, affirming that SB7066 unconstitutionally discriminates on the basis of wealth as applied to those genuinely unable to pay. *Jones v. Gov. of Fla.*, 950 F.3d 795 (11th Cir. 2020).

53.     The State Defendants petitioned for rehearing *en banc* on February 26, 2019. Pet. for Reh'g En Banc, *Jones v. Gov. of Fla.*, No. 19-14551 (11th Cir. Feb. 26, 2020). After no judge in regular active service on the Eleventh Circuit called for a poll of the Court, the petition for rehearing *en banc* was denied on March 31, 2020. Order, *Jones v. Gov. of Fla.*, No. 19-14551 (11th Cir. Mar. 31, 2020). On April 8, the mandate from the Eleventh Circuit issued. ECF 329.

54.     The State Defendants filed an omnibus motion for summary judgment on all claims on February 18, 2020. ECF 267. This Court denied the motion as to all claims still pending in the case on March 30, 2020. ECF 311.

55.     On April 7, 2020, the Court granted the *Raysor* Plaintiffs motion for class certification. ECF 321.

### C. NVRA Notice and Claims

56.     On June 29, 2019, the Gruver Plaintiffs served a letter on Secretary Lee alleging violations of the National Voter Registration Act ("NVRA") on behalf of themselves "and persons similarly situated." PX841 at 1 (6/29/19 Letter from Sean Morales-Doyle, et al.). On October 8, 2019, the Court granted the plaintiffs in each case leave to amend their Complaints to assert claims under the NVRA. ECF 204 at 301:11–302:12; ECF 203 at ¶ 11.

57.     On October 29, 2019, the *Raysor* Plaintiffs sent Secretary Lee's counsel a letter alleging the same substantive violations of the NVRA as those listed in the *Gruver* Plaintiffs' June 29, 2019 notice letter. PX850 (10/29/19 Email from Danielle Lang, et al.).

58.     On October 29, 2019, the *Raysor* Plaintiffs filed a Motion for Leave to Amend Complaint to add NVRA claims relying upon the notice of violations provided by the *Gruver* Plaintiffs, or, in the alternative, extending the deadline to amend the *Raysor* Complaint by 90 days. ECF 11. This Court granted *Raysor* Plaintiffs' motion for leave to amend on November 5, 2019. ECF 216.

59.     More than 90 days have passed since the *Raysor* Plaintiffs' served Secretary Lee with their NVRA notice letter and filed their Motion for Leave to Amend Complaint.

VI.   **Florida Has a Long History of Disenfranchising People with Felony Convictions**

   A. **Before Amendment 4, Florida Had One of the Harshest Felony Disenfranchisement Laws in the Nation**

60.      Prior to Amendment 4, Florida was one of just three states that permanently disenfranchised its citizens for committing a single felony offense. Florida disenfranchised a higher percentage of its adult citizens than any other state in the United States—more than 10 percent of the overall voting age population and more than twenty-one percent of the Black voting age population—and was responsible for more than 25 percent of the approximately 6.1 million U.S. citizens disenfranchised nationwide on the basis of convictions. *See* Brief for Sentencing Project, *Hand v. Scott*, No. 18-11388, 2018 WL 3328534 (11th Cir. June 28, 2018); PX162 at 3, 12 (Sentencing Project Report).

61.      Before the passage of Amendment 4, a person's ability to have their civil rights restored rested solely upon the unfettered discretion of the Florida Board of Executive Clemency ("Clemency Board"). Fla. Const. art. IV, § 8; *see also* Fla. R. Exec. Clemency 4; PX893 ¶ 91 (Kousser Report).

62.      During the pre-Amendment 4 era, Florida erroneously denied rights restoration to more than 14,208 individuals between 1998 and 2000. PX893 ¶ 98 (Kousser Report). Between 1992 and 2001, the State failed to provide assistance

with rights restoration to nearly 125,000 individuals, approximately 31,000 of whom were eligible for automatic rights restoration under the rules at that time. *Id.* ¶ 99.

63.      During this period, the State also had a history of erroneously removing citizens from the voter rolls on the basis of alleged ineligibility due to a past felony conviction.

64.      For example, before the 2000 election, then-Florida Secretary of State Katherine Harris sent a list of 58,000 alleged returning citizens who were registered voters to Supervisors of Elections that she had determined should be removed from the voting rolls due to felony convictions. *Id.* at ¶ 94. Although only 11 percent of Florida's voting population at the time were Black, 44 percent of those on the list were Black. *Id.* Afterwards, and following a lawsuit, it was determined that 12,000 of the individuals on the list had been wrongfully removed from the rolls because they were mistakenly identified as having felony convictions. *Id.*

### B. Felony Disenfranchisement Was One of Many Tools Florida Used to Disenfranchise Black People After the Civil War

65.      Florida's voting restrictions have existed for over a hundred years. After Reconstruction, Florida adopted a number of laws designed to suppress the Black vote including literacy and residency tests and a poll tax. See PX893 at ¶¶ 159, 185 (Kousser Report).

66.      Felony disenfranchisement was another such tool. *Id.* ¶ 163.

67.     Even after restrictions on voting such as literacy and residency tests were struck down, Florida maintained strict rules permanently disenfranchising individuals who had been convicted of felonies. Fla. Const. art. VI, § 4 (amended in 1968).

68.     From 1888 until 1968, there were no Black legislators in the Florida State Legislature. PX893 ¶ 187.

69.     From 1972 forward, Florida was covered in part by the Voting Rights Act, and the federal government required Florida to preclear its voting changes to demonstrate that they did not retrogress on the ability of Black and other protected groups from being able to participate in elections and elect their candidates of choice. U.S. Dep't of Justice, *Jurisdictions Previously Covered by Section 5*, https://www.justice.gov/crt/jurisdictions-previously-covered-section-5       (last accessed on April 15, 2020); PX893 ¶¶ 187–89.

70.     From 1985 through 2012, the Florida Legislature attempted to make at least five changes to state election laws, which the federal government or a federal court rejected because those changes had a discriminatory purpose or effect in violation of section 5 of the Voting Rights Act. PX893 ¶¶ 187–88; *see also Florida v. United States*, 885 F. Supp. 2d 299 (D.D.C. 2012) (three-judge court) (finding that Florida's proposed changes to its early-voting laws were discriminatory); U.S. Dep't

of Justice, Civil Rights Div., *Voting Determination Letters for Florida* (Aug. 7, 2015), https://www.justice.gov/crt/voting-determination-letters-florida.

71.     Florida's pattern of electoral manipulation and voter suppression, including against racial minorities and other vulnerable groups, has continued to today. *See Democratic Exec. Comm. v. Lee*, 915 F. 3d 1312, 1321 (11th Cir. 2019) (holding that a state law was unconstitutional because it had led to the rejection of valid absentee ballots due to alleged signature mismatches); *see also Rivera Madera v. Detzner*, 325 F. Supp. 3d 1269, 1278 (N.D. Fla. 2018) (finding that Florida's failure to provide voting materials in Spanish violated the Voting Rights Act); *League of Women Voters v. Detzner*, 314 F. Supp. 3d 1205, 1216 (N.D. Fla. 2018) (enjoining the State from categorically barring early-voting sites at colleges because it "lopsidedly impacts Florida's youngest voters").

72.     Felony disenfranchisement disproportionally affects Black citizens in Florida. More than one in five of Florida's Black voting-age population could not vote under the felony disenfranchisement regime that existed prior to 2018. PX162 at 3 (Sentencing Project Report). While Black citizens comprised 16 percent of Florida's population in 2016, they made up nearly 33 percent of all those previously disenfranchised by a felony conviction. PX893 ¶ 206.

73.     During former Governor Rick Scott's two terms, his administration restored voting rights to twice as many white returning citizens as Black returning citizens. DX85; DX86 at 6 (4/30/19 Email and NAACP Letter). Moreover, the number of clemencies drastically fell from a high of nearly 90,000 in one year under former Governor Charlie Crist to a little over 3,000 in eight years under Governor Scott. PX893 ¶¶ 15, 126, 140.

74.     Motivated by the stark decline in the numbers of executive clemency applications granted during the 1990s and beyond, *see id.* ¶ 103 fig. 2, legislators—almost all of whom were Black—began introducing numerous bills to reform Florida's felony disenfranchisement regime, *id.* ¶ 108. From 1998 through 2018, legislators introduced 53 rights restoration bills, indicating "an issue of particular concern to black legislators and the communities they represented." *Id.* ¶¶ 108–9. None passed. *Id.*

75.     With limited policy opportunities available, advocates have also unsuccessfully sought to address Florida's practice of felony disenfranchisement through the federal courts. *Johnson v. Gov. of Fla.*, 405 F.3d 1214 (11th Cir. 2005).

VII.   **Prior to Amendment 4 Florida's Rights Restoration Process Was Arbitrary, Interminable, and Rarely Successful**

76.     Before Amendment 4, the only avenue for rights restoration of voting rights was to seek clemency from the Executive Clemency Board, comprised of the

Governor and members of the Cabinet. *See* Fla. Const. art. IV § 8(a) (1968). Executive Clemency is granted infrequently and without articulated standards. ECF 207 at 5.

77.     Every decision on executive clemency is subject to the "unfettered discretion" of the Governor, who has the authority "to deny clemency at any time, for any reason." Fla. R. Exec. Clemency 4.

78.     Individuals who have completed all sentences imposed and all conditions of supervision must wait at least five years before they are eligible to apply for rights restoration, subject to other restrictions. Fla. R. Exec. Clemency 9(A).

79.     Individuals convicted of certain enumerated crimes must wait seven years after completion of all sentences and all conditions of supervision before they are eligible to apply. Fla. R. Exec. Clemency 10(A). The Clemency Board removed the requirement that clemency applicants pay off restitution on January 21, 2020. PX297; *Jones*, 950 F.3d at 811 n.9.

80.     Even after an individual becomes eligible and applies for clemency, they will likely wait years before their application is processed and decided. ECF 207 at 5–6 (finding that the clemency process "has moved at glacial speed.") (citing testimony of Plaintiff Tyson, ECF 204 at 170–71).

81.     If an application is denied, the Governor may unilaterally extend the period during which the applicant must wait to reapply beyond the minimum two years set out in the clemency rules, including by extending such a period indefinitely. *See* Fla. R. Exec. Clemency 4 (allowing the Governor to deny clemency "at any time, for any reason."); PX296 (FCOR Charts) (showing thousands currently pending applications from 2008 on).

82.     Success under this system is exceedingly rare. Over a seven-year period, fewer than 3,000 individuals had their rights restored through executive clemency. *Hand v. Scott*, 285 F. Supp. 3d 1289, 1310 (N.D. Fla. 2018) *vacated and remanded sub. nom Hand v. DeSantis*, 946 F.3d 1272 (11th Cir. 2020); PX296.

83.     Between January 1, 2018 and December 31, 2019, despite the backlog of pending clemency applications, the Board of Executive Clemency reviewed only 180 clemency applications and only 116 people had their rights restored either through a pardon or restoration of civil rights. PX772 (Response to Supp. Request for Discovery) at 1–3; *see also* PX296 at 1–3 (FCOR Charts Summarizing Numbers of Clemency Applications Received and Dispositions) (showing that as of December 31, 2019, 3,126 clemency applications were pending).

84.     Of the 180 applications reviewed in 2018 and 2019, 37 were for full pardons, of which the Board granted 14. *Id.* at 1. None of the 37 applicants had any

outstanding LFOs. *Id.* Of the 180 applications, 138 were for the restoration of civil rights, 101 of which were approved, 25 of which were rejected, and two of which were withdrawn. *Id.* at 3. Only eight individuals with outstanding LFOs, or approximately 6 percent of the total number of applications, were granted rights restoration. *Id.* No individuals with outstanding restitution were granted rights restoration. *Id.*

85.     In contrast, during the period from 2007 to 2010, more than 150,000 individuals were granted clemency. PX893 ¶¶ 103 fig.2, 104, 161.

## VIII. <u>Florida Voters Enacted Amendment 4 to End Permanent Disenfranchisement for All Floridians Except Those Convicted of Murder or a Felony Sexual Offense</u>

### A. Amendment 4 Was Conceived and Enacted Against the Backdrop of Historical Discrimination, Legislative Failure, and the Broken Clemency System

86.     The Florida Constitution may be amended through a citizen initiative. A proposed amendment will pass if it receives 60 percent approval from voters. Fla. Const. art. I, § 5(e).

87.     To place a citizen initiative on the ballot, Floridians must collect a number of qualified electors' signatures equal to eight percent of the votes cast in the last presidential election, from at least half of the state's U.S. Congressional

districts. Fla. Const. art. XI, §§ 3–4. Signatures are valid for two years. Fla. Stat. § 100.371(11).

88.      In light of more than 20 years of failure by state legislators to end permanent felony disenfranchisement in Florida and ongoing concern over the arbitrariness and inadequacy of the clemency system, *see Hand*, 285 F. Supp. 3d at 1302, voters began a massive push to pass a constitutional amendment to automatically restore voting rights to returning citizens. PX893 ¶ 26 (Kousser Report).

89.      On April 20, 2017 the Florida Supreme Court approved the proposed amendment language pursuant to the single-subject rule. *Advisory Op. to the Attorney Gen. Re: Voting Restoration Amendment*, 215 So. 3d 1202, 1208 (Fla. 2017).

90.      Floridians for Fair Democracy, along with partners and activists across the state, successfully gathered more than 840,000 valid signatures in support of a proposed initiative to automatically re-enfranchise citizens with felony convictions, other than murder or sex offenses, after completion of their sentences. Voting Restoration Amendment 14-01, Florida Division of Elections, https://dos.elections.myflorida.com/initiatives/initdetail.      asp?account=64388

&seqnum=1. On January 23, 2018, the proposed amendment was certified for the November 6, 2018 ballot. *Id.*

91.     A substantial number of news articles highlighted that a disproportionate number of returning citizens were Black. PX893 ¶¶ 57 n.40, 88 n.71, 116 n.106, 117–136, 142 n.129, 144 n.135, 192.

92.     Three days before the November 6, 2018 election, the Tampa Bay Times, which is the local newspaper of SB7066's lead sponsor Representative Grant, published findings from an extensive joint study with the Miami Herald, demonstrating the racial bias in Florida's felony disenfranchisement system. A banner, front-page headline highlighted the study's finding that returning citizens are disproportionately Black. *Id.* ¶¶ 14, 88.

> **B. The Public Discussion of the Effects of Amendment 4 Leading Up to the Election Centered on the Large Numbers of Individuals Who Would Benefit from Automatic Rights Restoration and Rarely Touched on LFOs**

93.     Mainstream and widespread media coverage of the Amendment 4 campaign estimated that it would restore voting rights to between 1.2 and 1.6 million returning citizens in Florida. *Id.* ¶¶ 57 n.40, 85, 88 n.71, 117, 119, 122, 133 n.123, 142 n.129, 144 n.135, 192.

94.     There were 55 articles in ten major Florida newspapers that discussed "felon voting" and contained explicit or implicit references to sentences from October 1 through November 7 (the day after the election). *Id.* ¶ 11.

95.     Twenty-five of the fifty-five articles explicitly stated people would be eligible for rights restoration once they had "served" their prison sentence and any sentence of parole or probation. *Id.* ¶ 62. Nineteen of the fifty-five articles described Amendment 4 so generally that voters could have found that rights restoration was conditioned only on completion of a prison sentence and any sentence of parole or probation. *Id*. ¶ 64. Only fourteen suggested that rights restoration was conditioned on payment of restitution, as well as completion of any term of incarceration or supervision. *Id.* ¶ 63. And only two of the fifty-five articles contained any mention of other forms of LFOs. *Id*. ¶¶ 27, 65.

## C. A Large Majority of Floridians Voted to End Permanent Disenfranchisement

96.     The chief purpose of Amendment 4 was to end permanent disenfranchisement and automatically restore voting rights to people with past convictions. *Advisory Op. to the Attorney Gen. Re: Voting Restoration Amendment*, 215 So. 3d at 1208 ("[T]he chief purpose of the amendment is to *automatically* restore voting rights to [certain] felony offenders . . . upon completion of all terms of their sentence.") (emphasis added).

43

97.     Amendment 4 provides that:

> (a) . . . Except as provided in subsection (b) of this section, any disqualification from voting arising from a felony conviction shall terminate and voting rights shall be restored upon completion of all terms of sentence including parole or probation.
> (b) No person convicted of murder or a felony sexual offense shall be qualified to vote until restoration of civil rights.

Fla. Const. art. VI, § 4.

98.     On November 6, 2018, 5,148,926 Floridians—nearly 65 percent of the electorate—voted for Amendment 4. *See* Fla. Const. art. VI, § 4(a); Voting Restoration Amendment 14-01, Florida Division of Elections, https://dos.elections.myflorida.com/initiatives/initdetail.asp?account=64388&seqnum=1. The passage of Amendment 4 was the largest expansion of the franchise since the passage of the Voting Rights Act.

## IX.   SB7066 Was Enacted To Restrict the Number Of Individuals Who Would Qualify for Rights Restoration Under Amendment 4

### A. Prior To the Enactment of SB7066 Florida Officials Permitted the Registration of Returning Citizens with Outstanding LFOs

99.     Amendment 4 went into effect on January 8, 2019.

100.     Between January 8, 2019 and July 1, 2019, Defendants implemented Amendment 4 as if it required only completion of incarceration, parole, and probation; they did not require payment of LFOs as a condition of registering or voting. *See* PX303 at 5–6 (12/17/18 Internal Briefing Paper) (containing no mention

44

of LFOs in Amendment 4 implementation plan); PX622 (1/7/19 Email from Sarah Revell) (confirming no change in registration process after Amendment 4); PX578 (3/4/19 Email from Sarah Revell); PX31 (6/7/19 Email from Maria Matthews) (instructing SOEs to continue verifying "potentially ineligible registered voters" by checking only whether the "person is still in prison or under supervision with the DOC" without mention of LFOs); PX286 (St. Lucie County Amendment 4 FAQs); PX28 (Osceola County Amendment 4 FAQs); PX25 at 74:22–75:19 (Arrington Dep.) (confirming that prior to July 1 payment of LFOs "was not a requirement" and "not something the Secretary of State said was required"); PX39 at 54:7–55:16 (Barton Dep.).

101.    During that time, State Defendants did not inform election officials or voters that Amendment 4 barred returning citizens with outstanding LFOs from registering to vote and voting. PX808 (DOS Talking Points); PX522 (DOS Talking Points); PX39 at 48:17–49:12 (Barton Dep.); PX484 at 1 (Miami-Dade County SOE RFA Responses); PX485 at 1–2 (Indian River County SOE RFA Responses); PX486 at 1 (Duval County SOE RFA Responses); PX505 at 1 (Leon County SOE RFA Responses). Defendants did not send denial of voter registration or removal notices based on outstanding LFOs. PX569 (2/13/19 Email from Stephen Usztok) (indicating that Leon County SOE invalidated felon matches "regardless of fine or

fee status" and only preserved matches when individual was incarcerated or on parole/probation); PX32 (6/18/19 Email from Maria Matthews).

102.    During this time, Defendants approved the voter registration applications submitted by several of the Individual Plaintiffs and many others similarly situated, and accordingly at least some of those individuals voted in local elections during the spring. *See, e.g.*, PX3 ¶ 7 (Gruver Decl.); PX7 ¶ 4 (Ivey Decl.); PX12 ¶ 21 (Tyson Decl.); PX13 ¶ 10 (McCoy Decl.); PX14 ¶ 10 (Singleton Decl.); PX346 (1/10/19 Email from Paul Lux) ("I am not aware of any SOE in the State who is refusing to accept registration forms from previously ineligible applicants."); PX578 (3/4/19 Email from Sarah Revell).

103.    In communications with their constituents, several legislators—including sponsors of SB7066—expressed confusion as to whether Amendment 4 required payment of LFOs. *See, e.g.*, PX332 (Compilation of Legislators' Responses to Constituent Emails); PX879 (12/12/18 Brandes Memorandum) (questioning whether rights are restored "at the end of the sentence or after restitution has been repaid?").

104.    Based on the text of Amendment 4 and the actions already being taken by the Supervisors of Elections prior to the 2019 legislative session, multiple parties informed the legislature and Secretary of State that Amendment 4 was self-executing

and the Secretary of State only needed to provide administrative guidance to properly administer the new law. *See, e.g.*, Letter from Desmond Meade et al. to Fla. Secretary of State (Dec. 13, 2018), https://www.aclufl.org/sites/default/files/ guidance_letter_to_secretary_of_state_regarding_a4_implementation.pdf; PX817 (3/11/19 FRRC et al. Letter); PX381 (4/8/19 ACLU Florida Written Testimony); PX888 & PX889 (4/22/19 Email and NAACP Letter); DX85 & DX86 (4/30/19 Email and NAACP Letter); *see also* PX333 (Compilation of Constituents' Emails to Legislators). Some legislators also acknowledged that Amendment 4 was self-executing. *See, e.g.*, PX307 at 3:10–3:11 (4/23/19 Florida Senate Rules Committee Hearing).

105.    Nevertheless, the Florida House and Senate pressed on with hearings related to SB7066 and its predecessor bills House Bill 7089 ("HB7089") and Senate Bill 7086 ("SB7086"), claiming that they needed to enact implementing legislation. *See, e.g.*, PX158 (4/23/19 Florida House Hearing) (also available at https://www.myfloridahouse.gov/VideoPlayer. aspx?eventID=2443575804 _2019041264); PX163 (5/2/19 Florida Senate Hearing); PX893 ¶¶ 38, 69, 75, 107 (Kousser Report).

**B. Prior to and During the 2019 Legislative Session, Legislators Were Aware That an LFO Requirement Would Be Difficult If Not Impossible to Implement**

106.    In October 2016, the Financial Impact Estimating Conference ("FIEC")[2] conducted an analysis of Amendment 4's anticipated impact, which included testimony from Amendment 4 proponents, the Secretary of State, county election supervisors, the Office of Economic and Demographic Research, the Department of Corrections, the Department of Law Enforcement, the Executive Office of Clemency, and the Commission on Offender Review. *See Financial Impact Estimating Conference: Public Workshop,* The Florida Channel (Oct. 5, 2016), https://thefloridachannel.org/videos/10516-financial-impact-estimating-conference-public-workshop-voter-restoration-amendment ("Oct. 5 FIEC Conference"); *Financial Impact Estimating Conference: Principals' Workshop*, The Florida Channel (Oct. 17, 2016), https://thefloridachannel.org/videos/101716-financial-impact-estimating-conference-principals-workshop-voter-restoration-amendment ("Oct. 17 FIEC Conference"); PX893 ¶ 47.

---

[2]    The FIEC is an interagency group charged with determining the prospective costs of measures to state and local governmental bodies of measures before the initiatives are voted on by the public and is known as the "research arm" of the Legislature. PX893 ¶ 46; *see* Fla. Stat. § 100.371(13).

107.   The FIEC hearings on Amendment 4 examined the availability of information on payments of restitution, fines, and fees—who collected it, how returning citizens and election officials could access it, and what problems could be anticipated if payment of some or all LFOs were required before someone were allowed to vote under Amendment 4. PX893 ¶ 48. Florida state officials testified that there was no central data repository on LFOs. *Id.* ¶ 48, 169–70; Oct. 17 Conference at 0:15–0:16 (statement of Matt Hasbrouck); Oct. 5 FIEC Conference at 1:54–1:55 (statement of Jose Diez-Arguelles). The hearings also revealed that there was no agency or database that could verify federal and out-of-state felony convictions. Oct. 5 FIEC Conference at 1:09–1:12 (colloquy between Amy Baker and Julia McCall); PX893 ¶¶ 169–70.

108.   The Secretary of State and the Office of Economic and Demographic Research must publish FIEC reports and materials online. Fla. Stat. § 100.371(13)(e)(3)–(5). Two of the four principals of the FIEC conference must be a staff member from the Florida House of Representatives and a staff member of the Florida Senate. Fla. Stat. § 100.371(13)(c)(1).

109.   The Staff Director for the Senate Committee on Criminal Justice obtained a copy of the full FIEC Report on Amendment 4 and an executive summary. PX871 (3/25/19 Email from Lauren Jones); PX872 (Summary of Initiative Financial

Information Statement Voting Restoration Amendment). In that report, the FIEC determined that Amendment 4's phrase "terms of sentences" was "unclear." PX872 at 1.

110.     During the legislative and public debates leading up to the passage of SB7066, individuals and Florida agencies repeatedly alerted the Florida legislature of the fact that there was no single authority in state or county governments that was tasked with pulling together all of the necessary information to determine LFOs. PX158 at 7:04–7:05 (4/23/19 Florida House Hearing) (colloquy between Reps. Driskell and Grant); PX893 ¶¶ 171–173, 181. Representative Grant, sponsor of SB7066's predecessor in the House, acknowledged that: "the State of Florida nowhere keeps a discrete data element that documents whether or not somebody completed the term of their sentence." PX158 at 6:02–6:03.

111.     On February 14, 2019, the House heard from agencies and individuals about financial obligations as they related to returning citizens. This included statements from Lee Adams, Chief of the Florida Department of Correction's ("FDOC") Bureau of Admission and Release, that FDOC in many cases "ha[s] no way of knowing" if an individual has not completed her financial obligation after termination of supervision. PX161 at 1:18 (2/14/19 Florida House Joint Meeting of Criminal Justice Subcommittee and Judiciary Committee); PX893 ¶ 171. Carolyn

Timmann, Martin County Clerk of Court, testified that county clerks have limitations in what data they have on returning citizens, explaining that county clerks do not have restitution information in a majority of cases. PX161 at 00:29, 00:54; PX893 ¶ 171. A few weeks later, on April 23, 2019, in response to questions about where a returning citizen can go to find if they are eligible, Representative Grant stated that "[t]here is no stakeholder in the State of Florida that can serve as a source of truth that somebody completed all terms of their sentence." PX158 at 7:04; PX893 ¶ 172. During that same hearing, Representative Grant also stated that he was "a bit embarrassed" because he did not realize before that there is "no process" and "no database in the State of Florida that contains . . .the [information]" on whether someone would be eligible to vote with an LFO. PX158 at 6:02 (colloquy between Reps. Grieco and Grant); PX893 ¶ 172.

112.    Election officials also sounded the alarm that verifying LFOs would be all but impossible with existing state resources. PX383 at 5 (Department of State Draft Bill Analysis of SB7086) (noting that "no single source exists . . . about whether and when a person has completed his or her sentence"); PX509 at 1 (4/2/19 Email from Maria Matthews); PX399 (4/24/19 Email from Paul Lux) ("[Supervisors] simply do not have the resources or access to proper information to

make those determinations without a substantial investment in our infrastructures and information networks.").

113.    A Bill Analysis and Fiscal Impact Statement prepared by the Senate Rules Committee staff predicted that SB7066 would require (but did not provide) significant funding, information technology resources, and staff capacity that the Department of State did not have. PX313 at 27 (4/22/19 Bill Analysis and Fiscal Impact Statement). The Legislature contemplated creating a "clearinghouse or centralized location for all the relevant data" to verify returning citizens' eligibility but rejected the idea because it was "very costly" and "may not be necessary" in light of the "relationship" between the Department of State and other agencies. PX365 at 6 (FAQs for SPB 7086). The Legislature also refrained from giving the Department of State rulemaking authority in the area of rights restoration. PX389 (4/19/19 Email from Ryan Cox); PX390 (Draft Amendment to SB7086).

114.    Legislators therefore knew that an LFO requirement would make it practically impossible for Florida officials, voters, and voter registration organizations to know who is and who is not eligible to register and vote under SB7066. PX893 ¶¶ 171–173, 181; *see also* PX904 at 60:7–9 (Kousser Dep.)

115.    Because the Legislature also knew that any LFO requirement would disproportionately impact Black returning citizens, *see infra*, it knew that any

increased bureaucratic complexities would disproportionately harm Black returning citizens. *Id.* at 60:10–15.

### C. Legislators Intentionally Chose to Define "Completion of All Terms of Sentence" in the Most Restrictive Manner and Ignored Warnings that Doing So Would Disproportionately Impact Black Floridians

116.     The two bills that eventually became the relevant LFO provisions in SB7066 were HB7089 and SB7086. PX893 ¶ 8 (Kousser Report).

117.     HB7089 originated in the Criminal Justice Subcommittee of the House Judiciary Committee, chaired by Representative Grant. PX161 at 0:14 (2/14/19 Florida House Joint Meeting of Criminal Justice Subcommittee and Judiciary Committee); PX893 ¶ 149. SB7086 was sponsored by Senator Brandes who served as the Vice Chair of the Senate Criminal Justice Committee. PX893 ¶ 149.

118.     Given the work of the Criminal Justice Committees, its members were aware of the racial makeup of returning citizens and the economic barriers they face in reentry. *Id* ¶ 30. It was widely reported that prior to Amendment 4, Black Floridians were disproportionately impacted by Florida's practice of permanent disenfranchisement for people convicted of a felony, under which 23 percent of Black voting age Floridians were barred from voting. *Id*. ¶ 192.

119.     Senator Brandes was the principal sponsor of the First Step Act, a bill passed during the same session, which was intended to reduce the state's prison

population and involved a discussion of the racial demographics of Florida's prison population. *Id.* ¶ 149.

120.     During the House and Senate hearings on HB7089 and SB7086, legislators were informed about the expected results of imposing an LFO requirement in order to vote, including by:

> a)     Returning citizens, who testified that an LFO requirement would permanently disenfranchise them based on their inability to pay. *Voting Rights Restoration Act: Hearing on S.B. 7086 Before the S. Comm. on the Judiciary* at 0:45:45–0:50:23 (Mar. 25, 2019), http://www.flsenate.gov/media/videoplayer?EventID =2443575804_2019031354&Redirect=true ("Mar. 25 Senate Hearing"); PX893 ¶ 73.

> b)     The Florida State Conference of the NAACP, which submitted six letters detailing the harmful effects the bill would have on Black returning citizens. *See* ECF 286-10 at 25:20– 26:18, 28:12–29:15 (Ellison Dep.); PX875 (4/3/19 NAACP Letter); PX888 & PX889 (4/22/19 Email and NAACP Letter); DX85 & DX86 at 2 (4/30/19 Email and NAACP Letter). One of these letters informed the legislature that the bill would "reproduce a two-tiered level of citizenship" that "will disproportionately impact low-income and racial minority returning citizens" and highlighted the economic barriers that returning citizens face due in part to "collateral consequences that serve as barriers to basic necessities, including employment and housing." PX889 at 2, 4–5; *see also* ECF 286-10 at 25:20– 26:18; 28:12–29:15.

> c)     Florida's Public Defender Association, which submitted a position paper reminding the legislature that "fees, court costs, and surcharges that are not part of a sentence or a condition of probation should not be required." PX350 at 1.

d)    Law Enforcement Leaders, a national coalition of current and former law enforcement officials, which submitted a letter to the legislature in opposition to the bills opposing an LFO requirement because it would "add no public safety value" and "effectively disenfranchise thousands of nonviolent offenders with financial obligations that they will never be able to pay due to poverty and those with too large of financial obligations – usually from nonviolent property crimes – that they will never be able to pay off in their lifetime." PX398 at 2.

e)    Individual advocates, such as Neil Volz the political director of the FRRC, who testified that his group opposed the bill because it "[would] restrict the ability to vote for thousands of Floridians, especially people who are poor, especially people of color." *Voting Rights Restoration Act: Hearing on H.B. 7089 Before the H. Criminal Justice Subcomm. of Judiciary Comm.* at 1:11–1:14 (Mar. 19, 2019), https://www.myfloridahouse.gov /VideoPlayer.aspx?eventID=2443575804_2019031246 (remarks of Neil Volz) ("Mar. 19 House Hearing"); PX893 ¶ 157.

121.    Other legislators also noted that an LFO requirement would disproportionately harm Black returning citizens and their families. PX893 ¶¶ 87, 90, 150, 157, 160–161, 193. Some of the specific statements by legislators include:

a)    Representative Adam Hattersley who argued that the bill was "targeting the poor . . . and targeting minorities . . .", Mar. 19 House Hearing at 1:46–1:47; PX893 ¶ 157;

b)    Representative James Bush, a Black legislator, who warned that the contemplated bill might violate constitutional protections of voters of color, Mar. 19 House Hearing at 1:58–2:16; PX893 ¶ 157;

c)    Representative Anna Eskamani who expressed concern that the bill would prevent minimum wage workers from having their voting rights restored as intended by Amendment 4, PX154 at 3:45 (5/3/19 Florida          House          Session)          (also          available          at

https://www.myfloridahouse.gov/VideoPlayer.aspx?eventID=
2443575804_2019051002) (colloquy between Rep. Eskamani and
Rep. Grant); PX893 ¶ 150; and

d) Representative Shevrin D. Jones who warned his colleagues during
floor debate that 83 percent of fines are never paid back and over 60
percent of those fines that are never paid back are from Black
returning citizens. PX158 at 7:20–7:22 (4/23/19 Florida House
Hearing) (colloquy between Reps. Jones and Grant); PX893 ¶ 160.

122.    In addition, in the House on the last day of session, Representative

Dotie Joseph explained to her colleagues the history of felony disenfranchisement,

voter suppression against Black voters, and the racial disparities defining the Florida

criminal justice system:

> The reality is that the policy decision to disenfranchise felons
> was one of the tools that was used by this legislature back in the 1800s
> to keep African-Americans from exercising their right to vote . . . .
> Enforcement of those Black Codes were so effective that by the 1870s
> and 1880s, more than 95% of the convicts in the state of Florida were
> Black. That was not the case before. Legislator William J. Purman
> reportedly bragged about the policies that had kept Florida from
> becoming 'nigger-ized.' Of those racially motivated disenfranchising
> laws, removing a felon's right to vote was one of the most effective of
> those. . . . Florida's felon population [tends to be] overrepresented by
> black and brown people who are, in many cases, the victims of a

56

criminal justice system that disproportionally targets, arrests, charges, prosecutes, convicts, and sentences people of color at a higher rate based on no other factor, [other] than their race.

PX154 at 4:11–4:21 (5/3/19 Florida House Session); PX893 ¶ 163.

123.    Despite such warnings, the sponsors of SB7066, HB7089, and SB7086 refused to empirically study or determine how many people would be disenfranchised on account of any legislation. PX893 ¶¶ 147, 157, 202. In the House, Representative Grant said that he did not know or care how many people would be disenfranchised if the legislation passed: "I was asked, have I done a study to know how many people are impacted by this. I said no. They said, are you willing to take a study. I said no. And here's why. I'm happy to review when we're done, members. But members, I don't want to know the impact of this. Because it's irrelevant." PX309 at 3:57–4:02 (4/4/19 Florida House State Affairs Committee Hearing) (remarks of Rep. Grant); PX893 ¶ 202.

