# EXHIBIT G



DEFENDANT SOS
EXHIBIT

**44**

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF FLORIDA
2
              CASE NO.:  4:19-CV-300-RH-MJF
3

4
    KELVIN LEON JONES, et al.,
5
                     Plaintiffs,
6    vs.

7    RON DeSANTIS, in his official
     capacity as Governor of Florida,
8    et al.,

9                    Defendants.
     _____/
10

11             CONTINUED DEPOSITION OF

12                 MARIA MATTHEWS

13

14             VOLUME 2 (Pages 223 - 342)

15

16             Monday, January 27, 2020
                 9:13 a.m. - 12:25 p.m.
17

18

19                 HOLLAND & KNIGHT
                315 South Calhoun Street
20              Tallahassee, Florida 32301

21
                Stenographically Reported By:
22            JUDY LYNN MARTIN, NOTARY PUBLIC

23

24   Job No.:  175837

25

**Page 224**

1
2  APPEARANCES:
3  On behalf of the Raysor Plaintiffs:
4      CAMPAIGN LEGAL CENTER
       1101 14th Street, Northwest
5      Washington, DC 20005
       BY:  Mark Gaber, Esquire
6           Jonathan Diaz, Esquire
7
8
9  On behalf of the Gruver Plaintiffs:
10     AMERICAN CIVIL LIBERTIES UNION OF FLORIDA
       118 West Adams Street
11     Jacksonville, Florida 32202
       BY:  Jimmy Midyette, Esquire (Via telephone)
12
13
       -and-
14
       NAACP LEGAL DEFENSE AND EDUCATIONAL FUND
15     40 Rector Street
       New York, New York 10006
16     BY:  John Cusick, Esquire (Via telephone)
17
18     -and-
19
20     AMERICAN CIVIL LIBERTIES UNION OF FLORIDA
       4343 West Flagler Street
21     Miami, Florida 33134
       BY:  Anton Marino, Esquire (Via telephone)
22
23
24
25

**Page 225**

1
2  Appearances (Continued)
3  On behalf of Secretary of State:
4
       FLORIDA DEPARTMENT OF STATE
5      500 South Bronough Street
       Tallahassee, Florida 32399
6      BY:  Ashley Davis, Esquire
7
       -and-
8
       HOLLAND & KNIGHT
9      315 South Calhoun Street
       Tallahassee, Florida 32301
10     BY:  Tara Price, Esquire
11
12
13 On behalf of Hillsborough County:
14     HILLSBOROUGH COUNTY ATTORNEY'S OFFICE
       601 East Kennedy Boulevard
15     Tampa, Florida 33602
       BY: Stephen Todd, Esquire (Via telephone)
16
17
18 On behalf of Leon County:
19     MESSER CAPARELLO
       2618 Centennial Place
20     Tallahassee, Florida 32308
       BY:  Mark Herron, Esquire (Via telephone)
21
22
23 On behalf of Alachua County:
       ALACHUA COUNTY ATTORNEY'S OFFICE
24     12 Southeast First Street
       Gainesville, Florida 32601
25     BY:  Corman Hanson, Esquire (Via telephone)

**Page 226**

1
2                I N D E X
3  Testimony of MARIA MATTHEWS
4  Direct Examination by MR. GABER          227
5  CERTIFICATE OF OATH                      339
   CERTIFICATE OF REPORTER                  340
6  Errata Sheet                             341
7
8
9                EXHIBITS
10 Matthews Exhibits
11 Exhibit No. 22    Notice of Deposition      230
12 Exhibit No. 23    Email Chain dated 10/28/2019   274
13 Exhibit No. 24    Email dated 12/20/2019    276
14 Exhibit No. 25    Restoration of Voting Rights
                     Work Group Report        302
15
16
17
18
19
20
21
22
23
24
25

**Page 227**

1              MARIA MATTHEWS
2  Proceedings began at 9:13 a.m.:
3          THE STENOGRAPHER:  Do you swear or affirm that
4  the testimony you're about to give will be the
5  truth, the whole truth, and nothing but the truth?
6          THE WITNESS:  I do.
7              MARIA MATTHEWS,
8  having been first duly sworn or affirmed, as hereinafter
9  certified, testified as follows:
10             DIRECT EXAMINATION
11 BY MR. GABER:
12     Q    Good morning, Ms. Matthews.  My name is
13 Mark Gaber.  I represent the Raysor plaintiffs in this
14 action.
15          Could you please state your name for the
16 record?
17     A    Maria Matthews.
18     Q    What is your position with the Secretary of
19 State's Office?
20     A    I'm the director for the Division of Elections
21 with the Florida Department of State.
22     Q    You previously testified in a deposition in
23 this litigation; is that right?
24     A    Yes.
25     Q    You are testifying now as the corporate

MARIA MATTHEWS

2  representative for the Secretary of State; is that
3  right?
4      A   Yes.
5      Q   So the record is clear, is it your
6  understanding as well that your previous testimony is
7  also being taken as testimony on behalf of the Secretary
8  of State as corporate representative?
9      A   Yes.
10     Q   I know that you are an attorney and you've
11 been deposed before, so I won't spend a lot of time on
12 the intro things, but we should both make an effort to
13 speak slowly and clearly so the reporter can get the
14 information down and not talk over one another.  And if
15 I ask a question that you don't understand, please ask
16 for clarification.  Unless you say otherwise, we'll
17 presume that you understood the question.
18         Does that work for you?
19     A   Yes.
20     Q   If at any time you need a break, please let me
21 know.  I just ask that you answer the question that's
22 pending on the table before taking the break.  Okay?
23     A   Yes.
24     Q   Is there any reason that you cannot answer my
25 questions truthfully today?

MARIA MATTHEWS

2      A   No.
3      Q   Did you bring any materials with you today?
4      A   No.
5      Q   What did you do to prepare for today's
6  deposition?
7      A   I reviewed some documentation, just my depo
8  that I did before, and I talked to my attorneys.
9      Q   Any other documents that you looked at in
10 preparation for today's deposition?
11     A   Again, it would just be documents kind of
12 related to this and -- and the discovery documents.
13     Q   Any in particular?
14     A   Admissions, request for production of
15 documents.
16     Q   Did you look at any other documents that were
17 produced by the Secretary of State's Office to
18 plaintiffs?
19     A   I don't believe so.
20     Q   Have you read the October 2019 order of the
21 district court granting preliminary injunction?
22     A   I have read it in the past.
23     Q   Have you also read the decision of the Florida
24 Supreme Court -- the advisory opinion decision of the
25 Florida Supreme Court, Amendment 4?

MARIA MATTHEWS

2      A   I have read that in the past.
3      MR. GABER:  I'm going to mark Exhibit 22.
4          (Marked for Identification is Matthews Exhibit
5      Number 22.)
6  BY MR. GABER:
7      Q   This is the Notice of Deposition of Defendant
8  Laurel M. Lee In Her Official Capacity as Secretary of
9  State of Florida, Pursuant to Rule 30(b)(6).
10         Have you seen this notice?
11     A   Yes.
12     Q   Are you familiar with the eight topics that
13 are listed on the notice?
14     A   Just refreshing, yes.
15     Q   Do you feel like you are the appropriate
16 person to answer questions about these topics in the
17 Department of State?
18     A   Yes.
19     Q   Have you testified as the corporate
20 representative for the Department of State before?
21     A   I believe so.
22     Q   Do you have a sense of how many times?
23     A   It's not something I like to keep track of.
24     Q   Hopefully this isn't that painful.  I just
25 want to -- for purposes of today's deposition, the

MARIA MATTHEWS

2  questions that I ask will be focused on the time period
3  after your last deposition.  So to the extent that's not
4  clear from the question itself, that is the time frame
5  that we are looking at.  I think that was September 13,
6  2019.
7          Since that time, since September 13, 2019,
8  what steps has the Secretary of State's Office taken to
9  implement SB 7066?
10     A   We continued to review -- conduct automated
11 matches, review those matches, create files that are
12 credible and reliable in accordance with the law.  It
13 encompasses those matches that relate to those
14 individuals who appear to be in prison or under
15 supervision with the Department of Corrections or who
16 have a felony conviction adjudication for murder or a
17 conviction for felony sexual offense adjudicated.
18     Q   Are those the only categories of matches that
19 are currently being conducted?
20     A   Those are the only categories of matches that
21 we are reviewing and for which if we determine that they
22 are credible and reliable are sending down.  We are
23 reviewing cases, or matches rather, that relate to those
24 who don't fall in those categories, but we are not
25 sending those down yet.

MARIA MATTHEWS

2  Q    When you say matches for those who don't fall
3  into these categories, what categories are you
4  reviewing?
5  A    Those would be individuals who -- well, don't
6  fall into those categories.  It could be people who have
7  outstanding legal financial obligation or otherwise have
8  not completed the terms of their sentence.
9  Q    One clarification.  When you say sending down,
10  do you mean to the Supervisors of Elections?
11  A    That is correct.
12  Q    When you say that it would be people who have
13  outstanding legal financial obligations, I mean, are you
14  actually matching for people with outstanding legal
15  financial obligations?
16  A    We are currently working with our legal
17  counsel on that process, but we're reviewing those kinds
18  of matches.
19  Q    What system do you have in place to determine
20  whether someone has outstanding LFOs?
21  A    Just as with any other match, we consult the
22  resources that we have available, so that could be the
23  CCIS, which is the Comprehensive Case Information System
24  that the Clerk of Court has, which is their single
25  database for documents, court documents; it can also be

MARIA MATTHEWS

2  the Department of Corrections' data online; it can also
3  be the Federal Commission on Offender Review, their
4  clemency database; all the sources that we use to
5  determine that we have been and continue to do to
6  determine whether somebody is eligible and whether that
7  match is credible and reliable.
8  Q    When did you begin identifying matches based
9  on LFOs?
10  A    It's a review.  It's an ongoing review that
11  we're doing at this point.  Certainly once the advisory
12  opinion from the Florida Supreme Court that is -- felt
13  like it was appropriate to move forward with that, but,
14  again, I'm working with the attorneys on this, because
15  it's a complicated...
16  Q    Were there any other -- prior to the advisory
17  opinions issuance, was there review being done of
18  matches that showed outstanding LFOs?
19  A    Yeah.  We were still doing it, but, again,
20  working with our attorneys.  Nothing is being sent down
21  that doesn't fall into the categories that I mentioned
22  earlier.
23  Q    So are you collecting like a list of
24  registrants who have, in your view, outstanding LFOs and
25  can -- storing that somewhere?

MARIA MATTHEWS

2  A    No.  I think it's just a matter of us looking
3  at potential matches as -- that may -- that fall into
4  that category and then working with our attorney to
5  determine if that is how -- how to best create a match
6  that we can feel comfortable that is credible and
7  reliable.
8  Q    Who is the attorney that you work with on
9  this?
10  A    It's the legal -- it's our General Counsel's
11  Office.
12  Q    Is there any policy that's been created in the
13  office or that's been drafted about how to determine
14  whether someone has outstanding LFOs?
15  A    We have procedures that were last amended in
16  December that discuss how to go about creating a
17  credible and reliable match, depending on whether the
18  person's in prison or under supervision, murder, felony
19  sexual offense, as well as noncompletion of a sentence.
20  Q    That was amended in December of 2019?
21  A    Correct.
22  Q    Is December of 2019 the first version of that
23  document that includes the noncompletion of sentence?
24  A    No, I believe other prior versions included
25  reference to it, but haven't been acted on again.  As I

MARIA MATTHEWS

2  said, we have not sent any files down to the Supervisors
3  relative to that category.
4  Q    When did the noncompletion of sentence
5  aspect -- and that relates generally to the LFOs; is
6  that your understanding?
7  A    It could be.  There are other aspects to a
8  sentence.
9  Q    Right.  But the completion of the LFOs aspect
10  of this, which is new to your office's review falls
11  under the noncompletion of sentence part of that
12  description; is that fair?
13  A    Yes.
14  Q    When did that aspect begin to appear in the
15  procedures?
16  A    I would defer to the record in terms of the
17  documents that have been handed over.
18  Q    When this litigation first started, you
19  understand that some of your documents were provided to
20  the plaintiffs in the case; is that right?
21  A    Yes.
22  Q    Since that happened, has any additional update
23  been done to provide documents after that period of time
24  to your attorneys to provide over to the plaintiffs?
25  A    I trust that my attorneys would -- our

MARIA MATTHEWS

1
2 attorneys would have handed over anything that had been
3 requested personally to discovery.
4    Q    Do you know how many copies of these
5 procedures or how many different versions there have
6 been since the time of when you first turned your
7 documents over and today?
8    A    Again, I would defer to the record and the
9 only -- the last version I know of right now is the one
10 in December.
11    Q    That's the version that you're currently
12 using?
13    A    Correct.
14    Q    What's the name of that document?
15    A    It's BVRS procedures for felony matches,
16 something like that.
17    Q    Is that a document that's provided to the
18 Supervisors of Elections as well?
19    A    No.  That's an internal document for our
20 staff, but for the Division of Elections, Bureau of
21 Voter Registration Services, to use to process these
22 files.
23    Q    Since the time of your last deposition, has
24 any written guidance or instructions been provided to
25 Supervisors of Elections regarding how to determine

MARIA MATTHEWS

1
2 whether someone has outstanding LFOs?
3    A    No.
4    Q    How about any sort of informal emails with
5 Supervisors of Elections on that topic?
6    A    It's possible that there may have been
7 individual emails.  If there was a question regarding
8 that, quite frankly we would defer to our General
9 Counsel's Office to reply.
10    Q    Have you received any questions personally
11 related to determining if someone has outstanding LFOs
12 if they're eligible to register to vote?
13    A    No, I haven't.
14    Q    Are you aware of any that members of your
15 staff have received?
16    A    I don't recall at this time.  Again, their
17 direction would be to refer the matter to the General
18 Counsel's Office.
19    Q    How do you determine whether an individual who
20 you see has an outstanding LFO whether you believe that
21 person is eligible to vote?
22        MS. DAVIS:  Objection.  Calls for -- well,
23        this -- be careful, because your answer could
24        impact attorney/client privilege.
25 BY MR. GABER:

