9

# The 1968 Florida Constitution was created without racial animus, and the subsequent Constitution Revision Commissions amending it also acted without racial animus.

Mary E. Adkins, J.D., M.A.

## I.       Scope of report

I have been retained as an expert by counsel for defendant, the Florida Secretary of State, in this civil case. My report responds to that of Dr. J. Morgan Kousser, submitted on March 2, 2020. That 112-page report theorizes that Florida's SB7066 and the underlying provision in the 1968 Florida Constitution, which predates what is referred to in this litigation as Amendment 4, arose from racist roots.

This report refutes that theory and establishes the reformist, not racist, impetus that created Florida's current constitution. In this report, all facts can be cited to my 2016 book *Making Modern Florida*, unless otherwise cited.

## II.      Credentials

I have been a member of the faculty at the University of Florida Levin College of Law for fifteen years, and carry the title of Master Lecturer. I earned a J.D. degree and an M.A. in history. About ten years ago I began intense study about the origins of Florida's 1968 Constitution. That interest resulted in my


DEFENDANT SOS COMPOSITE EXHIBIT

145

10

first book, *Making Modern Florida: How the Spirit of Reform Shaped a New State Constitution* (Gainesville, FL: University Press of Florida 2016), which underwent a peer review and a separate editing process and has received all positive professional reviews.  The book told the story of how timing and perseverance on the part of a group of reformers resulted in a modern constitution for a growing state. I conducted sixteen interviews in person for the book, including interviews with Governor Claude Kirk (1967-1971) and the successive House Speakers Ralph Turlington (1967-1969), Richard Pettigrew (1971-1972) and Terrell Sessums (1973-1974).  I read the voluminous transcripts of the 1966 Constitution Revision Commission's plenary sessions and the vast majority, if not all, of the documents contained in the Florida State Archives generated by the 1966 CRC, its committees, and the multiple legislative sessions that worked to implement the draft that CRC produced. I also relied on the extensive transcribed interviews available through the Samuel Proctor Oral History Project at the University of Florida and other sources. A complete listing is given in the bibliography of my book. I also read as one source the full newspaper clipping file maintained by the CRC during its existence, which is also available at the Florida State Archives.

Since then I have published more on the subject: an article, the result of a keynote address regarding Florida's then-upcoming 2017-18 Constitution Revision Commission, titled "The Same River Twice: A Brief History Of How The

1968 Florida Constitution Came To Be And What It Has Become," 18 Fla. Coastal L. Rev. 5 (Fall 2016); an article reviewing and critiquing Florida's CRC process, titled "What Florida's Constitution Revision Commission Can Teach and Learn From Those of Other States," 71 Rutgers L. Rev 1177 (Fall 2019)(published March 2020); an article in the Spring 2020 edition of the magazine Florida FORUM, titled "Our Evolving Constitutions," about the history of the 1968 constitution; and an upcoming peer-reviewed biography of 1966 CRC Chair, former Florida Bar and American Bar Association President, and head of the Holland & Knight law firm, Chesterfield Smith, titled *Chesterfield Smith, America's Lawyer* (Gainesville, FL: University Press of Florida, 2020). I am also under contract as a co-author of an upcoming case book on Florida Constitutional Law.

I have presented, moderated, been interviewed, or acted as a panelist 53 times about Florida constitution revision and specifically the CRC history and process. Those instances have included being an invited presenter to committees of the 2017-18 Constitution Revision Commission. I have received four grants to partially fund my research.

I was asked by Florida's ACLU to testify before the 2017-18 CRC regarding an amendment proposed by it, but declined to do so as an advocate or to accept payment. I have never in the past four years testified as an expert at trial or by deposition. I am a graduate of the University of Florida Levin

College of Law, where I served as Senior Executive Editor of the Florida Law Review. I have been a member of The Florida Bar since 1992, but for the past several years have elected inactive status as my teaching, research, and writing preclude a separate practice of law.

I am being paid $200 per hour to perform specific research into the narrow questions presented here and to write a report. For time spent in deposition or in court, my rate is $300 per hour. Reasonable out-of-pocket expenses are being reimbursed to me.

My complete CV is attached to this report as Exhibit 1.

### III.    The proper role of newspapers as a historian's tool

Reputable historians often use newspapers as sources. Newspapers are a reliable source to ascertain how facts looked as they were happening. They might capture, for example, the fact that lynchings were celebrated in real time as public events attended by hundreds, rather than treated as the criminal acts they were. A newspaper might provide a source for color in a historical event that is otherwise reduced to transcripts. For example, in my book, *Making Modern Florida*, I used newspaper accounts to describe conversations and comments spoken by members of the Constitution Revision Commission of 1966 when they were not in the Senate Chamber being transcribed by a court reporter.

13

But, newspapers are incomplete as a sole source for facts. Often a newspaper will write a story as the facts appear at the time, when further investigation reveals the facts to be different. For example, when a bomb was discovered at the Summer Olympics in Atlanta in 1996, the security guard who found it before detonation was originally a suspect. Newspapers and broadcast media relentlessly focused on Jewell; only three months later he was cleared.[1] Instances such as this illustrate how newspapers get their deserved, but deservedly limited, sobriquet as the "first draft of history."

What a newspaper cannot do reliably is inform what the newspaper's readers are thinking. This is where Dr. Kousser mistakenly depends on newspapers. A newspaper story reflects the thinking of the person who wrote the story.  But a newspaper story tells one nothing about what the reader actually read, or whether the reader understands what the article intended to convey. By publishing facts or opinions a newspaper cannot control the mind of the reader. Thus, Dr. Kousser's reliance on newspapers as a window into the minds of the newspapers' readers is misplaced.

## IV.    Brief historical review of previous constitutions

---

[1] Bill Rankin, "An Emotional Jewell Recalls 88-Day Ordeal," *Atlanta Journal* and *Atlanta Constitution*, October 29, 1996.

14

To provide context for my conclusions about the framers of the 1968 Constitution and subsequent Constitution Revision Commissions, it is necessary to briefly point out that people convicted of certain crimes have been subject to disqualification from voting under every Florida Constitution, beginning in 1838, before Florida's admission as a state and when African Americans did not have the vote at all in the Florida territory.[2] Therefore, in its earliest inception in Florida, the felon disqualification provision almost certainly was not intended to affect African Americans.

To provide a backdrop for the extent of reform the 1968 Florida Constitution represented, it is necessary to describe the shortcomings of the constitution in place immediately before the 1968 one. That constitution was adopted in 1885, by segregationist southern whites, after Reconstruction ended. That constitution aimed to take appointive, and most other, power from the governor and to install provisions that disadvantaged African Americans. The executive branch provided for a one-term governor and six other cabinet members elected statewide who could be, and were, re-elected indefinitely. There was no lieutenant governor; if a governor died or otherwise left office, the President of the Senate became governor. The governor and cabinet members sat in various combinations over executive branch departments, commissions

---

[2] Fla. Const. Art. VI, § 5 (1838).

and boards. The exact number of executive department boards was unknown but was estimated to total about one hundred and fifty; responsibility for executive decisions was notoriously difficult to divine. This dilute executive responsibility was often called the "plural executive," or, derisively, the "seven governors" system.

