# **EXHIBIT 1**



PLAINTIFFS' EXHIBIT

**PX886**

Jones et al v. Desantis et al
CaseNo 4:19-cv-00300

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

KELVIN LEON JONES, et al.,

*Plaintiffs,*

v.

RON DESANTIS, in his official
capacity as Governor of the State
of Florida, et al.,

*Defendants.*

Consolidated Case No. 4:19-cv-300-RH/MJF

## REBUTTAL REPORT OF PROFESSOR TODD DONOVAN

Dated: March 16, 2020

### 1. Introduction

In an expert report by Dr. Michael Barber (dated March 2, 2020) provided to me by

Plaintiffs' counsel, Dr. Barber concluded that Florida's Amendment 4 would not have been

approved with over 60% support without "particular language used in the ballot initiative"

(Barber, p. 21) and without "the inclusion of this provision." (Barber, p. 21). The "provision"

Dr. Barber refers to appears to be the phrases "completion of the whole sentence" and "paid all

fines" (Barber, p. 21), neither of which appear in the text of the Amendment or summary that

appeared on the ballot. Dr. Barber also uses phrase "financial obligations" (Barber, p. 19),

"monetary obligations" (Barber, p. 20), and "fines and fees" throughout his report when

discussing language he associates with Amendment 4, none of which appear in the text of the

1

Plaintiffs' Exhibit PX886   p. 2 of 67

Amendment or ballot summary.  Referencing pre-election polling (Appendix B, Exhibit 4 and

Exhibit 6 in Dr. Barber's report), Dr. Barber concludes that "their quantitative analysis suggests

that the inclusion of this provision was instrumental in garnering enough public support for the

initiative to pass the 60% threshold needed to enact a constitutional amendment in Florida"

(Barber report, p. 21; also see Barber, p. 16, and note 28).

In this report, I demonstrate that Dr. Barber's claims about ballot language affecting

support for Amendment 4 are unfounded, because much of the language he refers to was not

included in Amendment 4.  I document that his claims are not supported by the academic

literature he cites.  Further, I document that the analysis conducted by Dr. Barber to support his

claims, and the data he used, were incomplete and flawed.


## 2. Qualifications

I am a Professor of political science at Western Washington University, and past director

of the graduate program in political science at Western Washington University.  I have published

many peer-reviewed articles and I have co-authored and co-edited academic, university press

books about voting on ballot initiatives, as reflected in my curriculum vitae, attached as

Exhibit A.  My work - much of it based on statistical analysis of public opinion data - is heavily

cited in the academic literature.  A Google Scholar search will show that I am among the world's

top cited scholars of direct democracy (among people who listed direct democracy as a research

area).  I also rank among the most cited scholars of public opinion (among those who opted to

list that field as a research area with Google Scholar).

I have been invited to present and discuss my research at universities and conferences on

six continents, often on the subject of direct democracy and voting on ballot measures.  Editors

2

of the top peer-reviewed journals of political science, and other peer-reviewed academic journals, frequently call on me to review studies of voting on ballot measures and studies of public opinion related to ballot measures.  I have recently played a lead editorial role for a peer reviewed, international journal focusing on ballot measures, with an emphasis on understanding how voters engage with ballot measures.

At Western Washington University, I teach courses on research methods and statistics, elections and voting, and state and local politics.  I have had honorary and visiting affiliations with the University of Washington, Washington State University, the University of Melbourne, and the Australia National University.  I have worked as an expert witness and have been retained to prepare expert reports on election matters in multiple U.S. state courts, in the Province of British Columbia, in U.S. federal courts, and I was an expert consultant for the Center for Disease Control regarding voting on ballot measures.

### 3. Summary

I demonstrate that Dr. Barber's claim that Amendment 4 would not have passed without ballot language he identifies as relevant, is not supported by his report.  Dr. Barber's conclusions do not consider academic literature on factors that are known to affect how people vote on real world ballot measures.  Equally important, he neglects to consider that there was a robust election campaign on the matter.  Further, his report emphasizes supposed effects of language and wording that did not appear in the text of Amendment 4, nor on the ballot, and were not implied by the text that did appear.

Sections 4 and 5 of this report illustrates that framing, or wording effects associated with ballot measure language in an artificial setting, does not demonstrate that opinions are altered by

3

Plaintiffs' Exhibit PX886   p. 4 of 67

ballot language in the real-world setting of a ballot initiative campaign.  Section 6 presents well

known academic literature about voting on ballot measures that Dr. Barber did not consider. This

literature documents a wide array of information associated with actual ballot measure

campaigns that are known to mitigate or negate effects of how measures might be worded or

framed.  In Section 7, I demonstrate that there was a robust campaign associated with

Amendment 4, of the sort that would provide the information documented in Section 6 that

mitigates wording effects.  Section 8 then demonstrates that much of the language that Dr.

Barber claims as being consequential to Amendment 4 passing was not included or necessarily

implied in Amendment 4.  Section 9 then illustrates that Dr. Barber used unreliable and poorly

documented survey data to support his claims, and that these same data suggest that Amendment

4 would have passed with or without the language that he claims was essential to it passing.

Section 10 concludes that Dr. Barber's report does not provide evidence that voters would have

voted differently in November of 2018 had they known that restoration of voting rights under

Amendment 4 would or would not apply to people who had completed their sentences but had

outstanding financial obligations, or those who completed their sentence but could not afford to

pay outstanding financial obligations.


**4. Dr. Barber's report omits findings from academic research on the limited effects of framing / wording associated with ballot measures, and thus overstates the potential for such effects.**

Dr. Barber notes, "In the context of ballot measures, past research has found that small

changes in the presentation (or frame) of a ballot question can change the expressed opinion of

voters." (p.7).  However, the research he cites directly related to that statement does not support

his claim.  Dr. Barber supported this specific claim with references to three academic articles.

4

Plaintiffs' Exhibit PX886   p. 5 of 67

The first article (Schuldt et al. 2011) is a question wording experiment examining partisan divisions in regards to responses to "global warming" versus "climate change." That article makes no mention of ballot measures, ballot questions, initiatives, or campaigns.[1] The article contains no analysis of campaigns and no assessment of the amount of support a ballot measure might receive. Given the experiments in this article were conducted absent any context related to ballot measures, it is not appropriate for comparison to potential outcomes on ballot measures. The second article Dr. Barber cites to support his claim (Reilly and Richey 2011) contains no analysis of opinion data, no analysis of framing effects, no analysis of campaigns and no assessment of the amount of support a ballot measure might receive.[2] Neither of these articles demonstrates that "changes in the presentation (or frame) of a ballot question can change the expressed opinion of voters" (Barber, p. 7).

The third article he cites to support his claim (Hoblot 2009) does contain analysis of survey experiments on framing effects associated with perceptions of referendums conducted in Europe. Yet the author of that study is careful to conclude that framing effects are moderated by many factors, including elite endorsements and campaign effects. Or, as Holbot concluded, "in real world campaigns, voters are exposed to competing elite cues and conflicting frames,

---

[1] Schuldt, J. P., Konrath, S. H., & Schwarz, N. (2011). "Global warming" or "climate change"? Whether the planet is warming depends on question wording. *Public opinion quarterly*, *75*(1), 115-124. These authors employed the American Life Panel (ALP) survey modeled after a survey by ABC News, Stanford University and Time Magazine. The ALP is a web panel conducted by the RAND Corporation, with respondents (over 18) recruited via the University of Michigan Survey of Consumer Attitudes. There were 2267 respondents, with a response rate reported was 78%.

[2] Reilly, S., & Richey, S. (2011). Ballot question readability and roll-off: The impact of language complexity. *Political Research Quarterly*, *64*(1), 59-67.

5

highlighting both negative and positive consequences of the proposal" (Hobolt 2009:28).[3]

Holbot is also careful not to take the effect size of a framing effect found in her artificial context

(a survey experiment), to infer from that observation and guess as to how much a particular

frame corresponds with the amount of support an actual ballot measure received.  In discussing

"real-world campaigns" (p. 28), Hobolt also notes that the extant literature "has shown that

individuals exposed to the campaign information were more likely to rely on their issue attitudes

when voting and less likely to abstain" (p. 28, citing Hobolt 2005, 2007, 2009).[4]  Effects of

frames on voters found in experimental studies, she concludes, are "tempered by pre-existing

attitudes and partisanship and mediated by their knowledge of politics" (Hobolt 2009: 29).

Limitations associated with these articles are important to highlight as they illustrate that their

findings do not apply to the context of Amendment 4.

There are additional places in his report where Dr. Barber cites literature on framing

effects associated with the wording of ballot propositions where that literature is actually much

more cautious about the potential for such effects to be consequential.  On p. 9 of his report, Dr.

Barber cites additional research as evidence in support of his claim that framing / wording effects

may affect results in ballot measure elections.  Here his report references Binder, Childers and

Johnson (2015) in support of his claim that "small changes in initiative language can sway

support one way or another" (on statewide tax initiatives) (Barber, p. 9).  However, that Binder et

---

[3] Hobolt, S. B. (2009). *Europe in question: Referendums on European integration*. Oxford: Oxford University Press.  Chapter 5.  Page numbers refer to this copy of the chapter; http://aei.pitt.edu/33067/1/hobolt._sara_binzer.pdf

[4] Hobolt, Sara B. (2005). 'When Europe Matters: The Impact of Political Information on Voting Behaviour in EU Referendums', Journal of Elections, Public Opinion and Parties, 15(1): 85 109.  Hobolt, Sara B. (2007). 'Campaign Information and Voting Behavior' in Claes H. de Vreese (ed.) Dynamics of Referendum Campaigns. An International Perspective, Palgrave. Hobolt, Sara (2009) European in Question. Referendums on European Integration. Oxford: Oxford University Press.

6

Plaintiffs' Exhibit PX886   p. 7 of 67

al. article is titled "Campaigns and the Mitigation of Framing Effects on Voting Behavior."
Those authors are careful to conclude that potential effects of wording observed in survey
research may disappear in the face of campaign activity.  They note that where campaigns are
active, "framing effects are less effective and not statistically significant" (Binder et al 2015:
703).[5]

In addition, Dr. Barber cites an article by Burnett and Kogan (2015) as support for his
claim (Barber, p. 9) that changes in ballot language sway support at the polls on statewide
initiatives on Voter ID laws.  This is actually on the potential for framing effects associated with
"abortion and same sex marriage" measures (Burnett and Kogan 2015: 110).[6]  Again, Dr. Barber
neglects to report on the caution that authors of these studies have about how much they might
infer that framing / wording effects of ballot measures alter election outcomes.  These authors
also found that "an active election environment, in which voters confront new information, and
learn over the course of the campaign, can substantially mitigate the effects of ballot framing"
(Burnett and Kogan 2015: 110).  These authors note that such information that mitigates the
effects of framing include "endorsements from prominent interest groups" (Burnett and Kogan
2015: 110; and at p. 118).  These authors say their results actually "point to a heartening
conclusion" that in the real world, "voters who are most vulnerable to potentially deceptive
ballot text are the ones most likely to learn about positions that prominent groups and individuals

---

[5] Binder, M., Childers, M., & Johnson, N. (2015).  Campaigns and the mitigation of framing
effects on voting behavior: A natural and field experiment.  *Political Behavior*, *37*(3), 703-722.

[6] Burnett, C. M., & Kogan, V. (2015). When does ballot language influence voter choices?
Evidence from a survey experiment. *Political Communication*, *32*(1), 109-126.

7

have taken on issues appearing on the ballot and to use this information in structuring their own voting behavior" (Burnett and Kogan 2015: 121).[7]

It is important to note that in all of these peer-reviewed studies on potential effects of ballot wording, none of the authors attempt to infer from the estimated wording / framing effects that they observe in the artificial setting of their studies to make conclusions about actual election results, as Dr. Barber does in his report. That is, in a peer-review process that produced these articles, these authors are cautious and do not conclude that framing / wording effects are instrumental, pivotal, or decisive in affecting whether or not a ballot proposition passed or failed in the real world.

As I discuss below in Sections 6 and 7, it is important to consider the real world of ballot initiative campaigns in order to understand myriad factors – above and beyond issue framing and ballot wording – that affect how people make decisions when voting on ballot measures. Studies of public opinion conducted absent an actual campaign may demonstrate experimental effects in an artificial setting (e.g. a poll taken over the Internet, or a phone poll, or a focus group). Or, as in Barber et al. (2017), in these artificial settings they may find no wording effects on topics that people might be familiar with.[8] Moreover, demonstrating framing / wording effects does not mean that opinions on the matter being studied will actually be altered by the frame / wording in a real-world campaign setting. Nor does it establish that experiments conducted in an artificial context designed to measuring framing / wording effects are in any way "instrumental" in the outcome of an election, as claimed by Dr. Barber (Barber, p. 21).

---

[7] Burnett, C. M., & Kogan, V. (2015). When does ballot language influence voter choices? Evidence from a survey experiment. *Political Communication*, *32*(1), 109-126.

[8] Barber, M., Gordon, D., Hill, R., & Price, J. (2017). Status Quo Bias in Ballot Wording. *Journal of Experimental Political Science*, *4*(2), 151-160.

8

Plaintiffs' Exhibit PX886   p. 9 of 67

In sum, Dr. Barber overstates the potential that wording, framing or ballot language may have in affecting results of ballot measure elections.

### 5. Dr Barber's own research demonstrates the fragility of framing / wording effects.

Dr. Barber also cites his own research (Barber, p. 8 note 15; Barber, p. 13) in support of his claim that "ballot initiative language can have large impacts on support for the proposal" (Barber, p. 8). Yet the Barber et al. (2017) study that he cites further documents the fragility of effects of ballot initiative language on opinions that might be found in experimental studies. His study reports that "we find that status quo bias can change the share of voters supporting a policy by up to eight percentage points and this effect is concentrated among less informed voters" (Barber, p.8). This study was conducted with a non-representative sample of subjects[9] paid to take a survey via Amazon's Mechanical Turk platform. This platform is useful for conducting experiments, but we cannot infer from such data that any such framing effect would be "up to eight percentage points" in a real world setting where an actual campaign on the issue was involved.[10]

Indeed, this is demonstrated in Barber et al. (2017:157). In the section of the paper where the authors test for framing effects on specific (hypothetical) initiative proposals, they find no effect of framing / wording when they consider a (hypothetical) initiative on a topic that respondents have more familiarity with. As Barber et al. conclude: "it appears the high-information context of this particular issue mutes the impact of status quo bias" (Barber et al. 2017:157). In other words, as the experiment came closer to a real-world condition (asking

---

[9] The sample is disproportionately younger, male, liberal, and well-educated.

[10] Barber, M., Gordon, D., Hill, R., & Price, J. (2017). Status Quo Bias in Ballot Wording. *Journal of Experimental Political Science*, *4*(2), 151-160.

9

Plaintiffs' Exhibit PX886   p. 10 of 67

about a ballot measure on a topic that people might be familiar with), framing effects did not

exist, and were statistically insignificant (Barber et al 2017:175, Table 4).

**6. Substantial peer-reviewed literature demonstrates voters use many information sources when deciding on ballot measures; sources that may negate framing / wording effects**

     Dr. Barber neglected literature about voting on ballot measures that demonstrates voters

decide with many information sources that may negate framing / wording effects. As noted

above, studies of the potential of framing / wording effects on ballot measures regularly conclude

that such effects are mitigated or disappear in the face of campaigns and the information that

ballot initiative campaigns generate.

     There is a large, frequently cited literature presenting research on how voters decided on

ballot measures – involving many factors other than ballot wording / framing - that Dr. Barber's

report does not address.  Much of this literature demonstrates that forces associated with actual

campaigns, as well as attributes of individual voters, affect how people decide on ballot

measures.  To summarize before providing specific details, this large body of literature

documents that voters approach decisions on ballot measures with multiple sources of

information, and with various information "short cuts" that help them navigate their decisions on

ballot measures.  Sources of information include (but are not limited to) information associated

with campaigns and the campaign period, including media coverage, newspaper endorsements,

interest group endorsements, positions taken by parties, positions taken by prominent elected

officials, Google searches, campaign advertisements, discussions with friends and family, and

the voter's partisanship.  "Short-cuts" include information such as endorsements from well-

known elites (e.g. elected officials) and interest groups.  Dr. Barber's inferences drawn from the

narrower literature on wording / framing effects associated with voting on ballot measures (a

10

literature that he does not accurately represent) neglect to account for many additional factors that are known to be important determinants of how voters decide on ballot measures.  When these factors are considered, the information that Dr. Barber presents about any potential effects size of framing / wording effects in the real world appears further inflated and overstated.

