EXHIBIT 13



PLAINTIFFS' EXHIBIT

**PX892**

Jones et al v. Desantis et al
Case No. 4:19-cv-00300

March 2, 2020

**United States District Court
for the Northern District of Florida
Tallahassee Division**

Kelvin Jones,

     Plaintiffs,

     v.                      Consolidated Case No. 4:19-cv-300

Ron DeSantis, etc., et al.,

     Defendants.

_____

**Expert Report of Traci R. Burch, Ph.D.**

**Associate Professor of Political Science
Northwestern University
Scott Hall, Department of Political Science
Northwestern University,
Evanston, IL 60208
and
Research Professor
American Bar Foundation
The American Bar Foundation
750 North Lake Shore Drive 4th Floor
Chicago, IL 60611**

On Behalf of Plaintiffs Jeff Gruver, Emory Marquis "Marq" Mitchell, Betty Riddle, Kristopher Wrench, Keith Ivey, Karen Leicht, Raquel Wright, Steven Phalen, Clifford Tyson, Jermaine Miller, Curtis D. Bryant, Jr., Jesse D. Hamilton, LaToya Moreland, Florida State Conference of the NAACP, Orange County Branch of the NAACP, and League of Women Voters of Florida

_Traci Burch_

_____
**Traci R. Burch, Ph.D.**

1

# Table of Contents

I.  Background and Qualifications ........................................................................3

II.  Summary of Opinions Offered .......................................................................6

III.  Researching Statewide Legal Financial Obligations in the Absence of a
     Publicly Available Statewide Database...........................................................15

IV.  Methodology..................................................................................................19

V.  Results: Financial Costs and other Barriers to Accessing Accurate and
     Complete Information ....................................................................................24

  A.  Problems Encountered During Phone Calls with Clerks' Offices ..............28

  B.  Problems Encountered in Online Databases ...............................................33

  C.  Problems Determining the Payment Due to Satisfy the Requirements
      of SB7066 .................................................................................................37

    1.  Inability to Discern Initial Assessed Amounts.........................................39

    2.  Problems Determining How Much Was Paid on a Case ........................51

    3.  Problems Determining How Payments are Applied ................................52

  D.  Prohibitions and Other Logistical Barriers to Partial Payments. ...............55

VI.  Conclusion ....................................................................................................66

APPENDIX ............................................................................................................70

2

Plaintiffs' Exhibit PX892   p. 3 of 103

## I.   Background and Qualifications

My name is Traci Burch.  I am Associate Professor of Political Science at Northwestern University and Research Professor at the American Bar Foundation. I received my Ph.D. in Government and Social Policy from Harvard University in 2007.

Over the past 15 years, I have led several large, long-term quantitative and qualitative research projects on political participation in the United States, with a particular focus on the ways in which interactions with the criminal justice system can either mobilize or inhibit political participation.  I am widely regarded as an expert on the intersection of criminal justice and political participation, having produced some of the first direct estimates of the voting patterns of individuals who had been convicted of felony offenses.  My work in this field has been widely cited and has won several awards.  In particular, my dissertation on felony disfranchisement, "Punishment and Participation: How Criminal Convictions Threaten American Democracy" won the Robert Noxon Toppan Prize for the Best Dissertation on a Subject of Political Science at Harvard in 2007.  I also achieved national recognition for this work; the dissertation was also awarded the E.E. Schattschneider Award from the American Political Science Association for the best dissertation in American Government, and the William Anderson Award for the best dissertation in federalism, intergovernmental relations, and state and local

3

politics.  Several articles from this dissertation, including work evaluating voting patterns among people with felony convictions in Florida, have been published in leading peer-reviewed journals such as *Political Behavior* and *Law and Society Review*.  My academic book on this matter, *Trading Democracy for Justice*, was published by the University of Chicago Press and also won multiple national awards from the American Political Science Association and its sections, including the Ralph J. Bunche Award for the best  scholarly work that explores the phenomenon of ethnic and cultural pluralism  and best book awards from the law and politics and urban politics sections.

I have testified before the U.S. Commission on Civil Rights about the collateral consequences of felony convictions.  I have received several grants for my work, including a grant from the Stanford University Center on Poverty and Inequality.  I also serve as co-Principal Investigator on a National Science Foundation grant that supports graduate and postdoctoral fellowships at the American Bar Foundation.  I have served on Editorial Boards of several leading journals including *Political Behavior* and *Law and Social Inquiry*.  Currently, I am on the Board of Overseers for the General Social Survey, a longstanding national public opinion survey run by the National Opinion Research Center at the University of Chicago.

4

My curriculum vitae is provided in the **Appendix**.  I am being compensated $300 per hour for work in this case, plus expenses. This is my first engagement as an expert witness.

Counsel for the Plaintiffs in the above-captioned litigation retained me to provide consultation and analysis on the impact of certain provisions of Senate Bill (SB) 7066, which was adopted by the Florida state legislature and signed into law on June 28, 2019.  I have been asked to assess the burdens imposed on returning citizens[1] who seek to determine whether they have certain legal financial obligations (LFOs), as defined by SB7066, so that they may determine whether they are eligible to vote in the state of Florida.  I also have been asked to assess the consistency and reliability of the information provided by Florida officials about what LFOs returning citizens may owe before registering to vote and voting.

In formulating my opinions in this report, I draw primarily on standard sources and methods in political science, including (1) a study conducted by me and my research team, under my direction and supervision, of the LFOs of a random sample of 153 Florida returning citizens; and (2) a second study of LFOs and payment procedures, which we conducted through (a) phone calls with offices

---

[1]     This report uses the term returning citizens to refer to people with felony convictions (other than murder and sexual offense) who have completed any incarceration and community supervision and would be eligible to vote but for outstanding legal financial obligations under Florida law.

of clerks of court and (b) reviewing and analyzing clerk online databases in all 67 of Florida's counties.  In the course of conducting this research, I also rely upon – many other standard sources that include, but are not limited to, publicly available data and reports produced by the Florida Department of Law Enforcement (FDLE); the state's county clerks of courts and their online databases; the Florida Department of Corrections (FDOC); and other state and local agencies, national public interest groups, and scholarly studies.

## II.    Summary of Opinions Offered

As I will discuss below in greater detail, my report draws on a multi-stage study examining three public sources of information about LFOs from Florida state or county agencies, which do not include information about LFOs stemming from out-of-state or federal convictions. Based on my preliminary analysis of the LFOs assessed in 760 felony cases across a random sample of 153 Florida returning citizens, the State of Florida cannot provide reliable or consistent information about what LFOs returning citizens may owe when they are otherwise eligible to register to vote and vote.

SB7066 provides that county Supervisors of Elections ("Supervisors") will look to sources including, but not limited to "a clerk of the circuit court, the Board of Executive Clemency, the Department of Corrections, the Department of Law Enforcement, or a United States Attorney's Office" in making determinations that

6

LFOs have or have not been satisfied. Fla. Stat. § 98.075(5). My research team and I attempted to verify criminal history and LFOs for a random sample of 153 individuals in the three public sources that contain information about LFOs assessed at sentencing for state felony convictions—reports from the FDLE, online databases of the clerks of the circuit court in several counties, and phone calls with the clerks' offices—to assess the consistency and accessibility of the information that Florida's sources are providing to the public. The goal of the research was to determine what information Florida's agencies are providing to the public and how easy or difficult it is to obtain that information. As such, I was not attempting to make a final determination of the true assessed amount for the individuals in my study. Rather, I was interested in reporting what the agencies told me and how easy or difficult it was to get these answers. With respect to accuracy, I draw my conclusions based on discrepancies in the data provided throughout these sources. Where there are discrepancies, only one (or none) of the reports can be accurate. I do not otherwise attempt to test the accuracy of the reports provided by these public sources.

I am able to draw two conclusions from my analysis of these data. *First*, I conclude that the state agencies we studied cannot provide consistent and reliable information with regard to the LFOs owed to the state assessed in the "four corners of the sentencing document." Fla. Stat. § 98.0751(2)(a). This provision conditions

7

voter restoration on the repayment of all LFOs contained in the "four corners of the sentencing document."  I will show that we had several indicators that the data provided by at least some of these sources was not reliable.  We found major discrepancies in the amounts initially assessed and still due according to information from the county clerks' offices as compared to the FDLE reports, and as between the county clerks' staff and their own online databases.  These discrepancies affect almost all of the 153 individuals in our study. In fact, only five of the 153 people did not have discrepancies between the clerk online databases and the FDLE report in any of their cases.  When we include calls to the clerks of court, we had difficulty reconciling the information across the FDLE report, the clerks' online data, and the information given to us by clerk staff for almost all of the 153 individuals we researched. In particular, we were able to confirm that the three sources matched for all cases for only three of the 153 people in the sample. In other words, 98% of the 153 people in our sample experienced inconsistencies across the three sources we considered for at least one, and sometimes all, of their cases.

The discrepancies are widespread. The FDLE reports conflicted with the clerks' online data in 79.6% of the cases we studied, and we could not validate the clerks' online data over the phone in 76.5% of cases.  Moreover, the discrepancies are serious. We count only discrepancies that represent more than 10% of the

8

amount owed on a case or discrepancies that stem from missing cases and data. The discrepancies result from issues such as different totals for the amounts initially assessed, a lack of correspondence between cases (e.g., we found several cases that appear in the FDLE report that we could not find in the clerks' online databases and vice versa), failures to update records (e.g., a clerk told us a debt was due even though it was listed as paid on their website), and the inability or unwillingness of clerks to answer questions over the phone. The effect of these discrepancies is that a potential registrant may pay their LFOs based on information from one source—and, therefore, believe they have satisfied their obligation to vote under SB7066; and a Supervisor, relying on another source, could conclude that the registrant has not satisfied their LFO obligations under SB7066. A potential registrant also may decline to register because they cannot conclusively determine if or how much they owe, or be in jeopardy of removal from the voter rolls because a different agency or source may indicate that they owe more money on the same case or even on a different set of cases altogether.

I also find that the state will have difficulty disaggregating initially assessed amounts from interest, fees, or other penalties that have accrued in some cases. SB7066 explicitly states that the LFOs required to be paid to register to vote "include only the amount specifically ordered by the court as part of the sentence and do not include any fines, fees, or costs that accrue after the date the obligation

Plaintiffs' Exhibit PX892   p. 10 of 103

is ordered as a part of the sentence." Fla. Stat. § 98.0751(2)(a)(5)(c). In some cases, it is possible to make this distinction.  However, in other cases, it is unclear whether the "amount due" (sometimes the only figure given online or over the phone) includes collections fees or other surcharges in addition to the obligations originally assessed in the "four corners of the sentencing document."  For instance, in response to phone inquiries, staff in several clerks' offices (Alachua, Nassau, Duval, Holmes, Leon, Gadsden, Osceola, and Pinellas) either would not or could not distinguish the portion of the LFO for the initial assessment from late charges and other penalties in 25 cases. While it may be possible to refer directly to sentencing documents to calculate the initial amount due, we found evidence that at least ten counties—including Holmes, Okaloosa, Gulf, Dixie, Columbia, Broward, and Pinellas—charge to access documents that could provide those initial assessed amounts.

*Second*, in addition to the widespread confusion that discrepancies in the assessed amounts and payments across government sources will cause, we identified several other burdensome policies at the state and county levels that will likely affect many, if not all, returning citizens who attempt to determine and pay their LFOs.  These policies generally present three problems: (i) it can be impossible to pay *only* the amounts assessed for felony convictions at the time of sentencing and not also pay interest, collection agency fees, convenience fees, or

10

other debt imposed *after* sentencing; (ii) clerks' offices lacked the expertise and capacity to help returning citizens determine their LFOs and which ones are disqualifying for voting purposes; and/or (iii) there are burdensome administrative costs associated with simply seeking access to LFO information. In fact, as a result of such policies, I conclude that the process of researching and paying LFOs is expensive, time consuming, and ultimately, discouraging for people who want to vote.

In my opinion, clerks' offices are not equipped to accept and apply payments only to amounts assessed in "the four corners of the sentencing document." SB7066's LFO payment requirements "include only the amount specifically ordered by the court as part of the sentence" and do not "include any fines, fees, or costs that accrue after the date the obligation is ordered as a part of the sentence." Fla. Stat. § 98.075(5). However, based on my examination of county online databases and Florida law, policies preventing partial payments and policies that require the payment of interest, collection agency fees, convenience fees, or other debt imposed after sentencing make it impossible for some returning citizens to pay towards *only* the amounts originally assessed "in the four corners of the sentencing document." In at least 25 counties,[2] policies require residents to pay

---

[2]     These 25 counties are: Clay, Gilchrist, Gulf, Hardee, Charlotte, Bradford, Walton, Lake, Polk, Collier, Miami-Dade, Santa Rosa, Seminole, Escambia, Brevard, Citrus, Lee, Osceola, St. Lucie, Orange, Hernando, Manatee, St. Johns, Okaloosa, and Palm Beach.

11

amounts beyond the LFOs assessed at sentencing on their felony cases when making payments in some instances.  These policies are especially strict for debts that are in collections (and the state allows counties to turn over LFOs to debt collectors after 90 days, per Florida Statute §§938.35 and 28.246).  Clerks' staff in eight counties (Clay, Gilchrist, Gulf, Hardee, Charlotte, Bradford, Walton, and Lake) agreed that it is not possible to make payments *only* toward the originally assessed amounts and not the fees imposed after the sentence.

Further, I also document that under the current policies against partial payments in at least five counties—including Brevard, Miami Dade, Lee, Okaloosa, and Palm Beach—clerks will refuse payments on debts in collections from anyone who attempts to pay *only* an assessed amount without the additional collections and other fees.  These additional costs are not just nominal fees, as these costs may add more than 40% to the assessed amount due.  In at least seven other counties (Collier, Hernando, Manatee, Orange, St. Lucie, St. Johns, and Seminole), clerks do not accept payments on debts in collections at all; the payments must go through collection agencies and are subject to the partial payment policies of the specific agency.  Some counties, such as Lee, Osceola, and St. Lucie, prohibit partial payments unless the individual is enrolled in a payment plan, which means that paying a partial payment equal to just the amount assessed at sentencing is prohibited.

12

I also show that when county clerks do accept partial payments, policies at the local and state levels still prevent the payment of costs exclusively from "the four corners of the sentencing document." In many counties, some of the payment will be directed toward payment fees, which would leave outstanding debt. In accordance with Florida Statute §§28.246 and 28.24(26)(b-c), some counties charge either $5 per payment or a one-time $25 fee for processing partial payments for each case, including through payment plans. I found explicit mention of these fees on the online databases of Clay, Citrus, Brevard, Santa Rosa, Seminole, Escambia, and Lee counties. These fees accrue on top of other payment or processing fees such as Polk County's $14 satisfaction fee that is added to all payments or convenience fees that are added for credit card payments. As one example, in Polk County, even if a returning citizen pays the $100 assessed against her at sentencing, the clerk will not certify that the LFO is paid unless the returning citizen also pays an additional $14 satisfaction fee. Therefore, such policies ensure that only payment of *all* debts for felony cases—including the after-applied fees, interest, and surcharges that are assessed on top of the originally ordered amount—will practically meet SB7066's obligation because counties may divert part of a payment to satisfy these payment fees and not the amount from the four corners of the sentencing document.

13

We uncovered additional burdens on determining the amount of and paying off LFOs through our research on clerks' online databases and processes and from our analysis of LFOs in 760 cases of 153 Florida returning citizens.  These issues also complicated our attempts to get data on LFOs for our sample of 153 people.  In addition to the discrepancies we found with respect to missing cases and differing assessed amounts, we found online databases with broken links or links to entirely different cases than the ones we selected.  We sometimes found it difficult to look up cases in the online databases or by calling the clerks using case numbers from the FDLE reports because the formats were not the same.  One county (Escambia) requires a certain format for case number searches on their website that sometimes do not match FDLE Uniform Case Numbers.  Calling the clerks' offices can take multiple attempts and long holds.  Ultimately, we were unable to get through to clerks to research 171 (of 677) cases (for 153 individuals) because no one answered the phone in some counties despite repeated attempts.[3]  Other offices operate under limited business hours because of cost constraints: for instance, the Miami-Dade court of the circuit clerks' office is open only three hours per day.  Some clerks refused to answer questions about cases or directed us to other

---

[3]     These 171 cases were from Hillsborough, Orange, Pinellas, Miami-Dade, Lee, Escambia, Alachua, Palm Beach, Madison, Wakulla, and Broward counties.  Phone calls have only 677 cases in the denominator because we were not able to make multiple attempts to call 83 cases out of the 760.

14

Plaintiffs' Exhibit PX892   p. 15 of 103

agencies.  We were unable to research 235 of our 677 cases (for 153 individuals) over the phone because clerks could not or would not help us.[4]  Some clerks' online databases *charged* for access to their documents or other resources.  Many county online databases do not provide clear information about which debts are in collections, or the amount of additional collections fees. During our initial round of calls to research the process of looking up LFOs, staff in eight[5] clerks' offices told us that people with felony convictions needed to file for clemency or check with the parole or probation offices to vote.

In the sections that follow, I provide more detailed data, documentation, and examples to support these conclusions.  First, however, I begin by briefly reviewing the literature on LFOs that is relevant for this study.  Following that discussion, I will outline my research and data collection methods.

### III.   Researching Statewide Legal Financial Obligations in the Absence of a Publicly Available Statewide Database

LFOs imposed on convicted defendants (and sometimes imposed pre-conviction) have increased in both frequency and amount in the United States, generally, and Florida, specifically, over the past 25 years.  Much of the explosion

---

[4]      These 235 cases were from Hillsborough, Duval, Broward, Escambia, Pinellas, Seminole, Volusia, Osceola, Miami-Dade, Leon, and Gadsden counties. Phone calls have only 677 cases in the denominator because we were not able to make multiple attempts to call 83 cases out of the 760.

[5]      These counties are Hendry, Hernando, Highlands, Hamilton, Gadsden, Hardee, Calhoun, and Walton.

15

Plaintiffs' Exhibit PX892   p. 16 of 103

stems from the difficulty of financing expensive criminal justice systems in the face of tight state and local budgets, especially in Florida where there is no income tax.  Nationally, a majority of inmates and 84% of people sentenced to probation were also assessed a fine or fee upon conviction, and nearly 40% of people sentenced to probation were required to pay restitution upon conviction.[6] According to a Brennan Center for Justice report, in addition to restitution, Florida courts can impose nearly numerous fines and/or fees upon conviction for a crime, many of which are mandatory.[7]

The imposition of LFOs by legislatures has proceeded in many instances without any corresponding investment in the administrative capacity necessary to implement them effectively.  As a result, many states lack a centralized system designed to keep track of the obligations imposed on individuals by the patchwork of institutions that impose legal debt.  Florida is no exception. I was not able to find a single complete data source that could provide the information required

---

[6]     Harris, Alexes, Heather Evans, and Katherine Beckett. "Drawing Blood from Stones: Legal Debt and Social Inequality in the Contemporary United States." *American Journal of Sociology* 115.6 (2010): 1753-799. Web.

[7]     Diller, Rebekah. "The Hidden Cost of Florida's Criminal Justice Fees."  Brennan Center for Justice, (2010), https://www.brennancenter.org/sites/default/files/legacy/Justice/FloridaF&F.pdf, last accessed 2/26/2020; *See also* Menendez, Matthew and Lauren-Brooke Eisen. "The Steep Costs of Criminal Justice Fees and Fines." Brennan Center for Justice, (2019), https://www.brennancenter.org/our-work/research-reports/steep-costs-criminal-justice-fees-and-fines.

Plaintiffs' Exhibit PX892   p. 17 of 103

under SB7066—that is, that would provide information about the completion of prison, probation, parole, court-ordered fines, fees, costs, and restitution.[8] Currently, aside from restitution payees who may sometimes be able to collect on their own, the administrative responsibility for these debts is fragmented across many Florida actors, including judges, county attorneys, court administrators, clerks, probation and parole officers, and prison officials, which means that fines and fees are levied and collected by different agencies without coordination. A joint report by the Bureau of Justice Assistance and the Justice Center of the Council of State Governments recommends that agencies coordinate and integrate distinct policies, procedures, and information systems to consolidate the fines, fees, and restitution owed by each individual.[9]  As of the date of this report, it does not appear that Florida, however, has yet to start much less complete such integration.

