**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

KELVIN LEON JONES et al.,

       Plaintiffs,

                              CONSOLIDATED

v.                              CASE NO.  4:19cv300-RH/MJF

RON DeSANTIS et al.,

       Defendants.

_____/

## OPINION ON THE MERITS

The State of Florida has adopted a system under which nearly a million otherwise-eligible citizens will be allowed to vote only if they pay an amount of money. Most of the citizens lack the financial resources to make the required payment. Many do not know, and some will not be able to find out, how much they must pay. For most, the required payment will consist only of charges the State imposed to fund government operations—taxes in substance though not in name.

The State is on pace to complete its initial screening of the citizens by 2026, or perhaps later, and only then will have an initial opinion about which citizens must pay, and how much they must pay, to be allowed to vote. In the meantime,

year after year, federal and state elections will pass. The uncertainty will cause some citizens who are eligible to vote, even on the State's own view of the law, not to vote, lest they risk criminal prosecution.

This pay-to-vote system would be universally decried as unconstitutional but for one thing: each citizen at issue was convicted, at some point in the past, of a felony offense. A state may disenfranchise felons and impose conditions on their reenfranchisement. But the conditions must pass constitutional scrutiny. Whatever might be said of a rationally constructed system, this one falls short in substantial respects.

The United States Court of Appeals for the Eleventh Circuit has already ruled, in affirming a preliminary injunction in this very case, that the State cannot condition voting on payment of an amount a person is genuinely unable to pay. *See Jones v. Governor of Fla.*, 950 F.3d 795 (11th Cir. 2020). Now, after a full trial on the merits, the plaintiffs' evidence has grown stronger. This order holds that the State *can* condition voting on payment of fines and restitution that a person is able to pay but *cannot* condition voting on payment of amounts a person is unable to pay or on payment of taxes, even those labeled fees or costs. This order puts in place administrative procedures that comport with the Constitution and are less burdensome, on both the State and the citizens, than those the State is currently using to administer the unconstitutional pay-to-vote system.

## I. The Consolidated Cases

These are five consolidated cases. The plaintiffs assert the requirement to pay to vote is unconstitutional across the board or alternatively as applied to those who are unable to pay the amount at issue. There are differences from one case to another in the plaintiffs' legal theories and in the named defendants. All the defendants are named only in their official capacities.

In No. 4:19cv301, the plaintiffs are Bonnie Raysor, Diane Sherrill, and Lee Hoffman, individually and on behalf of a class and subclass. The defendants are the Florida Secretary of State and, under a consented amendment,[1] the Hillsborough County Supervisor of Elections. These plaintiffs assert the pay-to-vote system violates the Twenty-Fourth Amendment, which prohibits a state from denying or abridging the right to vote in a federal election by reason of failure to pay "any poll tax or other tax." On this claim the plaintiffs represent a class of all persons who would be eligible to vote in Florida but for unpaid financial obligations, with this exception: named plaintiffs in the other consolidated cases are excluded from the class.

These plaintiffs also assert the pay-to-vote system discriminates against citizens who are unable to pay and thus violates the Equal Protection Clause. On this claim the plaintiffs represent a subclass of all persons who would be eligible to

---

[1] *See* ECF No. 18 in 4:19cv301.

vote in Florida but for unpaid financial obligations that the person asserts the person is genuinely unable to pay, again excluding other named plaintiffs.

Finally, these plaintiffs assert, but not on behalf of a class, that the pay-to-vote system is void for vagueness, denies procedural due process, and violates the National Voter Registration Act, 52 U.S.C. § 20501 et seq.

In No. 4:19cv302, the plaintiffs are 12 individuals and 3 organizations. The individuals are Jeff Gruver, Emory Marquis Mitchell, Betty Riddle, Karen Leicht, Keith Ivey, Kristopher Wrench, Raquel L. Wright, Steven Phalen, Jermaine Miller, Clifford Tyson, Latoya A. Moreland, and Curtis D. Bryant. The organizations are the League of Women Voters of Florida, the Florida State Conference of the NAACP, and the Orange County Branch of the NAACP. The defendants are the Secretary of State and the Supervisors of Elections of Alachua, Broward, Duval, Hillsborough, Indian River, Leon, Manantee, Miami-Dade, Orange, and Sarasota Counties.

These plaintiffs assert the pay-to-vote system discriminates against citizens who are unable to pay in violation of the Due Process and Equal Protection Clauses. They assert the State has failed to provide uniform guidance and that the pay-to-vote system thus is being applied inconsistently in different counties, violating the principle established by *Bush v. Gore*, 531 U.S. 98 (2000). The plaintiffs assert the pay-to-vote system violates the Fourteenth Amendment

because determining the amount that must be paid to vote imposes an unwarranted burden on potential voters. The plaintiffs assert the pay-to-vote system imposes an unconstitutional "poll tax or other tax," is unconstitutionally vague, denies procedural due process, unduly burdens political speech and associational rights in violation of the First Amendment, is racially discriminatory, and violates the National Voter Registration Act. The plaintiffs originally asserted, but now have abandoned, a claim under the Ex Post Facto Clause.

In No. 4:19cv304, the plaintiffs are Rosemary Osborne McCoy and Sheila Singleton. The defendants are the Governor of Florida, the Secretary of State, and the Duval County Supervisor of Elections. The plaintiffs assert the pay-to-vote system discriminates against citizens who are unable to pay in violation of the Equal Protection Clause. They assert the system violates the Twenty-Fourth Amendment, discriminates based on gender, denies procedural due process, is void for vagueness, and violates the Eighth Amendment's ban on excessive fines.

In No. 4:19cv272, the plaintiff is Luis Mendez. In No. 4:19cv300, the plaintiff is Kelvin Leon Jones. In both cases, the defendants are the Governor, the Secretary of State, and the Hillsborough County Supervisor of Elections. Mr. Mendez and Mr. Jones have not participated since early in the litigation and did not appear at trial. This order dismisses their claims without prejudice and, as the State

agreed on the record would be proper, restores them to the plaintiff class and subclass.[2]

The Governor and Secretary of State are the defendants who speak for the State of Florida in this litigation. They have consistently taken the same positions. For convenience, this order sometimes refers to them collectively as "the State."

The cases were originally consolidated for case-management purposes, but they have now been tried together. This order consolidates the cases for all purposes, sets out the court's findings of fact and conclusions of law, enters an injunction, and directs the entry of judgment.

## II. Disenfranchisement, Amendment 4, and SB7066

Beginning in 1838, Florida's Constitution allowed the Legislature to disenfranchise felons.[3] The Legislature enacted a disenfranchisement provision at least as early as 1845.[4]

A state's authority to do this is beyond question. In *Richardson v. Ramirez*, 418 U.S. 24 (1974), the Supreme Court read an apportionment provision in section 2 of the Fourteenth Amendment as authority for states to disenfranchise felons. As Justice O'Connor, speaking for the Ninth Circuit, later said, "it is not obvious"

---

[2] *See* Trial Tr., ECF No. 417 at 39.

[3] *See Johnson v. Governor of Fla.*, 405 F.3d 1214, 1218 (11th Cir. 2005).

[4] *Id.*

how the section 2 apportionment provision leads to this result. *Harvey v. Brewer*, 605 F.3d 1067, 1072 (9th Cir. 2010). But one way or the other, *Richardson* is the law of the land.

Recognizing this, in *Johnson v. Governor of Florida*, 405 F.3d 1214 (11th Cir. 2005) (en banc), the court explicitly upheld Florida's then-existing disenfranchisement provisions. The bottom line: Florida's longstanding practice of denying an otherwise-qualified citizen the right to vote on the ground that the citizen has been convicted of a felony is not, without more, unconstitutional.

Florida has long had an Executive Clemency Board with authority to restore an individual's right to vote. But the Board moves at glacial speed and, for the eight years before Amendment 4 was adopted, reenfranchised very few applicants.[5] For the overwhelming majority of felons who wished to vote, the Executive Clemency Board was an illusory remedy.

Florida's Constitution allows voter-initiated amendments. To pass, a proposed amendment must garner 60% of the vote in a statewide election.[6] Amendment 4, which passed with 64.55% of the vote, added a provision

---

[5] *See, e.g.*, Prelim. Inj. Hr'g Tr., ECF No. 204 at 170-71; *see also* Pls.' Ex. 893, ECF No. 286-13 at 55-65.

[6] Fla. Const. art XI, § 5(e).

automatically restoring the voting rights of some—not all—felons. The new

provision was codified as part of Florida Constitution article VI, section 4.

> The full text of section 4, with the new language underlined, follows:
>
>> (a) No person convicted of a felony, or adjudicated in this or any other state to be mentally incompetent, shall be qualified to vote or hold office until restoration of civil rights or removal of disability. <u>Except as provided in subsection (b) of this section, any disqualification from voting arising from a felony conviction shall terminate and voting rights shall be restored upon completion of all terms of sentence including parole or probation.</u>
>>
>> <u>(b) No person convicted of murder or a felony sexual offense shall be qualified to vote until restoration of civil rights.</u>

Fla. Const. art. VI, § 4 (emphasis added). The exclusion of felons convicted of

murder or sexual offenses is not at issue in these cases. References in this order to

"felons" should be read to mean felons convicted only of other offenses, when the

context makes this appropriate.[7]

At least on its face, Amendment 4 was self-executing. Under Florida law,

the amendment's effective date was January 8, 2019. Individuals with felony

---

[7] This order does not use the plaintiffs' proposed term "returning citizens." The order instead uses "citizens" or "individuals" when the context is clear but "felons" when necessary, because the term is both more accurate and less cumbersome. "Returning" is inaccurate or at least imprecise; the citizens have not been away, except, for some, in prison, and most who went to prison have been back for years or decades. Respect is not a zero-sum game—more is almost always better. This order aims at providing equal respect to those on both sides, save as necessary to accurately set out the facts and ruling.

convictions began registering to vote on that day. Supervisors of Elections accepted the registrations.[8] This accorded with Florida law, under which Supervisors are required to accept facially sufficient registrations, subject to later revocation if a voter is found ineligible.

During its spring 2019 session, the Legislature took up issues related to Amendment 4, eventually passing a statute referred to in this order as SB7066. The statute includes a variety of provisions. Two are the most important for present purposes.

First, SB7066 explicitly defines the language in Amendment 4, "completion of all terms of sentence including probation or parole," to mean not just any term in prison or under supervision but also financial obligations included in the sentence—that is, "contained in the four corners of the sentencing document." Fla. Stat. § 98.0751(2)(a). This does not include amounts "that accrue after the date the obligation is ordered as a part of the sentence." *Id*. § 98.0751(2)(a)5.c.

Second, SB7066 explicitly provides that a financial obligation still counts as part of the sentence—still must be paid for the person to be eligible to vote—if the sentencing court converts it to a civil lien. *Id*. Conversion to a civil lien, usually at the time of sentencing, is a longstanding Florida procedure that courts often use for

---

[8] *See* Pls.' Ex. 44, ECF No. 152-41 at 3-4; *see also* Pls.' Ex. 66, ECF No. 152-63.

obligations a criminal defendant cannot afford to pay.[9] Conversion takes the obligation out of the criminal-justice system and leaves the obligation enforceable only through the civil-justice system.

The financial obligations included in a sentence may include fines, fees, costs, and restitution.

Fines are imposed in a minority of cases.[10] The amount is determined by the court, subject to a maximum set by statute. For a small number of offenses, there is a mandatory fine of at least a specified amount.[11]

Fees and costs are imposed in all cases, with few if any exceptions, though there was a time when that was not so.[12] Each type of fee or cost is authorized, indeed usually required, by statute. These are not traditional court costs of a kind usually awarded in favor of a prevailing litigant; they are instead a means of funding the government in general or specific government functions. [13] An

---

[9] *See* Fla. Stat. § 938.30(6)-(9); Prelim. Inj. Hr'g Tr., ECF No. 204 at 94; Pls.' Ex. 189, ECF No. 167-20 at 48; Trial Tr., ECF No. 396 at 61-62, 100

[10] *See* Trial Tr., ECF No. 396 at 28-29.

[11] *See, e.g.*, Fla. Stat. §§ 806.13(6)(a) (requiring a fine for certain criminal mischief offenses); 812.014(2)(c)(7) (requiring a $10,000 fine for theft of a commercially farmed animal).

[12] *See* Trial Tr., ECF No. 396 at 34-35.

[13] *See* Trial Tr., ECF No. 396 at 23-35.

example is a flat $225 assessment in every felony case, $200 of which is used to fund the clerk's office and $25 of which is remitted to the Florida Department of Revenue for deposit in the state's general revenue fund.[14] Another example is a flat $3 assessment in every case that is remitted to the Department of Revenue for further distribution in specified percentages for, among other things, a domestic-violence program and a law-enforcement training fund.[15]

Restitution is ordered in a minority of cases and is payable to a victim in the amount of loss as determined by the court. Restitution is sometimes awarded jointly and severally against participants in the same crime, even when they are charged in different cases. Most restitution orders require payment directly to the victim, but some orders provide for payment through the Clerk of Court or Department of Corrections, who charge a fee before payment of the remainder to the victim. Over time, the fee has sometimes been a percentage, sometimes a flat amount.

The parties have sometimes referred to amounts a criminal defendant must pay as "legal financial obligations" or "LFOs." This order adopts this terminology but uses it in a precise, more limited way: to refer only to obligations that the State

---

[14] *See* Fla. Stat. § 938.05(1)(a); *see also* Trial Tr., ECF No. 396 at 95.

[15] *See* Fla. Stat. § 938.01(1).

says must be paid before a felon's right to vote is restored under Amendment 4 and SB7066. The terminology does not change when the obligation is paid; if it was an "LFO" when imposed, it remains an "LFO" after payment—once an "LFO," always an "LFO." As we shall see, the State's position on whether an amount is covered by SB7066 has not always been clear or consistent. But for purposes of this order, by definition, whatever the State says is covered is an "LFO"; any other obligation is not.

## III. *The Eleventh Circuit Ruling on Inability to Pay*

Early in this litigation, the plaintiffs moved for a preliminary injunction on some but not all of their claims. After an evidentiary hearing, a preliminary injunction was granted in favor of the 17 individual plaintiffs and against the Secretary of State and the Supervisors of Elections in the counties where the plaintiffs resided.[16]

The preliminary injunction had two parts. First, an enjoined defendant could not take any action that both (a) prevented a plaintiff from registering to vote, and (b) was based only on failure to pay an LFO that the plaintiff asserted the plaintiff was genuinely unable to pay. Second, an enjoined defendant could not take any action that both (a) prevented a plaintiff from voting and (b) was based only on a failure to pay an LFO that the plaintiff showed the plaintiff was genuinely unable

---

[16] ECF No. 207.

to pay. In short, plaintiffs who claimed inability to pay could register, and plaintiffs who showed inability to pay could vote.

The preliminary injunction explicitly allowed the Secretary to notify Supervisors of Elections that an individual plaintiff had unpaid LFOs that would make the plaintiff ineligible to vote absent a showing of genuine inability to pay. The preliminary injunction left the state discretion on how the plaintiffs would be allowed to establish their inability to pay.

The State appealed. The United States Court of Appeals for the Eleventh Circuit affirmed, squarely holding that Florida cannot prevent an otherwise-eligible felon from voting just because the felon has failed to pay LFOs the felon is genuinely unable to pay. *Jones v. Governor of Fla.*, 950 F.3d 795 (11th Cir. 2020). This order of course follows the Eleventh Circuit's decision—and would reach the same result anyway.

This order does not repeat or even attempt to summarize the Eleventh Circuit decision. On the inability-to-pay claim, the Eleventh Circuit's analysis is more important than anything included in this order.

## IV.  *The Florida Supreme Court Decision on "All Terms of Sentence"*

After entry of the preliminary injunction and while the federal appeal was pending, the Florida Supreme Court issued an advisory opinion in response to a request from the Governor. *See Advisory Op. to the Governor Re: Implementation*

*of Amendment 4, the Voting Restoration Amendment*, 288 So. 3d 1070 (Fla. 2020)

The court said "all terms of sentence including probation and parole," within the

meaning of Amendment 4, includes financial obligations. This settles the question

of whether fines, fees, costs, and restitution are covered; they are.

The court did not address what "completion" of these amounts means,

because the Governor explicitly told the court he was not asking for an advisory

opinion on that issue. *Id.* at 1074-75. The issue is important, because "completion"

could reasonably be construed to mean payment to the best of a person's ability,

bringing Amendment 4, though not SB7066, into alignment with the plaintiffs'

inability-to-pay argument and *Jones*. The Florida Supreme Court did not address

the issue, instead heeding the Governor's limitation on his request for an advisory

opinion.

## *V. The Plaintiffs*

Determining how much a person convicted of a felony in Florida was

ordered to pay as part of a criminal sentence is not as easy as one might expect. It

is sometimes easy, sometimes hard, sometimes impossible. Determining how much

a person has paid, especially given the State's byzantine approach to calculating

that amount, is more difficult, but this, too, is sometimes easy, sometimes hard,

sometimes impossible. This is addressed below in the analysis of the merits.

The record includes evidence on the plaintiffs' obligations, often introduced by the State, apparently to show how easily their obligations could be calculated. But even with a team of attorneys and unlimited time, the State has been unable to show how much each plaintiff must pay to vote under the State's view of the law. For Mr. Gruver, the State submitted a judgment, but it does not include any financial obligations.[17] Mr. Gruver says he was ordered to pay fees and costs totaling $801.[18] He is genuinely unable to pay that amount. The record includes a civil judgment for that amount dated 17 days after Mr. Gruver was sentenced.[19] Perhaps the criminal judgment included the same amount and it was converted to a civil lien 17 days later. Or perhaps no amount was included in the criminal judgment at all. Mr. Gruver says that with interest and collection fees, the debt has grown to roughly $2,000.[20]

One cannot know, from the information in this record, whether any financial obligation was included in the "four corners" of Mr. Gruver's criminal judgment. *See* Fla. Stat. § 98.0751(2)(a). If this is the best the State's attorneys could do, one

---

[17] Defs.' Ex. 17A, ECF No. 148-18 at 3-5.

[18] Pls.' Ex. 3, ECF No. 152-2 at 3.

[19] Defs.' Ex. 17A, ECF No. 148-18 at 2.

