UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

KELVIN LEON JONES, *et al.,*

      Plaintiffs,

                              CONSOLIDATED
v.                             Case No. 4:19-cv-300-RH/MJF

RON DeSANTIS, *et al.*,

      Defendants.

_____/

## THE GOVERNOR & SECRETARY OF STATE'S MOTION FOR A STAY PENDING APPEAL AND INCORPORATED MEMORANDUM OF LAW

### BACKGROUND

After an eight-day bench trial in these five-consolidated cases, this Court issued on May 24, 2020 a final opinion and order on the merits, ECF No. 420, and on May 26, 2020 a final judgment. ECF 421. The final order and judgment include specific injunctive relief. The Governor and Secretary of State seek a stay of the final order and judgment pending resolution of their request for an expedited, en banc appeal before the U.S. Court of Appeals for the Eleventh Circuit.

### ARGUMENT

In deciding whether to grant a stay, this Court considers "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether

issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009). The first two factors are the "most critical." *Id*.

## I. THE STATE IS SUBSTANTIALLY LIKELY TO SUCCEED ON THE MERITS.

### A. This Court's Wealth-Based Discrimination holding (and the 11th Circuit's preliminary injunction opinion) conflict with binding precedent and are likely to be revisited by the en banc 11th Circuit.

**1.** All Equal Protection challenges, including the wealth-based discrimination claims brought by the Plaintiffs, require a showing of intentional discrimination. Indeed, the Eleventh Circuit has held, in the specific context of felon re-enfranchisement, that a "scheme could violate equal protection if it ha[s] both the purpose and effect of invidious discrimination." *Hand v. Scott*, 888 F.3d 1206, 1207 (11th Cir. 2018) (underline in original). Because the Plaintiffs "have not alleged— let alone established . . . —that Florida's scheme has a discriminatory purpose," *id*., Eleventh Circuit law forecloses their wealth-based discrimination claim.

Although the Eleventh Circuit held otherwise at the preliminary-injunction stage, it did so in a way that created an irreconcilable, intra-circuit conflict with *Hand*. By the plain terms of the *Hand* opinion, *all* Equal Protection challenges (like the Plaintiffs' wealth-based discrimination claims) brought against *any* "reenfranchisement scheme[]" (like Senate Bill 7066) require proof that the scheme has "both the purpose and effect of invidious discrimination." *Id*. (underline in

2

original). To limit *Hand*'s holding to race-based discrimination claims requires rewriting that first-in-time opinion.

Despite the preliminary-injunction opinion's attempt to limit *Hand* to race-based equal protection challenges by, e.g., pointing to language from a different case that the *Hand* opinion happened to quote,[1] *Hand* itself was not race-discrimination case. Rather, the *Hand* Plaintiffs alleged that "Florida's scheme of voter reenfranchisement for convicted felons" afforded "the State Executive Clemency Board . . . 'unbridled discretion' to deny voter reenfranchisement in the absence of any articulable standards." *Id*. at 1207. In rejecting their Equal Protection challenge, the *Hand* Court noted that the *Hand* Plaintiffs had "not shown (*nor have they even claimed*) that Florida's constitutional and statutory scheme had as its purpose the intent to discriminate on account of, say, race, national origin, or some other insular classification; *or that it had the effect of a disparate impact* on an insular minority." *Id*. at 1210 (emphases added). Because *Hand* did not adjudicate a claim of race discrimination, the preliminary-injunction opinion erred by finding *Hand* inapposite

---

[1] Specifically, the preliminary-injunction opinion quoted *Hand* as holding that "Proof of *racially* discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Jones v. Governor of Fla*., 950 F.3d 795, 828 (11th Cir. 2020) (emphasis added). That quote from *Hand*, however, was itself a quote from the Supreme Court's opinion in *Hunter v. Underwood*, 471 U.S. 222, 228 (1985). *See Hand*, 888 F.3d at 1210.

because the wealth-based discrimination claim here is "not a race discrimination" claim. *Jones*, 950 F.3d at 828.

And, to be clear, the distinction that both Amendment 4 and Senate Bill 7066 make is based on a past conviction for a felony, not wealth.  No wealth-based distinction is apparent on the face of either the constitutional or statutory provision. No intent can be gleaned from the text of the constitutional or statutory provisions other than the conditioning of re-enfranchisement on satisfaction of "all terms of sentence" for a felony except "murder or a felony sexual offense."

For these reasons, the State is substantially likely to succeed on the merits of its argument that the Plaintiffs' wealth-based discrimination claim must fail because the Plaintiffs failed to allege, let alone establish, the State's intention to discriminate on the basis of wealth when it passed Senate Bill 7066.

