**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

KELVIN LEON JONES et al.,

      Plaintiffs,

                             CONSOLIDATED

v.                             CASE NO.  4:19cv300-RH/MJF

RON DeSANTIS et al.,

      Defendants.

_____/

**<u>ORDER DENYING A STAY</u>**

The plaintiffs obtained declaratory and injunctive relief after an eight-day
bench trial. The defendant Governor and Secretary of State of Florida have filed a
notice of appeal. Apparently acknowledging that the plaintiffs are entitled to
prevail on one of their claims under the law of the circuit, the Governor and
Secretary have moved for a stay pending a ruling on their petition for immediate en
banc review. This order denies the motion to stay.

## I.  The Underlying Dispute

It is useful to begin with a brief description of the underlying dispute. This
description is taken directly from the 125-page opinion that resolved the case on

the merits, ECF No. 420, cited as *Jones v. DeSantis*, No. 4:19cv300-RH/MJF, 2020 WL 2618062 (N.D. Fla. May 24, 2020). This order refers to that opinion as "*Jones II*."

The State of Florida has adopted a system under which nearly a million otherwise-eligible citizens will be allowed to vote only if they pay an amount of money. Most of the citizens lack the financial resources to make the required payment. Many do not know, and some will not be able to find out, how much they must pay. For most, the required payment will consist only of charges the State imposed to fund government operations—taxes in substance though not in name.

The State is on pace to complete its initial screening of the citizens by 2026, or perhaps later, and only then will have an initial opinion about which citizens must pay, and how much they must pay, to be allowed to vote. In the meantime, year after year, federal and state elections will pass. The uncertainty will cause some citizens who are eligible to vote, even on the State's own view of the law, not to vote, lest they risk criminal prosecution.

This pay-to-vote system would be universally decried as unconstitutional but for one thing: each citizen at issue was convicted, at some point in the past, of a felony offense. A state may disenfranchise felons and impose conditions on their reenfranchisement. But the conditions must pass constitutional scrutiny. Whatever

might be said of a rationally constructed system, this one falls short in substantial respects.

The United States Court of Appeals for the Eleventh Circuit has already ruled, in affirming a preliminary injunction in this very case, that the State cannot condition voting on payment of an amount a person is genuinely unable to pay. *See Jones v. Governor of Fla.*, 950 F.3d 795 (11th Cir. 2020) ("*Jones I*"). After a full trial on the merits, the plaintiffs' evidence grew stronger. *Jones II* held that the State *can* condition voting on payment of fines and restitution that a person is able to pay but *cannot* condition voting on payment of amounts a person is unable to pay or on payment of taxes, even those labeled fees or costs. *Jones II* put in place administrative procedures that comport with the Constitution and are less burdensome, on both the State and the citizens, than those the State was using to administer the unconstitutional pay-to-vote system.

## II. The Motion to Stay

The motion to stay is curious. By its terms, the motion asks not for a stay pending appeal but for a stay only pending a ruling on the State's extraordinary request to bypass consideration of the appeal by a panel and instead for immediate en banc review: "The Governor and Secretary of State seek a stay of the final order and judgment *pending resolution of their request for an expedited, en banc appeal*

before the U.S. Court of Appeals for the Eleventh Circuit." Mot. to Stay, ECF
No. 423, at 1 (emphasis added).

The limited stay request is perhaps an acknowledgement that the Governor
and Secretary (sometimes collectively referred to as "the State") cannot meet the
standards for a stay pending appeal if the law of the circuit, as set out in *Jones I*, is
followed. That view is plainly correct. It is also possible, though, that the State did
not mean to concede the point. This order addresses both the motion the State
actually made—for a stay pending a ruling on the request for immediate en banc
review—and the broader issue of a stay pending appeal.

## III.  The Standard for a Stay Pending Appeal

A four-part test governs a stay pending appeal: "(1) whether the stay
applicant has made a strong showing that he is likely to succeed on the merits; (2)
whether the applicant will be irreparably injured absent a stay; (3) whether
issuance of the stay will substantially injure the other parties interested in the
proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S.
770, 776 (1987); *see also Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312,
1317 (11th Cir. 2019) (applying the same test); *Venus Lines Agency v. CVG
Industria Venezolana De Aluminio*, 210 F.3d 1309, 1313 (11th Cir. 2000) (same).

