# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

September 11, 2020

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  20-12003-AA
Case Style:  Kelvin Jones, et al v. Governor of Florida, et al
District Court Docket No:  4:19-cv-00300-RH-MJF
Secondary Case Number:  4:19-cv-00304-RH-MAF

Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been
entered pursuant to Rule 36 of the Federal Rules of Appellate Procedure.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Jeff R. Patch
Phone #: 404-335-6151

OPIN-5 Issuance of En Banc Opinion

[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 20-12003
_____

D.C. Docket Nos. 4:19-cv-00300-RH-MJF; 4:19-cv-00304-RH-MAF


KELVIN LEON JONES,
ROSEMARY MCCOY, et al.,

                                                    Plaintiffs-Appellees,

versus

GOVERNOR OF FLORIDA,
FLORIDA SECRETARY OF STATE,

                                                    Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Florida
_____

(September 11, 2020)

Before WILLIAM PRYOR, Chief Judge, WILSON, MARTIN, JORDAN, JILL
PRYOR, NEWSOM, BRANCH, GRANT, LUCK, and LAGOA, Circuit Judges.

WILLIAM PRYOR, Chief Judge, delivered the opinion of the Court, in which
NEWSOM, BRANCH, GRANT, LUCK, and LAGOA, Circuit Judges, joined,
except with respect to Part III–B–2, in which only NEWSOM and LAGOA,
Circuit Judges, joined.

WILLIAM PRYOR, Chief Judge:

Florida has long followed the common practice of excluding those who commit serious crimes from voting. But in 2018, the people of Florida approved a historic amendment to their state constitution to restore the voting rights of thousands of convicted felons. They imposed only one condition: before regaining the right to vote, felons must complete *all* the terms of their criminal sentences, including imprisonment, probation, and payment of any fines, fees, costs, and restitution. We must decide whether the financial terms of that condition violate the Constitution.

Several felons sued to challenge the requirement that they pay their fines, fees, costs, and restitution before regaining the right to vote. They complained that this requirement violates the Equal Protection Clause of the Fourteenth Amendment as applied to felons who cannot afford to pay the required amounts and that it imposes a tax on voting in violation of the Twenty-Fourth Amendment; that the laws governing felon reenfranchisement and voter fraud are void for vagueness; and that Florida has denied them procedural due process by adopting requirements that make it difficult for them to determine whether they are eligible to vote. The district court entered a permanent injunction that allows any felon who is unable to pay his fines or restitution or who has failed for any reason to pay his court fees and costs to register and vote. Because the felons failed to prove a

violation of the Constitution, we reverse the judgment of the district court and vacate the challenged portions of its injunction.

## I. BACKGROUND

Like many other States, Florida has long prohibited convicted felons from voting. The first Constitution of Florida gave the legislature the power "to exclude . . . from the right of suffrage, all persons convicted of bribery, perjury, or other infamous crime." Fla. Const. art. VI, § 4 (1838). The legislature exercised this power to disenfranchise those convicted of an "infamous crime" shortly after the Union admitted Florida in 1845. 1845 Fla. Laws 78. And until late 2018, the Constitution of Florida provided without qualification that "[n]o person convicted of a felony . . . shall be qualified to vote or hold office until restoration of civil rights." Fla. Const. art. VI, § 4(a) (2018).

In 2018, the people of Florida amended their constitution to restore the voting rights of some felons. Amendment 4 began as a voter initiative that appeared on the general election ballot in November 2018. The amendment provides that "any disqualification from voting arising from a felony conviction shall terminate and voting rights shall be restored upon completion of all terms of sentence including parole or probation." Fla. Const. art. VI, § 4(a). It does not apply to felons convicted of murder or a felony sexual offense. *Id.* § 4(a)–(b). The

amendment passed with about 65 percent of the vote, just over the required 60-percent threshold. *See id.* art. XI, § 5(e).

Shortly after Amendment 4 took effect, the Florida Legislature enacted a statute, Senate Bill 7066, to implement the amendment. This statute defined the phrase "[c]ompletion of all terms of sentence" in Amendment 4 to mean any portion of a sentence contained in the sentencing document, including imprisonment, probation, restitution, fines, fees, and costs. Fla. Stat. § 98.0751(2)(a). The Supreme Court of Florida later agreed with that interpretation and ruled that the phrase "all terms of sentence" includes all financial obligations imposed as part of a criminal sentence. *Advisory Opinion to the Governor re: Implementation of Amendment 4*, 288 So. 3d 1070, 1084 (Fla. 2020).

To vote in Florida, a person must submit a registration form. The form requires registrants to affirm that they are not a convicted felon or that, if they are, their right to vote has been restored. Florida does not require felons to prove that they have completed their sentences during the registration process. The State allows felons to request an advisory opinion on eligibility before registration, and any felon who registers in reliance on an opinion is immune from prosecution. If the registration form is complete and the Division of Elections determines that the registrant is a real person, it adds the person to the voter registration system. If the State later obtains "credible and reliable" information establishing that the person

4

has a felony conviction and has not completed all the terms of his sentence, the person is subject to removal from the voter rolls. *See* Fla. Stat. § 98.075(5). But any such felon is considered a registered voter, and before removal from the voter registration system, he is entitled to notice—including "a copy of any documentation upon which [his] potential ineligibility is based"—and a hearing, as well as *de novo* judicial review of an adverse eligibility determination. *Id.* §§ 98.075(7), 98.0755.

At the time of trial, Florida had received 85,000 registrations from felons who believe they were reenfranchised by Amendment 4. State law requires that those registrations be screened for, among other things, the voters' failure to complete the terms of their sentences including financial obligations. *Id.* § 98.0751. Florida has yet to complete its screening of any of the registrations. Until it does, it will not have credible and reliable information supporting anyone's removal from the voter rolls, and all 85,000 felons will be entitled to vote. *See id.* §§ 98.075(5) and (7).

Several felons sued Florida officials to challenge the requirement that they pay their fines, fees, costs, and restitution before regaining the right to vote. Among other provisions, they alleged that the reenfranchisement laws violate the Equal Protection and Due Process Clauses of the Fourteenth Amendment and the Twenty-Fourth Amendment.

The district court entered a preliminary injunction in favor of the felons because it concluded they were likely to succeed on their claim under the Equal Protection Clause. It ruled that requiring felons to complete all financial terms of their sentences before regaining the right to vote was unconstitutional wealth discrimination as applied to felons unable to pay the required amounts. The preliminary injunction ordered the officials not to prevent the plaintiff felons from registering or voting based solely on their inability to pay any outstanding financial obligations in their sentences.

A panel of this Court affirmed the preliminary injunction on interlocutory appeal. *Jones v. Governor of Fla.*, 950 F.3d 795, 800 (11th Cir. 2020). The panel held that the decision to condition reenfranchisement on the completion of "all terms of sentence" violated the Equal Protection Clause as applied to indigent felons who cannot afford to pay their fines, fees, costs, and restitution. *Id.* It reached this conclusion by applying heightened scrutiny on the ground that Amendment 4 and Senate Bill 7066 discriminate on the basis of wealth. *Id.* at 817. It also suggested in dicta that the laws may fail even rational basis review. *Id.* at 809, 817.

The district court certified a class and a subclass of felons for purposes of final injunctive and declaratory relief. *See* Fed. R. Civ. P. 23(b)(2). The class comprises "all persons who would be eligible to vote in Florida but for unpaid

financial obligations." The subclass comprises "all persons who would be eligible to vote in Florida but for unpaid financial obligations that the person asserts the person is genuinely unable to pay."

Before trial, the State adopted what the district court called the "every-dollar method" for determining when felons complete their financial terms of sentence. Under this policy, the State credits all payments a felon makes for any obligations related to his sentence toward the original obligations imposed in the sentence. For example, if a felon establishes a payment plan to complete his terms of sentence, any payments the felon makes for setting up or administering the plan also count toward the original financial obligations imposed in the sentence. After a felon has paid an amount equal to that imposed in his sentence, the State considers the felon's financial terms of sentence complete for purposes of reenfranchisement.

After a trial on the merits, the district court ruled that Amendment 4 and Senate Bill 7066 violate the Equal Protection Clause as applied to felons who cannot afford to complete their sentences. It applied heightened scrutiny to reach that conclusion based on the panel decision in the earlier appeal, and it alternatively ruled that the laws failed even rational basis review as applied to felons who are unable to pay the required amounts. The district court also ruled that Amendment 4 and Senate Bill 7066 impose a "tax" on voting by requiring

7

felons to pay court fees and costs imposed in their sentences in violation of the Twenty-Fourth Amendment.

The district court did not decide whether Florida's reenfranchisement laws violate the Due Process Clause. It stated that there was "considerable force" to the arguments that the relevant laws are void for vagueness and deny the felons procedural due process. It found that felons are sometimes unable to determine the amount of financial obligations imposed in their sentences or the total amount they have paid toward all related obligations. The amount of financial obligations imposed in a sentence is usually clear from the judgment, which can be obtained from the county of conviction. But many felons no longer have copies of their judgments, and some counties may lack records for older convictions. When judgments contain both misdemeanor and felony offenses, it may not be immediately clear whether all financial obligations were imposed only for a disqualifying felony offense. The district court did not decide whether these facts established a violation of the Due Process Clause, but it stated that its remedy for the other constitutional violations would eliminate any due process concerns.

The district court awarded declaratory and injunctive relief. It declared Amendment 4 and Senate Bill 7066 unconstitutional insofar as they prohibit otherwise-eligible felons who are "genuinely unable to pay" their financial obligations from voting, require felons to pay "amounts that are unknown and

cannot be determined with diligence" to regain their voting rights, and require any felons "to pay fees and costs as a condition of voting." It enjoined any defendant from taking steps to enforce those requirements. But it did not enjoin the requirement that felons pay "a determinable amount of fines and restitution as a condition of voting" if they can afford to do so.

The district court also imposed new procedures to govern the registration and voting process for felons. Its injunction required the Secretary of State to publish a form to request an advisory opinion from the Division of Elections regarding the existence and amount of any outstanding fines or restitution that could render a felon ineligible to vote. The form allowed requesters to check a box that stated, "I believe I am unable to pay the required amount." If the Division failed to respond to a request within 21 days and if the requester checked the box, the injunction required that the requester be allowed to vote.

The Governor and the Secretary of State appealed. They petitioned this Court for initial hearing en banc and moved to stay most aspects of the permanent injunction pending appeal. We granted both requests.

## II. STANDARDS OF REVIEW

We review the decision to enter a permanent injunction for an abuse of discretion, but we review the underlying legal conclusions *de novo* and any factual

findings for clear error. *See Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1349 (11th Cir. 2009).

## III. DISCUSSION

We divide our discussion in three parts. We first explain that Amendment 4 and Senate Bill 7066 do not violate the Equal Protection Clause. Next, we explain why the laws do not impose a tax on voting in violation of the Twenty-Fourth Amendment. Finally, we reject the arguments that the challenged laws are void for vagueness and that Florida has denied the felons due process.

### A.  Amendment 4 and Senate Bill 7066 Do Not Violate the Equal Protection Clause.

The practice of disenfranchising persons who commit serious crimes has a long history that predates the founding of the Republic. George Brooks, Comment, *Felon Disenfranchisement: Law, History, Policy, and Politics*, 32 Fordham Urb. L.J. 851, 852–53 (2005). As Judge Friendly explained, early American States may have based the practice on the Lockean understanding that those who break the social contract by committing a crime "have abandoned the right to participate in further administering the compact." *Green v. Bd. of Elections*, 380 F.2d 445, 451 (2d Cir. 1967). And as a practical matter, "it can scarcely be deemed unreasonable for a state to decide that perpetrators of serious crimes shall not take part in electing the legislators who make the laws, the executives who enforce these, the

prosecutors who must try them for further violations, or the judges who are to consider their cases." *Id.*

When the States ratified the Fourteenth Amendment in 1868, 29 of their constitutions permitted or required felon disenfranchisement. *Richardson v. Ramirez*, 418 U.S. 24, 48 & n.14 (1974). Section 2 of the Fourteenth Amendment expressly allows States to disenfranchise criminals without having their representation reduced in Congress. U.S. Const. amend. XIV, § 2. Today, almost all States disenfranchise felons in some way, although the recent trend is toward expanding access to the franchise. *Jones*, 950 F.3d at 801 & nn.1–3.

Based on the express provision for felon disenfranchisement in section 2 of the Fourteenth Amendment, the Supreme Court held in *Richardson v. Ramirez* that the Equal Protection Clause in section 1 of the same amendment does not forbid the practice. 418 U.S. at 54–56. The Court held that the Equal Protection Clause permits States to disenfranchise all felons for life, even after they have completed their sentences. *Id.* at 56. Florida largely followed this practice before the adoption of Amendment 4. It presumptively disenfranchised felons for life upon conviction, subject only to discretionary restoration of voting rights by executive clemency. *Jones*, 950 F.3d at 802.

This appeal requires us to consider what limits the Equal Protection Clause places on the selective *restoration* of felons' voting rights. By conditioning

reenfranchisement on the completion of all terms of sentence, Florida has decided
to restore some felons to the franchise but not others. The felons challenge the
classification Florida has drawn between felons who have completed all their terms
of sentence, including financial terms, and those who have not. They argue that
this classification violates the Equal Protection Clause as applied to felons who
have completed all other terms of sentence but cannot afford to pay their fines,
fees, costs, and restitution.

Under the Equal Protection Clause, classifications that neither implicate
fundamental rights nor proceed along suspect lines are subject to rational basis
review. *See, e.g.*, *Heller v. Doe ex rel. Doe*, 509 U.S. 312, 319–20 (1993).
Whatever may be true of the right to vote generally, felons "cannot complain about
their loss of a fundamental right to vote because felon disenfranchisement is
explicitly permitted under the terms of *Richardson*." *Harvey v. Brewer*, 605 F.3d
1067, 1079 (9th Cir. 2010) (O'Connor, J.); *accord Johnson v. Bredesen*, 624 F.3d
742, 746 (6th Cir. 2010); *Hayden v. Paterson*, 594 F.3d 150, 170 (2d Cir. 2010);
*Owens v. Barnes*, 711 F.2d 25, 27 (3d Cir. 1983). If the right of felons to vote were
fundamental, every law that distinguished between different groups of felons in
granting or denying access to the franchise would be subject to "exacting judicial
scrutiny." *Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 628 (1969). But
the Constitution does not put States to an all-or-nothing choice when it comes to

deciding whether felons may vote. As our predecessor Court held decades ago, the Constitution "grants to the states a realm of discretion in the disenfranchisement and reenfranchisement of felons which the states do not possess with respect to limiting the franchise of other citizens." *Shepherd v. Trevino*, 575 F.2d 1110, 1114 (5th Cir. 1978).

States may restrict voting by felons in ways that would be impermissible for other citizens. For example, no one doubts that a State could not require citizens never convicted of a crime to serve a term of confinement or supervision to access the franchise. Such a requirement would have "no relation to voting qualifications" and so would be invalid under the Equal Protection Clause. *Harper v. Va. Bd. of Elections*, 383 U.S. 663, 670 (1966). But States may unquestionably require felons to complete their terms of imprisonment and parole before regaining the right to vote. *See Richardson*, 418 U.S. at 55–56; *Hayden*, 594 F.3d at 171. The reason for this difference is clear: requiring felons to complete their sentences is directly related to voting qualifications because imprisonment and parole are imposed as punishment for the crimes by which felons forfeited their right to vote.

Although States enjoy significant discretion in distributing the franchise to felons, it is not unfettered. A State may not rely on suspect classifications in this area any more than in other areas of legislation. But absent a suspect classification that independently warrants heightened scrutiny, laws that govern felon

disenfranchisement and reenfranchisement are subject to rational basis review. *Shepherd*, 575 F.2d at 1114–15. Every other Circuit to consider the question has reached the same conclusion. *See Johnson*, 624 F.3d at 746; *Harvey*, 605 F.3d at 1079; *Hayden*, 594 F.3d at 170; *Owens*, 711 F.2d at 27. Were the rule otherwise, the "realm of discretion" States enjoy in this area would prove illusory. *Shepherd*, 575 F.2d at 1114.

The only classification at issue is between felons who have completed all terms of their sentences, including financial terms, and those who have not. This classification does not turn on membership in a suspect class: the requirement that felons complete their sentences applies regardless of race, religion, or national origin. Because this classification is not suspect, we review it for a rational basis only.

In the earlier appeal from the preliminary injunction, the panel elided this analysis and applied "some form of heightened scrutiny" on the ground that Amendment 4 and Senate Bill 7066 invidiously discriminate based on wealth. *Jones*, 950 F.3d at 817. That decision was wrong. To reiterate, Florida withholds the franchise from *any* felon, regardless of wealth, who has failed to complete *any* term of his criminal sentence—financial or otherwise. It does not single out the failure to complete financial terms for special treatment. And in any event, wealth is not a suspect classification. *See, e.g.*, *Maher v. Roe*, 432 U.S. 464, 470–71

14

(1977). Outside of narrow circumstances, laws that burden the indigent are subject only to rational basis review. *See M.L.B. v. S.L.J.*, 519 U.S. 102, 123–24 (1996).

To justify its application of heightened scrutiny, the panel relied on Supreme Court precedents governing poll taxes, *Harper*, 383 U.S. 663; poverty-based imprisonment, *e.g.*, *Bearden v. Georgia*, 461 U.S. 660 (1983); and access to judicial proceedings, *e.g.*, *Griffin v. Illinois*, 351 U.S. 12 (1956). The felons ask us to affirm the permanent injunction based on these same decisions. But none of these precedents, alone or in combination, requires heightened scrutiny for the decision to condition reenfranchisement on the full completion of a criminal sentence.

Consider first *Harper*, which invalidated a $1.50 poll tax under the Equal Protection Clause. This poll tax applied to the Virginia electorate generally; any voter who wished to cast a ballot in a state election had to pay the tax. *Harper*, 383 U.S. at 664 n.1. Although States have the power to set voter qualifications, the Court explained that the Equal Protection Clause "restrains the States from fixing voter qualifications which invidiously discriminate." *Id.* at 666. Because poll taxes bear "no relation" to voter qualifications, the Court concluded that Virginia had "introduce[d] a capricious or irrelevant factor" by requiring voters to pay the tax. *Id.* at 666, 668. Under *Harper*, it is a per se violation of the Equal Protection

Clause for a State to "make[] the affluence of the voter or payment of any fee an

electoral standard." *Id.* at 666.

Amendment 4 and Senate Bill 7066 are markedly different from the poll tax

in *Harper*. They do not make affluence or the payment of a fee an "electoral

standard." *Id.* They instead impose a different electoral standard: to regain the right

to vote, felons, rich and poor, must complete all terms of their criminal sentences.

Unlike the poll tax in *Harper*, that requirement is highly relevant to voter

qualifications. *See Richardson*, 418 U.S. at 55; *Hayden*, 594 F.3d at 171. It

promotes full rehabilitation of returning citizens and ensures full satisfaction of the

punishment imposed for the crimes by which felons forfeited the right to vote. That

criminal sentences often include financial obligations does not make this

requirement a "capricious or irrelevant factor." *Harper*, 383 U.S. at 668. Monetary

provisions of a sentence are no less a part of the penalty that society imposes for a

crime than terms of imprisonment. Indeed, some felons face substantial monetary

penalties but little or no prison time.

Because the financial obligations at issue are directly related to legitimate

voter qualifications, *Harper* is inapplicable. The en banc Ninth Circuit rejected a

similar request to apply *Harper* to valid voter qualifications that impose a financial

burden on some voters. It held that "[r]equiring voters to provide documents

proving their identity is not an invidious classification based on impermissible

standards of wealth or affluence, *even if some individuals have to pay to obtain the documents*." *Gonzalez v. Arizona*, 677 F.3d 383, 409 (9th Cir. 2012) (en banc) (emphasis added), *aff'd sub nom. Arizona v. Inter Tribal Council of Az., Inc.*, 570 U.S. 1 (2013). Like requiring voters to prove their identity, requiring felons to complete their full criminal sentences "falls squarely within the state's power to fix core voter qualifications." *Id.* The felons' contrary reading of *Harper* would call into question *any* law that made voting more expensive for some people than others, even if the additional cost were directly tied to valid voter qualifications.

*Harper* also proves too much to help the felons, which is further evidence that it does not apply. *Harper* held that the Virginia poll tax was unconstitutional *regardless* of whether a voter could pay the tax; it did not matter whether a voter "ha[d] $1.50 in his pocket or nothing at all, pa[id] the fee or fail[ed] to pay it." 383 U.S. at 668. But no one doubts that the Equal Protection Clause allows Florida to require felons who are *able* to complete the financial terms of their sentences to do so. If completing the financial terms of a sentence were truly "irrelevant" to voter qualifications, *id.*, Florida could not require *any* felons to satisfy that requirement as a condition of voting. The watered-down version of *Harper* that the felons would have us apply ignores the crucial distinction between poll taxes and Florida's reenfranchisement law: poll taxes are *never* relevant to voter qualifications, but laws that require the completion of a criminal sentence are. *See*

17

*Richardson*, 418 U.S. at 55. The per se rule of *Harper* does not apply to voting

requirements that are related to legitimate voter qualifications, even if some voters

must pay to comply with the requirement. *See Gonzalez*, 677 F.3d at 409;

*Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 189 (2008) (plurality

opinion) (explaining that *Harper* invalidates voting restrictions that "are unrelated

to voter qualifications"); *cf. Cipriano v. City of Houma*, 395 U.S. 701, 702–04

(1969) (asking whether a law that gave only property taxpayers the right to vote in

certain elections was necessary to serve a compelling state interest but not applying

the per se rule of *Harper*).

In addition to *Harper*, the panel in the earlier appeal relied on two other lines

of Supreme Court precedent to apply heightened scrutiny. *Jones*, 950 F.3d at 817–

19. These decisions represent limited exceptions to the general rule that rational

basis review applies to claims of wealth discrimination. *See M.L.B.*, 519 U.S. at

123–24. They do not apply here.

The first line of precedent, which culminated in the *Bearden* decision,

applies when the State imprisons a person by reason of his inability to pay a fine.

*Bearden*, 461 U.S. at 667–69; *see also Tate v. Short*, 401 U.S. 395, 396–98 (1971);

*Williams v. Illinois*, 399 U.S. 235, 240–41 (1970). *Williams*, *Tate*, and *Bearden* all

involved criminal defendants whose sentences included fines or restitution.

*Bearden*, 461 U.S. at 662–63, 667. In each decision, the defendant was unable to

pay the required amount solely because of poverty, which led the State to impose an additional term of imprisonment on the defendant that was not part of his original sentence. *Id.* The Court explained in *Bearden* that "if the State determines a fine or restitution to be the appropriate and adequate penalty for the crime, it may not thereafter imprison a person solely because he lacked the resources to pay it." *Id.* at 667–68. But because Amendment 4 and Senate Bill 7066 do not impose an additional term of imprisonment on felons who fail to pay their financial obligations, they are far afield of the laws that *Bearden* and its predecessors considered.

The earlier panel erroneously read these decisions to stand for the proposition that "a state may not *extend punishment*"—that is, disenfranchisement—"on account of inability to pay fines or fees." *Jones*, 950 F.3d at 818 (emphasis added). The Supreme Court has never extended *Bearden* beyond the context of poverty-based *imprisonment*. *See Kadrmas v. Dickinson Pub. Schs.*, 487 U.S. 450, 461 n.* (1988) (declining to extend *Bearden*). And *Williams*, the foundational decision in this line of precedent, stated that nothing in its holding "limit[ed] the power of the [State] to impose alternative sanctions" *besides* imprisonment on defendants who cannot satisfy the monetary terms of their sentences. 399 U.S. at 245; *accord Bearden*, 461 U.S. at 671–72.

But even if *Bearden* applied beyond poverty-based imprisonment, it would not help the felons for a more fundamental reason. Amendment 4 and Senate Bill 7066 do not impose *additional punishment* because of a felon's failure to pay his fines, fees, costs, and restitution. Florida automatically disenfranchises all felons upon conviction, and the challenged laws only *lift* that punishment for felons who have completed all terms of their sentences. This case would resemble *Bearden* if Florida left the right to vote intact upon conviction but then revoked the franchise from any felons who could not pay their fines and restitution. In that scenario, the State would have determined that its "penological interests do not require" disenfranchisement, which would call into doubt the decision to impose disenfranchisement solely because of a felon's inability to pay fines and restitution. *Bearden*, 461 U.S. at 670. But Florida does nothing of the kind.

The Supreme Court has also applied heightened scrutiny to laws that condition access to certain judicial proceedings on the ability to pay. *See M.L.B.*, 519 U.S. at 110–16 (tracing the development of this exception to *Griffin*, 351 U.S. 12). But this exception to rational basis review applies only when the State makes "access to judicial processes in cases criminal or quasi criminal in nature turn on ability to pay." *Id.* at 124 (citation and internal quotation marks omitted). And even when the Supreme Court has extended the right of access to the courts to *other kinds* of judicial proceedings, it has "felt compelled to justify even . . . slight

extension[s] of the right." *Lewis v. Casey*, 518 U.S. 343, 354 (1996). The extension

the felons seek is hardly "slight"—the challenged laws do not concern access to

judicial proceedings *at all*. The access-to-courts precedents are wholly inapposite.

The felons resist the conclusion that the *Bearden* and *Griffin* lines of

precedent are limited to the contexts in which they arose, but they identify no

decisions that invoke *Bearden* or *Griffin* to apply heightened scrutiny to a claim of

wealth discrimination outside those contexts. And the dissenters' contention that

"the Supreme Court applied *Griffin* to the voting context in *Harper*," Jordan

Dissent at 119, is plainly inaccurate. Far from "rel[ying] on *Griffin* to

invalidate . . . Virginia['s] poll tax," *id.*, *Harper* cited *Griffin* once in passing to

support the proposition that "[l]ines drawn on the basis of wealth or

property . . . are traditionally disfavored," *Harper*, 383 U.S. at 668 (citing *Griffin*,

351 U.S. 12). The Court did not provide even a pinpoint citation to any passage in

*Griffin*, much less analysis extending it to the context of voting. *Id.* The Supreme

Court has made clear that heightened scrutiny for claims of wealth discrimination

is the exception, not the rule. *M.L.B.*, 519 U.S. at 123–24. Unable to fit their claim

into any existing exception, the felons rely on "nothing more than an

amalgamation" of multiple theories, each of which lacks merit on its own. *Pac.*

*Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 452 (2009).

21

We hold that rational basis review applies and overrule the contrary holding by the panel in the earlier appeal from the preliminary injunction. *Jones*, 950 F.3d at 800. Stare decisis does not counsel that we should adhere to that earlier decision. *See McCarthan v. Dir. of Goodwill Indus.-Suncoast, Inc.*, 851 F.3d 1076, 1096 (11th Cir. 2017) (en banc). The doctrine of stare decisis "is at its weakest when we interpret the Constitution." *Ramos v. Louisiana*, 140 S. Ct. 1390, 1405 (2020) (internal quotation marks omitted). Because the panel interpreted the Constitution and not a statute, only we or the Supreme Court can correct its "gravely mistaken" reasoning. *Id.* That earlier decision is inconsistent with clear Supreme Court precedent and every relevant decision of our sister circuits—indeed, it is, to our knowledge, the only appellate decision *ever* to apply heightened scrutiny to felon reenfranchisement in the absence of any suspect classification. *See id.* (considering "consistency with related decisions"). And any reliance interests on that decision— which affirmed a preliminary injunction entered earlier this year in this very litigation—are weak. *See Franchise Tax Bd. v. Hyatt*, 139 S. Ct. 1485, 1499 (2019) (rejecting "case-specific costs" as a reliance interest that can justify adhering to "an incorrect resolution of an important constitutional question").

A classification survives rational basis review if it is rationally related to some legitimate government interest, *Heller*, 509 U.S. at 320, and two interests are relevant here. Florida unquestionably has an interest in disenfranchising convicted

felons, even those who have completed their sentences. *See Richardson*, 418 U.S. at 56. But Amendment 4 and Senate Bill 7066 also reflect a different, related interest. They advance Florida's interest in *restoring* felons to the electorate after justice has been done and they have been fully rehabilitated by the criminal justice system. The policy Florida has adopted reflects the "more modern view" described in *Richardson* that "it is essential to the process of rehabilitating the ex-felon that he be returned to his role in society as a fully participating citizen when he has completed the serving of his term." *Id.* at 55. The twin interests in disenfranchising those who disregard the law and restoring those who satisfy the demands of justice are both legitimate goals for a State to advance. *See id.* at 55–56. The question is whether the classification Florida has adopted between felons who have completed their full sentences and those who have not is rationally related to those interests.

The dissenters suggest that Florida's only possible interests are in punishment and debt collection, Jordan Dissent at 145–49, and that narrow view leads them to conclude that Senate Bill 7066 is irrational, *id.* at 149. The dissenters dismiss our view that Florida also has an interest in restoring rehabilitated felons to the electorate as "an *ipse dixit* . . . [that] merely restates what the law does." *Id.* at 141. But it is not unusual for a policy to directly achieve an objective itself. *See Adams ex. rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 968 F.3d 1286, __ (11th Cir.

2020) (W. Pryor, C.J., dissenting). And we do not think it is unnatural to find state interests broader than punishment and revenue-raising in a reenfranchisement law.

In deciding whether Florida's classification is rational, we are mindful that our review is extremely narrow. *See FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314 (1993) ("This standard of review is a paradigm of judicial restraint."). We must uphold the classification unless the felons "negative every conceivable basis which might support it." *Id.* at 315 (internal quotation marks omitted). For this reason, the Supreme Court "hardly ever strikes down a policy as illegitimate under rational basis scrutiny." *Trump v. Hawaii*, 138 S. Ct. 2392, 2420 (2018). In the rare instances when it has done so, "a common thread has been that the laws at issue lack any purpose other than a 'bare desire to harm a politically unpopular group.'" *Id.* (alteration adopted) (quoting *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973)); *see also Romer v. Evans*, 517 U.S. 620, 634 (1996); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 446–47, 450 (1985). There is no evidence that any kind of animus toward indigent felons motivated Florida voters and legislators to condition reenfranchisement on the completion of all terms of sentence. After all, the voters of Florida made it easier for the vast majority of felons—who are disproportionately indigent—to regain their voting rights. So we must uphold their choice if there is any conceivable basis that could justify it. *See Heller*, 509 U.S. at

319 ("[R]ational-basis review . . . is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." (internal quotation marks omitted)).

Under this deferential standard, we readily conclude that Florida's classification survives scrutiny. The people of Florida could rationally conclude that felons who have completed all terms of their sentences, including paying their fines, fees, costs, and restitution, are more likely to responsibly exercise the franchise than those who have not. *See Green*, 380 F.2d at 451. If a State may decide that those who commit serious crimes are presumptively unfit for the franchise, *id.*, it may also conclude that those who have completed their sentences are the best candidates for reenfranchisement.

To be sure, the line Florida drew might be imperfect. The classification may exclude some felons who would responsibly exercise the franchise and include others who are arguably less deserving. But Florida was not required "to draw the perfect line nor even to draw a line superior to some other line it might have drawn." *Armour v. City of Indianapolis*, 566 U.S. 673, 685 (2012). The Constitution requires only "a rational line." *Id.* The line between felons who have completed their sentences and those who have not easily satisfies that low bar.

The classification is rational for other reasons too. Before extending the franchise to even more felons, Florida may have wished to test the waters by reenfranchising only those who complete their full sentences. Under rational basis

review, "reform may take one step at a time." *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 489 (1955). The State need not "strike at all evils at the same time or in the same way," *Semler v. Or. State Bd. of Dental Exam'rs*, 294 U.S. 608, 610 (1935), and "[a] statute is not invalid under the Constitution because it might have gone farther than it did," *Roschen v. Ward*, 279 U.S. 337, 339 (1929). Although "every reform that benefits some more than others may be criticized for what it fails to accomplish," that reality does not invalidate the measure under the Equal Protection Clause. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 39 (1973).

Confusion about Florida's voter registration system and the record before the district court leads the dissenters to conclude that Senate Bill 7066 "does not 'rationally' further the goal of re-enfranchising felons," a goal the dissent acknowledges only "[f]or the sake of argument." Jordan Dissent at 141, 143. The dissenters purport to prove that conclusion with a smoking gun: "the fact that Florida had restored voting rights to 0 felons as of the time of trial." *Id.* at 143. But that "fact" is not true. Once a felon submits a facially complete registration form and Florida determines that he is a real person, he is added to the voting rolls as a registered voter; he is not then required to prove that he has completed his sentence. To be sure, Florida attempts to identify "registered voters" with felony convictions whose rights have not been restored and, after securing "credible and

reliable" information, initiates the process of removing them from the voter registration system. Fla. Stat. §§ 98.075(5) and (7); *see also id.* at § 98.0751(3) (governing administration of § 98.075(5) in the light of Amendment 4). But at the time of trial, 85,000 felons had submitted facially complete voter registration forms, and Florida had not yet been able to find information justifying the removal of *any* of them from the voting rolls. Until it does, *all* 85,000 are entitled to vote. The dissenters' contention that state officials' implementation of Amendment 4 has prevented any felons from benefitting from the amendment is false. Eighty-five thousand felons are now registered voters, and each one will remain so unless Florida meets its self-imposed burden of gathering the information necessary to prove his ineligibility. Our dissenting colleagues quibble with our assertion that all of these registered voters are "entitled to vote," *see* Jordan Dissent at 144; Martin Dissent at 94 n.3, but they point to no evidence that any of the 85,000 voters will be unable to cast a ballot in an upcoming election.