124.    As a trained lawyer, an elected official working on election law, and having repeatedly cited voting cases from federal circuits during the legislative session, Representative Grant knew that there may be potential litigation surrounding SB7066 and likely was aware of the decision in the North Carolina

photo ID case, *N.C. State Conference of NAACP v. McCrory*, 831 F.3d 204, 226 (4th Cir. 2016). PX904 at 210:10–23 (Kousser Dep.). In *McCrory*, the North Carolina legislature explicitly requested and reviewed race data, which, among other factors, the Fourth Circuit found supported a finding that the legislature targeted Black voters with surgical precision. PX904 at 210:24–211:1–3; *McCrory*, 831 F.3d at 230 (holding that North Carolina acted with discriminatory purpose in targeting Black voters with "surgical precision" based, in part, on the General Assembly's request for and receipt of race data that showed that Black voters would be disproportionately impacted by the proposed legislation's restrictions on certain voter resources). Had Representative Grant requested race data on the impact of SB7066, he would have had to justify his vote in favor of SB7066 despite its negative racial impact, which would have made it difficult to sustain. PX904 at 211:4–12.

125.    The legislature was also aware—and Rep. Grant conceded—that Florida residents with out-of-state or federal convictions could not seek waivers and that judges were not required to waive LFOs of people who were unable to pay those LFOs. PX154 at 2:56 (5/3/19 Florida House Session) (colloquy between Rep. Grant and Rep. Gottlieb concerning out-of-state convictions); *id*. at 3:19–3:20 (Rep. Grant recognizing that courts were not required to have community service programs); *id*. at 4:06 (remarks of Rep. Geller on waiving LFOs after conversion to civil liens);

PX163 at 6:30 (5/2/19 Florida Senate Hearing) (Sen. Brandes admitting that the bill set no standards for judges in waiving); PX893 ¶ 166, n.166.

126.     Although the proponents of HB7089 and SB7086 claimed to be implementing the will of the voters who passed Amendment 4, during the legislative session, the legislature did not *act* as if constrained by the language of Amendment 4. Numerous representatives and senators proposed different versions of implementing legislation with different amendments. For example, acknowledging that clemency rules did not require payment of court costs and fees for civil rights to be restored,[3] Rep. Grant advocated for a higher standard than the clemency process or status quo. Mar. 19 House Hearing at 2:29:28; PX893 ¶ 68. The original version of HB7089 introduced by Representative Grant required payment not only of all restitution, fines, and fees associated with a person's felony conviction, but also the costs of drug tests during probation and expenses related to a felony conviction. *Id*. ¶ 70.

127.     The asserted purpose of SB7066 itself is to define the terms of one's criminal sentence. Rep. James Grant, the House bill's sponsor, referred to "fines,

---

[3]     As of January 21, 2020, clemency rules no longer require payment of restitution to apply. Op. at 27 n.9.

fees, [and] court costs" in a hearing as "punishment for a crime." PX309 at 2:58 (4/4/19 Florida House State Affairs Committee Hearing). A failed amendment to the House bill would have allowed Floridians eligible to vote under Amendment 4 but for outstanding LFOs to get on a payment plan and be eligible to register upon receipt of their first payment, thus "end[ing] a purgatory of sub-citizenship." *See* PX158 at 7:56:00–8:05:40 (4/23/19 Florida House Hearing). In opposing the amendment, Rep. Grant called the amendment "an affront to Florida voters" and noted that for criminal defendants who must pay off restitution before being eligible to register to vote under SB7066, "this person isn't being punished because they're poor, this person is being punished because they caused that amount of damage." *Id.*

128.     Legislators debated various alternatives in structing its implementation of both the term "completion" and the scope of "terms of sentence." Other House and Senate members proposed amendments to each bill that would have lessened the restrictive, punitive, and discriminatory impacts of the proposed legislation. *See, e.g.*, Mar. 25 Senate Hearing at 0:44:01–0:44:20, 0:55:40; PX163 at 7:50–8:14 (5/2/19 Florida Senate Hearing); PX158 at 7:59–8:05 (4/23/19 Florida House Hearing) (debate between Reps. Jenne, Jacquet, Masullo, and Grant); PX893 ¶¶ 73–74, 180, 212.

129.     Representative McGhee proposed an amendment that would have removed the requirement to pay all LFOs. PX158 at 8:21–8:22 (4/23/19 Florida House Hearing) (Amendment 709273). His amendment failed. *Id.*

130.     Senators Randolph Bracy and Perry Thurston proposed amendments to exclude the payment of restitution that had been converted to civil liens as requirement for rights restoration. Mar. 25 Senate Hearing at 0:44–0:45 (Amendment 776780); PX408 (Amendment 110742); PX893 ¶ 180. These amendments failed. *Id.*

131.     Representative Evan Jenne proposed an amendment to allow returning citizens to have their rights restored if they had set up a payment plan to satisfy restitution, fines, and fees. PX307 at 7:59–8:05 (4/23/19 Florida House Hearing) (Amendment 583329) (debate between Reps. Jenne, Jacquet, Masullo, and Grant); PX893 ¶ 212. He explained to his legislative colleagues that courts in many areas of the state currently set up such payment plans. PX893 ¶ 212. His amendment failed. *Id.* ¶ 213.

132.     Senator Brandes successfully amended SB7086 to allow returning citizens to vote if their fines and fees had been converted to civil liens, but this language did not make it into SB7066. Amendment 703932 to S.B. 7086 (Fla. 2019), https://www.flsenate.gov/Session/Bill/2019/7086/Amendment/703932/PDF;

PX893 ¶ 72. Senator Bracy went a step further to amend SB7086 to allow returning citizens to vote if *any* LFOs, including restitution, had been converted to civil liens. Mar. 25 Senate Hearing at 0:44–0:55 (Amendment 776780); PX893 ¶ 73. His amendment failed. *Id.*

133.     The amendments excluding LFOs that had been converted to civil liens were requested by advocates. Mar. 25 Senate Hearing at 0:45:45–0:50:23 (remarks of Cecile Scoon), 1:09:40 (statement of Kirk Bailey); PX893 ¶ 73.

134.     Courts often convert financial obligations to civil liens in cases where defendants cannot afford to pay the amount being assessed. *See* ECF 207 at 7, 22; *see also Jones*, 950 F.3d at 803; Fla. Stat. § 960.29 (recognizing that civil restitution liens "rest[] upon the principle of remediation and not punishment," and serve the goal of "fully compensating crime victims, the state, and its local subdivisions"); PX309 at 3:08 (4/4/19 Florida House State Affairs Committee Hearing); PX277 at 7–10 (Stanford Blake Decl.); PX306 at 1:00:45–1:00:55 (4/24/19 Florida House Session).

135.     The civil lien procedure exists to avoid the inappropriate and unconstitutional punishment of poverty. *See* H.R. Staff Analysis, H.B. 1381, Reg.

Sess. (Fla. 1998)[4] (citing *Coxon v. State*, 365 So.2d 1067 (Fla. Dist. Ct. App. 1979));
*see also Hewett v. State*, 613 So.2d 1305, 1306 (Fla. 1993); PX277 ¶¶ 7–10.

136.     Conversion of an LFO to a civil obligation takes the LFO out of the
criminal justice system. PX277 at 7–10; PX306 at 1:00:45–1:00:55 (4/24/19 Florida
House Session); PX206 (1/24/19 Email from Nassau County Clerk) (describing
criminal cases as closed once LFOs are converted to a civil lien).

137.     Due to the high number of citizens, particularly Black citizens, who had
their LFOs converted to civil liens there was extensive debate, legislative testimony,
and advocacy presented on the provision requiring payment of LFOs converted to
civil liens as a condition of rights restoration. Mar. 19 House Hearing at 0:41, 1:56–
1:57; Mar. 25 Senate Hearing at 44:01–44:20, 45:45–50:23 (remarks of Cecile
Scoon), 109:40 (statement of Kirk Bailey); PX893 ¶¶ 71, 73.

138.     On May 2, 2019, the penultimate day of the legislative session, Senator
Brandes introduced a new strike-all amendment to an entirely separate Senate
elections bill—SB7066. PX893 ¶¶ 75, 205; PX163 at 7:50–8:14 (5/2/19 Florida
Senate Hearing). This unusual move prevented amendments in the House, deprived

---

[4]Available at http://www.flsenate.gov/Session/Bill/1998/1381/Analyses/
19981381HCP_hb01381S1.CP.pdf.

opportunity for further debate, and stopped public interest groups from organizing or protesting. *Id*. ¶ 205.

139.    This new bill, SB7066, did not include any of the above amendments and instead incorporated the most restrictive possible iteration of SB7086 and HB7089, requiring payment of all fines, fees, costs, and restitution imposed at the time of sentencing before a returning citizen could register or vote. PX34 (Text of SB7066 as Enacted); PX893 ¶ 191. It did not include an exception for LFOs converted to civil liens. *Id.*

140.    Senator Brandes noted, during a colloquy with Senator Jason Pizzo, that he agreed that the previous three different versions of the bill—which included the above ameliorative amendments—comported with the "will of the electorate," even though each bill set different requirements for paying LFOs before a returning citizen could have his or her voting rights restored. PX163 at 6:36–6:38 (5/2/19 Florida Senate Hearing); PX893 ¶ 190.

141.    Following limited debate on the last day of the legislative session, the House and Senate passed SB7066 strictly along party lines, with only Republicans voting in favor and Democrats voting against. PX163 at 7:50–8:14 (5/2/19 Florida Senate Hearing); PX154 at 4:54 (5/3/19 Florida House Session); PX893 ¶ 162.

### X.   SB7066 Denies Rights Restoration to Otherwise Eligible Floridians Solely on the Basis of Their Outstanding LFOs

142.    On June 28, 2019, Defendant Governor DeSantis signed SB7066 into law. PX430 (6/28/19 Letter from Gov. DeSantis to SOS Lee Transmitting SB7066).

143.    SB7066 requires returning citizens to pay all LFOs "specifically ordered by the court as part of the sentence" before their voting rights are restored. Fla. Stat. § 98.0751(2)(a)(5)(c).

144.    SB7066 defines "completion of all terms of sentence" to require completion of any portion of sentence contained in the "four corners of the sentencing document," Fla. Stat. § 98.0751(2), including payment of restitution, fines, court fees, and costs, regardless of a person's ability to make payment, Fla. Stat. § 98.0751(2)(a)(5).

145.    SB7066 states that the LFO requirement can be met in one of three ways: (1) actual payment of all covered LFOs in full, (2) termination of the obligation "[u]pon the payee's approval" either in open court or through a notarized consent, or (3) completion of community service hours "if the court, unless otherwise prohibited by law or the State Constitution, converts the financial obligation to community service." *Id.* § 98.0751(2)(a)(5)(e).

146.    SB7066 provides no standard or guidance to courts or state agencies acting as payees on whether to approve termination of LFOs. It also provides no

mechanism for approval to terminate an obligation if a payee is unavailable or non-responsive or if a court has converted those financial obligations to a civil judgment.

147.    SB7066 gives third-party payees, including, for example, insurance companies, for-profit debt collection agencies, and private individuals, absolute discretion to grant or deny a person's request for approval to terminate LFOs, for any reason or no reason. *Id.* § 98.0751(2)(a)(5)(e)(II).

148.    The alternatives to full payment outlined in SB7066 that may be granted by a Florida court—termination of a debt as payee or conversion to community service—are subject to the courts' complete discretion. Courts are under no obligation to modify sentences or terminate LFO requirements as a payee. Nor are courts under any obligation to convert LFOs into community service, even if a court finds that an individual has no ability to pay. *See id.* § 98.0751(2)(a)(5)(e)(III); § 938.30(2). There is no mechanism for individuals with out-of-state or federal convictions to have their LFOs terminated or converted to community service by a Florida court.

149.    Conversion to community service has been rare in practice in Florida. The Florida Clerks of Court found in 2008 that "only 16 of 67 counties reported converting any mandatory LFOs imposed in felony cases to community service," and "[o]f those 16 that did report using community service, 10 converted less than

66

$3,000 of mandatory LFOs to community service in one year." PX155 at 23 (Brennan Center Report on Florida Criminal Justice Fees).

150.     According to the 2018 annual report by the Florida Court Clerks & Comptrollers, the circuit criminal courts in charge of felony cases assessed over $264 million in LFOs, not including restitution, in the 2017-2018 fiscal year alone. Of that sum, just over $1 million was converted to community service. This included 0.5 percent of mandatory fines, court costs, and penalties, and 0.9 percent of discretionary fines, court costs, and penalties assessed that year. *None* of the assessed $51,579,063 in fees, service charges, and costs was converted to community service. Florida Court Clerks & Comptrollers, *2018 Annual Assessments and Collections Report, Statewide Summary – Circuit Criminal* at 10 (2018), https://finesandfeesjusticecenter.org/content/uploads/2019/01/2018-Annual-Assessments-and-Collections-Report.pdf; PX156. Fees are mandatory LFOs over which judges and clerks have little ability to waive or reduce amounts owed. PX298 at 6 (2019 OPAGGA Report). Indeed, a wide variety of additional LFOs may be ineligible for conversion community service: restitution, restitution surcharges, indigence application fees, partial payment fees, affidavit charges, and incarceration fees. *See, e.g.*, PX188 at 29 (Alachua County Criminal Division Business Rules).

151.     If an LFO is converted to community service, clerks' offices treat the obligation as unsatisfied until all community service hours have been completed, with the amount of the financial obligation reduced at a low hourly wage rate, which varies by county. *See* Fla. Stat. §§ 938.30(2), 318(8)(b); PX276 at 63:17–64:17 (Timmann Dep.); ECF 204 at 89:19–90:06 (Prelim. Inj. Hr'g Tr.) (Shannon Cash-Russell Testimony). Thus, "the prospect of satisfying financial obligations in this way is often wholly illusory." ECF 207 at 39.

152.     If an LFO remains unpaid after 90 days of assessment, clerks are required by state law to refer amounts uncollected to a private attorney or collection agent. Fla. Stat. § 28.246(6); *see also* PX298 at 7 (2019 OPAGGA Report). State law also permits that private collection agent hired by a court clerk to add up to a 40 percent surcharge on the amount it collects from delinquent payments. Fla. Stat. § 28.246(6); *see also* PX155 at 22; PX298 at 7; PX134 at 107 (Leon County Notice of Failure to Contact and Pay). Referral to private collection agencies makes it even more difficult to pay an outstanding LFO. Errors by the collection agency, such as incorrectly seeking LFOs that have been voided by the court, cannot be appealed and resolved directly with the court. PX155 at 22. County clerks may also defer to for-profit collection agencies to negotiate or settle LFOs to maximize collections, again making it difficult to seek termination of the obligation from the court. *See*

PX204 & PX205 (Penn Credit Collection Services Agreement with Walton County and Settlement Services). Failure to pay upon referral to a collections agency may also result in suspension of the returning citizen's driver's license, which further impedes a person's ability to pay. PX155 at 21–22; PX134.

## XI.   The State of Florida Uses Revenue Generated from Payment of LFOs to Fund Its Criminal Justice System and Other State Functions.

### A. LFOs are Designed to Fund Florida's Government

153.     LFOs—including restitution, fines, fees and costs—are forced contributions designed to produce revenue for Florida in substantial quantities. *See* Fla. Stat. §§ 775.083(1), 142.01, 775.089(1)(a)(2), 960.17, 960.21, 215.20; *see also* PX295 (Distribution Schedule of Court-Related Filing Fees, Service Charges, Costs and Fines); PX298 (OPPAGA Report); PX155 at 5 (Brennan Center Report) ("From 1996 through 2007, the Florida Legislature created or authorized more than 20 new categories of . . . surcharges, fees, and other monetary obligations . . . related to criminal cases and violations."); ECF 207 at 20 (Order Denying Mot. to Dismiss or Abstain and Granting a PI) ("Quite apart from a sentencing judge's decision about the proper punishment for a given felony—punishment that may include a fine— Florida law requires the judge to impose fees whose primary purpose is to raise revenue, sometimes for a specific purpose."); PX156 at 9 (FCCC 2018 Annual Assessments and Collections Report) (showing that between October 1, 2017 and

69

September 30, 2018, $609,466,492 in fines, court costs, and other monetary penalties were assessed, and $454,522,230 in fees, service charges, and costs were assessed).

154.    Florida's constitution requires the State's courts to be self-funding through the imposition of fees and costs. *See* Fla. Const. art. V, § 14. State prosecutors' offices similarly rely on LFOs for funding. PX477 at 1.

155.    Legislators were aware of the nature of LFOs as revenue generators when they enacted SB7066. *See* PX330 (12/18/18 Email from Sen. Jason Pizzo) (directing Clerk to treat any LFO income resulting from SB7066 as "found money"); PX844 at 1–2 (Memorandum from Sen. Jeff Brandes) (seeking research on potential methods "for funding the courts rather than utilizing adequate and appropriate filing fees for judicial proceedings and service charges and costs, including, in part, the fines, fees, and costs imposed at the conclusion of a criminal case"); PX745 at 11 (House of Representatives Staff Analysis, PCB CRJ 19-03) (describing types of LFOs and their purposes).

156.    Florida law requires a sentencing judge to impose fees whose primary purpose is to raise revenue, sometimes for a specific purpose. ECF 207 at 20; *see also* PX382 at 1 (Financial Impact Estimating Conference Memo) (predicting that if "terms of sentence" does not include "payment of court-ordered restitution, fines,

and court costs . . . there will be a potential loss of revenues" and, if they are included, "it will result in additional revenues to state and local governments").

157.    In order to implement that funding system, Florida's legislature has required the State Department of Revenue to maintain a Clerks of the Court Trust Fund. Fla. Stat. § 213.131. Ninety percent "of all court related fines, fees, service charges, and costs collected by court clerks must be deposited" into that fund. PX155 at 9 (Brennan Center Report).

158.    Florida law also requires each clerk to establish a "fine and forfeiture fund," into which the clerks must deposit a variety of revenue streams, including criminal fines, court costs, and "[a]ll other revenues received by the clerk as revenue authorized by law to be retained by the clerk." Fla. Stat. § 142.01.

159.    The clerks must use these monies to fund all of their "court-related functions." Fla. Stat. § 28.37(1) (citing Fla. Const. art. V, § 14(b)); *see also* PX505 at 5 (Def. Earley's Responses to Pls. First RFAs) (stating that "the primary sources of funding for the Florida offices of the clerks of the circuit and county courts performing court-related functions are filing fees for judicial proceedings, services charges, and costs for performing court-related functions, which include mandatory court costs for defendants").

160.    However, the Florida legislature has also provided for the use of all types of LFOs—costs, fees, fines, and restitution—to fund the government more generally. *See* PX155 at 8 (Brennan Center Report) (Fla. Legislature has "created LFOs to cover state functions wholly unrelated to the underlying offense"); PX505 at 6 (Def. Earley's Responses to Pls. First RFAs) (admitting that "some of the revenue generated by LFOs goes to the State's General Revenue Fund"); *see also* PX892 at 17 n.7 (Burch Report); Matthew Menendez, Michael F. Crowley, Lauren-Brooke Eisen, and Noah Atchison, *The Steep Costs of Criminal Justice Fees and Fines*, Brennan Center for Justice 1, 27 (Nov. 21, 2019), https://www.brennancenter.org/sites/default/files/2019-11/2019_10_Fees%26Fines_Final5.pdf.

161.    First, a $225 court cost is imposed on every person pleading guilty or *nolo contendere* to, or being found guilty of a felony, and $25 of that cost is remitted to the State's General Revenue Fund. Fla. Stat. § 938.05.

162.    Second, under Florida statute, clerks of the court must distribute "the cumulative excess of all fines, fees, service charges, and costs retained by the clerks of the court" to the Florida Department of Revenue for distribution. Fla. Stat. § 28.37(3)(a); *see also* PX298 at 6 (OPPAGA Report). This excess becomes part of

the General Revenue Fund and is used to fund other areas of state government, including those unrelated to criminal justice.

163.     Third, some LFOs are remitted to other state trust funds from which the State then deducts an eight percent service charge for deposit in the General Revenue Fund. Fla. Stat. § 215.20(1); *see also* PX295 at 43–64 (2019 Distribution Schedule of Court-Related Filing Fees, Service Charges, Costs and Fines). For example:

   a)  A 5 percent surcharge on every fine charged for a felony offense is deposited in the Crimes Compensation Trust Fund. Fla. Stat. § 938.04.

   b)  A $50 court cost is imposed on every person pleading guilty or *nolo* contendere to, or being convicted of, any crime, of which $49 is remitted to the Crimes Compensation Trust Fund and the remaining $1 is retained by the Clerk. Fla. Stat. § 938.03.

   c)  The $50 application fee charged to everyone that applies for a public defender is deposited in the Indigent Criminal Defense Trust Fund, except that the clerks may retain 2 percent of the fees, $0.20 of which they must remit to the General Revenue Fund. Fla. Stat. § 27.52(1)(d).

164.     In some circumstances, restitution is paid directly into the Crimes Compensation Trust Fund. Fla. Stat. §§ 775.089(1)(a), 960.17. The purpose of the Crimes Compensation Trust Fund is to provide "for the payment of all necessary and proper expenses incurred by the operation of the department and the payment of claims." Fla. Stat. § 960.21. The "department" is defined as the Department of Legal Affairs. *Id.* § 960.03.

165.     By statute, an eight percent service charge "representing the estimated pro rata share of the cost of general government" is appropriated from all income deposited in the Crimes Compensation Trust Fund. *Id.* §§ 960.20, 215.20.

166.     Orders of restitution, including those payable to the Crimes Compensation Trust Fund, also accrue interest. Fla. Stat. § 775.089(5).

167.     For example, Ms. McCoy was ordered to pay restitution totaling $6,400 to a specific victim and the "Victim Compensation Trust Fund." DX17H at 42–57 (McCoy Sentencing & Judgment Documents). The restitution orders against Ms. McCoy note that "[i]f Victim Compensation has compensated the victim in part or in whole, then payments shall be made and distributed first to the victim, and when fully compensated, to Victim Compensation for reimbursement." *Id.*; Fla. Stat. § 775.089. Although Duval County refers to the "Victim Compensation Trust Fund" in Ms. McCoy's restitution order, Florida law refers to this fund as the Crimes Compensation Trust Fund. *See* Fla. Stat. Ann. 775.089 (referring to the "Crimes Compensation Trust Fund" in the general restitution statute); *see generally* PX418 at 1 (CS/SB7066 Election Administration Chart) (including "the state" as a potential victim for restitution).

168.     Similarly, Ms. Singleton was also ordered to pay restitution in the amount of $12,110.81 to the victim and the Victims Compensation Trust Fund

(legally called the Crimes Compensation Trust Fund), and her restitution order notes that "[i]f Victim Compensation has compensated the victim in part or in whole, then payments shall be made and distributed first to the victim, and when fully compensated, to Victim Compensation for reimbursement." DX136 at 1 (Judgment & Restitution Order of Singleton).

169.     When clerks receive partial payment of LFOs, they are to prioritize distribution of any monies to be remitted to the State's General Revenue Fund. Fla. Stat. § 28.246(5); *see also* ECF 204 at 129:7–15 (10/7/19 Hearing Tr.) (testimony of Shannon Cash-Russell) ("Statutorily, we have to hit certain buckets first. So, if there was an outstanding public defender application fee, it would go to that first, followed by the fine, then the court costs, and the various trust fund fees.").

170.     In State Fiscal Year 2017-18, clerks of court collected $746.16 million from LFOs in criminal cases, and over $113 million of that revenue was remitted to the General Revenue Fund. *See* PX298 at 13.

**B. LFOs Include Additional Fees and Charges**

171.     It is often impossible to pay off the LFOs that are a prerequisite to restoration under SB7066 without paying additional fees and charges that fall outside the "four corners of the sentencing document." *See, e.g.*, Fla. Stat. § 945.31 (allowing Department of Corrections to assess an administrative processing fee of

four percent on all restitution and court-ordered payments from persons under custody or supervision); ECF 204 at 89:14–24 (10/7/19 Hearing Tr.) (testimony of Shannon Cash-Russell) (restitution is typically paid to Department of Corrections); Fla. Stat. §§ 28.246(5), 28.24(26) (allowing clerks to charge administrative processing charges for partial payments, some of which are remitted to General Revenue Fund); PX115 at 2 (Brennan Center Report) (Florida "requires courts to refer outstanding debt to collection agencies, which can add up to a 40 percent surcharge on existing debt."); Fla. Stat. § 28.246(6); PX21 at 5 (Carey Haughwout Decl.) ("[O]utstanding costs are sent to a collection agency when payments are not made pursuant to schedule. Interest and collection costs attach to the amount owed. When payments are made on the judgment, the collection agency takes the interest and collection costs owed and sends the balance to the Clerk.").

172.    The expert report of Traci R. Burch documents numerous ways in which Florida counties make it impossible for returning citizens to pay their disqualifying LFOs under SB7066 without also paying extraneous fees or charges. For example, Dr. Burch found that at least ten counties—including Holmes, Okaloosa, Gulf, Dixie, Columbia, Broward, and Pinellas—charge fees for access to documentation of the LFOs originally imposed at the time of sentencing. PX892 at 12 (Burch Report). Without such documentation, it can be impossible to

disentangle those initial LFOs (which are disqualifying under SB7066) from other amounts of interest, surcharges, collections fees, and late penalties (which do not determine voting eligibility). *Id*. at 9–10; *see also* ECF 204 at 115:09–18 (10/7/19 Hearing Tr.) (testimony of Shannon Cash-Russell, explaining that Leon County charges $1.00 per page). Additionally, in some counties it is impossible for returning citizens to make payments toward the balance of their original LFOs without also paying a fee for the privilege of making the payment. PX892 at 14, 62–63. Similarly, Dr. Burch found that in some counties, Clerk of Court staff will not permit returning citizens to make a payment that goes exclusively toward the original LFO balance, rather than being prorated across original and non-original LFOs. *Id.* at 63–65; *see also* ECF 204 at 97:20–98:05, 106:10–18 (testimony of Shannon Cash-Russell).

173.    For example, while Plaintiff Jermaine Miller has paid the Department of Corrections more than he was originally assessed in restitution, the Department claims he still owes restitution because four percent of those payments were directed to the administrative fee charged by the Department. PX11 at ¶ 7 (Miller Decl.).

### C. LFOs Have No Connection to Culpability

174.    Florida has chosen to pay for its criminal-justice system in significant measure through LFOs imposed regardless of whether a criminal defendant is

adjudicated guilty or adjudication is withheld. *See* Fla. Const., art. V, § 14 (requiring courts to self-fund through fees and costs).

175.    The amount of fees assessed is the same for a defendant who is convicted by a jury or pleads guilty, a defendant who pleads no contest, and a defendant who is not convicted but whose adjudication is withheld. ECF 207 at 20.

176.    Similarly, "the fees often bear no apparent relationship to culpability. The fees for a violent felony that produces substantial bodily injuries may be the same as the fees for a comparatively minor, nonviolent felony, including, for example, shoplifting items of sufficient value." ECF 207 at 20; *see also* PX295 at 43–60, 4 (noting policy choice in favor of uniform, statewide court fees).

177.    Florida statutes provide for at least 590 LFOs related to felony convictions, including dozens of statutes providing for court costs and hundreds of statutes providing that certain criminal offenses are punishable by fines. *See* Statutory Costs Chart and Statutory Fines Chart, attached hereto as Appendices A and B, respectively. [5]

--------------------

[5] The Statutory Costs Chart attached as Exhibit A includes some costs that are not included in the "four corners of the sentencing document."

78

178.    Each of the 590 LFOs provided for by statute are imposed on defendants regardless of whether they plead nolo contendere; 563 are imposed even when adjudication is withheld; and at least one (the fee for applying for a public defender) is imposed even when a defendant is found not guilty. *Id*; Fla. Stat. 27.52(1)(b).

179.    Of the 38 court costs provided for by statute, 24 are mandatory, leaving no discretion to the sentencing judge. *See* App. A.

180.    Of those 38 court costs, 34 do not fluctuate based on the severity of the offense or the defendant's level of culpability. *See* App. A.

181.    A number of fines imposed under Florida law are mandatory and do not fluctuate based on the severity of the offense. *See, e.g.*, Fla. Stat. §§ 316.061(1) (mandating a fixed $5 assessment in addition to any fine); 812.014(2)(c)(7) (mandating a fixed $10,000 fine).

182.    For example, as part of her criminal sentence, Ms. McCoy was ordered to pay $666 in costs, fines, and fees, DX17H at 38, which were assessed and allocated in the following ways:

    a) $3 to the Additional Court Cost Clearing Trust Fund pursuant to Fla. Stat. § 938.01, which is distributed to the Department of Law Enforcement's Criminal Justice Standards and Training Trust Fund, the Operating Trust Fund for the Criminal Justice Grant Program, and the Department of Children and Families Domestic Violence Trust Fund;

b) $50 to the Crimes Compensation Trust Fund pursuant to Fla. Stat. § 938.03, which distributes $49 to the Crimes Compensation Trust Fund and $1 to the collecting clerk's office;

c) $225 to the Local Government Criminal Justice Trust Fund pursuant to Fla. Stat. § 938.05, which distributes $25 into the General Revenue Fund and the remaining $200 into the "fine and forfeiture fund" for use by the clerk of the circuit court in performing court-related functions under Fla. Stat. § 142.01;

d) $3 distributed to Duval County for the Duval County Teen Court Trust Fund pursuant to Fla. Stat. § 938.19 and Duval County Ordinance Code § 634.108, for the operation of teen court programs;

e) $65 distributed to Duval County to be used for "innovations, legal aid, law library, teen court programs" pursuant to Fla. Stat. § 939.185 and Duval County Ordinance Code § 111.385;

f) $100 for Cost of Prosecution under Fla. Stat. § 938.27(8), which distributes the entire amount to the State Attorneys Revenue Trust Fund for expenses incurred in investigating and prosecuting criminal cases;

g) $20 for the Crime Stoppers Fund pursuant to Fla. Stat. § 938.06, which distributes $17 to the Crime Stoppers Trust Fund to be used for grants to support crime fighting programs, Fla. Stat. § 16.555, and $3 to the collecting clerk;

h) $100 for Court Appointed Counsel Fees under Fla. Stat. § 938.29, which is distributed to the Indigent Criminal Defense Trust Fund;

i) $50 for Application for Court Appointed Counsel Fees, under Fla. Stat. § 27.52, which is distributed to the Indigent Criminal Defense Trust Fund, Fla. Stat. § 27.562;

j) $50 for Cost under Fla. Stat. § 775.083(2), which imposes a cost each time a defendant is convicted of a felony (or other offense) and distributes the money to the county to be used for crime prevention programs, including safe neighborhood programs.

183.     As part of her criminal sentence, DX137 at 3 (Singleton Judgment), Ms.

Singleton was ordered to pay costs, fines, and fees in the amount of $771, which

were assessed and allocated in the following ways:

> a) $50 to the Crimes Compensation Trust Fund pursuant to Fla. Stat. § 938.03, which distributes $49 to the Crimes Compensation Trust Fund and $1 to the collecting clerk's office;
>
> b) $3 to the Court Cost Clearing Trust Fund pursuant to Fla. Stat. § 938.01, which is distributed to the Department of Law Enforcement's Criminal Justice Standards and Training Trust Fund, the Operating Trust Fund for the Criminal Justice Grant Program, and the Department of Children and Families Domestic Violence Trust Fund;
>
> c) $100 to the Crimes Compensation Trust Fund pursuant to Fla. Stat. § 775.0835;
>
> d) $100 for the Sheriff's Office Investigative Cost under Fla. Stat. § 938.27, which is allocated for actual expenses incurred in conducting the investigation and prosecution of the criminal case and may also go toward the salaries of permanent employees;
>
> e) $100 for Prosecution Investigative Cost under Fla. Stat. § 938.27, which distributes the entire amount to the State Attorneys Revenue Trust Fund for expenses incurred in investigating and prosecuting criminal cases;
>
> f) $50 for Public Defender Fees under Fla. Stat. § 938.29, which is distributed to the Indigent Criminal Defense Trust Fund;
>
> g) $225 for the Local Government Criminal Justice Trust Fund pursuant to Fla. Stat. § 938.05, which distributes $25 into the General Revenue Fund and the remaining $200 into the "fine and forfeiture fund" for use by the clerk of the circuit court in performing court-related functions under Fla. Stat. § 142.01;

81

h) $5 as a 5 percent surcharge on Ms. Singleton's fine pursuant to Fla. Stat. § 938.04, which is deposited into the Crimes Compensation Trust Fund;

i) $20 to the Crime Stoppers Fund pursuant to Fla. Stat. § 938.06, which distributes $17 to the Crime Stoppers Trust Fund to be used for grants to support crime fighting programs, Fla. Stat. § 16.555, and $3 to the collecting clerk;

j) $3 distributed to Duval County for the Duval County Teen Court Trust Fund pursuant to Fla. Stat. § 938.19 and Duval County Ordinance Code § 634.108, for the operation of teen court programs;

k) $65 distributed to Duval County to be used for "innovations, legal aid, law library, teen court programs" pursuant to Fla. Stat. § 939.185 and Duval County Ordinance Code § 111.385;

l) $50 for Cost of Court under Fla. Stat. § 775.083(2), which imposes a cost each time a defendant is convicted of a felony (or other offense) and distributes the money to the county to be used for crime prevention programs, including safe neighborhood programs.

## XII.   **The Majority of Floridians with LFOs are Genuinely Unable to Pay Them**

184.     Prior to the enactment of Amendment 4, up to 1.6 million Floridians were disenfranchised on the basis of a past felony conviction. *See* PX162 (Sentencing Project Report).

185.     Before Amendment 4 passed, it was widely reported that the Amendment would restore the right to vote to between 1.2 and 1.6 million Floridians. PX893 ¶¶ 57, 40, 85, 88, 71, 117, 119, 122, 133, 123, 142, 129, 144, 135, 192 (Kousser Report).

82

186.    Dr. Smith identified more than one million individuals residing in Florida who have past Florida state convictions for qualifying felonies, and who have completed their sentence, including incarceration and supervision. PX894 ¶ 9 (Smith Second Supp. Report). This does not account for Florida residents with federal or out-of-state convictions. PX154 at 13:48 (5/3/19 Florida House Hearing).

187.    Of those one million individuals, 774,490, or approximately 77 percent, have outstanding LFOs related to their felony convictions.[6] PX894 ¶ 9. Over 61 percent of otherwise eligible Floridians owe more than $500, and the majority owe more than $1,000. *Id.* ¶¶ 25 & tbl.3, 31.

188.    Returning citizens leave the criminal justice system saddled with considerable LFO debt. *See, e.g.*, ECF 207 at 43–44 (finding that in one county, at least $698 in LFOs are assessed upon all defendants represented by a public defender); Fla. Stat. § 893.135 (imposing mandatory fines of at least $25,000 and up to $750,000 for drug trafficking convictions); PX6 ¶ 6 (Leicht Decl.) (jointly and severally liable for about $59 *million* in outstanding restitution).

---

[6]    These data are "conservative," that is, "biased against inflating the number of persons with felony convictions who are otherwise eligible to vote under SB7066 but for their outstanding LFOs." PX894 at ¶¶ 4–5, 36.