MARIA MATTHEWS

1
2    Q    To be clear, I'm not intending any of my
3 questions to do that, so please just let me know if --
4    A    Can you reword, please, or restate what you
5 asked?
6    Q    Sure.  How do you determine whether an
7 individual who you believe has outstanding LFOs is
8 eligible to vote or not?
9        MS. DAVIS:  Same objection.
10    A    What we determine is we have a potential match
11 and we look to the records that are available to
12 determine if that is the correct individual, if it's
13 definitely a felony conviction of adjudication but no
14 circumstances have changed to alter that determination,
15 we create and collect the documents to support that.
16        And once we believe that that is credible and
17 reliable, we then send that match down to the
18 Supervisors of Elections.  Supervisors of Elections then
19 have an obligation under the law to notify the voter
20 that there is a potential ineligible match.
21        That voter then has due process under the law
22 to counter that in any way or to say, no, that's not me,
23 no, that's not a felony conviction, and any other
24 evidence they wish to put forward to the Supervisor of
25 Elections -- Supervisor of Elections.  Person went to

MARIA MATTHEWS

1
2 98.075(7), determines whether an individual remains on
3 the roles or not.
4 BY MR. GABER:
5    Q    I guess my question is focused on LFOs in
6 particular.  So what specific LFOs does your office view
7 as disqualified?
8        MS. DAVIS:  Objection, form and
9        attorney/client.
10    A    Again the same process that we use to
11 determine whether someone is -- whether a potential
12 match is credible and reliable is used regardless of
13 whether it's an LFO or any other -- I guess I don't --
14 I'm not quite sure I understand.
15 BY MR. GABER:
16    Q    What is your understanding of the specific
17 LFOs that do disqualify a registrant?
18        MS. DAVIS:  Objection.
19    A    Right now my understanding is -- our
20 understanding is that if a sentence has --
21        MS. DAVIS:  Careful of attorney/client
22        privilege.
23    A    That goes to the heart of completion of the
24 sentence.
25 BY MR. GABER:

MARIA MATTHEWS

2    Q   Does the Secretary of State's Office have a
3 position as to which specific LFOs are disqualifying for
4 voters in Florida?
5    A   Not at this time.
6    Q   Does the Secretary of State's Office have a
7 plan, or a timeline, for when it intends to have a
8 position as to which specific LFOs are disqualifying?
9    MS. DAVIS:  Objection, attorney/client.
10    MR. GABER:  Again I'm not -- I'm not asking
11    for any privileged communications with your
12    attorneys, but is that instruction not to answer?
13    MS. DAVIS:  That's an instruction not to
14    answer.  The answer to that question is
15    attorney/client privilege.
16 BY MR. GABER:
17    Q   If a voter -- you have a hotline for voters to
18 ask questions; is that right?
19    A   Yes.
20    Q   If a voter called, or voters call, what are
21 they currently being told with respect to which LFOs are
22 disqualifying?
23    A   If an individual calls on the line, they are
24 currently directed to contact the Clerk of Court
25 regarding their -- their conviction and their sentence

MARIA MATTHEWS

1 and/or the Department of Corrections in terms of
2 supervision and prison terms.  We don't offer any other
3 information.
4    Q   You said that the -- your office is currently
5 reviewing matches that indicate LFOs but not sending
6 down to Supervisors of Elections those files right now;
7 is that right?
8    A   Each match is case by case, so if we get a
9 case in which this is an issue or the terms of the
10 sentence, we examine that, put documents together, and
11 then we consult with the -- with our General Counsel's
12 Office.
13    Q   But at the moment if the only reason that you
14 would send the file down is because of the LFO issue
15 within the umbrella of completion of terms, at the
16 moment those are not being sent to the Supervisors; is
17 that right?
18    A   That's correct.
19    Q   Is your office making determinations about
20 whether the information is credible and reliable?
21    A   We're reviewing case by case to determine a
22 process for that, to feel comfortable about what's
23 credible and reliable.
24    Q   Have you identified -- among that subset of

MARIA MATTHEWS

1 files that are currently under review, are there some
2 where the determination has been made that the
3 information is credible and reliable?
4    A   Not yet.
5    Q   What is the process of coming to that
6 conclusion?
7    A   I --
8    Q   Let me specify.  Is there -- when you go
9 through these determinations to determine whether
10 information is credible and reliable, do you set the
11 credible and reliable ones aside and have like a these
12 are done, these are ready to go when we send them, and
13 then there's some that you're unsure of yet; have you
14 segregated these files in any way for the range of your
15 comfort with the credibility and reliability of
16 information?
17    A   If a determination is made about credible and
18 reliable that it's valid, then it will be sent down, but
19 that has not been made yet with any of these other
20 cases.
21    Q   When you say "valid," do you mean valid -- the
22 information that there is outstanding LFOs is correct;
23 is that right?
24    A   Valid in that it is a credible and reliable

MARIA MATTHEWS

1 match, whatever the basis would be for it.
2    Q   In this case, I'm asking about the match to
3 the outstanding LFOs.
4    A   Correct.  We have not made any determination.
5 Obviously legislation and litigation is ongoing right
6 now.
7    Q   Other than the December 20 procedures, is
8 there any other written guidance or memos or information
9 in your office for how the staff should collect
10 information and review it to determine whether that
11 information about outstanding LFOs is credible and
12 reliable?
13    A   That would be the source document.
14    Q   What does that document -- I don't believe
15 we've received that document, so you'll have to forgive
16 my ignorance about it, but what does that document set
17 out as the procedure for determining whether there are
18 outstanding LFOs?
19    A   The document covers the whole process for how
20 a credible and reliable match is determined, regardless
21 of the basis.  And there's a section in there relating
22 to looking to CCIS, which is the Clerk's single source
23 for documents as well as Clerk of Courts websites and
24 any other sources that a staff member can go to to

MARIA MATTHEWS

1
2 support the match.
3         At this time, the procedure indicates that if
4 they come across a case like that, they work it like any
5 other providing -- determining that it's the same
6 person, that it's truly a felony conviction, and
7 collecting all documents that would support both the
8 identity match, the felony record match, as well as
9 anything else but for these LFOs, and I put in quote.
10 Those are set aside for further research later and
11 that's what the document indicates.
12     Q   Are you contacting -- is your office
13 contacting Clerk of Courts to obtain individual
14 sentencing files in addition to using CCIS and the other
15 sources you mentioned?
16     A   Yes.  That is a -- there are frequently
17 documents that are not on -- or not frequently, just
18 documents that may not be online, and it's a
19 case-by-case basis.  So if the documents aren't there or
20 if the documents are insufficient to be able to make
21 that credible and reliable match, then we reach out to
22 the Clerk of Courts.
23     Q   As your staff are reviewing these documents
24 for outstanding LFOs, have you asked them to document or
25 keep track of issues that they encounter in determining

MARIA MATTHEWS

1
2 whether or not someone has outstanding LFOs?
3     A   With the files that are being created
4 if that -- I'm not aware of many, but it's just case by
5 case.  If they have difficulty obtaining a document or
6 determining something, that is what's being bumped up
7 for further review with our legal counsel's office.
8     Q   Has that further review -- what's the status
9 of that with respect to these LFOs?
10     A   I expect that probably within the next week or
11 so we will start crystallizing that process and maybe
12 even do, I'm speculating now, but test cases and, you
13 know, of matched files.
14         There's a lot involved.  We have to make sure
15 we have staff properly trained, we have to make sure
16 that the Supervisors of Elections are also familiar
17 with, because these cases -- these types of cases will
18 involve a lot more documentation, so there's an
19 education process to that, making sure that everybody is
20 on board and comfortable with -- with that new aspect of
21 matches.
22     Q   Have you conducted training in your office for
23 how to collect these documents, how to understand them?
24     A   That's an ongoing process, yes.
25     Q   Does that involve -- do you have written

MARIA MATTHEWS

1
2 training materials, PowerPoints, things like that?
3     A   I believe that there were some training
4 materials initially, yes, and then there will be more
5 developed as we finalize this particular process.
6     Q   At what point do you anticipate actually
7 sending to the Supervisors of Elections files?
8         MS. DAVIS:  Objection, attorney/client
9     privilege.  Don't answer that.
10 BY MR. GABER:
11     Q   I'd like to show you what is already an
12 exhibit in your depositions, so we don't need to mark it
13 again.  This is Exhibit 17 from your first deposition.
14         Do you recognize this document?
15     A   Yes.
16     Q   What is this document?
17     A   This is the internal procedure documents for
18 processing felon match files.
19     Q   Is this the document that's been updated with
20 the December version?
21     A   Yes.
22     Q   This version is August 7, 2019; right?
23     A   Correct.
24     Q   On page 3 of the document, you see a
25 screenshot from CCIS; is that right?

MARIA MATTHEWS

1
2     A   Yes.
3     Q   There's two examples, one example of paid and
4 one -- I suppose there's three examples, example of
5 paid, example of no info available, and example of
6 outstanding fees; do you see that?
7     A   Yes.
8     Q   Now, when you last testified you spoke about
9 the fact that -- the fact that it says restitution
10 zero -- balance due zero, that -- you weren't sure
11 whether or not that meant that in fact there was no
12 restitution, because restitution may not be tracked in
13 the system; is that correct?
14     A   I would defer to the record, my deposition, on
15 that.
16     Q   Do you have a -- do you have a further
17 understanding of what this screenshot within CCIS means
18 with respect to restitution than you did at your last
19 deposition?
20     A   We've been working with the Clerks of the
21 Court to try to understand what these numbers reflect
22 and mean.  You would still have to look to the
23 sentencing documents.
24     Q   In the process of working with the Clerk of
25 Courts, what have you learned as to what these numbers

MARIA MATTHEWS

1  mean?

2    A   That they are what they are.

3    Q   What does that mean?

4    A   That they may have recorded that there's no

5  restitution and that may or may not be relied upon,

6  depending on what the court records indicate.

7    Q   So is the -- have you developed a process

8  based upon your discussions with the Clerk of Courts as

9  to how you should proceed if you see restitution total

10  zero in CCIS?

11    A   Again, we've been working with our attorneys

12  to determine what the screenshot, which is just one

13  piece of the documentation that may or may not support a

14  credible and reliable match, still have to go to the

15  sentencing documents and whatever court records are

16  available to indicate whether this screenshot has

17  information that is current and accurate.

18    Q   If the underlying sentencing documents shows

19  restitution zero, then would you view this as credible

20  and reliable that there is no restitution?

21      MS. DAVIS:  Objection, form.

22    A   Again, each of these is a case-by-case basis,

23  so I don't want to make a blanket statement about it.

24  BY MR. GABER:

---

MARIA MATTHEWS

1    Q   What if the underlying documents shows that

2  there was a restitution order but the CCIS screen

3  reports zero -- total zero, balance due zero, what --

4  since you last testified, do you have further policies

5  or procedures or understanding of how you should proceed

6  in that instance?

7    A   Again, we're working with our attorney to

8  determine what -- what additional steps may need to be

9  taken to reconcile that difference.  In the end, I am

10  not going to allow a record to go down if there's an

11  inconsistency or inability to be able to make that

12  credible and reliable match.

13    Q   You mentioned you've been working with your

14  attorney, is there any -- as of today, is there any plan

15  or policy for how to proceed if the CCIS reports zero

16  balance due and the -- or zero restitution and the

17  underlying documents shows restitution?

18      MS. DAVIS:  Objection, attorney/client.

19      MR. GABER:  Are you instructing her not to

20  answer that?

21      MS. DAVIS:  Don't answer.

22  BY MR. GABER:

23    Q   In general, it's your understanding that

24  restitution may not be tracked as accurately as some

---

MARIA MATTHEWS

1  other LFOs; is that fair?

2      MS. DAVIS:  Objection to form.

3  BY MR. GABER:

4    Q   I'm speaking about whether restitution has

5  been paid.

6    A   I believe it's been reported in the work group

7  report, Clerk of Courts, that restitution is not always

8  captured in CCIS.

9    Q   Some other areas are if LFOs have been

10  converted to civil liens, old records that maybe weren't

11  electronically recorded, and debts that have been turned

12  over to credit agencies; is that correct?

13      MS. DAVIS:  Objection, form.

14    A   Yeah, I think I need you to restate.

15  BY MR. GABER:

16    Q   Are those other categories of potential LFOs

17  that may not accurately be contained within CCIS, is

18  that still your understanding?

19      MS. DAVIS:  Objection to form.

20    A   Can you repeat that, I'm sorry?

21  BY MR. GABER:

22    Q   So restitution is one category where there

23  might be problems with the electronic tracking; is that

24  fair?

---

MARIA MATTHEWS

1      MS. DAVIS:  Objection, form.

2  BY MR. GABER:

3    Q   Within CCIS, the reporting -- is it your

4  understanding that the reporting of restitution owed is

5  still today not completely accurate for all of the files

6  that are kept in CCIS?

7    A   I can't speak to that.  All I can speak to is

8  case by case.  Once we get one, then we'll be making

9  that determination whether restitution information is

10  credible and reliable in the -- in the system.

11    Q   Have you had cases since your last deposition

12  where it appeared that the restitution was not

13  accurately reported in CCIS?

14    A   We haven't made that call yet, no.

15    Q   When you say that, you mean you haven't made

16  the determination, the final determination, about

17  whether the information in CCIS is inaccurate; is that

18  correct?

19    A   We are working on reviewing what potential

20  scenarios may arise with these types of cases.  I can't

21  make a blanket statement about how -- whether the

22  information is inaccurate or completely incomplete.  At

23  this time, it would just be on a case-by-case basis.

24    Q   Right.  So have there been cases where there's

MARIA MATTHEWS

1
2  a question as to whether the restitution reporting in
3  CCIS is accurate in your review thus far?
4      A   Is accurate?
5      Q   Is not accurate.
6      A   I believe that we have seen some indication
7  that the information there may not be consistent with
8  the court records.
9      Q   Is there a way with the CCIS information to
10 determine whether there are outstanding civil liens; is
11 that reported in CCIS to your understanding?
12     A   It's part of the court record.
13     Q   Have you encountered files in your review
14 since your last deposition where there's questions as to
15 whether or not someone owes outstanding civil liens for
16 their LFOs?
17         MS. DAVIS:  Objection, form.
18     A   I don't recall any.
19 BY MR. GABER:
20     Q   Have you had -- in the files that you have
21 been reviewing, have you had files that it's unclear
22 whether there are LFOs that were sent to a credit agency
23 to collect if those have been completed and paid?
24         MS. DAVIS:  Objection, form.
25     A   I don't know.