The legislature sat in sixty-day biennial sessions that required it to budget for two years but allowed it to exercise oversight over actual spending only after the two years were completed, at the next session. The legislature had no permanent professional staff or auditor to monitor how budget monies were spent. The constitution apportioned the legislature accurately for 1885, but contained strictures that prevented meaningful reapportionment when the population patterns changed drastically in the twentieth century. For example, the constitution guaranteed every county at least one representative, but no county could have more than three. This would prove disastrously difficult to manage, much less justify, by 1960 when, for example, Dade County had more than 900,000 people and Lafayette County fewer than 3,000.[3]

The judicial article allowed the legislature to add courts with locally determined jurisdictions. By the mid-1960s the legislature had authorized more than fifteen different locally determined jurisdictions that differed among

---

[3] Exploring Florida: Florida Census: 1960, http://fcit.usf.edu/florida/docs/c/census/1960.htm.

counties. This meant that a person seeking legal redress had to know the various inconsistent jurisdictions among counties. All members of the judiciary were elected in partisan campaigns.

Counties and cities had limited home rule and were dependent on the legislature for authorization of local projects. That authorization proceeded through local bills that choked the legislature with their volume: all non-routine local governmental decisions had to be made during the sixty-day period every two years when the legislature met. Oversight of local bills was generally limited to the local legislative delegation and transformed those legislators into czars over their geographic areas.

Racial segregation of schools was mandated in the constitution. Mixed-race marriages were banned "forever." The constitution provided for a poll tax that the legislature could require of citizens as a precondition to voting; poll taxes were used at that time to discourage blacks, who were usually poor, from voting.

Voting was restricted to men aged 21 or older who had lived in the state for a full year and in the county in which he voted for six months. (Florida did, of course, allow women to vote after the U.S. Constitutional amendment in 1920.)[4] However, felons and persons "non compos mentis," "insane," or under

---

[4] U.S. Const. Amend. 19 (1920).

17

guardianship could not vote,[5] and persons who had been convicted of bribery, perjury, larceny, or "infamous crime," or who had bet on an election or had had any role in a duel, could not hold office.[6]

**V.      Attempts to revamp 1885 constitution.**

As the later 1900s progressed Florida's population boomed, but almost all of the growth came to southern and central Florida. The effect of the legislative apportionment scheme became painfully clear: while most of Florida's residents lived in the south, most of its legislative districts were in the north. The legislature was controlled by a long-serving bloc of northern and rural legislators that became known as the Pork Chop Gang, for the "pork" they brought to their rural districts. The Pork Chop Gang resisted the cultural and demographic changes that the population boom brought. They did not support the needs of the large cities. Roads, prisons and health facilities were built, for example, disproportionately in the north.

Residents of the southern part of the state needed more representation in the legislature and a change to the local bill process, which could be accomplished only through significant reapportionment and constitutional modifications. But the constitution did not allow the legislature to reapportion

---

[5] Fla. Const. Art. VI § 4 (1885).
[6] Fla. Const. Art. VI § 5 (1885).

18

itself enough to accomplish a fair distribution. The constitution, then, had to change. But, under the 1885 Constitution, it could be amended only one section at a time, and only by the legislators: the very people who stood to lose their seat under a fair apportionment.

The Florida Bar suggested a draft of a new constitution in 1947. The League of Women Voters came out with a "yardstick" for constitution revision in 1960. And Governor LeRoy Collins (1955-61) attempted several avenues to accomplish constitutional change. The legislature, however, was in no mood to cooperate. It would approve special committees and commissions to review the constitution, but ignore or distort their finished proposals.

After the U. S. Supreme Court decided *Baker v. Carr*,[7] in 1962, allowing the federal courts to intervene in state apportionment disputes, residents of Dade County sued Florida's Secretary of State, alleging that Florida's legislative apportionment was unconstitutional. The litigation bounced between the federal district court and the U.S. Supreme Court, took five years to finally resolve, and was pending in 1965, when the legislature approved another constitution revision commission.

---

[7] Baker v. Carr, 369 U.S. 186 (1962).

19

## VI.  The 1968 Constitution was drafted without racial animus and broke continuity with previous constitutions.

The 1968 Constitution was drafted by a group dominated by reformers. It was not drafted with racial animus. A person unfamiliar with the members of the 1966 Constitution Revision Commission and with the precise moment in history when it occurred in Florida might be tempted to categorize any product the Commission produced as having come from the unreconstructed South. But in the case of Florida's CRC that drafted the 1968 Constitution, such a categorization would be inaccurate.

For example, Dr. Kousser quotes the opinion of newspaper columnist Fred Grimm and a single Florida House Representative, Dotie Joseph, as claiming the felon disqualification language in Article VI, Section 4 of the 1968 Florida Constitution is a remnant of Jim Crow.[8] However, as shown above, this view is inaccurate; at its inception the provision predated most African American voting.

This section will describe the structure, members, process, and work of the 1966 CRC, and will demonstrate how the CRC's product broke continuity with previous constitutions, and why its members acted without racial animus.

a. The 1965-67 CRC in  general, and its structure

---

[8] Kousser, ¶ 163, March 2, 2020 report.

20

The revision process started in 1965 when the Florida Legislature passed a bill creating a thirty-seven-person Constitutional Revision Commission. The 1965 bill creating the CRC was patterned after an earlier constitutional revision commission created in 1955. Under the 1965 bill, the Governor appointed ten members to the commission including the chair, the Florida Senate President eight members, the Florida House Speaker eight members, the Chief Justice five members, and the Florida Bar five members. The Attorney General was automatically a member. The Governor appointed Bartow attorney Chesterfield Smith as the chair. Smith publicly promised comprehensive reform of the Florida constitution.

Smith subdivided the CRC into ten committees, two administrative and eight substantive committees. Two committees relevant to this Report are the Suffrage and Elections committee, a substantive committee, and the Style and Drafting Committee, an administrative committee. Simply by organizing the group into committees, Smith was shaping the articles of the new constitution.

b. The Chair of the CRC and its members

The CRC of 1965-67, created by statute, was a body that set its own purpose to wholly reform the Constitution. Regardless of whether the legislature intended that result when it passed the bill creating the CRC, when Governor Haydon Burns appointed Chesterfield Smith chair of the body, its future as a reform commission was secured.

21

### 1. CRC Chair Chesterfield Smith

When Chesterfield Smith was appointed chair of the CRC, he had just completed his year as President of The Florida Bar, where a priority of his was affordable legal services. He was the impetus behind the growth of his firm, Holland, Bevis, McRae, and Smith, in Bartow. In 1968 the firm would merge with another to become what is now Holland & Knight.

Smith grew up in a financially challenged broken home, and was a reformer at heart. As captain of a field artillery battalion in World War II, he occupied a town in Germany that had a prison camp adjacent to it. The camp conditions were horrid. Smith's solution: he had all the townspeople trade places with the prisoners and told them they could not return to their homes until they had made the prison habitable. They completed the work in two days.