*6.1 Endorsements and cues as real-world campaign information*

Dr. Barber ignored widely cited literature related to voting on ballot measures, literature that documents many factors important to voting beyond wording effects.  I measure the scale and prominence of literature neglected by Dr. Barber as represented here in terms of the number of citations (as recorded by Google Scholar) to particular scholarly work.  Specifically, research by Lupia (1994 – 2140 citations) documents that when voters decide based on information "short-cuts", or cues from endorsements on a series of California state-level ballot measures led even poorly-informed voters to end up making decisions on ballot measures that emulate decisions made by people who were well informed.[11]  Such cues are widely available, and allow people who may know little about the content and wording of a ballot measure to vote in a way similar to how they might have had they been more fully informed (also see Lupia and Matsusaka 2004 – 389 citations; and Bowler and Donovan 2000 – 688 citations).[12]  Relatedly, Gerber and Philips (2003 – 82 citations) found that interest group endorsements increased public

---

[11] Lupia, APSR. Lupia, A. (1994). Shortcuts versus encyclopedias: Information and voting behavior in California insurance reform elections. *American Political Science Review*, *88*(1), 63-76.

[12] Lupia, A., & Matsusaka, J. G. (2004). Direct democracy: new approaches to old questions. *Annu. Rev. Polit. Sci.*, *7*, 463-482.  Bowler, S., & Donovan, T. (2000). *Demanding choices: Opinion, voting, and direct democracy*. University of Michigan Press.

11

support for local ballot measures in California.[13]  Campbell and Monson (2003 – 47 citations) also found that Mormon voters took cues from Church leaders when voting on ballot measures.[14] To put this plainly, for many people, knowing who is for or against a ballot measure may be sufficient information to make a choice on the matter – regardless of how the matter was framed or worded.

*6.2 Evidence of multiple sources of real-world campaign information*

In addition to cues from groups and individuals, voters have many sources of real-world information to draw on – beside ballot wording / framing – when making decisions on ballot propositions.  Bowler and Donovan (2002 – 63 citations) reported public opinion survey data of voters in California and Washington state that asked people what information they used when considering ballot measures.  Respondents reported having multiple sources of information. Majorities of Washington respondents reported using state-provided voter's guides, information from newspapers, television news, word of mouth, and radio news as sources of information. Sixty-three percent of Washington respondents (where the survey allowed them to list multiple sources) reported having at least four independent sources of information they used when deciding on ballot measures.[15]

---

[13] Gerber, E. R., & Phillips, J. H. (2003). Development ballot measures, interest group endorsements, and the political geography of growth preferences. *American Journal of Political Science*, *47*(4), 625-639.

[14] Campbell, D. E., & Monson, J. Q. (2003). Following the leader? Mormon voting on ballot propositions. *Journal for the scientific study of religion*, *42*(4), 605-619.

[15] Bowler, S., & Donovan, T. (2002).  Do voters have a cue? Television advertisements as a source of information in citizen–initiated referendum campaigns.  *European Journal of Political Research*, *41*(6), 777-793.

12

As noted below, during the 2018 campaign over Amendment 4 in Florida, cues from elite endorsements and cues from newspaper editorials were plentiful and widely available.  These are important, real-world sources of information that mute or negate framing / wording effects found in experiments and pre-election surveys.

*6.3 Partisanship and partisan cues as campaign information*

Dr. Barber suggests (Barber, pp. 7 – 8) that framing of ballot measure language is particularly consequential because of "the absence of the party cue" (Citing Magleby 1984: 168). Although Magleby's influential and path-breaking book deserves tremendous respect, empirical academic research published since 1984 documents that a voter's partisanship plays a substantial role in how they decide to vote on ballot propositions.  Branton (2003 – 138 citations) used public opinion data to assess determinants of voting across a range of ballot measures and concluded that "individual-level party identification is consistently related to voting behavior across each of the various types of ballot propositions."[16]  Smith and Tolbert (2001 – 140 citations) likewise examined aggregate level data and survey data, and concluded that partisanship was the largest predictor of support for ballot measures.[17]

Voters who have an affiliation for a party take cues from party organizations and party elites.  The campaign context for Amendment 4 provided such cues, with groups such as Our Revolution (a group associated with Sen. Bernie Sanders), and prominent elected Democrats

---

[16] Branton, R. P. (2003). Examining individual-level voting behavior on state ballot propositions. *Political Research Quarterly*, *56*(3), 367-377.

[17] Smith, D. A., & Tolbert, C. J. (2001). The initiative to party: Partisanship and ballot initiatives in California. *Party Politics*, *7*(6), 739-757.

13

Plaintiffs' Exhibit PX886   p. 14 of 67

(including Sen. Sanders,[18] Secretary Julian Castro,[19] and Mayor Andrew Gillum[20]) endorsing the measure and at least two visible Republicans (including Former US Rep. / Commissioner of Agriculture Andrew Putnam and US Rep. Richard Corcoran) opposing it.[21] Spending on the issue was virtually one-sided, and it received 65% support. This suggests that while partisan cues were available, the measure passed with bi-partisan support. Nonetheless, information available in the form of partisan cues was available to voters during a real world campaign that must be considered when one attempts to make inferences about effects sizes (of framing / wording effects) from experiments or surveys conducted in an artificial setting.

*6.4 Ballot measure campaigns as real-world sources of information*

Campaigns, and activities associated with campaigns are an additional, readily available source of information that voters respond to in ballot measure campaigns. Bowler and Donovan (1994) examine public opinion polls to illustrate that there is considerable volatility in opinions during ballot measures campaigns, particularly associated with voters who were undecided early on becoming aware of the measure and forming an opinion as the campaign period progresses.[22] Sratmann (2006 – 88 citations) documents that campaign spending on ballot measure campaigns

---

[18] @BernieSanders, Twitter (Sept. 26, 2018, 7:49 PM) https://twitter.com/BernieSanders/status/1045097961091473408

[19] Ryan Nichol, *'Julian Castro 2020'? Former HUD head addresses Democrats in Miami*, Fla. Politics (Oct. 1, 2018), https://floridapolitics.com/archives/276177-julian-castro-blue-gala

[20] Steve Bousquet, *Where they stand: Candidates for governor on vote for felons*, Tampa Bay Times (Jan. 30, 2018) https://www.tampabay.com/florida-politics/buzz/2018/01/30/where-they-stand-candidates-for-governor-on-vote-for-felons/

[21] *Id.*, *supra*, note 20.

[22] Bowler, S., & Donovan, T. (1994). Information and opinion change on ballot propositions. *Political Behavior*, *16*(4), 411-435.

14

Plaintiffs' Exhibit PX886   p. 15 of 67

has significant, measurable effects on outcomes in ballot measures.[23]  Nicholson's study (2003 –

217 citations) of the political environment of ballot measure campaigns concluded that the

electoral cycle, media coverage, campaign spending contribute to awareness of ballot

measures.[24]  There is also evidence that people conducted Google searches on initiatives

appearing on the ballot, and that such searches peak right before the election. (Reiley et al 2012 –

68 citations).[25]  In sum, polling done years earlier, in the absence of the Amendment 4 campaign

Amendment 4, is not a valid indicator of support Amendment 4 received on election day in 2018.

In sum, there are multiple sources of information associated with real world ballot

initiative campaigns – beyond framing and wording effects - that have been demonstrated to be

associated with how voters make decisions on ballot measures.  The literature about voting on

ballot measures presented in this section was omitted from Dr. Barber's report, a report that

attempts to explain voting on Amendment 4 based on one single factor (framing / wording

effects).  Section 3 of this report demonstrates that it has not been established in the existing

literature on voting on ballot measures that wording / framing effects are a factor that is critical

in how voters decide on ballot measures such as Amendment 4.

This section of my report demonstrates a wide recognition in the academic community

that factors associated with information from real world campaigns, including media coverage,

endorsements, partisanship, campaign spending, learning over the course of a campaign, news

---

[23] Stratmann, T. (2006). Is spending more potent for or against a proposition? Evidence from ballot measures. *American Journal of Political Science*, *50*(3), 788-801.

[24] Nicholson, S. P. (2003). The political environment and ballot proposition awareness. *American Journal of Political Science*, *47*(3), 403-410.

[25] Reilly, S., Richey, S., & Taylor, J. B. (2012). Using Google search data for state politics research: An empirical validity test using roll-off data. *State Politics & Policy Quarterly*, *12*(2), 146-159.

Plaintiffs' Exhibit PX886   p. 16 of 67

coverage, word of mouth discussions, Google searches, may all, cumulatively, affect how people vote on ballot measures such as Amendment 4.  Dr. Barber omitted consideration of the effects this information has on voting on ballot measures.  His claim that the ballot language or wording / framing of Amendment 4 was "instrumental" or "pivotal" (Barber, p. 16) to Amendment 4 passing (Barber, p. 21) is thus a faulty claim inferred from a highly artificial setting that ignores a vast academic literature, and neglects to consider the reality of ballot proposition campaigns and how people vote on ballot measures.  The well-established literature on voting on ballot measures presented here, but omitted from Dr. Barber's report, has accumulated over 4000 citations on Google Scholar.

**7. There was a substantial campaign associated with Amendment 4 that generated information for voters as described in Section 4 of this report.**

Sections 4, 5, and 6 of this report document multiple flaws associated with the logic and inferences that Dr. Barber used to reach his conclusions.  Those sections further document that campaigns, and associated information from campaigns, provide information to voters that mitigate, and can negate, any framing / wording effects that might be measured in an artificial, experimental setting or pre-election survey.  It should be established, then, that the real world campaign context involving Amendment 4 provided voters with multiple opportunities to be exposed to, access, and respond to information (described in Section 6 of this report) that moderates, mitigates, and / or negates any effects of ballot wording / framing that Dr. Barber infers from pre-election polling that are presented in the Appendix B of his report.

As for the campaign context, it is clear there was an extensive campaign over Amendment 4 in 2018 that likely affected why people supported Amendment 4.  Regarding the information sources available to voters noted in Section 6, (and as noted elsewhere above) many

16

groups and individuals endorsed and took positions on Amendment 4 during the campaign period in 2018, providing the actual cues and information sources (presented in Section 6) that may mitigate and negate framing wording effects associated with how a ballot measure is worded.

During the campaign over Amendment 4 in 2018, voters were exposed to the information and cues discussed above, factors that the literature cited above have identified as mitigating and eliminating framing effects that might be measured in surveys and experiments. As noted, Dr. Barber's report cited literature that concluded that "an active election environment, in which voters confront new information, and learn over the course of the campaign, can substantially mitigate the effects of ballot framing" (Burnett and Kogan 2015, p 110).[26] In addition to endorsements from prominent, well know partisan elected officials cited above, many newspapers ran editorials on Amendment 4 during the 2018 campaign, including the *New York Times*[27], *The Washington Post*[28], *The Tampa Bay Times*[29], *The South Florida Sun Sentinel*[30],

---

[26] Burnett, C. M., & Kogan, V. (2015). When does ballot language influence voter choices? Evidence from a survey experiment. *Political Communication*, *32*(1), 109-126.

[27] Editorial Board, *Florida's 1.5 Million Missing Voters*, NYTimes (Jan. 2, 2018) https://www.nytimes.com/2018/01/02/opinion/florida-missing-voters.html

[28] Editorial Board, *Floridians should scrap these retrograde, racist voting laws*, WaPo (Jan. 27, 2018, 7:04 PM) https://www.washingtonpost.com/opinions/floridians-should-scrap-these-retrograde-racist-voting-laws/2018/01/27/dbfd2a86-0220-11e8-bb03-722769454f82_story.html

[29] *Op.: Times recommends: Yes on Amendment 4*, Tampa Bay Times (Oct. 3, 2018) https://www.tampabay.com/opinion/editorials/times-recommends-yes-on-amendment-4-20180928/

[30] Editorial Board, *Five good — seven bad — amendments for Florida's Constitution*, Sun Sentinel (Oct. 5, 2018, 11:00 AM), https://www.sun-sentinel.com/opinion/endorsements/fl-op-end-good-bad-constitutional-amendments-20181005-story.html

17

Plaintiffs' Exhibit PX886   p. 18 of 67

*Florida Today*, *The Tallahassee Democrat,*[31].  Additional coverage occurred in the *Orlando Sentinel*[32], the *Miami Herald*,[33] the *Florida Times Union* / Jacksonville.com[34], and the *Palm Beach Post*.[35]

    In addition, over \$20,000,000 was spent on the campaign for Amendment 4,[36] and many groups took formal positions on Amendment 4, including the Florida National Organization for Women, the Christian Coalition of America, the Florida Education Association, Florida TaxWatch, and the Human Rights Defense Center.

     In sum, Amendment 4 of 2018 passed with 64.5% in favor in a context where voters were exposed to a robust campaign that included substantial expenditures on advertising, that included substantial media coverage, newspaper endorsements, endorsements by partisan

---

[31] Editorial Board, *Florida's constitutional amendments: Vote 'yes' on 4 and 11, 'no' on rest*, Tallahassee Democrat (Oct. 7, 2018, 10:22 AM)**,** https://www.tallahassee.com/story/opinion/editorials/2018/10/07/floridas-amendments-yes-4-and-11-no-rest-our-opinion/1494375002/

[32] Editorial Board, *Florida's Election 2018: Our endorsements for governor, U.S. Senate, U.S. House and the amendments*, Orlando Sentinel (Oct. 19, 2018, 5:40 PM) https://www.orlandosentinel.com/opinion/editorials/os-op-orlando-sentinel-endorsements-20181018-htmlstory.html#amend1

[33] Editorial Board, *Learn how 12 Florida amendments affect your life, and your wallet, before you vote*, Miami Herald (Oct. 7, 2018) https://www.miamiherald.com/opinion/editorials/article219635000.html

[34] Editoria l Board, *Editorial: Sorting out confusing amendments for the voters*, Fla. Times-Union (Oct. 14, 2018) https://www.jacksonville.com/opinion/20181014/editorial-sorting-out-confusing-amendments-for-voters

[35] Editorial Board, *Editorial: Time to restore voting rights to 1.5 million Floridians; 'Yes' on Amendment 3*, Palm Beach Post (Oct. 23, 2018, 9:54 AM) https://www.palmbeachpost.com/news/20181014/editorial-time-to-restore-voting-rights-to-15-million-floridians-yes-on-amendment-3

[36] *Florida Amendment 4, Voting Rights Restoration for Felons Initiative (2018)*, Ballotpedia, https://ballotpedia.org/Florida_Amendment_4,_Voting_Rights_Restoration_for_Felons_Initiative_(2018)#cite_ref-72; citing information accessed from the Florida Department of State, Campaign Finance database.

Plaintiffs' Exhibit PX886   p. 19 of 67

candidates (Democrats and Republicans), and endorsements by many interest groups. As documented above, the academic literature about voting on ballot measures has established that these are important sources of information that affect how people vote on ballot measures. Further, as shown above, the literature on framing / wording effects associated with voting on ballot measures shows that these sources of information mitigate or negate potential effects of wording / framing of ballot measures. Many information sources were present and abundant during the campaign over Amendment 4 in 2018. As such, it is reasonable to conclude that myriad factors contributed to Amendment 4 passing with 64.5% of the vote, including media coverage, editorials, campaigns, and endorsements. Therefore, it is not possible to conclude that one single factor – wording / framing – was "instrumental."

In sum, evidence presented here suggests it was highly unlikely that the framing / wording of Amendment 4 had any effect, let alone a decisive effect, on the amount of support Amendment 4 received.