The collection of legal debts by multiple agencies with limited resources makes debt collection and communication with debtors less efficient. In Florida, LFOs may be collected by the FDLE, FDOC, or the clerk of the circuit court in which the conviction occurred.  Some debts may have been turned over to

---

[8]      Supplemental Expert Report of Daniel A. Smith, Ph.D., *Jones v. DeSantis*, N.D. Fla., No. 4:19-cv-300-RH/MJF, ECF No. 153-1, September 17, 2019.
[9]      McLean, Rachel and Michael Thompson. "Repaying Debts". Council of State Governments Justice Center, (2007). Print. Summary available at https://csgjusticecenter.org/wp-content/uploads/2012/12/repaying_debts_summary.pdf, last accessed 02/28/2020.

17

collection agencies as well.  LFOs imposed for federal convictions and convictions in other states also are implicated by SB7066's requirements.

Accounting for this reality, SB7066 allows elections Supervisors to consult with a range of sources including but not limited to, "a clerk of the circuit court, the Board of Executive Clemency, the Department of Corrections, the Department of Law Enforcement, or a United States Attorney's Office," in making determinations about the status of LFOs associated with felony sentences. Fla. Stat. § 98.075(5). There is some indication of coordination across these sources with respect to the accuracy of information (for instance, the FDLE receives information about cases and dispositions from the county circuit court clerks through the LOGAN reporting system).[10]  However, it is still an open question as to whether the public can access the data from the clerks' offices or FDLE, and if so, whether these sources would give the same information about the obligations, financial and otherwise, imposed by courts in individual cases. Moreover, there are some sources that are not available to the public, such as the Comprehensive Case Information System (CCIS).

---

[10]     FDLE Criminal Justice Information Services Crime Information Bureau, FDLE Update presented to: Florida Clerks and Comptrollers 2015 Summer Conference, (2015), https://cdn.ymaws.com/www.flclerks.com/resource/resmgr/LOGAN.pdf (last accessed Feb. 26, 2020).

Plaintiffs' Exhibit PX892   p. 19 of 103

## IV.   Methodology

Given the importance of the data sources enumerated in SB7066 to the
election Supervisors' decisions about eligibility, it is necessary to take a closer
look at these data sources to determine whether people who have exited custody
and are otherwise eligible to register and vote can access and use them to get
accurate information about the existence and status of their LFOs.  My report
draws on a multi-stage study that examines the three public sources of information
about LFOs assessed for felony convictions in Florida's circuit courts, which are
referenced in SB7066: (i) reports generated by the FDLE, (ii) the online databases
of clerks of the court, and (iii) the staff of the clerks of the circuit courts.  We do
not examine data from the FDOC or Board of Executive Clemency because their
LFO data are not generally accessible to the public and we are not interested in
LFOs assessed for supervision; we do not examine US Attorneys' Offices because
we are not looking at LFOs from federal cases. Nor do we examine data from out-
of-state convictions.

Initially, my research team and I accessed the county circuit courts' online
databases in all 67 counties and collected data on such factors as (a) the time,
information, or other resources needed to access case dispositions, (b) whether
sentencing documents were available online, (c) convenience and other fees for
accessing information, documents, and making payments, (d) the availability of

19

online payments, and (e) other payment policies.[11]  We also called the clerks'

offices in all 67 counties to ask questions about the process for looking up LFOs by

phone.  The calls were made between September 27 and November 25, 2019.

We followed up this initial cataloguing of general information by attempting

to research LFOs for a random sample of 153 individuals.[12]  First, we purchased

---

[11]     It is important to note that about 30 clerk websites utilized common content from a template.  This template content did not provide much information about payment policies, collections fees, or other information we sought in the study.

[12]     Counsel for *Gruver* Plaintiffs provided me with a list of 229,608 individuals who had exited supervision for felony convictions (excluding murder or sex offenses) in Florida state courts who had been assessed LFOs at the time of sentencing.  We used a random number generator to produce our sample from people with addresses in Bunnell, Clearwater, Ft. Lauderdale, Gainesville, Jacksonville, Kissimmee, Pensacola, Quincy, St. Petersburg, Tallahassee, and Tampa from this list.  Narrowing the sample to cities in just a few counties would allow for sufficient sample size for county-level analyses if necessary.  The counties were matched in terms of presidential party vote choice, racial diversity, and population size.  Our target sample size was 150 people.  To estimate an error rate is to estimate a proportion.  Estimating the appropriate sample size is an inexact science that requires a number of assumptions, balanced by experience and efficiency concerns.  Because I was interested in both individual-level and case-level estimates, I wanted to get a sufficient number of both to make inferences.  Under the assumptions that each person has, on average, three felony cases and that the true error rate in the population for individuals is 10%, we arrive at an individual level sample size minimum of 138 to be able to calculate a margin of error within +/- five percentage points at traditional levels of statistical significance and power.  This sample size more than allows for the calculation of margins of error within +/- five percentage points at the case level regardless of the true error rate in the cases (minimum sample size =384 cases; assuming three cases per person gives 414 cases).  Even at a 50% error rate, a sample size of 150 individuals would give confidence intervals of +/- eight percentage points at traditional levels of statistical significance and power.  Since it turns out that the error rate at the individual level is 98%, the sample size of 153 individuals is more than sufficient to give estimates with a margin of error close to +/- two percentage points.  Also, since I found about five cases per person in my sample, 760 cases was enough to get close to a margin of error about +/- three percentage points even at an error rate of about 20-25% for FDLE and phone comparisons on individual cases.

20

public criminal background reports on those 153 individuals from the FDLE at a cost of $25 per report (including a $1 convenience fee) and recorded data on the amount assessed for court costs, fines, fees, and restitution associated with felony convictions.[13]  We also recorded sentencing dates, the race, counties of conviction, and other data about the person convicted of the felony.  We then attempted to verify the information from the FDLE background report first via the clerks' online databases accessible to the public, and then again via phone calls to the county clerks' offices.  We searched the clerks' databases for individual cases listed in the FDLE report, and also in the conviction counties listed in the FDLE report by name and date of birth to look for felony cases that might be in the clerks' records but not in the FDLE records.

 We kept track of numerous variables for both the calls and online searches. For both the database searches and the calls, researchers were trained to look for or ask about several items that would be useful for calculating the amount due on LFOs, including the amount initially assessed at sentencing for fines, fees, court costs, and restitution, the total amount of payments made, the amount still due on the initial assessed amount, any late fees or other charges that had been assessed, and the total amount due.  We kept track of the financial costs associated with

---

[13]    Individuals are supposed to be able to access their own FDLE report free of charge.

21

looking up cases.  We also tracked the time it took to research cases online or the

time we spent on calls for the cases.  We kept notes about the outcomes of online

searches and calls, such as when we or the clerks could not find cases.  Finally, we

also recorded qualitative information such as our impressions, direct quotations,

problems we encountered, or sources of confusion. I provide detailed descriptions

of any and all scripts we used for phone calls in the **Appendix** to this report.

The research design outlined here has several strengths.  Most importantly,

relying on a random sample of the population of the returning citizens who might

register to vote allows me to produce an unbiased estimate of the discrepancies in

LFO amounts between sources, the number of individuals affected by such

discrepancies, the average investment of time and money an individual would need

to make to look up cases, and other factors.  We did not cherry-pick subjects based

on whether they might have errors; each person in the data had an equal likelihood

of being part of our analysis.  The research design also allows me to assess

qualitative factors related to looking up information, such as difficulty in

interpreting case records or the helpfulness of clerk staff.  Finally, I was able to

learn about aspects of the process—including policies about making payments—

that might ultimately affect whether a person could satisfy their LFOs.

It is also worth noting, however, that this methodology allowed me to

identify inconsistencies in the state's information on outstanding LFOs, not the

Plaintiffs' Exhibit PX892   p. 23 of 103

actual amount owed. Due to the nature of the process of looking up LFOs set up by the clerks' offices, especially the lack of a statewide, comprehensive, unified database of information about LFOs imposed by various entities in the state, my estimates of the LFOs owed by each person are only as reliable as the information I was able to obtain from the state and clerks of court. In fact, the point, as I will show below, is that state and local agencies often give out conflicting information about LFOs. For this reason, I do not provide estimates of the amount of LFOs owed for felony convictions.

Moreover, my estimates of the effort needed to obtain information about LFOs are conservative for several reasons. First, I do not consider convictions that take place in federal or other state courts, the addition of which involve other data sources and may incur further time and other burdens. I also do not count the significant amount of time spent looking through and discarding misdemeanor and traffic cases that often came up in public records in addition to the felony cases at issue here. We only researched cases in counties for which we had evidence that an individual might have felony convictions—typically the county of residence and all conviction counties listed in the criminal background check document we purchased from the FDLE. We found evidence that 23 people in the sample had cases in multiple counties. We did not search databases or make calls to all 67 counties for all 153 individuals in the study, as one would need to do to verify that

23

there were not additional, outstanding LFOs in other counties that were not included in the FDLE report.  As shown below, we did find some evidence that the FDLE reports are not comprehensive in that there were some cases in the clerk data that did not appear on the FDLE report, so calling counties beyond those included in the FDLE may be necessary to ensure that there are no outstanding LFOs.  I also do not consider or comprehensively quantify the time or money it may take to sort out discrepancies in LFOs across sources when possible, either by contacting the clerks' offices by phone or in person, obtaining receipts or other proof of payment, or looking up sentencing documents.   As a result, even with the extent of the problems I am able to document, my research still underestimates the true burden of establishing the LFOs that must be satisfied before a person can register to vote and vote.

### V.   Results: Financial Costs and other Barriers to Accessing Accurate and Complete Information

Navigating bureaucracies can be quite difficult and time consuming for most people, who encounter government agencies only periodically.  Rational choice is one theory that is helpful for understanding individual behavior, such as whether to contact a government agency. In this context, rational choice theory posits that individuals choose to engage in or abstain from a behavior based on whether they believe the benefits they receive from engaging will outweigh the associated costs

24

of activity.[14]  Engaging with a bureaucracy is costly to the extent that researching who to contact and then visiting or calling to get information requires time and money.[15]

State and local agencies determine how much time and money an individual needs to invest to obtain information by setting the rules for accessing information—by making it freely available on the web, or by requiring forms or other steps for access.  They can also set their hours and staffing to increase service and train staff to be more or less helpful.  In particular, the agency experience in terms of staff knowledgeability, friendliness, and helpfulness matters a great deal.  As White, Nathan, and Faller (2015) write:

> Recent scholarship, however, has shown that small changes in the costs of obtaining information about an action can significantly influence voluntary behaviors. For example, simplifying information and providing assistance in completing forms can lead to significantly higher rates of college enrollment among students from low-income families (Bettinger et al. 2012), more applications to selective colleges from high-achieving students who are eligible for scholarships (Hoxby and Turner 2013), and higher uptake of valuable tax credits among eligible tax payers (Bhargava and Manoli 2013; Saez 2009). Importantly, these experimental studies show that small information

---

[14]    Downs, Anthony. *An Economic Theory of Democracy*. New York: Harper, 1957. Print.
[15]    Downs, Anthony. *An Economic Theory of Democracy*. New York: Harper, 1957; Verba, Sidney, Kay Lehman Schlozman, , and Henry Brady.. *Voice and Equality: Civic Voluntarism in American Politics*. Cambridge, Mass.: Harvard University Press. 1995. Print.

Plaintiffs' Exhibit PX892   p. 26 of 103

costs deter action even when substantial individual benefits are at stake.[16]

State and local government staff  have a great deal of control over access to information.  White, Nathan, and Faller (2015) argue that "resource-constrained bureaucrats frequently have discretion over which services are delivered and to whom; discretionary decisions made by local bureaucrats often become *de facto* public policy."[17]

For individuals seeking information, their ability to bear the cost of engaging with a bureaucracy is greatly affected by their resources such as time, money, education, and civic skills.[18]  It is worth noting that my research team and I are all highly educated (aside from me, there are four advanced undergraduates and six people with masters' degrees all associated with major research universities on the project).  We also had the benefit of sharing our collective wisdom and experience gained over (approximately two months of) time from investigating multiple cases across Florida.  However, it is no secret that people with felony convictions tend to

---

[16]     White, Ariel, Noah Nathan, and Julie Faller. "What Do I Need to Vote? Bureaucratic Discretion and Discrimination by Local Election Officials." *The American Political Science Review* 109.1 (2015): 129-42. Web.

[17]     White, Ariel, Noah Nathan, and Julie Faller. "What Do I Need to Vote? Bureaucratic Discretion and Discrimination by Local Election Officials." *The American Political Science Review* 109.1 (2015): 129-42. Web.

[18]     Verba, Sidney, Kay Lehman Schlozman, and Henry Brady. *Voice and Equality: Civic Voluntarism in American Politics*. Cambridge, Mass.: Harvard University Press. 1995.

26

Plaintiffs' Exhibit PX892   p. 27 of 103

have access to fewer resources than the rest of the population even prior to their convictions.  For instance, in a national sample of state prisoners, about 70% of state inmates and 40% of state probationers did *not* have a high school diploma— in comparison, only 18% of the general population lacked high school diplomas.[19] Only 55% of state prisoners were employed full time at the time of their arrest and only 15% reported earning more than $25,000 before their arrest.[20]  Thus, our estimates of difficulties are only a floor—the general public are likely to have an even more difficult time navigating what I will show to be a very cumbersome system.

My research team and I encountered several barriers that arose during our interactions with the clerks over the phone and in the online databases that made it difficult to calculate LFOs for particular individuals.  These barriers required resources such as time, money, and civic skills to navigate successfully, and even then we were sometimes unable to do so. I detail the issues we encountered below.

---

[19]     Harlow, C. W. "Education and Correctional Populations." Bureau of Justice Statistics. (2003), https://www.bjs.gov/content/pub/pdf/ecp.pdf , last accessed February 26, 2020.
[20]     Beck, Allen et al.  "Survey of State Prison Inmates, 1991." NCJ 136949, United States Department of Justice, Bureau of Justice Statistics, (1993), https://www.bjs.gov/content/pub/pdf/SOSPI91.PDF, last accessed February 26, 2020.

27

Plaintiffs' Exhibit PX892   p. 28 of 103

## A.   Problems Encountered During Phone Calls with Clerks' Offices

With respect to our calls to the clerks' offices, we encountered several issues that made looking up LFOs particularly burdensome.  **Figure 1** below summarizes the problems we encountered in our initial calls to clerks of court to document processes across all 67 counties.  *First*, we experienced long wait times and difficulty getting someone on the line when we called some offices.  For our initial call to research the lookup process in Jefferson County, for instance, our team had to call the clerk's office five times before someone answered the phone.  In Palm Beach County, wait times were extraordinarily long—the recording said we were 35th in the queue and the system disconnected the calls after 30 minutes of waiting. We were disconnected several times.  The Public Records center line was often busy in Escambia County.  In Miami-Dade County, the clerk's office had reduced hours (including telephone hours) because of budget cuts—to 9am-12pm  on Monday through Friday, times when most people are working and may be unable to call to look up their LFOs.  When we called the Miami-Dade Clerk to look up cases for an individual, we were told that "they do not take calls for this matter as they are understaffed and to email or look online."  We could not get a live person on the phone in Hillsborough County at times and often their automated system could not find the cases we requested.  Palm Beach County also had a queue when

28

we called to look up individual cases, and we never got through to the clerk either to look up cases or ask questions about the process.  Ultimately, we were *unable* to look up 25% (of 677) cases over the phone because of problems getting through.

In cases where someone answered the phone, we experienced hold times longer than 10 minutes for 11 counties (including Marion, Miami-Dade, Monroe, Sarasota, Brevard, Broward, Flagler, Duval, and Hillsborough) when we called to research general information about the process of looking up LFOs.  We also recorded several instances of long wait times (10 minutes or more) for information on specific cases.

*Second*, even when we got through to a live person, sometimes a member of the clerks' staff could not or would not provide information to us over the phone. Staff refused to help us on a number of occasions for several reasons.  In our initial calls for information about the process, clerks' office staff in eight of 67 counties directed us to other offices (such as collections agencies or Parole and Probation) because they did not think they could help us because of concerns about felon voting (Hendry, Hernando, Highlands, Hamilton, Gadsden, Hardee, Calhoun, and Walton counties, as discussed in more detail below).  In response to inquiries about particular cases, the clerks in at least two counties, Broward[21] and Escambia, do

---

[21]     We were told that in Broward, no information on closed cases could be provided over the phone.

Plaintiffs' Exhibit PX892   p. 30 of 103

not provide information about at least some LFOs over the phone and require all requests to be made in writing.  In Broward, the written requests must be made for closed cases and responses often take three to four weeks according to the clerk's office.  Several other counties, including Charlotte, Pinellas, Polk, and Hillsborough, also require requests for information on older cases to be made in writing.[22]  We were told that the Volusia County clerk's office, as another example, does not answer questions over the phone about cases sentenced 2013 and earlier.  Occasionally, a staff member would refuse to look up LFO information for a particular individual because they had too many cases—we received this response in Duval, Hillsborough, and Pinellas counties.  For instance, in Pinellas County, we were told that clerks would only look up three cases per individual at a time over the phone.  Duval County also implemented a policy in which clerks would only look up three cases at a time.  Broward County has a similar three-case policy as well (for open cases—closed cases require a written request).  It is worth noting that 56.86% of our sample of 153 individuals had more than three felony cases, which means that most of our sample would have to call the clerks' office multiple times to look up all their cases *if* they had felony convictions in counties with such a policy.  One research assistant could not

---

[22]      For this report, we are not defining what "older cases" means because it varied from county to county and there was no clear cut off date.  For example, a common response would be that a case "is so old that it is not in my system."

30

research LFOs for six individuals in Duval County because the clerk refused to

help and directed our caller to "just check the website," despite our caller

discussing with the clerk that sometimes the two sources conflicted. We had other

clerks direct us to use the website in lieu of talking to them as well.  Overall, we

were not able to look up information over the phone for 235 cases (34.7% of our

sample) because clerks could not or would not help us.

Finally, an unexpected barrier arose during some of our initial inquiries

about the process of looking up LFOs: clerks' staff in several counties gave out

information that cast doubt on the ability of people with felony convictions to vote

in Florida.  As noted in the script used by callers **appended** to this report, our

research team called each office saying that they wanted to help a family member

figure out how much money they owed in LFOs so that the family member could

register to vote.[23]  (We did not state that we were calling about a relative or family

---

[23]     Such audit studies that request or apply for information from government agencies
are common, and institutional review practices exempt elected and appointed government
officials (such as county clerks) from protections afforded other human subjects. For
example, see the National Science Foundation's policy, 45 CFR Part 690: Federal Policy
for the Protection of Human Subjects, here:
https://www.nsf.gov/bfa/dias/policy/docs/45cfr690.pdf, Last accessed 02/26/2020.  For
examples of research, see White, Ariel, Noah Nathan, and Julie Faller. "What Do I Need
to Vote? Bureaucratic Discretion and Discrimination by Local Election Officials." *The
American Political Science Review* 109.1 (2015): 129-42. Web.  Also, Ewald, Alec.  "A
Crazy-Quilt of Tiny Pieces: State and Local Administration of American
Disenfranchisement Law". The Sentencing Project, (2005),
https://www.sentencingproject.org/wp-content/uploads/2016/01/A-Crazy-Quilt-of-Tiny-

31

Plaintiffs' Exhibit PX892   p. 32 of 103

member when looking up LFOs for the 153 specific individuals, just in the calls for general information.)  As shown in **Figure 1** below, in response to this prompt, eight of the 67 offices (11.9%) told the caller that they did not think a person with a felony conviction could vote and suggested they call the "election supervisors," "clemency board," or "parole and probation" to check.  Specifically, clerks' office staff in Hendry, Hernando, Highlands, Hamilton, Gadsden, Hardee, Calhoun, and Walton counties gave such responses.  For instance, in Walton County, our caller was directed to "come down to the office to get a petition for clemency through the Tallahassee office of the executive in order to be able to vote." The felony clerk in Hamilton County insisted that we call Probation and Parole about paying LFOs to vote because "all fines needed to be paid through them."  The clerk in Gadsden County also told us that felons could not vote unless they apply for clemency first. There was also some confusion among the clerks' staff—the Broward clerks' office told us that there was nothing "in the book" about paying fines to vote.  The Brevard County Clerk also said they had not heard about anyone paying fines to vote.

---

Pieces-State-and-Local-Administration-of-American-Criminal-Disenfranchisement-Laws.pdf. Last accessed 02/26/2020.