[20] Pls.' Ex. 24, ECF No. 152-23 at 2.

wonders how Mr. Gruver or the Division of Elections could be expected to do better.

Mr. Mitchell was unaware he owed any amount until he registered to vote and received a notice from his county's Clerk of Court.[21] He now believes he owes $4,483 arising from convictions in Miami-Dade and Okeechobee Counties.[22] The record does not show what amounts were included in his sentences.[23] The Miami-Dade Clerk of Court's website includes a docket entry indicating $754 was assessed as costs.[24] One cannot know, from this record, what amount the State asserts Mr. Mitchell must pay to vote. But Mr. Mitchell works at a nonprofit without salary; even if the amount was only $754, Mr. Mitchell would be unable to pay it.[25]

Ms. Riddle was convicted of felonies between 1975 and 1988 in two different counties. She asked the Clerks of Court for copies of the records of the

---

[21] Pls.' Ex. 4, ECF No. 152-3 at 5.

[22] *Id.*

[23] *See* Defs.' Ex. 17B, ECF No. 148-19.

[24] *Id.* at 6.

[25] *See* Pls.' Ex. 4, ECF No. 152-3 at 5.

convictions, but she was told the Clerks were unable to find them.[26] Ms. Riddle apparently owes roughly $1,800 in connection with later convictions, but the Clerk's records do not match those maintained by the Florida Department of Law Enforcement. Ms. Riddle is unable to pay that amount.[27] Ms. Riddle does not know, and despite diligent efforts has been unable to find out, how much the State says she must pay to vote.

Ms. Leicht was convicted of a federal felony and ordered to pay over $59 million in restitution jointly and severally with others.[28] She is unable to pay that amount. After Amendment 4 passed, she was hesitant to register to vote, fearing criminal prosecution, but a state senator encouraged her to register, and she did.[29]

Mr. Ivey was convicted of a felony in 2002. His judgment shows he was assessed $428 in fees, but he did not know he owed any amount until a reporter told him in 2019.[30] Mr. Ivey has not asserted or proven he is unable to pay. The

---

[26] *See* Prelim. Inj. Hr'g Tr., ECF No. 204 at 162-65.

[27] *Id.* at 165-66.

[28] Pls. Ex. 6, ECF No. 152-5 at 3.

[29] *Id.*

[30] *See* Defs.' Ex. 17C, ECF No. 148-20 at 4; *see also* Pls.' Ex. 7, ECF No. 152-6 at 3.

judgment shows no fine, but a printout from the Clerk of Court seems to say "minimum fines" were assessed.[31] The amount the State asserts Mr. Ivey must pay to vote is apparently $428, but that is not clear.

Mr. Wrench apparently owes $3,000 in connection with felony convictions.[32] He is unable to pay that amount. But it is unclear whether he would have to pay this amount, or anything close to it, to be able to vote.

Mr. Wrench was convicted of felonies under two case numbers on December 15, 2008.[33] The State introduced copies of the judgments, but it is unclear whether the copies are complete. The criminal judgments, or at least the portion in the record, do not show any financial obligations. But on February 2, 2009, a civil judgment was entered under the first case number for $1,874 in "financial obligations"—no further description was provided—that, according to the civil judgment, had been ordered as part of the sentence.[34] Similarly, on March 15, 2011, more than two years later, a civil judgment was entered under the second case number for $601 in unspecified "financial obligations" that, again according

---

[31] *See* Defs.' Ex. 17C, ECF No. 148-20 at 33-34.
[32] *See* Pls.' Ex. 8, ECF No. 152-7 at 3.

[33] *See* Defs.' Ex. 17D, ECF No. 148-21 at 8-12, 18-20.

[34] *Id.* at 4.

to the civil judgment, had been ordered as part of the sentence.[35] It is unclear what amount, if any, the State asserts Mr. Wrench must pay on these convictions to be eligible to vote.

Mr. Wrench was convicted of another felony on November 7, 2011.[36] An order included in the judgment assessed costs of $200 with other amounts struck through and initialed.[37] But a civil judgment was entered on March 5, 2012 for $871.[38] It is unclear what amount the State asserts Mr. Wrench must pay on this conviction to be eligible to vote.

Ms. Wright was convicted of a felony. Her sentence included $54,137.66 in fines and fees.[39] The judge immediately converted the full amount to a civil lien.[40] Ms. Wright is employed part-time and earns $450 per month.[41] She is unable to pay the fines and fees.

---

[35] *Id.* at 15.

[36] *Id.* at 26.

[37] *Id.* at 27-28.

[38] *Id.* at 23.

[39] *See* Pls.' Ex. 9, ECF No. 152-8; *see also* Defs.' Ex 17E, ECF No. 148-22.

[40] Defs.' Ex. 17E, ECF No. 148-22 at 10.

[41] *See* Pls.' Ex. 9, ECF No. 152-8 at 4.

Dr. Phalen was convicted of a felony in Wisconsin in 2005.[42] He was assessed $150,000 in restitution and has made regular payments, but he still owes $110,000. Under Wisconsin law, he would be eligible to vote. The State of Florida has acknowledged in this litigation that a felony conviction in another state does not  make a person ineligible to vote in Florida if the person would be eligible to vote in the state where the conviction occurred.[43] So Dr. Phalen is eligible to vote in Florida, he just didn't know it when he joined this litigation.

Mr. Miller was convicted in 2015 of two felonies and a misdemeanor that were prosecuted as part of the same case.[44] The judgment assessed $1,221.25 in fees and costs and $233.80 in restitution.[45] He paid $252 on the restitution obligation—more than the original assessment—but the Department of Corrections says he still owes $1.11, apparently based in part on the Department's 4% surcharge for collecting payments.[46] The records of the Florida Department of Law

---

[42]  *See* Pls.' Ex. 10, ECF No. 152-9.
[43] Trial Tr., ECF No. 408 at 81.

[44] *See* Defs.' Ex. 17F, ECF No. 148-23.

[45] *Id.* at 9-10.

[46] Pls.' Ex. 11, ECF No.152-10 at 3-4, 35-38.

Enforcement and Clerk of Court give different amounts still owed for fees and costs, but whatever the accurate number, Mr. Miller is unable to pay it.

Mr. Tyson was convicted of felonies between 1978 and 1998.[47] He was ordered to pay fees, costs, and restitution. He paid the restitution. He has been unable, despite extraordinary effort, to determine the amount still owed for fees and costs.[48] There are discrepancies in the available records that cannot be reconciled. But whatever the precise balance, Mr. Tyson is unable to pay it. Even so, it is no longer clear the State contends Mr. Tyson must pay the outstanding balance to be able to vote, as addressed below in the discussion of the merits.

Ms. Moreland was convicted of a felony and ordered to pay $618 in fees and costs, but a separate cost sheet listed the amount as $718.[49] She is unable to pay either amount. She registered to vote when she thought she was eligible, but the Manatee County Supervisor of Elections removed her from the roll based on the unpaid LFOs, after giving proper notice. The Supervisor has reinstated her pending developments in this litigation.

---

[47] *See* Pls.' Ex. 12, ECF No. 152-11.

[48] *See, e.g.*, Prelim. Inj. Hr'g Tr., ECF No. 204 at 172-79; *see also* Trial Tr., ECF No. 393 at 185.

[49] *See* Pls.' Ex. 531, ECF No. 354-7 at 47, 80.

Mr. Bryant owes more than $10,000 in fines, fees, and costs assessed on felony convictions.[50] He pays $30 per month under a payment plan but is unable to pay the full amount or whatever amount he would have to pay to vote.[51] He registered to vote after Amendment 4 was adopted, believing he was eligible. In due course, though, he learned of the State's contrary position. He submitted a declaration early in this litigation, but he was not a named plaintiff when the preliminary injunction was issued, and the preliminary injunction thus did not explicitly apply to him.[52] Even though the Eleventh Circuit affirmed the preliminary injunction before the March 2020 presidential primary in an opinion making clear that Mr. Bryant is constitutionally entitled to vote, he chose not to vote.[53] Having left his criminal past behind, he did not wish to risk prosecution.[54]

Ms. McCoy was convicted of a felony and ordered to pay $666 in fees and $6,400 in restitution through the Clerk of Court.[55] She paid the fees but is unable to

---

[50] Trial Tr., ECF No. 397 at 68.

[51] *Id.* at 66-68.

[52] *See* Pls.' Ex. 23, ECF No. 152-22.

[53] Trial Tr., ECF No. 397 at 73-74.

[54] *Id.*

[55] *See* Defs.' Ex. 17H, ECF No. 148-25 at 35-57.

pay the restitution.[56] The restitution balance, with interest, has grown to $7,806.72.
Ms. McCoy tried to set up a payment plan but was told the Clerk of Court does not
allow payment plans for restitution.[57]

Ms. Singleton was sentenced for a felony on April 8, 2011.[58] The judgment
is in the record. It includes $771 in fees and costs.[59] Ms. Singleton is unable to pay
that amount. The judgment does not mention restitution. A separate restitution
order was entered requiring Ms. Singleton to pay the victim $12,110.81; the
judge's signature was undated, but the order was file-stamped July 9, 2014, over
three years after Ms. Singleton was sentenced.[60] The record includes another
restitution order directing Ms. Singleton to pay a different victim $12,246.00; that
order bears no date.[61] If, as appears likely, Ms. Singleton was not ordered to pay
restitution until three years after she was sentenced, the State apparently agrees that

---

[56] *See* Prelim. Inj. Hr'g Tr., ECF No. 204 at 134-36.

[57] Trial Tr., ECF No. 397 at 57.

[58] *See* Defs.' Ex. 17I, ECF No. 148-26 at 4-8.

[59] *Id.* at 6.

[60] *Id.* at 9-10.

[61] *Id.* at 2-3.

she can vote without paying the restitution.[62] Ms. Singleton would not have known this had she not participated in this litigation.

Ms. Raysor was convicted of a felony. Her judgment is not in the record, but she signed a payment plan calling for $30 monthly payments toward a total obligation of $5,000.[63] She is current on her payments and on pace to pay the full balance by 2031. She is unable to pay a greater amount—as the State apparently acknowledged by agreeing to the payment plan.

Ms. Sherrill has felony convictions. Her judgments are not in the record. It is unclear what financial obligations were imposed as part of the sentence, but the outstanding balance is $2,279.[64] Ms. Sherrill is unable to pay that amount.

Mr. Hoffman has felony convictions. He believes he owes $1,772.13 in one county and $469.88 in another county in connection with the convictions.[65] He is unable to pay those amounts. Mr. Hoffman also has a misdemeanor conviction in a case erroneously titled on the docket as a felony[66]—a recurring problem that led

---

[62] Trial Tr., ECF No. 408 at 104.

[63] *See* Pls.' Ex. 15, ECF No. 152-14.

[64] *See* Defs.' Ex. 17K, ECF No. 148-28; *see also* Pls.' Ex. 16, ECF No. 152-15.

[65] *See* Pls.' Ex. 17, ECF No. 152-16.

[66] *See* Defs.' Ex. 17L, ECF No. 148-29 at 26-28; *see also* Trial Tr., ECF No. 408 at 210-12.

the Secretary of State's Division of Elections to incorrectly assert more than 20 others were ineligible to vote in one county alone.[67]

The League of Women Voters is an advocate for increased voter registration and turnout. The League conducts voter-registration drives and conducts programs to educate the public.[68] The Florida State Conference of the NAACP and the NAACP's Orange County Branch are member-based civil-rights organizations who advocate for the rights of members, including the right to vote.[69] The NAACP organizations have members directly affected by the State's pay-to-vote system— who are unable to vote under that system but will be able to vote if the plaintiffs prevail in this litigation.

The confusion created by SB7066 and the State's failure to articulate clear standards for its application, together with the difficulty determining whether any given felon has unpaid LFOs, caused the League and the State Conference of the NAACP to expend resources unnecessarily and interfered with their voter-registration activities. Each organization curtailed its voter-registration activities out of fear that citizens who registered with the organization's help might be

---

[67] *See* Earley Dep. Designations, ECF No. 389-3 at 45-46; *see also* Pls' Exs. 76-77, ECF No. 152-73, 152-74.

[68] *See* Trial Tr., ECF No. 396 at 155.

[69] *See* Trial Tr., ECF No. 397 at 6-7.

prosecuted, even if the organization and the citizen believed the citizen was eligible. As a result, the organizations signed up fewer new voters—and are continuing to sign up fewer new voters—than they otherwise would have.

## VI. The Registration Process

To be eligible to vote in Florida, a person must submit a registration form. If the county Supervisor of Elections deems the form complete on its face, the Secretary of State's Division of Elections determines, using personal identifying information, whether the person is real. If so, the person is added to the voting roll, subject to later revocation if it turns out the person is ineligible.[70]

The Division of Elections takes the laboring oar at that point, reviewing the registration for, among other things, disqualifying felony convictions.[71] The Division also periodically reviews all prior registrations for felony convictions, because a person who was eligible at the time of initial registration may be convicted later.

If the Division finds a disqualifying felony conviction, the Division notifies the proper Supervisor of Elections. Some Supervisors review the Division's work

---

[70] *See* Defs.' Ex. 16, ECF No. 148-16 at 5; *see also* Earley Dep. Designations, ECF No. 389-3 at 29.

[71] Defs.' Ex. 16, ECF No. 148-16 at 6-8; *see also* Fla. Stat. § 98.075(5).

for accuracy; some do not.[72] If the Supervisor concludes, with or without an independent review, that the registrant is not eligible to vote, the Supervisor sends the registrant a notice giving the registrant 30 days to show eligibility.[73] The registrant may request a hearing before the Supervisor, and if unsuccessful may file a lawsuit in state court, where review is de novo.[74] Requests for a hearing are extremely rare; even long serving Supervisors have rarely conducted more than one or two during an entire tenure.[75]

Supervisors sometimes address felony convictions on their own, without awaiting notice from the Division that a registrant is ineligible. The Supervisors do not, however, have the resources to perform the bulk of the screening process or to conduct hearings on individual issues like the amount of a registrant's LFOs or a registrant's ability to pay.

## VII. Standing

The defendants have asserted lack of standing on multiple grounds. Their positions were rejected in earlier orders and are addressed here only briefly.

---

[72] *See, e.g.*, Earley Dep. Designations, ECF No. 389-3 at 60-63, 129-30; *see also* Pls.' Ex. 69, ECF No. 152-66; Latimer Dep. Designations, ECF No. 389-4 at 90-91.

[73] *See* Fla. Stat. § 98.075(7).

[74] Fla. Stat. § 98.0755.

[75] *See* Trial Tr., ECF No. 393 at 42; *see also* Trial Tr., ECF No. 402 at 54-55.

In *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992), the Supreme Court said the "irreducible constitutional minimum of standing contains three elements." First, the plaintiff "must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id*. (internal quotation marks and citations omitted). Second, "there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Id*. (internal quotation marks, ellipses, and brackets omitted). Third, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id*. (internal quotation marks omitted); *see also Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547-48 (2016).

The State says the plaintiffs lack standing because they have already registered to vote. But the State says most or all are ineligible to vote, and fraudulently voting is a felony. If the plaintiffs win this lawsuit, they will be able to vote; if they lose, most will not be able to vote. The plaintiffs have standing to challenge provisions that prevent or deter them from voting.

The State says the plaintiffs have no standing because, according to the State, the plaintiffs challenge only SB7066 as applied, not Amendment 4. Because Amendment 4 requires payment of LFOs, the State says, holding SB7066

unconstitutional as applied would make no difference; the plaintiffs would still have to pay their LFOs to be able to vote.

One flaw in the argument is the assertion that SB7066 goes no further than Amendment 4. As addressed ahead, SB7066 has a number of provisions that Amendment 4 lacks, including, for example, the definition of "completion," the treatment of LFOs that are converted to civil liens, and the prescription of a specific, flawed registration form. The Secretary of State's Division of Elections is following procedures, some attributed to SB7066, that cannot be gleaned from Amendment 4.

Much more significantly, the State is simply wrong when it asserts the plaintiffs do not challenge application of Amendment 4 to otherwise-eligibile citzens with unpaid LFOs. The complaints were filed before the Florida Supreme Court construed Amendment 4 to cover LFOs, so it is not surprising that the complaints focused on SB7066 and its explicit reference to LFOs. But it has been clear all along that the plaintiffs assert it is unconstitutional to condition voting on payment of LFOs, especially those a person is unable to pay. The preliminary injunction, entered before the State filed its answers, read the complaints this way.[76] The Eleventh Circuit clearly understood this on appeal. *See, e.g.*, *Jones*, 950

---

[76] *See* ECF No. 207 at 7-8.

F.3d at 800 (noting that the plaintiffs brought suit, "challenging the
constitutionality of the LFO requirement"). The plaintiffs explicitly confirmed
their position on the record at the trial, making clear they challenge the
requirement to pay LFOs as a condition of voting, whatever the source of that
requirement, including Amendment 4.[77]

Here, as always, the plaintiffs are the masters of their claim. *See, e.g.*, *United
States v. Jones*, 125 F.3d 1418, 1428-29 (11th Cir. 1997). The State cannot
redefine the plaintiffs' claim to the State's liking and attack only the claim as
redefined. So the State's argument is unfounded.

Further, in closing argument, the plaintiffs said that if their complaints could
somehow be construed not to allege that Amendment 4, to the extent it conditions
voting on payment of LFOs, is unconstitutional as applied, then they requested
leave to amend the complaints to conform to the evidence—that is, to include such
a claim.[78] No amendment is necessary, because the complaints allege and have
been construed all along to include such a claim, and the State has known it all
along, or at least from the date when the preliminary injunction was issued. If,
however, the complaints were somehow read more narrowly, I would grant leave

---

[77] Trial Tr., ECF No. 417 at 26-27, 48-49.

[78] Trial Tr., ECF No. 417 at 27-28; *see also* Fed. R. Civ. P. 15(b).

to amend, so that the claim can properly be resolved on the merits. The State would suffer no prejudice.