**2.** Wealth-based discrimination claims, moreover, are subject only to rational-basis review. Because the State may "exclude from the franchise convicted felons who have completed their sentences and paroles," *Richardson v. Ramirez*, 418 U.S. 24, 55 (1974), it follows that, "[h]aving lost their voting rights, [the] Plaintiffs lack any fundamental interest to assert." *Johnson v. Bredesen*, 624 F.3d 742, 746 (6th Cir. 2010); *see also Owens v. Barnes*, 711 F.2d 25, 27 (3d Cir. 1983) ("[T]he right of felons to vote is not 'fundamental.'"). Indigency, of course, is not a protected class for purposes of equal protection. *Harris v. McRae*, 448 U.S. 297, 323 (1980);

*see also Papasan v. Allain*, 478 U.S. 265, 283-84 (1986); *Maher v. Roe*, 432 U.S. 464, 471 (1977). And "[u]nless the challenged classification burdens a fundamental right or targets a suspect class, the Equal Protection Clause requires only that the classification be rationally related to a legitimate state interest." *Lofton v. Sec'y of the Dep't of Children & Family Servs.*, 358 F.3d 804, 818 (11th Cir. 2004) (citing *Nordlinger v. Hahn*, 505 U.S. 1, 10, 112 (1992)).

Lest there be any doubt about the appropriate standard of review, the former Fifth Circuit, in an opinion that still binds this Court, *see Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981), has held that "selective disenfranchisement or re-enfranchisement of convicted felons . . . must bear" only "a rational relationship to the achieving of a legitimate state interest." *Shepherd v. Trevino*, 575 F.2d 1110, 1114-15 (5th Cir. 1978). Because Senate Bill 7066 prescribes how "selective. . . re-enfranchisement of convicted felons" is to occur, *Shepherd* controls the standard of review.

The preliminary-injunction opinion erred in its attempt to distinguish *Shepherd*, and the State is substantially likely to prove this on appeal. The sum-total of the preliminary-injunction opinion's attempt to distinguish *Shepherd* is this: "the classification [at issue in *Shepherd*] did not implicate wealth or any suspect classification." *Jones*, 950 F.3d at 824. Although true, these points are irrelevant. As noted above, decades of supreme court caselaw confirm that indigency (i.e., lack of

5

wealth) is not a suspect class and does not ratchet up the level of scrutiny.[2] And because *Shepherd* remains the law of the circuit, the State is substantially likely to succeed on the merits of its argument that the Plaintiffs' wealth-based discrimination claim must be analyzed under the rational-basis standard.[3]

3. Senate Bill 7066 plainly survives rational basis review. As an initial matter, the rationality of Senate Bill 7066 must be assessed with regard to *all* felons who seek re-enfranchisement, and not as-applied either to a sub-class of felons who cannot afford to pay their legal financial obligations. "[A] *classification* does not

---

[2] Every court to address this question is in accord, *see, e.g.*, *Bredesen*, 624 F.3d at 746; *Harvey*, 605 F.3d at 1079; *Owens*, 711 F.2d at 27, including the dissenting opinion in *Bredesen, see Bredesen*, 624 F.3d at 755 (Moore, J., dissenting) ("I agree with the majority as to some components of its equal-protection analysis. I agree that the Plaintiffs in this case have no fundamental right to vote under existing case law. *See Wesley v. Collins*, 791 F.2d 1255, 1261 (6th Cir. 1986) (citing, among other cases, *Richardson v. Ramirez*, 418 U.S. 24, 26 (1974)). I also agree that the Plaintiffs' membership in 'a class of less wealthy individuals is not a suspect class' under prevailing precedent. *Molina-Crespo v. United States MSPB*, 547 F.3d 651, 660 (6th Cir. 2008) (citing *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 29 (1973)). Given these two conclusions, I must also agree that, because the Tennessee provisions neither burden a fundamental right nor discriminate against a suspect class, the Plaintiffs bear the burden to show that § 40-29-202(b) and (c) bear no rational relationship to any legitimate government end. *See FCC v. Beach Communications*, 508 U.S. 307, 315 (1993).").