## IV. Likelihood of Success on the Merits

The pay-to-vote system runs afoul of the Constitution in three respects that bear on the stay issue. The motion to stay focuses on the first, inability to pay, but *Jones I* settles that issue on liability, and the motion to stay as filed in this court— unlike the State's filings in the Eleventh Circuit—offers no criticism of the *Jones II* remedy. The motion to stay wholly ignores the second issue, the State's staggering inability to administer its system; the *Jones II* remedy uses a structure suggested at trial by the State itself. The motion to stay includes only a brief discussion of the third issue, the Twenty-Fourth Amendment's ban on any "poll tax *or other tax*," and the State misrepresents the caselaw on that issue; in any event, staying the *Jones II* remedy on that issue would sow confusion but otherwise make no practical difference.

### A. *Inability to Pay*

A state cannot allow one citizen to vote but not an otherwise-identically-situated second citizen when the only difference is wealth—when the first citizen has money and so can pay a debt but the second citizen does not have money and cannot pay the same debt. This is so even when the debt arose from a criminal sentence; in that instance, the refusal to let the second citizen vote is increased punishment for the underlying offense—increased punishment solely for being impecunious:

> Here, these plaintiffs are punished more harshly than those who committed precisely the same crime—by having their right to vote taken from them likely for their entire lives. And this punishment is linked not to their culpability, but rather to the exogenous fact of their wealth. Indeed, the wealthy identical felon, with identical culpability, has his punishment cease. But the felon with no reasoned prospect of being able to pay has his punishment continue solely due to the impossibility of meeting the State's requirement, despite any bona fide efforts to do so. Whatever interest the State may have in punishment, this interest is surely limited to a punishment that is applied in proportion to culpability.

*Jones I*, 950 F.3d at 812.

*Jones I* is controlling on this issue. And as set out in *Jones II*, the record compiled at trial makes the result even more clear. *See Jones II*, 2020 WL 2618062 at *13-27. The motion to stay makes no attempt at all to come to grips with the evidence and with the irrationality of the State's system.

Instead, the State doubles down on its assertion that the required showing of intent in a wealth case parallels the required showing in a race case—the showing required by cases dating to *Washington v. Davis*, 426 U.S. 229 (1976). But the Supreme Court has explicitly rejected this very assertion. *See M.L.B. v. S.L.J.*, 519 U.S. 102, 126–27 (1996). Any intellectually honest reading of *M.L.B.* settles this issue. It is not surprising, then, that *Jones I* squarely and correctly refuted the State's assertion: "the Supreme Court has squarely held that *Davis*'s intent requirement is not applicable in wealth discrimination cases." *Jones I*, 950 F.3d at 828 (citing *M.L.B.*, 519 U.S. 102, 126–27 (1996)). The State says this part of *Jones*

*I* should be reconsidered en banc, but the en banc court, no less than the panel, will be bound by *M.L.B.* and the other Supreme Court cases accurately cited in *Jones I*.

No matter how many times the State asserts the contrary, a statute that punishes some individuals more harshly than others based only on wealth, or that irrationally conditions eligibility to vote on wealth, is unconstitutional. An additional finding of unconstitutional intent is not required. *Jones I* correctly so held, as it was required to do under a substantial line of Supreme Court decisions, including not just *M.L.B.* but also *Bearden v. Georgia*, 461 U.S. 660 (1983), and other cases. The motion to stay does not even mention those cases.

In any event, this issue is much ado about nothing. Even on a claim of racial discrimination, a plaintiff need not show racial *animus*; a plaintiff need only show racial *motivation*. This is the holding of *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265-66 (1977). And race need not be the *sole* motivation but only *a* motivation. *Id.* When the Florida Legislature adopted SB7066 conditioning voting on payment of money, the Legislature well knew that it was making poor people ineligible to vote, even when otherwise-identically-situated people with money would be eligible. A legislative motive was to achieve precisely that result.

The State insists that this effect—that poor people would be unable to vote while those with money could pay their obligations and vote—was unintended.

The assertion makes no sense. Whatever else might be said of SB7066, its obvious financial effect was not an accident. The Legislature achieved precisely what it intended: a system favoring those with money over those without.

Why else did SB7066 provide that amounts converted to civil liens were still disqualifying? Why else did SB7066 allow financial obligations to be paid through community service—but only after delays and at such unrealistic conversion rates that the option was almost entirely illusory? A motive was to prefer those with money over those without. Lest there be any doubt, I now expressly so find. The Legislature would not have adopted SB7066 but for the actual motive to favor individuals with money over those without.