The felons argue that Florida rendered its classification irrational by adopting the "every dollar" method for determining when a sentence is complete, but this argument misunderstands rational basis review. If the relationship between a State's interest and its means of achieving it is "at least debatable," then it survives scrutiny. *Gary v. City of Warner Robins*, 311 F.3d 1334, 1339 (11th Cir. 2002) (quoting *United States v. Carolene Prods. Co.*, 304 U.S. 144, 154 (1938)).

The "every dollar" policy is at least arguably related to Florida's interest in reenfranchising only those felons who have paid their debt to society and been fully rehabilitated. It ensures that no felons will be reenfranchised unless they have paid amounts equal to those imposed in their criminal sentences. Florida could rationally define "completion" of a sentence in this manner to help ensure that felons who enrolled in payment plans pay no more to complete their sentences than felons who paid their fines, fees, costs, and restitution immediately.

The reasoning of the district court and the panel in the earlier appeal bore no resemblance to rational basis review. Their first error was to assess the rationality of Florida's classification by asking only whether it was rational to prohibit *these plaintiffs* from voting. *See Jones*, 950 F.3d at 813 ("Florida's continued disenfranchisement of *these seventeen plaintiffs* is not rationally related to any legitimate governmental interest." (emphasis added)); *Jones v. DeSantis*, __ F. Supp. 3d __, __, 2020 WL 2618062, at *15 (N.D. Fla. 2020) (claiming that a proper approach to rational-basis scrutiny allows a court to "consider[] the rationality of a statute as applied to particular plaintiffs without opining on its rationality more generally." (quoting *Jones*, 950 F.3d at 814)). A legislative classification "may be based on rational speculation unsupported by evidence." *Beach Commc'ns*, 508 U.S. at 315. For that reason, a law may be rational "even if in a particular case [it] appears to discriminate irrationally." *In re Wood*, 866 F.2d

1367, 1370 (11th Cir. 1989); *see also Beller v. Middendorf*, 632 F.2d 788, 808 n.20 (9th Cir. 1980) (Kennedy, J.) ("Nearly any statute which classifies people may be irrational as applied in particular cases.").

The dissenters repeat the error of the district court and the panel in the earlier appeal. And they accuse us of ignoring the Supreme Court's decision in *City of Cleburne*, *see* Jordan Dissent at 135–36, which they describe as applying rational-basis review to affirm a judgment "insofar as it [held an] ordinance invalid as applied in this case," *City of Cleburne*, 473 U.S. at 448. But applying rational-basis review in a "*case*" is not the same as applying it to the unique circumstances of a specific plaintiff. After the passage cited by the dissenters, the Supreme Court in *City of Cleburne* evaluated whether the city's proffered reasons for requiring a permit for a group home of people with intellectual disabilities but not for comparable facilities rationally reflected relevant differences between "the mentally retarded *as a group*" and others. *Id.* at 448–50 (emphasis added). The Court did not focus on factors unique to the particular disabled people involved in the appeal—*City of Cleburne* does not justify the dissenters' narrow focus on whether Florida's classification applies rationally to the particular plaintiffs in this appeal.

The second error of the district court and the panel in the earlier appeal was to assume that the law would be rational if most felons could eventually pay their

fines, fees, costs, and restitution but irrational if a substantial number could not.
*See Jones*, 950 F.3d at 814. The proportion of felons who can eventually complete
their sentences has no bearing on whether it is rational to conclude that felons who
*do* complete their sentences—whatever their number—are generally more
deserving of reenfranchisement than those who do not. The district court and the
panel in the earlier appeal reached a contrary conclusion only by disregarding
settled law. *See Beach Commc'ns*, 508 U.S. at 315; *United States v. Castillo*, 899
F.3d 1208, 1213 (11th Cir. 2018). The dissenters echo that flawed reasoning when
they contend that any law that would leave a substantial portion of felons unable to
benefit from Amendment 4 is "a nullification of the will of the electorate." Jill
Pryor Dissent at 200. But the face of the amendment makes clear that Florida
voters do not share the dissenters' view that it is unjust to tell some criminals that
they have incurred debts to society that will never be repaid. *See* Fla. Const. art.
VI, § 4(b) (denying automatic reenfranchisement to felony sex offenders and
murderers). In fact, it is the dissenters who would nullify the will of the Florida
electorate by reenfranchising felons whom voters clearly would not have expected
to benefit from Amendment 4, including a named plaintiff who jointly owes $59
million in restitution for conspiracy to commit insurance and wire fraud. Florida's
voters intended only to reenfranchise felons who have been fully rehabilitated, and
Senate Bill 7066 drew a rational line in pursuit of that goal.

### B.  Amendment 4 and Senate Bill 7066 Do Not Violate the Twenty-Fourth Amendment.

Ratified in 1964, the Twenty-Fourth Amendment to the Constitution forbids taxes on voting in federal elections:

> The right of citizens of the United States to vote in any primary or other election for President or Vice President, for electors for President or Vice President, or for Senator or Representative in Congress, shall not be denied or abridged by the United States or any State by reason of failure to pay any poll tax or other tax.

U.S. Const. amend. XXIV, § 1. The felons argue that Florida has denied them the right to vote by reason of their failure to pay court fees and costs imposed in their criminal sentences, which they contend are an "other tax" under the Twenty-Fourth Amendment. They do not argue that fines and restitution are taxes, and for good reason. Fines, which are paid to the government as punishment for a crime, and restitution, which compensates victims of crime, are not taxes under any fair reading of that term.

The felons' argument presents two questions: first, whether fees and costs imposed in a criminal sentence are taxes under the Twenty-Fourth Amendment; and second, if fees and costs are taxes, whether Florida has denied the right to vote "by reason of" the failure to pay fees and costs.

### 1.  Court Costs and Fees Are Not Taxes.

The term "tax" is a broad one, but it does not cover all monetary exactions imposed by the government. The Supreme Court has long distinguished taxes from

31

*penalties* in a variety of contexts. *See, e.g.*, *United States v. Constantine*, 296 U.S. 287, 293–94 (1935); *United States v. La Franca*, 282 U.S. 568, 572 (1931). This distinction was well established when the Twenty-Fourth Amendment was adopted, and it continues to define the outer limits of the term "tax" today. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 563, 567–70 (2012) (holding, under the canon of constitutional avoidance, that a federal law levied a tax because it could reasonably be read not to impose a penalty). In short, if a government exaction is a penalty, it is not a tax.

"The difference between a tax and a penalty is sometimes difficult to define," *Child Labor Tax Case*, 259 U.S. 20, 38 (1922), but at least one principle is clear. The Supreme Court has explained in multiple contexts that "if the concept of penalty means anything, it means punishment for an unlawful act or omission." *Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 567 (quoting *United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213, 224 (1996)); *see also La Franca*, 282 U.S. at 572. Court fees and costs imposed in a criminal sentence fall within this definition: they are part of the State's punishment for a crime. They are not taxes.

Several features of the costs and fees at issue make clear that they are punishment for criminal wrongdoing. Most importantly, they are part of a defendant's criminal *sentence*—"the punishment imposed on a criminal

wrongdoer." *Sentence*, *Black's Law Dictionary* (11th ed. 2019). Florida caselaw

holds that the costs of prosecution are criminal punishment for purposes of double

jeopardy; they cannot be increased after a defendant begins serving his sentence.

*Martinez v. State*, 91 So. 3d 878, 879–80 (Fla. Dist. Ct. App. 2012). And if a felon

cannot pay a financial obligation imposed in his sentence, the sentencing court may

"convert the statutory financial obligation into a court-ordered obligation to

perform community service," Fla. Stat. § 938.30(2), a provision that makes little

sense if costs and fees exist primarily to raise revenue and not to punish and

rehabilitate offenders.

Like fines and restitution, fees and costs are also linked to culpability.

Florida imposes heftier costs on felony offenders than those convicted of

misdemeanors or criminal traffic offenses, and it does not impose *any* fees and

costs if a criminal case ends in an acquittal or a *nolle prosequi*. *See id.*

§§ 938.05(1), 939.06(1). Florida imposes fees and costs *only* on those who are

convicted of a crime or who have their adjudication of guilt withheld, a process

that allows the court to suspend the imposition of sentence if it determines "that the

defendant is not likely again to engage in a criminal course of conduct and that the

ends of justice and the welfare of society do not require that the defendant

presently suffer the penalty imposed by law." *Id.* § 948.01(2). But even felony

defendants who have their adjudication of guilt withheld are subject to the punitive

and rehabilitative powers of the sentencing court: they must complete a term of probation and may have to pay both fines and costs. *See State v. Tribble*, 984 So. 2d 639, 640–41 (Fla. Dist. Ct. App. 2008); *Clinger v. State*, 533 So. 2d 315, 316–17 (Fla. Dist. Ct. App. 1988). The punitive nature of fees and costs is no less applicable to defendants who plead *nolo contendere* because that plea, like a guilty plea, results in a conviction and "gives the court the power to punish." *Vinson v. State*, 345 So. 2d 711, 715 (Fla. 1977).

The Supreme Court has relied on similar features to conclude that exactions that bore a far greater resemblance to taxes than court costs do were in fact penalties. For example, the Court held that a "so-called tax" on the possession of illegal drugs was in reality criminal punishment in part because the exaction was "conditioned on the commission of a crime." *Dep't of Revenue of Mont. v. Kurth Ranch*, 511 U.S. 767, 781 (1994); *see also Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 566 (relying on *Kurth Ranch* to distinguish taxes from penalties). "That condition," the Court explained, was "significant of penal and prohibitory intent rather than the gathering of revenue." *Kurth Ranch*, 511 U.S. at 781 (internal quotation marks omitted). The Court relied on similar reasoning to hold that a $1,000 excise imposed only on those who violated state liquor laws was a penalty, not a tax. *Constantine*, 296 U.S. at 295.

The functional analysis used in *National Federation of Independent Business* supports our conclusion that the fees and costs in this appeal are penalties, not taxes. The Court explained that exactions imposed only on those who knowingly violate the law are suggestive of a penalty, not a tax. 567 U.S. at 565–66. The Court also stressed that using a "criminal prosecution" to collect an exaction is "suggestive of a punitive sanction." *Id.* at 566. And the Court reasoned that an exaction is likely a tax when the behavior to which it applies is lawful. *Id.* at 568 ("Neither the Act nor any other law attaches negative legal consequences to not buying health insurance, beyond requiring a payment to the IRS. . . . [I]f someone chooses to pay rather than obtain health insurance, they have fully complied with the law."). Here, by contrast, fees and costs are imposed only on those who, following criminal prosecution for their unlawful acts, are subject to the punitive and rehabilitative powers of a Florida court. The characteristic features of penalties that the Court noted were absent in *National Federation of Independent Business* are present here.

To be sure, one purpose of fees and costs is to raise revenue, but that does not transform them from criminal punishment into a tax. Every financial penalty raises revenue for the government, sometimes considerable revenue. In addition to costs and fees, Florida uses criminal fines to fund both its courts and general government operations, but that additional purpose does not make them taxes. *See*

Fla. Stat. § 142.01(1) (establishing the "fine and forfeiture fund" for use "in performing court-related functions"); *id.* § 775.083(1) (directing that criminal fines be deposited in the fine and forfeiture fund); *id.* § 316.193(2)(a) (directing the clerk to remit portions of fines for driving under the influence "to the Department of Revenue for deposit into the General Revenue Fund"). Nor does the fact that many fees and costs do not vary based on the severity of the offense render them nonpunitive. Some punishments, like disenfranchisement, are imposed on all felons alike regardless of the severity of their crimes. Because court costs and fees are legitimate parts of a criminal *sentence*—that is, part of the debt to society that felons must pay for their crimes—there is no basis to regard them as a tax. We hold that fees and costs imposed in a criminal sentence are not taxes under the Twenty-Fourth Amendment, and we reject the felons' Twenty-Fourth Amendment argument on that basis.

2.   Florida Does Not Deny the Right to Vote "by Reason of" Failure to Pay a Tax.

Even if fees and costs were taxes, the felons' reliance on the Twenty-Fourth Amendment would be misplaced. The Twenty-Fourth Amendment provides that "[t]he right . . . to vote . . . shall not be denied or abridged . . . by reason of failure to pay any poll tax or other tax." U.S. Const. amend. XXIV, § 1. A financial obligation that indirectly burdens the right to vote is permissible under the Twenty-Fourth Amendment when the State has a constitutionally legitimate reason for

imposing the voter qualification that creates the indirect burden. But before

explaining why, it is necessary to address—and reject—an argument that the State

makes.

In addition to its argument that fees and costs are not taxes, the State

contends that the Twenty-Fourth Amendment "does not apply when the right to

vote has been constitutionally forfeited." Quoting the Ninth Circuit's opinion in

*Harvey v. Brewer*, the State contends that because disenfranchised felons have

"lost their right to vote, they . . . have no cognizable Twenty-Fourth Amendment

claim until their voting rights are restored." 605 F.3d at 1080; *see also Johnson*,

624 F.3d at 751. The State maintains that Amendment 4 and Senate Bill 7066

provide only "requirements for *reenfranchisement*," which the Twenty-Fourth

Amendment does not govern.

The implication of that logic for the other voting-rights amendments shows

why the State's argument is plainly wrong. If the voting-rights amendments protect

only those with a pre-existing right to vote and do not apply to so-called

"reenfranchisement laws," then a State would not violate the Fifteenth Amendment

by denying that right to reenfranchisement only to black felons. A State also would

not violate the Nineteenth Amendment by denying the right only to female felons.

And it would not violate the Twenty-Sixth Amendment by denying the right only

to younger felons. According to the State's logic, none of the voting-rights

amendments would have anything to say about discriminatory "reenfranchisement" laws, because reenfranchisement is "an act of grace" extended to a class that has no cognizable rights. To be sure, the State denied that implication of its position at oral argument, *see* Oral Argument at 7:00–8:00 (Aug. 18, 2020) (conceding that discriminatory reenfranchisement laws would violate the Fifteenth, Nineteenth, and Twenty-Sixth Amendments), and for good reason. Any of the discriminatory reenfranchisement laws described above would clearly violate the voting-rights amendments.

Consider the Supreme Court's treatment of literacy tests. Some States denied illiterate persons the right to vote after the ratification of the Fifteenth Amendment, a practice the Supreme Court held was then lawful. *See Guinn v. United States*, 238 U.S. 347, 366 (1915); *Lassiter v. Northampton Cnty. Bd. of Elections*, 360 U.S. 45, 50–53 (1959). But even though States were free to deny the right to vote to *all* illiterate persons, the Fifteenth Amendment forbade them to discriminate within the class of illiterate non-voters by exempting only white citizens from literacy tests. *See Guinn*, 238 U.S. at 364–65.

In the same way, States may deny all felons the right to vote but may not, consistent with the Twenty-Fourth Amendment, discriminate among felons by extending the franchise to some felons while denying it to others by reason of their failure to pay a tax. The Twenty-Fourth Amendment, like the Fifteenth and

Nineteenth Amendments before it and the later Twenty-Sixth Amendment, applies whenever the State sets a voter qualification that extends the right to vote to some persons but denies it to others on a prohibited basis. The Twenty-Fourth Amendment plainly applies to felon reenfranchisement. The only remaining question is whether Florida denies some felons the right to vote "by reason of" their failure to pay a poll tax or other tax.

The felons argue that the phrase "by reason of" requires "the simple and traditional standard of but-for causation," which asks whether "a particular outcome would not have happened 'but for' the purported cause." *Bostock v. Clayton County*, 140 S. Ct. 1731, 1739 (2020) (internal quotation marks omitted). Florida law violates the Twenty-Fourth Amendment, the felons argue, because Amendment 4 and Senate Bill 7066 make their failure to pay court fees and costs a but-for cause of the denial of their right to vote. The problem with this argument is that the text of the Twenty-Fourth Amendment does not establish a but-for causal relationship between the failure to pay a tax and the denial of the right to vote.

To be sure, "[t]he phrase 'by reason of' denotes some form of causation." *Husted v. A. Philip Randolph Inst.*, 138 S. Ct. 1833, 1842 (2018) (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009)). But the phrase is not self-defining, and dictionary definitions are of limited value because they tend to define "because of," "by reason of," and "on account of" only in circular reference to one

another. *See, e.g.*, *Account*, *Webster's New International Dictionary* (2d ed. 1959) (defining "on account of" as "[f]or the sake of; by reason of; because of"); *Reason*, *Oxford English Dictionary* (1933) (defining "[b]y . . . reason of" as "on account of"). Indeed, the Supreme Court has explained that the phrase "by reason of" can bear meanings that range from but-for cause, *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 265–66 (1992), all the way to sole cause, *Husted*, 138 S. Ct. at 1842–43. Absent a more specific definition in the text, we must look to context to determine whether "by reason of" in the Twenty-Fourth Amendment refers to but-for cause, sole cause, or some other relationship. *See id.* at 1842 (citing *Holmes*, 503 U.S. at 265–68); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 2, at 56 (2012) ("[W]ords are given meaning by their context . . . ."). And the context of the Twenty-Fourth Amendment forecloses the possibility that but-for causation is the relevant standard.

The most relevant context is the text of the other voting-rights amendments to the Constitution. The felons acknowledge this reality. They point to the fact that the "Twenty-Fourth Amendment's text mirrors the Fifteenth, Nineteenth, and Twenty-Sixth Amendments" as evidence that the Twenty-Fourth Amendment, like the other amendments, imposes a categorical ban on certain voting qualifications—a ban that is "not subject to exceptions in the rights-restoration context."

The felons are correct in one respect: just as it would plainly violate the other amendments to reenfranchise only white, male, or 30-year old felons, it would also violate the Twenty-Fourth Amendment to reenfranchise only felons who pay a poll tax—that is, a tax on the franchise itself. But the felons overlook one important difference between the Twenty-Fourth Amendment and the other amendments: the language it uses to describe the relationship between the denial of the right to vote and the prohibited basis of that denial.

Consider the text of all four voting-rights amendments. The Fifteenth Amendment says that the right to vote may not be denied "*on account of* race, color, or previous condition of servitude." U.S. Const. amend. XV, § 1 (emphasis added). The Nineteenth Amendment says that this right may not be denied "*on account of* sex." *Id.*, amend. XIX (emphasis added). And the Twenty-Sixth Amendment says that it may not be denied to citizens age 18 or older "*on account of* age." *Id.*, amend. XXVI, § 1 (emphasis added). In contrast, the Twenty-Fourth Amendment alone uses the phrase "by reason of" instead of "on account of."

A material variation in language suggests a variation in meaning. *See* Scalia & Garner, *Reading Law* § 25, at 170–73; *see also* Akhil Reed Amar, *Intratextualism*, 112 Harv. L. Rev. 747, 761 (1999) ("[T]he same (or very similar) words in the same document should, at least presumptively, be construed in the same (or a very similar) way. But the flip side of the intratextual coin is that when

41

two (or more) clauses feature different wording, this difference may also be a clue to meaning, and invite different construction of the different words."). So the text of the Constitution creates an inference that the right to vote stands in a different relationship to race, sex, and age than it does to the nonpayment of taxes. To understand this difference in meaning, one should begin with the meanings of the Fifteenth and Nineteenth Amendments, both of which were well established when the Twenty-Fourth Amendment was ratified. With an understanding of those amendments in place, evidence surrounding the ratification of the Twenty-Fourth Amendment makes clear that the difference in language reflects a difference in meaning.

The Fifteenth and Nineteenth Amendments are best understood to forbid any voter qualification that makes race or sex a but-for cause of the denial of the right to vote. The relationship between the right to vote and a person's race is the most thoroughly discussed in Supreme Court precedent, and the but-for causation principle is clear in that context. Race is never a permissible criterion for determining the scope of the franchise. And this understanding extends to the Nineteenth Amendment's prohibition of sex-based voter qualifications.

The Fifteenth Amendment's prohibition on accounting for race as a voter qualification is absolute. This prohibition is powerful enough to "remove . . . or render inoperative" any suffrage provision in a state constitution that refers to race,

even in the absence of implementing legislation by Congress. *Neal v. Delaware*, 103 U.S. 370, 389 (1880); *accord Guinn*, 238 U.S. at 363. The amendment has similar bite even when States impose discriminatory voting qualifications by facially neutral means. In *Guinn*, the Supreme Court invalidated an amendment to the Constitution of Oklahoma that created a literacy test for voting but exempted from the test any person who was eligible to vote before the ratification of the Fifteenth Amendment. 238 U.S. at 364–67. Although the state constitution "contain[ed] no express words" limiting the franchise "on account of race, color, or previous condition of servitude," the grandfather clause "inherently [brought] that result into existence," which violated the Fifteenth Amendment. *Id.* at 364–65. As the Supreme Court explained in another early decision interpreting the Fifteenth Amendment: "If citizens of one race having certain qualifications are permitted by law to vote, those of another having the same qualifications must be." *United States v. Reese*, 92 U.S. 214, 218 (1875). If changing a voter's race changes his eligibility to vote, the law is invalid. *Cf. Bostock*, 140 S. Ct. at 1739.

To be sure, our nation failed to achieve the egalitarian goal of the Fifteenth Amendment to any significant degree until Congress used its power under section 2 of the amendment to enact the Voting Rights Act of 1965. *See South Carolina v. Katzenbach*, 383 U.S. 301, 308–09 (1966). But the amendment established a powerful baseline: States must set voter qualifications without any

regard to race. The Fifteenth Amendment does not subject race-based voter qualifications to strict scrutiny—they are per se unconstitutional. *See Rice v. Cayetano*, 528 U.S. 495, 511–12 (2000). It ensures that any argument that a race-based voter qualification is "tied rationally to the fulfillment" of an important government interest, *id.* at 548 (Ginsburg, J., dissenting) (internal quotation marks omitted), falls on deaf ears. "There is no room under the Amendment for the concept that the right to vote in a particular election can be allocated based on race." *Id.* at 523 (majority opinion). If a State acts in any way to make race relevant to voter qualifications, either facially or with a discriminatory purpose, it violates the Fifteenth Amendment. *See Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 481 (1997) (citing *City of Mobile v. Bolden*, 446 U.S. 55, 62 (1980) (plurality opinion)).

The Nineteenth Amendment forbids the use of sex as a voter qualification in the same way. The Supreme Court has discussed the Nineteenth Amendment in detail only twice—once in a decision upholding the amendment against a challenge to its validity, *Leser v. Garnett*, 258 U.S. 130, 136 (1922), and once in a decision upholding a poll tax that included an exception for nonvoting women, *Breedlove v. Suttles*, 302 U.S. 277, 279–80 (1937), *overruled by Harper*, 383 U.S. 663. In both decisions, the Court confirmed that the Nineteenth Amendment operates just like the Fifteenth Amendment. The Court explained in *Leser* that the Nineteenth

Amendment "is in character and phraseology precisely similar to the Fifteenth." 258 U.S. at 136. And in *Breedlove*, the Court stated that the Nineteenth Amendment, like the Fifteenth, is an absolute and self-enforcing prohibition on discriminatory classifications in voting. 302 U.S. at 283 ("[The Nineteenth Amendment] applies to men and women alike and by its own force supersedes inconsistent measures, whether federal or state." (citing *Leser*, 258 U.S. at 135)).

By the time Congress proposed the Twenty-Fourth Amendment in 1962, the Fifteenth and Nineteenth Amendments, which provided that the right to vote could not be denied or abridged "on account of race" or "on account of sex," were clearly and correctly understood to prevent the States from making a person's eligibility to vote turn in any way on race or sex. Under the Fifteenth and Nineteenth Amendments, a but-for-causation test like the one the felons propose accurately reflects the constitutional rule. When a State sets a voter qualification that would allow a person to vote but for the person's race or sex, it violates the Constitution.

But the Twenty-Fourth Amendment did not adopt the language of the Fifteenth and Nineteenth Amendments wholesale. The Twenty-Fourth Amendment prohibits States from denying the right vote "by reason of" the failure to pay a tax, not "on account of" it. If possible, that different language should be given a different meaning. Interpreting the phrase "by reason of" only as a synonym for

"on account of" violates well-established principles of textual interpretation. *See* Scalia & Garner, *Reading Law* § 25, at 170–73.

Ample evidence supports the conclusion that "by reason of" in the Twenty-Fourth Amendment does not refer to but-for causation. To begin, the only Supreme Court decision to apply the amendment does not reflect a but-for causal standard. In *Harman v. Forssenius*, decided only a year after ratification of the Twenty-Fourth Amendment, the Court considered a Virginia law enacted in anticipation of the amendment that allowed voters to forego payment of their poll taxes and still vote in federal elections if they filed a "certificate of residence" at least six months before the election. 380 U.S. 528, 531–32 (1965). Because the Twenty-Fourth Amendment "nullifies sophisticated as well as simple-minded modes of impairing the right guaranteed" and the certificate requirement "perpetuat[ed] . . . the disenfranchising characteristics of the poll tax which the Twenty-fourth Amendment was designed to eliminate," the Supreme Court held that the certificate requirement was an unconstitutional substitute for the poll tax. *Id.* at 540–42 (internal quotation marks omitted). The *Harman* Court based its decision on the rule that a State may not impose "a material requirement solely upon those who refuse to surrender their constitutional right to vote in federal elections without paying a poll tax." *Id.* at 541.

46

If the felons are correct that the Twenty-Fourth Amendment prohibits States from setting voter qualifications that make the failure to pay a tax a but-for cause of the denial of the right to vote, then the rule *Harman* announced was unexpectedly narrow. Under the law challenged in *Harman*, voters were turned away if they failed to either pay a poll tax or file a certificate of registration—each failure was a but-for cause of the denial of the right to vote. So if but-for causation were the relevant standard, most of the analysis in *Harman*, and the entire rule quoted above, would have been unnecessary. The Court could have decided the case by pointing out that the failure to pay a tax was part of the causal chain that led to the denial of the right to vote. So *Harman* suggests that the Twenty-Fourth Amendment requires a tighter relationship between nonpayment of a tax and denial of the right to vote than but-for causation.

Other settled principles confirm that the Twenty-Fourth Amendment does not adopt a but-for causal standard. *Richardson* allows States to disenfranchise all felons upon conviction; it makes no exception for felons who were convicted because they failed to pay their taxes. 418 U.S. at 56. And the Twenty-Fourth Amendment has never been understood to prohibit States from disenfranchising tax felons, even if the failure to pay taxes is a but-for cause of their disenfranchisement. *See generally* Sloan G. Speck, Comment, *"Failure to Pay Any Poll Tax or Other Tax": The Constitutionality of Tax Felon Disenfranchisement,*

74 U. Chi. L. Rev. 1549 (2007). The en banc Ninth Circuit has similarly held that

requiring voters to present identification at the polls does not violate the Twenty-

Fourth Amendment even though obtaining identification "may have a cost."

*Gonzalez*, 677 F.3d at 407. That conclusion is consistent with the plurality opinion

in *Crawford v. Marion County Election Board*, which concluded that Indiana's

voter-identification law was facially constitutional, 553 U.S. at 204, even as it

acknowledged that obtaining valid identification could involve paying between $3

and $12 to obtain a copy of one's birth certificate, *id.* at 198 n.17.

Because the phrase "by reason of" cannot refer only to but-for causation, it

is necessary to consider other possible meanings. Focusing on the main word in

that phrase yields an answer: the Twenty-Fourth Amendment prohibits denials of

the right to vote for which the failure to pay a tax is not only the but-for cause, but

also the *reason* for the State's action.

The word "reason" has multiple commonly used subsenses. Some of them,

of course, are closely related to but-for causation. *See, e.g.*, *Reason*, *Webster's New*

*International Dictionary* (2d ed. 1959) ("A ground or cause"). But the Twenty-

Fourth Amendment's textual divergence from the Fifteenth, Nineteenth, and

Twenty-Sixth Amendments, together with other contextual clues, eliminates these

subsenses from consideration. Many of the other subsenses of the word "reason"

relate to the concept of justification, itself a kind of causation. For example,

"reason" may refer to an "expression or statement offered . . . as a justification of an act or procedure" or a "consideration, motive, or judgment . . . leading to an action or course of action; a rational ground or motive." *Id.* This second, justification-based subsense controls the meaning of "by reason of" in the Twenty-Fourth Amendment.

Under this second subsense, the Twenty-Fourth Amendment prohibits denials of the right to vote motivated by a person's failure to pay a tax. It does not prohibit every voting requirement with any causal relationship to the payment of a tax. If a State establishes a legitimate voter qualification for constitutionally legitimate reasons, it does not violate the Twenty-Fourth Amendment—even if the qualification sometimes denies the right to vote because a person failed to pay a tax. To take the most obvious example, a requirement that voters have no felony convictions is lawful even if the but-for cause of a felony conviction is the failure to pay taxes. The Twenty-Fourth Amendment does not forbid the disenfranchisement of tax felons.

That conclusion finds support in *Harman*, the only Supreme Court decision to apply the Twenty-Fourth Amendment. Central to *Harman*'s reasoning was the Court's judgment that the certificate-of-residency alternative was designed as a "substitute" for the poll tax, which in turn "was born of a desire to disenfranchise the Negro." 380 U.S. at 542–43. The Court also concluded that Virginia's scheme

was not necessary to enforce its residency requirements, especially considering that forty-six States were able to limit the electorate to residents without resort to similar measures. *Id.* In the light of those realities, it was clear that Virginia lacked a legitimate justification for its law—the State's bifurcated registration system was motivated by a desire to tax the franchise. Because Virginia had no constitutionally legitimate reason for its law that made the failure to pay a tax a but-for cause of the denial of the right to vote, *Harman* held that the law violated the Twenty-Fourth Amendment.

Even if court costs and fees imposed in a criminal sentence were taxes, Amendment 4 and Senate Bill 7066 would not violate the Twenty-Fourth Amendment. To be sure, if these obligations were taxes, the failure to pay them would be a but-for cause of continued disenfranchisement, just as the failure to pay the poll tax was a but-for cause of the denial of the right to vote in *Harman*. But unlike the law in *Harman*, Amendment 4 and Senate Bill 7066 are a legitimate exercise of Florida's power to set core voter qualifications. The *reason* these laws leave some felons disenfranchised—the *justification* for their continued disenfranchisement—is not their failure to pay a tax. It is instead Florida's legitimate interest in restoring to the electorate only fully rehabilitated felons who have satisfied the demands of justice. Because the justification for the voting qualifications in Amendment 4 and Senate Bill 7066 is a constitutionally legitimate

50

interest and not the failure to pay a tax, they satisfy the requirements of the

Twenty-Fourth Amendment.

The dissenters support their argument against this interpretation with several

pages of appeals to legislative history. *See* Jordan Dissent at 186–88. Even were

we to assume that some recourse to legislative history is appropriate in the

interpretation of the Twenty-Fourth Amendment—and we do not, *see* Scalia &

Garner, *Reading Law* § 66, at 369—the committee reports, floor debates, and press

statements from politicians cited by the dissenters would not be the best evidence.

In fact, the legislative history supports an interpretation that gives the phrase "by

reason of" in the Twenty-Fourth Amendment a different meaning than the phrase

"on account of" in the other voting-rights amendments. The House Judiciary

Committee considered several proposed versions of a poll-tax amendment,

including two that used the same "on account of" language as the Fifteenth and

Nineteenth Amendments. *Abolition of Poll Tax in Federal Elections: Hearings*

*Before Subcommittee No. 5 of the Committee on the Judiciary*, 87th Cong. 1–5

(1962). But the language that the committee reported out, which was eventually

presented to the states and ratified as the Twenty-Fourth Amendment, used the

different "by reason of" construction. H.R. Rep. No. 1821, at 1–2 (1962). Giving

different phrases different meanings makes all the more sense when it can be

shown that the drafter considered and rejected consistent language.

*C.  Florida Has Not Violated the Due Process Clause.*

Although the district court did not decide whether Florida's

reenfranchisement laws violate the Due Process Clause, part of its injunction

cannot be justified by any of its other rulings. The district court declared

Amendment 4 and Senate Bill 7066 unconstitutional as applied to felons who

cannot determine the amount of their outstanding financial obligations with

diligence, and it created a process under which felons could request an opinion

from the Division of Elections stating their total amount of outstanding fines and

restitution. The injunction allowed any felon who did not receive an answer within

21 days to register and vote, and it prohibited the defendants from causing or

assisting in the prosecution of any persons who registered or voted under this

process. The felons ask us to affirm these aspects of the injunction on the grounds

that the relevant Florida laws are void for vagueness and deny them procedural due

process.

We first address the vagueness challenge. To register to vote in Florida, a

person must affirm that he is not disqualified from voting because of a felony

conviction. And it is a crime for a person to "willfully submit[] any false voter

registration information," Fla. Stat. § 104.011(2), or to "willfully vote[] at any

election" "knowing he or she is not a qualified elector," *id.* § 104.15. The felons

argue these criminal laws are void for vagueness because Senate Bill 7066 makes it

difficult or impossible for some felons to determine whether they are eligible to vote.