189.     Meanwhile, returning citizens' *pre*-incarceration incomes are generally lower than the incomes of their non-incarcerated peers. A 2015 study found that "incarcerated people had a median annual income of $19,185 [in 2014 dollars] prior to their incarceration, which is 41% less than non-incarcerated people of similar ages." PX894 at 27, 27 n.22 (Smith Second Supp. Report) (citing *Prisoners of Poverty: Uncovering the pre-incarceration incomes of the imprisoned*, Prison Policy Initiative (2015)).[7] An individual Floridian making $19,185 in 2014 would be indigent under Florida law, which provides that a person is indigent if she has an "income . . . equal to or below 200 percent of the then-current federal poverty guidelines." Fla. Stat. § 27.52(2)(a); *see also* 2014 Poverty Guidelines, U.S. Dep't of Health & Human Servs., https://aspe.hhs.gov/2014-poverty-guidelines (federal poverty line of $11,670 for a household of one).

190.     According to guidelines for payment plans set forth in Florida law, it would take someone with the median *pre-incarceration* income of $19,185 more than sixteen months to pay off $500 worth of LFOs, and nearly three years to pay off $1,000 in LFOs. *See* Fla. Stat. § 28.246 ("A monthly payment amount, calculated based upon all fees and all anticipated costs, is presumed to correspond to the

---

[7] Available at https://www.prisonpolicy.org/reports/income.html.

person's ability to pay if the amount does not exceed 2 percent of the person's annual net income . . . divided by 12."). That excludes the surcharges, late fees, and interest that are often required to be paid before returning citizens can pay off their underlying debts. *See supra* XI(B).

191.     For those who owe higher amounts, payment at the standard rates can take over a decade. *See, e.g.*, PX15 ¶ 8 (Raysor Decl.) (demonstrating that based on Plaintiff Raysor's payment plan, she will be ineligible to vote until 2031). And those with lower incomes may never be able to pay off their LFOs, because they are unable to afford even a small monthly payment. *See, e.g.*, PX16 ¶ 15 (Sherrill Decl.), (demonstrating that Ms. Sherrill's income is less than half the median income for formerly incarcerated individuals, and that she does not ever expect to be able to pay off her LFOs).

192.     More than 50 percent of criminal defendants reported no earnings in the three years prior to incarceration. PX896 at 8 (Walker Report).

193.     Thus, returning citizens are already "substantially socio-economically disadvantaged" when they enter the criminal justice system. *Id*; *see also* PX277 (Judge Blake Decl.) ("Many of the defendants in my courtroom were indigent and represented by public defenders."); PX299 at 22 (Volusia County Clerk of Court

Report) ("In the past five years in Volusia County, Florida 69% of the 24,000 felony cases that received sentences were indigent.").

194.    Florida law requires LFOs to be imposed regardless of the defendant's ability to pay. *See, e.g.*, Fla. Stat. § 893.135 (mandatory fines for drug trafficking without regard to ability to pay); Fla. Stat. § 938.05 ($225 standard court cost, imposed regardless of ability to pay); PX699 (Outline for Presentation by Judge Steven Scott Stephens) (discussing certain statutory costs and noting that "for none of these costs is the 'ability to pay' a factor").

195.    Post-incarceration, returning citizens also face a "significant incarceration 'wage penalty' estimated to range between 10–30% between those with a conviction and those without." PX894 at 27 (Smith Second Suppl. Report); PX895 at 10–11 (Weinstein Report).

196.    A person with a criminal conviction is less likely than a person without a criminal conviction to find gainful employment. PX896 at 3–4 (Walker Report).

197.    More than 27 percent of formerly incarcerated individuals between the ages of 25 and 44 years old are unemployed—higher than the unemployment rate during the Great Depression—and homelessness is nearly ten times higher for formerly incarcerated people than for the general population. PX894 ¶ 39 (Smith Second Suppl. Report).

198.     Dr. Walker determined that just 55 percent of formerly incarcerated individuals released in 2012 reported *any* income in the first year after their release, and that those who did averaged less than $11,000 annually in income. PX896 at 8 (Walker Report).

199.     Further, Dr. Walker detailed the many impediments that returning citizens face not just in achieving employment, but also housing and education. *See id.* at 10–16.

200.     Retired Florida Eleventh Circuit Judge Stanford Blake has explained in a sworn declaration that, in his experience, many formerly incarcerated Floridians encounter barriers to "employment, housing, and a living wage" and often fail to pay their LFOs, "not due to unwillingness to pay or willful disobedience of the law but rather because of inability to pay." PX277 ¶ 10.

201.     Plaintiffs' testimony that they are unable to afford payment of LFOs is consistent with the analysis of Dr. Walker and Dr. Smith, as well as Judge Blake's declaration. *See, e.g.*, PX4 ¶ 20; PX11 ¶ 9; PX13 ¶ 11; PX14 ¶ 11.

202.     Internal reports by Florida's legislature, including two separate House staff reports, further demonstrate that "most criminal defendants are indigent." *Jones*, 950 F.3d at 816 (quoting H.R. Staff Analysis, H.B. 1381, Reg. Sess. (Fla. 1998); H.R. Staff Analysis, H.B. 13, Reg. Sess. (Fla. 1999)).

203.     Florida's own metrics demonstrate that the state does not anticipate receiving payment for the mine-run of LFOs it assesses *solely* because returning citizens who owe those debts are unable to pay. From 2013 to 2018, "Florida had minimal collections expectations for between 58.2% to 68.4% of all fines and fees it assessed to returning citizens outside of incarceration . . . *based on inability to pay*"—either because those returning citizens were determined indigent or had their LFOs converted to a civil judgment or lien. PX894 ¶ 37 (Smith Second Suppl. Report) (emphasis added); *see also* PX299 at 53 ("Defendants' limited availability due to prison sanctions, and inability to pay due to low incomes and higher costs of fines for drug related charges, contribute to existing collection difficulties.").

204.     Records from at least two counties, Escambia and Lake County, show that 72 percent and 71percent, respectively, of returning citizens released from incarceration or supervision with a non-disqualifying felony conviction were represented by a public defender. PX894 ¶¶ 42, 46 (Smith Second Suppl. Report). Florida law provides a public defender for individuals charged with a felony when they are "determined to be indigent." Fla. Stat. § 27.51. Dr. Smith concluded that these findings "likely understate[] the rate of public defender assignments statewide." PX894 ¶ 42 n.27.

205.     Similarly, a case study in Volusia County found that from fiscal years 2010-2014 found 69 percent of defendants were adjudicated indigent and 62 percent of all LFOs were assessed against individuals found indigent. *Id*. ¶ 50; PX903. A case study in Lee County found 92.3 percent of survey respondents indicated that inability to pay is a significant factor in the low collections rates for LFOs. PX894 ¶ 50; PX903.

206.     By any economic indicator, returning citizens are indigent and highly unlikely to have spare money to be able to pay anything in LFOs, let alone amounts in the hundreds, thousands, or tens of thousands before upcoming elections if ever. *See supra* ¶¶ 188–205.

207.     The current national health crisis provoked by COVID-19—which has also triggered an employment crisis and economic downturn, and almost 17 million claims for unemployment benefits in the three-week period ending on April 4[8]— only further undermines returning citizens' economic stability and ability to pay hundreds or thousands of dollars in outstanding LFOs.

――――――――――――――――――

[8] Jim Zarroli & Avie Schneider, *Jobs Carnage Mounts: 17 Million File For Unemployment In 3 Weeks*, NPR (Apr. 9, 2020), https://www.npr.org/sections/ coronavirus-live-updates/2020/04/09/830216099/6-6-million-more-file-for- unemployment-as-coronavirus-keeps-economy-shut.

## XIII. <u>The LFO Requirement Has a Disproportionate Impact on Black Floridians</u>

208.     Black Floridians are more likely to be arrested, charged, convicted, and then more harshly sentenced than white Floridians. PX893 ¶ 206 (Kousser Report); *see also* PX151 (Wood Report). Black people are overrepresented in the State's criminal justice system, representing 16 percent of Florida's population but more than 32 percent of those disenfranchised for a felony conviction. *Id.* ¶ 206.; *see also* PX504 at 3 (OPPAGA Report on Fines and Fees Assessed in Felony Cases) ("[I]n all but four of the counties with data on race, black defendants are assessed criminal fines and fees at greater percentages than the percentage of black residents in the county population."); PX870 at 1 (Florida Campaign for Criminal Justice Reform Report) ("Black people make up only 16.9 [sic] of the general population, but comprise 47 percent of Florida's prison population."); PX151 (Wood Report).

209.     Black people are generally poorer than their white counterparts *before* they enter the criminal justice system due to the socioeconomic disparities and the racial wage gap. *Id.* ¶¶ 30, 149; PX895 at 4, fig.1; 5, figs.2 & 3; 6, fig.4; 7, fig.5; 9; 12–13 (Weinstein Report).

210.     Black Floridians who are otherwise eligible to vote but for LFOs are significantly less likely to be able to gain their voting right under SB7066, as

compared to similar white returning citizens, because of the number of outstanding LFOs tied to their felony conviction. PX895 at 28, tbl.4; 28–30, tbl.5.

211.    Racial disparities exist for returning citizens who have met the terms of their felony conviction but who have outstanding LFOs. PX894 at 23, tbl.5 (Smith Second Supp. Report).

212.    Black returning citizens are more likely to owe LFOs as compared to white returning citizens. *Id.* ¶¶ 24–25, 28. Fewer than one in five (17.8 percent) Black returning citizens released from control or supervision, who have a qualifying felony conviction, are eligible to register and vote under SB7066 because they have paid all outstanding LFOs. *Id.* ¶ 24. In contrast, more than one in four (26 percent) of white returning citizens released from control or supervision, who have qualifying felony convictions, are eligible to register to vote and vote under SB7066. *Id*.

213.    Black returning citizens are more likely to owe larger dollar amounts as compared to white returning citizens. *Id.* ¶¶ 25, 28, tbls.3–4. Based on county level data from all sixty-seven counties, Black returning citizens are more likely to owe over $500 and $1,000 in LFOs as compared to non-Black returning citizens. *Id.* ¶ 25, tbl.3. Moreover, Black returning citizens are disproportionately more likely than white individuals to owe over $10,000 in LFOs. *Id.* ¶ 28, tbl.4.

214.    Upon reintegrating into their families and communities, returning citizens endure a series of collateral consequences that serve as barriers to basic necessities, including employment, education, health and housing. PX896 at 10–19 (Walker Report). For Black returning citizens, these collateral consequences are compounded by discrimination in employment and other areas. *Id.* at 13.

215.    Furthermore, alternatives to avenues for rights restoration are less available to Black Floridians than to their white counterparts, as evidenced by racial disparities in the granting of applications. PX904 at 208:25–209:17.

216.    Each type of LFO—restitution, fines, fees, court costs—added to SB7066 increased its disenfranchising effect and exacerbated the impact on Black returning citizens—not only by increasing the amount that must be paid in full before being able to register and vote, but also by increasing the burdens on returning citizens to determine how much they owe in LFOs and how to pay only their disqualifying LFOs. PX893 ¶¶ 22, 164, 167–75, 181 (Kousser Report).

217.    The legislature knew about the increased bureaucratic complexities that would result with each additional LFO because of the limited data and resources. *See supra* Section IX.C; PX904 at 60:7–9. Because the legislature also knew that any LFO requirement would disproportionately impact Black returning citizens, it

knew that any increased bureaucratic complexities would disproportionately harm Black returning citizens. *Id.* at 60:10–15.

## XIV.  **The LFO Requirement Has a Disproportionate Impact on Black Women**

218.   Statistically, women in the workforce earn less money than their male counterparts. PX895 at 4 (Weinstein Report). The economic disparity, or wage gap, further widens for women of color as compared to white men, Black men, and white women. *Id.* at 3. Consequently, women of color experience poverty at heightened rates as compared to their female and male counterparts.

219.   Specifically, formerly incarcerated Black women have an unemployment rate of 43.6 percent as compared to the unemployment rates for formerly incarcerated Black men (35.2 percent), White women (23.2 percent), and White men (18.4 percent). PX896 at 4; Lucius Couloute & Daniel Kopf, *Out of Prison & Out of Work: Unemployment among formerly incarcerated people*, Prison Policy Initiative, at fig.2 (July 2018), https://www.prisonpolicy.org/reports /outofwork.html ("Couloute & Kopf").

220.   Moreover, 33 percent of formerly incarcerated Black women who find employment obtain only part-time or occasional jobs, whereas only 14 percent of formerly incarcerated working White men are working part-time or occasional jobs. Couloute & Kopf at tbl. 3.

221.    Likewise, "[e]ven before they are incarcerated, women in prison earn less than men in prison, and earn less than non-incarcerated women of the same age and race." Wendy Sawyer, *The Gender Divide: Tracking Women's State Prison Growth*, Prison Policy Initiative (2018), https://www.prisonpolicy.org/reports /women_overtime.html.

222.    In sum, (1) women enter the criminal justice system having earned less money than men and, therefore, are less affluent; (2) women exit the criminal justice system owing LFOs they cannot afford; and (3) women of color are even less likely to find gainful employment that would allow them to pay off the LFOs.

223.    Dr. Weinstein has provided an expert opinion that "[t]he wage and income differential for women of color places women of color at a distinct disadvantage (because of their gender and race) in terms of their ability to pay fines and legal financial obligations." PX895 at 3 (Weinstein Report). This opinion is supported by evidence including*, inter alia*, (1) the wage differential for women in the United States; (2) the wage differential for women of color in Florida in particular; and (3) the impact of incarceration on the wage differential. *Id.*

224.    Dr. Walker's testimony will establish the "impediments to economic stability and independence" that low-income women, especially women of color, face before and after they exit the criminal justice system. PX896 at 3 (Walker

Report). Her testimony will further establish that the *McCoy* Plaintiffs, and similarly situated women, are less likely than their male and white female counterparts to satisfy SB7066's LFO requirement in order to vote.

225.     Plaintiffs Rosemary McCoy and Sheila Singleton will describe the difficulties they have faced in finding permanent, gainful employment because of their criminal history background; the obstacles they continue to face in terms of reintegration into society; and the unique importance of voting to them, their families, and their communities.

## XV.   Floridians With LFOs Cannot Determine Their Eligibility to Register and Vote Under SB7066

### A. Voters Must Affirm their Eligibility to Register and Vote in Florida

226.     Voter registration is a prerequisite to voting in Florida. Fla. Stat. § 97.041(3).

227.     In order to register to vote in Florida, an applicant must affirm that they are eligible to vote. All forms of voter registration in Florida require an affirmation that the voter is "qualified to register as an elector under the Constitution and the laws of the State of Florida." Fla. Stat. § 97.051.

228.     Prior to the enactment of SB7066, Florida's uniform statewide voter registration application required applicants to affirm "I am not a convicted felon, or,

if I am, my rights relating to voting have been restored." *See* PX35 (Fla. Voter Registration Application, effective Oct. 2013); Fla. Stat. § 97.052(2)(t).[9]

229.    As amended by SB7066, Florida's uniform statewide voter registration application requires applicants to attest whether they have been convicted of a felony, and if convicted, to affirm either: (i) that their "voting rights have been restored by the Board of Executive Clemency;" or (ii) that their "voting rights have been restored pursuant to s. 4, Article VI of the State Constitution upon the completion of all terms of [their] sentence, including parole or probation." *See* Fla. Stat. § 97.052(2)(t)(3).

230.    The national mail-in voter registration form requires an affirmation that the voter meets the eligibility requirements of their state (which, for Florida, states that if convicted of a felony, voting rights must be restored). PX37 (Federal Voter Registration Application).

231.    Some counties permit applicants to use either the pre- or post-SB7066 voter registration application, other counties permit applicants to use only one or the other. PX902 (Responses to Second Set of Interrogatories from SOEs).

---

[9] In addition, state law required that the application form be designed to ensure that "convicted felons whose civil rights have been restored . . . are not required to reveal their prior conviction[.]" *See id*. § 97.052(2)(u).

232.    Both the pre- and post-SB7066 voter registration applications are available on the Department of State's website. *See* Florida Online Voter Registration System, Dep't of State, https://registertovoteflorida.gov/home (last visited Mar. 23, 2020).

233.    The Department of State's website does not explain the difference between the two forms or instruct applicants to use one or the other. *See id*.

234.    Like the amended form provided for in SB7066, the Florida Online Voter Registration System requires applicants to attest whether they have been convicted of a felony, and if convicted, to affirm either: (i) that their "voting rights have been restored by the Board of Executive Clemency;" or (ii) that their "voting rights have been restored pursuant to s. 4, Article VI of the State Constitution upon the completion of all terms of [their] sentence, including parole or probation." *See* Florida Online Voter Registration System, Dep't of State, https://registertovoteflorida.gov/eligibilityreactive (last visited Mar. 23, 2020) ("Fla. Online Voter Registration System").

235.    Neither Florida's amended voter registration application nor the Online Voter Registration System define the phrase "completion of all terms of sentence." Neither mention LFOs. *See id*.; PX35 (Fla. Voter Registration Application).

236.     Neither Florida's amended voter registration application nor the Online Voter Registration System contain the text of "s. 4, Article VI of the State Constitution," nor any mention of the phrase "Amendment 4." *See* Fla. Online Voter Registration System; PX35. Toshia Brown, a top official at the Division of Elections, testified that she did not know the section of Florida's Constitution where Amendment 4 was codified. PX88 at 108:14–18 (Brown Dep.).

237.     Individuals with out-of-state convictions whose voting rights were restored in another jurisdiction cannot sign the attestation on Florida's amended voter registration application as it does not accurately reflect the basis for their eligibility to vote. ECF 207 at 47; Prelim. Inj. Hr'g Tr., ECF 205 at 201:22–202:7; PX96 at 213:4–215:18 (Matthews Dep.); PX749 (10/4/19 Email from Maria Matthews) ("the 3 legislatively directed statements do not address the scenario" of a voter with a felony conviction in another state whose rights are restored under the laws of that state); PX715 (SOE Earley's Comments for Working Group) (the language of the amended voter registration application "provides no good option for out of state felons who have had their voting rights restored").

238.     Despite repeated suggestions that they would, during the 2020 Legislative session the Legislature did not change the amended voter registration form. *Cf.* PX880 (10/27/19 Email from Jeff Brandes) (stating that this Court's

"points on the third box of the registration form is [sic] well taken and we are working on clarifying language."); Tr. of Mar. 26, 2020 Status Conf., ECF 238 at 7:18–8:7 (Defendants confirming that Florida legislature has not "revert[ed] back to the pre-2019 form").

239.    Although there is a *mens rea* requirement for criminal liability for false swearing or submission of false registration information under Fla. Stat. § 104.011, the voter registration forms omit the intent requirement and state that submitting false affirmation is a felony. *See* PX35 (Fla. Voter Registration Application eff. 10/2013); PX36 (Fla. Voter Registration Application eff. 7/2019).

240.    Defendant Lee has made it clear that the oath on Florida's forms requires a registering voter to ascertain their eligibility—including rights restoration under SB7066—*before* registering to vote. *See* PX96 at 179:23–189:10, 190:21–25 ( Matthews Dep.) ("Every voter is responsible of their own determination of whether they are eligible or not. . . . They are the ones that are having to swear under oath."); *see also* PX88 at 152:12–22 (Brown Dep.) ("A: If they are unsure whether or not there are disqualifying fines and fees, because they may be eligible, they may not be eligible. But you are affirming that you know that you are eligible, so I would not register to vote. Q: So those individuals should not be registering to vote? . . . A: They need to find out if they are eligible, if those fines and fees fall under or are

exempt from it."); PX172 at 2 (SOS Internal Memo on Impact of Amendment 4) ("The onus is on the person when completing the form to know whether he or she meets the eligibility requirements."); PX82 at 2 (2013 letter from Secretary of State to Leon County SOE) (reprimanding him for advising voters unsure of their eligibility to register to vote in order to ascertain their status; "Under no circumstances should a voter registration official advise applicants to affirm something they do not know to be true. An applicant who took such advice and willfully made a false affirmation could be subject to criminal liability.").

241.    Local election officials across the state have similarly testified that returning citizens cannot register to vote until they determine their own eligibility under SB7066. *See, e.g.*, PX25 at 108:15–19 (Arrington Dep.) ("Q: And they should not register to vote until they've fully ascertained whether or not they're eligible under SB 7066; is that right? A: If they asked our guidance, that's what they are told."); PX39 at 119:3–7 (Barton Dep.) ("Because when they sign that application, they're saying the information they put on it is true and correct. So I would not encourage someone to register to vote if they are not sure. . . . I would encourage them to check."); PX44 at 4 (Forwarded Labasky Memo to All SOEs RE: Restoration of Voting Rights) ("It is the responsibility of the applicant . . . to affirm all information in the application is true, subject to the penalty of false swearing.");

PX126 at 7 (Miami-Dade SOE White's Responses to First Set of Interrogs.) ("Florida law requires that individuals ensure they are eligible to vote at the time they submit a voter registration and every time an individual casts a ballot."). Despite considering such a recommendation, the Restoration of Voting Rights Work Group failed to recommend that Florida "[d]evelop a statewide form (such as an affidavit of diligent search) for convicted felons to affirm that they have made a good faith effort" to ascertain outstanding terms of sentence and believe they have none. PX732 at 4 (Restoration of Voting Rights Work Group Draft Findings and Recommendations).

242.    Warnings reminding returning citizens that it is their responsibility to determine their eligibility under Amendment 4 and SB7066 are routine in the materials created and distributed by local election officials. *See, e.g.*, PX127 at 4 (Miami-Dade County Procedures for Incomplete or Denied Voter Registrations) ("It is the voter's responsibility to confirm if their voting rights have been restored. We urge voters to use these resources to confirm your sentence is complete, and thus your rights restored, before completing a voter registration application."); PX217 at 2 (Nassau County SOE Amendment 4 FAQ) ("It is the voter's responsibility to confirm whether or not their voting rights have been automatically restored."); PX253 at 2 (Hillsborough County SOE Amendment 4 FAQ) ("It is your

101

responsibility to affirm that all information submitted on your voter registration application is correct and accurate.").

243.    The Department of State's position is that returning citizens "are the ones on the hook for determining whether they are eligible or not." PX96 at 179:23–25, 179:25–189:4, 190:21–25 ("Every voter is responsible of their own determination of whether they are eligible or not. . . . They are the ones that are having to swear under oath."); PX303 (Div. of Elections Internal Briefing Paper RE: Amendment 4).

244.    Moreover, the Department has taken the position, *see supra*, that affirming eligibility when one is unsure is itself improper and could lead to prosecution. *See* PX96 at 179:13–25 (Matthews Dep.).

245.    The Supervisor of Elections for Leon County submitted written testimony to the Restoration of Voting Rights Work Group that the language on the amended form "is proving to be a huge disincentive for citizens who have been convicted of a felony but who now desire to vote." *See, e.g.*, PX715 (SOE Earley's Comments for Working Group) (going on to say that the new language "appears to single [people with felony convictions] out, which creates anxiety and distrust").

246.    The Department does not consider evidence of intent when referring elections complaints regarding registering or voting while ineligible. ECF 258-8 at

291:24–292:18 (Matthews 30(b)(6) Dep.); *see also* PX288 (Referral Letter – Elections Fraud Compl.).

247.     The state's attorneys may prosecute an individual for registering or voting while ineligible even where the only evidence of intent is that the person signed an affirmation that they were eligible. *See* PX288; PX289 (Shang Deferred Prosecution Agreement).

248.     An individual may be subject to substantial financial penalties for registering or voting while ineligible, even without any admission or finding of guilt. *Id*.

249.     Even those who registered during the "safe harbor period" between January 8, 2019 and July 1, 2019 cannot participate without fear of prosecution since unlawful voting is also subject to criminal investigation and prosecution. *See* Fla. Stat. §§ 104.15, 104.16, 104.42.

250.     Even for named plaintiffs in this case, Supervisors of Elections have been unwilling to provide registered voters with assurances of their eligibility to cast a ballot. PX851 (3/10/2020 Email from Leah Aden).

251.     The Department has no position on whether an active registered voter who has not been removed from the rolls despite having outstanding LFOs is eligible to vote. PX96 189:17–190:25 (Matthews Dep.). Some Supervisors of Elections have

determined that active voters with outstanding LFOs are ineligible to vote, while others have determined the opposite. *Compare* PX39 at 124:12–24 (Barton Dep.), *with* PX55 at 203:1–9 (Earley Dep.).

252.     If an active voter who has not been removed from the rolls despite having outstanding LFOs casts a ballot, the Department does not have a position on whether that person has voted while ineligible in violation of Florida law. *See* PX96 at 189:21–191:6 (Matthews Dep.).

253.     The risk that registered voters with outstanding LFOs will be subject to complaints of voter fraud and threats of criminal prosecution is not hypothetical. *See, e.g*, PX826 (documenting 361 complaints of voter fraud received by Florida DOS since 2013).

254.     There are numerous examples of both state and non-state actors— including some already active in Florida—alleging that registered voters are ineligible and thus have committed a criminal act, based on flawed data obtained from state records without regard to voter intent. *See Texas LULAC* v. *Whitley*, No. 5:19-cv-00074-FB (W.D. Tex. Feb. 27, 2019); *LULAC-Richmond* v. *Public Interest Legal Foundation*, No. 1:18-cv-00423 at 1, (E.D. Va. Aug. 13, 2018); PX864 (compilation of letters from external groups to Florida counties and the Florida DOS alleging the presence of ineligible voters on the voter registration rolls, without

offering any evidence of intent); *cf. United States* v. *Florida*, 870 F. Supp. 2d 1346 (N.D. Fla. 2012).

### B. People with Past Convictions Face Substantial Burdens in Determining Eligibility and Paying Disqualifying LFOs

255.    Florida's LFO records are "decentralized, often accessible only with great difficulty, sometimes inconsistent, and sometimes missing altogether," such that "[i]f Florida does not clean up its records, some genuinely eligible voters may choose to forgo voting rather than risk prosecution." ECF 207 at 43–44.

256.    "[T]he State of Florida cannot provide reliable or consistent information about what LFOs returning citizens may owe when they are otherwise eligible to register to vote and vote." PX892 at 7 (Burch Report); *see also* PX175 at 2–3 (7/8/19 Clerk's Amendment 4 Quick Response Team Conference Call Minutes) ("The concern is that CCIS is not accurate.") (exposing holes in CCIS related to restitution: "CCIS did not have information if there was restitution to be paid directly to the victim."); PX854 (9/25/19 Email from Amber Marconnet) (email thread between DOS and clerk seeking to determine whether a fee was paid).

257.    SB7066 requires an individual to have paid off any LFOs contained "in the four corners of the sentencing document including those ordered "as a condition of any form of supervision," Fla. Stat. § 98.0751(5)(b). SB7066 also states that it does not require payment of LFOs that accrue after the date the obligation is ordered.

Fla. Stat. § 98.0751(2)(a) (5)(c). These provisions may be internally inconsistent where a condition of supervision includes an LFO that accrues after sentencing. *See, e.g.*, PX12 at 2, 11 (Tyson Decl. and Decl. Exhibits) (ordering Tyson to pay $10 per month towards the cost of his supervision); PX531 at 74, 75 (Kenyon Arrest and Court Records) (ordering Kenyon to pay $50 per month plus a 4 percent surcharge towards the cost of her supervision and showing the potential to be charged per day of electronic monitoring).

258.    The "terms of sentence" for the same convictions may vary dramatically with respect to which LFOs are ordered within the relevant sentencing documents, both within counties and across counties. *See* PX273 at ¶¶ 3–4 (Martinez Decl.).

259.    The documents used in sentencing vary from county to county within Florida (and across states and federal courts). *Id*.; PX96 at 183:4–7 (Matthews Dep.) (Director Matthews testifying that she "know[s] for a fact" that not all 67 counties use the same format for sentencing documents.); PX719 at 24:20–25:2 (10/15/19 Restoration of Voting Rights Work Group Meeting Transcription) ("[T]he forms that are actually used in the 67 counties vary. Pretty significantly from county to county."); PX214 at 4–14 (Pinellas Judgment and Sentencing Document); PX89 (Miami-Dade Sentencing Documents); PX220 (Sarasota Judgment and Sentencing Document).

260.     There are no reliable, publicly available sources for determining whether individuals have outstanding LFOs, whether they have paid their LFOs, or whether their LFOs are disqualifying. *See* PX892 at 8–9 (Burch Report); *see also* PX39 86:25–88:4 (Barton Dep.); PX55 at 197:14–198:10 (Earley Dep.); PX88 at 143:2–5 (Brown Dep.); PX96 at 184:14–20 (Matthews Dep.); PX1 ¶¶ 10–20 (Smith Report); PX340 at 1 (Fla. Court Clerks & Comptrollers Amendment 4 Media Resources) ("It's complicated because the information on various parts of a sentence . . . is housed with different agencies in different databases. Clerks have access to some data, but even our data won't tell the whole story."); PX732 at 3 (Restoration of Voting Rights Work Group Draft Findings and Recommendations) ("The Work Group recognizes the biggest challenge is addressing the felony records of the past whose access, availability, terms, forms, procedures, and recordkeeping may vary from jurisdiction to jurisdiction."); PX383 at 5 (Dept. of State 2019 Agency Legislative Bill Analysis for SB7086) ("At this time, no single source exists that confirms for the Department or for the convicted felon that he or she has completed all terms of the sentence for every felony."); PX696 at 6:24–7:4 (10/1/19 Restoration of Voting Rights Work Group meeting Transcript) ("FCOR or Commission on Offender Review, we do not maintain any type of database specifically not related to convicted felons, their criminal histories, whether they've completed all their

terms of sentence or satisfaction of their monetary obligations."); PX106 at 4–6 (Division of Elections Memo on Clerk of Court Highlights and Challenges) (explaining that records are often misplaced or destroyed by Clerks of Court and commenting on the difficulty of finding records even when available to the public on clerks' websites; "Even if they are available online, we have to wait for redaction or they are difficult to locate because the images are not labeled in a way that makes them easily identifiable; they have image numbers rather than document titles, like arrest report or judgment."); PX804 (Bureau of Voter Registration Services Internal Resource Guide for Access to Official Court Documents in Florida) (listing which clerks offices provide online access to court records and which do not).

261.    Clerks of court in Florida do not reliably record or track restitution obligations. PX88 at 143:6–21 (Brown Dep.); PX96 at 184:14–20 (Matthews Dep.); PX39 at 86:25–87:17, 108:7–25, 128:1–9 (Barton Dep.); PX55 at 197:20–198:10 (Earley Dep.); PX255 (8/23/19 Email from Maria Matthews); PX175 at 3 (7/8/19 Clerk's Amendment 4 Quick Response Team Conference Call Minutes) ("Restitution is a big problem."); PX461 at 21 (11/15/19 Florida Clerks of Court Study Final Report) ("Delays in uploading or updating information, poor quality of scanned documentation, and inaccurate or mismatched data in software databases is

an issue across multiple counties."); Prelim. Inj. Hr'g Tr., ECF 204 at 111:01–02 (Prelim. Inj. Hr'g Tr.) (testimony of Shannon Cash-Russell).

262.     Most of the publicly available documents from state or county agencies provide conflicting information with respect to the assessment and payment status of LFOs. PX892 at 6 (Burch Report); PX1 ¶¶ 10–20 (Smith Report).

263.     Dr. Burch found discrepancies of more than 10 percent in the records of 98 percent of individuals whose cases she researched, depending on which source she looked at, including discrepancies as to the original amount of LFOs assessed in relation to a particular case. PX892 at 8, 55 (Burch Report).

264.     The LFO information available to Defendants and voters is rarely itemized for each individual fine, fee, and cost assessed, and is inconsistent and of poor quality. *See, e.g.*, PX39 at 107:23–108:1 (Barton Dep.); PX88 at 143:2–5 (Brown Dep.); PX55 at 199:24–200:13 (Earley Dep.); PX1 ¶¶ 10–20, 53 (Smith Report); PX461 (11/15/19 Florida Clerks of Court Study Final Report).

265.     Returning citizens—despite great efforts—cannot determine what they owe because their records are conflicting, incomplete, or no longer even exist. *See* PX11 ¶¶ 4–7, 13 (Miller Decl.); see *also* Prelim. Inj. Hr'g Tr., ECF 204 at 162:08–165:18, 172:14–75:23 (Prelim. Inj. Hr'g Tr.) (testimony of Betty Riddle and Clifford Tyson); PX860; PX861 (phone messages left with DOS staff from citizens trying to

determine voter eligibility under SB7066); PX250 (press release stating Broward County Clerk is unable to determine voter eligibility, voters may lack information necessary to do so on their own).

266.     There are major discrepancies in the amounts initially assessed and still due according to information from the county clerks' offices as compared to the FDLE reports, and as between the county clerks' staff and their own databases. PX892 at 7–8 (Burch Report). Only 5 of the 153 individuals in Dr. Burch's sample did not have discrepancies between the clerk online databases and the FDLE report in any of their cases. *Id.* at 9.

267.     Dr. Burch identified cases where the clerk's online database showed that LFOs had been paid in full, but the clerk's office stated there was an outstanding balance, and vice versa. *See id*. at 52–53.

268.     Returning citizens face "burdensome administrative costs" in trying to determine their LFO information and voter eligibility, a process that "is expensive, time consuming, and ultimately, discouraging for people who want to vote." *Id.* at 12. The process of researching LFOs often presents long wait times on the phone, inscrutable or defective websites, unhelpful clerks, or information that could only be accessed in hardcopy, in person, or with a fee. *Id.* at 29–37; ECF 204 at 162:24–165:13 (Prelim. Inj. Hr'g Tr.) (testimony of Betty Riddle).

110

269.     The Department of State is aware of the delay or impossibility of obtaining sentencing records or accurate LFO information. *See* PX106 (Director Matthews noting that certain counties do not provide judgments, that clerks' offices sometimes destroy sentencing records or misplace older sentencing records, and that some clerks' offices provide inaccurate or incomplete information); PX 103; PX96 at 128:5–146:10, 181:6–9, 182:3–22 (Matthews Dep.).

270.     In Miami-Dade County, the clerk's office reduced hours (including telephone hours) because of budget cuts—to 9am-12pm on Monday through Friday. PX892 at 29 (Burch Report); *see also* PX106 at 6 (Division of Elections Memo on Clerk of Court Highlights and Challenges). These times are when most people are working and may be unable to call to look up their LFOs. *Id.*

271.     Several other counties, including Charlotte, Pinellas, Polk, and Hillsborough, also require requests for information on older cases to be made in writing. *Id.* at 31. Volusia County clerk's office, for example, does not answer questions over the phone about cases sentenced 2013 and earlier. *Id.*

272.     At least eleven counties—including Holmes, Okaloosa, Gulf, Dixie, Columbia, Broward, Hamilton, Flagler, Calhoun and Pinellas—charge fees to access case records online (or to request additional information when it is not shown online, a common problem for relatively older cases). *Id.* at 34; *see also* ECF 204 at 115:09–

111

18 (Prelim. Inj. Hr'g Tr.) (testimony of Shannon Cash-Russell, noting that Leon County charges $1.00 per page). In Dixie County, for example, the "Records Search: Court and Official" button on the home page links to myfloridacounty.com, a pay site (but confusingly, their dropdown menu to search court records goes to their "free" court records site). PX892 at 35–36 (Burch Report); *see also* https://dixieclerk.com, which links to https://www3.myfloridacounty.com/official _records/index.html, (last accessed Feb. 26, 2020).