MARIA MATTHEWS

1
2  BY MR. GABER:
3      Q   How many files have been going through the
4  review process for LFOs since your last deposition?
5      A   What we're doing is -- the primary process
6  right now is focusing on those in prison, those in
7  supervision, murder, or felony sexual offense.  What
8  we're doing on the side is occasionally reviewing files
9  that are -- that don't fall into that and seeing what it
10 yields, and then I'm working with the general counsel --
11 we're working with the General Counsel's Office to
12 determine how to handle that to develop a process.
13     Q   Are you running a search against the entire
14 registration list, how are you identifying the sort of
15 universe of potential voters that you should look at for
16 this purpose?
17         MS. DAVIS:  Objection, form.
18     A   Right now the process involves anybody who
19 registers to vote, anybody who changes their address,
20 anybody -- any time that a new felony record is created,
21 it's -- whether you affirm that you're not a felon or
22 not, every -- all those records are matched against
23 criminal records to create these potential automated
24 matches, so that's happening on a daily basis.
25         And then for purposes of being able to focus

MARIA MATTHEWS

1
2  on the those in prison in supervision, murder, and
3  felony sexual offense, we worked with the respective
4  criminal justice agencies to add additional information
5  that would help to be able to refine those and anything
6  else presumably.  We don't know for a fact whether they
7  are LFOs or anything else.  We just know they don't fall
8  into those four categories.
9  BY MR. GABER:
10     Q   So is the only thing you're doing right now
11 the ongoing process when there's a new registration
12 application or have you gone backwards to look at
13 registrants within say the past year to see whether any
14 of them who may have passed the -- they're not in
15 prison, they're not under supervision to determine
16 whether those people have potentially outstanding LFOs?
17     A   Every day it's the whole -- the whole
18 registration system whether you've been in there --
19 you've been registered since, you know, 1990 or you just
20 registered yesterday.
21     Q   I guess the question is how -- how would you
22 identify the people who are subject now to this review
23 for LFOs, did you take steps to -- because presumably
24 they made it through whatever your review system is
25 without being flagged up until the point in time when

MARIA MATTHEWS

1
2  you started reviewing for LFOs.  So I'm just --
3         MS. DAVIS:  Objection.
4  BY MR. GABER:
5      Q   -- I'm trying to get to how you went back and
6  how you determined.
7      A   I don't know that those are LFOs.  All I know
8  is they don't fall into these other categories.
9      Q   So there are people who have a conviction
10 based on this -- how you match and they're everyone who
11 doesn't have a murder conviction, a sexual offense
12 conviction, and isn't currently incarcerated or under
13 supervision; is that correct?
14         MS. DAVIS:  Object to form.
15         THE WITNESS:  Yeah, I lost you.
16 BY MR. GABER:
17     Q   What I'm trying to get at:  Are you confident
18 that -- maybe confident's not the right word.  The
19 system you have in place to do these matches, will it
20 have, today for example, captured all of the people
21 based on the information you have that could potentially
22 have outstanding LFOs?
23         MS. DAVIS:  Objection to form.
24     A   It captures -- or at least initially captures
25 all voter registration records that match up with a

MARIA MATTHEWS

1 felony conviction record regardless of whether they're
2 in prison, in supervision, murder, felony sexual
3 offense, or anything else that falls outside it.
4 That's -- that's been the -- that hasn't changed.
5         What's changed is now once you go into a case
6 or match, then you have to determine whether it's one of
7 these -- you know, whether there is legal financial
8 obligations outstanding or any other term of the
9 sentence.
10 BY MR. GABER:
11    Q    Is that review -- that review is not solely
12 forward looking with new registrations; is that correct?
13    A    Correct.
14    Q    So now you're going back and looking at people
15 who might not have earlier been flagged but now will
16 potentially be because of the outstanding LFOs; is that
17 fair?
18         MS. DAVIS:  Objection, form and
19    attorney/client privilege.  Be careful of that.
20    A    I'm not sure I quite understand that question.
21 BY MR. GABER:
22    Q    Let me try a different way.  If I -- there was
23 a sunset period in SB 7066, is that your understanding,
24 where if someone registered to vote, they wouldn't be

MARIA MATTHEWS

1 viewed as having unlawfully affirmed their eligibility
2 because of outstanding LFOs?
3         MS. DAVIS:  Objection, attorney/client.  Don't
4    answer.
5 BY MR. GABER:
6    Q    Well, you've read SB 7066; right?
7    A    Yes.
8    Q    At your last deposition you testified about
9 the sunset provision; do you recall that?
10    A    If you point me to it.
11    Q    Are you familiar with the fact that if someone
12 registered to vote on say February 5, 2019, when SB 7066
13 was enacted, a provision was included to ensure that
14 those folks who registered between Amendment 4's
15 effective date and the effective date of SB 7066 would
16 not be subject to prosecution for having registered;
17 that's a fact in the --
18         MS. DAVIS:  Objection.
19 BY MR. GABER:
20    Q    Are you familiar with that fact?
21    A    I'm aware that there's a provision in Senate
22 Bill 7066 in chapter law that was enacted that allowed
23 some grace period between the effective date of
24 constitutional amendment and the effective date of the

MARIA MATTHEWS

1 bill.
2    Q    So if someone registered during that grace
3 period, someone who has outstanding LFOs, now that your
4 office is collecting and reviewing those files, would
5 that person who registered during the grace period be
6 among the people who would be captured by this new
7 review process?
8         MS. DAVIS:  Objection, form.
9    A    Anybody who registers, anybody who's already
10 registered, any time a new felony conviction record is
11 created or corrected such that it allows for a match to
12 be made, there is the potential for you to be identified
13 as a convicted felon.
14 BY MR. GABER:
15    Q    I understand there's a potential.  Are people
16 who registered during the grace period having their
17 registrations now reviewed to determine whether they
18 have outstanding LFOs?
19    A    That I can't answer.  I mean, it would be
20 until the case-by-case review.  Again, we are not
21 actively reviewing and sending those kinds of case files
22 down.  We're still working through to make sure we're
23 comfortable with what is a credible and reliable packet
24 relating to those people that don't fall into the other

MARIA MATTHEWS

1 four categories.
2    Q    Is it your -- is the Secretary of State's
3 Office collecting the files or working through the files
4 of everyone who your information shows has outstanding
5 LFOs who's registered at any point say from 2019 to
6 present?
7         MS. DAVIS:  Objection, form.
8    A    We are working with the General Counsel's
9 Office on these types of case files to determine and
10 finalize a process and comfort level regarding these
11 kinds of cases without actively sending anything down
12 right now.
13         MR. GABER:  Let's take a short break.
14         (Recessed at 10:00 a.m. to 10:12 a.m.)
15 BY MR. GABER:
16    Q    Ms. Matthews, we were talking about the
17 matching process, and I want to just clarify a few
18 things, but your office determines whether to review a
19 file when the matching process occurs based on new
20 information that happens on a given day; is that a
21 correct statement?
22         MS. DAVIS:  Objection, form.
23    A    The match process begins primarily with a
24 match of voter registration records, which can consist

MARIA MATTHEWS

1  of new registered voters as well as existing registered
2  voters against criminal record database.
3        So any time someone registers new and any
4  person that is currently registered and anything that
5  changes in that record would trigger that.  And then any
6  time there's a change in criminal record that -- that
7  might change the demographic matching or that I might
8  have been -- when I first registered I wasn't a felon, a
9  convicted felon, but something has happened since then
10  and now I've got this record it's going -- and this is a
11  daily process, seven days a week, over and over and over
12  again.
13  BY MR. GABER:
14    Q    If there's no -- if a person on the
15  registration list hasn't previously been flagged and
16  there's no new conviction information, no new driver's
17  license application, or change in their location of
18  their registration, if there's nothing new that happens,
19  will that person be reviewed for outstanding LFOs?
20    A    Only if it creates a felony match to begin
21  with, an automated match, which is data.  Then we -- the
22  Division of Elections is responsible for doing the
23  manual review of determining whether that automated
24  match is credible and reliable based on sources of

MARIA MATTHEWS

1  information that are available to us.
2    Q    After the Florida Supreme Court's advisory
3  opinion, that's when your office started to add to the
4  criteria for what you look at whether or not the person
5  has outstanding LFOs; is that correct?
6        MS. DAVIS:  Objection to form and be careful,
7        attorney/client privilege.
8    A    Anybody who is matched up for a felony
9  conviction, regardless of whether it's because they're
10  in prison, supervision, murder, felony sexual offense,
11  or all others which may be LFO or not, that process is
12  ongoing, that never stopped.
13        What is new is making these distinctions
14  between are they in prison, are they in supervision, are
15  they -- is it a conviction for murder or felony sexual
16  offense or any other.
17  BY MR. GABER:
18    Q    What additional information does your office
19  need to make to be able to start sending down to the
20  Supervisors of Elections' files based on someone's
21  outstanding LFOs?
22        MS. DAVIS:  Objection, attorney/client
23        privilege.
24  BY MR. GABER:

MARIA MATTHEWS

1    Q    Roughly how many files are currently being --
2  are caught in this sort of category where they've been
3  reviewed for LFOs but your office has not yet made a
4  credible and reliable determination in order to send
5  them down to the Supervisors of Elections?
6        MS. DAVIS:  Objection to form.
7    A    I don't have that information.
8  BY MR. GABER:
9    Q    Do you have a rough sense of how large this
10  population is?
11        MS. DAVIS:  Same objection.
12    A    Can you restate the question again?
13  BY MR. GABER:
14    Q    Sure.  So it sounds to me like there is a
15  group or a collection of voters for whom your office has
16  begun to review to determine whether they have
17  outstanding LFOs but are not yet sending those files to
18  the Supervisors of Elections, because you don't feel
19  comfortable making a credible and reliable determination
20  about that information; is that correct?
21    A    We are currently not sending documents --
22  matches down that don't fall into those four categories.
23    Q    Are you keeping those -- are you keeping like
24  a list of those files or is there like physical files

MARIA MATTHEWS

1  for those people so that when you do begin to send them
2  down, if you do, you'll know who they are?
3    A    There are automated matches at this point,
4  some of which may have a case file built for them.
5    Q    Do you have a sense for how many case files
6  there are on -- solely on the basis of LFOs?
7        MS. DAVIS:  Objection to form.
8    A    I believe that it's about upwards of 65,000 or
9  more.
10  BY MR. GABER:
11    Q    Is that case files that have been created on
12  the basis of LFOs?
13    A    No.  Those are just automated matches.
14    Q    Is there a distinction between automated
15  matches and case files?
16    A    An automated match is the data.  A case file
17  will be when you start building and doing your manual
18  review.
19    Q    Do you have a sense for how many are in that
20  process, the case file manual review process?
21    A    No.
22    Q    Is there a way that you could learn that
23  information?
24    A    I -- perhaps.

MARIA MATTHEWS

1
2    Q    What would you do to learn that information?
3    A    I'd have to consult staff and possibly IT
4    staff.
5    Q    What is the policy with respect to determining
6    whether an LFO was imposed at the time of the sentence
7    versus accrued -- an accrued obligation after the
8    sentence?
9         MS. DAVIS:  Objection, form and
10        attorney/client privilege.
11        MR. GABER:  Is that an instruction not to
12        answer?
13        MS. DAVIS:  Correct.  Director Matthews, you
14        know, I try to keep it as succinct as possible.  If
15        I say attorney/client privilege, then just don't
16        answer the question.
17        Will that be more clear?
18        MR. GABER:  Yeah, yeah, thanks.
19   BY MR. GABER:
20        Q    Whether or not a voter is eligible because
21   their LFO accrued after their sentence or ineligible
22   because it was imposed at sentencing time is not
23   information that you're willing to share with a voter,
24   for example, who asks?
25        MS. DAVIS:  Objection to form.

MARIA MATTHEWS

1
2    A    That is not information that we would answer
3    for the voter.
4    BY MR. GABER:
5    Q    Have you given any -- given any guidance or
6    answered any questions from clerks -- or Supervisors of
7    Elections about the distinction between LFOs accrued
8    after the sentence and those imposed at sentence?
9    A    No.
10   Q    No one has asked you about that?
11   A    No one has -- any -- any questions regarding
12   that would be referred to the General Counsel's Office.
13   Q    So you've spoken to no one other than your
14   attorneys about whether an LFO accrued after the
15   sentence or was imposed at sentence; is that what you're
16   saying?
17   A    That I recall, yes.
18   Q    If a voter called the hotline asking for
19   information about that issue, what would they be told?
20   A    Again, staff would be directed to follow the
21   responses in the hot -- hotline manual that says that
22   the individual needs to contact either the Clerk of
23   Court in which the conviction was made and/or the
24   Department of Corrections to determine anything relative
25   to their sentence.