He would, as head of Holland & Knight, force his firm to hire and promote women lawyers and black lawyers. He was not afraid to have an openly gay lawyer in the firm in the1980s, in the midst of the AIDS panic. His firm was the first to create a full-time Community Service Team dedicated to pro bono work; that team was heavily involved in gaining restitution for the residents of Rosewood, an African American town near Cedar Key, Florida, that was burned to the ground by nearby whites in 1923.

In 1973, as President of the American Bar Association, Smith's was among the first voices of the "establishment" to condemn President Richard Nixon for what became known as the "Saturday Night Massacre." His statement in a press conference at the time, "No man is above the law," resounded in a period of apathy and cynicism.

This was the man whom Governor Burns placed at the chair of the new Constitution Revision Commission. In later interviews, CRC members recalled his management style as forceful. Joseph Jacobs, an attorney who had marched with blacks in St. Augustine in 1964, when Dr. Martin Luther King came to lead protests, said that Smith "seldom asked for advice or counsel, he would just tell you what he had in mind for you, and you usually followed that advice." Third District Court of Appeal Judge Thomas Barkdull, the only person who would serve on each CRC through 1998 and who was widely acknowledged as informal vice-chair of the CRC, later told an interviewer that CRC members often referred to Smith as "Lord Chesterfield." Reubin Askew, then a young state senator on the CRC, said in an interview that Smith insisted everyone be called simply "Commissioner," regardless of their position outside the CRC—but also that "there was only one king—and everybody knew who he was and his name was Chesterfield."

This forceful personality was also described unanimously by the other commissioners as dedicated to creating the best new constitution possible. In

one speech, Smith exhorted his commissioners to "worry about my state for the next hundred years" and to write a reform constitution, not just a rewrite of the existing one.

### 2.  Other commissioners

The CRC members were appointed by a diverse group of officials and spanned a variety of walks of life. Though all were white and only one was female, they represented several professions—from judges, lawyers, and legislators to a retail executive, a newspaper editor, and a labor leader. They also represented a variety of political views. Though most were Democrats, they represented the split of the times: some Democrats, such as *Miami News* editor William Baggs and his protégé, Dick Pettigrew, were the more liberal Roosevelt-Kennedy-Johnson type who opposed the Vietnam War, favored eighteen-year-old voting, and believed in equality for women. Others, such as Robert Ervin, were conservative Southern Democrats who had inherited their party from Civil War-era ancestors. A few were Republicans, and the Republican members, such as Donald Reed and William Young, tended to represent middle-of-the-road interests and to favor reform, given that the political atmosphere in Florida was only then emerging from the Pork Chop Gang days of conservative Democratic control.

### c.  The CRC's process of deciding on, and drafting, a new constitution

24

Smith held an organizational meeting of the entire CRC in January 1966 and gave the committees their orders: meet and come up with broad, philosophical questions having to do with their assigned part of the constitution. Then, in the spring, the whole CRC would reconvene to argue these questions, which Smith dubbed "certified questions." Smith assigned a commissioner to argue the pro and con of each question, to make sure the whole CRC saw issues on both sides.

The committees were then to meet to decide on proposed language for their part of the constitution. Each committee held separate meetings, which were open to the public, and prepared proposals that they sent to the Style and Drafting committee in late spring. The Style and Drafting committee received the written proposals for language from the eight substantive committees, including Suffrage and Elections, and harmonized that language into a consistent constitution. This was a reiterative process, as Style and Drafting had to harmonize conflicting provisions that had been drafted in ignorance of each other for this first full draft.

The first draft was published in every major Florida newspaper in full at the end of June 1966; then the CRC held public meetings in July in five cities, from Pensacola to Miami. The committees met again in September to revise their articles accordingly. These revisions became a draft that formed the basis for the CRC's final, three-week-long plenary session between Thanksgiving and

25

Christmas 1966. For that session, the eight substantive committees were disbanded, and the CRC members were reformed into general-jurisdiction committees called simply A, B, C, and D. These committees could move to amend anything already in the draft. Thus, the new constitution received input from different types of committees, one specific and one general; pro-and-con debate; and public hearings. The CRC signed off on the new constitution on January 7, 1967. And that process got it only to the legislature.

> d. <u>The Suffrage and Elections Committee</u>

The CRC Suffrage and Elections committee meetings occurred on February 2 and 3, 1966; March 30 and 31, 1966; May 18, 1966; and September 30, 1966. At its first meeting, the committee addressed two matters: specifying certified questions to be debated by the full commission at its upcoming March 1966 plenary meeting, and creating a first draft of the areas in the constitution dealing with elections.

The committee membership was balanced politically. The chair was George Stallings, Jr., a conservative legislator who had chaired an earlier Interim Elections Study Committee in the Legislature in 1963. The vice-chair was Bill Young, then a young Republican legislator from St. Petersburg. The remainder of the committee members, forming a majority, were Dick Pettigrew, a young liberal Democrat from; Richard Earle, a lawyer from St. Petersburg who would go on to lead disciplinary efforts against a sitting Florida Supreme

Court justice, a courageous position by any measure; and Warren Goodrich, the head of the state's Democratic Party and a law school friend of Chesterfield Smith. All but Richard Earle had served on the 1963-65 Interim Elections Study Committee. That committee recommended comprehensive reform to Florida elections statutes but did not attempt to change the underlying constitutional bases for the statutes.

The disqualification of felons from voting or holding public office was never a debated issue for the committee. At its February 2 and 3 meeting, the committee specified three certified questions of great interest: whether the constitution should include a citizens' initiative, whether to lower the voting age below twenty-one, and whether to continue special elections for school taxes. Though the provisions disqualifying felons from voting were not the topic of a certified question, the committee did review them. The committee removed language iterating specific crimes and streamlined language regarding both persons convicted of felonies and persons adjudicated incompetent. Though the committee considered restricting the disqualification to persons actually in prison serving a sentence, it ultimately rejected that language. It appears that while the language was considered and reconsidered, the underlying concept—that persons convicted of a felony should not vote—was not controversial.

The Suffrage and Elections committee met again in late March 1966, but did not work on the felon-voting language until its May meeting, when it

27

reworded the language describing the disqualifications. The committee changed section 5 to read: "No person convicted of a felony or adjudicated mentally incompetent in this or any other state shall be qualified to vote or hold public office until his civil rights are restored or his disability removed."

This committee did receive two outside critiques of voting language and specifically the felon-disqualification language. One was by Elston Roady, an FSU political science professor, and one from Hal McClamma, a legal assistant in the Secretary of State's office. Both offered what amounted to stylistic language changes to the article, recommending against redundancy and unclear language.

The committee transmitted this draft to the Style and Drafting Committee, which compiled a complete draft constitution dated June 30, 1966. The Style and Drafting Committee accepted the draft language on disqualification without change and placed it in the June 30, 1996 draft constitution.

The final meeting of the committee occurred September 20 and 21, 1966. The committee worked from the June 30, 1966 draft compiled by the committee on Style and Drafting. The Suffrage and Elections committee made proposed changes to most sections of the June 30, 1966 draft. In particular, Suffrage and Elections changed the wording of Section 4 to now read: "No person adjudged guilty of a felony or mentally incompetent in this or any other

state shall be qualified to vote or hold public office until his civil rights are restored or his disability removed."