**8. Dr. Barber does not demonstrate words such as "fees," "fines," and "financial obligations" were associated with the wording of Amendment 4.**

This report has documented that Dr. Barber used the extant academic literature, inappropriately, in an attempt to support his claim that "the inclusion of this provision was instrumental in garnering enough public support for the initiative to pass the 60% threshold to enact a constitutional amendment in Florida" (Barber, p. 16). I have shown (Section 4) that it is not reasonable to infer from the academic literature that wording / framing effects were decisive or "instrumental" (Barber, p. 21) or "pivotal" (Barber report p. 16) in determining whether or not Amendment 4 passed or did not pass.

19

There are additional issues of flawed logic and inappropriate evidence that further undermine Dr. Barber's claims about "particular language *used in the ballot initiative*" (Barber, p. 21) (emphasis added) that he claims were "instrumental" (Barber, p. 21) to Amendment 4 passing.  At a few points in his report it appears this "language" that he suggests that was used in Amendment 4, that purportedly affected how people voted on Amendment 4, was understood to relate to "financial obligations" (mentioned three times on p. 19 of Dr. Barber's report).  Section 6 of his report also includes a discussion of pre-election "message testing" of language about "fine and fees" (Barber, p. 12), or "the payment of fines and fees" (Barber, p. 13), or "fees, fines and community service" (Barber, p. 14).  Dr. Barber also cites a general reference to a "debt" being paid and "restitution" (Barber, p. 16).

Dr. Barber's logic here seems to be that far before Amendment 4 appeared on the ballot words such as "fines" and "fees" and "debt" were used or message tested by people promoting what might have eventually become Amendment 4 of 2018.  He notes on p. 14 of his report discussion of such words in polls from 2013, 2014, and 2016 (Barber, p. 14).  His logic about wording / framing effects implies that these discussions of those words, conducted years before there was a campaign associated with Amendment 4 and potentially unknown to voters in 2018, were a critical factor that determined why voters approved Amendment 4 in 2018, or that excluding these words somehow from Amendment 4 and influenced how people voted. There is no indication, however, that voters when they voted understood "all terms of sentences" to require legal financial obligations.

The words "fees," "fee," "fines," "financial obligations," "debt," and "dues" do not appear in the most relevant place where, as tested in the literature discussed in Sections 4 and 5 of this report, framing / wording effects are expected to occur: the actual ballot.  None of these

20

words occur in the title of Amendment 4 as presented to the public by the Florida Division of Elections, nor did they appear on the ballot.[37] These words do not exist in the ballot title, ballot summary, nor text of Amendment 4 that was presented to the public by the Florida Division of Elections.[38]  None of these sources said, for example, "completion of all terms of sentence including (or excluding) payment of restitution, fines, fees, costs, and/or civil liens."  Dr. Barber does not establish how voters somehow filtered out the many different sources of information about Amendment 4 (documented above in Sections 6 and 7 of this report) when deciding on Amendment 4 in 2018, but somehow became aware of, and then made decisions based on, a particular interpretation of the Amendment's application with regard to financial obligations, based on key words that were nowhere in the ballot they interacted with.

Studies of framing / wording effects on voting on ballot measures discussed above in Sections 4 and 5 of this report, including Dr. Barber's own research (Barber et al 2017), test for such wording effects by manipulating language used in a hypothetical or actual ballot initiative. In these studies, respondents are randomly assigned different versions of a ballot measure, with the words that are expected to trigger a framing effect included in one condition of the study, while omitted from another.  That is, the key words that are expected to affect how people might respond are included in one condition, but not another.  Yet the words that Dr. Barber states were purportedly "message tested" well before the campaign over Amendment 4, did not appear on the ballot as either included or excluded from the requirements for restoration.

---

[37] Proposed Constitutional Amendments and Revisions for the 2018 General Election.  Florida Division of Elections. Florida Department of State. P. 10-11. Also see official sample ballot for November 6, 2018.

[38] Proposed Constitutional Amendments and Revisions for the 2018 General Election.  Florida Division of Elections. Florida Department of State. P. 10-11. Also see official sample ballot for November 6, 2018.

21

In sum, Amendment 4 contained no references to fees, fines, or financial obligations. It is not appropriate, nor logical, to conclude that language that was not used in the ballot initiative, and terms neither explicitly included or excluded in the requirements of the amendment, had an instrumental wording effect that led to the passage of the initiative.

**9. Dr. Barber's method of analysis uses unreliable data, and suggests that Amendment 4 would have passed without reference to terms he claims were pivotal**

Dr. Barber's report is not explicit about which specific words were the supposed causal factor or factors in determining that Amendment 4 was approved.  As noted in Section 8 of this report, much of Dr. Barber's report stresses the importance of words that did not appear in the title or text of Amendment 4.  Dr. Barber's report also cites pre-election polls from 2014 that suggested the wording, "completion of all sentence terms including restitution appears to increase support about 5 percentage points" (Barber, p. 15, citing Appendix B, Exhibit 4 in his report) and other pre-election survey results that suggested the wording "complete all terms of their sentences include [sic] probation and parole" could "increase support" by 7% (Barber report p. 16, citing Appendix B, Exhibit 6, Phase III section).

On p. 16 of his report, Dr. Barber infers from those polls that "Given that Amendment 4 passed with just under 65% of the voter's support, and needed to reach a threshold of 60% under the Florida Constitution, it is likely that the particular inclusion of this language was pivotal to the passage of the amendment."  It is not clear in his report which survey he based this on, or what specific ballot language was supposedly "pivotal," but note 28 (Barber, p. 16) of his report suggests the inference is from a poll conducted in 2014 presented in Appendix B, Exhibit 6 of his report, that contained 816 respondents.  Dr. Barber goes as far as to claim (Barber, p. 16, note 28) "that we are 95% confident the impact of *the change in the ballot language* is between 2.7%

22

and 11.3%, with our best estimate being a 7 percentage point difference (emphasis added)." Yet the report is not clear about what ballot language was "changed," nor if the "pivotal" language in survey question was "restitution" or "terms of sentences" or "probation and parole."

Amendment 4 did include the words "upon completion of all terms of sentence including parole or probation."[39] As I have noted above, pre-election surveys that purport to estimate the size of wording effects are not a valid reflection of the real world potential that such language may have on voting in the context of an actual ballot measure campaign. Campaigns expose voters to substantial amounts of information – news coverage, their own information searches, group endorsements, endorsements by elected officials, and more – information that mitigates or negates potential wording effects that might have been seen in the artificial setting of survey research. Moreover, we have limited information about the representativeness of the polling that Dr. Barber relies on.

He correctly notes there is substantial uncertainty about the polling data presented in a 2014 report that he references in Appendix B, Exhibit 4 (Barber, p. 16 note 28) and that he uses in his report (Barber, p. 15). There is no information about sampling method, response rates, number of respondents, nor about mode of interview, full question wording or response options for answering questions.[40] He fails to present information regarding whether or not these survey questions in Appendix B, Exhibit 6, Phase III were a forced yes or no response choice, or if they allowed an undecided response. We do not know if the response options asked people if they would vote on an amendment, or if they would sign a petition, or if they were asked about more general sentiments. As such, it is not valid for Dr. Barber to draw inferences from these data.

---

[39] Proposed Constitutional Amendments and Revisions for the 2018 General Election. Florida Division of Elections. Florida Department of State. P. 10-11.

[40] The survey data in Exhibit 4 may be the same as that described on page 8 in Exhibit 4 (Lake Research) but this is not specified in Dr. Barber's report.

23

The survey data from 2014 that Dr. Barber references in Appendix B, Exhibit 6, Phase III is said to be collected from 816 respondents "online" by Hamilton Campaigns, but no information is provided about the sampling method or response rates, nor about full question wordings or response options allowed for answering questions. Again, it is not valid for Dr. Barber to draw inferences from these data.

All of that said, if we were to accept Dr. Barber's methods, and presume that a pre-election survey conducted years prior to a campaign produced valid estimates of wording / framing effects and produced valid point estimates of public opinion in Florida that persisted for years without being affected by the campaign context eventually surrounding Amendment 4 (I contend this method of Dr. Barber's is not appropriate), the survey data Dr. Barber based his claims on can be used to demonstrate that Amendment 4 would have passed with or without the use of the words "upon completion of  all terms of sentence including probation or parole." Appendix B, Exhibit 6, p. 9 of Dr. Barber's report, and p. 18 of his report shows that when respondents were asked about an amendment that "restores the voting rights of Floridians with felony convictions after they completed their time in prison," that 70% of respondents supported something related to that (again, we have no information from Dr. Barber's report about the full question wording, so it is not clear what estimates from his data actually reflect). When respondents were given additional information about an amendment that "restores the voting rights of Floridians with felony convictions after they complete all terms of their sentence include [sic] probation and parole" that 77% of respondents support something related to that.

A key point here is that the data Dr. Barber relies on suggest an amendment that "restores the voting rights of Floridians with felony convictions after they complete their time in

24

prison" would be well above the 60% threshold, regardless of whether it including language about "all terms of their sentence include [sic] probation and parole."

## 10. Conclusion

To conclude, Dr. Barber's report does not establish that Amendment 4 received 64.5% in November 2018 as the result of any particular wording in the ballot language and or wording in the text of Amendment 4.  Furthermore, his report does not establish that "fees," "fines," "financial obligations," "legal financial obligations," "debts," or "restitution," while absent from the ballot summary and text of Amendment 4, played any role, let alone an "instrumental" and "pivotal" role, in determining that Amendment 4 passed with 64.5%.  His report does not establish, nor provide any evidence, that people who voted in favor of Amendment 4 in 2018 did so as a result of any consideration or understanding of whether the ballot language included "fees," "fines," "financial obligations," "legal financial obligations," "debts," or "restitution."

Dr. Barber's report does not provide any evidence that voters would have voted differently in November of 2018 had they known that restoration of voting rights under Amendment 4 did or did not apply to people who had completed their sentences, but for outstanding financial obligations.  His report does not provide any valid evidence that voters would have voted differently in November of 2018 had they known that Amendment 4 was later interpreted to apply to people who had not, or could not, pay outstanding "fees," "fines," "financial obligations," "legal financial obligations," "debts," or "restitution."  Data presented in Dr. Barber's report actually suggests that Amendment 4 passed regardless of the inclusion or exclusion of language specific to financial obligations.

25

Plaintiffs' Exhibit PX886   p. 26 of 67

One would need to make several, awkward, untenable leaps of logic to reach a conclusion that voters would have voted differently on Amendment 4 had they known it could be used to include people who completed their sentences but-for payment of outstanding financial obligations associated with their conviction, or people who completed their sentence but-for payment of outstanding financial obligations associated with their conviction  that they were unable to pay.  One would need to assume that voters read and responded to a phrase such as "all terms of sentence" as requiring the inclusion of such things as restitution, paying fees, fines, and other legal obligations.  One would then, further, need to leap to assume that voters read "all terms of sentence" as also requiring payment for people who are unable to afford to pay such obligations.  It requires multiple, extreme, awkward and untenable logical leaps to make these assumptions. There is no evidence in Dr. Barber's report that would support such logical leaps.

Signed on March 16, 2020 in Whatcom County, Washington.

_____
Todd Donovan

26

# EXHIBIT A

## Curriculum Vitae
## Todd Donovan

Department of Political Science          360.650.3018
Western Washington University            Todd.Donovan@wwu.edu
Bellingham WA 98225                      http://faculty.wwu.edu/donovat

### Academic Positions

*Professor*, Political Science                    Western Washington University
*Associate Professor,* Political Science          Western Washington University
*Assistant Professor*, Political Science          Western Washington University

### Visiting & Honorary Academic Positions

*Senior Foley Fellow,* Foley Institute for Public Policy      Washington State University
*Visiting Fellow,* Research School of the Social Sciences....Australia National University
*Visiting Scholar*, Department of Political Science ............University of Western Australia
*Visiting Lecturer,* Department of Political Science          University of Melbourne
*Affiliated Faculty*, Center for American Politics.      ..........University of Washington
*Board of Scholars*                              Initiative and Referendum Institute
*Research & teaching assistant,* Political Science      University of California, Riverside

### Education

Ph.D.  Political Science.  University of California, Riverside
B.A Economics & Government. California State University, Sacramento

### Research Areas

Representation and electoral systems, political behavior and electoral politics, public opinion, direct democracy, American state politics & policy

### Teaching Areas

Campaigns and elections; political parties; comparative electoral systems; introductory research methods and statistics; American politics; American state and local politics

### Awards & Honors

2016 - 2021. Whatcom County Council (non-partisan); elected by the public
2017. Governor's Smart Communities Award (as County Council member)
2015. Tim Ormsby Award for Faculty Civic Engagement (WWU)
2013. President, Pacific Northwest Political Science Association
2007. Paul J. Olscamp Outstanding Research Award.  Western Washington University
2007. Longley Prize. Best paper published on representation and electoral systems
        Awarded by APSA Elections and Representation Section
2006. *Best Paper Award*. State Politics Section. American Political Science Association
2003. *Allan Saxe Award* for best paper on state and local politics presented at SWPSA meeting

1

Plaintiffs' Exhibit PX886   p. 29 of 67

## Scholarship Metrics

| | | | |
|---|---|---|---|
| Google Scholar profile | Cites: 8000 | h-index: 46 | i10-index: 99 |
| ResearchGate   profile | Cites: 3000 | h-index: 30 | |
| Web of Science profile | Cites: 2600 | h-index: 29 | i10-index: 47 |

## PUBLICATIONS; Books:

Donovan, T., editor.  2018. *Changing How America Votes.*  Lanham, MD: Rowman and Littlefield.

Includes:
- T. Donovan. "Evaluating Elections: Are they Working Well?" (Chapter 1)
- T. Donovan. "When Do Election Rules Change?" (Chapter 15)

Clayton, C., T. Donovan and N. Lovrich, co-editors. 2018.  *Governing the Evergreen State: Political Life in Washington State*.  Washington State University Press.

Includes:
- T. Donovan. "Elections in Washington" (Chapter 2).

  - Review in *Pacific Historical Review*, Spring 2019

Bowler, S. and T. Donovan.  2013.  *The Limits of Electoral Reform*.  Oxford, UK: Oxford University Press.

- Review in London School of Economics *Politics and Policy Blog*, July 2013.
- Review in Democratic Audit, July 2013
- Review in *West European Politics*, May 2014 37(3):674-75.
- Review in *Election Law Journal*, May 2014 13(2):346-348.
- Review in *Journal of Contemporary European Studies*, Sept. 2014 22(3):345-6
- Review in *Political Studies*, August 2015 13(3):423-4
- Review in *Czech Journal of Political Science,* January 2016:83-85.
- Review in *Perspectives on Politics,* September 2016 14(3):895-7

Donovan, T. and K. Hoover.  2013.  *The Elements of Social Scientific Thinking*.  Wadsworth / Cengage.  Eleventh edition.

Redlawsk, D, C. Tolbert and T. Donovan.  2011.  *Why Iowa? How Caucuses and Sequential Elections Improve the Presidential Nominating Process.*  Chicago: University of Chicago Press.
- Review in *Choices: Current Reviews for Academic Libraries*, August 2011. Highly recommended
- Review in *Claremont Review of Books*, Fall 2011: 1-3.
- Review in *The Annals of Iowa*, Fall 2011 70(4):391-92
- Review in *The Monkey Cage*, January 3, 2012.
- Featured in *New York Times* 538 blog, January 4, 2012.
- Review in *Political Science Quarterly* Winter 2011/12, 126(4): 697-8.
- Review in *Congress & The Presidency*, Oct. 2012, 39(3):348-50.
- Review in APSA's *Perspectives on Politics*, June 2013 11(2):657-58.
- Featured in *538blog*, February 10, 2016
- Referenced in *New York Times*, Jan 28, 2020 (online).

2

**Books, continued**

Donovan, T., C. Mooney and D. Smith.  2009.  *State and Local Politics: Institutions and Reform.* Thomson Wadsworth.

- Brief first edition paperback, 2010.
- Second edition, 2011.
- Second brief edition 2012.
- Third edition, 2012.
- Fourth edition, 2015. (with T. Osborne)
  - Referenced by Justice Sotomayor, US Supreme Court

Cain, B., T. Donovan and C. Tolbert, editors. 2008.  *Democracy in the States: Experiments in Election Reform*.  Washington, DC: Brookings Institution Press. Co-editor.