Plaintiffs' Exhibit PX892   p. 33 of 103



*Figure 1: Barriers to Researching Debt.  Data from initial calls to all 67 Florida counties.*

## B.    Problems Encountered in Online Databases

We also encountered difficulties during our attempts to look up cases for the 153 individuals in the clerks' online databases.  We found several instances in which Uniform Case Numbers on the FDLE report did not match case numbers in the clerks' online databases or over the phone.  We found 35 cases affected by this problem.  The problem was widespread in Escambia County (which had space for too few digits for case numbers in the online database), but we also found examples of these case number discrepancies in Nassau, Osceola, Duval, Pinellas, and Polk counties. We also found at least one individual in Pinellas County where

33

the FDLE year of birth did not match that listed in the county clerk's database, which made it difficult to look up this person's LFOs initially.  Information about relatively older cases was available only sporadically in some counties.  We could not find any information for cases, or could only find sporadic information for cases, online before the 1990s or early 2000s in Jackson, DeSoto, and Hillsborough counties.  In other counties, such as Broward, Polk, Gadsden, and Escambia, such cases are available online but are sometimes missing information about LFOs.  As I will show below, the lack of information, or incorrect information, for older cases caused many of the discrepancies between the FDLE information and clerk data that we were able to find.

There are several other barriers to getting access to the online data.  On their initial page, Leon County appears to require a full application, a notarized letter, and a submission to get access to case documents.  Researchers looking up cases in Duval and Marion counties had to sign up for an account to access even their public data. As shown in **Figure 2** below, we could find evidence that at least ten counties (such as Holmes, Okaloosa, Gulf, Dixie, Columbia, Broward, Hamilton, Flagler, Calhoun and Pinellas) charge fees to access case records online (or to request additional information when it is not shown online, a common problem for relatively older cases).  For instance, in Dixie County, the "Records Search: Court and Official" button on the home page links to myfloridacounty.com, a pay site

34

(but confusingly, their dropdown menu to search court records goes to their "free" court records site).[24]  Sometimes, relatively older cases are not available online, but only in paper.  Counties charge to fill these records requests.  For instance, Gulf County charges $1 per page and $2 per certified document, $.75 for shipping, and a $3.50 service fee to access case records (and there is a $7.25 minimum).  We were told to request several cases from Pinellas County, where it costs $1.00 per page ($2.00 per page for certified copies) plus a 3.5% processing fee to mail official records—and there still is no guarantee that these documents will have information about LFOs.  We had to request specific case records from Holmes County at a cost of $3.00 per page.  We were told by the clerk's office that looking up interest on liens in Alachua County costs $7 per lien (for the cases we were researching, we could only figure out the initial assessed amount if we knew the interest rate).[25] Overall, there were 13 cases where clerk staff had no information about a case because the cases were too old, and, as mentioned previously, some noted that they would need to do further research to answer questions about those older cases.

---

[24]     See https://dixieclerk.com, which links to https://www3.myfloridacounty.com/official_records/index.html.  Last accessed 2/26/2020.  Screenshots on file with author.

[25]     The clerk's office had the total due and needed to know the interest rate. It was unclear why they needed the interest rate, perhaps to figure out the initial amount. But either way, it would cost $7.00 to look up the lien to get that interest rate.

35

Many online databases were poorly designed and confusing.  For instance, several researchers had trouble looking up information using the Hillsborough County website; one researcher took 26 minutes to find the correct place to start her case searches on that county website.  In Osceola County, the website is not clear that records for felony cases can be found by searching "Court Records," not "Official Records."  I found several sites that did not have a search function to allow a user to quickly jump to relevant information (Baker, Nassau, and Okeechobee counties).  The Calhoun County site crashed twice when we were trying to look up payment information.  The Osceola County site search function did not work when we tried to access it in late December 2019.

We noticed other design flaws that made the online databases difficult to use.  Often, the records searches contained no help menu or key for interpreting the returned records.  These features would have been helpful for understanding abbreviations.  There were many Latin legal terms and court processes in the records that would be unfamiliar to lay people.  There is no consistency in what is included in the "amount due" and other aggregations.  For example, sometimes collections fees or interest are included in a county's "assessed amount" calculations and sometimes they are not.  I will discuss this phenomenon more fully in the sections that follow.

36



***Figure 2:*** *Counties that Impose Fees to Verify and Pay Legal Debt. Data from initial calls to all 67 Florida counties.*

### C.   Problems Determining the Payment Due to Satisfy the Requirements of SB7066

To reiterate, SB7066 provides that only outstanding LFOs imposed at sentencing for felony convictions would prevent eligibility for voter registration. *See* Fla. Stat. §98.0751(2)(a). The statute further clarifies that fines, interest, late charges, and other debt incurred after the sentence should not disqualify a potential voter. *See* Fla. Stat. §98.0751(2)(a)(5.)(c.).  Election Supervisors may check with several sources, including "a clerk of the circuit court, the Board of Executive Clemency, the Department of Corrections, the Department of Law Enforcement, or

37

a United States Attorney's Office," to verify whether a person seeking to vote still owes LFOs. Fla. Stat. § 98.075(5).

A serious problem facing people who may have LFOs is the inability of state agencies to provide them with clear and consistent information about the amount that they would need to pay to satisfy SB7066's LFO requirement. As discussed in the previous sections, my research team and I examined LFOs incurred for 760 felony cases for 153 individuals using FDLE reports, clerk of the county circuit court online court records, and phone calls to the clerks of the court offices, all of which Florida identifies as sources election Supervisors may consult when determining voter eligibility. Where possible, we recorded the initial amount assessed at sentencing for court costs, fines, fees, and restitution, any information on payments made, and, where available, the amount due on the assessed amounts and the total amount due. We encountered three problems. *First*, because of discrepancies within and across sources or a lack of information, we often were not able to determine definitively the initially assessed LFO amount. *Second*, information about the payments made was sometimes unavailable or incorrect. *Third*, as a result of these and other issues, we often were not able to separate what was still due on LFOs imposed at sentencing from what was due on other fees imposed afterwards, making it impossible to discern the amount that needed to be

38

paid from "the four corners of the sentencing document."  I consider each issue in more detail below.

### 1.   *Inability to Discern Initial Assessed Amounts*

In my opinion, it is frequently not possible to definitively determine the LFOs assessed at sentencing using FDLE reports, clerks of courts online databases, or phone calls to the clerks of courts.  As I will show, in some cases, the initial LFO amount is not available through these sources.  In other cases, I will show that when information about initial LFO amounts is provided, that information often conflicts with that provided by the other sources.  As a result, an individual who relies on one of these sources to determine their LFOs may get different information from that provided to election Supervisors, leading to consequences like people declining to register to vote, the purging of voters from the rolls, or initiation of a criminal investigation if they have registered and/or voted in error. The fact that relying on these sources to determine and pay LFOs is no guarantee against adverse consequences could have a chilling effect on registration and voting.  Put another way, the lack of reliability and contradictions in the data, in my opinion, will likely have a chilling effect on registration and voting. For the 153 individuals we researched, we were not able to verify consistency in the information across all three sources for 150 (98.04%) of them.  The 95%

39

Plaintiffs' Exhibit PX892   p. 40 of 103

confidence interval for this estimate ranges from 94.61% to 99.55%.[26] If the true error rate among the population in the counties we studied fell above or below this range, the probability of us getting the estimated error rate that we got from our random sample of that population purely by chance is less than 5%.

When comparing the FDLE reports to the clerks' online databases, the LFO assessments provided by the two sources are frequently not consistent with one another and it is unclear which is correct.  We found that of the 153 individuals whose records we researched, the information was consistent between the county clerk online databases and the FDLE reports in all cases for only five individuals (3.27%).  This means that for 96.73% of the people in our sample, the FDLE and the clerk databases provided inconsistent information for some or all of their felony cases.  At the case level, of the 760 felony cases we examined across those 153 people, only 156 were consistent across the FDLE and clerk online databases (20.53%).  We found discrepancies in 79.47% of cases, with a 95% confidence interval of 76.61% to 82.36%.

As **Figure 3** below shows, we found four reasons for the discrepancies.  The most common problem is that the FDLE had a different amount for the initial assessment than the clerk website, a problem we found in 281 of 760 cases

_____

[26]   This and other confidence intervals calculated using R package "binom" by Sundar Dorai-Raj.

Plaintiffs' Exhibit PX892   p. 41 of 103

(36.97%).[27]  We counted only differences greater than 10% of the assessment as "discrepancies," which means these discrepancies were not trivial amounts.  More troubling is that we found that cases sometimes appeared in one source but not the other.  We found 146 cases that were in the FDLE report that we could not find on the clerk website (19.21%).  We found an additional 108 cases that were in the clerk online databases but not in the FDLE report (14.21%).  Finally, we found 70 cases where the clerk had the case online, but the financial information was missing (9.21%).

---

[27]      One likely explanation for some of these errors is that what clerks listed as "assessed amounts" often included hidden fees or other charges incurred after sentencing. Often, there was no other information on the website that would enable one to determine the initial assessment.

41

Plaintiffs' Exhibit PX892   p. 42 of 103



***Figure 3****: Outcomes from researching cases through FDLE reports and clerks'
online databases. N=760. The chart presents results from comparing initial
assessed amounts listed in FDLE reports with those listed in county clerks' online
data. The category "Online but Not FDLE" refers to cases that were in the clerks'
database but not listed in the FDLE report; "In FDLE Not Online" refers to cases
that were in the FDLE report but could not be found in clerks' database; "Clerk
has case but no info" refers to cases in which clerks found a record but the record
did not have LFO information; "FDLE ≠ Online" refers to cases in which the
assessed amount listed in the FDLE does not match clerks' data; and "OK" refers
to cases in which there are no discrepancies between the FDLE and clerks' online
data.*

We also found discrepancies between the information the clerks' staff

provided over the phone and the information from the clerks' online databases. As

shown in **Figure 4** below, in 518 or 76.51% of our cases, we were unable to verify

42

information we found in the FDLE report or website over the phone.[28]  We found an additional 47 cases (6.94%) in which the assessed amount or other information provided over the phone did not agree with the online amounts.  We found another 38 cases (5.61%) that were in the FDLE report or on the clerk website that the clerks' staff could not find over the phone.  We found 14 cases that the clerk found on the phone that we could not find online or in the FDLE report (2.07%).  There were 13 cases where the clerk could find a case but had no information about LFOs due, as discussed in the previous section (1.94%).  The biggest problem with getting case information over the phone, as noted in the previous section, is that in many of our cases, clerks' staff either refused to look up cases we requested (235 cases or 34.71%) or we could not get through over the phone (171 cases or 25.26%).  In total, we could not verify the clerks' databases against their phone responses in 76.51% of cases.  The 95% confidence interval for this estimate ranges from 73.19% to 79.60%.

---

[28]      As of the date of this report, we have called and have not yet obtained data for 83 cases.  We have data for 677 cases and thus use that number as the denominator when calculating percentages for call discrepancies.

43

Plaintiffs' Exhibit PX892   p. 44 of 103



***Figure 4****: Outcomes from researching cases online and through phone calls to clerks' offices. N=677 cases. The chart presents the results of comparing amounts due recorded in clerks' online databases with those reported by clerks over the phone. "OK" refers to cases in which we were able to confirm the online data over the phone; "Not found by clerk" refers to cases that were online but not found by the clerk over the phone; "Found by clerk not online" refers to cases that were mentioned by clerks over the phone but missing in online databases; "Clerk Phone ≠ Clerk Web" refers to cases in which the amounts reported by clerks over the phone did not agree with what was reported in clerks' online data; "No help over the phone" refers to cases we could not research because clerks refused to help, due to policy, too many cases, et cetera; "Clerk has no info on case" refers to cases in which the clerk could find a case on the phone but did not have info on LFOs; and "Calls not answered" refers to cases we could not research because we were not able to get through to clerks' offices after repeated attempts.*

44

The discrepancies stemmed from several problems with the data.  First, data quality issues abound: we found several examples of conflicting and inaccurate information about initial assessed amounts in the clerk records.  Across counties, clerks inconsistently included post-sentencing fines and fees (such as interest or collections fees) in their aggregations of the initial assessed amounts, such that different counties' total due calculations relate differently to the amount assessed in the "four corners of the sentencing document."  Also, in many counties, the aggregated amounts calculated on these websites sometimes contain information about post-sentence fines and fees and are not accurate representations of what is due on the fines imposed at sentencing. For example, **Figures 5** and **6** below show two cases for an individual, who was convicted of felonies in Pinellas County. Examining these two cases, the first of which is in collections, shows how fines and fees are recorded in the "Total Financial Assessment" calculated by the Pinellas clerk of court database.  In **Figure 5**, we see that the "Total Financial Assessment" is listed as $772.20 in case number "AAA" [the actual case number, as with cases "BBB" through "JJJ" *infra*, has been redacted; in each instance, the originals are on file with report author].  However, closer examination reveals that the amount assessed at sentencing was only $468.  The remaining $304.20 reflects collections fees, some of which were recalled (listed as "Payments and Credits"). In contrast, **Figure 6** shows that for that same individual in Pinellas County, in

45

case "AAA", the "Total Financial Assessment" is $800 and includes only the

amount assessed at sentencing.





**Figure 5** Snapshot of case "AAA", redacted, excerpted and enlarged to show amount assessed at sentencing, collections referral, balance due, and payments. Balance due reflects $468 assessed at sentencing plus an additional 25%. Entire record from Pinellas County online database available in **Appendix**.

46



## OTHER EVENTS AND HEARINGS

| Date | Event | Detail |
|---|---|---|
| 03/01/2012 | **PARTIAL PAYMENT** | *PARTIAL PAYMENT $53.07; DEFT: A; VER: F* |
| 03/01/2012 | **PD LIEN PAYMENT** | *PUBLIC DEFENDER LIEN PAID - $100.00; DEFT: A; VER: F* |
| 12/01/2011 | **PARTIAL PAYMENT** | *PARTIAL PAYMENT $14.73; DEFT: A; VER: F* |
| 11/04/2011 | **PARTIAL PAYMENT** | *PARTIAL PAYMENT $46.77; DEFT: A; VER: F* |
| 09/30/2011 | **COSTS OF PROSECUTION PAID** | *COSTS OF PROSECUTION PAID - $100.00; DEFT: A; VER: F* |
| 09/30/2011 | **PARTIAL PAYMENT** | *PARTIAL PAYMENT $10.43; DEFT: A; VER: F* |
| 08/25/2011 | **PARTIAL PAYMENT** | *PARTIAL PAYMENT $86.94; DEFT: A; VER: F* |
| 08/12/2011 | **PARTIAL PAYMENT** | *PARTIAL PAYMENT $1.61; DEFT: A; VER: F* |
| 08/12/2011 | **INDIGENT CRIMINAL DEFENSE FEE PAID** | *INDIG CRIM DEF FEE PAID - $50.00; DEFT: A; VER: F* |
| 06/23/2011 | **PARTIAL PAYMENT** | *PARTIAL PAYMENT $8.21; DEFT: A; VER: F* |
| 09/24/2010 | **CERTIFICATE OF DISCHARGE TO BOND AGENCY** | *CERTIFICATE OF DISCHARGE TO BOND AGENCY T550234745; DEFT: A; VER: N* |
| 09/22/2010 | **JUDGMENT FOR ATTORNEY FEES AND/OR COSTS** | *JDMT FOR ATTY FEES & COSTS $ 100 SAC; DEFT: A; VER: F* |
| 09/22/2010 | **JUDGMENT FOR FINE AND/OR COSTS** | *JUDGMENT FOR FINE/COST $ 132F/568C; DEFT: A; VER: F* |



DEFENDANT

Court Ordered    *Click Here!*
*Pay Now!*    Fines, Fees, Costs?

| Date | Transaction | | Amount |
|---|---|---|---|
| | Total Financial Assessment | | 800.00 |
| | Total Payments and Credits | | 303.07 |
| | **Balance Due as of 02/04/2020** | | **496.93** |
| 09/16/2010 | Transaction Assessment | | 550.00 |
| 09/16/2010 | Transaction Assessment | | 100.00 |
| 09/16/2010 | Transaction Assessment | | 100.00 |
| 09/16/2010 | Transaction Assessment | | 50.00 |
| 09/16/2010 | COUNTER PAYMENT | Receipt # 20350701 | (53.07) |
| 09/16/2010 | COUNTER PAYMENT | Receipt # 20350703 | (100.00) |
| 09/16/2010 | COUNTER PAYMENT | Receipt # 20350705 | (100.00) |
| 09/16/2010 | COUNTER PAYMENT | Receipt # 20350707 | (50.00) |

**Figure 6** Snapshot of case "AAA, excerpted and enlarged to show amount assessed at sentencing, balance due, and payments.  Entire record from Pinellas County online database available in **Appendix**.

Similarly, Hernando County treats the "Assessed Amount" inconsistently—

the collections fee is included in the total online in case number "BBB" (**Figure 7**)

(below), but not in case number "BBB" (**Figure 8**) (below).  As a result of these

47

differences in what is included in balance calculations on-line, it is difficult to determine a rule across counties and sometimes within counties for how closely their total due tracks the remaining balance on fines and fees assessed in the "four corners of the sentencing document."



**Figure 7** Snapshot of case "BBB". The defendant was assessed two $40 public defender fees on 1/21/1999 and 3/1/2005. The $79.77 remaining debt (after a $.23 payment) was sent to collections and was assessed a 30% collections fee, or $23.93. The total assessed amount and balance due are sums of the public defender and collections fees, less the $.23 payment. Entire record from Hernando County online database available in **Appendix**.

48

| | | | |
|---|---|---|---|
| 05/13/2014 | Payment received: $76.92 Receipt Number H 290843 | | |
| 05/13/2014 | Assessment 2 Total Assessed $708.00 Balance Remaining $671.08 | | |
| 05/13/2014 | Assessment 1 Total Assessed $40.00 Balance Remaining $0.00 | | |
| 05/13/2014 | PAYMENT POSTED 5/13/2014 | | |
| 05/05/2014 | MADE PARTIAL PAYMENT THRU MSB | | |
| 09/30/2009 | ASSESSED MSB FEE FOR SERVICES 266.40 DUE | | |
| 09/30/2009 | CASE REFERRED TO MSB COLL AGENCY - CALL (800) 568-7004 | | |
| 09/30/2009 | COMPLIANCE CONDITIONS UPDATED | | |

**Financial Summary**

| Financial Summary | | | |
|---|---|---|---|
| Assessment | Total: $888.00 | Paid to Date: $76.92 | Balance Due: $811.08 |
| Restitution | Total: $0.00 | Paid to Date: $0.00 | Balance Due: $0.00 |

| Financial Details | | | | | |
|---|---|---|---|---|---|
| Count | Assessment Due | Assessment Paid to Date | Restitution Due | Restitution Paid to Date | Last Payment Date |
| | $888.00 | $76.92 | $0.00 | $0.00 | - |

**Figure 8** Snapshot of case "BBB", excerpted and enlarged to show collection agency fee, balance due, and payments.  The defendant was assessed $708 in "Felony W/H or PTI" and a $100 public defender lien on 6/15/2006 in addition to two $40 public defender fees on 5/15/2006 and 8/1/2006 for a total of $888, which is reflected in the financial summary.  However, the collection agency fee is not added to the assessment or the balance due.  Entire record from Hernando County online database available in **Appendix**.

We have other indications of data issues from the clerks' staff.  For example, when we called Martin County to look up information about case number "CCC", the person on the phone noticed that the restitution assessment was not in the online records and updated their database on the spot to reflect an additional $6,000 in debt.  Similarly, when we called Alachua County to research LFOs for an individual, the clerk said that the "online numbers are probably wrong" and that she would research them with her supervisor and call us back (she found missing

49

payments; that update is discussed below).  The clerk in Alachua County also noted that she could not see everything for "older" cases, so she was not even sure about some of the totals she gave us for cases "DDD" and "EEE" and would call us back after she researched them further.

Clerks' staff repeatedly noted difficulties with "older" cases, which pose problems for the clerk databases.  Cases from before 2005 were more likely to be missing from the clerk databases, and, as mentioned previously, we had several instances in which staff said that cases were too old to be in their system.  Older cases were not available over the phone and needed to be requested in writing, often for a fee in those 13 cases where clerks had no information over the phone. Altogether, however, the error rate did not differ significantly depending on the age of the case because newer cases had different types of errors (see **Table** in the **Appendix** for more information).

Because of these discrepancies across sources and the inconsistencies within sources, sentencing documents, which we did not pull, may be a better source for determining the amount assessed at sentencing.  However, in some counties as noted above, these documents can only be obtained via written request, and for a fee.  These fees may become expensive, as counties charge per page to send these documents, and persons with multiple convictions would have to purchase multiple sets of sentencing documents. Most importantly, sentencing documents do not

50

have information about payments that have been made and how those payments are applied, which, as I shall discuss in the next section, also pose problems for calculating the amount still due on the initial assessment.