The officials who are primarily responsible for administering the Florida's election system and registering voters are the Secretary of State at the state level and the Supervisors of Elections at the county level. The Secretary is not always a proper defendant in an election case. *See Jacobson v. Fla. Sec'y of State*, No. 19-14552, 2020 WL 2049076 (11th Cir. Apr. 29, 2020). But the Secretary has a substantial role in determining whether felons are eligible to vote. Indeed, she has the primary role in determining whether a felon who has registered should be removed from the roll, including on the ground of unpaid LFOs. She does not deny she is a proper defendant here.[79]

Prior governors have asserted they are not proper defendants in cases of this kind. But here the Governor asserts an interest and says he does not wish to be dismissed. He made the same assertion in the prior appeal, and the Eleventh Circuit, without deciding whether he had a stake in the matter, allowed him to remain in the case. *See Jones*, 950 F.3d at 805-06. This order takes the same approach.

The Supervisors of Elections have asserted they are not proper defendants, but they, too, have a critical role in registration and removal of felons from the

---

[79] Trial Tr., ECF No. 417 at 43.

rolls. They are proper defendants, as explained at greater length in denying their motion to dismiss. *See* ECF Nos. 107, 110 at 7-9, 272 at 60-63; *see also Jacobson*, 2020 WL 2049076 at *9.

In sum, the plaintiffs have standing, and the Secretary and Supervisors, if not also the Governor, are the officials who can redress the claimed violations. The Secretary and Supervisors, if not also the Governor, are proper defendants. *See Ex parte Young*, 209 U.S. 123 (1908).

## VIII.  Reenfranchisement Must Comply with the Constitution

When a state decides to restore the right to vote to some felons but not others, the state must comply with the United States Constitution, including the First, Fourteenth, Fifteenth, Nineteenth, and Twenty-Fourth Amendments. It is no answer to say, as the State does, that a felon has no right to vote at all, so a state can restore the right to vote or not in the state's unfettered discretion. Both the Supreme Court and the Eleventh Circuit have squarely rejected that assertion.

In *Richardson v. Ramirez*, 418 U.S. 24 (1974), the plaintiffs were felons who had completed their terms in prison and on parole but who, under California law, were still denied the right to vote. The Supreme Court rejected their claim that this, without more, violated the Equal Protection Clause.

Even so, the Court did *not* say that because a state could choose to deny all felons the right to vote and to restore none of them, the state's decision to restore

the vote to some felons but not others was beyond the reach of the Constitution.

Quite the contrary. The Court remanded the case to the California Supreme Court

to address the plaintiffs' separate contention that California had not treated all

felons uniformly and that the disparate treatment violated the Equal Protection

Clause. *Id.* at 56. The remand was appropriate because when a state allows some

felons to vote but not others, the disparate treatment must survive review under the

Equal Protection Clause. The same is true here.

It is no surprise, then, that in the earlier appeal in this very case, the Eleventh

Circuit took the same approach. The court made clear that the state's decision on

which felons to reenfranchise was subject to constitutional review—indeed to

heightened scrutiny. *See Jones*, 950 F.3d at 809, 817-23.

Similarly, in *Johnson v. Governor of Florida*, 405 F.3d 1214 (11th Cir.

2005) (en banc), the court upheld Florida's decision to disenfranchise all felons,

subject to restoration of the right to vote by the Florida Executive Clemency

Board. Again, though, the court did *not* say that a state's decision to restore the

vote to some felons but not others was beyond constitutional review. Instead, citing

an equal-protection case, the court made clear that even in restoring the right of

felons to vote, a state must comply with other constitutional provisions. *See id.*,

405 F.3d at 1216-17 n.1 (citing *Harper v. Va. State Bd. of Elections*, 383 U.S. 663,

668 (1966)).

An earlier decision to the same effect is *Shepherd v. Trevino*, 575 F.2d 1110 (5th Cir. 1978). There the court said a state's power to disenfranchise felons does not allow the state to restore voting rights only to whites or otherwise to "make a completely arbitrary distinction between groups of felons with respect to the right to vote." *Id.* at 1114. As a decision of the Old Fifth Circuit, *Shepherd* remains binding in the Eleventh. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

Other courts, too, have recognized that provisions restoring the voting rights of felons are subject to constitutional review. *See, e.g.*, *Harvey v. Brewer*, 605 F.3d 1067, 1079 (9th Cir. 2010) (O'Connor, J.) (holding the Equal Protection Clause applicable to Arizona's felon-restoration statute but rejecting the plaintiffs' claim on the merits; noting that a state could not restore the vote only to felons of a specific race or only to those over six feet tall); *Johnson v. Bredesen*, 624 F.3d 742, 746-50 (6th Cir. 2010) (holding the Equal Protection Clause applicable to Tennessee's felon-restoration statute but rejecting the plaintiffs' claim on the merits); *Owens v. Barnes*, 711 F.2d 25, 26-27 (3d Cir. 1983) (holding the Equal Protection Clause applicable to Pennsylvania's felon-restoration statute but rejecting the plaintiff's claim on the merits).

This unbroken line of decisions puts to rest any assertion that the State can simply do as it pleases when restoring the right to vote to some felons but not others. The State may now have abandoned that position.

## IX. Inability to Pay

The case involves individuals with at least one felony conviction, with no conviction for murder or a sexual offense, who have completed all prison or jail terms and all terms of supervision, and whose right to vote under Amendment 4 and SB7066 turns entirely on LFOs. There are two distinctions that are critical to the constitutional analysis. The first is between individuals who have paid their LFOs and those who have not. The second involves only individuals who have unpaid LFOs; the distinction is between individuals who can afford to pay the LFOs and those who cannot. In *Jones*, the focus was on the second distinction. Both are at issue now. There are also equal-protection claims asserting race and gender discrimination, but they are addressed in later sections of this order.

### A.  The Proper Level of Scrutiny

In *Jones*, the Eleventh Circuit applied "heightened scrutiny" to the pay-to-vote system's treatment of citizens who are unable to pay the amount at issue—that is, to the distinction between citizens who are able to pay their LFOs and those who are not. The court said heightened scrutiny applies because the system creates "a wealth classification that punishes those genuinely unable to pay fees, fines, and restitution more harshly than those able to pay—that is, it punishes more harshly solely on account of wealth—by withholding access to the ballot box." *Jones*, 950 F.3d at 809.

The court derived this holding from a long line of Supreme Court decisions. *See, e.g.*, *M.L.B. v. S.L.J.*, 519 U.S. 102 (1996); *Bearden v. Georgia*, 461 U.S. 660 (1983); *Zablocki v. Redhail*, 434 U.S. 374 (1978); *Tate v. Short*, 401 U.S. 395 (1971); *Williams v. Illinois*, 399 U.S. 235 (1970); *Griffin v. Illinois*, 351 U.S. 12 (1956). No purpose would be served by repeating here the Eleventh Circuit's full analysis. *Jones* settles the issue, and even without *Jones*, the result would be the same—for the reasons set out in *Jones*, in the order that *Jones* affirmed, and in the many Supreme Court decisions on which those holdings relied. The pay-to-vote system, at least as applied to those unable to pay, is subject to heightened scrutiny.

*Jones* did not address the proper level of scrutiny for the pay-to-vote system as applied to citizens who are *able* to pay—that is, for the distinction between

citizens who have paid their LFOs and those who can afford to pay but have not

done so. The system still impacts voting, a feature that, in any other circumstance,

would trigger heightened scrutiny. Indeed, a wide array of state election laws, even

those without a direct impact on the right to vote, are subject to more than typical

rational-basis scrutiny. A court must identify and weigh "the character and

magnitude of the asserted injury to the rights protected by the First and Fourteenth

Amendments that the plaintiffs seek to vindicate against the precise interests put

forward by the State as justifications for the burden imposed by its rule, taking into

consideration the extent to which those interests make it necessary to burden the

plaintiff's rights." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson

v. Celebrezze*, 460 U.S. 780,789 (1983) (internal quotation marks omitted)).

Nonetheless, in *Shepherd v. Trevino*, 575 F.2d 1110, 1115 (5th Cir. 1978),

the court held a reenfrachisement law subject to only rational-basis scrutiny. The

law afforded more favorable treatment to felons convicted in Texas state court than

to those convicted in federal court. As *Jones* makes clear, *Shepard* does not require

rational-basis scrutiny when other factors are present, including, for example, race

(as noted in *Shepard* itself) or wealth (as involved in *Jones*). And *Shepard* predated

*Anderson* and *Burdick*. Still, no later, binding decision directly contravenes

*Shepard*. Absent other grounds for applying a higher level of scrutiny, *Shepard*

remains a binding decision that requires application of only rational-basis scrutiny.

This order applies heightened scrutiny to the pay-to-vote system as applied to those unable to pay (as *Jones* requires) and rational-basis scrutiny to the system as applied to those able to pay (as *Shepard* requires).

## B. Heightened Scrutiny

Heightened scrutiny requires an analysis of the legitimate governmental interests allegedly served by a challenged provision. Before entry of the preliminary injunction, the State's primary argument was that in deciding to reenfranchise some citizens but not others, a state can do as it wishes, with no meaningful constitutional review. As set out above, that is plainly incorrect. The State also briefly identified a single legitimate interest allegedly served by the pay-to-vote system: the interest in reenfranchising only those felons who have completed their sentences.

The State went further in its appeal of the preliminary injunction, identifying additional interests allegedly served by the pay-to-vote system, including punishment, enforcing its laws, debt collection, and administrative convenience. But the Eleventh Circuit held they all fell short. The evidence now in the record after a full trial further support the Eleventh Circuit's analysis.

The State has not identified any additional interests allegedly served by the pay-to-vote system. When reminded, late in closing argument at the end of the

trial, that the State had identified interests on appeal but nothing more in this court, the State said only that it stood by whatever it said on appeal.[80]

*Jones* thus settles the question whether the pay-to-vote system, as applied to citizens who are genuinely unable to pay their LFOs, survives heightened scrutiny. It does not. The plaintiffs are entitled to prevail on their claim that they cannot be denied the right to vote based on failure to pay amounts they are genuinely unable to pay.

### C. Rational-Basis Scrutiny

*Jones* expressed "reservations" about whether the pay-to-vote system, as applied to those genuinely unable to pay, "would pass even rational basis scrutiny." *Jones*, 950 F.3d at 809. The record now shows the reservations were well founded. First, the evidence shows the system does not pass rational-basis scrutiny under the analysis set out in *Jones*. Second, the evidence shows additional irrationality: the State has shown a staggering inability to administer the system and has adopted a bizarre position on the amount that must be paid. The State's actions now call into question whether the pay-to-vote system is rational even as applied to those who are able to pay.

*Jones* noted two possible approaches to rational-basis scrutiny. First, the court said the issue might be whether the pay-to-vote system is rational as applied

---

[80] *See* Trial Tr., ECF No. 417 at 71-74.

to felons genuinely unable to pay their LFOs. Second, the court said the issue might be only whether the pay-to-vote system is rational as applied to the universe of felons with LFOs, including those who both can and cannot pay. On this second view, a plaintiff cannot assert an individual as-applied challenge to a provision that is subject to only rational-basis scrutiny; such a provision need only be rational in its typical application. *Jones* did not definitively resolve the question of which of these approaches is appropriate—and there was no need for a resolution, because the court applied heightened scrutiny.

Following the Eleventh Circuit's lead, this order takes on these rational-basis issues, first addressing which approach is proper, then addressing each in turn.

### *(1)  The Proper Approach to Rational-Basis Scrutiny*

The better view is that a plaintiff can assert an individual as-applied challenge to a provision that is subject to rational-basis review, just as a plaintiff can assert an as-applied challenge to a provision that is subject to strict or heightened scrutiny. The level of scrutiny affects the analysis on the merits, but there is no reason to preclude a plaintiff from asserting that a provision is unconstitutional as applied to the plaintiff, regardless of the proper level of scrutiny. Quite the contrary. Standing is a prerequisite to federal jurisdiction. To establish standing, a plaintiff must show a concrete and particularized injury. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548-50 (2016). This makes it more

appropriate, not less, for a plaintiff to focus on application of a challenged

provision to the plaintiff, not just to others. It is thus not surprising that, as *Jones*

recognized, the Supreme Court has on occasion "considered the rationality of a

statute as applied to particular plaintiffs without opining on its rationality more

generally." *Jones*, 950 F.3d at 814 (citing *City of Cleburne v. Cleburne Living Ctr.*,

473 U.S. 432, 435 (1985)).

To be sure, administrative convenience is a legitimate state interest that in

most circumstances provides a rational basis for line-drawing, even when some

affected individuals fall on the wrong side of the line—when some individuals are

treated in a manner that, but for administrative convenience, would make little or

no sense. But this is a merits issue, not a question of whether the plaintiff may

assert an as-applied challenge in the first instance.

As it turns out, the outcome here is the same regardless of which approach to

rational-basis scrutiny is applied.

### (2) *Rational-Basis Scrutiny as Applied to the Plaintiffs*

First, if an individual as-applied challenge can be brought in a rational-basis

case, *Jones* settles the question, holding the pay-to-vote system irrational as

applied to individuals who are unable to pay:

> [I]f the question on rational basis review were simply whether the
> LFO requirement was rational as applied to the truly indigent—
> those genuinely unable to meet their financial obligations to pay
> fees and fines, and make restitution to the victims of their crimes—

> we would have little difficulty condemning it as irrational. Quite
> simply, Florida's continued disenfranchisement of these seventeen
> plaintiffs is not rationally related to any legitimate governmental
> interest.

*Jones*, 950 F.3d at 813.

### (3) *Rational-Basis Scrutiny of the Mine-Run Case*

*Jones* said the outcome under the second approach—the approach looking

not at application of the pay-to-vote requirement to those unable to pay but instead

to all felons affected by the requirement—might turn on the proportion of felons on

each side of the line. The court said:

> If rational basis review, then, generally is designed to ask only
> if the codification has some conceivable relation to a legitimate
> interest of the state, we would readily say that the LFO
> requirement as applied to the whole class of felons is rational. The
> analysis becomes more difficult, however, when the requirement is
> irrational as applied to a class of felons genuinely unable to pay *if*
> this class of the impecunious actually resembles the mine-run felon
> who has otherwise completed the terms of his sentence. Put
> another way, if the LFO requirement is irrational as applied to
> those felons genuinely unable to pay, and those felons are in fact
> the *mine-run* of felons affected by this legislation, then the
> requirements may be irrational as applied to the class as a whole.

*Id.* at 814 (emphasis in original).

The record now shows that the mine-run of felons affected by the pay-to-

vote requirement are genuinely unable to pay.[81] I find as a fact that the

---

[81] *See* Trial Tr., ECF No. 388 at 61-62, 73-88; Trial Tr., ECF No. 396 at 16-23, 29-
34, 37-40, 42-44, 84, 90-93, 99-100; Trial Tr., ECF No. 393 at 157-162; Pls.' Ex.

overwhelming majority of felons who have not paid their LFOs in full, but who are otherwise eligible to vote, are genuinely unable to pay the required amount, and thus, under Florida's pay-to-vote system, will be barred from voting solely because they lack sufficient funds.[82]

Indeed, given the State's other methods for enforcing the requirement to pay, there is no reason to believe—and the Legislature had no reason to believe—that any significant number of felons were able to pay but chose not to. The State's other enforcement methods include not only those available to ordinary creditors but also the ability to suspend a felon's driver's license and the ability to imprison a felon who is still on supervision and chooses not to pay.

### (4) *Administrative Irrationality*

The analysis to this point has tracked *Jones*. First, as applied to those who are unable to pay, the pay-to-vote system is subject to heightened scrutiny and fails. Second, as applied to those who are unable to pay, the pay-to-vote system fails even rational-basis scrutiny. Third, if as-applied challenges are not available to a subset of those affected by a provision that is subject to only rational-basis

---

894, ECF No. 360-48; Pls.' Ex. 299, ECF No. 349-5; Pls.' Ex. 156, ECF No. 348-15 at 4-7, 10-18; Pls' Ex. 298, ECF No. 349-41; Pls.' Ex. 462, ECF No. 353-27; Pls.' Ex. 876, ECF No. 360-34.

[82] The evidence supporting this finding includes the expert testimony of Dr. Daniel A. Smith. I credit Dr. Smith's testimony in full.

scrutiny, the pay-to-vote system still fails, because the system is irrational as applied to the mine-run of affected felons and thus is irrational as a whole.

What has been said to this point would be enough to resolve this claim. But there is more. The State has shown a staggering inability to administer the pay-to-vote system and, in an effort to reduce the administrative difficulties, has largely abandoned the only legitimate rationale for the pay-to-vote system's existence.

The administrative difficulties arise primarily at three levels.

### *1. Determining the Original Obligation*

First, many felons do not know, and some have no way to find out, the amount of LFOs included in a judgment.[83] In recent years, most Florida counties, but not all, have used a standard form of judgment. If a felon knows to obtain from the county of conviction a copy of the judgment, the original amount of LFOs will usually, but not always, be clear.[84]

Few individuals will know, however, that they must obtain copies of their judgments. Most will start with the internet or telephone or perhaps by going in

---

[83] *See* Trial Tr., ECF No. 396 at 51-58, 81-83, 92, 98-99; Trial Tr., ECF No. 393 at 168-69, 172; Prelim. Inj. Hr'g Tr., ECF No. 204 at 163-65; *see also* Pls.' Ex. 7, ECF No. 152-6 at 3.

[84] *See* Trial Tr., ECF No. 396 at 102; Trial Tr., ECF No. 393 at 187; *see, e.g.*, Defs.' Ex. 17C, ECF No. 148-21 at 4; Defs.' Ex. 17F, ECF No. 148-23 at 10.

person to the office of the county Supervisor of Elections or Clerk of Court. Trying to obtain accurate information in this way will almost never work. A group of well-trained, highly educated individuals—a professor specializing in this field with a team of doctoral candidates from a major research university—made diligent efforts over a long period to obtain information on 153 randomly selected felons.[85] They found that information was often unavailable over the internet or by telephone and that, remarkably, there were inconsistencies in the available information for all but 3 of the 153 individuals.[86]

        For felons who are astute enough or learn that they need copies of their judgments to determine how much they must pay to vote, the problem is not solved. Few felons already have copies of their judgments, especially after any term in custody or when years or decades have passed.[87] Many counties charge a fee for a copy of a judgment.[88] Many felons cannot afford to pay a fee, and

---

[85] *See* Pls.' Ex. 892, ECF No. 360-47; *see also* Trial Tr., ECF No. 388 at 143-206, 221-25.