[3] Rational-basis review applies for the independent reason that neither Senate Bill 7066 nor Amendment 4 disenfranchise anyone. Instead, they re-enfranchise former felons who have fully paid their debt to society. Because the Plaintiffs take issue with a reform measure that, in their view, should be available to a broader group, "the principle that calls for the closest scrutiny of distinctions in laws denying fundamental rights, is inapplicable." *Katzenbach v. Morgan*, 384 U.S. 641, 657 (1966).

violate the Equal Protection Clause so long as there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Estrada v. Becker*, 917 F.3d 1298, 1310 (11th Cir. 2019) (emphasis added).[4] Classifications, in turn, can be "significantly over-inclusive or under-inclusive." *Williams v. Pryor*, 240 F.3d 944, 948 (11th Cir. 2001). Indeed, "[n]early any statute which classifies people may be irrational as applied in particular cases." *Beller v. Middendorf*, 632 F.2d 788, 808 n.20 (9th Cir. 1980) (Kennedy, J.). But, so long as the generally applicable classification they draw is rational, rational-basis review is met. *Cf. Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 206 (2008) (Scalia, J., concurring) (explaining in a First and Fourteenth Amendment context that when courts "grapple with the magnitude of burdens [on the right to vote], [they do] so categorically and [do] not consider the peculiar circumstances of individual voters or candidates").

For that reason, Senate Bill 7066 "must be upheld" if there is "any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993).[5] And there are plenty.

---

[4] *See also Estrada*, 917 F.3d at 1310-11 ("[A] *classification* must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification. . . . We assume the *classification* is constitutional, and the appellants—as the challengers—must negative every conceivable basis which might support the *classification*." (emphases added) (internal citations and quotation marks omitted)).

[5] *Accord Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) (holding that "every reasonable construction must be resorted to, in order to save a statute from unconstitutionality");

7

Most critically, and as Justice O'Connor recognized, a state may reasonably conclude that "only those who have satisfied their debts to society through fulfilling the terms of a criminal sentence are entitled to restoration of their voting rights." *Harvey*, 605 F.3d at 1079. And as the Sixth Circuit observed, states have legitimate interests in requiring criminals "to fulfill their sentences." *Bredesen*, 624 F.3d at 747. The State, moreover, has a "valid interest[]" in "encouraging payment" of legal financial obligations. *Bredesen*, 624 F.3d at 747.[6]

Senate Bill 7066 was "not aimed at encouraging the collection of payment from *indigent* felons, but from *all* felons." *Bredesen*, 624 F.3d at 748 (emphases in original); *see also Madison*, 163 P.3d at 759 (Washington re-enfranchisement law "does not distinguish between rich or poor felons" and instead requires "all felons to complete all of the terms of their sentences before they may seek reinstatement of their civil rights"). The State plainly acted rationally when it drew the line at re-enfranchisement of those former felons who had repaid their entire debt to society, as established in the four corners of their respective sentencing documents. The

---

*Vance v. Bradley*, 440 U.S. 93, 97 (1979) (court will not strike down a statute under rational-basis review "unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [the court] can only conclude that the legislature's actions were irrational").

[6] Even if, as the Court found, the "mine-run" former felon might not be able to pay off all legal financial obligations immediately, he or she can work towards satisfying these legal financial obligations over time. The legislature did not act irrationally by incentivizing gradual repayment of debts incurred due to felony convictions.

State's "every-dollar method" for calculating and determining when the debt had been paid did not blur the rational basis. ECF 420 at 56. Rather, this made the line easier to see; the debt-to-society rationale underlying the fulfillment of all terms of a sentence and administrability rationale underlying the every-dollar method are *not* mutually exclusive. Accordingly, the State is likely to succeed on its argument that Senate Bill 7066 survives rational-basis review.

> **B.      The Plaintiffs have no cognizable Twenty-Fourth Amendment claim, and even if they did, fees and courts costs are not "other taxes."**

**1.**  Before this Court's final opinion, five federal courts (three circuits and two districts), one of which included a retired United States Supreme Court Justice, had taken up the question whether former felons could avail themselves of a Twenty-Fourth Amendment claim. Each earlier court has held, in so many words, that "[h]aving lost their right to vote, [former felons] now have no cognizable Twenty-Fourth Amendment claim until their voting rights are restored." *Harvey*, 605 F.3d at 1080 (O'Connor, J.).[7] Because this Court's order is joining the short side of a lopsided split (five federal court opinions versus one dissenting opinion), it is substantially likely that the State will prevail on appeal.

---

[7] *Accord Johnson v. Bredesen*, 624 F.3d 742, 750 (6th Cir. 2010); *Howard v. Gilmore*, No. 99-2285, 2000 WL 203984, at *2 (4th Cir. Feb. 23, 2000); *Thompson v. Alabama*, 293 F. Supp. 3d 1313, 1332-33 (M.D. Ala. 2017); *Coronado v. Napolitano*, No. 07-1089, 2008 WL 191987 (D. Ariz. Jan. 22, 2008).