The State is unlikely to prevail on its assertion that *Jones I*'s reading of *M.L.B.* should be reconsidered en banc.

### B. *Staggering Inability to Administer the Pay-to-Vote System*

*Jones II* analyzed in depth the State's staggering inability to administer the system it has put in place. The State is on pace to complete its initial review of the already-pending felon voter registrations in early 2026. Additional registrations may push the completion date of just the initial review into the 2030s. In the meantime, many individuals will be unable to determine whether they must pay some amount to be eligible to vote and, if so, how much they must pay. Some

individuals who are eligible to vote, even on the State's own view of the law, will choose not to vote because they are unwilling to risk criminal prosecution.

The motion to stay does not even mention these issues. The State is unlikely to prevail on any assertion that the *Jones II* findings of fact are clearly erroneous or on any assertion that its inability to administer its system is constitutionally acceptable. And even more clearly, the State is unlikely to prevail on any assertion that this issue, which turns on the evidence in a record than spans well in excess of 10,000 pages, should be taken en banc without even an initial review by a panel.

In any event, the injunctive relief provided on this issue will cause the State no harm, let alone any irreparable harm, as addressed below.

## C. Poll Tax or Other Tax

The Twenty-Fourth Amendment prohibits a state from denying or abridging the right to vote based on failure to pay any "poll tax or other tax." The motion to stay does not attempt to explain how a "fee" assessed for no purpose other than to fund the government is not a tax. But the State says felons can be required to pay a tax to vote—that the Twenty-Fourth Amendment does not apply to them. The State makes no attempt to square this with the position it has passionately asserted on other issues: that constitutional provisions and statutes should be construed based on their plain language.

Nor does the State's position make sense. If the Fourteenth Amendment applies to felon reenfranchisement—as every court that has addressed the issue, including the Supreme Court and the Eleventh Circuit en banc, has said it does— why not also the Twenty-Fourth?

The State says *Jones II* is on the wrong side of a 5–1 split among federal courts on this issue. That is simply not so. *Jones II* holds that restitution and fines are not taxes, thus agreeing with the other courts that have addressed the issue. But *Jones II* also holds that fees imposed only to fund the government—and that are imposed identically on defendants who are and are not adjudicated guilty—are taxes. The circuit decisions cited by the State do not address fees of this kind. *See Johnson v. Bredesen*, 624 F.3d 742 (6th Cir. 2010) (holding restitution and child support are not taxes under the Twenty-Fourth Amendment); *Harvey v. Brewer*, 605 F.3d 1067 (9th Cir. 2010) (holding fines and restitution are not taxes under the Twenty-Fourth Amendment); *Howard v. Gilmore*, No. 99-2285, 2000 WL 203984, at *2 (4th Cir. Feb. 23, 2000) (upholding a requirement to pay a $10 fee to begin the rights-restoration process).

What matters, of course, is not what other courts have said in other circumstances. What matters is what the Twenty-Fourth Amendment says. And whether it means what it says. The State has made no effort to explain the inconsistency in its approach to constitutional adjudication—its assertion that

Florida's Amendment 4 means what it says but the Twenty-Fourth Amendment does not.

Still, one could come out either way on likelihood of success on this issue. The State cannot, however, meet the other requirements for a stay on this issue, as addressed below.

## V. Irreparable Harm to the State

The State seeks to stay an injunction with several parts. Most will cause no irreparable harm to the State. None should be stayed.

### A. Determining the Amount Owed

The injunction requires the Secretary of State and Supervisors of Elections to make a form available that felons may use to request an advisory opinion from the Division of Elections on the amount the felon must pay to be eligible to vote. The State should not be heard to complain about this. Requesting an advisory opinion—a procedure created by a Florida statute—was the State's own suggestion, put forward in response to the plaintiffs' argument that the inability to determine the amount owed was a due-process problem.

Making a form available so that individuals can more easily do what the State suggested they do will cause no irreparable harm. In the motion to expedite in the Eleventh Circuit, the State says the injunction requires the Division to provide an advisory opinion within 21 days. That is not so. The injunction does not require

the Division to provide an advisory opinion at all. But if the Division does not provide a requested advisory opinion within 21 days, the State cannot preclude the requesting individual from registering and voting based on unpaid amounts, until the Division provides the requested information. This hardly seems unreasonable. Surely when the State suggested this process as a solution, it did not mean it could delay a response indefinitely.