Under the Due Process Clause, a law is void for vagueness if it "fails to give ordinary people fair notice of the conduct it punishes" or is "so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). But a law "is not vague because it may at times be difficult to prove an incriminating fact." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Instead, a law is vague when "it is unclear *as to what fact must be proved*." *Id.* (emphasis added). And even laws that are "in some respects uncertain" may be upheld against a vagueness challenge if they contain a scienter requirement. *United States v. Waymer*, 55 F.3d 564, 568 (11th Cir. 1995); *see also Gonzales v. Carhart*, 550 U.S. 124, 149 (2007) ("The Court has made clear that scienter requirements alleviate vagueness concerns.").

The challenged laws are not vague. Felons and law enforcement can discern from the relevant statutes exactly what conduct is prohibited: a felon may not vote or register to vote if he *knows* that he has failed to complete all terms of his criminal sentence. *See* Fla. Stat. §§ 104.011(2), 104.15, 98.0751(1)–(2). This clear standard, which includes a scienter requirement, provides fair notice to prospective voters and "limit[s] prosecutorial discretion." *Carhart*, 550 U.S. at 150.

The felons' real complaint is that it is sometimes difficult to determine whether a felon has completed the financial terms of his sentence. They offer examples of felons who cannot locate their criminal judgments, cannot determine which financial obligations were imposed for felony as opposed to misdemeanor offenses, or do not know how much they have paid toward their financial obligations. But these concerns arise not from a vague law but from factual circumstances that sometimes make it difficult to determine whether an incriminating fact exists. *See United States v. Williams*, 553 U.S. 285, 306 (2008) (explaining that a law is not rendered vague by "the possibility that it will sometimes be difficult to determine" the existence of an incriminating fact). These difficulties in proving the facts that determine a felon's eligibility to vote cast no doubt on the clarity of the requirement that felons neither register nor vote if they *know* they have not satisfied the financial obligations imposed in their sentences. Because there is no uncertainty about "what fact must be proved" to convict a defendant under these statutes, the laws are not vague. *Fox*, 567 U.S. at 253; *see also Williams*, 553 U.S. at 305–06.

The felons argue that the State's "every dollar" policy makes the challenged laws vague, but that policy only *narrows* the scope of criminal liability. *Cf. Ward v. Rock Against Racism*, 491 U.S. 781, 795–96 (1989). The challenged laws forbid felons to register or vote if they know they have failed to complete their sentences.

And the policy adopts one of the narrowest possible constructions of "failing to complete" a sentence. Under the policy, a felon fails to complete the financial terms of his sentence only if his total payments toward *all* obligations related to his sentence—even financing costs that accrue after sentencing—are *less* than the amount imposed in his sentence. This narrowing construction mitigates vagueness concerns instead of enhancing them: a felon cannot reasonably think he has "completed" his terms of sentence if the total amount he has paid toward *all* related obligations is less than the amount included in his sentence. And only felons in this category are ineligible to vote under the "every dollar" policy.

The dissenters insist that the law is vague because some felons will not be certain about their eligibility, and a "wrong guess . . . results in severe consequences," possibly including "an arrest for a voting violation." Jordan Dissent at 169 (internal quotation marks omitted). Never mind the fact that no felon who honestly believes he has completed the terms of his sentence commits a crime by registering and voting, *see* Fla. Stat. §§ 104.011(2), 104.15 (establishing scienter requirements for voting violations), and that at least 85,000 felons felt the law was clear enough for them to go ahead and register. The dissenters' vagueness argument strains credulity.

The felons also argue that Florida has denied them procedural due process. *See Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). They assert a liberty interest

in the right to vote and argue that Florida has deprived them of that interest without adequate process. We may assume that the right to vote is a liberty interest protected by the Due Process Clause. *But see Johnson v. Hood*, 430 F.2d 610, 612 (5th Cir. 1970) ("[E]ven an improper denial of the right to vote for a candidate for a state office achieved by state action is not a denial of a right of property or liberty secured by the due process clause." (internal quotation marks omitted) (alteration adopted)). Even so, this argument fails because any deprivation of that right was accomplished through the legislative process and the process for adopting a constitutional amendment, which provide more than adequate procedures for the adoption of generally applicable rules regarding voter qualifications.

In deciding what the Due Process Clause requires when the State deprives persons of life, liberty or property, the Supreme Court has long distinguished between legislative and adjudicative action. *See, e.g.*, *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445–46 (1915). The State often deprives persons of liberty or property through legislative action—general laws that apply "to more than a few people." *Id.* at 445; *see also 75 Acres, LLC v. Miami-Dade County*, 338 F.3d 1288, 1296 (11th Cir. 2003) (deeming an action legislative because it was "enacted by a legislative body" performing a "fundamentally legislative" function or, alternatively, was "generally applicable" and "prospective in nature"). When the State does so, the affected persons are not entitled to *any*

56

process beyond that provided by the legislative process. *Bi-Metallic*, 239 U.S. at 445 ("General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule."); *accord 75 Acres*, 338 F.3d at 1294. In contrast, the Due Process Clause may require individual process when a State deprives persons of liberty or property through adjudicative actions—those that concern a "relatively small number of persons" who are "exceptionally affected, in each case upon individual grounds," by the state action. *Bi-Metallic*, 239 U.S. at 446; *see also 75 Acres*, 338 F.3d at 1294. To determine the process due for adjudicative deprivations, courts apply the familiar balancing test of *Mathews v. Eldridge*, 424 U.S. 319.

The felons were deprived of the right to vote through legislative action, not adjudicative action. Under its Constitution, Florida deprives all felons of the right to vote upon conviction. *See* Fla. Const. art. VI, § 4(a). This constitutional provision is a law "of general applicability" that plainly qualifies as legislative action. *See 75 Acres*, 338 F.3d at 1296–97. And even if we accept the argument that Amendment 4 and Senate Bill 7066 deprive felons of the right to vote by conditioning reenfranchisement on the completion of all terms of sentence, those laws also qualify as legislative acts. *See id.* The legislative and constitutional-

amendment processes gave the felons all the process they were due before Florida

deprived them of the right to vote and conditioned the restoration of that right on

completion of their sentences.

The felons complain that it is sometimes difficult to ascertain the facts that

determine eligibility to vote under Amendment 4 and Senate Bill 7066, but this

complaint is only another version of the vagueness argument we have already

rejected. The Due Process Clause does not require States to provide individual

process to help citizens learn the facts necessary to comply with laws of general

application.

To avail themselves of the *Mathews v. Eldridge* framework, the felons were

obliged to prove a deprivation of liberty based on *adjudicative* action. *See 75*

*Acres*, 338 F.3d at 1294. But the felons do not challenge any individual voter-

eligibility determinations that could qualify as adjudicative action, so *Mathews*

does not apply. And in any event, Florida provides registered voters with adequate

process before an individual determination of ineligibility. Before being removed

from the voter registration system, voters are entitled to predeprivation notice and a

hearing. Fla. Stat. § 98.075(5), (7). And any voter who is dissatisfied with the

result is entitled to *de novo* review of the removal decision in state court. *Id.*

§ 98.0755. These procedures provide more than adequate process to guard against

erroneous ineligibility determinations. *See Mathews*, 424 U.S. at 333–35.

The injunction the district court entered looks nothing like a remedy for a denial of due process. It does not require additional procedures for any existing adjudicative action that deprives felons of a liberty interest in voting. Instead, it *creates* an adjudicative process to aid felons in complying with nonvague laws of general application. States are certainly free to establish such a process—indeed, Florida has done so through its preregistration advisory-opinion process and accompanying immunity from criminal prosecution. But the notion that due process *mandates* this kind of procedure in the absence of any adjudicative action is unprecedented. The injunction did not remedy any denial of due process, so we cannot affirm it on that ground.

A fundamental confusion in this litigation has been the notion that the Due Process Clause somehow makes Florida responsible not only for giving felons notice of the standards that determine their eligibility to vote but also for locating and providing felons with the *facts* necessary to determine whether they have completed their financial terms of sentence. The Due Process Clause imposes no such obligation. States are constitutionally entitled to set legitimate voter qualifications through laws of general application and to require voters to comply with those laws through their own efforts. So long as a State provides adequate procedures to challenge individual determinations of ineligibility—as Florida does—due process requires nothing more.

## IV. CONCLUSION

We **REVERSE** the judgment of the district court and **VACATE** the challenged portions of its injunction. We **LIFT** the stay of the cross-appeal, Case No. 20-12304, and **DIRECT** the Clerk to sever the cross-appeal, issue a briefing schedule for it, and assign a panel to resolve it.

WILLIAM PRYOR, Chief Judge, joined by LAGOA, Circuit Judge, concurring:

I write separately to explain a difficult truth about the nature of the judicial role. Our dissenting colleagues predict that our decision will not be "viewed as kindly by history" as the voting-rights decisions of our heroic predecessors. Jordan Dissent at 189 (citing Jack Bass, *Unlikely Heroes: The Dramatic Story of the Southern Judges Who Translated the Supreme Court's* Brown *Decision Into a Revolution for Equality* (1981)). But the "heroism" that the Constitution demands of judges—modeled so well by our predecessors—is that of "devotion to the rule of law and basic morality." Patrick E. Higginbotham, *Conceptual Rigor: A Cabin for the Rhetoric of Heroism*, 59 Tex. L. Rev. 1329, 1332 (1981) (reviewing Bass, *Unlikely Heroes*, *supra*). As a distinguished colleague presciently warned decades ago, there is a "genuine risk" that later judges will "easily misunderstand" this lesson. *Id.* Our duty is not to reach the outcomes we think will please whoever comes to sit on the court of human history. The Constitution instead tasks us with "administering the rule of law in courts of limited jurisdiction," *id.* at 1343, which means that we must respect the political decisions made by the people of Florida and their officials within the bounds of our Supreme Law, regardless of whether we agree with those decisions. And in the end, as our judicial oath acknowledges, we will answer for our work to the Judge who sits outside of human history.

LAGOA, Circuit Judge, concurring:

I concur fully with the majority opinion.  There is nothing unconstitutional about Florida's reenfranchisement scheme.  I write separately to express an additional reason why, in my judgment, heightened scrutiny does not apply here.

## I.

Since 1838, the Florida constitution has explicitly authorized felon disenfranchisement as a criminal sanction, *see* Fla. Const. art. VI, § 4 (1838), and Florida has had such a law on the books since 1845, *see* Act of Dec. 29, 1845, ch. 38, art. 2 § 3, 1845 Fla. Laws 77, 78.  Florida continues to disenfranchise felons,[1] and it is not alone in this respect—forty-seven other states and the District of Columbia also practice some form of felon disenfranchisement.  *See Jones v. Governor of Florida*, 950 F.3d 795, 801 n.3 (11th Cir. 2020) (*Jones I*).

In 1968, Florida took its first step toward reenfranchising felons.  In November of that year, Florida voters approved by referendum Florida's current constitution.  Its enactment expanded the electorate in two ways.  First, while the previous constitution "disenfranchised persons convicted of certain misdemeanors such as petty larceny, under the new 1968 [constitution], only those persons

---

[1] The Supreme Court has upheld the constitutionality of such felon-disenfranchisement schemes against challenges brought under the Equal Protection Clause of the Fourteenth Amendment.  In *Richardson v. Ramirez*, 418 U.S. 24 (1974), the Court—harmonizing the Amendment's first and second sections—held that section two of the Fourteenth Amendment authorized an "affirmative sanction" of felon disenfranchisement. *See id.* at 41–55.

convicted of felonies could be disenfranchised." *Johnson v. Governor of Florida*, 405 F.3d 1214, 1221 (11th Cir. 2005) (en banc).  Second, while none of Florida's previous constitutions provided for the restoration of civil rights, the 1968 constitution provided a path for felons to restore their right to vote: executive clemency.  *See* Fla. Const. art. IV, § 8(a) (1968).

Today, felons in Florida—including those with out-of-state and federal convictions—may petition the Clemency Board to have their civil rights restored after completing the carceral terms of their sentence.  *See* Fla. Stat. § 940.05; Fla. R. Exec. Clem. 5. Notably, a felon is not required to finish paying his pecuniary obligations before applying for clemency.  *See* Fla. R. Exec. Clem. 10; *see also Johnson*, 405 F.3d. at 1216 n.1.

Florida's felon civil-rights-restoration scheme has survived numerous constitutional challenges.  In 1969, a group of felons challenged on equal protection and due process grounds both the disenfranchisement and the reenfranchisement provisions of the 1968 constitution.  *See Beacham v. Braterman*, 300 F. Supp. 182, 183 (S.D. Fla.), *aff'd*, 396 U.S. 12 (1969).  A three-judge panel of the Southern District of Florida upheld the provisions at issue against both challenges, concluding—before the Supreme Court's decision in *Richardson*—that felon disenfranchisement is authorized under the United States Constitution and that clemency, as part of the pardon power, is not subject to judicial control.  *Id.* at 183–

84.  The Supreme Court summarily affirmed.  *Beacham v. Braterman*, 396 U.S. 12 (1969).

In *Johnson*, a group of felons argued that the 1968 constitution was adopted with an invidious discriminatory motive in violation of the Equal Protection Clause and that the requirement that felons pay restitution before being granted clemency violated the Twenty-Fourth Amendment's prohibition on poll taxes.  405 F.3d at 1216 n.1, 1217.  The district court granted the State's summary judgment motion on both counts, and this Court, sitting en banc, affirmed.  *Id.* at 1217, 1235.  We found no evidence that the 1968 Florida constitution was enacted with any racial bias.  *Id.* at 1225.  And we noted that the payment of restitution was not a prerequisite to applying for executive clemency.  *See id.* at 1216 n.1.

Finally, in *Hand v. Scott*, 888 F.3d 1206 (11th Cir. 2018), a group of felons argued that the unfettered discretion the Florida Clemency Board exercised in its administration of the clemency process facially violated the Equal Protection Clause of the Fourteenth Amendment.  *Id.* at 1207.  While the issue was ultimately mooted before the merits were heard, we granted the State a stay pending appeal and concluded that the State was likely to prevail on the merits of the felons' claim that the Clemency Board's "broad discretion" to operate its "standardless" clemency process violated equal-protection principles.  *Id.* at 1208–10.

In short, Florida's felon civil-rights-restoration process has, for fifty-two years, provided felons a constitutionally permissible path to the restoration of their civil rights, including the right to vote.

On November 6, 2018, Florida voters[2] passed the "Voting Rights Restoration Act"—or "Amendment 4." This ballot initiative further expanded felons' access to reenfranchisement by amending the Florida constitution as follows:

> (a) No person convicted of a felony, or adjudicated in this or any other state to be mentally incompetent, shall be qualified to vote or hold office until restoration of civil rights or removal of disability. *Except as provided in subsection (b) of this section, any disqualification from voting arising from a felony conviction shall terminate and voting rights shall be restored upon completion of all terms of sentence including parole or probation.*
>
> *(b) No person convicted of murder or a felony sexual offense shall be qualified to vote until restoration of civil rights.*

Fla. Const. art. VI, § 4(a)–(b) (amended 2018) (amended text in italics).

In May 2019, the Florida legislature passed Senate Bill 7066 ("SB-7066"), Fla. Stat. § 98.0751, which implemented Amendment 4. As relevant here, SB-7066 did two things. First, it defined "[c]ompletion of all terms of sentence" to include "any portion of a sentence that is contained in the four corners of the sentencing document," including: release from imprisonment; termination of probation, parole

---

[2] The Florida constitution may be amended by referendum "if the proposed amendment or revision is approved by vote of at least sixty percent of the electors voting on the measure." Fla. Const. art. XI, § 5(e).

or community control; fulfillment of any additional terms ordered by the court; and payment of all restitution to victims and "fines or fees ordered by the court as a part of the sentence or that are ordered by the court as a condition of any form of supervision." Fla. Stat. § 98.0751(2)(a).

Second, it established how the financial obligations could be completed:

Financial obligations required under sub-subparagraph a. or sub-subparagraph b. are considered completed in the following manner or in any combination thereof:

(I) Actual payment of the obligation in full.

(II) Upon the payee's approval, either through appearance in open court or through the production of a notarized consent by the payee, the termination by the court of any financial obligation to a payee, including, but not limited to, a victim, or the court.

(III) Completion of all community service hours, if the court, unless otherwise prohibited by law or the State Constitution, converts the financial obligation to community service.

A term required to be completed in accordance with this paragraph shall be deemed completed if the court modifies the original sentencing order to no longer require completion of such term. The requirement to pay any financial obligation specified in this paragraph is not deemed completed upon conversion to a civil lien.

*Id.* § 98.0751(2)(a)5.e.[3]

In this way, then, in implementing Amendment 4, SB-7066 provides felons four new avenues—in addition to the existing executive clemency process—to

---

[3] Florida Statute § 98.0752(2)(a)5.d. sets forth the parameters for the judicial modification established in the last paragraph of § 98.0752(2)(a)5.e.

restore their right to vote upon "completion of all terms of sentence": (1) actual payment of their financial obligations; (2) receipt of a payee's termination of those financial obligations; (3) conversion of any financial obligations to community service hours and subsequent completion of those hours; and (4) judicial modification of the original sentencing order. *See id.* § 98.0751.

## II.

The core dispute in this case is whether Florida's felon reenfranchisement scheme, which does not consider a felon's ability to pay his legal financial obligations ("LFOs"), should be subject to some form of heightened scrutiny or mere rational basis review.  I agree that heightened scrutiny is inappropriate for the reasons laid out in the majority opinion.  In my judgment, heightened scrutiny is also inappropriate because Florida provides indigent felons alternative avenues to attain reenfranchisement.

## A.

As the Supreme Court has directed, we must, in the equal protection context:

> decide, first, whether [the law] operates to the disadvantage of some suspect class or impinges upon a fundamental right explicitly or implicitly protected by the Constitution, thereby requiring strict judicial scrutiny. . . . If [it does] not, the [law] must still be examined to determine whether it rationally furthers some legitimate, articulated state purpose and therefore does not constitute an invidious discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment.

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973).

The first question—is there a fundamental right involved—has been addressed already:  felons who have been disenfranchised have no fundamental right to vote.  Indeed, this finding was at the core of the Supreme Court's decision in *Richardson*.  There, the Court said that, consistent with the Constitution, states may strip—even permanently—the right of felons to participate in the franchise. *Richardson*, 418 U.S. at 54 ("As we have seen, however, the exclusion of felons from the vote has an affirmative sanction in § 2 of the Fourteenth Amendment, a sanction which was not present in the case of the other restrictions on the franchise which were invalidated in the cases on which respondents rely.").

Consistent with that principle, we already have applied rational basis review to felon reenfranchisement schemes.  *See Shepherd v. Trevino*, 575 F.2d 1110, 1114–15 (5th Cir. 1978).[4]  In *Trevino*, we examined a Texas reenfranchisement scheme that allowed for discretionary reenfranchisement of those convicted in *state* court but had no analogous mechanism for the reenfranchisement of felons convicted in *federal* court.  *Id.* at 1111.  We had no trouble concluding that only rational basis review applied (and thus, necessarily, that felons had no fundamental right to vote). *Id.* at 1114–15 ("Therefore, we conclude that selective disenfranchisement or

---

[4] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted all Fifth Circuit decisions issued before October 1, 1981, as binding precedent.

reenfranchisement of convicted felons must pass the standard level of scrutiny applied to state laws allegedly violating the equal protection clause.  Such laws must bear a rational relationship to the achieving of a legitimate state interest.").

Every court to have analyzed the issue has reached the same conclusion: felons do not have a fundamental right to vote.  *See Harvey v. Brewer*, 605 F.3d 1067, 1079 (9th Cir. 2010) (O'Connor, J.) ("[Felons] cannot complain about their loss of a fundamental right to vote because felon disenfranchisement is explicitly permitted under the terms of *Richardson*. . . . Therefore, we do not apply strict scrutiny as we would if plaintiffs were complaining about the deprivation of a fundamental right."); *Johnson v. Bredesen*, 624 F.3d 742, 746 (6th Cir. 2010) ("Having lost their voting rights, Plaintiffs lack any fundamental interest to assert. . . . 'It is undisputed that a state may constitutionally disenfranchise convicted felons, and that the right of felons to vote is not fundamental.'" (quoting *Wesley v. Collins*, 791 F.2d 1255, 1261 (6th Cir. 1986))); *Madison v. State*, 163 P.3d 757, 767 (Wash. 2007) ("However, *Richardson* clearly distinguished the right that is at stake for felons from the Court's previous holdings that citizens possess a fundamental right to vote."); *Owens v. Barnes*, 711 F.2d 25, 27 (3d Cir. 1983) ("Plaintiff's argument fails because the right of convicted felons to vote is not 'fundamental.' That was precisely the argument rejected in *Richardson*."); *Williams v. Taylor*, 677 F.2d 510, 514 (5th Cir. 1982) ("Appellant's interest in retaining his right to vote is

69

constitutionally distinguishable from the 'right to vote' claims of individuals who are not felons.  Section 2 of the Fourteenth Amendment allows a state to prohibit a felon from voting, and its classification of felons for voting restrictions must bear only a rational relation to the achieving of a legitimate state interest." (citation omitted)).

The second question—is a suspect classification at issue—is also well settled: indigency is not a suspect class.  Nor could it be.  As Justice Harlan noted, "[e]very financial exaction which the State imposes on a uniform basis is more easily satisfied by the well-to-do than by the indigent."  *Douglas v. California*, 372 U.S. 353, 361 (1963) (Harlan, J., dissenting); *accord Lewis v. Casey*, 518 U.S. 343, 376 (1996) (Thomas, J., concurring).  Under any view that indigency was a suspect class under the Fourteenth Amendment, "regulatory measures always considered to be constitutionally valid, such as sales taxes, state university tuition, and criminal penalties, would have to be struck down."  *Lewis*, 518 U.S. at 376 (Thomas, J., concurring) (citing *Douglas*, 372 U.S. at 361–62 (Harlan, J., dissenting)).

Applying this principle, the Supreme Court has held that discrimination against the indigent, without more, does not implicate a suspect classification—and thus does not trigger heightened scrutiny.  *See, e.g.*, *Maher v. Roe*, 432 U.S. 464, 471 (1977) ("In a sense, every denial of welfare to an indigent creates a wealth classification as compared to nonindigents who are able to pay for the desired goods

or services.  But this Court has never held that financial need alone identifies a suspect class for purposes of equal protection analysis."); *Rodriguez*, 411 U.S. at 29 (noting that "this Court has never heretofore held that wealth discrimination alone provides an adequate basis for invoking strict scrutiny").

Under the traditional principles of equal protection, it is clear that only rational basis review would apply to Florida's reenfranchisement scheme.  Because no suspect class or fundamental right is implicated, neither condition that triggers heightened scrutiny is present in this case.  But this does not end the inquiry, as my colleagues in dissent argue that heightened scrutiny is required here because of a line of Supreme Court precedent usually associated with *Bearden v. Georgia*, 461 U.S. 660 (1983).

## B.

As explained in the majority opinion, the *Bearden* line of cases applies only in certain well-defined contexts: poverty-based imprisonment and access to judicial proceedings.  *See* Maj. Op. at 15–21.  Because this case does not present either of those situations, and because the Supreme Court has cautioned against extending the doctrine beyond them, *see Lewis*, 518 U.S. at 354, it is not applicable here.[5]

---

[5] It should also be noted that each of the *Bearden* cases involved, through no more than two degrees of separation, a fundamental liberty interest. In the criminal cases where imprisonment was at issue, the fundamental liberty interest at issue is plain: "Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary

There is a reason the doctrine is so limited by subject matter—the *Bearden* line of cases is a unique amalgamation of constitutional doctrines that does not fit neatly within traditional principles of Fourteenth Amendment jurisprudence. The Supreme Court has never made clear whether the doctrine rests on equal protection or due process principles. Some decisions now associated with this line rested their analyses explicitly on the Due Process Clause. *See, e.g.*, *Boddie*, 401 U.S. at 382. Others have relied entirely on the Equal Protection Clause. *See, e.g.*, *Williams v. Illinois*, 399 U.S. 235, 245 (1970). In *Bearden*, the Supreme Court stated that this was intentional: "Due process and equal protection principles converge in the Court's analysis in these cases." 461 U.S. at 665. "The equal protection concern relates to the legitimacy of fencing out would-be appellants based solely on their inability to pay core costs," *M.L.B. v. S.L.J.*, 519 U.S. 102, 120 (1996), while the

---

governmental action." *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) (citing *Youngberg v. Romeo*, 457 U.S. 307, 316 (1982)). And in the civil cases, the Supreme Court has explicitly required the identification of a fundamental liberty interest to trigger *Bearden* scrutiny. *Compare Boddie v. Connecticut*, 401 U.S. 371, 374 (1971) (waiving filing fees, on due process grounds, for marriage dissolution because marriage and divorce are fundamental interests), *with United States v. Kras*, 409 U.S. 434, 445 (1973) (declining to waive filings fees required to secure discharge of bankruptcy because bankruptcy discharge entails no "fundamental interest"). Only one case— *Mayer v. Chicago*, 404 U.S. 189 (1971)—does not meet this criterion. In *Mayer*, the Court waived a filing fee for an indigent defendant who violated a statute that imposed only fines. Nevertheless, that case is distinguishable for the very reason identified in the majority opinion—it, at the very least, arose in the access-to-courts context. *See Christopher v. Harbury*, 536 U.S. 403, 412–15 (2002) (describing *M.L.B. v. S.L.J.*, *Griffin v. Illinois*, *Mayer* and *Boddie* as "prior cases on denial of access to courts [that] have not extended over the entire range of claims that have been brought under that general rubric elsewhere"). And Justice Thomas has identified the peculiarity of the *Mayer* decision in this line of precedent. *See M.L.B. v. S.L.J.*, 519 U.S. 102, 140–45 (1996) (Thomas, J., dissenting).

72

"due process concern homes in on the essential fairness of the state-ordered proceedings anterior to adverse state action," *id.*, or, in other words, on the "fairness of relations between the criminal defendant and the State," *Bearden*, 461 U.S. at 665. Both concerns are necessary for the application of *Bearden* scrutiny, but neither is alone sufficient. This is because indigency, as we have already seen, is not a suspect class. It is for this reason that *Bearden* cases have only appeared in the two contexts discussed in the majority opinion.

But even if we were to extend the doctrine to the felon-reenfranchisement context, I believe this case would fail to meet its requirements. In *Rodriguez*, the Supreme Court, in distinguishing that case from *Bearden*-type cases, stated that the

> individuals, or groups of individuals, who constituted the class discriminated against in our prior [*Bearden*-type] cases shared two distinguishing characteristics: because of their impecunity they were completely unable to pay for some desired benefit, and as a consequence, they sustained an absolute deprivation of a meaningful opportunity to enjoy that benefit.

411 U.S. at 20. Neither of these conditions is satisfied here.

On this point, it is worth noting that "actual payment" of LFOs is but one avenue available to the felon who seeks to have his voting rights restored in Florida. SB-7066 provides for three alternative avenues: termination of the obligation by the payee; conversion of LFOs to community service hours; and judicial modification of the original sentencing order. And the Florida constitution continues to provide felons the avenue of executive clemency. Thus, felons in Florida generally have five

avenues available to them to secure reenfranchisement.  Felons unable to pay their LFOs have four avenues available if their convictions were in-state, while indigent felons with out-of-state convictions or federal convictions have two.[6]

As such, indigent felons in Florida are not deprived of reenfranchisement solely because of inability to pay.[7]  Nor do they suffer an absolute deprivation of a meaningful opportunity to attain reenfranchisement.  Some indigent felons will be granted clemency.  Some will have their LFOs converted to community service hours.  Some will have their original sentencing order modified by a court.  And some will have their debts terminated by the payee.  All indigent felons have alternative avenues available, and some will succeed in pursuing those avenues.

In dissent, my colleagues note that "regaining access to the ballot through these methods is highly unlikely."  Jordan Dissent at 131 n.6.  And our previous panel decision similarly determined that the non-payment avenues to

---

[6] Indigent felons with out-of-state convictions can seek executive clemency in Florida, *see* Fla. R. Exec. Clem. 5, 10B, or have their rights restored in the state of their conviction, *see Schlenther v. Dep't of State, Div. of Licensing*, 743 So. 2d 536, 537 (Fla. Dist. Ct. App. 1998) ("Once another state restores the civil rights of one of its citizens whose rights had been lost because of a conviction in that state, they are restored and the State of Florida has no authority to suspend or restore them at that point.  The matter is simply at an end.").  Indigent felons with federal convictions can seek executive clemency, *see* Fla. R. Exec. Clem. 5, 10B, or a presidential pardon, *see* U.S. Const. art. II, § 2, cl. 1.

[7] The *Bearden* Court itself referred repeatedly to the fact that the indigents at issue were being punished "solely" for their indigency.  *See Bearden*, 461 U.S. at 661, 664, 667, 674.  Their status as indigents was not merely a substantial reason for their punishment, but the *sole* reason. *See id.* at 674 ("[T]his is no more than imprisoning a person *solely* because he lacks funds to pay the fine, a practice we condemned in *Williams* and *Tate*." (emphasis added)).

reenfranchisement "suffer from a common and basic infirmity—they are entirely discretionary in nature," and, as such, none "is a viable stand-in for the automatic reenfranchisement enjoyed by felons" who can afford to pay. *Jones I*, 950 F.3d at 826. But neither the appellees, nor the previous panel decision, nor the dissenters identify any case in which a state provided indigents an alternative route to the attainment of a state-created benefit that the Supreme Court struck down as violative of the *Bearden* principle. And as the Supreme Court has said, "at least where wealth is involved, the Equal Protection Clause does not require absolute equality or precisely equal advantages." *Rodriguez*, 411 U.S. at 24.

Moreover, the alternative treatment of indigents here is not occasioned due to their indigency, but rather "for some legitimate State interest." *Walker v. City of Calhoun*, 901 F.3d 1245, 1260 (11th Cir. 2018) ("The *sine qua non* of a *Bearden*- or *Rainwater*-style claim, then, is that the State is treating the indigent and the non-indigent categorically differently. Only someone who can show that the indigent are being treated systematically worse 'solely because of [their] lack of financial resources,'—and not for some legitimate State interest—will be able to make out such a claim." (citation omitted) (quoting *Bearden*, 461 U.S. at 661)). As explained in the majority opinion, "[t]he people of Florida could rationally conclude that felons who have completed all terms of their sentences, including paying their fines, fees, costs, and restitution, are more likely to responsibly exercise the franchise than those

who have not."  Maj. Op. at 25. When a felon pays his LFOs, this interest is furthered.  But if a felon is unable to pay those LFOs, the alternative avenues available to that indigent felon ensure that he has satisfied some other form of "completion" of his full sentence before being granted access to the franchise. Because completion of a criminal sentence is undoubtedly a valid voter qualification, *see* Maj. Op. at 17, the people of Florida have a legitimate interest in enforcing compliance with that requirement.

Finally, the dissent's suggestion that SB-7066's alternatives to payment in full frustrate the intent of Florida's voters when they approved Amendment 4 is contrary to the plain language of that constitutional amendment.  First, Amendment 4 expressly conditions reenfranchisement "upon completion of all terms of sentence including parole and probation."  The dissent reads this language to include felons who are unable to pay their LFOs because they have "'completed' all terms of their sentences that they can."  But the constitutional language does not say that, and the dissent's reading dilutes the mandated connection between the benefit— reenfranchisement—and its required condition—completion of all terms of sentence, including all financial obligations imposed as part of the criminal sentence. "Completion" means "the act of completing" or "the state of being completed." *Completion*, *Webster's New World College Dictionary* (3d ed. 1997); *see also Completion, The American Heritage Dictionary of the English Language* (4th ed.

76

2000) (same).  "Complete" means "fully carried out," "concluded," or "brought to an end."  *Complete*, *Merriam-Webster's Collegiate Dictionary* (10th ed. 1993); s*ee also Complete, The American Heritage Dictionary of the English Language* (4th ed. 2000) (defining "complete" as "[h]aving come to an end; concluded" or "[t]o bring to a finish or an end").  To fully carry out or to conclude a financial obligation is to pay it in full.  Thus, under the plain language of Amendment 4, a felon who is unable to pay his LFOs would not have completed all terms of his sentence and would be ineligible for reenfranchisement.

SB-7066, however, establishes additional methods for a felon to complete all the pecuniary terms of his sentence other than through payment of LFOs for purposes of reenfranchisement.  A felon who has his LFOs converted to community service hours, which he then satisfies, or who has his original sentencing order modified to no longer require completion of his LFOs has completed that obligation.  At any of these junctions, the felon's pecuniary terms of sentence have been "fully carried out" and "brought to an end."[8]

Second, by its very terms, Amendment 4 does not reenfranchise all, or even most, felons.  In enacting Amendment 4, the people of Florida chose to reenfranchise

---

[8] The felons' and dissent's invocation of the canon of constitutional avoidance to argue that "completion" means "completion to the best of one's ability" is of no avail.  That canon "has no application in the absence of statutory ambiguity."  *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 494 (2001).  Here, there is no such ambiguity.

only felons who were not convicted of murder or a felony sexual offense and who had satisfied an express condition—the "completion of all terms of [their] sentence." Fla. Const. art. VI, § 4(a)–(b).  To argue that the purpose of Amendment 4 was to reenfranchise a particular percentage of felons that this Court deems acceptable is to ignore the words adopted by the people of Florida when they amended their constitution.