273.    LFO information from relatively older cases may not be available online, but only in paper. PX892 at 35 (Burch Report). Counties charge to fill these records requests. *Id.* Gulf County charges $1 per page and $2 per certified document, $.75 for shipping, and $3.50 service fees to access records and there is a $7.25 minimum. *Id.* Pinellas County charges $1.00 per page, $2.00 per page for certified copies, and a 3.5 percent processing fee to mail official records. *Id.* Holmes County charges $3.00 per page. *Id.* To determine interests on liens, Alachua County charges $7.00 per lien. *Id.* at 35, 54.

274.    Dr. Burch confirmed that Florida "will have difficulty disaggregating initially assessed amounts from interest, fees, or other penalties that have accrued," and therefore, "it can be impossible to pay *only* the amounts assessed for felony convictions at the time of sentencing," as is required under SB7066. *Id.* at 9–10; *see*

112

*also* ECF 204 at 97:20–98:05, 106:10–18 (Prelim. Inj. Hr'g Tr.) (testimony of Shannon Cash-Russell).

275.　There is no reliable way for voters, counties, or the Department to disaggregate payments made for obligations that are ordered in the four corners of the sentencing document from those that may have accrued later. PX892 at 10–12 (Burch Report); PX11 ¶ 7 (Miller Decl.).

276.　County clerks were often unable to determine whether an outstanding balance represented only the amount assessed at sentencing or also included amounts accruing afterwards. PX892 at 10 (Burch Report).

277.　Policies preventing partial payments and policies that require the payment of interest, collection agency fees, convenience fees, or other debt imposed after sentencing make it impossible for some returning citizens to pay towards only the amounts originally assessed "in the four corners of the sentencing document." *Id* at 11.

278.　Procedures and requirements differ significantly among counties. In at least 25 counties—Clay, Gilchrist, Gulf, Hardee, Charlotte, Bradford, Walton, Lake, Polk, Collier, Miami-Dade, Santa Rosa, Seminole, Escambia, Brevard, Citrus, Lee, Osceola, St. Lucie, Orange, Hernando, Manatee, St. Johns, Okaloosa, and Palm Beach—policies require residents to pay amounts beyond the LFOs assessed at

113

sentencing on their felony cases when making payments in some instances. *Id.* at 2–3, n.2, 11 n.2, 66–67.

279.    In at least five counties, also including Miami-Dade, clerks disallow payment of only amounts that are disqualifying under SB7066 and not interest, collection agency fees, convenience fees, or other debts that accrue after the sentence, which can sometimes add more than 40 percent to the LFO balance. *Id.* at 10–12.

280.    In at least five counties, clerks will refuse payments on debts in collections from anyone who attempts to pay *only* an assessed amount without additional collections and other fees. *Id.* at 12.

281.    State law allows counties to turn over LFOs to debt collectors after 90 days. Fla. Stat. §§ 938.35 and 28.246.

282.    Debt collection agencies may add fees of up to 40 percent of the total amount of outstanding LFOs due as payment for collecting fees. Fla. Stat. § 28.246(6). Eight counties—including Gulf, Miami-Dade, Duval, Martin (before 12/2015), Polk, Leon, St. Lucie, and Volusia—charge 40 percent fee of the total debt sent to collections agencies. PX892 at 56; *see also* ECF 204 at 97:09–98:16 (Prelim. Inj. Hr'g Tr.) (testimony of Shannon Cash-Russell). Twelve counties—including Orange, Broward, Brevard, Martin (after 12/2015), Escambia, Sarasota, Clay,

114

Seminole, Marion, Collier, Pinellas, and Hernando—charge fees ranging from 20 to 35 percent of the total for debt sent to collections agencies. PX892 at 56.

283.    In seven counties—including Collier, Hernando, Manatee, Orange, St. Lucie, St. Johns, and Seminole—they do not accept payments on debts in collection. *Id.* at 59. For instance, the Collier County website says that for debts in collections, "you must add an additional 32% service charge. You must also pay all collections agency payments directly to the Collections Agency." *Id.* at 60–61; *see* https://apps.collierclerk.com/court-divisions/criminal/collection-agency-payments, (last accessed Feb. 26, 2020). Likewise, according to the Orange County Clerk website, "Once an account is turned over to a collection agency, all payments must be made through that collection agency." PX892 at 61; https://www.myorangeclerk.com/Divisions/Criminal/Collections-Court,       (last accessed Feb. 26, 2020).

284.    In Seminole County, it appears that payments to the agencies must include the 25 percent fee as they provide, "Fines and fees referred to a Collection Agency must be paid directly to the Agency listed in the notice you received. Payment must include the Collection Agency's 25% contingency fee." PX892 at 61; *see* https://www.seminoleclerk.org/collection-agencies/, (last accessed Feb. 26, 2020).

285.     According to the Orange County Clerk, for cases turned over to collections there is a collections fee of 25 percent plus a $25 payment fee imposed. PX892 at 57. According to Orange County's website, all cases not paid in full within 90 days in the absence of a payment plan, or cases with payment plans that are more than 90 days past due, get turned over to collections agencies and will be assessed 25 percent plus $25 to pay on top of the court-ordered amount. *Id.*

286.     Some policies at the local and state levels still prevent individuals from being able to pay just the costs from "the four corners of the sentencing document" even for debts that are not in collections. *Id.* at 62.

287.     Some counties, such as Lee, Osceola, and St. Lucie, explicitly prohibit partial payments unless the individual is enrolled in a payment plan, so that individuals who are not in a payment plan cannot direct payments just to the assessed amount. *Id.* For example, Osceola County's court payment portal states, "You may make a partial payment using a payment plan only if the court has approved and assigned you a plan with a beginning balance and a specified monthly payment amount." *Id.*; *see* https://www.ncourt.com/x-pressV3_2/juris/fl/flosceola/Landing_ Osceola.aspx, (last accessed Feb. 26, 2020).

288.     Even when county clerks do accept partial payments, in accordance with Florida Statute §28.246, counties charge fees for processing payments on a per

case basis. Partial payment fees typically are charged either $5 per payment or a one-time $25 fee. PX892 at 61. These fees are explicitly mentioned on the online databases of Clay, Citrus, Brevard, Santa Rosa, Seminole, Escambia, and Lee counties. PX892 at 61. Most policies are similar to Santa Rosa County's policy, which states, "Partial payments are accepted w/a fee; $5 per payment or one-time $25 fee." PX892 at 63; *see* http://www.santarosaclerk.com/court_info.html, (last accessed Feb. 26, 2020). Counties also charge convenience fees, especially for credit card payments of LFOs. PX892 at 63. Collier County charges $5 to pay online. PX892 at 62. Seminole County charges credit card payment fees ranging from 3.5 percent in-person to 6 percent over the phone. *Id*.

289.    Organizational Plaintiffs are also affected by these difficulties. Organizational Plaintiffs devote significant resources to registering voters, getting out the vote, and conducting voter protection on election days. SB7066 has forced all three groups to divert substantial time and resources away from other core activities to, for example, work with returning citizens to help clarify the voter registration process, and determine whether they have outstanding LFOs, and/or are eligible to register to vote and vote. PX18 at ¶¶ 2–6, 8–9 (Neal Decl. on behalf of Orange County NAACP); PX19 at ¶¶ 2, 5, 8, 10–11 (Nweze Decl. on behalf of Fla.

117

NAACP); PX20 at ¶¶ 3, 7, 16, 18 (Brigham Decl. on behalf of LWVF); ECF 286-2 at 8, 60:10–24; 61:7–25 (Excerpts from Neal Dep.).

290.    The Department of State has acknowledged that it will require additional costs to train employees to review felony records and LFO obligations. *See* PX96 at 105:17–107:24; 124:4–125:2.

291.    It is now substantially more time-consuming to train members and volunteers to assist returning citizens seeking to submit registration applications than it was to train volunteers for voter registration activities before the passage of SB7066. PX20 at 6. For example, in order to comply with SB7066, the voter-registration process, which takes five to ten minutes for a voter without felony convictions, now takes—where possible at all—between 30 minutes and four hours for a single, eligible returning citizen, *id.*, and has become "very cumbersome and time[-]consuming and scary." ECF 286-3 at 3, 37:17–18 (Excerpts from Scoon Dep.). Organizational members and volunteers are also hesitant to conduct core voter registration activities due to the risk of creating legal liability for returning citizens who have no means to determine whether their LFOs would make them ineligible to register. PX20 at 4; ECF 286–3 at 3, 35:9–36:18; ECF 286–2 at 61:7–25.

### C. Defendants Will Not Assist Voters Seeking Determinations of Their Eligibility to Register

292.    Despite the foregoing, the Department of State will not tell citizens whether they are eligible to vote, whether they have completed their sentence, what LFOs are disqualifying, whether a voter is eligible to vote if her sentence has been modified such that outstanding LFOs are no longer considered part of the sentence, or whether an individual who is genuinely unable to pay is eligible to vote. ECF 286–8 at 12, 240:2–15; 26–27, 264:20–265:3; 32, 270:8–14; 38–39, 286:19–287:2 (Matthews 30(b)(6) Dep.); PX96 at 184:14–20, 189:5–191:6 (Matthews Dep.). The Department similarly will not provide guidance to county SOEs on how they or voters should make these determinations. *Id.*; *see also* PX798 (1/16/2020 Email from Amber Marconnet) (responding to email from SOE re: lack of guidance on what to tell voters); PX801 (compilation of requests from citizens for guidance from DOS); PX39 at 45:25–46:8, 106:7–10, 108:2–6, 108:18–21, 121:4–8 (Barton Dep); ECF 286-4 at 84:18–85:1, 85:12–13 (Latimer Dep.); PX25 at 104:20–24 (Arrington Dep.).

293.    If individuals call the Department of State inquiring about eligibility, they are directed to the County Clerks or the Department of Corrections. PX96 at 184:14–17, 186:7–11; ECF 258-8 at 265:20–25, 270:8–13; PX802 at 5–6 (9/20/19

Email from Maria Matthews). The Department will not answer *any* questions about the application of SB7066's LFO requirements.

294.     Staff at the County Clerks offices are often unavailable or unresponsive, and when they can be reached, they "lack[] the expertise and capacity to help returning citizens determine their LFOs and which ones were disqualifying for voting purposes," PX892 at 12 (Burch Report); *see also* PX259 (7/18/2019 Email from Richard Herring) (includes statement that clerks are unable to make eligibility determinations, and that the responsibility lies with the DOS and SOEs); PX265 at 2–3 (7/15/19 Clerk's Amendment 4 Quick Response Team Minutes) (noting the need for legal opinions about various topics including whether sentencing documents include incarceration fees and whether interest is a condition of the sentence). The Division of Elections has itself referenced the insufficient or inconsistent ability of clerks' offices to return the necessary documents to ascertain voter eligibility. *See* PX638 at 2 (Division of Elections Memo on Clerk of Court Highlights and Challenges) ("Many counties do not send all documents requested and include no response addressing the missing items. We have to reach out again for clarification as to whether they exist at all or did someone just forget to include them."); PX103 (04/04/19 Email from Toshia Brown).

295.     Moreover, the Clerks' data is also unreliable. The CCIS system does

not reliably track restitution, *see* ECF 258-8 at 246:24–248:7, and information

regarding other LFOs may not be available, or may not be consistent with what is in

court records, *see* PX542 at 3 (12/30/19 BVRS Internal Procedures - Felony Match

Case Files) (indicating that where this is the case, the record should be tagged as

"NMNSO - Financial Obligations Undetermined."); *see also* PX175 (7/8/19 Clerk's

Amendment 4 Quick Response Team Conference Call Minutes); PX179 (8/22/19

Email from Laura Roth); PX180 (8/29/19 Email from Karen Rushing) (all three

highlighting inaccuracies and discrepancies between CCIS and DOC data, issues

with restitution); PX794 (9/25/19 Email from Amber Marconnet) (exchange

between DOS and Hillsborough clerk trying to untangle fees associated with a count

that was dropped from those on which voter was convicted). PX636 (09/16/19

Florida Court Clerks and Comptrollers Presentation to Restoration of Voting Rights

Work Group); PX638 (Division of Elections Memo on Clerk of Court Highlights

and Challenges); PX262 at 6 (8/21/19 Email from Jeanne Worthington) (FDOC

Official noting that "[m]any times, while reviewing an inmate's commitment we

find discrepancies between it and the information listed in CCIS.").

296.     The Department of Corrections ("DOC") is similarly unequipped to

provide voters with information about their eligibility under SB7066. *See, e.g.*,

121

PX284 (DOC will only provide releasees with records related to current sentence); PX655 at 9 (DOC Restoration of Voting Rights for Convicted Felons Presentation) (DOC "cannot provide legal advice or determine if you are eligible to vote.").

297.    County supervisors of elections do not have, on hand, the information necessary to determine whether someone has paid their LFOs, and thus direct inquiries to other agencies, only to have those agencies bounce the applicant back to them. PX279 at 51 (Restoration of Voting Rights Work Group Report); *see also* PX25 at 106:2–107:4, 109:12–111:7, 124:23–126:6 (Arrington Dep.); PX881 (4/24/19 Email from Paul Lux) ("[T]he Supervisors are not in favor of any language to implement Amendment 4 that results in the responsibility of determining whether a voter registration applicant has completed all terms of their sentence residing in the office of the Supervisor. We simply do not have the resources or the access to proper information to make those determinations without a substantial investment in our infrastructures and information networks."); PX39 at 116:2–16 (Barton Dep.); PX727 (11/11/19 Email from Vicki Cannon) (Nassau County SOE saying that SOEs "do not have the information to provide citizens to confirm whether the terms of their sentence have been completed" and asking DOS to stop DOC from including language in their Termination of Supervision Letter encouraging individuals to

"contact the Supervisor of Elections in your county of release" "[f]or additional information related to the restoration of voting rights.").

298.     Florida election officials concede that counties will apply SB7066 differently. *See* ECF 258–8 at 183:4–8 (Matthews Dep.); PX39 at 126:4–18 (Barton Dep.); PX25 at 104:25–105:6 (Arrington Dep.). Different county supervisors give differing instructions to returning citizens about determining their eligibility. *Compare* PX55 at 200:20–201:7, *with* PX 39 at 95:6–10.

299.     Because of "the lack of reliability and contradictions in the data," Dr. Burch concludes, there will "likely [be] a chilling effect on registration and voting" because individuals cannot "conclusively determine if or how much they owe." PX892 at 10, 40.

300.     Unless a voter is able to obtain legal counsel, there is no one to assist voters in determining their own eligibility. PX25 at 85:23–86:2, 101:5–11; PX96 at 179:23–189:4; PX55 at 225–26, 200:20–201:7; *see supra* ¶¶ 294–298 (describing how DOS, Clerks, DOC, and SOEs cannot effectively or at all assist voters in determining their own eligibility).

301.     Even if a voter has legal counsel, they may not be able to ascertain their eligibility because legal counsel is also hamstrung by incomplete and inconsistent data and the lack of interpretive guidance from the Department charged with

implementing SB7066. PX21 at 6–7 (Carey Haughwout Decl.) (saying that the Palm Beach County public defenders "do not have the time or resources" to "assist clients with multiple felony convictions…determine the status of their outstanding LFOs."); PX851 (3/10/2020 Email from Leah Aden) (Email from Gruver counsel seeking and failing to get reassurance that Plaintiff Latoya Moreland would be permitted to vote); PX12 ¶¶ 4–5, 7–11, 13–17, 16 (Tyson Decl.) (attesting that, even with the help of counsel in obtaining his judgment and sentence documents, he is still unable to determine how much he still owes).

302.     SB7066 established a Restoration of Voting Rights Work Group ("Work Group"). The Work Group submitted a report with non-binding recommendations in November 2019. PX279 at 27–28.

303.     The Voting Rights Restoration Work Group made many recommendations aimed at addressing this administrative nightmare, but the Department has not taken any meaningful steps to execute those recommendations. ECF 258-8 at 309:2–311:5, 311:17–314:19, 315:4–316:22 (Maria Matthews 30(b)(6) Dep.).

304.     Relevant data has not been consolidated, despite the recommendation of the Work Group. *See id.* at 309:2–7.

305.     No voting rights liaison had been appointed. *Id.* at 310:4–10.

306.     The Secretary's office has "not yet shared information with the Supervisors of Elections regarding the uniform instructions that should be issued regarding restoring voting rights." *Id.* at 312:13–313:14.

307.     There is no timeline for when—if ever—the Department will fulfill the Work Group's recommendation that it coordinate with FCOR to identify sources of information about restitution. *Id.* at 315:4–316:22, 316:16–20 (responding "no" to whether she had a sense if the recommendation would be fulfilled by the March or November 2020 elections).

308.     The Department of State has also declined to establish a mechanism for returning citizens who are unable to pay to register and vote. The Department's position is that SOEs make eligibility determinations, that the preliminary injunction order applies only to the named plaintiffs, and that the Department has no broader obligation to accommodate otherwise eligible voters who are unable to pay. *Id.* at 284:5–287:24.

309.     As a result of this non-guidance, the Supervisor of Manatee County purged Individual Plaintiff Moreland, who joined this lawsuit after the preliminary injunction was entered, on the grounds that she had "fines [that] were found to be outstanding." ECF 287 ¶ 3; *see also* PX851 (3/10/2020 Email from Leah Aden).

Many other individuals with outstanding LFOs have been removed from the rolls in Manatee County. *See* PX908.

### D. The Only Process Available for Determining Eligibility Occurs *After* Registration

310.    According to Defendants' statements, the only existing procedure for determining a voter's eligibility is the process for removing active voters from the voter registration rolls. See Fla. Stat. §§ 98.075(5), (7); PX97 ¶ 9–11 (Matthews Decl.).

311.    Under Florida law, a voter registration applicant is registered to vote and placed on the voter rolls so long as their registration application contains all the information required by law necessary to establish the person's eligibility and the social security number, driver's license, or identification number provided on the form corresponds to an actual person. PX97 ¶ 9–10.

312.    If an applicant affirms they are eighteen, a citizen, have not been adjudicated mentally incompetent with respect to voting, and have not been convicted of a felony or have had their rights restored, those affirmations are taken as true and the individual is registered to vote. *Id.* ¶ 10; PX25 at 22:2–12 (Arrington Dep.).

126

313.     Once a voter is added to the rolls, they cannot be removed, other than at the request of the voter, unless it is determined, based on credible and reliable information, that the voter is ineligible. PX97 ¶ 11; see also Fla. Stat. 98.075(5).

314.     The initial determination of whether an active voter is ineligible due to a past felony conviction is supposed to be made by the Department of State. Fla. Stat. § 98.075(5).

315.     If the Department has "credible and reliable information" that a voter has been convicted of a felony and has not had their rights restored, it is required to notify the relevant Supervisor of Elections and provide the supervisor with the supporting documentation indicating the voter is ineligible. Fla. Stat. § 98.075(5).

316.     If the Supervisor receives information of a voter's ineligibility from the Department of State, the Supervisor then determines whether it is credible and reliable evidence of ineligibility. If so, they are required to send the voter a letter notifying them of their potential ineligibility. Id §§ 98.075(5), (7).

317.     If the voter does not respond within 30 days to a notice of ineligibility, they risk being purged from the rolls. Fla. Stat. § 98.075(7)(a)(3).

318.     Upon receipt of a notice of ineligibility, or notice that they have been purged, the voter can deny the accuracy of the information, or request a hearing. *Id.* § 98.075(7)(a)(5).

319.     In either situation, the Supervisor must review the evidence presented and make a determination based on the preponderance of the evidence. *Id.* §§ 98.075(7)(a)(5), (7)(b).

320.     A voter removed pursuant to a determination of ineligibility has the right to appeal. *Id.* § 98.075(7)(b)(5).

321.     Supervisors of Elections use significantly different processes for determining whether to remove voters identified by the Department as potentially ineligible.

322.     Different counties treat notification of potential ineligibility from the Department of State differently, depending in large part on their available resources. PX55 at 128:12–129:14 (Earley Dep.); *see also* PX141, PX142, PX807, PX823, PX825 (form notices of potential ineligibility from Supervisors' offices in Broward, Jackson, Leon, and Orange Counties, each providing different information); PX855 (questions from Hernando County Supervisor's office regarding information to include with notice).

323.     Leon County conducts independent research to verify that voters identified by the Department are ineligible before initiating cancellation of their registration. PX55 at 42:13–44:20, 128:12–129:14 (Earley Dep.).

324.     Hillsborough County initiates the cancellation process for registered voters solely in reliance on the information provided by the Secretary of State. PX83 at 60:7–65:19 (Latimer Dep.).

325.     And Manatee County has cancelled voters' registrations—including a named plaintiff—without first receiving notification from the Secretary of State. See ECF 287 ¶ 3 ("[T]he State had no input into the decision to remove Ms. Moreland – that was done at the Supervisor level in the ordinary course[,]" as was "removal of other voters in the same manner . . ."); *see also* PX181 (8/23/19 Email from Matt Whyte).

### E. Even the Post-Registration Process Is Currently Inactive Because the Department Cannot Ascertain Eligibility Due to LFOs

326.     Notwithstanding the process in place for identifying ineligible registered voters due to felony conviction, the Department of State is currently *not* identifying ineligible registered voters who have outstanding LFOS for Supervisors of Elections. ECF 258–8 at 4, 231:25–232:11 (Matthews 30(b)(6) Dep.).

327.     Between approximately December 1, 2018 and June 6, 2019, the Department did not send down any records to the counties indicating that there was credible and reliable evidence that an individual was ineligible because of outstanding LFOs related to a past felony conviction. The Department continued to identify individuals who had past felony convictions, and to categorize those

individuals based on whether the reviewer thought the individual had been convicted of murder or a felony sexual offense. PX88 at 49:7–50:23, 59:16–22 (Brown Dep.); PX96 at 81:8–23, 149:23–151:12 (Matthews First Dep.); PX55 at 87:1–5, 132:10–22 (Earley Dep.).

328.    On approximately June 6, 2019, the Department began sending records to the counties indicating there was credible and reliable evidence that a registered voter is ineligible because they are currently incarcerated for a felony conviction or under supervision (*i.e.,* probation or parole) for the same. PX88 at 59:16–22, 61:14–19, 67:3–19 (Brown Dep.); ECF 258-8 at 4, 231:7–22 (Matthews 30(b)(6) Dep.).; PX96 at 81:8–23, 149:23–151:12 (Matthews First Dep.); PX55 at 132:10–22 (Earley Dep.).

329.    The "credible and reliable" records the Department used in this process were DOC records that on their face disclaimed accuracy with respect to the type of conviction or current supervision status of the individual. PX26 (Sample DOC Records); PX96 at 156:7–158:4, 158:14–21 (Matthews First Dep.); PX39 at 61:1–62:12 (Barton Dep.); PX55 at 141:2–12 (Earley Dep.).

330.    Immediately after the Department started sending notices to the counties on June 6, 2019, the Leon County Supervisor of Elections identified many problems with the notices including lack of authoritative judgment and sentencing

130

documentation and the flagging of individuals that were not necessarily convicted of any felony conviction. *See* PX71, PX72, PX73, PX75, PX76, PX77, PX78 (reflecting discovery and investigation of problems by Leon Supervisor's office). The Department of State was quickly alerted to these issues. *See* PX74 (6/27/19 Email from Amber Marconnet).

331.     These warnings were initially met with insistence that the Department's process was credible and reliable and should be used for initiating the removal process. PX248 at 2-3 (6/7/19 Email from Maria Matthews).

332.     Ultimately, however, the Department acknowledged that its initial process for identifying even those individuals under supervision was flawed and identified potentially eligible individuals for removal. PX88 at 67:17–69:2 (Brown Dep.). On June 26 or 27, 2019, the Department stopped sending notices related to individuals on parole or probation for this reason but did not recall the notices it sent between June 6 and June 26 and did not notify the Supervisor of Elections of these known errors. *Id.* at 67:12–68:10, 104:15–23.

333.     As early as September 2019 the Department again began sending records about voters thought to be in DOC custody for a felony. PX97 ¶25.

334.     To make an initial determination of eligibility with respect to a past felony conviction, the Department compares voter registration records against

records provided by the Florida Department of Law Enforcement ("FDLE") and the Florida Department of Corrections ("DOC") on a daily basis, and then investigates any matches to determine whether the registered voter is the same person as the individual identified by FDLE or the DOC. PX97 ¶ 12–16 (Matthews Decl.); See ECF 152-93 at 11–14 (Matthews Dep. Tr.).

335.    If an identity match is confirmed, the Department next confirms hat the individual was actually convicted of a felony, and not a lesser offense. *Id*. ¶ 16, ECF 132-1 at 139–40; *but see* PX55 at 43:13–44:20 (Mark Earley Dep.) (noting that the Department has made errors including identifying people convicted of misdemeanors as having been convicted of felonies).

336.    If the person was convicted of the felony, the Department next determines whether they are still in prison or under supervision with the Department of Correction for a felony conviction. PX97 ¶ 20.

337.    If the person is no longer under supervision, the Department next determines whether the person was convicted of murder or a felony sexual offense as defined in SB7066. *Id*. ¶ 21.

338.    A conviction for murder or a felony sexual offense as defined in SB7066 is deemed credible and reliable evidence that the registered voter is ineligible to be registered or vote absent a grant of clemency. *Id.*

132

339.     Active voters who do not fall into any of the above four categories—in prison, on supervision, conviction for murder, or conviction for felony sexual offense—are categorized as "Not Murder, Not Felony Sexual Offense" ("NMNSO"). PX542 at 3 (12/30/19 BVRS Internal Procedures Memo).

340.     The Department indicates it has identified "upwards of 65,000 or more" active voters in this category. ECF 258-8 at 262:15–263:10, 335:10–24 (Matthews 30(b)(6) Dep.).

341.     For these individuals, the Department is researching outstanding LFOs but is not acting on that research. *Id.* at 243:15–244:22. According to a December 30, 2019 memorandum, for these registrants, the Department "obtains the sentencing document(s) that identify financial obligations (restitution, fines, fees, and/or court costs), if any ordered as part of the sentence." PX542 at 3.

342.     The Department has not defined what "sentencing" documents it looks at to determine financial obligations, other than to state that "the sentence may be part of the judgment." *See id*.; ECF 258-8 at 296:24–297:14 (Matthews 30(b)(6) Dep.).

343.     The guidance also instructs reviewers to collect financial obligation information for the registrant from Financial Summary Information in the Comprehensive Case Information System ("CCIS"). PX542 at 3.

344.     The Financial Summary Information screenshot from CCIS is "one piece of the documentation that may or may not support a credible and reliable match" in addition to sentencing documents and other court records. ECF 258-8 at 248:12–18 (Matthews 30(b)(6) Dep.).

345.     If the "sentencing documents" "do not indicate that any financial obligations were ordered," the reviewer marks the file with the comment "NMNSO – No Financial Obligations." PX542 at 3.

346.     If the sentencing documents show that LFOs were ordered, but the Financial Summary "shows no information available or the information is unclear in relation to what was ordered" the reviewer enters the comment "NMNSO – Financial Obligations Undetermined" in the record. *Id.*; *see also* PX802 at 2 (draft procedure indicating that evidence of $0.00 balance is not sufficient evidence of payment in full).

347.     If the sentencing documents indicate that any LFOs were ordered at the time of sentencing, but CCIS shows that "no restitution is owed and/or paid while other financial obligations have been" then reviewer enters the comment "NMNSO-Restitution Obligations Undetermined" into the record, and the record "will be revisited later for further research." PX542 at 3.

348.     These cases are marked for further research even when the CCIS shows a restitution balance of zero and the sentencing document does not indicate that restitution was ordered. *Id.* at 3–4 (requiring further research if CCIS shows a restitution balance of zero, so long as the sentencing documents indicate that "restitution, fines, fees *and/or* court costs" were ordered at the time of sentence) (emphasis added); *see also* PX802 at 2.

349.     Finally, if the sentencing documents indicate that financial obligations were ordered at the time of sentencing and the CCIS Financial Summary shows an outstanding balance, the reviewer enters the comment "NMNSO-Fees Outstanding" into the record and the record "will be revisited later for further research." PX542 at 4.

350.     The Department has not identified what further research will be done on records where the LFOs are undetermined or outstanding, or what further sources will be relied on. ECF 258-8 at 315:3–316:22 (Maria Matthews 30(b)(6) Dep.).

351.     The Department does not have a position on which LFOs render a person ineligible to vote, and which ones are non-disqualifying because they accrue after sentencing or are not contained within a sentencing document. *Id.* at 240:2–15. It does not have a position on how to address sentencing modifications. *Id.* at 267:23–271:9. The Department does not have a position on how to reconcile

discrepancies in the data available, how to determine which LFOs are disqualifying, or how to determine whether those disqualifying LFOs have been paid. *Id.* at 325:6–13.

352.    To the extent the Department does know this information, department officials assert that the information is privileged or in flux, subject to the outcome of this litigation. *Id.*; *see also id.* at 243:5–7, 246:6–9, 261:19–24; 266:2–267:8.

353.    The Department does not have access to information on outstanding LFOs for out-of-state convictions. PX96 at 54:19–22; 187:18–20, 188:18–191:16 (Matthews First Dep.).

354.    For out-of-state convictions, reviewers are directed to "[m]ake out-of-state court doc requests through the designated Regulatory Specialist II staff member." PX542 at 4.

355.    The guidance document directs reviewers to an entity called "ProCon" to determine whether a voter with an out-of-state conviction has had their rights restored in the state where they were convicted (either in state or federal court). *Id. See also* State Felon Voting Laws, ProCon.org, https://felonvoting.procon.org/state-felon-voting-laws/ (last visited Apr. 13, 2020).

356.    ProCon.org does not assert or intend to be a comprehensive, up-to-date library of state felony disenfranchisement laws, but rather provides context for

policy conversations. *See* ProCon.org, "About Us," https://www.procon.org/about-us.php.

357.    Several of the ProCon notations regarding out-of-state re-enfranchisement laws are inaccurate and certain to lead to the disenfranchisement of eligible voters who have had their rights restored in the state of their conviction. *Compare* State Felon Voting Laws, ProCon.org, https://felonvoting.procon.org /state-felon-voting-laws/) *with* Ala. Code § 17-3-30.1(c).

358.    For federal convictions, the Dec. 30, 2019 memorandum does not provide any details on how reviewers are to determine the amount and status of any financial obligations ordered at the time of sentencing and merely states that "if the information is indeterminate we will need to invalidate based on incomplete information." PX542 at 4.

359.    The Department cannot identify what constitutes a sentencing document for federal convictions. PX96 at 144:6–21, 182:18–184:10, 184:14–17, 187:11–14 (Matthews First Dep.). The Department does not have reliable information on outstanding LFOs from federal courts. *See id.* at 185:2–23; PX692 at 14 (8/19/2019 Work Group Meeting Transcript).

360.    Although the Department is currently reviewing and flagging active voters who may be ineligible due to outstanding LFOs, the Department has yet to

begin sending down records to the counties indicating there is credible and reliable information that a registered voter is ineligible due to outstanding LFOs. ECF 258-8 at 231:20–232:11 (Matthews 30(b)(6) Dep.).

361.    Ms. Matthews testified that this is because the Department is not "comfortable" that the current process for identifying individuals with outstanding LFOs provides "credible and reliable" information regarding LFOs. *Id.* at 283:16–284:4.

362.    So, the Department is working "to determine and finalize a process and comfort level regarding these types of cases without sending anything down." *Id*. at 259:9–13.

363.    The Department has not identified a standard for what constitutes "credible and reliable" information that an active voter is ineligible due to outstanding LFOs. *See* PX542 at 7 (referring to the credible and reliable determination as a "case by case" process.").

364.    The Department does not know whether, when, or for what reasons the information it has collected in any particular case may be deemed credible and reliable such that they can begin sending records of voters who are potentially ineligible due to outstanding LFOs to county supervisors. ECF 258-8 at 271:25–273:2 (Matthews 30(b)(6) Dep.).

## XVI.  **Counties Are Implementing SB7066's LFO Requirement Differently**

365.     The Florida legislature specifically chose to have SB7066 implemented in a decentralized manner without a detailed statewide process. *See* PX694 at 19 (9/16/19 Work Group Meeting Transcript) (Rep. Grant explaining that legislators intentionally left "flexibility for the local constitutionals to do their work to make this work"). As noted above, the county Supervisors of Elections have varying processes, procedures, and standards they currently apply to implement SB7066. *See supra* ¶¶ 321–25.

366.     Although counties can adopt procedures to terminate, waive, or modify outstanding LFOs entirely to provide for restoration of voting rights, they are under no obligation to do so under SB7066. *See* Fla. Stat. § 93.0751(2)(a)(5)(e) (deeming a term of sentence complete "*if* the court modifies the original sentencing order to no longer require completion of such term") (emphasis added).

367.     Different counties have already adopted different procedures and standards for determining eligibility. *See* Florida Rights Restoration Coalition Amicus Br., ECF 173-1 at 10–11 (identifying three counties that have established or are establishing a procedure, and stating that "FRRC has conferred with a total of ten counties to date" about such options).

139

368.     As of now, only four Florida counties—Miami-Dade, Hillsborough, Palm Beach, and Broward—provide procedures specifically for returning citizens to seek waiver, modification, or termination of their outstanding LFOs so that they can become eligible to vote under SB7066. *See Amendment 4 Fines & Fees Review*, Florida Rights Restoration Coalition, https://floridarrc.com/fines/ (encouraging returning citizens with LFOs in the four "participating counties" to apply for help regaining voting rights); Daniel Rivero, *People Across Florida Are Getting Their Voting Rights Back. Few Republicans Could Benefit*, WUSF (Jan. 6, 2020)[10]; PX447 (Collaborative Plan for Miami-Dade County) (outlining sentence-modification process specific to fines—not restitution—for persons unable to pay).

369.     Miami-Dade has developed an expedited procedure for returning citizens to seek modification of their sentences so that LFOs are no longer an obstacle to voting. *See* PX447. Because of this local procedure, a returning citizen in Miami-Dade with outstanding LFOs is more likely to be able to vote in the November 2020 election than an identically situated person in another Florida county who must petition for a waiver or modification in the normal course.

---

[10]   Available at https://wusfnews.wusf.usf.edu/post/people-across-florida-are-getting-their-voting-rights-back-few-republicans-could-benefit.

370.    In Miami-Dade and Hillsborough Counties, the sentence-modification procedures remove the barrier to voting otherwise posed by LFOs that the returning citizen cannot pay; however, they do not eliminate the financial obligation itself. *See* PX447 at 2; PX134 at 91–92 (Broward County Form Motion); Rivero, *People Across Florida Are Getting Their Voting Rights Back.* Rep. Grant, the co-sponsor of SB7066, has stated that such a limited-purpose modification of LFOs to restore voting rights violates SB7066. PX694 at 20.

## A. Officials in Different Counties Have Different Interpretations of Which LFOs Preclude Voting Under SB7066

371.    Supervisors of Elections, Clerks of Court, prosecutors and other officials throughout Florida do not share a unified understanding of which outstanding LFOs make a returning citizen ineligible to vote under SB7066.