MARIA MATTHEWS

1
2    Q    Does the update to the procedure -- the
3    December update to the procedure manual, does it address
4    the issue of accrued versus imposed at sentence?
5         MS. DAVIS:  Objection to form.
6    A    I actually don't have the document before me.
7    I -- again, we're working on those processes, so I don't
8    believe that is covered in there, no.
9    BY MR. GABER:
10   Q    Are you actually working on a new update that
11   would address this issue?
12   A    In consult with the General Counsel's Office,
13   yes.
14   Q    Is there a timeline for when that new
15   update -- the new update to the procedure manual will be
16   ready?
17        MS. DAVIS:  Objection.
18   A    Again, that's in consult with our attorney and
19   also the Secretary of State.
20   BY MR. GABER:
21   Q    So there is not -- there is not a planned
22   timeline or there is?
23        MS. DAVIS:  Objection, attorney/client
24        privilege.
25        MR. GABER:  The date of the release is

MARIA MATTHEWS

1
2    privilege, is that --
3         MS. DAVIS:  Yes.
4         MR. GABER:  That's because there's some legal
5         advice that goes into the date?
6         MS. DAVIS:  The process, the bases, when,
7         under what circumstances, that's all
8         attorney/client privilege information.
9    BY MR. GABER:
10   Q    If a voter asks any of these questions, are
11   they told that you can't answer it because it's
12   privileged?
13   A    When a person calls on a hotline, staff is
14   directed to follow the script that's in the hotline
15   manual and that...
16   Q    Are Supervisors of Elections entitled to
17   initiate the due process and potential removal process
18   if someone is potentially ineligible due only to
19   outstanding LFOs.
20   A    Supervisors of Elections are supposed to
21   follow that process, 98.075(7), regardless of what the
22   nature of the match is.
23   Q    What is the Secretary of State's position with
24   respect to a person who has had their sentence modified
25   such that they still owe LFOs but the LFOs are no longer

MARIA MATTHEWS

1  part of the criminal sentence?
2        MS. DAVIS:  Objection, legal conclusion, form.
3     A    Again, Secretary of State as well as the
4  Division of Elections is going to just follow what the
5  law says, and we're working with the General Counsel's
6  Office in terms of determining what is a credible and
7  reliable match regardless of what -- or at least for
8  that category of individuals that don't fall into the
9  four other ones.
10 BY MR. GABER:
11    Q    The four other ones being the murder, sexual
12 offense --
13    A    Correct.
14    Q    But there are people -- is it your
15 understanding that there are people who have had their
16 -- had a modification done such that their outstanding
17 LFOs are no longer considered part of the sentence; is
18 that your understanding?
19       MS. DAVIS:  Objection, form.
20    A    Again, it's a case by case.  So until we
21 actually encounter a case like that, I cannot answer
22 that question.
23 BY MR. GABER:
24    Q    My question is are you aware that that is
25

MARIA MATTHEWS

1  happening in the state of Florida?
2     A    I can't speak to that.
3     Q    You're not familiar with any news stories
4  about that or...
5     A    It's news and I'm going to -- I still have to
6  do my process regardless of what's reported in the news.
7     Q    So does the Secretary of State not have a
8  position with respect to whether voters are eligible
9  once their -- once there's a modification that removes
10 the LFOs from the criminal sentence?
11       MS. DAVIS:  Objection, form.
12    A    I believe the Secretary's position is going to
13 be to enforce the law, and she will consult with her
14 attorneys regarding what that means in terms of these
15 types of cases.
16 BY MR. GABER:
17    Q    Is there a current position that you're aware
18 of as to whether or not the Secretary views those voters
19 as eligible?
20       MS. DAVIS:  Objection, form.
21    A    Again, she's going to enforce the law and
22 follow the law in consult with her attorneys.
23 BY MR. GABER:
24    Q    Right, but that doesn't quite answer my
25

MARIA MATTHEWS

1  question.  So what is the Secretary of State's position
2  as to what that law says for someone who has had
3  their -- a modification to remove their LFOs from the
4  criminal sentence?
5     A    I can't answer that question.  I think it
6  calls for a legal conclusion.  I can't answer it.
7     Q    So if a voter asks that question who had had
8  their sentence modified, you would not be able to answer
9  that question for them; is that --
10    A    We would not answer that question on the
11 hotline or -- again, we would direct them to speak to
12 the Clerk of Court, their attorneys.  We would not
13 answer that question.
14    Q    Would the Secretary -- once you do start
15 sending these files down to the supervisors, if that
16 happens, would someone who's in this scenario having had
17 their -- a modification done, would the Secretary
18 consider it credible and reliable information that they
19 were ineligible, that there was once LFOs but they've
20 been modified to be taken out of the sentence?
21    A    Again, we would follow what the law is and if
22 it's consistent with what the law says, then that's what
23 would be followed, but I can't -- until we come up
24 with -- it's going to case-by-case basis.
25

MARIA MATTHEWS

1     Q    So it sounds like there's no policy with
2  respect to those people at this point; is that --
3        MS. DAVIS:  Objection.
4     A    Again, this process involving those that don't
5  fall into that category is still in state of we're
6  working on developing and understanding the variety of
7  cases that might come up in scenarios.  It's very fact
8  specific case by case.
9  BY MR. GABER:
10    Q    So you can't tell me, am I right, whether or
11 not any additional guidance will be available or updates
12 to the procedures prior to the registration deadline for
13 the March 2020 primary; is that --
14       MR. GABER:  That might actually be a question
15       for you.  Given that the date is privileged -- or
16       you're asserting privilege over the date, is that
17       the case that she can't answer whether or not there
18       will be additional guidance or updates to the
19       procedures before the registration deadline?
20       MS. DAVIS:  Objection to form really.
21       THE WITNESS:  Are you referring to these
22       procedures?
23 BY MR. GABER:
24    Q    There's going to be -- you were discussing
25

MARIA MATTHEWS

2 that you're working with your attorneys to update the
3 procedures and determine what information is credible
4 and reliable; is that correct?
5    A    Yes.
6    Q    Is there a plan to have that -- more clarity
7 on that before the registration deadline for the
8 March 2020 primary?
9    A    I can't speak to that right now.  We're --
10 it's still -- we're working on that.
11    Q    When is the registration deadline for the
12 March 2020 primary?
13    A    It's February 18th I believe, so it's 29 days
14 before.
15    Q    So that's about three weeks from now?
16    A    Correct.
17    Q    So at this point, you can't tell me whether or
18 not there will be more clarity before that deadline?
19    A    That -- no.  At this point, I can't.
20    Q    Does that apply too with respect to which LFOs
21 are disqualifying?
22    A    It applies to anything that's not already
23 covered in this procedure, and, yes, relative to LFOs or
24 any of those that do not fall into those other
25 categories and are -- whether their sentence is complete

MARIA MATTHEWS

2 or not.
3    Q    Since your last deposition, have you done any
4 research to determine whether or not for federal
5 convictions PACER will report to you the accurate amount
6 of restitution that is still owed?
7    A    That falls also in line with working with the
8 General Counsel's Office.  PACER obviously provides
9 court documents and we're working to see what available
10 documents are made available.  If we can't find
11 something on a clerk's database, we will reach out to
12 the jurisdiction itself.
13    Q    Have you done that since the last deposition?
14    A    We have reached out to Clerks of Courts for
15 federal felonies but relative to those four categories
16 that I was talking to you about.
17    Q    What about with respect to LFOs?
18    A    I don't know if we've done any of those or
19 not.
20    Q    What about for out-of-state convictions, have
21 you -- since your last deposition, have you reached out
22 to those jurisdictions to determine if outstanding LFOs
23 are owed?
24    A    Same thing would apply.
25    Q    So that's no?

MARIA MATTHEWS

2    A    Same thing as with federal felony.
3    Q    I'm forgetting what the answer was.  You're
4 working with the attorneys to determine a process; is
5 that --
6    A    Right.  If we have a case file from out of
7 state or a federal felony and if -- if it happens to
8 fall into that category or if there's any question about
9 it, we're dealing with different courts, we regularly
10 consult with our counsel.
11    Q    Did the Department of State take any steps to
12 implement the district court's October 18, 2019,
13 preliminary injunction order?
14    A    The judge directed -- we did share the
15 email -- we did email and sent the order to the
16 Supervisors of Elections.
17    Q    What other -- or did you take any other steps
18 to implement the judge's preliminary injunction order
19 beyond sending an email and the order to the
20 Secretary -- to the Supervisors?
21    A    No, I don't believe so.
22    MR. GABER:  I'll mark as Exhibit 23 an
23 October 28, 2019, email.
24    (Marked for Identification is Matthews Exhibit
25 Number 23.)

MARIA MATTHEWS

2 BY MR. GABER:
3    Q    Is this the email that you sent to the
4 Supervisors of Elections attaching the district court's
5 preliminary injunction order?
6    A    Correct.  This appears to be the email dated
7 October 28th.
8    Q    It says on the bottom that you will offer
9 subsequent guidance as may be needed.  Did you offer any
10 subsequent guidance since October 28, 2019?
11    A    When there was a subsequent order, we did.
12 And primarily the guidance that has been provided is if
13 they had any specific questions regarding compliance to
14 contact us.  And if they did contact us, we would -- we
15 would have referred it to the General Counsel's Office.
16    Q    Did any Supervisors contact you in response to
17 this email?
18    A    I think there might have been one or two.
19    Q    Do you recall what their questions were?
20    A    It was about the order and just being clear on
21 it, and I referred them to the General Counsel's Office.
22    Q    Are you aware of whether their questions were
23 answered by the General Counsel's Office?
24    A    I trust that our attorneys answered their
25 questions to the best that they could consistent with

Page 276

MARIA MATTHEWS

1  whatever the order -- what the order was and what the
2  law is.
3  Q    Were these supervisors who had in their
4  jurisdiction some of the individual-named plaintiffs or
5  were they Supervisors of other counties?
6  A    The one I most recall is that there I believe
7  was that they had someone in their jurisdiction.  It was
8  Duval County.
9  Q    When you say "someone," is it one of the
10 plaintiffs?
11 A    Correct.
12 Q    Was the question about the individual
13 plaintiff or was it a more general question?
14 A    I don't recall.
15 Q    Did the question come to you?
16 A    Yes, the call came to me.
17 Q    It was a phone call?
18 A    Yes.
19        MR. GABER:  We'll mark Exhibit 24.
20        (Marked for Identification is Matthews Exhibit
21     Number 24.)
22 BY MR. GABER:
23 Q    This is a December 20, 2019, email that you
24 sent.  Is this the other email that you sent about the

Page 277

MARIA MATTHEWS

1  subsequent order that the district court issued?
2  A    Correct.
3  Q    Other than these two emails, are there any
4  other guidance that you sent out to all the supervisors
5  in this manner about Amendment 4 or SB 7066 or this
6  litigation?
7  A    I honestly can't recall at this moment if we
8  sent another email to the Supervisors regarding match
9  files, regarding prisoners -- folks in prison,
10 supervision, murder, or felony sexual offense.
11 Q    Do you think that you may have done that with
12 respect to those categories?
13 A    I may have.
14 Q    What about with respect to legal financial
15 obligations?
16 A    No.
17 Q    Has the Secretary of State's Office taken any
18 steps to establish a mechanism for voters who assert an
19 inability to pay outstanding LFOs for them to be able to
20 vote?
21 A    No.
22 Q    Is that an issue -- has -- has there been
23 discussions about what a potential mechanism might be?
24 A    No.  I believe the position is that the Clerk

Page 278

MARIA MATTHEWS

1  of Courts are working on this, but that would be
2  something within their purview.
3  Q    The position is that it's within the purview
4  of the Clerks of Courts to develop a mechanism for
5  voters who assert an inability to pay their outstanding
6  LFOs and are thus eligible?
7        MS. DAVIS:  Objection to form.
8  A    It would be a matter for either the Clerks of
9  the Court or the legislature to determine what inability
10 to pay would look like.
11 BY MR. GABER:
12 Q    How did you come to the conclusion that it was
13 for the Clerks of Courts or the legislature to determine
14 a process for ascertaining who is unable to pay?
15        MS. DAVIS:  Objection, form.
16 A    I would say it's because the Courts are the
17 ones that impose the sentence and the Clerks of Court
18 are the ones that are monitoring or maintaining,
19 tracking the outstanding sentence components.
20        So they would be best that -- they would be
21 the best body to be able to provide a means or mechanism
22 for these individuals to be able to show that they
23 cannot pay.
24 BY MR. GABER:

Page 279

MARIA MATTHEWS

1  Q    Do you know if they are in the process
2  of creating such a process, a mechanism, for those
3  orders?
4  A    I don't know for certain.  I'm sure that they
5  are aware of these issues so that they are -- that they
6  may be doing that.
7  Q    Have you had conversations with Clerks of
8  Courts to suggest that there is in fact a process
9  underway to create such a mechanism?
10 A    I do believe that we've reached out to the
11 Clerks of Courts to ask them what, if any, forms or
12 processes they have developed that would help us to --
13 to look for these documents that might be in the Clerk
14 of Courts, you know, database, so that we know what to
15 look for.
16 Q    When you say "look for," are you referring to
17 information that would suggest someone is unable to pay
18 their outstanding LFOs?
19 A    Any -- any documentation that would help us to
20 determine if this is a credible and reliable match,
21 meaning that the individual definitely is a felon,
22 definitely has -- has -- whatever the terms were that we
23 can figure out what's happened to that sentence.
24 Q    So I'm asking about -- setting aside the

MARIA MATTHEWS

1  matching process, I'm asking now about the district
2  court's preliminary injunction and the discussion about
3  creating a procedure whereby a voter can prove that they
4  have an inability to pay and are therefore eligible to
5  vote.
6       Have you had discussions with the Clerks of
7  Courts that leads you to believe that they are
8  developing standards or a mechanism through which voters
9  could make that showing?
10     A   I don't know if they have.
11     Q   But the Secretary of State's Office has not
12 taken any steps to create such a process; is that right?
13     A   No.
14     Q   Have you given any guidance to any Supervisors
15 of Elections about whether they should create a process
16 that would prevent voters to prove that they have an
17 inability to pay their outstanding LFOs?
18     A   Ultimately the Supervisor of Elections is the
19 one that determines based on whatever we sent them or
20 whatever they created -- because they could get matches
21 themselves directly and bypass the State.
22     And once that due process plays out, if an
23 individual comes in and provides whatever evidence, it
24 could be just their statement alone, I can't afford to

MARIA MATTHEWS

1  pay this, that -- the Supervisor is required to take all
2  of that and adjudicate whether they believe that
3  individual, whether that's enough for them to say, okay,
4  you don't have to -- we believe you're still eligible to
5  be registered.
6       What that might look like, whether it's
7  actually a form, an affidavit, whether it's just a
8  statement under oath, in an oral hearing, that really is
9  for the Supervisors to -- that determination.
10     And that -- that has been the case regardless
11 whether -- for any basis if someone were to say, no, I
12 did get clemency and there was no evidence to support
13 that but they believe that individual, maybe they would
14 accept that.
15     Q   So your office hasn't given any guidance about
16 whether it should accept that or what standards
17 Supervisors should use to make a determination about
18 inability to pay?
19     A   We actually would refer to 98.075(7), which
20 talks about what the Supervisor of Elections should be
21 considering when they make a determination of whether
22 somebody is ineligible and should be removed.  It's
23 actually set out in the statute.
24     Q   This discussion about inability to pay, that

MARIA MATTHEWS

1  comes from the district court's preliminary injunction
2  order, though, correct, that's not in the statute?
3       A   Correct.  It's not spelled out that way, but
4  any evidence that an individual would present to the
5  Supervisor of Elections, whether it's an inability to
6  pay is part of that consideration of that evidence.
7       Q   So is it the Secretary of State's position
8  that right now a Supervisor of Election could decide
9  that a voter should remain on the roles because they are
10 unable to pay their outstanding LFOs?
11     MS. DAVIS:  Objection, attorney/client
12     privilege, form.
13 BY MR. GABER:
14     Q   Well, so we just had a discussion about how a
15 Supervisor of Election could either on the basis of an
16 attestation or a statement, or whatever information the
17 voter gives, that they could make that determination,
18 they're empowered to make that determination on their
19 own; is that --
20     A   They're empowered by that section.
21     Q   Are you aware of whether any Supervisors of
22 Election are doing that currently with respect to
23 determinations about inability to pay and voter
24 eligibility?