Only stylistic changes were made to Article VI, Section 4 in the ensuing six months.

### VII.   The legislature that revised the CRC's product did not act with racial animus and provided a further break from previous constitutions.

In 1966, Florida elected its first Republican governor since Reconstruction. Claude Kirk had no experience in government but had observed the final sessions of the CRC and agreed that constitution reform was a priority. Therefore, at his January inauguration speech, he called for a January 9 special session of the legislature to convene for the purpose of constitution revision.

But that session was aborted before it could properly begin. As Chesterfield Smith was delivering a speech to the legislators on the importance of constitution reform, the United States Supreme Court announced its final decision in *Swann v. Adams*, Florida's reapportionment case.[9] The Court announced that the current legislature was unconstitutionally apportioned. Further, the Court announced that it would no longer allow the legislature to

---

[9] Swann v. Adams, 385 U.S. 440 (1967).

29

craft its own apportionment plan: the federal district court would take care of that issue. The legislature had no power to do anything.

One month later, the United States District Court for the Southern District of Florida announced an apportionment scheme. New elections for the entire legislature were held using the new court-approved districts. The new legislature elected in the spring of 1967 was younger, more urban, and contained more liberal Democrats and more Republicans than any legislature in the past eight decades. This was the legislature that was to tackle the new constitution draft the CRC had provided.

When this reapportioned legislature convened on July 31, 1967 for a special session on constitution revision, some of the first amendments to the CRC's draft constitution were criminal-defendant-friendly, such as banishing the death penalty (which failed) and constitutionalizing the right to counsel and a speedy trial (which passed). The Senate did not get to Article VI until mid-August, and its focus was on whether the voting age should be eighteen or twenty-one.

It took nearly another year for the legislature to agree on a final draft to put before the voters. The final constitution was divided into three main parts for ballot purposes. Article VI was separate, because the voting age—the only substantive change at issue in the article—was controversial. (Ironically, after the legislature decided to offer Article VI separately it changed the proposed

voting age back to twenty-one.) Article VIII was separate because its provisions regarding home rule were considered controversial. Article V was not on offer, as the legislature had been unable to agree on how to reform the judiciary. The remaining proposal comprised the rest of the constitution.

Though the legislature did not revisit the felon disqualification section, it, like the CRC, showed no racial animus. In fact, both bodies knew how to remove the vestiges of racial animus from the constitution. They removed the provision mandating segregated schools, even though most of Florida had not yet integrated its schools. They removed the provision banning mixed-race marriages, even though mixed-race marriages were not generally approved of at the time. They also removed the poll tax.

The voters of Florida voted to adopt the new constitution in the general election of November 1968.

### VIII.  Later CRCs

The new constitution provided, in contrast to the 1885 one, for several ways to be amended. The new constitution provided for citizens' initiatives and for a new and unique body: the nation's only (then and now) automatically recurring constitution revision commission, with the power to place proposals

31

directly on the ballot.[10] The first CRC would meet ten years after the constitution was adopted, and every twenty years thereafter.

---

[10] Fla. Cont. Art. XI, § 2 (1968).

32

a. <u>1977-78 CRC</u>

The 1977-78 CRC was the first to meet under the terms of the new constitution. Reubin Askew, who had been a member of the 1965-67 CRC, was now governor, and chose Talbot "Sandy" D'Alemberte to be chair. The political party composition of this CRC was thirty-three Democrats and four Republicans. Racial and gender diversity was improved over the 1965-67 CRC: this CRC had two African Americans, two Latinos, and five women.

After the Commission had held public hearings around the state and solicited proposals from the public, it compiled them by the article and section and then proposed each to the full commission. Any proposal receiving at least ten votes would move forward for consideration by the commission.

The Commission initially did not take up a proposal to remove the voting disqualification from felons, even though it had been suggested in a public hearing. The proposal received zero votes in September 1977 and appeared dead. But in December, the Privacy and Elections Committee received a request from Governor Askew to consider a proposal that would merely suspend voting rights for persons adjudicated guilty of a felony while they were imprisoned or on parole or probation. At the completion of all these conditions the right to vote would be automatically restored. This represented a significant change in the constitutional language, even though for practical purposes at

33

that time, it would have little effect on the already nearly universal restoration occurring under Askew's leadership.

Governor Askew had been automatically restoring felon rights under the authority of a rule he and the cabinet had promulgated. And in 1974 the legislature had passed a law automatically restoring voting rights to felons under the same conditions, but the Florida Supreme Court held it unconstitutionally encroached on the clemency authority vested exclusively in the executive branch. Therefore, Askew requested the CRC to propose automatic restoration so that it could be directly authorized in the constitution.

The CRC approved the measure, and it was placed on the ballot along with the CRC's other proposals. However, like all the CRC's proposals that year, it was rejected by the voters. D'Alemberte and others who have analyzed the failure of any of that CRC's proposals to pass have generally cited the presence of another proposal on that year's ballot, a measure that would have allowed casino gambling. A well-publicized campaign was organized urging voters to "say no" to the casino gambling proposal. Observers have theorized that the "say no" campaign influenced voters on all of that year's proposals. No race-related reasons have been put forward; in fact, when any of the particular proposals are mentioned as ripe for failure, the abolition of the elected cabinet is mentioned most often.

     b.  <u>1997-98 CRC</u>

34

The 1997-98 CRC convened at a unique time in Florida's political history: for the first time since Reconstruction, both houses of the legislature had Republican majorities. The Governor, Lawton Chiles, was a Democrat who had served on the 1965-67 CRC; the Chief Justice, Gerald Kogan, leaned left; and the Attorney General, Robert Butterworth, was a Democrat. This meant that, at least by appointing authority, the CRC was evenly divided between the two major political parties: eighteen Republican and eighteen Democrat. Attorney General Butterworth, the only member whose position was written into the CRC membership, broke the tie to 19-18 in favor of Democrats. This CRC was also slightly more balanced as to race, ethnicity, and gender than any of its predecessors, with three African Americans, three Latino or Latina, and ten women. I have interviewed fourteen of the members of the 1997-98 CRC; most have, without being prompted, said it was the most collegial governmental work they had experienced, with all members respecting each other, even when their positions on an issue were opposed.

This CRC's attention to suffrage and election issues remained with changing the primary elections systems. The only changes it proposed to Article VI, Section 4 was an unsuccessful attempt to remove term limits for certain elected officials.

c. <u>2017-18 CRC</u>

35

The 2017-18 CRC was, as to political party dominance, the mirror image of the 1977-78 body: it contained thirty-three Republican members and four Democrats. However, it finally achieved something close to a representative cross-section of Florida as to race, ethnicity, and gender, with six African Americans; five Latinos and Latinas, including the Chair; and fifteen women.

Another achievement of this CRC was a proposal to restore voting rights to felons. Dr. Kousser asserts that, by the end of Rick Scott's second term as governor, after fifty-three bills to re-enfranchise felons failed, "the only alternative was a citizens' initiative." Dr. Kousser does not mention that a second alternative was available at that very moment in time: the 2017-18 CRC.