- ebook 2011

  Includes:
- C. Tolbert, T. Donovan, B. Cain. "The Promise of Electoral Reform." (Chapter 1)
- C. Tolbert, T. Donovan, B. King and S. Bowler, "Election Day Registration, Competition, and Voter Turnout." (Chapter 6).
- T. Donovan.  "A Goal for Reform." (Chapter 13).

  - Review in *Future Survey*, 2008 30(10):13-14.
  - Review in *Election Law Journal*, August 2009, 8(3):267-75.
  - Review in *Perspectives on Politics*, September 2010, 8(4):1230-1232.

Anderson, C., A. Blais, S. Bowler, T. Donovan and O. Listhaug.  2005. *Losers' Consent: Elections and Democratic Legitimacy*.  Oxford, UK: Oxford University Press.

  - Review in *Comparative Political Studies*, May 2006, 39(4): 524-8.
  - Review in *West European Politics*, 2006, (29)1:180.
  - Review in *Journal of Peace Research*, 2006 (43)6:750.
  - Review in *Representation*, April 2006, 42 (1): 85-6.
  - Review in *Journal of Politics*, April 2008, 70(2): 562-3.
  - Review in *Political Studies Review*, 2008 6(3)
  - Review in *Party Politics*, 2010 16(2):283-92
  - Review in *Politische Vierteljahresschrift*, 2010. 51(3): 576-577

- Italian translation:  2006. *Il Consenso Dei Vinti: Elezioni e Legittimita Democratica*. Roma: Edizioni Carlo Amore.
- Paperback edition.  2008.

Donovan, T. and S. Bowler.  2004. *Reforming the Republic: Democratic Institutions for the new America*.  Prentice Hall. Real Politics in America Series.  Equal authors.

Bowler, S., T. Donovan and D. Brockington. 2003. *Electoral Reform and Minority Representation: Local Experiments with Alternative Elections.* Ohio State University Press.  Bowler and Donovan, equal co-authors.
  - Review in *Perspectives on Political Science*.  2003, 32(2).
  - Review in Choices, 2003.  Recommended.
  - Review in APSA's *Perspectives on Politics*, March 2004, 2(1).
  - Review in *Journal of Urban History*, 2006 33(1):140-9.

3

Plaintiffs' Exhibit PX886   p. 31 of 67

**Books, continued**

Bowler, S. and T. Donovan. 1998. *Demanding Choices: Opinion and Voting in Direct Democracy*.  Ann Arbor: University of Michigan Press.

- Paperback edition, 2000.
- ebook, 2010
  - Review in *American Political Science Review*, June 2000 (94): 455-6.
  - Review in *Social Science Quarterly*, December 2000 (81):104.
  - Review in *Political Studies*, March 2002 (48):212.

Bowler, S., T.  Donovan and C. Tolbert. 1998. *Citizens as Legislators: Direct Democracy in the United States*.  Columbus: Ohio State University Press. Co-editor.

- Reprinted in cloth, 2000
- Reprinted in paper, 2016

 Includes:
- T. Donovan and S. Bowler. "An Overview of Direct Democracy in the American States." (Chapter 1)
- C. Tolbert, D. Lowenstein, T. Donovan. " Election Law and Rules for Using Initiatives." (Chapter 2)
- D. McCuan, S. Bowler, T. Donovan, and K. Fernandez. "California's Political Warriors: Campaign Professionals and the Initiative Process." (Chapter 3)
- T. Donovan, S. Bowler, D. McCuan and K. Fernandez. "Contending Players and Strategies: Opposition Advantages in Initiative Elections (Chapter 4)
- J. Wenzel, T. Donovan and S. Bowler. "Direct Democracy and Minorities: Changing Attitudes about Minorities Targeted by Initiatives." (Chapter 11)
- T. Donovan and S. Bowler. "Responsive or Responsible Government?" (Chapter 12).

  - Review in *American Political Science Review*, June 1999 (93):446-7.
  - Review in *Social Science Quarterly*, September 1999 (80): 619
  - Received "outstanding" rating from the American Association of University Presses' University Press Books Committee, 1999.
  - Referenced by Justice Sotomayor, US Supreme Court

Hoover, K. and T. Donovan. 1995.  *The Elements of Social Scientific Thinking*. St. Martin's Press. 6th edition.

- Seventh edition, 2001
- Eighth edition, 2004
- Chinese language version of 6th edition published 2006
- Ninth edition, 2008
- Tenth edition, 2011.
- Chinese language version of 10th edition published 2015
  - Review in *Library Quarterly*, 1996
  - Review in *Reference & Research Book News*, 2007 (August), p. 88

4

**Edited Journals and Symposia**

Donovan, T. 2019. Editor. The promise and peril of direct democracy. *Politics and Governance*. 7(2). June.

Donovan, T. & S. Bowler. Co-editors. 2018. Special issue on 2016 US election. *Journal of Elections, Public Opinion and Parties*. 28 (2). May.

Donovan, T. 2007. Editor. Mini symposium. "Diversity and democracy." *Political Research Quarterly*. 60(2): 274-337.

**Articles:**

Donovan, T. 2019. "Authoritarian attitudes and support for radical right populists." *Journal of Elections, Public Opinion and Parties*. 29:448-464. (online September 19)

- Altmetric 8

Donovan, T., C. Tolbert and K. Gracey. 2019. "Self reported understanding of ranked choice voting." *Social Science Quarterly*. 100(5):1768-1776.

- Altmetric 23; Top 25% of all research scored by this metric.
- Referenced in NBCNews.com, Nov 7th 2019
- Referenced in Vox.com, Nov. 5th 2019.

Bowler, S. and T. Donovan. 2019. "Perceptions of referendums and democracy: The referendum disappointment gap." *Politics and Governance*. 7(2): 277-241.

- 900 views; 450 downloads

Donovan, T. and S. Bowler. 2019. "To Know it is to Loath it: Perceptions of Campaign Finance and Attitudes about Congress." *American Politics Research*. 47 (5):951-969.

- Altmetric 10
- Featured in PsyPost.org, April 9, 2019

Bowler, S. and T. Donovan. 2018. "Partisan predispositions and public support for making it easier to vote." *American Politics Research*. 46(6):971-995.

- Altmetric 8
- 300 downloads

Donovan, T. and S. Bowler. 2018. "Donald Trump's challenge to the study of elections, public opinion, and parties." *Journal of Elections, Public Opinion and Parties*. 28 (2):125-134.

- 2400 views
- Over 1000 views in 2018

5

Plaintiffs' Exhibit PX886   p. 33 of 67

**Articles (continued):**

Donovan, T. and D. Redlawsk. 2018. "Donald Trump and right-wing populists in comparative perspective." *Journal of Elections, Public Opinion and Parties*. 28 (2):173-189.

- Altmetric 16; Top 25% of research scored on this metric
- Referenced in *Washington Examiner* (ouch) June 12, 2018
- Over 1600 views
- Over 1000 views, 2018-Feb. 2019

Donovan, T. and J. Karp. 2017.  "Electoral rules, corruption, inequality, and evaluations of democracy."  *European Journal of Political Research*. 56(3): 469-86.

- Altmetric 10 (top 25% 'attention' of all research by this metric).
- Top 20 most downloaded *EJPR* articles in 2017 (over 700).

Bowler, S., D. Denemark, T. Donovan, and D. McDonnell.  2017.  "Right-wing populist party supporters: Dissatisfied but not direct democrats." *European Journal of Political Research*.  56(1): 70-91.

- Altmetric 92 ; Top 5% of all research scored by this metric.
- Referenced in *The Guardian*, Feb 13, 2018.

Bowler, S. and T. Donovan. 2016.  "A partisan model of electoral reform: Voter identification laws and confidence in state elections." *State Politics and Policy Quarterly.*  16(3):340-361.

- Referenced in Washington Post / Monkey Cage, Sept 18, 2017.
- Featured on London School of Economics USAPP blog, February 2016
- Posted on Election Law Blog, July 26, 2016
- Top 20 most read of all *SPPQ* articles in 2017
- Altmetric score 42; Ranked in top 5% of research impact scored by Altmetric
- 4th most cited *SPPQ* articles, 2015-2018

Donovan, T., C. Tolbert and K. Gracey. 2016.  "Campaign civility under preferential and plurality voting." *Electoral Studies*.  42:157-163.

- Referenced in NBCNews.com, Nov. 7 2019
- Featured in *The Boston Globe*, March 13 2016.
- Featured in *Scientific American* blog, April 7 2016
- Referenced by *Time Magazine* (Time.com) June 2, 2016
- Featured on WHYY, The Pulse November 3, 2016
- Referenced on CNBC, Nov. 4, 2019.

Bowler, S. and T. Donovan.  2016.  "Campaign money, congress and perceptions of corruption." *American Politics Review*.  44(2):272-295.

- Featured on London School of Economics USAPP blog
- Top 20 most read of all APR articles in 2017 (500+ views)
- Top 20 most cited APR articles 2016 – 2016, 1300 views
- Altmetric 9, Top 25% of research scored by this metric

6

**Articles (continued):**

Bowler, S., Brunell, T., Donovan, T, and P. Gronke.  2015.  "Election administration and perceptions of fair elections." *Electoral Studies*.  38:1-9.

- Top 10 most cited *Electoral Studies* articles, 2015 – 2018
- Over 20 citations in Web of Science

Donovan, T.  2014.  "The irrelevance and (new) relevance of religion in Australian federal elections." *Australian Journal of Political Science*. 49(4):626-646

- Over 900 views.

Donovan, T., D. Redlawsk and C. Tolbert.  2014.  "The 2012 Iowa Caucus and its Effects on the Presidential Nomination Contest." *Presidential Studies Quarterly*. 44(3):446-465.

- Altmetric 39; Top 5% of all research scored by this metric
- Referenced in Pacific Standard, Feb. 3, 2016

Donovan, T. and C. Tolbert. 2013. "Do Popular Votes on Rights Create Animosity Toward Minorities?"  *Political Research Quarterly*.  66(4):910-923.

- Featured on *The Monkey Cage* blog, August 7, 2013.
- Featured on London School of Economics USAPP blog, December 2013.
- Altmetric score 25; Top 25% of research on this metric.

Donovan, T. 2013. "Direct Democracy and Campaigns Against Minorities." *University of Minnesota Law Review*.   97(5):1730-1779.

Bowler, S. and T. Donovan.  2013.  "Civic Duty and Turnout in the UK Referendum on AV: What Shapes the Duty to Vote." *Electoral Studies*. 32(2):265-273.

Lawrence, E., T. Donovan, and S. Bowler.  2013. "The Adoption of the Direct Primary in the United States." *Party Politics*.  19(1): 3-18.

Donovan, T.  2012 "The Top Two Primary: What Can California Learn from Washington?" *California Journal of Public Policy*.  4(1)

Collingwood, L., M. Barreto and T. Donovan. 2012.  "Early Primaries, Viability and Changing Preferences for Presidential Candidates." *Presidential Studies Quarterly*. 42(2):231-255.

Bowler, S. and T. Donovan. 2012.  "The Limited Effects of Election Reforms on Efficacy and Engagement." *Australian Journal of Political Science*. 47(1):55-71.

Bowler, S. and T. Donovan. 2011. "Electoral Competition and the Voter." *Public Opinion Quarterly*. 75(1): 151-164.

Donovan, T.  2010. "Obama and the White Vote." *Political Research Quarterly*. 63(4):863-74.

Plaintiffs' Exhibit PX886   p. 35 of 67

## Articles (continued):

Bowler, S. Karp, J. and T. Donovan.  2010.  "Strategic Coalition Voting: Evidence from New Zealand." *Electoral Studies*. 29(3): 350-57.

Tolbert, C. A. Keller and T. Donovan. 2010. "A Modified National Primary: State Losers and Support for Changing the Presidential Nomination Process." *Political Science Quarterly*. 125(3): 393-424.

- Summarized in *Wilson Quarterly*, 2010 34(4):71
- Reprinted in *Presidential Selection and Democracy* (D. Caraley and R. Shapiro eds), The Academy of Political Science. 2019

Lawrence, E, T. Donovan and S, Bowler.  2009. "Adopting Direct Democracy: Testing Competing Explanations of Institutional Change." *American Politics Research*. 37(6): 1024-1047.

Medina, D. X., A. Ugues, S. Bowler, T. Donovan.  2009.  "Two Political Worlds? The Relevance of Language in California." *California Journal of Public Policy*.  1(1): Art 29.

Donovan, T., C. Tolbert and D. Smith.  2009.  "Political Engagement, Mobilization, and Direct Democracy." *Public Opinion Quarterly*.  73(1): 98-118.

Donovan, T. and R. Hunsaker. 2009. " Effects of Early Elections in US Presidential Nomination Contests." *PS: Political Science and Politics*.  42(1): 45-52.

Parry, J. and T. Donovan.  2009. "Leave the Rascals in: Explaining Support for Extending Term Limits." *State Politics and Policy Quarterly*.  8(3):293-308.

Tolbert, C., D. Bowen and T. Donovan.  2009.  "Initiative Campaigns: Direct Democracy and Voter Mobilization." *American Politics Research*.  37(1): 155-192.

Donovan, T., C. Tolbert and D. Smith.  2008.  "Priming Presidential Votes by Direct Democracy." *Journal of Politics*. 70(4): 1217-1231.

Donovan, T.  2008. "The Limbaugh Effect: A Rush to Judging Cross-Party Raiding in the 2008 Democratic Presidential Nomination Contest" *The Forum: Journal of Applied Research in Contemporary Politics*. 6(2).

- Discussed in *The New York Times*, October 2, 2009.
- Discussed in MotherJones.com, February 2020.

Bowler, S. T. Donovan and J. Karp.  2007.  "Enraged or Engaged?: Preferences for Direct Citizen Participation in Affluent Democracies." *Political Research Quarterly*. 60(3):351-62.

Donovan, T.  2007.  "A Goal for Reform: Make Elections Worth Stealing." *PS: Political Science and Politics*. (October): 681-86.

Bowler, S. and T. Donovan.  2007. "Reasoning About Institutional Change: Winners, Losers and Support for Electoral Reform." *British Journal of Political Science*. 37 (July): 455-76.

8

Plaintiffs' Exhibit PX886   p. 36 of 67

**Articles (continued):**

Donovan, T. and J. Karp. 2006. "Popular Support for Direct Democracy." *Party Politics*. 12 (5): 871-688.

Bowler, S. and T. Donovan. 2006. "Direct Democracy and Political Parties in America." *Party Politics*. 12 (5): 649-669.

Bowler, S, T. Donovan and J. Karp. 2006. "Why Politicians Like Electoral Institutions: Self-interest, Values, or Ideology?" *Journal of Politics*. 68(2): 434-446.

- Longely Prize for best paper published in 2006. APSA Section on elections and representation.

Donovan, T., J. Parry and S. Bowler. 2005. "O Other, Where Art Thou? Support for Proportional Representation in the United States." *Social Science Quarterly*. 86(1):147-59.

- Alan Saxe Award for best paper presented at SWPSA, 2003.

Bowler, S. and T. Donovan. 2004. "Measuring the Effect of Direct Democracy on State Policy." *State Politics and Policy Quarterly*. 4(3): 345-363. (Fall).

- In top five most cited articles from *SPPQ*, as of November 2015

Donovan, T.  S. Bowler, J. Karp and R. Hanneman. 2004. "Sports, Social Group Membership and Political Engagement in New Zealand." *Australian Journal of Political Science.* 39(2) (July).

Bowler, S. and T. Donovan. 2004.  "Evolution in State Governance Structures: The Unintended Consequences of State Tax and Expenditure Limitations." *Political Research Quarterly*. 57(2): 189-196.

Banducci, S., T. Donovan and J. Karp. 2004. "Minority Representation, Empowerment, and Participation." *Journal of Politics*. 66(2): 534-56.

Bowler, S., T. Donovan, and R. Hanneman. 2003. "Art for Democracy's Sake?: Social Group Membership and Civic Engagement in Europe." *Journal of Politics.* 65(4):1111-1129.