### 2.      Problems Determining How Much Was Paid on a Case

To know how much remains due on LFOs assessed at sentencing, we need some information about the payments made on the debt.  Only the clerks of court, and in some cases debt collection agencies, can provide this information; if it is not in the initial sentencing document or the FDLE report.  Unfortunately, however, the data quality issues that pervade the initial assessed amounts are even worse when it comes to payment data.

We found several examples of cases in which the listed payments do not add up to the payment totals listed.  One typical example can be found in Pinellas, again looking at an individual's case identified as "AAA" in **Figure 6**, previously referenced above.  The clerk's aggregated "Total Payments and Credits" column lists $303.07 paid on this case and a balance due of $496.93. But looking more closely at the record, we found $471.76 had been paid if we include all the partial payments on the case.  It is unclear why only the $250 in counter payments and the $53.07 partial payment were included in the payment total aggregated by the clerk. We had difficulties calculating payments in at least five additional cases in Pinellas County.  We also found discrepancies in Duval County, where clerks said money

51

was still owed on cases that the website said had been paid in full (cases "FFF" and "GGG"). We found payment discrepancies in Marion County as well (case "HHH").  Sometimes payments had been made, but were not recorded online.  We found this issue with six cases in Leon County.  Regarding an individual's cases that the Alachua clerk flagged for us as potentially inaccurate referenced above, the clerk's office called us back and told us about additional payments made on two of the cases that were not reflected in the online data.

Finally, we also had questions about whether clerks gave full information about payments made through collections agencies.  For instance, in the example from Hernando County shown in **Figure 8** above, we can see that the clerk applied a payment of $76.92 received on the case from the collection agency.  But, according to their website, Hernando County charges a 30% fee on debts in collections.  Did the collection agency take its 30% fee off the top before forwarding that payment to the clerk?  If so, then the person may have paid $100 ($76.92 to the clerk and $23.08, which is 30% of $76.92, to the collections agency).

### 3.    *Problems Determining How Payments are Applied*

To try to figure out what is still owed on amounts assessed "in the four corners of the sentencing document," under SB7066, it is also necessary to know how payments are applied—that is, how much of each payment goes toward

52

paying down the initial debt rather than to fees or interest.  I found a few examples

where this math was clear.  In Hernando County, for instance, the record for case

"BBB" from **Figure 8** above clearly indicates that $40 of the $76.92 payment

satisfied the public defender fee and the remainder was applied to the $708 felony

assessment so that the remaining balance on that fee was $671.08.  (However, as

noted above, it is not clear whether an additional amount was paid to the collection

agency).  Pinellas County, for its faults that I noted, also sometimes attempts to

link payments to particular assessed amounts; the records in the individual's case

("AAA") from **Figure 6** above show that his payments were applied to his public

defender and prosecution fees; however, there are some payments that are not

counted in the total amount paid and that are not earmarked to particular debts. For

most cases in which partial payments, but not full payments, have been made, it is

not possible to figure out how much of the remaining debt is for the amount

assessed in the "four corners of the sentencing document" rather than post-

sentencing fines and fees.  In some cases, clerks over the phone could not

differentiate outstanding balances based on whether they were assessed at

sentencing or after. In 25 (of the 677) cases (3.69%), the clerks' staff could not

give us an initial assessed amount and just provided the total still due.[29]  Often,

---

[29]     For instance, for case "III", the clerk could only tell us the total amount due, which
included interest, but could not tell us the initial amount or the interest rate.

Plaintiffs' Exhibit PX892    p. 54 of 103

information online also was insufficient to disaggregate the remaining originally assessed amount (after payments) from later-applied charges. I have already noted examples in Pinellas and Hernando counties where the assessed amounts includes collections fees inconsistently; sometimes we were unable to figure out whether an assessed amount matched what was in the sentencing document or included additional fees.  The online data often did not indicate how much these post-sentence fees were or even that they were imposed.  Going back to the above-mentioned case involving the individual in Alachua County, the clerk told us about 10 liens based on that individuals' cases but would charge $7 per lien to look up the amount of interest that was being added to the cases.  For these cases, we could not determine the remaining amount due on the amount initially assessed at sentencing without paying the lookup fee to find out the amount of interest that was being added.

In sum, based on our experiences with comparing information on LFOs that we gathered from clerks' staff, clerks' databases, and FDLE reports, I conclude that the State of Florida cannot provide consistent information about what an individual owes on the amounts initially assessed at sentencing.  Moreover, acquiring any information about LFOs is burdensome in terms of time and money, and requires substantial skill, time, and practice to decipher court records and FDLE reports.  We found numerous discrepancies and inconsistencies both within

54

and across sources.  We also encountered problems accessing clerk staff over the phone and finding cases online and in the FDLE reports.  These problems affected 150 of 153, or 98%, of the people in our random sample. Put another way, for 150 of 153 in our random sample, we were ultimately unable to verify how much was owed of the outstanding disqualifying LFOs imposed at sentencing.

### D.     Prohibitions and Other Logistical Barriers to Partial Payments.

Before registering to vote and voting, SB7066 requires that citizens—who are no longer supervised in prison, on probation, or on parole for felonies—must satisfy the amount assessed "in the four corners of the sentencing document" and the law explicitly excludes "any fines, fees, or costs that accrue after the date the obligation is ordered as a part of the sentence."  However, as noted in the summary, the state and county policies that govern partial payments may make it impossible for people who owe LFOs due to felony convictions to avoid paying interest, collection agency fees, convenience fees, and other debt imposed after sentencing before they can complete payment of the full four-corners amount.

We were able to determine that 51 of the 153 individuals in the study (33.33%) had at least one case that, according to the county clerk or their website, was in collections.  Florida Statute §28.246 allows counties to turn over LFOs to debt collectors after 90 days past due.  These agencies may add fees of up to 40%

55

Plaintiffs' Exhibit PX892   p. 56 of 103

of the total amount due as payment for collecting the fee. **Table 1 below** provides all the information I was able to find about the collection agency fees charged in each county. Eight counties—including Gulf, Miami-Dade, Duval, Martin (before 12/2015), Polk, Leon, St. Lucie, and Volusia—charge the full 40% fee on debts in collections. An additional twelve counties—Orange, Broward, Brevard, Martin (after 12/2015), Escambia, Sarasota, Clay, Seminole, Marion, Collier, Pinellas, and Hernando—charge fees ranging from 20 to 35% of the total for debts sent to collection agencies. This additional 20-40% fee might take people by surprise because the court clerks' offices provide very little information on clerks' websites or in their online databases about the collections fee. In our searches, we could see that counties inconsistently included the collections agency fee in the total amount due, or made note of the existence and amount of collections fees only occasionally, if at all on their websites. Miami-Dade and Collier counties indicated elsewhere on their website that the total amount due from their databases did not include collections agency fees, but most counties did not provide additional information about the collections agency fees or indicate that defendants would have to submit a large additional sum to satisfy their court-ordered debt.

---

Plaintiffs' Exhibit PX892   p. 57 of 103

**Table 1**: *Collections Fees by County.* Data obtained from clerk online databases.

---

**40%:** Gulf, Leon, Miami-Dade, Martin (before 12/2015), Polk, St. Lucie, Duval, and Volusia

**25-35%:** Orange, Broward, Brevard, Martin (after 12/2015), Escambia, Sarasota, Clay, Seminole, Collier, Hernando, Pinellas

**20%:** Marion

**Unknown:** Hendry, Highlands, Hillsborough, Holmes, Indian River, Jackson, Jefferson, Monroe, Nassau, Okaloosa, Okeechobe, Wakulla, Citrus, Columbia, Desoto, Dixie, Flagler, Franklin, Gadsden, Gilchrist, Glades, Hamilton, Hardee, Alachua, Baker, Bay, Bradford, Calhoun, Charlotte, Washington, Walton, Santa Rosa, Sumter, Suwannee, Taylor, Union, Lafayette, Lake, Lee, Levy, Liberty, Madison, Manatee, St. John, Pasco, Palm Beach, Osceola, Putnam

Orange County is quite typical.  When we called to inquire about ways to pay legal debt, we were told by the court clerk's office that the collections fee was 25% plus a $25 payment fee for cases turned over to collections.  According to Orange County's website, all cases not paid in full within 90 days in the absence of a payment plan, or cases with payment plans that are more than 90 days past due, get turned over to collections agencies and will be assessed 25% plus $25 to pay on top of the court-ordered amount.

A relatively common practice, cited below, prevents clerks from accepting partial payments or any payments on debts after they have been sent to collection agencies.  I was able to find language on online databases in at least five

Plaintiffs' Exhibit PX892   p. 58 of 103

counties—Brevard, Miami-Dade, Lee, Okaloosa, and Palm Beach—that stated that

clerks would refuse to accept payment on debts in collections from anyone who

attempts to pay just an assessed amount without including the additional

collections and other fees.  A typical example can be found on the Miami-Dade

County website, which states, "If your case has been assigned to a collection

agency, the Clerk's Office will be able to accept full payment of your outstanding

financial obligation.  You can contact the collection agency assigned to your

case(s) directly to make partial payments as well as full payments"

(http://www.miami-dadeclerk.com/courts_criminal_collections.asp.  Last accessed

2/26/2020.  Screenshot on file with report author.).  Similarly, Okaloosa County

directs that people with debts in collections "must either pay the balance in full or

call Penn Credit to make arrangements to resolve the balance due"

(http://www.okaloosaclerk.com/index.php/court-services/198-payments-plans.

Last accessed 2/26/2020.  Screenshot on file with report author.). I do not have

information about the policy of the collection agencies with respect to allocating

partial payments toward assessments, collections fees, or other costs.  Some

counties may have rules that add contingency fees to all partial payments: for

instance, Brevard County does allow partial payments, but their website notes

explicitly that "[p]artial payments are only accepted in amounts of $100 or greater

plus the collection agency fee unless the account balance is less than $100"

58

(http://www.brevardclerk.us/pay-collection-agency-debt-directly-to-clerk.  Last

accessed 2/26/2020.  Screenshot on file with report author.)  Other counties may

enforce similar policies although I could not find such information on their online

databases.

In practice, these policies can dramatically increase the amount a person

with a felony conviction needs to pay to vote.  In our data, an individual has debt

from case "JJJ" that has been sent to a collections agency in Brevard County. The

clerk reports an outstanding balance of $807.  Based on the above policy, which

requires all payments to include the 25% collections fee, this individual would

need to pay at least $201.75 in *additional* fees to pay off this $807 debt to Brevard

County (assuming there are no other fees or penalties).

In at least seven other counties, clerks do not accept payments on debts in

collections at all; the payments must go through collection agencies and thus are

subject to the partial payment policies of the agency.  I found language to this

effect on the online databases of Collier, Hernando, Manatee, Orange, St. Lucie,

St. Johns, and Seminole counties, but others may enforce similar policies without

explicitly mentioning them online.  For instance, the Collier County website says

that for debts in collections, "you must add an additional 32% service charge. You

must also pay all collections agency payments directly to the Collections Agency"

(https://apps.collierclerk.com/court-divisions/criminal/collection-agency-payments.

59

Last accessed 2/26/2020.  Screenshot on file with author).  Likewise, according to the Orange County Clerk website, "Once an account is turned over to a collection agency, all payments must be made through that collection agency" (https://www.myorangeclerk.com/Divisions/Criminal/Collections-Court, Last accessed 2/26/2020.  Screenshot on file with author.).  I noted previously regarding the Hernando County case in **Figure 8** above that I was not able to determine from the record whether the collections agency took its fee before sending the payment to the county clerk.  In these instances, I do not have information on collection agency payment policies and further research is needed to determine whether collection agencies will allocate payments to just amounts assessed in the "four corners of the sentencing document" or whether they take a portion of all monies collected as their fee.  In Seminole County, it appears that payments to the agencies must include the 25% fee as they provide, "Fines and fees referred to a Collection Agency must be paid directly to the Agency listed in the notice you received.  Payment must include the Collection Agency's 25% contingency fee" (https://www.seminoleclerk.org/collection-agencies/. Last accessed 2/26/2020. Screenshot available upon  request.).[30]

---

[30]      It is worth noting that all counties participate in "Operation Green Light," which is a one-day amnesty program for paying LFOs.  Operation Green Light waives collection agency fees for debts in collections, but only for debts that are paid in full, including late fees and other charges.  However, Operation Green Light does not allow a person to

60

Other policies at the local and state levels still prevent individuals from being able to pay just the costs from "the four corners of the sentencing document" even for debts that are not in collections.  *First*, some counties, such as Lee, Osceola, and St. Lucie, explicitly prohibit partial payments unless the individual is enrolled in a payment plan, so that individuals who are not in a payment plan cannot direct payments just to the assessed amount.  For example, Osceola County's Ncourt payment portal states, "You may make a partial payment using a payment plan only if the court has approved and assigned you a plan with a beginning balance and a specified monthly payment amount" (https://www.ncourt.com/x-pressV3_2/juris/fl/flosceola/Landing_Osceola.aspx. Last accessed 2/26/2020.  Screenshot available upon request.).

*Second*, even when county clerks do accept partial payments, in accordance with Florida Statute §28.246, counties charge fees for processing payments on a per case basis.  Partial payment fees typically are charged either $5 per payment or a one-time $25 fee.  I was able to find explicit mention of these fees on the online databases of Clay, Citrus, Brevard, Santa Rosa, Seminole, Escambia, and Lee counties.  Most policies are similar to Santa Rosa County's policy, which states,

---

avoid paying all post-sentence fees and interest.  Some counties (Pinellas is an example) do allow people with outstanding LFOs to enter into payment plans on amnesty days, but entering the payment plan incurs a $25 fee per case.  It also is worth considering the timing of this amnesty day relative to voter registration deadlines.  The last event was in October 2019.

61

"Partial payments are accepted w/a fee; $5 per payment or one time $25 fee" (http://www.santarosaclerk.com/court_info.html. Last accessed 2/26/2020. Screenshot available upon request.).  These fees accrue on top of other payment or processing fees such as Polk County's $14 satisfaction fee or Miami-Dade County's $25 payment fee that are added to all payments.  Counties also charge convenience fees, especially for credit card payments.  We were able to verify these payment charges and fees for about 27 of the 67 counties (40.3%).  The usual fee is 3% or 3.5% of the payment amount for online and/or phone credit card payments or , in some counties, a flat fee.  Collier County charges $5 to pay online. Seminole County charges credit card payment fees ranging from 3.5% in-person to 6% over the phone.  These fees are important—if an individual were to pay only the amount initially assessed in the "four corners of the sentencing document," some of their payment may be directed toward these payment fees, leaving an outstanding balance on the debt that was initially assessed.

*Third*, as previously mentioned, under SB7066, the Florida Legislature limited the LFOs relevant for voter eligibility to "victim restitution and fines and fees ordered as part of the sentence" and provided that they "do not include fines, fees, interest, or other penalties that accrued after the sentence."  However, based on my understanding, Florida Statute §28.246 allocates partial payments across fees, service charges, court costs, and fines owed to different government entities

62

on a pro-rated basis. Several county clerks reference Florida Statute §§28.246 and

28.24(26) at various points on their online databases, especially with respect to

partial payment plans and fees as I noted above (See

https://www.lakecountyclerk.org/courts/payment_plans.aspx. and

https://www.citrusclerk.org/242/Payment-Plan for typical examples.  Last accessed

2/26/2020.)

     Subsection 5 of Florida Statute §28.246 reads as follows:

> (5)   When receiving partial payment of fees, service charges, court
>
> costs, and fines, clerks shall distribute funds according to the
>
> following order of priority:
>
> (a)   That portion of fees, service charges, court costs, and fines to be
>
> remitted to the state for deposit into the General Revenue Fund.
>
> (b)   That portion of fees, service charges, court costs, and fines
>
> required to be retained by the clerk of the court or deposited into the
>
> Clerks of the Court Trust Fund within the Department of Revenue.
>
> (c)   That portion of fees, service charges, court costs, and fines
>
> payable to state trust funds, allocated on a pro rata basis among the
>
> various authorized funds if the total collection amount is insufficient
>
> to fully fund all such funds as provided by law.

Plaintiffs' Exhibit PX892   p. 64 of 103

> (d)   That portion of fees, service charges, court costs, and fines
> payable to counties, municipalities, or other local entities, allocated on
> a pro rata basis among the various authorized recipients if the total
> collection amount is insufficient to fully fund all such recipients as
> provided by law.

It is worth researching further whether, in practice, clerks allocate payments on a pro rata bases among the various authorized recipients in line with the requirements listed above, as well as whether this policy can be construed to allow payments of just fines and fees imposed at sentencing.

Further evidence supports my contention that clerks are not set up to apply payments only to amounts assessed in the "four corners of the sentencing document." As part of the initial calls to all 67 county clerks' offices, we asked the clerks' office staff whether it would be possible to direct payments just to satisfy originally assessed amounts rather than fees or other charges. Staff in 8 counties— Clay, Gilchrist, Gulf, Hardee, Charlotte, Bradford, Walton, and Lake—said this was not possible. Staff in 33 other counties said they did not know if it was possible to direct payments to satisfy originally assessed amounts.[31] Only 8

---

[31] Hendry, Hernando, Highlands, Madison, Martin, Miami-Dade, Monroe, Nassau, Okaloosa, Okeechobee, Wakulla, Citrus, Collier, Columbia, DeSoto, Dixie, Duval, Escambia, Flagler, Franklin, Glades, Hamilton, Alachua, Baker, Bay, Brevard, Broward, Calhoun, Washington, Leon, Levy, Madison, and Manatee.

64

counties indicated that it may be possible to pay just the assessed amounts in some circumstances (Hillsborough, Holmes, Indian River, Jackson, Jefferson, Lafayette, Lee, and Liberty).

    To summarize these findings, several policies at the county and state levels combine to make paying just the amounts "assessed in the four corners of the sentencing document" for a felony conviction impossible for many people.  County clerks and collection agencies require the payment of collections agency fees ranging from 20-40% of the amount due and charge satisfaction fees, payment fees, partial payment fees, and convenience fees to accept payments.  Often, counties are not able to direct payments toward fees "assessed in the four corners of the sentencing document" rather than late fees, interest, or other penalties. Clerks' office staff made this point explicitly to the research team in eight counties over the phone, and other counties may have similar policies.  As a result of the county-level policies, based on language that I could find on their online databases or through calls to their offices, some or all individuals in at least the following 25 counties would be forced to pay more than just the amount assessed in the four corners of the sentencing document to satisfy the requirements of SB7066, especially if their payments were more than 90 days past due: Clay, Gilchrist, Gulf, Hardee, Charlotte, Bradford, Walton, Lake, Polk, Collier, Miami-Dade, Santa

65

Rosa, Seminole, Escambia, Brevard, Citrus, Lee, Osceola, St. Lucie, Orange,

Hernando, Manatee, St. Johns, Okaloosa, and Palm Beach.

## VI.    Conclusion

For the reasons I set out above, I conclude that researching the amount owed

for LFOs in Florida is a time consuming, expensive, and burdensome endeavor

and, notwithstanding, still may lead to inconclusive answers and inconsistent

information about the amount of LFOs owed.  In this report, I provide numerous

examples of the difficulties that we encountered when trying to research LFOs for

a random sample of 153 individuals across 760 cases, including: an inability to get

through to clerks' offices even after multiple calls; long wait times in seeking to

contact clerks' offices; website issues including glitches and incomplete or missing

information; and clerks who refused to help us or, when they did, lacked complete

information.  As I have shown, sometimes cases required written requests or

additional payments to get information.  I have provided abundant evidence that

court records may be confusing even to researchers with advanced degrees because

the records can provide contradictory or incomplete information.

I also conclude that expending the effort to research LFOs through the

sources listed in SB7066 is unlikely to provide reliable information about the LFOs

an individual would need to pay to satisfy the debts imposed "in the four corners of

the sentencing document."  I have documented widespread discrepancies between

66

the FDLE reports and the clerks' online databases, and even between the clerks'

online databases and their own staff's information.  We were unable to match the

FDLE records to the clerks' online data for 96.73% of our 153 sampled

individuals.  We found discrepancies between the clerks' online data and their

responses over the phone for 16.54% of the 677 cases we attempted to call and

could not verify the online information due to unanswered phone calls or clerks'

refusal to help us in an additional 59.99% of cases.  We found payments that did

not add up and missing cases.  Sometimes, even the clerks' staff questioned the

reliability of their own data, such as in Alachua County when a clerk thought the

records needed additional research.  Clerks staff also complained about lack of

time to complete these requests, such as the Miami-Dade Deputy Clerk who said

they were "understaffed."