[86] *See* Pls.' Ex. 892, ECF No. 360-47 at 9-10, 38-56, 67-68; *see also* Trial Tr., ECF No. 388 at 185-86. I credit the testimony of Dr. Traci R. Burch, the professor responsible for this research.

[87] *See* Trial Tr., ECF No. 396 at 56; Prelim. Inj. Hr'g Tr., ECF No. 204 at 163-65, 172.

[88] *See* Trial Tr., ECF No. 388 at 229; Pls.' Ex. 892, ECF No. 360-47 at 16.

requiring a potential voter to pay a fee that is not part of a felony sentence presents its own set of constitutional issues.

In any event, for older felonies, a copy of the judgment may not be available at all, or may be available only from barely legible microfilm or microfiche or from barely accessible archives, and only after substantial delay.[89] As one example, a Supervisor of Elections said she had been unable to assist a person with a 50-year-old conviction for which records could not be found; the Supervisor could not determine the person's eligibility to vote.[90] And even when records can eventually be found, delaying a voter's ability to register presents its own set of constitutional issues.

Even if a felon manages to obtain a copy of a judgment, the felon will not always be able to determine which financial obligations are subject to the pay-to-vote requirement. Judgments often cover multiple offenses, with sentences imposed simultaneously, often without matching financial obligations with specific offenses. The offenses may include felonies on which a conviction is entered, felonies on which adjudication is withheld, and misdemeanors. Only felonies on which a conviction is entered disqualify a felon from voting and thus may be

---

[89] *See* Trial Tr., ECF No. 396 at 81-83; Trial Tr., ECF No. 393 at 170-72, 186-88.

[90] Trial Tr., ECF No. 393 at 19-20.

subject to the pay-to-vote system. But when a judgment does not allocate financial obligations to specific offenses, it is impossible to know what amount must be paid to make the person eligible to vote.

An example well illustrates the problem. The Director of the Division of Elections—the ranking state official actively working on these issues—was shown at trial the judgment of Mr. Mendez, one of the 17 named plaintiffs.[91] The judgment applies to both a felony and a misdemeanor and includes a $1,000 fine, but the judgment does not indicate whether the fine applies to the felony or the misdemeanor or partly to one and partly to the other. The Director said she did not know whether Mr. Mendez would be allowed to vote only upon payment of the fine—that this was an issue that would require further analysis.[92]

In sum, 18 months after adopting the pay-to-vote system, the State still does not know which obligations it applies to. And if the State does not know, a voter does not know. The takeaway: determining the amount of a felon's LFOs is sometimes easy, sometimes hard, sometimes impossible.

### 2. Determining the Amount that Has Been Paid

Determining the amount that has been paid on an LFO presents an even greater difficulty. It is often impossible.

---

[91] *See* Trial Tr., ECF No. 408 at 190-200; Defs.' Ex. 17N, ECF No. 148-31.

[92] Trial Tr., ECF No. 408 at 197-98.

It does not help that the State has adopted two completely inconsistent methods for applying payments to covered obligations. This order addresses each method in turn. For convenience, the order attaches labels to each method that, while not entirely accurate, will make explanations less cumbersome.

### (a) The Actual-Balance Method

The most obvious method for determining whether an obligation has been paid is to determine the original amount of the obligation and to deduct any principal payments that have been made on the obligation. This happens every day across the nation and indeed across the world. It happens for mortgages, car loans, student loans, credit cards, and all manner of installment obligations. When payments are applied in this manner, what remains is the actual balance owed on the obligation. This order refers to this method of applying payments as the actual-balance method.

The most obvious method for determining the amount that must be paid under the State's pay-to-vote system is the actual-balance method. Suppose, for example, a judgment requires a felon to pay $300. The felon is unable to pay all at once and so sets up a payment schedule. The county charges, and the felon pays, a $25 fee for setting up the payment schedule.[93] In due course the county turns the

---

[93] Trial Tr., ECF No. 396 at 29.

matter over to a collection agency.[94] The felon pays $100 to the collection agency, which keeps $40 as its fee and turns over $60 to the county for application on the felon's debt. The county's records will show the outstanding balance as $240, calculated as $300 - $60. Using the actual-balance method, the felon will be required to pay $240 to vote.

The hypothetical is realistic in most respects. Many counties, perhaps most, assess a $25 fee for setting up a payment plan.[95] Most counties, perhaps all, routinely turn accounts over to collection agencies. Collection agencies routinely charge fees of up to 40% and routinely remit to a county only the net remaining after deducting the fee.[96] County records routinely show only the net payment, not the amount retained by the collection agency.[97] The only unrealistic part of the

---

[94] *Id.* at 29, 32, 93; *see also* Trial Tr., ECF No. 393 at 201-02, 206-07. Some of the individual plaintiffs have had their outstanding LFOs sent to a collections agency. *See, e.g.*, Pls.' Ex. 24, ECF No. 152-23; Pls.' Ex. 11, ECF No. 152-10; Trial Tr., ECF No. 388 at 41-42; Trial Tr., ECF No. 397 at 66-67.

[95] *See* Fla. Stat. § 28.246(5); *see also* Trial Tr., ECF No. 396 at 29; Pls.' Ex. 15, ECF No. 152-14 at 13.

[96] *See* Fla. Stat. §§ 938.35, 28.246(6); Trial Tr., ECF No. 393 at 190, 206-07; Prelim. Inj. Hr'g, ECF No. 204 at 96-98.

[97] Trial Tr., ECF No. 388 at 221-25; Trial Tr., EF No. 393 at 190, 206-07; Prelim. Inj. Hr'g Tr., ECF No. 204 at 98.

hypothetical is this: in recent years, all felons have been assessed fees well in excess of $300.

When testifying at trial, the Assistant Director of the Division of Elections initially testified, in effect, that the actual-balance method is the proper method for determining how much a felon must pay to vote.[98] In response to a similar hypothetical—the same as posed above but without the $25 fee for setting up a payment plan—the Assistant Director testified that the felon would be required to pay $240 to vote, calculated as the initial $300 obligation less the net payment of $60.[99] The Assistant Director also acknowledged an email she sent to a Supervisor of Elections in September 2019 using the actual-balance method and concluding, based on this method, that a specific felon was not eligible to vote.[100]

In November 2019, the Work Group that SB7066 established to study administration of this system made recommendations.[101] One was that the State establish a system for clearly matching payments to the specific obligations to which they applied. This matters under the actual-balance method but not under the

---

[98] Trial Tr., ECF No. 413 at 153-55.

[99] *Id.*

[100] *Id.* at 157-161; *see also* Pls.' Ex. 854, ECF No. 360-12.

[101] *See* Pls.' Ex., 279 & Defs' Ex. 27, ECF No. 240-1 at 19.

State's newly adopted alternative method, as addressed below. The recommendation thus makes clear that the Work Group believed the actual-balance method was the proper method for determining the amount that must be paid to vote.

The actual-balance method was also consistent with the State's position in this litigation. In opposing the preliminary injunction, the State said a felon could call the Clerk of Court to determine the "outstanding" amount of fees and costs.[102] This could only refer to the actual-balance method, which requires the Clerk to know the net amount of payments that have been applied on an obligation, not the gross amount of all payments, whether or not applied on the obligation, as required for application of the State's alternative method, as addressed below.

The record includes an example. A Clerk's records showed a payment of $76.92.[103] The plaintiffs' expert managed to work backwards and figure out that, in all likelihood, this resulted from a $100 payment to a collection agent, whose fee agreement allowed it to retain 30% of the net payment.[104] Dividing $100 by 1.3 yields a payment to the Clerk of $76.92 and a fee to the agent of $23.08. But

---

[102] *See* ECF No. 132 at 28.

[103] *See* Trial Tr., ECF No. 388 at 199-202, 221-25.

[104] *Id.* at 221-25.

nothing in the Clerk's records showed this is what happened. If one's goal was to determine total payments, rather than the outstanding balance, there would be no way to do it—unless, perhaps, an expert assisted by a team of Ph. D. candidates had time to pour over records and work backwards. This could not have been what the State meant.

Similarly, in the State's brief in the Eleventh Circuit, the State repeatedly said the requirement was to pay any "outstanding" LFOs.[105]

Nothing in this record suggests that before March 2020, anyone believed or even considered it possible that the amount a felon would be required to pay to vote would properly be calculated using anything other than the actual-balance method. It is not surprising, then, that one Supervisor of Elections testified she had never heard of the alternative method the State now embraces.[106]

As the litigation progressed, though, it became evident that the actual-balance method presented substantial, perhaps insurmountable constitutional difficulties. The State's records were incomplete and inconsistent, especially for older felonies, and often did not match payments with obligations. This made it

---

[105] *See, e.g.*, *Jones v. Govenor of Fla.*, No. 19-14551, Appellant's Br. at 19, 41, 43.

[106] Trial Tr., ECF No. 413 at 169-70; Trial Tr., ECF No. 393 at 38-39,

impossible to calculate the balance owed in many cases. An expert analysis

showed inconsistencies for 98% of a randomly selected group of felons.[107]

The case of one named plaintiff, Clifford Tyson, is illustrative. An

extraordinarily competent and diligent financial manager in the office of the

Hillsborough County Clerk of Court, with the assistance of several long-serving

assistants, bulldogged Mr. Tyson's case for perhaps 12 to 15 hours.[108] The group

had combined experience of over 100 years.[109] They came up with what they

believed to be the amount owed. But even with all that work, they were unable to

explain discrepancies in the records.[110]

Other examples abound. Restitution is usually payable only to the victim

directly.[111] A sentence often, indeed usually, includes an order prohibiting the

defendant from contacting the victim.[112] The defendant may have no record of

amounts paid, especially if they were paid years or decades ago, and may never

---

[107] *See* Pls.' Ex. 892, ECF No. 360-47 at 9.

[108] Trial Tr., ECF No. 393 at 185.

[109] *Id.*

[110] *Id.* at 183-86.

[111] *Id.* at 157; Prelim. Inj. Hr'g Tr., ECF No. 204 at 104-05.

[112] *See, e.g.*, Trial Tr., ECF No. 397 at 60.

have known how the victim applied them—whether, for example, amounts were credited to interest, and if so, in what amount. The State has no record of restitution payments at all, except in the smaller number of cases in which restitution is payable to or through the Clerk of Court or Department of Corrections.[113]

When this information is unknown, it may be unknowable. Individual victims may have died or moved to parts unknown, and corporate victims may have gone out of business or been merged into other entities. Indeed, there may be nobody to pay, even if a felon is willing and able to make a payment. Insisting on payment of amounts long forgotten seems an especially poor basis for denying the franchise.

In addition, in many cases, probably most, a felon could not pay the outstanding balance without being required to pay additional amounts—amounts that were not included in a sentence and that a felon could not, under any plausible theory, be required to pay as a condition of voting.

Two examples illustrate the problem.

First, suppose a felon owes $100 and wishes to pay it to become eligible to vote. If the debt has been turned over to a collection agency, the Clerk of Court will not accept a payment. The felon will have to pay the collection agency a

---

[113] Trial Tr., ECF No. 393 at 157; Prelim. Inj. Hr'g Tr., ECF No. 204 at 104-05.

greater amount, as much as $166.67, to produce a net payment of $100 to the Clerk. It is hard to explain why a felon should have to pay the additional $66.67 to be able to vote.

Second, if restitution is payable not directly to the victim but through the Clerk of Court or Department of Corrections, the Clerk or Department imposes a charge for processing the payment—sometimes a specific amount, sometimes a percentage. The record includes, as an example, a 4% fee.[114] On that basis, a felon who owes $100 in restitution will have to pay $104 to vote—not just the $100 included in the sentence. It is hard to explain why a felon should have to pay the additional $4 to be able to vote. Indeed, it is hard to explain why the $4 charge is not a tax prohibited by the Twenty-Fourth Amendment.

That the $4 fee is a tax can be shown by comparing a purchase to a theft. If an individual buys a grill for $100, the state exacts a 6% sales tax; the buyer must pay $106. If an individual steals the grill, the court will require restitution of the same $100, and, upon payment, the state may exact a 4% charge. If the $6 charge is a tax, as it plainly is, it is hard to explain why the $4 charge is not also a tax. There is no plausible theory under which a felon can be required to pay a $4 tax to vote. The same analysis applies when the State's take is not 4% but a flat fee.

---

[114] *See, e.g.*, Pls.' Ex. 11, ECF No. 152-10 at 3-4, 34-38.

The takeaway: under the actual-balance method, determining what part of an LFO has been paid is sometimes easy, sometimes hard, sometimes impossible.

### (b) The Every-Dollar Method

To avoid some of these intractable constitutional difficulties, in March 2020, less than two months before the trial, the State abruptly changed course.[115] The State adopted what I referred to at trial as the "first-dollar method," an appellation the parties adopted, not as accurate but as convenient, and perhaps out of deference to the court. A better description is the "every-dollar method," a description that is used in this order.

The State decided, entirely as a litigating strategy, that instead of having to pay the outstanding balance of a specific obligation, an individual would be required only to make total payments on any related obligation, whether or not included in the sentence itself, that added up in the aggregate to the amount of the obligations included in the sentence.[116] Put differently, the State decided to retroactively reallocate payments, now applying every payment to the obligations in the original sentence, regardless of the actual purpose for which the payment

---

[115] *See* Defs.' Ex. 167, ECF No. 343-1; Defs.' Ex. 144, ECF No. 352-11; *see also* Trial Tr., ECF No. 408 at 127-30; Trial Tr., ECF No. 413 at 169-70.

[116] Trial Tr., ECF No. 413 at 169; Trial Tr., ECF No. 308 at 130, 165, 170.

was made or how it was actually applied. And the State decided to treat future

payments the same way.

The approach can be illustrated with the same hypothetical set out above.

Recall that the judgment required payment of $300; the county imposed, and the

felon paid, a $25 fee to set up a payment plan; and the felon paid $100 to a

collection agency, which kept $40 and remitted $60 to the county. This left an

actual balance of $240, calculated as $300 - $60. Now, though, the State says the

individual needs to pay only $175 to vote, calculated as $300 - $25 - $100. The

State treats the $25 fee that the felon paid to set up a payment plan not as having

been paid on that fee but as having been paid on the original $300 obligation. And

the State treats the entire $100 paid to the collection agency as having been paid on

the original $300 obligation, even though $40 of that amount never made it to the

county, was not credited on the $300 obligation, and is not even reflected in the

county's records.[117]

If the every-dollar approach accomplished its goal of shoring up the State's

position in this litigation, it would present, for the affected part of the plaintiffs'

claims, a voluntary-cessation issue. A "defendant's voluntary cessation of

allegedly unlawful conduct ordinarily does not suffice to moot a case." *Friends of*

---

[117] *See* Trial Tr., ECF No. 393 at 190-91, 206-07; Trial Tr., ECF No. 388 at 221-
25; Prelim. Inj. Hr'g, ECF No. 204 at 97-98.

*the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 174 (2000). The same is true for an individual claim within a case. A claim becomes moot only "if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id*. at 189 (internal quotation marks and citations omitted).

When the defendant is a governmental entity, "there is a rebuttable presumption that the objectionable behavior will *not* recur." *Troiano v. Supervisor of Elections in Palm Beach Cty.*, 382 F.3d 1276, 1283 (11th Cir. 2004) (emphasis in original). Relevant considerations include whether the change in the governmental entity's position was adopted only in response to litigation and whether the change has been incorporated into a statute or rule or formal policy. *See Rich v. Sec'y, Fla. Dep't of Corr.*, 716 F.3d 525, 531-32 (11th Cir. 2013); *Atheists of Fla., Inc. v. City of Lakeland*, 713 F.3d 577, 594 (11th Cir. 2013).  Here the every-dollar method was adopted only in response to the litigation; it is not set out in a statute or rule or even in a formal policy; and it could be abandoned just as easily as it was adopted. The State could easily revert to the actual-balance method.

As it turns out, the every-dollar method makes the pay-to-vote system's constitutional deficiencies worse, not better; the State's change of course undermines—it does not shore up—the State's position. This makes the discussion of voluntary cessation largely academic.

The explanation is this. The State's principal justification for the pay-to-vote system is that a felon should be required to satisfy the felon's entire criminal sentence before being allowed to vote—that the felon should be required to pay the felon's entire debt to society. But the every-dollar method gravely undermines this debt-to-society rationale. Under the every-dollar approach, most felons are no longer required to satisfy the criminal sentence. Four illustrations make the point.

First, recall that in the hypothetical set out twice above, the judgment required payment of $300; the county imposed, and the felon paid, a $25 fee to set up a payment plan; and the felon paid $100 to a collection agency, which kept $40 and remitted $60 to the county. This left an actual balance of $240, calculated as $300 - $60. Under the every-dollar approach, though, the State says the individual can vote upon payment of only $175, calculated as $300 - $25 - $100. The $175 payment will leave a balance of $65 still owed on the criminal sentence—an amount whose payment can be enforced as part of the criminal case. But the State says the felon can vote. The debt to society, defined as compliance with the sentence, has not been paid.

Second, recall that in a different hypothetical set out above, $100 in restitution could be paid only by tendering $104 to the entity designated to collect it, perhaps the Department of Corrections. The Department would take its 4% fee, or $4, and send the remaining $100 forward as payment to the victim in full. Under

the every-dollar approach, however, the individual could vote upon payment of just $100, not $104. From a $100 payment, the Department would still take its 4% fee and so would apply the payment as $3.85 to the Department and $96.15 to the victim. The State says the felon could vote, even though the victim would still be owed $3.85.[118] The same analysis would apply if the Department charged a flat fee, not a percentage. Either way, the debt to society, defined as compliance with the sentence, would not have been paid.

Third, Mr. Tyson was convicted of multiple felonies long ago. He was sentenced to probation. The sentences included restitution, now paid in full, and fees with an outstanding balance Mr. Tyson is unable to pay. While on probation, Mr. Tyson was required to pay, and sometimes did pay, $10 per month toward the cost of supervision.[119] As the State acknowledges, when a felon is required to pay the cost of supervision, this is not an amount that must be paid to vote; the amount is not part of the sentence but instead accrues later.[120] Under the every-dollar method, though, the amount is credited against the amount that must be paid to

---

[118] *See, e.g.*, Trial Tr., ECF No. 408 at 173-75.

[119] *See* Prelim. Inj. Hr'g Tr., ECF No. 204 at 174-75.