**2.**  Even if the State fails on its argument that the Twenty-Fourth Amendment is categorically inapplicable, it is still substantially likely to succeed on its argument that the Plaintiffs' Twenty-Fourth Amendment claim fails. As this Court's final opinion recognizes, "[t]he financial obligations at issue were imposed as part of a criminal sentence." ECF No. 420, at 73. This means that, as a practical matter, only those fines and fees that are included in a punitive sanctioning document (a criminal sentence) need be completed before a former felon regains his right to vote.

In other words, although some costs and fees are imposed regardless of adjudication, only those costs and fees that constitute part of a felony sentence (i.e., a punitive sanction) will bar a former felon from the ballot box, so long as they remain incomplete. For this reason, they serve largely the same "regulation and punishment" ends as do fines and restitution. *Bailey v. Drexel Furniture Co*., 259 U.S. 20, 38 (1922). And that renders immaterial the observation that "fees" *in general* "are assessed regardless of whether a defendant is adjudged guilty." ECF No. 420, at 78.

That the proceeds of fees and costs make their way to the State does not turn legal financial obligations designed to serve the punitive, retributive, and rehabilitative ends of the criminal justice system into taxes for purposes of the Twenty-Fourth Amendment. If that were all it took to create a Twenty-Fourth Amendment violation, then the fine-repayment requirement would also raise

substantial constitutional concerns, and this Court has twice rejected the argument that they do. For these reasons, the State is substantially likely to succeed on the merits of the Plaintiffs' Twenty-Fourth Amendment claim.

### C.   Much of the Court's injunction becomes unnecessary if the State succeeds on the merits.

During the last several months, the State has worked feverously to learn how to implement a novel felon re-enfranchisement system while exercising its right to defend Amendment 4 and Senate Bill 7066. Part of the State's defense has been (and, on appeal, will continue to be) that it need not determine a person's ability to pay. And, as explained at trial, the State expects that the advisory opinion process will otherwise help determine eligibility to register and vote under Amendment 4 and Senate Bill 7066, together with information that individuals themselves have, or have access to through public defenders and private lawyers and clerks of court.

For the reasons discussed above, the State expects to succeed on the merits. If the State does succeed, then much of this Court's injunctive relief becomes unnecessary because that relief is derivative of the substantive conclusions regarding an inability to pay a precise amount that excludes fees and costs. *Compare* ECF 420 at 118-19, ¶ 2 *with id.* at 119-23, ¶¶ 4, 6-16.

## II.   THE STATE WILL BE IRREPARABLY HARMED ABSENT A STAY.

As this Court has already recognized, "[i]f a plaintiff is allowed to vote but it turns out the plaintiff is ineligible, the State will suffer irreparable harm, and the

public interest will not be served." ECF No. 234, at 11. Voting for the August primary begins in mere weeks. *See Election Dates for 2020*, Fla. Dep't of State, Div. of Elections, https://dos.myflorida.com/elections/for-voters/election-dates/ (last visited May 28, 2020). There will be no presidential, gubernatorial, or U.S. Senate race in that primary. *Id.* Without a particularly newsworthy race, turnout for the August primary is historically lower compared to two other statewide elections during the year, the presidential preference primary and the general election; fewer voters decide the outcome in the August primary. *Compare* 2008, 2012, 2016 Non-Presidential Primary Turnout, *with* 2008, 2012, 2016 Presidential Primary and General Election Turnout.[8]  Thus, absent a stay, the effect of voters who another court later reveals to be ineligible to vote would be more pronounced in the lower turnout August election, causing irreparable harm to the State and the integrity of the election process.

The State also has "a substantial interest in avoiding chaos and uncertainty in its election procedures." *Hand*, 888 F.3d at 1214. While respectful and mindful of this Court's final order, the State recognizes that the final order is anything but final. Additional changes might yet come as appellate courts grapple with these important issues. Changing from one scheme to another—each with its own set of rules, forms,

---

[8] *See Voter Turnout Summary Data*, Fla. Dep't of State, Div. of Elections, https://dos.myflorida.com/elections/data-statistics/elections-data/voter-turnout/ (last visited May 28, 2020).

guidance, and communication to elections officials—would make the already difficult task of conducting an election even more difficult.

Finally, as a more general matter, "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.*" New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co*., 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers); *accord, e.g*., *Maryland v. King*, 567 U.S. 1301, 1301 (2012) (Roberts, C.J., in chambers); *Hand*, 888 F.3d at 1241. This is especially true where, as here, parts of a state constitutional amendment— approved by millions of Floridians—together with a state statute are concerned.