### B. Inability to Pay

The injunction requires the State to allow individuals to register and to vote if, based on the Eleventh Circuit's decision in *Jones I*, they are constitutionally entitled to vote. This part of the injunction should not be stayed.

### 1. Registration

Registration causes no irreparable harm because it merely starts the process. Unless the registrant actually votes, the only harm is administrative, and in one respect it is a net benefit, not a harm. The sooner a person registers, the sooner the State may start the vetting process. And as addressed below, delaying registration will cause substantial—indeed irreparable—harm to the plaintiff organizations and to the individual plaintiffs and class members, making a stay of this part of the injunction improper on that basis as well.

### 2. Voting

The analysis is different for *voting*. If the injunction remains in place, the Eleventh Circuit does not weigh in, and an election goes forward, some individuals will vote even though the State says they are ineligible. This will be the case for individuals who owe amounts they are unable to pay—individuals who, under *Jones I*, are constitutionally entitled to vote.

This does not support a stay, though, because, as set out above, the State has not made the required "strong showing" that it is likely to succeed on its challenge to *Jones I*. Moreover, as set out below, a stay will cause substantial—indeed irreparable—harm to the plaintiffs, and a stay will not serve the public interest.

### 3. Advisory Opinion

*Jones II* puts in place a process for determining inability to pay—a rebuttable presumption. The motion to stay takes no issue with that process, which is both reasonable and workable. But in the motion to expedite in the Eleventh Circuit, the State criticizes the remedy, both misreading it and mischaracterizing it as a wholesale rewriting of the State's elections laws.

The State had more than six months after entry of the preliminary injunction, and more than three months after the Eleventh Circuit's definitive ruling in *Jones I*, to come up with its own process for determining inability to pay. The State chose to do nothing.

The State's decision to ignore a definitive Eleventh Circuit ruling was unusual. States sometimes took positions like this in the 1950s and '60s. States have rarely done so since. The parties have every right to litigate this issue to the end of the line. To that end, I have endeavored at every turn to preserve each side's appellate rights. But after choosing to ignore *Jones I*, the State ought not be heard to complain about the court's chosen remedy, which, as set out in *Jones II*, will be more easily administered, especially by the Supervisors of Elections, than the default process that was already in place. It perhaps bears noting that the Supervisors of Elections, who have an important role in this process, have not complained about the remedy. The injunction was crafted taking full account of the Supervisors' position at trial.

The State says, in its motion to expedite, that the injunction requires the Division of Elections to respond to a request for an advisory opinion within 21 days. That is not so. The Division need not respond to a request for an advisory opinion at all. But if, within 21 days, the Division does not assert ability to pay, the State cannot bar the person from registering and voting or refer the person for prosecution, except on grounds unrelated to financial obligations. This prohibition ends if, at any later point, the Division has "credible and reliable information that the requesting person is currently able to pay the financial obligations at issue." *Jones II*, 2020 WL 2618062 at *45. The requirement for "credible and reliable"

information again tracks the State's own position, as asserted time and again at

trial. *See* Fla. Stat. § 98.0751(3)(a).

### C. Twenty-Fourth Amendment

Under the part of the injunction based on the Twenty-Fourth Amendment,

the State cannot prohibit an otherwise-eligible felon from registering and voting

based on the failure to pay fees or costs that are, in substance, taxes.

As set out above, registration causes no irreparable harm because it merely

starts the process.

If there were any individuals whose eligibility to vote depended on this

Twenty-Fourth Amendment ruling, the injunction requiring the State to allow the

individuals to vote would pose a risk of harm. But the State has not shown that

there exists even a single individual who has failed to pay fees or costs that the

person is able to pay. So long as the inability-to-pay ruling in *Jones I* holds, the

ruling on fees and costs will have no practical impact, at least as shown by this

record.

At first blush, it may seem curious that nobody who is able to pay fees and

costs would fail to pay them. But the State has powerful collection tools, including

the ability to suspend a driver's license; these provide a compelling incentive to

pay when one is able to do so. As discussed in *Jones II*, this is one of many facts

that make the pay-to-vote system irrational—that put the lie to the State's assertion

that the system is justified by the State's interest in collecting amounts that are collectible. Given the emphasis in *Jones I* on the "mine-run" case, *see Jones*, 950 F.3d at 811, 814-17, one would have expected the State to introduce evidence of at least one person capable of paying who failed to pay, if indeed any such person exists. The burden of proof was not on the State, but it did call witnesses. The State failed to prove the existence of even one person who willfully failed to pay.