I would thus hold that, even if *Bearden*'s heightened scrutiny were extended to the context of felon-reenfranchisement, application of that doctrine is inappropriate here.  The due process concerns that animated that decision are wholly absent.   And the equal protection component is inapplicable because Florida provides indigent felons alternative avenues to reenfranchisement apart from actual payment of LFOs.  Because those alternative avenues further Florida's legitimate interest in ensuring that only felons who have completed the terms of their sentence are granted access to the franchise pursuant to Amendment 4, no unconstitutional wealth discrimination is occasioned.  The "equal protection of the laws [does not] deny a State the right to make classifications in law when such classifications are rooted in reason."   *Griffin v. Illinois*, 351 U.S. 12, 21 (1956) (Frankfurter, J., concurring).

III.

My dissenting colleagues take issue with many aspects of Florida's LFO system, as well as Florida's broader policy of funding its justice system through, among other things, the assessment of criminal fees and costs (even though Florida is far from unique in that regard[9]).   Much of their critique articulates a policy preference that Florida's voters and its legislature could and should have done more. But as the Supreme Court has instructed, "[a] statute is not invalid under the Constitution because it might have gone farther than it did[.]" *Roschen v. Ward*, 279 U.S. 337, 339 (1929).  "[E]very reform that benefits some more than others may be criticized for what it fails to accomplish," *Rodriguez*, 411 U.S. at 39, so "reform may take one step at a time," *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 489 (1955).

Florida took its first step toward felon reenfranchisement in 1968—reenfranchising all misdemeanants and establishing for the first time a discretionary, executive-clemency process that could restore a felon's civil rights.  *See* Fla. Const.

---

[9] A fifty-state survey conducted by the Brennan Center for Justice, the National Center for State Courts, and NPR shows that Florida is, in fact, firmly in the majority when it comes to the fees charged to felons.  *See* Joseph Shapiro, *State-by-State Court Fees*, NPR (May 19, 2014), https://www.npr.org/2014/05/19/312455680/state-by-state-court-fees (citations omitted). Forty-nine out of fifty States charge criminal defendants for electronic monitoring services.  *See id.* Forty-four out of fifty States charge defendants for costs of supervision.  *See id.*  Forty-three States and the District of Columbia charge defendants for the use of a public defender.  *See id.*  And forty-one out of fifty States charge felons for room and board.  *See id.*  In total, thirty-one states (including Florida) charge defendants for all four types of costs.  *See id.*

art. IV, § 8(a) (1968).  With the passage of Amendment 4, Florida took a second step, reenfranchising those felons who were not convicted of murder or a felony sexual offense and who had satisfied an express condition—the "completion of all terms of [their] sentence."  Our role in the constitutional system is simply to review that step for compliance with the Constitution, not to lengthen its stride.  To proceed otherwise would violate the principles of federalism and separation of powers—the two structural guarantors of individual rights and liberty in our Constitution.

For the reasons set forth in the majority opinion and this concurrence, Florida's felon reenfranchisement scheme is constitutional.  It falls to the citizens of the State of Florida and their elected state legislators, not to federal judges, to make any additional changes to it.

MARTIN, Circuit Judge, joined by WILSON, JORDAN, and JILL PRYOR,

Circuit Judges, dissenting:

I am pleased to join Judge Jordan's dissent in full.  I write separately to

elaborate on the due process problems that stem from Florida's actions here and

exist separately from the other constitutional deficiencies discussed in Judge

Jordan's dissent.  In particular, I take issue with the position accepted by the

majority that Florida's constitutional amendment imposes no obligation, or even

any responsibility, on the State to provide its citizens with the information required

in order for them to register to vote.  Maj. Op. at 59.

## I.

The District Court's unchallenged findings of fact led it to observe that

Florida's implementation of Amendment 4 has been an "administrative train

wreck."  Jones v. DeSantis ("Jones II"), ___ F. Supp. 3d ___, 2020 WL 2618062,

at *34 (N.D. Fla. May 24, 2020).  The majority breezes over the infirmities of the

process.  But I cannot so easily condone a system that is projected to take upwards

of six years simply to tell citizens whether they are eligible to vote; that demands

of those citizens information based on a legal fiction (of its own making) known as

the "every-dollar" method; and which ultimately throws up its hands and denies

citizens their ability to vote because the State can't figure out the outstanding

balances it is requiring those citizens to pay.  This system does not comport with due process of law.

A.

When analyzing a claim for procedural due process, the first question we must ask is whether the plaintiffs have established the deprivation of a constitutionally protected liberty or property interest.  See, e.g., Woods v. Comm'r, Ala. Dep't of Corr., 951 F.3d 1288, 1293 (11th Cir. 2020).  The Plaintiffs here have clearly established such a protected interest.

All agree that the right to vote is a fundamental right protected by the Fourteenth Amendment.  See, e.g., Reynolds v. Sims, 377 U.S. 533, 561–62, 84 S. Ct. 1362, 1381 (1964) ("Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic society.").  It is true, of course, that despite its fundamental status, the right to vote may be abridged or altogether withheld by the State.  This is the holding of Richardson v. Ramirez, 418 U.S. 24, 94 S. Ct. 2655 (1974), in which the Supreme Court held that the Fourteenth Amendment condones felon disenfranchisement.  Id. at 54–56, 94 S. Ct. at 2671–72.  But Richardson does not tell us what a State may do once the State Legislature—or, in this case, the people—adopts a scheme to restore the fundamental right to vote to its ex-felons.

Once a State promises its citizens restoration of their right to vote based on defined, objective criteria, it has created a due-process interest.  This seems obvious based on a few distinct, though related, principles of law.  The first is the general idea that "a State creates a protected liberty interest by placing substantive limitations on official discretion."  Olim v. Wakinekona, 461 U.S. 238, 249, 103 S. Ct. 1741, 1747 (1983).  Relevant examples abound.  For instance, in Kapps v. Wing, 404 F.3d 105 (2d Cir. 2005), the Second Circuit held that New York created a property interest in low-income energy benefits when it adopted a "statutory framework[]" that "set[] fixed eligibility criteria" for those benefits.  Id. at 114.  Also, the Sixth Circuit, in Jasinski v. Tyler, 729 F.3d 531 (6th Cir. 2013), found a due-process interest created by the State's filing of a child-protection petition under Michigan's Child Protection Law.  Id. at 541–44.  This was so because the relevant statute mandated the filing of a petition when fixed "substantive predicates" were met, and because the outcome of the petition could not be altered by official discretion.  Id. at 543–44.  The lesson from this body of law is that when a State promises its citizens an entitlement based upon the satisfaction of objective criteria, it creates a due process right for those citizens.  Florida did just that, here.

Second, the fundamental nature of the right to vote matters.  It has been a generally accepted principle for over 50 years "that the right to vote is one of the

fundamental personal rights included within the concept of liberty as protected by

the due process clause." United States v. Texas, 252 F. Supp. 234, 250 (W.D.

Tex.), aff'd per curiam, 384 U.S. 155, 86 S. Ct. 1383 (1966).  The right to vote

becomes a nullity once people were barred from ever getting on the voter rolls.

Thus, States cannot prevent eligible citizens from registering to vote without

giving them due process of law.  See Hall v. Louisiana, 108 F. Supp. 3d 419, 438

(M.D. La. 2015) (holding no due process violation in part because the plaintiffs

"did not encounter any problems registering to vote"), aff'd, 884 F.3d 546 (5th Cir.

2018); see also Bell v. Marinko, 235 F. Supp. 2d 772, 777–78 (N.D. Ohio 2002)

(recognizing that the deprivation of voter registration implicates the fundamental

right to vote).  Florida has, in effect, done just that here.  Its Constitution now

promises these citizens the right to vote upon completion of their sentences.  The

people to whom this promise has been made have a constitutional interest in being

allowed, to the fullest of their abilities, to exercise that right.

We know, as the Supreme Court has told us, that Florida could have

withheld the franchise from people with felony convictions for all eternity.  But

once 65% of the people of Florida decided that these returning citizens would be

allowed to exercise their right to vote upon "completion of all terms of sentence,"

see Jones II, 2020 WL 2618062, at *3, and the Florida Legislature set objective

criteria for what it means to "complet[e] all terms of sentence," a due-process

interest was born.

B.

The State, for what it is worth, does not seem to dispute that upon the

adoption of Amendment 4 and SB-7066, it created a due-process interest. Instead,

the State says its implementation of Amendment 4 does not "deny" the due-process

interest at stake. As the State tells it, the only time any interest in the right to vote

was implicated was upon a returning citizen's original conviction.

However, the State confuses the right to enfranchisement with the right to

reenfranchisement. Deprivation of enfranchisement was lawfully done upon

conviction. But deprivation of the right to reenfranchisement occurs when a

returning citizen is stymied in his efforts to vote because he does not know when or

how he can complete all terms of his sentence. That is what the Plaintiffs allege

happened here, and what they proved in the District Court.

II.

We have thus far established that the State deprives returning citizens of a

due-process interest in the right to reenfranchisement when it deprives them of the

information necessary to exercise that right. Note that this principle does not turn

on returning citizens' ability to pay or whether their outstanding legal financial

obligations ("LFO") balance consists solely of court costs and fees. Of course, if

85

the majority had agreed that the State's implementation of Amendment 4 violated

the Equal Protection Clause or the Twenty-Fourth Amendment, those

considerations would be relevant.  My point here is that the Plaintiffs' due-process

claim should proceed no matter what, albeit in a slightly more limited fashion than

if they had also succeeded on their other constitutional claims.

Having established allegations amounting to the deprivation of a due-process

interest in reenfranchisement, I next examine whether the State's process is, in fact,

inadequate.[1]  Whether the State-provided process is constitutionally adequate

requires balancing "(A) the private interest affected; (B) the risk of erroneous

deprivation of that interest through the procedures used; and (C) the governmental

interest at stake."  Nelson v. Colorado, 581 U.S. ___, 137 S. Ct. 1249, 1255 (2017)

(citing Mathews v. Eldridge, 424 U.S. at 335, 96 S. Ct. at 903).

---

[1] For the reasons expressed in Judge Jordan's dissent, the majority is mistaken in its framing of the due process question as one concerning a legislative, rather than adjudicative, action.  The Plaintiffs do not say Amendment 4, SB-7066, or the Florida constitutional provision that strips individuals of the right to vote upon a felony conviction, see Fla. Const. art. VI, § 4(a), were enacted without due process of law.  This alone makes the majority's reliance on Bi-Metallic Investment Co. v. State Board of Equalization, 239 U.S. 441, 36 S. Ct. 141 (1915), misguided. The majority also focuses exclusively on the removal of people from voter rolls in its analysis under Mathews v. Eldridge, 424 U.S. 319, 96 S. Ct. 893 (1976).  However, I view the scope of the due process interest here to be much broader.  People are deprived of a protected due process interest when they cannot register to vote because they lack reliable information about their outstanding balances.  People are likewise deprived of a protected due process interest when they don't vote for fear of criminal prosecution while they wait for the Division of Elections to review their voter registrations—a process that apparently takes years to complete.  Meanwhile, elections will come and go.  Because the Division's determinations are necessarily individualized and fact-specific, Florida's voter reenfranchisement scheme is one for which "persons [are] . . . exceptionally affected, in each case upon individual grounds" and entitled to due process.  See Bi-Metallic, 239 U.S. at 446, 36 S. Ct. at 142–43.  I reject the majority's conclusion to the contrary.

A.

Returning citizens have a strong interest in the right to reenfranchisement.

See Ga. Muslim Voter Project v. Kemp, 918 F.3d 1262, 1270 (11th Cir. 2019) (Jill

Pryor, J., concurring) (stating that interests that "implicate[] the right to vote" are

"substantial" (quotation marks omitted)).  Florida's only argument to the contrary

is that other citizens—those who are currently able to exercise their right to vote—

have a stronger interest at stake than returning citizens.  As a result, Florida makes

what I view as the wacky argument that these other citizens' right to vote will be

"dilut[ed]" if we recognize returning citizens' interest in reenfranchisement.  Reply

Br. of Appellant at 26.  The language the State cites in support of its "dilution"

proposition comes from Reynolds, in which the Supreme Court held that

"[r]acially based gerrymandering" and "the conducting of white primaries" deny

"the right of suffrage" by "debasement or dilution."  377 U.S. at 555, 84 S. Ct. at

1378.  Reynolds simply reaffirmed the one person, one vote principle, and in no

way supports the idea that returning citizens' interest in voting is somehow weaker

than the interest of anyone else.

B.

In order to register, returning citizens must know they have no outstanding

LFOs.  Navigating this process implicates three distinct administrative concerns:

(1) determining the original LFO obligation; (2) determining the amount that has

been paid; and (3) processing the voter registration.  Based on Judge Hinkle's

undisputed factual findings, all three steps of this process are rife with irrationality

and ineptitude.  Thus, the risk of erroneous deprivation—that is, a returning citizen

who should be able to register to vote being waylaid in those efforts—is high.

1.

First, the State's inability to determine the amount of disqualifying LFOs

imposed creates a risk of erroneous deprivation.  As Judge Hinkle found,[2] "many

felons do not know, and some have no way to find out, the amount of LFOs

included in a judgment."  Jones II, 2020 WL 2618062, at *16.  For instance, Dr.

Traci Burch, an expert for the Plaintiffs, testified about her efforts "to obtain

information on 153 randomly selected felons."  Id. at *17.  Judge Hinkle credited

Dr. Burch's testimony that information about original LFO obligations was hard to

track down and, when it was possible to obtain, "there were inconsistencies in the

available information for all but 3 of the 153 individuals."  Id.

Even if Florida were correct that felons convicted in state court "can [easily]

access their sentencing records directly through the County Clerks' office," Br. of

Appellant at 54, further complications arise.  For one, "[m]any counties charge a

fee for a copy of a judgment," which Judge Hinkle found many felons cannot

---

[2]  The District Court's findings of fact are, of course, reviewed for clear error.  U.S.
Commodity Futures Trading Comm'n v. S. Tr. Metals, Inc., 894 F.3d 1313, 1322 (11th Cir. 2018).
And the State's briefing does not argue that any of the facts relevant to this claim were erroneous.

afford to pay.  Jones II, 2020 WL 2618062, at *17.  For another thing, older

judgments can be hard, if not impossible, to find.  See id.  Finally, "[e]ven if a

felon manages to obtain a copy of a judgment, the felon will not always be able to

determine which financial obligations are subject to the pay-to-vote requirement."

Id.; see also id. at *18 ("18 months after adopting the pay-to-vote system, the State

still does not know which obligations it applies to.  And if the State does not know,

a voter does not know.").

All these requirements lead to the conclusion that it "is sometimes easy,

sometimes hard, sometimes impossible" for a returning citizen to figure out his

original LFO obligation.  See id.  Without this information, these citizens can

hardly be expected to know how much they have to pay off.

## 2.

Second, even if a returning citizen is able to determine his original LFO

obligation, then "[d]etermining the amount that has been paid on an LFO" is

likewise "often impossible."  Id. at *18.

The State, pointing to its advisory-opinion system for voter eligibility, says

the Plaintiffs cannot complain about the inability to determine LFO obligations

because, since the enactment of SB-7066, only about 30 members of the public

have made inquiries of the Florida Department of State about "voter eligibility

with regards to financial terms of sentence."  Br. of Appellant at 55.  This is beside

the point.  Although the State offers the advisory opinions as a panacea, it explains in its briefing that these advisory opinions actually only give a returning citizen "a legal determination on whether he would violate the laws against false registration and fraudulent voting by registering and voting given the facts and circumstances attendant to his case."  Id.  The Department of State's current advisory-opinion process does not promise returning citizens accurate information about their outstanding LFOs.

And in any event, this record shows the precise amount of payments made is "sometimes easy, sometimes hard, sometimes impossible" for a returning citizen to determine.  Id. at *21, *23.  The District Court discussed a number of examples of returning citizens struggling mightily to calculate their outstanding LFO balance.  One named plaintiff, Clifford Tyson, contacted the Hillsborough County Clerk of Court to help him determine his outstanding LFO balance.  Id. at *20.  The District Court recounted that it took the Clerk of Court's "financial manager" and "several long-serving assistants" 12 to 15 hours to come up with an answer.  Id.  Even at the end of that painstaking process, nobody was able "to explain discrepancies in the records" that surfaced.  Id.

Under the majority's decision, it remains incumbent on the person seeking to vote to bring all relevant "facts and circumstances" to the State's attention, including the amount of his outstanding LFOs.  To the contrary, I believe the State

has an obligation to give accurate information to its citizens about how much it believes they must still pay to discharge their obligations under SB-7066. This is particularly so, in light of the State's idiosyncratic "every-dollar" method of calculating payment. Under this method, all payments made in relation to an LFO are to be counted toward the outstanding balance of a criminal sentence, even if a portion of the payment has in fact been allocated elsewhere in the payment process. See id. at *21. So it is the State's position, adopted by the majority, that a returning citizen can qualify to vote if he has paid the amount assessed in his sentencing document, but still has outstanding LFOs if any portion of his payments were, say, pocketed by a debt collection company. As I understand it, this "every-dollar" method is not the mode of accounting any local government uses for any purpose. This is likely because the calculation method was devised midway through this case, apparently as a litigation strategy, and seems completely divorced from how LFO remittances actually work. But, because no formal policy, rule, or statute in Florida provides for the tracking of "every dollar" paid, for many, this "fact" the State demands to know is simply unknowable. This result cannot comport with due process.

Take, for example, Betty Riddle, one of the named plaintiffs in this case. Ms. Riddle requested copies of her felony records from the Clerks of Court in the two counties of her convictions, which date between 1975 and 1988. Jones II,

2020 WL 2618062, at *6.  However, she was told the Clerks were unable to find

records of the convictions.  Id.  Ms. Riddle believes she owes approximately

$1,800 in connection with later convictions, but the Clerk's records do not match

those maintained by the Florida Department of Law Enforcement.  Id.  Even as a

party to this litigation, Ms. Riddle does not know, and has been unable to find out,

how much she must pay to vote.  Id.  This process has all the certainty of counting

jellybeans in a jar.  Under the majority's holding, it is entirely consistent with due

process that Ms. Riddle cannot access her right to vote, because she does not, and

cannot, know how much she needs to pay, even if she could pay.

There is no reason to think Ms. Riddle's situation is unique.  For several of

the named plaintiffs— Jeff Gruver, Emory Marquis Mitchell, Keith Ivey,

Kristopher Wrench, Jermaine Miller, Clifford Tyson, Latoya A. Moreland, and Lee

Hoffman—the District Court noted discrepancies in available records or lack of

definitive information regarding what they owed.  Id. at *6–9.  And again, in a

random sample of 153 individuals with felony convictions reviewed by a research

team, all but three had inconsistencies in the available information regarding their

LFOs.  Id. at *17.  People who make a bona fide effort to satisfy their LFOs may

nevertheless face the risk of criminal prosecution if the records they relied on in

tallying "every dollar" paid are inaccurate or do not exist.  Florida's

reenfranchisement scheme, which demands potentially unknowable facts, does not

comport with due process.

3.

Then there is also the processing of voter registrations, another

administrative quagmire.  To be eligible to vote in Florida, one must submit a

registration form.  Simple enough.  But the process that follows is anything but.  If

the county Supervisor of Elections deems the form complete on its face, then the

Secretary of State's Division of Elections takes up the task of deciding whether the

person is real, and, if so, adds that person to the voting roll.  In the meantime, and

periodically for years thereafter, the Division of Elections reviews registrations for,

among other things, disqualifying felony convictions.  A person who is uncertain

of her eligibility to vote—say, because she does not know whether she has satisfied

her LFOs to the State's satisfaction—may choose to wait for the Division of

Elections to complete its review process.  Then if the Elections Division finds that

a person is disqualified for any reason, including unpaid LFOs, the Division is to

notify the proper county Supervisor of Elections.  Some Supervisors review the

Division's work for accuracy, but some do not.  Then the Supervisors begin the

process of removing people from the voter rolls.

All of this review takes time.  In light of the chaos created by the majority's

holding that LFOs must be satisfied according to the "every-dollar" method,

countless scores of individuals will be uncertain of their eligibility to vote.  At the time of the trial, the Florida Division of Elections had identified more than 85,000 registered voters with felony convictions whose eligibility had to be screened.  The District Court made a finding of fact, unchallenged by the State, that it will take until 2026 at the earliest, and possibly even into the 2030s, for the State to complete its eligibility determinations.  Id. at *24.  Some registered voters are undoubtedly eligible to vote.  But again, uncertainty will cause some segment of eligible voters not to vote, lest they risk criminal prosecution.  This delay and uncertainty attendant in Florida's voter registration processing system also fails to satisfy due process.[3]

## C.

Finally, I observe that the State has offered no countervailing interest to justify the denial of procedures sufficient to permit the reenfranchisement granted by Amendment 4.  To be sure, "the Government's interest, and hence that of the

---

[3] The majority opinion says the 85,000 people who are waiting to be screened are "entitled to vote."  This statement is not consistent with the evidence as well as Florida's litigation position in this case.  The Division of Elections Director testified that she herself would not feel comfortable taking an oath that she was eligible to vote if she were in the shoes of a returning citizen who was unsure of the amount they owed.  The wisdom reflected by her discomfort is demonstrated by at least two things.  First, Florida argues to us here that it has an interest in avoiding any presumption that the people who have registered are entitled to vote.  Also, the Florida legislature considered and rejected a bill that gave a safe harbor to protect from prosecution those who vote believing that they have paid their LFOs but were later shown to have amounts outstanding.

The facts from this record show it will take until at least 2026 to pass on the eligibility of the 85,000 citizens whose voter registration applications are currently pending.

public, in conserving scarce fiscal and administrative resources is a factor that must be weighed."  Mathews, 424 U.S. at 348, 96 S. Ct. at 909.  "At some point the benefit of an additional safeguard to the individual affected by the administrative action and to society in terms of increased assurance that the action is just, may be outweighed by the cost."  Id.  But we are nowhere near that point.  In fact, the State does not argue that the incremental increase in the allocation of resources to ensure accurate decisions about the eligibility of returning citizens to vote would be unduly burdensome.  Nor, based on this record, could it.  See Ga. Muslim Voter Project, 918 F.3d at 1272 (Jill Pryor, J., concurring) (rejecting a State's arguments of substantial burden under Mathews where it failed to support its assertion).  In any event, as I see it, the important interest in this case outweighs any cost considerations the State may have.

*     *     *

Sixty-five percent of Florida voters conferred the right to reenfranchisement upon returning citizens once they completed all terms of their sentence.  With its Constitution amended in this way, Florida gained an obligation to establish procedures sufficient to determine the eligibility of returning citizens to vote, and to notify them of their eligibility in a prompt and reliable manner.  The majority's decision to vacate the District Court's injunction and reverse its holding on procedural due process grounds relieves the State of Florida of this obligation

95

expected of it by its people.  For this reason, as well as those articulated by Judge

Jordan, I dissent from the majority's decision.

JORDAN, Circuit Judge, joined by WILSON, MARTIN, and JILL PRYOR, Circuit
Judges, dissenting.

> "*Failure to pay court fines and fees should never result in the deprivation of
> fundamental rights, including the right to vote.*"
>
> AMERICAN BAR ASSOCIATION, RESOLUTION: TEN GUIDELINES ON COURT
> FINES AND FEES, GUIDELINE 5 (AUG. 2018).

In 2018 Florida's voters, by a 64.55% super-majority, enacted Amendment 4
to allow felons to vote "upon completion of all terms of sentence including parole
or probation."   Since then, the Florida legislature has decreed, *see* Fla. Stat. §
98.0751, and the Florida Supreme Court has ruled, *see Advisory Opinion to
Governor re Implementation of Amendment 4, The Voting Restoration Amendment*,
288 So. 3d 1070 (Fla. 2020), that Amendment 4 requires felons to satisfy legal
financial obligations ("LFOs") before being allowed to vote.

But if anyone thought that Florida really cared about collecting unpaid
LFOs—whether for crime victims or for its own coffers—that pretense was laid bare
at trial, which was held after we affirmed the district court's preliminary injunction.
*See Jones v. Governor of Fla.*, 950 F.3d 795 (11th Cir. 2020) ("*Jones I*").   The
district court concluded that Florida's LFO requirement violates the Equal Protection
Clause of the Fourteenth Amendment, under both heightened scrutiny and rational
basis review.   *See Jones v. DeSantis*, -- F. Supp. 3d --, 2020 WL 2618062, at *14–
26 (N.D. Fla. May 24, 2020) ("*Jones II*").   It also ruled that the LFO requirement
violates the Due Process Clause and the Twenty-Fourth Amendment. *See id.* at *27–

29, 36–37.  And it issued a limited and tailored remedy in the form of an LFO

advisory opinion process, a process Florida itself had suggested.  *See id.* at *42–44.

The evidence showed, and the district court found, that since the passage of

Amendment 4 Florida has demonstrated a "staggering inability to administer" its

LFO requirement.  *See id.* at *14.  That is an understatement.  Florida cannot tell

felons—the great majority of whom are indigent—how much they owe, has not

completed screening a single felon registrant for unpaid LFOs, has processed 0 out

of 85,000 pending registrations of felons (that's not a misprint—it really is 0), and

has come up with conflicting (and uncodified) methods for determining how LFO

payments by felons should be credited.  *See id.* at *24.  To demonstrate the

magnitude of the problem, Florida has not even been able to tell the 17 named

plaintiffs in this case what their outstanding LFOs are.  *See id.*  So felons who want

to satisfy the LFO requirement are unable to do so, and will be prevented from voting

in the 2020 elections and far beyond.  Had Florida wanted to create a system to

obstruct, impede, and impair the ability of felons to vote under Amendment 4, it

could not have come up with a better one.

Incredibly, and sadly, the majority says that Florida has complied with the

Constitution.  So much is profoundly wrong with the majority opinion that it is

difficult to know where to begin.  But one must start somewhere, so I will first turn

to the facts, those "stubborn things," *Campbell v. Fasken*, 267 F.2d 792, 796 (5th

Cir. 1959), which though proven at trial and unchallenged on appeal, are generally relegated to the dustbin in the majority opinion.

## I

The majority proceeds as though the reality on the ground does not matter, but the record tells a different story.  After an eight-day bench trial, the district court issued a 125-page opinion containing the following findings of fact—none of which Florida challenges on appeal.

1. **"[T]he overwhelming majority of felons who have not paid their LFOs in full, but who are otherwise eligible to vote, are genuinely unable to pay the required amount, and thus, under Florida's pay-to-vote system, will be barred from voting solely because they lack sufficient funds."** *Jones II*, **2020 WL 2618062, at \*16.**

This finding is supported by the testimony of Dr. Daniel A. Smith, which the district court credited in full.  *See id.* at \*16, n.82.  For example, Dr. Smith testified that of the over one million people convicted of a qualifying felony in Florida who have otherwise completed the terms of their sentences, 77.4% owe some form of LFO.  *See* Tr. at 60; D.E. 334-1 at ¶ 9.  In the counties for which Dr. Smith had indigency data, about 70% of those felons who had completed their sentences (except for payment of LFOs) were represented by a public defender, which indicates that they are indigent.  *See* Tr. at 73–78; D.E. 334-1 at ¶¶ 42, 46, 50.

The Public Defender for Palm Beach County testified that about 80% of criminal defendants in felony cases are represented by court-appointed counsel at

trial because of indigency.  She also explained that the statewide data is similar to

that in Palm Beach County.  *See* Tr. at 279.  The Chief Operating Officer of the Clerk

of the Circuit Court for Hillsborough County similarly testified that 80% of criminal

defendants in felony cases in that municipality are indigent and represented by court-

appointed counsel.  *See id.* at 624.

## 2. "[M]any felons do not know, and some have no way to find out, the amount of LFOs included in a judgment."  *Jones II*, 2020 WL 2618062, at *16.

Under § 98.0751, which implements Amendment 4, the LFOs that a felon

must pay to vote "include only the amount specifically ordered by the court as part

of the sentence and do not include any fines, fees, or costs that accrue after the date

the obligation is ordered as a part of the sentence."  § 98.0751(2)(a)(5)(c).  But

sentencing documents vary by county, *see* D.E. 152-93 at 183-84, and do not

consistently show which amounts were imposed at sentencing.  *See* D.E. 360-47 at

9–12.  The record is replete with examples of situations where the sentencing

document does not clearly set out what a felon owes.  *See Jones II*, 2020 WL

2618062, at *6–10 (recounting examples).  For instance, Florida submitted a

judgment for one of the plaintiffs, Jeff Gruver, that did not include any financial

obligations.  *See id.* at *6.  But the record in Mr. Gruver's case also includes a civil

judgment for $801 dated 17 days after Mr. Gruver was sentenced.  *See id.*  It is

unclear whether the criminal judgment included the same amount and was converted

to a civil lien 17 days later, or whether no amount was included in his criminal judgment at all.  *See id.*  Mr. Gruver said that with interest and collection fees, the debt has grown to roughly $2,000.  *See id.*  As the district court stated: "One cannot know, from the information in this record, whether any financial obligation was included in the 'four corners' of Mr. Gruver's criminal judgment."  *Id.*

The district court found that many felons do not know whether they are required to pay LFOs for the following reasons:

- Few felons will know that they must obtain copies of their judgments to determine whether they owe LFOs.

- For those felons who do know that they need a copy of their judgment, few have copies of their judgments because many have served long terms in custody or decades have passed since their judgments were issued.

- Many counties charge a fee for a copy of a judgment, which many felons cannot afford to pay.

- For older felonies, a copy of the judgment may not be available at all or may be available only from barely legible microfilm or microfiche from barely accessible archives.

- Even if a felon has a copy of the judgment, it is not always clear which financial obligations are subject to the LFO requirement (e.g., if the judgment covers multiple offenses, including misdemeanors, and does not specify for which offense the fee is owed).

*See id.* at *16–17.

**3. Even if a felon knows that he owes LFOs, "[d]etermining the amount that has been paid on an LFO presents an even greater difficulty" and "is often impossible."  *Jones II*, 2020 WL 2618062, at *18.**

One reason for this difficulty is that there is no single source that collects information on unpaid LFOs, making it very difficult for the state (and the felon) to determine how much is owed.  The analysis prepared for the Florida Legislature confirmed this mess.  *See* Florida Department of State, 2019 Agency Legislative Bill Analysis for SB 7086, D.E. 351-18 at 5 ("At this time, no single source exists that confirms for the Department or for the convicted felon that he or she has completed all terms of the sentence for every felony.").  Florida has made no attempts to solve this problem.[1]

In addition to failing to aggregate LFO information in one centralized place, Florida's records contain substantial inconsistencies.  *See Jones II*, 2020 WL 2618062, at \*17, 19.  As the district court explained, Dr. Traci R. Burch—a professor of political science working with a team of doctoral candidates from a major research university—made diligent efforts over a long period to obtain information on 153 randomly selected felons.  *See id.* at \*17.  Dr. Burch's team found "that information was often unavailable over the internet or by telephone and that, remarkably, there

---

[1] As former and current election administrators have explained in their amicus brief, this state of affairs forces election administrators to "engage in a multi-step, individualized process to determine whether an individual voter has an outstanding felony-LFO," and to "shoulder an impossible burden, requiring them to stretch budgets or divert staff to conduct research that is not within their expertise and for which they often lack access to necessary data[.]" Amicus Br. of Current and Former Election Administrators at 21, 24–25.  That is why other states, such as Wisconsin, require its department of corrections to keep track of who is ineligible to vote and to maintain a list of people currently ineligible to vote on account of a conviction.  *See id.* at 21.

were inconsistencies in the available information for all but 3 of the 153 individuals."
*Id.*  In other words, there were inconsistencies in the state's records for 98% of the people in the sample.  *See id.* at *19.  The district court credited Dr. Burch's testimony.  *See id.* at *17, n.86.  *See also* D.E. 360-47 at 9.

Dr. Burch's expert report provides more detail on the discrepancies in Florida's data, including that the Florida Department of Law Enforcement reports conflict with the clerks' online data regarding LFOs in 79.6% of cases in the sample. *See* D.E. 360-47 at 9.  Dr. Burch testified about other obstacles her research team faced in obtaining information on LFOs, such as that 40% of the 67 counties charged some kind of payment or processing fee to look at their databases, and 15% charged a fee even to access records such as sentencing documents.  *See* Tr. at 164.  She and her team struggled to obtain information over the phone because clerks were often unhelpful, and had difficulty obtaining information online because some websites were poorly designed, difficult to use, or inaccessible.  *See id.* at 167–169.  In 60% of cases, they could not even get through to clerks on the phone or clerks would not help them ascertain the amount due over the phone.  *See id.* at 184–85.

Another problem is that restitution is usually payable only to the victim directly.  *See Jones II*, 2020 WL 2618062, at *20.  Florida has no record of restitution payments at all, except in the smaller number of cases when restitution is payable to or through the Clerk of Courts or the Department of Corrections.  *See id.*  The district

court found that this information "may be unknowable": the felon may have no record of amounts paid (especially if they were paid years or decades ago); individual victims may have died or moved to parts unknown; and corporate victims may have gone out of business or merged into other entities. *See id.*

**4. In many cases, "probably most," felons cannot pay their outstanding balance without being required to pay additional fees that were not included in their sentence. *See Jones II*, 2020 WL 2618062, at \*20–23.**

If a felon sets up a payment schedule because he is unable to pay a judgment all at once, many counties assess a \$25 fee for setting up a payment plan. *See id.* at \*18.   And if a felon fails to pay his LFOs, his account may be turned over to a collection agency. *See id.*   These collection agencies, in turn, routinely charge fees of up to 40% and remit to the county only the net amount remaining after deducting the fee. *See id.*   County records often show only the net payment, not the amount retained by the collection agency. *See id.*   And in some counties, online records do not distinguish between LFOs from the four corners of the sentencing documents and any later accrued fees. *See* Tr. at 133–34, 651, 943–45.