372.    Officials in Miami-Dade County have advised returning citizens that SB7066 "does NOT require that a person pay fees and costs before their voting rights may be restored" because a "standard Sentencing Order" does not include fees and costs, although it may include fines and restitution. PX447 at 1–2; *see also id.* at 5–6 (noting that the State Attorney, Clerk of Court, and other Miami-Dade officials contributed to the document containing this interpretation); PX694 at 6, 12 (Sen. Pizzo explaining that judgments and sentences in Miami-Dade are separate documents, with the former containing any fees and costs). This interpretation

appears inconsistent with the Department of State's current stance on which LFOs are disqualifying. *See* PX256 at 2 (8/14/19 Email from Amber Marconnet) (indicating their inclusion of LFOs under SB7066 even if not recorded on certain judgment documents).

373.    In other counties, officials have not interpreted SB7066 to exclude all fees and costs from disenfranchising LFOs. *See, e.g.*, PX55 at 185:4–25 (Mark Earley Dep.) (expressing a tentative understanding that some fees and costs are included in sentencing documents and thus covered by SB7066); PX83 at 86:10–18 (Craig Latimer Dep.) (Hillsborough County Supervisor of Elections stating that if a returning citizen "owe[s] fines and fees by the statute, that would be a reason for ineligibility."). In numerous counties, Supervisors and their staffs lack any firm understanding of what fees and costs (if any) must be completed before voting under SB7066. *See, e.g.*, PX55 at 186:23–187:2; PX25 at 88:2–10 (Mary Jane Arrington Dep.).

374.    Similarly, officials in different counties have expressed varying understandings of whether interest that accrues on LFOs can be a term of sentence requiring completion before voting under SB7066. *See* PX262 (8/23/19 Email from Karen Rushing) (discussion between Clerks of Court about whether SB7066 covers interest when the sentencing document refers to interest).

**B. Returning Citizens in Different Counties Have Differing Ability to Pay Disqualifying LFOs Without Incurring Fees**

375.     Individuals who have been assessed the same types and amounts of LFOs are subject to different payment rules depending on the county in which they live. PX892 at 8–13 (Burch Report).

376.     For example, in Miami-Dade County, $25 of a $200 payment would go to a processing fee, rather than the debt the returning citizen was seeking to pay down. In Gulf, Leon, Miami-Dade, Polk, St. Lucie, Duval, and Volusia Counties, 40 percent of a $200 payment—$80—would be paid to a debt collection agency fee before being applied toward outstanding LFOs. *See* PX892 at 57–58 (Burch Report); ECF 204 at 96:20–98:16 (Cash-Russell Testimony at Preliminary Injunction Hearing).

377.     In 27 of the 67 counties, 3 percent to 3.5 percent of a payment would go toward a credit card or online payment fee; thus, after a $200 payment toward a $200 debt, there would still be an outstanding balance of $6 to $7. And often multiple fees and assessments apply to the same payment. PX892 at 63 (Burch Report).

378.      In each of the counties with mandatory fees or assessments, the returning citizen who pays the amount of their outstanding LFOs would still have an outstanding balance, and thus would not be eligible to register or vote under SB7066. *Id.*

143

### C. Counties Have Different Practices on Negotiating Payment of LFOs

379.     Clerks of Court throughout Florida have varying policies on "determining whether to negotiate civil judgments/liens for fines, court costs, and other monetary obligations." PX134 at 96 (7/15/19 Email from Matt Whyte). Thus, returning citizens in some counties may be able to negotiate a way satisfy the conditions of eligibility under SB7066 by paying less than they initially owed, while returning citizens in other counties lack this opportunity.

380.     For example, Palm Beach County negotiates settlements for fines and costs. The county's negotiation process sometimes involves researching the debtor's ability to pay. *Id.* at 97.

381.     By contrast, Marion County does not negotiate LFOs, and Leon County negotiates only on interest. *Id.* at 96–97.

## ARGUMENT[11]

### I.     The LFO Requirement Constitutes Unconstitutional Wealth Discrimination, and Would Not Survive Even Rational Basis Review[12]

As the Eleventh Circuit has already held, withholding voting rights for nonpayment of LFOs from those who cannot pay does not withstand heightened scrutiny and thus violates the Fourteenth Amendment.[13] *Jones v. Governor of Fla.*, 950 F.3d 795 (11th Cir. 2020).

The Eleventh Circuit also noted SB7066's LFO requirement might not survive rational basis scrutiny. *See id.* at 809–17. Indeed, Plaintiffs' evidence demonstrates there is no rational basis for the LFO requirement. Thus, although heightened

---

[11] Plaintiffs file these consolidated Proposed Conclusions of Law, but each Plaintiff group joins only those parts of the brief related to their alleged claims.

[12] This Court has already concluded that Plaintiffs have standing to bring their claims against Defendants. ECF 207 at 8; *see also Jones v. Gov. of Fla.*, 950 F.3d 795, 805–06 (11th Cir. 2020). Moreover, Plaintiffs have previously addressed this issue in response to two motions that Defendants filed and this Court denied, and Plaintiffs incorporate those arguments herein. *See* Pls.' Opp'n to Defs.' Mot. to Dismiss, ECF 121 at 5–9; Pls.' Mem. of Law in Opp'n to Defs.' Mot. for Summary Judgment, ECF 286 at 7–13. Plaintiffs incorporate those arguments herein.

[13] That decision is the law of the case, binding in the Eleventh Circuit. *See, e.g.*, *United States v. Gillis*, 938 F.3d 1181, 1198 (11th Cir. Sept. 13, 2019) (holding that the law of the circuit as established in the first case to address an issue must be followed until altered by the Eleventh Circuit *en banc* or the United States Supreme Court).

scrutiny applies, Plaintiffs ask this Court to hold that in addition to failing heightened scrutiny, the LFO requirement violates the Fourteenth Amendment even under this less stringent standard of review.

*Jones* observed that the LFO requirement is "clearly not" rational "as applied to those unable to pay." *Id.* at 810; *see also id.* ("[T]he continued disenfranchisement of felons who are genuinely unable to pay LFOs . . . does not further any legitimate state interest."). This is because the state cannot advance any potential state interest —deterrence, punishment, or incentivizing payment—by conditioning voting rights restoration on LFO payment by those unable to pay. *See id.* at 810–13. "The State cannot draw blood from a stone." *Id.* at 827.

The parties differ, however, as to whether the rationality of a statute in an as-applied challenge is evaluated based on its application to those who are unduly burdened by it, or as applied to the general case. As demonstrated below, the proper lens for evaluating the LFO requirement is as applied to those who cannot pay. The LFO requirement fails under either lens, however, because individuals who cannot afford to pay their outstanding LFOs *are* the general case.

### A. The Appropriate Lens For Reviewing Rational Basis is As-Applied to Those Unduly Burdened by the Challenged Statute

To the extent this Court evaluates whether the LFO requirement withstands rational basis review, the appropriate inquiry is not whether the LFO requirement is

rational *generally*, as Defendants now contend, but whether it is rational *as applied* to returning citizens who cannot afford their outstanding LFOs.

In *Harvey v. Brewer*, Justice O'Connor recognized that a *separate* constitutional analysis exists for determining a challenged law's constitutionality as applied to persons unable to pay LFOs. 605 F.3d 1067, 1080 (2010) (concluding that although Arizona's LFO requirement was rational *generally*, "withholding voting rights from those who are truly unable to pay their criminal fines due to indigency [may] not pass this rational basis test"). This approach is consistent with past Supreme Court and federal appellate decisions applying rational basis in the as-applied context. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985) ("Because in our view the record does not reveal any rational basis for believing that the Featherston home would pose any special threat to the city's legitimate interests, we affirm the judgment below insofar as it holds the ordinance invalid as applied in this case."); *O'Day v. George Arakelian Farms, Inc.*, 536 F.2d 856, 859–60 (9th Cir. 1976) ("As applied to the appellant in this case, the double bond requirement is not reasonably or rationally related to a legitimate governmental purpose[.]").

In the wealth discrimination context specifically, the Supreme Court has emphasized that the proper equal protection classification is between those who can

147

pay versus those who cannot. *See Williams v. Illinois*, 399 U.S. 235, 242 (1970) (evaluating "operative effect" of facially neutral statute as distinguishing between those who can pay and those who cannot); *Tate v. Short*, 401 U.S. 395, 399 (1971) (same). *Williams* and *Tate* applied heightened scrutiny given the penalty imposed for failure to pay just as the Eleventh Circuit did in *Jones*. But under this precedent, the first step for determining the equal protection classification in a wealth discrimination case is to evaluate the restriction *as applied* to those who cannot pay. That same framework would apply even if the correct standard were rational basis. *See U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 537 (1973) (focusing on the "practical effect" of classification to conclude it did not further a legitimate governmental interest). Here, the practical effect of the LFO requirement is to deny Florida citizens the right to vote solely because they cannot pay off their LFOs. *See Jones*, 950 F.3d at 810–13, 826–27.

Furthermore, "[t]he rational-basis standard is not a toothless one." *Schweiker v. Wilson*, 450 U.S. 221, 234 (1981) (quotations omitted). In the elections context, in particular, courts impose meaningful limits on the state when applying rational basis review. *See, e.g.*, *Bush v. Gore*, 531 U.S. 98, 107 (2000) (Florida's ballot canvassing practices violated rational basis review by "accord[ing] arbitrary and disparate treatment to voters in its different counties"); *Lubin v. Panish*, 415 U.S.

148

709, 718 (1974); *Fulani v. Krivanek*, 973 F.2d 1539, 1547 (11th Cir. 1992). Moreover, The Supreme Court carefully scrutinizes laws that serve no purpose other than a "bare . . . desire to harm a politically unpopular group." *Moreno*, 413 U.S. at 534; *see also Lawrence v. Texas*, 539 U.S. 558, 580 (2003) (O'Connor, J., concurring); *Romer v. Evans*, 517 U.S. 620, 634–35 (1996). Individuals who have past felony convictions and limited economic means are one such unpopular group, and "discrimination [against such groups] is unlikely to be soon rectified by legislative means." *Cleburne*, 473 U.S. at 440.

As such, the appropriate level of analysis on an as-applied challenge in the elections context is to determine whether a statute is rational as applied to those unduly burdened by it. *See Mays v. LaRose*, 951 F.3d 775, 785 (6th Cir. 2020) ("All binding authority to consider the burdensome effects of disparate treatment on the right to vote has done so from the perspective of only affected electors—not the perspective of the electorate as a whole."). And, the LFO requirement fails rational basis as applied to those who cannot pay. *Jones*, 950 F.3d at 810.

### B. Even When Evaluated Against the General Case, the LFO Requirement Lacks a Rational Basis Because Those Who Cannot Pay *Are* the General Case

The Eleventh Circuit indicated that the LFO requirement fails rational basis review if returning citizens who are unable to pay their LFOs "are in fact the *mine-*

*run* of felons affected by this legislation." *Id.* at 814. Plaintiffs will establish that the majority of individuals with outstanding LFOs are unable to pay, and thus represent the "mine-run" of individuals affected by SB7066. Thus, the requirement is irrational even when evaluated generally, rather than solely as applied to those who cannot pay. *See id* at 815 ("[I]f the plaintiffs in this case, as to whom the requirement at issue is clearly irrational, are the rule rather than the exception, we would have serious doubt about the requirement's rationality.").[14]

When applying rational basis to a general class of persons, the classification must "broadly correspond[] to reality," and reflect "common-sense generalizations" and underlying assumptions reasonably conceived to be true. *Id.* at 814–16 (citing *Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307 (1976); *Califano v. Jobst*, 434 U.S. 47 (1977)); *see also Vance v. Bradley*, 440 U.S. 93, 97 (1979). The LFO requirement is irrational as applied to those who cannot pay. *Jones*, 950 F.3d at 810. Therefore, the LFO requirement is also irrational as applied to the general case unless it is

---

[14] As the court noted, "[t]he State appears to almost concede this point, arguing in its brief that '[a]bsent any evidence that felons unable to pay their outstanding legal financial obligations vastly outnumber those able to pay,'" the LFO requirement must be constitutional. *Jones*, 950 F.3d at 814 (quoting Defs' Eleventh Circuit Br. at 29).

"conceivable for Florida to believe a reasonable proportion could pay." *See id.* at 817. It is not.

At trial, Plaintiffs will demonstrate that *all* available evidence strongly indicates that returning citizens who are unable to pay their LFOs do in fact comprise the mine-run of returning citizens to whom the LFO requirement applies. *See id.* at 815–16 (finding that the preliminary record already suggests that those who cannot pay are the "mine-run" of cases). Dr. Smith's analysis indicates that more than 77% of over one million returning citizens with Florida convictions who have completed incarceration or supervision are disenfranchised by outstanding LFOs. Plaintiffs' Prop. Findings of Fact ("Fact Section") ¶¶ 186–87. Indeed, Florida's own records suggest that the state has minimal collections expectations for a sizable majority (58.2% to 68.4%) of the LFOs it assesses to non-incarcerated individuals *solely because of their inability to pay*. *Id.* ¶ 203. Florida itself has twice determined in House staff reports that "[m]ost criminal defendants are indigent." *Jones*, 950 F. 3d at 816 (quoting H.R. Staff Analysis, H.B. 1381, Reg. Sess. (Fla. 1998); H.R. Staff Analysis, H.B. 13, Reg. Sess. (Fla. 1999)). And the evidence at trial—including testimony from Carey Haughwout, Public Defender for Florida's 15th Circuit—will demonstrate that the vast majority of felony criminal defendants are indigent such that they are eligible for court-appointed counsel. Dr. Smith's analysis supports that

conclusion. *See* Fact Section ¶¶ 204–05 (demonstrating that around 70% of returning citizens in three Florida counties were deemed indigent and afforded court-appointed counsel, a percentage that "likely understated the rate of public defender assignments statewide").

The evidence presented at trial will also demonstrate the many poor economic indicators for returning citizens, which support the finding that those who have outstanding LFOs are unable to pay. *See id.* ¶¶ 189, 192–93 195–200, 207, 214, 218–24. Returning citizens have lower annual incomes before incarceration and fare no better post-incarceration; they earn substantially lower wages than the general public and face higher rates of unemployment and homelessness. *See id.* And, the ongoing pandemic, which has triggered a crisis of unemployment,[15] only further undermines returning citizens' economic stability and ability to pay hundreds or thousands of dollars in outstanding LFOs.

---

[15] *See* U.S. Department of Labor, Office of Unemployment Insurance Weekly Claims Report (April 9, 2020), https://www.dol.gov/ui/data.pdf (reporting 6,606,000 in new unemployment claims during the week of April 4 alone).

The trial record will show that the mine-run of returning citizens are unable to pay their LFOs. Thus, the LFO requirement is irrational as applied to the general case.[16]

## II.    The LFO Requirement in SB7066 Violates the Twenty-Fourth Amendment

The Twenty-Fourth Amendment prohibits conditioning access on the right to vote upon payment of "any poll tax or other tax." U.S. Const. amend. XXIV, § 1. This Court has already held that the Twenty-Fourth Amendment applies to returning citizens. *See* ECF 207 at 40. Likewise, Plaintiffs have fully briefed that issue and incorporate those arguments here. *See* ECF 286 at 38–40 (MSJ Opp.).

The text, purpose, and history of the Twenty-Fourth Amendment indicate that its proscription is broad enough to prohibit the conditioning of rights restoration on the payment of any LFOs or any other government-imposed financial obligation.

--------------------------------

[16] Beyond this clear record of irrationality on the facts of this case, the Supreme Court has held wealth restrictions generally are irrational in the context of elections. *See Harper v. Va. St. Bd. of Elections*, 383 U.S. 663, 668 (1966) ("Wealth, like race, creed, or color, is not germane to one's ability to participate intelligently in the electoral process."); *id*. ("To introduce wealth or payment of a fee as a measure of a voter's qualifications is to introduce a capricious or irrelevant factor."); *see also Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 198 (2008) (stating that the photo ID law would be invalid "under our reasoning in *Harper*, if the State required voters to pay a tax or a fee to obtain a new photo identification").

And, even under a functional test, Florida's LFOs constitute a "tax" for purposes of the Twenty-Fourth Amendment. As such, SB7066's requirement that returning citizens pay their LFOs before voting is unconstitutional.

### A. The Twenty-Fourth Amendment Prohibits Any "Price Tag" on Voting

SB7066 violates the Twenty-Fourth Amendment because it requires returning citizens to pay for their right to vote. The history of the Twenty-Fourth Amendment makes clear that its purpose is best served by a liberal construction of the term "tax" that prohibits any such requirement. That is reflected both by Congress's intent in ratifying the Twenty-Fourth Amendment, and the history of the problem the Amendment sought to address: states used poll taxes to suppress votes, not to raise revenue.

Just a year after the Twenty-Fourth Amendment's ratification, the Supreme Court recognized that the primary objections to the poll tax—which led to the passage of the Amendment—were "that it exacted a price for the privilege of exercising the franchise," and that despite being facially neutral, it was a device employed to exclude disfavored groups from the franchise. *Harman v. Forssenius*, 380 U.S. 528 at 539–40 (1965) (citing legislative hearings).

The objection to "exacting a price" for voting grew out of a "general repugnance to the disenfranchisement of the poor." *Id.* at 539. The inclusion of

154

"other tax" in the Twenty-Fourth Amendment reflects the desire to capture all price tags on the franchise regardless of their precise form. Congress also rejected a version of the Twenty-Fourth Amendment that read in part: "Nothing in this article shall be construed to invalidate any provision of law denying the right to vote to paupers or persons supported at public expense or by charitable institutions." H.R.J. Res. 404, 87th Cong. § 2 (as reported by H. Comm. on the Judiciary, May 14, 1962). This further underscores Congress's intent that the franchise not depend on a citizen's wealth.

The debates concerning the Twenty-Fourth Amendment confirm that it was driven by a broad objection to conditioning the franchise on payment and a corresponding intention to draft the amendment to prevent clever workarounds:

- "This amendment will prevent the imposition not only of a poll tax but of any other tax as a prerequisite to voting and will apply not only to a State but to the United States as well, *and it is broad enough to prevent the defeat of its objectives by some ruse or manipulation of terms*." 108. Cong. Rec. 17669 (daily ed. Aug. 7, 1962) (statement of Rep. Halpern) (emphasis added).

- "Mr. Speaker, the payment of money, whether directly or indirectly, whether in a small amount or in a large amount, should never be permitted to reign as a criterion of democracy. There should not be allowed a scintilla of this in our free society." *Id.* at 17657 (statement of Rep. Fascell).

- "While the amount of the poll tax now required is small, there should not be any price tag or any kind of tax on the right to vote. For some people this financial imposition may be enough to discourage participation in the electoral process." *Id.* at 17666 (statement of Rep. Boland).

- "Placing the payment of a fee between the voter and ballot box is distinctly not in keeping with the ideals of our democracy." *Id.* (statement of Rep. Yates).

- "Any charge for voting unjustly discriminates against people of limited means. And whatever the amount of money, a citizen of the United States should not have to pay for his constitutional right to vote." *Id.* at 17667 (statement of Rep. Gallagher).

The intent was to protect against attempts at "impairing the right guaranteed," through "sophisticated as well as simple-minded modes," *Harman*, 380 U.S. at 540–41 (quoting *Lane v. Wilson*, 307 U.S. 268, 275 (1939)).

The Amendment's history also demonstrates that its proponents did not intend to draw a strict line based on whether the exactions in question were motivated *primarily* by a desire to raise revenue. A principal motivation for the passage of the amendment was to stop poll taxes precisely because they were used by the States to deny Black men the right to vote and *not* meant to serve the ostensible purpose of a tax—revenue generation. *See id.* States that imposed poll taxes were explicit that their primary intent was to regulate access to the ballot box, not to raise revenue. *See Campbell v. Goode*, 172 Va. 463, 466 (1939) (concluding poll tax "was not intended primarily for the production of revenue, but to limit the right of suffrage"); *Davis v.*

156

*Teague*, 220 Ala. 309, 313 (1929) (limiting methods for compelling payment of poll tax because it "is not an obligation that may be enforced by legal process or otherwise, but is an obligation to be performed voluntarily as a test of good citizenship"); *Ratliff v. Beale*, 74 Miss. 247, 20 So. 865, 869 (1896) (concluding poll tax was "primarily intended by the framers of the constitution as a clog upon the franchise, and secondarily and incidentally only as a means of revenue").

When the Supreme Court struck down Virginia's poll tax in *Harman*, its decision did not turn on any finding that the primary function of the poll tax was to raise revenue. Instead, the Court noted *Campbell*'s acknowledgment that the poll tax was aimed primarily at "limiting 'the right of suffrage.'" *Harman*, 380 U.S. at 544 (quoting *Campbell*, 172 Va, at 466, and holding that "the poll tax, regardless of the services it performs, was abolished by the Twenty-fourth Amendment"). The unconstitutional defect with Virginia's law was simply that it abridged the right to vote for failure to pay. *Id.* That is precisely the problem that SB7066 now poses in Florida.

The aim of the Twenty-Fourth Amendment was to prohibit placing *any* price tag on the right to vote, even one as small as $1.50. *See id.* at 530–31. Importing a narrowing construction of the term "tax" conflicts with the Twenty-Fourth

157

Amendment's purpose. *See Johnson v. Bredesen*, 624 F.3d 742, 775 (6th Cir. 2010) (Moore, J., dissenting).

### B. Under the "Functional Approach" Adopted by Federal Courts, LFOs are Taxes in Florida

Notwithstanding the broad construction the Twenty-Fourth Amendment's language should be given, the LFOs at issue here—restitution, fines, fees, and costs—all qualify as taxes under the "functional approach" that federal courts have used to identify a tax in other contexts. *See* ECF 286 at 40–45. Plaintiffs incorporate by reference their prior briefing addressing this issue. *See id*.

Indeed, it is increasingly clear that regardless of any penological purpose they may have, LFOs that accompany convictions in Florida are largely aimed at generating revenue for the state. The Supreme Court recently noted its concern that states are turning to this combined system of taxation and penalty, stating that "fines may be employed 'in a measure out of accord with the penal goals of retribution and deterrence,' for 'fines are a source of revenue[.]'" *Timbs v. Indiana*, 139 S. Ct. 682, 689 (2019) (quoting *Harmelin v. Michigan*, 501 U.S. 957, 979, n.9 (1991) (opinion of Scalia, J.)). As the Court noted in *Timbs*, "[p]erhaps because they are politically easier to impose than generally applicable taxes, state and local governments nationwide increasingly depend heavily on fines and fees as a source of general revenue." *Id.* (quoting Br. for ACLU et al. as *Am. Curiae*).

Florida exemplifies this approach. With its constitutional prohibition on income taxes, *see* Fla. Const. art. VII, § 5 (prohibiting income and estate taxes) and its constitutional requirement that the courts primarily fund themselves, *id.* art. V, § 14(b)–(c), Florida relies on LFOs as an essential part of its taxation system. *See, e.g.*, ECF 286 at 15–16, 42–44, (detailing how the money generated by restitution, fines, fees, and costs is directed to various court and state funding accounts); *see also* Fact Section XI.A. In so doing, Florida has converted what might otherwise be penalties into taxes.

Moreover, many LFOs in Florida bear no relation to the criminal behavior at issue, and thus do not serve any punitive purpose, but rather *only* function to generate revenue for the state. As the Court has noted, most fees and costs in Florida are imposed regardless of whether a defendant is adjudicated guilty or adjudication is withheld.[17] ECF 207 at 20–22; *see also* ECF 286 at 43. This is equally true for fines. *see* Fact Section ¶¶ 177–78, 181. At least one fee (the fee for applying for a public defender) is imposed even when a defendant is found not guilty. *See id.* ¶ 178. And

---

[17] Notably, a person is not disenfranchised when adjudication is withheld, and obviously not when they are acquitted. Fl. Const. art. VI, § 4 (providing for disenfranchisement only upon conviction); *Clarke v. U.S.*, 184 So. 3d 1107, 1115 (Fla. 2016) (one purpose of withholding adjudication is to avoid "the loss of civil rights").

fees and costs typically have no relationship to the seriousness of the offense charged or the degree of the defendant's culpability. ECF 207 at 20–22; *see* Fact Section XI.C. An LFO cannot be said to primarily serve the purpose of punishing criminal behavior when it applies to a person regardless of whether they are adjudicated guilty of committing a crime. *See* Fla. Stat. § 948.01(2) (adjudication may be withheld only upon a court's determination that the defendant need not "suffer the penalty imposed by law"). Nor should it be viewed primarily as a device for punishing criminal behavior when it does not vary or fluctuate based on the severity of the crime.

Furthermore, LFOs that have been converted to civil liens have been taken "out of the criminal-justice system." ECF 207 at 22. "Judges often do this when they know the defendant is unable to pay the amount being assessed." *Id.*; *see also* Fact Section ¶¶ 134–36. In fact, the procedure exists to avoid the inappropriate and unconstitutional punishment of poverty. *See id.* ¶ 135. In short, conversion of an LFO to a civil judgment effectively strips the LFO of its punitive character for the express purpose of avoiding the indefinite punishment of poverty, while leaving in place civil enforcement mechanisms for ensuring revenue generation where possible. *See* Fla. Stat. § 960.29 (recognizing that civil restitution liens "rest[] upon the principle of remediation and not punishment," and serve the goal of "fully compensating crime victims, the state, and its local subdivisions"). Wherever an

LFO may lie on the spectrum between penalty and tax, it becomes a tax upon conversion to a civil obligation and sheds any features of a penalty.

Finally, to the extent that fines and restitution in Florida serve some punitive purposes, they also raise revenue for the State. *See* Facts Section XI. And the imposition of restitution and fines is inextricably comingled with service fees, surcharges, and other similar flat taxes. *Id.* at XI.A–B. Florida cannot evade the Twenty-Fourth Amendment's reach by intertwining its systems of taxation and punishment. That would be precisely the "ruse or manipulation of terms" that the Amendment's legislative proponents aimed to bar, lest they be used for the "defeat of [the Amendment's] objectives." 108 Cong. Rec. 17669 (daily ed. Aug. 7, 1962) (statement of Rep. Halpern). This Court should hold that the "other tax" clause of the amendment bars the denial or abridgment of the right to vote for failure to pay an LFO. In the alternative, the Court should hold that Florida may not condition voting rights on the payment of any LFO that is not primarily intended to punish, including all fees and costs and any LFO that has been converted to a civil obligation.

### III.    The LFO Requirement Violates the Fourteenth Amendment Because the State Is Incapable of Implementing It

Plaintiffs will demonstrate at trial that the State has proven incapable—as a legal and factual matter—of (1) determining with any accuracy whether an individual has outstanding LFOs that render them ineligible to vote; (2) providing

161

potential voters with the information necessary to determine if they are eligible; (3) guiding local election officials in assessing eligibility under the LFO provision; (4) or ensuring that voters have the means to ascertain which outstanding LFOs are disqualifying and how to pay those disqualifying LFOs directly without incurring additional fees and costs. *See* ECF 98-1 at 71–79; ECF 177-1 at 5–18; ECF 286 at 33–37, 46–63, incorporated here by reference; *see also* Fact Section IX–X, XII, XV–XVI. As a result, eligible voters will be erroneously deprived of the right to vote, thousands of Floridians will be chilled from registering or voting because they cannot definitively ascertain whether they are eligible, and county elections officials will be left to interpret and apply the law according only to their differing understanding of its requirements, creating nonuniformity and disparate outcomes for similarly situated citizens. *See id.* This includes Organizational Plaintiffs' members who cannot determine their eligibility with any certainty. *See* PX18 ¶¶ 4–5 (Neal Decl.); PX20 ¶¶ 6–7 (Brigham Decl.).

As such, the LFO requirement violates due process because it is void for vagueness and violates equal protection by imposing an undue burden on eligible voters. The remedy for these violations is to enjoin the LFO requirement in its entirety. If it is not enjoined in full, the state must adopt additional procedures to provide Floridians with procedural due process in determining their eligibility with

respect to LFOs, and to ensure uniformity among the counties in implementing the requirement.

### A. The State's Inability to Implement the LFO Requirement Demonstrates That it is Unconstitutionally Vague

The State's refusal to inform voters or Supervisors of Elections (or anyone else) [18] of what the law requires coupled with the State's refusal to make the necessary eligibility determinations for returning citizens seeking to register renders the LFO requirement unconstitutionally vague. *See* ECF 98-1 at 73–79; ECF 177-1 at 13–16; ECF 286 at 57–60, incorporated here by reference.

The void for vagueness doctrine addresses two due process concerns: "first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *F.C.C. v. Fox*, 567 U.S. 239, 253 (2012). And "when speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Id.* at 253–254. Here, the Secretary's refusal to provide even basic guidance to voters

---

[18] This includes Organizational Plaintiffs who assist their members in determining eligibility and registering to vote, and engage in voter registration activity and outreach in their communities. *See* Fact Section III.B, ¶ 291.

or election officials on the meaning, interpretation, and application of SB7066's LFO requirements coupled with her insistence that voters determine their eligibility under those requirements *prior* to registering renders the law void for vagueness. While SB7066's LFO requirement may not be facially ambiguous, the Secretary's unwillingness to provide guidance on the ambiguities that "ordinarily can be resolved" by interpretation, combined with the "factual vagueness" surrounding individuals' determinations about what they owe in LFOs, renders the requirement unconstitutional. *See* ECF 207 at 49.

First, a law must provide "a person of ordinary intelligence" with fair notice of what is required. *Fox*, 567 U.S. at 253. Here, the Secretary's representative has admitted that even her staff—who specialize in determining voter eligibility—are "simply not versed or professionally trained at this level to understand court documents to this level." PX106 (8/29/19 Email from Maria Matthews). When voters call her office seeking advice as to the LFO requirements, they are redirected to other government officials, who also will not advise voters of their eligibility. Without clarity on their eligibility, potential voters cannot register. *See* Fact Section ¶¶ 292–297. On the record that will be developed at trial, no one can reasonably conclude that a person of ordinary intelligence will usually be able to ascertain their eligibility post-conviction under these circumstances. *See* Fact Section ¶¶ 255–276.

164

This factual vagueness and lack of basic guidance from the Department charged with implementing SB7066 will chill eligible voters from registering and voting. That is precisely the evil that the void for vagueness doctrine is designed to avoid.

Second, the void for vagueness doctrine also serves to limit arbitrary or discriminatory enforcement of the law. Here, the state concedes there is no uniform guidance on the application of SB7066's LFO requirements, fixed standards for determining eligibility are impossible, and individualized determinations must be made by the Department and Supervisors on a "case by case" basis. *See* Fact Section ¶¶ 306, 351–52, 359, 363. The State's refusal to adopt any standards, definitions, or procedures for determining eligibility on the basis of LFOs leaves election officials to "make determinations of [eligibility] upon their own notions of what the law should be instead of what it is." *Giaccio v. Pennsylvania*, 382 U.S. 399, 403 (1966). Different interpretations of the LFO requirement and its application have already proliferated at the county level and will continue to do so in the vacuum created by the Secretary. *See* Fact Section ¶¶ 251, 298, 371–74. Such individualized interpretations result in arbitrariness and make it impossible for voters to conform to the requirements of the law. *See Giacco*, 382 U.S. at 404 (holding a statute constitutionally invalid "both as written and as explained" where its abstractness rendered compliance impossible).

Though states are often able to cure vague statutes through administrative interpretation and implementation, *see Ward v. Rock Against Racism*, 491 U.S. 781, 795–796 (1989), the Department has done the opposite. The Secretary's refusal to answer even relatively simple questions from Supervisors and voters about how the LFO requirement should apply has created confusion and vagueness where it may not otherwise exist. For example, she has been unwilling to give a position on how to reconcile the statute's inclusion of everything in the "sentencing document" with its exclusion of LFOs that accrue after sentencing. *See* Fact Section ¶¶ 351, 274–79. In *Ward*, the Court held that "[a]dministrative interpretation and implementation of a regulation are of course highly relevant to our [vagueness] analysis, for '[i]n evaluating a facial challenge to a state law, a federal court must . . . consider any limiting construction that a state court or enforcement agency has proffered.'" 491 U.S. at 795–796 (quoting *Hoffman Estates v. Flipside, Hoffman Estates Inc.*, 455 U.S. 489 at 494, n.5 (1982)). Here, no such limiting constructions have been offered. Indeed, neither the legislature nor Department has taken action to cure the known vagaries in SB7066's implementation and help voters and election officials navigate the "administrative nightmare" of determining outstanding LFOs. ECF 204 at 162:08–165:18 (Prelim. Inj. Hr'g Tr.); *see also* Fact Section XV.

166

Failures of administering officials, rather than mere facial vagueness, often make laws void for vagueness. *See, e.g.*, *Watkins v. U.S.*, 354 U.S. 178 (1957) ("The statement of the Committee Chairman in this case, in response to petitioner's protest, was woefully inadequate to convey sufficient information as to the pertinency of the questions to the subject under inquiry."); *Fox*, 567 U.S. at 254 ("This regulatory history, however, makes it apparent that the Commission policy in place at the time of the broadcasts gave no notice [of the unlawful conduct.]"). That is precisely the case here.

Nor can Defendants cure these failures by vaguely asserting that they are still working on implementing the law. *See U.S. v. Stevens*, 559 U.S. 460, 480 (2010) (statutory scheme is not made constitutional "merely because the Government promised to use it responsibly"); *cf. Johnson v. U. S.*, 135 S.Ct. 2551, 2558 (2015) (finding that "the failure of persistent efforts to establish a standard" is evidence of vagueness). Because the state has proven either unwilling or incapable of providing any standard or procedure for determining eligibility with respect to LFOs, the LFO requirement is void for vagueness.

## B. SB7066 Unduly Burdens the Right to Vote

Under the First and Fourteenth Amendments, an election law must serve a legitimate purpose sufficient to warrant the burden it imposes on the right to vote.

*See Anderson v. Celebrezze*, 460 U.S. 780, 788–89 (1983); *Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *see also Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318 (11th Cir. 2019). The *Anderson-Burdick* sliding scale standard applies to laws burdening the franchise and balances the severity of the burden against the "precise interests put forward by the state as justifications." *Burdick*, 504 U.S. at 434. The *Anderson* Court noted that "it is especially difficult for the State to justify a restriction that limits political participation by an identifiable political group whose members share a[n] . . . economic status." *Anderson*, 460 U.S. at 793; *see also Fulani*, 973 F.2d at 1544–45.

First, the Department's administration of SB7066's LFO requirement severely burdens eligible voters who owe nothing in felony LFOs but who are nevertheless chilled from registering or voting because they cannot verify their LFO status with certainty. This includes Organizational Plaintiffs' members who cannot determine their eligibility with any certainty. *See* PX18 ¶¶ 4–5 (Neal Decl.); PX20 ¶¶ 6–7 (Brigham Decl.). Plaintiffs hereby incorporate by reference their previous arguments. *See* ECF 98-1 at 57–63; ECF 177-1 at 16–18; ECF 286 at 60–63. The factual record demonstrates that LFO records are often missing or destroyed, there are significant discrepancies in the vast majority of LFO records, and the election officials tasked with administering SB7066's LFO requirement are unable to

determine eligibility and unwilling to provide guidance to prospective voters. *See, e.g.*, Fact Section ¶¶ 255–69, 292–301. As in *League of Women Voters of Florida v. Browning*, SB7066's LFO requirement is simultaneously "unworkable" and "virtually unintelligible," while it is "accompanied by substantial penalties" for those who fail to abide by it. 863 F. Supp. 2d 1155, 1160–61 (N.D. Fla. 2012). And as in *Browning*, State Defendants offer "no legitimate interest" in maintaining this unworkable system, stating only that "issues" in the law should be "worked out"— despite the fact that Defendants themselves appear to have done nothing for months. *Id.* at 1161–62.