MARIA MATTHEWS

1       A   No, I am not.  I know for a fact that they are
2  not basing it on any files that we sent, because we
3  haven't sent any.  Now, they may have case files that
4  they created and that might be an issue, but I can't --
5  I don't know.
6       Q   Have you had conversations with Supervisors
7  about these topics about inability to pay and their
8  discretion to make the determination of whether the
9  voter is eligible?
10     A   These discussions, questions, things like this
11 did arise during conferences -- conference that we had
12 in December for the Supervisors of Elections, but we
13 were not able to provide them any definitive answers at
14 that time, because we are in a state of litigation, we
15 now have legislature in session, and we're still working
16 with our attorneys to review each case which presents
17 unique circumstances and facts to try to develop a
18 process that the Secretary can feel comfortable with,
19 the Department can feel comfortable with, the Division
20 can feel comfortable with, and that I personally can
21 feel comfortable with about sending anything down.
22     Q   At this point you're not comfortable sending
23 matches for LFOs down to the Supervisors of Elections
24 for review; is that correct?

MARIA MATTHEWS

2    A   And when I -- yes.  When I say comfort, I mean
3  having a process that is -- is -- supports being
4  credible and reliable.
5    Q   Is it your understanding from the district
6  court's partial stay order that the current state of the
7  Court's order is that people can register if they assert
8  that they have an inability to pay their outstanding
9  LFOs but for the moment the part about voting is stayed
10  but expires sometime in early February; is that your
11  understanding?
12    A   My understanding of the order is that it just
13  applies to those plaintiffs.
14    Q   Right.  The injunction applies to the
15  plaintiffs; is that what you mean?
16    A   Yes.
17    Q   Do you understand that the district court in
18  his order laid out the Court's view of what the
19  Constitution requires more generally for all voters of
20  Florida?
21    A   I have read the order.
22    Q   So does the Secretary of State's Office have
23  any plan for if the district court's partial stay
24  expires, what process voters will undertake to show that
25  they have an inability to pay their LFOs and are

MARIA MATTHEWS

2  therefore under his order eligible to vote?
3        MS. DAVIS:  Objection, form and
4    attorney/client privilege.
5  BY MR. GABER:
6    Q   Will there be a process -- if the district
7  court's stay expires and the order is not otherwise --
8  the order is still in place by the time of the
9  registration deadline and by the time of the March 2020
10  election, will there be a mechanism put in place by the
11  Secretary of State's Office for a voter to prove an
12  inability to pay?
13        MS. DAVIS:  Objection, attorney/client
14    privilege and form.
15        MR. GABER:  You're suggesting that the
16    existence of whether -- the existence of a
17    mechanism planned by the Secretary of State's
18    Office is a privileged matter?
19        MS. DAVIS:  When and under what circumstances
20    we would institute a process, other than what
21    Director Matthews has already testified about,
22    about being comfortable with a credible and
23    reliable procedure, yes, that's attorney/client
24    privilege.
25  BY MR. GABER:

MARIA MATTHEWS

2    Q   Have you talked to anyone, other than your
3  attorneys, about whether a mechanism should be put in
4  place by the Secretary of State's Office for voters who
5  want to prove that they have an inability to pay and are
6  therefore eligible to vote?
7    A   Other than the attorneys and perhaps the work
8  group discussions, but the report is pretty
9  comprehensive and would kind of lay that out.  That may
10  be the only other context in which it may have come up.
11    Q   Did the discussions with the work group
12  involve what a potential process -- potential mechanism
13  issued by the Secretary of State would look like for
14  inability to pay?
15    A   A lot of time has passed since then, so I
16  would defer to the report, which again has the
17  transcripts, there's audio recordings, the report
18  itself.
19    Q   If a voter were to call right now and ask how
20  they can prove that they have an inability to pay and so
21  therefore they believe they're eligible to vote, what
22  are they told?
23    A   Again, they would have to go to the Clerk of
24  Court to determine if there's a process there or to
25  speak to their Supervisor of Elections if -- assuming

MARIA MATTHEWS

2  there is a case file on that individual themselves.
3    Q   Is it your view that the Supervisors of
4  Elections are authorized now to determine that a voter
5  is eligible because they can't afford to pay their
6  outstanding LFOs?
7    A   Supervisor of Elections are empowered under
8  that section I cited earlier to consider all evidence.
9  Evidence could be oral, it could be written, that
10  includes the testimony of the individual and whether
11  that information is presented to the Supervisor as part
12  of that evidentiary consideration is -- exists right
13  now.
14    Q   That includes inability to pay the outstanding
15  LFOs; is that your understanding?
16    A   Anything that's presented to the Supervisor.
17    Q   Is inability to pay one of the factors the
18  Supervisor can consider in making that determination?
19    A   I think based on this court order, yes.
20    Q   But it's your position now that would be
21  county to county, Supervisor-to-Supervisor discretionary
22  determination?
23        MS. DAVIS:  Objection.
24    A   Case by case.
25  BY MR. GABER:

Page 288

MARIA MATTHEWS

2  Q   The conference you mentioned, is that the
3  Winter FSASE Conference?
4  A   Yes.
5  Q   When did that happen?
6  A   I think it was early December, maybe the
7  second week in December.
8  Q   Did you present at the conference?
9  A   We did, um-hum.
10  Q   Was the district court's preliminary
11  injunction order part of the discussions that happened
12  at that conference?
13  A   I believe there was a litigation update that
14  was provided during that conference.
15  Q   What was sent to the Supervisors as part of
16  the update?
17  A   I don't recall the specifics of it.  It would
18  have been just updating on what the litigation and I'm
19  sure that they would have stuck, I didn't do the
20  presentation myself, that they would have stuck very
21  closely to what the orders -- what the current status of
22  the litigation is, what the orders said.  And for any
23  open questions that were asked, they would have been
24  very cognizant of whether it was delving into any
25  attorney/client privilege or preparation for litigation.

Page 289

MARIA MATTHEWS

2  Q   Who gave that presentation?
3  THE WITNESS:  Ashley, I think it was you, now
4  that I remember.
5  MS. DAVIS:  That is correct.
6  BY MR. GABER:
7  Q   Do you know whether there are written notes or
8  a presentation or notes in preparation for a
9  presentation for that conference and that specific
10  litigation update?
11  A   There would have been a presentation, but I
12  don't know that -- there would have been a presentation.
13  Notes, I don't know.
14  Q   Were you present for that presentation?
15  A   I was.
16  Q   Did Supervisors ask questions in the
17  presentation?
18  A   Supervisors ask questions all the time in
19  presentations.  They are -- they like to ask questions.
20  Q   Did any Supervisor ask questions about whether
21  they could make determinations about a voter's inability
22  to pay and their eligibility?
23  A   I'm sorry, I cannot recall.
24  Q   Did the work group report come up during the
25  FSASE winter meeting?

Page 290

MARIA MATTHEWS

2  A   I believe that we mentioned it.  Supervisors
3  would have been informed about it before, because the
4  report was due November -- it was due no later than
5  November 1st.  I think it came out October 31st or
6  October 30th, so they would have been directed to that
7  report.
8  Q   Do you have any written materials or documents
9  or emails about the winter meeting, the presentations,
10  planning for the presentations, the litigation update?
11  A   Again, there would be the agenda that the
12  association puts out and indicates that we're going to
13  be present, then there would be our PowerPoint that we
14  had, and that's it.
15  Q   Did you email about the presentations and
16  planning for them with your staff or others?
17  A   I'm sure I consulted with my staff regarding
18  presentation if I had any particular questions.
19  Q   How many different -- or were there sessions,
20  other than the litigation update, that dealt with the
21  issue of SB 7066 Amendment 4 or the district court's
22  preliminary injunction?
23  A   I think it would have been all covered in the
24  litigation part, but it's possible that Supervisors
25  might ask a question out of specific context.

Page 291

MARIA MATTHEWS

2  Q   If an individual were to affirm on their voter
3  registration form that their rights have been restored
4  but the Secretary determines that they have outstanding
5  LFOs, would the Secretary refer the person for criminal
6  prosecution?
7  MS. DAVIS:  Objection, form.
8  A   At this time -- until it happens, I'm not
9  going to be able to say.  There is an obligation under
10  the law in Chapter 104 regarding if there is fraud or
11  anything else to refer to the State Attorney's Office.
12  BY MR. GABER:
13  Q   Would the Secretary of State consider
14  registering, notwithstanding the voter having
15  outstanding LFOs, to fall under that provision that
16  would require referral to the state's attorney?
17  A   I'm not sure I understand your question, but
18  the point right now is that every individual who affirms
19  on a voter registration application becomes a registered
20  voter, if the application is otherwise complete.  The
21  process for identifying going behind and seeing whether
22  that is truly the case occurs after the individual is
23  registered.
24  Q   When the Secretary of State refers someone to
25  a state attorney, do -- does your office undergo any

MARIA MATTHEWS

1    investigation to ascertain the intent of the voter,
2    whether they knew they were doing something that
3    potentially violated the law?
4        MS. DAVIS:  Objection, form.
5        A    Right now any individual can file -- or if
6    they allege that someone is -- shouldn't be registered
7    or shouldn't vote because of any reason, including
8    something like, that we direct them to go and complete
9    an elections fraud complaint, so we can get specifics
10   about it.  The legal office will look to see if there's
11   legal sufficiency to that.  And if there is, then that
12   matter is referred to the prosecutor -- prosecuting
13   office, right, and it will be their -- that's going to
14   be their job to determine whether intent is a component
15   or whether intent was there.  We won't be making that,
16   we're just going to be looking at legal sufficiency of
17   the fraud complaint.
18   BY MR. GABER:
19       Q    Legal sufficiency is whether or not there are
20   facts that could violate the law; is that correct?
21       A    Um-hum.
22       Q    Any of those complaints or reports will
23   necessarily go to the state's attorneys in the
24   individual counties?

MARIA MATTHEWS

1        MS. DAVIS:  Objection to form.
2        A    Yes.
3    BY MR. GABER:
4        Q    Does that include registering when potentially
5    ineligible because of issues surrounding a conviction?
6        A    It can be any basis for which someone is
7    alleging that that person is not eligible to be
8    registered or not eligible to vote.
9        Q    In addition to fraud complaints that you
10   receive, does the Secretary of State's Office when it
11   makes credible and reliable information determinations
12   that a voter might not be eligible and sends that
13   information to Supervisors, is there also a referral to
14   the state's attorney if there's a belief that there is a
15   legally sufficient potential that a violation of law
16   happened?
17       MS. DAVIS:  Objection to form.
18       A    We would not do that at that point.  Because
19   at that point, the due process hasn't played itself out
20   quite frankly.  And until that Supervisor makes the
21   determination that that person is ineligible, then that
22   would be the juncture at which if a Supervisor --
23   Supervisor has that responsibility if they've made that
24   determination whether they would go and refer that.

MARIA MATTHEWS

1    BY MR. GABER:
2        Q    But if the -- if the allegation comes in
3    through a fraud complaint, that is the determination of
4    whether that's sufficient evidence at your office and
5    your office sends that to the state's attorney?
6        MS. DAVIS:  Objection, form.
7        A    Correct.  There's two processes that are
8    happening there, so if an -- if a fraud complaint comes
9    in, that's one angle.  If we get information and it gets
10   reviewed for legal sufficiency and if it's determined to
11   be so, then it gets referred to the prosecutor's office.
12       At the same time, we will take that
13   information and look if we've had a prior match
14   because -- and if we have, but we couldn't determine
15   whether it was valid at that time.  It may be now that
16   we have more information and, therefore, we will act --
17   so that's that administrative -- quasi judicial
18   administrative process, so two tracks.
19   BY MR. GABER:
20       Q    Does the Secretary have any written policies
21   or procedures about criminal referrals for individuals
22   who register or vote despite having outstanding LFOs?
23       A    No.
24       Q    Does the Secretary have a position with

MARIA MATTHEWS

1    respect to the upcoming March 2020 primary if a voter
2    votes provisionally because they believe that they are
3    eligible because they have an inability to pay their
4    outstanding LFOs how those votes will be handled?
5        A    That process -- that's the safety net in the
6    law, so that if you go to vote and someone alleges or --
7    that you are ineligible, you are still allowed to vote a
8    provisional ballot and still allowed to have the
9    opportunity to present information that suggests that
10   you are eligible and you have up until 5:00 p.m. the
11   second day following the election.
12       MR. GABER:  Can we take a short break?
13       (Recessed at 11:05 a.m. to 11:14 a.m.)
14   BY MR. GABER:
15       Q    Ms. Matthews, when SB 7066 and its earlier
16   versions were being considered in the legislature, your
17   office prepared a fiscal analysis; is that right?
18       A    Correct.
19       Q    At the time -- and I think this was for an
20   earlier version than SB 7066, but you reported that it
21   would require quadrupling of the staff to go through the
22   information and make determinations about the different
23   categories that changed as a result of the legislation;
24   is that correct?