The 2017-18 CRC had three proposed amendments under consideration that would have restored voting rights to certain felons. The issue of felon voting was popular during the CRC's first round of public hearings around the state, which occurred in the spring and summer of 2017. Pertinent to this analysis is the proposal of Commissioner Chris Smith, a Democratic member of the Florida Senate who is black. Smith's proposal intentionally mirrored the language of the citizens' petition that ultimately became Amendment 4, was passed by more than the required supermajority of voters in the 2018 general election, and was the basis for SB 7066, the subject of this litigation. In a meeting of the CRC's Ethics and Elections Committee on January 18, 2018,

36

Smith stated that he mirrored the language so that, in case the citizens'
petition did not get enough signatures to appear on the ballot, the language the
people had signed on to, and that had already been approved by the Florida
Supreme Court, could go forward—in Smith's words, "to keep the issue going
in case there was an issue with the signature gathering."[11] Smith, therefore,
already knew the Supreme Court had heard oral argument on the very
language he proposed. It is reasonable to infer that he also knew of Dean Jon
Mills's colloquy at the hearing in which he stated that "all terms means all
terms."[12] Smith pointedly acknowledged the large amount of work a successful
petition drive takes, and told the committee, "You have my word—if the
signatures are good, this gets withdrawn the next day."[13] Thus, the most recent
CRC considered the restoration of voting rights of felons a priority and stated it
was ready to place it on the ballot even if the citizens' initiative had not been
able to.

---

[11] The Florida Channel, 1/18/18 Constitution Revision Commission
Ethics & Election Committee, https://thefloridachannel.org/videos/1-
18-18-constitution-revision-commission-ethics-elections-committee/.
[12] Advisory Opinion to the Attorney General Re: Voting Restoration
Amendment SC16-1785 and Advisory Opinion to the Attorney General
Re: Voting Restoration Amendment (FIS) SC16-1981. Florida Supreme
Court Oral Arguments, Mar. 6, 2017,
https://wfsu.org/gavel2gavel/viewcase.php?eid=2421.
[13] The Florida Channel, 1/18/18 Constitution Revision Commission
Ethics & Election Committee, https://thefloridachannel.org/videos/1-
18-18-constitution-revision-commission-ethics-elections-committee/.

37

IX.   **Amendment 4 and its Advocates**

    a.  <u>Jon L. Mills</u>

Jon L. Mills, former Democratic Speaker of the House of Representatives of Florida, Dean Emeritus of the University of Florida Levin College of Law, and founding director of the Center for Governmental Responsibility at the University of Florida, represented all four of the entities that backed the initiative that became Amendment 4 for the required Florida Supreme Court hearing to determine that the Amendment 4 ballot language was fair and not misleading. Mills has a history of representing sponsors of citizens' initiatives successfully before that court; indeed, through his Center for Governmental Responsibility he has dedicated his career to improving governmental transparency. Mills, still active in the Democratic Party, has supported the candidacies of Barack Obama and Cory Booker. No one who knows Mills's work career would consider him racist. It was with the support of the initiative's backers that Mills appeared before the court and told the court that the initiative contemplated completion of incarceration, parole, probation, costs, fines, and restitution.

But to insinuate a nefarious motive to Mills because he supported a court-funding amendment twenty years before, as footnote 25 of Dr. Lousser's

38

report does, is to fail to understand that amendment and the factors present in the Florida court system at that time.

When the judiciary article of the Florida Constitution, Article V, was passed in 1972, four years after the rest of the constitution, it swept away the idiosyncratic local variations on courts, some funded completely and directly by the fees and fines they generated, and replaced them with a uniform system of two tiers of trial courts and two tiers of appellate courts. But the piece that kept the system from being truly uniform was how the system was funded. Nearly all of the costs of the state court system were funded from local taxes. Wealthier counties were better able than poorer counties to fund state attorneys, public defenders, and court staff. Funding the state judicial system was a great burden on the counties, many of which were already at their maximum millage rates and could not raise local taxes.

What the 1998 Article V revision put forth by the 1997-98 Constitution Revision Commission accomplished was to shift the funding of the court system from the counties to the state, so the burden across counties would be more equitable.[14] Dean Mills neither introduced the bill nor participated in the debate as to its particulars. He was selected to chair a select committee to

---

[14] 1997-98 Constitution Revision Commission, proceedings, Nov. 14, 1997, https://fall.law.fsu.edu/new_crc/minutes/crcminutes111497.html.

examine the feasibility and effects of the proposal. His committee's conclusions were based on the value of an independent judiciary and the need to fund it on an equal basis through uniform state funds, not variable local funds. The clerks' offices were, under this revision, to be funded by fees and fines.[15] Therefore, it is misleading to characterize Mills's involvement in heading the select committee as him having a "particular interest in increasing the incentives to collect fines and fees." An accurate characterization is that Mills studied how to make funding of the judicial branch more equitable.

In telling the Florida Supreme Court on behalf of the Amendment 4 proponents that "all terms means all terms," Mills was speaking for his clients. Any implication that he somehow had an interest in spiking fees that felons have to pay, thereby making it less likely the beneficiaries of his own clients would be able to regain the vote, is easily discredited by a look at the 1997-98 CRC proceedings – not to mention Mills' impeccable reputation.

   b. Voters of Florida

When Florida voters went to the polls on November 6, 2018, they had thirteen proposed constitutional amendments to consider. In the same

---

[15] 1997-98 Constitution Revision Commission, proceedings, Feb. 12, 1998, https://fall.law.fsu.edu/new_crc/minutes/crcminutes0.html.21287

40

elections in which they approved Amendment 4 with a supermajority vote, they also approved Amendment 6, Marsy's Law, with a supermajority.

Among the guarantees Marsy's Law placed in the constitution was "[t]he right to full and timely restitution in every case and from each convicted offender for all losses suffered, both directly and indirectly, by the victim as a result of the criminal conduct. All monies and property collected from any person who has been ordered to make restitution shall be first applied to the restitution owed to the victim before paying any amounts owed to the government."[16] Thus, on the same day Floridians voted to allow felons to vote after satisfying all terms of their sentence, Floridians also voted to constitutionalize the obligation to pay restitution "in every case."

### X.    Conclusion

The transition to the 1968 Constitution of Florida took several steps and several iterations of review. From 1966 to today, the many, many framers have had multiple opportunities to reconsider every aspect of the constitution. The felon disqualification from voting has been no exception: it was changed, though not abolished, in 1966; proposed to be narrowed to current incarceration and characterized as merely "suspended" in 1978; and

---

[16] Fla Const. Art. I, § XX (1968, amended 2018).

41

significantly narrowed, mirroring the language of the citizens' initiative, in 2018. The break with any earlier provisions of the Florida Constitution is complete; no evidence of the slightest racial animus as to Article VI, section 4 exists.