Bowler, S, T. Donovan, and J. Karp. 2002. "When Might Institutions Change? Elite Support for Direct Democracy in Three Nations." *Political Research Quarterly*. 55(4)731-754.

Bowler, S. and T. Donovan. 2002. "Do Voters Have a Cue? TV ads as a Source of Information in Referendum Voting." *European Journal of Political Research*. 41(6): 777-793.

Pippen, J., S. Bowler and T. Donovan. 2002. "Election Reform and Direct Democracy: The Case of Campaign Finance Regulations in the American States." *American Politics Research*. 30(6):559-82.

Bowler, S. and T. Donovan. 2002. "Democracy, Institutions and Attitudes about Citizen Influence on Government." *British Journal of Political Science*. 32:371-390.

Plaintiffs' Exhibit PX886   p. 37 of 67

**Articles (continued):**

Karp, J. , J. Vowles, S. Banducci, and T. Donovan. 2002. "Strategic Voting, Party Activity, and Candidate Effects: Testing Explanations for Split Voting in New Zealand's New Mixed System." *Electoral Studies*.  21:1-22.

Bowler, S., T. Donovan, M. Neiman and J. Peel. 2001. "Institutional Threat and Partisan Outcomes: Legislative Candidates' Attitudes toward Direct Democracy." *State Politics and Policy Quarterly.* 1(4):364-79.

Bowler, S., D. Brockington and T. Donovan. 2001. "Election Systems and Voter Turnout: Experiments in the US." *Journal of Politics*.  63(3) 902-915.

- Reprinted 2008 in The *Lanahan Readings in State and Local Government: Diversity, Innovation, and Rejuvenation*, 2nd Edition, Lanahan Publishers, Inc.

Donovan, T. and C. Morrow. 2001. "The 2000 Washington Second Congressional District Race." *PS Online*, also abstracted in *PS: Political Science and Politics*. 34(2): 275-6.

Donovan, T.  2000. "Mobilization and Support of Minor Parties: Australian Senate Elections." *Party Politics*. 6(4): 473-486.

Bowler, S. and T. Donovan. 2000.  "California's Experience with Direct Democracy - the first 80 years." *Parliamentary Affairs*.  53(4): 644-656.

Donovan, T., S. Bowler and T. Terrio. 2000. "Support for Third Parties in California." *American Politics Quarterly.*  27: 50-71.

Bowler, S., T. Donovan, and D. Farrell. 1999.  "Party Strategy and Voter Organization Under Cumulative Voting in Victorian England."  *Political Studies*.  47:906-17.

Banducci, S., T. Donovan and J. Karp. 1999. "Proportional Representation and Attitudes about Politics: Results from New Zealand." *Electoral Studies*.  18(4): 533-555.

Bowler, S. and T. Donovan. 1998.  "Two Cheers for Direct Democracy or Who's Afraid of the Initiative Process." *Representation: Journal of Representative Democracy*.  35:247-254.

Brockington, D., T. Donovan, S. Bowler and R. Brischetto. 1998. "Minority Representation Under Cumulative and Limited Voting in Local Elections." *Journal of Politics*.  60:1108-1125.

- Reprinted 2001, 2004 in K. Hoover and T. Donovan. *Elements of Social Scientific Thinking.*  7th and 8th editions.

Donovan, T. and S. Bowler 1998.  "Direct Democracy and Minority Rights: An Extension." *American Journal of Political Science*.  43:1020-25.

Bowler, S. T. Donovan and K. Fernandez. 1996. "The Growth of the Political Marketing Industry and the California Initiative Process." *European Journal of Marketing*. 30:173-186.

10

**Articles (continued):**

Donovan, T. and M. Neiman. 1995. "Local Growth Control Policies and Changes In Community Characteristics." *Social Science Quarterly*. 76:780-793.

Bowler, S. and T. Donovan. 1995. "Popular Responsiveness to Taxation" *Political Research Quarterly.* 48:77-99.

Bowler, S. and T. Donovan. 1994. "Information and Opinion Change on Ballot Propositions." *Political Behavior*. 16:411-433.

Donovan, T. and J. Snipp. 1994. "Support for Legislative Term Limitations in California: Group Representation, Partisanship and Campaign Information." *Journal of Politics*.  56:492-501.

Bowler, S. and T. Donovan. 1994. "Economic Voting and Ballot Propositions." *American Politics Quarterly.*  22:27-40.

Bowler, S., T. Donovan and J. Snipp. 1993. "Local Sources of Information and Voter Choice in State Elections: Micro-Level Foundations of the Friends and Neighbors Effect." *American Politics Quarterly.*  21:473-489.

Donovan, T. 1993. "Community Controversy and the Adoption of Economic Development Policies." *Social Science Quarterly.*  74:386-402.

Donovan, T. and M. Neiman. 1992.  "Community Social Status, Suburban Growth and Local Government Restrictions on Residential Development. *Urban Affairs Quarterly*. 28:323-336.

Donovan, T. and M. Neiman. 1992. "Citizen Mobilization and the Adoption of  Local Growth Controls.*" Western Political Quarterly*. 45:651-675.

Bowler, S., T. Donovan and T. Happ. 1992. "Ballot Propositions and Information Costs: Direct Democracy and the Fatigued Voter." *Western Political Quarterly*. 45:559-568.

**Chapters & Articles in Edited Volumes:**

Donovan, T. 2020. "Barak Obama and the 2018 Presidential Election."  In *Voting and Political Representation in America: Issues and Trends*. ABC-CLIO.

Donovan, T. 2020. "Direct Democracy." In *Voting and Political Representation in America: Issues and Trends.* ABC-CLIO.

11

**Other Chapters & Articles in Edited Volumes:** (continued):

Bowler, S. and T. Donovan. 2019.  "Citizens and Direct Democracy."  In R. Dalton, (ed.)
    *Oxford Research Encyclopedia in Politics*.  Oxford University Press.

- Featured on OUPblog, January 22, 2017

Donovan, T. 2019. "The promise and peril of direct democracy: An introduction. *Politics
    and Governance*. 7(2). 169-172.

Donovan, T.  2017.  "Cognitive Mobilization." Chapter 18 in Kai Arzheimer, Jocelyn Evans,
    and Michael Lewis-Beck (eds).  *Sage Handbook of Electoral Behaviour*.  Sage
    Publications.

- 2700 reads (Researchgate measure)

Donovan, T. and S. Bowler.  2016.  "Experiments on the Effects of Opinion Polls and
    Implications for Laws Banning Pre-election Polling."  In Andre Blais and Jean-
    Francois Lasier (eds.) *Voting Experiments*. Springer.

Denemark, D., T. Donovan, and R. Niemi. 2016.  "Advanced Democracies: The Erosion of
    Traditional Democratic Citizenship."  In D. Denemark, R. Mattes and R. Niemi
    (eds.) *Growing up Democratic: Does it Make A Difference?*.  Lynne Rienner.

Donovan, T.  2014.  "Direct Democracy: Lessons from the United States."  *Political
    Insights*. December.

Donovan, T.  2014.  "Referendums and Initiatives in North America."  In M. Qvortrup (ed.)
    *Referendums Around the World*.  Palgrave MacMillan.

- Reviewed in *Political Studies*, 2015, 13(4):590-91
- Reviewed in *Swiss Political Science Review*, 2015 21(1):202-204.
- New, revised edition 2017

Bowler, S. and T. Donovan.  2014.  "State Direct Democracy and Public Policy." In Donald
    Haider-Markel (ed.) *The Oxford Handbook of State and Local Government*.  Oxford
    University Press.

Donovan, T. 2011. "Elections and Voting in Washington State." In. C. Clayton & N.
    Lovrich (eds). *Governing Washington: Politics and Government in the Evergreen
    State*.  Washington State University Press.

Donovan, T.  2011. "Redistricting and Direct Democracy."  In G. Moncrief (ed.)
    *Reapportionment and Redistricting in the West*.   Rowman & Littlefield.

Donovan, T. and S. Bowler.  2011.  "Election Reform: What is Expected, and What
    Results?" in S. Medvic  (ed.), *New Directions in American Politics.*  Routledge.

Bowler, S. and T. Donovan.  2010.  "Direct Democracy in the United States" In  Jan
    Leighley (ed.) *The Oxford Handbook of American Elections and Political Behavior*.
    Oxford University Press.  Paperback ed, 2012.

12

**Other Chapters & Articles in Edited Volumes:** (continued):

Donovan, T.  2010.  " The United States Should Adopt a National Initiative and Referendum" in R. Nelson and R. Ellis, *Debating Reform*.  Washington, DC: CQ Press.

- Revised, reprinted 2014. Second edition.
- Reprinted 2017.  Third edition.
- Revised, reprinted 2019. Fourth edition

Donovan, T. 2009.  "Washington." Essay in D. P. Haider-Markel et al (eds.) *Political Encyclopedia of U.S. States and Regions*.  Washington, DC: CQ Press.

Bowler, S. and T. Donovan.  2008.  "Electoral Reform and (the lack of) Electoral System Change in the US."  In, A. Blais, ed. *To Keep or Change First Past the Post*: *The Politics of Electoral Reform.*  Oxford University Press.

Donovan, T. and D. Smith.  2008.  "Identifying and Preventing Signature Fraud on Ballot Measure Petitions."  in R. Michael Alvarez and Thad Hall (eds.) *Election Fraud: Detecting and Deterring Electoral Manipulation*.  Washington, DC: Brookings Institution Press.

Bowler, S. and T. Donovan.  2008. "Barriers to Participation for Whom? Regulations on Voting and Uncompetitive Elections." M. Levi, J. Johnson, J. Knight and S. Stokes (eds.) *Designing Democratic Government: Making Institutions Work*.  New York: Russell Sage Foundation.

Bowler, S. and T. Donovan. 2008  "Direct Democracy's Effects on Political Parties."  In S. Bowler and A. Glazer (eds.), *Direct Democracy's Impact on American Political Institutions.*  Palgrave Macmillan.

Donovan, T. D, Denmark and S. Bowler.  2007.  "Trust, Citizenship and Participation: Australia in Comparative Perspective." In D. Denemark et. al. (eds.) *Australian Social Attitudes: The 2nd Report*.  University of New South Wales Press.

- Alternate version, 2008. "Trust, Citizenship and Participation: The United States in Comparative Perspective."  In K. Hoover and T. Donovan *Elements of Social Scientific Thinking*.  Ninth Edition.  Reprinted 2011 (Tenth Edition).  Reprinted 2013 (Eleventh Edition).

Donovan, T. 2007. "Direct Democracy as Super-precedent? Political Constraints of Citizen-Initiated Laws."  *Willamette Law Review*. 43(2): 189 - 234.

Bowler, S., T. Donovan and J. van Heerde.  2005. "The United States."  In M. Gallagher and P. Mitchell (ends) *The Politics of Electoral Systems*.  Oxford, UK: Oxford University Press.

Bowler, S. and T. Donovan.  2005. "Cumulative Voting and Minority Representation: Can it Work?"  In G. M. Segura and Shaun Bowler (ends) *Diversity In Democracy: Minority Representation in the United States*. Charlottesville: University of Virginia Press.

Donovan, T.  2005. "Campaign Effects." essay in S. Best and B. Radcliff (eds.) *Polling in America: An Encyclopedia of Public Opinion.*  Greenwood Press.  (pp. 58- 64).

13

**Other Chapters & Articles in Edited Volumes:** (continued):

Banducci, S., T. Donovan, and J. Karp.  2005. "Minority Representation, Empowerment, and Participation in New Zealand and the United States." In G. M. Segura and Shaun Bowler (ends) *Diversity In Democracy: Minority Representation in the United States*. Charlottesville: University of Virginia Press.

Bowler, S. and T. Donovan.  2005.  "Voters, Candidates, and Institutions: Can Voters Make Sense of Institutions? Can Candidates Make Sense of Voters?"  In David McCuan and Stephen Stambough (eds.) *Initiative-Centered Politics: The New Politics of Direct Democracy*.  Durham, NC: Carolina Academic Press.

Donovan, T.  2004. "The Legislature."  In (eds.) C. Clayton, L. Leloup and N. Lovrich, *Government and Politics in the State of Washington*.  Washington State University Press.

Bowler, S. and T. Donovan. 2003.  "Direct Democracy in the American States."  In V. Gray and R. Hanson (eds.) *Politics in the American States: A Comparative Analysis*. 8th edition. Washington, DC: Congressional Quarterly Press.

- Revised version, 2008.  Gray and Hanson (eds.) 9th Edition.
- Revised version, 2012.  Gray, Hanson and Kousser (eds.) 10th Edition.
- Revised version, 2017   Gray, Hanson and Kousser (eds.) 11th Edition

Donovan, T. and C. Morrow.  2002.  "The Washington Second Congressional District Race." In D. Magleby (ed.)*The Other Campaign: Soft Money and Issue Advocacy in the 2000 Congressional Elections*. Lanham, MD: Rowman and Littlefield.

Bowler, S. and T. Donovan.  2002. "Political Reform via the Initiative Process: Proposition 198 as an Example." In B. Cain and E. Gerber (eds.) *Voting at the Political Fault Line: California's Experiment with the Blanket Primary*. Berkeley:  IGS/University of California Press.

Bowler, S. and T. Donovan.  2001. "Popular Control of Referendum Agendas: Implications for Democratic Outcomes and Minority Rights."  In Mendelsohn and Parkin (ends) *Referendum Democracy: Citizens, Elites and Deliberation in Referendum Campaigns.* London: Macmillan.

Donovan, T., S. Bowler and D. McCuan. 2001. "Political Consultants and the Initiative Industrial Complex."  In L. Sabato, B. Larson, and H. Ernst (eds.) *Dangerous Democracy? The Battle over Ballot Initiatives in America.*  Lanham, MD: Rowman and Littlefield.

Donovan, T., S. Bowler and J. Wenzel. 2000. "Direct Democracy and Gay Rights Initiatives after *Romer*."  In C. Rimmerman, K. Wald and C. Wilcox (ends). *Politics of Gay Rights*. Chicago: University of Chicago Press.

Donovan, T. 1999.  "The California Peace and Freedom Party."  In Ness and Hayduck (eds.), *The Encyclopedia of Third Parties in American*.  Armonk, NY: M.E. Sharpe.

14

**Other Chapters & Articles in Edited Volumes:** (continued):

Donovan, T. and S. Bowler.  1997.  "Direct Democracy and Minority Rights: Opinions on Anti-Gay and Lesbian Ballot Initiative." In S. Witt and S. McKorkle (eds.)  *Assessing Anti-Gay Rights Initiatives.*  Greenwood Press.

Donovan, T., M. Neiman and S. Brumbaugh. 1994. "Two Dimensions of Local Growth Strategies." In M. Baldassare (ed*) Studies in Community Sociology*.  JAI Press. 4:153-169.

Bowler, S. D. Broughton, T. Donovan and J. Snipp. 1992. "The Informed Electorate? Voter Responsiveness to Campaigns in Britain and Germany." In S. Bowler and David Farrell (eds.) *Electoral Strategies and Political Marketing*. Macmillan. Pp. 204-222.


**Published Reviews and Review Essays:**

~~Donovan, T.  nd.  Invited review of R. Michael Alvarez and Bernard Grofman (eds.) "Election Administration in the United States: The State of Reform after Bush v. Gore.  *Journal of Politics*. Forthcoming~~

Donovan, T.  2005.  Invited review of J. Matsusaka's *For the Many or the Few*. In *Political Science Quarterly*.  120(3):505-06.

Donovan, T. 2005. Invited review of S. Piott's *Giving Voters a Voice: Origins of the Initiative and Referendum in American*.  In *Pacific Historical Review*.  642-43.

Donovan, T.  2003. An invited review of R. Ellis' *Democratic Delusions: The Initiative Process in American*, and R. Alexander's *Rolling the Dice With State Initiatives*.  In *Perspectives on Politics*. 1(1) 180-81.

Donovan, T.  2001.  An invited review of J. Thurber and C. Nelson's *Campaign Warriors: Political Consultants in Elections*.  In *American Political Science Review*.  95(2):448.