Finally, despite language in SB 7066 that excludes debt imposed after

sentencing such as interest or late fees, I found evidence that in many counties, it is

nearly impossible to pay only debts imposed at sentencing due to policies

governing partial payments, payment fees, and collection fees.  I highlighted

several counties that do not accept partial payments on certain debts. I discussed

how other counties impose payment fees and collections fees and will direct

portions of payments to those other obligations.  Eight counties told us over the

phone that they could not direct payments just to pay down initial imposed

67

amounts.  As a result, I was able to identify at least 25 counties with policies that could require at least some of the people trying to pay LFOs to pay more than just the amount assessed in the "four corners of the sentencing document" to satisfy their obligation under SB7066.

68

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

I reserve the right to continue to supplement my declarations in light of additional facts, testimony, and/or materials that may come to light.

Executed this March 2, 2020, at Cook County, Illinois.


**Traci R. Burch, Ph.D.**

69

# APPENDIX

## *LFO Lookup Call Script for Cases for Specific Individuals*

Call the county court clerk in the conviction county for the case(s) for the individuals listed in the FDLE to request the following:

"Hi, I'm calling to find out how much someone owes for felony convictions.  I want to know how much was originally assessed in fines and fees or restitution and whether they've been paid."  Make sure it's clear that you're only interested in FELONY convictions.

IF THEY ASK YOU WHO YOU ARE, SAY "I'm a student doing some research on fines and fees."  If they say they can't release information to you say, "Yes you can, this is a matter of public record."

If they give you totals, ask, "Can you please break down these totals for me?" and then use the following prompts:

--"Is that just for the assessed amount?"

--"How much was it originally?"

--"Was there any victim restitution?"

--IF YES: "Have they paid any of that?"

--"Have any payments been made?"

--IF YES: "What's the total of the payments?"

--"Can you tell me anything about late fees or interest or other things that would also need to be paid?"

--"Is it in collections?"

IF they ask for an email follow up to look up all this information, make a note and send the email.  Consult with me if you need help writing it.

Also, record the time of the phone call and any other notes about holds, unusual information as noted in the excel sheet using the worksheet below.

Thank them for their time.

70

Plaintiffs' Exhibit PX892   p. 71 of 103

## **LFO Lookup Call Worksheet**

Case Number/individuals
(s)_____

Call Time Start_____   Call Time End _____

On hold for _____

Number of calls _____

Date of successful contact_____

Told student researcher?_____

| Case 1 | Email sent? |
|---|---|
| _____ | _____ |
| Initial Assessed | Received data |
| _____ | _____ |
| Assessed Amt Due | Case2 |
| _____ | _____ |
| Victim Rest Initial | Initial Assessed |
| _____ | _____ |
| Victim Rest Due | Assessed Amt Due |
| _____ | _____ |
| Total Payments | Victim Rest Initial |
| _____ | _____ |
| Late charges | Victim Rest Due |
| _____ | _____ |
| Total Amount Due | Total Payments |
| _____ | _____ |
| In Collections? | Late charges |
| _____ | _____ |
| Refuse to help, why?_____ | Total Amount Due_____ |

71

Plaintiffs' Exhibit PX892   p. 72 of 103

In Collections?
_____

Refuse to help,
why?_____

Email sent?
_____

Received data
_____

Plaintiffs' Exhibit PX892   p. 73 of 103

**Instructions for initial calls/website research for 67 county clerks of the circuit court:**

1. Check the clerk of the county court website (should be available from here https://www.flclerks.com/page/FindaClerk).
2. Check the county clerk's website to fill the following into the spreadsheet, answer Y for yes and N for no:
   a. Are public court records accessible online? (typically under "search court records")
   b. Do you have to pay to access them?
   c. Can you search by name only?
   d. If yes to "c," search using either last name Brown, first initial "w" or last name Johnson, first initial W:
      i. Are you able to access information about individual fines, fees, and restitution through the web?
         1. Separated by type/purpose? (restitution/fines/fees?)
         2. Sentencing or fines fees document available? (some may be hidden)
         3. Amount due for different fines/fees?
         4. Total amount due?
         5. About how long did it take you to access the information about fines and fees for one case?
   e. Can you pay online?
   f. Do online payments cost money?
   g. What information do you need to pay online?
3. Call the clerk of the county court's office.
   a. "Hello, I have some questions. My [family member] wants to find out what he owes on his case so he can vote. What does he have to do?"
      i. Directed to go online
      ii. Directed to call back with (list information)
      iii. Directed to come to clerks' office
      iv. If offer to help now, say something like "he's not with me now, I'm just trying to help him do it later."

73

Plaintiffs' Exhibit PX892   p. 74 of 103

      v.  Refused to help now—if you get something like have him call back since they're his cases

b.  FOLLOWUP: IF say online or come to clerks' office, ASK IF HE CAN DO IT OVER THE PHONE.

c.  What information does he need to have to look it up? Can you just use his name? (Mark all that are NECESSARY in the spreadsheet as "nec" and others that can be used as OPTIONAL (opt).
      i.  Name
      ii.  Date of birth
      iii.  Case number/citation number
      iv.  Other identifiers (list)

d.  Can you find how much he owes for all his cases at one time? Answer might be something like the following.  Paraphrase the exact answer in the spreadsheet
      i.  It depends on the number of cases
      ii.  It depends on ….
      iii.  Yes, we can look it all up at once
      iv.  You need to email/call/write us with the info and we can get back to you in X days
      v.  The online system will let you do that

e.  How long does this usually take? Record the exact answer in the spreadsheet.

f.   "Does he need to pay the whole thing or just part of it?"
      i.  Can he put all the payment to just the fine or does it go to the late fees too?

g.  End the call—"I think I've got it.  Thank you for your help"

h.  Did they volunteer the information that they could only look up information for cases in their county? (Yes/No)

i.  Time and Date of call

j.  Length of call

k.  Did someone answer on the first try?

l.  Placed on hold?

m. NOTES

n.  NOTE: YOU CANNOT RECORD CALLS IN FLORIDA WITHOUT CONSENT OF BOTH PARTIES.

74

Table: Cases by County w/ Error Rate

| Conviction County | Cases with Phone, FDLE, or Online Issue | Total Cases | |
|---|---|---|---|
| Alachua | 33 | 49 | 67.3% |
| Brevard | 5 | 6 | 83.3% |
| Broward | 98 | 100 | 98.0% |
| Clay | 5 | 6 | 83.3% |
| DeSoto | 1 | 1 | 100.0% |
| Dixie | 1 | 1 | 100.0% |
| Duval | 126 | 143 | 88.1% |
| Escambia | 14 | 17 | 82.4% |
| FLAGLER | 1 | 1 | 100.0% |
| Gadsden | 7 | 7 | 100.0% |
| Hillsborough | 156 | 160 | 97.5% |
| Holmes | 1 | 1 | 100.0% |
| Jackson | 1 | 1 | 100.0% |
| Lake | 1 | 1 | 100.0% |
| Lee | 2 | 2 | 100.0% |
| Leon | 52 | 57 | 91.2% |
| Madison | 1 | 1 | 100.0% |
| Manatee | 1 | 1 | 100.0% |
| Marion | 2 | 2 | 100.0% |
| Martin | 1 | 1 | 100.0% |
| Miami-Dade | 9 | 9 | 100.0% |
| Nassau | 4 | 6 | 66.7% |
| Okaloosa | 1 | 2 | 50.0% |
| Orange | 6 | 6 | 100.0% |
| Osceola | 12 | 15 | 80.0% |
| Palm Beach | 3 | 3 | 100.0% |

75

Plaintiffs' Exhibit PX892   p. 76 of 103

| Conviction County | Cases with Phone, FDLE, or Online Issue | Total Cases | |
|---|---|---|---|
| Pasco | 6 | 6 | 100.0% |
| Pinellas | 122 | 131 | 93.1% |
| Polk | 3 | 3 | 100.0% |
| Putnam | 1 | 1 | 100.0% |
| Seminole | 1 | 1 | 100.0% |
| St. Lucie | 1 | 1 | 100.0% |
| Sumter | 1 | 1 | 100.0% |
| Taylor | 1 | 1 | 100.0% |
| Volusia | 12 | 13 | 92.3% |
| Wakulla | 2 | 2 | 100.0% |
| Walton | 1 | 1 | 100.0% |

Table: Error Rates Over Time

| Years | % Incorrect |
|---|---|
| 1976-1989 | 93.1% |
| 1990-1999 | 89.0% |
| 2000-2009 | 90.4% |
| 2010-2019 | 92.1% |

Plaintiffs' Exhibit PX892   p. 77 of 103

Table: Characteristics of Individuals in Sample

| Characteristic | Number of Individuals |
|---|---|
| Female | 17 |
| Male | 135 |
| Unspecified Gender | 1 |
| Black | 97 |
| Hispanic* | 1 |
| White | 54 |
| Unknown Race | 1 |
| Average Age | 46.33 |
| Total | 153 |

*The FDLE records did not seem to include a Hispanic category for race, even though some people coded as White or Black had surnames that the U.S. Census Bureau lists as among the most common for people reporting Latino ethnicity.

Plaintiffs' Exhibit PX892   p. 78 of 103

## *Pinellas County Online Database Records*

Page 1 of 3



Plaintiffs' Exhibit PX892   p. 79 of 103

| 08/26/2002 | **Plea** |
| | 1: ███████████████ |

| 08/26/2002 | **Sentence** (Judicial Officer: KHOUZAM, NELLY N) |
| | 1: ███████████████ |
| | State Probation (1 Yr ) |
| | Comment (Fine: 000003.00; CourtCost: 000465.00; CostofSupervisionRate: 50; ) |
| | Provisions (Special Provision SENTENCED UNDER GUIDELINES) |

**OTHER EVENTS AND HEARINGS**

| 12/04/2017 | **COLLECTIONS RECEIVED BY LINEBARGER GOGGAN BLAIR      Doc # 2** |
| | Party: ███████ |
| 12/03/2017 | **REFERRED TO COLLECTION AGENCY      Doc # 1** |
| 02/12/2015 | **REFERRED TO COLLECTION AGENCY** |
| 12/13/2009 | **REFERRED TO COLLECTION AGENCY** |
| | *REFERRED TO COLLECTION AGENCY; DEFT: A; VER: F* |
| 08/29/2002 | **JUDGMENT FOR COSTS** |
| | *JUDGMENT FOR COST $ 468 OR 12201/2236-001; DEFT: A; VER: F* |
| 08/28/2002 | **MTN & ORD FORWARDED FOR NOTICE OF SUSPENSION OF DL TO DHSMV** |
| | *MTN/ORDER FWD NOTICE/SUSP/DL TO DHSMV 8; DEFT: A; VER: F* |
| 08/28/2002 | **DRIVER'S LICENSE REVOKED** |
| | *DRIVERS LICENSE REVOKED : 2Y (BPO) RPT TO TALL 091102; DEFT: A; VER: F* |
| 08/26/2002 | **CHANGED PLEA TO NOLO CONTENDERE** |
| | *CHANGED PLEA TO NOLO CONTENDERE; DEFT: A; VER: F* |
| 08/26/2002 | **SENTENCED UNDER GUIDELINES** |
| | *SENTENCED UNDER GUIDELINES; DEFT: A; VER: F* |
| 08/26/2002 | **JUDGMENT** |
| | *JUDGEMENT OR 12198/0372-002; DEFT: A; VER: F* |
| 08/26/2002 | **PROBATION ORDERED - ADJUDICATED GUILTY** |
| | *PROBATION ORDERED - ADJ/G 12M/DO; DEFT: A; VER: F* |
| 08/26/2002 | **PAY FINE** |
| | *PAY FINE $ 256.00; DEFT: A; VER: N* |
| 08/26/2002 | **COURT FACILITIES COURT COSTS** |
| | *COURT FACILITIES COURT COSTS $ 150; DEFT: A; VER: N* |
| 08/26/2002 | **CRIMINAL JUSTICE EDUCATIONAL & TRAINING FUND ASSESSED $2.00** |
| | *CRIM JUST EDUC/TRAIN FD ASSESSED $ 2.00; DEFT: A; VER: N* |
| 08/26/2002 | **INVESTIGATIVE COSTS ASSESSED** |
| | *INVESTIGATIVE COSTS ASSESSED $ 60/CW; DEFT: A; VER: N* |
| 08/26/2002 | **COSTS OF SUPERVISION WAIVED** |
| | *COSTS OF SUPERVISION WAIVED; DEFT: A; VER: F* |
| 08/26/2002 | **MISCELLANEOUS TEXT** |
| | *INCLUDING SURCHARGE; DEFT: A; VER: F* |
| 08/26/2002 | **HEARING**  (8:30 AM) (Judicial Officer JUDGE, DEFAULT CONVERSION) |
| | Result: LEGACY MINUTES |
| 07/23/2002 | **CONVERTED DOCKET** |
| | *NOTICE OF PRE-TRIAL - 082602 COURTROOM: C AT 08:30; DEFT: A; VER: F;* |
| 07/22/2002 | **PRE-TRIAL HEARING SET** |
| | *PRE-TRIAL HRG SET: 082602/0830 AM -C-; DEFT: A; VER: N* |
| 07/22/2002 | **HEARING**  (1:30 PM) (Judicial Officer JUDGE, DEFAULT CONVERSION) |
| | Result: LEGACY MINUTES |
| 07/02/2002 | **ANSWER TO DEMAND FOR DISCOVERY** |
| | *ANSWER TO DEMAND FOR DISCOVERY 8; DEFT: A; VER: F* |
| 07/02/2002 | **DEMAND NOTICE OF INTENTION TO CLAIM ALIBI** |
| | *DEMAND NOTICE INTENTION TO CLAIM ALIBI; DEFT: A; VER: F* |
| 06/21/2002 | **CONVERTED DOCKET** |
| | *NOTICE OF ARRAIGNMENT - 072202 COURTROOM: C AT 01:30; DEFT: A; VER: F;* |
| 06/19/2002 | **INFORMATION FILED** |
| | *INFORMATION FILED: (1CT) ATTEMPTED PURCHASE OF COCAINE; DEFT: A; VER: F* |
| 04/19/2002 | **ORDER GRANTING** |
| | *ORDER GRANTING D/MTN TO MODIFY BOND; DEFT: A; VER: N* |
| 04/19/2002 | **BOND AMENDED** |
| | *BOND AMENDED TO $ 750; DEFT: A; VER: N* |
| 04/19/2002 | **HEARING**  (10:00 AM) (Judicial Officer JUDGE, DEFAULT CONVERSION) |
| | Result: LEGACY MINUTES |
| 04/17/2002 | **DEFENDANT'S INVOCATION OF CONSTITUTIONAL RIGHTS** |
| | *DEFT INVOCATION CONSTITUTIONAL RIGHTS; DEFT: A; VER: F* |
| 04/13/2002 | **COMPLAINT & ADVISORY** |
| | *COMPLAINT AND ADVISORY ATTMPT PURCHASE CRACK COCAINE; DEFT: A; VER: F* |
| 04/13/2002 | **ORDER OF PROBABLE CAUSE FOUND** |
| | *ORDER OF PROBABLE CAUSE FOUND; DEFT: A; VER: F* |
| 04/13/2002 | **PD APPOINTED WRITTEN PLEA NG BY PD & DEMAND FOR DISCOVERY** |
| | *PUBLIC DEFENDER APPOINTED (INSOLVENCY); DEFT: A; VER: F* |
| 04/13/2002 | **BOND AMENDED** |
| | *BOND AMENDED TO $ 1000; DEFT: A; VER: F* |
| 04/13/2002 | **DEMAND FOR DISCOVERY** |
| | *DEMAND FOR DISCOVERY; DEFT: A; VER: N* |
| 04/13/2002 | **WRITTEN PLEA NOT GUILTY BY PD** |
| | *WRITTEN PLEA NOT GUILTY-PUBLIC DEFENDER; DEFT: A; VER: N* |
| 04/13/2002 | **INVESTIGATIVE COSTS REQUESTED** |
| | *INVESTIGATIVE COSTS REQUESTED $ 60/CW; DEFT: A; VER: F* |
| 04/13/2002 | **HEARING**  (8:00 AM) (Judicial Officer JUDGE, DEFAULT CONVERSION) |
| | Result: LEGACY MINUTES |

---
FINANCIAL INFORMATION
---

DEFENDANT ██████████████

Court Ordered    *Click Here!*

*Pay Now!*   Fines, Fees, Costs?

| | |
|---|---|
| Total Financial Assessment | 772.20 |
| Total Payments and Credits | 187.20 |
| **Balance Due as of 02/04/2020** | **585.00** |

| | | |
|---|---|---|
| 08/26/2002 | Transaction Assessment | 571.20 |
| 08/26/2002 | Transaction Assessment | 84.00 |
| 11/30/2017 | BP COLLECTION RECALL | (187.20) |
| 12/03/2017 | Transaction Assessment | 117.00 |

https://ccmspa.pinellascounty.org/PublicAccess/CaseDetail.aspx?CaseID=██████████        2/4/2020

80

Plaintiffs' Exhibit PX892   p. 81 of 103



Skip to Main Content  Logout  My Account  Search Menu  New Criminal Search  Refine Search   Back          Location : Pinellas County   Help

# REGISTER OF ACTIONS
### CASE NO. ▇▇▇▇▇▇

Order Documents!  **Click Here!**
Request Now!  Including Certified!

STATE OF FLORIDA vs. ▇▇▇▇▇▇

§
§
§
§
§
§
§
§

Case Type:  **FELONY**
Date Filed:  **12/27/2009**
Location:  **Division I**
Judicial Officer:  **HELINGER, CHRIS**
Case Number History:
LAB REPORT NUMBER:
UNIFORM CASE NUMBER:

## RELATED CASE INFORMATION

**Related Cases**
▇▇▇▇   (LEGACY - FOPS CASE)

## PARTY INFORMATION

| | | **Attorneys** |
|---|---|---|
| BONDSMAN/D/FREDDIE-DIXON-BAIL-BONDS<br>14835 49TH ST N<br>CLEARWATER, FL 33762<br>Other Agency Numbers<br>02299649 TRUE SPN | Male Unavailable | |
| DEFENDANT | ▇▇▇▇▇ | ~~STACEY M SCHROEDER~~<br>~~Public Defender~~<br>~~Attn: PUBLIC DEFENDERS~~<br>~~OFFICE~~<br>~~14250 49th ST N~~<br>~~CLEARWATER, FL 33762~~<br>~~727-464-6516(W)~~ |
| STATE | STATE OF FLORIDA<br><br>14250 49th STREET NORTH<br>ROOM 1000<br>CLEARWATER, FL 33762 | WESLEY DICUS<br>P O BOX 5028<br>SAO<br>CLEARWATER, FL 33758<br>727-464-6221(H)<br><br>RYAN LOSSIUS<br>P O BOX 5028<br>SAO<br>CLEARWATER, FL 33758<br>727-464-6221(H) |

## CHARGE INFORMATION - (CHECK PCSO FOR CUSTODY INFO)

| Charges: | | Statute | Level | Date |
|---|---|---|---|---|
| 1. ▇▇▇▇▇ | | ▇ | FELONY - | |

**Bonds**
SURETY BOND        #T1050199937        $1,000
01/04/2010        OPEN BOND
02/27/2010        RELEASED BOND
Counts:01
12/26/2009        Arrest Date
Comments:

DEFENDANT SPN00042302: █████████████████████████; BOND
COMPANY: FREDDIE DIXON BAIL BONDS; ADDRESS 1: 14835 49TH ST N; ADDRESS 2: CLEARWATER FL;
ZIP: 33762; ADBCASM_POWER_NBR: T1050199937; ADBCASM_CASE: 0927661CFANO;
ADBCASM_PROCESS_DATE: 0; ADBCASM_DISPOSITION: RLSD; ADBCASM_AMOUNT: 0000010000[;
ADBCASM_AMOUNT: 1000.00; ADBCASM_FINE_COST: 0.00; ADBCASM_ESTREATURE_AMT: 0.00;
ADBCASM_REFUND_AMT: 0.00; ADBCASM_OTHER: 0.00; ADBCASM_ASSESSED_COSTS: 0.00;
ADBCASM_OTHER_HELD: 0.00; ADBCASM_OTHER_ORDER: 0.00; ADBCASM_DISPOSITION_GDATE:
20100227;

| | | |
|---|---|---|
| SURETY BOND | #T550234745 | $2,500 |
| 06/28/2010 | OPEN BOND | |
| 09/16/2010 | RELEASED BOND | |
| Counts:01 | | |
| 12/26/2009 | Arrest Date | |