[120] *See* ECF No. 408 at 103; Fla. Stat. § 98.0751(2)(a)5.c. (stating that "all terms of sentence" does not include amounts that "accrue after the date the obligation is ordered as part of the sentence").

vote. Mr. Tyson has not paid all the LFOs that were imposed as part of his sentences. But under the every-dollar method, he may be eligible to vote, even though his debt to society, defined as compliance with the sentence, has not been paid.

Fourth, Christina Paylan's sentence included $513 in fees she has not paid.[121] She took an appeal and paid $1,554.65 toward the cost of preparing the record. The fact that she pursued an appeal should have nothing to do with whether she can vote. But under the State's every-dollar approach, she is eligible to vote, even though her LFOs were not paid, because her payment for appellate costs exceeded the LFOs. She is eligible to vote, that is, even though her debt to society, defined as compliance with the sentence, has not been paid.

This fourth example shows just how far the State is willing to stray from any approach that makes sense. Consider three individuals who committed the same crime and drew the same sentence, including the same LFOs. All three are out of prison and off supervision. The first individual has money, pays the LFOs, and can vote. The second and third have no money, owe the same amount on their LFOs, and cannot pay it. The only difference between the second and third is this: the second found a relative who put up funds for an appeal, while the third took no appeal. Under the State's pay-to-vote system, coupled with the every-dollar

---

[121] *See* Pls.' Ex. 854, ECF No. 360-12; Trial Tr., ECF No. 413 at 157-60.

method, the first and second individuals can vote; the third cannot. The first can vote because she has money. The second can vote because she took an appeal. This should not disqualify a person from voting—but it also should not make a person eligible who otherwise would not be. The third cannot vote because she does not have money and did not take an appeal. This result is bizarre, not rational.

The amounts in some of these examples are small, but the numbers could be multiplied by 10 or 100 or 1,000, and the principle would be the same. Moreover, the Supreme Court has made clear that when the issue is paying to vote, even $1.50 is too much. *See Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 664 n.1, 668 (1966). On voting issues, the old British maxim holds true: in for a penny, in for a pound.

Many more examples could be given showing the irrationality of the pay-to-vote system when coupled with the every-dollar method. Individuals will be allowed to vote with unpaid restitution, even when they can afford to pay. The same will be true for fines, fees, and costs. In sum, the every-dollar method thoroughly departs from, and thus undermines, the debt-to-society rationale.

What the Fifth Circuit said of a different reenfrachisement argument is equally true of Florida's every-dollar argument: "The ingenuity of this argument is matched only by its disingenuousness." *Shephard v. Trevino*, 575 F.2d 1110, 1113 (5th Cir. 1978). The every-dollar approach is contrary to the State's original

understanding, was conceived only in an effort to shore up the State's flagging position in this litigation, and renders the pay-to-vote system more irrational, not less.

In any event, the takeaway for the administrability analysis is this: even using the every-dollar method, determining the amount of payments allocable to LFOs is sometimes easy, sometimes hard, sometimes impossible.

### 3. Processing Registrations in the Division of Elections

The Secretary of State's Division of Elections screens all newly registered voters for felony convictions.[122] The Division also periodically screens previously registered voters to determine whether they have new convictions.[123]

Before Amendment 4, the process consisted primarily of matching two sets of data, one consisting of registrants, the other of felons. The Division ordinarily required matches on at least three of four data points: full name, driver's license number, social security number, and state identification card number.[124] If there was a match—the registrant was a felon—the Division needed only to check on restoration of rights, either through the Florida Executive Clemency Board or

---

[122] *See* Defs.' Ex. 16, ECF No. 148-16 at 6-8; *see also* Fla. Stat. § 98.075(5).

[123] *See* Defs.' Ex. 16, ECF No. 148-16 at 6-8; *see also* Fla. Stat. § 98.075(5).

[124] Defs.' Ex. 16, ECF No. 148-16 at 7-8.

under another state's laws.[125] The Division reported to the proper Supervisor of Elections any match that, in the Division's terminology, was not "invalidated" through restoration of rights. The Division was staffed to handle the workload.

Amendment 4 and SB7066 increased the workload by several orders of magnitude. The question was no longer just whether there was a match that had not been invalidated by the Clemency Board or under another state's laws. Now the Division had to address three new questions: whether a matched individual had a felony conviction for murder or a sexual offense, whether the individual was in custody or on supervision, and whether the individual had unpaid LFOs.[126]

Florida law requires a budget analysis in connection with proposed legislation. The analysis for the bill that was rolled into SB7066 projected a need for 21 additional employees to process the increased workload.[127] The estimate was almost surely too low. But the Legislature allocated no funds for additional employees, and the Division has hired none.

As of the time of trial, the Division has 85,000 pending registrations of individuals with felony convictions—registrations in need of screening for murder

---

[125] *Id.* The Division uses an unreliable website to assess other states' laws.

[126] *See id.* at 8-9.

[127] Pls.' Ex. 313, ECF No. 349-14 at 27.

and sexual offenses, for custody or supervision status, and for unpaid LFOs.[128] In the 18 months since Amendment 4 was adopted, the Division has had some false starts but has completed its review of not a single registration. Indeed, while the Division has worked on murder and sexual offenses and on custody or supervision status, the Division has not even begun screening for unpaid LFOs, with this exception: the Division's caseworkers have preliminarily screened the 17 named plaintiffs for unpaid LFOs, and the Division Director has reviewed the work on some but not all of the 17. None of the 17 is ready to go out.[129]

Even without screening for unpaid LFOs, all the Divison's caseworkers combined can process an average of just 57 registrations per day.[130] The LFO work, standing alone, is likely to take at least as long as—probably much longer than—the review for murder and sexual offenses and for custody or supervision status. Even at 57 registrations per day, screening the 85,000 pending registrations will take 1,491 days. At 261 workdays per year, this is a little over 5 years and 8 months. The projected completion date, even if the Division starts turning out work today, and even if screening for LFOs doesn't take longer than screening for

---

[128] Trial Tr., ECF No. 408 at 185-86; Trial Tr., ECF No. 413 at 84.

[129] Trial Tr., ECF No. 408 at 199-200.

[130] *Id.* at 146, 185-86.

murders, sexual offenses, custody, and supervision, is early in 2026. With a flood of additional registrations expected in this presidential election year, the anticipated completion date might well be pushed into the 2030s.[131]

To be sure, days before the trial began, the Department of State entered into an interagency agreement with the Florida Commission on Offender Review. The Commission apparently will provide staffing assistance. But it is unlikely the assistance will offset the work needed to process LFOs, let alone cut into the work needed on murder and sexual offenses and custody or probation status. The Division's figure of 57 registrations per day is still the best estimate of the overall processing rate. The State has provided no evidence that, even with the Commission's help, it will be able to complete its review of the pending and expected applications earlier than 2026.[132]

The takeaway: 18 months after Amendment 4 was adopted, the Division is not reasonably administering the pay-to-vote system and has not been given the resources needed to do so.

### 4. The Deterrent Effect on Registrants

Because of the State's failure to administer the pay-to-vote system reasonably, many affected citizens, including some who owe amounts at issue and

---

[131] *See* Trial Tr., ECF No. 388 at 104-05.

[132] *See* Defs.' Ex. 168, ECF No. 343-2; *see also* Trial Tr., ECF No.408 at 147.

some who do not but cannot prove it, would be able to vote or even to register only by risking criminal prosecution. It is likely that if the State's pay-to-vote system remains in place, some citizens who are eligible to vote, based on the Constitution or even on the state's own view of the law, will choose not to risk prosecution and thus will not vote.

The State says felons who register in good faith need not fear prosecution and those who are eligible will not be deterred from registering or voting. The assertion rings hollow. It is true that a conviction for a false affirmation in connection with voting requires a showing of willfulness, *see* Fla. Stat. § 104.011, and a conviction for illegally voting requires a showing of fraud, *see id*. § 104.041. For at least four reasons, though, the State's confidence that prospective voters will not be unjustifiably deterred is misplaced.

First, SB7066 provides immunity from prosecution for those who registered in good faith between January 8, 2019, when Amendment 4 took effect, and July 1, 2019, when SB7066 took effect. A proposal to add a good-faith provision for other registrants was rejected.[133]

---

[133] *See* Rep. Geller, Proposed Amendment 239235 to HB 7089 (2019), available at https://www.flsenate.gov/Session/Bill/2019/7089/Amendment/239235/PDF.

Second, the State's registration form includes a warning that a false statement is a felony; the warning omits the statutory requirement for willfulness.[134] Accurate advice of the penalties for submitting a false registration is proper, indeed required. *See* 52 U.S.C. § 20507(a)(5). But here the advice is not complete; an individual attempting to register is told, in effect, that the individual will have committed a felony if it turns out the individual was not eligible, regardless of willfulness. The deterrent effect is surely strong on individuals who have served their time, gone straight, and wish to avoid entanglement with the criminal-justice system.[135] Indeed, the deterrent effect is surely strong for individuals who are in fact eligible but are not sure of that fact. That the Director of the Division of Elections cannot say who is eligible makes clear that some voters also will not know.

Third, the record includes evidence that a local official—one whose home address was protected from public disclosure under Florida law—used her City

---

[134] *See* Pls.' Ex. 35, ECF No. 152-33 (pre-SB7066 registration form); Pls.' Ex. 36, ECF No. 152-34 (post-SB7066 registration form); Defs.' Ex. 169, ECF No. 343-3 (April 17, 2020 draft registration form); Defs.' Ex. 170, ECF No. 343-4 (April 17, 2020 draft registration form).

[135] *See* Trial Tr., ECF No. 397 at 73; *see also* Prelim. Inj. Hr'g Tr., ECF No. 204 at 172, 153.

Hall address when registering to vote.[136] This was improper but perhaps understandable; some public officials and law enforcement officers whose jobs make them vulnerable to retaliation use office addresses for mail and other purposes. The official was charged and entered into a deferred-prosecution agreement. In Florida, where any voter can challenge any other voter's eligibility, and where a mistake can lead to a prosecution, it is hardly surprising that a felon who is newly eligible to vote but unsure of the rules would decide not to risk it.

Fourth, a Supervisor of Elections who advocated voter registration advised one or more prospective voters who were unsure of their eligibility to submit registrations so the issues could be addressed. The Secretary of State at that time—not the current Secretary—sent the Supervisor a strident letter instructing him not to do this again.[137] This casts doubt on the State's professed tolerance for good-faith mistakes or even for good-faith efforts to determine eligibility.

The takeaway: it is certain that some eligible voters will choose not to vote because of the manner in which the State has administered—and failed to administer—the pay-to-vote system.

---

[136] *See* Pls.' Ex. 288, ECF No. 348-25; Pls.' Ex. 289, ECF No. 286-19.

[137] Pls.' Ex. 82, ECF No. 152-79.

### *(5)  A Concluding Word on Rational-Basis Scrutiny*

The State's inability to reasonably administer the pay-to-vote system, including its inability in many instances even to determine who is eligible to vote and who is not, renders the pay-to-vote system even more irrational than it otherwise would be.

Far from undermining the Eleventh Circuit's conclusion that the pay-to-vote system is unconstitutional as applied to those unable to pay, the evidence now further supports that view and, if anything, calls into question the conclusion that the system is rational even as applied to those who are able to pay.

A note is in order, too, about the interplay between this analysis and the defendants' assertion in the prior appeal, addressed alternatively in the Eleventh Circuit's opinion, that an as-applied challenge to a provision subject to only rational-basis scrutiny looks not to the specific plaintiffs but to the mine-run of cases. If that were correct—as set out above, it is not—the conclusion would be inescapable that the entire pay-to-vote system is unconstitutional, because the record now shows that the mine-run case is a person who is genuinely unable to pay. In *Jones*, the Eleventh Circuit said the State almost conceded the point—that is, said that if the mine-run case was a person unable to pay, the entire system would fall. *See Jones*, 950 F.3d at 814.

The State has offered only three justifications for the pay-to-vote system. The first is the punishment or debt-to-society rationale—that a felon should be required to satisfy the felon's entire criminal sentence before being allowed to vote. But this does not justify requiring payment by those unable to pay, and the State has itself severely undercut this rationale by adopting the every-dollar method, under which many felons will be allowed to vote before paying all amounts due on their sentences.

The second purported justification is the debt-collection rationale—that the system provides an incentive to pay the amounts at issue. But one cannot get blood from a turnip or money from a person unable to pay. And the State has far better ways to collect amounts it is owed. Moreover, one might well question the legitimacy of the State's interest in leveraging its control over eligibility to vote  to improve the State's financial position.

The third purported justification is administrative convenience—that the state should be able to pursue the first two goals efficiently. This third justification is entirely derivative of the other two; if the debt-to-society and debt-collection rationales cannot sustain the pay-to-vote system, neither can administrative convenience. This order will improve, not compromise, the administrability of the State's system.

The pay-to-vote system does not survive heightened or even rational-basis scrutiny as applied to individuals who are unable to pay and just barely survives rational-basis scrutiny as applied even to those who are able to pay.

## X. Poll Tax or Other Tax

The Twenty-Fourth Amendment to the United States Constitution provides that a citizen's right to vote in a federal election "shall not be denied or abridged by the United States or any State by reason of failure to pay any poll tax or other tax." The State says the amendment does not apply to felons because they have no right to vote at all, but that makes no sense. A law allowing felons to vote in federal elections but only upon payment of a $10 poll tax would obviously violate the Twenty-Fourth Amendment.

Florida has not, of course, explicitly imposed a poll tax. The financial obligations at issue were imposed as part of a criminal sentence. The obligations existed separate and apart from, and for reasons unrelated to, voting. Every court that has considered the issue has concluded that such a preexisting obligation is not a poll tax. *See, e.g.*, *Johnson v. Bredesen*, 624 F.3d 742, 751 (6th Cir. 2010); *Harvey v. Brewer*, 605 F.3d 1067, 1080 (9th Cir. 2010); *Thompson v. Alabama*, 293 F. Supp. 3d 1313, 1332-33 (M.D. Ala. 2017); *Coronado v. Napolitano*, No. cv-07-1089-PHX-SMM, 2008 WL 191987 at *4-5 (D. Ariz. Jan. 22, 2008).

This does not, however, end the Twenty-Fourth Amendment analysis. The amendment applies not just to any poll tax but also to any "other tax." As the State has emphasized in addressing Florida's Amendment 4, "words matter."[138] The same principle applies to the Twenty-Fourth Amendment. The words "any . . . other tax" are right there in the amendment.

There is no defensible way to read "any other tax" to mean only any tax imposed at the time of voting or only any tax imposed explicitly for the purpose of interfering with the right to vote. "Any other tax" means "any other tax." A law prohibiting citizens from voting while in arrears on their federal income taxes or state property taxes would plainly violate the Twenty-Fourth Amendment. A state could not require a voter to affirm, on the voter-registration form or when casting a ballot, that the voter was current on all the voter's taxes. The very idea is repugnant.

The only real issue is whether the financial obligations now at issue are taxes. As the Supreme Court has made clear time and again, whether an exaction is a "tax" for constitutional purposes is determined using a "functional approach," not simply by consulting the label given the exaction by the legislature that imposed it. *See, e.g.*, *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 564-66 (2012) (collecting cases).

---

[138] *See* ECF No. 132 at 32.

The Supreme Court has said the "standard definition of a tax" is an "enforced contribution to provide for the support of the government." *United States v. State Tax Comm'n.*, 421 U.S. 599, 606 (1975) (quoting *United States v. La Franca*, 282 U.S. 568, 572 (1931)). More recently, the Court has said the "essential feature of any tax" is that "[i]t produces at least some revenue for the Government." *Nat'l Fed'n*, 567 U.S. at 564 (citing *United States v. Kahriger*, 345 U.S. 22, 28 n.4 (1953)).

The plaintiffs say cases like *National Federation* and *Kahriger* deal with the meaning of tax under Article I and thus do not apply to the Twenty-Fourth Amendment. And indeed, one might well conclude that the definition of a tax under the Twenty-Fourth Amendment should be as broad as the evil that led to the amendment's enactment: the pernicious practice of requiring citizens to pay to vote. But Article I and *Kahriger* were in the books when the Twenty-Fourth Amendment was adopted. The better approach is to read the Twenty-Fourth Amendment the same way.

Restitution payable to the private victim of a crime—not to a government—is intended to compensate the victim, not raise revenue for the government. Restitution thus lacks the essential feature of a tax. This makes clear that restitution payable to a private victim is not a tax. And while the issue is perhaps closer, the result is the same when restitution is payable to a government as a victim.

Restitution that is payable to the government is intended not to fund government operations but to reimburse the government for actual losses it has suffered in the past. In short, restitution is intended to compensate the victim, regardless of the victim's identity, and is not a tax.

For criminal fines, the issue is closer. Fines generate revenue for the government that imposes them, but the primary purpose is to punish the offender, not to raise revenue. Fines vary from individual to individual. They are imposed based on the court's assessment of culpability, or, in the case of minimum mandatory fines, based on the legislature's assessment of culpability.

In *National Federation*, the Court did not provide an exhaustive list of relevant considerations relevant to the functional approach to determining whether an exaction is a tax. But the Court did address the consideratons that were important there. One was the size of the exaction; a "prohibitory" charge is likely a penalty, while a modest charge is more likely a tax. *Id*. at 565-66. A second consideration is scienter; punishment is more likely to be imposed on those who intentionally break the law. *Id*. at 565-66. A third consideration is who enforces the exaction—whether a taxing authority or agency with responsibility to punish those who violate the law. *Id.* at 566.

These same considerations are instructive here. Fines vary in amount from case to case, but they are often substantial or, in the language of *National*

*Federation*, "prohibitory." *Id*. at 566. Unlike fees or costs, fines ordinarily are imposed only on those who are adjudged guilty, almost always of an offense that requires scienter. And the amount of a fine is determined by the sentencing authority, that is, by the judge in the criminal case. In sum, under a functional analysis, fines are criminal penalties, not taxes.