## III.   A STAY WILL NOT SUBSTANTIALLY INJURE ANY FORMER FELON.

As of the date of this filing (May 29, 2020), the State has already filed its Notice of Appeal. Additionally, the State plans to request immediate en banc review, on an expedited basis. With these attempts to expedite resolution of the appeal, the State hopes to have a more definitive resolution of the issues before the November 2020 General Election. If the State is wrong on the merits, injury to those wishing to cast a ballot should be limited to the August 2020, non-presidential primary.

## IV.   A STAY WILL SERVE THE PUBLIC INTEREST.

As this Court has already recognized, "[t]he public interest in the integrity of elections outstrips, though just barely, the interest of an individual plaintiff in voting." ECF No. 234, at 11. This is because "[i]f a plaintiff is allowed to vote but it

13

turns out the plaintiff is ineligible, the State will suffer irreparable harm, and the public interest will not be served." ECF No. 234, at 11. And as discussed above, the problem is particularly acute in a lower turnout election like the August primary where fewer voters vote, making the impact of each ineligible voter greater.

Moreover, the public interest is served in allowing the appeals process to end before making major changes to the State's voter-eligibility requirements. This would better preserve the autonomy of the States in our federal system. The significance of that last interest should not be underestimated. When "fundamental questions of federalism" are at stake, "considerations of comity [should] prevent this Court from determining that the interests of the State of Florida are either outweighed by any threatened harm to [private litigants], or are inconsistent with 'public policy.'" *Jupiter Wreck, Inc. v. Unidentified, Wrecked & Abandoned Sailing Vessel,* 691 F. Supp. 1377, 1390 (S.D. Fla. 1988) (Marcus, J.).

## CONCLUSION

For the foregoing reasons, this Court should stay the effect of the final order, ECF No. 420, and final judgment, ECF 421, pending appellate review of this case.

Respectfully submitted by:

JOSEPH W. JACQUOT
(FBN 189715)
General Counsel
joe.jacquot@eog.myflorida.com
NICHOLAS A. PRIMROSE
(FBN 104804)
Deputy General Counsel
nicholas.primrose@eog.myflorida.com
JOSHUA E. PRATT (FBN 119347)
Assistant General Counsel
joshua.pratt@eog.myflorida.com
Executive Office of the Governor
400 S. Monroe St., PL-5
Tallahassee, FL 32399
Telephone: (850) 717-9310
Fax: (850) 488-9810

*Counsel for Governor Ron DeSantis*

GEORGE N. MEROS, JR.
(FBN 263321)
george.meros@hklaw.com
TARA R. PRICE (FBN 98073)
tara.price@hklaw.com
Holland & Knight LLP
315 South Calhoun Street, Suite 600
Tallahassee, Florida 32301
Telephone: (850) 224-7000
Facsimile: (850) 224-8832

BRADLEY R. MCVAY (FBN 79034)
General Counsel
brad.mcvay@dos.myflorida.com
ASHLEY E. DAVIS (FBN 48032)
Deputy General Counsel
ashley.davis@dos.myflorida.com
Florida Department Of State
R.A. Gray Building Suite, 100
500 South Bronough Street
Tallahassee, Florida 32399-0250
Phone: (850) 245-6536
Fax: (850) 245-6127

*/s/ Mohammad O. Jazil*
MOHAMMAD O. JAZIL
(FBN 72556)
mjazil@hgslaw.com
GARY V. PERKO (FBN 855898)
gperko@hgslaw.com
EDWARD M. WENGER
(FBN 85568)
ewenger@hgslaw.com
Hopping Green & Sams, P.A.
119 South Monroe Street, Suite 300
Tallahassee, Florida 32301
Phone: (850) 222-7500
Fax: (850) 224-8551

*Counsel for Florida Secretary of State
Laurel M. Lee*

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULES</u>

The undersigned certifies that the foregoing complies with the size, font, and formatting requirements of Local Rule 5.1(C), and that the foregoing complies with the word limit in Local Rule 7.1(F); this motion contains 2,879 words, excluding the case style, signature block, and certificates.

The undersigned conferred with counsel for the Plaintiffs regarding the foregoing.  Plaintiffs oppose the relief sought.

*/s/ Mohammad O. Jazil*
Attorney

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was served

to all counsel of record via email on this May 29, 2020.

<u>/s/ Mohammad O. Jazil</u>
Attorney