Requiring compliance with this component of the injunction will harm the State only if the *Jones I* inability-to-pay component of the injunction is stayed.

### D. Criminal Prosecution

The injunction prohibits the defendants for referring an individual for prosecution for acting in reliance on an advisory opinion. This again accords with the State's own position at trial; in response to the plaintiffs' due-process arguments, the State said that under Florida law, a person who relies on an advisory opinion cannot be prosecuted. That may or may not be correct, but the State again should not be heard to complain about an injunction that merely requires the State to do what the State says it is already required to do.

### E. Notice of the Governing Standards

The injunction requires the State to make available a plain-language description of the standards that govern a felon's eligibility to vote. This will cause no irreparable harm. Indeed, one might have expected the State to do this on its

own. If a stay is granted on other parts of the injunction—it should not be—the plain-language description will need to be altered to be accurate during the life of the stay, but this is not a basis to dispense entirely with an accurate plain-language description.

### F.  The Indefensible Registration Form

The injunction requires the State to discontinue use of a plainly improper voter-registration form. The State has made no real effort to defend the form, and the State says it has always allowed use of an older, proper form. The State says it does nothing at all different when a person uses the older, proper form instead of the new, indefensible form; which form is used makes absolutely no difference. Discontinuing use of the indefensible form that makes no difference will cause no harm, irreparable or otherwise.

## VI.  Substantial Harm to the Plaintiffs

A person who is denied the ability to vote in violation of the United States Constitution suffers not just substantial harm but irreparable harm. Period.

Staying the injunction will cause irreparable harm to the plaintiffs. This will be so for the August 18, 2020 election as well as for the November 3, 2020 election. The August election includes not only party primaries but also important nonpartisan elections. The State's suggestion that denying an individual's constitutional right to vote in August will not cause substantial harm is incorrect.

Florida requires voters to register 29 days before an election. *See* Fla. Stat. § 97.055(1)(a). The deadline to register for the August 18 election is July 20. A stay is certain to prevent some eligible voters from voting—even some who are eligible on the State's own view of the law but who are uncertain of that and do not wish to risk criminal prosecution.

## VII.  Public Interest

There are public-interest considerations on both sides of the equation. The State is correct that, other things being equal, it is better to have fewer changes in voting procedures. So a constitutional ruling should be enforced once and for all, when possible, not on-again-off-again. Here, though, that interest cuts against a stay. The Eleventh Circuit decision in *Jones I* has been in place for nearly four months. A stay will end compliance not just with this court's decision in *Jones II* but with the Eleventh Circuit's ruling in *Jones I*.

In any event, the interest in continuity does not justify denying the vote to those constitutionally entitled to vote. Other things being equal, it is better to follow the Constitution. When, as here, a constitutional issue has been settled by the Eleventh Circuit, a stay is rarely justified.

*Jones I* was a measured, thoughtful, comprehensive decision of the Eleventh Circuit. The Supreme Court exists for a reason; sometimes circuit courts get it wrong. And en banc petitions exist for a reason; sometimes a panel gets it wrong.

But this panel got it right. This is a particularly inauspicious time for the State of Florida to cling to an outdated system that was overwhelmingly rejected by the State's electorate.

Immediately after entry of the preliminary injunction, the Governor seemed to agree, issuing, and later adopting in court, this statement: "Today's ruling affirms the Governor's consistent position that convicted felons should be held responsible for paying applicable restitution, fees and fines while also recognizing *the need to provide an avenue for individuals unable to pay back their debts as a result of true financial hardship*." Hr'g of Dec. 3, 2019 Tr., ECF No. 239 at 5-8 (emphasis added). The order now on appeal provides an avenue, just as the Governor said was proper. The public interest will be served by putting the ruling in place now rather than later.

## VIII.  Conclusion

The motion to stay is, in effect, a motion to stay implementation of the Eleventh Circuit's decision in *Jones I*. Fidelity to the standards governing stays pending appeal requires denial of the motion.

IT IS ORDERED:

The motion to stay, ECF No. 423, is denied.

SO ORDERED on June 14, 2020.

s/Robert L. Hinkle_____
United States District Judge