The district court also found that Florida has "adopted two completely inconsistent methods" for applying these additional payments to covered obligations. *See Jones II*, 2020 WL 2618062, at \*18.   This makes an intolerable situation even worse.

At first, Florida argued that a felon should receive credit only for the amounts that it actually received from his payment (referred to by the district court as the "actual-balance method").  *See id.*  Under this approach, for example, a defendant who paid $100 to a collection agency might find that only $60 of his payment went to satisfy the amount owed on his LFOs (as he would receive no credit for the $40 a collection agency charged and kept to cover its fees).  This method leads to the felon often having to pay more than the LFO amount in his judgment to vote, as he must also pay applicable collection or processing fees.  *See id.* at *20.

Then, in March of 2020—less than two months before trial—Florida "abruptly changed course," adopting a different method which the district court called the "every-dollar method."  *Id.* at *21.  Under this newly-minted approach, a felon only has to make payments that add up to the aggregate amount of the obligations included in the judgment, no matter the actual purpose for the payment. *See id.*  So, if a felon pays $100 to a collection agency, the entire $100 will count to satisfy the LFO requirement—even if $40 is retained by the collection agency as a collection fee.  Florida, however, has not codified this new method; "it is not set out in a statute or rule or even in a formal policy[.]"  *Id.* at *22.  So it is anyone's guess whether it will last, or will be replaced by a third, fourth, or fifth method that conveniently suits Florida's then-existing interests and prevents felons from figuring out their LFO obligations.

Even on its own terms, Florida's new approach has intrinsic problems. Because county records routinely show only the net payment that the county receives from collection agencies, it may be impossible to calculate the amount that felons paid under this approach. Significantly, the district court found that the every-dollar method undermines Florida's main rationale for the LFO requirement—that a felon must satisfy his entire criminal sentence before being allowed to vote—because under this approach, most felons will not have to satisfy their judgment in full before regaining the right to vote. *See id.* at *22–23.

For example, as the district court noted, if a felon owed $100 in restitution, but had to pay a $4 fee to the Department of Corrections to process his full payment, under the actual-balance method he would have to pay $104 in total to be eligible to vote. *See id.* at *22. Under the every-dollar method, however, the felon would only have to pay $100 in total to be eligible to vote—even though the victim would only receive about $96 ($100 – the $4 fee). *See id.* Indeed, the Director of the Division of Elections admitted at trial that under the every-dollar method, the victim may sometimes receive $0 in restitution payments—even though restitution was ordered in the judgment—if the amount of payments made towards fees and surcharges equals or exceeds the amount of restitution ordered. *See* Tr. at 1359. So much for Florida's asserted interest in the full payment of LFOs.

106

Further highlighting the potential arbitrary results that may result from the every-dollar method, the district court asked the Director of the Division of Elections the following hypothetical at trial.   Take an individual who has two felony convictions: one for which he owes $25 in LFOs, and another for which he owes $15 in LFOs.  Assume that the felon paid $50 in total towards the first conviction— $25 for the LFOs in the judgment, plus another $25 for various fees and surcharges that accrued after sentencing—but only paid $10 toward the second conviction. What happens then?   The Director testified that the felon would not be eligible to vote, as he would still owe LFOs for the second conviction.  *See id.* at 1323.  If those same convictions were charged in a single case, however, and the same payments were made, that felon would be eligible to vote—as the total amount paid would exceed the amount of LFOs owed.  *See id.*

5. **In the 18 months since Amendment 4 was adopted by Florida voters, Florida has not completed screening *even a single registrant* for unpaid LFOs, and it has processed 0 out of 85,000 pending registrations of felons. *See Jones II*, 2020 WL 2618062, at \*24.**

To be eligible to vote in Florida, a person must submit a registration form. *See id.* at \*9.   If the County Supervisor of Elections deems the form complete on its face, the Secretary of State's Division of Elections determines, using personal identifying information, whether the person is real.  *See id.*  If so, the person is added to the voting roll, subject to later revocation if it turns out that he is ineligible.  *See id.*

The Division of Elections takes the laboring oar at that point, reviewing the registration for disqualifying felony convictions. *See id.  See also* § 98.075(5) ("The department shall identify those registered voters who have been convicted of a felony. . ."); § 98.0751(3)(a) ("The department shall obtain and review information pursuant to s. 98.075(5) related to a person who registers to vote and make an initial determination on whether such information is credible and reliable regarding whether the person is eligible . . . ").  If the Division finds a disqualifying felony conviction, it notifies the proper County Supervisor of Elections of the voter's potential ineligibility to be registered.  *See Jones II*, 2020 WL 2618062, at *10. Upon receipt of the notice, the Supervisor sends the registrant a notice giving him 30 days to show eligibility. *See id.  See also* § 98.075(7) (outlining procedures for removal from the voter rolls).  The registrant may request a hearing before the Supervisor, and if unsuccessful may file a lawsuit in state court, but hearings are "extremely rare." *Jones II*, 2020 WL 2618062, at *10.

The district court found that County Supervisors of Elections sometimes address felony convictions on their own, without awaiting notice from the Division of Elections that a registrant is ineligible. *See id.*  But they do not have the resources to perform the bulk of the screening process. *See id.*  Thus, there was testimony at trial that one County Supervisor had removed some voters due to outstanding LFOs, *see* Tr. at 927–29, even though the Division had not processed a single felon for

unpaid LFOs.  That County Supervisor testified that while his office would check for restitution payments if that data was available, they did not "go into the details" because "there is no database in the state of Florida to be able to check all the different court costs that might be outstanding."  *Id.* at 908–09, 912–14, 918–19. Although he said his office would check for information on LFOs with the county's clerk of court or the Comprehensive Case Information System database, that system does not include records for out-of-state cases or federal cases.  *See id.* at 920–21. He also acknowledged that he did not receive *any* guidance from the Division of Elections about how to implement the LFO requirement.  *See id.* at 909–10, 928.

Another County Supervisor of Elections similarly testified that she was unaware of any reliable database that she or voters can rely on to assess outstanding LFOs.  *See id.* at 483.  She recounted that after the passage of § 98.0751, her office occasionally received questions from voters about their eligibility under the new law. *See id.* at 480–81.  Her office initially tried to help voters determine their LFOs by contacting the clerk of court or the relevant collection agency, but often they were unable to get "a definitive answer" and "were just butting [their] heads against the wall."  *Id.* at 481–82.  She explained that generally, after a new election law is passed, the Division of Elections writes a rule to "make sure that all 67 [Supervisors of Elections] are treating [their] voters basically in the same manner*."  Id.* at 474. But, she said, since the passage of § 98.0751, there has not been a new rule issued—

109

or any guidance given—as to how to implement the LFO requirement.  *See id*. at

474, 476.  In other words, Florida has done nothing to address the LFO problem.

Moreover, the Division of Elections has not screened any registered felons for

outstanding LFOs.  Specifically, the district court found that "[a]s of the time of trial,

the Division ha[d] 85,000 pending registrations of individuals with felony

convictions—registrations in need of screening for murder and sexual offenses, for

custody or supervision status, and for unpaid LFOs.  In the 18 months since

Amendment 4 was adopted, the Division has had some false starts but has completed

its review of *not a single registration*."  *Jones II*, 2020 WL 2618062, at *24

(emphasis added).

The Division of Elections has not even begun screening for unpaid LFOs,

except for the 17 named plaintiffs in this case, and inexplicably even those reviews

had not been completed at the time of trial.  *See id*.  Indeed, the Director of the

Division acknowledged that it was not currently implementing the LFO requirement,

and admitted that the Division is still "trying to finalize" its "process in a way that

can be understood and implemented."  Tr. at 1236, 1265–66.[2]

---

[2] In an email dated August 29, 2019, the Director of the Division of Elections outlined some of the
challenges Florida faces "in trying to determine financial obligations imposed by a sentencing
document."  In that same email, the Director said: "My staff simply are not versed or professionally
trained at this level to understand court documents to this level."  D.E. 153-4 at 1, 4–6.  If Division
employees are hopelessly lost, how can felons possibly hope to figure out their LFO status?

The district court found that "even if the Division starts turning out work today, and even if screening for LFOs doesn't take longer than screening for murders, sexual offenses, custody, and supervision," the Division's projected screening rate—at best—would be complete in early 2026. *See Jones II*, 2020 WL 2618062, at *24. That is at least three elections (2020, 2022, 2024)—including two presidential elections—away.

Amendment 4 and § 98.0751 significantly increased the workload on the Division of Elections. In addition to screening for felonies, the Division now has to address three new questions: whether a felony conviction is for murder or a sexual offense, whether the individual is still in custody or supervision, and whether the individual has unpaid LFOs. *See id.* The budget analysis for the Senate Bill that became § 98.0751 therefore projected a need for 21 new employees to process the increased workload. *See id.* But as the district court found, the Florida Legislature has allocated *no* funds for new employees, and the Division has hired none. *See id.* That is a pretty good (and damning) indication of Florida's disdain for Amendment 4.

6. **"It is likely that if the State's pay-to-vote system remains in place, some citizens who are eligible to vote, based on the Constitution or even on the state's own view of the law, will choose not to risk prosecution and thus will not vote." *Jones II*, 2020 WL 2618062, at *25. In other words, the district court found that it is likely that the lack of clarity about LFO obligations will likely deter eligible felons from voting, out of fear that they will be prosecuted if they vote and then later find out that they were not in fact eligible.**

Under Florida law, making a false affirmation in connection with voting, as well as fraud in connection with voting, are criminal offenses.  *See* Fla. Stat. §§ 104.011 (false affirmation in connection with voting) & 104.041 (fraud in connection with casting vote).  Although the former requires a showing of willfulness, and the latter requires a showing of fraud, felons may not be aware of those requirements.  In fact, the 2019 voter registration form includes a warning that "[i]t is a 3rd degree felony to submit false information," and that "[m]aximum penalties are $5,000 and/or 5 years in prison," without mentioning the statutory requirement of willfulness.  *See* D.E. 343-3; D.E. 152-33.

Florida's voter registration form requires registrants to sign an oath affirming under penalty of perjury that they are eligible to vote.  *See* D.E. 343-3; D.E. 152-93 at 189; D.E. 167-3 at 2.  Needless to say, it is particularly difficult for registrants to affirm their eligibility without being able to obtain accurate information about their LFO obligations.  As the district court stated: "That the Director of the Division of Elections cannot say who is eligible makes clear that some voters also will not know."  *Jones II*, 2020 WL 2618062, at *25.

The Director of the Divisions testified that if she "were in the voter's position, [she doesn't] know that [she] would be swearing under oath if [she] wasn't sure" about her eligibility to vote.  *See* Tr. at 1381.  She testified that to avoid this "challenge," *id.*, felons who are concerned about the risk of prosecution may request

112

an LFO advisory opinion from the Division, and they will be immune from prosecution if they rely on the advisory opinion in good faith. *See id.* at 1206–07, 1214–16, 1315.  *See* Fla. Stat. § 106.23(2) (setting forth the advisory opinion process).  She could not, however, say how long it would take to get an advisory opinion. *See* Tr. at 1387–89.

The district court took Florida up on the Director's suggestion. *See Jones II*, 2020 WL 2618062, at *37, 42.  The injunction it crafted sets up an advisory opinion process, and allows an individual to go forward with registration and voting if the Division fails to provide an advisory opinion within 21 days. *See id.* at *43.  It also prescribes a method for determining inability to pay. *See id.*  The district court explained "that the State *can* condition voting on payment of fines and restitution that a person is able to pay but *cannot* condition voting on payment of amounts a person is unable to pay or on payment of taxes, even those labeled fees or costs." *Id.* at *1.  Thus, the injunction largely mirrors Florida's own advisory opinion process and serves two purposes: (1) it provides a method for determining inability to pay; and (2) if a felon can pay, it requires the state to tell him how much he owes. *See id.* at *43.

**7. "Fees and costs are imposed in all cases, with few if any exceptions. . . . Each type of fee or cost is authorized, indeed usually required, by statute. These are not traditional court costs of a kind usually awarded in favor of a prevailing litigant; they are instead a means of funding the government in general or specific government functions." *Jones II*, 2020 WL 2618062, at *4.**

113

Florida imposes a flat $225 assessment in every felony case, $200 of which is used to fund the clerk's office and $25 of which is remitted to the Florida Department of Revenue for deposit in the state's general revenue fund. *See id.*; Fla. Stat. § 938.05(1)(a). There is also a flat $3 assessment in every case that is remitted to the Department of Revenue for further distribution in specified percentages for, among other things, a domestic violence program and a law-enforcement training fund. *See Jones II,* 2020 WL 2618062, at *4; Fla. Stat. § 938.01(1).

As the district court found, Florida has chosen to pay for its criminal-justice system in significant measure through fees routinely assessed against its criminal defendants. *See Jones II*, 2020 WL 2618062, at *28. *See also* Fla. Const., art. V, § 14 (providing that all funding for clerks of court must be obtained through fees and costs, with limited exceptions). The district court found that "[e]very criminal defendant who is convicted, and every criminal defendant who enters a no-contest plea of convenience or is otherwise not adjudged guilty but also not exonerated is ordered to pay such amounts." *Jones II*, 2020 WL 2618062, at *28. For example, in one county, the fees total $668 for every defendant who is represented by a public defender and $548 for every defendant who is not, and more if multiple counts are charged. *See id*.

With these facts in mind, I turn to the plaintiffs' equal protection, due process, and Twenty-Fourth Amendment claims.

## II

In my view, we correctly ruled in *Jones I*, 950 F.3d at 817–25, that heightened scrutiny should apply to the plaintiffs' equal protection claim.   But even if heightened scrutiny does not apply, the district court properly concluded that Florida's LFO scheme fails rational basis review.  *See Jones II*, 2020 WL 2618062, at *15–26.

## A

We held in *Jones I* that "heightened scrutiny applies . . . because we are faced with a narrow exception to traditional rational basis review: the creation of a wealth classification that punishes those genuinely unable to pay fees, fines, and restitution more harshly than those able to pay—that is, it punishes more harshly solely on account of wealth—by withholding access to the ballot box."  *Jones I*, 950 F.3d at 809.  I wholeheartedly agree.

## 1

The Supreme Court's opinions in *Griffin v. Illinois*, 351 U.S. 12 (1956), *Bearden v. Georgia*, 461 U.S. 660 (1983), and their progeny establish that "the state may not treat criminal defendants more harshly on account of their poverty."  *Jones I*, 950 F.3d at 818.  In *Griffin*, 351 U.S. at 16–19, the Supreme Court held that an Illinois rule requiring a criminal defendant to purchase a certified copy of the trial record to appeal his sentence—without any exception for the indigent—flouted due

process and equal protection.   Significantly, the Supreme Court came to this conclusion even though the right to an appeal in a criminal case is not constitutionally guaranteed.  *See id.* at 18 (citing *McKane v. Durston*, 153 U.S. 684, 687–88 (1894)).  In *Bearden*, 461 U.S. at 661–62, the Supreme Court held that the Fourteenth Amendment prohibits a state from revoking an indigent defendant's probation for failing to pay a fine and restitution.  The Court relied on *Griffin* and explained that "[d]ue process and equal protection principles converge in [its] analysis in these cases."  *Id.* at 665 (citing *Griffin*, 351 U.S. at 17).  *See also Williams v. Illinois*, 399 U.S. 235, 241 (1970) (holding that a state cannot subject convicted defendants to a period of imprisonment beyond the statutory maximum solely because they are too poor to pay the fine imposed); *Tate v. Short*, 401 U.S. 395, 398 (1971) (holding that a state cannot convert a fine into a jail term solely because the defendant is indigent and cannot immediately pay the fine in full).

At times, the Supreme Court has characterized disenfranchisement as "a nonpenal exercise of the power to regulate the franchise."  *Trop v. Dulles*, 356 U.S. 86, 96–97 (1958) (plurality opinion).   Florida acknowledges, however, that its disenfranchisement is punitive.  *See* Appellants' Initial En Banc Br. at 3 ("Persons convicted of a felony in Florida are automatically disenfranchised *as part of the punishment for their crimes*."); *id.* at 4 ("[F]elon disenfranchisement, again, *is a punishment for felony conviction.*").   Thus, as we explained in *Jones I*, Florida—

contrary to *Griffin* and *Bearden*—"has chosen to continue to punish those felons who are genuinely unable to pay fees, fines, and restitution on account of their indigency, while re-enfranchising all other similarly situated felons who can afford to pay." *See Jones I*, 950 F.3d at 819.  "Just like in *Bearden* and in *Griffin*, the fact that [Florida] originally was entitled to withhold access to the franchise from felons is immaterial; rather, heightened scrutiny is triggered when [it] alleviates punishment for some, but mandates that it continue for others, based solely on account of wealth." *Id.*[3]

In *Griffin* and its progeny, "a financial fee imposed by the state was found to discriminate because it effectively prevented indigents from exercising important rights granted by the state to all citizens but conditioned upon a monetary payment." Note, *Discrimination Against the Poor and the Fourteenth Amendment*, 81 Harv. L. Rev. 435, 435 (1967), cited with approval in *Williams*, 399 U.S. at 241 n.16.  The Supreme Court has described the classes of persons discriminated against in these cases as having two distinguishing characteristics: "[B]ecause of their impecunity they were completely unable to pay for some desired benefit, and as a consequence, they sustained an absolute deprivation of a meaningful opportunity to enjoy that

---

[3] The majority correctly notes that in *Williams*, the Supreme Court stated that courts may impose alternative sanctions, aside from imprisonment on defendants, who cannot satisfy the monetary terms of their sentences. *See* Maj. Op. at 19.  But this does not permit a state to disproportionately punish an indigent felon—by denying him an important right—solely because of his indigency.

benefit." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 20 (1973).  Under

this framework, heightened scrutiny applies here because the LFO requirement

results in an absolute deprivation of the right to vote for felons in any elections that

take place while they are indigent.

The majority tries to characterize *Griffin* and *Bearden* as two separate and

limited exceptions to rational basis review for claims of wealth discrimination.  *See*

Maj. Op. at 18.  It asserts that *Bearden* applies only when inability to pay is the sole

justification for imprisonment, and that *Griffin* applies only when the state

conditions access to certain judicial proceedings on the ability to pay.  *See id.* at 18–

21.  The majority, I believe, is mistaken on both fronts.

*Griffin* and *Bearden* are not two separate and discrete exceptions.  In fact,

*Bearden* relied on *Griffin*, and extended its rationale to a new context.  *See Bearden*,

461 U.S. at 664 ("*Griffin's* principle of 'equal justice,' which the Court applied there

to strike down a state practice of granting appellate review only to persons able to

afford a trial transcript, *has been applied in numerous other contexts*.") (emphasis

added).  *Bearden* therefore "provides a doctrinal intervention for eliminating

systems that block people from reenfranchisement due solely to an inability to pay

economic sanctions."  Beth A. Colgan, *Wealth-Based Penal Disenfranchisement*, 72

Vand. L. Rev. 55, 143 (2019).  And, as relevant here, the Supreme Court has

repeatedly and consistently applied *Griffin* in other cases involving state-created

rights and benefits. *See, e.g.*, *Douglas v. California*, 372 U.S. 353, 355 (1963) (relying on *Griffin* to hold that states must appoint counsel to represent indigent defendants in appeals as of right under state law); *Mayer v. Chicago*, 404 U.S. 189, 194–97 (1971) (applying *Griffin* to indigent defendant who sought to obtain free transcripts to appeal his conviction on non-felony charges); *Boddie v. Connecticut*, 401 U.S. 371, 382 (1971) (relying, in part, on *Griffin* to hold that a state cannot make obtaining a divorce contingent on the ability to pay court fees and costs); *M.L.B. v. S.L.J.*, 519 U.S. 102, 107 (1996) (holding under *Griffin* that a state may not "condition appeals from trial court decrees terminating parental rights on the affected parent's ability to pay record preparation fees").

The Supreme Court has also applied the *Griffin* equality principle to cases that do not involve access to the judicial process and criminal law. For example, the Supreme Court applied *Griffin* to the voting context in *Harper v. Virginia Board of Elections*, 383 U.S. 663, 668 (1966). In that case, the Supreme Court relied on *Griffin* to invalidate a Virginia poll tax. The Court held that a state "violates the Equal Protection Clause of the Fourteenth Amendment whenever it makes the affluence of the voter or payment of any fee an electoral standard." *Id.* at 666. The Court explained: "To introduce wealth or payment of a fee as a measure of a voter's qualifications is to introduce a capricious or irrelevant factor. The degree of the discrimination is irrelevant. In this context—that is, as a condition of obtaining a

119

ballot—the requirement of fee paying causes an 'invidious' discrimination that runs afoul of the Equal Protection Clause." *Id.* at 668 (citation omitted).

Because it applied *Griffin* to voting, *Harper* indicates that heightened scrutiny should apply here. Indeed, in *McDonald v. Board of Election Commissioners of Chicago*, 394 U.S. 802, 807 (1969), the Supreme Court, citing *Harper* and *Douglas*, again confirmed that when it comes to the franchise, "careful examination . . . is especially warranted where lines are drawn on the basis of wealth or race, two factors which would independently render a classification highly suspect and thereby demand a more exacting judicial scrutiny." *See also Bullock v. Carter*, 405 U.S. 134, 144 (1972) (applying heightened scrutiny under *Harper* to evaluate a Texas law requiring candidates to pay a filing fee as a condition to having their name placed on the ballot); *Lubin v. Panish*, 415 U.S. 709, 718 (1974) (holding "that in the absence of reasonable alternative means of ballot access, a State may not, consistent with constitutional standards, require from an indigent candidate filing fees he cannot pay"). If there was any doubt on this point, the Supreme Court reiterated in *M.L.B.* that heightened scrutiny applies to wealth classifications in cases involving "[t]he basic right to participate in political processes as voters and candidates." *M.L.B.*, 519 U.S. at 124. That is the exact situation we have here.[4]

_____

[4] As a full court we have already applied *Harper* to felons and voting in an en banc case. In *Johnson v. Governor of Florida*, 405 F.3d 1214 (11th Cir. 2005) (en banc), felons challenged

The majority seeks to avoid the application of *Harper* by asserting that, unlike the poll tax in that case, the LFO requirement "do[es] not make affluence or the payment of a fee an 'electoral standard.'"  Maj. Op. at 16.  Instead, the majority asserts, the LFO requirement makes completing all terms of a sentence an "electoral standard," which is "highly relevant to voter qualifications."  *Id.*  To support its contention that *Harper* does not apply because the restriction on voting is "directly related to legitimate voter qualifications," the majority relies on *Gonzalez v. Arizona*, 677 F.3d 383, 409 (9th Cir. 2012) (en banc), *aff'd sub nom. Arizona v. Inter Tribunal Council of Az., Inc.*, 570 U.S. 1 (2013), and *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008) (plurality opinion).  *See* Maj. Op. at 16–18.  I don't see how either case supports the majority's position.

In *Crawford*, the Supreme Court addressed whether a state statute requiring citizens voting in-person to present photo identification violated the Fourteenth Amendment.  *See* 553 U.S. at 185.  The identification requirement did not apply to absentee ballots submitted by mail, and the law permitted indigent voters to cast a

---

Florida's then-existing disenfranchisement law.  The law provided that a felon who completed his sentence could apply for clemency to have his civil rights restored.  *See id.* at 1216 n.1.  One of the plaintiffs' claims was that the restoration scheme violated constitutional and statutory prohibitions against poll taxes.  We recognized that "[a]ccess to the franchise cannot be made to depend on an individuals' financial resources."  *Id.* (citing *Harper*, 383 U.S. at 668).  We affirmed the district court's grant of summary judgment for the defendants on these claims, but that was "[b]ecause Florida [did] not deny access to the restoration of the franchise based on ability to pay[.]"  *Id.*  "Under Florida Rules of Executive Clemency, . . . the right to vote can still be granted to felons who cannot afford to pay restitution."  *Id.*

provisional ballot.  *See id.* at 186.  A plurality of the Court stated that, under *Harper*, any burden on voters "must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Id.* at 191 (citation and internal quotation marks omitted).  In upholding the statute, the plurality explained that it served legitimate state interests—including preventing voter fraud and protecting public confidence in elections—and did not impose a substantial burden on voters. *See id.* at 191–200.  Importantly, however, the plurality also said the following: "The fact that most voters already possess a valid driver's license, or some other form of acceptable identification, would not save the statute under our reasoning in *Harper*, if the State required voters to pay a tax or a fee to obtain a new photo identification." *Id.* at 198.  That possibility was not a problem in *Crawford* because the state issued photo identification cards for free.  *See id.*  The plurality further noted that "the record says virtually nothing about the difficulties faced by . . . indigent voters," so the impact the statute would have on that group was unclear. *See id.* at 201.

Similarly, in *Gonzalez* the Ninth Circuit upheld a state law that required voters to show identification to cast a ballot at the polls.  *See* 677 F.3d at 408–10.  It concluded that "[r]equiring voters to provide documents proving their identity is not an invidious classification based on impermissible standards of wealth or affluence, even if some individuals have to pay to obtain the documents," because under

*Crawford*, the benefits of the law were significant, and "the burden is minimal[.]" *See id.* at 409–410.

Here, in contrast, the LFO requirement is not an identification measure designed to prevent voter fraud or restore the integrity of the electoral process. And the LFOs at issue do not pose a "minimal" burden on felons who wish to vote. The record instead reflects, and the district court found, that hundreds of thousands of felons would be eligible to vote but for their inability to pay LFOs. *See Jones II*, 2020 WL 2618062, at *1 ("Florida has adopted a system under which nearly a million otherwise-eligible citizens will be allowed to vote only if they pay an amount of money."). As in *Harper*, the LFO requirement makes "affluence" the electoral standard, even though "[v]oter qualifications have no relation to wealth[.]" *Harper*, 383 U.S. at 666. Given the importance of voting in our political system, *Harper*, *Griffin*, and *Bearden* call for heightened scrutiny. *Cf.* John Hart Ely, Democracy and Distrust 87 (1980) (advocating a "participation-oriented" and "representation-reinforcing" approach to judicial review).

## 2

Heightened scrutiny also applies for another reason—the right to vote is indisputably fundamental. *See, e.g., Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886) (voting "is regarded as a fundamental political right . . . preservative of all rights"); *Reynolds v. Sims*, 377 U.S. 533, 561–62 (1964) ("Undoubtedly, the right of suffrage

is a fundamental matter in a free and democratic society.").  And even if voting is not fundamental for felons who are re-enfranchised, it is certainly a critically important right that demands a searching analysis.

The majority contends that felons do not have a fundamental right to vote because felon disenfranchisement is permitted under *Richardson v. Ramirez*, 418 U.S. 24 (1974).  *See* Maj. Op. at 11–12.  That contention is too simplistic, and "amounts to an analytical trick."  Ann Cammett, *Shadow Citizens: Felony Disenfranchisement and the Criminalization of Debt*, 117 Penn. St. L. Rev. 349, 396 (2012).  Although *Richardson* interpreted § 2 of the Fourteenth Amendment to permit states to disenfranchise felons, *see* 418 U.S. at 54, it did not address what level of scrutiny would or should apply if a state chose to re-enfranchise felons but conditioned re-enfranchisement on their ability to pay LFOs. *See id*. at 56. *Richardson* cannot control an issue it did not confront (or even discuss).  *Cf. United States v. Maines*, 20 F.3d 1102, 1104 (10th Cir. 1994) (referring to the right to vote as "fundamental" in the context of  analyzing whether a felon's civil rights have been restored under 18 U.S.C. § 921(a)(20)); *United States v. Bost*, 87 F.3d 1333, 1336 (D.C. Cir. 1996) (same).[5]

---

[5] Three Justices of the Supreme Court have already indicated that they believe the right to vote here is fundamental.  In her dissent from the denial of the plaintiffs' application to vacate the stay we issued, Justice Sotomayor, joined by Justices Ginsburg and Kagan, stated that "[t]his case implicates the 'fundamental political right' to vote." *Raysor v. DeSantis*, -- S. Ct. --, 2020 WL 4006868, at *1 (2020) (Sotomayor, J., dissenting) (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006)).

As we explained in *Jones I*: "[T]he state's ability to *deprive* someone of a profoundly important interest does not change the nature of the right, nor whether it is deserving of heightened scrutiny when access to it is made to depend on wealth." *Jones I*, 950 F.3d at 823. "To the same extent that felons are not entitled to vote, the plaintiffs in *Williams*, *Tate*, and *Bearden* were no longer entitled to their liberty [due to their convictions]. Nevertheless, because the interest in liberty is so important, the [Supreme] Court held that the state could not rely on the plaintiffs' wealth in deciding whether to deprive them of liberty." *Id.* at 822–823. In the words of Chief Justice Alexander of the Washington Supreme Court:

> Although freedom is a fundamental right, it is recognized that freedom can be taken away as punishment for a felony. However, once all of the assigned punishment has been imposed, except for the payment of financial obligations, failure to pay those financial obligations cannot be used to continue depriving felons of their freedom. Freedom, thus, remains a fundamental right. Just as freedom is a fundamental right, so is the right to vote. . . . [F]elons can be deprived of the right to vote, notwithstanding its fundamental nature, as punishment for a felony. However, voting remains a fundamental right, and when all other conditions of a sentence have been fulfilled, felons cannot be deprived further of their right to vote for failure to pay LFOs.

*Madison v. State*, 163 P.3d 757, 779–80 (Wash. 2007) (Alexander, C.J., dissenting) (citations omitted).

Analytically, it helps to think of felons in states that have not used § 2 of the Fourteenth Amendment to disenfranchise them. Given that § 2's permission to disenfranchise persons convicted of crimes is not self-executing, felons in these

125

states retain a fundamental right to vote because they have never had the franchise taken away from them.  Florida's citizens, through Amendment 4, have restored a fundamental right that had been previously denied to felons through disenfranchisement.  *See* Cherish M. Keller, *Re-Enfranchisement Laws Provide Unequal Treatment: Ex-Felon Re-Enfranchisement and the Fourteenth Amendment*, 81 Chi.-Kent L. Rev. 199, 215–16 (2006) ("[W]hen a state provides a mechanism by which ex-felons can regain the right to vote, then a fundamental right is at stake.").

A long line of Supreme Court cases further establishes that, even when the right to vote is not constitutionally guaranteed—i.e., not fundamental—"once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment." *Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 629 (1969) (quoting *Harper*, 383 U.S. at 665). In *Kramer*, a New York law provided that certain school district residents could vote in an election for school board members only if they owned (or leased) taxable real property within the district, or were parents of children enrolled in the local public schools.  *See id.* at 622.  Even though elections for those positions were not constitutionally required, the Supreme Court invalidated the law under heightened scrutiny, explaining that "[t]he need for exacting judicial scrutiny of statutes distributing the franchise is undiminished simply because, under a different statutory

126

scheme, the offices subject to election might have been filled through appointment."
*Id.* at 628–29.  Once New York chose to provide citizens the right to elect school board members, it had to do so equally and constitutionally.

Cases similar to *Kramer* abound.  *See Cipriano v. Houma*, 395 U.S. 701, 704 (1969) ("[I]f a challenged state statute grants the right to vote in a limited purpose election to some otherwise qualified voters and denies it to others, 'the Court must determine whether the exclusions are necessary to promote a compelling state interest.' . . . [N]o less showing that the exclusions are necessary to promote a compelling state interest is required merely because 'the questions scheduled for the election need not have been submitted to the voters.'") (quoting *Kramer*, 395 U.S. at 627, 629); *McDonald*, 394 U.S. at 807 ("[W]e have held that once the States grant the franchise, they must not do so in a discriminatory manner."); *Evans v. Cornman*, 398 U.S. 419, 422 (1970) ("[T]here can be no doubt at this date that once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment.") (citations and internal quotation marks omitted); *Hill v. Stone*, 421 U.S. 289, 297 (1975) ("[A]ny classification restricting the franchise on grounds other than residence, age, and citizenship cannot stand unless the district or State can demonstrate that the classification serves a compelling state interest.").  So, having given certain felons

the right to vote through Amendment 4, Florida must comply with the Fourteenth Amendment's guarantee of equal protection.

Even if the right to vote were not fundamental in this context, heightened scrutiny would still apply under *Griffin*, as that case did not turn on whether the right to appeal a criminal conviction was constitutionally guaranteed.  Indeed, in *Griffin*, the Supreme Court recognized that the state was not required to provide criminal defendants a right to appellate review of their convictions.  *See Griffin*, 351 U.S. at 18 (citing *McKane*, 153 U.S. at 687–88).  Yet the Court held that once a state grants such a right, it should not be permitted to "do so in a way that discriminates against some convicted defendants on account of their poverty."  *Id.*  So too here.