Second, the Department's administration of the LFO requirement places a severe burden on returning citizens with outstanding LFOs that they cannot afford to pay. Under the decisions of this Court and the Eleventh Circuit, returning citizens who would be eligible to vote *but for* their outstanding LFOs may not be denied the right to vote on the basis of LFOs they cannot afford. They are therefore entitled to the Fourteenth Amendment protections of the *Anderson-Burdick* line of cases. This Court has ruled, and the Eleventh Circuit has affirmed that in order to vote, returning citizens with outstanding LFOs must assert and show their inability to pay. ECF 207 at 53–55; ECF 244 at 8; *Jones*, 950 F.3d at 832–33. Due to Defendants' intransigence, there is no procedure for doing that. For months, State Defendants

have refused to provide returning citizens unable to pay LFOs with a pathway to register and vote, without risking prosecution. It is a severe burden to be required to do the impossible in order to vote: to show an inability to pay when there is no mechanism to do so.

The magnitude of the LFO burden is also substantial. Dr. Smith's conservative analysis has identified more than seven hundred thousand returning citizens who are eligible to vote but for outstanding LFOs, and, as already demonstrated, *see supra* Section I.B, a majority of those individuals are unable to pay. *See also* Fact Section XII. This level of mass disenfranchisement plainly constitutes a severe burden on the right to vote. *See, e.g.*, *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014) ("[E]ven one disenfranchised voter—let alone several thousand—is too many"); *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312 (11th Cir. 2019) (upholding a court's decision on *Anderson-Burdick* grounds to enjoin Florida's rejection of approximately 4,000 vote-by-mail ballots for a signature non-match).

The State has also failed to provide any legitimate countervailing justification for burdening the right to vote. Defendants' refusal to provide the means for determining or asserting eligibility serves no purpose other than to discourage participation in elections. *See Browning*, 863 F. Supp. 2d at 1164–65 (the threat of

170

criminal penalties only discourages voter registration). The State's sole defense is that *Anderson-Burdick* is inapplicable because "felons in Florida have no claim of right to the franchise unless those rights are restored." ECF 268 at 47. This ignores the fact that the LFO requirement severely burdens (a) returning citizens with outstanding LFOs they are unable to pay, who *are eligible to vote* pursuant to this Court's and the Eleventh Circuit's decisions; and (b) returning citizens who owe nothing but cannot determine definitively whether they have disqualifying LFOs because Florida lacks accessible and complete LFO records. It need not be this way. It is the state's choice to shift the burden of determining eligibility entirely onto the voter. The state's refusal to guide that determination and its failure to put in place a system for determining ability to pay have created these obstacles. Forcing the burden of a state-created administrative nightmare onto eligible voters imposes an undue and unjustified burden on the right to vote.

The state's refusal to construct a constitutionally compliant regime serves no legitimate state interest, while its inability or unwillingness to implement a system for determining eligibility will burden hundreds of thousands of eligible voters. As such, the LFO requirement imposes an undue burden on voters and must be enjoined.

## C. SB7066's LFO Requirement Violates Due Process

The fundamental requirement of due process is that individuals be afforded the opportunity to be heard at a meaningful time and in a meaningful manner prior to being deprived of a governmental benefit. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). Under *Mathews*, the determination of what process is due rests on the balance between (1) the interest affected; (2) the risk of erroneous deprivation under the current procedures and the "probable value, if any, of additional or substitute procedural safeguards;" and (3) the state's interest, including the "fiscal and administrative burdens" additional procedures would entail. *Id.* at 335. The Plaintiffs incorporate by reference the arguments made on their procedural due process claims from their prior briefing. ECF 98-1 at 73–79; ECF 177-1 at 5–13; ECF 286 at 46–57.

> *i. Because the LFO Requirement Implicates the Fundamental Right to Vote, the Interests Affected are Substantial*

In addition to the interests previously articulated, *see id.*, Floridians have a substantial interest in the benefit of an eligibility determination under SB7066, because the determination *itself* implicates the fundamental right to vote. *See Ga. Muslim Voter Project v. Kemp*, 918 F.3d 1262, 1270–71(11th Cir. 2019) (finding that where a specific interest "implicates the fundamental right" it is afforded "more than modest weight"). Floridians who are eligible to vote under SB7066—including

172

Organizational Plaintiffs' members—are entitled to a determination that allows them to exercise that right. And Floridians who are ineligible under SB7066—including individual Plaintiffs and Organizational Plaintiffs' members—are entitled to a determination as to what they must do to *become* eligible pursuant to Florida law. *See Atherton v. D.C. Office of Mayor*, 567 F.3d 672, 689 (D.C. Cir. 2009) (holding that due process applies to interests "created by state laws or policies" where such laws or policies "contain substantive limitations on official discretion, embodied in mandatory statutory or regulatory language"); *see also Ky. Dept. of Corrs. v. Thompson*, 490 U.S. 454, 462 (1989) (holding that "states create[] a liberty interest by establishing 'substantive predicates' to govern official decision-making and, further, by mandating the outcome to be reached upon a finding that relevant criteria have been met") (citations omitted). SB7066 mandates that Floridians become eligible to vote upon payment of certain LFOs but excludes other LFOs from the eligibility criteria. Floridians who are otherwise eligible to vote are entitled to a determination as to whether the LFO criteria have been met, and if not, what they must do to become eligible.

       *ii.  The Evidence Demonstrates a Substantial Risk of Erroneous Deprivation*

The risk of deprivation of the interests alleged both here and in Plaintiffs' previous briefing is substantial. The Plaintiffs incorporate by reference the evidence

and arguments demonstrating the risk of erroneous deprivation made in their previous filings. *See* ECF 98-1 at 73–79; ECF 177-1 at 5–13; ECF 286 at 46–57. The evidence demonstrates not only the substantial risk of *erroneous* deprivation, but also the substantial risk of *total* deprivation. This is because the State is incapable (or at least unwilling), as a legal and factual matter, of determining eligibility under SB7066, of providing potential voters and elections officials with the information necessary to determine eligibility, or of providing voters and elections officials the information necessary to determine how voters can become eligible. *See id.*; *see generally* Fact Section XV.E. Thus, it is not just that current procedures will result in *some* potential voters being denied their interests in registering, voting, or obtaining an eligibility determination erroneously, but that the state's failure to adopt any procedures is likely to deny *all* or nearly all potential voters these interests entirely.

     *iii.  The State's Interests Can be Furthered by Adopting Additional Procedures to Protect Against Erroneous Deprivation*

If the LFO requirement is not enjoined in its entirety, the state must adopt additional procedures to ensure that voters are not prevented from registering and voting for fear of prosecution; that voters can obtain a determination of their eligibility under SB7066 without fear of prosecution; and that voters are actually informed as to whether they are eligible to vote under SB7066, and if not, what they

174

must do to become eligible. Doing so would *further* the state's interest in allowing votes by eligible voters while preventing votes by ineligible voters, *see Jones*, 950 F.3d at 829, particularly since the current procedures do neither.

At present, eligible voters are precluded from voting because of their inability to access or obtain an eligibility determination, while the Department indicated that it has identified "upwards of 65,000" voters could vote in reliance on their active registrations without any determination of eligibility, and thus without any protection from prosecution on the basis of allegations of ineligibility. Fact Section ¶¶ 239, 243-254, 339-40. The state must ensure that potential voters are able to register and obtain an eligibility determination without threat of prosecution. *Cf. Watkins v. U.S.*, 354, U.S. 178, 215 (1957) (finding that due process requires that individuals must be "accorded a fair opportunity to determine whether they are within their rights"). The state must adopt uniform guidelines for how the Department and the SOEs will *make* eligibility determinations, including what constitutes credible and reliable evidence of ineligibility. And in cases where the state cannot ascertain eligibility due to unclear records, the state must issue a determination that the voter is entitled to vote unless or until they are removed from the voter registration rolls after the notice and hearing procedures provided for by state law are completed. *See id.* Such a process would be entirely in accordance with

175

SB7066, which instructs the Department to construe ambiguities "in favor of the registrant." Fla. Stat. § 98.0751(4).

### D. Defendants' Implementation of SB7066 Violates *Bush* v. *Gore* Requirements of Uniform Application of Election Laws

The standard for a *Bush v. Gore* claim is outlined by Plaintiffs in their prior filing. ECF 286 at 33–37. "[A] citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972). "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104–05 (2000). The Fourteenth Amendment's Equal Protection Clause guarantees not only "the initial allocation of the franchise"—that is, the right to vote—but also "the manner of its exercise." *Id*. It requires not just a statewide standard for administering elections, but also "minimum procedures necessary" to implement it consistently. *Id*. at 109.[19] SB7066 violates the Fourteenth Amendment because the statute is not

---

[19] The statute at issue in *Bush v. Gore*, for example, contained a governing standard for counting ballots, yet violated the Equal Protection Clause as a result of "the absence of specific standards to ensure its equal application," and the failure of the State to formulate "uniform rules" to apply the standard to recurring circumstances. *Id*. at 106.

being—and cannot be—uniformly and consistently applied in Florida. A returning citizen with outstanding LFOs is more likely to be permitted to register, vote, and have her vote counted in some jurisdictions than in others.

Plaintiffs will demonstrate at trial that the Department of State ("DOS") has not provided *any* guidance to county election officials about how they should: (i) identify a returning citizen's outstanding LFOs, (ii) determine what constitutes a disenfranchising LFO, (iii) determine the outstanding balance on disqualifying LFOs, or (iv) implement a process for confirming voters' eligibility or the basis for removing them from the rolls. *See* Fact Section ¶¶ 251, 292, 351–52, 359, 363. SB7066 itself also provides no guidance to county election officials.[20] The lack of *any* instructions, let alone uniform ones, has left county Supervisors essentially guessing at how to implement SB7066's LFO requirement. *See* Fact Section ¶¶ 292, 373. In doing so, county Supervisors are adhering to differing rules and practices

---

[20] The law makes reference to "clerk[s] of the circuit court[s], the Board of Executive Clemency, the Department of Corrections, the Department of Law Enforcement, or a United States Attorney's Office" as a non-exhaustive list of potential sources of information on felony convictions generally, Fla. Stat. § 98.075(5), but fails to provide a definitive source of information concerning outstanding LFOs. The Florida legislature's choice to refrain from creating a uniform process or a centralized source of LFO information was intentional. Fact Section ¶ 365.

177

related to registration, voter eligibility, and registration removals without any meaningful oversight from DOS. *See* Fact Section ¶¶ 321–25, 367–81.

The end result is that returning citizens with the *same* LFOs, but residing in different counties, may receive entirely *different* outcomes—with some being able to register and vote, while others are subjected to removal from the registration rolls. This is the gravamen of an equal protection violation under *Bush* v. *Gore*—where a lack of uniform procedures results in "a greater likelihood that one's vote will not be counted on the same terms as the vote of someone in a [different] county." *Stewart* v. *Blackwell*, 444 F. 3d 843, 871 (6th Cir. 2006), vacated *on mootness grounds*, 473 F.3d 692 (6th Cir. 2007). It is no different here, where the lack of uniform procedures will lead returning citizens to be able to vote in some counties while those similarly situated in other counties may be removed from the rolls—the exact "arbitrary and disparate treatment" precluded by *Bush* v. *Gore*, 531 U.S. at 104.

> i. *SB7066 Provides Unequal Access to Restoration of Voting Rights Among Counties, in Violation of the Equal Protection Clause*

At the most basic level, SB7066 fails to create uniform statewide procedures for returning citizens to determine if they are eligible to register to vote. The record demonstrates the Secretary has not provided *any* guidance to local election officials, resulting in inconsistent instructions from SOEs to returning citizens in their county.

178

Fact Section ¶¶ 292, 322, 367–74. Election officials have testified that they provide different instructions to returning citizens seeking to determine their eligibility. *See Id.* ¶¶ 251, 298. Florida election officials, including the Director of the Division of Elections, have testified that they agree counties apply SB7066 differently. *See id.*

Standards for identifying and paying LFOs are arbitrary and differ from county to county. *First*, counties apply unequal standards for determining what constitutes an LFO within the four corners of the sentencing document. At trial, Carey Haughwout, the Public Defender for the 15th Judicial Circuit, will testify that in Palm Beach County, the State Attorney has changed sentencing documents so that some mandatory court costs are not considered terms of sentence within the four corners of the document, for returning citizens to avoid the burden on their right to vote.[21] Similarly, the evidence shows that Miami-Dade County officials do not consider court fees and costs to be disenfranchising LFOs under SB7066, if those fees and costs are not included in standard sentencing documents. Fact Section

---

[21] Gomez, Alan, *Ahead of Florida primary, 1.4 Million Former Felons Unsure Whether They Can Vote in 2020*, USA Today (Mar. 16, 2020), https://www.lcsun-news.com/story/news/politics/elections/2020/03/16/1-4-million-floridians-unsure-whether-they-can-vote-in-november-electoin/4722829002/) ("In Palm Beach County, State Attorney Dave Aronberg has already changed his sentencing documents so future costs are not tied to sentences, and is helping felons remove existing courts fee from sentences already imposed".).

¶ 372. As such, a returning citizen who has completed incarceration and her terms of supervision and who owes only court costs may be eligible for restoration if she resides in Palm Beach or Miami-Dade County, but not if she resides in other counties across Florida. This result—in which voter eligibility depends solely on a county's preferred format of sentencing documents—arbitrarily deprives some returning citizens of their right to vote.

*Second*, returning citizens are subject to different payment rules across counties, which can prolong their disenfranchisement. At trial, Plaintiffs will present expert testimony from Dr. Burch, which proves that similarly situated individuals are treated differently based on the payment policies of the county in which they owe LFOs. *See* Fact Section ¶¶ 277–88, 375–78. In some counties, returning citizens may pay their outstanding LFOs without fees or penalties; their rights are automatically restored upon payment of their LFOs alone. Other counties require returning citizens to pay a set fee or percentage before satisfying their LFO obligations; there, returning citizens who pay the full LFO amount still have an outstanding balance and remain deprived their right to vote. *See id.* State law permits differing county clerk payment policies, but the Equal Protection Clause does not permit those differing policies to determine who qualifies to vote.

*Third*, waiver and termination of LFO requirements differ from county to county. In most of the 67 counties, courts do not have a process in place for returning citizens to seek termination or modification of their outstanding LFOs for voting purposes. *See* Fact Section ¶ 368; Fla. Stat. § 98.0751(2)(a)(5)(e). Nor do all counties provide an opportunity for conversion to community service. PX157 at 15. Among the counties that do provide a process to terminate outstanding LFOs, they do not terminate restitution. *See* Fact Section ¶ 368 (citing PX447 (Collaborative Plan for Miami-Dade County)).

Even among counties that do offer some process for termination or modification of LFOs, those processes have county-specific features. Some counties offer a "rocket docket" for modification of LFOs which could (absent current closure of the courts) result in restoration before the upcoming federal election, other counties merely permit applications for termination in the normal course of court proceedings. *See* Fact Section ¶ 369; *see also* ECF 173-1 at 10–11 (FRRC Amicus Br.). Hillsborough County offers opportunities for modification or waiver of LFOs for the purposes of voting, such that payment is still required, but no longer poses a barrier to re-enfranchisement—an avenue unavailable to returning citizens with convictions in other counties. *See* Fact Section ¶ 370. Because of the variations between county policies and practices, returning citizens with identical LFO

181

obligations are more likely to have their rights restored in some counties than in others.

> ii. *Defendants Apply Inconsistent Rules and Processes for Removing Registered Returning Citizens from the Voter Rolls For Outstanding LFOs, Resulting in the Non-Uniform Application of Election Standards*

Florida's unequal application of SB7066 is also evident in county registration list maintenance procedures, which differ significantly from county to county based on what the county considers "credible and reliable evidence of ineligibility." *See* Fact Section ¶¶ 321–25. The Secretary of State is responsible for notifying the appropriate Supervisor of Elections if a registered voter has been convicted of a felony and has not had their rights restored. *See* Fla. Stat. § 98.075(5). Counties appear to treat that notification differently, depending in large part on their available resources. For example, Leon County conducts its own independent research to verify that voters identified by the Secretary are ineligible before initiating cancellation of their registration, Fact Section ¶ 323, while Hillsborough County initiates the cancellation process for registered voters upon receipt of the information from the Secretary, without any additional research, *see id.* ¶ 325. Apparently, Manatee County has cancelled voters' registrations—including a named plaintiff—without first receiving notification from the Secretary of State. *Id.* The Secretary's inability to provide Supervisors with credible and reliable evidence of returning

182

citizens' eligibility—or even define what would constitute such evidence, *see id.* ¶ 363—and the Supervisors' differing procedures for treating that unreliable evidence lead to non-uniformity in counties' maintenance of the voter rolls.

Defendants have not provided adequate guidance on SB7066 to Supervisors of Elections to ensure uniform statewide implementation of the law. As a result, similarly situated returning citizens face unequal access to restoration, unequal standards for determining eligibility, and unequal standards and procedures for cancellation of their registrations.

### IV.   SB7066 Violates the First Amendment Right of the League of Women Voters of Florida to Engage in Voter Registration Activities

For the same reasons discussed *supra*, SB7066's LFO requirement makes it exceedingly burdensome, and in some instances impossible, for the League and other voter registration organizations to determine the eligibility of and ultimately register returning citizens who are eligible to vote. SB7066 also mandates a registration form that is confusing and, with respect to some returning citizens, unusable. SB7066 thereby severely burdens the speech and association of the League, which has a core mission of registering eligible voters. Whether subject to strict scrutiny as a restriction on core political speech or subject to the sliding scale analysis under *Anderson-Burdick*, SB7066 violates the First Amendment.

## A. The League's Right to Engage in Voter Registration Activities is Protected by the First Amendment as "core political speech" and Expressive Association

The League has a First Amendment right to engage in voter registration and get-out-the-vote activities. *League of Women Voters of Fla. v. Browning*, 575 F. Supp. 2d 1298, 1321–22 (S.D. Fla. 2008); *League of Women Voters of Fla. v. Cobb*, 447 F. Supp. 2d 1314, 1334 (S.D. Fla. 2006); *see also Monterey Cty. Democratic Cent. Comm. v. U.S. Postal Serv.*, 812 F.2d 1194, 1196 (9th Cir. 1987). In fact, "encouraging others to register to vote" is "pure speech" and therefore "core First Amendment activity." *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1158 (N.D. Fla. 2012); *see also Preminger v. Peake*, 552 F.3d 757, 765 (9th Cir. 2008); *Am. Ass'n of People with Disabilities v. Herrera*, 690 F. Supp. 2d 1183, 1216 (D.N.M. 2010) ("[T]o participate in voter registration is to take a position and express a point of view in the ongoing debate whether to engage or to disengage from the political process."). Organized voter registration activities are also political association protected by the First Amendment. *League of Women Voters v. Hargett*, 400 F. Supp. 3d 706, 720 (M.D. Tenn. 2019) ("[O]rganizing between individuals in support of registration efforts involves political association that is, itself, protected under the First Amendment.") (citing *Hernandez v. Woodard*, 714 F. Supp. 963, 973 (N.D. Ill. 1989)); *Herrera*, 580 F. Supp. at 1229. Given that the League registers and

184

educates voters as part of its central mission, it is without question that the League's activities are protected by the First Amendment.

### B. SB7066 Imposes a Severe Burden On the League's Speech and Association

SB7066 severely burdens the League's speech and association in at least three ways.

First, by basing voter eligibility on information that is difficult, if not impossible, to discern, the law converts voter registration, a process that normally takes minutes, into an hours-long investigation that often requires consultation with an attorney. ECF 98-21 (Brigham Decl.) at ¶¶ 13–14; Scoon Dep. at 126:02–128:08. In fact, as the League's First Vice President Cecile Scoon, a practicing attorney, will testify at trial, she has designed a continuing legal education course to help other attorneys provide such advice. In *Georgia Coalition for the People's Agenda, Inc. v. Kemp*, 347 F. Supp. 3d 1251, 1264 (N.D. Ga. 2018), the court found a process that required a voter who had already submitted proof of citizenship with his registration application to make two trips to the polls, conduct independent research, and hunt down a name and telephone number to give to election officials so that his citizenship status could be verified, to be severe. In this case, the League often will do far more than that and still fail to determine eligibility for many returning citizens. *See* Scoon Dep. at 35:23–40:25.

185

Second, because it is often impossible to know what LFOs a returning citizen owes, the League and its members fear that by registering returning citizens, they create the risk of legal liability. *See id.* at 35:23–36:13; 36:21–37:18. As noted above, some of the League's members have stopped registration efforts entirely as a result of this fear. In *League of Women Voters v. Browning*, 863 F. Supp. at 1160–61, this Court found the League likely to succeed in a challenge to a provision that created a "simply unworkable" process for voter registration organizations that made voter registration drives "a risky business." There, as here, Florida acknowledged that the statute created issues that would "need to be worked out." *Id.* at 1161. SB7066 itself created a Work Group to address just such issues but there has been no action on its recommendations. As the Court noted in *Browning*, "[w]hen rights of this magnitude are at stake, it is not too much to ask the state to work out the issues in advance." 863 F. Supp. 2d at 1161.

Finally, because SB7066 requires the League to divert resources toward efforts to determine eligibility for returning citizens, it limits the League's ability to engage in voter registration more generally. Returning citizens make up nearly one-tenth of all voting-age citizens in Florida, *Hand v. Scott*, 285 F. Supp. 3d 1289, 1310 (N.D. Fla. 2018), and surely an even higher percentage of those that remain unregistered. In this context, it is simply not feasible for the League to efficiently

and effectively conduct voter registration drives without creating the risk of prosecution for any of the returning citizens it registers.

Once again, the burden on the League's First Amendment-protected activities is not a necessary outgrowth of any LFO requirement. It is the Department's unsupported choice to shift all responsibility for initial eligibility determinations onto voters—and thus onto organizations seeking to register voters—that creates this undue burden on the League's First Amendment rights.

### C. The Burdens Imposed on the League by SB7066 are Unconstitutional Restrictions on "Core Political Speech"

Although electoral regulations are typically evaluated on the *Anderson-Burdick* sliding scale, election laws implicating core political speech, like voter registration drives, "veer[] instead into an area where the First Amendment has its fullest and most urgent application." *Hargett*, 400 F. Supp. 3d at 722 (quoting *Eu v. S.F. Cty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989)) (quotation marks omitted). These laws are therefore subject to "exacting" scrutiny. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345–46 (1995) (citing *Meyer v. Grant*, 486 U.S. 414, 420 (1988)).

The burden on First Amendment protected activities of the League SB7066 is subject to strict scrutiny, rather than the *Anderson-Burdick* framework, because SB7066 does not simply regulate "the mechanics of the electoral process" with a

"second-order effect" on political speech. *McIntyre*, 514 U.S. at 345; *Hargett*, 400 F. Supp. 3d at 724–25 (citing *Schmitt v. LaRose*, 933 F.3d 628 (6th Cir. 2019)). Instead, by making eligibility determinations near impossible, *see infra* Section III, and creating a thoroughly confusing registration form, SB7066 *directly* impedes the League's ability to engage in core political speech. In fact, this Court has noted already that SB7066 seems to have been designed, in part, to "deter" and "discourage" registration. ECF 204 at 199:09–11 (Oct. 7, 2019 PI Hr'g Tr.); ECF 205 at 257:02–05 (Oct. 8, 2019 PI Hr'g Tr.). The First Amendment protects not just against laws barring speech, but also against regulations that make political speech more burdensome or expensive. *Citizens United v. Fed'l Election Comm'n*, 558 U.S. 310, 337 (2010); *see id.* at 340 ("[P]olitical speech must prevail against laws that would suppress it by design or inadvertence.").

SB7066 plainly cannot survive strict scrutiny. But even if the *Anderson-Burdick* sliding scale applies, the LFO requirements in SB7066 still fail to pass constitutional muster. As set forth above, the burden that the law imposes on the speech and association of the League and its members is severe. When the burdens imposed by an election regulation are severe, "the level of scrutiny undergoes a concomitant increase." *Jacobson v. Lee*, 411 F. Supp. 3d 1249, 1281 (N.D. Fla. 2019) (citing *Burdick*, 504 U.S. at 434). For all the reasons previously stated, *see*

188

*supra* Section III, the State's interests do not outweigh the burden on the League's protected activities. There is no legitimate, much less compelling, state interest justifying these serious limitations on and, in some cases, outright denial of the League's First Amendment rights.

## V.   SB7066 Violates the National Voter Registration Act

SB7066 violates the provisions of the National Voter Registration Act of 1993 ("NVRA") governing voter registration forms, voter registration, and voter list maintenance.[22] As demonstrated above, the State of Florida willfully ignored the practical implications of implementing SB7066 when it enacted the law. The result is a voter registration form that violates the NVRA's mandates to notify applicants of the eligibility requirements and to seek only the minimum amount of information necessary from applicants. The form now discourages voter registration, contravening the NVRA's stated purpose. Moreover, the "administrative nightmare" that SB7066 has created results in nonuniform and discriminatory voter list

---

[22] With respect to their standing to bring claims under the NVRA, the Raysor Plaintiffs incorporate by reference arguments made in Plaintiffs' Memorandum of Law in Opposition to the State Defendants' Motion for Summary Judgment, ECF 286 at 22–24, and *Raysor* Plaintiffs' Motion for Leave to Amend Complaint, *Raysor v. Lee*, No. 4:19-cv-301-RH-MJF, ECF 11

maintenance that not only violates the U.S. Constitution, *see supra* Section III.D., but also the NVRA.

## A. The Amended Voter Registration Application Fails to Notify Applicants of Eligibility Requirements

The amended voter registration application does not satisfy the NVRA's requirements that it specify eligibility requirements. The NVRA provides that voter registration forms "shall include a statement that [] specifies each eligibility requirement (including citizenship)." 52 U.S.C. § 20508(b)(2)(A); *see also id.* § 20505(a)(2) (requiring state-created forms to meet § 20508's requirements); *see also id.* § 20507(a)(5) (requiring that voter registration forms "inform applicants . . . of [] voter eligibility requirements").

The NVRA's "specify" and "inform" provisions require states to provide explicit, particularized information about voter eligibility requirements. As the district court adjudicating a challenge to Alabama's voter registration form recently concluded, the NVRA's "specify" requirement can be understood by its plain terms: "'Specify' is defined in BLACK'S LAW DICTIONARY as 'to mention specifically; to state in full and explicit terms; to point out; to tell or state precisely or in detail; to particularize; or to distinguish by words one thing from another.'" *Thompson v. Alabama*, No. 2:16-cv-783-ECM, 2019 WL 6522039, at \*10, ___ F. Supp. 3d ___, (M.D. Ala. Dec. 3, 2019) (quoting BLACK'S LAW DICTIONARY (6th ed. 1990));

190

*see also id.* (noting dictionary definition of "specify" as "'to mention or name in a specific or explicit manner,' 'to include as an item in a specification,' 'to make specific: to give a specific character or application to'" (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, Unabridged (2019))); *see also Kucana v. Holder*, 558 U.S. 233, 243 n.10 (2010) ("'[S]pecify' means to name or state explicitly or in detail." (quotation marks omitted)). The use of "marginally ambiguous" language does not suffice to "specify" something. *Id.* (quoting *Soltane v. U.S. Dep't of Justice*, 381 F.3d 143, 147 (3d Cir. 2004) (Alito, J.)).

The same is true with respect to the NVRA's "inform" provision, 52 U.S.C. § 20505(a)(2). While "inform" has not been defined for purposes of the NVRA, "[i]n the absence of a statutory definition of a term," courts may look to the "common usage" of words and "turn to dictionary definitions for guidance." *CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1222–23 (11th Cir. 2001). According to Merriam-Webster, "inform" means "to communicate knowledge to" and the example provided is "to *inform* a prisoner of his rights." *See* "Inform," *Merriam-Webster.com Dictionary*, https://www.merriam-webster.com/dictionary/inform; *see also* DUTY, Black's Law Dictionary (11th ed. 2019) (defining "duty to inform" to mean the "[p]rofessional obligation to ensure that a client or patient understands, *as fully as possible*, the potential benefits and harm of a decision that the client faces")

(emphasis added). In other words, the NVRA requires Florida to communicate to potential voters as fully as possible the eligibility requirements so that citizens understand them. The revised voter registration application fails to do so with respect to the eligibility of returning citizens.

Florida's amended voter registration application neither "specif[ies]" the eligibility requirements nor "inform[s]" voters of them. As amended by SB7066, Florida's uniform statewide voter registration application requires applicants to attest to whether the applicant has been convicted of a felony, and if convicted, to affirm either: (i) that their "voting rights have been restored by the Board of Executive Clemency;" or (ii) that their "voting rights have been restored pursuant to s. 4, Article VI of the State Constitution upon the completion of all terms of [their] sentence, including parole or probation." Fact Section ¶ 229; PX36 (Fla. Voter Registration Application, effective Jul. 2019).

First, the amended application does not inform individuals with out-of-state or federal convictions whose voting rights were restored in the jurisdiction of their conviction that they are eligible to vote, and through that omission actually suggests that they are *not* eligible. *See* ECF 207 at 47 (noting that the new attestations "do not reach felons whose rights have been restored in other states or through other methods, including executive pardons")*.* The amended application not only fails to

inform such applicants that they are eligible, it is simply unusable for them. *See id.* (noting the Secretary's acknowledgement that "there are eligible individuals who could not attest to any of the three new statements."); *see also* ECF 204 (Oct. 7, 2019 PI Hr'g Tr.) 200:22–203:25.

Second, the new form does not specify the eligibility requirements for returning citizens with Florida state convictions. Remarkably, since the legislature's purported main purpose in enacting SB7066 was to clarify that Amendment 4 required the payment of all LFOs, the application does not even mention the payment of LFOs as an eligibility requirement. Moreover, the application is not written in plain language, contains complex legal citations, and requires knowledge of the law beyond what is stated on the form to understand.

The amended application requires applicants whose "voting rights were restored pursuant to s. 4, Article VI of the State Constitution" to know the meaning of the phrase "completion of all . . . terms of sentence," PX36, a phrase that remains unsettled even after much dispute and litigation. *See* ECF 286 at 13 (noting that the Florida Supreme Court declined to interpret the term "completion"—and whether that always requires payment—in Amendment 4 and that the Secretary has conceded Amendment 4 does not require payment of LFOs for completion of a criminal sentence). Supervisor Earley concluded that the language of the form is so confusing

that it would discourage applications; he estimated that few of his constituents had ever heard of the Board of Clemency and that "essentially none" are familiar with s.4, Art. VI, of the State Constitution. ECF 204 at 202:09–203:25. Moreover, even if the NVRA's mandate that eligibility requirements be "specif[ied]" could be satisfied with legal citations (it cannot), it is hardly enough to direct voters to the Florida Constitution, given the legislature's determination that more was needed; yet the application does not mention SB7066 or any of its requirements. *See* PX36. A voter would have no way to know, for example, that the conversion of their LFOs to civil liens—an occurrence that most would understand to have ended their criminal liability—does not actually constitute completion of their sentence under SB7066. *See* Fla. Stat. § 98.0751(2)(a)(5)(e)(III).

Senator Brandes, one of SB7066's architects, acknowledged that this Court's "points on the third box of the registration form is [sic] well taken and we are working on clarifying language." Facts Section ¶ 238. Nonetheless, the legislature did not amend the form this year. *Id.* ¶ 239. It is indisputable that the voter registration application, as amended by SB7066, entirely fails to communicate voter eligibility requirements so that citizens can understand them, and it thus violates the NVRA.

194

**B. The Amended Application Requires More Information Than is Necessary to Prevent Duplicate Voter Registrations and Assess Applicants' Eligibility**

The amended application requires more information from prospective voters than is necessary to prevent duplicate registrations and to assess eligibility in violation of the NVRA. Section 5 of the NVRA permits states to only require "the minimum amount of information necessary to--(i) prevent duplicate voter registrations; and (ii) enable State election officials to assess the eligibility of the applicant and to administer voter registration and other parts of the electoral process[.]" 52 U.S.C. § 20504(c)(2)(B). "The term 'minimum' contemplates the least possible amount of information." *Fish v. Kobach*, 840 F.3d 710, 736 (10th Cir. 2016).

Because it requires applicants to affirm whether or not they have been convicted of a felony, *see* Fla. Stat. § 97.052(2)(t)(3) (2019), the application form, as amended by SB7066, requires *more* than the "minimum" information necessary. Indeed, officials have testified that the amended application's three checkboxes require superfluous information from the voters, and that the applications are processed the same regardless of which boxes are checked. *See, e.g.*, PX88 at 113:02–115:05 (Brown Dep.) (agreeing that "nothing about which box is checked affects how [she] processes the application"), PX25 at 96:19–25 (Arrington Dep.)

195

(testifying that Osceola County does not process applications differently depending upon which box is checked).

Moreover, prior to SB7066, Florida never required as much information from the voter even when nearly all persons with felony convictions were excluded from the right to vote. Instead, prior to SB7066's enactment, Florida's voter registration application required an applicant to affirm, "I am not a convicted felon, or, if I am, my rights relating to voting have been restored." Fact Section § 228, *see also* Fla. Stat. § 97.052(2)(t) (2018). Consistent with the NVRA, Florida law also previously provided that "[t]he registration application must be . . . designed so that convicted felons whose civil rights have been restored . . . are not required to reveal their prior conviction[.]" *See* Fla. Stat. § 97.052(2)(u) (2018). Defendants have made no argument or offered any facts showing that, after Amendment 4, applicants must state whether they have been convicted of a felony in order for the State to prevent duplicate voter registrations and assess applicants' eligibility. There is thus no question that the application form required by SB7066 violates the NVRA.

### C. The Amended Application Discourages Voter Registration Contrary to the Essential Purpose of the NVRA

The voter registration application required by SB7066 violates the NVRA for a third reason: it defeats the law's primary purpose of "increas[ing] the number of eligible citizens who register to vote in elections for Federal office[.]" 52 U.S.C.

§ 20501(b)(1). Congress sought to increase voter registration because state efforts "to keep certain groups of citizens from voting"—specifically, immigrant people, Black people, and the rural poor—had caused a massive decrease in turnout. *See* H.R. REP. 103-9, 2, 1993 U.S.C.C.A.N. 105, 106.[23] Rather than create a form that a newly re-enfranchised group could understand and use with ease, Florida adopted a voter registration application that is so confusing and deficient that it inhibits registration.