MARIA MATTHEWS

1
2    MS. DAVIS:  Objection to form.  If you have
3  the document, you can show it to her.  It probably
4  would be best.
5  BY MR. GABER:
6    Q   Do you recall reporting there would be a
7  quadrupling of staff?
8    A   I recall there being --
9    MS. DAVIS:  Objection.  I think the deposition
10  is supposed to be post September 13.
11    MR. GABER:  I will get to that.  I'm laying a
12  foundation for that.
13  BY MR. GABER:
14    Q   Do you recall reporting that there would be a
15  quadrupling?
16    A   I remember there being a report of increased
17  staffing needs.
18    Q   Does that sound about right that it was about
19  quadrupling?
20    A   Yes.
21    Q   Has there been an increase in staff on account
22  of SB 7066 going into effect in the Secretary's office?
23    A   Not yet, no.
24    Q   Does the Secretary of State have a position as
25  to whether case sheets in addition to the actual

MARIA MATTHEWS

1
2  sentencing document can provide evidence -- sufficient
3  evidence of what is the terms of a sentence for an
4  individual?
5    A   I believe that's under consideration.  I think
6  we use that as well for other case files.
7    Q   But as of today, there's no determination as
8  to whether that's sufficient reporting of the terms of
9  the sentence within the sentencing document; is that
10  correct?
11    MS. DAVIS:  Objection to form.
12    A   Again, I think that's under advisement with
13  the General Counsel's Office and we have not sent any
14  files down relative to that.
15  BY MR. GABER:
16    Q   Earlier you testified that you were
17  crystallizing a process for test cases for the matching
18  process and that that would be happening within the next
19  week or so; do you recall that testimony?
20    MS. DAVIS:  Objection to form.
21    A   It's trying to crystallize a process, but then
22  there has to be training, there has to be messaging to
23  the Supervisors, all of that.
24  BY MR. GABER:
25    Q   Are there documents that reflect the

MARIA MATTHEWS

1
2  crystallization and the development of that matching
3  system that you have?
4    MS. DAVIS:  Objection to form.
5    A   At this juncture, it's just the latest version
6  of the procedures.
7  BY MR. GABER:
8    Q   The December version of the procedures?
9    A   Correct.
10    Q   What did you mean when you said that a new
11  process was being crystallized with test cases?
12    MS. DAVIS:  Objection, form.
13    A   Meaning that once we get -- once we're all in
14  agreement as to what a case file will look like, what
15  needs to be in there, then that will be memorialized in
16  the new procedures.
17  BY MR. GABER:
18    Q   Have you sent emails to anyone on this topic?
19    A   No.
20    Q   You have not exchanged an email with any staff
21  or anyone involved in this process about what that
22  procedure should look like?
23    A   Well, I am in communication with my staff.
24  They're in the same suite that I am.  So there may be
25  email exchange asking about this or that, but that's it.

MARIA MATTHEWS

1
2    Q   Is there a plan for training to address a new
3  procedure?
4    A   Yes.
5    Q   What is that plan?
6    A   Plan would be once we crystallize a process,
7  how we can best train staff to be able to know, and put
8  these files together.
9    Q   When will that training happen?
10    A   Again, in consult with the General Counsel's
11  Office and when the Secretary says we're ready to go.
12    Q   Are there training materials that have been
13  drafted?
14    A   I don't believe we formalized any training
15  material yet -- we have training material from previous,
16  but not updated.
17    Q   But are there drafts of the material whether
18  they've been formalized or not?
19    A   I have not seen anything.
20    Q   Who would be in charge of that?
21    A   It could originate from the General Counsel's
22  Office, it could -- well, it hasn't originated from my
23  office yet.
24    Q   Are you aware that there are materials that
25  are being worked on for training?

MARIA MATTHEWS

2  A    I really don't know.
3  Q    So you've just identified that there will need
4 to be training?
5  A    Correct.
6  Q    Who would do that training?
7  A    It would be in conjunction with the General
8 Counsel's Office and the Division of Elections.
9  Q    You made reference to within the next week,
10 that the process was crystalizing in the next week, what
11 did you mean by that?
12     MS. DAVIS:  Objection, form.
13  A    Well, I mean, it's a week to week, so I just
14 said crystallizing hoping that we can start to move this
15 along.
16 BY MR. GABER:
17  Q    This means an update to the procedures for how
18 to handle matches involving LFOs is that -- that's part
19 of it?
20  A    Procedures to handle those matches that don't
21 fall into those other four categories.
22  Q    Do you anticipate that that -- that there will
23 be a final or near final procedure within the next week?
24  A    Again, that's not my call to make and that's
25 with consult with the general counsel and Secretary of

MARIA MATTHEWS

2 State.
3  Q    I understand that you don't make the decision,
4 but do you -- do you have reason to believe that that is
5 the time frame or something like that time frame for
6 when the new procedures will be approved?
7  A    We're working daily to -- on this -- on this
8 stuff.  So if and when we're directed to begin, we'll
9 hopefully be ready to start.
10  Q    Who makes that call that you should begin?
11  A    Again that's in consult with the General
12 Counsel's Office and the Secretary of State.
13  Q    Is that you that consults with Secretary of
14 State?
15  A    And my staff, the key leadership staff, yes.
16  Q    Sitting here today, do you have an estimate as
17 to when that new procedure will be approved?
18  A    No, I don't.
19  Q    Do you anticipate that it will happen prior to
20 the March 2020 primary election?
21  A    I don't know.
22     MR. GABER:  I want to turn to the report for
23  the Restoration of Voting Rights Work Group from
24  November 2019, which I will mark as an exhibit,
25  Number 25.

MARIA MATTHEWS

2     (Marked for Identification is Matthews Exhibit
3  Number 25.)
4 BY MR. GABER:
5  Q    Do you recognize this document?
6  A    Yes.
7  Q    What is it?
8  A    This appears to be the Secretary of State's
9 Notice of Filing the Restoration of Voting Rights Work
10 Group Report to the federal court in the Jones v.
11 DeSantis case.
12  Q    And attaches as an exhibit the report itself;
13 is that correct?
14  A    It contains just the report part.  It does not
15 include the appendices.
16  Q    In the interest of our environment, I did not
17 print the unlimited appendices.  Are you familiar with
18 the work group, did you have a role in that process?
19  A    Yes.  The department -- the Division of
20 Elections served as the administrative support for the
21 work group, that meant we were responsible for handling
22 the travel, if there were any out-of-county travel,
23 setting up the meetings, the reportings, and acting at
24 the direction of the work group.
25  Q    What's your understanding of the purpose and

MARIA MATTHEWS

2 responsibilities of the work group?
3  A    Well, I reference to the law in the executive
4 summary, which I'm now on page 5.  The work group was
5 charged with studying the issues involving the
6 restoration of voting rights and then specifically three
7 main areas, the consolidation of data necessary to
8 verify the eligibility of a registered voter, the
9 process for informing a registered voter of the -- where
10 they could find out about their data necessary to verify
11 their eligibility, as well as any other relevant
12 policies or procedures verifying the eligibility.
13  Q    The Secretary of State was the chair of the
14 work group; is that right?
15  A    That's correct.
16  Q    Did you attend the work group meetings?
17  A    I did.  I believe I attended all of them, but
18 perhaps maybe one.
19  Q    Who drafted the work group report?
20  A    The -- the actual initial draft based on what
21 was heard in the -- in the hearings was a collaborative
22 effort between the Division of Elections and the General
23 Counsel's Office.
24  Q    Were you involved in writing the report?
25  A    I was involved.

MARIA MATTHEWS

1

2    Q    Were you the primary drafter of the report?

3    A    No.

4    Q    Who was?

5    A    Well, it's a collaborative effort.

6    Q    Who was responsible for shepherding the

7  collaboration?

8    A    Again, a collaborative effort to do that.

9    A    I've been in those collaborative efforts.

10  They usually help if there's someone in charge.

11   A    Obviously I'm -- was responsible to get -- we

12  developed the framework, the contents, where everything

13  had to be, where it had to fall, and getting the

14  information in there, and then we relied on the hearing

15  minutes as well as what we heard in attendance, and we

16  did the initial draft, and then of course the Secretary

17  and the work group would review through.

18   Q    Did you send or receive emails or other

19  documents or paper documents pertaining to the work of

20  the work group?

21   A    Say that again.

22   Q    Did you send emails or receive emails that

23  discussed the work group, the meetings, planning for the

24  meetings, who would attend, or other subjects related to

25  the work group during the time that it was occurring?

MARIA MATTHEWS

1

2    A    Not to the entirety of the work group --

3    Q    I mean in general.

4    A    -- but to the Secretary -- yes, and internally

5  the General Counsel's Office of course as well and the

6  Secretary determining who is going to appear or needed

7  to appear and for which meetings.

8    Q    Did you exchange drafts of the work group

9  report over email?

10   A    There were definitely drafts.  I just don't

11  recall how they were shared.

12   Q    Was anyone outside of the Secretary of State's

13  Office given a draft report or collaborated with for

14  drafting the report, such as the members of the work

15  group?

16   A    I believe the stage that the work group was

17  was when they developed the recommendations, and then

18  they -- there's emails seeking their input.

19   Q    Were drafts of the report shared with members

20  of the work group for their review?

21   A    I believe the entire report was, I mean, with

22  the exception of the appendices, but I believe a draft

23  was provided to them with the recommendations -- the

24  initial draft of the recommendations to see if that's --

25  and then it was presented at one of the meetings.

MARIA MATTHEWS

1

2    Q    Were there changes made to those initial

3  recommendations through the editing process in

4  collaboration with the work group members?

5    A    I am most certain that the members did have

6  input and that they made some -- maybe not all of them,

7  but they definitely -- they were input, yes.

8    Q    Did that input come in the form of written

9  communications to your office or to the Secretary?

10   A    I believe -- yes.  I'm just recalling

11  Supervisor Cannon being one of the most vocal -- or

12  having the most extensive comments.

13   Q    Supervisor Cannon?

14   A    Hold on, I just don't recall the name of --

15  yes.  So, yes, if they had any edits or comments, they

16  were asked to -- to provide those.

17   Q    Do you have on your computer a file folder

18  dedicated to the work group -- to your work on the work

19  group?

20   A    Yes.

21   Q    What sort of documents are in the folder?

22   A    Administrative, everything from, as I

23  indicated before, travel, meeting minutes, anything

24  relative to the work group.

25   Q    Then separately in your email inbox, do you

MARIA MATTHEWS

1

2  keep -- do you organize them by folders, do you --

3    A    I do.

4    Q    Are you organized with your email -- I'm

5  totally not.  So do you have a folder for work group --

6  for this work group?

7    A    I believe I have a folder that is marked

8  Restoration of Voting Rights Work Group.

9    Q    Do you have a folder for SB 7066 or Amendment

10  4 issues as well in your email?

11   A    No, I did not create a specific one for that.

12   Q    What about with respect to documents you store

13  on your computer, do you have a folder for Amendment 4

14  or SB 7066?

15   A    There may be something under legislation.

16   Q    If you could turn to page 18 and 19 of the

17  report, I want to talk about some of the specific

18  recommendations that are contained.  Under

19  Recommendation A, the consolidation of all relevant data

20  necessary to verify the eligibility of a registered

21  voter for restoration of voting rights; do you see that

22  section?

23   A    Yes.

24   Q    Among the --

25        MS. DAVIS:  Page 18.

                    MARIA MATTHEWS

1         THE WITNESS:  No, I know.  I thought he was
2    going to talk about the recommendations.
3  BY MR. GABER:
4         Q    I am.  The Department of State doesn't have
5    direct authority over the Clerks; is that right, the
6    Clerk of Courts?
7         A    Yeah, that's a separate branch.
8         Q    Has the Department provided the Clerks with
9    any additional information or guidance based on these
10   recommendations about voter registration eligibility or
11   rights restoration?
12        A    We did seek their input about if a call was
13   received, to whom would we direct the individual to get
14   help about whether they had satisfied their sentence or
15   not.
16        Q    When you say we sought input, was this through
17   the work group or separately from the work group?
18        A    No.  We -- the work group sought the
19   information as well as we were continuing to work with
20   and try to reach out to the Clerks, as I mentioned
21   earlier in the deposition about what documents are you
22   developing or procedures you're developing so that we
23   can take those into consideration as we work on our own
24   procedures.
25

                    MARIA MATTHEWS

1         Q    One of the -- do you know whether the five
2    recommendations here listed under consolidating the
3    relevant data, do you know whether any of these
4    recommendations have been fulfilled?
5         MS. DAVIS:  Objection to form.
6         A    No.  Definitely not fulfilled, but I do know
7    that the legislature -- at least to Number 5, there is
8    legislation that has been filed regarding technology
9    system.
10   BY MR. GABER:
11        Q    Is it your view that that legislation would
12   fulfill the need that's identified by the recommendation
13   in Number 5?
14        A    At this juncture, I couldn't say.
15        Q    With respect to Numbers 1 through 4, do you
16   have any information to suggest that steps have been
17   taken to put these recommendations into place by the --
18   by Clerk reports?
19        A    No.
20        Q    Turning to page 22, these are recommendations
21   for Part B, which is the process of informing a
22   registered voter of the entity or entities that are
23   custodians of the relevant data necessary for verifying
24   his or her eligibility for restoration, do you see that,
25

                    MARIA MATTHEWS

1    and then there's some findings and the recommendations?
2         A    Yes.
3         Q    Recommendation Number 4 is the -- that there
4    be a designated voting rights liaison for restoration of
5    rights to assist in interagency information sharing; do
6    you see that?
7         A    Yes.
8         Q    Has someone been appointed to be that person?
9         A    No.
10        Q    Is there a process underway to identify a
11   candidate for that position?
12        A    This speaks in terms of liaison, so this would
13   be respective to each of the stakeholders mentioned
14   here.  And at this juncture we're just speaking with the
15   agency representatives, but there is no formalized
16   designation that I'm aware of at this time.
17        Q    That's for the Department of State?
18        A    I know for the Department of State we do not
19   have someone designated, but other than -- somebody
20   calls on the hotline, we direct them to the Clerk of
21   Court or the Department of Corrections.
22        Q    So you're not aware for any of these
23   departments that are listed here whether or not -- or
24   are you aware that they have not designated at this

                    MARIA MATTHEWS

1    point someone to be the liaison?
2         MS. DAVIS:  Objection to form.
3         A    I am not aware of any such designation at this
4    time.
5  BY MR. GABER:
6         Q    Recommendations 1 and 2 recommended
7    information pertaining to the loss of rights and
8    subsequent restoration of rights be provided during a
9    plea colloquy and then noticed by -- and noticed by the
10   Department of Corrections, has the Department of State
11   provided DOC with guidance as to what information should
12   be contained in such a notice?
13        A    Hold on just a minute.  Let me read this,
14   please.
15        Q    Yes.
16        A    My understanding is that Department of
17   Corrections is currently providing notice to their
18   inmates at the time that they are at a certain point to
19   let them know what their outstanding terms are as well
20   as sharing that information with the Clerk of Court.
21        Q    Have you seen any of those notices?
22        A    No, but I have asked for a copy.
23        Q    You haven't received one yet?
24        A    Not that I recall.
25

MARIA MATTHEWS

2  Q   Who did you ask?

3  A   I asked staff to reach out to the Department

4  of Corrections, so that we could see what those notices

5  look like.