Respectfully submitted,

*Mary E. Adkins*

Mary E. Adkins, J.D., M.A.
\

42

# EXHIBIT 1

43

# MARY E. ADKINS

Post Office Box 511, Melrose, Florida 32666
adkinsm@law.ufl.edu
(352) 316-3693

## EXPERIENCE

**University of Florida Levin College of Law,** Gainesville, Fl.
Master Legal Skills Professor, August 2012 - present
Senior Legal Skills Professor, August 2009 - August 2012
Legal Skills Professor, February 2006 - August 2009
Adjunct Legal Skills Professor, January 2005 - February 2006.

Teach legal research, analysis and communication, both oral and written. Supervise six to eight teaching assistants per semester. Teach Appellate Advocacy and provide guidance to members and leadership of Florida Moot Court Team. Taught Florida Civil Procedure and supervised externships.

**Cameron, Hodges, Coleman, LaPointe, & Wright, P.A., Ocala and Jacksonville, FL. Associate Attorney.** 2001– 2004.
Very busy insurance defense civil practice; successfully managed and litigated large caseload, Wrote effective pleadings, motions, memoranda of law, and briefs; tried and mediated cases. Worked in Ocala office until, in March 2004, managed Jacksonville satellite office.

**Sole practitioner, Melrose, FL.** 1999 –2001.
General civil law practice; represented both plaintiffs and defendants in personal injury, contract litigation, land use, real estate, insurance, and governmental cases. Wrote and argued motions and briefs; conducted discovery, trials and mediations.

**Jones, Carter & Drylie, P.A., Gainesville, FL. Associate Attorney.** 1994—1998. Civil practice with emphasis in diverse insurance defense litigation, small business representation, and land use law. Wrote and argued motions and briefs; conducted discovery, trials and mediations.

**Holland & Knight, Jacksonville, FL. Associate Attorney.** 1992—1994. Civil litigation practice in firm's Jacksonville office with emphasis on real-estate-related litigation. Participated in firm committees; wrote and argued motions and briefs; conducted discovery, trials and mediations.

**University of Miami School of Music,** Miami, FL.
Director of Development, 1987-1988. Worked with alumni and friends of the School to raise

funds for the School.

**Muscular Dystrophy Association,** Fort Myers, FL.
District Director, 1985-1986; Program Coordinator, 1982-85.
Directed staff and volunteers for all programs, including successful fund-raising programs, in ten-county area.

| | |
|---|---|
| **Education:** | M.A, University of Florida History Department, 2017 |
| | J.D., University of Florida College of Law, 1991 |
| | B.S.J., University of Florida College of Journalism and Communications, 1979 |

| | |
|---|---|
| **Honors:** | Florida Law Review: Senior Executive Editor, 1991; Selection Committee Chair, Fall 1991. |

**Publications:**

"Our Evolving Constitutions," Florida FORUM (Spring 2020).

"What Florida's Constitution Revision Commission Can Teach and Learn From Those of Other States," 71 Rutgers U. L. Rev. 1177 (Summer 2019).

Guest editor, "Florida's 2017-2018 Constitution Revision: It's Your Turn to Decide," 92 The Florida Bar J. 10 - 27 (Sept. 2018).

"The Same River Twice: A Brief History Of How The 1968 Florida Constitution Came To Be And What It Has Become," 18 Fla. Coastal L. Rev. 5 (Fall 2016).

*Making Modern Florida: How the Spirit of Reform Shaped a New State Constitution.* (Gainesville, FL: University Press of Florida 2016*).*

Rev. of *Reubin O'D. Askew and the Golden Age of Florida Politics*, by Martin A. Dyckman, 85 The Florida Bar J. 60 (2011).

"Persuasive Analytical Legal Writing," Bahçeşehir Űniversitesi Hűkűk Fakultesi (Bahçeşehir University Law Faculty) Kazanci 125 (Turk.) (2011).

"The Unblinking Eye Turns to Appellate Law: Cameras in Trial Courtrooms and Their Effect on Appellate Law," 15 Journal of Technology Law & Policy 65 (2010).

45

"Seven Qualities for Beginning Appellate Attorneys" in Vol. XVI, No. 6 of *The Record*, the Journal of the Appellate Practice Section of The Florida Bar, Spring 2008.

National Business Institutes seminar materials, "Current Issues Impacting Insurance Defense Practice in Florida", June 28, 2005, Jacksonville, Florida.

**Works in Progress:**

*Chesterfield Smith, America's Lawyer* (Gainesville, FL: University Press of Florida 2020).

Florida Constitutional Law casebook (with Jon L. Mills), forthcoming 2021, advance contract, Carolina Academic Press.

Help with autobiography of retired Florida Supreme Court Justice James E. C. Perry, working title: *I Came To Kick Down Doors.*

Follow-up book to *Making Modern Florida*, discussing issues common to the three Florida Constitution Revision Commissions, working title: *The Same River Thrice: Fifty Years of Florida Constitution Revision.*

**Presentations and Other Professional Activities:**

**January 8, 2020: Lecturer, "Making Modern Florida,"** Historical Society of Palm Beach County, West Palm Beach, FL

**March 13, 2019: Speaker, "Women in Florida's Constitutional History,"** Democratic Women's Club of St. John's County, St. Augustine, FL.

**March 10, 2019: Speaker, "Constitution Revision, Reapportionment, and the League of Women Voters of Florida,"** Orange County League of Women Voters, Orlando, FL.

**August 30, 2018: Moderator, "40 Years of the Constitution Revision Commission: A Panel Discussion,"** Florida's Historic Capitol, Tallahassee, FL.

**August 28, 2018: Speaker, "Constitution Revision Commission proposals,"** Alachua County League of Women Voters - Oak Hammock Branch, Gainesville, FL.

46

**August 10, 2018 (and August 2017 and 2016):** team-taught legal research, writing, and drafting exercise for UF Levin College of Law orientation, Gainesville, FL.

**August 9, 2018: Workshop participant, "Connecting Through Scholarship,"** Southeastern Association of Law Schools annual meeting, Fort Lauderdale, FL.

**August 9, 2018: Discussion group participant, "Connecting Through Diversity: Teach, Learn, Educate Yourself,"** Southeastern Association of Law Schools annual meeting, Fort Lauderdale, FL.

**June 28, 2018: Keynote Speaker, "Making Modern Florida,"** Florida Association of Clerks and Comptrollers 40th Anniversary Meeting, West Palm Beach, FL.

**May 24, 2018: Speaker, "Women in Florida's Constitutional History,"** Democratic Women's Club of the Lake Area, Melrose, FL.

**May 19, 2018: Speaker, "2017-18 Constitution Revision Commission: A Historical Perspective,"** Florida Historical Association, Sarasota, FL.

**May 8, 2018: Speaker, "Constitution Revision Commission proposals,"** Alachua County Senior Center Civics Class, Gainesville, FL.

**February 21, 2018: Panelist, "Constitution Revision Commission issues,"** Jacksonville Bar Association, Jacksonville, FL.

**February 15, 2018: Speaker, "Florida's Constitutions,"** Florida Conference of Historians, Tallahassee, FL.

**February 1, 2018: Panelist, "Constitution Revision Commission issues,"** Sarasota Tiger Bay Club, Sarasota, FL.

**January 30, 2018: Speaker, "Historical Perspectives on Constitution Revision Commissions,"** Legislative Reunion, Tallahassee, FL.