Donovan, T. 1993.  "Prospects for a Reasoning Public." An invited essay reviewing P. Sniderman, et al *Reasoning and Choice: Explorations in Political Psychology*. *Contemporary Psychology*.  American Psychological Association. March. 38:242-44.

Donovan, T. 1990. An invited review of F. Hawkins and J. M. Thomas' *Making Regulatory Policy.  Policy Studies Review*.  10:177-181.

15

**Grants, Fellowships, Expert Work, etc.:**

2019. Breif of Direct Democracy Scholars as Amici Curiae Supporting Petitioners. Schmitt et al v La Rouse.   Petition for Writ of Certiorari. Supreme Court of the United States.

2019. Brief for 190 Bipartisan Elected Officials, from counties and cities as *Amici Curiae* Supporting Respondents.  *United States Department of Commerce et al. Petitioners v. State of New York, et al.* Supreme Court of the United States.

2018. Expert witness report. For plaintiffs.  *Leach v. Reagan.* Superior Court, State of Arizona, County of Maricopa.

2016.  Election analyst.  Sky News UK.  2016 US presidential election.
Reviewed in the *Evening Standard*, Nov. 9.

2013-14.  Grant funded research.  Democracy Fund grant to Center for Voting and Democracy.  Study of Rank Choice Voting and Campaign Civility.

2013.  Visiting Fellow, School of Politics and International Relations, Research School of the Social Sciences, Australian National University funded for 2013.

2013.  Brief of Political Scientists as *Amici Curiae* in Support of Respondents. *Town of Greece v. Galloway.*  Supreme Court of the United States. With 14 others.

2013.  Brief *Amici Curiae* of Political Scientists Gary Segura, Shaun Bowler, Todd Donovan, Zoltan Hajnal, Rodney Hero, Stephan Nicholson, and Caroline Tolbert in Support of Chase Cantrell. Supreme Court of the United States.

2012.  Expert witness report.  Tennessee Attorney General's Office.  *Tigrett t al v. Cooper et al*.  US District Court, Western District of Tennessee.

2012.  Expert report for plaintiffs.  *Satorre v. San Mateo Board of Supervisors.*

2012.  Expert witness report.  Tennessee Attorney General's Office.  *Green Party v. Hargett.*  US District Court, Western District of Tennessee.

2011-12.  Co-PI, UK Referendum Survey Experiments.  Jack Vowles, Sara Hobolt, Shaun Bowler and Todd Donovan.  British Academy.

2011.  Brief Amici Curiae.  *Coalition to Defend Affirmative Action, et al and Cantrell et al v. Regents of the University of Michigan*.  Gary Segura, Shaun Bowler, Todd Donovan, Zoltan Hajnal, Rodney Hero, Steven Nicholson and Caroline Tolbert. US Court of Appeal for the Sixth Circuit; Supreme Court of the United States.

2010.  Expert witness report.  Washington Attorney General's Office.  *Washington State Republican Party et al v. State of Washington, et al.* US District Court, Western District of Washington.

2010. Brief *Amici Curiae* of Direct Democracy Scholars in Support of Respondents.  *Doe v. Reed*.  Smith, D., T. Donovan, J. Parry and C. Tolbert. Supreme Court of the United States.

16

Plaintiffs' Exhibit PX886   p. 44 of 67

**Grants, Fellowships, Expert Work, etc. (continued):**

2009.  Expert witness report.  Montana Attorney General's Office.  *Kelly and Dreyer vs. McCulloch.*  US District Court of Montana.

2006.  Expert analysis / Declaration*. Washington State Troopers Association et al v. State of Washington*.  Thurston County Superior Court.

2006.  Expert witness report.  Alaska Attorney General's Office. *Green Party v. State of Alaska, Division of Elections*. Supreme Court of the State of Alaska.

2004.  Expert analysis / report. Washington Attorney General's Office.  Effects of campaign spending in non-partisan contests.

2004. Research grant. Canadian Embassy/Canadian Studies Grant Programs.   "Treaty Negotiations Referendum Project."

2003 - 04.  Expert panelist.  U.S. Department of Health and Human Services, Center for Disease Control. "Local Fluoridation Campaigns."

2003.  National-sample Survey Experiment. Conducted by Time-sharing Experiments in the Social Sciences, an NSF infrastructure project (A. Lupia and D. Muntz, PIs). "Chronic Losing and Democracy."

2002. Contracted research report. Pew Project on 2002 Competitive Elections. "Incumbent vs. Challenger Races."  (S. Merisel, PI).

2002.  Expert witness.  First Nation's Treaty Project. *Wilson Bob et al vs. Her Majesty the Queen in Right of the Province of British Columbia, et al.*

2002.  Expert panelist. Democracy Foundation.  "Assessment of National Initiative for Democracy."

2001 - 2002.  Expert witness. Washington State Attorney General's Office (For federal trial in United State District Court for Western Washington and the 9th Cir. Court of Appeal, *Washington Democratic Party et. al vs. Sam Reed et al).*

2000-2001. Contracted research report.  Center for the Study of Elections and Democracy (BYU)/Pew Trust.  "Outside Money in Congressional Elections."  (D. Magleby, PI).

1999-2000. Small Research Grant. American Political Science Association.  "Public Opinion about Democratic Institutions: Constituencies for Change."

1999-2000. Research Grant. Canadian Embassy/Canadian Studies Grant Programs.   "Elite Attitudes about Direct Democracy in Western Canada."

1994.  Contracted Research Report. The Evergreen State College.  Washington State Institute for Public Policy.  "Proportional Representation in Local Elections."

17

Plaintiffs' Exhibit PX886   p. 45 of 67

**Internal Research Grants and Awards:**

2015.  Survey of Iowa Caucus voters.  Mini Grant.  OPS.

2013.  Attitudes about Campaign Finance.  Mini Grant. OSP.

2010.  "Attitudes about Judicial Elections." Vice Provost for Research.  Summer Research Grant.

2009.  Western Washington Bureau for Faculty Research.  Grant-in-aid.  "Opinions on candidate qualities." Washington Poll experiment.

2007. Western Washington Bureau for Faculty Research.  Grant-in-aid.  "Presidential Nomination Panel Study: Washington Poll."

2002. Vice Provost for Research.  Summer Research Grant.  "Electoral Populism in Comparative Perspective: Response to Globalization in Four Democracies."

2000.  Western Washington Bureau for Faculty Research.  Grant-in-aid.  "Attitudes about Institutions: Washington Survey."

1998-1999.  Western Washington University, Bureau for Faculty Research.  Pilot Project Grant.   "Public Attitudes about Direct Democracy."

1998.  Western Washington University, Vice Provost for Research.  Summer Research Grant.  "The Behavioral Effects of Changing from SMD/Plurality to MMP Election Rules in New Zealand."

1995. Western Washington University, Vice Provost for Research.  Summer Research Grant. "Cumulative Voting in the United States."

1995.  Western Washington University, Bureau for Faculty Research.  Pilot Project Grant. "Modified at-Large Voting Systems in the US."

**Grant Funded Research Reports:**

Donovan, T. and C. Morrow.  2001.  "The Washington Second Congressional District Election." In D. Magleby (ed.) *Election Advocacy: Soft Money and Issue Advocacy in the 2000 Congressional Elections*.  Report funded by the Pew Charitable Trusts. Magleby P.I.  p. 261-267.

Donovan, T. with H. Smith. 1994. *Proportional Representation in Local Elections*. Report commissioned by the Washington State Institute for Public Policy at The Evergreen State College.  Donovan P.I.

Neiman, M. and T. Donovan. 1991.  *Survey of Southern California Economic Development Officials: Survey Results*.  Report for Discussion Issued to California Redevelopment Agencies.  UC Riverside, unpublished.  Neiman P.I.

18

**Grant Funded Research Reports:**

Donovan, T. and M. Neiman. 1990. *Growth Control Project: Survey Results*. Issued to The John and Dora Haynes Foundation, Los Angeles, CA, and Southern California Planning Directors. UC Riverside, unpublished. Neiman P.I.

**Summary of Paper Presentations (sort of recent):**

American Political Science Association, 2020, 2019, 2016, 2015, 2014, 2013, 2012 (rained out), 2011, 2009, 2007
International Political Science Association, 2020, 2016, 2014, 2013, 2000
University of Iowa, 2020, 2016, 2012, 2008
State Politics and Policy Conference, 2019, 2017, 2015, 2014, 2013, 2008, 2007, 2005, 2004.
Pacific Northwest Political Science Association, 2019, 2018, 2014, 2013, 2012, 2008
Georgetown University, Florence campus. Workshop on political parties. 2018
Western Political Science Association, 2017, 2016, 2015, 2014, 2013, 2011, 2010, 2009, 2008, 2007, 2005
Washington State University Foley Institute 2017, 2015, 2012, 2011
Mainz, Germany; Democratic Anxieties Workshop 2017
Pontificia Universidad Catolica de Chile, 2017
Elections, Public Opinion, Parties Conference UK, 2016, 2014, 2011, 2009
European Consortium for Political Research 2015, 2012
The Australian National University 2014, 2013
Midwest Political Science Association 2012, 2011, 2010, 2009, 2008
Binghamton University
Boise State University
European Political Science Association
Foley Institute Governing Washington Conference, Olympia
Gould School of Law, University of Southern California
King County Bar Association
Northwest Legal Foundation, CLE
Russell Sage Foundation
Rice University
Texas Tech University
Thurston County Bar Association, CLE
Stanford University
Southern Political Science Association
SUNY Buffalo
University of California, Irvine
University of California, Riverside
University of Pennsylvania
University of Plymouth
University of Minnesota School of Law
University of Montreal, Making Electoral Democracy Work
University of Washington
University of Washington, Bothell
University of Western Australia
Willamette University College of Law

19

**Thesis Supervision as Chair:**

Joel Jordan.  2016.  Senior Honor's Thesis.  Political Science. Chair.

Sean Kelly.  2013.  Senior Honor's Thesis.  Political Science. Chair.

Janice Ward.  2012.  MA Thesis, Political Science.  Chair.  Religious Devotion and Partisan Intensity.

Caroline Theobald.  2011.  Senior Honor's Thesis.  Political Science. Chair.

Canon Brooke.  2010.  MA Thesis, Political Science.  Chair.  Political Change in the Intermountain West.

Magic Wade.  2009.  MA Thesis, Political Science.  Chair.  Evaluating Critical Mass Theory: Incrementalism or Rapid Change? A Study of Women's Advancement in Cabinet in 24 Democracies, 1945-2008.

Robert Hunsaker.  2008.  Senior Honor's Thesis.  Political Science, Chair.

Michael Barr.  2005.  MA Thesis, Political Science.  Examination of the Running Start Program in Washington.  Chair.

Adam Mahoney.  2005.  Senior Honor's thesis, Political Science.  Chair.

Chuck Tanner.  2004.  MA Thesis, Political Science. Ideology and the 1968 vote for George Wallace: A test of the Middle American Radical Theory of Political Alienation.  Chair.

Mitra Pemberton.  2003. Senior Honor's Thesis, Political Science.  Political Parties and Referendums in Western Europe.  Chair.

Amanda White.  2000.  MA Thesis, Political Science.  Testing for the Effects of Participation in the Arts on Tolerance.  Chair.

Steven R. L. Millman. 1997. MA Thesis, Political Science.  Effects of Term Limits on the Quality of Members of the US House: Testing The Mondak Model.  Chair.

Tammy Terrio. 1997.  MA Thesis, Political Science.  Dealignment, Independence and Minor Party Support in California.  Chair.

Tracy Sulkin. 1997.  Senior Honor's Thesis, University Honors.  Do Electoral Systems Matter? Candidate and Organizational Activity In US Local Elections Under Cumulative Voting, Districting and At-Large.  Chair

David Brockington. 1995. MA Thesis, Political Science.  Applying Two Models of Voting Behavior to the Candidacy of Ross Perot in the 1992 Election.  Chair.

Jeffrey Soth. 1995.  Self-Interest, Income Stratification, and Economic Voting in the Presidential Election of 1984.  Chair.

Member of several additional MA committees.

20

**Examples of Department Service:**

Various departmental committees 1991 - current
    (Budget, Personnel, Graduate, Curriculum, various search committees)
Graduate Program Director; 1995-1998; Acting Graduate Program Director; 2003.
American Politics Search Committee Chair, 2018


**Examples of University Service:**

State Council of Faculty Representatives, 2003 – 05.
Academic Senate Executive Committee, 2003 – 05.
Performance Contracts Working Group 2004.
Search Committees:  VP External Affairs (2004); Director of Residence Life (2004).
Graduate Council; 1999-2001.  1997-1999.
University graduate program reviews: Chemistry, Science Education, Anthropology.
University Undergraduate Research Committee, 1997 -


**Examples of Community Service:**

University Salary and Welfare Committee, 2001-2003.
Discovery Days panelist, several years.
Alumni Association presentations

Regular news interviews about research on initiatives, voting, and elections (examples):

    BBC, Wall Street Journal, New York Times, USA Today, Newsday (NY), Washington Post, Scientific American, Associated Press (NY, Seattle, Olympia, Spokane), UPI, AP, CNBC, Crosscut, Gannet, Bloomberg, Huffington Post, Boston Globe, Los Angeles Times, Globe and Mail (Canada), Canadian News Bureau, Seattle Times, Seattle PI, Al Jazzera America, Seattle Weekly, Tacoma News Tribune, Tri-Cities News, Education Weekly, Oregonian, Miami Herald, San Francisco Chronicle, Sacramento Bee, Fresno Bee, Washington Magazine, Bellingham Herald, McClatchy, MotherJones.com, High Country News, Local papers in Spokane, Vancouver, WA, Everett, WA, Olympia, WA, Longview, WA, California, Oregon, Maine, Florida, Illinois, etc.


TV/Radio/press interviews/shows (examples):

MSNBC, Fox News, CNN Radio, KGMI Bellingham, other Whatcom/Skagit Co. radio stations; KPLU Tacoma/Seattle; KUOW/NPR Seattle, Michigan Public Radio, TVW, KVOS, Australian Broadcast Corp., CTV Canada, CBC Canada, CBC Radio 1 Vancouver On The Coast, CBC Radio 1 Victoria On The Island, Sky News UK, KPCC Los Angeles NPR, BBC Radio Scotland, Seattlemet.com, High Country News, etc.

21

Plaintiffs' Exhibit PX886   p. 49 of 67

**Examples of Extended Broadcast Media Presentations:**

- Fall 2016          Portland LWV forum on election reform
- Fall 2016          Live election night analysis, Sky News, UK
- Spring 2016        Debate on Superdelegates, NPR Los Angeles
- Winter 2015        Polling and the Pollster panel, Foley Institute, TVW
- Fall 2014          Election comments, NPR, Seattle Times, etc.
- Fall 2013          Election comments, NPR, NY Times, WSJ, etc.
- Fall 2012          Election commentary, CBC, KUOW, etc.
- Fall, 2010         Election commentary, FOX news, NPR
- Fall, 2008         Election night commentary, KUOW NPR
- Winter 2008        "Northwest Notebook.' KVOS TV.
- Fall 2006          "Inside Olympia." 1hr TV show.
- Fall 2004          "Inside Olympia." 1hr TV show.
- Summer 2004        "Inside Olympia."  1hr TVW show.
- Spring 2004        1 hr Commentary on Reagan Funeral. Cable News NW.
- Summer 2003        Author's Hour.  TVW state-wide cable-broadcast interview.
- May 2003           City of Seattle, Citizen Advisory Panel on Council Elections.