DEFENDANT SPN00042302: █████████████████████████; BOND
COMPANY: FREDDIE DIXON BAIL BONDS; ADDRESS 1: 14835 49TH ST N; ADDRESS 2: CLEARWATER FL;
ZIP: 33762; ADBCASM_POWER_NBR: T550234745; ADBCASM_CASE: 0927661CFANO;
ADBCASM_PROCESS_DATE: 0; ADBCASM_DISPOSITION: RLSD; ADBCASM_AMOUNT: 0000025000[;
ADBCASM_AMOUNT: 2500.00; ADBCASM_FINE_COST: 0.00; ADBCASM_ESTREATURE_AMT: 0.00;
ADBCASM_REFUND_AMT: 0.00; ADBCASM_OTHER: 0.00; ADBCASM_ASSESSED_COSTS: 0.00;
ADBCASM_OTHER_HELD: 0.00; ADBCASM_OTHER_ORDER: 0.00; ADBCASM_DISPOSITION_GDATE:
20100916;

Comments:

---

### EVENTS & ORDERS OF THE COURT

**DISPOSITIONS**

09/16/2010 **Disposition**
1: ████████████

09/16/2010 **Plea**
1: ████████████

09/16/2010 **Sentence** (Judicial Officer: HELINGER, CHRIS)
1: ████████████████████████████████████████████████
Comment (Fine: 000297.00; CourtCost: 000353.00; )
Provisions (Special Provision SENTENCED UNDER GUIDELINES)

**OTHER EVENTS AND HEARINGS**

03/01/2012 **PARTIAL PAYMENT**
*PARTIAL PAYMENT $53.07; DEFT: A; VER: F*
03/01/2012 **PD LIEN PAYMENT**
*PUBLIC DEFENDER LIEN PAID - $100.00; DEFT: A; VER: F*
12/01/2011 **PARTIAL PAYMENT**
*PARTIAL PAYMENT $14.73; DEFT: A; VER: F*
11/04/2011 **PARTIAL PAYMENT**
*PARTIAL PAYMENT $46.77; DEFT: A; VER: F*
09/30/2011 **COSTS OF PROSECUTION PAID**
*COSTS OF PROSECUTION PAID - $100.00; DEFT: A; VER: F*
09/30/2011 **PARTIAL PAYMENT**
*PARTIAL PAYMENT $10.43; DEFT: A; VER: F*
08/25/2011 **PARTIAL PAYMENT**
*PARTIAL PAYMENT $86.94; DEFT: A; VER: F*
08/12/2011 **PARTIAL PAYMENT**
*PARTIAL PAYMENT $1.61; DEFT: A; VER: F*
08/12/2011 **INDIGENT CRIMINAL DEFENSE FEE PAID**
*INDIG CRIM DEF FEE PAID - $50.00; DEFT: A; VER: F*
06/23/2011 **PARTIAL PAYMENT**
*PARTIAL PAYMENT $8.21; DEFT: A; VER: F*
09/24/2010 **CERTIFICATE OF DISCHARGE TO BOND AGENCY**
*CERTIFICATE OF DISCHARGE TO BOND AGENCY T550234745; DEFT: A; VER: N*
09/22/2010 **JUDGMENT FOR ATTORNEY FEES AND/OR COSTS**
*JDMT FOR ATTY FEES & COSTS $ 100 SAC; DEFT: A; VER: F*
09/22/2010 **JUDGMENT FOR FINE AND/OR COSTS**
*JUDGMENT FOR FINE/COST $ 132F/568C; DEFT: A; VER: F*
09/20/2010 **COMMITMENT PACKET TO DEPARTMENT OF CORRECTIONS**
*COMMITMENT PACKET TO DEPT OF CORRECTIONS; DEFT: A; VER: N*
09/16/2010 **AMENDED INFORMATION**
*INFORMATION AMENDED: (2CTS) SALE AND/OR DELIVERY OF; DEFT: A; VER: F*
09/16/2010 ████████████████████████████
09/16/2010 **SENTENCED UNDER GUIDELINES**
*SENTENCED UNDER GUIDELINES; DEFT: A; VER: F*
09/16/2010 **MISCELLANEOUS TEXT**
*\*\*\* COUNT 01 \*\*\*; DEFT: A; VER: N*
09/16/2010 **CHANGED PLEA TO GUILTY**

Page 3 of 5



| | |
|---|---|
| | *CHANGED PLEA TO GUILTY; DEFT: A; VER: F* |
| 09/16/2010 | **JUDGEMENT & SENTENCE** |
| | *JUDGEMENT & SENTENCE ; DEFT: A; VER: F* |
| 09/16/2010 | |
| | |
| 09/16/2010 | |
| | |
| 09/16/2010 | |
| | *PAY FINE $ 550.00; DEFT: A; VER: N* |
| 09/16/2010 | **COSTS OF PROSECUTION ASSESSED** |
| | *COSTS OF PROSECUTION ASSESSED $ 100.00; DEFT: A; VER: N* |
| 09/16/2010 | **INDIGENT CRIMINAL DEFENSE FEE ASSESSED** |
| | *INDIGENT CRIMINAL DEFENSE FEE ASSESSED $ 50; DEFT: A; VER: N* |
| 09/16/2010 | **INDIGENT CRIMINAL DEFENSE FEE ASSESSED AS A LIEN** |
| | *INDIGENT CRIM DEF FEE ASSESSED AS A LIEN; DEFT: A; VER: N* |
| 09/16/2010 | **PD LIEN ASSESSED** |
| | *PUBLIC DEFENDER LIEN ASSESSED $ 100; DEFT: A; VER: N* |
| 09/16/2010 | **DRIVER'S LICENSE REVOKED** |
| | *DRIVERS LICENSE REVOKED : 2Y; DEFT: A; VER: F* |
| 09/16/2010 | **DNA TESTING FEE TO PCSO** |
| | *DNA TESTING FEE TO PCSO 7.00; DEFT: A; VER: F* |
| 09/16/2010 | **MISCELLANEOUS TEXT** |
| | *\*\*\* COUNT 02 \*\*\*; DEFT: A; VER: N* |
| 09/16/2010 | **MISCELLANEOUS TEXT** |
| | *CHANGED PLEA TO GUILTY; DEFT: A; VER: F* |
| 09/16/2010 | **MISCELLANEOUS TEXT** |
| | *JUDGEMENT & SENTENCE ; DEFT: A; VER: F* |
| 09/16/2010 | |
| | |
| 09/16/2010 | |
| | |
| 09/16/2010 | |
| | |
| 09/16/2010 | **MISCELLANEOUS TEXT** |
| | *PAY FINE $ 550.00; DEFT: A; VER: N* |
| 09/16/2010 | **MISCELLANEOUS TEXT** |
| | *FINE/COST CONCURRENT WITH: COUNT 01; DEFT: A; VER: N* |
| 09/16/2010 | **MISCELLANEOUS TEXT** |
| | *COSTS OF PROSECUTION ASSESSED $ 100.00; DEFT: A; VER: N* |
| 09/16/2010 | **MISCELLANEOUS TEXT** |
| | *COST OF PROSECUTION CONCURRENT WITH: COUNT 01; DEFT: A; VER: N* |
| 09/16/2010 | **MISCELLANEOUS TEXT** |
| | *INDIGENT CRIMINAL DEFENSE FEE ASSESSED $ 50; DEFT: A; VER: N* |
| 09/16/2010 | **MISCELLANEOUS TEXT** |
| | *INDIGENT CRIM DEF FEE ASSESSED AS A LIEN; DEFT: A; VER: N* |
| 09/16/2010 | **MISCELLANEOUS TEXT** |
| | *PUBLIC DEFENDER LIEN ASSESSED $ 100; DEFT: A; VER: N* |
| 09/16/2010 | **MISCELLANEOUS TEXT** |
| | *PUBLIC DEFENDER LIEN CONCURRENT WITH: COUNT 01; DEFT: A; VER: N* |
| 09/16/2010 | **MISCELLANEOUS TEXT** |
| | *DRIVERS LICENSE REVOKED : 2Y TALL 092310; DEFT: A; VER: N* |
| 09/16/2010 | **MISCELLANEOUS TEXT** |
| | *D/L REV CONC WITH COUNT 01; DEFT: A; VER: F* |
| 09/16/2010 | **MISCELLANEOUS TEXT** |
| | *DNA TESTING FEE TO PCSO 7.00; DEFT: A; VER: N* |
| 09/16/2010 | **HEARING**  (8:30 AM) (Judicial Officer JUDGE, DEFAULT CONVERSION) |
| | Result: LEGACY MINUTES |
| 09/16/2010 | **HEARING**  (8:30 AM) (Judicial Officer JUDGE, DEFAULT CONVERSION) |
| | Result: LEGACY MINUTES |
| 08/09/2010 | **WITNESS SUBPOENA RETURNED** |
| | *WITNESS SUBPOENA RETURNED (4); DEFT: A; VER: F* |
| 08/06/2010 | **SUBPOENA TO SHERIFF** |
| | *SUBPOENA (010) STATE; DEFT: A; VER: F* |
| 08/03/2010 | **NOTICE** |
| | *NOTICE OF TRIAL - 091610 COURTROOM: I AT 08:30; DEFT: A; VER: F* |
| 08/02/2010 | **MISCELLANEOUS TEXT** |
| | *\*\*\* Counts 01-02 \*\*\*; DEFT: A; VER: N* |
| 08/02/2010 | **TRIAL SET** |
| | *TRIAL SET: 091610/0830 AM -I-; DEFT: A; VER: N* |
| 08/02/2010 | **HEARING**  (8:30 AM) (Judicial Officer JUDGE, DEFAULT CONVERSION) |
| | Result: LEGACY MINUTES |
| 07/27/2010 | **ADDITIONAL LIST OF WITNESSES** |
| | *ADDITIONAL LIST OF WITNESSES 8; DEFT: A; VER: F* |
| 07/27/2010 | **ACKNOWLEDGEMENT OF ADDITIONAL TANGIBLE EVIDENCE** |
| | *ACK OF ADDL TANGIBLE EVIDENCE; DEFT: A; VER: F* |
| 07/20/2010 | **NOTICE** |
| | *NOTICE OF PRE-TRIAL - 080210 COURTROOM: I AT 08:30; DEFT: A; VER: F* |
| 07/19/2010 | **MISCELLANEOUS TEXT** |
| | *\*\*\* Counts 01-02 \*\*\*; DEFT: A; VER: N* |
| 07/19/2010 | **ORDER GRANTING** |
| | *ORDER GRANTING: D/MTN TO CONTINUE; DEFT: A; VER: N* |
| 07/19/2010 | **WAIVED RIGHT TO SPEEDY TRIAL** |
| | *WAIVED RIGHT TO SPEEDY TRIAL; DEFT: A; VER: N* |
| 07/19/2010 | **PRE-TRIAL HEARING SET** |

https://ccmspa.pinellascounty.org/PublicAccess/CaseDetail.aspx?CaseID=     2/4/2020

Plaintiffs' Exhibit PX892   p. 84 of 103

Page 4 of 5

| Date | Event |
|---|---|
| | *PRE-TRIAL HRG SET: 080210/0830 AM -I-; DEFT: A; VER: N* |
| 07/19/2010 | **HEARING** (8:30 AM) (Judicial Officer JUDGE, DEFAULT CONVERSION) |
| | Result: LEGACY MINUTES |
| 06/29/2010 | **NOTICE** |
| | *NOTICE OF PRE-TRIAL - 071910 COURTROOM: I AT 08:30; DEFT: A; VER: F* |
| 06/29/2010 | **SURETY BOND POSTED** |
| | *SURETY BOND POSTED; DEFT: A; VER: F* |
| 06/28/2010 | **MISCELLANEOUS TEXT** |
| | *** Counts 01-02 ***; DEFT: A; VER: N* |
| 06/28/2010 | **ORDER GRANTING** |
| | *ORDER GRANTING: D/MTN TO SET BOND; DEFT: A; VER: N* |
| 06/28/2010 | **BOND AMENDED** |
| | *BOND AMENDED TO $ 3500.00 (TOTAL); DEFT: A; VER: N* |
| 06/28/2010 | **MISCELLANEOUS TEXT** |
| | *-COUNT 1 BOND AMENDED TO $2500.00; DEFT: A; VER: N* |
| 06/28/2010 | **MISCELLANEOUS TEXT** |
| | *-COUNT 2 BOND AMENDED TO $1000.00; DEFT: A; VER: N* |
| 06/28/2010 | **PRE-TRIAL HEARING SET** |
| | *PRE-TRIAL HRG SET: 071910/0830 AM -I-; DEFT: A; VER: N* |
| 06/28/2010 | **HEARING** (8:30 AM) (Judicial Officer JUDGE, DEFAULT CONVERSION) |
| | Result: LEGACY MINUTES |
| 06/10/2010 | **NOTICE RETURNED SERVED** |
| | *NOTICE RETURNED SERVED; DEFT: A; VER: F* |
| 06/07/2010 | **NOTICE** |
| | *NOTICE OF PRE-TRIAL - 062810 COURTROOM: I AT 08:30; DEFT: A; VER: F* |
| 06/04/2010 | **MISCELLANEOUS TEXT** |
| | *** Counts 01-02 ***; DEFT: A; VER: N* |
| 06/04/2010 | **WAIVED RIGHT TO SPEEDY TRIAL** |
| | *WAIVED RIGHT TO SPEEDY TRIAL; DEFT: A; VER: N* |
| 06/04/2010 | **PRE-TRIAL HEARING SET** |
| | *PRE-TRIAL HRG SET: 062810/0830 AM -I-; DEFT: A; VER: N* |
| 06/04/2010 | **HEARING** (8:30 AM) (Judicial Officer JUDGE, DEFAULT CONVERSION) |
| | Result: LEGACY MINUTES |
| 05/14/2010 | **NOTICE RETURNED SERVED** |
| | *NOTICE RETURNED SERVED; DEFT: A; VER: F* |
| 05/11/2010 | **NOTICE** |
| | *NOTICE OF PRE-TRIAL - 060410 COURTROOM: I AT 08:30; DEFT: A; VER: F* |
| 05/10/2010 | **MISCELLANEOUS TEXT** |
| | *** Counts 01-02 ***; DEFT: A; VER: N* |
| 05/10/2010 | **PRE-TRIAL HEARING SET** |
| | *PRE-TRIAL HRG SET: 060410/0830 AM -I-; DEFT: A; VER: N* |
| 05/10/2010 | **HEARING** (8:30 AM) (Judicial Officer JUDGE, DEFAULT CONVERSION) |
| | Result: LEGACY MINUTES |
| 04/16/2010 | **NOTICE** |
| | *NOTICE OF PRE-TRIAL - 051010 COURTROOM: I AT 08:30; DEFT: A; VER: F* |
| 04/15/2010 | **MISCELLANEOUS TEXT** |
| | *** Counts 01-02 ***; DEFT: A; VER: N* |
| 04/15/2010 | **ORDER GRANTING** |
| | *ORDER GRANTING: D/MTN TO CONTINUE; DEFT: A; VER: N* |
| 04/15/2010 | **PRE-TRIAL HEARING SET** |
| | *PRE-TRIAL HRG SET: 051010/0830 AM -I-; DEFT: A; VER: N* |
| 04/15/2010 | **HEARING** (8:30 AM) (Judicial Officer JUDGE, DEFAULT CONVERSION) |
| | Result: LEGACY MINUTES |
| 04/02/2010 | **NOTICE RETURNED SERVED** |
| | *NOTICE RETURNED SERVED; DEFT: A; VER: F* |
| 03/29/2010 | **NOTICE** |
| | *NOTICE OF PRE-TRIAL - 041510 COURTROOM: I AT 08:30; DEFT: A; VER: F* |
| 03/26/2010 | **MISCELLANEOUS TEXT** |
| | *** Counts 01-02 ***; DEFT: A; VER: N* |
| 03/26/2010 | **WAIVED RIGHT TO SPEEDY TRIAL** |
| | *WAIVED RIGHT TO SPEEDY TRIAL; DEFT: A; VER: N* |
| 03/26/2010 | **PRE-TRIAL HEARING SET** |
| | *PRE-TRIAL HRG SET: 041510/0830 AM -I-; DEFT: A; VER: N* |
| 03/26/2010 | **REMOVE FROM** |
| | *REMOVE FROM: PTL 041210/0830 AM -I-; DEFT: A; VER: N* |
| 03/26/2010 | **NOTICE RETURNED SERVED** |
| | *NOTICE RETURNED SERVED; DEFT: A; VER: F* |
| 03/26/2010 | **HEARING** (8:30 AM) (Judicial Officer JUDGE, DEFAULT CONVERSION) |
| | Result: LEGACY MINUTES |
| 03/23/2010 | **NOTICE** |
| | *NOTICE OF PRE-TRIAL - 041210 COURTROOM: I AT 08:30; DEFT: A; VER: F* |
| 03/22/2010 | **MISCELLANEOUS TEXT** |
| | *** Counts 01-02 ***; DEFT: A; VER: N* |
| 03/22/2010 | **PRE-TRIAL HEARING SET** |
| | *PRE-TRIAL HRG SET: 041210/0830 AM -I-; DEFT: A; VER: N* |
| 03/22/2010 | **HEARING** (1:30 PM) (Judicial Officer JUDGE, DEFAULT CONVERSION) |
| | Result: LEGACY MINUTES |
| 03/05/2010 | **ANSWER TO DEMAND FOR DISCOVERY** |
| | *ANSWER TO DEMAND FOR DISCOVERY; DEFT: A; VER: F* |
| 03/05/2010 | **DEMAND NOTICE OF INTENTION TO CLAIM ALIBI** |
| | *DEMAND NOTICE INTENTION TO CLAIM ALIBI; DEFT: A; VER: F* |
| 03/03/2010 | **NOTICE RETURNED SERVED** |
| | *NOTICE RETURNED SERVED; DEFT: A; VER: F* |
| 03/02/2010 | **CERTIFICATE OF DISCHARGE TO BOND AGENCY** |

https://ccmspa.pinellascounty.org/PublicAccess/CaseDetail.aspx?CaseID=████    2/4/2020

Plaintiffs' Exhibit PX892   p. 85 of 103

|  |  |  |
|---|---|---|
|  | *CERTIFICATE OF DISCHARGE TO BOND AGENCY T1050199937; DEFT: A; VER: N* |  |
| 03/01/2010 | **NOTICE** |  |
|  | *NOTICE OF ARRAIGNMENT - 032210 COURTROOM: I AT 01:30; DEFT: A; VER: F* |  |
| 02/27/2010 | **MISCELLANEOUS TEXT** |  |
|  | *** Counts 01-02 ***; DEFT: A; VER: N* |  |
| 02/27/2010 | **ORDER GRANTING** |  |
|  | *ORDER GRANTING; S/MTN TO REVOKE BOND; DEFT: A; VER: N* |  |
| 02/27/2010 | **REVOKE AND/OR RELEASE BOND** |  |
|  | *REVOKE/RELEASE/REFUND BOND; DEFT: A; VER: N* |  |
| 02/27/2010 | **BOND AMENDED** |  |
|  | *BOND AMENDED TO $ 0.00 TOTAL; DEFT: A; VER: N* |  |
| 02/27/2010 | **HEARING**  (8:00 AM) (Judicial Officer JUDGE, DEFAULT CONVERSION) |  |
|  | Result: LEGACY MINUTES |  |
| 02/26/2010 |  |  |
| 02/26/2010 |  |  |
| 01/05/2010 | **SURETY BOND POSTED** |  |
|  | *SURETY BOND POSTED; DEFT: A; VER: F* |  |
| 01/05/2010 | **HEARING**  (10:00 AM) (Judicial Officer JUDGE, DEFAULT CONVERSION) |  |
|  | Result: LEGACY MINUTES |  |
| 12/30/2009 | **AFFIDAVIT OF INDIGENT STATUS** |  |
|  | *AFFIDAVIT OF INDIGENT STATUS; DEFT: A; VER: F* |  |
| 12/30/2009 | **DETERMINATION OF STATUS - INDIGENT** |  |
|  | *DETERMINATION OF STATUS - INDIGENT; DEFT: A; VER: F* |  |
| 12/30/2009 | **DEFENDANT'S INVOCATION OF CONSTITUTIONAL RIGHTS** |  |
|  | *DEFT INVOCATION CONSTITUTIONAL RIGHTS; DEFT: A; VER: F* |  |
| 12/27/2009 | **COMPLAINT & ADVISORY** |  |
|  | *COMPLAINT AND ADVISORY SALE OR DELIVERY OF CRACK COCAINE; DEFT: A; VER: F* |  |
| 12/27/2009 | **ORDER OF PROBABLE CAUSE FOUND** |  |
|  | *ORDER OF PROBABLE CAUSE FOUND; DEFT: A; VER: F* |  |
| 12/27/2009 | **PD APPOINTED WRITTEN PLEA NG BY PD & DEMAND FOR DISCOVERY** |  |
|  | *PUBLIC DEFENDER APPOINTED (INSOLVENCY) - PROVISIONAL; DEFT: A; VER: F* |  |
| 12/27/2009 | **INDIGENT CRIMINAL DEFENSE FEE ASSESSED** |  |
|  | *INDIGENT CRIMINAL DEFENSE FEE ASSESSED $ 50; DEFT: A; VER: N* |  |
| 12/27/2009 | **BOND AMENDED** |  |
|  | *BOND AMENDED TO $ 1000.00; DEFT: A; VER: F* |  |
| 12/27/2009 | **DEMAND FOR DISCOVERY** |  |
|  | *DEMAND FOR DISCOVERY; DEFT: A; VER: N* |  |
| 12/27/2009 | **WRITTEN PLEA NOT GUILTY BY PD** |  |
|  | *WRITTEN PLEA NOT GUILTY-PUBLIC DEFENDER; DEFT: A; VER: N* |  |
| 12/27/2009 | **HEARING**  (8:00 AM) (Judicial Officer JUDGE, DEFAULT CONVERSION) |  |
|  | Result: LEGACY MINUTES |  |