The same is not true for the many categories of fees routinely assessed against Florida criminal defendants. Florida has chosen to pay for its criminal-justice system in significant measure through such fees.[139]

The fees are sometimes denominated "costs," though they are not court costs of the kind routinely assessed in favor of the party who prevails in litigation. Whether an assessment is labeled a fee or cost makes no relevant difference, as demontstrated by SB7066 itself. The statute first says "all terms of sentence" includes "fines or fees," leaving out costs. Fla. Stat. § 98.0751(2)(a)5.b. But in the next sentence, the statute says the covered amounts do not include "fines, fees, or costs" that accrue after the date the obligation is ordered as part of the sentence. *Id*. § 98.0751(2)5.c. Nobody has attributed any significance to the omission of "costs"

---

[139] *See* Fla. Const., art. V, § 14 (providing that all funding for clerks of court must be obtained through fees and costs, with limited exceptions); *see also* Trial Tr., ECF No. 396 at 34-35.

from the first of these provisions. For convenience, this opinion sometimes refers
to all such charges as "fees."

Every criminal defendant who is convicted, and every criminal defendant
who enters a no-contest plea of convenience or is otherwise not adjudged guilty but
also not exonerated, is ordered to pay such amounts.[140] In one county, for example,
the fees total at least $668 for every defendant who is represented by a public
defender and $548 for every defendant who is not, and more if there are multiple
counts.[141]

There is no controlling authority, and very little authority at all, addressing
the question whether assessments like these are "other taxes" within the meaning
of the Twenty-Fourth Amendment. The most persuasive discussion of the issue is
in a dissenting opinion. *See Johnson v. Bredesen*, 624 F.3d 742, 770-72 (6th Cir.
2010) (Moore, J., dissenting). The statute at issue there required felons to pay
restitution and child support before being reenfranchised. The court held these
were not taxes—a holding fully consistent with the analysis set out above. Judge
Moore noted, though, that the state took a 5% fee for processing child-support
payments, and she asserted this fee was an "other tax" prohibited by the Twenty-
Fourth Amendment. The reasoning applies much more persuasively to the fees at

---

[140] *See* Trial Tr., ECF No. 396 at 25, 27-28, 77-78, 97.

[141] *See* Trial Tr., ECF No. 396 at 23-24.

issue here, which are not merely fees for processing payments on assessments that are not themselves taxes; the fees at issue here have been directly levied by, and are paid in full to, state governmental entities.[142]

In any event, the *National Federation* factors favor treating the fees assessed in Florida as taxes, not penalties. For most categories of fees, the amount is fixed, and with rare exceptions, the amount is comparatively modest, certainly not "prohibitory." Most fees and costs are assessed without regard to culpability; a defendant adjudged guilty of a violent offense ordinarily is assessed the same amount as a defendant who is charged with a comparatively minor nonviolent offense, denies guilt, pleads no-contest, and is not adjudged guilty. The amount of a given fee, while nominally imposed by the judge, is ordinarily determined by the Legislature. And the fees are ordinarily collected not through the criminal-justice system but in the same way as civil debts or other taxes owed to the government, including by reference to a collection agency.

In sum, the fees are assessed regardless of whether a defendant is adjudged guilty, bear no relation to culpability, and are assessed for the sole or at least primary purpose of raising revenue to pay for government operations—for things

---

[142] Less persuasively, Judge Moore also asserted restitution payable to the state as a victim was an "other tax." This order does not accept that view.

the state must provide, such as a criminal-justice system, or things the state chooses to provide, such as a victim-compensation fund. A tax by any other name.

If a state chose to fund its criminal-justice system by assessing a $10 fee against every resident of the state, nobody would doubt it was a tax. Florida has chosen to fund its criminal-justice system by assessing just such a fee, but to assess it not against all residents but only against those who are alleged to have committed a criminal offense and are not exonerated. As a measure designed to raise revenue to fund the government, this would be a tax even if exacted only from those adjudged guilty. The result is made more clear by the state's exaction of the fee even from those not adjudged guilty.

If, as the Supreme Court held in *National Federation*, the government's assessment of $100 against any person choosing not to comply with the legal obligation to obtain conforming health insurance is a tax, a larger assessment against a person who is charged with but not adjudged guilty of violating some other legal requirement is also not a tax, at least when, as in Florida, the purpose of the assessment is to raise money for the government. And if a fee assessed against a person who is not adjudged guilty is a tax, then the same fee, when assessed against a person who *is* adjudged guilty, is also a tax.

The Twenty-Fourth Amendment precludes Florida from conditioning voting in federal elections on payment of these fees and costs. And because the Supreme

Court has held, in effect, that what the Twenty-Fourth Amendment prescribes for federal elections, the Equal Protection Clause requires for state elections, Florida also cannot condition voting in state elections on payment of these fees and costs.

## XI. Race Discrimination

The Gruver plaintiffs assert a claim of race discrimination. This order sets out the governing standards and then turns to the claims and provisions at issue.

### A. The Governing Standards

To prevail on a claim that a provision is racially discriminatory, a plaintiff must show that race was a motivating factor in the provision's adoption. *See, e.g.*, *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977); *Washington v. Davis*, 426 U.S. 229 (1976). A racially disparate impact is relevant to the question whether race was a motivating factor, but in the absence of racial motivation, disparate impact is not enough.

If race was a motivating factor, the defendant may still prevail by showing that the provision would have been adopted anyway, even without the improper consideration of race. *See, e.g.*, *Mt. Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *see also Hunter v. Underwood*, 471 U.S. 222, 228 (1985).

### B. Amendment 4

The plaintiffs make no claim that race was a motivating factor in the voters' approval of Amendment 4. The amendment was intended to restore the right to

vote to a large number of felons. It was an effort to expand, not contract, the

electorate. Most voters probably were aware that the proportion of African

Americans with felony convictions exceeds the proportion of whites with felony

convictions—this is common knowledge. But if anything, the voters' effort was to

restore the vote to African American felons, as well as all other felons, not to

withhold it.

### C. The Florida Supreme Court Ruling

The plaintiffs also do not assert the Florida Supreme Court was motivated by

race when it issued its advisory opinion holding that "all terms of sentence," within

the meaning of Amendment 4, include financial obligations.

### D. SB7066

The plaintiffs *do* assert that SB7066 was motivated by race. The State makes

light of the argument, asserting that SB7066 merely implements Amendment 4,

and that SB7066, like Amendment 4, expands, not contracts, the electorate. But

that is not so. SB7066 includes many provisions that go beyond Amendment 4

itself, including some that limit Amendment 4's reach in substantial respects.

Amendment 4 had already expanded the electorate; SB7066 limited the expansion.

The State also offers lay opinion testimony that key legislators were not

motivated by racial animus—testimony that would not be admissible over

objection, proves nothing, and misses the point.[143] It is true, and much to the State's credit, that the record includes no evidence of racial animus in any legislator's heart—no evidence of racially tinged statements, not even dog whistles, and indeed no evidence at all that any legislator harbored racial animus.

Under *Arlington Heights*, though, the issue is not just whether there was racial animus in any legislator's heart, nor whether there were other reasons, in addition to race, for a legislature's action. To establish a prima facie case, a plaintiff need only show that race was a motivating factor in adoption of a challenged provision. *See Hunter*, 471 U.S. at 227-28; *see also United States v. Dallas Cty. Comm'n*, 739 F.2d 1529, 1541 (11th Cir. 1984).

The issue is far more serious than the State recognizes. Indeed, the issue is close and could reasonably be decided either way.

Four aspects of SB7066 are adverse to the interests of felons seeking reenfrachisement and are worthy of discussion here.

SB7066's most important provision, at least when it was adopted, defined "all terms of sentence," as used in Amendment 4, to include financial obligations. The Florida Supreme Court later ruled that this is indeed what this phrase means, rendering this part of SB7066 inconsequential. This does not, however, establish that the Legislature's treatment of this issue was not motivated by race.

---

[143] Meade Dep. Designations, ECF No. 342-1 at 121.

When SB7066 was enacted, it was possible, though not likely, that the court would reach a different result. More importantly, it was possible the court would not rule on this issue before the 2020 election, and that felons with unpaid financial obligations would be allowed to register and vote. Indeed, this was already occurring. Some Supervisors of Elections believed Amendment 4 did not apply to financial obligations.[144] So SB7066's provision requiring payment of financial obligations was important.

SB7066's second most important provision was probably its treatment of judicial liens. Florida law allows a judge to convert a financial obligation included in a criminal judgment to a civil lien. Judges often do this, usually because the defendant is unable to pay. The whole point of conversion is to take the obligation out of the criminal-justice system—to allow the criminal case to end when the defendant has completed any term in custody or on supervision.

When a defendant's criminal case is over, and the defendant no longer has any financial obligation that is part of or can be enforced in the criminal case, one would most naturally conclude the sentence is complete. The Senate sponsor of

---

[144] *See* Trial Tr., ECF No. 393 at 10-11; Barton Dep. Designations, ECF No. 389-2 at 49-50; Earley Dep. Designations, ECF No. 389-3 at 72-73.

SB7086 advocated this view.[145] But the House sponsor's contrary view prevailed, and, under SB7066, conversion to a civil lien does not allow the person to vote.[146]

This result is all the more curious in light of the State's position in this litigation that when a civil lien expires, the person is no longer disqualified from voting.[147] So the situation is this. The State says the pay-to-vote system's legitimate purpose is to require compliance with a criminal sentence. When the obligation is removed from the criminal-justice system, the person is still not allowed to vote. But when the obligation is later removed from the civil-justice system—when the civil lien expires—the person can vote. Curious if not downright irrational.

In any event, it cannot be said that on the subject of civil liens, SB7066 simply followed Amendment 4.

The third SB7066 provision that bears analysis is the registration form it mandates. The form is indefensible, provides no opportunity for some eligible

---

[145] *See, e.g.*, Pls.' Ex 400, ECF No. 351-28; *see also* Pls.' Ex. 893, ECF No. 286-13 at 47-48.

[146] *See* Pls.' Ex. 893, ECF No. 286-13 at 47-48; *see also* Fla. Stat. § 98.0751.

[147] *See* Trial Tr., ECF No. 408 at 84-85, 144; Trial Tr., ECF No. 413 at 16-17.

felons to register at all, and is sure to discourage others.[148] It is so obviously deficient that its adoption can only be described as strange, as was the Legislature's failure to correct it after the State was unable to defend it in any meaningful way in this litigation and actively sought a legislative cure.

The fourth aspect of SB7066 that warrants attention is its failure to provide resources to administer the system the statute put in place. The Legislature was provided information on needed resources and surely knew that without them, the system would break down. SB7066 provided no resources.

SB7066 included many other provisions, some favorable to felons seeking reenfranchisement.[149] The issue on the plaintiffs' race claim is not whether by enacting SB7066, the Legislature adopted the only or even the best reading of Amendment 4 or implemented the amendment in the best possible manner. The issue is whether the Legislaure was motivated, at least in part, by race.

SB7066 passed on a straight party-line vote. Without exception, Republicans voted in favor, and Democrats voted against.[150] The defendants' expert testified

---

[148] Prelim. Inj. H'rg Tr., ECF No. 204 at 201-04; Prelim. Inj. H'rg Tr., ECF No. 205 at 49-50.

[149] *See, e.g.*, Fla. Stat. §§ 98.0751(2)(a)(5)(d), (e) (allowing a court to modify some financial obligations).

[150] *See* Pls.' Ex. 893, ECF No. 286-13 at 87.

that felon reenfrachisment does not in fact favor Democrats over Republicans.[151]
He based this on studies that might or might not accurately reflect the situation in
today's Florida and might or might not apply to felons with unpaid LFOs as
distinguished from all felons. What is important here, though, is not whether the
LFO requirement actually favors Democrats or Republicans, but what motivated
these legislators to do what they did.

When asked why, if reenfranchisement has no partisan effect, every
Republican voted in favor of SB7066 and every Democrat voted against, the
State's expert suggested only a single explanation: legislators misperceived the
partisan impact.[152] As he further acknowledged, it is well known that African
Americans disproportionately favor Democrats.[153] He suggested no other reason
for the legislators' posited misperception and no other reason for the straight party-
line vote.

This testimony, if credited, would provide substantial support for the claim
that SB7066 was motivated by race. If the motive was to favor Republicans over
Democrats, and the only reason the legislators thought these provisions would
accomplish that result was that a disproportionate share of affected felons were

---

[151] Trial Tr., ECF No. 402 at 113-14.

[152] *See id.* at 117-18.

[153] *Id.*

African American, prohibited racial motivation has been shown. *See, e.g.*, *Hunter v. Underwood*, 471 U.S. 222, 233 (1985); *N. Carolina State Conference of NAACP v. McCrory*, 831 F.3d 204, 226-27 (4th Cir. 2016). The State has not asserted the Legislature could properly consider party affiliation or use race as a proxy for it and has not attempted to justify its action under *Hunt v. Cromartie*, 526 U.S. 541, 551 (1999) (noting that a state could engage in political gerrymandering, "even if it so happens that the most loyal Democrats happen to be black Democrats and even if the State were conscious of that fact").

Parenthetically, it bears noting that the expert's explanation is troublesome, even apart from its racial implications. *See, e.g.*, *Anderson v. Celebrezze*, 460 U.S. 780, 793 (1983) ("As our cases have held, it is especially difficult for the State to justify a restriction that limits political participation by an identifiable political group whose members share a particular viewpoint, associational preference, or economic status.").

Before turning to the contrary evidence, a note is in order about two items that do not show racial motivation.

First, the House sponsor of SB7066 emphatically said during legislative debate that the bill was simply a faithful implementation of Amendment 4—in effect, "nothing to see here." This is not true. SB7066 included much that was not in Amendment 4, even as later construed by the Florida Supreme Court. The

plaintiffs say this "faithful steward" argument was a pretext to hide racial

motivation. And the plaintiffs are correct that pretextual arguments often mask

prohibited discrimination. But there are other, more likely explanations for the

sponsor's argument. It was most likely intended simply to garner support for

SB7066 and perhaps to avoid a meaningful discussion of the policy choices baked

into the statute. The argument says nothing one way or the other about the policy

choices or motivation for the legislation.

Second, the House sponsor also said during debate that he had not sought

information on racial impact and had not considered the issue at all. The plaintiffs

say this shows willful blindness to the legislation's obvious racial impact and was

again a pretext for racial discrimination. Properly viewed, however, the sponsor's

statement does not show racial motivation. It probably shows only an awareness

that a claim of racial discrimination was possible, perhaps likely, and a reasonable

belief that, if the sponsor requested information on racial impact, the request would

be cited as evidence of racial bias. *See, e.g.*, *McCrory*, 831 F.3d at 230 (citing the

request for and use of data on race in support of a finding of intentional race

discrimination in voting laws). And while any suggestion that the sponsor did not

know SB7066 would have a racially disparate impact could reasonably be labeled

pretextual, that is not quite what the sponsor said. On any fair reading, the

sponsor's assertion was simply that race should not be a factor in the analysis—an

entirely proper assertion. The statement says nothing one way or the other about whether perceived partisan impact was a motivating factor for the legislation, about whether the perceived partisan impact was based on race, or about whether race was thus a motivating factor in the passage of SB7066.

In sum, the plaintiffs' race claim draws substantial support from the inference—in line with the testimony of the State's own expert—that a motive was to support Republicans over Democrats, coupled with the legislators' knowledge that SB7066 would have a disparate impact on African Americans, who vote for Democrats more often than for Republicans. The plaintiffs' other evidence adds little.

There are also other explanations for these SB7066 provisions, as well as evidence inconsistent with the inference of racial motivation.

First, a substantial motivation for the SB7066 definition of "all terms of sentence" was the belief that this is what Amendment 4 provides. This was not a pretext to hide racial motivation. Indeed, as it turns out, the view was correct. The Florida Supreme Court has told us so.

Second, while it is less clear that SB7066's treatment of judicial liens was based on an honest belief that this is what Amendment 4 requires, it is also less clear that this was an effort to favor Republicans over Democrats or that the only reason for believing this provision would have that effect was race.

Third, while the SB7066 registration form is indefensible, there is no reason to believe this was related to race. A more likely explanation is inattention or shoddy craftsmanship or perhaps lack of concern for felons of all races.

Fourth, there is no reason to believe the failure to provide resources was based on race. A more likely explanation is budgetary.

More importantly, there are other provisions in SB7066 that promote, rather than restrict, reenfranchisement. SB7066 provides that to be reenfranchised, a felon need not pay financial obligations that are not included in the four corners of the sentencing document or that accrue later.[154] SB7066 allows courts to modify sentences to eliminate LFOs if specific conditions are met.[155] And of less significance—it provides a remedy that, if not entirely illusory, will rarely matter—SB7066 authorizes courts to allow defendants to satisfy LFOs through community service.[156] These provisions would not have made it into SB7066 if the only motivation had been to suppress votes or to favor Republicans over Democrats.

On balance, I find that SB7066 was not motivated by race.

A note is in order, too, about the limited effect of this finding.

---

[154] Fla. Stat. § 98.0751(2)(a), (2)(a)(5)(c).

[155] *Id.* § 98.0751(2)(a)(d), (e).

[156] *Id.*

A contrary finding for the SB7066 definition of "all terms of sentence" would make no difference, for two reasons. First, for this provision, the State would prevail on its same-decision defense; the Florida Supreme Court's decision now makes clear the State would read "all terms of sentence" to include financial obligations, with or without SB7066. Second, striking this part of SB7066 as racially discriminatory would make no difference—the Florida Supreme Court's decision would still be controlling.

A contrary finding for SB7066's treatment of judicial liens would make a difference—judicial liens would be excepted from the LFO requirement. But the difference might not be much. LFOs are usually converted to civil liens when an individual is unable to pay. This order will end discrimination against those unable to pay—and thus will render the SB7066 treatment of judicial liens much less important.

A contrary finding for the SB7066 registration form would make no difference. As set out below, the form violates the National Voter Registration Act and will be enjoined for that reason.

And finally, even with a contrary finding for SB7066's failure to provide resources to administer the pay-to-vote system, the remedy would not be an order to provide more resources. This order's remedy on other claims will mitigate, but by no means cure, the pay-to-vote system's administrative train wreck. The remedy

that would be imposed based on a finding of racial discrimination would do nothing more.

The bottom line: the plaintiffs have not shown that race was a motivating factor in the enactment of SB7066.

## XII. Gender Discrimination

The McCoy plaintiffs assert the pay-to-vote requirement discriminates against women in violation of the Fourteenth Amendment's Equal Protection Clause and violates the Nineteenth Amendment, which provides that a citizen's right to vote "shall not be denied or abridged . . . on account of sex."