The other cases that the majority relies on, *see* Maj. Op. at 12–13, are distinguishable because they do not concern the denial of the franchise to felons who are unable to pay LFOs.  For instance, *Shepherd v. Trevino*, 575 F.2d 1110 (5th Cir. 1978), did not involve conditioning the restoration of felons' voting rights on their ability to pay LFOs. Instead, the case addressed a Texas statute which provided a mechanism for the re-enfranchisement of convicted state felons who satisfactorily completed the terms of their probation, without providing a similar mechanism for the re-enfranchisement of successful federal probationers.  *See id.* at 1111.  The former Fifth Circuit declined to apply heightened scrutiny to this classification, explaining that selective re-enfranchisement of felons is permissible under

*Richardson*.  *See id.* at 1114–15.  It also noted, however, that § 2 of the Fourteenth Amendment does not remove all equal protection considerations from state-created classifications denying the right to vote to some felons while granting it to others. *See id.* at 1114 ("No one would contend that section 2 permits a state to disenfranchise all felons and then reenfranchise only those who are, say, white.  Nor can we believe that section 2 would permit a state to make a completely arbitrary distinction between groups of felons with respect to the right to vote.").

Similarly, though *Harvey v. Brewer*, 605 F.3d 1067 (9th Cir. 2010), affirmed the denial of felons' claim that a re-enfranchisement scheme violated equal protection under rational basis review, the Ninth Circuit noted that the "complaint did not allege that any of [the plaintiffs] were incapable of paying the remainder of the money owed under their sentences." *Id.* at 1071.  As Justice O'Connor, writing for the *Harvey* panel, put it: "[N]o plaintiff alleges that he is indigent, so to the extent that fact might affect the analysis, we explicitly do not address challenges based on an individual's indigent status." *Id.* at 1079.  *Harvey* therefore does not speak to the indigency issue before us. *Cf. Hayden v. Paterson*, 594 F.3d 150, 154 (2d Cir. 2010) (analyzing a claim that racial animus motivated the adoption of New York's felon disenfranchisement provisions); *Owens v. Barnes*, 711 F.2d 25, 26 (3d Cir. 1983) (evaluating claim that Pennsylvania's election code violated equal protection by

denying incarcerated convicted felons the right to vote, while permitting

unincarcerated felons to vote).

The only case the majority cites that is truly in conflict with our decision in

*Jones I* is *Johnson v. Bredesen*, 624 F.3d 742 (6th Cir. 2010).  In *Bredesen*, a divided

Sixth Circuit panel rejected an equal protection challenge to a Tennessee voter re-

enfranchisement statute which conditioned restoration of felons' voting rights on the

payment of court-ordered victim restitution and child support obligations.  *See id.* at

746–50.  For two reasons, I submit that the Sixth Circuit's application of rational

basis review is not persuasive.  First, the Sixth Circuit relied on *Richardson* to

conclude that no fundamental right was at stake following re-enfranchisement, *see

id.* at 746, but as discussed above *Richardson* did not decide that issue.  Second, the

Sixth Circuit distinguished *Griffin* by stating that it "concerned fundamental

interests[.]"  *Id.* at 749.  But the Supreme Court acknowledged in *Griffin* that the

right to appellate review of criminal convictions was not constitutionally required or

fundamental, and yet still applied heightened scrutiny.  *See* 351 U.S. at 18.

I would apply heightened scrutiny, just as we did in *Jones I*, and conclude that

Florida's LFO scheme does not survive.  *See Jones I*, 950 F.3d at 825–28.  The *Jones

I* panel's analysis is exhaustive and compelling, and I do not repeat it at length here.

But to summarize, "[t]he form heightened scrutiny took in *Bearden* was comprised

of four considerations: (1) the nature of the individual interest affected; (2) the extent

to which it is affected; (3) the rationality of the connection between legislative means and purpose; and (4) the existence of alternative means for effectuating the purpose." *Id.* at 825 (citations and internal quotation marks admitted).   Voting is an important and weighty interest, even if not deemed fundamental in this context.  *See id.* at 825–26.   That interest is "profoundly affected" here because the LFO requirement completely denies indigent felons the right to vote, at least in any election that occurs while they are indigent.   *See id.* at 826.   And, as I will discuss shortly, the LFO requirement does not rationally serve any conceivable legitimate state interest, and Florida has far better ways to collect felons' debts.  *See id.* at 826–27.[6]

---

[6] As we explained in *Jones I*, indigent felons may terminate their LFOs (1) "[u]pon the payee's approval," (2) upon completing community service hours, if converted by the court, or (3) by a discretionary grant of clemency.  *See Jones I*, 950 F.3d at 826; § 98.0751(2)(a)(5)(d)–(e).   But regaining access to the ballot through these methods is highly unlikely.   As for the first option, neither victims nor collection agencies are likely to agree to forgive felons' debts.  *See Jones I*, 950 F.3d at 826.  Community service conversion is unavailable to felons whose debts have been converted to civil liens and for those with federal convictions, and it could take years to complete community service hours, during which time felons may miss many opportunities to vote.  *See id.* And all three avenues "are entirely discretionary in nature," whereas felons who are able to pay "enjoy near immediate, *automatic* re-enfranchisement as of right."  *Id.*  The Public Defender for Miami-Dade County testified about some of these difficulties at trial, *see* Tr. at 378–81, 412, and the literature supports his testimony.  *See* Carol Gonzalez, *Is the Rising Trend of Voter Restoration Leading to Permanent Disenfranchisement of Felons? Florida Joins the Voter Restoration Trend*, 44 Nova L. Rev. 195, 220 (2020) ("[T]he process of petitioning a judge to convert outstanding LFOs into community service was not laid out in the bill.  As a result, many things are unclear; for instance, whether a lawyer will be needed to petition the judge in order to get the LFOs turned into community service.").   The concurrence suggests that these alternatives make Florida's LFO scheme constitutional, *see* Lagoa Concurrence at 73–74, but the Supreme Court has told us that the state has the burden of showing that such alternatives are "effective" for the exercise of the right in question.  *See Mayer*, 404 U.S. at 195.  Florida has not made any factual showing of effectiveness here.

**B**

Florida contends that the equal protection claim fails because the plaintiffs cannot show that it *purposefully* discriminated against indigent felons.   *See* Appellants' Initial En Banc Br. at 14–19.   The majority does not address this contention, but it is important to show how meritless it is.   The Supreme Court expressly held in *M.L.B.* that such a showing of intent is not required to prevail on a wealth discrimination claim under *Griffin.   See M.L.B.*, 519 U.S. at 126–27.

In *M.L.B.*, the Supreme Court distinguished *Washington v. Davis*, 426 U.S. 229, 232 (1976), which involved an equal protection challenge to the requirement that individuals had to pass a written test to be hired as police officers in Washington, D.C.   *See id.*   Although a greater proportion of black test-takers failed the test than white test-takers, the Court concluded that this disproportionate impact, standing alone, could not prove unconstitutional racial discrimination.   In this context, to establish an equal protection violation, the black test-takers had to show purposeful racial discrimination.   *See id.* at 242.   The Supreme Court explained in *M.L.B.* that cases like *Griffin* and *Williams*, unlike *Davis*, involve laws that are not "merely *disproportionate* in impact.   Rather, they are wholly contingent on one's ability to pay, and thus visit different consequences on two categories of persons."   *M.L.B.*, 519 U.S. at 127 (internal quotation marks and alterations omitted).   Because these laws "apply to all indigents and do not reach anyone outside that class," the Court

concluded that purposeful discrimination need not be shown.  *See id.  See also Jones I*, 950 F.3d at 828 ("[T]he Supreme Court has *never* required proof of discriminatory intent in a wealth discrimination case[.]") (citing cases).[7]

Here, as in *M.L.B.*, *Griffin*, and *Williams*, the LFO requirement makes the restoration of the right to vote contingent on a felon's ability to pay.  In other words, it continues to disenfranchise all indigent felons, while restoring the right to vote to felons who can pay.  Under *M.L.B.*, proof of discriminatory intent is simply not required.

I also note that the Supreme Court has not required a showing of intentional discrimination in other cases involving arbitrary discrimination in the voting/election context.  *See, e.g., Bush v. Gore*, 531 U.S. 98, 104–110 (2000) (determining that Florida's recount procedures conflicted with equal protection without analyzing whether intentional discrimination had been shown); *Harper*, 383 U.S. at 666 (concluding that a state violates equal protection "whenever it makes the affluence of the voter or payment of any fee an electoral standard" without

---

[7] Florida disputes that the LFO requirement precludes all indigent felons from voting, while not reaching non-indigent felons, because a felon who can afford to pay LFOs but chooses not to also will not have his voting rights restored.  *See* Appellants' En Banc Reply Br. at 2. But the same argument could have been made in *M.L.B.*, which involved a Mississippi requirement of paying record preparation fees to appeal an order terminating parental rights.  *See* 519 U.S. at 106–07.  In addition, there is no evidentiary support for Florida's suggestion that non-indigent felons are choosing not to pay LFOs and then seeking to vote.  Indeed, the record reflects that most felons are indigent, and the district court's injunction requires evidence that the felon cannot pay.  *See Jones II*, 2020 WL 2618062, at *45.

addressing purposeful discrimination).  *See also Hunter v. Hamilton Cty. Bd. of Elections*, 635 F.3d 219, 234 n.13 (6th Cir. 2011) (explaining that intentional discrimination need not be shown to establish an equal protection violation regarding an arbitrary method of counting provisional ballots because "a showing of intentional discrimination has not been required in these cases").  This case does not involve the inconsistent counting of ballots, but it does involve the arbitrary and "unguided differential treatment" of potential voters, *see id.* at 238, even among those felons seeking to pay their LFOs.

## C

Though I would review the LFO requirement under heightened scrutiny, my bottom-line position does not turn on what level of scrutiny applies.  Even under rational basis review, the district court correctly held that the LFO requirement violates equal protection.  *See Jones II*, 2020 WL 2618062, at *15–26.

## 1

As every student of constitutional law knows, the Supreme Court has not always applied rational basis review with the same level of "bite."  *See, e.g.*, Laurence Tribe, American Constitutional Law § 16-5, at 999–1000 (1978); Jeffrey D. Jackson, *Classical Rational Basis and the Right to be Free of Arbitrary Legislation*, 14 Geo. J.L. & Pub. Pol'y 493, 508 (2016).  The more important the interest at stake, the more demanding rational basis review becomes.  *Compare, e.g.*,

*F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313–15 (1993) ("In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge[s] if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."), *with, e.g.*, *Zobel v. Williams*, 457 U.S. 55, 65 (1982) (holding that Alaska statutory scheme which distributed income derived from its natural resources based on the length of each citizen's residence violated the equal protection clause under rational basis review because Alaska "show[ed] no valid state interests which are rationally served by the distinction it makes between citizens who established residence before 1959 and those who have become residents since then").

The majority applies the most deferential form of rational basis review. *See* Maj. Op. at 22–30. But if heightened scrutiny does not apply under the *Griffin-Bearden-Harper* line of cases, the fact that voting rights are being denied due to indigency at least warrants a more exacting form of rational basis review. The right to vote—even if not considered fundamental for felons who are re-enfranchised—is certainly an important one in our democracy, and it should not be lumped together with other state-created benefits that lack similar institutional significance.

The majority also says—incorrectly I think—that an as-applied challenge is inappropriate under rational basis review. *See* Maj. Op. at 28–29. In *Cleburne v.*

*Cleburne Living Center*, 473 U.S. 432, 446–50 (1985), the Supreme Court reviewed, under rational basis, a zoning ordinance that required a special use permit for the operation of a group home for the mentally disabled.   It found the ordinance unconstitutional "as applied" in that case.   *See id.* at 447 (stating that reviewing the zoning ordinance as applied "is the preferred course of adjudication since it enables courts to avoid making unnecessarily broad constitutional judgments").   The majority may not like *Cleburne*, but it is not for us to choose which Supreme Court cases we are bound by.   "When dealing with binding vertical precedent, a court has no room to decide how much weight or value to give each case."   Bryan A. Garner et al., The Law of Judicial Precedent § 15, at 155 (2016).[8]

Reviewing statutes as applied to indigents, moreover, seems to be typical in wealth discrimination cases where due process and equal protection guarantees intersect.   For instance, in *Griffin*, the Supreme Court evaluated whether a state statute requiring defendants to pay for transcripts needed for an appeal could be applied "so as to deny adequate appellate review to the poor while granting such review to all others."   *See* 351 U.S. at 13.   It did not (as the majority would have us do here) ask whether a state may require payment for transcripts generally.

---

[8] The majority says that *Cleburne* did not focus on the "particular disabled people involved in the appeal," but on "the mentally retarded *as a group*."   Maj. Op. at 29.   But here, similarly, the district court examined how the LFO requirement applies to indigents as a group and did not simply focus on the unique circumstances of the specific plaintiffs.   Recall that the district court certified a sub-class comprised of felons "who would be eligible to vote in Florida but for unpaid [LFOs] that [they] assert[ ] [they are] genuinely unable to pay."   D.E. 321 at 18.

And *Griffin* is not an outlier.  In other indigency cases the Supreme Court has not struck down statutes that require payment on their face; it has instead told states that in applying these requirements they must account for those who cannot pay.  *See Boddie*, 401 U.S. at 372–73 (reviewing a challenge to state procedures requiring payment of fees and costs to bring an action for divorce "as applied" to the plaintiffs who were unable to pay the fees); *Mayer*, 404 U.S. at 195 (emphasizing that "the State must provide a full verbatim record *where that is necessary to assure the indigent* as effective an appeal would be available to the defendant with resources to pay his own way") (emphasis added); *M.L.B.*, 519 U.S. 107 (holding that the state "may not deny M.L.B., *because of her poverty*, appellate review of the sufficiency of the evidence on which the trial court found her unfit to remain a parent") (emphasis added).  The district court therefore did not err in reviewing the LFO requirement as applied to individuals who are unable to pay.  *See Jones II*, 2020 WL 2618062, at *26.

In addition, we explained in *Jones I* that even if we do not evaluate the rationality of a statute "as applied" to the plaintiffs who were indigent, the focus of rational basis review is on the "typical" or "mine-run" member of the affected class. *See Jones I*, 950 F.3d at 814–17.  That principle, rather than misstating rational basis precedent, comes directly from the Supreme Court's decision in *Califano v. Jobst*, 434 U.S. 47, 55 (1977): "The broad legislative classification must be judged by

reference to the characteristics typical of the affected classes rather than by focusing on selected, atypical examples." *See also Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 315–17 (1976) (discussed in *Jones I*, 950 F.3d at 814–815).  And it picks up on Florida's implicit concession in *Jones I* that the LFO scheme could fail rational basis review if there was "evidence that felons unable to pay their [LFOs] vastly outnumber those able to pay."  Appellants' Initial Br. in *Jones I* at 29 (citing *Jobst* and *Murgia*).

The district court found "that the mine-run of felons affected by the pay-to-vote requirement are genuinely unable to pay," *Jones II*, 2020 WL 2618062, at *16, and Florida does not challenge this finding on appeal.  Though the majority says a "substantial number" of felons being unable to pay LFOs does not make the scheme irrational, *see* Maj. Op. at 30, the district court found that "the *overwhelming majority* of felons who have not paid their LFOs in full, but who are otherwise eligible to vote, are genuinely unable to pay[.]"  *Jones II*, 2020 WL 2618062, at *16 (emphasis added).  How can a system that seeks to encourage felons to pay LFOs be rational if the vast majority are simply *unable* to pay?

## 2

Rational basis review is deferential to government action, but it is not "toothless." *Schweiker v. Wilson*, 450 U.S. 221, 234 (1981).  Under the rational basis standard, a law that distinguishes between different groups does not violate

equal protection if "there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 366–67 (2001).  The rational basis test thus has two prongs: (1) the law must further a legitimate state interest; *and* (2) there must be "a rational relationship between the government's objective and the means it has chosen to achieve it." *Leib v. Hillsborough Cty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1306 (11th Cir. 2009).

In its earliest equal protection cases applying rational basis review, the Supreme Court expounded on the second prong.  For example, in *Gulf, C. & S.F. Ry. Co. v. Ellis*, 165 U.S. 150, 153 (1897), the Supreme Court reviewed an equal protection challenge to an act that required railroad companies to pay attorney's fees if they lost, but did not award them attorney's fees if they prevailed.  The Supreme Court explained that if a state law creates a classification, it must be "one based upon some reasonable ground—some difference which bears a just and proper relation to the attempted classification—and is not a mere arbitrary selection." *Id.* at 165–66.  Thus, a state "may not say that all men beyond a certain age shall be alone thus subjected [to the payment of attorney's fees], *or all men possessed of a certain wealth*," as "[t]hese are distinctions which do not furnish any proper basis for the attempted classification." *Id.* at 155 (emphasis added). *See also Atchison, T. & S.F.R. Co. v. Matthews*, 174 U.S. 96, 105 (1899) ("Is the classification or

discrimination prescribed thereby purely arbitrary, or has it some basis in that which has a reasonable relation to the object sought to be accomplished?").

Over the years, the Supreme Court has repeatedly emphasized that, even under rational basis review, there must be some reasonable relationship between the state's goal and the means chosen to achieve it. *See, e.g.*, *Bullock*, 405 U.S. at 145 ("[E]ven under conventional standards of review, a State cannot achieve its objectives by totally arbitrary means; the criterion for differing treatment must bear some relevance to the object of the legislation."); *Romer v. Evans*, 517 U.S. 620, 632 (1996) ("[E]ven in the ordinary equal protection case calling for the most deferential of standards, we insist on knowing the relation between the classification adopted and the object to be attained."); *Armor v. Indianapolis*, 566 U.S. 673, 681 (2012) (stating that a law will survive rational basis review if "the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational") (citation and internal quotation marks omitted). Florida asserts that it has an interest in ensuring "that *all* felons complete *all* terms of sentence to repay their debt to society," or in other words, "in enforcing the punishments it has imposed for violations of its criminal laws." Appellants' Initial En Banc Br. at 35. *See also id.* at 38 (describing the state's interest "in demanding a full measure of justice from every felon"). The majority somewhat re-frames Florida's goals, stating that "two interests are relevant here": Florida's "interest in disenfranchising

140

convicted felons" and its related "interest in *restoring* felons to the electorate after justice has been done and they have been fully rehabilitated[.]"  Maj. Op. at 22–23.

Disenfranchising felons, however, is not the goal of Amendment 4.  Quite the opposite, Amendment 4 automatically restored voting rights to felons who completed all the terms of their sentences.  *See Advisory Op. to the Att'y Gen. Re: Voting Restoration Amendment*, 215 So. 3d 1202, 1208 (Fla. 2017) ("[T]he chief purpose of the amendment is to automatically restore voting rights to felony offenders[.]").  Nor was disenfranchisement the purpose of § 98.0751, which implemented Amendment 4 and is titled "Restoration of voting rights; termination of ineligibility subsequent to a felony conviction."  Framing Florida's goal as *re-enfranchising* felons who have completed the terms of their sentences is an *ipse dixit*—it merely restates what the law does, rather than provide an interest furthered by the LFO requirement.

For the sake of argument, however, let's assume the legitimacy of each of the asserted state interests.  If we do that, "[t]he only remaining question is whether [Florida] achieved its purpose in a patently arbitrary or irrational way."  *U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 177 (1980).  In my view, the answer to that question is yes.

I will start with whether the LFO requirement rationally furthers the goals articulated by the majority.  Though Florida may disenfranchise felons under

*Richardson*, or choose to re-enfranchise only some felons, it cannot draw arbitrary lines between those felons it re-enfranchises and those it does not.  *See Shepherd*, 575 F.2d at 1114 ("Nor can we believe that section 2 would permit a state to make a completely arbitrary distinction between groups of felons with respect to the right to vote."); *Harvey*, 605 F.3d at 1079 ("[A] state could not choose to re-enfranchise voters of only one particular race . . ., or re-enfranchise only those felons who are more than six-feet tall.").

In *Harvey*, the Ninth Circuit concluded that a state "has a rational basis for restoring voting rights only to those felons who have completed the terms of their sentences, which includes the payment of any fines or restitution orders."  605 F.3d at 1079.  But as previously noted Justice O'Connor, writing for the panel, cautioned that "[p]erhaps withholding voting rights from those who are truly unable to pay their criminal fines due to indigency would not pass the rational basis test, but we do not address that possibility because no plaintiff in this case has alleged he is indigent." *Id.* at 1080.

Re-enfranchising felons who complete the terms of their sentences—except for those who are *unable* to pay LFOs—"amounts to nothing 'more than a naked assertion that [a felon's] poverty by itself,' is a sufficient reason to disqualify the felon from regaining the right to participate in the exercise of democracy." *Bredesen*, 624 F.3d at 758 (Moore, J., dissenting) (quoting *Bearden*, 461 U.S. at

671).  *See* Marc Meredith & Michael Morse, *Discretionary Disenfranchisement: The Case of Legal Financial Obligations*, 46 J. Legal Stud. 309, 311 (2017) ("Although less-wealthy individuals are not a suspect class, conditioning the restoration of the right to vote on LFOs without evaluating whether someone is truly unable to pay might not even satisfy a rational basis test.").  The majority bases its entire rational basis analysis on the proposition that felons cannot intelligently exercise the franchise—the right to vote—unless they have fully paid their LFOs.  *See* Maj. Op. at 25.  But as *Harper* teaches, a felon's wealth has no bearing on whether he is qualified to vote.  *See Harper*, 383 U.S. at 668 ("To introduce wealth or payment of a fee as a measure of voter's qualifications is to introduce a capricious or irrelevant factor.  The degree of the discrimination is irrelevant.  In this context—that is, as a condition of obtaining a ballot—the requirement of fee paying causes an 'invidious' discrimination that runs afoul of the Equal Protection Clause.") (citation omitted).  The notion that the indigent cannot be rehabilitated due solely to their inability to pay is non-sensical.

Critically, the fact that Florida had restored voting rights to 0 felons as of the time of trial indicates that this scheme does not "rationally" further the goal of re-enfranchising felons.  Instead, it shows that Florida's organs of government are doing their best to slowly but surely suffocate Amendment 4.

The majority says that even though their registrations have not been screened, "all 85,000 [registered] felons will be entitled to vote."  Maj. Op. at 5, 27.  It also seems to suggest that felons may go ahead and register, as "[o]nce a felon submits a facially complete registration form . . ., he is added to the voting rolls as a registered voter; he is not then required to prove that he has completed his sentence."  *Id.* at 26.  But these statements overlook the critical fact that Florida has kept tens of thousands of felons in voting limbo, not knowing their LFO status (and therefore not knowing their eligibility to vote).

Should felons choose to vote after registering, and then later find out that they are not in fact eligible to vote, they may be subject to prosecution.  Even the Director of the Division of Elections acknowledged at trial that if she "were in the voter's position, [she doesn't] know that [she] would be swearing under oath if [she] wasn't sure about" her eligibility.  *See* Tr. at 1381.  She agreed that requiring felons to affirm their eligibility to vote in their registration forms "is certainly a challenge . . . and that's why [the Division] offered up the advisory opinion, to see if that would give them some cover."  *Id.*  To make matters more treacherous for felons, there is no good-faith safe harbor to protect those who register and vote, but later turn out to be mistaken about their eligibility.  *See Jones II*, 2020 WL 2618062, at *25 ("SB7066 provides immunity from prosecution for those who registered in good faith between January 8, 2019, when Amendment 4 took effect, and July 1, 2019, when SB7066

144

took effect.  A proposal to add a good-faith provision for other registrants was rejected.").

Unlike the majority, Florida does not assert that felons should go ahead and vote once they register, instead arguing that it "has an interest in avoiding having felons presumed eligible to vote before an investigation can reasonably be completed, as that would pose a substantial risk of authorizing *ineligible* felons to vote." Appellants' En Banc Reply Br. at 32.  If the majority's suggestion that felons can simply vote once they register (without knowing whether they have actually satisfied their LFO requirements) were accurate, that would belie Florida's contention (adopted by the majority) that the purpose of the LFO-requirement is to ensure that felons cannot vote until they complete all terms of their sentences.[9]

### 3

Florida, as noted, maintains that the LFO scheme advances its interest in "*all* felons complet[ing] *all* terms of sentence," or in enforcing the punishments it imposes.  *See* Appellants' Initial En Banc Br. at 35.  To the extent that Florida's interest is in punishment, as we explained in *Jones I*, the LFO scheme punishes indigent felons "more harshly than those who committed precisely the same crime.

---

[9] The majority's statement that "Florida ha[s] not yet been able to find information justifying the removal of *any* of them from the voting rolls," Maj. Op. at 27, is also misleading. Florida has not even started implementing the LFO screening process, *see* Tr. at 1236, even though Amendment 4 was enacted in 2018.

. . . And this punishment is linked not to their culpability, but rather to the exogenous fact of their wealth." *Jones I*, 950 F.3d at 812.  This cannot be rational.

If Florida's interest is in felons repaying their full debts to society, requiring indigent felons to pay LFOs before regaining the right to vote does not actually aid in collections.  *See id.* at 811 ("The problem with the incentive-collections theory is that it relies on the notion that the destitute would only, with the prospect of being able to vote, begin to scratch and claw for every penny, ignoring the far more powerful incentives that already exist for them—like putting food on the table, a roof over their heads, and clothes on their backs."); *Jones II*, 2020 WL 2618062, at *26 ("[O]ne cannot get blood from a turnip or money from a person unable to pay."). The LFO requirement thus erects a barrier to voting for the indigent, "without delivering any money [to the state or to victims] at all[.]" *Zablocki v. Redhail*, 434 U.S. 374, 389–91 (1978) (invalidating a state statute that required an individual to show he had satisfied court-ordered child support before being able to marry).  *See also Bredesen*, 624 F.3d at 756 (Moore, J., dissenting) ("I fail to see how preconditioning suffrage on a payment that a person is unable to make is in any rational way related to the government's interest in promoting that payment.").

In addition, Florida "has far better ways to collect amounts it is owed." *Jones II*, 2020 WL 2618062, at *26.  In *United States Department of Agriculture v. Moreno*, 413 U.S. 528, 529 (1973), the Supreme Court invalidated—under rational

basis review—a provision of the Food Stamp Act which permitted individuals who live in households where everyone is related to obtain food stamps, but denied food stamps to those who live in households where at least one person is unrelated. Although the government argued that this scheme would minimize fraud in the administration of the food stamp program—a seemingly unassailable contention under rational basis review—the Supreme Court found that the existence of other provisions aimed specifically at preventing fraud cast doubt on that goal. *See id.* at 536–37. The Supreme Court also explained that "in practical effect, the challenged classification simply does not operate so as to rationally further the prevention of fraud." *Id.* at 537. If the scheme in *Moreno* was found constitutionally wanting, Florida's LFO requirement does not stand a chance of surviving.

Here, as in *Moreno*, other statutes aimed at collecting LFOs cast doubt on Florida's purported goal. *See, e.g.*, Fla. Stat. § 28.246(6) (authorizing the clerk of court to pursue the collection of financial obligations by referring the account to a private attorney or collection agent); Fla. Stat. § 938.35 (authorizing a board of county commissioners or governing body of a municipality to refer the collection of fees, fines, or costs to which it is entitled to a private attorney or collection agent); Fla. Stat. § 775.089(12)(a) (authorizing the court to enter an income deduction order to make deductions from income paid to the defendant to meet the defendant's restitution obligations). And felons are required by law to pay all of their outstanding

LFOs whether or not their voting rights are restored.  Those LFOs are not wiped out if indigent felons are allowed to vote.

Moreover, "in practical effect" the LFO requirement does not rationally further Florida's asserted goal.  *See Moreno*, 413 U.S. at 537.  The district court's undisputed factual findings show that Florida often cannot tell felons how much they owe.  If Florida cannot inform felons about the amount of LFOs they have outstanding—information which they must have in order to satisfy their obligations—how can this system possibly encourage or incentivize felons to complete the terms of their sentences?  There is no answer, because no answer is possible.

Florida's newly-minted every-dollar method—created, I think, for this litigation—also undermines the claimed goal of requiring that every felon complete all terms of his sentence, as it allows a felon to regain the right to vote without actually satisfying his LFOs.  As discussed earlier, under the every-dollar method, a felon need not pay all of his underlying LFOs, so long as the amount of payments made towards fees and surcharges equals or exceeds the amount of LFOs initially ordered.  This could, in some cases, lead to a victim receiving less than the full amount of restitution ordered, or Florida receiving less than the fines, fees, and costs imposed.  *See* Tr. at 1359.  Florida says that the every-dollar policy "promotes administrability by making it easier to track felon payments while demanding that

148

felons pay the monetary amounts set forth in their sentencing document before regaining eligibility to vote."  Appellants' En Banc Reply Br. at 16.  But the district court's unchallenged factual findings establish that it does just the opposite, given that county records routinely show only the net payment received from collections agencies, making it extremely difficult (if not impossible) to calculate the amount that felons have already paid under this approach.

Florida further claims that it is "treating all felons equally, regardless of financial circumstance," by requiring that all felons pay their LFOs before regaining the right to vote.  *See* Appellants' Initial En Banc Br. at 35.  But, in effect, the LFO requirement precludes indigent felons from voting, while re-enfranchising those felons who can pay—the antithesis of equal treatment.  A system that permits non-indigent felons to regain the right to vote, while continuing to disenfranchise indigent felons, cannot be rational.  *Cf. Bredesen*, 624 F.3d at 759 (Moore, J., dissenting) ("Because the Plaintiffs are otherwise eligible for the automatic restoration of the right to vote but are prevented from attaining that right because of their inability to pay a sum, the Tennessee statute effectively sets affluence as a voting qualification and is plainly irrational.").

Two decades ago, the Supreme Court explained in *Bush* that "[t]he right to vote is protected in more than the initial allocation of the franchise.  Equal protection applies as well to the manner of its exercise."  531 U.S. at 104.  The Supreme Court

held in that momentous case that the recount mechanisms Florida implemented during the 2000 election did not "satisfy the minimum requirement for nonarbitrary treatment of voters" because of "the absence of specific standards to ensure its equal application." *Id.* at 105–06. "The formulation of uniform rules" was necessary because "the standards for accepting or rejecting contested ballots might vary not only from county to county but indeed within a single county from one recount team to another." *Id.* at 106. It is not too much to demand the same here. "The idea that every voter is equal to every other voter in his State," *Gray v. Sanders*, 372 U.S. 368, 380 (1963), applies to felons and non-felons alike. *See id.* at 380–81 ("Minors, felons, and other classes may be excluded [from voting]. But once the class of voters is chosen and their qualifications specified, we see no constitutional way by which equality of voting power may be evaded.") (citation omitted).

In Florida, whether a felon is deemed eligible to vote may vary county by county, depending on which Supervisor of Elections reviews a felon's registration. This is because the Division of Elections has not provided any guidance whatsoever to Supervisors of Elections on how to implement the LFO requirement, *see* Tr. at 474, 476, and there is confusion about how to determine how much a felon owes— with different officials following different methods. *See Jones*, 2020 WL 2618062, at *19 (noting that "one Supervisor of Elections testified she had never heard of the [every-dollar] method the State now embraces"). As one County Supervisor of

Elections testified, "usually the Division of Elections writes a rule to help us implement the law.  Rules are very important because they make sure that all 67 of us are treating our voters basically in the same manner."  Tr. at 474.  Yet after the passage of § 98.0751, Florida has issued no new rules for implementing the LFO requirement.  *See id.*  "This is not a process with sufficient guarantees of equal treatment."  *Bush*, 531 U.S. at 107.

To recap, Florida has effectively disenfranchised almost the entire class of felons who were given the right to vote by Amendment 4.  And it has done so by means that bear no rational relationship to the goals it seeks to achieve.

## III

The majority says that the district court did not decide whether Florida's re-enfranchisement scheme violates the Due Process Clause.  *See* Maj. Op. at 8, 52.  In my view, the district court concluded that the LFO requirement violates due process: "The requirement to pay, as a condition of voting, amounts that are unknown and cannot be determined with diligence is unconstitutional."  *Jones II*, 2020 WL 2618062, at *44.  This is a due process holding—not an equal protection holding—as it does not rest on differential treatment of those who are unable to pay, but on Florida's failure to give felons adequate notice or information on how to satisfy the terms of their sentences.

The district court got it right.  The LFO requirement violates due process because Florida does not provide felons with adequate notice of their eligibility to vote.  Contrary to the majority's assertion, *see* Maj. Op. at 56–58, the LFO requirement is not merely "legislative," and it is subject to a procedural due process challenge.  Figuring out whether felons have paid their LFOs is adjudicative, for the Division of Elections is tasked with both conducting an individualized assessment of a felon's LFOs and determining whether they have been satisfied.

Finally, § 98.0751 is unconstitutionally vague.  It does not provide sufficient standards for how to determine whether a felon has satisfied the LFO requirement, resulting in arbitrary application.

## A

"The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property[.]"  *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005).  Our analysis under the Due Process Clause "proceeds in two steps: We first ask whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the procedures followed by the State were constitutionally sufficient."  *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011).

"A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' . . . or it may arise from an expectation or interest created by state laws or policies."  *Wilkinson*, 545 U.S. at 221 (citations

omitted).  The right to vote creates a fundamental liberty interest.  *See, e.g.*, *Harper*, 383 U.S. at 670 ("[T]he right to vote is too precious, too fundamental to be so burdened or conditioned."); *Reynolds*, 377 U.S. at 554 ("Undeniably the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections."); Cook *v. Randolph Cty.*, 573 F.3d 1143, 1152 (11th Cir. 2009) ("The Constitution certainly protects the right to vote."); *Doe v. Rowe*, 156 F. Supp. 2d 35, 47–48 (D. Me. 2001) ("[V]arious courts have recognized that the fundamental nature of the right to vote gives rise to a liberty interest entitled to due process protection.") (citing cases).