As Supervisor Earley indicated and the Court has already found, the amended application discourages—or even sometimes prohibits—eligible returning citizens from applying because it is confusing, underinclusive (failing to specify the eligibility requirements for individuals whose voting rights were restored by law in another jurisdiction), and overinclusive (requiring applicants to unnecessarily disclose their prior felony conviction). *See* ECF 207 at 47 (concluding that "the form will not only discourage eligible felons from voting but will make it impossible for

---

[23] Indeed, SB7066 is a perfect example of the "techniques" for voter suppression that Congress sought to address. *See* H.R. REP. 103-9, 2, 1993 U.S.C.C.A.N. 105, 106 (listing such "techniques" as "[t]he poll tax, literacy tests, residency requirements, selective purges, elaborate administrative procedures and annual reregistration requirements"). SB7066 places a price tag on voting, discriminates against Black voters, and requires returning citizens to navigate an elaborate administrative system to determine eligibility.

some eligible felons to even apply"). Indeed, as the Court has noted, the application seems designed to deter registration. ECF 205 at 257:02–05 (Oct. 8, 2019 PI Hr'g Tr.). The application form, as amended by SB7066, thus violates the NVRA.

### D. Defendants' Application of SB7066 is not Uniform nor Nondiscriminatory

The NVRA requires that any voter list maintenance program be uniform and nondiscriminatory. 52 U.S.C. § 20507(b)(1). As administered by Defendants, the voter list maintenance program enacted by SB7066 is neither.

#### i. Defendants Have Failed to Implement a Uniform Voter List Maintenance Program

The NVRA's uniformity requirement means that counties across a state may not apply different standards in implementing a voter list maintenance program. *See* H.R. Rep. No. 103-9, 15, 1993 U.S.C.C.A.N. 105, 119 ("The term 'uniform' is intended to mean that any purge program or activity must be applied to an entire jurisdiction."); *Ind. State Conference of the NAACP v. Lawson*, 326 F. Supp. 3d 646, 662 (S.D. Ind. June 8, 2018) (finding Indiana's voter list maintenance program would likely fail to be uniform because of differing guidance to county officials on how to determine whether a particular voter was eligible and the "wide discretion" afforded to county officials in making that determination); *Ass'n of Cmty. Orgs. for Reform Now (ACORN) v. Edgar*, No. 95 C 174, 1995 WL 532120, at *2 (N.D. Ill.

Sept. 7, 1995) (rejecting the argument that uniformity *within* a county complies with § 20507(b)(1), which requires the "uniformity and non-discriminatory nature of '[a]ny *State* program or activity . . .'") (emphasis in original). Moreover, while a state may delegate the administration of some aspects of its voter registration program to local election administrators, it may not thereby circumvent its federal obligation to employ uniform voter-list-maintenance procedures statewide. *See United States v. Missouri*, 535 F.3d 844, 850 (8th Cir. 2008) (state may not avoid requirement to conduct a reasonable list maintenance program by delegating implementation to local officials); *Ariz. Democratic Party v. Reagan*, No. 16-CV-03618, 2016 WL 6523427, at *6 (D. Ariz. Nov. 3, 2016) ("The Secretary does not serve as a mere legal adviser to the counties. From her statutory responsibility to oversee elections in [the state] flows not only authority, but a duty to ensure that voter registration regulations are administered in a fair and uniform manner.").

There can be no question that Defendants' implementation of SB7066 is not uniform.

*First*, as described above, the administrative nightmare that SB7066 has inflicted has resulted in wide-ranging interpretations by the *many* county and state entities that are involved in determining the amount of outstanding LFOs. Returning citizens in precisely the same circumstances will receive different eligibility

determinations. *See* Fact Section ¶¶ 231, 241. There are any number of variables in the process that differ from county to county (and even within officials in the same county office), including but not limited to:

- differing understandings of which LFOs are disqualifying;

- different sentencing documents;

- different interpretations of "four corners of the sentencing document";

- different policies regarding debt collection agencies and surcharges; and

- different levels of difficulty obtaining accurate information (or even *any* information) from clerks' offices. *See* Fact Section ¶¶ 258–262, 278, 282, 376–77.

*Second*, the Secretary's failure to issue any meaningful guidance as to how SOEs should implement SB7066 has already created and will continue to result in nonuniform voter list maintenance. It has already done so, as illustrated by the process being implemented in Manatee County. *See* Fact Section ¶ 309. As noted above, the Secretary has not provided *any* guidance on SB7066 to SOEs regarding how to: (i) identify whether a returning citizen has outstanding LFOs, (ii) determine which LFOs are disqualifying, (iii) determine the outstanding balance on disqualifying LFOs, (iv) implement a process for confirming voters' eligibility or the basis for removing them from the rolls, or (v) comply with the preliminary injunction by implementing a process that includes an ability-to-pay determination.

*See* Fact Section ¶ 292. SB7066 itself also fails to provide such guidance to the Supervisors. Moreover, the State has failed to implement any of the recommendations of the Restoration of Voting Rights Work Group, such as consolidating relevant data, identifying sources of information about restitution, or providing individuals with an opportunity "to demonstrate a partial or full inability to pay outstanding [LFOs] and obtain a judicial determination on ability to pay." Fact Section ¶¶ 302–07.

*Third*, Defendants inconsistently use the pre- and post-SB7066 voter registration applications. Counsel for the Secretary acknowledged "that the website that the Secretary of State maintains has the old form and the new form." ECF 239 at 48:07–08 (Dec. 12 Hr'g Tr.). However, the statewide online voter registration portal uses only the new form. Fact Section ¶ 234. Moreover, the practices of Defendant SOEs vary widely. Some counties attest that they only use the old form (Alachua, Manatee, Miami-Dade, Sarasota), at least one county only makes the new form available (Broward), and still others make both forms available (Duval, Hillsborough, Indian River, Leon, Orange). *Id.* ¶ 231. The ability of eligible returning citizens with out-of-state and federal convictions to fill out a voter registration application depends entirely on the county in which they reside, and

whether they apply online or using the hard copy form. Registration is thus nonuniform among and within counties.

The NVRA makes clear that the eligibility of returning citizens cannot be made to depend on the unfettered discretion and the variable (and at times mistaken) legal interpretations of local election officials.

> ii. *Defendants' Application of SB7066 Results in Discriminatory Treatment of Voters Between and Within Counties, in Violation of the NVRA*

SB7066 also fails the NVRA's nondiscriminatory requirement because the law discriminates on the basis of both wealth and race. *See supra* Section I, *infra* Section VI. The tremendous effort required, even for eligible returning citizens, to determine whether all disqualifying LFOs have been satisfied predominantly burdens poor people and Black people. In addition, SB7066 discriminates against returning citizens, who will be far more likely to suffer improper removal, due to the use of utterly unreliable data. *See United States v. Florida*, 870 F. Supp. 2d 1346, 1350 (N.D. Fla. 2012) (noting that a state's list maintenance program likely violated the NVRA because the Secretary's "methodology made it likely that the properly registered citizens who would be required to respond and provide documentation would be primarily newly naturalized citizens [and t]he program was likely to have a discriminatory impact on these new citizens").

For these reasons, this Court should conclude that SB7066 violates the NVRA.

## VI.   SB7066 Was Enacted with a Discriminatory Purpose

### A. The U.S. Constitution Forbids a Legislature from Acting with a Discriminatory Intent

The Fourteenth and Fifteenth Amendments to the U.S. Constitution prohibit voting practices enacted with a racially discriminatory purpose. U.S. Const. amend. XIV; U.S. Const. amend. XV; *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 481–82 (1997); *Rogers v. Lodge*, 458 U.S. 613, 617 (1982).

In analyzing whether a government action was motivated by a discriminatory purpose, courts apply the framework articulated in *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–268 (1977) ("*Arlington Heights*"). *Arlington Heights* specifies that "an important starting point" for assessing discriminatory purpose is "the impact of the official action[, *i.e.*,] whether it bears more heavily on one race than another." *Id.* at 266 (quotation marks omitted). Additional evidentiary sources include, but are not limited to: (1) historical background of the decision; (2) the specific sequence of events leading up to the challenged decision; (3) departures from the normal procedural sequence, as well as substantive departures; (4) legislative or administrative history, including contemporary statements; (5) foreseeability of discriminatory impact;

203

(6) knowledge of discriminatory impact; and (7) the availability of less discriminatory alternatives. *Jean v. Nelson*, 711 F.2d 1455, 1486 (11th Cir. 1983); *Arlington Heights*, 429 U.S. at 268.

To prevail on a claim of racially discriminatory purpose at trial, the evidence must demonstrate that discriminatory purpose was a motivating factor for the government action. Plaintiffs "do[] not have to prove that racial discrimination was a 'dominant' or 'primary' motive, only that it was a motive." *United States v. Dallas Cty. Comm'n*, 739 F.2d 1529, 1541 (11th Cir. 1984) (quoting *Arlington Heights*, 429 U.S. at 265–66). Nor does discriminatory purpose require a showing of "ill will, enmity, or hostility" toward minorities. *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 472–73 & n.7 (11th Cir. 1999). An intent to disadvantage minority citizens to gain a perceived political or partisan benefit qualifies as discriminatory intent. *See League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 440 (2006) (stating that taking away a political opportunity just as minorities were about to exercise it "bears the mark of intentional discrimination"); *Hunter v. Underwood*, 471 U.S. 222, 233 (1985) (finding intentional discrimination where a state enacted a law to harm Black and poor white voters for partisan purposes); *N. Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204, 226–27 (4th Cir. 2016) (similar).

204

Discriminatory purpose may be proved by direct or circumstantial evidence. *Rogers*, 458 U.S. at 618. Courts must consider "all of the circumstances that bear upon the issue of discriminatory intent," *Foster v. Chatman*, 136 S. Ct. 1737, 1748 (2016), "including the normal inferences to be drawn from the foreseeability of defendant's actions," *United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009). Expert evidence is also highly relevant. *See Hunter*, 471 U.S. at 229–30 (relying on experts to find discriminatory intent); *NAACP v. Gadsden Cty. Sch. Bd.*, 691 F.2d 978, 982 (11th Cir. 1982) (holding the district court clearly erred in discounting expert testimony on intentional discrimination).

"[O]fficial actions motivated by a discriminatory purpose 'have no legitimacy at all under our Constitution.'" *Stout v. Jefferson Cty. Bd. of Educ.*, 882 F.3d 988, 1014 (11th Cir. 2018) (quoting *City of Richmond v. United States*, 422 U.S. 358, 378–79 (1975) (alterations omitted)). Once racial discrimination is shown to have been a 'substantial' or 'motivating' factor behind enactment of the [challenged] law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." *Hunter*, 471 U.S. at 228.

### B. The Purpose of SB7066's LFO Requirement, at Least in Part, Was to Minimize the Political Participation of Black Returning Citizens

Plaintiffs' evidence at trial will demonstrate that SB7066's LFO requirement was motivated, at least in part, by an intent to minimize the opportunity of Black

returning citizens to participate in the political process in violation of the Fourteenth and Fifteenth Amendments.

> *i. SB7066's LFO Requirement Has a Disproportionate Impact on Black Returning Citizens*

An "important starting point" for this Court's analysis of intentional racial discrimination is whether SB7066's LFO requirement "bears more heavily" on Black returning citizens than on white returning citizens. *Arlington Heights*, 429 U.S. at 266. "[T]he impact of an official action is often probative of why the action was taken in the first place since people usually intend the natural consequences of their actions." *Bossier Par.*, 520 U.S. at 487. Impact can be the "most probative evidence of intent" because it offers "objective evidence of what actually happened rather than evidence describing the subjective state of mind of the actor." *Crum v. Alabama*, 198 F. 3d 1305, 1322 (11th Cir. 1999) (citation omitted). Here, there is abundant and uncontested evidence in the current record—which the evidence at trial will further bolster—that SB7066's LFO requirement disproportionately harms Black returning citizens.

Because Black Floridians are more likely to be arrested, charged, convicted, and then more harshly sentenced than white Floridians, Black people are overrepresented in the State's criminal justice system. Fact Section ¶ 208; PX893 ¶¶ 143, 192 (Kousser Report); *see also* PX151 (Wood Report). Black Floridians

206

represent only 16% of Florida's population but more than 32% of those disenfranchised for a felony conviction. Fact Section ¶ 208.[24] Black people are generally poorer than their white counterparts *before* they enter the criminal justice system due to socioeconomic disparities and the racial wage gap. *Id.* ¶ 209. And contact with Florida's criminal justice system creates additional economic burdens, including LFOs and a series of collateral consequences that serve as barriers to basic

---

[24] Drawing upon his expertise in political history, legal history, minority voting rights, race relations, and quantitative methods, *Gruver* Plaintiffs' expert, Dr. J. Morgan Kousser, analyzed evidence related to the question of whether SB7066's LFO requirements were adopted with a racially discriminatory purpose. PX893 ¶¶ 1, 3. Dr. Kousser followed the guidelines set forth in *Arlington Heights*, 429 U.S. at 252, and its progeny, which are similar to procedures followed by historians in making such assessments. *Id.* ¶¶ 2, 24; PX904 at 216:24–218:05 (Kousser Dep.). Historians use these factors as a logical and circumstantial basis for assessing the issue of intent. *Id.* In forming his opinions, Dr. Kousser considered each of these factors, as well as factors found in related lower federal court opinions, drew upon his expertise, and relied on sources standard in historical and social scientific analysis for assessing discriminatory intent, including: legislative records, depositions, scholarly papers and books, and newspapers and other reports. PX893 ¶¶ 1–2, 24, 33–37. Dr. Kousser rarely, including with respect to his scholarly work, interviews self-interested parties—in this case, legislators, voters, or advocates—to prepare his analysis. This is because after-the-fact explanations and justifications by self-interested parties, especially during pending litigation, are of very little, if any, value. PX904 at 30:10–33:08. Both as a historian and as an expert witness, he relies upon evidence contemporary to the events, not on what people say later on. *Id.* Dr. Kousser is qualified to serve as an expert in political history, minority voting rights, race relations, and the legal history of those subjects, and quantitative methods. PX893 ¶ 3.

necessities, including employment, education, health and housing. *Id.* ¶ 120(b), 214. For Black returning citizens, these collateral consequences are compounded by racial discrimination in employment and other areas. *Id.* ¶ 214. All told, returning citizens, particularly Black returning citizens, face heightened financial obstacles that hamper their reentry and leave them with limited resources to pay outstanding LFOs.

Even if Black and white returning citizens could afford to pay LFOs at the same rate—which they cannot—the overrepresentation of Black people among returning citizens would mean SB7066 has a substantially disparate impact. According to Dr. Smith's unrebutted expert findings, 82.2% of Black returning citizens have outstanding LFOs, as compared to 74% of white returning citizens. *Id.* ¶¶ 211–12. Among those who owe LFOs, Black returning citizens are more likely to owe larger dollar amounts. *Id.* ¶ 213. And even the administrative nightmare of SB7066—which makes satisfaction of LFOs an "expensive, time consuming, and ultimately, discouraging" process, PX892 at 12, 67 (Burch Report)—is likely to disproportionately impact Black returning citizens, who have fewer socioeconomic means to navigate SB7066's bureaucratic morass to restore their voting rights, PX893 ¶¶ 10, 139; *see also id.* ¶¶ 22, 208. As discussed infra, lawmakers were

208

warned of these inevitable hurdles and socioeconomic racial disparities before passing SB7066 and did nothing to defray them.

Finally, alternative avenues for voting rights restoration are largely illusory for Black returning citizens. Not only does the clemency process "move[] at a glacial speed," ECF 207 at 5, but a recent, high-profile legal challenge to the clemency process revealed racial disparities in the granting of applications, Fact Section ¶¶ 73, 215.

In response to this unrebutted evidence, Defendants assert that if SB7066 has a racially discriminatory impact, then so too does Amendment 4. Not so. SB7066 and Amendment 4 are not identical; nor are their impacts on Floridians. More than six months *before* the Florida Supreme Court's advisory opinion, Florida enacted SB7066's LFO provision, which imposes a strict definition of "completion of all terms of sentence." The legislature defined "completion" to require the full payment of LFOs, and, as explained above, it did so without any accommodation for people genuinely unable to pay. By contrast, Amendment 4 is silent as to what "completion" means. For example, while SB7066 declares a sentence does not become "complete" when a court converts LFOs to a civil lien—a mechanism often employed when a criminal defendant is unable to pay their LFOs—nothing in Amendment 4 requires such a harsh result.

209

The recent Florida Supreme Court advisory opinion interpreting Amendment 4 does not eliminate these differences between Amendment 4 and SB7066. The opinion expressly declined to define "completion" under Amendment 4 and certainly did not import SB7066's definition into Amendment 4. As Amendment 4 advocates and Black legislators warned, as described below in greater detail, SB7066's inflexible and restrictive definition denied the intended fruits of Amendment 4 to a significant portion of returning citizens, who are disproportionately Black.

### ii.   The Legislature Knew the Foreseeable Racial Impact of SB7066

The evidence at trial will show that Florida officials knew or understood that enacting the LFO requirement would disproportionately harm Black returning citizens and feigned ignorance of that fact. Although the legislature sought to keep such evidence out of the record by expressly declining to study the racial impact of SB7066's LFO requirement prior to its enactment, the racial and socioeconomic impacts were well known to, and widely documented by, Florida officials.

The legislature knew that most people could not afford to pay their LFOs and knew that hardship is particularly acute for Black returning citizens. For example, the legislature previously acknowledged, by enacting legislation, Fla. Stat. § 960.29, that the frequent use of conversion of LFOs to civil judgments was necessary to avoid criminally punishing defendants for their poverty. The State also has admitted

it has minimal collections expectations for outstanding fines and fees. *Jones*, 950 F.3d at 816. And during floor debate, Rep. Shevrin D. Jones reminded his colleagues that over 60% of those fines that are never paid back are from Black returning citizens. Fact Section ¶ 121(d).

Further, from SB7066's legislative debate and the findings of the 2016 Financial Impact Estimating Conference ("FIEC"), the legislature was aware of the administrative problems with an LFO requirement. Legislators knew that identifying one's LFOs could present a significant burden due to the lack of centralized records, limited access to federal and out-of-state felony conviction records, and the discrepancies in information provided. PX893 ¶¶ 22, 46–47, 168-175, 211.

The legislature was also aware of well-documented racial disparities endemic in the State's criminal justice system. In particular, the sponsors of SB7066 knew the bill's likely discriminatory impact based on their acute awareness of these racial disparities from their legislative work. Although these disparities are largely common knowledge, *id.* ¶ 192, Rep. Grant's and Sen. Brandes's leadership positions on the Florida House and Senate criminal justice committees, respectively, would have repeatedly exposed them and other committee members to information about the racial and socioeconomic makeup of the State's prisons and criminal justice system. Fact Section ¶¶ 117–19; PX893 ¶¶ 28, 194, 200. Likewise, legislators would

211

also have known of these demographics in light of their consideration of Florida's First Step Act, a criminal reform bill spearheaded by Sen. Brandes that received hearings and press coverage in the same session as SB7066. Fact Section ¶ 119.

Moreover, the racial impact of rights restoration was widely reported in Florida. For decades, press reports have described how Florida's practice of felony disenfranchisement disproportionately impacted Black Floridians, *id.* ¶ 118, a disparity also recognized in a recent high-profile court decision, PX893 ¶ 206. During the Amendment 4 campaign itself, especially in 2018, many newspapers reported that Black returning citizens comprised a disproportionately large percentage of the estimated 1.4 million who stood to have their voting rights restored under the Amendment. Fact Section ¶¶ 91–92. It would be inescapable to any legislator who followed the news that adding a restrictive LFO requirement that would limit the reach of Amendment 4 would disproportionately affect Black returning citizens.

In addition to these widespread news accounts, legislators heard directly about the racial impact during the legislative session. Black legislators and members of the public forewarned of the racial impact of SB7066's LFO requirement. PX893 ¶¶ 73, 84, 87, 90, 154, 157, 160–161, 193. 163, 179, 193. Rep. Dotie Joseph, for example, made a statement tracing the history of felony disenfranchisement policies that in

their intent and effect prevented Black citizens from voting, and placed the bill squarely within that shameful tradition. Fact Section ¶ 122; PX893 ¶ 193. In light of the commonly known racial disparities in income and wealth, legislators also raised questions about the bill's economic impact. Fact Section ¶121(c); PX893 ¶ 151. Legislators also raised concerns about the administrative burdens that an LFO requirement would present due to the lack of a centralized system to track LFOs and the inability of State agencies to provide complete information about LFOs to returning citizens. PX893 ¶ 172.

Through committee hearing testimony, letters, and meetings with staff, multiple advocacy organizations also *repeatedly* informed the legislature that the bill would "reproduce a two-tiered level of citizenship, disproportionately impacting low-income and communities of color." Fact Section ¶ 120(b). These organizations demanded that, at minimum, the legislature study the impact of the bill. *See, e.g.*, PX889 at 6–7 (4/22/19 NAACP Letter); DX86 (4/30/19 NAACP Letter).

All told, such contemporaneous statements in the legislative history of SB7066 and its predecessor bills "may be highly relevant" in an inquiry into discriminatory intent. *Arlington Heights*, 429 U.S. at 268. Here, the legislative record contains consistent, yet unheeded, warnings about the discriminatory impact of the LFO requirement.

Although Defendants have pointed to post-legislative-session deposition testimony of Desmond Meade of the FRRC to claim that his organization supported SB7066, ECF 296 at 20–21, during the legislative session, FRRC repeatedly raised the alarm that the bill would "restrict the ability to vote for thousands of Floridians, especially people who are poor, especially people who are people of color," Fact Section ¶ 120(e) (quoting legislative testimony by Neil Volz of FRRC), and would "continu[e] to oppress poor Black and Brown communities," PX893 ¶ 157 (quoting legislative testimony by FRRC's Michael Anderson). The Court must focus on such contemporaneous statements in analyzing legislative intent, "not post hoc justifications." *Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 799 (2017); *see also Glenn v. Brumby*, 663 F. 3d 1312, 1321 (11th Cir. 2011).

That the proponents of SB7066 did not attempt to rebut these charges of racial impact and economic harm, PX893 ¶¶ 154–55, 162, and rejected repeated calls to study the issue, also points toward a finding of discriminatory intent. Rep. Grant's statements refusing to study the bill's impact because he "intentionally wanted to stay blind to the data," *id*. ¶¶ 151–152, 202, are particularly revealing. Such feigned ignorance and deliberate attempts to keep data about impact out of the record are tantamount to an admission of knowledge. "[D]eliberate ignorance is the equivalent of knowledge." *United States v. Schaffer*, 600 F.2d 1120, 1122 (5th Cir. 1979).

Moreover, Rep. Grant's statements—as well as what he heard on and off the legislative floor, in committee meetings, and elsewhere—demonstrate that the reason he sought to prevent impact data from entering the legislative record was to evade future allegations of discrimination. *Compare* PX893 ¶ 152 (quoting Rep. Grant: "[A]s I have repeatedly stated, I did not want to know data, because I did not want anybody to be able to make the allegation that my work product was skewed by any data."), *with McCrory*, 831 F.3d at 230 (holding that North Carolina acted with discriminatory purpose in targeting Black voters with "surgical precision" based, in part, on the General Assembly's request for and receipt of race data that showed Black voters would be disproportionately impacted by the proposed legislation's restrictions on certain voter resources). Legislators' willful avoidance of widely known, but inconvenient, information does not preclude a finding that they had actual knowledge of facts that are "common sense." *Veasey v. Abbott*, 830 F.3d 216, 236 (5th Cir. 2016) (en banc).

Any discussion about an LFO requirement therefore could not be detached from how these known racial disparities and socioeconomic hardships would foreseeably interact with such a requirement. As such, there were strong objective reasons for the legislature to conduct or obtain an analysis of whether and to what extent any LFO requirement would have a disparate racial impact *prior* to its

215

enactment. The legislature's refusal to study the impact strongly suggests an effort

by the bill's proponents to avoid, and indeed hide from, the results.

> iii.   *The Sequence of Events Reveals the Legislature Failed to Lessen SB7066's Known Discriminatory Impact*

"The specific sequence of events leading up to" the passage of SB7066 "also

may shed some light on a decisionmaker's purposes." *Arlington Heights*, 429 U.S.

at 267.

Taken together, the evidence at trial will support the following facts and

inferences. By late April 2019:

(1)    The legislature was aware that an LFO requirement would disproportionately impact Black returning citizens;

(2)    The legislature was aware that there was no central database on LFOs;

(3)    The legislature was aware that determining LFOs would be difficult for returning citizens and State and county officials;

(4)    The legislature was aware that each additional LFO in the bill would increase the time and resources necessary for returning citizens to obtain LFO information from State and county officials;

(5)    Because the legislature knew an LFO requirement would disproportionately impact Black returning citizens, it also knew that adding requirements that would increase time and resources determining LFOs owed would also disproportionately burden Black returning citizens;

(6)    Amendment 4's sponsors and proponents opposed implementing legislation;

(7)    Amendment 4's sponsors and proponents largely opposed an LFO requirement;

216

(8)    Amendment 4's sponsors and proponents directly raised their concerns about the foreseeable racial and socioeconomic impact of enacting any LFO requirement;

(9)    SB7066's key sponsors actively avoided conducting a racial or other impact study despite repeated requests;

(10)   SB7066's key sponsors with executive committee leadership positions in legislative criminal justice committees were simultaneously working on bills, particularly the Florida First Step Act, where they assessed and considered issues of racial disparities in Florida's criminal justice system;

(11)   The legislature knew its proposed modification and waiver provisions were inadequate and ineffectual;

(12)   The legislature rejected amendments to SB7066 that would have lessened the discriminatory impact; and,

(13)    Sen. Brandes introduced a new strike-all amendment that combined the most restrictive LFO provisions into a final bill and procedurally stifled debate, House amendments, and further public advocacy in opposition.

This sequence of events leading to the passage of SB7066, described in more detail below, shows overwhelming community opposition to an LFO requirement because of its discriminatory impact and administrative burdens. This impact was repeatedly brought to the legislature's attention in multiple forums and materials.

Before Amendment 4 passed, the research arm of the legislature, the FIEC held a series of hearings and issued a report in 2016 that identified the administrative problems that would arise from an LFO requirement due to the lack of a central data repository on LFOs and the fact that information on the balance and payments toward restitution was not in any database. Fact Section ¶¶ 106–109.

After Amendment 4's passage, by a supermajority of Florida voters, its sponsors and proponents, including FRRC, maintained that it was self-executing. They requested that Defendant Secretary of State affirm that Amendment 4 did not require implementing legislation and take immediate administrative action to provide guidance to properly administer it. PX893 ¶ 13; PX889 at 2–3.

Contrary to this request, the legislature instead claimed that it needed to pass legislation to be faithful to the will of the voters who passed Amendment 4—a dubious justification that Plaintiffs' expert Dr. Kousser terms the "Faithful Steward Assertion." PX893 ¶ 7. Despite claiming that the legislature had no discretion under Amendment 4, the legislature introduced competing bills: SB7086 in the Senate, principally sponsored by Sen. Brandes, and HB7089 in the House, principally sponsored by Rep. Grant. Fact Section ¶¶ 116–19.

In subsequent hearings on the proposed bills, Florida State agencies again testified about the administrative problems with LFO tracking and records—facts readily apparent to Florida officials at least since the 2016 FIEC hearings. *Id.* ¶ 107; PX893 ¶¶ 168–169, 171–173, 181. In response, Rep. Grant conceded during the legislative session that "no stakeholder in the State of Florida [] can serve as a source of truth that somebody completed all terms of their sentence." Fact Section ¶ 111.

218

As described above, legislators ignored this and other testimony regarding the racial and other impacts of HB7089 and SB7086 and declined to study the issue. PX893 ¶¶ 179, 202; *see also supra* Section VI.B.ii. Instead, the legislature rejected proposed amendments that would have ameliorated the discriminatory impact. *See infra* Section VI.B.iii.

In a superficial response to sustained public criticism of SB7066's LFO requirement, the bill sponsors added alternative definitions of "completion" that purported to allow returning citizens to fulfill their LFOs without full payment. These alternatives, however, including waiver, termination, or modification of the LFO requirement, or conversion to community service, depend entirely on judicial discretion. *See* Fla. Stat. § 98.0751(5)(e)(III). Legislators were informed that these alternatives would be inadequate and ineffectual for multiple reasons, including that they were not available to returning citizens with out-of-state and federal convictions, and that judges may lack authority to waive LFOs that had previously been converted to civil liens. Fact Section ¶ 125; *see also supra* Section V.D. In addition, the community service option—even where available—is extremely burdensome and largely illusory. ECF 207 at 39–40.

At the same time, the legislature rejected amendments that would have defined "completion" of a sentence in a manner that mitigated the restrictive and

discriminatory impact of SB7066's LFO requirement. During consideration of HB7089 and SB7086, both chambers rejected multiple ameliorative amendments:

- An amendment introduced by Rep. McGhee that would have removed the requirement to pay all LFOs, Fact Section ¶ 129;

- An amendment introduced by Rep. Evan Jenne that would have allowed returning citizens to vote if they had set up a payment plan to satisfy LFOs, *id.* ¶ 131;

- Amendments introduced by Senators Randolph Bracy and Perry Thurston that would have excluded any LFO that had been converted to a civil lien from the payment requirement, *id.* ¶ 130; and,

- An amendment introduced by Sen. Brandes that would have excluded fines, fees, and court costs (but not restitution) that had been converted to civil liens, *id.* ¶ 132.

As the legislature was aware based on its past legislative action on this issue, conversion of LFOs to civil liens is a common practice by State court judges that is frequently employed when a criminal defendant cannot afford to pay. ECF 207 at 7; Fact Section ¶ 134. The rejected amendments would have prevented a significant amount of LFO debt from becoming barriers to restoring the right to vote—debt that is more likely to be held by returning citizens who are unable to pay it. PX893 ¶¶ 71,

73, 180, 191; ECF 268-3 at 47:10–49:19 (Scoon Dep.). Instead, the legislature chose to adopt one of the most restrictive LFO iterations proposed.

Moreover, each additional type of LFO included in the bill increased its disenfranchising effect—and exacerbated the impact on Black returning citizens—not only by increasing the amount that must be paid fully before being able to register and vote, but also by increasing the burdens on returning citizens to determine how much they owe in LFOs and how to prioritize paying their disqualifying LFOs. *See* PX893 ¶¶ 22, 164, 167–75, 181. As early as 2016, the State knew that it could not provide reliable or consistent information about LFOs, *id.* ¶¶ 22, 46; Fact Section ¶ 256, and widespread barriers and costs in counties compound these and other burdens, Fact Section ¶¶ 263–73; PX892 at 29–37. Since many of Florida's innumerable LFOs are created by statute, the legislature also had the power to do away with various LFOs entirely to avoid allowing them to become barriers to voting. The legislature's repeated rejection of a more limited LFO requirement or amendments that would have lessened the racial impact of SB7066 supports a finding of discriminatory intent.

Finally, on May 2, 2019, Sen. Brandes introduced a new strike-all amendment which inserted the near-final bill into an entirely separate piece of legislation—SB7066. The strike-all amendment included the most restrictive requirements of the

LFO provision in HB7089 and SB7086 and combined them. Tellingly, the strike-all procedural mechanism stifled meaningful debate, prevented amendments in the House, and deprived the public and advocacy groups of another chance to continue organizing, protesting, and speaking out in opposition to the requirement of full payment of LFOs. Fact Section ¶ 138. Following limited debate on the last day of the session, the House and Senate passed SB7066 along strict party lines, with Republicans voting in favor and Democrats voting against, followed by Republican Governor Ron DeSantis signing SB7066 into law. *Id.* ¶¶ 141–42.

Although employing a strike-all amendment mechanism on the last days of a legislative session may have not broken any procedural rules, its intended effect was clear: to stifle and prevent meaningful engagement. *See McCrory*, 831 F.3d at 228 ("But, of course, a legislature need not break its own rules to engage in unusual procedures."). "This hurried pace," along with refusal to study the discriminatory impact, "the House [having] no opportunity to offer its own amendments before the up-or-down vote," a "vote proceed[ing] on strict party lines," and that the Governor "of the same party as the proponents of the bill" signing it into law, "strongly suggests an attempt to avoid in depth scrutiny." *Id.*

All told, the sequence of events shows a legislature fully aware of the racially discriminatory impact of SB7066's LFO requirement and the administrative burdens

that magnified this impact, as well as supporters of Amendment 4 arrayed against the LFO requirement. In response, the proponents of the bill rejected amendments to lessen the harm, added ineffectual fig-leaf solutions, and employed procedural maneuvering to stifle debate. This chronology strongly supports a finding of discriminatory intent.

> *iv. The Legislature Hid Its Effort to Suppress Black Political Participation Behind Tenuous Justifications*

Another factor probative of discriminatory intent is the tenuousness of Defendants' policy interests underlying SB7066's LFO requirement. The disconnect between SB7066's LFO requirement and the issues Defendants claim it addresses further supports an inference of an impermissible motive. Indeed, the legislature's many and shifting rationales are probative of discriminatory intent because they "fail to correspond in any meaningful way" to the enacted legislation. *Veasey*, 830 F.3d at 263.

First, the claim that SB7066 did nothing more than implement the will of the voters who passed Amendment 4 cannot withstand scrutiny. PX893 ¶¶ 7, 86. During the legislative session, Amendment 4's sponsors and proponents advocated against any implementing legislation for Amendment 4 because its mandatory provisions were self-executing. Fact Section ¶ 104. Further, rather than being constrained by the clear will of the voters, the legislature exercised ample discretion in structuring

223

SB7066's LFO provisions. *Id.* ¶¶ 126, 140; PX893 ¶ 68. Proponents of the bill admitted that they were not limited to only one formulation that would accord with the will of the voters; indeed, Sen. Brandes explained during a Senate hearing that previous bills with different requirements for paying LFOs before a returning citizens' voting rights would be restored all comported with the "will of the electorate." Fact Section ¶ 140. Armed with this discretion, the legislature chose the most unduly restrictive version of an LFO requirement. PX893 ¶¶ 166, 191.

Furthermore, Dr. Kousser's report systematically rebuts any purported will-of-the-voters justification (*i.e.*, the Faithful Steward Assertion). As part of Dr. Kousser's analysis, he conducts a systematic analysis of 55 articles in ten major Florida newspapers that discussed "felon voting" and contained explicit or implicit reference to sentences from October 1 through November 7, 2018 (the day after the election). *Id.* ¶¶ 54–55, tbl.2. These newspaper articles represent the most systematic source of the definition of "sentence" that was presented to voters before they cast their ballots on Amendment 4. *Id.* ¶¶ 33–37. Dr. Kousser's unrebutted analysis establishes that almost no voters were exposed to a definition of "completion of sentence" as restrictive as the definition enacted in SB7066. Fact Section ¶¶ 94–95, 140. He demonstrates that (1) Amendment 4's proponents took different positions on LFOs during its campaign, rarely referencing that it required payment of all LFOs

(at most restitution), (2) the FIEC determined that Amendment 4 was "unclear," (3) legislators disagreed on terms of SB7066 and its predecessor bills, (4) legislators believed that alternative and less restrictive LFO requirements would comport with the will of the voters, and (5) legislators and Amendment 4's sponsors and proponents disagreed with the need for and opposed an LFO requirement. PX893 ¶¶ 38–85. For all these reasons, any contention that in passing SB7066's LFO requirement, the legislature was merely implementing the clear requirements of Amendment 4 should be rejected as pretextual.