6  Q   Do you know when you made that request?

7  A   I don't recall.

8  Q   Do you have an expectation of when you'll

9  receive a copy of that notice?

10  A   I'm going to follow up.

11  Q   Today?

12  A   Today.

13  Q   What about the first recommendation about the

14  colloquy, has recommendation been given to the

15  appropriate agency to give guidance as to what that plea

16  colloquy information should look like?

17  A   I don't believe that we have shared anything

18  with the Clerk of Courts on this.

19  Q   If you turn to page 23, Recommendation Number

20  6, that recommends requiring uniform information on

21  websites/handbooks for the Clerks, Supervisors,

22  Department of Corrections, FCOR, and the Department of

23  State regarding the restoration of civil and voting

24  rights; do you see that?

25  A   No.  You said 23?

MARIA MATTHEWS

2  Q   Number 6.

3  A   Oh, we're still on the recommendations.  As

4  indicated earlier in my deposition, we did reach out to

5  the Clerk of Court and the Department of Corrections

6  regarding information about how to restore civil rights

7  and voting rights.  The Department of Corrections I

8  believe is already sharing information, although I don't

9  know if it's exactly the same language as what we have.

10  We have not yet shared information with the

11  Supervisors of Elections regarding the uniform

12  instructions that should be issued regarding restoring

13  voting rights if it's not one of those for clemency --

14  other than clemency.

15  Q   Why not?

16  A   We're still discussing internally.

17  Q   Do you have a sense of when that uniform

18  information will be provided to the Supervisors?

19  A   No, I do not.

20  Q   Do you know whether it will be provided in

21  time for the March 2020 primary election?

22  A   No, I do not.

23  Q   What about the November 2020 general election?

24  A   No, I do not.

25  Q   What about with respect to the Florida

MARIA MATTHEWS

2  Commission of Offender Review and the Florida, you are

3  the Florida Department of -- has any guidance been

4  provided to the Commission on Offender Review for

5  uniform language to put this recommendation into place?

6  A   They may have information on their website.  I

7  don't know that it was in coordination with us.

8  Q   Has an effort been made to make sure that

9  these various websites and handbooks of these different

10  agencies are uniform, if they weren't in coordination?

11  A   It would be our desire to ensure that the

12  information is uniform across the board.  We have put it

13  on our website.  Department of Corrections is doing

14  their part and --

15  Q   But it sounds like no steps have actually been

16  taken to make them uniform other than --

17  A   That process --

18  MS. DAVIS:  Objection to form.

19  A   -- has not been complete.

20  BY MR. GABER:

21  Q   Moving to Section 4C, which begins on page 23

22  and carries over after that, that's any other relevant

23  policies and procedures for verifying the eligibility of

24  a registered voter for restoration of voting rights

25  under Section 4, Article VI of the State Constitution;

MARIA MATTHEWS

2  do you see that?

3  A   Yes.

4  Q   On page 24, paragraph 1, this is under the

5  recommendations.  The work group recommends that FCOR

6  and the Department should work together to create a

7  uniform process for researching further outstanding

8  restitution on a potential match for which information

9  is otherwise not available or ascertainable through

10  Clerk reports and/or DOC records or other applicable

11  records after a diligent search; do you see that?

12  A   Yes.

13  Q   Has there been any communications between the

14  Department and FCOR on creating such a process?

15  A   Yes.

16  Q   What do those communications entail?

17  A   Determining what -- what FCOR can provide in

18  terms of their ability to determine whether there is

19  outstanding restitution.

20  Q   Did that come in the form of email or written

21  communications?

22  A   It may have been an email.  We've also met

23  with them.

24  Q   Did you exchange any documents or paper on

25  this topic with FCOR representatives?

MARIA MATTHEWS

1
2     A    I believe that we did share documents with
3  them regarding a sample file.
4     Q    Did you come to any conclusions in terms of
5  how you can create a uniform process for conducting this
6  research?
7     A    We consulted with them based on their
8  expertise in researching cases for clemency.  We haven't
9  reached any definitive conclusion on what their role
10  will be and what -- what they may add to that process.
11  It's all part of that ongoing discussion.
12     Q    Do you have a sense for when you'll have
13  reached a definitive conclusion to put Recommendation
14  Number 1 into effect?
15     A    No.
16     Q    Do you have any sense that it will happen
17  before the March 2020 primary?
18     A    No.
19     Q    What about the November 2020 general election?
20     A    No.  With that being said, we are -- there are
21  still things outstanding.  We have litigation going on,
22  legislature, things can change.
23     Q    On page 24, paragraph 4 recommends that each
24  stakeholder agency, including the Department of State,
25  continue to enhance data systems and data input

MARIA MATTHEWS

1
2  procedures with a focus on timely availability,
3  accuracy, quality, and consistency of data; do you see
4  that?
5     A    Yes.
6     Q    What steps have been taken by the Department
7  to enhance its data systems and input procedures
8  pursuant to this recommendation?
9     A    By "Department" you mean Department of State?
10     Q    Department of State.
11     A    We've been working with the Department of
12  Corrections, the Florida Department of Law Enforcement,
13  the Florida Commission on Offender Review regarding
14  their respective databases and how information that they
15  have can be -- can be enhanced and if there's added
16  information -- informational fields that we need for
17  them to send to us so that it improves the quality of
18  the matches that we are getting.
19     Q    Have any of those recommended enhancements
20  discussed with the various entities gone into effect?
21     A    Pieces and parts.
22     Q    Which pieces?
23     A    Data, data coming from these -- from the these
24  entities.  For example, the Florida Commission on
25  Offender Review, we've asked them for reconciliation

MARIA MATTHEWS

1
2  files on their clemency to make sure that we have the
3  most current and has captured any changes to their
4  database, the Florida Department of Law Enforcement is
5  also working on their criteria and data that they send
6  over as well as DOC, but those have -- but it's a work
7  in progress, so it hasn't been finalized.
8     Q    Are there new categories of data that are now
9  being sent over that were not previously or what -- what
10  types of changes will you see happen if the
11  recommendation is followed through with?
12     A    Additional field -- I can speak for the
13  Department of Corrections' additional fields relative to
14  the fact that whether somebody is in supervision and
15  changes to that, because people who are in prison and in
16  supervision, their status can change from day to day,
17  and previously that was not of interest to us.  We just
18  needed to know whether the individual was -- had
19  received clemency.
20          And now based on this additional fields of
21  information that can determine whether it's going to
22  fall into those four categories or whether it will fall
23  into something else.
24     Q    Does "something else" mean potentially that
25  it's just outstanding LFOs?

MARIA MATTHEWS

1
2     A    Correct.
3     Q    But at this point, this is a work in progress
4  and these enhancements have not been made to your
5  satisfaction; is that --
6     A    No.  We're working to agree to understand each
7  other's data.  These systems were not created
8  necessarily originally to speak to each other.
9     Q    Has that understanding improved since the work
10  group report was released?
11     A    Yeah, these agencies work well with us and we
12  work with them.  It certainly has highlighted the issues
13  and the data.
14     Q    What types of issues have you encountered
15  through this collaborative process that have been
16  highlighted for you?
17     A    Just challenges to the way data is stored
18  in -- in a different -- in another agency and how to be
19  able to extract that data and get that data to us in a
20  meaningful way that we can use it to make a credible and
21  reliable match.
22     Q    Recommendations 5 and 7 talk about this
23  litigation and the judge's order and the -- as well as
24  the voter registration statement in the SB 7066
25  registration changes; do you see that?

MARIA MATTHEWS

1
2  A    Yes.
3  Q    What if any conversations have the Department
4  of State had with the legislature or representatives
5  from the legislature staff from a legislature about
6  these two recommendations?
7  A    I am aware that there is some legislation that
8  is being offered in both these -- in the area -- not
9  both these areas, I'm sorry.  At least for Number 5 that
10 there is legislation being proposed to revert to the
11 singular question about felon status.
12       Any time that -- whether it's myself or the
13 Secretary of State is asked by the legislature to speak
14 on something, we take no position, but we are -- we're
15 there as any other agency to offer information up.
16 Q    Have you or your staff spoken to legislatures
17 or legislative staff with respect to Recommendations 5
18 and 6?
19 A    Say that again.
20 Q    Have you or your staff spoken, either in
21 written or oral form, with either legislatures or their
22 staff with respect to Recommendations 5 and 6?
23 A    Not to date.
24 Q    More generally since your last deposition in
25 this case, have you spoken with any legislatures or

MARIA MATTHEWS

1
2  legislative staff about Amendment 4, SB 7066, or the
3  district court's preliminary injunction order?
4  A    Again, if not me -- or if the Secretary is
5  called up there, it would be for informational purposes,
6  and I believe that she was asked about the statewide
7  form, so.
8  Q    Have any recommendations been given by the
9  Secretary of State to legislatures or their staff about
10 creating legislation that would create a mechanism to
11 determine inability to pay for voters who could then be
12 eligible?
13 A    I'm not aware of that specific inquiry, no.
14 Q    Does the Department regularly provide
15 information or guidance to the legislature on issues of
16 election law?
17 A    Yes.  If they ask, we do.
18 Q    Is there an operating procedure for how to
19 respond to those requests, are they done in writing
20 or --
21 A    Any request that comes in for assistance or
22 from a senator or representative and/or their staff is
23 directed through the legislative director and a
24 determination is made whether it needs to have a visit,
25 a phone call to provide whatever information they're

MARIA MATTHEWS

1
2  seeking to help them -- them determine what the policy
3  is going to be.
4  Q    Do you know whether there's been any contact
5  with legislators or their staff by that department on
6  the topics of Amendment 4, SB 7066, or this litigation?
7  A    I am aware that the Secretary has gone up the
8  Hill to speak to some legislatures I believe on this
9  statewide voter application, just for background
10 information, to understand how registration occurs and
11 how felony matches occur and that she has also been in
12 touch with legislator about -- legislation about -- I
13 think it's with Representative Grant regarding that
14 technology proposal that he has.
15 Q    Which legislator -- legislators did she speak
16 to on the topic of the registration form?
17 A    That I don't remember.  I just remember Grant.
18 Q    Are you aware of any conversations, requests
19 for information on the topic of the district court's
20 preliminary injunction and potential legislation about
21 inability to pay?
22 A    No, and I would be surprised quite frankly,
23 since we're in litigation, that she would talk about
24 that.
25 Q    Are you aware of the governor's press release

MARIA MATTHEWS

1
2  after the District court entered the preliminary
3  injunction order saying that he agreed with the order?
4  A    I remember seeing a tweet.
5  Q    Do you know whether the Secretary of State
6  shared that position?
7  A    I don't -- you'd have to show me which tweet
8  we're talking about.
9  Q    The tweet that you remember.  Did the
10 Secretary of State agree with the governor with respect
11 to the district court's preliminary injunction order
12 after it was entered?
13       MS. DAVIS:  Objection to form.
14 A    Well, I remember -- I guess I should
15 backtrack.  I remember a tweet, but I'm not sure --
16 again, I think what I would say here is that the
17 Secretary of State is going to agree with whatever a
18 court says and whatever the law is.  That is what her
19 position is going to be, whether she -- yeah, that's
20 what...
21 BY MR. GABER:
22 Q    Do you know whether the Secretary of State
23 agreed that it was appropriate to have a process in
24 place for individuals who have -- who are unable to pay
25 their LFOs that they should be eligible to register and

Page 324

MARIA MATTHEWS

1    vote?
2          MS. DAVIS:  Objection to form.
3      A   I would think the Secretary again would uphold
4    whatever the order -- a court order is and whatever the
5    legislation laws are.
6    BY MR. GABER:
7      Q   Are you aware of any potential legislation
8    that would address the issue of setting up a process for
9    voters who have an inability to pay to have a
10   determination made for them to register and vote if
11   they're deemed eligible?
12     A   I wish I could say, but I haven't had time to
13   go through all the legislation that's been filed.
14     Q   If the district court's injunction is upheld
15   and the legislature doesn't take action, is there a plan
16   in place for the Secretary to issue some guidance as to
17   how Supervisors should make determinations about a
18   voter's inability to pay?
19         MS. DAVIS:  Objection to form and
20   attorney/client privilege.
21   BY MR. GABER:
22     Q   Is there a plan or a draft plan for how voters
23   should proceed if they get inconsistent information from
24   the various law enforcement and other agencies as to

Page 325

MARIA MATTHEWS

1    whether they owe outstanding LFOs?
2      A   Can you repeat that?
3          MS. DAVIS:  Objection to form.
4    BY MR. GABER:
5      Q   I don't know if I can.  Does the Secretary
6    have guidance for Supervisors or for voters for how they
7    should proceed if they get inconsistent information from
8    the Department of Corrections or the Clerk of Courts as
9    to whether they -- whether or not they owe outstanding
10   LFOs?
11     A   At this time we don't have anything, because
12   we haven't sent anything down.
13     Q   By sent it down, you mean sent down --
14     A   Credible and reliable matches down to the
15   counties based on that, yes.
16     Q   Has the Secretary of State issued any
17   guidance, whether formal or informal, to Supervisors or
18   Clerks of Court regarding the State Supreme Court's
19   advisory opinion on the meaning of one phrase in the
20   middle of Amendment 4?
21         MS. DAVIS:  Objection, form.
22     A   Secretaries -- we sent the advisory opinion to
23   the Supervisors of Elections.  I don't believe we
24   elaborated on anything.