**January 17, 2018: Speaker, "2017-18 Constitution Revision Commission issues,"** League of Women Voters of Alachua County, Oak Hammock Branch, Gainesville, FL.

**December 21, 2017: Recorded interview on "Making Modern Florida"** with Orlando Magic VP Pat Williams for radio broadcast.

47

**December 15, 2017: Speaker, "The Same River Twice: Lessons from Florida's Constitution Revision Commissions,"** Martin County Bar Association, Stuart, FL.

**November 30, 2017: Speaker, Constitution Revision Commission Declaration of Rights Committee,** Tallahassee, FL.

**November 28, 2017: Recorded interview on "Making Modern Florida"** for Fluent in Floridian podcast, episode 29.

**November 17, 2017: Speaker, "The Same River Twice: Lessons from Florida's Constitution Revision Commissions,"** Eighth Judicial Circuit Bar Association, Gainesville, FL.

**November 9, 2017: Speaker, Florida Lecture Series, "Making Modern Florida,"** Florida Southern College, Lakeland, FL.

**October 25, 2017: Keynote speaker, "History and Current Issues: Florida's Constitution Revision Commission"** League of Women Voters of Alachua County Fall Luncheon, Gainesville, FL.

**October 12, 2017: Panelist, "History and Current Issues: Florida's Constitution Revision Commission,"** Florida House on Capitol Hill trustees annual meeting, Ponte Vedra Beach, FL.

**October 6, 2017: Speaker, Florida Historical Society, "Making Modern Florida,"** Cocoa, FL.

**October 6, 2017: Recorded interview, "Making Modern Florida,"** for Florida Frontiers television show episode, Cocoa, FL.

**October 3, 2017: Recorded podcast on "History of Florida's Constitution Revision Commission,"** for The Florida Bar, Tallahassee, FL.

**October 3, 2017: Speaker, "History of Florida's Constitution Revision Commission,"** Declaration of Rights Committee of the Florida Constitution Revision Commission, Tallahassee, FL.

**September 27, 2017: Panelist, "Local Government issues with Florida's Constitution Revision Commission,"** Florida Association of Counties annual meeting, Lake Buena Vista, FL.

48

**September 19, 2017: Speaker, "History and Current Issues: Florida's Constitution Revision Commission,"** George C. Young American Inn of Court, Orlando, FL.

**September 6, 2017: Panelist, "History and Current Issues: Florida's Constitution Revision Commission,"** Florida Appellate Judges' Educational Conference, Orlando, FL.

**August 17, 2017: Panelist, "Florida Constitution Commission: WHAT it is and WHY it should matter to you,"** Manatee Tiger Bay Club, Bradenton, FL.

**July 19, 2017: Speaker, "Going Deep: How In-depth Interviews can Bridge Cultural Differences,"** with retired Florida Supreme Court Justice James E.C. Perry (via Skype), Association of Legal Writing Directors (ALWD) Biennial Conference, Minneapolis, MN.

**July 11, 2017: Speaker, "Florida Cases in the U. S. Supreme Court,"** University of Florida Levin College of Law Idea Incubator, Gainesville, FL.

**June 21, 2017: Speaker, "*Making Modern Florida,*"** Books & Books, Coral Gables, FL.

**May 30, 2017: Recorded interview for podcast** for "New Books in Law" podcast series; interviewer, Ian Drake.

**May 21, 2017: Speaker, "The Same River Twice: History of Florida's Constitution Revision,"** Florida Historical Society Annual Meeting, at sea aboard Carnival *Sensation.*

**April 24, 2017: Panelist, "A Conversation about the Florida Constitution Revision Commission,"** University of Florida Levin College of Law, Gainesville, FL.

**March 29, 2017: Speaker, "Florida's Constitution Revision Commission: Historical Perspectives and Current Issues,"** Manatee County Bar Association, Bradenton, FL.

**March 22, 2017: Panelist, "Constitutional Revision Commission,"** Florida Chamber of Commerce Capitol Days, Tallahassee, FL.

**March 21, 2017: Speaker, "Florida's Constitution Revision Commission: Historical Perspectives and Current Issues,"** League of Women Voters of Alachua County - Oak Hammock Branch, Gainesville, FL.

**March 11, 2017: Panelist, "The Same River Twice: Florida's Constitution Revision Commission,"** Florida Conference of Historians Annual Meeting, Punta Gorda, FL.

**February 22, 2017: Speaker, "The Same River Twice: Florida's Constitution Revision Commission,"** LeRoy Collins Institute Board of Directors, Tallahassee, FL.

**February 10 - 12, 2017: Speaker, "Florida's Constitution Revision Commission: Historical Perspectives and Current Issues" and judged student proposals** at Bob Graham Center for Public Service Future of Florida Summit, Gainesville, FL.

**December 8, 2016: Speaker, "Florida's Constitution Revision Commission: Historical Perspectives and Current Issues"** Florida Bar Board of Governors Committee on Constitution Revision Commission, Clearwater Beach, FL.

**September 29, 2016: Speaker, "Making Modern Florida"** Melrose Friends of the Library, Melrose, FL.

**September 15, 2016: Keynote speaker: "Making Modern Florida,"** Santa Fe College Democracy Day, Gainesville, FL.

**August 10, 2016: Speaker, "Making Modern Florida"** Tallahassee Women Lawyers, Tallahassee, FL.

**July 11, 2016: Moderator, "You Contain Multitudes: Finding and Polishing Your Unique Qualities,"** panel presentation at Legal Writing Institute Biennial Meeting, Portland, OR.

**April 1, 2016: Speaker, "Florida's Constitution: Historical Perspectives and Current Issues,"** Constitutional Scholars Forum, Barry University School of Law, Orlando, FL.

**March 19, 2016: Co-speaker, "Not So Fast: Crafting Assignments to Address Students' Logical Lapses,"** with Joe Jackson, at Rocky Mountain Legal Writing Conference, Tucson, AZ.

**March 4, 2016: Keynote speaker, "The History of the CRC,"** Florida Coastal Law Review Symposium, *20-20: A look into the 2017 Florida Constitution Revision Commission*, Jacksonville, FL.

**February 25, 2016: Speaker, "Drafting a Constitution, Drafting a Legislature,"** Faculty Workshop, University of Florida Levin College of Law, Gainesville, FL.

**February 4, 2016: American Inns of Court team presentation panelist, "Past and Current Issues in Florida Constitution Revision,"** at First District Court of Appeal,

50

Tallahassee, FL.

**November 12, 2015: Speaker, "Past and Current Issues in Florida Constitution Revision,"** League of Women Voters of Alachua County - Oak Hammock Branch, Gainesville, FL.

**October 8, 2015: Panelist, "The Florida Constitution at 50 Years: Looking Ahead to the 2017-2018 Revision Commission** UF Law Center for Governmental Responsibility and the Bob Graham Center for Public Service (co-sponsors), Gainesville, FL.

**August 2015 (and every August since 2006): Speaker, "How to Brief a Case,"** UF Levin College of Law orientation, Gainesville, FL.

**August 1, 2015: Panelist, "Workshop on Legal Writing, Reasoning, and Research: Grading and Assessment,"** Southeastern Association of Law Schools 2015 Conference, Boca Raton, Florida.