**Examples of Local Speaking Engagements:**

- Fall 2019          Indivisible Bellingham, Impeachment forum, Speaker.
- Fall 2018          Munro Institute post-election forum. Speaker.
- Fall 2016          Dean's Lecture series, lecture on Trump and politics, Speaker
- Fall 2016          Munro Institute Panel on campaign finance
- Fall 2016          Munro Institute Panel on populism, Speaker
- Spring 2016        Munro Institute Panel on civic engagement, Moderator
- Winter 2016        Whatcom LWV panel on money in politics, Speaker
- Winter 2015        WWU Alumni Assoc. "Ignite Your Intellect" Speaker
- Fall 2014          WWU Academy of Lifelong Learning (4 hr course)
- Spring 2014        WA Association of County Officials State conference. Speaker
- Spring 2014        King County Bar Assoc. Public Policy Committee.  Speaker
- Fall 2012          World Issues Forum.  Speaker.
- Fall 2012          American Society of Women Accountants.  Speaker
- Fall 2012          Bellingham Rotary Club.  Lunch speaker.
- Spring 2011        Whatcom County Bar forum.  Speaker.
- Fall 2010          Bellingham City Club.  Speaker
- Fall 2009          Washington Association of County Officials.   Speaker.
- November 2008      Dean's Lecture series, panel on 2008 election
- June 2008          Semiamoo Club.  Speaker.
- May 2005           Bellingham City Club.  Speaker/panelist.
- March 2005         Bellingham Sunrise Rotary.  Speaker.
- October 2004       Bellingham Kiwanis.  Speaker.
- May 2004           Lummi Island Grange. Speaker.
- May 2004           Public Affairs Speaker Series. Unitarian Fellowship.  Speaker.
- November 2003      Whatcom Co. Bar Association.  Speaker.
- February 2003      BRF /Sigma Xi Talk, WWU.  Speaker.
- November 2002      Western Washington Family Open House.  Speaker.

22

**Examples of community volunteer service**

Current (as of 2020):

Whatcom County Council
Northwest Washington Clear Air Agency Board
Whatcom Transit Authority Board

Previous:

Columbia Neighborhood Association Board
Washington Conservation Voters, Whatcom County Chapter
Citizens' Election Advisory Board, City of Bellingham Representative
Futurewise Washington State Board
Futurewise Whatcom Board
Whatcom County Charter Review Commission

**Examples of Professional Service:**

Editorial Boards:
- *Politics and Governance* (2018 -  )
- *State Politics and Policy Quarterly* (2001 -  2004).
- *Political Research Quarterly* (2006 - 2014)

Executive Council / Councils:
- APSA Representation and Electoral Systems Section (2017-2019)
- Midwest Political Science Association (2009 - 12)
- Western Political Science Association (2005-08)
- Pacific Northwest Political Science Association (2000-01; 2003-05; 200?-14).
  - President, 2013; ex-officio 2014-15
- American Political Science Association, State Politics Section,  (2003 – 05)

Section organizer:
- Midwest Political Science Association meeting, 2008
- Pacific Northwest Political Science Assoc. meeting, 1999, 2003, 2004, 2006, 2009, 2010, 2012, 2014
- Western Political Science Assoc. meeting, 2003
- Southwestern Social Science Assoc. meeting, 2002

Chair/Panel organizer:
- Midwestern Political Science Association meeting, 2002
- American Political Science Association meeting, 1998
- Western Political Science Association meeting, 1994

Discussant:
- European Consortium for Political Research, 2015
- American Political Science Association meeting, 1998, 2001, 2004, 2007, 2010
- State Politics and Policy Conference, 2004, 2007, 2015
- Midwestern Political Science Association meeting, 2002, 2004
- Pacific Northwest Political Science Association meeting, 1996, 2003, 2009, 2010, 2014
- Western Political Science Association meeting, 1992, 1995, 2001, 2003, 2004, 2007, 2009

23

**Examples of Professional Service (continued):**

External reviewer (2012-2020)

- Ph.D candidate, Vrije Universiteit Amsterdam
- Tenure candidate II, University of Houston
- Tenure candidate, University of Las Vegas Nevada
- Tenure candidate, Portland State University
- Tenure candidate I, University of Houston
- Tenure candidate, Ohio State University
- Department external review, University of Montana

Grant / Fellowship Proposal Reviewer:
- NSF Graduate Research Fellowship Program panelist
- Canada Foundation for Innovation/Foundation canadienne pour l'innovation
- National Science Foundation (US) program proposal reviewer
- Fund for Scientific Research / FRS-FNRS expert (Belgium)
- Fonds zur Förderung der wissenschaftlichen Forschung / Austrian Science Fund
- Chilean National Science and Technology Commission (CONICYT - Chile).
- European Research Council

**Examples of Professional Service (continued):**

Article and Book Manuscript Reviewer:

American Behavioral Scientist, American Journal of Political Science, American Politics Quarterly/American Politics Review, American Political Science Review, British Journal of Political Science, Canadian Journal of Political Science, Community and Society, Comparative Political Studies, Comparative Politics, Congressional Quarterly Press, Democratization, Electoral Studies, Environment and Planning, International Journal of Politics, Culture, and Society, Journal of Elections Public Opinion and Parties, Journal of Politics, Journal of Political and Military Sociology, Journal of Theoretical Politics, Latin American Politics and Society; Legislative Studies Quarterly, Party Politics, Pearson/Prentice Hall, Political Communication, Political Behavior, Political Research Quarterly/Western Political Quarterly, Political Studies, Polity, Princeton University Press, Public Choice, Public Opinion Quarterly, Publius: The Journal of Federalism, Representation, Research & Politics, Sage Publications (UK), Social Problems, Social Science Quarterly, Sociological Perspectives, Southeastern Political Review, State and Local Government Review, State Politics and Policy Quarterly, University of Michigan Press, University of Pittsburgh Press, Urban Studies, Urban Affairs Review, Westview Press, others.

Plaintiffs' Exhibit PX886   p. 52 of 67

**United States District Court
for the Northern District of Florida
Tallahassee Division**

Kelvin Jones, et. al.,

        Plaintiffs,

v.                        Consolidated Case No. 4:19-cv-300

Ron DeSantis, et al.,

        Defendants.

_____

**Rebuttal Expert Report
of J. Morgan Kousser, Ph.D.**

**Professor of History and Social Science
Caltech Division of the Humanities and Social Sciences
MC 228-77
214 Baxter Hall
1200 E California Blvd.
Pasadena, CA 91125**

On Behalf of Plaintiffs Jeff Gruver, Emory Marquis "Marq" Mitchell, Betty Riddle, Kristopher Wrench, Keith Ivey, Karen Leicht, Raquel Wright, Steven Phalen, Clifford Tyson, Jermaine Miller, Curtis D. Bryant, Jr., Jesse D. Hamilton, LaToya Moreland, Florida State Conference of the NAACP, Orange County Branch of the NAACP, and League of Women Voters of Florida

1

## Response to Report of Michael Barber

1.      I have been asked by the *Gruver* plaintiffs in *Jones v. DeSantis* to respond to the March 2, 2020 expert report of Prof. Michael Barber to determine whether it supports or undermines my own report and findings in this case.[1]

2.      In his brief paper, Prof. Barber spends eight pages summarizing some of the vast literature in political science and social psychology on the importance of "framing" issues.  He then devotes eight pages to an analysis of selected materials related to the campaign for Amendment 4, two newspaper articles, and three letters dated after the Amendment's passage from individuals or groups that supported the Amendment.  He comes to four conclusions.  First, that proponents of Amendment 4 made systematic efforts to test different messages so as to maximize the likelihood of the Amendment's passage.  Second, that proponents decided that including the phrase "completion of the whole sentence" in campaign materials would make the initiative more likely to pass than explicitly phrasing re-enfranchisement as automatic upon release from incarceration.  Third, that the campaign for Amendment 4 implicitly assumed and clearly conveyed to the public that "completion of the whole sentence" necessarily included paying all fines and restitution.  Fourth, that the inclusion of "completion of the whole sentence" was "instrumental" in the passage of Amendment 4.

3.      As I have no specific expertise on the scholarly literature on framing, I do not express an opinion on Prof. Barber's review of that literature.  It is not surprising that any decently-financed initiative campaign on a serious issue would test messages using polls and focus groups.  For example, the controversy over the wording of the ballot description for Prop. 8 on same-sex marriage, which Prof. Barber uses as a prime example, was widely discussed at the time.[2]

---

[1] March 2, 2020 Expert Report of Michael Barber, *Jones v. DeSantis* [hereinafter Mar. 2 Barber Report].

[2] Mar. 2 Barber Report, p. 9.  For contemporary reference to the wording controversy, see Joshua Irving Kob and Rebekah Lee Grodsky, "California Initiative Review/  Proposition 8:  Eliminates Right of Same-Sex Couples To Marry.  Initiative Constitutional Amendment: (University of the Pacific, McGeorge School of Law, 2008), pp. 6-7, https://www.mcgeorge.edu/documents/Publications/Prop_8_2008.pdf>, accessed March 15, 2020.

2

4.     But it is curious that Prof. Barber nowhere quotes the exact wording of Amendment 4 or the Ballot Summary for the Amendment, or discusses that wording.  The Ballot Summary stated:  "This amendment restores the voting rights of Floridians with felony convictions after they complete all terms of their sentence including parole and probation.  The amendment would not apply to those convicted of murder or sexual offenses. . . ."[3]  The exact language of the Amendment, excluding the murder and sex crime section, reads "Except as provided in subsection (b) of this section, any disqualification from voting arising from a felony conviction shall terminate and voting rights shall be restored upon completion of all terms of sentence including parole or probation."[4]

5.     The Ballot Summary is undoubtedly the statement that reporters, op-ed writers, or editors from print or digital media would have been more likely to have read than any other statement because it is simple, official, and easily retrievable.[5]  For the same reasons, voters would also probably have consulted that summary or media reports based fundamentally on it. How could an expert report aimed at providing "information about how different language used in ballot initiatives, such as Amendment 4 in Florida, can impact likely support for the initiative" not discuss the actual text of the Amendment or of the Ballot Summary, which had been approved by the

---

[3] "Final Petition Language & State Format Approval," Supplemental Appendix to Reply Brief of Secretary of State, Laurel M. Lee, in Case No. SC19-1341, Appendix B, p. 44, Advisory Opinion to the Governor Re: Implementation of Amendment 4, the Voting Restoration Amendment, Supreme Court of Florida, [hereinafter Secretary of State Supplemental Appendix].

[4] *Ibid.*

[5] For a few references, see, e.g.,
https://en.wikipedia.org/wiki/2018_Florida_Amendment_4>,
https://ballotpedia.org/Florida_Amendment_4,_Voting_Rights_Restoration_for_Felons_Initiative_(2018)> , https://www.aclufl.org/en/voter-restoration-amendment-text>,
https://www.fl-counties.com/amendment-4> , accessed Mar. 10, 2020.  In the days before the November, 2018 election, local election officials sometimes published sample ballots giving the ballot summaries.  See, e.g., sample ballot from Leon County Supervisor of Elections in *Tallahassee Democrat*, Oct. 14, 2018, p. A4; Sample ballot, Brevard County Supervisor of Elections, *Florida Today*, Nov. 4, 2018, p. A26.  The close tracking of the Ballot Summary language in news stories, op-eds, and editorials given in Table 2 in my original March 2, 2020 report provides further evidence for the statements in this paragraph.  March 2, 2020 Expert Report of J. Morgan Kousser, Ph.D., at 30-33 (hereinafter Mar. 2 Kousser Report).

3

Plaintiffs' Exhibit PX886   p. 55 of 67

Florida Supreme Court? How could Prof. Barber not deal at some length with the fact that the plain text of the Amendment and the Ballot Summary nowhere explicitly refer to fines, fees, restitution, or any other legal financial obligations (hereinafter LFOs)? If proponents of Amendment 4 had been so certain that explicitly phrasing the Amendment to allow voting only by those who had paid all LFOs in full, why would they not have phrased the Amendment and ballot terms in that way?

6.      If one is concerned with how a ballot measure is framed to try to capture votes, then the approval of the Ballot Summary by the Florida Supreme Court in 2017 is relevant. The title and summary, in that Court's words, "would reasonably lead voters to understand that the chief purpose of the amendment is to automatically restore voting rights to felony offenders, except those convicted of murder or felony sexual offenses, upon completion of all terms of their sentence."[6] But the January, 2020 Advisory opinion to the Governor, to which Prof. Barber devotes a key sentence, would not seem relevant to the question of how Amendment 4 was framed, because that second advisory opinion was only issued long after the passage of Amendment 4.[7]

7.      Support for Prof. Barber's second and fourth conclusions, which will be discussed together for convenience, is mixed.[8] Let me review the evidence. Political consultants who advised groups considering a ballot initiative campaign at least during 2014 analyzed polling data from 2013 and 2014 that tested the appeal of two propositions. The first read "The amendment restores the voting rights of Floridians with felony convictions after they complete their time in prison." Seventy percent of respondents (10% over the 60% requirement for a constitutional amendment) favored an amendment stated in that fashion. The second wording read "The amendment restores the voting rights of Floridians with felony convictions after they complete all terms of their sentence include (sic – including) probation and parole." Support for the proposition in that form, which is

---

[6] *Advisory Opinion to the Attorney General RE: Voting Restoration Amendment*, 215 So. 3d 1202, 1208 (Fla. 2017). Note that this advisory opinion did not explicitly mention any legal financial obligations.

[7] *Advisory Opinion to the Governor Re: Implementation of Amendment 4, the Voting Rights Restoration Amendment*, No. SC19-1341 (Supreme Court of Florida, Jan. 16, 2020).

[8] Compare the brief discussion in the Mar. 2 Barber Report, pp. 15-16.

4

close to the final wording for Amendment 4, except that it does not explicitly exclude those convicted of murder or sex offenses, was 7 percentage points higher than the first statement of the proposition.[9]  Note that this second form of the question does not explicitly mention fines, fees, or restitution.

8.      A 2013 poll with a smaller number of respondents (507, compared to the 2014 poll's 816) found that a proposition promising voting rights after release from incarceration won support from only 42% of "likely voters," compared to 47% for a statement that "includes completion of all sentence terms including restitution."[10]  The memo does not give the full wording for either form of the questions.  Note also that it does not include fines, fees, parole, or probation and that the available material does not define "likely voters" for this poll.[11]  A further poll, conducted by Hamilton Campaigns later in 2014, found an even smaller difference between two possible versions of the ballot language, both of which "carved out" an exception for those convicted of murder and sex offenses:

- •    "Carve out with prison time – 59% support

- •    "Carve out with full sentence completion – 61% support"[.][12]

9.      The EMC/North Star consultants remark that there was no statistically significant difference between the results (70% vs. 77%) of polling the two potential forms of the amendment in 2014.[13]  They do not report whether the five percentage point difference in the 2013 poll or the 2% difference in the

---

[9] The wording of the propositions and the percentages in favor are given in an undated, unattributed memo, "Proposed Campaign Research Program (2016-2018)," in Secretary of State Supplemental Appendix, Attachment B, p. 5 (p. 42 of the whole document).  This memo is included in a series of related materials that were apparently produced by two opinion research companies, EMC Research and North Star Opinion Research, one associated with Democrats (EMC) and the other, with Republicans (North Star).

[10] The included document does not define "likely voters" or specify whether the election in which they were likely to vote was a presidential year or an off-year.

[11] "Proposed Campaign Research Program (2016-2018)," Secretary of State Supplemental Appendix, Attachment B, p.4, (p. 41 of whole document).

[12] Undated memo "Recap of Ballot Language, Title & Summary Research Program (2003-2014)," in Secretary of State Supplemental Appendix, Attachment F, p. 123 of whole document.

[13] "Proposed Campaign Research Program (2016-2018)," Secretary of State Supplemental Appendix, Attachment B, p. 6 (p. 43 of whole document).

5

later 2014 poll were statistically significant, but because the number of respondents in the 2013 poll was smaller, and the difference was smaller than in the first 2014 poll, it was likely not statistically significant. Because both of the 2014 polls had the same number of respondents, a 2% difference was not likely to be significant, if a 7% difference was not.