---

## FINANCIAL INFORMATION

DEFENDANT ▮



Court Ordered   *Click Here!*
*Pay Now!*   Fines, Fees, Costs?

| | | |
|---|---|---|
| Total Financial Assessment | | 800.00 |
| Total Payments and Credits | | 303.07 |
| **Balance Due as of 02/04/2020** | | **496.93** |
| 09/16/2010 | Transaction Assessment | 550.00 |
| 09/16/2010 | Transaction Assessment | 100.00 |
| 09/16/2010 | Transaction Assessment | 100.00 |
| 09/16/2010 | Transaction Assessment | 50.00 |
| 09/16/2010 | COUNTER PAYMENT | Receipt # 20350701 | (53.07) |
| 09/16/2010 | COUNTER PAYMENT | Receipt # 20350703 | (100.00) |
| 09/16/2010 | COUNTER PAYMENT | Receipt # 20350705 | (100.00) |
| 09/16/2010 | COUNTER PAYMENT | Receipt # 20350707 | (50.00) |

https://ccmspa.pinellascounty.org/PublicAccess/CaseDetail.aspx?CaseID=▮        2/4/2020

## *Hernando County Online Database Records*
Hernando County OCRS                                                    Page 1 of 4



| Case Number | Filed Date | Case Type | Status | Contested |
|---|---|---|---|---|
| ▓▓▓▓▓ | 11/06/1998 | Felony ▓▓ | CLOSED | NO |

| | Charge Seq # | Description | Date | Phase | Trial |
|---|---|---|---|---|---|
| | 1 | ▓▓▓▓ | 03/18/1999 | Court:Adjudicated Guilty | No Trial |

| Party Name | Party Type | Attorney | Bar ID |
|---|---|---|---|
| SPRINGSTEAD, JACK W | JUDGE | | |
| TOMBRINK, RICHARD JR | JUDGE AT DISPOSITION | | |
| ▓▓▓ Search This Party | DEFENDANT | | |
| ▓▓▓ Search This Party | ALSO KNOWN AS | | |
| ▓▓▓ Search This Party | ALSO KNOWN AS | | |

### Dockets

Page : 1        ALL ▾

| Image | Doc # | Action Date | Description | Pages |
|---|---|---|---|---|
| | | 03/23/2011 | ASSESSED MSB FEE FOR SERVICES 23.93 DUE | |
| | | 03/23/2011 | CASE REFERRED TO MSB COLL AGENCY - CALL (800) 568-7004 | |
| | | 03/23/2011 | COMPLIANCE CONDITIONS UPDATED | |
| | | 03/23/2011 | SENT TO COLLECTION ISSUED- | |
| | | 08/03/2007 | BACKLOG SCAN OF DOCKET ENTRIES PRIOR TO 1/1/07 | |
| | | 03/11/2005 | PAYMENT OF $.23 RECEIVED ON CF17 | |
| | | 03/01/2005 | JUDGMENT WITHOUT FINGERPRINTS BK 17985 PG 1828 | |
| | | 03/01/2005 | SENTENCING GUIDELINE SCORESHEET | |
| | | 03/01/2005 | SENTENCE | |
| | | 03/01/2005 | CHARGES/COSTS/FEES | |
| | | 03/01/2005 | UNIFORM COMMITMENT TO CUSTODY OF DEPT OF CORRECTIONS | |
| | | 03/01/2005 | FINGERPRINTS OF DEF -SEE 98-1043CF | |
| | | 03/01/2005 | AFFIDAVIT OF INDIGENT STATUS | |
| | | 03/01/2005 | ASSESSED FEL PUB DEF FEE $40 40.00 DUE 03/01/2005 | |

https://www.civitekflorida.com/ocrs/app/caseinformation.xhtml?query=QqkNfxfZVcENKf...   2/4/2020

86

Hernando County OCRS                                                            Page 2 of 4



| Image | Doc # | Action Date | Description | Pages |
|-------|-------|-------------|-------------|-------|
| | | 03/01/2005 | CLOSED CASE | |
| | | 03/01/2005 | SENTENCING GUIDELINE SCORESHEET | |
| | | 03/01/2005 | ORDER OF REVOCATION OF PROBATION | |
| | | 03/01/2005 | FINGERPRINTS FILED | |
| | | 03/01/2005 | $ REDUCE TO JUDGMNT | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | 03/01/2005 | CLOSE VOP WARRANT-PL GLTY ADMIT-ADJ GLTY-WAIVE HEAR- | |
| | | 03/01/2005 | DEFENSE ATTY: GONZALEZ, AURELIO A APD ASSIGNED | |
| | | 01/20/2005 | PASCO COUNTY ARREST AFFIDAVIT | |
| | | 01/20/2005 | VOP/VOCC WARRANT RETURNED SERVED 1/20/05 | |
| | | 01/20/2005 | UNSECURE CASE STATUS | |
| | | 01/20/2005 | REOPEN CASE | |
| | | 01/20/2005 | JDG: J SPRINGSTEAD-DEF SIGNED-BOND SET @ NONE | |
| | | 01/20/2005 | VOP ARRAIGNMENT SET FOR 03/01/2005 AT 09:00 IN HCC/D, | |
| | | 01/20/2005 | DEFENSE ATTY: TEMPORARY APPT OF PD ASSIGNED | |
| | | 01/19/2005 | VOP WARRANT ISSUED EXECUTED HERNANDO COUNTY SHERIFFS OFFIC By 591 | |
| | | 01/19/2005 | REOPENED FOR VOP WARRANT | |
| | | 08/17/2004 | LTR FROM DEF REQUESTING COURT DATE FOR VOP | |
| | | 07/19/2004 | AMENDED AFFIDAVIT VIOLATION OF PROBATION | |
| | | 06/24/2004 | JUDGE J SPRINGSTEAD ASSIGNED | |
| | | 06/21/2004 | WARRANT/CAPIAS ISSUED - CASE SECURED | |
| | | 06/21/2004 | VOP WARRANT ISSUED FOR VOP/VOCC (STATE)-BOND: NO BOND | |
| | | 01/04/2000 | MARCH 18, 1999 | |
| | | 01/04/2000 | ORIGINAL TRANSCRIPTS OF CHANGE OF PLEA/SENTENCING DATED | |
| | | 03/18/1999 | JUDGEMENT WITHOUT FINGERPRINTS | |
| | | 03/18/1999 | APOLOGY LETTER-PER P & P CONTRACT | |
| | | | | |
| | | | | |
| | | 03/18/1999 | PT:DEF P-PREV. PL W/DRAWN-PL GLTY-PSI WVD-PDR WVD-ADJ | |
| | | 03/18/1999 | CLOSED CASE | |
| | | | | |
| | | | | |

87

Plaintiffs' Exhibit PX892   p. 88 of 103

Hernando County OCRS                                                      Page 3 of 4

| Image | Doc # | Action Date | Description | Pages |
|-------|-------|-------------|-------------|-------|
| ▮ | | | ▮ | |
| | | 03/18/1999 | ADJUDICATED GUILTY 1 | |
| | | 03/18/1999 | DEFENDANT APPEARED PRES W/ATTY FOR NO TRIAL TRIAL 1 | |
| | | 03/18/1999 | DEFENDANT ENTERED PLEA OF GUILTY 1 | |
| ▮ | | | ▮ | |
| ▮ | | | ▮ | |
| | | 03/18/1999 | WAIVER OF RIGHTS & PLEA AGREEMENT FILED | |
| | | 02/25/1999 | DEF TO HERANDO CO. CRTHOUSE 031899 PRETRL] | |
| | | 02/25/1999 | PETITION/ORDER FOR TRANSFER OF INMATE [HCSO TO DELIVER | |
| | | 02/25/1999 | TOMBRINK | |
| | | 02/25/1999 | PRE TRIAL SET FOR 03/18/1999 AT 09:00 IN HCC/B, JDG: R | |
| | | 02/18/1999 | COUNTY JAIL | |
| | | 02/18/1999 | DEF UNTIL 031899 FOR PRE TRL--PER PD:DEF MAY BE IN PASCO | |
| | | 02/18/1999 | P/TRL: DEF N/P PD PRESENT-SPEEDY TRL WVD CONTD AT REQ OF | |
| | | 02/18/1999 | NTC TO APPEAR ON 031899 FOR PRETRL: MAILED BY CLERK | |
| | | 01/21/1999 | CONTD AT REQUEST OF DEF TIL 021899 FOR PRETRL | |
| | | 01/21/1999 | PRETRL: DEF P--REP BY BOVE,APD--SPEEDY TRIAL WAIVED-- | |
| | | 01/21/1999 | TOMBRINK | |
| | | 01/21/1999 | PRE TRIAL SET FOR 02/18/1999 AT 09:00 IN HCC/B, JDG: R | |
| | | 01/21/1999 | ASSESSED PD APPLIC FEE 40.00 DUE 01/21/1999 | |
| | | 01/21/1999 | NTC TO APPEAR 021899 @9:00 FOR PRETRL SIGNED BY DEF | |
| | | 01/08/1999 | STATES DISCOVERY EXHIBIT | |
| | | 01/05/1999 | LTR TO JUDGE TOMBRINK FROM DEF | |
| | | 12/28/1998 | DEFENSE ATTY: BOVE, CHRIS APD ASSIGNED | |
| | | 12/10/1998 | NOTICE OF DISCOVERY | |
| | | 12/08/1998 | PL NG: CONTD AT REQUEST OF DEF TIL 012199 FOR PRETRL | |
| | | 12/08/1998 | ARRN: DEF P--REP BY BOVE,APD--WAIVED READING OF INFO-- | |
| | | 12/08/1998 | TOMBRINK | |
| | | 12/08/1998 | PRE TRIAL SET FOR 01/21/1999 AT 09:00 IN HCC/B, JDG: R | |
| | | 12/08/1998 | NOTICE TO APPEAR 012199 PRETRL:SIGN BY DEF | |
| | | 12/01/1998 | PROSECUTOR: KLAPKA, NICOLE A SCHELL ASSIGNED | |
| | | 11/24/1998 | INFORMATION FILED ON GRAND THEFT OF FIREARMS | |
| | | 11/24/1998 | FILED 1 | |
| | | 11/10/1998 | DEFENSE ATTY: APPTD PUBLIC DEF ASSIGNED | |
| | | 11/06/1998 | NOTICE TO APPEAR 120898 ARRAIGN TO DEF:MAIL BY CLERK | |

Plaintiffs' Exhibit PX892   p. 89 of 103

Hernando County OCRS                                                Page 4 of 4

| Image | Doc # | Action Date | Description | Pages |
|-------|-------|-------------|-------------|-------|
| | | 11/06/1998 | APPTED PD-RET 120898 ARRAIGN | |
| | | 11/06/1998 | ▓▓▓▓▓▓▓▓-1ST APPEAR-BOND SET @ $2000.00- | |
| | | 11/06/1998 | ARRESTING OFFICERS AFFIDAVIT/BOOKING REPORT FILED | |
| | | 11/06/1998 | JUDGE R TOMBRINK ASSIGNED | |
| | | 11/06/1998 | CASE FILED WITH CLERK | |
| | | 11/02/1998 | R TOMBRINK | |
| | | 11/02/1998 | ARRAIGNMENT SET FOR 12/08/1998 AT 09:00 IN HCC/B, JDG: | |

Judge Assignment History ☐

Court Events ☐

Sentences ☐

| Seq : 1 | Sentence | Status | Date Imposed | Date Effective | Judge At Sentence |
|---------|----------|--------|--------------|----------------|-------------------|
| | ██████ | ████ | ████ | ████ | ██████ |
| | Money Imposed | Concurrent | 03/01/2005 | 03/01/2005 | TOMBRINK, RICHARD JR |

Financial Summary ☐

| Financial Summary | | |
|---|---|---|
| Assessment | Total: $103.93 | Paid to Date: $0.23 | Balance Due: $103.70 |
| Restitution | Total: $0.00 | Paid to Date: $0.00 | Balance Due: $0.00 |

| Financial Details | | | | | |
|---|---|---|---|---|---|
| Count | Assessment Due | Assessment Paid to Date | Restitution Due | Restitution Paid to Date | Last Payment Date |
| | $103.93 | $0.23 | $0.00 | $0.00 | - |

Reopen History ☐

** Pursuant to Florida Statutes and Florida Rules of Court Procedure, records that have been designated as expunged, sealed or confidential may not be available through this service. For additional information on specific records please contact the Clerk of Court.

https://www.civitekflorida.com/ocrs/app/caseinformation.xhtml?query=QqkNfxfZVcENKf...   2/4/2020

Plaintiffs' Exhibit PX892   p. 90 of 103

Hernando County OCRS                                                    Page 1 of 4



| | | | | |
|---|---|---|---|---|

New Search   Expand All

| Case Number | Filed Date | Case Type | Status | Contested |
|---|---|---|---|---|
| ████ | 05/15/2006 | Felony ██ | CLOSED | NO |

| | Charge Seq # | Description | Date | Phase | Trial |
|---|---|---|---|---|---|
| | 1 | ████ | 09/28/2006 | Court:Adjudicated Guilty | No Trial |

| Party Name | Party Type | Attorney | Bar ID |
|---|---|---|---|
| RUSHING, STEPHEN O | JUDGE | | |
| RUSHING, STEPHEN O | JUDGE AT DISPOSITION | | |
| ████ Search This Party | ALSO KNOWN AS | | |
| ████ Search This Party | ALSO KNOWN AS | | |
| ████ Search This Party | DEFENDANT | | |
| ████ Search This Party | ALSO KNOWN AS | | |

**Dockets**

Page : 1     [ALL ▾]

| Image | Doc # | Action Date | Description | Pages |
|---|---|---|---|---|
| | | 05/13/2014 | Payment received: $76.92 Receipt Number H 290843 | |
| | | 05/13/2014 | Assessment 2 Total Assessed $708.00 Balance Remaining $671.08 | |
| | | 05/13/2014 | Assessment 1 Total Assessed $40.00 Balance Remaining $0.00 | |
| | | 05/13/2014 | PAYMENT POSTED 5/13/2014 | |
| | | 05/05/2014 | MADE PARTIAL PAYMENT THRU MSB | |
| | | 09/30/2009 | ASSESSED MSB FEE FOR SERVICES 266.40 DUE | |
| | | 09/30/2009 | CASE REFERRED TO MSB COLL AGENCY - CALL (800) 568-7004 | |
| | | 09/30/2009 | COMPLIANCE CONDITIONS UPDATED | |
| | | 09/30/2009 | SENT TO COLLECTION ISSUED- | |
| | | 02/08/2007 | BACKLOG SCAN OF DOCKET ENTRIES PRIOR TO 1/1/07 | |
| | | 10/20/2006 | ORDER OF REVOCATION OF PROBATION | |
| | | 09/28/2006 | | |

Hernando County OCRS                                                    Page 2 of 4

| Image | Doc # | Action Date | Description | Pages |
|-------|-------|-------------|-------------|-------|
| | | | ORD ASSESS,FEES,COSTS,FINES/ENTER JUDGMNT[BK2337 PG135 | |
| | | 09/28/2006 | JUDGMENT WITH FINGERPRINTS (BK:2336 PG:1925) | |
| | | 09/28/2006 | COURT ORDER REPORT OF DISPOSITION | |
| | | 09/28/2006 | CLOSED CASE | |
| | | 09/28/2006 | SENTENCING GUIDELINE SCORESHEET | |
| | | 09/28/2006 | DISCOVERY TESTING | |
| | | 09/28/2006 | SENTENCE–DNA TEST–REDUCE TO JDGMNT–DEF WAIVES DNA | |
| | | 09/28/2006 | PLEA: ADMIT–WAIVE VOP HRG–CONCUR W/ANY OTHER | |
| | ▆▆▆ | ▆▆▆ | ▆▆▆▆▆▆ | |
| | ▆▆▆ | ▆▆▆ | ▆▆▆▆▆▆▆ | |
| | ▆▆▆ | ▆▆▆ | ▆▆▆▆ | |
| | ▆▆▆ | ▆▆▆ | ▆▆▆▆▆▆▆ | |
| | ▆▆▆ | ▆▆▆ | ▆▆▆▆▆ | |
| | | 09/28/2006 | CLOSED FOR OTHER REASON | |
| | | 08/31/2006 | HCC / E JDG: STEPHEN RUSHING | |
| | | 08/31/2006 | VOP STATUS CHECK SET FOR 9/28/2006 AT 09:00 IN | |
| | | 08/31/2006 | DEFENDANT NOTICED IN OPEN COURT | |
| | | 08/31/2006 | DEFENDANT PRESENT | |
| | | 08/01/2006 | AFFIDAVIT OF INDIGENT STATUS | |
| | | 08/01/2006 | ASSESSED FEL PUB DEF FEE $40 40.00 DUE 08/08/2006 | |
| | | 08/01/2006 | VIOLATION PLEA DENY | |
| | | 08/01/2006 | / E JDG: STEPHEN RUSHING | |
| | | 08/01/2006 | HCC | |
| | | 08/01/2006 | STATUS CHECK VOP SET FOR 08/31/2006 AT 09:00 IN | |
| | | 08/01/2006 | APD | |
| | | 08/01/2006 | PUBLIC DEFENDER APPOINTED - GONZALEZ, AURELIO A | |
| | | 08/01/2006 | DEFENDANT NOTICED IN OPEN COURT | |
| | | 08/01/2006 | DEFENSE ATTY: GONZALEZ, AURELIO A APD ASSIGNED | |
| | | 08/01/2006 | PROSECUTOR: WELLS, MARLENE ASSIGNED | |
| | | 08/01/2006 | DEFENDANT PRESENT | |
| | | 07/21/2006 | PAYABLE TO WF & PF | |
| | | 07/21/2006 | THE OFFENSE (VICTIMS OUT OF POCKET EXPENSES ONLY MJ) | |
| | | 07/21/2006 | AMENDED RESTITUTION ORDER $516.83 FOR DAMANGES FROM | |
| | | 07/05/2006 | INFORMATION PURPOSE ONLY | |
| | ▆▆▆ | ▆▆▆ | ▆▆▆▆▆▆▆ | |
| | | 07/05/2006 | PURPOSES ONLY | |
| | | 07/05/2006 | VOP/VOCC WARRANT FOR PC ARREST FOR INFORMATION | |
| | | 06/27/2006 | AFFIDAVIT OF INDIGENT STATUS-INCOMPLETE/UNSIGNED | |
| | | 06/27/2006 | 8/1/06–DEF SIGNED | |