To prevail under the Fourteenth Amendment, the plaintiffs must show intentional gender discrimination—that is, the plaintiffs must show that gender was a motivating factor in the adoption of the pay-to-vote system. This is the same standard that applies to race discrimination, as addressed above.

The plaintiffs assert the Nineteenth Amendment should be read more liberally, but the better view is that the standards are the same. The Nineteenth Amendment was an effort to put women on the same level as men with respect to voting, just as the Fifteenth Amendment was an effort to put African American men on the same level as white men. Indeed, the Nineteenth Amendment copied critical language from the Fifteenth, which provides that a citizen's right to vote "shall not be denied or abridged . . . on account of race, color, or previous

condition of servitude." As is settled, a claim under the Fifteenth Amendment requires the same showing of intentional discrimination as the Fourteenth Amendment's Equal Protection Clause. *See, e.g.*, *Burton v. City of Belle Glade*, 178 F.3d 1175, 1187 n.8 (11th Cir. 1999) (stating "vote dilution, vote denial, and traditional race discrimination claims arising under the Fourteenth and Fifteenth Amendments all require proof of intentional discrimination"). In sum, there is no reason to read the Nineteenth Amendment differently from the Fifteenth.

On the facts, the plaintiffs' theory is that women with felony convictions, especially those who have served prison sentences, are less likely than men to obtain employment and, when employed at all, are likely to be paid substantially less than men.[157] The problem is even worse for African American women. This pattern is not limited to felons; it is true in the economy at large.

As a result, a woman with LFOs is less likely than a man with the same LFOs to be able to pay them. This means the pay-to-vote requirement is more likely to render a given woman ineligible to vote than an identically situated man.

This does not, however, establish intentional discrimination. Instead, this is in effect, an assertion that the pay-to-vote requirement has a disparate impact on women. For gender discrimination, as for race discrimination, *see supra* Section IX, disparate impact is relevant to, but without more does not establish, intentional

---

[157] *See* Pls.' Ex. 895, ECF No. 318-2; Pls' Ex. 896, ECF No. 318-1.

discrimination. Here there is nothing more—no direct or circumstantial evidence of gender bias, and no reason to believe gender had anything to do with the adoption of Amendment 4, the enactment of SB7066, or the State's implementation of this system.

Moreover, the pay-to-vote requirement renders many more men than women ineligible to vote. This is so because men are disproportionately represented among felons. As a result, even though the impact on a given woman with LFOs is likely to be greater than the impact on a given man with the same LFOs, the pay-to-vote requirement overall has a disparate impact on men, not women. Even if disparate impact was sufficient to establish a constitutional violation, the plaintiffs would not prevail on their gender claim.

## XIII. Excessive Fines

The Eighth Amendment prohibits imposition of "excessive fines." The provision applies to the states. *See Timbs v. Indiana*, 139 S. Ct. 682 (2019). The McCoy plaintiffs assert LFOs, when used as a basis to deny eligibility to vote, violate this provision.

At first blush, the assertion seems farfetched. Any fine at issue was imposed at the time of sentencing, usually long ago. The fine was within the statutory limit unless something went badly wrong, and there is no evidence of that. If there was a basis to assert the fine was an excessive punishment for the offense of

conviction—there probably was not—the assertion presumably would have been made at the time of sentencing or on direct appeal or at the latest in a collateral proceeding. It is almost surely too late to bring a federal challenge, and a challenge would properly be made in a separate proceeding addressing the criminal judgment, not as part of a voting case.

On closer examination, there is more to the claim. A fine that was unobjectionable when entered, as the plaintiffs' fines presumably were, would not have been deemed constitutionally excessive standing alone. What makes the fine excessive, in the plaintiffs' view, is the effect it did not have when entered but acquired only when the State adopted the pay-to-vote system. It is one thing to impose a fine that requires payment of money. It is quite another to impose a fine that, in effect, disqualifies the offender from voting.

On balance, this order holds that a state does not violate the Excessive Fines Clause by refusing to reenfranchise a felon who chooses not to pay a fine that the felon has the financial ability to pay. This order need not and does not address the question whether the Excessive Fines Clause prohibits a state from refusing to reenfranchise a felon based on a fine the felon is unable to pay. As set out above, doing that is unconstitutional anyway, on other grounds.

## XIV. Due Process

The Raysor, Gruver, and McCoy plaintiffs assert that even if the State can properly condition restoration of the right to vote on payment of LFOs, the manner in which the State has done so violates the Due Process Clause. The argument has two parts: the plaintiffs assert the governing standards are impermissibly vague and that the State has provided no constitutionally adequate procedure for determining whether an individual meets the standards.

The arguments carry considerable force. As set out above, determining the amount that must be paid to make a person eligible to vote is sometimes easy, sometimes hard, sometimes impossible.[158] In 18 months since Amendment 4 was adopted, the State has done almost nothing to address the problem—nothing, that is, except to jettison the most logical method for determining whether the required amount has been paid and substituting a bizarre method that no prospective voter would anticipate and that doesn't solve the problem. [159] The flaws in Florida's approach are especially egregious because a person who claims a right to vote and turns out to be wrong may face criminal prosecution. [160]

---

[158] *See supra* Section IX.C(4).

[159] *Id.*

[160] *Id.*

The Due Process Clause "requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 351, 357 (1983); *see also Johnson v. United States*, 135 S. Ct. 2551 (2015). Florida law makes it a crime to submit a false affirmation in connection with voting, Fla. Stat. § 104.011, or to fraudulently vote, *see id*. § 104.041. These provisions are clear enough on their face. But in the absence of eligibility standards "that ordinary people can understand"—standards that can be applied to known or knowable facts—the clarity of the statutory words is meaningless. *See Giacco v. Pennsylvania.*, 382 U.S. 399, 402-03 (1966) ("It is established that a law fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits or leaves judges and jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case.").

The State says its system comports with procedural due process because a person who registers to vote has a right to a hearing before being removed from the roll. The Supervisor of Elections in the county at issue conducts the hearing and renders a decision. A person who is dissatisfied with the result is entitled to de novo judicial review.

If the process was available to all who wish to register, and if the Supervisors had the resources to conduct the required hearings for all comers, the process would easily satisfy due process. *See, e.g.*, *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) (setting out a framework for determining what process is due in a given circumstance); *J.R. v. Hansen*, 736 F.3d 959, 966 (11th Cir. 2015) (same). But this process is available only to a person who is able to register in the first place. A person cannot invoke this process at all if the person is unable or unwilling to register because the person is uncertain of eligibility and unwilling to risk prosecution.

The State says such a person can request an advisory opinion from the Division of Elections and that this will satisfy due process.[161] Indeed, the State says that a person who requests an advisory opinion on eligibility to vote and acts in accordance with the opinion is immune from prosecution under the criminal statutes at issue.[162] It is not at all clear that the Florida statutes on which the State relies for these assertions actually so provide, but this order accepts the State's construction of its statutes.

If implemented in a timely manner with adequate, intelligible notice, the advisory-opinion procedure and attendant immunity will satisfy due process and

---

[161] *See* Fla. Stat. § 106.23(2); Trial Tr., ECF No. 408 at 91-94, 100-03, 197-98.

[162] Trial Tr., ECF No. 408 at 91-94, 100-03.

remedy the vagueness attending application of the criminal statutes. This order requires adequate, intelligible notice and timely responses to requests for advisory opinions. Even in the absence of a ruling for the plaintiffs on the vagueness and procedural-due-process claims, the same requirements would be included in the remedy for the constitutional violation addressed in section IX above.

## XV. The Organizations' Claims

An organization that engages in voter-registration activities may assert its own constitutional rights relating to that process. *See, e.g.*, *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341-42 (11th Cir. 2014); *Fla. State Conference of NAACP v. Browning*, 522 F.3d 1153, 1164-66 (11th Cir. 2008). The League of Women Voters conducts voter-registration efforts but has curtailed them because of the pay-to-vote system, its breadth (including its application to those unable to pay), the lack of clear standards for determining eligibility to vote, and the additional confusion created by the State's flailing implementation of the pay-to-vote system. The League has curtailed its activities in part because it does not wish to subject voters to a risk of prosecution and does not wish to risk the League's reputation by signing up individuals who may ultimately be deemed ineligible.[163]

---

[163] *See* Trial Tr., ECF No. 396 at 173-80.

One example of the injury the League has suffered is this: the League created an entire continuing education program on the pay-to-vote sysem, but the program became outdated when the State changed from the actual-balance method to the every-payment method for determining whether a felon's LFOs have been paid.[164] The State's uncertain, shifting implementation of the program has interfered with the League's associational rights and has caused the League to divert substantial resources from other endeavors. The League has registered fewer voters than it would have in the absence of the State's constitutional violations.

The Florida State Conference of the NAACP and the NAACP Orange County Branch have standing to assert the rights of their members, some of whom have been directly impacted by the State's constitutional violations. For example, Mr. Bryant, a member of the Orange County Branch, was constitutionally entitled to vote but did not do so in the March 2020 primary, not wishing to risk prosecution.[165] In addition, the State Conference, if not the Orange County Branch, has diverted resources and suffered injuries similar to the League's.[166] The organization has reached out to and registered fewer voters than it otherwise would have.

---

[164] *See id.* at 175-76, 191-92.

[165] Trial Tr., ECF No. 397 at 73.

[166] *See, e.g.,* Trial Tr., ECF No. 397 at 19, 32-37.

These rulings ultimately make no difference in the remedy that this order would put in place anyway, based only on the claims of the individual plaintiffs and the certified class and subclass. That remedy is sufficient to redress the organizations' claims.

## XVI. The National Voter Registration Act

The Gruver and Raysor plaintiffs assert the State has violated the National Voter Registration Act in two respects: by using an improper voter registration form and by allowing different counties to apply different standards in determining eligibility to vote.

The State asserts all the individual plaintiffs but one, Mr. Bryant, lack standing to challenge the registration form because they registered to vote using a different form, not the one they now challenge. And the State asserts the Raysor plaintiffs did not wait the statutorily required period after giving the notice that must precede an NVRA claim. The State also contests the claim on the merits.

The State's procedural objections do not bar the claim.

Mr. Bryant used the challenged registration form.[167] In addition, the organizational plaintiffs have members who have used or will use the form if it is not enjoined. Indeed, Mr. Bryant is himself a member of the NAACP Orange

---

[167] Trial Tr., ECF No. 397 at 69-71.

County Branch. Mr. Bryant and the organizational plaintiffs have standing to challenge the form. The other individual plaintiffs lack standing to challenge the form, but this is inconsequential. And in any event, all the plaintiffs have standing to challenge the inconsistent application of the pay-to-vote system from one county to another.

The NVRA creates a private right of action but requires advance notice and an opportunity to cure during a specified period. *See* 52 U.S.C. § 20510(b)(1). The original Gruver plaintiffs, including the organizational plaintiffs, gave notice to the proper official, the Florida Secretary of State. *See* Fla. Stat. § 97.012(9) (naming the Secretary the chief election officer). [168] The State did not cure the alleged violations within the specified period, so litigation could go forward. The State has not contested the claims of Mr. Bryant and the organizations based on the notice-and-cure provision.

The Raysor plaintiffs also gave notice but did so later, and they filed their NVRA claim before expiration of the cure period, as measured from the date of their notice. This makes no difference. The State had already been provided the required opportunity to cure and had chosen not to do so. Properly construed, the statute does not require multiple notices of the same alleged violation and multiple opportunites to cure. The Gruver plaintiffs' notice thus was sufficient to allow the

---

[168] *See* Pls.' Ex. 841, ECF No. 360-2.

Raysor plaintiffs' claims to go forward. *See, e.g.*, *Calloway v. Partners Nat'l Health Plans*, 986 F.2d 446, 449-50 (11th Cir. 1993) (allowing one employee to rely on another employee's timely notice of a Title VII claim based on the "single-filing rule"); *Ass'n of Community Orgs. For Reform Now v. Miller*, 129 F.3d 833, 838 (6th Cir. 1997) (allowing one party to rely on another party's NVRA notice). *Contra Scott v. Schedler*, 771 F.3d 831 (5th Cir. 2014).

On the merits, the plaintiffs are correct that the registration form mandated by SB7066 violates the NVRA. So do the later forms the State has floated as possible replacements. The chronology helps explain this.

The old form—the form in effect before SB7066—had a single relevant statement: "I affirm that I am not a convicted felon, or if I am, my rights relating to voting have been restored." *See* Fla. Stat. § 97.052(2)(t) (2018). This provided all the information that needed to be on the form.

SB7066 made a hash of this. Gone was the old, easily understood statement. In its place were three checkboxes; the registrant had to choose one. *See* Fla. Stat. § 97.052(2)(t) (2019). The first box was for nonfelons: "I affirm I have never been convicted of a felony." The second and third boxes were for felons. The second: "If I have been convicted of a felony, I affirm my voting rights have been restored by the Board of Executive Clemency." The third: "If I have been convicted of a felony, I affirm my voting rights have been restored pursuant to s. 4, Art. VI of the

State Constitution upon the completion of all terms of my sentence, including

parole or probation."

The new form is objectionable at several levels. There is no reason to require

a registrant who is eligible to vote to disclose a nondisqualifying felony to the local

Supervisor of Elections. In any event, few if any registrants are likely to know that

Amendment 4 is now "s. 4, Art. VI" of the State Constitution.[169] Worse, an

individual with an out-of-state felony conviction who would be eligible to vote in

the state of conviction is eligible to vote in Florida.[170] But such an individual has

no box to check on the registration form.[171]

Perhaps more importantly, there is no reason—other than perhaps to

discourage felons from registering—for the multiple boxes. As the Director of the

Division of Elections has acknowledged, the State makes no use of the additional

information; a registration on the new form is processed precisely the same way as

---

[169] Prelim. Inj. Hr'g Tr., ECF No. 204 at 202-03.

[170] Trial Tr., ECF No. 408 at 81-82; *see also Schlenther v. Dep't of State, Div. of Licensing*, 743 So. 2d 536, 537 (Fla. 2d DCA 1998) ("Once another state restores the civil rights of one of its citizens whose rights had been lost because of a conviction in that state, they are restored and the State of Florida has no authority to suspend or restore them at that point.").

[171] Prelim. Inj., Hr'g Tr., ECF No. 205 at 50.

a registration on the old form.[172] The new form thus runs afoul of the NVRA's

mandate that a voter registration form require only such identifying and other

information "as is necessary to enable the appropriate State election official to

assess the eligibility of the applicant and to administer voter registration and other

parts of the election process." 52 U.S.C. § 20508(b)(1); *see also id.*

§§ 20504(c)(2)(B) & 20505(a)(2).

Amendments to the statute prescribing the registration form were proposed

but not adopted during the Legislature's 2020 session.[173] On the first day of trial, in

an attempt to deal with this issue, the State proposed a rule with a new form that

adds a checkbox for out-of-state felons.[174] But the form still would require

information that would have no effect on the processing of registrations; the form

thus would still violate the NVRA.

During the trial, the State floated yet another possible form, this one with yet

another new checkbox: "If I have been convicted of a felony, I affirm that I have

completed all terms of my sentence except any financial obligations I am

---

[172]  *See* Trial Tr., ECF No. 408 at 134; *see also* Brown Dep. Designations, ECF No. at 389-5 at 115; Trial Tr., ECF No. 393 at 25.

[173] *See* Trial Tr., ECF No. 413 at 75-76.

[174] *See* Defs.' Ex. 169, ECF No. 343-3; *see also* Pls.' Ex. 919, ECF No. 384-1.

genuinely unable to pay."[175] This is commendable to some extent; it is at least an effort—the first—to deal with the preliminary injunction and affirmance in *Jones*, which occurred months earlier. But the new box is deficient on its face; it could be honestly checked by an individual with a conviction for murder or a sexual offense who is ineligible to vote.[176]

The State has tendered no legitimate reason to dispense with the old registration form and no new registration form that complies with the NVRA.

In addition to their complaint about the registration form, the plaintiffs say the State's failure to provide guidance to the county Supervisors of Elections will cause different eligibility standards to be applied in different counties. The plaintiffs say this will violate the NVRA requirement for voter rolls that are "uniform" and "nondiscriminatory." 52 U.S.C. § 20507(b)(1).

This is a substantial complaint, but it need not be addressed at this time. The remedy that this order puts in place anyway, based on the other violations, substantially reduces the risk that different eligibility standards will be applied in different counties, rendering this risk speculative.

---

[175] Defs.' Ex. 170, ECF No. 343-4; *see also* Trial Tr., ECF No. 408 at 137-40.

[176] Trial Tr., ECF No. 408 at 139-41.

In sum, the organizational plaintiffs and Mr. Bryant are entitled to prevail on their NVRA claim based on the noncompliant registration form.

## XVII.  *Bush v. Gore*

The plaintiffs say the different eligibility standards in different counties will violate not only the NVRA but also the equal-protection principle established by *Bush v. Gore*, 531 U.S. 98 (2000). Here, as under the NVRA, this is a substantial claim. But here, for the same reasons as for the NVRA, the claim need not be addressed at this time.

## XVIII.  *Severability*

The State makes the rather remarkable assertion that if it cannot prevent people who are unable to pay LFOs from voting, then all of Amendment 4 must fall—that even felons who have served all their time, are off supervision, and have paid all amounts they owe cannot vote. This is a breathtaking attack on the will of the Florida voters who adopted Amendment 4.

The State says this is a severability issue, and perhaps it is. But LFOs are not mentioned in Amendment 4 at all. At least on one view, there is nothing to sever. Even on that view, however, the same issues are part of the remedy analysis. Either way, the critical issue is the proper remedy for the unconstitutional application of Amendment 4 to a subset of affected individuals. The remedy must be properly matched to the violation.

The State relies on *Ray v. Mortham*, 742 So. 2d 1276 (Fla. 1999). There the Florida Supreme Court addressed a voter-initiated amendment to the Florida Constitution imposing term limits. The amendment had specific language listing the offices to which it applied. Some were state offices, some federal. The attempt to impose limits on eligibility for federal offices violated the United States Constitution, so the question was whether the explicit but unconstitutional language in the amendment addressing federal offices should be severed from the explicit and constitutional language addressing state offices. This was a classic severability issue—whether, after striking invalid language, the amendment's other language remained valid. The court held the provisions severable—thus upholding the will of the voters who adopted the amendment, to the extent consistent with the United States Constitution.