Though the Constitution permits states to disenfranchise felons, *see Richardson*, 418 U.S. at 54, Florida's citizens chose through Amendment 4 to provide a right to vote for felons who have completed all terms of their sentences, thereby creating a liberty interest.  And when a state chooses to create a liberty interest, "the Due Process Clause requires fair procedures for its vindication." *Swarthout*, 562 U.S. at 220 ("There is no right under the Federal Constitution to be conditionally released before the expiration of a valid sentence, and the States are under no duty to offer parole to their prisoners.  When, however, a State creates a liberty interest, the Due Process Clause requires fair procedures for its vindication— and federal courts will review the application of those constitutionally required procedures.").  *See also Wolff v. McDonnell*, 418 U.S. 539, 558 (1974) ("We think

153

a person's liberty is equally protected, even when the liberty itself is a statutory creation of the State."); *Bell v. Burson*, 402 U.S. 535, 539 (1971) (repeating "the general proposition" that the Due Process Clause "limit[s] state power to terminate an entitlement whether the entitlement is denominated a 'right' or a 'privilege'"); *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1338 (N.D. Ga. 2018) ("Having created an absentee voter regime through which qualified voters can exercise their fundamental right to vote, the State must now provide absentee voters with constitutionally adequate due process protection.").[10]

Before a state can deprive a person of a liberty or property interest, due process obligates it to provide him with adequate notice.  *See, e.g.*, *Snyder v. Massachusetts*, 291 U.S. 97, 127 (1934) ("It is fundamental that there can be no due process without reasonable notice and a fair hearing."), *overruled in part on other grounds by Malloy v. Hogan*, 378 U.S. 1 (1964).  That notice must "apprise the

---

[10] Though the majority "assume[s] that the right to vote is a liberty interest protected by the Due Process Clause," it cites *Johnson v. Hood*, 430 F.2d 610, 612 (5th Cir. 1970), to suggest that the right to vote in a state election is not a right secured by the Due Process Clause.  *See* Maj. Op. at 56.  *Johnson* is not germane for a couple of reasons.  First, unlike *Johnson*, this case involves the right to vote in *both* federal and state elections.  Second, we later held in *Duncan v. Poythress*, 657 F.2d 691, 700 (5th Cir. Unit B Sept. 28, 1981), that "the due process clause of the fourteenth amendment prohibits action by state officials which seriously undermine the fundamental fairness of the electoral process."  We explained that *Johnson* "involved [a] garden variety challenge[ ] to the manner in which ballots were counted by state election officials"; it did not concern "fundamentally unfair election practices or purposeful conduct which threatened the democratic system."  *Id.* at 704.  Thus, we declined to read *Johnson* "as precluding federal relief in th[e] very different case of a fundamental breakdown of the democratic system."  *Id.*  The plaintiffs here do not bring a "garden variety" challenge to the method in which ballots are counted, but instead assert a lack of adequate procedures to inform them of their eligibility to vote.  *Johnson* is therefore inapplicable.

affected individual of, and permit adequate preparation for, an impending 'hearing.'"

*Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 14–15 (1978) (holding that notice that a utility bill was overdue and that service would be disconnected unless payment was made by a certain date violated due process because it "[d]id not advise the customer of the availability of a procedure for protesting a proposed termination of utility service as unjustified").  *See also Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) ("The notice must be of such nature as reasonably to convey the required information[.]"); *Armstrong v. Manzo*, 380 U.S. 545, 550 (1965) ("[A]n elementary and fundamental requirement of due process . . . is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.").

A Florida statute, § 98.075(7), outlines the procedures for removal from the voter rolls, including notice of the registered voter's ineligibility and an opportunity to request a hearing.  But these procedures fall constitutionally short for several reasons.

First, the procedures set forth in § 98.075(7) do not come into play until *after* the Division of Elections begins to screen registrants, determines that they are ineligible to vote, and seeks to remove them from the voter rolls.  As the district court found, and Florida does not contest, the Division of Elections has processed 0

out of 85,000 pending registrations of felons.  So, for those 85,000 registrants—and all those who will surely follow—the statutory requirement of notice and a hearing is completely illusory.  Those appalling numbers, unfortunately, mean nothing to Florida or to the majority.

Second, should any of these 85,000 registrants choose to vote in the upcoming election—as they may believe, in good faith, they have a right to do—they risk criminal prosecution if they turn out to be wrong about their eligibility.  Given Florida's lack of clarity regarding how to calculate outstanding LFOs, this will surely be the case for at least some felons.  The truth is that many of these registrants will not vote to avoid the risk of prosecution, even if they are in fact eligible, creating a de facto denial of the franchise.  *See N.A.A.C.P. v. Button*, 371 U.S. 415, 433 (1963) ("The threat of sanctions may deter their exercise almost as potently as the actual application of sanctions.").  Florida ignores this reality, and the majority is blind to it.

Third, there is no procedure for a felon to determine his eligibility to vote *before* registering—even though the voter registration form requires registrants to sign an oath affirming that they are qualified to vote.  Florida says that felons who wish to vote may access their records through the county clerk's office or call clerks to obtain information.  *See* Appellants' Initial En Banc Br. at 54.  But the record belies that claim, and reflects that such inquiries are usually fruitless.  As discussed

earlier, the evidence at trial showed that the state's records are often inconsistent or incomplete, clerks are often unhelpful, counties do not maintain records of payments (including collection or payment plan fees), and the state often maintains no records of restitution.  Two County Supervisors of Elections testified that there is no reliable database that voters can use to check all the different LFOs they may owe.  And even if some records are available, Florida's own witnesses can't say whether the actual-balance method, or the every-dollar method, should be used to determine the amount of LFOs outstanding.  Understandably, the district court found that "[t]rying to obtain accurate information" by contacting the supervisor of elections or clerk of court "will almost never work."  *Jones II*, 2020 WL 2618062, at *17.

Fourth, if a felon registers based on the belief that he is eligible to vote, and then turns out to be wrong, he may be prosecuted for making a false affirmation in connection with voting.  Florida downplays this risk, proclaiming that felons should rest assured that they will not be convicted if they registered in good faith because willfulness must be shown to prove a violation of Fla. Stat. § 104.011.  But that comforting assurance—tactically made for an advantage in litigation—is useless, as it does not tell us how the state's prosecutors will choose to prosecute possible or alleged violations of the law.  *Cf. Stenberg v. Carhart*, 530 U.S. 914, 940–41 (2000) (declining to accept the attorney general's "narrowing interpretation" of the state's abortion statute as "authoritative" because it did not bind the state courts or local law

enforcement authorities).  Felons should not have to register in the hope that a jury will later find good faith should they be prosecuted.  *See Morgan v. Wofford*, 472 F.2d 822, 827 (5th Cir. 1973) ("Especially when criminal sanctions may be involved, we have always been careful to surround the procedures through which the state may deprive a defendant of freedom with safeguards against possible miscarriages of justice.").[11]

**B**

The Director of the Division of Elections testified that, to avoid risk of prosecution, a felon may request an advisory opinion.  Under Fla. Stat. § 106.23(2), any person who relies on an advisory opinion in good faith will be immune from prosecution.  But that statute does not make clear that the advisory opinion process is available to any individual with questions about his or her eligibility to vote.  *See* § 106.23(2) ("The Division of Elections shall provide advisory opinions when requested by any supervisor of elections, candidate, local officer having election-related duties, political party, affiliated party committee, political committee, or other person or organization engaged in political activity, relating to any provisions or possible violations of Florida election laws . . . .").  The statute, moreover, sets no time frame for when the Division must provide an advisory opinion.  *See id.*

---

[11] And, as noted earlier, the Florida Legislature rejected a proposal to add a good-faith safe harbor to SB7066.  *See Jones II*, 2020 WL 2618062, at *25.

Tellingly, the Director could not say how long it would take to obtain an advisory opinion, other than to generally state that it could take a week or months. *See* Tr. at 1387–89.  To make matters worse, the Division's own website does not provide guidance on what a request for an advisory opinion should include. *See id.* at 1393. Florida's lack of good faith in the 18 months since the passage of Amendment 4 is undeniable and palpable.  What Florida is really unhappy about is that the district court's advisory opinion process will actually require it to work, to do its job, within a specified time-frame.

Although it was the Director of the Division of Elections who suggested the advisory opinion procedure at trial, Florida now incredibly argues that "[t]he district court offered no legal basis for charging *the State* with the responsibility of providing felons with information about their own unfulfilled criminal sentences and any payments that they themselves have made toward them."  Appellants' Initial En Banc Br. at 53.  The majority seems to adopt this argument, stating that the Due Process Clause does not make Florida responsible for "locating and providing felons with the *facts* necessary to determine whether they have completed their financial terms of sentence."  Maj. Op. at 59.

This is a remarkable holding.  I know of no cases (or other authorities) that say or hold that a state can impose a condition for the exercise of a right or privilege, and then refuse to explain to a person what the condition consists of or how to satisfy

it.  To the contrary, §§ 98.075(5) and 98.0751(3)(a)—Florida's own laws—obligate the Division of Elections to make initial eligibility determinations, and §§ 98.075(7) and 98.0751(3)(b) charge County Supervisors of Elections with making the ultimate determination of eligibility.  Federal law likewise requires states to inform applicants of voter eligibility requirements.  *See* 52 U.S.C. § 20507(a)(5)(A).  How can Florida make eligibility determinations without figuring out the amount of LFOs that a felon has outstanding?  Florida cannot choose to condition the right to vote on payment of LFOs and then throw up its hands and refuse to tell potential voters how to fulfill that condition.  "[A] party's ability to take steps to safeguard its interests does not relieve the State of its constitutional obligation."  *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 799 (1983).[12]

To put this in some perspective, imagine a state that requires, as a condition of renewing drivers' licenses and vehicle registrations, that drivers pay all outstanding citations for parking/traffic infractions.  A driver goes to his county agency and is told that he may have some unpaid citations.  He asks for information about the citations and their respective amounts so that he can verify their accuracy and pay whatever is outstanding.  But the clerk tells him that the state can't give him

---

[12] As 19 states and Washington D.C. have explained, "many States task their court systems, not their residents, with maintaining a record of outstanding LFOs and amounts paid.  Indeed, it is perfectly reasonable to expect the government actors that impose LFOs to keep track of those obligations."  Amicus Br. of District of Columbia, Illinois, California, Colorado, *et al.* at 27–30 (describing the approaches of other states).

the information because the debt for the citations has been sold to third-party collection agencies; those agencies charge certain fees (which vary by agency and year) on top of the citation amounts; and the county has no way of knowing what those fees are or what amounts have been paid or credited.  The clerk tries to call other state agencies (and some of the collection agencies) to get answers, but to no avail, and tells the driver he will have to figure everything out on his own.  So the driver has to leave without his license and car registration, and will need to risk driving in violation of the law—and face arrest—in order to get to work, take his children to school, and carry out the other tasks of daily life.  Would this state of affairs be constitutionally permissible?  Of course not.

Assuming Florida ever gets around to processing felons' registrations—something I have significant doubts about given the record in this case—those who it believes are ineligible would presumably receive notice under § 98.075(7).  That statute does not, however, require the County Supervisor of Elections to disclose in the notice the amount of LFOs that a felon owes.  *See* § 98.075(7)(a)(1)(a) (providing that the notice must include a "statement of the basis for the registered voter's potential ineligibility," but not requiring a specific determination of the amount of LFOs owed).  And the record reflects that Florida often will be unable to determine that amount itself.  *See* D.E. 360-47 at 8–9.  Indeed, one County Supervisor of Elections testified that she would not even feel equipped to handle a hearing on

161

outstanding LFOs, should a voter request one. *See* Tr. at 501 ("Q. Do you feel adequately equipped with information to handle a hearing on outstanding fines and fees if a voter requests one? A. Not at this . . . time.").

Florida's additional argument—that "concerns about the precise amount of a felon's outstanding financial obligations simply do not attend a system in which the sole question for eligibility is whether *any* amount remains outstanding," Appellants' Initial En Banc Br. at 52—is astounding. With no way to figure out how much they owe, or whether they owe anything at all, felons cannot know whether they have satisfied their payment obligations, and so cannot contest their ineligibility if they request a hearing. Nor can they determine how much money they need to allot towards paying off their LFOs in order to obtain the right to vote in future elections. *Cf. Morgan*, 472 F.2d at 827 (holding that a defendant must have a chance to challenge the accuracy of the amount of restitution owed).

Even if felons could be saddled with the initial burden of trying to figure out their LFO status, it is Florida—and only Florida—which has the information and the ability to provide the ultimate answer to the felons' inquiries. There is no third-party aggregator of data to whom the felons can turn.

As the Seventh Circuit has aptly stated: "It is universally agreed that adequate notice lies at the heart of due process. Unless a person is adequately informed of the reasons for denial of a legal interest, a hearing serves no purpose—and resembles

more a scene from Kafka than a constitutional process." *Chicago Cable Commc'ns v. Chicago Cable Comm'n*, 879 F.2d 1540, 1546 (7th Cir. 1989) (citations and internal quotation marks omitted). *Cf.* Franz Kafka, The Trial (1925). Although § 98.075(7) sets out a procedure in form, in substance it does not provide meaningful notice or information before depriving felons of the right to vote, now guaranteed to them under Florida law. *See Bell*, 402 U.S. at 541 ("[I]n reviewing state action in this area [of due process] we look to substance, not bare form, to determine whether constitutional minimums have been honored.") (citation and internal quotation marks omitted); *Mullane*, 339 U.S. at 315 ("[P]rocess which is a mere gesture is not due process. The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it.").

## C

The majority rejects the plaintiffs' due process argument because, it says, any deprivation of their right to vote "was accomplished through the legislative process and the process for adopting a constitutional amendment[.]" Maj. Op. at 56. It is true that "[w]hen the legislature passes a law which affects a general class of persons, those persons have all received procedural process—the legislative process." *75 Acres, LLC v. Miami-Dade Cty.*, 338 F.3d 1288, 1294 (11th Cir. 2003) (citation and internal quotation marks omitted). But the majority ignores the necessary adjudicative phase of the re-enfranchisement process under Florida's own laws.

On its face, § 98.0751 sets forth an adjudicative process for determining felons' eligibility to vote. It explains that "[t]he department shall obtain and review information pursuant to s. 98.075(5) related to a person who registers to vote and make an initial determination on whether such information is credible and reliable regarding whether the person is eligible," and that "[u]pon making an initial determination of the credibility and reliability of such information, the department shall forward such information to the supervisor of elections pursuant to s. 98.075." § 98.0751(3)(a). It further provides that "[a] local supervisor of elections shall verify and make a final determination pursuant to s. 98.075 regarding whether the person who registers to vote is eligible," and that "the supervisor of elections may request additional assistance from the department in making the final determination, if necessary." § 98.0751(3)(b)–(c).

As these provisions make clear, determining eligibility to vote under Florida law requires evaluating past facts, including the amount of LFOs a felon was ordered to pay, and then calculating the amount that has already been paid (and where or to whom the payments are credited). This requires a number of adjudicative decisions—e.g., deciding whether LFOs are linked to misdemeanor or felony convictions if a felon has both, deciding whether to employ the actual-balance or every-dollar method, and deciding what evidence is enough to prove a payment has been made.

Under Supreme Court and Eleventh Circuit precedent, this process is undeniably individual and adjudicatory. *See Prentis v. Atlantic Coast Line Co.*, 211 U.S. 210, 226 (1908) ("A judicial inquiry investigates, declares, and enforces liabilities as they stand on present or past facts and under laws supposed already to exist. That is its purpose and end. Legislation, on the other hand, looks to the future and changes existing conditions by making a new rule, to be applied thereafter to all or some part of those subject to its power."); *Crymes v. DeKalb Cty.*, 923 F.2d 1482, 1485 (11th Cir. 1991) ("If the facts utilized in making a decision are specific, rather than general, in nature, then the decision is more likely administrative. Moreover, if the decision impacts specific individuals, rather than the general population, it is more apt to be administrative in nature."). *See also Thomas v. New York*, 143 F.3d 31, 36 n.7 (2d Cir. 1998) (inquiring whether the action at issue is "fully legislative" such that the legislative process is the only process due or "at least in part[ ] adjudicative" such that individuals have a right to procedural due process and explaining that "[a]djudicative facts are facts about the parties and their activities"), cited with approval in *75 Acres*, 338 F.3d at 1296. Indeed, Florida's procedure for determining whether registrants should be removed from the voter rolls is similar to schemes that the Supreme Court has reviewed in other due process cases involving the denial of a state-created benefit. *See, e.g.*, *Goldberg v. Kelly*, 397 U.S. 254, 260–62 (1970) (reviewing whether a state's procedure for terminating public assistance

payments violated procedural due process); *Mathews v. Eldridge*, 424 U.S. 319, 340–49 (1976) (reviewing whether the procedure for terminating Social Security disability benefit payments complied with due process).

The First Circuit's opinion in *Garcia-Rubiera v. Fortuno*, 665 F.3d 261 (1st Cir. 2011), is both instructive and persuasive. There, Puerto Rico law required all motor vehicle owners to pay for compulsory, state-issued automobile insurance, but guaranteed a reimbursement for those who had already paid for private insurance. *See id.* at 263. The relevant statute, however, did not itself set up procedures for reimbursement or tell insureds where or how to find such procedures. *See id.* In fact, insureds would not find the procedures unless they went in person to the proper office of government and made an "appropriate request" for a copy of the regulation. *See id.* at 263–64. The First Circuit held that this scheme violated the notice requirements of the Due Process Clause. *See id.* at 264. In so holding, it explained that enactment of the statute did not provide adequate notice, as it gave "no notice to insureds of how to obtain reimbursement; it merely direct[ed] the Secretary of the Treasury to 'establish a procedure for processing the reimbursement request from any person.'" *Id.* at 272 (citation omitted). "Absent a trip, in person, to the appropriate office of government and a proper request to inspect the regulation, the Commonwealth has left plaintiffs in the dark as to every aspect of [the procedure]. The Commonwealth's statutory notice argument thus fails." *Id.* at 274.

Here, similarly, neither Amendment 4 nor § 98.0751 tells felons how to determine whether they have outstanding LFOs.  The legislative process is not the end of the matter, and Florida's current adjudicatory scheme cannot possibly give adequate notice to felons as to whether they will be regaining the right to vote or not.  And, as in *Fortuno*, absent a trip or a call to the appropriate government office (or collection agency), felons will not know how these decisions are made—only here, even with such a call or trip, they still may not have access to accurate information about their outstanding LFOs or know whether they are eligible to vote.  Thus, "more than statutory notice is required."  *Id.* at 275.

## D

The due process problems do not end there.  The Supreme Court has told us that a law may be vague for two independent reasons:  "First, it may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary and discriminatory enforcement."  *Chicago v. Morales*, 527 U.S. 41, 56 (1999).  In my view, § 98.0751 is impermissibly vague for the latter reason—it fails to "provide explicit standards" on how to implement the LFO requirement so as to avoid "arbitrary and discriminatory" application.  *See Grayned v. Rockford*, 408 U.S. 104, 108 (1972).

"Vague laws invite arbitrary power . . . by leaving the people in the dark about what the law demands and allowing prosecutors and courts to make it up."  *Sessions*

*v. Dimaya*, 138 S. Ct. 1204, 1223–24 (2018) (Gorsuch, J., concurring).  The lack of standards regarding how to implement the LFO requirement—as demonstrated by the evidence at trial and the district court's unchallenged factual findings—allows the Division of Elections and County Supervisors of Elections to "make it up" as they go, outside the legislative process and without any oversight to ensure uniformity.

As already discussed, § 98.0751(3)(a)–(b) provides that the Division shall make an "initial determination" about a registrant's eligibility to vote, and a local Supervisor of Elections must then "verify and make a final determination."  But the statute does not provide any guidance on how to determine whether a felon owes LFOs, and in what amount, if those matters are not clear from the four corners of the sentencing document.  And there has been no guidance from Florida officials on what to do if records about a felon's LFOs are unclear or inconsistent.  *See* Tr. at 512–13.

The majority says that the law itself is not vague, and instead felons are just uncertain about "factual circumstances" regarding their eligibility to vote.  *See* Maj. Op. at 54.  But these "factual circumstances" are the whole ballgame, and not merely insignificant details.  In any event, it is not just felons who are confused about whether they have satisfied the terms of their sentences.  Because the Division of Elections has not provided any guidance to County Supervisors of Elections on how

to implement the LFO requirement, they too are "left guessing" as to how to impose it. *See Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1319 (11th Cir. 2017) (en banc) (holding that a Florida law that barred health care practitioners from "unnecessarily harassing a patient about firearm ownership" was unconstitutionally vague because reasonable doctors were "left guessing" as to what was prohibited). And a "wrong guess" here results in "severe consequences": the wrongful denial of the right to vote, or an arrest for a voting violation. *See id.*

The record shows that, because of the absence of clear guidelines, there is a lack of consistency in how County Supervisors of Elections are imposing the LFO requirement. Some may be enforcing it; others may not. One County Supervisor of Elections, for example, testified that his office only checks for restitution. *See* Tr. at 912–13 ("Q. So is it your testimony that the only legal financial obligation you currently check for is restitution? A. Currently, right now that's what we are looking for . . . We are not trying to dig up the fines and fees and that type of thing. I think the law is not clear on that, but that's where we are."). It is unclear what other County Supervisors are doing. Not only does the record before the district court reflect the risk of arbitrary enforcement, the risk seems to be well known. *See* Gonzalez, *Voter Restoration*, 44 Nova L. Rev. at 220 ("[T]he restoration of voting rights [in Florida] continues to be complicated and discriminatory. There is no single entity in place to track LFOs, and it will be very expensive to create such a system.

169

. . .  [I]t is unclear how individuals will know the total amount of LFOs they need to pay before regaining their right to vote, or how election officials will know who is able to register.").

What a great system Florida has set up.  If the stakes were not so high, it would be laughable and deserving of a Dave Barry article lampooning the state's bureaucratic incompetence and malfeasance.  *See, e.g.*, Dave Barry, Best. State. Ever.: A Florida Man Defends His Homeland 22 (2016) ("[O]ur state government is excellent. . . . No, that's a lie.").

There is also an incredible lack of uniformity as to what method Florida uses to determine the amount of LFOs owed.  The Director of the Division of Elections testified at trial that the every-dollar method would be used, but as the district court noted, the Assistant Director of the Division of Elections initially testified, in effect, that the actual-balance method is the proper approach.  And one County Supervisor of Elections testified she had never heard of the every-dollar method.  *See Jones II*, 2020 WL 2618062, at \*19.  As a result of this bureaucratic confusion, and Florida's failure to codify any method, whether a felon is considered to have completed his LFO obligations may depend on who is reviewing that felon's registration form— someone who follows the every-dollar method, or someone who applies the actual-balance method, or someone who comes up with a brand new method.  The right to

vote—even if considered a state-created benefit for re-enfranchised felons—is too important to be denied in this inconsistent, unorderly, and nonsensical manner.

## IV

The Twenty-Fourth Amendment, ratified in 1964, provides that the right to vote "shall not be denied or abridged by the United States or any State by reason of failure to pay any poll tax or other tax." U.S. Const. amend. XXIV. This straightforward language confirms the principle that "a tax on the right to vote is constitutionally indefensible." *United States v. Alabama*, 252 F. Supp. 95, 105 (M.D. Ala. 1966) (three-judge court) (Johnson, J., concurring).

The district court concluded that fees and costs routinely imposed by Florida on criminal defendants are "other tax[es]" prohibited by the Twenty-Fourth Amendment, as they are "assessed regardless of whether a defendant is adjudged guilty, bear no relation to culpability, and are assessed for the sole or at least primary purpose of raising revenue to pay for government operations. . . . A tax by any other name." *Jones II*, 2020 WL 2618062, at *29. The Supreme Court's only decision interpreting the Twenty-Fourth Amendment, the text and contemporaneous understanding of the Amendment, and Supreme Court cases analyzing what constitutes a "tax" all confirm that the district court was correct.

**A**

Fees and costs routinely imposed on criminal defendants—in operation and in substance—constitute an "other tax" under the Twenty-Fourth Amendment. *See United States v. Constantine*, 296 U.S. 287, 294 (1935) (explaining that courts "[d]isregard[ ] the designation of the exaction, and view[ ] its substance and application" to determine whether a payment is a penalty or a tax). Although Florida law views these fees and costs as part of the "criminal sanction" imposed on those who are convicted, *see Martinez v. State*, 91 So. 3d 878, 880 (Fla. 5th DCA 2012), that characterization does not bind us in interpreting the Twenty-Fourth Amendment. *See, e.g.*, *Macallen Co. v. Massachusetts*, 279 U.S. 620, 625 (1929) ("As it many times has been decided neither state courts nor Legislatures, by giving the tax a particular name, or by using some form of words, can take away our duty to consider its nature and effect.").

Let's start with *Harman v. Forssenius*, 380 U.S. 528 (1965), the only case in which the Supreme Court has addressed the Twenty-Fourth Amendment. In *Harman*, the Supreme Court held that a Virginia law requiring those who wished to vote in a federal election to either (1) pay the poll tax required for state elections (then $1.50), or (2) complete a notarized/witnessed certificate of residency before each election, violated the Twenty-Fourth Amendment. *See id.* at 531–34.

172

Although the residency certificate itself was not a monetary "tax" of any kind, the Court broadly interpreted the Twenty-Fourth Amendment and ruled that the certificate could not be used as an alternative means of paying a poll tax. *See id.* at 541 ("[I]n order to demonstrate the invalidity of [the Virginia law], it need only be shown that it imposes a material requirement solely upon those who refuse to surrender their constitutional right to vote in federal elections without paying a poll tax.").  The Court pointed out that the certificate requirement was constitutionally problematic in part because obtaining the certificate from local election officials and then filing it with the city or county treasurer was "plainly a cumbersome procedure" which "amount[ed] to annual re-registration[.]" *Id.* at 541–42.  Finally, the Court rejected Virginia's argument that "the certificate is a necessary substitute method of proving residence" because "constitutional deprivations may not be justified by some remote administrative benefit to the State."  *Id.* at 542.

*Harman* teaches that a state-imposed and non-monetary condition on voting can violate the Twenty-Fourth Amendment even if the condition is not itself a "tax." With *Harman* in mind, I turn to the fees and costs that Florida imposes on all those convicted of crimes in its courts.

## B

When the Twenty-Fourth Amendment was ratified, a "tax" was commonly understood as a "[c]ontribution levied on persons, property, or business, *for support*

*of government*."  Concise Oxford Dictionary of Current English 1328 (5th ed. 1964) (emphasis added).  This was also the accepted legal meaning.  *See* Ballentine's Law Dictionary 1255 (3d ed. 1969) ("A forced burden, charge, exaction, imposition, or contribution assessed in accordance with some reasonable rule of apportionment by authority of a sovereign state upon the persons or property within its jurisdiction to provide public revenue *for the support of the government, the administration of the law, or the payment of public expenses*.") (emphasis added); Black's Law Dictionary 28 (4th ed. 1951) ("[A] pecuniary contribution . . . *for the support of a government*.") (emphasis added).

Not only was this the contemporaneous understanding in the early 1960s, but the Supreme Court has long defined "tax" the same way.  *See, e.g.*, *United States v. La Franca*, 282 U.S. 568, 572 (1931) ("A 'tax' is an enforced contribution to provide for the support of government; a 'penalty' . . . is an exaction imposed by statute as punishment for an unlawful act."); *United States v. State Tax Comm'n of Miss.*, 421 U.S. 599, 606 (1975) ("[T]he standard definition of a tax" is  an "enforced contribution to provide for the support of government") (citation and internal quotation marks omitted).  So there should be no dispute about what a "tax" is.

More recently, in *National Federation of Independent Business v. Sebelius*, 567 U.S. 519, 565 (2012), the Supreme Court analyzed whether a  "penalty" (so labeled by Congress) imposed on those who did not comply with the individual

174

mandate to purchase health insurance under the Affordable Care Act was a tax.  In concluding that the so-called "penalty" was indeed a tax, the Court considered factors such as the amount of the payment, the lack of a scienter requirement, and the collection of the payment solely by the IRS through the normal means of taxation.  *See id.* at 566–67.

Under these authorities, the fees and costs Florida imposes on convicted defendants are taxes within the meaning of the Twenty-Fourth Amendment.  As the district court explained, for most categories of fees "the amount is fixed, and with rare exceptions, the amount is comparatively modest[.]"  *Jones II*, 2020 WL 2618062, at *29.  The fees are also ordinarily collected in the same way as civil debts or other taxes owed to the government, including by reference to a collection agency—not necessarily through the criminal justice system.  *See id*.  And there is no scienter requirement, as a defendant who pleads no contest and is not adjudged guilty also must pay fees and costs.  *See id.*  Moreover, the fees and costs are imposed on felons convicted of crimes that do not have a mens rea element.  *See, e.g.*, Fla. Stat. §§ 893.13(1), 893.101(2) (explained in *State v. Adkins*, 96 So. 3d 412, 415–16 (Fla. 2012)).

Most importantly, the primary purpose of these fees and costs is to raise revenue for the operation of Florida's government.  As mentioned earlier, Florida funds its criminal-justice system in large part through fees routinely assessed against

175

criminal defendants.  *See* Fla. Const., art. V, § 14 (providing that, with limited exceptions, all funding for clerks of court and county courts must come from fees and costs).  Florida law therefore requires that payments of fees and costs be retained in various trust funds to generate revenue for court-related functions, and that the excess be remitted to the Florida Department of Revenue to fund other areas of state government.  *See* Fla. Stat. §§ 28.37(3), 213.131, 215.20, 142.01, 960.21.

For example, Fla. Stat. § 938.01(1) requires felons to pay $3 as a court cost, and that sum is remitted to the Department of Revenue for, among other things, a domestic violence program and a law-enforcement training fund.  Similarly, Fla. Stat. § 938.05 imposes a flat $225 fee in every felony case, $200 of which is used to fund the clerk's office and $25 of which is remitted to the Florida Department of Revenue for deposit in the state's general revenue fund.  At trial, the Public Defender for Palm Beach County testified that fees total $668 for every felony defendant who is represented by a public defender.  *See* Tr. at 284.  Examples of the fees and costs included in that figure are "costs associated for a Court Cost Clearing Trust Fund," a "local ordinance cost," and "a Crime Stoppers Trust Fund fee."  *Id*. at 287.  The Public Defender for Miami-Dade County similarly testified that defendants in his jurisdiction are typically assessed between $700 and $800, a sum which includes, among other things, fees that fund programs like "Crime Stoppers," "teen courts," "crime prevention programs," the "Criminal Justice Trust and Education Fund," and

"additional court costs that go to the local courts, including $65 court costs." *Id*. at 355–56.

The majority says that these fees and costs are penalties, and not fines, because they are linked to culpability and are not imposed on defendants who are acquitted. *See* Maj. Op. at 33. Although they are also imposed on those who plead no contest and/or have their adjudication of guilt withheld, the majority emphasizes that under Florida law defendants who withhold their adjudication or plead no contest may be subject to punishment. *See id.* at 33–34. The majority's contention that these fees and costs are punitive, however, is belied by the fact that they bear no relation to the crimes charged, as "a defendant adjudged guilty of a violent offense ordinarily is assessed the same amount as a defendant who is charged with a comparatively minor nonviolent offense, denies guilt, pleads no-contest, and is not adjudged guilty." *Jones II*, 2020 WL 2618062, at *29. And, as noted earlier, we are not bound by Florida's own characterization of these fees and costs. *See Macallen*, 279 U.S. at 625.

But even if there is some incidental punitive purpose for these fees and costs, that does not change the undeniable fact that their *primary* purpose is the raising of revenue. And Supreme Court precedent tell us that it is the primary purpose that matters. *See Bailey v. Drexel Furniture Co.*, 259 U.S. 20, 38 (1922) ("Taxes are occasionally imposed in the discretion of the Legislature on proper subjects with the

*primary motive* of obtaining revenue from them and with the incidental motive of discouraging them by making their continuance onerous.  They do not lose their character as taxes because of the incidental motive.") (emphasis added).  In *Bailey*, for example, the Supreme Court analyzed whether a child labor tax law, which imposed a purported "tax" on certain businesses if they employed children in violation of the law, involved a tax or a penalty.  The Court concluded that the "exaction" was a penalty, rather than a tax, because the primary purpose of the payment was "practically to achieve" the result of outlawing child labor.  *See id.* at 38–41.  The exaction there was the "principal consequence" of violating the child labor law, demonstrating that it was really a penalty for violations.  *See id.* at 38.

In contrast, the fees and costs here do not aim to outlaw any behavior.  Nor are they the principal consequence for committing a felony offense—imprisonment, fines, and restitution serve that purpose.  The fees and costs here serve primarily to raise revenue for the state, and therefore are taxes.  *See Bredesen*, 624 F.3d at 770–74 (Moore, J., dissenting) (explaining that a 5% administrative fee tacked on to child support and restitution payments constituted a tax under the Twenty-Fourth Amendment); Cammett, *Shadow Citizens*, 117 Penn. St. L. Rev. at 379 ("[P]ublic cost-recovery fees reflect the efforts of states to pass the costs of criminal justice and other state deficits onto prisoners.").  As one of the *amici* correctly explain, "[t]he mere fact of antecedent criminal conviction does not change a 'tax' to something

else."  Amicus Br. of Tax & Constitutional Law Professors at 13 (noting that if hypothetically Florida imposed an income tax of 10% on individuals convicted of crimes, and prohibited felons from voting if they failed to pay the tax, that would violate the Twenty-Fourth Amendment).  I could not have put it any better.