Second, Defendants' contention that SB7066's LFO requirement was necessary to remove "subjectivity" and provide objective guidelines and "truth" is easily disproven. *Id*. ¶ 211. As described above, the legislature knew that there was *no* single centralized database for LFOs and *no* consistent processes set out for the eleven different databases with potentially relevant LFO information. *Supra* Section VI.B.i–ii; PX893 ¶ 211. Dr. Burch's expert report reveals that even today Florida cannot provide reliable or consistent information about what LFOs returning citizens may owe, and the policies for accessing LFO information are burdensome and vary across the 67 counties. PX892 at 7–16. The desire for "objectivity and uniformity" was as untenable during the 2019 legislative session as it is today.

Third, any argument that SB7066's LFO requirement was justified because the waiver and modification provisions expanded voting rights is easily defeated. *See* ECF 296 at 17–18. Because the legislature enacted a more restrictive requirement for restoration of voting rights than Amendment 4 mandates, the need for SB7066's purported modification and waiver provisions was self-created. Nevertheless, as discussed above, these purported alternatives to payment of LFOs are unavailable for many returning citizens. Fact Section ¶ 125. The paltry, ineffectual nature of these provisions belies the State's assertion that the legislature took meaningful steps to limit the harsh consequences of SB7066.

Defendants belatedly raise yet another unsupported justification for SB7066's LFO requirement: incentivizing payment of LFOs. Appellant's Brief, *Jones v. DeSantis*, No. 19-14551 (Dec. 13, 2019) at 28–29. This "post hoc justification[]" was never advanced during the 2019 legislative session and should be rejected. *Bethune-Hill*, 137 S. Ct. at 799. Indeed, during the legislative session, Rep. Grant asserted that it would be "offensive" to suggest "that revenue is a good incentive for people to get their voting rights back." Apr. 4, 2019 House State Affairs at 4:02:17. Regardless, the legislature knew that a majority of returning citizens are unable to pay their LFOs and therefore could not be incentivized in this manner; furthermore, restoring their voting rights did not relieve them of their obligation to pay LFOs. As

the Eleventh Circuit has now concluded, Florida has no real collection interest for individuals, "who despite their best efforts, are genuinely unable to pay." *Supra* Section I.[25]

> ### v. SB7066 Builds Upon Florida's History of Voting Discrimination

As Defendants agree, a decision's historical background is relevant to showing discriminatory intent. ECF 286 at 27; *Arlington Heights*, 429 U.S. at 267. Plaintiffs' evidence establishes that SB7066's LFO requirement is a continuation of

---

[25] Any defense that SB7066 was motivated by partisan concerns, or that any such partisan concerns would preclude the concurrent existence of a discriminatory purpose, must fail. The evidence at trial will show that support for SB7066 fell along party lines, with Republican legislators supporting it and Democratic legislators opposing. This partisan split may have been driven in part by the perception, frequently reported in the media, that Amendment 4's re-enfranchisement of a disproportionately Black population of returning citizens would harm Republican electoral fortunes. PX893 ¶¶ 14, 88–89, 132–133, 135, 142–143, 148, 176. But, as in *LULAC v. Perry*, the means the legislature chose for attempting to skew political power in Florida was the minimization of Black political participation, and that establishes that discriminatory purpose was at least a motivating factor for the passage of SB7066. *See* 548 U.S. at 442 (criticizing "the troubling blend of politics and race" that characterized the Texas congressional redistricting plan that the Court found to have a discriminatory purpose); *Cooper v. Harris*, 137 S. Ct. 1455, 1473 n.7 (2017) ("In other words, the sorting of voters on the grounds of their race remains suspect even if race is meant to function as a proxy for other (including political) characteristics.").

the well-established and judicially recognized history of racial discrimination against Black voters in Florida. *See Rogers*, 458 U.S. at 625–26.

Despite Defendants' claims that Plaintiffs rely only on historical evidence "from more than one-hundred years ago." ECF 296 at 18, the record evidence shows Florida's very recent history of voting-related discrimination, which SB7066 builds upon. From 1985 through 2012, the Florida legislature attempted at least five changes to state election laws that the federal government or a federal court rejected because those changes had a discriminatory purpose or effect in violation of Section 5 of the Voting Rights Act. Fact Section ¶ 70; PX907 at 70:03–08 (Adkins Dep.); *see, e.g.*, *Florida v. United States*, 885 F. Supp. 2d 299, 351, 357 (D.D.C. 2012) (three-judge court) (finding that Florida's proposed changes to its early-voting laws were discriminatory); U.S. Dep't of Justice, Civil Rights Div., Voting Determination Letters for Florida (Aug. 7, 2015), https://www.justice.gov/crt/voting-determination-letters-florida.

Florida's pattern of electoral manipulation and voter suppression, including against racial minorities and other vulnerable groups, has continued to this day. Fact Section ¶ 71; *see*, *e.g.*, *Democratic Exec. Comm. of Fla. v. Lee*, 915 F. 3d 1312, 1320–21, 1331 (11th Cir. 2019) (holding that a state law was unconstitutional because it had led to the rejection of absentee ballots due to alleged signature

mismatches); *Rivera Madera v. Detzner*, 325 F. Supp. 3d 1269, 1278 (N.D. Fla. 2018) (finding that Florida's failure to provide voting materials in Spanish violated the Voting Rights Act); *League of Women Voters v. Detzner*, 314 F. Supp. 3d 1205, 1216 (N.D. Fla. 2018) (enjoining the State from categorically barring early-voting sites at colleges because it "lopsidedly impacts Florida's youngest voters"). This recent history of judicial decisions and Section 5 objections is highly relevant. *See McCrory*, 831 F.3d at 223–24.

Racial discrimination has been particularly pervasive in voting rights restoration, an area where the State has repeatedly failed to keep its commitment to returning citizens. Prior to Amendment 4, the only avenue for rights restoration was the clemency process, which "depended entirely on the policies and often whims of the governor and the other three members of the Executive Clemency Board." PX893 ¶¶ 91–93, 103; Fact Section ¶ 61. As former Governor Rick Scott said, in the clemency process, "We can do whatever we want." PX893 ¶ 91. As described above, the number of clemency applications granted starkly declined over the years and this route has largely been illusory for Black returning citizens. *Id.* ¶ 103 fig.2. Furthermore, after regaining their voting rights, many returning citizens were wrongly purged from the rolls in the 1990s and early 2000s, actions that appeared to have a racial disparate impact. Fact Section ¶¶ 62–64.

Against this background, legislators—almost all of whom were Black—introduced numerous bills to reform Florida's felony disenfranchisement regime. Fact Section ¶ 74. From 1998 through 2018 legislators introduced 53 bills, representing "an issue of particular concern to black legislators and the communities they represented." *Id*. None passed. *Id*.

Amendment 4's passage came after more than 20 years of unsuccessful legislative efforts and lawsuits, inconsistent use of executive clemency power, purges of returning citizens from voter rolls, and failed advocacy to ease restrictions on the voting rights of returning citizens—frustrating setbacks in the effort to combat a long and well-documented history of Black voter disenfranchisement. *Id*. ¶¶ 60–75. Passage of SB7066 cannot be detached from this history.

\* \* \*

In sum, the evidence demonstrates that SB7066's LFO requirements were enacted with a discriminatory purpose, and that the legislature adopted this legislation because of, and not simply in spite of, its discriminatory impact on Black

returning citizens. Defendants have failed to show that SB7066 would have been enacted without race discrimination as a motivating factor.[26]

## VII.   SB7066 Unduly Burdens the Voting Rights of Low-Income Women of Color

Low-income women of color simultaneously represent three of the classifications the Supreme Court has granted the strongest constitutional protections. *See, e.g.*, *Johnson v. California*, 543 U.S. 499, 505 (2005) (race); *United States v. Virginia*, 518 U.S. 515 (1996) (gender); *Bearden v. Georgia*, 461 U.S. 660 (1983) (socioeconomic status). Plaintiffs incorporate by reference their prior briefing in support of their gender-based equal protection and Nineteenth Amendment claims. *See* ECF 286 at 63–69.

While there are very few voting rights cases or studies that focus on a law's particular impact on women,[27] courts have adopted a balancing test to election law challenges that have an undue burden on certain subgroups, *Anderson*, 460 U.S.

---

[26]   Defendants' rebuttal expert to Dr. Kousser, Dr. Mary Adkins, conceded that she is not offering any opinions on whether SB7066 was motivated by racial discrimination. PX907 21:07–17, 45:01–03, 22:05–12 (Adkins Dep.).

[27] *See, e.g.*, *Ball v. Brown*, 450 F. Supp. 4 (N.D. Ohio 1977) (challenging law that automatically removed women from the voter registration rolls upon marriage); Michael J. Pitts, *Empirically Measuring the Impact of Photo ID Over Time and Its Impact on Women*, 48 INLR 605 (2015).

at 780; struck down laws for being unduly burdensome on women, *Planned Parenthood of Southeastern, PA v. Casey*, 505 U.S. 833 (1992); and rejected policies that bear a disproportionate burden on one gender over another, *Wengler v. Druggists Mut. Ins. Co.*, 446 U.S. 142 (1980) (striking down workers' compensation death benefits policy that required widowers but not widows to present proof of financial dependence on deceased spouse). These decisions encapsulate contexts in which the legislative intent might not have been to harm one gender over another, but the law's impact does just that. *See Hobson v. Pow*, 434 F. Supp. 363, 366 (1977) (recognizing that "the principle of equal protection is violated when different punishment for offenses is grounded merely on the basis of gender").

Moreover, Plaintiffs have brought a separate Nineteenth Amendment claim because it specifically protects *women* from any election law that denies or diminishes their right or ability to vote. In fact, despite the enactment of the Fourteenth and Fifteenth Amendments, it took the passage of the Nineteenth Amendment before several states would allow a woman to cast a ballot. *See* Reva B. Siegel, *She the People: The Nineteenth Amendment, Sex Equality, Federalism, and the Family*, 115 Harv. L. Rev. 947 (2002) (laying out the history of women's suffrage and advancing a "synthetic reading" of the Fourteenth and Nineteenth Amendments).

232

Because women are discriminated against and marginalized in other areas of economic life, imposing a monetary requirement in order to vote has an even more harmful impact on them. Just as race, age, and class often receive rigorous protections in the voting rights context, so too do women deserve the enforcement of a constitutional provision designed specifically to address their unique circumstances. In fact, courts should be especially critical of an election law that burdens a group that is already facing multiple layers of discrimination. Therefore, the Nineteenth Amendment has been and remains an important source of legal protection, especially for women of color.

SB7066 uses LFOs as a proxy to keep a significant number of women barely above, just at, or below the poverty line from voting. Furthermore, the failure to acknowledge and account for the economic disparities that contribute to the gender wage gap will open the door for even more class-based laws like SB7066. Without such legal protections, Plaintiffs McCoy and Singleton will never have their political voices heard in the most effective way—through the ballot box.

## VIII. <u>SB7066 Violates the Eighth Amendment's Prohibition on Excessive Fines</u>

Plaintiffs reincorporate their prior briefing, *see* ECF 286 at 71–76, and reassert that by conditioning a returning citizen's right to vote on payment of LFOs imposed pursuant to a previous criminal conviction, SB7066 constitutes punishment grossly

disproportionate to any conceivable goals of justice in violation of the Eighth Amendment's prohibition on excessive fines.

In *Timbs*, 139 S. Ct. 682, the U.S. Supreme Court explained that "the protection against excessive fines guards against abuses of government's punitive or criminal-law-enforcement authority" and "has been a constant shield throughout Anglo-American history[, as e]xorbitant tolls undermine other constitutional liberties." *Id.* at 686, 689 (incorporating Excessive Fines Clause as applicable to the states). Fines may be excessive where they are utilized "in a measure out of accord with the penal goals of retribution and deterrence," particularly where state and local governments across the country rely heavily on fines and fees as a source of revenue. *Id.* at 689 (quoting *Harmelin*, 501 U.S. at 979, n.9).

The principles of an excessive fines claim apply broadly, where the Eighth Amendment "limits the government's power to extract payments, whether in cash or in kind, as punishment for some offense." *United States v. Bajakajian*, 524 U.S. 321, 328 (1998) (citations and quotation marks omitted).[28] "The notion of

---

[28] The U.S. Supreme Court has clarified that the Excessive Fines Clause "was intended to limit only those fines directly imposed by, and payable to, the government." *Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal*, Inc., 492 U.S. 257, 268 (1989).

punishment, as we commonly understand it, cuts across the division between the civil and the criminal law." *Austin v. United States*, 509 U.S. 602, 610 (1993) (citation and quotation marks omitted). To determine whether the sanction at issue is subject to the Eighth Amendment's prohibition on excessive fines, a court must determine whether the sanction "serv[es] *in part* to punish."[29] *Id.* at 610 (emphasis added). Thus, to be within reach of the Excessive Fines Clause, a sanction can be civil or criminal in nature, and it may also serve a remedial purpose, so long as it can "be explained as serving in part to punish." *Id.*

Once the court determines that the sanction at issue is partially punitive, it must then review the proportionality of the penalty imposed and determine whether it is excessive. *United States v. One Parcel Prop. Located at 427 & 429 Hall St., Montgomery, Montgomery Cty., Ala.*, 74 F.3d 1165, 1172 (11th Cir. 1996). Courts looks to the offense for which the owner of the property is being punished and compare the severity of the fine with the seriousness of the underlying offense. *Id.* "[A] punitive forfeiture violates the Excessive Fines Clause if it is grossly

---

[29] The Supreme Court in *Austin v. United States* held that the test articulated in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69 (1963), for determining whether a sanction is punitive for an ex post facto claim was not the relevant inquiry in an excessive fines claim. 509 U.S. 602, 610 n.6 (1993).

disproportional to the gravity of a defendant's offense." *Bajakajian*, 524 U.S. at 334. But the Eleventh Circuit has noted that "the relevant factors will vary from case to case." *One Parcel Prop.*, 74 F.3d at 1172.

### A. SB7066 Is Subject to the Eighth Amendment Because It Serves To Punish in Purpose and in Practice

SB7066 satisfies the "partially punitive" test. As explicitly recognized in *Jones*, 950 F.3d at 812, SB7066 constitutes punishment, and those who are unable to pay their LFOs "are punished more harshly than those who committed precisely the same crime—by having their right to vote taken from them likely for their entire lives." As noted by the Eleventh Circuit, Defendants themselves argued that SB7066 furthers the State's punitive interests by continuing to punish people with felony convictions by withholding their right to vote until they pay off outstanding LFOs. *See id.* at 810–11. Indeed, the purpose of SB7066 is to define the terms of one's *criminal* sentence to include legal financial obligations and provide that to be eligible to register to vote, a Floridian with a prior felony conviction (that is not murder or a felony sexual offense) must have paid in full all fines, fees, costs, and restitution ordered by the court as part of their criminal sentence or as a condition of any form of supervision, even when a court has converted those financial obligations to a civil judgment. Fla. Stat. § 98.0751(2)(a)(5).

The legislative history of SB7066 and its House companion bill demonstrate that it is at least partially punitive. *See* Facts Section ¶ 127 (Rep. Grant referring to "fines, fees, [and] court costs" as "punishment for a crime" and opposing payment plan amendment as "an affront to Florida voters" and noting that for criminal defendants who must pay off restitution before being eligible to register to vote under SB7066, "this person isn't being punished because they're poor, this person is being punished because they caused that amount of damage").[30] Finally, SB7066 invokes the state's criminal power to punish by prohibiting returning citizens from registering to vote unless and until they have fully paid LFOs that were imposed as part of a criminal sentence, even when those LFOs have been removed from the criminal court's jurisdiction and converted to a civil lien. Fla. Stat. § 98.0751(2)(a)(5). Thus, even if it can be said to have a non-punitive purpose, SB7066 serves at least in part to punish and is therefore a sanction subject to the Eighth Amendment. *See Bajakajian*, 524 U.S. at 328 (holding that statute directing

---

[30] In *Paroline v. United States*, 572 U.S. 434, 456 (2014), the U.S. Supreme Court noted that restitution, though paid to a victim, likely implicates the Excessive Fines Clause because it is "it is imposed by the Government at the culmination of a criminal proceeding and requires conviction of an underlying crime. Thus, despite the differences between restitution and a traditional fine, restitution still implicates the prosecutorial powers of government." *Id.* (citations and quotation marks omitted).

forfeiture of currency as additional sanction for violation of reporting requirement is punishment subject to Excessive Fines Clause); *United States v. Dicter*, 198 F.3d 1284, 1292 (11th Cir. 1999) (applying Excessive Fines Clause to forfeiture of defendant's medical license incident to his conviction for over 200 drug crimes).

### B. Denying the Right to Vote to Returning Citizens Who Have Failed to Pay LFOs Is a Grossly Disproportionate Penalty, Especially for Those Too Poor to Pay

Given the "offense" for which returning citizens are being punished, namely, failure to pay LFOs imposed in their criminal cases, the next question is whether the punishment—denial of the right to vote until the LFOs are paid in full—is excessive. Denying a returning citizen the right to vote as punishment is wholly out of proportion to the transgression of failing to pay off LFOs imposed as part of a prior criminal sentence, especially when the returning citizen is too poor to pay.

A court looks to three factors to determine the excessiveness of a punishment: "(1) whether the defendant falls into the class of persons at whom the criminal statute was principally directed; (2) other penalties authorized by the legislature (or the Sentencing Commission); and (3) the harm caused by the defendant." *United States v. Sperrazza*, 804 F.3d 1113, 1127 (11th Cir. 2015) (quoting *United States v.*

*Browne*, 505 F.3d 1229, 1281 (11th Cir. 2007) (summarizing *Bajakajian*)).[31] In *Bajakajian*, 524 U.S. at 336–37, the Court held that forfeiture of $357,144 the defendant failed to report in violation of a criminal reporting statute was grossly disproportionate in violation of the Excessive Fines Clause because the defendant did not fit the class of persons for whom the statute was designed—money launderers, tax evaders, and drug traffickers; the maximum penalty under the criminal statute was six months in prison and a $5,000 fine; and the harm the defendant caused the government was minimal as no money was lost. *See also United States v. Ramirez*, 421 F. App'x 950, 952 (11th Cir. 2011) (finding that forfeiture of $967,100 for reporting offense would have been grossly disproportionate in violation of Excessive Fines Clause).

Here, like the fine in *Bajakajian*, SB7066 is grossly disproportionate for returning citizens too poor to pay LFOs. First, as explained above, the purpose of

---

[31] The U.S. Supreme Court put this test in a broader context by explaining that in cases where the Court imposes limits on punishments that are grossly disproportional to the gravity of the offense, the Court has focused on the same three criteria: (1) the degree of the defendant's reprehensibility or culpability; (2) the relationship between the penalty and the harm to the victim caused by the defendant's actions; and (3) the sanctions imposed in other cases for comparable misconduct. *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 435 (2001) (citing *Bajakajian*, 524 U.S. at 334).

SB7066 is to prevent returning citizens from voting until they have fully paid all LFOs associated with their criminal sentences, which can only be effective for those with the ability to pay who are willfully not paying. Thus, just as the defendant was not the intended target of the law in *Bajakajian*, returning citizens too poor to pay LFOs were not the intended targets of SB7066's punitive purpose. *See United States v. One Single Family Residence Located at 18755 N. Bay Rd., Miami*, 13 F.3d 1493, 1498 (11th Cir. 1994) (holding that forfeiture of individual's $150,000 home was disproportionate penalty in violation of Excessive Fines Clause where he was convicted for using personal home for illegal gambling but criminal statute was aimed at syndicated operations).

*Second*, Florida law separately protects individuals from being punished for inability to pay LFOs. Those who do not pay their LFOs may only be held in contempt by a sentencing court if the court determines their failure to pay is willful. *See Del Valle v. State*, 80 So. 3d 999, 1005–06 (Fla. 2011) (citing *Bearden*, 461 U.S. at 664). And those whose LFOs have been converted to civil liens are subject to civil collection penalties only if they willfully fail to pay, including judgments on real or personal property. *See* Fla. Stat. Ann. § 938.30. But for those too poor to pay their LFOs, Florida law prevents a finding of contempt for failure to pay, *Del Valle*, 80 So. 3d at 1005–06, and a judge can convert financial obligations into community

service for a person if they determine a person is unable to pay LFOs that have been converted into civil liens, Fla. Stat. Ann. § 938.30(2). Accordingly, the existing penalties for those too poor to pay off their LFOs already set a ceiling on punishment that is in no way comparable to the punishment exacted by SB7066—loss of the right to vote. *See Bajakajian*, 524 U.S. at 336–37.

*Finally*, returning citizens who could not afford to pay their LFOs before SB7066 cause no harm when they continue to be unable to pay now that SB7066 strips them of their right to vote. SB7066's punishment is wildly disproportionate to the "offense" of a returning citizen who is too poor to pay off their LFOs. *See id.* (defendant's actions in reporting crime caused relatively little harm to government).

Plaintiffs Rosemary McCoy's and Sheila Singleton's situations illustrate the gross disproportionality of SB7066's LFO requirement. Ms. McCoy and Ms. Singleton were ordered to pay costs and fees as part of their criminal sentence, $666 for Ms. McCoy and $771 for Ms. Singleton, payable to the Duval County Clerk of Court and distributed to numerous state and county funds. Fact Section at ¶¶ 182–83. They were also ordered to pay restitution, $6,400 for Ms. McCoy and $12,110.81 for Ms. Singleton, payable to the Duval County Clerk of Court and distributed to the victim and the "Victim Compensation Trust Fund" run by the state. *Id.* ¶¶ 167–68. Each order of restitution continues to accrue interest, and as of March 4, 2020, Ms.

241

McCoy owes an additional $1,406.72 in interest and Ms. Singleton owes an additional $3,245.12 in interest. *Id.* ¶ 18; PX897 at 2 (Duval County Clerk of Courts Receipt – Singleton & McCoy).

For both women, their criminal records have made it extremely difficult to obtain gainful employment and satisfy their LFOs. Fact Section ¶ 18.

Punishing Ms. McCoy and Ms. Singleton—and those similarly situated—by denying them their right to vote unless and until they pay off these LFOs—penalizes them for their poverty and is grossly disproportionate to any punitive purpose SB7066 has for returning citizens who are found to be willfully not paying LFOs. Tying payment of their outstanding LFOs to Ms. McCoy's and Ms. Singleton's ability to vote bears no relation to their existing inability to pay, and preventing them—and those like them—from voting until they pay off these sums that fund the state is not a proper or proportional exercise of the state's power to extract payment as punishment. *See Harmelin*, 501 U.S. at 978 n.9 ("There is good reason to be concerned that fines, uniquely of all punishments, will be imposed in a measure out of accord with the penal goals of retribution and deterrence. Imprisonment, corporal punishment, and even capital punishment cost a State money; fines are a source of revenue. As we have recognized in the context of other constitutional provisions, it makes sense to scrutinize governmental action more closely when the State stands

242

to benefit."). Accordingly, SB7066 violates the Eighth Amendment's prohibition on excessive fines.

### IX.   The Court should reject Defendants' attempts to invalidate Amendment 4

Defendants argue that the LFO requirement in Amendment 4, as interpreted by the Florida Supreme Court, is exactly coterminous with SB7066 *and* that an LFO requirement in Amendment 4 is inseverable from the rest of the Amendment. Thus, Defendants argue that if Plaintiffs succeed on any of their constitutional claims with respect to SB7066, the appropriate remedy would be to invalidate Amendment 4. This argument fails for two reasons. First, the Eleventh Circuit held that "under Florida law the unconstitutional application of the LFO requirement is *easily severable* from the remainder of Amendment 4 . . . ." *Jones*, 950 F.3d at 808 (emphasis added); *see also id*. at 831 n.13; *id*. at 832. None of the evidence Defendants will produce at trial is sufficient to overcome this finding. Second, a severability analysis with respect to Amendment 4 is unnecessary because the Court can remedy Plaintiffs' claims by simply enjoining SB7066's definition of "completion" of LFOs.

### A. The LFO requirement is severable from Amendment 4

The Eleventh Circuit held that "the unconstitutional application of the LFO requirement is *easily severable* from the remainder of Amendment 4[.]" *Jones*, 950

F.3d at 808 (emphasis added); *see also id*. at 831 n.13; *id*. at 832. Both the Eleventh Circuit and the Florida Supreme Court have held that "Florida law clearly favors (where possible) severance of the invalid portions of a law from valid ones," *see, e.g.*, *id*. at 831; *Ray v. Mortham*, 742 So. 2d 1276, 1280 (Fla. 1999), because the purpose of severability is to preserve the constitutionality of existing law, including with respect to citizen-initiated constitutional amendments. *Ray*, 742 So. 2d at 1281 ("[W]e must afford no less deference to constitutional amendments initiated by our citizens and uphold the amendment if, after striking the invalid provisions, the purpose of the amendment can still be accomplished."). Amendment 4's purpose of ending lifetime disenfranchisement for returning citizens through automatic rights restoration must continue, even in the absence of SB7066's LFO requirement.

Plaintiffs incorporate by reference their previous briefing on this issue. *See* ECF 121 at 15–26. As Plaintiffs have already demonstrated, the LFO requirement is severable because all four of the necessary factors under Florida law have been met. *Id.* Floridians' overall purpose in enacting Amendment 4 was to end permanent disenfranchisement for all Floridians other than those convicted of murder or a

felony sexual offense.[32] *Id.* at 19–22; *see also* Br. of Raysor Appellees, *Jones v. Governor of Fla*, No. 19-14551 at *59–61 (11th Cir. Jan. 10, 2020). SB7066's LFO requirement contravenes this purpose. *See* Br. of Raysor Appellees, *Jones v. Gov. of Fla*, No. 19-14551 at *59–61 (demonstrating that excising the LFO requirement would ensure that individuals with non-disqualifying convictions, like Diane Sherrill, and those similarly situated, are not permanently disenfranchised due to their inability to pay off their LFOs).

Moreover, the LFO requirement is not "so inseparable in substance" from incarceration and supervision such "that it can be said [Florida voters] would not have passed the one without the other." *Ray*, 742 So. 2d at 1283; *see also* ECF 121 at 25–26, incorporated by reference. "[I]t is the State's burden to show that Amendment 4 would not have been adopted absent the unconstitutional application of the LFO requirement to those unable to pay," *Jones*, 950 F.3d at 832 (citing *Ray*, 742 So. 2d at 1281). Defendants failed to carry this burden on the preliminary record,

---

[32] Amendment 4's principle sponsor agrees. ECF 173-1 at 6 (Br. of FRRC as Amicus Curiae) (noting Amendment 4 endeavors "to end permanent disenfranchisement in Florida for all felonies other than murder and felony sexual offense[s]"); *see also id*. at 19 ("Floridians' decision to automatically restore voting rights constitutes a vote to *end* permanent disenfranchisement.") (emphasis in original).

*see id.* (finding the State's arguments "speculative"), and are no more able to do so at trial.

Defendants offer no "concrete evidence," *Jones*, 950 F.3d at 832, that voters would have rejected Amendment 4 but for an implicit understanding that it would require payment of LFOs as a condition of rights restoration. Nor are their arguments—which run counter to both academic theory and common sense—persuasive. *Id.* As Dr. Donovan's expert report and testimony will show, the assertion by Defendants' expert that limited, stale survey data from 2013 and 2014 demonstrates that voters in 2018 would not have enacted Amendment 4 but for an LFO requirement is not supported by any accepted academic theory or methodology, and indeed is contradicted by that expert's own studies. *E.g.*, PX886 at 22–25 (Donovan Rebuttal Report). Indeed, Defendants' expert offers no evidence that an average voter would have understood there to have been any financial requirements associated with completion of a sentence—and certainly no understanding of what should occur if a person is unable to pay. Defendants suggest that a handful of statements by Amendment 4's proponents indicating rights restoration would be conditioned upon payment of restitution conclusively establish that voters would not have enacted Amendment 4 but for an LFO requirement. But, as both Dr. Donovan's and Dr. Kousser's reports and testimony will demonstrate, this assertion ignores the

myriad other influences and sources of information that inform voting behavior. *E.g.*, *id.* at 10–19; PX893 at ¶¶ 27–28, 30–33, 39–42, 44–45, 50 (Kousser Report). Dr. Kousser's systematic review of major Florida newspaper publications' description of Amendment 4 just before the November 2018 elections demonstrates that the ballot campaign did not focus on or uniformly inform voters that rights restoration would hinge on payment of LFOs; in fact, a super-majority of the articles did not identify Amendment 4 as being tied to any LFO requirement. Facts Section ¶¶ 93–95. Defendants evidence is speculative at best, and thus insufficient to demonstrate that "enough Florida voters would have voted differently if they knew Amendment 4 could not be used to exclude" voters who had "otherwise completed their sentences" because to do so would run afoul of the Constitution's prohibition on wealth discrimination. *Jones*, 950 F.3d at 832. Defendants' own expert agrees. PX906 at 84:23–85:12 (Barber Dep.) (in response to question whether Amendment 4 would not have passed if "all terms of sentence" language were not included: "I can't say that. I don't think anyone can say that.").

Finally, the first and fourth factors establishing severability "are presumed to be satisfied 'in almost any case,'" and are met here. *Jones*, 950 F.3d at 832 (holding that the LFO requirement "can obviously be excised, leaving Amendment 4 as a complete act").

247

**B. The Court Can Grant Plaintiffs' Relief Without Implicating Amendment 4 by Enjoining SB 7066's Definition of "completion" With Respect to LFOs**

Defendants argue that Amendment 4 and SB7066 are coterminous, such that any unconstitutional provision of SB7066 necessarily renders Amendment 4 unconstitutional as well. Not so. In advising the Governor on the meaning of "all terms of sentence" as used in Amendment 4, the Florida Supreme Court expressly declined to address the meaning of the term "completion." *See Advisory Op. to the Gov. Re: Implementation of Amendment 4*, 288 So. 3d 1070, 1075 (Fla. 2020). ("[T]he Governor requests advice solely as to the narrow question of whether the phrase 'all terms of sentence' includes LFOs ordered by the sentencing court. We answer only that question."); *see also* Oral Argument, *Advisory Op. to the Gov. Re: Implementation of Amendment 4*, SC19-1314, at 16:47–17:19 (Fla. Nov. 6, 2019).[33] (Governor's counsel acknowledging no determination sought of the meaning of "completion"). Indeed, the Court specifically noted during oral argument that it could *avoid* placing Amendment 4 in conflict with the U.S. Constitution by declining to define "completion." *Id.* at 1:13:58–1:14:11 (colloquy with Luck, J.).

---

[33]    *Available at*:    https://thefloridachannel.org/videos/11-6-19-florida-supreme-court-oral-arguments-advisory-opinion-to-the-governor-re-implementation-of-amendment-4-the-voting-restoration-amendment-sc19-1341.

As such, the only definition of "completion" with respect to LFOs is found in SB7066, which requires full payment either in cash or in hours worked, or modification of the sentence at the discretion of the court and the payee. Fla. Stat. § 98.0751(5)(e). If the Court finds that SB7066's definition of "completion" with respect to LFOs is unconstitutional, either in whole or in part, it can simply enjoin the requirement to the extent of its unconstitutionality.[34] *See, e.g.*, *Pine v. City of W. Palm Beach, Fla.*, 762 F.3d 1262, 1270–71 (11th Cir. 2014) (when "faced with more than one plausible interpretation of a law," court should assume the legislature did not intend "the alternative which raises serious constitutional doubts"). Thus, no severability analysis is necessary, and Defendants' ostensibly reluctant urgings to strike Amendment 4 in its entirety should be rejected.

---

[34] Indeed, Florida law requires that courts construe the law to avoid infirmity if that construction contravenes neither the law's text nor purpose. *Pine*, 762 F.3d at 1270–71 (citations omitted); *see also State v. Presidential Women's Ctr.*, 937 So. 2d 114, 116 (Fla. 2006) ("[W]e adhere to the principle that '[w]hen two constructions of a [law] are possible, one of which is of questionable constitutionality, the [law] must be construed so as to avoid any violation of the constitution.'").

## CONCLUSION

For the foregoing reasons, based on the evidence presented herein, and based on the evidence to be presented at trial, Plaintiffs respectfully request that the Court enter final judgment in their favor and against Defendants on all claims.


**Date: April 14, 2020**

Respectfully submitted,

*/s/ Julie A. Ebenstein*
Julie A. Ebenstein (Fla. Bar No. 91033)
R. Orion Danjuma*
Jonathan S. Topaz*
Dale E. Ho**
American Civil Liberties Union
Foundation, Inc.
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 284-7332
jebenstein@aclu.org
odanjuma@aclu.org
jtopaz@aclu.org
dho@aclu.org


Sean Morales-Doyle*
Eliza Sweren-Becker*
Myrna Pérez
Wendy Weiser
Brennan Center for Justice at NYU
School of Law
120 Broadway, Suite 1750
New York, NY 10271
Tel: (646) 292-8310

Leah C. Aden*
John S. Cusick*
NAACP Legal Defense and
Educational Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
Tel: (212) 965-2200
laden@naacpldf.org
jcusick@naacpldf.org

Jennifer A. Holmes*
NAACP Legal Defense and
Educational Fund, Inc.
700 14th Street, N.W.,Suite 600
Washington D.C. 20005
Tel: (202) 682-1300
jholmes@naacpldf.org

Pietro Signoracci*
David Giller*
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas

wendy.weiser@nyu.edu
myrna.perez@nyu.edu
sean.morales-doyle@nyu.edu
eliza.sweren-becker@nyu.edu

New York, NY 10019
Tel: (212) 373-3000
psignoracci@paulweiss.com
dgiller@paulweiss.com

Daniel Tilley (Fla. Bar No. 102882)
Anton Marino (Fla. Bar No. 1021406)
American Civil Liberties Union of
Florida
4343 West Flagler St., Suite 400
Miami, FL 33134
Tel: (786) 363-2714
dtilley@aclufl.org
amarino@aclufl.org

*Counsel for Gruver Plaintiffs*

/s/ *Nancy G. Abudu*
Nancy G. Abudu (Fla. Bar No. 111881)
Caren E. Short*
Southern Poverty Law Center
P.O. Box 1287
Decatur, GA 30031-1287
Tel: (404) 521-6700
nancy.abudu@splcenter.org
caren.short@splcenter.org

*Counsel for Plaintiffs Rosemary Osborne McCoy & Sheila Singleton*

251

/s/ *Danielle M. Lang*              Chad W. Dunn[†]
Danielle M. Lang*              (Fla. Bar No. 119137)
Mark P. Gaber*[†]              Brazil & Dunn 1200 Brickell Ave,
Molly E. Danahy*              Suite 1950
Jonathan M. Diaz*              Miami, FL 33131
Blair Bowie*              Tel: (305) 783-2190
Campaign Legal Center              chad@brazilanddunn.com
1101 14th Street, Ste. 400
Washington, D.C. 20005
Tel: (202) 736-2200
dlang@campaignlegal.org
mgaber@campaignlegal.org
mdanahy@campaignlegal.org
jdiaz@campaignlegal.org
bbowie@campaignlegal.org

*Counsel for Raysor Plaintiffs*

\* Admitted *Pro Hac Vice*
\*\* *Pro Hac Vice* application forthcoming
[†] Class Counsel

252

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 14, 2020, I served a true and correct copy of the foregoing document via electronic notice by the CM/ECF system on all counsel or parties of record.

*/s/ Julie A. Ebenstein*
Julie A. Ebenstein

*Counsel for Plaintiffs*