Page 326

MARIA MATTHEWS

1          MR. GABER:  Take a short break.
2          (Recessed at 11:57 a.m. to 12:10 p.m.)
3    BY MR. GABER:
4      Q   Just a few more questions, Ms. Matthews.  At
5    your earlier deposition, you were asked about whether
6    the CCIS database aggregates misdemeanor financial
7    obligations with felony financial obligations and at the
8    time you said you didn't know.  Have you learned since
9    then whether that's the case?
10     A   I don't know if we have specifically
11   determined that or not.
12     Q   Is that a question that you've had with
13   respect to the CCIS database?
14     A   It would certainly be a question we would
15   explore, yes.
16     Q   You testified previously about the matching
17   process that it flags felony adjudications and that they
18   then go on for manual review, does that process exclude
19   cases where adjudication is withheld by the criminal
20   court?
21     A   It is supposed to.  Of course, any automated
22   process might have some, but it is supposed to exclude
23   that, but that's why we do the manual review.
24     Q   Is that an area that you found can be flawed

Page 327

MARIA MATTHEWS

1    with the automated process that it will incorrectly flag
2    folks who have had their adjudication withheld?
3          MS. DAVIS:  Objection, form.
4      A   We can find incomplete information or
5    insufficient information and that's why again with the
6    manual process it's not -- we're working initially with
7    the automated data, but we're then trying to find the
8    documentation to support it to help with those kinds of
9    discrepancies that might arise.
10   BY MR. GABER:
11     Q   We talked a little bit about the funding --
12   the projected need for more staff and resources for the
13   Department to implement these new procedures as a result
14   of SB 7066, does the Department plan to ask the
15   legislature for that additional funding to have new
16   staff and resources?
17     A   We actually have filed an amended budget
18   request to allocate I believe up to a million to assist
19   with resources, including staffing and whatever other
20   needs are in order to deal with our files.
21     Q   Is that an additional million dollars or is it
22   reallocated from some other part of the budget request?
23     A   Good question and I don't recall.
24     Q   With respect to -- we've talked today about

MARIA MATTHEWS

1 various documents that you have.  Since September, has
2 there been an effort to collect new documents, new
3 emails, new paper documents, or items you have stored on
4 your computer that relate in any way to the topic of
5 this lawsuit?
6 
7     A    Any documents that have been requested through
8 litigation, I would trust that the General Counsel's
9 Office would be responsive and would have asked me and
10 anyone else who might have documents responsive to it,
11 and we would have provided it.
12    Q    Have you asked -- have you been asked to
13 supplement your documents since the initial request came
14 in in September or August?
15    A    Yes.
16    Q    Have you provided those documents too?
17    A    We would have provided them to the General
18 Counsel's Office and they would have replied in
19 accordance.
20         MR. GABER:  I don't have any further
21 questions, but we have not -- plaintiffs have not
22 received any supplemental production in this case
23 since September.
24         None of the documents that were discussed
25 today, put in the procedures, and email exchanges

MARIA MATTHEWS

1 and documents related to the work group have been
2 produced to us.  I know that my colleague,
3 Molly Danahy, sent an email, I think Mr. Jazil
4 responded, and she followed up again, but we have
5 not received any response to that.
6         So I guess I'm putting on the record here, but
7 I would like to know whether or not the Secretary
8 plans to produce these additional materials.
9         MS. PRICE:  There will be documents produced
10 today, absolutely.
11         MR. GABER:  Will they include the -- you know,
12 the items we talked about in the deposition today?
13         MS. PRICE:  They'll include anything that's
14 responsive to the request for which we have a duty
15 to supplement under the federal rules.
16         MR. GABER:  I would just ask if there are any
17 in particular that came up today during the
18 deposition that if someone could just take a look
19 and make sure that those items are also among the
20 -- that are being produced, because I think
21 everything we talked about today would be
22 responsive to the request.  So with that, I have no
23 further questions.
24         I don't know if y'all do or someone on the

MARIA MATTHEWS

1 phone does.
2         THE WITNESS:  I did want to -- because
3 something with -- I thought about this later.  I
4 don't want it -- want it to be clear that I do not
5 know what the Supervisor of Elections are doing at
6 the local level in terms of LFOs, but I am pretty
7 sure that they are not doing anything regarding
8 that, because we've still got litigation going.
9         And as I'm talking and, you know, it appears
10 that we're in a state of flux is because of that.
11 We can't do anything definitive, because the
12 landscape keeps changing on us.  And Supervisors,
13 they do typically look to us for guidance on when
14 new procedures come into play and law, so they're
15 going to look to see what we do before they
16 probably implement something.
17         So I'm pretty sure there isn't any
18 Supervisor -- even though they might have the
19 authority to do something, that they are exercising
20 it at this point, because we're all kind of waiting
21 how litigation, how legislature, even as we're
22 having internal discussions and everything.
23 BY MR. GABER:
24    Q    How does that interact then with the

MARIA MATTHEWS

1 March 2020 election that's coming up really quickly?
2    A    People can still register to vote and if --
3 it's still up to the individual to affirm on a
4 registration application form that they believe
5 themselves to be eligible.  They'll get on the roles if
6 the application is complete.  We will still be doing the
7 cross-checking afterwards, subject to the limitations I
8 told you about or spoke to you about today.  And in
9 terms of those who are already registered, if they are
10 eligible, they should be able to vote.
11    Q    So what about the folks then -- I'm sorry, you
12 spoke so I have questions.  What about the folks who
13 might be among the people who their files are being
14 reviewed, they're being set aside right now, they're not
15 being sent down, they register, because they can
16 register as you said, the March 2020 primary comes, they
17 vote, and then afterwards it's determined that there's
18 credible and reliable information that they were not
19 eligible; for those people then, what's the Secretary of
20 State's position about whether they were eligible to
21 cast a ballot despite not having the notice that the due
22 process provision would give them if the files had been
23 sent down?
24         MS. DAVIS:  Objection.  That's outside the

MARIA MATTHEWS

1  scope of her additional comments and some of that,
2  if not most of that, was already covered in the
3  direct examination that you've already concluded.
4       MR. GABER:  I think it was well within the
5  scope of additional comments.
6       MS. DAVIS:  The scope of the additional
7  comments was limited to clarifying, I think, that
8  the Supervisors -- we don't have any information
9  that the Supervisors are acting independently as to
10  LFOs.
11 BY MR. GABER:
12      Q    I would like you to -- I would like you to
13  answer the question, if it needs to be in your
14  individual capacity.  It's well within the topics of the
15  notice and we're still at the deposition.
16           So I would like to know what the Secretary of
17  State's position is for someone who votes in the March
18  2020 election because they were informed that they could
19  register on their belief that they have an
20  outstanding -- that they can't -- they have an inability
21  to pay.
22           And if the Secretary later after the election
23  sends down a file suggesting that they now think the
24  information is credible and reliable, what is the

MARIA MATTHEWS

1  Secretary of State's position with respect whether that
2  voter is eligible to vote in the March 2020 election?
3       MS. DAVIS:  Objection to form.
4       A    I think I actually talked about this earlier
5  in the deposition and that is that determination gets
6  made by the Supervisor of Elections.  At that juncture,
7  then the individual is removed, that's the quasi
8  judicial administrative process, and then it's -- the
9  Supervisor of Elections whether they -- they have a duty
10  under Chapter 104 if they believe that there is a reason
11  to be referring that to also refer that person to the
12  state -- to the prosecutor or the State Attorney's
13  Office.
14 BY MR. GABER:
15      Q    But you also just offered that the Supervisors
16  look to the Department of State and even suggested that
17  they don't do anything until they get the guidance
18  from -- from you.  So what -- what is the guidance that
19  you would give Supervisors with respect to the voters
20  who are in that predicament?
21      MS. DAVIS:  Objection to form.
22      A    At this juncture, I don't know that I have an
23  answer for that.
24 BY MR. GABER:

MARIA MATTHEWS

1       Q    Is it possible that the state might -- that
2  the Secretary of State or the Supervisors might refer to
3  the -- those people to the state's attorney if after the
4  election the Secretary of State deemed that there was
5  credible and reliable information that they were
6  ineligible but didn't provide that information to the
7  voter before the next election?
8       MS. DAVIS:  Objection to form.
9       A    Again, the Supervisor of Elections is not
10  going to be determined -- is not going to be referring
11  it based on us just sending the file.  It's going to be
12  based on their determination once an individual has an
13  opportunity to provide evidence.  At that point, the
14  Supervisor, like they always have, have a duty to refer
15  any matter that they believe that's fraudulent.
16 BY MR. GABER:
17      Q    Is there any concern or effort to address this
18  situation before the March 2020 primary, is there any
19  plan to give notice to the voters who are currently
20  under review but not yet being sent down to the
21  Supervisors that there's some risk that the Secretary of
22  State might deem that they are ineligible?
23      A    Well, you're on notice when you fill out that
24  application that if you're not filling it out under --

MARIA MATTHEWS

1  because you're supposed to fill it out under oath.
2       Q    Right.  The oath is that you believe that you
3  are affirming that you are eligible and you've said
4  that's the voter's responsibility to make that
5  determination of whether they're eligible; right?
6       MS. DAVIS:  Objection to form.
7       A    I'm sorry, say that again.
8  BY MR. GABER:
9       Q    So if the voter -- obviously if they've
10  registered, they've obviously affirmed that they believe
11  they're eligible.  The Secretary of State's Office has a
12  list of I think it was 65,000 or so, I don't have the
13  exact number in front of me, people who are
14  potentially -- who potentially -- the Secretary of State
15  has information that they owe outstanding LFOs and that
16  eventually might lead to files being sent down to the
17  Supervisors; is that --
18      MS. DAVIS:  Objection to form.
19 BY MR. GABER:
20      Q    -- correct?
21      A    Again, all I know is that those 65,000 are --
22  don't fall into this other four categories.  I don't
23  know if they're LFOs until we review them.
24      Q    Among them are likely to be people who owe

Page 336

MARIA MATTHEWS

1 LFOs; is that fair?
2         MS. DAVIS:  Objection to form.
3      A   Yes, there is likely.
4 BY MR. GABER:
5      Q   At this point, there's no plan to send those
6 files down to the Supervisors before the March 2020
7 election; is that also correct?
8      A   We have not made a decision.
9      Q   Is the same true with the respect to the
10 November 2020 election?
11     A   Correct.
12     Q   So those voters will not have the benefit of
13 the Secretary of State's determination about whether
14 there's credible and reliable information that they
15 might be ineligible before they have to make a decision
16 of whether they should vote in the March 2020 primary;
17 is that right?
18        MS. DAVIS:  Objection to form.
19     A   Again, no different than now if someone is
20 identified as being a convicted felon.  It's a
21 potential.  Until that process plays itself out, they
22 are -- they are deemed registered and they are deemed
23 eligible.
24 BY MR. GABER:

Page 337

MARIA MATTHEWS

1      Q   But they're deemed eligible, because they
2 haven't been deemed ineligible; is that --
3      A   They're deemed eligible to vote at that point.
4      Q   That determination doesn't control whether or
5 not you might later refer someone for prosecution for
6 having been unlawfully registered or unlawfully voting,
7 right, you don't think just because they're registered
8 that means that they were eligible?
9         MS. DAVIS:  Objection.
10 BY MR. GABER:
11     Q   You understand the distinction I'm getting at?
12     A   Again, until that process, that due process
13 plays itself out, that person is deemed eligible to be
14 registered and eligible to vote.
15        MR. GABER:  I don't have any further
16 questions.
17        MS. DAVIS:  We don't have any further.
18        MR. GABER:  Anyone on the phone?  That sounds
19 good.
20        THE STENOGRAPHER:  Did you want to order this?
21        MR. GABER:  Yes.
22        THE STENOGRAPHER:  Ma'am, did y'all want to
23 order?
24        MS. DAVIS:  Yeah, send it to Tara.

Page 338

MARIA MATTHEWS

1      (Thereupon, the reading and signing of this
2 deposition was RESERVED.
3      The proceedings concluded at 12:25 p.m.)

Page 339

CERTIFICATE OF OATH

1 STATE OF FLORIDA
2 COUNTY OF LEON
3         I, JUDY LYNN MARTIN, Notary Public, State
4 of Florida, certify that MARIA MATTHEWS personally
5 appeared before me on January 27, 2020, and was duly
6 sworn.
7
8      Signed this 31st day of January, 2020.
9
10        *Judy Lynn Martin*
11
12 JUDY LYNN MARTIN
13 Notary Public, State of Florida
   My Commission No. GG1925542
14 Expires: April 9, 2022

| | | |
|---|---|---|
| Page 340 | | Page 341 |

**Page 340**

```
1              CERTIFICATE OF REPORTER
2    STATE OF FLORIDA
3    COUNTY OF LEON
4
5         I, JUDY LYNN MARTIN, do hereby certify
6    that I was authorized to and did stenographically
7    report the foregoing deposition of MARIA MATTHEWS;
8    that a review of the transcript was requested; and
9    that the transcript is a true record of my
10   stenographic notes.
11        I FURTHER CERTIFY that I am not a
12   relative, employee, attorney, or counsel of any of
13   the parties, nor am I a relative or employee of any
14   of the parties' attorney or counsel connected with
15   the action, nor am I financially interested in the
16   action.
17        Dated this 31st day of January, 2020.
18
19
20   Judy Lynn Martin
21   _____
     JUDY LYNN MARTIN
22
23
24
25
```

**Page 341**

```
1                    ERRATA SHEET
2         DO NOT WRITE ON THE TRANSCRIPT
            ENTER CHANGES ON THIS SHEET
3
     KELVIN LEON JONES, ET AL., VS. RON DESANTIS, ET AL.
4    Deponent:  MARIA MATTHEWS
     Date of :  January 27, 2020
5    Case No.:  4:19-CV-300-RH-MJF
6    PAGE   LINE       REMARKS
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   Under penalties of perjury, I declare that I have read
     the foregoing document and that the facts stated in it
22   are true.
23   Signature of Witness _____
24   Dated this _____ day of _____, _____.
25
```