**September 12, 2014: Speaker, "Pigs, Pot, and Policy: The Creation of Florida's Modern Constitution,"** Institute for Learning in Retirement, Oak Hammock, Gainesville, FL.

**July 31, 2014: Speaker, "Pigs, Pot, and Policy: The Creation of Florida's Modern Constitution,"** as Patrick Riordan Memorial Fellow at University of South Florida Libraries, Tampa, FL.

**June 30, 2014: Speaker, "Computer to Professor: Anything You Can Do, I Can Do Better?,"** Legal Writing Institute Annual Meeting, Philadelphia, PA.

**April 25, 2014: Facilitator, ALWD Innovative Teaching Workshop,** Stetson University College of Law, Gulfport, FL.

**December 7, 2012: Panelist, "Teaching Mediation with Legal Writing,"** Legal Writing Institute One-Day Workshop, Nova Southeastern University Shepard Broad Law Center, Fort Lauderdale, FL.

**October 2012: Speaker, "Legal Analysis,"** an academic support program, to first-year law students at the University of Florida Fredric G. Levin College of Law, Gainesville, FL.

**December 2, 2011: Panelist, "Effective Use of Teaching Assistants,"** Legal Writing Institute One-Day Workshop, University of Miami College of Law, Coral Gables, FL.

51

**June 6 - 9, 2011: Speaker, "Persuasive Analytical Legal Writing,"** Twenty-First Century Global Legal Skills Conference, Bahçeşehir University, Istanbul, Turkey**.**

**May - June, 2011:** Assistant Editor, Mark Yates, *The Carnegie Effect: Elevating Practical Training over Liberal Education in Curricular Reform*, Volume 17, Legal Writing: The Journal of the Legal Writing Institute (2011).

**Fall 2010 - Spring 2012:** Assistant Editor, Legal Writing: The Journal of the Legal Writing Institute.

**Spring 2008 - Spring 2012:** Externship faculty advisor for student externs.

**2009, 2010: Brief Judge,** National Child Welfare & Adoption Law Moot Court Competition.

**Fall 2012, Fall 2010 - Spring 2011, Fall 2008 - Spring 2009: Mentor,** University of Florida Women's Leadership Committee Women's Mentoring Program.

**Spring 2008 - present:** Assist with preparing Environmental Moot Court students for competitions.

**December 2007:** Briefed and argued **Price v. State**, SC06-2045, before Supreme Court of Florida.

**January 2007, February 2013; May 2015: University of Warsaw, Center for American Law Studies, Warsaw, Poland.** Developed and taught compressed Legal Writing course to class of 100 law students**.**

**September 2004**: **Speaker, "Wills and Basic Estate Planning,"** Melrose Library Association, Melrose, FL.

**Awards:**

2015 University of Florida Faculty Enhancement Opportunity Award (Fall).

2015 Samuel Proctor Oral History Program travel award (Summer).

2014 Samuel Proctor Oral History Program travel award (Summer).

2014 USF Libraries Riordan Memorial Fellowship in Florida Studies.

2008 Association of Legal Writing Directors (ALWD) Scholarship.

2008 University of Florida Student Affairs Committee Award.

**University Service:**

**Fall 2019 – present:** UF Levin College of Law Adjunct Teaching Committee.

**Fall 2018 – Spring 2019:** UF Levin College of Law Faculty Development Committee.

**Fall 2017 - Spring 2018:** UF Levin College of Law Strategic Planning/Curriculum Committee.

**Fall 2016 - Spring 2017:** UF Levin College of Law Facilities and Technology Committee.

**Fall 2016 - Spring 2018:** UF Levin College of Law working group on reimagining skills teaching and learning.

**Fall 2014 - Spring 2016:** UF Levin College of Law Judicial Clerkship Committee.

**Fall 2013 - Spring 2015:** Ad hoc committee for the UF Levin College of Law Cuban-

American Lawyers Project 40th Anniversary Celebration.

**Fall 2013 - March 2014:** UF Levin College of Law Dean Search Committee.

**January 2013 - present:** Faculty Advisor, UF Levin College of Law Florida Moot Court.

**Fall 2012 - present:** UF Levin College of Law Non-Tenure-Track Appointments & Promotions Committee.

**Fall 2011 - Spring 2015:** UF Levin College of Law Strategic Planning Committee.

**Fall 2010 - Spring 2013:** UF Levin College of Law Curriculum Committee.

**Fall 2010 - Spring 2013:** University of Florida Faculty Senate.

**Spring 2010:** UF Levin College of Law Ad Hoc Research Teaching Committee.

**Fall 2007 - Spring 2010:** UF Levin College of Law Admissions Committee.

**Fall 2007 - Spring 2011:** UF Common Reading Program Committee.

**Fall 2007 - Spring 2010:** UF Preservation of Historic Buildings and Sites Committee.

**Fall 2006 - Spring 2007:** UF Levin College of Law Adjunct Teaching Committee.

**Professional Affiliations and Service:**

**January 2018 – present: Chair** (2020), Chair-Elect (2019), Secretary (2018), AALS Section on Legal Writing, Research, and Reasoning.

**August 2019 – present:** Member, Executive Committee; **August 2018 - July 2022, August 2016 - July 2017:** Member, Board of Directors, ALWD (Association of Legal Writing Directors).

**June 2019 – present:** Member, Executive Committee, First Appellate District American Inn of Court.

**June 2019 - present:** Second Vice-President (2019), Secretary (2017-18), Treasurer (2015-16), Florida Supreme Court Historical Society.

**February 2015 - January 2018:** Member, Eighth Judicial Circuit Grievance Committee; vice-chair, February – July 2017; chair, August 2017 – January 2018.

**2015 - 2018:** ALWD Diversity Initiatives Committee.

**2014 - present:** Chair, Oral History, Florida Supreme Court Historical Society.

**2014 - 2016:** Legal Writing Institute Global Legal Skills Committee.

**2013 - present:** Board of Trustees, Florida Supreme Court Historical Society.

**2013 - 2015:** ALWD Survey Committee; ALWD Innovative Teaching Committee.

**2010 –2012:**  Legal Writing Institute Professional Development Committee.


**Community Affiliations and Service:**

**2012 - present:** Member, League of Women Voters of Florida.

**2010 - 2012:** Steering and Foundational Committee, Melrose Senior Community Center.

**1999 - present:** Historic Melrose Inc., 1999 - present, President, 2007 - 2009, Vice-President, 2006 - 2007 and 2009 - 2010, executive board member, 2005.

**1992 - present:** Melrose Bay Property Owners Association, President, 2003 – 2004.


**Current Professional and Community Memberships:**

> AALS, Section of Legal Writing, Reasoning, and Research
> Association of Legal Writing Directors, board member
> Eighth Judicial Circuit Bar Association
> First District Appellate American Inn of Court, faculty liaison, September 2014 – present
> Florida Historical Society
> Florida Supreme Court Historical Society
> League of Women Voters of Florida
> Legal Writing Institute
> The Florida Bar, 1992-present (inactive status since 2014)**.**