10.     Nevertheless, the consultants believed that "the attacks against an amendment that restores right after completion of prison raise concerns about the ability to pass a post-incarceration amendment. . . . there are fewer emotional concerns to be raised in opposition to a post-sentence voting rights restoration amendment."[14]  They do not identify the "emotional concerns" or offer any evidence to support a conclusion that one wording of the proposed proposition was more likely to pass than the other. Nonetheless, the memo "strongly recommended that a post-sentence amendment be used for final language as being more likely to pass. . . ."[15] Since the language finally adopted to put forward in Amendment 4 did use the "complete . . . their sentence" formulation, Prof. Barber's second conclusion – that the words were chosen because proponents thought it more likely to pass – seems correct.  But the memo, which he cites in part, offers no evidence whatsoever for his fourth conclusion, that inclusion of the "completion of the whole sentence" formulation was "instrumental" to the passage of Amendment 4, because, as the consultants' memo noted, the "whole sentence" formulation did not receive the support of statistically significantly more voters than the "prison time" version.[16]

11.     In support of Prof. Barber's third point, that proponents of Amendment 4 assumed that the "whole sentence" formulation implicitly assumed and clearly conveyed that "whole sentence" would be understood by voters as including fines, fees, and restitution, he states that a presentation by the political consultants "suggests that the proponents of the bill considered the phrase 'completion of the whole sentence' included fines and fees since they note the two together in their discussion of the pros and cons of including this language in the future ballot initiative text."[17]  But on the

---

[14] *Ibid.*
[15] *Ibid.*
[16] Mar. 2 Barber Report, p. 21.
[17] Mar. 2 Barber Report, p. 12.

6

contrary, the consultants explicitly stated that "The online survey test[ed] public opinion on different elements of public options separately":

- "Completion of sentence/completion of time in prison";

- "Fees, fines & restitution/excluding monetary terms of sentence; . . ."[18]

12.    Instead of suggesting that the proponents implicitly included fines, fees, and restoration as part of the whole sentence, this material suggests that proponents or at least consultants considered that fines, fees, and restitution would be perceived by voters as separate questions from "completion of the sentence." And as the analysis of newspaper articles in my March 2, 2020 report shows, that is exactly how newspaper articles treated the phrase "complete all terms of their sentence." Only two of 55 articles from a variety of Florida newspapers explicitly include fines, fees, and restitution in the definition.[19] Prof. Barber chose to cite one of the two articles that did explicitly include these LFOs when discussing the Amendment.[20] Although the citation of this op-ed by a person who was not connected with the Amendment 4 campaign is not representative of all of the newspaper articles in which definitions of a "sentence" appear, it does amount to an acknowledgement by Prof. Barber of the importance of such newspaper evidence. He just made no effort to analyze the newspapers extensively or systematically, as I did.

13.    The other article that he discusses, one from the out-of-state digital platform Vox, does not really support the proposition that "completion of the sentence" includes fines, fees, and restitution, as Prof. Barber says it does. He also notably leaves out a much clearer message in the article, that passage of Amendment 4 would disproportionately benefit Black people, because they are disproportionately affected by felon disfranchisement. Prof. Barber quotes Susanne Manning, who at the time worked with the FRRC. As an example of someone disfranchised by the pre-Amendment 4

---

[18] "Florida Rights Restoration Research Briefing, September 2, 2014," in Secretary of State Supplemental Appendix, Attachment D, p. 99 of whole document.
[19] Mar. 2 Kousser Report, pp. 30-42.
[20] Reggie Garcia, op-ed "Amendment 4 will give felons their lives back, and save the rest of us money," *Miami Herald*, Oct. 12, 2018, https://www.miamiherald.com/opinion/op-ed/article219954405.html> ; Mar. 2 Barber Report, pp. 18-19.

7

system, Manning cited a returning citizen who had not been able to vote for 19 years because after his release from prison, he was caught driving with a suspended license.  The article continues by saying "Amendment 4 'is going to affect people who have been waiting forever,' she [Manning] said."  To emphasize the point, but not explicitly to define what a sentence means, Manning stated, in a passage that Prof. Barber does include:  "People who have done their time. People who have finished their sentence, done their probation, paid their court costs, paid their fines, paid their restitution — and have still been waiting."[21]  This is not a gloss on the definition of completion of a sentence, but a persuasive statement about how bad the status quo is, aiming at convincing people to vote for Amendment 4.  Prof. Barber then quotes Desmond Meade, a leader of FRRC as saying in the Vox article "At the end of the day, when a debt is paid, it's paid."[22]  But Meade's statement is vague and does not explicitly mention any LFOs.  It might easily be read to say that when someone emerges from prison, his debt has been paid.  Indeed, the Merriam-Webster dictionary gives as the only example of "debt to society" the following: "After 10 years in prison, he has paid his debt to society and is a free man."[23]

14.     Although Prof. Barber's report is about the framing of Amendment 4 and what the proponents of the Amendment meant by completing a sentence, he must certainly be aware that *Jones v. DeSantis* is concerned with whether S.B. 7066 has a discriminatory intent, burden, and/or effect. So in his discussion of the Vox article, one of only two articles that he mentions, one might imagine that he would make at least a passing reference to a much clearer series of statements in the article.  The article states:

> "Black people, who are disproportionately arrested and incarcerated, would stand to benefit the most [from the passage of Amendment 4]. In 2016, more than 418,000 black people out of a black voting-age population of more than 2.3 million, or 17.9 percent of potential black

---

[21] Mar. 2 Barber Report, p. 16.  German Lopez, "One in 10 potential Florida voters can't legally vote.  Amendment 4 could change that." Vox, Oct. 17, 2018, updated Nov. 6, 2018, https://www.vox.com/policy-and-politics/2018/10/17/17978502/florida-amendment-4-felons-vote-disenfranchisement> .

[22] *Ibid*.

[23] "debt to society," https://www.merriam-webster.com/dictionary/debt%20to%20society?src=search-dict-box> .

8

voters in Florida, had finished sentences but couldn't vote due to a
felony record, according to the Sentencing Project. . . .

"Florida disenfranchises more potential voters than any other state,
with more than 10 percent of all potential voters and more than 21
percent of potential black voters in Florida unable to vote due to felony
records."[24]

15.    Prof. Barber begins the section of his paper in which he discusses the
Vox article by characterizing it as one of "[s]everal materials from the
campaign."[25]  In fact, he does not examine any public materials from the
campaign – only an internal memorandum about messaging from ACLU of
Florida Executive Director Howard Simon, urging proponents of
Amendment 4 to deduct those who have not paid fines, fees, and restitution
from the number of returning citizens who would be automatically re-
enfranchised by Amendment 4.[26]  Although the Sentencing Project's
estimate that there were 1.4 million returning citizens in Florida was the
most often cited statistic during the debate over Amendment 4 – e.g., it was
in the first line of the Vox article that Prof. Barber cites – Simon's private
strategic statement apparently attempted to encourage the proponents to use
a smaller number.

16.    But Prof. Barber does not note that Simon used other definitions of
sentence completion publicly, and that he continued to cite the 1.4 million
figure himself.  In an op-ed a week before the 2018 election, Simon declared
that the Amendment "applies to those who have completed all the terms of
their sentence, including incarceration, restitution, parole and probation that
a judge has imposed . . ."[27] This explicitly mentions restitution, but not fines
or fees.  And the day after Amendment 4 passed, Simon was quoted in the
New York Times as being unsure of how Amendment 4 would affect
partisan outcomes in Florida, "because nobody has a good understanding of

---

[24] *Ibid.*

[25] *Ibid.*

[26] Feb. 11, 2018 Memo from Howard Simon to Executive Board, "The number of people
who could be impacted by Amendment 4," included in E-mail from Howard Simon to
CLU/FRRC members (Feb. 12, 2018, 9:15 a.m.) reproduced in Mar. 2 Barber Report,
Appendix C (pp. 46-48 of the materials including the report).

[27] Howard Simon, guest columnist, "Restoring ex-felons' voting rights deserves your
'yes' vote," *Fort Myers News-Press*, Oct 28, 2018, p. A38.

9

what the political leanings are of 1.4 million people who have completed all the terms of their sentences."[28]  Despite his memo of eight months earlier, here, Simon asserts that 1.4 million people – i.e., even those who still owe restitution, fines, and fees – "have completed all the terms of their sentences."  Simon's public statements are inconsistent with the view that the campaign for Amendment 4 consistently portrayed Amendment 4 as mandating the payment of all LFOs before the right to vote could be restored to returning citizens.

17.    Prof. Barber then discusses parts of three letters from the ACLU and other pro-Amendment 4 organizations written after the passage of Amendment 4 – on December 13, 2018, January 21, 2019, and March 11, 2019 – which were not "materials from the campaign" that were intended to influence voters in the November, 2018 election.  They were, instead, parts of negotiations with two Florida Secretaries of State and legislative leaders.[29]  Interestingly, each of them, on the first page, asserts, in bold type, that "Amendment 4 is Self-Executing."  This statement, of course, supports these organizations' view that S.B. 7066 was unnecessary.  Prof. Barber does not quote these identical statements.  While it is true that the first two letters state that any financial obligation that was part of the original sentence must be satisfied before a returning citizen can register to vote, the January 21, 2019 letter, from ACLU of Florida Political Director Kirk Bailey to the Florida Senate Criminal Justice Committee, notes that Amendment 4 "was silent on whether any financial obligations would need to be satisfied before the voting disqualification automatically terminated."[30]

18.    The March 11 letter to Secretary of State Lee went further in qualifying the view that sentence completion required the payment of all LFOs.  It, in effect, took a similar position to sections of S.B. 7086 – that a returning citizen should be re-enfranchised if his LFOs had been converted to civil liens, for example, which was very different from S.B. 7066 and which did not support what I have called in my March 2, 2020 report the Faithful Steward Assertion.  Chronological evidence implies that this letter

---

[28] Frances Robles, "1.4 Million Floridians With Felonies Win Long-Denied Right to Vote," *New York Times*, Nov. 7, 2018, https://www.nytimes.com/2018/11/07/us/florida-felon-voting-rights.html?action=click&module=RelatedLinks&pgtype=Article> .

[29] Mar. 2 Barber Report, Appendix D, pp. 52-53, 57-65 of the materials.

[30] Mar. 2 Barber Report, Appendix D, p. 52 of the materials.

10

reflected negotiations then going on between the FRRC and Sen. Brandes. As late as Feb. 27, Brandes had stated that he believed that "your sentence is not up until you pay all your fines."[31] But on March 25, Brandes amended his own bill "to require felons to pay only the fees set by a judge as part of the sentence."[32] According to a reporter from the Tallahassee Democrat, Brandes's amendment of his own bill resulted from the fact that he had been "[s]tung by critics who said a House proposal to implement the constitutional amendment would create a new Jim Crow law by imposing a poll tax . . ."[33] As indicated in the next paragraph, the March 11 letter essentially took the same position as Brandes's amendment, an amendment that transformed S.B. 7086 until the last days of the legislative session.

19.    The March 11 letter also took a strong position against disfranchisement because of poverty.  It is worth quoting two paragraphs of the letter in full:

> "Generally, monetary obligations are considered conditions of probation under Florida statutes and therefore monetary obligations generally have been fulfilled when probation ends.  There are also situations where a person is discharged from probation and parole without having fully paid all monetary obligations.  Logically, election officials should be able to rely on the judgment of the criminal justice system when defining completion of sentence. Consequently, a sentence is complete with a person is discharged from supervision (incarceration and parole or probation) – as is consistent with rules in the vast majority of U.S. states and the Florida Constitution.  This approach is the most reasonable option, because it offers clarity to both prospective voters and elections officials.
>
> "Finally, disenfranchisement on the basis of poverty is anathema to American jurisprudence and violates the fundamental principles on

---

[31] Daniel Rivero, "Despite Confusion About Amendment 4, Florida Is Granting Felons Voting Rights," WLRN, Feb. 27, 2019, https://www.wlrn.org/post/despite-confusion-about-amendment-4-florida-granting-felons-voting-rights> .

[32] Hearing on S.B. 7086 before the Senate Judiciary Committee, March 25, 2019, http://www.flsenate.gov/media/videoplayer?EventID=2443575804_2019031354&Redirect=true, at 36:30.

[33] James Call, "Senate moves less restrictive former felon voting bill," *Tallahassee Democrat*, Mar. 26, 2019, p. A1.

11

which this country was founded. When anyone completes all terms of
their criminal sentence and parole or probation, even if they have a
civil financial obligation (which is not part of a criminal sentence),
their right to vote should be automatically restored under Amendment
4. Implementation of Amendment 4 should stand for the principle
that financial inability to pay is not an insurmountable barrier to the
right to vote."[34]

Prof. Barber does not mention these two paragraphs, which may be
read as a further specification of the FRRC's position.

20.     Prof. Barber's report does not show that voters understood
Amendment 4 to require payment of all LFOs before a returning citizen
could be re-enfranchised, that the diverse group of proponents of
Amendment 4 (many of whom, such as Neil Volz and Cecile Scoon, he does
not even mention) presented a clear, consistent message that Amendment 4
required such payments, or that a "completion of the sentence" phrasing of
the Amendment was "instrumental" in the passage of the Amendment.

21.     First, he never examines the wording of the Ballot Summary or
explains why voters would have assumed that Amendment 4 implicitly
required payment of all LFOs. What message would they have received
from the way the text was explicitly framed?

22.     Second, he never explains why, if internal polling results indicated
that payment of all LFOs were such a benefit to passage of Amendment 4,
and proponents of the Amendment believed that the Amendment required
such payments, they did not explicitly include payment of LFOs in the
Ballot Summary and legal terms of the Amendment. Why leave an allegedly
winning framing implicit?[35]

---

[34] Letter, Florida Rights Restoration Coalition to Secretary of State Laurel Lee, March 11,
2019, Mar. 2 Barber Report, pp. 60-65, at pp. 63-64.
[35] Prof. Barber does not argue that the authors of Amendment 4 deliberately left the text
of the Amendment vague, but that voters understood that it implicitly required payment
of all fines, fees, and restitution. As he states in the penultimate sentence of his Mar. 2
Report, "it is clear that a discussion of the 'completion of the whole sentence' and 'paid
all fines' was a part of the message testing process for the campaign, and that proponents
of Amendment 4 conveyed this to the public as part of their campaign to pass the
initiative."

12

23.     Third, Prof. Barber only very casually examines the actual campaign for Amendment 4, and he totally ignores the longer history of felon disfranchisement in Florida and the events and discussion during the legislative session of 2019 that, after much jockeying and many revealing statements, led to the passage of S.B. 7066.

24.     Fourth, he misrepresents the finding of internal polling from 2013 and 2014 (long before the Amendment even qualified for the ballot, much less before the 2018 campaign). The materials cite three different attempts to determine whether a ballot proposition re-enfranchising returning citizens after incarceration or after completion of sentence polled better with Florida voters. He does not mention that none of the three apparently found a statistically significant difference between the two sets of wordings, or that the percentages in favor varied from 42% to 77% in the space of less than two years. This does not support Prof. Barber's contention that the "completion of sentence" framing was "instrumental" in the passage of the Amendment.

25.     Fifth, he distorts the slight evidence that he does cite about the public campaign for Amendment 4.

26.     Sixth, he fails to mention evidence in one article that he does cite that the Amendment was expected to diminish racial discrimination in voting.

27.     Seventh, he distorts the consistency with which proponents of Amendment 4 included payment of all LFOs in their internal discussions, the letters with which they sought to influence the actions of Secretaries of State and leaders of the State Legislature, and other positions that they took in public. Prof. Barber fails to notice or quote passages from letters written after the passage of Amendment 4 that argue that the Amendment was self-executing and that LFOs that had been converted to civil liens, for example, should not prevent the re-enfranchisement of a returning citizen. In light of the fact that there was already a ruling in this case that "the State of Florida cannot deny restoration of a felon's right to vote solely because the felon does not have the financial resources necessary to pay restitution . . . [or] the other financial obligations," it seems more than an oversight that Prof.

13

Barber fails to quote a strikingly similar sentiment in the March 11, 2019 letter from the FRRC to Secretary of State Lee.[36]

---

[36] *Jones v. DeSantis*, 410 F. Supp. 3d 1284, 1301 (N.D. Fla. 2019).

14

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

I reserve the right to continue to supplement my declarations in light of additional facts, testimony, and/or materials that may come to light.

Executed this March 16, 2020, at Los Angeles County, California.

J. Morgan Kousser, Ph.D.

15

Plaintiffs' Exhibit PX886   p. 67 of 67