91

Plaintiffs' Exhibit PX892   p. 92 of 103

| Image | Doc # | Action Date | Description | Pages |
|---|---|---|---|---|
| | | 06/27/2006 | 1ST APPEARANCE-BOND SET NO BOND--WILL HIRE ATTY--RET | |
| | | 06/27/2006 | P C ARREST AFFIDAVIT/BOOKING REPORT FILED ON VOP | |
| | | 06/27/2006 | JDG: STEPHEN RUSHING--DEF SIGNED | |
| | | 06/27/2006 | VOP ARRAIGNMENT SET FOR 08/01/2006 AT 09:00 IN HCC/E, | |
| | | 06/27/2006 | REOPENED FOR OTHER REASON | |
| | | 06/27/2006 | DEFENSE ATTY: NO ATTORNEY AT THIS TIME ASSIGNED | |
| | | 06/27/2006 | JUDGE STEPHEN RUSHING ASSIGNED | |
| | | 06/19/2006 | ORD ASSESS,FEES,COSTS,FINES/ENTER JUDGMENT(IF INDICATE)TO BE RECORDED | |
| | | 06/15/2006 | ASSESSMENT REDUCED TO JUDGMENT/LIEN | |
| | | 06/15/2006 | STANDARD CONDITIONS OF SUPERVISION | |
| | | 06/15/2006 | ASSESSED PUBLIC DEF LIEN 100.00 DUE 06/14/2008 | |
| | | 06/15/2006 | ASSESSED FELONY W/H OR PTI 708.00 DUE 06/14/2008 | |
| | | 06/15/2006 | CLOSED CASE | |
| | | 06/15/2006 | SENTENCING GUIDELINE SCORESHEET | |
| | | 06/15/2006 | WAIVER OF RIGHTS & PLEA AGREEMENT | |
| | | 06/15/2006 | ACKNOWLEDGMENT REGARDING AMOUNT OF CREDIT TIME SERVED | |
| | | 06/15/2006 | CO HOLD-VOP(MM) | |
| | | 06/15/2006 | JUDGMENT LIEN (VICTIM'S OUT OF POCKET)--DEF HAS SUMTER | |
| | | 06/15/2006 | CASE--ALL F/C/F $848--BALANCE OF RESTIT IN INS.CO. AS | |
| | | 06/15/2006 | RESERVE--TERM-ALL CONDITIONS MET--RELEASE TODAY THIS | |
| | | 06/15/2006 | ███████████████████RESTITUTION TBD- | |
| | | 06/15/2006 | ████████████████████ | |
| | | 06/15/2006 | DEFENDANT SENTENCED AS FOLLOWS: - CNT 1 | |
| | | 06/15/2006 | ADJUDICATION WITHHELD 1 | |
| | | 06/15/2006 | DEFENDANT APPEARED PRES W/ATTY FOR NO TRIAL TRIAL 1 | |
| | | 06/15/2006 | DEFENDANT ENTERED PLEA OF GUILTY 1 | |
| | | 06/15/2006 | DEFENSE ATTY: BAUER, DAVID APD ASSIGNED | |
| | | 06/08/2006 | INFORMATION FILED CT 1 | |
| | | 06/08/2006 | PROSECUTOR: LEWIS, D ROBERT ASSIGNED | |
| | | 05/17/2006 | J SPRINGSTEAD-DEF SIGNED | |
| | | 05/17/2006 | ARRAIGNMENT SET FOR 06/15/2006 AT 09:00 IN HCC/D, JDG: | |
| | | 05/17/2006 | DEFENSE ATTY: APPTD PUBLIC DEF ASSIGNED | |
| | | 05/17/2006 | JUDGE J SPRINGSTEAD ASSIGNED | |
| | | 05/15/2006 | AFFIDAVIT OF INDIGENT STATUS | |
| | | 05/15/2006 | ASSESSED FEL PUB DEF FEE $40 40.00 DUE 05/22/2006 | |
| | | 05/15/2006 | CASE FILED WITH CLERK | |
| | | 05/13/2006 | ARREST 1-BOND CT1 $5000 | |

| Judge Assignment History | ☐ |
|---|---|

Plaintiffs' Exhibit PX892   p. 93 of 103

Hernando County OCRS

Page 4 of 4



Court Events

Sentences

| Seq : 1 | Sentence | Status | Date Imposed | Date Effective | Judge At Sentence |
|---|---|---|---|---|---|
| | ████ | Not Applicable | 09/28/2006 | 09/28/2006 | RUSHING, STEPHEN O |
| | ████ | Not Applicable | 09/28/2006 | 09/28/2006 | RUSHING, STEPHEN O |
| | Money Imposed | Not Applicable | 09/28/2006 | 09/28/2006 | RUSHING, STEPHEN O |

Financial Summary

| Financial Summary | | | |
|---|---|---|---|
| Assessment | Total: $888.00 | Paid to Date: $76.92 | Balance Due: $811.08 |
| Restitution | Total: $0.00 | Paid to Date: $0.00 | Balance Due: $0.00 |

| Financial Details | | | | | |
|---|---|---|---|---|---|
| Count | Assessment Due | Assessment Paid to Date | Restitution Due | Restitution Paid to Date | Last Payment Date |
| | $888.00 | $76.92 | $0.00 | $0.00 | - |

Reopen History

** Pursuant to Florida Statutes and Florida Rules of Court Procedure, records that have been designated as expunged, sealed or confidential may not be available through this service. For additional information on specific records please contact the Clerk of Court.

Plaintiffs' Exhibit PX892   p. 94 of 103

## Traci Burch

**Employment**

- Associate Professor, Northwestern University Department of Political Science (2014-Present)

- Research Professor, American Bar Foundation (2007- Present)

- Assistant Professor, Northwestern University Department of Political Science (2007-2014)

**Education**

- *Harvard University*
    Ph.D. in Government and Social Policy
    Dissertation: *Punishment and Participation: How Criminal Convictions Threaten American Democracy*
  Committee: Jennifer Hochschild (Chair), Sidney Verba, and Gary King

- *Princeton University*
    A.B. in Politics, *magna cum laude*

**Publications**

- Kay Lehman Schlozman, Philip Edward Jones, Hye Young You, Traci Burch, Sidney Verba, Henry E. Brady.  2018.  "Organizations and the Democratic Representation of Interests: What Happens When Those Organizations Have No Members?" *Perspectives on Politics.*

- Burch, Traci.  2016. "Political Equality and the Criminal Justice System." In <u>Resources, Engagement, and Recruitment</u>. Casey Klofstad, ed.  Philadelphia: Temple University Press.

- Burch, Traci.  2016.  "Review of <u>The First Civil Right</u> by Naomi Murakawa." *The Forum.*

- Kay Lehman Schlozman, Philip Edward Jones, Hye Young You, Traci Burch, Sidney Verba, Henry E. Brady.  2015.  "Louder Chorus – Same Accent: The Representation of Interests in Pressure Politics, 1981-2011." In  Darren Halpin, David Lowery, Virginia Gray, eds. <u>The Organization Ecology of Interest Communities</u>.  New York: Palgrave Macmillan.

- Burch, Traci.  2015.  "Skin Color and the Criminal Justice System: Beyond Black-White Disparities in Criminal Sentencing." *Journal of Empirical Legal Studies* 12(3): 395-420.

94

- Burch, Traci.  2014.  "The Old Jim Crow: Racial Residential Segregation and Neighborhood Imprisonment."  *Law & Policy* 36(3) 223-255.

- Burch, Traci.  2014.  "The Effects of Imprisonment and Community Supervision on Political Participation."  Detaining Democracy Special Issue.  *The Annals of the American Academy of Political and Social Science* 651 (1) 184-201.

- Burch, Traci.  2013.  Trading Democracy for Justice: Criminal Convictions and the Decline of Neighborhood Political Participation.  Chicago: University of Chicago Press.

- Hochschild, Jennifer, Vesla Weaver, and Traci Burch.  2012.  Transforming the American Racial Order.  Princeton: Princeton University Press.

- Schlozman, Kay Lehman, Sidney Verba, Henry Brady, Traci Burch, and Phillip Jones. 2012.  "Who Sings in the Heavenly Chorus?  The Shape of the Organized Interest System." In Schlozman, Kay Lehman, Sidney Verba, and Henry Brady, The Unheavenly Chorus, Princeton: Princeton University Press.

- Schlozman, Kay Lehman, Sidney Verba, Henry Brady, Phillip Jones, and Traci Burch. 2012.  "Political Voice through Organized Interest Activity."  In Schlozman, Kay Lehman, Sidney Verba, and Henry Brady, The Unheavenly Chorus, Princeton: Princeton University Press.

- Burch, Traci.  2012.  "Did Disfranchisement Laws Help Elect President Bush?  New Evidence on the Turnout and Party Registration of Florida's Ex-Felons."  *Political Behavior* 34 (1); 1-26.

- Burch, Traci.  2011.  "Turnout and Party Registration among Criminal Offenders in the 2008 General Election."  *Law and Society Review* 45(3): 699-730.

- Burch, Traci.  2011.  "Fixing the Broken System of Financial Sanctions."  *Criminology and Public Policy* 10(3).

- Hochschild, Jennifer; Vesla Weaver, and Traci Burch.  2011.  "Destabilizing the American Racial Order."  *Daedalus* 140; 151-165.

- Burch, Traci.  2009.  "Can the New Commander-In-Chief Sustain His All Volunteer Standing Army?"  *The Dubois Review on Race* 6(1).

- Burch, Traci. 2009. "Review of *Imprisoning Communities,* by Todd Clear."  *Law and Society Review* 43(3) 716-18.

95

- Burch, Traci. 2009. "American Politics and the Not-So-Benign Neglect of Criminal Justice," in <u>The Future of American Politics</u>, ed. Gary King, Kay Schlozman, and Norman Nie. (New York: Routledge).

- Schlozman, Kay Lehman and Traci Burch. 2009. "Political Voice in an Age of Inequality," in <u>America at Risk: Threats to Liberal Self-Government in an Age of Uncertainty</u>, ed. Robert Faulkner and Susan Shell (Ann Arbor: University of Michigan Press).

- Hochschild, Jennifer and Traci Burch. 2007. "Contingent Public Policies and the Stability of Racial Hierarchy: Lessons from Immigration and Census Policy," in <u>Political Contingency: Studying the Unexpected, the Accidental, and the Unforeseen</u>, ed. Ian Shapiro and Sonu Bedi (New York: NYU Press).

**Honors and Fellowships**

- **American Political Science Association 2014 Ralph J. Bunche Award (for <u>Trading Democracy for Justice</u>).**

- American Political Science Association Urban Section 2014 Best Book Award (for <u>Trading Democracy for Justice</u>).

- American Political Science Association Law and Courts Section 2014 C. Herman Pritchett Award (for <u>Trading Democracy for Justice</u>).

- Research grant, Stanford University Center for Poverty and Inequality (2012).

- American Political Science Association E. E. Schattschneider Award for the best doctoral dissertation in the field of American Government (2009)

- American Political Science Association William Anderson Award for the best doctoral dissertation in the field of state and local politics, federalism, or intergovernmental relations (2008)

- American Political Science Association Urban Section Best Dissertation in Urban Politics Award (2008)

- Harvard University Robert Noxon Toppan Prize for the best dissertation in political science (2007)

- Institute for Quantitative Social Sciences Research Fellowship (2006-07)

Plaintiffs' Exhibit PX892   p. 97 of 103

- *European Network on Inequality* Fellowship (2005)

- Research Fellowship, The Sentencing Project (2005)

- Doctoral Fellow, Malcolm Weiner Center for Inequality and Social Policy (2004-07)

**Professional Service**
- General Social Survey Board of Overseers (2020-2025)

- APSA Kammerer Prize Committee (2017)

- Associate Editor, *Political Behavior* (2015-2019)

- APSA Law and Courts Section, Lifetime Achievement Award Prize Committee (2014-2015)

- Law and Society Association, Kalven Prize Committee (2013-2014)

- American Political Science Association, Urban Politics Section Dissertation Prize Committee(2012-13)

- American Political Science Association, Urban Politics Section Executive Committee (2012-13)

- Law and Society Association Diversity Committee, (2012-2013)

- American Political Science Association, Urban Politics Section Program Co-Chair (2011)

- Associate Editor, *Law and Social Inquiry*

- American Political Science Association, Urban Politics Section Book Prize Committee (2009)

- Reviewer for *The American Political Science Review, Public Opinion Quarterly, American Politics Research, and Time-Sharing Experiments in the Social Sciences.*

**Presentations and Invited Talks**

- Pennsylvania State University, State College, PA.  "Effect of Officer Involved Killings on Protest.  November 2019.

- Princeton University. Princeton NJ.  "Effects of Police Shootings on Protest among Young

97

Blacks." November 2019.

- Missouri Fellows of the American Bar Foundation. Branson, MO. Police Shootings and Political Participation in Chicago. September 2019.

- Northwestern University. "Police Shootings and Political Participation." November, 2018.

- Princeton University. Princeton, NJ. "Police Shootings and Political Participation." September, 2018.

- University of California at Los Angeles. Los Angeles, CA. "Police Shootings and Political Participation." August, 2018.

- American Bar Association Annual Meeting. Chicago, IL. "Police Shootings and Political Participation." August 2018.

- American Bar Endowment Annual Meeting. Lexington, KY. "Effects of Police Shooting in Chicago on Political Participation." June 2018.

- Vanderbilt University. "Effects of Police Shootings in Chicago on Political Participation." April 2018.

- Washington University in St. Louis. "Effects of Pedestrian and Auto Stops on Voter Turnout in St. Louis." February 2018.

- Fellows of the American Bar Foundation, Los Angeles. "Assaulting Democracy." January 2018.

- Northwestern University Reviving American Democracy Conference. Panel presentation. "Barriers to Voting." January 2018.

- University of Illinois at Chicago. "Effects of Police Shootings in Chicago on Political Participation." October, 2017.

- Chico State University. "Constitution Day Address: Policing and Political Participation." September, 2017.

- Fellows of the American Bar Foundation, Atlanta, Georgia. "Policing in Georgia." May 2017.

- United States Commission on Civil Rights. Testimony. "Collateral Consequences of Mass

Plaintiffs' Exhibit PX892   p. 99 of 103

Incarceration." May 2017.

- Northwestern University Pritzker School of Law. "Effects of Police Stops of Cars and Pedestrians on Voter Turnout in St. Louis." April 2017.

- University of California at Los Angeles. Race and Ethnic Politics Workshop. "Effects of Police Stops of Cars and Pedestrians on Voter Turnout in St. Louis." March 2017.

- University of North Carolina at Chapel Hill. American Politics Workshop. "Effects of Police Stops of Cars and Pedestrians on Voter Turnout in St. Louis." February 2017.

- National Bar Association, St. Louis MO. "Political Effects of Mass Incarceration." July 2016.

- Harvard University, Edmond J. Safra Center for Ethics. Inequalities/Equalities in Cities Workshop. April 2016.

- American Political Science Association Annual Meeting. September 2015. "Responsibility for Racial Justice." Discussant.

- St. Olaf College. April 2015. "The Collateral Consequences of Mass Incarceration."

- Northwestern University. Institute for Policy Research. February 2015. "The Civic ~~Culture~~ Structure."

- Texas A&M University. Race, Ethnicity, and Politics Workshop. September 2014. "Trading Democracy for Justice."

- Columbia University Teachers College. The Suburban Promise of Brown Conference. May 2014. "Can We All Get Along, Revisited: Racial Attitudes, the Tolerance for Diversity, and the Prospects for Integration in the 21st Century."

- University of Kentucky. Reversing Trajectories: Incarceration, Violence, and Political Consequences Conference. April 2014. "Trading Democracy for Justice."

- University of Chicago. American Politics Workshop. March 2014. "How Geographic Differences in Neighborhood Civic Capacity Affect Voter Turnout."

- Kennedy School of Government, Harvard University. February 2014. "Trading Democracy for Justice.

99

- University of Michigan.  American Politics Workshop.  December 2013.  "Trading Democracy for Justice."

- Yale University.  American Politics and Public Policy Workshop.  September 2013.  "Trading Democracy for Justice."

- American Political Science Association Annual Meeting.  August 2013.  "The Heavenly Chorus Is Even Louder: The Growth and Changing Composition of the Washington Pressure System." With Kay Lehman Schlozman, Sidney Verba, Henry Brady, and Phillip Jones.

- National Bar Association, Miami Florida, July 2013.  "The Collateral Consequences of Mass Imprisonment."

- Loyola University.  American Politics Workshop.  December 2012.  "Mass Imprisonment and Neighborhood Voter Turnout."

- Marquette University School of Law.  November 2012.  "The Collateral Consequences of Mass Imprisonment."

- Yale University.  Detaining Democracy Conference.  November 2012.  "The Effects of Imprisonment and Community Supervision on Political Participation."

- Brown University.  American Politics Workshop.  October 2012.  "Mass Imprisonment and Neighborhood Voter Turnout."

- American Bar Association National Meeting, August 2012.   "Mass Imprisonment: Consequences for Society and Politics."

- University of Madison-Wisconsin.  American Politics Workshop. March 2012.  "The Spatial Concentration of Imprisonment and Racial Political Inequality."

- American Political Science Association Annual Meeting.  2011.   **"Theme Panel: How Can Political Science Help Us Understand the Politics of Decarceration?"**

- University of Pennsylvania.  Democracy, Citizenship, and Constitutionalism Conference.  April, 2011.  "Vicarious Imprisonment and Neighborhood Political Inequality."

- University of Chicago School of Law. Public Laws Colloquium. Chicago, IL. November, 2010. ""The Effects of Neighborhood Incarceration Rates on Individual Political Efficacy and Perceptions of Discrimination."

Plaintiffs' Exhibit PX892   p. 101 of 103

- Pomona College.  November, 2010.  "Incarceration Nation."

- University of Washington.  Surveying Social Marginality Workshop.  October 2010.  "Using Government Data to Study Current and Former Felons."

- American Bar Foundation, Chicago, IL, September 2010.  "The Effects of Neighborhood Incarceration Rates on Individual Political Attitudes."

- Northwestern University.  Chicago Area Behavior Conference. May 2010. "Trading Democracy for Justice: The Spillover Effects of Incarceration on Voter Turnout in Charlotte and Atlanta."

- Annual Meeting of the Law and Society Association, Chicago, IL, May 2010.  "Neighborhood Criminal Justice Involvement and Voter Turnout in the 2008 General Election."

- Annual Meeting of the Southern Political Science Association, Atlanta, GA, January 2010.  "The Art and Science of Voter Mobilization: Grassroots Perspectives on Registration and GOTV from Charlotte, Atlanta, and Chicago."

- University of Illinois at Chicago.  Institute for Government and Public Affairs.  November 2009.  "Turnout and Party Registration among Convicted Offenders during the 2008 Presidential Election."

- Annual Meeting of the American Political Science Association, Toronto, Ontario, Canada, September 2009.  "'I Wanted to Vote for History:' Turnout and Party Registration among Convicted Offenders during the 2008 Presidential Election."

- Harris School of Public Policy, University of Chicago. American Politics Workshop.  December 2008.  "Trading Democracy for Justice?  The Spillover Effects of Imprisonment on Neighborhood Voter Participation."

- Northwestern University School of Law.  Law and Political Economy Colloquium.  November 2008.  "Did Disfranchisement Laws Help Elect President Bush?  New Evidence on the Turnout Rates and Candidate Preferences of Florida's Ex-Felons."

- University of California, Berkeley.  Center for the Study of Law and Society. October 2008.  "Trading Democracy for Justice?  The Spillover Effects of Imprisonment on Neighborhood Voter Participation."

- Law and Society Association Annual Meeting, Montreal, Canada, May 2008.  "Did Disfranchisement Laws Help Elect President Bush?  New Evidence on the Turnout Rates and Candidate Preferences of Florida's Ex-Felons."

101

Plaintiffs' Exhibit PX892    p. 102 of 103

- Law and Society Association Annual Meeting, Montreal, Canada, May 2008. "Trading Democracy for Justice? The Spillover Effects of Imprisonment on Neighborhood Voter Participation."

- Midwest Political Science Association Conference, Chicago, IL, April 2007.  Paper: "Concentrated Incarceration: How Neighborhood Incarceration Decreases Voter Registration."

**Works in Progress**

- Burch, Traci.  "Effects of Pedestrian and Auto Checks on Voter Turnout in St. Louis."

- Burch, Traci. "Effects of Police Shootings on Political Participation in Chicago."

- Burch, Traci. "Which Black Lives Matter? Agenda Setting and Police Violence"

- Burch, Traci.  "Exploring the effects of Police Misconduct on Political Participation at the Local Level"

- Burch, Traci.  "How Common is Policing for Profit? Examining City Revenues from Fines, Forfeitures, and Fees."

- Burch, Traci.   "Vicarious Imprisonment and Political Inequality: How the Spatial Concentration of Imprisonment Shapes Black Voter Turnout."  Chapter in edited volume at University of Pennsylvania Press.  Book manuscript under review.

- Burch, Traci.  "The Civic ~~Culture~~ Structure: Neighborhood Organizational Presence and Voter Turnout"

102

Plaintiffs' Exhibit PX892   p. 103 of 103