On the other hand, in the federal cases holding state actions unconstitutional as applied to those unable to pay, severability was not discussed at all. *See, e.g.*, *M.L.B. v. S.L.J.*, 519 U.S. 102 (1996); *Bearden v. Georgia*, 461 U.S. 600 (1983). In those cases, just as here, a state provided a benefit it was not constitutionally obligated to provide at all, but providing the benefit to those who could pay while denying the benefit to those unable to pay was unconstitutional. The proper remedy was to make the benefit available to those unable to pay. This was so because, under the circumstances, ending the discrimination by making the benefit available

to those unable to pay was the proper exercise of equitable discretion. This was not framed as a severability issue, but the result would have been the same if it had been.

In any event, the question of whether this is properly framed as a severability issue or only as a remedy issue makes no difference; the substantive analysis is the same either way. The critical issue is whether, if the unconstitutional applications of the amendment are enjoined, it is still reasonable to apply the remainder of the amendment, and whether, if the voters had known the amendment would be applied only in this manner, they still would have approved it.

The answer is yes. I find as a fact that voters would have approved Amendment 4 by more than the required 60% had they known it would be applied in the manner required by this order. I would make this same finding regardless of which side has the burden of proof.

The voters' primary motivation plainly was to restore the vote to deserving felons at the appropriate time—to show a measure of forgiveness and to welcome even felons back into the electorate. The sentiment is hardly surprising. Forgiveness is a sentiment that appeals to most voters and has long been a mainstay of the state's most popular religions. And taxation without representation led a group of patriots to throw lots of tea into a harbor when there were barely

united colonies, let alone a United States. Before Amendment 4, no state

disenfranchised as large a portion of the electorate as Florida.

That did not mean, however, that voters were in a mood to immediately

reenfranchise everyone. The proponents of the amendment learned from focus

groups and polling that some voters were not as favorably disposed toward the

worst offenders or toward those who were still in jail or on supervision. There was

even a fleeting reference to restitution. The amendment was drafted to exclude

those convicted of murder or sexual offenses and to require completion of all terms

of sentence including probation and parole. In that form the amendment went

before the voters and garnered 64.55% of the vote.

The State says the focus groups and polling show that payment of LFOs,

including by those unable to pay, was critical to passage of the amendment. They

even presented expert testimony to support the assertion.[177] I do not credit the

testimony. Indeed, one in search of a textbook dismantling of unfounded expert

testimony would look long and hard to find a better example than the cross-

examination of this expert.[178] The State's assertion that voters understood

"completion of all terms of sentence" to mean payment of fines, fees, costs, and

---

[177] *See* Trial Tr., ECF No. 402 at 103-111, 123-29; *see also* Defs.' Ex. 66, ECF No. 346-1. The expert was Dr. Michael Barber.

[178] *See id.* at 129-98. I credit the testimony of the plaintiffs' expert who responded to Dr. Barber. The plaintiffs' expert was Dr. Todd Donovan.

restitution by those unable to pay and that this was critical to passage of the amendment is fanciful.

The focus groups and polling were conducted years before Amendment 4 was on the ballot. None were conducted, at least as shown by this record, in a scientifically reliable manner. None are reliable indicators of the change in the margin that would have been caused by a change in Amendment 4's wording or coverage.

More importantly, none of the focus groups and polling dealt separately with financial obligations. There were only fleeting references to these, and only in tandem with completion of all terms in prison or on supervision. The focus groups and polling did not address inability to pay at all. They provided no information on how a requirement to pay fines, fees, or costs, or even restitution, would have affected the vote, let alone how a requirement for payment by those unable to pay would have affected the vote.

The materials available to voters in advance of the election, whether in sample ballots or public-service materials of from proponents or in the media, included very few references to financial obligations, and fewer still to anything other than restitution.[179] Amendment 4 itself, as well as the summary on the ballot,

---

[179] *See* Pls.' Ex. 886, ECF No. 360-43 at 11-27; Trial Tr., ECF No. 413 at 112-43; Pls.' Ex. 893, ECF No. 286-13 at 27-44.

included no explicit reference to financial obligations, let alone to ability or inability to pay.[180] Amendment 4 was part of a long ballot with many proposed amendments; it is unlikely that many voters considered financial obligations at all, let alone inability to pay.

There is also another fundamental flaw in the State's analysis. For the requirement to pay the LFOs at issue to be critical to a voter's decision, the voter would need at least some understanding of LFOs—of who owes them and why and why they have not been paid. But very few voters had this information.

Surely very few Florida voters knew that every Florida felony conviction results in an order to pay hundreds of dollars in fees and costs intended to fund the government, even when the judge does not choose to impose a fine as part of the punishment and there is no victim to whom restitution is owed. Surely very few Florida voters knew that fees and costs were imposed regardless of ability to pay, that the overwhelming majority of felons who would otherwise be eligible to vote under Amendment 4 owed amounts they were unable to pay, and that the State had no ability to determine who owed how much. Had voters known all this, they might, as the State posits, have decided to scrap the whole thing. But the chance of that is remote. It is far more likely, and I find, that voters would have adhered to

---

[180] *See* Defs.' Ex. 15, ECF No. 148-15 at 9.

the more generous spirit that led to the passage of the amendment, even if it meant that those who had done all they could do but were unable to pay some remaining amount became eligible to vote.

Striking the entirety of Amendment 4 would be a dramatic departure from what the voters intended and from what they would have done had they known of the federal constitutional limits on the amendment's application.

## XIX. Remedy

The remedy for a constitutional violation is committed to the court's sound discretion. The remedy should be clear, as easily administered as feasible, and no more intrusive than necessary on a defendant's lawful prerogatives. *See Lemon v. Kurtzman*, 411 U.S. 192, 200 (1973) ("Moreover, in constitutional adjudication as elsewhere, equitable remedies are a special blend of what is necessary, what is fair, and what is workable.") (footnote omitted).

This order grants declaratory and injunctive relief commensurate with the violations addressed above.

The injunction takes the State up on its suggestion that individuals who are unsure of their eligibility status can simply request an advisory opinion from the Division of Elections. The injunction prescribes a form that may be used for requesting an advisory opinion and requires the Secretary of State and Supervisors of Elections to make the form available both in hard copy and online.

The injunction provides, in effect, that an advisory opinion cannot rely on unconstitutional grounds for asserting ineligibility. The injunction sets no deadline for the Division to provide an advisory opinion—there is no deadline under state law—but the injunction allows an individual to go forward with registration and voting after 21 days, unless and until the Division provides an advisory opinion showing ineligibility.

The injunction takes the State up on its suggestion that a person who acts in accordance with an advisory opinion may not be prosecuted for doing so. The injunction goes further and allows a person to rely on the Division's failure to provide an advisory opinion within 21 days. The injunction of course does not reach nonparties and thus does not bind the various state attorneys, but the injunction prohibits these defendants from contributing to such a prosecution.

The injunction prescribes a method for determining inability to pay. In effect, the injunction provides a rebuttable presumption based on facts that are objectively determinable without undue difficulty and that, in the overwhelming majority of cases, correlate with genuine inability to pay. The injunction does not limit the reliable information on which the State may base an assertion that an individual is able to pay—but when the presumption applies, the injunction does require reliable information to rebut it. This goes further than the preliminary

injunction, which left to the State wide discretion to devise a system for addressing inability to pay. With ample time to address the issue, that State did nothing.

A class member may proceed based on the presumption and in reliance on this order without requesting an advisory opinion. An advisory opinion is an option, not a requirement.

Under the injunction, to show that an LFO is disqualifying, an advisory opinion must set out the amount of the LFO. It is not enough just to provide an estimate or to say the amount is at least some given amount. The reason is this. If the person is unable to pay, the LFO is not disqualifying, so the requirement to set out the amount of the LFO makes no difference. If the person *is* able to pay, the State must tell the person the amount that must be paid—no more (because requiring the person to pay more as a condition of voting would plainly be unconstitutional) and no less (because the point is to allow the person to make the required payment).

In short, the remedy will allow prospective voters to determine whether they have LFOs, at least to the extent that is possible at all; will allow them to vote if they are otherwise eligible but have LFOs they are unable to pay; will reduce though not eliminate the risk of unfounded prosecutions; and will allow much easier and more timely administration than the system the State now has in place.

This last point is important. Recall that under its current system, the Division of Elections determines, for every person who submits a registration, whether the person has one or more felony convictions. For each conviction, the Division must find the judgment, determine whether it was for murder or a sexual offense, determine whether the person is in prison or on supervision, calculate the total amount of LFOs, and find every payment that has been made not only on an LFO but for any other purpose related to the conviction. The State surely has an interest in administering as efficiently as possible the procedures designed to prevent ineligible individuals from voting—the procedures that check for convictions of murder and sexual offenses and for individuals who are in prison or on supervision, not just for individuals with LFOs. Because the Division lacks sufficient staff to perform these duties in a reasonable time—as set out above, the Division is on track to complete the process by 2026 even without the added LFO procedures—every minute saved on LFOs is a minute that becomes available to review for murders, sexual offenses, prison, and supervision. Every minute available for those purposes increases the chance that ineligible individuals will be removed from the rolls—a goal that those on all sides should embrace.

The time saved by the remedy put in place by this order will be substantial. Most felony sentences do not include a fine or restitution. So in most cases, the Division will need to do nothing more on LFOs than review the judgment to

confirm there is no fine or restitution. In the remaining cases—the cases with a fine or restitution—the overwhelming majority of felons will be unable to pay. Based on this order, the Division will be able to quickly determine that the person has made an adequate showing of inability to pay, and the Division will rarely have a basis to challenge that showing. This will end the required work on LFOs.

This remedy is far better than the current system in another respect as well. The State proposes to push onto the Supervisors of Elections much of the work related to LFOs. Thus, for example, the State says the plaintiffs' procedural-due-process claim is unfounded because a voter is entitled to a hearing before the Supervisor of Elections on issues that include whether LFOs have been paid and whether the voter is unable to pay them. This would place an impossible burden on the Supervisors—a burden that the remedy provided by this order eliminates in all but the rarest of cases.

The remedy is by no means perfect. The pay-to-vote system will still make voter-registration efforts more difficult than they would be without the LFO requirement and will still deter at least some eligible citizens from registering and voting. Administering the pay-to-vote system will still be difficult, take too long, and consume too many Division of Elections resources. The remaining problems would be remedied if the entire pay-to-vote requirement, as applied to those who

are able to pay as well as those who are not, was ruled unconstitutional. The plaintiffs have fallen just short of such a ruling.

## XX. Conclusion

This order is intended to resolve all claims among all parties and to grant all the relief to which the plaintiffs are entitled. The order includes an injunction, directs the clerk to enter a Federal Rule of Civil Procedure 58 judgment, and reserves jurisdiction to enforce the injunction and judgment. For the reasons set out in *Jones v. Governor of Florida*, 950 F.3d 795 (11th Cir. 2020), and in this order,

IT IS ORDERED:

1. These five cases are consolidated for all purposes. All filings must be made in the consolidated electronic case file, No. 4:19cv300.

2. It is declared that the Florida pay-to-vote system is unconstutional in part:

(a) The system is unconstitutional as applied to individuals who are otherwise eligible to vote but are genuinely unable to pay the required amount.

(b) The requirement to pay, as a condition of voting, amounts that are unknown and cannot be determined with diligence is unconstitutional.

(c) The requirement to pay fees and costs as a condition of voting is unconstitutional because they are, in substance, taxes.

(d) The requirement to pay a determinable amount of fines and restitution as a condition of voting is not unconstitutional as applied to those who are able to pay.

3. The defendants must not take any step to enforce any requirement declared unconstitutional in paragraph 2 above.

4. The Secretary must make available in hard copy and online a form for requesting an advisory opinion from the Division of Elections substantially in the form of Attachment 1 to this order, subject to formatting and nonsubstantive modifications including, for example, addition of an address to which the request should be sent. This order refers to this as "the required form."

5. Each defendant Supervisor of Elections must make available at each office and must post online a notice of the right to request such an advisory opinion from the Division of Elections. The Supervisor must make the required form available in hard copy and online, either directly or by link to a state website.

6. If (a) within 21 days after receipt of a request for an advisory opinion using the required form that includes a request for a statement of the amount of any fine or restitution that must be paid to make the requesting person eligible to vote, (b) the Division of Elections does not provide an advisory opinion that includes the requested statement of the amount that must be paid together with an explanation of how the amount was calculated, then (c) the defendants must not take any step

to prevent, obstruct, or deter the requesting person from registering to vote and voting, (d) except on grounds unrelated to unpaid financial obligations, (e) unless and until the Division of Elections provides an advisory opinion that includes the requested statement of the amount that must be paid together with an explanation of how the amount was calculated.

7. If (a) within 21 days after receipt of a request for an advisory opinion using the required form that asserts inability to pay, (b) the Division of Elections does not provide an advisory opinion that asserts the requesting person is able to pay and provides a factual basis for the assertion, then (c) the defendants must not take any step to prevent, obstruct, or deter the requesting person from registering to vote and voting, (d) except on grounds unrelated to unpaid financial obligations.

8. If (a) within 21 days after receipt of a request for an advisory opinion using the required form, (b) the Division of Elections does not provide an advisory opinion showing the person is ineligible to vote, then (c) the defendants must not take any step to cause or assist a prosecution of the requesting person for registering to vote and voting, (d) based on anything the requesting person does before the Division of Elections provides an advisory opinion that shows the person is ineligible to vote, (e) except on grounds unrelated to financial obligations the State asserts the person must pay as a condition of voting.

9. For purposes of paragraphs 7 and 8, an assertion by the Division of Elections that a person is able to pay will have no effect—and paragraphs 6 and 7 will be applied as if the Division of Elections had made no such assertion—if (a) the requesting person had an appointed attorney or was granted indigent status in the last proceeding that resulted in a felony conviction, or (b) the person submitted with the request for an advisory opinion a financial affidavit that, if submitted in connection with a felony proceeding in a Florida circuit court, would be sufficient to establish indigent status under Florida Statutes § 27.52, or (c) all financial obligations that would otherwise disqualify the person from voting have been converted to civil liens, unless (d) the Division of Elections has credible and reliable information that the requesting person is currently able to pay the financial obligations at issue.

10. This order does not require any person to request an advisory opinion. The defendants must not take any step to prevent, obstruct, or deter a named plaintiff or member of the subclass from registering to vote or voting, except on grounds unrelated to unpaid financial obligations, if (a) the person had an appointed attorney or was granted indigent status in the last proceeding that resulted in a felony conviction, or (b) the person submits a financial affidavit that, if submitted in connection with a felony proceeding in a Florida circuit court, would be sufficient to establish indigent status under Florida Statutes § 27.52, or

(c) all financial obligations that would otherwise disqualify the person from voting have been converted to civil liens, unless (d) the Division of Elections or Supervisor of Elections in the person's home county has credible and reliable information that the requesting person is currently able to pay the financial obligations at issue.

11. The Secretary must make available in hard copy and online a statement of rules governing eligibility to vote after a felony conviction substantially in the form of Attachment 2 to this order.

12. Each defendant Supervisor of Elections must post at its offices and online a statement of rules governing eligibility to vote after a felony conviction substantially in the form of Attachment 2 to this order.

13. It is declared that financial obligations do not render these individuals ineligible to vote: Jeff Gruver, Emory Marquis Mitchell, Betty Riddle, Karen Leicht, Kristopher Wrench, Raquel L. Wright, Steven Phalen, Jermaine Miller, Clifford Tyson, Latoya A. Moreland, Curtis D. Bryant, Bonnie Raysor, Diane Sherrill, Lee Hoffman, Rosemary Osborne McCoy, and Sheila Singleton.

14. The defendants must not take any action based on financial obligations to prevent, obstruct, or deter the individuals listed in paragraph 13 from registering to vote or voting.

15. It is declared that fees and costs do not render Keith Ivey ineligible to vote.

16. The defendants must not take any action based on fees or costs to prevent, obstruct, or deter Keith Ivey from registering to vote or voting. This does not preclude action based on any unpaid fines.

17. It is declared that Florida Statutes § 97.052(2)(t) (2019) violates the National Voter Registration Act. The defendants must not use a form based on that statute.

18. The claims of the plaintiffs Kelvin Leon Jones and Luis Mendez are dismissed without prejudice. Their exclusion from the class and subclass is withdrawn, so they are now members if they meet the class and subclass definitions.

19. The declaratory and injunctive relief provided by this order runs in favor on the remaining named plaintiffs, including individuals and organizations, and the members of the certified class and subclass.

20. The declaratory and injunctive relief provided by this order and by the judgment that will be entered based on this order bind the defendants and their officers, agents, servants, employees, and attorneys—and others in active concert or participation with any of them—who receive actual notice of the injunctive relief by personal service or otherwise.

21. The court retains jurisdiction to enforce the declaratory and injunctive relief and the judgment that will be entered based on this order.

22. It is determined under Local Rule 54.1 that the plaintiffs in Nos. 4:19cv301, 4:19cv302, and 4:19cv304 are entitled to recover attorney's fees. Under Local Rule 54.2, these plaintiffs are entitled to recover costs. Rules 54.1 and 54.2 will govern further proceedings to determine the amount of the fee and cost awards, except that the deadline for the plaintiffs' filings under Rule 54.1(E) and for a bill of costs under Rule 54.2 is 30 days after (a) the deadline for filing a notice of appeal from the judgment on the merits, if no appeal is filed, or (b) if an appeal is filed, the date of issuance of the mandate of the United States Court of Appeals for the Eleventh Circuit affirming the judgment or dismissing the appeal. No motion to determine the fee amount and no bill of costs may be filed prior to the resolution of any appeal (or, if no notice of appeal is filed, prior to the expiration of the deadline for filing a notice of appeal).

23. The clerk must enter judgment in the consolidated case in favor of the plaintiffs in Nos. 4:19cv301, 4:19cv302, and 4:19cv304, as set out in this order, and dismissing without prejudice the claims in Nos. 4:19cv272 and 4:19cv300. The judgment must include the names of all parties and the class and subclass

definitions and must explicitly retain jurisdiction to enforce the injunction and

judgment.

SO ORDERED on May 24, 2020.

s/Robert L. Hinkle
United States District Judge