## C

Several colleagues in Part III.B.2 advocate for a narrow reading of the Twenty-Fourth Amendment by arguing that the phrase "by reason of" in the Amendment are different in meaning than the phrase "on account of" in the Fifteenth, Nineteenth, and Twenty-Sixth Amendments.  *See* Maj. Op. at 36–51 (explaining that "on account of" reflects a "but-for-causation" test, but "by reason of" requires "a tighter relationship between nonpayment of a tax and denial of the right to vote than but-for causation" and instead means "motivated by").  As Part III.B.2 does not even garner a plurality of the judges in the majority, I am unsure why this linguistic exegesis is necessary.  But given the number of pages dedicated to this contention, I will take a moment to point out its deficiencies.

A straightforward textual analysis shows that "by reason of" has the same meaning as "on account of."  Indeed, our colleagues acknowledge that dictionaries from the time the Twenty-Fourth Amendment was drafted define the phrases "by reason of" and "on account of" by reference to each other.  *See* Maj. Op. at 39–40. *See also* Webster's Third New International Dictionary of the English Language 13

(1961) (defining "on account of" as "for the sake of: *by reason of*: because of")
(emphasis added).   But rather than confront the inevitable conclusion—that the two
phrases are synonymous—our colleagues instead say that this means the dictionary
definitions "are of limited value."  Maj. Op. at 39.  What they are saying, I think, is
that they do not like the result of a simple textual analysis, and therefore feel free to
go beyond the text's common understanding because that understanding is not
helpful to their position.  If that is textualism, textualism is a mirage.

This analytical move is surprising given the current emphasis placed on public
understanding of the words used in constitutional text.   *See, e.g.*, *District of
Columbia v. Heller*, 554 U.S. 570, 576 (2008) ("In interpreting this text [of the
Second Amendment], we are guided by the principle that '[t]he Constitution was
written to be understood by the voters; its words and phrases were used in their
normal and ordinary as distinguished from technical meaning.'") (quoting *United
States v. Sprague*, 282 U.S. 716, 731 (1931)); Antonin Scalia & Bryan A. Garner,
Reading Law: The Interpretation of Legal Texts § 6, at 69 (2012) ("Words are to be
understood in their ordinary, everyday meanings—unless the context indicates that
they bear a technical sense.").  As noted, dictionaries from around the time the
Twenty-Fourth Amendment was ratified do provide a helpful definition of "by
reason of," demonstrating that it means "because of."  *See* Webster's New Twentieth
Century Dictionary of the English Language 1502 (2d ed. 1963) (defining "by reason

of" as "because of").   And "where the intention i[s] clear [from the text of a constitutional provision] there is no room for construction and no excuse for interpolation or addition." *Sprague*, 282 U.S. at 731.[13]

Rather than rely on these consistent definitions of the phrase "by reason of," our colleagues isolate the word "reason" and then select a definition of that one word to define the entire phrase.  *See* Maj. Op. at 48–49.  But "reason," when used in a phrase, cannot be read in isolation because the "text must be construed as a whole." Scalia & Garner, Reading Law § 24, at 167.  *See also Smith v. United States*, 508 U.S. 223, 233 (1993) ("[A] single word cannot be read in isolation[.]"); *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) ("Words are not pebbles in alien juxtaposition; they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their purport from the setting in which they are used. . . .") (citations and internal quotation marks omitted). "Phrases are not always (though they are sometimes) mere sums of their parts.  One cannot necessarily determine the meaning of *establishment of religion* by simply looking up the founding-era definitions of *establishment*, *of*, and *religion*, just as one

---

[13] Modern dictionaries likewise reflect that "on account of" and "by reason of" both mean "because of." *See* Webster's Dictionary of English Usage 687 (1989) ("*On account of* is commonly used as a compound preposition equivalent to *because of* . . . *On account of* was first recorded in this use in 1792, and has long been established as standard in both British and American English."); Bryan A. Garner, Garner's Modern American Usage 121 (2003) ("by reason of is usually an artificial way of saying *because of*"); The American Heritage Dictionary of the English Language 11 (5th ed. 2018) (defining "on account of" as "Because of; for the sake of").  *See also id.* at 1465 (defining "by reason of" as "[b]ecause of").

cannot determine the communicative content of the phrases *at all* or *for good* through the amalgamation of the meaning of the words in those phrases." Stephanie H. Barclay, Brady Earley, & Annika Boone, *Original Meaning and the Establishment Clause: A Corpus Linguistics Analysis*, 61 Ariz. L. Rev. 505, 528–29 (2019). After all, "even the strictest textualist would acknowledge that the meanings of the words and sentences in a statutory text are a function of their usages within a linguistic community." Bradley C. Karkkainen, *"Plain Meaning": Justice Scalia's Jurisprudence of Strict Statutory Construction*, 17 Harv. J.L. & Pub. Pol'y 401, 407 (1994).

Our colleagues next lean on a canon of construction that says courts can infer a different meaning if Congress has chosen to use different words in the same document (here, apparently, the Constitution). *See* Maj. Op. at 41. *See generally Crawford v. Burke*, 195 U.S. 176, 190 (1904) ("a change in phraseology creates a presumption of a change in intent"). Whatever its relevance elsewhere, that canon is of no assistance in this case. There can be no inference or presumption of a contrary intent when, as here, the different phrases used are synonymous with one another, i.e., when they have the same meaning. Given that our colleagues have offered nothing to explain the choice of the phrase "by reason of" in the Twenty-Fourth Amendment, that "word change as easily supports the inference that Congress merely swapped one synonym for another." *Milner v. Dep't of Navy*, 562

U.S. 562, 572 (2011).  *Accord Public Citizen, Inc. v. U.S. Dep't of H.H.S.*, 332 F.3d 654, 665 (D.C. Cir. 2003) ("[I]n this case, Congress' use of slightly different words to describe various reporting requirements shows little more than the legislature employed a modestly varied vocabulary to express similar meanings.").   Justice Holmes' quip that "there is no canon against using common sense in construing laws as saying what they obviously mean," *Roschen v. Ward*, 279 U.S. 337, 339 (1929), seems apropos here, as "by reason of" and "on account of" mean exactly the same thing.

I also disagree with our colleagues' claim in Part III.B.2 that *Harman* supports their narrow construction of the Twenty-Fourth Amendment.  As noted earlier, in *Harman* the Supreme Court invalidated a Virginia law that required voters to either pay a poll tax or annually file a certificate of residency in order to vote in federal elections by broadly construing the Twenty-Fourth Amendment.  *See* 380 U.S. at 541–44.   Analogizing the Twenty Fourth Amendment to the Fifteenth Amendment, the Supreme Court explained that "the Twenty-Fourth Amendment does not merely insure that the franchise shall not be 'denied' by reason of failure to pay the poll tax; it expressly guarantees that the right to vote shall not be 'denied or abridged' for that reason.  Thus, like the Fifteenth Amendment, the Twenty-fourth 'nullifies sophisticated as well as simple-minded modes' of impairing the right

guaranteed."  *Id.* at 540–41 (citation omitted).  *Harman* constitutes an expansive interpretation of the Twenty-Fourth Amendment, not a narrow one.

Given the analogy in *Harman* to the Fifteenth Amendment, I struggle to understand our colleagues' view that the Twenty-Fourth Amendment requires a "tighter relationship between nonpayment of a tax and denial of the right to vote than but-for causation."  Maj. Op. at 47.  Though the Supreme Court in *Harman* did not specifically analyze the phrase "by reason of," its holding suggests that the phrase imports some type of causation—as the Court invalidated a non-monetary requirement imposed on voters who refused to pay the poll tax.  *See* 380 U.S. at 541. A three-judge district court in our circuit, interpreting the Twenty-Fourth Amendment shortly after its passage, also seemed to view "by reason of" as embodying a but-for test.  *See Gray v. Johnson*, 234 F. Supp. 743, 746 (S.D. Miss. 1964) (invalidating a state law that required an elector who was exempt from the payment of a poll tax to obtain an exemption certificate and hold the certificate as a condition for voting because such "onerous requirements are occasioned solely by reason of the failure of the registered voter to pay his poll tax").[14]

---

[14] The other cases that our colleagues rely on in Part III.B.2—*Crawford*, 553 U.S. at 204, and *Gonzalez*, 677 F.3d at 407—do not support their view.  *See* Maj. Op. 48.  *Crawford* does not analyze the Twenty-Fourth Amendment, but instead evaluates whether a statute requiring voters to present photo identification violates the Fourteenth Amendment.  As mentioned earlier, the *Crawford* plurality noted that the statute would not pass muster under *Harper* if the state "required voters to pay a tax or a fee to obtain a new photo identification," but the state issued free photo identification cards.  *See* 553 U.S. at 198.  In *Gonzalez*, the Ninth Circuit determined that requiring

The Supreme Court in *Harman*, moreover, described the history of the Twenty-Fourth Amendment, and that history suggests that it was intended to prohibit disenfranchisement based on poverty: "Prior to the proposal of the Twenty-fourth Amendment in 1962, federal legislation to eliminate poll taxes, either by constitutional amendment or statute, had been introduced in every Congress since 1939. . . . Even though in 1962 only five States retained the poll tax as a voting requirement, Congress reflected widespread national concern with the characteristics of the tax." *Id.* at 538–39. Specifically, "Congressional hearings and debates indicate a *general repugnance to the disenfranchisement of the poor occasioned by the failure to pay the tax*." *Id.* at 539 (emphasis added). "In addition, and of primary concern to many, the poll tax was viewed as a requirement adopted with an eye to the disenfranchisement of Negroes and applied in a discriminatory manner." *Id.* at 540. "It is against this background that Congress proposed, and three-fourths of the States ratified, the Twenty-Fourth Amendment abolishing the poll tax as a requirement for voting in federal elections." *Id.*[15]

---

voters to provide identification at the polls did not constitute a tax or impose a material burden on voters for refusing to pay a tax, and thus did not violate the Twenty-Fourth Amendment. *See* 677 F.3d at 407–08. *Gonzalez*, however, did not analyze the phrase "by reason of."

[15] Though the Twenty-Fourth Amendment outlaws financial barriers to voting in *federal* elections, as discussed earlier, the Supreme Court invalidated the imposition of a poll tax on *state* elections in *Harper* under the Equal Protection Clause. *See Harper*, 383 U.S. at 666–67.

Legislative history further shows that supporters of the Twenty-Fourth Amendment understood it as a broad directive. *See* Amicus Br. of Tax & Constitutional Law Professors at 3–6 (outlining legislative history); Amicus Br. of Voting Rights Scholars at 10–12 (same); *Bredesen*, 624 F.3d at 773–75 (Moore, J., dissenting) (same). For example, in a report recommending the passage of the joint resolution proposing the Twenty-Fourth Amendment, the House Committee on the Judiciary stated that "[t]he purpose of this proposed constitutional amendment is to prevent the United States or any State from denying or abridging the right of citizens of the United States to vote . . . *because of* an individual's failure to pay any poll tax or other tax." H.R. Rep. No. 87-1821, at 2 (1962) (emphasis added). The report further states that the Amendment would "prevent both the United States and any State from setting up any substitute tax in lieu of a poll tax as a prerequisite for voting" and "prevent[ ] the nullification of the amendment's effect by a resort to subterfuge in the form of other types of taxes." *Id.* at 5.

In floor debates, Representative Neil Gallagher of New Jersey said that "[a]ny charge for voting unjustly discriminates against people of limited means. And whatever the amount of money, a citizen of the United States should not have to pay for his constitutional right to vote." 108 Cong. Rec. 17667 (1962). Representative Dante Fascell of Florida expressed a similar view: "[T]he payment of money, whether directly or indirectly, whether in a small amount or in a large amount, should

never be permitted to reign as a criterion of democracy.  There should not be allowed a scintilla of this in our free society." 108 Cong. Rec. 17657 (1962).  Representative Seymour Halpern of New York agreed: "This amendment will prevent the imposition not only of a poll tax but of any other tax as a prerequisite to voting and . . . it is broad enough to prevent the defeat of its objectives by some ruse or manipulation of terms."  108 Cong. Rec. 17669 (1962).  Representative Edward Boland of Massachusetts proclaimed that "[w]hile the amount of the poll tax now required is small, there should not be any price tag or any kind of tax on the right to vote." 108 Cong. Rec. 17666 (1962).  Representative Henry B. Gonzalez of Texas echoed that sentiment: "[t]here should not be any price tag or any other kind of tag on the right to vote." *Abolition of Poll Tax in Federal Elections: Hearing on H.J. Res. 404, 425, 434, 594, 601, 632, 655, 663, 670 & S.J. Res. 29 Before Subcomm. No. 5 of the H. Comm. on the Judiciary,* 87th Cong., 2d Sess. 15 (1962).

News reports from around the time the Twenty-Fourth Amendment was ratified also confirm its expansive understanding.  Senator Spessard Holland of Florida, who introduced the Amendment in the Senate, told the *Miami Herald* that he "believe[d] fervently that no price should be placed on the right to vote, and that the South 'needs so badly to be in an affirmative position on civil rights.'" David Kraslow, "Poll Tax Fate Could be Decided This Year," *Miami Herald*, Jan. 28, 1963, at 17.  President Lyndon B. Johnson remarked upon the Amendment's passage that

"there can be no one too poor to vote."   *See* Nan Robertson, "24th Amendment Becomes Official; Johnson Hails Anti-Poll Tax Document at Ceremonies," *N.Y. Times*, Feb. 5, 1964, at 14.

The fees and costs Florida imposes "exact[ ] a price for the privilege of exercising the franchise."   *Harman*, 380 U.S. at 539.   That is exactly what the framers of the Twenty-Fourth Amendment sought to prevent.   *See Bredesen*, 624 F.3d at 775 (Moore, J., dissenting) ("The drafters and supporters of the Twenty-Fourth Amendment plainly intended that the Amendment reach those payments of money that placed a price on the franchise, regardless of whether those taxes could also be characterized as debts or fees."); Ryan A. Partelow, *The Twenty-First Century Poll Tax*, 47 Hastings Const. L.Q. 425, 458 (2020) ("Once distilled, the principles at issue in both *Harman* and the legislative history of the Twenty-Fourth Amendment evidence that LFO disenfranchisement is plainly within the meaning of the [A]mendment's text as drafted by its framers.").[16]

---

[16] Our colleagues further assert in Part III.B.2 that "the Twenty-Fourth Amendment has never been understood to prohibit States from disenfranchising tax felons[.]" Maj. Op. at 47. Yet the very commentator they cite concludes that "the Twenty-Fourth Amendment's plain language precludes states from disenfranchising tax felons for federal elections," and that "the disenfranchisement of tax felons is facially unconstitutional under the Twenty-Fourth Amendment."   Sloan G. Speck, *"Failure to Pay Any Poll Tax or Other Tax": The Constitutionality of Tax Felon Disenfranchisement*, 74 U. Chi. L. Rev. 1549, 1551, 1569 (2007).   Only by proposing an "extratextual" analysis—a "preliminary frame"—can that commentator opine that tax felons can be disenfranchised. *See id.* at 1580.

As in *Harman* and *Gray*, the fees and costs here impose a material burden on voting. *See Harman*, 380 U.S. at 541; *Gray*, 234 F. Supp. at 746. "By the time of sentencing, Floridians with felonies are typically assessed at least $500 in mandatory fees and costs, though the precise amount varies by county even for the same underlying felony offense." Amicus Br. of the Fines and Fees Justice Center, *et al.*, at 6. Paying hundreds of dollars in fees and costs is an "onerous" burden to those with limited means, *see Harman*, 380 U.S. at 541, and 70 to 80 percent of Florida felons are indigent. They should not be forced to choose between "putting food on the table, a roof over their heads, and clothes on their backs," *Jones I*, 950 F.3d at 811—or paying fees that Florida uses to fund government operations—in order to exercise the right to vote granted to them by Amendment 4.

## V

Our predecessor, the former Fifth Circuit, has been rightly praised for its landmark decisions on voting rights in the 1950s and 1960s. *See generally* Jack Bass, Unlikely Heroes: The Dramatic Story of the Southern Judges Who Translated the Supreme Court's *Brown* Decision Into a Revolution for Equality 259–77 (1981). I doubt that today's decision—which blesses Florida's neutering of Amendment 4— will be viewed as kindly by history.

JILL PRYOR, Circuit Judge, joined by WILSON, MARTIN, and JORDAN, Circuit Judges, dissenting.

Nearly a century has passed since Langston Hughes pined for an America where "opportunity is real" and "[e]quality is in the air we breathe."[1]  In Florida, people convicted of felonies who have paid all the societal debts they can possibly pay were on the threshold of that America, welcomed home by Florida's electorate.  Florida's voters had decided on their own initiative that the franchise should be restored to their fellow citizens.  But Florida's legislature slammed the door shut, barring perhaps a million would-be voters from any real and equal opportunity to rejoin their fellow Floridians and denying the electorate their choice to grant that opportunity.  The legislature's action abrogated the protections of the Fourteenth and Twenty-Fourth Amendments on the right to vote, as Judge Martin and Judge Jordan eloquently explain in their dissents.  I join their dissents in full.  I write separately only to add context and echo the outrage of my fellow dissenting colleagues.

Following a nationwide trend toward reenfranchisement,[2] Florida's voters amended their state's constitution to provide that except for people convicted of

---

[1]     Langston     Hughes,     *Let     America     Be     America     Again*, https://www.poetryfoundation.org/poems/147907/let-america-be-america-again.

[2] *Jones v. Governor of Fla.*, 950 F.3d 795, 801 (11th Cir. 2020).  Reenfranchisement of people convicted of felonies who have served their sentences enjoys broad support, from the American Civil Liberties Union to the American Probation and Parole Association (APPA), a

murder or a sexual offense, "disqualification from voting arising from a felony
conviction *shall terminate* and voting rights *shall be restored* upon completion of
all terms of sentence including parole or probation." Fla. Const. art. VI, § 4
(emphasis added). Widespread media coverage of Amendment 4, a citizen's
initiative, estimated that it would restore voting rights to over one million Florida
citizens who have served their sentences and fulfilled all conditions of their parole
and probation.

Florida's formerly disenfranchised citizens began registering to vote on
January 8, 2019, when Amendment 4, known as the Voting Restoration
Amendment, went into effect. In a matter of weeks, though, Florida's legislature
was "aiming at a bill [interpreting Amendment 4] that had a maximal
disenfranchisement result." Doc. 286-13 at 13, 88–94 (expert report of J. Morgan
Kousser, Ph.D., citing, among other evidence, legislators' statements, competing
House and Senate bills introduced in response to Amendment 4, and the known
lack of a central data repository tracking legal financial obligations); *cited with
approval in Jones v. DeSantis* ("*Jones II*"), No. 4:19-cv-300-RH/MJF, __ F. Supp.

---

nonprofit organization counting as members over 1,700 individual probation or parole officers and
more than 200 probation and parole agencies. The APPA advocates for "restoration of voting
rights upon completion of an offender's prison sentence." En Banc Br. of Amici Curiae Am.
Probation & Parole Assoc. at 8–9. Police officers, too, have advocated for rights restoration
because reintegration of formerly incarcerated people reduces recidivism. *See* En Banc Br. of
Amici Curiae the District of Columbia et al. at 16–17.

3d __, 2020 WL 2618062 (N.D. Fla. May 24, 2020).  Senate Bill 7066 defined "all

terms of sentence" to include fees, fines, and restitution ordered upon conviction of

a felony.  With the passage of SB 7066 into law as Florida Statutes § 98.0751, the

legislature[3] conditioned every person's ability to vote under Amendment 4 on the

payment of sums of money—what we call legal financial obligations, or LFOs.

Florida characterizes § 98.0751 as the legislature's necessary attempt to tie

up loose ends of Amendment 4.  But that characterization greatly downplays the

statute's impact.  The statute denies the franchise to "the overwhelming majority"

of people who stood to benefit from Amendment 4.[4]  *Jones II*, 2020 WL 2618062,

_____

[3] I use "the legislature" here to refer to the majority that passed SB 7066.  The bill passed both houses of Florida's legislature "on a straight party-line vote.  Without exception, Republicans voted in favor, and Democrats voted against."  *Jones II*, 2020 WL 2618062 at *32.

[4] Despite evidence suggesting that voters were unaware that Amendment 4 would require payment of all restitution, fines, and fees accompanying a sentence before voting rights would be restored, Florida vehemently rejects any suggestion that "all terms of sentence" in Amendment 4 could be understood to exclude LFOs.  The State relies on the Florida Supreme Court's holding that "all terms of sentence" included LFOs.  *See Advisory Op. to the Governor Re: Implementation of Amendment 4, the Voting Restoration Amendment*, 288 So. 3d 1070 (Fla. 2020).  And it emphasizes that proponents of Amendment 4 represented to the Florida Supreme Court in an earlier proceeding to secure Amendment 4's spot on the ballot that financial obligations were a "term[] of sentence."  But whether voters believed that LFOs were part of the sentence that must be completed before voting rights would be restored is largely beside the point.  Florida's arguments do not convince me on what I see as the real question, whether voters who passed Amendment 4 thought it would function the way SB 7066 made it function.

When it comes to this question, Florida has offered no evidence that voters believed a person who was genuinely unable to pay his LFOs would be denied the franchise.  Denying reenfranchisement to people who can prove that they are truly unable to pay would not serve the purposes of the sentence completion requirement because they will have paid their debt to society insofar as they are able.  Indeed, when it decided the meaning of "all terms of sentence" the Florida Supreme Court "did not address what 'completion' of these amounts means."  *Jones II*, 2020 WL 2618062, at *6 (citing *Advisory Op.*, 288 So. 3d at 1074–75).  Those who are genuinely unable to

at *16; *see Jones v. Governor of Fla.* ("*Jones I*"), 950 F.3d 795, 815 (11th Cir.

2020) (detailing an expert's opinion that over 80 percent of people "with felony

convictions who had completed their terms of incarceration, parole, or probation

. . . had outstanding LFOs").  The statute may in effect deny the franchise to

virtually everyone who may have benefitted from the amendment.  And it

accomplishes this end seemingly by design.

The legislators who supported § 98.0751 knew—or at best were willfully

blind to the fact that—the statute would completely deprive a large majority of

Floridians with felony convictions of voting rights restoration.  LFOs often are

substantial—even in cases where the defendant is indigent.  The record reflects that

since 1996 Florida had added more than 20 new categories of financial obligations

for people convicted of crimes, with virtually no exemptions for people unable to

pay.[5]  These financial obligations often are untethered from the seriousness of the

offense.  As Judge Jordan points out, Florida assesses $225 against every person

---

pay the balance of their LFOs have "completed" all terms of their sentences that they can.  As
Judge Jordan explains, the Constitution prohibits denying the franchise based on inability to pay—
and we should not presume that the voters intended an unconstitutional result.  Moreover, is it
reasonable to conclude that Florida's voters thought when they passed Amendment 4 that it would
deny the franchise to the overwhelming majority of Floridians who ever had a felony conviction?
I don't think it is.

[5] Rebekah Diller, Brennan Center for Justice, *The Hidden Costs of Florida's Criminal
Justice        Fees        5–7        (2010)        ("Brennan        Center        Report"),
https://www.brennancenter.org/sites/default/files/2019-08/Report_The%20Hidden-Costs-
Florida's-Criminal-Justice-Fees.pdf.

convicted of a felony.  *See* Jordan Dissent at 114 (citing Fla. Stat. § 938.05(1)(a)).

Some financial obligations are actually imposed *based on* indigency:  For example,

Florida charges $50 to apply for a public defender, a constitutionally-required

service for which only indigent defendants qualify.[6]  *See Gideon v. Wainwright*,

372 U.S. 335 (1963).  In this topsy-turvy system, the district court found, "in one

county, the fees total at least $698 for every defendant who is represented by a

public defender and at least $548 for every defendant who is not."  *Jones I*, 950

F.3d at 816 (quoting district court's preliminary injunction order).  That county is

not an outlier.  One expert who compiled data from 58 of 67 Florida counties

calculated that, of "individuals with felony convictions who had completed their

terms of incarceration, parole, or probation," nearly 60 percent had outstanding

LFOs of at least $500, and nearly 40 percent had at least $1,000 outstanding.  *Id.* at

815; *see id.* (calling the expert's analysis "arguably a conservative one").

　　　The district court found "as a fact that the overwhelming majority of felons

who have not paid their LFOs in full, but who are otherwise eligible to vote, are

genuinely unable to pay the required amount."  *Jones II*, 2020 WL 2618062, at

*16.  Florida does not dispute this factual finding.

---

[6] Brennan Center Report at 6.  Florida does not waive the fee even if an applicant is found to be indigent and therefore entitled to a public defender.  *Id.* at 7; *see generally* Fla. Stat. § 27.52(1)(b).

Neither the extent of LFOs nor the inability of Floridians with felony

convictions to pay them was a mystery to Florida's legislature.  Of course, it was

the legislature that imposed many if not most of the financial obligations Floridians

with felony convictions shoulder.  *See, e.g.*, Fla. Stat. §§ 938.03 (imposing

mandatory fee of $50 to fund the Crimes Compensation Trust Fund and clerk of

court's office); 938.06 (imposing a fee of $20 for the Crime Stoppers Trust Fund).

And there can be no doubt that the sponsors of SB 7066 and the legislators who

voted for it knew that most criminal defendants are indigent—such data was part of

the legislative record.[7]  In short, the legislators knew[8]—or deliberately shut their

eyes to[9]—both the extent of the financial obligations Florida courts impose and the

---

[7]   *See, e.g.,* H.R. Staff Analysis, H.B. 1381, Reg. Sess. (Fla. 1998), http://archive.flsenate.gov/data/session/1998/House/bills/analysis/pdf/HB1381S1Z.CP.pdf;   *see also* Doc. 360-48 (Florida Court Clerks and Comptrollers data explaining "minimal collections expectation" for more than two-thirds of all fines and fees levied from 2013–2018 due to indigency).

[8]   SB 7066 was not the only bill relating to Amendment 4 that the legislature considered, and an alternate proposal that was rejected highlights the legislature's knowledge of SB 7066's impact.  Florida law provides that a sentencing court may convert LFOs to civil liens when defendants cannot pay them.  *See* Fla. Stat. § 938.30(6)–(9), *see Jones II*, 2020 WL 2618062, at *4 (explaining that civil liens are "often use[d] for obligations a criminal defendant cannot afford to pay").  The legislature considered a bill that would have allowed indigent people to regain their voting rights under Amendment 4 because it would have allowed those whose LFOs had been converted to civil liens to register.  Ultimately, though, the legislature rejected that proposal in favor of SB 7066, which contains no such exception.  *See Jones II*, 2020 WL 2618062, at *31 (describing SB 7086).

[9]   As an example of willful blindness, "[r]epeatedly during the debates over what became S.B. 7066, [one of its sponsors] repeated that he did not want to see any data about how many people would be affected by S.B. 7066." Doc. 286-13 at 12 (Kousser expert report); *see id.* at 80–82 (describing how SB 7066's sponsor repeatedly denied any interest in whether the bill was unfair to poorer Floridians; he told a fellow representative, "as I have addressed numerous times, I

fact that most people convicted of felonies in Florida genuinely cannot afford to pay these obligations.

Section 98.0751 expressly conditions reenfranchisement on payment of LFOs, which the vast majority of Floridians with felony convictions cannot pay. Under the statute, Amendment 4 is a nullity for most people who stood to benefit from it.

In practice, though, even those who could afford to pay LFOs, people the electorate undeniably intended to reenfranchise with Amendment 4, may be denied that opportunity.  That's because the Florida legislature also knew when it passed SB 7066 that administering the law would be a bureaucratic nightmare.  *See Jones II*, 2020 WL 2618062, at *16–26 (detailing Florida's "staggering inability to administer the pay-to-vote system").  The bill's sponsor "openly admitted that Florida did not have a centralized system in place [to track LFOs] and that it would be very difficult for the state agencies to perform the tasks that they were somehow supposed to after S.B. 7066 went into effect."  Doc. 286-13 at 13 (Kousser expert report).  The legislature "repeatedly discussed" the fact that "it would take eleven databases, stored in different agencies, in addition to restitution information that often no one at all kept track of, to determine whether someone had fulfilled all of

---

intentionally wanted to stay blind to the data" regarding the number of people SB 7066 would prohibit from voting because they could not afford to pay LFOs).

his financial obligations." *Id.* "The legislature knew that the more information—restitution plus fines plus fees plus court costs—they piled into the bill's requirements, . . . the more likely it would be that the task could *never* be completed—by staffers or returning citizens." *Id.* at 13–14 (emphasis added). If it is that difficult for the *State of Florida* to determine how much, if anything, a person owes, imagine how difficult it must be for the average person trying to find out if he is eligible. The district found that in some cases it is "impossible." *Jones II*, 2020 WL 2618062, at *6.

Based on information provided by the State itself, the district court found that Florida has made no real effort to help its citizens figure out how much, if anything, they must pay to vote. The budget analysis for SB 7066 projected a need for 21 additional Department of State employees to process the increased workload. Yet the legislature allocated no funds for additional employees. The Department hired no one—that's right, not a single person—to process the over 85,000 registration applications it had received before trial.[10] By April of 2020, when the trial was held, Florida's officials had not completed review of even *one* of these applications. By Florida's most optimistic estimates, the time it will take

---

[10] On the eve of trial, the Florida Department of State "entered into an interagency agreement with the Florida Commission on Offender Review," a department that "apparently will provide staffing assistance." *Jones II*, 2020 WL 2618062, at *24. Florida offered no evidence that its partnership with the Commission would speed up the review process, however. *See id.*

to review these applications to determine registrants' eligibility to vote will deny even those who could afford to pay outstanding LFOs the right to vote in the next two presidential elections, not to mention half a dozen or more other elections.

So what we know is that Florida imposes substantial, often exorbitant, financial obligations on people convicted of felonies—the overwhelming majority of whom are indigent—with no exceptions for those unable to pay.  The State doesn't track LFOs and has no mechanism for providing people seeking to register under Amendment 4 with notice of what and how much, if anything, they owe.

Florida doesn't seriously deny this.  Instead, it responds that it's just too bad if people can't figure out on their own how much they owe, because the State has no obligation to tell them whether they're eligible to vote under § 98.0751 or how much they would need to pay to get the right to vote back.  And here's the kicker: people aren't entitled to know how much they owe, Florida says, because they couldn't afford to pay it anyway.  No harm, no foul.  *See* Reply Br. of Appellants at 25–26 ("If [the district court's] factual findings are correct, there is zero risk of improper deprivation of voting eligibility for the overwhelming majority of felons . . . because regardless of how much process is given to a felon who is unable to pay the financial terms of his sentence, that felon will remain ineligible to vote." (citation omitted)).  This cavalier attitude is hard to believe, yet there it is in the record of this case for all to see.

From a potential Amendment 4 registrant's point of view, she cannot vote unless she can (1) figure out on her own how much she owes, and then (2) pay that amount.  For the reasons my dissenting colleagues and I have explained, it's unlikely that she is capable of paying and perhaps even more unlikely that she is capable of figuring out how much she owes.  So when she attempts to register, she must make her best guess that she has no unpaid LFOs—*under threat of felony prosecution*.  Although Florida downplays this threat by noting that a person can only be prosecuted for an intentional false affirmation of eligibility, the record suggests that the threat may be more real than the State makes it out to be.  *See Jones II*, 2020 WL 2618062, at *26 (discussing evidence showing Division of Election making referrals for prosecution for false registration when the only evidence of intent appeared to be a signed affirmation of eligibility).  And regardless of the likelihood of an actual prosecution, the registration form warns the would-be registrant that it's a felony to make a false statement on the form.  It does not say that the false statement must be willful or intentional.  What greater disincentive could there be for someone who has served her time than the threat of returning to prison for trying to register to vote?  Section 98.0751 made registering to vote a risky, if not impossible, task.  The impossibility of it seems to have been the whole point.

In arguing this appeal, the State told us outright what it has been showing us all along:  The State doesn't care if "the proportion of felons able to complete their sentence" with LFOs included is "0%."  Reply Br. of Appellants at 15–16.  If this is not a nullification of the will of the electorate, I don't know what would be.  And it is a dream deferred[11] for the men and women who, having paid their debt to society to the extent of their capacity—often by having served lengthy prison sentences and periods under supervision—are deprived of the franchise that Amendment 4 promised to automatically restore.  The majority today deprives the plaintiffs and countless others like them of opportunity and equality in voting through its denial of the plaintiffs' due process, Twenty-Fourth Amendment, and equal protection claims.  I dissent.

---

[11] Langston Hughes, *Harlem*, https://www.poetryfoundation.org/poems/46548/harlem.

20-12003   Jones v. Governor of Florida


ERRATA!


Please make the following two changes to Chief Judge Pryor's concurring opinion on Page 61:

1) < LAGOA, Circuit Judge,> instead of <LAGOA, Circuit Judge>
2) <whoever comes to sit> instead of <whomever comes to sit>